JUDGE GRIESA

PREET BHARARA
United States Attorney for the
Southern District of New York
By: PAUL M. MONTELEONI
    CHRISTINE I. MAGDO
Assistant United States Attorneys
One Saint Andrew's Plaza
New York, New York 10007
Telephone: (212) 637-2219/2297
Facsimile: (212) 637-0421
E-mail:   paul.monteleoni@usdoj.gov
          christine.magdo@usdoj.gov

13 CV 6326

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA,

        Plaintiff,

  - against -

PREVEZON HOLDINGS LTD.,
PREVEZON ALEXANDER, LLC,
PREVEZON SOHO USA, LLC,
PREVEZON SEVEN USA, LLC,
PREVEZON PINE USA, LLC,
PREVEZON 1711 USA, LLC,
PREVEZON 1810, LLC,
PREVEZON 2009 USA, LLC,
PREVEZON 2011 USA, LLC,
FERENCOI INVESTMENTS, LTD.,
KOLEVINS, LTD.,

        Defendants,

ANY AND ALL ASSETS OF PREVEZON
HOLDINGS, LTD.,

ANY AND ALL ASSETS OF PREVEZON
ALEXANDER, LLC, INCLUDING BUT
NOT LIMITED TO ALL RIGHT, TITLE
AND INTEREST IN THE REAL
PROPERTY AND APPURTENANCES KNOWN
AS ALEXANDER CONDOMINIUM, 250

**VERIFIED COMPLAINT**

No. 13 Civ.

ECF Case



RECEIVED
SEP 10 2013
U.S.D.C. S.D.N.Y.
CASHIERS

EAST 49th STREET, NEW YORK, NEW : 
YORK 10017, UNIT COMM3 ("250 : 
EAST 49th STREET, UNIT COMM3") : 
AND ANY AND ALL FUNDS ON DEPOSIT : 
IN BANK OF AMERICA ACCOUNT : 
NUMBER 4830 4456 8293 HELD IN : 
THE NAME OF PREVEZON ALEXANDER : 
LLC (THE "PREVEZON ALEXANDER : 
ACCOUNT"), : 
  : 
ANY AND ALL ASSETS OF PREVEZON : 
SOHO USA, LLC, INCLUDING BUT : 
NOT LIMITED TO ANY AND ALL : 
FUNDS ON DEPOSIT IN BANK OF : 
AMERICA ACCOUNT NUMBER 4830 : 
1615 8084 HELD IN THE NAME OF : 
PREVEZON SOHO USA LLC (THE : 
"PREVEZON SOHO ACCOUNT"), : 
  : 
ANY AND ALL ASSETS OF PREVEZON : 
SEVEN USA, LLC, INCLUDING BUT : 
NOT LIMITED TO ALL RIGHT, TITLE : 
AND INTEREST IN THE REAL : 
PROPERTY AND APPURTENANCES KNOWN : 
AS 127 SEVENTH AVENUE A/K/A 166 : 
WEST 18th STREET, RETAIL UNIT #2, : 
NEW YORK, NEW YORK ("127 SEVENTH : 
AVENUE, RETAIL UNIT 2") AND ANY : 
AND ALL FUNDS ON DEPOSIT IN BANK : 
OF AMERICA ACCOUNT NUMBER 4830 : 
4174 6021 HELD IN THE NAME OF : 
PREVEZON SEVEN USA LLC (the : 
"PREVEZON SEVEN ACCOUNT"), : 
  : 
ANY AND ALL ASSETS OF PREVEZON : 
PINE USA, LLC, INCLUDING BUT NOT : 
LIMITED TO ALL RIGHT, TITLE AND : 
INTEREST IN THE REAL PROPERTY : 
AND APPURTENANCES KNOWN AS THE : 
20 PINE STREET CONDOMINIUM, 20 : 
PINE STREET, NEW YORK, NEW YORK : 
10005, UNIT 2308 ("20 PINE : 
STREET, UNIT 2308"), : 
  : 
ANY AND ALL ASSETS OF PREVEZON : 
1711 USA, LLC, INCLUDING BUT NOT : 
LIMITED TO ALL RIGHT, TITLE AND :

INTEREST IN THE REAL PROPERTY          :
AND APPURTENANCES KNOWN AS THE         :
20 PINE STREET CONDOMINIUM, 20         :
PINE STREET, NEW YORK, NEW YORK        :
10005, UNIT 1711 ("20 PINE             :
STREET, UNIT 1711"),                   :
                                       :
ANY AND ALL ASSETS OF PREVEZON         :
1810, LLC,                             :
                                       :
ANY AND ALL ASSETS OF PREVEZON         :
2009 USA, LLC, INCLUDING BUT NOT       :
LIMITED TO ALL RIGHT, TITLE AND        :
INTEREST IN THE REAL PROPERTY          :
AND APPURTENANCES KNOWN AS THE         :
20 PINE STREET CONDOMINIUM, 20         :
PINE STREET, NEW YORK, NEW YORK        :
10005, UNIT 2009 ("20 PINE             :
STREET, UNIT 2009"),                   :
                                       :
ANY AND ALL ASSETS OF PREVEZON         :
2011 USA, LLC, INCLUDING BUT NOT       :
LIMITED TO ALL RIGHT, TITLE AND        :
INTEREST IN THE REAL PROPERTY          :
AND APPURTENANCES KNOWN AS THE         :
20 PINE STREET CONDOMINIUM, 20         :
PINE STREET, NEW YORK, NEW YORK        :
10005, UNIT 1816 ("20 PINE             :
STREET, UNIT 1816"),                   :
                                       :
ANY AND ALL ASSETS OF FERENCOI         :
INVESTMENTS, LTD.,                     :
                                       :
ANY AND ALL ASSETS OF KOLEVINS,        :
LTD.,                                  :
                                       :
                                       :
and all property traceable             :
thereto,                               :
                                       :
          Defendants in Rem.           :
_____:

     Plaintiff the United States of America (the "Government"),

by its attorney Preet Bharara, United States Attorney for the

Southern District of New York, for its verified complaint (the "Complaint") alleges, upon information and belief, as follows:

## INTRODUCTION

1.   This action is brought by the Government pursuant to 18 U.S.C. §§ 981(a)(1)(A), 985, and 1956(b)(1) seeking the forfeiture of certain property involved in laundering the proceeds of a Russian tax refund fraud scheme and the imposition of civil money laundering penalties.

2.   The Government's claims arise out of the laundering of proceeds of a criminal enterprise in Russia in a complicated series of transactions including real estate purchases in the Southern District of New York.  As set forth in more detail below, upon information and belief, a Russian criminal organization including corrupt Russian government officials (the "Organization") defrauded Russian taxpayers of approximately 5.4 billion rubles, or approximately $230 million in United States dollars, through an elaborate tax refund fraud scheme.  After perpetrating this fraud, members of the Organization have undertaken illegal actions in order to conceal this fraud and retaliate against individuals who attempted to expose it.  As a result of these retaliatory actions, Sergei Magnitsky, a Russian attorney who exposed the fraud scheme, was falsely arrested and died in pretrial detention.  Members of the Organization, and associates of those members, have also engaged in a broad

4

pattern of money laundering in order to conceal the proceeds of the fraud scheme.  This money laundering activity has included the purchase of pieces of Manhattan real estate with funds commingled with fraud proceeds.

3.  By this Complaint, the Government seeks forfeiture of all right, title and interest in the following property:

(a) ANY AND ALL ASSETS OF PREVEZON HOLDINGS, LTD.,

(b) ANY AND ALL ASSETS OF PREVEZON ALEXANDER, LLC, INCLUDING BUT NOT LIMITED TO ALL RIGHT, TITLE AND INTEREST IN THE REAL PROPERTY AND APPURTENANCES KNOWN AS ALEXANDER CONDOMINIUM, 250 EAST 49th STREET, NEW YORK, NEW YORK 10017, UNIT COMM3 ("250 EAST 49th STREET, UNIT COMM3") AND ANY AND ALL FUNDS ON DEPOSIT IN BANK OF AMERICA ACCOUNT NUMBER 4830 4456 8293 HELD IN THE NAME OF PREVEZON ALEXANDER LLC (THE "PREVEZON ALEXANDER ACCOUNT"),

(c) ANY AND ALL ASSETS OF PREVEZON SOHO USA, LLC, INCLUDING BUT NOT LIMITED TO ANY AND ALL FUNDS ON DEPOSIT IN BANK OF AMERICA ACCOUNT NUMBER 4830 1615 8084 HELD IN THE NAME OF PREVEZON SOHO USA LLC (THE "PREVEZON SOHO ACCOUNT"),

(d) ANY AND ALL ASSETS OF PREVEZON SEVEN USA, LLC, INCLUDING BUT NOT LIMITED TO ALL RIGHT, TITLE AND INTEREST IN THE REAL PROPERTY AND APPURTENANCES KNOWN AS 127 SEVENTH AVENUE A/K/A 166 WEST 18th STREET, RETAIL UNIT #2, NEW YORK, NEW YORK ("127 SEVENTH AVENUE, RETAIL UNIT 2") AND ANY AND ALL FUNDS ON DEPOSIT IN BANK OF AMERICA ACCOUNT NUMBER 4830 4174 6021 HELD IN THE NAME OF PREVEZON SEVEN USA LLC (the "PREVEZON SEVEN ACCOUNT"),

(e) ANY AND ALL ASSETS OF PREVEZON PINE

USA, LLC, INCLUDING BUT NOT LIMITED TO ALL
RIGHT, TITLE AND INTEREST IN THE REAL
PROPERTY AND APPURTENANCES KNOWN AS THE 20
PINE STREET CONDOMINIUM, 20 PINE STREET, NEW
YORK, NEW YORK 10005, UNIT 2308 ("20 PINE
STREET, UNIT 2308"),

(f) ANY AND ALL ASSETS OF PREVEZON 1711
USA, LLC, INCLUDING BUT NOT LIMITED TO ALL
RIGHT, TITLE AND INTEREST IN THE REAL
PROPERTY AND APPURTENANCES KNOWN AS THE 20
PINE STREET CONDOMINIUM, 20 PINE STREET, NEW
YORK, NEW YORK 10005, UNIT 1711 ("20 PINE
STREET, UNIT 1711"),

(g) ANY AND ALL ASSETS OF PREVEZON 1810,
LLC,

(h) ANY AND ALL ASSETS OF PREVEZON 2009
USA, LLC, INCLUDING BUT NOT LIMITED TO ALL
RIGHT, TITLE AND INTEREST IN THE REAL
PROPERTY AND APPURTENANCES KNOWN AS THE 20
PINE STREET CONDOMINIUM, 20 PINE STREET, NEW
YORK, NEW YORK 10005, UNIT 2009 ("20 PINE
STREET, UNIT 2009"),

(i) ANY AND ALL ASSETS OF PREVEZON 2011
USA, LLC, INCLUDING BUT NOT LIMITED TO ALL
RIGHT, TITLE AND INTEREST IN THE REAL
PROPERTY AND APPURTENANCES KNOWN AS THE 20
PINE STREET CONDOMINIUM, 20 PINE STREET, NEW
YORK, NEW YORK 10005, UNIT 1816 ("20 PINE
STREET, UNIT 1816"),

(j) ANY AND ALL ASSETS OF FERENCOI
INVESTMENTS, LTD.,

(k) ANY AND ALL ASSETS OF KOLEVINS, LTD.,

and all property traceable thereto,

(the "Defendants in Rem").

4.    The Government also seeks civil money laundering

penalties against PREVEZON HOLDINGS, LTD. ("PREVEZON HOLDINGS");

PREVEZON ALEXANDER, LLC ("PREVEZON ALEXANDER"), PREVEZON SOHO

USA, LLC ("PREVEZON SOHO"), PREVEZON SEVEN USA, LLC ("PREVEZON

SEVEN"), PREVEZON PINE USA, LLC ("PREVEZON PINE"), PREVEZON 1711

USA, LLC ("PREVEZON 1711"), PREVEZON 1810, LLC ("PREVEZON

1810"), PREVEZON 2009 USA, LLC ("PREVEZON 2009"), and PREVEZON

2011 USA, LLC ("PREVEZON 2011") (collectively the "Prevezon

Entities"); FERENCOI INVESTMENTS, LTD. ("FERENCOI"); and

KOLEVINS, LTD. ("KOLEVINS") (FERENCOI, KOLEVINS and the Prevezon

Entities collectively, the "Defendants in Personam") in an

amount to be determined at trial.

### JURISDICTION AND VENUE

5.   This Court has jurisdiction over this action pursuant

to 28 U.S.C. §§ 1345 and 1355(a).

6.   Venue is proper pursuant to 28 U.S.C. § 1355(b)(1)(A)

because acts and omissions giving rise to the forfeiture took

place in the Southern District of New York.

### FACTUAL ALLEGATIONS

7.   PREVEZON HOLDINGS, LTD. ("PREVEZON HOLDINGS") is a

holding company incorporated and registered in the Republic of

Cyprus.  It was incorporated on September 26, 2005 and has been

registered in New York State as a foreign business corporation

since November 12, 2009.

8.   The New York limited liability companies PREVEZON

ALEXANDER, LLC ("PREVEZON ALEXANDER"), PREVEZON SOHO USA, LLC

7

("PREVEZON SOHO"), PREVEZON SEVEN USA, LLC ("PREVEZON SEVEN"),
PREVEZON PINE USA, LLC ("PREVEZON PINE"), PREVEZON 1711 USA, LLC
("PREVEZON 1711"), PREVEZON 1810, LLC ("PREVEZON 1810"),
PREVEZON 2009 USA, LLC ("PREVEZON 2009"), and PREVEZON 2011 USA,
LLC ("PREVEZON 2011") (together with PREVEZON HOLDINGS, the
"PREVEZON ENTITIES"), are related to, and share the same counsel
as, PREVEZON HOLDINGS.

9.    DENIS KATSYV has been the sole shareholder of PREVEZON
HOLDINGS (either in his own name alone or in his own name and in
the name of another company he wholly owns) since June 19, 2008.

10.   TIMOFEY KRIT is a director of PREVEZON HOLDINGS and
was the sole shareholder of PREVEZON HOLDINGS from August 29,
2006 to June 18, 2008.

11.   ALEXANDER LITVAK is a business partner of KATSYV and
has been the beneficial owner of the bank accounts of PREVEZON
HOLDINGS at UBS, master number ending in 81, including U.S.
dollar account number ending in 81.60Y (the "PREVEZON HOLDINGS
8160 Account") and Euro account number ending in 81.70U (the
"PREVEZON HOLDINGS 8170 Account"), since December 16, 2005.

12.   FERENCOI INVESTMENTS, LTD. ("FERENCOI") is a British
Virgin Islands company founded in 2003 and beneficially owned by
KATSYV.

13.   KOLEVINS, LTD. ("KOLEVINS") is a British Virgin
Islands company founded in 2004 and beneficially owned by

LITVAK.  KRIT is listed as the sole director and shareholder of KOLEVINS.

14.  Hermitage Capital Management Limited ("Hermitage") is an investment advisory firm.  Hermitage has primarily advised the Hermitage Fund, an investment fund focused on investments in Russia.  Until 2006, the Hermitage Fund was the largest foreign portfolio investor in Russia.

15.  HSBC Private Bank (Guernsey) Limited ("HSBC Guernsey") is a Guernsey-based entity that served as trustee to the Hermitage Fund during all relevant periods.

16.  OOO Rilend ("Rilend"), OOO Parfenion ("Parfenion"), and OOO Makhaon ("Makhaon") are Russian Hermitage Fund portfolio companies owned by HSBC Guernsey as trustee through two shareholding vehicles, but, as set forth in more detail below, fraudulently re-registered to members of the Organization in 2007 as part of the fraud scheme giving rise to this action.

17.  Sergei Magnitsky was a Russian attorney who represented Hermitage in investigating the activities of the Organization, who was arrested at the direction of a member of the Organization, and who died in pretrial detention on November 16, 2009 at the age of 37.

## I.    THE $230 MILLION FRAUD SCHEME

### A. Overview

18.  Upon information and belief, in 2007 the Organization

engaged in an elaborate tax refund fraud scheme resulting in a fraudulently-obtained tax refund of approximately $230 million (the "$230 Million Fraud Scheme").  As part of the $230 Million Fraud Scheme, members of the Organization stole the corporate identities of the Hermitage portfolio companies Rilend, Parfenion, and Makhaon (the "Hermitage Companies"), and then used these stolen identities to make fraudulent claims for tax refunds.

19.  In order to procure the refunds, the Organization fraudulently re-registered the Hermitage Companies in the names of members of the Organization, and then orchestrated sham lawsuits against these companies.  These sham lawsuits involved members of the Organization as both the plaintiffs (representing sham commercial counterparties suing the Hermitage Companies) and the defendants (purporting to represent the Hermitage Companies).  In each case, the members of the Organization purporting to represent the Hermitage Companies confessed full liability in court, leading the courts to award large money judgments to the plaintiffs.

20.  The purpose of the sham lawsuits was to fraudulently generate money judgments against the Hermitage Companies. Members of the Organization purporting to represent the Hermitage Companies then used those money judgments to seek tax refunds.  The basis of these refund requests was that the money

10

judgments constituted losses eliminating the profits the Hermitage Companies had earned, and thus that the Hermitage Companies were entitled to a refund of the taxes that had been paid on these profits.  The requested refunds totaled 5.4 billion rubles, or approximately $230 million.

21.   Members of the Organization who were officials at two Russian tax offices corruptly approved the requests on the same day that they were made or the next business day, and approximately $230 million was disbursed to members of the Organization, purporting to represent the Hermitage Companies, two days later.

### B. Planning of $230 Million Fraud Scheme and Fraudulent Re-Registration of Hermitage Companies

22.   On information and belief, the $230 Million Fraud Scheme began on or about April 28, 2007, when key members of the Organization flew to Larnaca, Cyprus to plan the crime.  On that date, ARTEM KUZNETSOV, then a Lieutenant Colonel in Russia's Interior Ministry, flew with DMITRY KLYUEV, a convicted fraudster, the owner of the Russian bank Universal Savings Bank ("USB"), and on information and belief the mastermind of the Organization, from Moscow to Larnaca on a private jet.  On information and belief, they were met in Larnaca two days later by PAVEL KARPOV, then a Major in Russia's Interior Ministry, as well as two lawyers, ANDREY PAVLOV and his wife YULIA MAYOROVA,

all of whom flew together from Moscow on Aeroflot SU-487.
PAVLOV had known KLYUEV since 2001 and had provided him legal
services from time to time.

23.   On May 5 and 6, 2007, the Interior Ministry officers
KUZNETSOV and KARPOV, and the lawyers PAVLOV and MAYOROVA,
returned to Moscow.  On May 8, 2007, the convicted fraudster
KLYUEV was met in Larnaca by OLGA STEPANOVA, the head of Moscow
Tax Office No. 28, and her then-husband VLADLEN STEPANOV, who
flew to Larnaca together on Aeroflot SU-237.  Subsequently,
KLYUEV, STEPANOVA, and STEPANOV returned to Moscow.

24.   Approximately one month later, on or about June 4,
2007, KUZNETSOV led approximately 25 officers in a search of
Hermitage's office in Moscow.  The officers removed Hermitage's
computer server, virtually all of its computers, and dozens of
boxes of confidential financial documents and records.  Later
that day, KUZNETSOV joined approximately 25 officers in a search
of the offices of Firestone Duncan, a law firm that was advising
HSBC Guernsey and Hermitage.  The officers seized the original
statutory and financial documents of the Hermitage Companies
(Rilend, Parfenion, and Makhaon), as well as Firestone Duncan's
computer server and other computers and documents.  The officers
who identified themselves during these searches were from the
Moscow office of the Interior Ministry.

25.   Among the items seized in the searches of Hermitage's

and Firestone Duncan's offices were the corporate stamps, the official charters, the original tax certificates, and original registration certificates (the "corporate documents and seals") for Rilend, Parfenion, and Makhaon.  In denying requests from Hermitage to return the corporate documents and seals, the Russian Interior Ministry subsequently confirmed that these documents and seals, which were seized in the searches led by KUZNETSOV, remained in the custody of his colleague KARPOV.

26.  Unbeknownst to Hermitage or HSBC Guernsey, members of the Organization used the seized corporate documents and seals to fraudulently re-register ownership of Rilend, Parfenion, and Makhaon with the Russian corporate registry.  The ownership of these companies was fraudulently transferred in the registry from the shareholding vehicles of HSBC Guernsey, which had been holding them in trust for the Hermitage Fund, to OOO PLUTON ("PLUTON"), a Russian company wholly owned by VICTOR MARKELOV, identified by court documents as a former sawmill employee who had been convicted of manslaughter in 2002.

27.  Part of the process of transferring ownership of the Hermitage Companies to PLUTON in the corporate registry involved obtaining a court judgment confirming the change of ownership. On June 15, 2007, a body purporting to be the permanent arbitration court of the corporation OOO DETOKS issued a ruling stating that full ownership of the Hermitage Companies was

transferred to PLUTON.   On July 30, 2007, the arbitration court

of the Tatarstan Republic (a federal subject of Russia)

confirmed the purported DETOKS arbitration court ruling

transferring ownership of the Hermitage Companies to Pluton.

However, on information and belief, DETOKS does not operate a

genuine arbitration court.   DETOKS has no discernible presence

on Russian legal databases, and the registered headquarters for

DETOKS is a dilapidated residential building, photographs of

which are attached hereto as Exhibit A.

28.   PLUTON then registered new charters for the Hermitage

Companies, and the Russian corporate registry shows that HSBC

executives who had previously served as directors of the

Hermitage Companies were replaced by individuals with criminal

records: MARKELOV became fraudulently listed as director of

Parfenion,  VIACHESLAV KHLEBNIKOV, a convicted extortionist and

burglar, became fraudulently listed as director of Makhaon, and

VALERY KUROCHKIN, a convicted burglar, became fraudulently

listed as director of Rilend.

### C. Forging of Backdated Contracts and Filing of Sham Lawsuits Against Hermitage Companies

29.   On information and belief, the members of the

Organization who had stolen the corporate identities of the

Hermitage Companies used the seized corporate documents and

seals to forge backdated contracts with sham commercial

counterparties for use in sham lawsuits against the Hermitage Companies.

30.   The forged contracts involved three sham counterparties, LOGOS PLUS, INSTAR, and GRAND AKTIVE.  The forged contracts were virtually identical in form, purporting to require the Hermitage Companies to supply securities to the sham counterparty and to compensate the sham counterparty for its lost profits for failing to supply the securities.  Indeed, the forged contracts between LOGOS PLUS, INSTAR, GRAND AKTIVE, and the Hermitage Companies were essentially identical except that the parties to the contracts and the figures had been changed.

31.   The forged contracts contained multiple suspicious features.  The contracts between LOGOS PLUS and the Hermitage Companies purported to require LOGOS PLUS, a company with total capital at the time of approximately U.S. $300, to pay the Hermitage Companies approximately U.S. $500 million to buy securities.  Additionally, the forged contracts included extensive confidential information about the Hermitage Companies including bank account information, information on assets and holdings, custodian banks, and addresses of registration and incorporation of the Hermitage Companies.  Such information was confidential, but was contained in the records that had been seized from Hermitage and Firestone Duncan on or about June 4, 2007.  Moreover, although referencing confidential information,

the contracts contained various mistakes and inaccuracies, including referencing bank accounts that had not yet been opened, and using addresses that were incorrect as of the relevant time.

32.  Further, the LOGOS PLUS contracts referred to a power of attorney given an individual named Alexandr Strazhev authority to sign on behalf of LOGOS PLUS.  This power of attorney identified Strazhev by reference to a passport number. The passport number corresponded to a passport not issued to Strazhev but to a third person, who had reported the passport as missing in 2005.

33.  The forged contracts were used by LOGOS PLUS, INSTAR, and GRAND AKTIVE to file a series of sham lawsuits against the Hermitage Companies in arbitration courts in Moscow, St. Petersburg, and Kazan (the capital of the Tatarstan Republic) in or about July to November of 2007.

34.  In these sham lawsuits, the Hermitage Companies were purportedly represented by attorneys; these attorneys were, in fact, entirely unknown to Hermitage or HSBC Guernsey.  These attorneys included PAVLOV and MAYOROVA, the lawyers who had flown to Larnaca in or about April 2007 with KARPOV and, on information and belief, had met there with other members of the Organization including KARPOV's colleague KUZNETSOV, who had led the June 2007 searches.  Hermitage and HSBC had no prior

16

knowledge of or acquaintance with the attorneys that purported
to represent the Hermitage Companies in these sham lawsuits, and
had never hired them or authorized their appointment in any way.
These lawyers were not in fact representing Hermitage or HSBC
but were, on information and belief, members of the Organization
relying on forged powers of attorney.

35.   The lawyers purporting to represent the Hermitage
Companies appeared in the sham lawsuits, and, instead of
mounting any actual defense of the claims, acknowledged the
validity of the forged contracts and conceded full liability.

36.   These sham lawsuits were not truly contested
proceedings but instead were orchestrated with members of the
Organization on both sides, for the purpose of fraudulently
obtaining large money judgments against the Hermitage Companies
on the basis of the forged contracts.  Indeed, PAVLOV, one of
the attorneys appearing as counsel purportedly on behalf of the
Hermitage Companies in sham St. Petersburg proceedings against
LOGOS PLUS, appeared as counsel for plaintiff GRAND AKTIVE –
that is, suing the Hermitage Companies – in the sham Kazan
proceedings.

37.   Ultimately, between July 30, 2007 and December 11,
2007, the courts in St. Petersburg, Moscow and Kazan awarded
judgments totaling at least approximately U.S. $973 million
against the Hermitage Companies on the basis of the fraudulent

17

legal proceedings.

### D. Tax Refunds Based on Fraudulently Procured Judgments

38.   On information and belief, members of the Organization, purporting to represent the Hermitage Companies, used the fraudulently-obtained judgments against the Hermitage Companies to apply for a tax refund, and members of the Organization who worked at two Russian tax offices corruptly approved the tax refund.

39.   As part of their theft of the corporate identities of the Hermitage Companies, members of the Organization fraudulently re-registered the Hermitage Companies so as to cause their taxes to be processed by two particular tax offices. Specifically, the corporate registry reflects that Rilend was re-registered to an address within the jurisdiction of Moscow Tax Office No. 25, and that Parfenion and Makhaon were re-registered to addresses within the jurisdiction of Moscow Tax Office No. 28.   During the relevant period, the head of Moscow Tax Office No. 25 was YELENA KHIMINA, who on information and belief is a member of the Organization, and the head of Moscow Tax Office No. 28 was STEPANOVA, who had traveled to Larnaca in May of 2007 and on information and belief met with KLYUEV to plan the $230 Million Fraud Scheme.

40.   On December 21 and 24, 2007, after the fraudulently-obtained judgments were issued but before one of them came into

legal effect, members of the Organization submitted applications on behalf of the Hermitage Companies for refunds totaling 5.4 billion rubles or U.S. $230 million to Moscow Tax Offices No. 25 and 28.

41.   The basis for the requested refund was that the cumulative U.S. $973 million judgments against the Hermitage Companies from the sham lawsuits represented losses that were equal to, and thus negated, the profits the Hermitage Companies had made during the last tax year, entitling the Hermitage Companies to a refund of the taxes paid on those profits.

42.   In subsequent investigation, officials at Tax Offices No. 25 and 28 made witness statements claiming that amended tax returns were submitted in or about November of 2007 and claiming to have taken certain steps to verify the legitimacy of the claimed losses.   These statements do not appear to be fully accurate.   One official claimed, among other things, to have checked with the corresponding tax authorities whether the plaintiffs in the sham lawsuits had reported receivables corresponding to the fraudulently-obtained judgments, and to have found positive receivables reported.   However, the forms INSTAR and GRAND AKTIVE actually filed with the tax authorities show zero receivables over all relevant time periods.

43.   One of the judgments on which the refund applications were based, by its own terms, did not go into legal effect until

January 11, 2008.

44.   Nevertheless, on December 24, 2007 – the same day that most of the refund applications were filed and one business day after the others were filed – KHIMINA and STEPANOVA, as heads of Moscow Tax Offices 25 and 28, approved the U.S. $230 million in refunds, which on information and belief amounted to the largest known tax refunds in Russian history.

45.   As set forth in more detail in Part III, below, on December 26, 2007, just two days after the applications were made, refunds totaling U.S. $230 million were paid from the Russian treasury to bank accounts established in the name of the Hermitage Companies but, on information and belief, controlled by members of the Organization, and then laundered into a number of accounts and pieces of real property around the world by members and associates of the Organization.

### E. Similarities between 2007 $230 Million Fraud Scheme and 2006 Fraud Scheme

46.   The $230 Million Fraud Scheme is strikingly similar to what appears to have been a fraud scheme carried out by the Organization in 2006 involving two subsidiaries of Rengaz Holdings Limited ("Rengaz"), an offshore investment fund.

47.   On information and belief, in April 2006, two subsidiaries of Rengaz (the "Rengaz Companies") were sued by purported commercial counterparties.

48.   The lawsuits were brought in the Moscow and Kazan Arbitration Courts, two of the same courts in which the sham lawsuits against the Hermitage Companies were brought.

49.   The lawsuits were based on contracts almost identical to the forged contracts between LOGOS PLUS, INSTAR, and GRAND AKTIVE and the Hermitage Companies.  For example, the forged contract between LOGOS PLUS and Parfenion, used in the $230 Million Fraud Scheme, is essentially identical to the contract between one of the Rengaz Companies and its purported commercial counterparty, with only company names, dates, and sums changed.

50.   PAVLOV represented the plaintiffs in the lawsuits against the Rengaz Companies, similar to in the $230 Million Fraud Scheme (where he represented both the plaintiff and the defendant in different actions).

51.   The representatives purportedly acting on behalf of the Rengaz Companies acknowledged the validity of the contracts and conceded full liability, just as the lawyers purportedly acting on behalf of the Hermitage Companies did in the $230 Million Fraud Scheme.

52.   Just as in the $230 Million Fraud Scheme, the plaintiffs were awarded judgments that fully offset the prior profits of the Rengaz Companies.

53.   These judgments then formed the basis for tax refunds of approximately U.S. $107 million, which were approved by

Moscow Tax Offices No. 25 and 28, the same tax offices that approved the U.S. $230 million refunds in the $230 Million Fraud Scheme.   Prior to the refund application, the Rengaz Companies were moved to Moscow Tax Offices No. 25 and 28, just as in the $230 Million Fraud Scheme.

54.   The Rengaz Companies opened bank accounts at USB, the bank owned by KLYUEV, the convicted fraudster who flew KUZNETSOV to Larnaca on a private jet to plan the $230 Million Fraud Scheme, and the Rengaz Companies deposited large amounts there after the refunds.   As described in more detail in Part III, below, the $230 Million Fraud Scheme also involved the opening of USB accounts in the name of two of the Hermitage Companies and the use of those accounts to launder the fraud proceeds.

## II.   RETALIATION FOR INVESTIGATION OF THE $230 MILLION FRAUD SCHEME

### A. Investigation of $230 Million Fraud Scheme by Sergei Magnitsky and Others

55.   In or about October of 2007, Hermitage was contacted by the bailiff of the St. Petersburg court about the cases against the Hermitage Companies.   This was Hermitage's first notice of the sham lawsuits.   Attorneys retained by Hermitage, including Sergei Magnitsky, began to investigate the $230 Million Fraud Scheme.

56.   In or about the second half of October-November 2007, Magnitsky and others had discovered the theft of the corporate

identities of the Hermitage Companies and the involvement of KARPOV and KUZNETSOV. In early December 2007, Hermitage and HSBC Guernsey filed six criminal complaints with law enforcement agencies in Russia, naming KUZNETSOV and KARPOV as key individuals involved. Of these, four were rejected or ignored and one was assigned to KARPOV to investigate, despite the fact that he was named as a suspect. The fraudulent tax refund application and payment followed several weeks later.

57. On February 5, 2008, the Investigative Committee of the Prosecutor's Office opened a criminal case regarding the fraudulent re-registration of the Hermitage Companies. In June of 2008, Magnitsky gave testimony about the role of KUZNETSOV, KARPOV, and other officials involved in this misappropriation.

### B. Criminal Investigations of Magnitsky and Other Hermitage Lawyers

58. In or about May of 2008, KUZNETSOV approved a crime report which was used to open a criminal case against the two lawyers representing Hermitage who had prepared and filed the criminal complaints against him. These lawyers fled Russia.

59. By the summer of 2008, after the payment of the $230 million tax refund, Magnitsky had uncovered the $230 Million Fraud Scheme, and Hermitage and HSBC filed additional criminal complaints with Russian law enforcement agencies about the tax fraud.

60.   In or about October of 2008, Magnitsky again testified about the Organization, including about the roles of KUZNETSOV and KARPOV in the $230 Million Fraud Scheme.

61.   On or about November 6, 2008, the Interior Ministry appointed KUZNETSOV and his subordinates to investigate the $230 Million Fraud Scheme, although they had been named by Magnitsky as key perpetrators; on or about November 12, 2008 the Interior Ministry appointed KUZNETSOV and his subordinates to investigate Magnitsky and Hermitage.

62.   On November 24, 2008, KUZNETSOV's team arrested Magnitsky.

63.   In addition to Magnitsky's arrest, Interior Ministry officers working under the supervision of KUZNETSOV attempted to arrest additional lawyers representing Hermitage; these lawyers fled Russia.

**C. Magnitsky's Detention and Death**

64.   Magnitsky was kept in pretrial detention for almost one year.  He died on or about November 16, 2009 in Matrosskaya Tishina Prison in Moscow, Russia.

65.   On information and belief, at or about 10:30 AM on November 17, 2009, Matrosskaya Tishina prison staff informed Magnitsky's lawyers that Magnitsky died of pancreonecrosis, rupture of the abdominal membrane, and toxic shock.  At noon on that day, an Interior Ministry spokesperson reported his cause

of death as heart failure.  Magnitsky was 37 years old.

66.  On July 6, 2011, Russian President Dimitry Medvedev's Human Rights Council announced the results of its independent investigation into the death of Sergei Magnitsky,  The Human Rights Council concluded that Sergei Magnitsky's arrest and detention was illegal; he was denied access to justice by the courts and prosecutors of the Russian Federation; he was investigated by the same law enforcement officers whom he had accused of stealing Hermitage Fund companies and illegally obtaining a fraudulent U.S. $230,000,000 tax refund; he was denied necessary medical care in custody; he was beaten by 8 guards with rubber batons on the last day of his life; and the ambulance crew that was called to treat him as he was dying was deliberately kept outside of his cell for one hour and 18 minutes until he was dead.

67.  The report of the Human Rights Council also states the officials falsified their accounts of what happened to Sergei Magnitsky and, 18 months after his death, no officials had been brought to trial for his false arrest or the crimes he had uncovered.

68.  The Public Oversight Commission of the City of Moscow for the Control of the Observance of Human Rights in Places of Forced Detention, an organization empowered by Russian law to independently monitor prison conditions, concluded on December

29, 2009, "The members of the civic supervisory commission have reached the conclusion that Magnitsky had been experiencing both psychological and physical pressure in custody, and the conditions in some of the wards of Butyrka [one of the facilities in which Magnitsky was detained] can be justifiably called torturous."

### D. Reaction to Magnitsky's Death and Exposure of $230 Million Fraud Scheme

69.  On April 28, 2009, MARKELOV, the sawmill employee convicted of manslaughter, pled guilty in a Russian court to tax fraud amounting to approximately U.S. $230 million in connection with the $230 Million Fraud Scheme.  On March 10, 2011, KHLEBNIKOV, the convicted extortionist and burglar, also pled guilty to the U.S. $230 million tax fraud scheme.  The verdict announcing MARKELOV's sentence claimed that the tax authorities were deceived by MARKELOV and not complicit.  MARKELOV and KHLEBNIKOV were each sentenced to a five-year term of imprisonment.

70.  KUROCHKIN, the third member of the Organization to be fraudulently named director of one of the Hermitage Companies, was found dead on April 30, 2008 in Boripsol, Ukraine.  The official cause of death was cirrhosis.  KUROCHKIN was 43 years old.

71.  An article in the Russian newspaper Novaya Gazeta

reported that the Organization continued to commit similar tax refund fraud schemes in 2009 and 2010, including the theft of millions of dollars more in fraudulent refunds authorized by Moscow Tax Office 28 and routed through a bank registered at the same address as KLYUEV's bank USB.

72. In August of 2011, the Russian General Prosecutor's Office reopened the criminal case against Magnitsky, almost two years after his death. Magnitstky was charged with tax evasion in the first known posthumous prosecution in Russian history. On July 11, 2013, Magnitsky was convicted.

73. On December 14, 2012, President Barack Obama signed the Sergei Magnitsky Rule of Law Accountability Act of 2012, which directs the President to create, and publish in the Federal Register to the extent unclassified, a list of persons who, inter alia, were responsible for the detention, abuse, or death of Sergei Magnitsky; participated in efforts to conceal the legal liability for the detention, abuse, or death of Sergei Magnitsky; financially benefitted from the detention, abuse, or death of Sergei Magnitsky; or were involved in the criminal conspiracy uncovered by Sergei Magnitsky. *See* Pub. L. No. 112-208, 126 Stat. 1496.

74. On April 12, 2013, the United States Department of Treasury's Office of Foreign Assets Control published the list called for by the Act, which includes, among others, KARPOV,

KUZNETSOV, KHIMINA, and STEPANOVA.  *See* 78 Fed. Reg. 23827-01
(Apr. 22, 2013).

### III.        LAUNDERING OF PROCEEDS OF THE
### $230 MILLION FRAUD SCHEME

75.  Once the fraudulent tax refund was authorized, members
of the Organization, as well as associates of the Organization,
engaged in a complicated series of transactions in order to
launder the fraud proceeds and distribute them amongst the
members and associates of the Organization.  On information and
belief, these transfers often involved the use of shell
companies, nominees, and commingling of the proceeds of the $230
Million Fraud Scheme with other funds in order to launder the
fraud proceeds.

76.  Certain of these transfers, described in Parts III.A,
III.B, and III.D, below, are summarized on a diagram attached
hereto as Exhibit B.

### A. Payments From Russian Treasury to Misappropriated
### Hermitage Companies

77.  On December 26, 2007, two days after members of the
Organization made, and the Moscow Tax Offices 25 and 28
approved, the fraudulent refund applications, the Russian
treasury made a series of transfers totaling approximately 5.4
billion rubles to accounts that were set up in the name of the
Hermitage Companies (Parfenion, Rilend, and Makhaon) at two
banks, Intercommerz and USB.

a.   As to Parfenion, the Russian Treasury made three
     transfers on December 26, 2007 to an account in the
     name of Parfenion at the Russian bank Intercommerz
     (the "Parfenion Intercommerz Account").  The three
     transfers totaled approximately 3.276 billion rubles.

b.   As to Rilend, the Russian Treasury made two transfers
     on December 26, 2007 to an account in the name of
     Rilend at the Russian bank USB (the "Rilend USB
     Account").  The two transfers totaled approximately
     1.76 billion rubles.

c.   As to Makhaon, the Russian Treasury made two transfers
     on December 26, 2007 to an account in the name of
     Makhaon at USB (the "Makhaon USB Account").  The two
     transfers totaled approximately 373 million rubles.

78.  The Parfenion Intercommerz Account was opened on

December 20, 2007 (six days before the transfers from the

Russian Treasury) by MARKELOV, the sawmill operator.

Intercommerz was at the time the 432nd largest bank in Russia.

79.  The Rilend USB Account was opened on or about December

17, 2007 (nine days before the transfers from the Russian

Treasury) by KUROCHKIN.  The Makhaon USB Account was opened on

or about December 12, 2007 (two weeks before the transfers from

the Russian Treasury) by KHLEBNIKOV.  USB was at the time the

920th largest bank in Russia.

80.  In testimony in connection with his 2006 conviction

for fraud, KLYUEV admitted that he had purchased USB in November

2004 from its former owners and re-registered it to a number of

companies effectively controlled by KLYUEV, and that the board

of directors of the bank was a nominal body.  The chairman of

the board of USB was GENNADY PLAKSIN, who was the 100% owner of
INSTAR, one of the sham plaintiffs in the litigation against the
Hermitage Companies.  ALEXEI ZABOLOTKIN, a shareholder of USB,
was the 100% owner and director of GRAND AKTIVE until 2006.  As
set forth in Part I.C, above, GRAND AKTIVE would go on to be
another sham plaintiff in 2007.

81.   USB was voluntarily liquidated in or about June of
2008.

82.   The Interior Ministry stated publicly that it could
not trace the fraudulent tax refund money because the relevant
documents from USB were burned in a truck crash.

### B. Transfers from Accounts of Misappropriated Hermitage Companies Through Intermediaries

83.   From on or about January 21, 2008 through on or about
January 25, 2008, the Parfenion Intercommerz Account made a
series of six transfers to an account at the Russian bank
Sberbank in the name of a company called ZhK (the "ZhK
Account").  These six transfers totaled approximately 430
million rubles.

    a.   ZhK was established in or about November 2003 by a
resident of Moscow ("Individual-1").  On information
and belief, Individual-1 has told reporters, in
substance and in part, that although she filed
documents with the tax office, she "knew nothing of
ZhK."  "I have never been a shareholder or director of
the company," she was quoted as saying.  "I didn't
have a job, and I found an Internet commercial that
said there was a possibility to work as courier and
applicant for different companies."  On information

and belief, in or about November 2008, ZhK was folded into a new commercial entity along with two other companies, and the address of the new entity is in Vladivostok, thousands of miles from Moscow.

84. From on or about January 18, 2008 through on or about February 3, 2008, the Parfenion Intercommerz Account made a series of six transfers to a different account at Intercommerz, one in the name of a company called Fausta (the "Fausta Intercommerz Account"). These six transfers totaled approximately 1.108 billion rubles.

    a. Fausta was registered in July 2007 by a resident of Moscow ("Individual-2"). On information and belief, Individual-2 told a reporter that he did not establish the company. "I don't know anything about this company," he is quoted as saying. "Nobody asked me to establish it. Maybe some people got my passport details from banks where I took loans." On information and belief, liquidation of Fausta began in or about March of 2008, approximately a month after receiving the money from Parfenion. On information and belief, Individual-2 is listed as founder of at least two other companies which received portions of the stolen $230 million refunded funds.

85. After receiving the money from the Parfenion Intercommerz Account, the Fausta Intercommerz Account, between on or about February 6, 2008 through on or about February 8, 2008, made a series of ten transfers into the ZhK Account. These transfers totaled approximately 513 million rubles (in addition to the approximately 430 million rubles in transfers the Parfenion Intercommerz Account had made directly into the ZhK Account as described in paragraph 83, above).

86.   From on or about January 11, 2008 through on or about February 4, 2008, the Makhaon USB Account made a series of ten transfers to an account at Okean Bank, a Russian bank, in the name of a company called Anika (the "Anika Account").  These ten transfers totaled approximately 266 million rubles.

   a.   Liquidation of Anika began in late March of 2008, approximately a month and a half after Anika's receipt of funds from the Makhaon USB Account.  On information and belief, the husband of the founder of Anika was listed as director of a company that had received tax refund money in the 2006 Fraud Scheme.

87.   From on or about January 11, 2008 through on or about January 21, 2008, the Rilend USB Account made a series of seven transfers to an account at the Russian bank Mosstroieconombank in the name of a company called Univers (the "Univers Account").  These seven transfers totaled approximately 3.6 million rubles.

   a.   Univers was registered in October 2007 with an individual ("Individual-3") listed as the sole shareholder and director.  On information and belief, Individual-3 is listed in the Russian commercial registry as a shareholder in numerous companies in a pattern consistent with being a nominee owner.  In November 2008, Univers was reorganized in a similar manner to ZhK.  It was also joined with another company and the headquarters was also moved from Moscow to Vladivostok.  The same registration agents reorganized both Univers and ZhK.

88.   On information and belief, on or about February 5, 2008, the sawmill operator MARKELOV closed the Parfenion Intercommerz Account.  On or about February 6, 2008, the Makhaon USB Account and the Rilend USB Accounts were closed as well.  On

or about February 8, 2008, PLUTON sold the Hermitage Companies to British Virgin Islands corporation, BOILY SYSTEMS, LTD., for approximately U.S. $750.

89.   In addition to receiving transfers from the Rilend USB Account, the Univers Account then also received transfers from the Fausta Intercommerz Account and the Anika Account. Specifically, on or about February 5, 2008, the Fausta Intercommerz Account (which, as stated in paragraph 84, above, had just received funds from the Parfenion Intercommerz Account) made a transfer of approximately 98.9 million rubles into the Univers Account.  Also on or about that day, the Anika Account (which, as stated in paragraph 86, above, had just received funds from the Makhaon USB Account) made a transfer of approximately 69.9 million rubles into the Univers Account.

90.   Having received funds from the misappropriated Hermitage Companies directly and through intermediary accounts, the ZhK Account and the Univers Account then made transfers to a correspondent account at the Russian bank Alfa Bank, which was held in the name of Bank Krainiy Sever, another Russian bank (the "Bank Krainiy Sever Account").  Specifically, from on or about February 5, 2008 through on or about February 11, 2008, the ZhK Account made seventeen transfers, totaling approximately 525 million rubles, into the Bank Krainiy Sever Account.  And between those same dates, the Univers Account made seven

transfers, totaling approximately 290 million rubles, into the Bank Krainiy Sever Account.

      a.   On or about February 12, 2008 (the day after the last of these transfers to Bank Krainiy Sever), the Univers Account, which had been opened in November of 2007, was closed.

91. As it received these funds from the ZhK and Univers Accounts, the Bank Krainiy Sever Account was in turn transferring funds to accounts at a Moldovan bank in the name of two different companies in Moldova, Bunicon-Impex SRL ("Bunicon") and SC Elenast-Com SRL ("Elenast"). Specifically, from on or about February 5, 2008 through on or about February 6, 2008, the Bank Krainiy Sever Account made a series of five transfers to an account at the Moldovan bank Banca De Economii in the name of Bunicon (the "Bunicon Banca De Economii Account"). These transfers totaled approximately 528 million rubles. And between February 5 and February 13, 2008, the Bank Krainiy Sever Account made a series of ten transfers to an account at Banca De Economii in the name of Elenast (the "Elenast Banca De Economii Account"). These transfers totaled approximately 657 million rubles.

92. On February 13, 2008, the day that the Bank Krainiy Sever Account made the last transfer to the Elenast Banca De Economii Account, a Russian court ordered the Bank Krainiy Sever Account seized. Approximately one month later, the Central Bank

of the Russian Federation canceled Bank Krainiy Sever's banking license for money laundering violations.

93.   On information and belief, Bunicon was a shell company with a nominee administrator.  Bunicon was registered in or about July of 2007, with its administrator listed as Vladimir Buniovschi.  Bunichovschi was 24 years old at the time that Bunicon received the 528 million rubles in transfers from Bank Krainiy Sever.  Bunicon does not appear to have had any significant internet presence.  On information and belief, Bunicon's listed headquarters was a residential house in Chisinau, Moldova, a photograph of which is attached hereto as Exhibit C.

    a.   On information and belief, the residential house listed as Bunicon's headquarters was also the headquarters of two other companies, which also appear to be shell companies.  Besides sharing Bunicon's address, the other two companies, Melcon-Exim SRL ("Melcon") and Cupvitcons SRL ("Cupvitcons"), each (like Bunicon) also have corporate names that include portions of the name of their listed representatives— Anatolie Melnic for Melcon, Vitalie Cupcic for Cupvitcons.

94.   On information and belief, Elenast was also a shell company.  Elenast was registered on or about October of 2007, with its administrator listed as Stinga Elena.  Elenast does not appear to have had any significant internet presence.  On information and belief, Elenast's listed headquarters was a residential apartment building in Chisinau, Moldova, a

photograph of which is attached hereto as Exhibit D.

### C. Transfers to Key Participants

95.   Some of the money derived from the fraudulent tax refunds was directed to the core members of the Organization, who laundered it through various transactions and into, among other things, real estate purchases.

96.   For example, Arivust Holdings, Ltd. ("Arivust") is a Cyprus-based company with a bank account at the Swiss bank Credit Suisse (the "Arivust Account").  Arivust, incorporated in January 2008, is beneficially owned by STEPANOV, then-husband of STEPANOVA, the head of Moscow Tax Office No. 28, who had authorized millions of dollars worth of fraudulent refunds as part of the $230 Million Fraud Scheme.

97.   On February 5, 2008, in a wire transfer routed through the Southern District of New York, the Bunicon Banca De Economii Account transferred $726,000, to an account at a Latvian bank in the name of Nomirex Trading Limited.  In two transfers in February of 2008, that Nomirex account transferred almost 4 million euros to an account in the name of the British Virgin Islands company Quartell Trading, Ltd., which promptly transferred over U.S. $150,000 of that money to Baikonur Worldwide, Ltd., also a British Virgin Islands company.  In five transfers from on or about May 26, 2008 through on or about June 17, 2008, Baikonur (which on information and belief has shared

ownership with Quartell) sent approximately 7.1 million euros to Arivust.

98.  Thus, as of June 17, 2008, STEPANOV, then-husband of STEPANOVA, had received, through Arivust, approximately 7.1 million euros, of which at least a portion was directly traceable to the fraudulent refunds through Bunicon.

99.  Indeed, on information and belief, STEPANOV and STEPANOVA also purchased millions of U.S. dollars' worth of real estate in Dubai after the refund money was paid.

100.  The tax returns for STEPANOV and STEPANOVA from 2006 to 2009 report an average combined annual income of just $38,381.

### D. Transfers to Prevezon Holdings and Purchase of Prevezon Holdings by Katsyv

101.  On or about February 6, 2008, the Bunicon Banco Di Economii Account made a wire transfer (the "February 6, 2008 Bunicon Transfer") to an account with the Swiss bank UBS in the name of PREVEZON HOLDINGS (the "PREVEZON HOLDINGS 8160 Account").  The amount of this wire transfer was approximately U.S. $410,000.

102.  On or about February 13, 2008, the Elenast Banco Di Economii Account made a wire transfer (the "February 13, 2008 Elenast Transfer," and with the February 6, 2008 Bunicon Transfer, the "February 2008 Transfers") to the PREVEZON

HOLDINGS 8160 Account.  The amount of this wire transfer was approximately U.S. $447,354.

103. On May 23 and June 23 of 2008, the PREVEZON HOLDINGS 8160 Account converted millions of dollars into euros, which were transferred to the PREVEZON HOLDINGS 8170 Account.  The PREVEZON HOLDINGS 8170 Account then transferred over 3 million euros to AFI Europe, N.V. ("AFI Europe") in order to purchase a 30% interest in each of the Netherlands-based companies AFI Properties Berlin B.V., AFI Properties Logistics B.V., AFI Properties Development B.V., and AFI Properties B.V., (collectively the "Dutch companies"), which in turn hold percentage interests in German partnerships holding property in Germany.

104. As stated in paragraph 10, at the time of the February 2008 Transfers, KRIT was listed as the sole shareholder of PREVEZON HOLDINGS according to Cyprus public records.  At that time, he was 22 years old.  A personal webpage KRIT maintains currently lists him as a science graduate student in Russia.

105. Although KRIT was publicly listed as the sole shareholder of PREVEZON HOLDINGS from August 29, 2006 to June 18, 2008, as stated in paragraph 11, during that entire time period, the beneficial owner of the PREVEZON HOLDINGS accounts at UBS was LITVAK.

106. On or about June 19, 2008, KATSYV purchased a 100%

interest in the PREVEZON HOLDINGS from KRIT for $50,000. On information and belief, the PREVEZON HOLDINGS UBS accounts had over $2 million in assets at the time.  KRIT remained a director of PREVEZON HOLDINGS, and LITVAK remained beneficial owner of the PREVEZON HOLDINGS UBS accounts.

    a.   KATSYV, LITVAK and KRIT have been business associates in other ventures, dating back to before the February 2008 Transfers.  From October of 2007 through at least October of 2012, KRIT has officially been sole director of KOLEVINS and sole shareholder.  However, LITVAK was beneficial owner of KOLEVINS's bank accounts at UBS during this time period, KATSYV was also beneficial owner of KOLEVINS's UBS bank accounts, and an internal UBS document has referred to KOLEVINS as LITVAK's company.

107.  In 2013, in response to an article about the February 2008 Transfers, an employee of a public relations firm representing KATSYV ("Representative-1"), wrote to the reporting organization that had published the article.  At the time that Representative-1 wrote, KATSYV was the only shareholder of PREVEZON HOLDINGS, holding 1000 shares directly and the remaining 1 share through a different wholly-owned company. Representative-1 wrote that KATSYV had no involvement with the February 2008 Transfers, which predated KATSYV's purchase of PREVEZON HOLDINGS.  Representative-1 stated that after the February 2008 Transfers, "Mr. Krit, director of the firm, found himself unable to run the company on his own.  Through a mutual friend, he arranged to sell it to Mr. Katsyv for $50,000.  He

agreed to stay on as Mr. Katsyv's employee."

108. Representative-1 stated that after becoming aware of the February 2008 Transfers from a reporter, KATSYV "confirmed that the payments really had occurred and, although they did so prior to his involvement and ownership, he undertook a full review of where they had come from and how the funds were used." Representative-1 stated that the funds involved in the February 2008 Transfers derived from a deal between KRIT and "his friend, a Mr. Petrov." Representative-1 claimed that "Mr. Petrov" and KRIT "agreed jointly to develop a business based on investments in and management of property. Under the agreement Mr. Petrov was to transfer funds to Prevezon for this purpose."

109. Representative-1 stated that the funds for this joint venture were paid to PREVEZON HOLDINGS by Bunicon and Elenast because "Mr. Petrov was anticipating repayment through these companies of a debt owed him by a third party, a Mr. Kim." Representative-1 also wrote that PREVEZON HOLDINGS "has at no time had any direct commercial relations with Bunicon or Elenast."

110. However, the bank records reflecting the February 2008 Transfers describe the transfers from Bunicon and Elenast to PREVEZON HOLDINGS as prepayment for sanitary equipment.

**E. Purchase of Defendants in Rem in New York by Prevezon Entities**

111. In his 2013 communications with the reporting organization, Representative-1 stated that after KATSYV purchased PREVEZON HOLDINGS, the funds involved in the February 2008 Transfers "were invested in various New York properties, and it was agreed that Prevezon would manage these assets for five years and then transfer the properties to Mr. Petrov in full."

112. On or about November 30, 2009, PREVEZON HOLDINGS purchased 20 PINE STREET, UNIT 2009 from 20 Pine Street LLC for approximately $1,231,148 and also purchased Unit 1810 of that building ("20 PINE STREET, UNIT 1810") from 20 Pine Street LLC for approximately $829,351. Both purchases were made with funds from the PREVEZON HOLDINGS 8160 Account. The funds in the PREVEZON HOLDINGS 8160 Account used to fund these purchases included funds from KOLEVINS, funds from FERENCOI, and funds from AFI Europe. The AFI Europe funds had been transferred to the PREVEZON HOLDINGS 8170 Account in euros earlier that month and then converted into dollars and transferred into the PREVEZON HOLDINGS 8160 Account. LITVAK signed both deeds on behalf of PREVEZON HOLDINGS.

    a.   20 Pine Street LLC, the company from which PREVEZON HOLDINGS purchased 20 PINE STREET, UNIT 2009 and 20 PINE STREET, UNIT 1810, is a development of Africa-Israel USA ("AFI USA"), a company under common

ownership with AFI Europe.

    b.    On or about February 24, 2010, PREVEZON HOLDINGS transferred 20 PINE STREET, UNIT 1810 to PREVEZON 1810 and transferred 20 PINE STREET, UNIT 2009 to PREVEZON 2009.  KRIT signed both deeds on behalf of PREVEZON HOLDINGS.

    c.    In or about 2013, PREVEZON 1810 sold 20 PINE STREET, UNIT 1810.

113. On or about February 25, 2010, PREVEZON 1711 purchased 20 PINE STREET, UNIT 1711 from 20 Pine Street LLC for approximately $894,257, and PREVEZON PINE purchased 20 PINE STREET, UNIT 2308 from 20 Pine Street LLC for approximately $772,687.  Both purchases were made with funds from the PREVEZON HOLDINGS 8160 Account.  The funds in the PREVEZON HOLDINGS 8160 Account included funds from FERENCOI and KOLEVINS.  LITVAK signed the deeds on behalf of PREVEZON 1711 and PREVEZON PINE, respectively.

114. On or about August 26, 2010, PREVEZON SOHO purchased unit COM-1 of 160 Wooster Street ("160 WOOSTER STREET, UNIT COM-1") with approximately $6,286,000.  This purchase was made with funds from account number ending in 1947 at Marfin Popular Bank PCL, Cyprus, held in the name of PREVEZON HOLDINGS (the "PREVEZON HOLDINGS Marfin Account").

    a.    In or about April of 2013, PREVEZON SOHO sold 160 WOOSTER STREET, UNIT COM-1.

115. On or about March 21, 2011, PREVEZON 2011 purchased 20 PINE STREET, UNIT 1816 from 20 Pine Street LLC with

approximately $977,520 in funds from the PREVEZON HOLDINGS 8160 Account. The funds in the PREVEZON HOLDINGS 8160 Account used to make this purchase included funds from KOLEVINS. LITVAK signed the deed on behalf of PREVEZON 2011.

116. On or about December 14, 2011, PREVEZON SEVEN purchased 127 SEVENTH AVENUE, RETAIL UNIT 2 with approximately $6,500,000, including approximately $2,700,000 in funds from the PREVEZON HOLDINGS 8160 Account and approximately $3,300,000 from the PREVEZON HOLDINGS Marfin Account. The funds in the PREVEZON HOLDINGS 8160 Account used to make this purchase included funds from KOLEVINS. LITVAK signed a document in connection with the sale on behalf of PREVEZON SEVEN.

117. On or about September 13, 2012, PREVEZON ALEXANDER purchased 250 EAST 49th STREET, UNIT COMM3 with approximately $6,250,000. LITVAK signed a document in connection with the sale on behalf of PREVEZON ALEXANDER.

118. As of August 9, 2013, the balance of the PREVEZON SEVEN ACCOUNT (a bank account held in the name of PREVEZON SEVEN) was $80,759, the balance of the PREVEZON SOHO ACCOUNT (a bank account held in the name of PREVEZON SOHO) was $5,723, and the balance of the PREVEZON ALEXANDER ACCOUNT (a bank account held in the name of PREVEZON ALEXANDER) was $30,796.

## FIRST CLAIM
### (FORFEITURE UNDER 18 U.S.C. §§ 981(a)(1)(A), 985)

119. The Government incorporates by reference paragraphs 1 through 118 above as if fully set forth herein.

120. Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction in violation of section 1956 [or] 1957 . . . of [title 18, relating to money laundering offenses], or any property traceable to such property," is subject to forfeiture to the Government.

121. 18 U.S.C. § 1956(a)(1) imposes a criminal penalty on any person who:

> knowing that the property involved in a financial transaction involves the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity –
>
> (A)  (i)  with the intent to promote the carrying on of specified unlawful activity; or
>
> (ii)  with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986; or
>
> (B)  knowing that the transaction is designed in whole or in part –
>
> (i)  to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or
>
> (ii)  to avoid a transaction

reporting requirement under State

or Federal law[.]

122. Section 1956(a)(2) further imposes a criminal penalty

on any person who:

> transports, transmits, or transfers, or
> attempts to transport, transmit, or transfer
> a monetary instrument or funds from a place
> in the United States to or through a place
> outside the United States or to a place in
> the United States from or through a place
> outside the United States –
>
> (A)   with the intent to promote the carrying
>       on of specified unlawful activity; or
>
> (B)   knowing that the monetary instrument or
>       funds involved in the transportation,
>       transmission, or transfer represent the
>       proceeds of some form of unlawful
>       activity and knowing that such
>       transportation, transmission, or
>       transfer is designed in whole or in
>       part –
>
>       (i)   to conceal or disguise the
>       nature, the location, the source,
>       the ownership, or the control of
>       the proceeds of specified unlawful
>       activity; or
>
>       (ii)   to avoid a transaction
>       reporting requirement under State
>       or Federal law[.]

123. 18 U.S.C. § 1957 imposes a criminal penalty on any

person who "knowingly engages or attempts to engage in a

monetary transaction [in the United States] in criminally

derived property of a value greater than $10,000 and is derived

from specified unlawful activity."  A "monetary transaction"

includes the "deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument . . . by, through, or to a financial institution." 18 U.S.C. § 1957(f)(1).

124. Pursuant to 18 U.S.C. § 1956(h), "[a]ny person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."

125. For purposes of Sections 1956 and 1957, "specified unlawful activity" includes, among other things, mail fraud, wire fraud, and, with respect to a financial transaction occurring in whole or in part in the United States, an offense against a foreign nation involving fraud or any scheme or attempt to defraud, by or against a foreign bank, or involving bribery of a public official or the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official.

126. The Defendants in Rem constitute property involved in money laundering transactions and attempted money laundering transactions in violation of Sections 1956 and 1957 and therefore are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

SECOND CLAIM
(CIVIL MONEY LAUNDERING PENALTIES, 18 U.S.C. §§ 1956(a)(1)(A)
and (b))

127. The United States incorporates by reference paragraphs 1 through 125 above as if fully set forth herein.

128. Pursuant to Title 18, United States Code, Section 1956(b), "[w]hoever conducts or attempts to conduct a transaction described in subsection (a)(1) or (a)(3), or section 1957, or a transportation, transmission, or transfer described in subsection (a)(2), is liable to the United States for a civil penalty of not more than the greater of – (A) the value of the property, funds, or monetary instruments involved in the transaction; or (B) $10,000."

129. The Defendants in Personam engaged in financial transactions involving the proceeds of the $230 Million Fraud Scheme, and therefore involving specified unlawful activity within the meaning of the money laundering statute.

130. The Defendants in Personam acted with the intent of promoting and perpetuating the Organization's acts of fraud, corruption and money laundering, and to aid the members of the Organization in promoting their unlawful activities.

131. Accordingly, the Defendants in Personam are liable to the United States for the value of the funds and monetary instruments involved in the transactions, in an amount to be determined at trial.

**THIRD CLAIM**
**(CIVIL MONEY LAUNDERING PENALTIES, 18 U.S.C. §§ 1956(a)(1)(B)**
**and (b))**

132. The United States incorporates by reference paragraphs 1 through 118, 120 through 125, and 128 above as if fully set forth herein.

133. The Defendants in Personam engaged in financial transactions involving the proceeds of the $230 Million Fraud Scheme, and therefore involving specified unlawful activity within the meaning of the money laundering statute.

134. The Defendants in Personam knew that the financial transactions were designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the $230 Million Fraud Scheme.

135. Accordingly, the Defendants in Personam are liable to the United States for the value of the funds and monetary instruments involved in the transactions, in an amount to be determined at trial.

**FOURTH CLAIM**
**(CIVIL MONEY LAUNDERING PENALTIES, 18 U.S.C. §§ 1956(a)(2)(A)**
**and (b))**

136. The United States incorporates by reference paragraphs 1 through 118, 120 through 125, and 128 above as if fully set forth herein.

137. The Defendants in Personam transported, transmitted, and transferred monetary instruments and funds from a place in

the United States to or through a place outside of the United States, or to a place in the United States from or through a place outside the United States, with the intent to promote the Organization's underlying acts of mail fraud, wire fraud, corruption, and money laundering, and to aid the members of the Organization in promoting their unlawful activities.

138. Accordingly, the Defendants in Personam are liable to the United States for the value of the funds and monetary instruments involved in the transactions, in an amount to be determined at trial.

### FIFTH CLAIM
### (CIVIL MONEY LAUNDERING PENALTIES, 18 U.S.C. §§ 1956(a)(2)(B) and (b))

139. The United States incorporates by reference 1 through 118, 120 through 125, and 128 above as if fully set forth herein.

140. The Defendants in Personam transported, transmitted, and transferred monetary instruments and funds from a place in the United States to or through a place outside of the United States, or to a place in the United States from or through a place outside the United States, to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the $230 Million Fraud Scheme.

141. Accordingly, the Defendants in Personam are liable to the United States for the value of the funds and monetary

instruments involved in the transactions, in an amount to be determined at trial.

### SIXTH CLAIM
**(CIVIL MONEY LAUNDERING PENALTIES, 18 U.S.C. §§ 1956(b) and 1957)**

142. The United States incorporates by reference paragraphs 1 through 118, 120 through 125, and 128 above as if fully set forth herein.

143. The Defendants in Personam knowingly engaged in monetary transactions involving funds obtained from the $230 Million Fraud Scheme or funds traceable to such funds, and therefore involving criminally derived property which was derived from specified unlawful activity within the meaning of the money laundering statute.

144. Such transactions were made by, through, and to financial institutions and involved property of a value greater than $10,000.

145. Accordingly, the Defendants in Personam are liable to the United States for the value of the funds and monetary instruments involved in the transactions, in an amount to be determined at trial.

### SEVENTH CLAIM
**(CIVIL MONEY LAUNDERING PENALTIES, 18 U.S.C. §§ 1956(h) and (b))**

146. The United States incorporates by reference paragraphs 1 through 118, 120 through 125, and 128 above as if fully set

forth herein.

147. From at least December of 2007, through on or about August 20, 2013, the Defendants in Personam knowingly did combine, conspire, confederate, and agree together and with each other to violate 18 U.S.C. §§ 1956(a)(1)(A), (a)(1)(B), (a)(2)(A), (a)(2)(B), and 1957.

148. It was a part and an object of the conspiracy that the Defendants in Personam engaged in financial transactions that involved the proceeds of the $230 Million Fraud Scheme in order to promote the Organization's underlying acts of mail fraud, wire fraud, corruption, and money laundering.

149. It was a further part and object of the conspiracy that the Defendants in Personam engaged in financial transactions in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the $230 Million Fraud Scheme.

150. It was a further part and object of the conspiracy that the Defendants in Personam would transport, transmit, and transfer monetary instruments and funds from a place in the United States to or through a place outside of the United States, or to a place in the United States from or through a place outside the United States, with the intent to promote the Organization's underlying acts of mail fraud, wire fraud, corruption, and money laundering.

151. It was a further part and object of the conspiracy that the Defendants in Personam would transport, transmit, and transfer monetary instruments and funds from a place in the United States to or through a place outside of the United States, or to a place in the United States from or through a place outside the United States, to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the $230 Million Fraud Scheme.

152. It was a further part and object of the conspiracy that the Defendants in Personam engaged or attempted to engage in monetary transactions in criminally derived property of a value greater than $10,000, and which was derived from the $230 Million Fraud Scheme.

153. Accordingly, the Defendants in Personam are liable to the United States for the value of the funds and monetary instruments involved in the conspiracy, in an amount to be determined at trial, but at least $230 million.

## REQUEST FOR RELIEF

WHEREFORE plaintiff, the United States of America, requests that judgment be entered as follows:

A.    Enter judgment against the Defendants in Rem, and in favor of the United States, on the first claim alleged in the Complaint.

B.    Issue process to enforce the forfeiture of the

Defendants in Rem, requiring that all persons having
an interest in the Defendants in Rem be cited to
appear and show cause why the forfeiture should not be
decreed, and that this Court decree forfeiture of the
Defendants in Rem to the United States of America for
disposition according to law;

C.   Enter judgment against the Defendants in Personam, and
in favor of the United States, on the second through
seventh claims alleged in the Complaint.

D.   Award the United States civil money laundering
penalties from the Defendants in Personam on the
second through seventh claims alleged in the
Complaint, in an amount to be proven at trial to a
jury, plus prejudgment and postjudgment interest.

E.   Grant the Government such further relief as this Court

may deem just and proper, together with the costs and

disbursements in this action.

Dated: New York, New York          PREET BHARARA
       September 10, 2013          United States Attorney
                                   Attorney for the United States of
                                   America

                                   _____
                                   PAUL M. MONTELEONI
                                   CHRISTINE I. MAGDO
                                   Assistant United States Attorneys
                                   One Saint Andrew's Plaza
                                   New York, New York 10007
                                   Telephone: (212) 637-2219/2297
                                   Facsimile: (212) 637-0421
                                   E-mail: paul.monteleoni@usdoj.gov
                                           christine.magdo@usdoj.gov

## VERIFICATION

STATE OF NEW YORK            )
COUNTY OF NEW YORK           :
SOUTHERN DISTRICT OF NEW YORK )

Todd Hyman, being duly sworn, deposes and says that he is a Special Agent with the Department of Homeland Security, and as such has responsibility for the within action; that he has read the foregoing Verified Complaint and knows the contents thereof, and that the same is true to the best of his knowledge, information, and belief.

The sources of deponent's information and the ground of his belief are official records and files of the United States, information obtained directly by the deponent, and information obtained by other law enforcement officials and representatives during an investigation of alleged violations of Title 18, United States Code.

_____
Todd Hyman,
Special Agent
Department of Homeland Security,
Homeland Security Investigations

Sworn to before me this
9th day of September, 2013:

_____
NOTARY PUBLIC

MARCO DASILVA
Notary Public, State of New York
No. 01DA6145603
Qualified in Nassau County
My Commission Expires _May 8, 2014_

55