UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>             Plaintiffs,<br>   v.<br><br>PREVEZON HOLDINGS LTD., et al.<br><br>             Defendants,<br><br>ANY AND ALL ASSETS OF PREVEZON<br>HOLDINGS, LTD., et al.<br><br>             Defendants *in rem* | Case No. 1:13-cv-06326 (TPG)<br><br><br>**MEMORANDUM OF LAW IN<br>SUPPORT OF DEFENDANTS'<br>OMNIBUS MOTION TO DISMISS** |

John W. Moscow
BAKER & HOSTETLER L.L.P.
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile:  (212) 589-4201

Seth T. Taube
Richard B. Harper
BAKER BOTTS L.L.P.
30 Rockefeller Plaza
New York, NY 10112
Telephone: (212) 408-2500
Facsimile:  (212) 408-2501
seth.taube@bakerbotts.com

Mark A. Cymrot
BAKER & HOSTETLER L.L.P.
Washington Square, Suite 1100
1050 Connecticut Ave.,
Washington, D.C.  20036
Telephone:  (202) 861-1677
Facsimile:   (202) 861-1783

*Attorneys for Prevezon Holdings Ltd., Prevezon Alexander, LLC, Prevezon Soho USA, LLC,*
*Prevezon Seven USA, LLC, Prevezon Pine USA, LLC, Prevezon 1711 USA, LLC,*
*Prevezon 1810 LLC, Prevezon 2009 USA, LLC, and Prevezon 2011 USA, LLC*

# **TABLE OF CONTENTS**

**Page**

Table of Contents ................................................................................................... i

Table of Authorities ............................................................................................... ii

Introduction ........................................................................................................... 1

Statement of Facts ................................................................................................. 5

STANDARD OF REVIEW ..................................................................................... 8

I.   The Complaint Fails to Meet the Heightened Pleading Standard Applicable to Each Cause of Action ................................................................................................. 9

II.   The Complaint Fails to Allege Defendants' Knowledge Of or Intent to Promote Any Unlawful Activity ................................................................................................ 11

    A.   The Complaint Does Not Plausibly Allege that Defendants Knew of Unlawful Activity (Second, Third, Fifth, and Sixth Claims) ..................................................... 11

    B.   The Complaint Does Not Plead an Intent to Promote (Second and Fourth Claims) . 13

    C.   The Complaint Fails to State a Claim for Conspiracy (Seventh Claim) .................. 14

III.   The Complaint Fails to Identify the "Specified Unlawful Activity" Underlying the Alleged Money Laundering Violations ............................................................. 15

    A.   Foreign Tax Fraud is Not a Statutorily Defined Specified Unlawful Activity ......... 17

IV.   The Government Has Failed To Trace Tainted Funds to Defendants ............................. 18

    A.   There is No Reasonable Basis to Believe the Government Can Trace Tainted Funds Beyond the First Layer of Transfers From the Russian Treasury ............................ 20

    B.   The Government's Tracing Analysis Fails to Distinguish Between Tainted and Untainted Funds and Does Not Explain Why the $19.5 Million in Untainted Funds is Not the Source of the $857,354 Prevezon Holdings Received ................................ 22

    C.   The Government Fails to Establish that Any of the Allegedly Tainted Funds Were Transferred to the United States ...................................................................... 26

V.   The Complaint Fails to State a Claim Against Prevezon Alexander and Prevezon Soho 27

CONCLUSION ....................................................................................................... 29

## **TABLE OF AUTHORITIES**

**Page(s)**

### CASES

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)...............................................................3, 9, 11, 13, 16, 26, 27

*Att'y Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.,*
  268 F.3d 103 (2d Cir. 2001)..................................................................................17

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007).............................................................................3, 9, 11, 26

*Gyadu v. Hartford Ins. Co.,*
  197 F.3d 590 (2d Cir. 1999)..................................................................................15

*In re 650 Fifth Ave. & Related Properties,*
  777 F. Supp. 2d 529 (S.D.N.Y. 2011)........................................................8, 13, 18

*Moore v. Mitchell,*
  30 F.2d 600 (2d Cir. 1929) (L. Hand, J.) ............................................................18

*O'Brien v. Nat'l Prop. Analysts Partners,*
  936 F.2d 674 (2d Cir. 1991)....................................................................................8

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC,*
  446 F.Supp.2d 163 (S.D.N.Y.2006).......................................................................12

*Rosner v. Bank of China,*
  06 CV 13562, 2008 WL 5416380 (S.D.N.Y. Dec. 18, 2008) *aff'd,* 349 F. App'x 637
  (2d Cir. 2009).........................................................................................................12

*United States v. $1,399,313.74 in U.S. Currency,*
  591 F. Supp. 2d 365 (S.D.N.Y. 2008)....................................................................12

*United States v. $22,173.00 in U.S. Currency,*
  716 F. Supp. 2d 245 (S.D.N.Y. 2010).......................................................................8

*United States v. All Assets of G.P.S. Automotive Corp.,*
  66 F.3d 483 (2d Cir. 1995).......................................................................................3

*United States v. All Assets of G.P.S. Automotive Corp.* (Findings of Fact and Conclusions
  of Law),
  No. 91-0223 (E.D.N.Y. Jan. 26, 1994) ...................................................................3

*United States v. Awan,*
  459 F. Supp. 2d 167 (E.D.N.Y. 2006) *aff'd,* 384 F. App'x 9 (2d Cir. 2010)..........16

*United States v. Brown,*
  186 F. 3d 661 (5th Cir. 1999) ...............................................................................2, 13

*United States v. Certain Accounts, Together With All Monies on Deposit Therein,*
  795 F.Supp. 391 (S.D. Fl. 1992).............................................................18, 22, 25, 26

*United States v. Contents in Account No. 059-644190-69,*
  253 F. Supp. 2d 789 (D. Vt. 2003)...............................................................19, 24, 27

*United States v. Daccarett,*
  6 F.3d 37 (2d Cir. 1993)........................................................................................8

*United States v. Funds Held in the Name or for the Benefit of Wetterer,*
  210 F.3d 96 (2d Cir. 2000)....................................................................................18

*United States v. Garcia,*
  587 F.3d 509 (2d Cir. 2009)..................................................................................15

*United States v. Gotti,*
  459 F.3d 296 (2d Cir. 2006)..................................................................................11

*United States v. Huezo,*
  546 F.3d 174 (2d Cir. 2008)..............................................................................12, 15

*United States v. Jolivet,*
  224 F.3d 902 (8th Cir. 2000) ................................................................................13

*United States v. Miles,*
  360 F.3d 472 (5th Cir. 2004) .............................................................................3, 13

*United States v. Ness,*
  565 F.3d 73 (2d Cir. 2009)....................................................................................12

*United States v. One White Crystal Covered Bad Tour Glove and Other Michael Jackson Memorabilia,*
  No. CV 11-3582, 2012 WL 8455336 (C.D. Cal. April 12, 2012) ..........................15

*United States v. Real Property Known as Unit 5B of Onyx Chelsea Condominium,*
  No. 10 Civ. 5390 (KBF), 2012 WL 1883371 (S.D.N.Y. May 21, 2012) ...............16

*W. 79th St. Corp. v. Congregation Kahl Minchas Chinuch,*
  03 CIV. 8606RWS, 2004 WL 2187069 (S.D.N.Y. Sept. 29, 2004)......................15

*Wisconsin v. Pelican Insurance, Co.,*
  127 U.S. 265 (1888)..............................................................................................18

## STATUTES

18 U.S.C. § 981......................................................................................................18

18 U.S.C. § 983(a)(3)(A) ................................................................................8

18 U.S.C. § 983(c)(1) ...................................................................................18

18 U.S.C. § 983(c)(3) ...................................................................................26

18 U.S.C. § 1956 ..........................................................................................15

18 U.S.C. § 1956(a)(1) .....................................................................4, 9, 10, 11

18 U.S.C. § 1956(a)(1)(A)(i) ....................................................................4, 13

18 U.S.C. § 1956(a)(1)(B) ............................................................................12

18 U.S.C. § 1956(a)(2) ..............................................................................9, 11

18 U.S.C. § 1956(a)(2)(a) .............................................................................13

18 U.S.C. § 1956(a)(2)(B) ............................................................................12

18 U.S.C. § 1956(c)(7) ..................................................................................17

18 U.S.C. § 1956(c)(7)(B) .......................................................................16, 17

18 U.S.C. § 1956(h) ..............................................................................9, 11, 14

18 U.S.C. 1957 .....................................................................9, 11, 12, 14, 15

18 U.S.C. § 1957(a) .......................................................................................4

## OTHER AUTHORITIES

Federal Rule of Civil Procedure 9(b)...........................................3, 8, 11, 12

Federal Rule of Civil Procedure 12(b)(6) ......................................................9

Supplemental Rule E(2)(A) ..........................................................8, 11, 17, 18

Supplemental Rule G .....................................................................................2

Supplemental Rule G(2) .........................................................................8, 18

Supplemental Rule G(2)(f) ....................................................................21, 27

## INTRODUCTION

In this civil forfeiture and civil money penalties action, the Government alleges in extensive detail the existence of a $230 million Russian tax refund fraud by what is called the "Organization," the identities of its leaders, and their travels in Cyprus and Russia more than six years ago. The Complaint asserts that a Russian citizen, Sergei Magnitsky, died in detention after complaining about the tax refund fraud, and that the United States Congress passed the Magnitsky Act to punish those involved in his death.  In a recent pleading, the United States concedes that Defendants were not involved in Mr. Magnitsky's death, and explained that the references to Mr. Magnitsky's death are in the Complaint not for pure prejudicial effect but to show the Court "the willingness of members of the Organization [which Defendants are not alleged to be part of] to hide their fraud . . ."  *See* Memorandum of Law of the United States of America in Opposition to Application by Defendants to Vacate or Modify the Protective Order, n. 5 (Dkt. 47).

What the Government does not do is connect the eleven Defendant real estate companies or their primary owner, Denis Katsyv, to the alleged crimes.  The Government does not contend that any of the Defendants or Mr. Katsyv participated in the fraud, was a member of the so-called Organization, or even knew about the fraud.  Facts supporting the elements of knowledge, intent, concealment, agreement, or promotion of the alleged fraud or money laundering are totally missing from the Complaint.  Indeed, in the few paragraphs of the Complaint actually referring to Defendants, they are alleged to have conducted transactions—buying and selling property—consistent with a lawful real estate enterprise, which they are.  The transfers conducted to make those investments are no different than transactions conducted by other legitimate real estate companies worldwide.  When the Government fails to allege facts sufficient to show knowledge

or intent, it turns "the money laundering statute into a money spending statute." *United States v. Brown*, 186 F. 3d 661, 670 (5th Cir. 1999).

The Complaint seeks to forfeit "any and all assets" of Prevezon Holdings, Ltd. ("Prevezon Holdings") and ten other companies *in rem* and $230,000,000 civil money penalties because Prevezon Holdings received two transfers of funds totaling $857,354 into an account at UBS in Zurich allegedly from the proceeds of the Russian tax refund fraud.[1]  Compl. ¶¶ 101-02. Thereafter, Prevezon Holdings made a single transfer into a German investment with a major international real estate partner, AFI Europe.  There is no allegation of an effort to conceal the flow of funds to the German investment.  Starting 21 months after receiving the allegedly tainted funds and 17 months after transferring those funds into a German investment, Defendant companies made standard real estate investments in New York.  Years after the investments, when asked about the investment by a reporter, the Government concedes that Mr. Katsyv gave a forthright answer: first that he would look into it as he was not the owner of Prevezon Holdings at the time of the receipt of money, and thereafter that the funds came from an investor, Mr. Petrov, who is not alleged to have any relationship with the Organization.  Compl. ¶¶ 108-09, 111.

According to the Government's claims, these unremarkable real estate transactions make Mr. Katsyv's eleven companies a money laundering enterprise subject to forfeiture.  The Complaint, however, utterly fails to allege facts that establish money laundering.  The Complaint contains formulaic claims that fail to meet the pleading standards in Supplemental Rule G,

---

[1] Both the transfer into Prevezon Holdings and its transfer to invest the funds in Germany occurred more than five years before filing the Complaint.  There would seem to be statute of limitations defenses here, but since the Government in the Complaint does not identify the "transfers" that give rise to the claims, Defendants can only assert that there may well be a five year statute and the only money the Government says came from the Russian Treasury arrived outside the period of the statute.  For that reason alone the case must be dismissed.

Federal Rule of Civil Procedure 9(b) (regarding claims that sound in fraud), and the Supreme Court in *Twombly* and *Iqbal*. The Complaint fails to connect Defendants in any way to the Russian fraud, and fails to state facts demonstrating Defendants knew about the Russian tax fraud or intentionally avoided knowledge, made any effort to conceal the allegedly tainted funds or had an intent to conceal the funds or promote the Organization. Indeed, the Government concedes that they are not part of the Organization and pleads no facts showing agreement between the Defendants and the Organization.

In responding to Defendants' motion to vacate or modify the Protective Order, the Government compares its case against the corporate Defendants to one involving a "chop shop" that for two decades bought stolen cars from thieves, paid the thieves for the cars, stored the stolen cars on its property, used false entries on its books, and disposed of the evidence by dismantling the cars. *See United States v. All Assets of G.P.S. Automotive Corp.*, 66 F.3d 483 (2d Cir. 1995); *see also United States v. All Assets of G.P.S. Automotive Corp. (*Findings of Fact and Conclusion of Law), No. 91-0223 (E.D.N.Y. Jan. 26, 1994). However, this Complaint is missing many of the underlying factual elements of that scenario. For instance, the car thieves benefited from payments from the chop shop while the Complaint does not identify any benefit received by the so-called Organization from Defendants. This omission is particularly important since the crime of money laundering is aimed "*only at transactions which funnel ill-gotten gains directly back into the criminal venture.*" *United States v. Miles,* 360 F.3d 472, 479 (5th Cir. 2004). The chop shop concealed the evidence by dismantling the cars and recording false entries on its books, while the Complaint fails to identify any steps taken by the Defendants to conceal the allegedly tainted funds (as the funds went directly into a German investment and later investments in New York were made in the same manner through direct and open transactions).

3

Prior to the forfeiture action, the chop shop owners were convicted of multiple crimes while here no one associated with Defendants has been prosecuted or even subject to investigation.[2]

Although the Complaint asserts claims under virtually every possible theory of money laundering, the Government fails to explain how the facts of this case fit within any of those theories.  For example, the Complaint does not specify, among other things:

- how the Defendants had any knowledge of the alleged Russian tax refund fraud, the prior money laundering activities of others (the so-called "Organization," which they did not belong to), or that they knew the $857,354 constituted "proceeds of some form of unlawful activity" or "criminally derived property" (as required by 18 U.S.C. 1956 § (a)(1) and § 1957(a));

- how the funds were used to "conceal" or "promote the carrying on of specified unlawful activity" (as required by 18 U.S.C. 1956 § (a)(1)(A)(i) and (a(2)(A));

- with respect to conspiracy (¶¶ 124, 146-53), the identity by name or role of any members of the alleged conspiracy, the nature of the alleged agreement, or the requisite intent of the members of the alleged conspiracy;

- the "specified unlawful activity" underlying the alleged money laundering; or

- how the Government was able to trace the allegedly tainted funds through 90 transactions, making leaps of faith to replace evidence at  several obvious breaks in the chain.

Emblematic of the over-reaching in this Complaint, the Government seeks forfeiture of − and has already obtained a Protective Order regarding − "any and all assets" of Prevezon Alexander and Prevezon Soho despite the fact that nothing in the Complaint suggests that either of the entities ever received tainted funds, commingled its funds with any tainted funds, or were otherwise involved in the alleged tax refund fraud.  *See* Compl. ¶¶ 114, 117.  The Complaint should be dismissed.

---

[2]  Although persons have been convicted in Russia, no one associated with the U.S.-defined "Organization" has been prosecuted. Russia is not a complaining victim in this case.

## STATEMENT OF FACTS

The Government seeks the blanket forfeiture of all assets of, and civil money laundering penalties against eleven corporate defendants, for receiving funds from an alleged $230 million tax refund fraud against Russia.  The First Claim of the Complaint seeks the forfeiture of "any and all assets" of the Defendants, and the Second through Seventh Claims seek civil money laundering penalties against all Defendants *in personam*.

Despite the scope and magnitude of the remedies sought from the Defendants, the Complaint devotes little attention to those Defendants and contains scant factual allegations to support the actual claims against them.  Instead, the majority of the Complaint details, with great specificity, allegations of a $230 million tax refund scheme perpetrated, in 2007, by a criminal "Organization" in Russia—of which *none* of the Defendants are alleged to have been part.  *See* Compl. ¶¶ 2, 18-21, 44-45.  From there, the Complaint outlines allegations related to the investigation of the $230 million scheme by Sergei Magnitsky and his subsequent detention and death in a Russian prison (and the reaction thereto).  *Id*. ¶¶ 55-74.  The Complaint does not allege that any of the Defendants had anything to do with Mr. Magnitsky's detention or death, or even that they knew anything about it.

Not until halfway through the Complaint does the Government even attempt to start tracing the allegedly tainted funds from the Russian Treasury to the specific U.S. bank accounts and New York real estate property it seeks to have forfeited here.  *See id*. ¶¶ 75-118.  Exhibit B to the Complaint purports to trace tainted funds from the Russian Treasury through seven layers of transfers and nearly 90 transactions into and out of eleven bank accounts.  *Id*. at Exh. B, ¶ 76. The transfers identified in Exhibit B and the Complaint do not distinguish between the purportedly tainted funds from the Russian Treasury and non-tainted funds that were also transferred that came from other sources.  The funds from other sources were more than 22 times

larger than the amount of money Prevezon Holdings received; the Complaint never explains why it was the tainted—rather than the other-sourced money—that arrived at Prevezon Holdings. The Complaint does not provide specific dates of transfers or account balances, and does not allege that the purportedly tainted funds ever reached the United States.

With respect to the first layer of transfers from the Russian Treasury to three Russian bank accounts (one at Intercommerz and two at USB), the Complaint states that USB was "voluntarily liquidated" in June 2008 and that the Russian "Interior Ministry stated publicly that it could not trace the fraudulent tax refund money because the relevant documents from USB were burned in a truck crash." *Id.* ¶ 82. Despite the absence of records, the Complaint and Exhibit B nonetheless purport to trace tainted funds from USB bank through 56 different transactions into and out of four more accounts, into the Bank Krainiy Sever Account. *Id.* at Exh. B; ¶¶ 83-90. From there, the Complaint alleges that tainted funds were moved, via fifteen transfers, to the Bunicon and Elenast accounts. *Id.* ¶ 91.

The Complaint finally mentions Prevezon Holdings on page 37, alleging that the Prevezon Holdings 8160 account (at UBS in Switzerland) received two transfers totaling $857,354 of allegedly tainted funds in February 2008 (the "February 2008 Transfers"). *Id.* ¶¶ 101-02. The Complaint does not state that those funds ever reached New York or anywhere else in the United States. Instead, the Complaint acknowledges that in May and June 2008, the Prevezon Holdings 8160 account converted "millions of dollars into euros," which were then transferred to the Prevezon Holdings 8170 account (also at UBS in Switzerland). Those funds were then combined with other funds, and €3 million was transferred from the Prevezon Holdings 8170 account to an account for AFI Europe, which then used those funds to invest in real estate investments in Europe. *Id.* ¶ 103. The Complaint does not state that the allegedly

tainted funds were ever transferred to the United States after being transferred to AFI Europe. Instead, the Complaint includes the statement of an employee of a public relations firm, "Representative-1," who allegedly stated that "the funds involved in the February 2008 Transfers 'were invested in various New York properties, and it was agreed that Prevezon Holdings would manage these assets for five years and then transfer the properties to Mr. Petrov in full.'" *Id*. ¶ 111. According to the Complaint, the New York real estate purchases began in November 2009, twenty-one months after the February 2008 Transfers. *Id*. ¶ 112. The Complaint does not specifically trace the February 2008 Transfers to the New York real estate purchases. All it alleges is that six of the Defendant properties in New York were purchased, in whole or in part, with funds from the Prevezon Holdings 8160 account, for a total of approximately $7 million. *See id*. ¶¶ 112-13, 115-16. The Complaint also alleges that two other properties were purchased by Prevezon Soho and Prevezon Alexander, respectively, but the funds for those purchases did not come from the Prevezon Holdings 8160 account or any other account identified on Exhibit B to the Complaint. *Id*. ¶¶ 114, 116. No evidence is given, nor is any explanation advanced as to why those companies are charged.

As for Mr. Katsyv himself, the Complaint alleges that on June 19, 2008—months after the February 2008 Transfers—he purchased a 100% interest in Prevezon Holdings from Timofey Krit for $50,000, at a time when Prevezon Holdings' UBS accounts held over $2 million in assets. *Id*. ¶ 106. The Complaint acknowledges that the funds in the account (including those from the February 2008 Transfers) were invested by Mr. Petrov pursuant to an agreement between Mr. Petrov and Mr. Krit to develop a property investment/management business. *Id*. ¶ 108. As such, Prevezon Holdings, at the time Mr. Katsyv purchased the company, had a

liability to offset the assets in the UBS accounts, such that the purchase price would not be affected by the assets on deposit.

## STANDARD OF REVIEW[3]

Civil forfeiture is a "drastic remedy" requiring a heightened pleading standard that the Government simply cannot meet in this case. *United States v. Daccarett*, 6 F.3d 37, 47 (2d Cir. 1993). The Government asserts claims against defendants *in rem* (the First Claim) and *in personam* (the Second through Seventh Claims), all based on alleged violations of the money laundering statutes. The assertion of these claims place a heightened pleading standard on the Government. *See In re 650 Fifth Ave. & Related Properties*, 777 F. Supp. 2d 529, 542 (S.D.N.Y. 2011) (recognizing heightened pleading standards critical in forfeiture cases because of the potential for abuse of civil forfeiture process); *see also* 18 U.S.C. § 983(a)(3)(A) *and* Fed. R. Civ. P. Supp. R. E(2)(A) and G(2) (hereinafter "Supp. R."). More specifically, many, if not all, of the *in personam* claims sound in fraud and, as such, are governed by Federal Rule of Civil Procedure 9(b), requiring the Government to "state with particularity the circumstances constituting fraud or mistake." *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991) (conclusory fraud allegations are insufficient; rather, "[a]n ample factual basis must be supplied to support the charges"). The *in rem* claims are controlled by the heightened pleading standards applicable to forfeiture claims, namely Supp. R. G(2). *See United States v. $22,173.00 in U.S. Currency*, 716 F. Supp. 2d 245, 248 (S.D.N.Y. 2010) ("[T]he Government's complaint must assert specific facts supporting an inference that the property is subject to forfeiture.").

---

[3] Defendants adopt and incorporate by reference the previously filed Motion to Vacate or Modify the Protective Order and Motion to Dismiss for Lack of Jurisdiction and Failure to State a Claim as to Defendants Kolevins, Ltd. And Ferencoi Investments, Ltd.

Of course, on a motion to dismiss under Rule 12(b)(6), a court must also assess whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).[4]   The court need not credit "a legal conclusion couched as a factual allegation." *Id.*   Thus, a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Id.*   The plausibility standard is met only when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In short, all of the *in personam* and *in rem* claims functionally require the same heightened burden of pleading described above and each fails because the Government has not articulated a single cognizable claim that applies to Defendants.

## I.   The Complaint Fails to Meet the Heightened Pleading Standard Applicable to Each Cause of Action

In the First Claim of the Complaint, the Government seeks forfeiture of assets from eleven different entities pursuant to at least six different theories of money laundering.   Compl. ¶¶ 119-26.   Sections 1956 and 1957 generally require the Government allege facts demonstrating Defendants had knowledge of the unlawful nature of the specified unlawful activity or intended to conceal or promote some unlawful activity.   *See* 18 U.S.C. §§ 1956(a)(1), 1956(a)(2), 1956(h), 1957.   Despite spending over 100 paragraphs describing a purported Russian tax refund fraud, the death of an auditor and an Act of Congress, which the Defendants are *not* alleged to have been involved in or aware of, the Government devotes exactly six paragraphs to describing the legal basis for its forfeiture claims against these Defendants.   Compl. ¶¶ 120-25.   And those paragraphs do nothing more than recite the statutory language of Section 981 and the money

---

[4] Internal citations and quotations omitted throughout unless otherwise noted.

laundering statutes without explaining what facts (if any) support those theories of liability. *Id*. ¶¶ 120–24 (reciting elements of 18 U.S.C. §§ 1956(a)(1); 1956(a)(2); 1957; and 1956(h)).

The Second through Seventh Claims against the Defendants *in personam* also relying on Sections 1956 and 1957 are equally stunning in their lack of particularity. They contain no allegations suggesting that Defendants knew of the alleged Russian tax refund fraud, the money laundering activities of the "Organization," the nature of the upstream recipients as "shell" companies, or that the $857,354 constituted proceeds of some form of unlawful activity or "criminally derived property."

The Complaint appears to rely upon the assumption that Defendants are money laundering enterprises. However, the Government relies on a single receipt of allegedly tainted funds in February 2008 and a total of nine real estate transactions, eight of which occurred almost two years or more after February 2008 and without any connection to the alleged tainted funds. Compl. ¶¶ 101-02. If the Government's theory of this case were valid, the mere receipt of tainted funds by UBS Bank in Zurich would subject the bank to forfeiture of all its worldwide assets. Defendants did nothing more than UBS; Defendants ordered and UBS executed the funds transfers while neither is alleged to have the requisite knowledge or intent to satisfy the money laundering statutes.

Instead of details, each claim tracks the statutory language without explaining how the conduct at issue, *i.e.* the purchase of real estate in Manhattan by certain of the Defendants, fits into any of the money laundering theories claimed by the Government, or even what conduct allegedly violated the various money laundering statutes cited in the Complaint. For example, the Fourth Claim asserts that "Defendants in Personam transported, transmitted, and transferred monetary instruments and funds from a place in the United States to or through a place outside of

the United States, or to a place in the United States from or through a place outside the United States"—tracking almost verbatim the language of Section 1956 (a)(2)(A)—but never indicates which—if any—of the eight different real estate transactions or various other fund transfers identified in the Complaint are supposed to have violated this statute.  Compl. ¶ 137.

This type of "formulaic recitation of the elements" was specifically rejected by the Supreme Court in *Ashcroft v. Iqbal* and *Bell Atlantic Corp. v. Twombly* in the context of traditional pleading standards and certainly fails to satisfy the heightened pleading standards applicable to claims that sound in fraud under Rule 9(b) and to forfeiture claims.  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  Likewise, the Complaint lacks the "particularity" necessary to allow Defendants "to commence an investigation and frame a responsive pleading." Supp. R. E(2)(A).  Accordingly, the Complaint must be dismissed.

## II.  The Complaint Fails to Allege Defendants' Knowledge Of or Intent to Promote Any Unlawful Activity

All of the Government's claims contain a scienter requirement.  The money laundering statutes do not criminalize all transactions in criminal proceeds, but rather only those that were entered into with knowledge of their unlawful nature or with the intent to promote some unlawful activity.  *See* 18 U.S.C. §§ 1956(a)(1), 1956(a)(2), 1956(h), 1957.  The Complaint, however, contains only bald conclusions unsupported by factual assertions, and fails to allege any acts by any Defendants from which intent can be inferred.

### A.  The Complaint Does Not Plausibly Allege that Defendants Knew of Unlawful Activity (Second, Third, Fifth, and Sixth Claims)

The Government brings claims under sections 1956(a)(1), (a)(2), and 1957, all of which require a showing of actual knowledge.  The Second and Third Claims under section 1956(a)(1) apply only where a defendant "know[s] that the property involved represents the proceeds of some form of unlawful activity."  18 U.S.C. § 1956(a)(1); *see United States v. Gotti*, 459 F.3d

11

296, 334 (2d Cir. 2006).  The Third Claim under section 1956(a)(1)(B) requires that a defendant acts "knowing that a transaction is designed in whole or in part" to conceal the transaction in some way.  18 U.S.C. § 1956(a)(1)(B); *see United States v. Huezo*, 546 F.3d 174, 179 (2d Cir. 2008).  The Fifth Claim under section 1956(a)(2)(B) creates liability for a defendant who transports funds "knowing that the monetary instrument of funds involved . . . represent the proceeds of some form of unlawful activity."  18 U.S.C. § 1956(a)(2)(B); *see United States v. Ness*, 565 F.3d 73, 77 (2d Cir. 2009).  The Sixth Claim under section 1957 applies only to a defendant who "knowingly engages or attempts to engage in a monetary transaction in criminally derived property."  18 U.S.C. § 1957; *see United States v. $1,399,313.74 in U.S. Currency*, 591 F. Supp. 2d 365, 371-72 (S.D.N.Y. 2008).  Under Federal Rule of Civil Procedure 9(b), "the overwhelming weight of authority holds that actual knowledge is required, rather than a lower standard such as recklessness or willful blindness." *Rosner v. Bank of China*, 06 CV 13562, 2008 WL 5416380, *7 (S.D.N.Y. Dec. 18, 2008) *aff'd*, 349 F. App'x 637 (2d Cir. 2009) (quoting *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC,* 446 F.Supp.2d 163, 202 n. 279 (S.D.N.Y.2006)).

Although the Complaint contains considerable factual detail about the alleged criminal activities of other individuals—none of whom are defendants here—the Complaint contains no allegations connecting the Defendants to the underlying Russian tax refund fraud, or indicating that the Defendants participated in that fraud or were even aware of it when the transfers occurred in February 2008.  Likewise, the Complaint does not contend that the Defendants were part of the Organization, were privy to the activities of the Organization, or took any action with the specific intent to assist the Organization in promoting or concealing some unlawful activity. Rather than allege any specific facts tending to show scienter, the Complaint simply recites the

intent elements of the various statutes.  *See* Compl. ¶¶ 130, 134, 137, 140, 143, 147–51.  As noted throughout, mere recitation of the elements is insufficient to state a claim for either forfeiture or money laundering.  *See Iqbal*, 556 U.S. at 678.

**B.     The Complaint Does Not Plead an Intent to Promote (Second and Fourth Claims)**

The Government's Second and Fourth Claims require an intent to promote unlawful activity. 18 U.S.C. §§ 1956(a)(1)(A)(i) & 1956(a)(2)(a).  The promotion prong of money laundering has a "stringent mens rea requirement:" not only must the government show that the conduct at issue contributed to the specified unlawful activity, it must also show that the defendant engaged in it with the intent to further that activity.  *Brown*, 186 F.3d at 670; 18 U.S.C. §§ 1956(a)(1)(A)(i) & 1956(a)(2)(a); *see also In re 650 Fifth Ave.*, 777 F. Supp. 2d at 561.  As with the rest of the Complaint, these allegations, too, fall short.

Courts have stressed that careful attention to the "intent to promote" element is necessary to avoid "turning the money laundering statute into a money spending statute."  *In re 650 Fifth Ave.*, 777 F. Supp. 2d at 561 (quoting *Brown*, 186 F. 3d at 670).  The Government "bears the burden of proving that the money was used to further the carrying on of [the] illegal activity."  *United States v. Jolivet*, 224 F.3d 902, 909 (8th Cir. 2000).  Allegations that the defendant simply used or deposited the proceeds of a completed crime are insufficient by themselves to show an intent to further the required "carrying on" of the illegal activity.  *Id.*; *see also In re 650 Fifth Ave.*, 777 F. Supp. 2d at 561 ("The crime of money laundering promotion is aimed not at . . . proscribing all expenditures of ill-gotten gains, but only at transactions which funnel ill-gotten gains *directly back into the criminal venture*.") (quoting *United States v. Miles*, 360 F.3d 472, 479 (5th Cir. 2004)) (emphasis added).

13

As discussed in greater detail below, it is unclear from the Complaint what "specified unlawful activity" the Defendants are alleged to have promoted.  Even assuming the specified unlawful activity is the Russian tax refund fraud, nothing in the Complaint suggests that the Defendants were even aware of the underlying fraud, much less actively working to promote it. The Government does not include a single specific allegation that Defendants were involved in a transaction intended to promote the carrying on of a specified unlawful activity.  Instead, the Complaint generally claims that the "Defendants in Personam acted with the intent of promoting and perpetuating the Organization's acts of fraud, corruption and money laundering, and to aid the members of the Organization in promoting their unlawful activities."  Compl. ¶ 130; *see also* ¶ 137 (claiming Defendants acted "with the intent to promote the Organization's underlying acts of mail fraud, wire fraud, corruption, and money laundering") *and* ¶ 150 (claiming Defendants conspired to "promote the Organization's underlying acts of mail fraud, wire fraud, corruption, and money laundering").  This is simply not sufficient.

### C.      The Complaint Fails to State a Claim for Conspiracy (Seventh Claim)

The Government's conspiracy claim is similarly deficient.  *See* Compl. ¶¶ 146-53.  The Government fails to even allege facts to support any allegation that Defendants formed any agreement to violate the money laundering statute, or knowingly engaged in a conspiracy with the intent to commit such a violation.  This omission is dispositive of the Seventh Claim and any forfeiture arising out of that claim.

In its Seventh Claim, the Government alleges Defendants violated 18 U.S.C. § 1956(h), which creates liability for, "[a]ny person who conspires to commit any offense defined in this section or section 1957."  To state a claim under this statute, the Government must plausibly allege that "two or more people agree[d] to violate the federal money laundering statute, and that the defendant 'knowingly engaged in the conspiracy with the specific intent to commit the

offenses that [were] the objects of the conspiracy.'" *United States v. Garcia*, 587 F.3d 509, 515 (2d Cir. 2009) (quoting *Huezo*, 546 F.3d at 180).  The Government's claim fails on all fronts.

The Complaint does not contain any factual assertions that any of the Defendants entered into an agreement to violate the money laundering statutes, that they knowingly agreed to engage in wrongful conduct, or that Defendants had the specific intent to commit any money laundering violation.  In fact, many of the Defendant entities did not even exist until *after* the alleged money laundering offenses took place.  No one is identified, by name or by role, as a co-conspirator. The Seventh Claim itself does not assert any relevant facts, but is simply a loose recitation of the statutory language.  Such conclusory allegations of conspiracy are not sufficient to withstand a motion to dismiss.  *See, e.g.*, *Kiryas Joel Alliance v. Village of Kiryas Joel*, Fed. App'x 183, 191 (2d Cir. 2012) (affirming dismissal of conspiracy claim under 42 U.S.C. § 1985); *Gyadu v. Hartford Ins. Co.*, 197 F.3d 590, 591 (2d Cir. 1999) (same).

## III. The Complaint Fails to Identify the "Specified Unlawful Activity" Underlying the Alleged Money Laundering Violations

The Government claims that the defendant property is forfeitable because it was "involved in money laundering transactions . . . in violation of Sections 1956 and 1957[.]". Compl. ¶ 126.  It does not say what these activities are, as is required by 18 U.S.C. §§ 1956 and 1957.  *See W. 79th St. Corp. v. Congregation Kahl Minchas Chinuch*, 03 CIV. 8606RWS, 2004 WL 2187069, *9 (S.D.N.Y. Sept. 29, 2004) ("In short, in the absence of allegations concerning a 'specified unlawful activity,' no claim for money laundering may withstand a motion to dismiss."); *see also United States v. One White Crystal Covered Bad Tour Glove and Other Michael Jackson Memorabilia*, No. CV 11-3582, 2012 WL 8455336, *3-4 (C.D. Cal. April 12, 2012).

The Government is clearly aware of this requirement, as the Complaint contains a list of offenses that purport to qualify as specified unlawful activities under the money laundering statutes:

> "Specified unlawful activity" includes, among other things, mail fraud, wire fraud, and, with respect to a financial transaction occurring in whole or in part in the United States, an offense against a foreign nation involving fraud or any scheme or attempt to defraud, by or against a foreign bank, or involving bribery of a public official or the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official.

Compl. ¶ 125.  Defendants and the Court are left to guess which specified unlawful activity the Government intends to prove.  Such vague allegations do not satisfy the pleading requirements for a civil matter, much less the heightened pleading requirements for forfeiture actions.  *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  The Government's failure to identify the specified unlawful activity makes it impossible to ascertain how the property sought to be forfeited was used to advance the wrongful conduct.

Nor does the Government allege a specified unlawful activity based on "an offense against a foreign nation," which is limited by statute to certain types of "offenses" and is based on conduct that is "prohibited under the law of the foreign nation in which it is committed." *United States v. Awan*, 459 F. Supp. 2d 167, 183 (E.D.N.Y. 2006) *aff'd*, 384 F. App'x 9 (2d Cir. 2010); *see also* 18 U.S.C. § 1956(c)(7)(B).  If the Government intends to prove a specified unlawful activity based on an "offense against a foreign nation," it is only logical that the Government must indicate *which* foreign law it intends prove.  *United States v. Real Property Known as Unit 5B of Onyx Chelsea Condominium*, No. 10 Civ. 5390 (KBF), 2012 WL 1883371, *1, 5 (S.D.N.Y. May 21, 2012) (identifying specified unlawful activity as bribery in violation of

Taiwan anti-corruption laws).  Defendants cannot be required to speculate as to which law of the various countries mentioned in the Complaint−Russia, Switzerland, Germany, Cyprus, Moldova−the Government intends to prove.  The Complaint's "formulaic recitation" of the definition of specified unlawful activity does not provide Defendants with sufficient information to "commence an investigation and . . . frame a responsive pleading."  Supp. R. E(2)(A).

### A.    Foreign Tax Fraud is Not a Statutorily Defined Specified Unlawful Activity

Citing to the "offense against a foreign nation" language of Section 1956, the Government seems to assume, wrongly, that the alleged Russian tax refund fraud is itself a specified unlawful activity.  *See* Compl. ¶¶ 129; 133 ("The Defendants in Personam engaged in financial transactions involving the proceeds of the $230 Million Fraud Scheme, and therefore involving specified unlawful activity within the meaning of the money laundering statute."); *see also* Compl. ¶¶ 143, 148.  But Congress did not include foreign tax fraud on its list of specified unlawful activities.  *See* 18 U.S.C. § 1956(c)(7); *see also* § 1956(c)(7)(B) (identifying specific "offense[s] against a foreign nation" that can be considered a specified unlawful activity, which do not include tax fraud).  Congress had good reason:  Because tax laws "embody a sovereign's political will" and "mirror the moral and social sensibilities of a society," criminalizing transactions that stem from foreign tax offenses would necessarily involve U.S. courts in foreign policy issues, which may be better handled by the political branches.[5]  *Att'y Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 109 (2d Cir. 2001) (recognizing the Revenue Rule as "a longstanding common law doctrine providing that courts of one sovereign

---

[5] Including foreign tax fraud as a specified unlawful activity would lead to the possibility of criminalizing a wide range of U.S. transactions based on foreign tax policies that may conflict with U.S. public policy. For example, if a foreign country were to enact a punitive tax on members of a particular religious faith, any attempt to shelter assets from that tax in the United States could constitute "money laundering." Courts would then be placed in the uncomfortable position of either enforcing a discriminatory foreign tax law or rejecting it, which could interfere with U.S. foreign policy objectives.  Congress chose not to put courts in that position by omitting foreign tax fraud from its list of specified unlawful activities.

will not enforce final tax judgments or unadjudicated tax claims of other sovereigns"); *see also Moore v. Mitchell*, 30 F.2d 600, 604 (2d Cir. 1929) (L. Hand, J.) (Revenue Rule protects courts from having to "pass upon the provisions for the public order of another state"). *Moore v. Mitchell* contained a line of historic cases starting with *The Antelope*, 23 U.S. 66 (1825) and *Wisconsin v. Pelican Insurance, Co.*, 127 U.S. 265 (1888). *See Moore*, 30 F.2d at 604. The United States does not enforce the fiscal laws of other nations.

For all of these reasons, the Government must, but has failed to, identify the specified unlawful activity forming the basis of its Complaint with "sufficiently detailed facts to support a reasonable belief that it can meet its burden of proof." Supp. R. (G)(2). If the Government is unable to establish that the transfers at issue were the proceeds of a specified unlawful activity, as defined by the statute, its money laundering claims fail as a matter of law and the Complaint must be dismissed in its entirety.

## IV. The Government Has Failed To Trace Tainted Funds to Defendants

The Government is entitled to forfeiture in a money laundering case only where it can show, by a preponderance of the evidence, that the property sought is "involved in" or "traceable to" the money laundering violations alleged in the Complaint. 18 U.S.C. §§ 981, 983(c)(1) ("[T]he burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture[.]"); *United States v. Funds Held in the Name or for the Benefit of Wetterer*, 210 F.3d 96, 103 (2d Cir. 2000); *In re 650 Fifth Ave.*, 777 F. Supp. 2d at 570-71. The Government must plead its case "with such particularity that the defendant or claimant will be able . . . to commence an investigation of the facts and to frame a responsive pleading." Supp. R. E(2)(a). "The particularity requirement is imposed because of the drastic nature of forfeiture actions." *United States v. Certain Accounts, Together With All Monies on Deposit Therein*, 795 F.Supp. 391, 394 (S.D. Fl. 1992) (granting motion to dismiss forfeiture

action with respect to certain funds where government did not provide sufficient basis to establish all funds in an account were traceable to money laundering) (hereinafter "*Certain Accounts*").

The "tracing" that the Government claims to have done is defective.  The Complaint's tracing analysis lacks specificity and omits critical information, such as account balances and dates of transfers.  Without those specific details, the Complaint is nothing more than a general assertion of traceability, an approach that has squarely been rejected.  *United States v. Contents in Account No. 059-644190-69*, 253 F. Supp. 2d 789, 797 (D. Vt. 2003) (stating that a bald assertion of traceability, "without a more fulsome description of the transactions involved," is not a sufficient basis to believe that "funds are, in fact, traceable").

In short, a key requirement in the Government's case is the requirement that it build a chain connecting the funds in the wrongdoing with the Defendants; any break in the chain, as described below, necessitates dismissal of the Complaint.  Even taking the general allegations of the Complaint as true,[6] they do not establish that the allegedly tainted funds giving rise to the Government's money laundering and forfeiture claims—the $857,354 transferred into the Prevezon Holdings 8160 account at UBS Switzerland—are actually proceeds of a specified unlawful activity.  While Exhibit B of the Complaint purports to show the movement of funds from the Russian Treasury to the Prevezon Holdings 8160 account, a close examination of Exhibit B and the allegations in the Complaint demonstrates fatal breaks in the chain and the Government's ostensible tracing.

---

[6] As required at the Motion to Dismiss stage, Defendants accept the factual, but not the conclusory, allegations in the Complaint as true.

**A.      There is No Reasonable Basis to Believe the Government Can Trace Tainted Funds Beyond the First Layer of Transfers From the Russian Treasury**

According to the Complaint, the initial transfers of fraud-related funds went from the Russian Treasury to three accounts at two different Russian banks:  the Parfenion account at the Intercommerz Bank and the Rilend and Makhaon accounts at the USB Bank (not to be confused with the Swiss bank, UBS).  Compl. ¶ 77.  The USB accounts allegedly received over 2 billion rubles ($81.6 million USD).[7]  *Id.*



Excerpt from Compl., Exh. B. (attached in full at Exh. 1).  From there, the Government claims to trace roughly 270 million rubles ($11 million USD) that it says were transferred out of the USB accounts to two other Russian banks.  *Id.* ¶¶ 86, 87.

---

[7] For ease of reference, all currency amounts are approximate and reflect the exchange rate on January 18, 2008.



Excerpt from Compl., Exh. B (attached in full at Exh. 1).  To sustain the Complaint, this Court must find plausible that the Government has account records or other evidence from four Russian banks when the Russian government does not appear to be cooperating in the investigation. Even the Government admits that USB, the bank which would have effectuated the transfers and generated the records of those transfers was "voluntarily liquidated" in June 2008 and that the Russian "Interior Ministry stated publicly that it could not trace the fraudulent tax refund money because the relevant documents from USB were burned in a truck crash."  *Id.* ¶ 82.  The U.S. Government cannot trace funds from a Russian bank that closed over five years ago when the Russian government itself "stated publicly" that it cannot do so.  And how the U.S. Government intends to prove its case without key bank records is equally mystifying.  While the Government is not required to allege all known facts in its Complaint, it nonetheless "must state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden at trial."  Supp. R. G(2)(f).

Given these evidentiary hurdles, it is difficult to see how the Government will "be able to meet its burden at trial."   As the court recognized in *Certain Accounts*, "[t]he filing of a Complaint in a civil forfeiture action has far-reaching consequences for those who claim ownership of defendant property."  795 F.Supp. at 394.  If the Government lacks admissible evidence to support a key element of its claims, the Defendants should not be forced to endure protracted litigation while their assets are subject to a worldwide protective order simply to disprove evidence the Government does not have.

B.   **The Government's Tracing Analysis Fails to Distinguish Between Tainted and Untainted Funds and Does Not Explain Why the $19.5 Million in Untainted Funds is Not the Source of the $857,354 Prevezon Holdings Received**

The problems with the Government's tracing do not end there.  After the initial transfers into the Intercommerz and USB accounts depicted above, the Complaint then purports to trace the tainted funds through 56 different transactions into and out of four more accounts, culminating in the Bank Krainiy Sever Account, which appears to be a clearing account for multiple customers.  *See* Application by Defendants to Vacate or Modify the Protective Order, Exh. 1 ("Defendants' Revised Exhibit B") (attached in full at Exh. 2).  From the Bank Krainiy account, tainted funds were allegedly deposited (through fifteen transfers) into the Bunicon and Elenast accounts (Compl. ¶¶ 91), two companies that are not otherwise identified, which in turn allegedly transferred $410,000 and $447,354 respectively into the Prevezon Holdings 8160 account at UBS (Compl. ¶¶ 101-102).  *See also* Defendants' Revised Exhibit B (attached in full at Exh. 2).

In fact the Krainiy Sever Account had almost $19.5 million in non-tainted funds immediately before the $857,354 went to Prevezon Holdings.  There is no reason provided by the Government why the non-Treasury money could not have been the source of Prevezon

Holdings' funds.  Yet the Government offers no wire transfer forms—SWIFT 103 or SWIFT 202, no specific facts that explain how it decided to "trace" $857,354 dollars in allegedly "tainted funds" through hundreds of millions of dollars in tainted and untainted funds when any transfer could have been either Treasury funds or non-Treasury funds.  The failure of the Complaint to trace with particularity the $857,354—the heart of its money laundering claims—renders the entire Complaint deficient as a matter of law.  The decision to attribute tainted money to Prevezon Holdings is simply unsupported by the evidence in the Complaint or on Exhibit B. It must be dismissed.

The problems with the Government's tracing exercise are best understood by examining each link of the inferential chain.  For example, as illustrated on Defendants' Revised Exhibit B and described in the Complaint, 172.4 million rubles ($7 million USD) in tainted funds was transferred into the Univers account over the course of a few weeks, including two transfers "on or about" February 5, 2008.  Compl. ¶¶ 87, 89.



Excerpt from Defendants' Revised Exhibit B (attached in full at Exh. 2).

The Government then claims that 290 million rubles ($11.8 million USD)—117.6 million rubles ($4.8 million USD) *more* than the allegedly tainted funds—were transferred out of the Univers account, into the Bank Krainiy Sever account.  Compl. ¶ 90.  That is five times what Prevezon Holdings received.  There is no reason in the Complaint to assert that money constituted Treasury funds rather than non-Treasury funds.



Excerpt from Defendants' Revised Exhibit B (attached in full at Exh. 2).

The subsequent transfers into and out of the Bank Krainiy account suffer from the same problem:  Exhibit B indicates that 815 million rubles ($33.25 million USD) were transferred into the account, but over 1.185 *billion* ($48.3 million USD) were transferred out.[8]  Compl. ¶¶ 90-91; *see also* Revised Exhibit B.  "[C]ourts agree innocent funds are not forfeitable simply because they have been commingled with tainted funds.  The innocent funds must have been used in some way to hide the nature of the tainted funds."  *Contents in Account*, 253 F. Supp. 2d at 799.

---

[8] This is why specific details matter in tracing:  The Complaint states that transfers from the Fausta account to the ZhK account were made "on or about" February 6 to 8 (Compl. ¶ 85) and transfers from the Zhk account to Bank Krainiy were made "on or about" February 5 to 11 (Compl. ¶ 90).  *See* Defendants' Revised Exhibit B.  It is unclear how tainted funds could have been transferred *from* the ZhK account on February 5 if they are not alleged to have been transferred *into* the ZhK account until February 6.

Including both the 117.2 million rubles of non-Treasury funds that perforce went to Krainiy Sever bank as part of the 290 million transfer, and the 370 million rubles—in Krainiy Sever without Treasury funds, there were 487.2 million rubles—or $19.5 million of non-Treasury funds in Krainiy Sever before the $857,354 was transferred to Prevezon Holdings.  The Complaint does not set forth any facts explaining why it was Treasury funds rather than non-Treasury funds that went to Prevezon Holdings.   All the Government's claims against the Defendants depend on tracing Treasury money to the Prevezon Holdings 8160 account.   The Government's claim is that Krainiy Sever, on February 5 through February 13, possessed at least 1.185 billion rubles, quite possibly far more, of which at least 487.2 million rubles (117.2 million + 370 million) were not Treasury funds.

Absent an assertion that someone sent the Treasury money to Prevezon Holdings – there is no basis to accept that the money has been "traced" to Prevezon Holdings.  Money went to the Krainiy Sever bank from multiple sources.  It sent 370 million rubles more than it received to Bunicon and Elenast more than it received, according to the Government's tracing.  The money it sent to Bunicon and Elenast may have come from the Treasury in part—but a great deal did not.

From Bunicon and Elenast money went to Prevezon Holdings.  One might speculate on its source, but the Complaint, if its factual allegations are accepted, does *not* trace the funds, and in the absence of tracing, the case must be dismissed.

The Government's failure to distinguish between tainted and non-tainted funds in its analysis is precisely the problem identified by the court in *Certain Accounts*, which led to the dismissal of portions of the complaint in that case.  "The difficulty comes where, as here, the government seeks forfeiture of funds in an account into which tainted funds have been

25

negotiated, *without stating any facts concerning the balance of the account.*"   *Certain Accounts*, 795 F. Supp. at 395 (emphasis in original).   Recognizing the risk that an innocent owner "may be deprived of the use of funds" during the course of litigation, the *Certain Accounts* court noted the necessity to "scrutinize at the outset the government's complaint against the funds at issue." *Id.*   Here, the Complaint's attempt to trace the proceeds of the alleged fraud from the Russian Treasury to the Defendants fails to meet the plausibility standards of *Twombly* and *Iqbal*, and certainly lacks the requisite specificity required to establish a "reasonable belief" that there is a "substantial connection" between the funds and the alleged money laundering.   18 U.S.C. § 983(c)(3).

### C.   The Government Fails to Establish that Any of the Allegedly Tainted Funds Were Transferred to the United States

A few months after the transfers from Elenast and Bunicon were received in February 2008, the Prevezon Holdings 8160 account allegedly converted "millions of dollars into euros" which it then transferred to the Prevezon Holdings 8170 account.   Compl. ¶ 103.   The Complaint states that the Prevezon Holdings 8170 account then "transferred over 3 million euros to AFI Europe," which used those funds to invest in "German partnerships holding property in Germany."   *Id.*   After that, the Complaint is silent as to what happened to the allegedly tainted funds.   The obvious question is:  Did the $857,354 ever make it to New York?

The Government makes no effort to trace the funds invested in the German partnerships back to any Prevezon Holdings account or to any New York real estate.   Instead, the Government seems to be relying on statements made by an employee of a public relations firm, referred to as "Representative-1," to establish that funds from the February 2008 transfers were used to purchase real estate in New York.   Compl. ¶ 111 (quoting Representative-1 as saying the funds "were invested in various New York properties[.]").   When the Government itself claims that it

has traced the tainted funds to Germany, it cannot plausibly rely upon the hearsay statements of a public relations representative.

Based on all of these breaks in the tracing chain, the Government cannot reasonably claim that it has traced the $857,354 at issue here—roughly 28 million rubles out of "approximately *5.4 billion* rubles" from the alleged Russian tax refund fraud (Compl. ¶ 2)— through the roughly 90 transactions and 11 bank accounts identified on Exhibit B.   At most, the Complaint establishes the commingling of tainted and non-tainted assets through a series of transactions, but "[i]f the tracing requirement in § 981 is to be given any effect—as, indeed, it must—then the government is required to demonstrate something more than the fact of commingling, even across a series of complicated transactions, to establish that legitimate money is forfeitable by virtue of its commingling with tainted funds."  *Contents of Accounts Nos.*, 253 F.Supp. 2d at 799.  In reality, however, the Government's tracing exercise suffers from so many shortcomings that it cannot "support a reasonable belief that the government will be able to meet its burden of proof at trial."  Supp. R. G(2)(f).  Nor does the Complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal,* 556 U.S. at 678 (2009).  The Complaint must be dismissed.

## V.    The Complaint Fails to State a Claim Against Prevezon Alexander and Prevezon Soho

Even worse than the Government's failure to trace the allegedly tainted funds to the Prevezon Holdings 8160 account or to establish that those funds actually made it to the United States, the Government makes *no attempt* to connect any tainted funds to the real-estate purchases made by Prevezon Alexander and Prevezon Soho.   *See* Compl. ¶¶ 117 and 114, respectively.

With respect to Prevezon Alexander, the Complaint alleges only that it purchased 250 East 49th Street, Unit Comm3, for approximately $6.25 million, on September 13, 2012.  Compl. ¶ 117.  The Complaint does not even identify the source of the funds used to make this purchase, much less trace those funds to the allegedly tainted funds.  *Id.*   Nothing in the Complaint establishes a claim against Prevezon Alexander, and it must be dismissed from this matter entirely.

The same is true of Prevezon Soho.  The Complaint alleges only that Prevezon Soho purchased property ("160 Wooster Street, Unit Com-1") for approximately $6.286 million with funds from the Prevezon Holdings Marfin account located in Cyprus.  Compl. ¶ 114.  The Complaint does not allege that the Marfin account received tainted funds and does not claim that any tainted funds were used in the purchase.

In sum, the Complaint fails to make even bare allegations that either Prevezon Alexander or Prevezon Soho were involved in, or that their properties are traceable to, any laundering of proceeds from the alleged Russian tax refund scheme.  The Complaint fails to state a claim against Prevezon Alexander and Prevezon Soho and the claims against them should be dismissed.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants request that the Court grant their motion to dismiss.

Dated: December 24, 2013

Respectfully submitted,

John W. Moscow
Andrene L.K. Smith
BAKER & HOSTETLER L.L.P.
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile:  (212) 589-4201


Mark A. Cymrot
Paul M. Levine
BAKER & HOSTETLER L.L.P.
Washington Square, Suite 1100
1050 Connecticut Ave.,
Washington, D.C.  20036
Telephone:  (202) 861-1677
Facsimile:   (202) 861-1783

/s/ Seth T. Taube
Seth T. Taube
Richard B. Harper
BAKER BOTTS L.L.P.
30 Rockefeller Plaza
New York, NY 10112
Telephone: (212) 408-2500
Facsimile:  (212) 408-2501
seth.taube@bakerbotts.com


*Attorneys for Prevezon Holdings Ltd., Prevezon Alexander, LLC, Prevezon Soho USA, LLC, Prevezon Seven USA, LLC, Prevezon Pine USA, LLC, Prevezon 1711 USA, LLC, Prevezon 1810 LLC, Prevezon 2009 USA, and LLC, Prevezon 2011 USA, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 24th day of December 2013, a true and correct copy of Memorandum of Law in Support of Defendants' Omnibus Motion to Dismiss was electronically filed with the Clerk of the Court, Southern District of New York and sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

<u>/s/ Seth T. Taube</u>
Seth T. Taube