UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------- x

UNITED STATES OF AMERICA,

                      Plaintiff,

    - against -

PREVEZON HOLDINGS LTD., et al.,

                    Defendants,

    - and -

ANY AND ALL ASSETS OF PREVEZON HOLDINGS
LTD., et al.,

                    Defendants in Rem.

: 13 Civ. 6326 (TPG)

----------------------------------------------------------------- x

## MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO MOTIONS BY DEFENDANTS TO <u>DISMISS THE COMPLAINT</u>

PREET BHARARA
United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Paul M. Monteleoni
Christine I. Magdo
Assistant United States Attorneys
- Of Counsel -

## <u>TABLE OF CONTENTS</u>

**PRELIMINARY STATEMENT** ................................................................................ 1

**BACKGROUND** .................................................................................................... 2

    A.    The $230 Million Fraud Scheme ................................................... 3

    B.    The Defendants' Involvement in Laundering the Proceeds of the Fraud Scheme ................................................................................. 5

**ARGUMENT** ........................................................................................................ 9

    I.    THE COMPLAINT ALLEGES THAT THE DEFENDANT PROPERTY HAS BEEN INVOLVED IN MONEY LAUNDERING ................................. 9

    A.    Legal Standards Applicable to Motions to Dismiss.................................... 9

    B.    The Complaint Alleges a Specified Unlawful Activity ............................ 11

    C.    The Complaint Alleges Fraud Proceeds Have Been Traced to the Prevezon Defendants ................................................................................. 13

    D.    Defendants' Attempt to Assert "Evidentiary Hurdles" at the Complaint Stage is Patently Meritless ........................................................ 16

    E.    The Complaint Alleges That the Defendants Had the Requisite Mental State for Money Laundering ................................................................ 17

        1.    Knowledge Regarding Illicit Nature of Crime Proceeds .............. 17

        2.    Conspiracy and Intent to Promote.................................................. 20

    F.    The Complaint Alleges that the Prevezon Entities Were Involved in Money Laundering.................................................................................... 22

    II.    THIS COURT HAS JURISDICTION OVER KOLEVINS AND FERENCOI... 28

    A.    This Court Has Personal Jurisdiction Over Kolevins and Ferencoi ......... 28

    B.    This Court Has In Rem Jurisdiction Over the Assets of Kolevins and Ferencoi........................................................................................... 30

**CONCLUSION** .................................................................................................... **34**

The Government respectfully submits this Memorandum of Law in opposition to the motion by Prevezon Holdings, Ltd. ("Prevezon Holdings"), Prevezon Alexander, LLC, Prevezon Soho USA, LLC, Prevezon Seven USA, LLC, Prevezon Pine USA, LLC, Prevezon 1711 USA, LLC, Prevezon 1810, LLC, Prevezon 2009 USA, LLC, Prevezon 2011 USA, LLC (collectively the "Prevezon Subsidiaries") (Prevezon Holdings and the Prevezon Subsidiaries collectively the "Prevezon Defendants"), to dismiss the complaint for failure to state a claim (the "Prevezon motion"), D.I. 49,[1] and the motion of Kolevins, Ltd. ("Kolevins") and Ferencoi Investments, Ltd. ("Ferencoi") (the Prevezon Defendants, Kolevins, and Ferencoi collectively the "Defendants") to dismiss the complaint for lack of personal jurisdiction and failure to state a claim (the "Kolevins and Ferencoi motion"), D.I. 44.  For the reasons stated below, the motions should be denied in their entirety.

## PRELIMINARY STATEMENT

This case arises out of the laundering of a portion of the proceeds of a massive tax fraud scheme in Russia through the Defendants, a family of real estate corporations with holdings in Manhattan, and associated companies that funded real estate purchases in Manhattan.  The Government brought a case seeking to forfeit the assets of the Defendants as property involved in money laundering.  In a set of motions largely echoing their motion to vacate the protective order entered in this case, the Defendants raise a host of meritless challenges to the complaint.

Contrary to the Defendants' arguments, the complaint alleges the existence of a Russian tax fraud scheme amounting to wire fraud, a predicate offense for money laundering; it alleges in detail that the Defendants received some of the proceeds of the Russian tax fraud (and need not

---

[1] Citations to "D.I." refer to docket items in the above-captioned case.

address "evidentiary hurdles" the Defendants try to impose at this stage); it alleges numerous suspicious circumstances giving rise to the inference that the Defendants had the required culpable mental state for money laundering; and it alleges that the Defendant business entities involved themselves in money laundering by using their assets and corporate form to facilitate the laundering of the fraud proceeds.  Two of the Defendants, Kolevins and Ferencoi, are also incorrect to argue that they and their assets are beyond this Court's jurisdiction when they funded some of the very purchases of New York real estate that give rise to this action and they are subject to the orders of the Court.  Accordingly, the Defendant's various challenges to the complaint have no merit.

## BACKGROUND

This case seeks the forfeiture of the assets of the Defendants, eleven corporations (their assets the "Defendants in Rem") and the imposition of civil money laundering penalties against them.  The basis for this relief is the Defendants' participation in laundering a portion of the proceeds of an elaborate Russian tax fraud scheme into commercial and luxury residential real estate located in Manhattan.

As alleged in the verified complaint, a Russian criminal organization including corrupt Russian government officials (the "Organization") defrauded Russian taxpayers of approximately 5.4 billion rubles, or approximately $230 million in United States dollars, through an elaborate tax refund fraud scheme.  After perpetrating this fraud, members of the Organization have undertaken illegal actions in order to conceal this fraud and retaliate against individuals who attempted to expose it.  As a result of these retaliatory actions, Sergei Magnitsky, a Russian legal adviser who exposed the fraud, was falsely arrested and died in pretrial detention. Members of the Organization, and associates of those members, have also engaged in a broad

pattern of money laundering in order to conceal the proceeds of the fraud scheme.  This money laundering activity has included the purchase of pieces of Manhattan real estate with funds commingled with fraud proceeds.

### A.     The $230 Million Fraud Scheme

As alleged in the complaint, members of the Organization stole the corporate identities of three companies (OOO Rilend, OOO Parfenion, and OOO Makhaon, collectively the "Hermitage Companies"), which were portfolio companies of the Hermitage Fund, a foreign investment fund investing in Russia in the early 2000s.  Compl. ¶¶ 14, 16, 18.  The members of the Organization used these stolen identities to make fraudulent claims for tax refunds.  Compl. ¶  18.

In order to steal the corporate identities of the Hermitage Companies, members of the Organization caused law enforcement officers from the Interior Ministry to search the Russian offices of the Hermitage Fund and its Russian law firm in mid-2007, and to confiscate the original corporate stamps, official charters, and tax and registration certificates of the Hermitage Companies.  Compl. ¶¶ 24-25.  Using these original corporate stamps and documents, members of the Organization fraudulently re-registered ownership of the Hermitage Companies away from their rightful owner (an HSBC entity that had been holding them in trust for the Hermitage Fund) into the names of three members of the Organization who were convicted criminals.  Compl. ¶¶ 26, 28.  This false re-registration process involved obtaining an order from an arbitration court that appears not to be a genuine arbitration court.  Compl. ¶ 27 & Ex. A.

With the stolen corporate identities of the Hermitage Companies in hand, members of the Organization forged backdated contracts with sham commercial counterparties, purporting to owe the sham counterparties huge sums of money.  Compl. ¶¶ 29-32.  The sham counterparties, also controlled by members of the Organization, then filed lawsuits against the stolen Hermitage

Companies based on the sham contracts.  Compl. ¶¶ 33-34.  These lawsuits were sham proceedings in which members of the Organization represented the sham counterparties and also purported to represent the Hermitage Companies.  Compl. ¶¶ 34, 36.  Instead of mounting a defense, the members of the Organization purporting to represent the Hermitage Companies accepted the validity of the forged contracts and conceded full liability.  Compl. ¶ 35.  The purpose of these sham lawsuits was to fraudulently procure huge judgments against the Hermitage Companies.  Compl.  ¶ 36.

The members of the Organization purporting to represent the Hermitage Companies used the fraudulently procured judgment to apply for tax refunds, and members of the Organization working at two tax offices corruptly approved these refunds.  Compl. ¶ 38.[2]  Members of the Organization applied for tax refunds on the basis that the fraudulently-procured judgments constituted losses negating the profits the Hermitage Companies had made the previous year, entitling the companies to a refund of the taxes the Hermitage Companies had paid for 2006 (i.e., the taxes paid before the members of the Organization misappropriated the Hermitage Companies).  Compl. ¶¶ 40-41.  Tax officials working for the Organization corruptly approved those refund requests, which totaled U.S. $230 million, on December 24, 2007, within one business day of the requests being made.  Compl. ¶¶ 43-44.  The $230 million was paid just two days later.  Compl. ¶ 45.  As set forth below, the refunds were paid from the Russian treasury to accounts that the Organization had set up, purportedly on behalf of the Hermitage Companies but

---

[2] As part of their theft of the identities of the Hermitage Companies, the members of the Organization fraudulently changed the addresses of the Hermitage Companies so that their tax refund applications would fall within the jurisdiction of two particular tax offices controlled by members of the Organization.  Compl. ¶ 39.

in fact for the benefit of the Organization.  Compl. ¶ 45.

**B.    The Defendants' Involvement in Laundering the Proceeds of the Fraud Scheme**

After members of the Organization caused the $230 million in tax refunds to be paid, they, directly and through associates, engaged in a series of laundering transactions that dispersed the money to different countries through various shell companies.  Compl. ¶ 45. Ultimately, a portion of the fraud proceeds was transferred, through intermediaries, to Prevezon Holdings, which commingled these proceeds with other funds and laundered it into the purchase of Manhattan real estate.[3]

The complaint sets forth that approximately $230 million was paid from the Russian treasury to accounts in the name of the Hermitage Companies at two Russian banks on December 26, 2007, two days after the refunds were approved.  Compl. ¶ 77.  The accounts at these banks, which were at the time the 432nd largest and the 920th largest banks in Russia, had been opened by members of the Organization a matter of days before the refund payments were made, Compl. ¶¶ 78-79, and were closed less than two months later, after they had transferred the money on to other accounts, Compl. ¶ 88.

From the Hermitage Company accounts, the funds were transferred on to a number of

---

[3] Members of the Organization also undertook illegal means to retaliate against those who uncovered the fraud scheme, culminating in the arrest of Magnitsky and his death in detention. Compl. ¶¶ 55-65.  A human rights council found that Magnitsky's arrest and detention was illegal, that Magnitsky was denied necessary medical care while in custody, that he was beaten by 8 guards with rubber batons on the last day of his life, and that the ambulance crew called to treat him as he was dying was deliberately kept outside of his cell for one hour and 18 minutes until he was dead.  Compl. ¶ 66.  Although these retaliatory actions are relevant, inter alia, as evidence of the willingness of members of the Organization to hide their fraud through illegal means, and to eventual analysis of the proportionality of any forfeiture, the complaint does not allege that the Defendants were directly involved in the arrest, detention, or death of Magnitsky.

other accounts.  The complaint does not trace every dollar of the money from the Russian

treasury, but sets forth that large volumes of it passed through accounts for several layers of shell

companies, including a shell company that its registered founder claimed to have incorporated

based on an offer of money in an "Internet commercial," Compl. ¶  83(a) (shell company named

ZhK), a shell company that its registered founder denied incorporating, Compl. ¶ 84(a) (shell

company named Fausta), a shell company that was liquidated shortly after the receipt of the

funds and that was incorporated by the spouse of a person involved in a similar tax refund fraud

in 2006, Compl. ¶ 86(a) (shell company named Anika), and a shell company that was

reorganized several months after the transfer by the same registration agent, and in the same

manner, as one of the other shell companies, Compl. ¶ 87(a) (shell company named Univers,

similar to ZhK).  Some of these, the first-tier shells, received money directly from the Hermitage

Companies, *see* Compl. ¶¶ 84 (Fausta), 86 (Anika), and some, the second-tier shells, received

money both from the first-tier shells and from the Hermitage Companies directly, *see* Compl.

¶¶ 83 (Parfenion to ZhK directly), 84-85 (Parfenion to Fausta to ZhK); *id.* ¶ 87 (Rilend to

Univers directly); *id.* ¶¶ 84, 89 (Parfenion to Fausta to Univers); *id.* ¶ 86, 89 (Makhaon to Anika

to Univers).

　　　After a portion of the money had been transferred to the second-tier shells, both directly

and indirectly, it converged on a single account held by Bank Krainiy Sever.  Compl. ¶¶ 90-91.

Bank Krainiy Sever, in turn, was sending the money, commingled with other funds, abroad to

two Moldovan shell companies, Bunicon-Impex SRL ("Bunicon") and Elenast-Com SRL

("Elenast"), which both had accounts at the same bank in Moldova.  Compl. ¶ 91.  The same day

it made the last transfer to Elenast, the Bank Krainiy Sever account was seized by a Russian

court order, and approximately one month later Bank Krainiy Sever's banking license was canceled by Russian authorities for money laundering violations.  Compl. ¶ 92.

After being split up into the Bunicon and Elenast accounts, a portion of the funds, approximately $857,354, that had been transferred from Bank Krainiy Sever then converged on an account held by Prevezon Holdings in two February 2008 wire transfers.  Compl. ¶¶ 101-02.  Among the suspicious indicia surrounding these transfers were the fact that Bunicon and Elenast were apparent shell companies without real business addresses, *see* Compl. ¶¶ 93-94 & Exs. C-D, and that the bank records reflecting the transfers to Prevezon Holdings describe the transfers as prepayment for sanitary equipment, Compl. ¶ 110, which is false, Compl. ¶¶ 107-09.

At the time that Prevezon Holdings received the $857,354 from Bunicon and Elenast, it was officially owned by Timofey Krit (at that time already a business associate of Prevezon Holdings's current owner Denis Katsyv), but its Swiss bank accounts were beneficially owned by a different associate of Katsyv, Alexander Litvak.  Compl. ¶ 105.  Several months later, Katsyv officially purchased Prevezon from Krit.  Compl. ¶ 106.[4]

Starting in November of 2009 and continuing to September of 2012, first Prevezon Holdings and then other Prevezon Subsidiaries began to purchase Manhattan real estate.  Compl. ¶¶ 112-18.  The funds came from the Prevezon Holdings account, other Prevezon accounts, Ferencoi (owned by Katsyv) and Kolevins (owned by Krit, with Katsyv having beneficial ownership of its accounts).  Compl. ¶¶ 12, 13, 106(a), 112-13, 115-16.  A representative of

---

[4] Both before and shortly after Katsyv purchased Prevezon Holdings, Prevezon Holdings transferred funds to Europe for a joint investment with a different company, AFI Europe, N.V. Compl. ¶ 103.  AFI Europe subsequently returned a portion of funds to Prevezon to fund the purchase of some of the New York real estate.  Compl. ¶ 112.

Katsyv stated that the $857,354, which he claimed was sent to Prevezon on behalf of a third party named Petrov, was invested in various New York real properties. Compl. ¶¶ 109, 111. The price of the New York real properties substantially exceeds $857,354. Compl. ¶¶ 112-117.

### C.    Procedural History

On September 10, 2013, the Government filed the complaint, seeking forfeiture of the Defendants in Rem and money laundering penalties against the Defendants. On September 11, 2013, this Court docketed a Post-Complaint Protective Order Pursuant to 18 U.S.C. § 983(j)(1) (the "Protective Order"), which restrains the Defendants, their agents, and any persons having actual knowledge of the order, from transferring the Defendants in Rem (absent authorization from the Government or further order of the Court). D.I. 2. On December 3, 2013, Katsyv and two Katsyv-owned companies filed claims for the assets of Prevezon Holdings, the Prevezon Subsidiaries, and Ferencoi. D.I. 18-20. Prevezon Holdings and the Prevezon Subsidiaries also filed claims for each of their respective assets. D.I. 21-29. On December 20, 2013, Kolevins and Ferencoi filed claims for their respective assets. D.I. 42-43.

On December 11, 2013, Defendants moved to vacate or modify the Protective Order. On January 7, 2014, this Court authorized the Government to conduct limited discovery regarding the extent to which the Protective Order restrained legitimate businesses.

Kolevins and Ferencoi moved to dismiss the complaint on December 20, 2013. They claimed that they are not subject to personal jurisdiction under New York law; that their assets are beyond the in rem jurisdiction of this Court; and that the complaint fails to state a claim upon which relief can be granted. The Prevezon Defendants moved to dismiss the complaint for failure to state a claim on December 24, 2013, asserting that the complaint fails to state a claim because

it purportedly fails to allege the Defendants' intent; fails to identify a specified unlawful activity; fails to trace crime proceeds to the Defendants; and fails to allege the involvement of Prevezon Alexander and Prevezon Soho and the other Defendants in money laundering.  As stated below, these objections are without merit.

<u>**ARGUMENT**</u>

## I.    THE COMPLAINT ALLEGES THAT THE DEFENDANT PROPERTY HAS BEEN INVOLVED IN MONEY LAUNDERING

The Defendants seek to dismiss the complaint based on various purported failures to state a claim.  Defendants claim that the complaint does not allege a specified unlawful activity; that the complaint does not allege that fraud proceeds have been traced to the Defendants; that (apparently in the alternative) the complaint does not allege that fraud proceeds have been traced to Prevezon Soho, Prevezon Alexander, Ferencoi, or Kolevins; that—surprisingly—even if the complaint does allege that fraud proceeds have been traced to the Defendants it should nevertheless be dismissed because Defendants speculate that the Government will not be able to introduce admissible evidence that fraud proceeds have been traced to the Defendants; and that the complaint cannot seek the forfeiture of any and all assets of the Defendants.  These challenges are meritless and should be swiftly rejected.

### A.    Legal Standards Applicable to Motions to Dismiss

In *Ashcroft* v. *Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544 (2007), the Supreme Court expounded on the pleading requirements necessary to survive a motion to dismiss.  A Rule 12(b)(6) motion to dismiss should be granted if the complaint does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twomby*, 550 U.S. at 570).  "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 576 U.S. at 678.

When considering a Rule 12(b)(6) motion to dismiss, the court "must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." *Roth* v. *Jennings*, 489 F.3d 499, 510 (2d Cir. 2007) (internal quotation marks omitted); *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." (citation omitted)).  The trial court's task "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Walker* v. *Schult*, 717 F.3d 119, 124 (2d Cir. 2013) (internal quotation marks and citations omitted).

In a civil forfeiture action, the complaint must meet the pleading requirements set forth in Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions.  Rule G(2) requires, among other things, that the complaint "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." Rule G(2)(f).  Thus, a civil forfeiture complaint must do more than satisfy the mere notice pleading standards of the Federal Rules of Civil Procedure.  *See, e.g.*, *United States* v. *Daccarett*, 6 F.3d 37, 47 (2d Cir. 1993), *superseded on other grounds by* 18 U.S.C. § 983(c)(3).  The complaint does not, however, need to allege facts sufficient to prove the forfeitability of the defendant property, nor is the Government required to have sufficient evidence to establish the forfeitability of property at the time the complaint is filed.  The Civil Asset Forfeiture Reform

Act of 2000 ("CAFRA"), 106 Pub. L. No. 185, 114 Stat. 202 (2000), codified in part at 18

U.S.C. § 983, expressly provides that "[n]o complaint may be dismissed on the ground that the

Government did not have adequate evidence at the time the complaint was filed to establish the

forfeitability of the property." 18 U.S.C. § 983(a)(3)(D); *see also* 18 U.S.C. § 983(c)(2) ("[T]he

Government may use evidence gathered after the filing of a complaint for forfeiture to establish,

by a preponderance of the evidence, that property is subject to forfeiture."); Rule G(8)(b)(ii).

### B.    The Complaint Alleges a Specified Unlawful Activity

Defendants claim that the complaint does not allege the commission of specified

unlawful activity. Prevezon Mem. at 16-18.[5]  To the contrary, the complaint plausibly alleges

that the $857,354 transferred to Prevezon Holdings in 2008 was the proceeds of wire fraud,

which constitutes specified unlawful activity and thus a money laundering predicate.[6]  The

Complaint's allegations plainly indicate an elaborate fraud scheme, see Compl. ¶¶ 22-28

(alleging fraudulent re-registration of Hermitage Companies); *id.* ¶¶ 29-37 (alleging sham

lawsuits to fraudulently procure judgments); *id.* ¶¶ 38-45 (alleging payments of refunds based on

---

[5] Citations to "Prevezon Mem." refer to the memorandum of law filed in support of the Prevezon motion, D.I. 50.  Citations to "Kolevins Mem." refer to the memorandum of law filed in support of the Kolevins and Ferencoi motion, D.I. 45.

[6] The Government does not rely herein on an offense against a foreign nation as a predicate offense pursuant to 18 U.S.C. § 1956(c)(7)(B), although the complaint plainly alleges a fraud against Russian taxpayers involving "the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official," § 1956(c)(7)(B)(iv); *see also* Compl. ¶ 38 (alleging that Russian tax officials "corruptly approved" tax refunds); *id.* ¶ 69 (noting convictions in Russian court for tax fraud); *id.* ¶ 95-98 (alleging that tax refund proceeds were transferred to tax official through her then-husband), and a fraud "against a foreign bank," § 1956(c)(7)(B)(iii); *see also* Compl. ¶¶ 26-28 (alleging that registered ownership of Hermitage Companies was fraudulently transferred away from HSBC Guernsey to conspirators).  However, to avoid the need for analysis of foreign law, the Government does not rely on such offenses for purposes of this motion.

11

fraudulently-procured judgments), which involved the use of the United States wires, *see* Compl. ¶ 97 (alleging wire transfer routed through Southern District of New York as step to transferring funds to conspirator), and identifies wire fraud as a specified unlawful activity, Compl. ¶ 125; *see also* 18 U.S.C. § 1956(c)(7)(A) (defining specified unlawful activity to include violations listed in 18 U.S.C. § 1961(1)); 18 U.S.C. § 1961(1)(B) (listing "any act which is indictable under any of the following provisions of title 18, United States Code: . . . 1343 (relating to wire fraud)"). Nothing more is required. *See* 18 U.S.C. § 1343 (imposing criminal penalty on anyone who "having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice").

Defendants' claim that tax fraud against a foreign government is barred by the common-law revenue rule, Prevezon Mem. at 17-18, even if it uses the United States wires, is foreclosed by settled Second Circuit and Supreme Court precedent. In *Pasquantino* v. *United States*, 544 U.S. 349 (2005), the Supreme Court squarely held that "a plot to defraud a foreign government of foreign government violates the federal wire fraud statute, 18 U.S.C. § 1343," 544 U.S. at 353, and that this result "does not derogate from the common-law revenue rule," *id.* Even before the Supreme Court upheld this use of the wire fraud statute, this Circuit had already reached the same result. *See United States* v. *Trapilo*, 130 F.3d 547, 551 (2d Cir. 1997) (upholding money laundering prosecution with wire fraud as specified unlawful activity, agreeing with Government that "because the essence of *any scheme* to defraud is a defendant's fraudulent intent, the

appellees are not exempt from the strictures of the wire fraud statute simply because the object of the scheme involved defrauding a foreign government of tax revenue"); *European Cmty.* v. *RJR Nabisco, Inc.*, 424 F.3d 175, 181 (2d Cir. 2005) (citing *Trapilo* for proposition that "*Pasquantino* actually affirms the prior law of this Circuit"). Accordingly, there is nothing to Defendants' contention that the complaint fails to allege specified unlawful activity.

### C. The Complaint Alleges Fraud Proceeds Have Been Traced to the Prevezon Defendants

Defendants' claim that the complaint does not adequately trace fraud proceeds into the Prevezon Defendants is incorrect. As stated above, the complaint alleges that $230 million was transferred from the Russian treasury to accounts in the name of the Hermitage Companies but controlled by members of the Organization, Compl. ¶¶ 77-79, 99. From there, certain of the fraud proceeds were transferred to first-tier shell companies, Compl. ¶¶ 84, 86, and certain fraud proceeds were transferred to second-tier shell companies, either directly, Compl. ¶¶ 83, 87, or indirectly, Compl. ¶¶ 84-85, 86, 89. From the second-tier shell companies certain proceeds, commingled with other funds, were transferred to the Bank Krainiy Sever account, Compl. ¶¶ 90-91, and Bank Krainiy Sever, in turn, wired fraud proceeds, commingled with other funds, to the Moldovan shell companies Bunicon and Elenast, Compl. ¶ 91. Of these funds, $857,354 were sent from Bunicon and Elenast to Prevezon Holdings in February of 2008, Compl. ¶¶ 101-02, falsely described in bank records as prepayment for sanitary equipment, Compl. ¶¶ 107-10.

Defendants' objections to this tracing have no merit. Their objection that the tracing allegations are insufficiently detailed is entirely incorrect, as can be confirmed by even brief reference to the pages of allegations aggregating transfers into small groups over narrow date ranges, specifying the sending and receiving account and bank information, and providing details

on the amounts transferred.  *See* Compl. ¶¶ 77, 83-91, 101-02.  The claim that these pages of detail amount to "nothing more than a general assertion of traceability" is a remarkable characterization.  Prevezon Mem. at 19.

Moreover, Defendant's specific cavils with the tracing analysis are unpersuasive. Defendants claim that the tracing in the complaint does not plausibly suggest that the funds going to Prevezon were fraud proceeds as opposed to other assets commingled with fraud proceeds.  Prevezon Mem. at 22-24.  This objection misapprehends both the legal standards and the allegations in the complaint.  Under settled law, the Government is not required to adduce "wire transfer forms" in a complaint.  Prevezon Mem. at 23.  Instead, as to any bank account in which crime proceeds are commingled with other funds, either the funds that remain in the account, or the funds that leave the account can be treated as traceable proceeds, up to the extent of the crime proceeds.  *See United States* v. *Banco Cafetero Panama*, 797 F.2d 1154, 1159-60 (2d Cir. 1986); *see also, e.g.*, *United States* v. *Walsh*, 712 F.3d 119, 124 (2d Cir. 2013) (noting *Banco Cafetero*'s "accounting choices"); *United States* v. *Contents in Account No. 059-644190-69*, 253 F. Supp. 2d 789, 795 (D. Vt. 2003) (applying *Banco Cafetero* test for traceability).

Not only can the "first out" or "last out" rules be used as to any commingled account, *Banco Cafetero*, 797 F.2d at 1159, the complaint also alleges circumstances surrounding each of the challenged transactions which corroborate these presumptions by strongly suggesting that the transactions involved crime proceeds.  As alleged, the payments from the Russian treasury were made three business days after the $230 million in refunds were requested, Compl. ¶¶ 43-44, 77, to accounts in the names of the Hermitage Companies that had been set up at small banks several days before by members of the Organization, Compl. ¶¶ 78-79.  The transfers from the

14

Hermitage Companies to the first-tier and second-tier shell companies are also suspicious.  In addition to the timing of the closure of the Hermitage Company accounts shortly after completing these transfers, Compl. ¶ 88, each of the recipients of these transfers has indicia of being a shell company, such as being incorporated by someone seeking money based on an "Internet commercial," Compl. ¶ 83(a) (second-tier shell company ZhK), or by someone who denies having done so, Compl. ¶ 84(a) (first-tier shell company Fausta), or being liquidated or reorganized in suspicious proximity to having made the transfer, Compl. ¶¶ 86(a) (first-tier shell company Anika), 87(a) (second-tier shell company Univers).

The transfers from the second-tier shell companies to Bank Krainiy Sever, and from Bank Krainiy Sever to Bunicon and Elenast, are also suspicious.  The very pattern of the funds converging on the second-tier shell companies (directly and through intermediaries), converging again on Bank Krainiy Sever, diverging to Bunicon and Elenast, and converging once again on Prevezon Holdings is a suspicious pattern suggestive more of money laundering than of legitimate business activity.  *See* Compl. Ex. B.  And of course, the natures of Bank Krainiy Sever itself (which had its account shut down immediately after transferring funds to Elenast and was promptly subject to license revocation for money laundering, Compl. ¶ 92) and of Bunicon and Elenast, which appear to be mere shell companies without real business addresses, *see* Compl. ¶¶ 93-94 & Exs. C-D, provide further indicia of money laundering.  Moreover, it cannot seriously be doubted that Bunicon received fraud proceeds from Bank Krainiy Sever—the complaint alleges that in addition to transferring funds to Prevezon, Bunicon sent money to a number of other intermediaries which ultimately returned it, commingled with other funds, to one of the tax officials who had approved the fraudulent refunds.  Compl. ¶¶ 96-98.

Finally, the very transfers to Prevezon Holdings themselves bear significant indicia of laundering activity. Even leaving aside the suspicious fact of a real estate company receiving hundreds of thousands of dollars from companies that are not real businesses, the transfers to Prevezon Holdings themselves were falsely described in bank records as prepayment for sanitary equipment. Compl. ¶¶ 107-110. Accordingly, this case is nothing like those where courts have been concerned that an out-of-context flow of funds alone could create a "contagious disease" of money laundering. *Cf. United States* v. *Certain Accounts, Together with All Moneys on Deposit Therein*, 795 F. Supp. 391, 397-98 (S.D. Fla. 1992) (finding complaint insufficient as to "indirect accounts" when "[t]here has been no allegation that the indirect accounts were used for money laundering"). To the contrary, from first to last, each transaction has been accompanied by corroborating indicia of laundering crime proceeds.

## D. Defendants' Attempt to Assert "Evidentiary Hurdles" at the Complaint Stage is Patently Meritless

Flagrantly ignoring the standards applicable to a motion to dismiss and the specific statutory command to the contrary, Defendants attempt to assert evidentiary objections to the Government's tracing at the pleading stage. Prevezon Mem. at 21-22. This effort is audacious.

Defendants assert that the Court must speculate as to whether the Government has admissible evidence in its possession at this time. Prevezon Mem. at 21 ("[T]his Court must find plausible that the Government has account records or other evidence from four Russian banks when the Russian government does not appear to be cooperating in the investigation."); *id.* ("[H]ow the U.S. Government intends to prove its case without key bank records is equally mystifying."); *id.* at 22 (asserting "evidentiary hurdles" as ground for dismissal). To the contrary, the trial court's task "is merely to assess the legal feasibility of the complaint, *not to*

16

*assay the weight of the evidence which might be offered in support thereof*."  *Walker*, 717 F.3d at

124 (internal quotation marks omitted, emphasis added); *see also Twombly*, 550 U.S. at 555

(court proceeds "on the assumption that all the allegations in the complaint are true (even if

doubtful in fact)"); *id.* at 556 ("[A] well-pleaded complaint may proceed even if it strikes a savvy

judge that actual proof of those facts is improbable, and that a recovery is very remote and

unlikely." (internal quotation marks omitted)).  Indeed, Congress specifically enacted a provision

to make clear that the Government need not have admissible evidence at the complaint stage.

*Compare* Prevezon Mem. at 22 (urging dismissal "[i]f the Government lacks admissible

evidence to support a key element of its claims") *with* 18 U.S.C. § 983(a)(3)(D) ("No complaint

may be dismissed on the ground that the Government did not have adequate evidence at the time

the complaint was filed to establish the forfeitability of the property.").  This argument should be

rejected.

      **E.**    **The Complaint Alleges That the Defendants Had the Requisite Mental State for Money Laundering**

Defendants assert that the complaint does not plausibly allege that they had the necessary

culpable mental states for money laundering.  Prevezon Mem. at 11-15.  As the numerous

suspicious indicia surrounding the Prevezon transfers make clear, this contention is meritless.

      1.    <u>Knowledge Regarding Illicit Nature of Crime Proceeds</u>

The complaint adequately alleges that the Defendants had the requisite guilty knowledge

as to the fact that the fraud proceeds were criminally derived.  As an initial matter, Defendants

misstate the standard applicable to these claims.  Citing to cases involving civil claims for aiding

and abetting fraud—not involving money laundering—defendants claim that actual knowledge,

and not willful blindness, is required.  Prevezon Mem. at 12.  These cases do not apply.  This is

not a civil damages action sounding in fraud but an in rem forfeiture and in personam money laundering penalty action predicated, not on the Defendants aiding and abetting the underlying fraud, but on their laundering of that fraud's proceeds.[7]  Far from being required to know the details of the underlying fraud or specifically intending to assist in it, money launderers need not even know the nature of the crime generating the money.  *See United States* v. *Maher*, 108 F.3d 1513, 1526 (2d Cir. 1997) (explaining that the money laundering statute "reach[es] a person who knows that [s]he is dealing with the proceeds of some crime[,] even if [s]he does not know precisely which crime" (internal quotation marks omitted)).  Accordingly, Federal Rule of Civil Procedure 9(b), requiring particularity for circumstances amounting to fraud, does not apply to the defendants' state of mind,[8] and the Defendant's cases on aiding and abetting fraud are simply inapplicable.

---

[7] The statute permits forfeiture of property on the grounds that it is proceeds of wire fraud.  *See* 18 U.S.C. §§ 981(a)(1)(C), 1956(c)(7)(A), 1961(1)(B).  However, the Government is not proceeding on that theory, but is instead seeking to forfeit the Defendants in Rem as property involved in money laundering.  *See* Compl. ¶ 1 (citing 18 U.S.C. § 981(a)(1)(A) and not § 981(a)(1)(C)).  Even if the Government were proceeding on such a theory, it would not be required to prove that claimants aided and abetted the fraud scheme.  Rather, the Government would have to prove that the property "constitutes or is derived from proceeds traceable to" such a fraud, § 981(a)(1)(C), and if it established that, the claimants would have the burden of showing they were innocent owners, *see* 18 U.S.C. § 983(d).

[8] In any event the complaint contains copious "circumstances constituting fraud," Fed. R. Civ. P. 9(b), when it details the fraud scheme.  *See, e.g.*, Compl. ¶¶ 26-28 (describing transfer of corporations to nominees using stolen corporate documents and with a sham arbitration court order); *id.* ¶¶ 29-31 (describing forged contracts using stolen confidential information with telling errors in it); *id.* ¶ 32 (describing power of attorney based on stolen passport); *id.* ¶¶ 34-37 (describing sham proceedings where fraudsters purported to appear on behalf of stolen companies and confess liability, unknown to the actual owner of the companies); *id.* ¶¶ 39-44 (describing same-day or next-business-day approval of millions of dollars of tax refunds by coconspirators in tax offices); *id.* ¶¶ 46-54 (describing strikingly similar fraud scheme performed by some of the same conspirators in 2006).  Defendants do not contend otherwise.  *See* Prevezon Mem. at 12.

Contrary to Defendant's claims, the law is clear that knowledge in money laundering cases may be shown by proof of willful blindness, deliberate ignorance, or conscious avoidance. *United States* v. *Nektalov*, 461 F.3d 309, 314 (2d Cir. 2006) (applying conscious avoidance to money laundering sting); *United States* v. *Tillman*, 419 F. App'x 110, 112 (2d Cir. Apr. 15, 2011) (summary order) (defendant who allowed co-conspirators to make large deposits into her bank account and who then made large withdrawals after these deposits were made was, at the least, willfully blind to the nature of the activity in which she was engaged); *see generally United States* v. *Svoboda*, 347 F.3d 471, 480 (2d Cir. 2003) ("[K]nowledge consciously avoided is the legal equivalent of knowledge actually possessed.").  The complaint, which alleges that Defendants received $857,354 from two shell companies that did not have legitimate businesses by wire transfers that falsely described the funds as prepayment for sanitary equipment, when a representative of Katsyv stated that the funds were third-party payments in consideration for an investment in New York real estate, Compl. ¶¶ 93-94, 101-02, 107-10, plainly permits the circumstantial inference that the $857,354 transferred to Prevezon Holdings was in fact traceable to the Russian tax fraud scheme, and that the launderers, including Prevezon Holdings, whether or not they knew such details, knew or were willfully blind to the fact that the funds were proceeds of some sort of crime.[9]

---

[9] Accordingly, Defendants' attempted analogy between their conduct, in accepting fraud proceeds and commingling them into the purchase of real estate, and that of UBS in processing the transactions into and out of Prevezon's bank account fails.  Contrary to Defendants' claims, the complaint alleges that the Defendants—unlike UBS—had the requisite knowledge and intent. *Cf.* Prevezon Mem. at 10 ("Defendants ordered and UBS executed the funds transfers while *neither is alleged to have the requisite knowledge or intent* to satisfy the money laundering statutes." (emphasis added)).  In any event, as stated in Part I.F, *infra*, the Defendants had an especially substantial connection to the money laundering due to the nature of their business. All

2.    Conspiracy and Intent to Promote

The Defendants also claim that the complaint does not adequately allege that the Defendants engaged in promotion money laundering or money laundering conspiracy.  Prevezon Mem. at 13-15.[10]  This is incorrect.

The conspiracy objection is quickly disposed of.  The money laundering statute creates liability for "[a]ny person who conspires to commit any offense defined in this section [i.e., 18 U.S.C. § 1956] or section 1957."  18 U.S.C. § 1956(h).  The complaint alleges that each of the Defendants are related companies, either formally in the case of the Prevezon Defendants or through more indirect overlapping ownership in the case of Kolevins and Ferencoi, Compl. ¶¶ 7-13, 105-06, and that they acted in concert with one another in making the challenged real estate investments, Compl. ¶¶ 111-18.  That alone establishes the necessary agreement to invoke

of the previous layers of money laundering involved the flow of funds from bank account to bank account.  What the Defendants provided was an extra layer of protection that no bank could provide—the transfer of the funds into the accounts, and ultimately real property, not of a shell company but of a company with apparently legitimate real estate.

[10] Defendants also question, without fully developing this argument, how the complaint can allege that the money laundering transactions amounted to concealment money laundering, another possible basis for forfeiture.  Prevezon Mem. at 4.  The complaint's allegations—including that the funds were swiftly moved through multiple layers of shell companies within a few weeks, Compl. ¶¶ 77-94, and then $857,354 of those funds were transferred to Prevezon, which commingled it with other funds into investments in actual New York real estate over a multiyear period, Compl. ¶¶ 101-02, 111-18, and also potentially into a joint investment with a multinational company in Europe, Compl. ¶ 103—amply support an inference that this purchase of real estate, which moved the funds from a network of empty shell companies closer to the legitimate economy, was intended at least in part to "conceal or disguise the nature, the location, the source, the ownership, or the control" of those funds, 18 U.S.C. § 1956(a)(1)(B)(i); *accord id.* § 1956(a)(2)(B)(i). Defendants do not challenge any knowledge element of money laundering under § 1957 besides knowledge that the property is criminally derived, *see* Part I.A.1, and in any event could hardly dispute that the complaint alleges that the Defendants were aware that their receipt and later reinvestments of the funds constituted "monetary transactions" or had value exceeding $10,000.  *See* 18 U.S.C. § 1957(a), (f)(1).

conspiracy liability, but in addition the allegations of the complaint—showing not only the suspicious circumstances of Prevezon's receipt of the $857,354, Compl. ¶¶ 93-94, 101-02, 107-10, but also the similarity between those transfers and transfers to a member of the Organization, Compl. ¶¶ 95-100—easily permit a reasonable circumstantial inference that these suspicious transactions did not simply happen out of the blue but evinced a meeting of the minds between the Defendants and the other individuals engaged in laundering the funds, or even the members of the Organization who committed the underlying fraud.  A factfinder at trial would not be required to credit the Defendants' account of the incident in this litigation or even the entirety of Katsyv's representative's account.  The relevant inquiry on a motion to dismiss is whether the complaint sets forth facts giving rise to a "reasonable inference that the defendant is liable for the misconduct alleged," *Iqbal*, 576 U.S. at 678, and in light of the highly suspicious and coordinated web of transactions that the Defendants participated in, it is plain that that standard is met.

For similar reasons, the Complaint adequately alleges an intent to promote specified unlawful activity.  Bunicon wired Prevezon a portion of the $857,354 on February 6, 2008. Compl. ¶ 101.  On February 5, 2008—the day before it wired this money to Prevezon—Bunicon wired several hundred thousand dollars to a different company, which ultimately returned a portion of it, through intermediaries, to one of the members of the Organization who had authorized the fraudulent refunds in the first instance.  Compl. ¶¶ 97-98.  That is, a day before it sent money to Prevezon, Bunicon sent money to intermediaries who ultimately sent it back to the fraudsters.  The complaint also alleges that the fraudsters had conducted a strikingly similar fraud scheme the year before, Compl. ¶¶ 46-54, and that there were reports that they continued to

conduct tax fraud schemes in 2009 and 2010, Compl. ¶ 71.[11]  It is plainly reasonable to infer that

Prevezon may also have intended to send money back to the fraudsters for their 2009 and 2010

fraud schemes, through intermediaries or directly.  Indeed, Prevezon's representative claimed

that the Prevezon funds were ultimately to be returned to the investor they purportedly came

from, Compl. ¶¶ 108, 111.  It is entirely possible that discovery will reveal evidence that the

Prevezon funds were intended to be returned, either through this investor or some other channel,

to the fraudsters for use in such fraud schemes.  It is also possible that discovery may not bear

out this theory, but that possibility is not grounds for dismissal.  The Federal Rules do not require

certainty that a claim will prevail before a plaintiff is allowed to assert it; indeed, they do not

even "impose a probability requirement at the pleading stage," *Twombly*, 550 U.S. at 556.

Instead, all that is required is that the facts alleged give rise to a reasonable circumstantial

inference.  *Id.*; *see also Iqbal*, 576 U.S. at 678.  Given the apparently pervasive and repeated

nature of the fraudsters' conduct, the suspicious nature of the transfers to Prevezon, and their

striking similarity to transfers that ultimately were returned to the fraudsters, the inference that

Prevezon's transfers were also destined back to the fraudsters for use in their fraud schemes is

certainly reasonable.  The questions whether this theory ultimately withstands a motion for

summary judgment or prevails at trial are properly left to those stages; under the standards

applicable at this stage, these claims are plausibly alleged and should not be dismissed.

### F.    The Complaint Alleges that the Prevezon Entities Were Involved in Money Laundering

Defendants also question how the complaint can seek forfeiture of the entirety of the

---

[11] As noted in Part I.B, above, foreign tax fraud schemes can constitute wire fraud, which is a specified unlawful activity under the money laundering statute.

Defendants in Rem, arguing that it does not adequately allege that they are property involved in money laundering. Prevezon Mem. at 4, 10-11, Kolevins Mem. at 12-15. This is mistaken. The complaint alleges that the business entities represented by the Defendants in Rem involved themselves in money laundering by facilitating the money laundering transactions.

The money laundering statute permits forfeiture not just of laundered funds, but also of any property *involved* in the money laundering. *See* 18 U.S.C. § 981(a)(1)(A). When Prevezon Holdings commingled the fraud proceeds into its business activities and used its purchases of real estate to hide the source of the funds, Prevezon Holdings, the business entity, became property involved in money laundering. The Prevezon Subsidiaries, in addition to being property involved in money laundering as assets of Prevezon Holdings, also held a number of buildings in New York which the complaint alleges contained commingled fraud proceeds. *See* Compl. ¶ 111.[12] And Kolevins and Ferencoi commingled their own funds with the fraud proceeds when they funded the purchase of New York property that was bought in part with

---

[12] Defendants suggest that the $857,354 in fraud proceeds was invested solely in Europe, and not in New York. *See* Prevezon Mem. at 26-27. However, the complaint alleges that some funds were transferred back from Europe to fund the New York purchases, Compl. ¶ 112, and that Katsyv's representative stated that "the funds involved in the February 2008 Transfers 'were invested in various New York properties.'" Compl. ¶ 111. Moreover, the New York properties purchased by the Prevezon Defendants have a value of well over $857,354, Compl. ¶¶ 112-18, suggesting the commingling of the initial fraud proceeds with other funds. Whatever arguments Prevezon will ultimately make at trial, it is of course not appropriate at the complaint stage to ask the Court to discredit the statements of the representative of the owner of the Defendants. In any event, this is not determinative. Even leaving aside the complaint's allegation that Prevezon Holdings as an entity, including its New York assets, is involved in money laundering, on January 22, 2014, the Government of the Netherlands informed the United States that, pursuant to a treaty request, it was restraining the funds constituting the remaining value of Prevezon's investment with AFI Europe (a Dutch company) pending the resolution of this action.

those proceeds. Compl. ¶¶ 12, 13, 106(a), 112-13, 115-16.[13] Accordingly, all of the Defendants in Rem are the assets of business entities that were involved in money laundering and all are subject to forfeiture.

Property is "involved in" money laundering if it "'makes the prohibited conduct less difficult or more or less free from obstruction or hindrance.'" *In re 650 Fifth Ave. and Related Properties*, 777 F. Supp. 2d 529, 564 (S.D.N.Y. 2011) (quoting *United States* v. *Huber*, 404 F.3d 1047, 1060 (8th Cir. 2005)); *see also Huber*, 404 F.3d at 1061 n.11 (explaining that property commingled with the proceeds of specified unlawful activity when a laundering transaction took place is forfeitable as the corpus of the transaction); *United States* v. *All Funds on Deposit at Dime Savings Bank*, 255 F. Supp. 2d 56, 67 n.16 (E.D.N.Y. 2003) (explaining that if defendant uses commingled funds to acquire the equity in his house, and then uses that equity to secure a mortgage, the mortgage proceeds would be forfeitable in their entirety); *United States* v. *Contents of Account Nos. 208-06070 & 208-06068-1-2*, 847 F. Supp. 329, 334-35 (S.D.N.Y. 1994) (legitimate funds in a bank account used to conceal or disguise laundering are forfeitable).

A business entity that facilitates money laundering can thereby be property involved in money laundering. "'The ability to forfeit a business entity which is used to facilitate the offense of money laundering is well established.'" *In re 650 Fifth Ave.*, 777 F. Supp. 2d at 567 (quoting *United States* v. *Swank*, 797 F. Supp. 497, 502 (E.D. Va. 1992)). In *United States* v. *All Assets of G.P.S. Automotive Corp.*, 66 F.3d 483 (2d Cir. 1995), for example, the Second Circuit upheld the civil forfeiture of defendants' entire automotive salvage and repair shop, as well as the property

---

[13] As set forth in Part II.A, *infra*, this purposeful investment in New York real estate is wholly different from Defendants' characterization as "two foreign companies with foreign assets transferred funds into a foreign bank account," Kolevins Br. at 5.

on which it was located. *Id.* at 486. [14]  The Court found this sweeping forfeiture appropriate

because several unlawful transactions, such as removing or altering vehicle identification

numbers, had occurred at the business and were directly related to the defendants' fraud and

money laundering. *Id.*; *see also, e.g.*, *United States* v. *Schlesinger*, 396 F. Supp. 2d 267, 272

(E.D.N.Y. 2005), *aff'd*, 261 F. App'x 355 (2d Cir. 2008).[15]

      Although property involved in money laundering is forfeitable beyond the value of the

laundered funds, there is a statutory limit to the forfeitability of properties that facilitate money

laundering:  18 U.S.C. § 983(c)(3) provides that "if the Government's theory of forfeiture is that

the property was used to commit or facilitate the commission of a criminal offense, or was

involved in the commission of a criminal offense, the Government shall establish that there was a

---

[14] This case also quickly disposes of the Defendants' contention that the forfeiture of "any and all assets" of the Defendants somehow fails to comply with the specificity requirement of Supplemental Rule G. *See All Assets of G.P.S. Auto. Corp.*, 66 F.3d at 487.  Indeed, the Second Circuit upheld this forfeiture even while remanding in part for an asset-by-asset scrutiny regarding whether some of the assets constituted "instrumentalities" in the strict sense under the Double Jeopardy clause.  66 F.3d at 490-91.  (Significantly, this sense only refers to assets, such as contraband, that are so closely tied to an offense that their forfeiture is purely remedial with no punitive component. *See Austin* v. *United States*, 509 U.S. 602, 620-21 (1993).  In any event, the Double Jeopardy clause is not implicated in this case.)  What the Second Circuit did not do, of course—even while well aware that there were factual issues regarding the role of each of the company's assets in the offense—was to rule that the complaint could not seek forfeiture of all assets of the company. *See* 66 F.3d at 487.  The Second Circuit's rule is of course sensible; the Defendants can readily determine which assets the Government seeks to forfeit by examining their own balance sheets, and any entities holding a valid property interest in an asset of the Defendants can be expected to know that they do so.

[15] There are many other examples in the case law of businesses found subject to forfeiture under a facilitation theory. *See, e.g.*, *Swank Corp.*, 797 F. Supp. at 502 (proceeds of mail fraud scheme cleared through corporate bank accounts; if there is a substantial connection between business and laundering activity, entire business and all of its assets are forfeitable); *United States* v. *S. Side Finance*, 755 F. Supp. 791, 797-98 (N.D. Ill. 1991) (denying motion to dismiss action under § 981(a)(1)(A) to forfeit a car dealership where "[t]he government contend[ed] that the proceeds from the drug deals were laundered through the car dealership in an attempt to legitimize the profits").

substantial connection between the property and the offense." This "substantial connection" requirement "guards against an arbitrary taking of private property." *von Hofe* v. *United States*, 492 F.3d 175, 186 (2d Cir. 2007). But courts have recognized that the "hurdle imposed by the 'substantial connection' requirement is not . . . a particularly high one." *United States* v. *Borromeo*, 995 F.2d 23, 26 (4th Cir. 1993), *vacated in part on other grounds*, 1 F.3d 219 (4th Cir. 1993)). The property need have "more than an incidental or fortuitous connection to criminal activity," but "need not be integral, or essential, or indispensable" to the criminal activity. *United States* v. *Schifferli*, 895 F.2d 987, 990 (4th Cir. 1990).

When a business entity is used to conceal underlying unlawful activity, there is a substantial connection between the business and the offense. *See 650 Fifth Ave.*, 777 F. Supp. 2d at 567 (finding substantial connection to money laundering where business entity was used to disguise Iran's ownership of a building). Here that connection is clear. The complaint plausibly alleges that Prevezon Holdings served an important role as a vehicle for the fraud proceeds to reenter the legitimate financial system by being commingled with the funds of an entity which was involved in actual business. Indeed, though the shell companies the money passed through before Prevezon Holdings also laundered the proceeds by quickly transferring them through layers of transactions, in many ways the laundering provided by Prevezon Holdings was far more valuable. It is easy to infer that a far wider range of companies would engage in transactions with the Prevezon Defendants—actual real estate companies with actual real estate holdings— than would accept funds from a shell company like Bunicon or Elenast. By accepting the funds from those shell companies and injecting them, commingled with other funds, into actual real estate, Prevezon Holdings played a vital role in laundering the proceeds of the Russian fraud

26

scheme.  So, too, did the Prevezon Subsidiaries, which in addition to being assets of Prevezon

Holdings, provided it further legitimacy and accepted commingled funds into their properties.[16]

Kolevins and Ferencoi, which provided funds to commingle with the fraud proceeds for the

purchase of real estate, also facilitated the laundering by assisting in the conversion of fraud

proceeds to real estate.  Accordingly, all of the business entities represented by the Defendants

are property involved in money laundering, and accordingly their assets, the Defendants in Rem,

are subject to forfeiture.[17]

---

[16] The statements of Katsyv's representative that the $857,354 was invested in "various New York properties," Compl. ¶ 111, and the commingling of other funds of the Defendants with these funds in order to purchase far more than $857,354 worth in property, Compl. ¶¶ 112-18, do not rule out the possibility that the $857,354 was commingled into only a subset of the New York purchases.  If discovery reveals that to be the case, the Prevezon Subsidiaries corresponding to the pieces of real property that did not receive fraud proceeds would be involved in money laundering only as assets of Prevezon Holdings and essentially inventory that provided it with further legitimacy.  Nevertheless, the allegations of the complaint give rise to a reasonable inference at this stage that the "various New York properties" Katsv's representative was referring to are the New York properties alleged in the complaint, and thus that all of the Prevezon Subsidiaries holding these properties accepted fraud proceeds.

[17] Beyond the statutory substantial connection test, the Excessive Fines Clause of the Eighth Amendment also imposes a limit on the extent of a forfeiture.  This involves a multi-factor inquiry in which the Defendants would bear the burden of proving that forfeiture of the entire Defendants in Rem would be grossly disproportionate.  *See von Hofe*, 492 F.3d at 186 (setting out factors).  In conducting this inquiry, courts routinely uphold forfeiture awards several times larger than the amount of proceeds laundered.  *See, e.g.*, *United States* v. *Wyly*, 193 F.3d 289, 303 (5th Cir. 1999) (upholding forfeiture of $4 million in assets where $175,000 was laundered); *United States* v. *Aguasvivas-Castillo*, 668 F.3d 7, 17 (1st Cir. 2012) (upholding forfeiture of $20 million, only $4.4 million of which constituted fraud proceeds).  Importantly, a determination of gross disproportionality comes only after the jury phase of the trial has been completed, ensuring that the Court is able to consider a claim that forfeiture is excessive only after the full gravity and magnitude of the alleged offenses have been detailed at trial.  *See, e.g.*, *United States* v. *All Funds on Deposit at Citigroup Smith Barney Account No. 600-00338*, 617 F. Supp. 2d 103, 129-30 (E.D.N.Y. 2007); *see also United States* v. *8 Gilcrease Lane*, 587 F. Supp. 2d 133, 148 n.10 (D.D.C. 2008) ("[A] § 983(g) petition to determine whether a forfeiture is constitutionally excessive should be considered only after a forfeiture has been decreed").

II.    **THIS COURT HAS JURISDICTION OVER KOLEVINS AND FERENCOI**

Minimizing or ignoring the complaint's allegations that they provided funds for the purchase of real property in New York in the very transactions that are the subject of this action, Kolevins and Ferencoi claim to be beyond the Court's personal jurisdiction and assert that this Court has no power over their assets abroad.  Because they are being sued, and forfeiture is sought for their assets, for their investment of funds into real estate in New York, and because they are subject to the orders of this Court, these contentions are meritless.

A.    **This Court Has Personal Jurisdiction Over Kolevins and Ferencoi**

Kolevins and Ferencoi claim that this Court lacks jurisdiction to impose civil money laundering penalties upon them for commingling their money with fraud proceeds for the purpose of purchasing real property in the Southern District of New York—including property that their related companies still own in this district.  They are mistaken.

The complaint alleges that Kolevins and Ferencoi put money into New York real estate to be held in the name of the related Prevezon companies in money laundering transactions. Kolevins and Ferencoi are wrong to characterize the complaint as simply asserting that "two foreign companies with foreign assets transferred funds into a foreign bank account."  Kolevins Mem. at 5.  In fact, the complaint alleges that these companies transferred funds to a related company, *see* Compl. ¶¶ 7-13, 105-06 (noting overlapping ownership between Ferencoi, Kolevins, and Prevezon entities), to fund the purchase of real property in New York, Compl. ¶ 112, 113, 116, and that a representative of the effective owner of all of the Defendants stated that the disputed $857,354 was "invested in various New York properties," Compl. ¶ 111.  These allegations (together with those discussed in Part I, *supra*, showing that the $857,354 were fraud proceeds and that the Defendants knew or were willfully blind to their criminal origin), plainly

establish an inference that Kolevins and Ferencoi commingled their assets with the $857,354 to

purchase real property in New York, and thus involved themselves in money laundering by

facilitating it.

Kolevins and Ferencoi's investments amply constitute transaction of business in New

York and form the basis of this lawsuit, subjecting them to personal jurisdiction under New

York's long-arm statute and the Constitution. *See* N.Y. C.P.L.R. 302(a)(1) ("As to a cause of

action arising from any of the acts enumerated in this section, a court may exercise personal

jurisdiction over any non-domiciliary . . . who in person or through an agent . . . transacts any

business within the state"). Indeed, Kolevins and Ferencoi's contacts with New York are far

more substantial than the Second Circuit has recently held sufficient under New York's long-arm

statute and the constitution. In *Licci ex rel. Licci* v. *Lebanese Canadian Bank, SAL*, 732 F.3d

161 (2d Cir. 2013), the Second Circuit found a foreign bank subject to personal jurisdiction for

using a correspondent account in New York dozens of times. *Id.* at 165. Here, far more than

move money through the district swiftly using a correspondent account, Kolevins and Ferencoi

actively invested funds into the purchase of real estate that remained in this district, and indeed

in some cases remains owned by the other Defendants, companies related to Kolevins and

Ferencoi. Even if Kolevins and Ferencoi do not retain formal ownership interests in the New

York real property they helped purchase, their provision of funds to allow related companies to

purchase them is at least tantamount to such ownership and certainly constitutes the transaction

of business in New York. Since the purchase of these pieces of New York real estate is the "very

wrong alleged" in this lawsuit, *Licci*, 732 F.3d at 171, it is plainly reasonable under the

Constitution that Kolevins and Ferencoi be subject to personal jurisdiction in this district so that

they may be answerable for it.[18]

### B.    This Court Has In Rem Jurisdiction Over the Assets of Kolevins and Ferencoi

Because the claimants to the Defendants in Rem are subject to the personal jurisdiction of the Court, the Court has jurisdiction over assets under their control through the Protective Order and its ability to issue any further such orders necessary to secure the availability of property subject to forfeiture.

The Second Circuit in *United States* v. *Meza*, 63 F.3d 148 (2d Cir. 1995), determined that 28 U.S.C. § 1355 did not, standing alone, confer in rem jurisdiction over property located in a foreign country, and that in an action against such property "the property must be within the actual or constructive control of the district court in which the action is commenced." *Meza*, 63 F.3d at 152.[19] One way to show constructive control of foreign funds, in their entirety, is by

---

[18] Additionally, by filing claims to the Defendants in Rem, Kolevins and Ferencoi have waived objections to the maintenance of the in personam claims against them, purported reservations in their claims notwithstanding. *See United States* v. *Lebanese Canadian Bank SAL*, 285 F.R.D. 262, 266 (S.D.N.Y. 2012) (rejecting purported limited appearance by claimant to forfeiture action, noting "[U]nder the Federal Rules of Civil Procedure, the distinction between a special and general appearance has been abolished. Those Rules apply here, and they do not provide for restricted appearances for the purposes of in rem claims where a defendant is also the subject of in personam claims in the same action." (internal quotation marks and citation omitted)).

[19] The Third, Ninth and D.C. Circuits have all rejected this approach and found that 28 U.S.C. § 1355(b)(2) itself conferred in rem jurisdiction over foreign assets on the district courts. *See United States* v. *Approximately $1.67 Million in U.S. Currency*, 513 F.3d 991, 996–98 (9th Cir. 2008); *Contents of Account Number 03001288* v. *United States*, 344 F.3d 399, 403 (3d Cir. 2003). *United States* v. *All Funds in Account in Banco Espanol de Credito, Spain*, 295 F.3d 23, 27 (D.C. Cir. 2002). There is even some question as to whether *Meza* remains good law within the Second Circuit, as a subsequent panel indicated that 28 U.S.C. § 1355(b) was "designed to confer jurisdiction on the district courts to entertain forfeiture actions for property located overseas." *United States* v. *Certain Funds Contained in Account Numbers 600-306211-006, 600-306211-011 and 600-306211-014 Located at Hong Kong and Shanghai Banking Corp.*, 96 F.3d 20, 26 (2d Cir. 1996); *see also Approximately $1.67 Million in U.S. Currency*, 513 F.3d at 997

demonstrating that "the [foreign] government will turn over at least a portion of the seized funds to the United States." *Id*. at 154.

Here, however, constructive control over foreign assets is provided not by a foreign government, but by the parties before the Court. The Second Circuit in *Meza*, where a foreign government was cooperating, never had occasion to address whether there were other ways for a court to obtain actual or constructive control over assets in the absence of foreign governmental assistance. In particular, *Meza* was decided before the 2000 enactment of 18 U.S.C. § 983(j), which provided district courts with broad pretrial restraint authority to keep assets within the control of the Court for eventual forfeiture.[20] Indeed, the Supplemental Rules now reflect that a restraining order can provide the basis for a court's in rem jurisdiction over an asset: under the rules, an arrest warrant in rem, which provides a court with in rem jurisdiction, "is not necessary if the property is subject to a judicial restraining order." Supp. R. G(3)(b)(iii).

The Protective Order in this case, which was issued pursuant to 18 U.S.C. § 983(j)(1), provides the Court with control over the assets of Kolevins and Ferencoi because it compels them not to dissipate the assets pending the resolution of this case. *See* D.I. 2 ¶¶ 1-2.[21] As noted

---

n.3 (noting conflict in Second Circuit precedents). As *Meza* has never been expressly overruled, however, the Government assumes for purposes of this motion that it applies, and does not ask the Court to adopt the majority understanding of 28 U.S.C. § 1355(b)(2).

[20] Under this provision, the Court has sweeping power to "enter a restraining order or injunction, require the execution of satisfactory performance bonds, create receiverships, appoint conservators, custodians, appraisers, accountants, or trustees, or take any other action to seize, secure, maintain, or preserve the ability of property subject to civil forfeiture . . . upon the filing of a civil forfeiture complaint alleging that the property with respect to which the order is sought is subject to civil forfeiture." 18 U.S.C. § 983(j)(1)(A).

[21] Indeed, the Court has authority to effect the ultimate disposition of assets, if necessary. The language in § 983(j)(1)(A) directly mirrors the analogous criminal forfeiture statute, *see* 21 U.S.C. § 853(e)(1)(A), which courts treat as an "analogue" of the civil provision. *United States*

in Part II.A, *supra*, Kolevins and Ferencoi are subject to personal jurisdiction in this Court, and

they are accordingly subject to any orders of the Court with respect to the assets under their

control. *See, e.g.*, 18 U.S.C. § 983(j) (authorizing pretrial restraints); *id.* § 1956(b)(4)

(authorizing appointment of receiver).[22]  The Court thus has constructive control, and in rem

jurisdiction, over such assets.[23]

　　　The concerns that led *Meza* to retain the in rem jurisdiction requirement, that "[a]bsent

any degree of control over property located in a foreign country . . . a district court's forfeiture

order directed against such property would be wholly unenforceable," are fully addressed here.

63 F.3d at 152; *see also* Kolevins Br. at 9 (noting concerns with enforceability of judgments).

---

v. *Melrose E. Subdivision*, 357 F.3d 493, 499 (5th Cir. 2004) (applying § 853(e) caselaw to interpret § 983(j)).  In criminal cases, courts have interpreted the broad "take any other action" language of the statute to authorize orders to a defendant in the United States to repatriate foreign assets to preserve their ability for eventual forfeiture.  *See, e.g.*, *United States* v. *Sellers*, 848 F. Supp. 73, 77 (E.D. La. 1994).  This repatriation authority was eventually made explicit in criminal, but not civil forfeiture.  *See* 21 U.S.C. § 853(e)(4).  This was a mere clarification of an application of the power the court already possessed, *see* § 853(e)(4)(A) ("*Pursuant to its authority to enter a pretrial restraining order under this section*, the court may order a defendant to repatriate any property that may be seized and forfeited . . . ." (emphasis added)), and a provision of additional sanctions for failure to comply, *see* § 853(e)(4)(B).  Even before this clarification, courts interpreted the language of the criminal forfeiture provision—language mirroring the civil provision—to allow such orders.  *See, e.g.*, *Sellers*, 848 F. Supp. at 77

[22] This authority extends to assets abroad, so long as they are held by individuals within this Court's personal jurisdiction.  *See United States* v. *First Nat'l City Bank*, 379 U.S. 378, 384 (1965) (holding, in case involving statutory grant of pretrial restraint authority for tax judgment, "Once personal jurisdiction of a party is obtained, the District Court has authority to order it to 'freeze' property under its control, *whether the property be within or without the United States*." (emphasis added)).

[23] Even were the Court to conclude that it lacks in rem jurisdiction over any assets, it could still adjudicate the Government's interest in those assets vis-à-vis the claimants, though not as to other parties.  *See United States* v. *Real Property Located at 11205 McPherson Lane Ojai, Cal.*, 754 F. Supp. 1483, 1484 (D. Nev. 1991) ("[I]f we have *in personam* jurisdiction over Claimant, we may determine plaintiff's interest vis-à-vis Claimant's interest in the subject property.").

Far from being "wholly unenforceable," this Court's orders are binding on Kolevins and Ferencoi, as those entities are subject to personal jurisdiction in this Court.  Indeed, this control is more complete than that provided by a foreign government's cooperation, since the Court can enforce its orders directly upon claimants.  *Cf. Meza*, 63 F.3d at 153 (finding in rem jurisdiction "[n]otwithstanding the absence of a binding obligation on the part of the United Kingdom").  Thus, while *Meza* required a court to have some level of control over assets to prevent its orders from being a nullity, and recognized that this control need not be legally enforceable if a foreign government expressed its non-binding intentions to comply with the court's orders, Congress subsequently provided courts with the power to exercise control over assets owned by parties subject to their personal jurisdiction. Thus the Court now has control far more complete than did the district court in *Meza*, and has in rem jurisdiction. [24]

---

[24] Kolevins and Ferencoi object that the Complaint does not state the basis for in rem jurisdiction.  To the contrary, the complaint correctly states that 28 U.S.C. § 1355 gives this Court jurisdiction and venue.  Compl. ¶¶ 5-6.  A specific reference to the Protective Order is not required—when a complaint is filed against personal property and an arrest warrant in rem is sought, the complaint precedes the issuance or execution of the arrest warrant in rem, *see* Supp. R. G(3)(b); *cf.* 18 U.S.C. § 981(b)(2)(A), and thus would not specifically reference that instrument.  Since the Protective Order substitutes for an arrest warrant in rem in this case, *see* Supp. R. G(3)(b)(iii) ("a warrant is not necessary if the property is subject to a judicial restraining order"), it would be anomalous to require a specific reference to it. However, if the Court deems it necessary for the complaint to further specify that the Protective Order perfects in rem jurisdiction over the assets of Kolevins and Ferencoi, the Government respectfully requests leave to amend the complaint to include this information.

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court deny the Defendants' motions to dismiss the complaint.[25]

Dated:  New York, New York
        January 28, 2014

                            Respectfully submitted,

                            PREET BHARARA
                            United States Attorney
                            for the Southern District of New York


                    By:     /s/ Paul M. Monteleoni
                            Paul M. Monteleoni
                            Christine I. Magdo
                            Assistant United States Attorneys
                            Tel.:  (212) 637-2219/2297
                            E-mail: paul.monteleoni@usdoj.gov
                                    christine.magdo@usdoj.gov

---

[25] In the alternative, should the Court find a more specific reference to the Protective Order in the Complaint necessary, the Government respectfully requests leave to amend the complaint to plead that the entry of the Protective Order perfected in rem jurisdiction over the assets of Kolevins and Ferencoi.