UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------- x

UNITED STATES OF AMERICA,                        :

                              Plaintiff,         :        13 Civ. 6326 (TPG)

          - against -                            :

PREVEZON HOLDINGS LTD., et al.,                  :

                              Defendants,        :

          - and -                                :

ANY AND ALL ASSETS OF PREVEZON HOLDINGS          :
LTD., et al.,                                    :

                     Defendants in Rem.          :

                                                 :

---------------------------------------------------------------------- x


**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA
IN OPPOSITION TO RENEWED MOTION BY PREVEZON DEFENDANTS
TO DISMISS THE COMPLAINT AND IN FURTHER SUPPORT OF
MOTION TO FILE AN AMENDED COMPLAINT**


                              PREET BHARARA
                              United States Attorney
                              Southern District of New York
                              One St. Andrew's Plaza
                              New York, New York 10007


Paul M. Monteleoni
Christine I. Magdo
Andrew C. Adams
Assistant United States Attorneys
- Of Counsel -

## <u>TABLE OF CONTENTS</u>

**PRELIMINARY STATEMENT** ...................................................................................... 1

**BACKGROUND** ........................................................................................................... 2

      A.    The $230 Million Fraud Scheme ............................................................ 3

      B.    The Defendants' Involvement in Laundering the Proceeds of the Fraud
             Scheme ................................................................................................. 4

      C.    Procedural History ............................................................................... 7

           1.    Filing of the Complaint ............................................................ 7

           2.    The Court's Rejection of Prevezon's Motion to Vacate  the
                Protective Order ...................................................................... 7

           3.    The Defendants' Abandonment of Their Good-Faith Proposal for a
                Discovery Schedule and the Proposed Amended Complaint ....... 10

           4.    The First Session of the Deposition of Special Agent Todd Hyman
                and the Prevezon Defendants' Sanctions Motion ........................ 11

**ARGUMENT** ............................................................................................................. 13

    I.    AS THIS COURT HAS ALREADY DETERMINED, THE COMPLAINT
        STATES A CLAIM ............................................................................... 13

      A.    Legal Standards Applicable to Motions to Dismiss ................................. 13

      B.    As this Court Has Already Found, Defendants' Caricature of the
             Complaint is Baseless .......................................................................... 14

           1.    The Complaint Alleges that the Defendants Received Fraud
                 Proceeds ................................................................................. 15

           2.    The Complaint Alleges Specified Unlawful Activity ................... 16

           3.    The Complaint Alleges the Defendants' Culpable Mental States  17

    II.    DEFENDANTS' MOTION FOR RULE 11 SANCTIONS IS DEFECTIVE AND
        MERITLESS AND SHOULD BE STRUCK ........................................ 21

      A.    Although Incorrectly Citing Rule 11(a), Defendants Seek to Dismiss the
             Complaint as a Rule 11(b) Sanction ..................................................... 21

      B.    Defendants Have Failed to Comply With Rule 11(c)(2) ......................... 22

      C.    Counsel for Defendants are Aware that Defendants' Attempt to Dismiss
             the Complaint on the Grounds of Insufficient Evidence is Contrary to Law
             ............................................................................................................. 23

D.    In Any Event, the Government Has Substantial Evidence Supporting the Complaint .................................................................................... 26

    1.    Defendants' Attempt to Wring Legal Concessions from a Nonlawyer is an Improper Use of a Rule 30(b)(6) Deposition ..... 28

    2.    Defendants' Characterization of the Government's Legal Position is Tendentious ............................................................... 36

III.    DEFENDANTS ARTICULATE NO BASIS FOR DENYING LEAVE TO AMEND THE COMPLAINT ............................................................... 37

**CONCLUSION** .................................................................................................. **40**

The Government respectfully submits this Memorandum of Law in opposition to the renewed motion by Prevezon Holdings, Ltd. ("Prevezon Holdings"), Prevezon Alexander, LLC, Prevezon Soho USA, LLC, Prevezon Seven USA, LLC, Prevezon Pine USA, LLC, Prevezon 1711 USA, LLC, Prevezon 1810, LLC, Prevezon 2009 USA, LLC, and Prevezon 2011 USA, LLC (collectively the "Prevezon Subsidiaries") (Prevezon Holdings and the Prevezon Subsidiaries collectively the "Prevezon Defendants," together with Ferencoi Investments Ltd. and Kolevins Ltd. the "Defendants"), to dismiss the Verified Complaint (the "Complaint") for failure to state a claim and as a Rule 11 sanction, D.I. 79,[1] and in further support of its request, made by letter on February 18, 2014, to file an Amended Verified Complaint (the "Amended Complaint").  For the reasons stated below, the Prevezon Defendants' motion should be denied and the Government should be permitted to file the Amended Complaint.

## PRELIMINARY STATEMENT

In this deeply irresponsible motion, the Prevezon Defendants seek dismissal of the Complaint principally as a Rule 11 sanction based on the Government's alleged failure to conduct a reasonable inquiry into the facts, when the Government has thousands of pages of factual information supporting the Complaint.  The Prevezon Defendants base their claim for Rule 11 sanctions—which quite literally appears to have been written without consulting Rule 11, as it cites the wrong subsection of Rule 11 and flagrantly fails to comply with Rule 11's 21-day safe harbor provision—on their improper attempt to use a Rule 30(b)(6) deposition to wrest legal concessions from a nonlawyer.  In fact, however, even their presentation of the deposition testimony is highly one-sided, and in any event the Prevezon Defendants cannot wish away the

---

[1] Citations to "D.I." refer to docket items in the above-captioned case.

existence of voluminous documentation supporting the Complaint.

In addition to their defective and facially preposterous request for sanctions, the Prevezon Defendants also ground their motion in a purported failure to state a claim, based on arguments this Court has already rejected as "shocking" mischaracterizations of the Complaint.  Finally, the Prevezon Defendants oppose the filing of an Amended Complaint, which largely adopts changes they previously claimed to want, on the same faulty grounds that they use to urge dismissal.

The Prevezon Defendants' latest desperate attempt to deny the Government a fair opportunity for discovery should never have been filed.  It should be swiftly rejected.

## **BACKGROUND**

This case seeks the forfeiture of the assets of the Defendants, eleven corporations (their assets the "Defendants in Rem") and the imposition of civil money laundering penalties against them.[2]  The basis for this relief is the Defendants' participation in laundering a portion of the proceeds of an elaborate Russian tax fraud scheme into commercial and luxury residential real estate located in Manhattan.

As alleged in the Complaint, in 2007 a Russian criminal organization including corrupt Russian government officials (the "Organization") defrauded Russian taxpayers of approximately 5.4 billion rubles, or approximately $230 million in United States dollars, through an elaborate tax refund fraud scheme.  After perpetrating this fraud, members of the Organization, and associates of those members, have engaged in a broad pattern of money laundering in order to conceal the proceeds of the fraud scheme, including the purchase of

---

[2] The Amended Complaint would seek in rem forfeiture only of certain specified assets of nine of the Defendants, but would still seek civil money laundering penalties against all eleven Defendants.  *See* D.I. 81-5 (proposed Amended Complaint).

Manhattan real estate using funds that had been commingled with fraud proceeds.

**A.    The $230 Million Fraud Scheme**

As alleged in the complaint, members of the Organization stole the corporate identities of three companies (OOO Rilend, OOO Parfenion, and OOO Makhaon, collectively the "Hermitage Companies"), which were portfolio companies of the Hermitage Fund, a foreign investment fund investing in Russia in the early 2000s.  Compl. ¶¶ 14, 16, 18.  The members of the Organization used these stolen identities to make fraudulent claims for tax refunds.  Compl. ¶ 18.

In order to steal the corporate identities of the Hermitage Companies, members of the Organization caused officers from the Interior Ministry to search the Russian offices of the Hermitage Fund and its Russian law firm in mid-2007, and to confiscate the original corporate stamps and documents of the Hermitage Companies.  Compl. ¶¶ 24-25.  Using these items, members of the Organization fraudulently re-registered ownership of the Hermitage Companies away from their rightful owner (an HSBC entity as trustee for the Hermitage Fund) into the names of three convicted criminals.  Compl. ¶¶ 26, 28.  To do this, they obtained an order from an arbitration court that appears not to be a genuine court of any kind.  Compl. ¶ 27 & Ex. A.

With the stolen corporate identities of the Hermitage Companies in hand, members of the Organization forged backdated contracts with fake commercial counterparties, pursuant to which it appeared that the Hermitage Companies owed the supposed counterparties huge sums of money.  Compl. ¶¶ 29-32.  The counterparties, also controlled by members of the Organization, filed lawsuits against the stolen Hermitage Companies based on the forged contracts.  Compl. ¶¶ 33-34.  These lawsuits were sham proceedings in which members of the Organization represented both the supposed counterparties and also purported to represent the Hermitage Companies, orchestrating the proceedings so as to fraudulently procure huge judgments against

3

the Hermitage Companies.  Compl. ¶¶ 34-36.

The members of the Organization purporting to represent the Hermitage Companies used the fraudulently-procured judgments to apply for tax refunds on the basis that these judgments constituted losses negating the profits the Hermitage Companies had made the previous year, entitling the companies to a refund of the taxes the Hermitage Companies had paid for 2006 (i.e., the taxes paid before the fraudsters misappropriated the Hermitage Companies).  Compl. ¶¶ 40-41.  Tax officials working for the Organization corruptly approved those refund requests, totaling U.S. $230 million, on December 24, 2007, within one business day of the requests being made, and the $230 million was paid just two days later.  Compl. ¶¶ 43-45.  The refunds were paid from the Russian treasury to accounts that the Organization had set up in the name of the Hermitage Companies for the benefit of the Organization.  Compl. ¶ 45.

## B.     The Defendants' Involvement in Laundering the Proceeds of the Fraud Scheme

After members of the Organization caused the $230 million in tax refunds to be paid, they, directly and through associates, engaged in a series of laundering transactions that dispersed the money to different countries through various shell companies.  Compl. ¶ 45.  Ultimately, a small portion of the fraud proceeds—approximately $857,354—was transferred, through intermediaries, to Prevezon Holdings, which commingled these fraud proceeds with other funds and laundered them into the purchase of Manhattan real estate.[3]

---

[3] Members of the Organization also undertook illegal means to retaliate against those who uncovered the fraud scheme, culminating in the arrest of Sergei Magnitsky, a lawyer who exposed the scheme, and his death in detention.  Compl. ¶¶ 55-65.  A human rights council found that Magnitsky's arrest and detention was illegal, that Magnitsky was denied necessary medical care while in custody, that he was beaten by eight guards with rubber batons on the last day of his life, and that the ambulance crew called to treat him as he was dying was deliberately kept

The Complaint alleges that approximately $230 million was paid from the Russian treasury to accounts in the name of the Hermitage Companies at two Russian banks on December 26, 2007, two days after the refunds were approved. Compl. ¶ 77. The accounts at these banks, which were at the time the 432nd largest and the 920th largest banks in Russia, had been opened by members of the Organization just days before the refund payments were made, Compl. ¶¶ 78-79, and were closed less than two months later, after they had transferred the money on to other accounts, Compl. ¶ 88.

From the Hermitage Company accounts, the stolen funds were transferred on to a number of other accounts. The Complaint does not trace every dollar of the money after it left the Russian treasury, but does set forth that large volumes of it passed through accounts for several layers of shell companies. *See* Compl. ¶ 83(a) (shell company named ZhK); *id.* ¶ 84(a) (shell company named Fausta); *id.* ¶ 86(a) (shell company named Anika); *id.* ¶ 87(a) (shell company named Univers). Some of these, the first-tier shells, received money directly from the Hermitage Companies, *see* Compl. ¶¶ 84 (Fausta), 86 (Anika), and some, the second-tier shells, received money both from the first-tier shells and from the Hermitage Companies directly, *see* Compl. ¶¶ 83 (Parfenion to ZhK directly), 84-85 (Parfenion to Fausta to ZhK); *id.* ¶ 87 (Rilend to Univers directly); *id.* ¶¶ 84, 89 (Parfenion to Fausta to Univers); *id.* ¶ 86, 89 (Makhaon to Anika to Univers).

After a portion of the money had been transferred to the second-tier shells, both directly

---

outside of his cell for one hour and 18 minutes until he was dead. Compl. ¶ 66. Although these retaliatory actions are relevant, inter alia, as evidence of the willingness of members of the Organization to hide their fraud through illegal means, and to eventual analysis of the proportionality of any forfeiture, *see* infra note 10, the Complaint does not allege that the Defendants were directly involved in the arrest, detention, or death of Magnitsky.

and indirectly, those funds converged into a single account held by Bank Krainiy Sever. Compl. ¶¶ 90-91. Bank Krainiy Sever, in turn, was sending the money, commingled with other funds, abroad to two Moldovan shell companies, Bunicon-Impex SRL ("Bunicon") and Elenast-Com SRL ("Elenast"), which both had accounts at the same bank in Moldova. Compl. ¶ 91. On the same day that it made its last transfer to Elenast, the Bank Krainiy Sever account was seized pursuant to a Russian court order, and approximately one month later Bank Krainiy Sever's banking license was canceled by Russian authorities for money laundering. Compl. ¶ 92.

After being split up into the Bunicon and Elenast accounts, a portion of the funds, approximately $857,354, that had been transferred from Bank Krainiy Sever then converged on an account held by Prevezon Holdings in two February 2008 wire transfers. Compl. ¶¶ 101-02. Among the suspicious indicia surrounding these transfers were the fact that Bunicon and Elenast were apparent shell companies without real business addresses, *see* Compl. ¶¶ 93-94 & Exs. C-D, and that the bank records reflecting the transfers to Prevezon Holdings describe the transfers as prepayment for sanitary equipment, Compl. ¶ 110, which is false, Compl. ¶¶ 107-09.

At the time that Prevezon Holdings received the $857,354 from the Bunicon and Elenast accounts in Moldova, it was officially owned by Timofey Krit (at that time already a business associate of Prevezon Holdings's current owner Denis Katsyv), but its Swiss bank accounts were beneficially owned by a different associate of Katsyv, Alexander Litvak. Compl. ¶ 105. Several months later, Katsyv officially purchased Prevezon from Krit. Compl. ¶ 106.[4]

---

[4] Both before and shortly after Katsyv purchased Prevezon Holdings, Prevezon Holdings transferred funds to Europe for a joint investment with a different company, AFI Europe, N.V. Compl. ¶ 103. AFI Europe subsequently returned a portion of funds to Prevezon to fund the purchase of some of the New York real estate. Compl. ¶ 112.

Starting in November of 2009 and continuing to September of 2012, first Prevezon Holdings, and then other Prevezon Subsidiaries, began to purchase Manhattan real estate. Compl. ¶¶ 112-18.  The funds came from the Prevezon Holdings account, other Prevezon-owned accounts, Ferencoi (owned by Katsyv) and Kolevins (owned by Krit, with Katsyv having beneficial ownership of its accounts).  Compl.  ¶¶ 12, 13, 106(a), 112-13, 115-16.  A public relations representative of Katsyv stated that the $857,354, which he claimed was sent to Prevezon by a "Mr. Kim" on behalf of a third party named Petrov, was invested in various New York real properties.  Compl. ¶¶ 109, 111.  The purchase price of the New York real properties substantially exceeds $857,354.  Compl. ¶¶ 112-117.

### C.    Procedural History

#### 1.    Filing of the Complaint

On September 10, 2013, the Government filed the Complaint, seeking forfeiture of the Defendants in Rem and money laundering penalties against the Defendants.  On September 11, 2013, this Court docketed a Post-Complaint Protective Order Pursuant to 18 U.S.C. § 983(j)(1) (the "Protective Order"), restraining the transfer of the Defendants in Rem absent authorization from the Government or further order of the Court.  D.I. 2.

#### 2.    The Court's Rejection of Prevezon's Motion to Vacate the Protective Order

On December 11, 2013, Defendants filed a motion to vacate or modify the Protective Order.  In that motion and its supporting papers, the Defendants claimed the Protective Order should be vacated in its entirety, or modified, because the Complaint purportedly failed to allege that fraud proceeds were transferred to Prevezon Holdings, Defs.' TRO Mem. (D.I. 39) at 22-26; Defs.' TRO Reply Mem. (D.I. 53) at 11-13, the Complaint supposedly failed to allege the

Defendants' culpable mental state, Defs.' TRO Mem. at 11-13, 17-18; Defs.' TRO Reply Mem.
at 5-8, the Complaint and Protective Order did not describe the property to be restrained with
sufficient specificity, Defs.' TRO Mem. at 20; Defs.' TRO Reply Mem. at 21, the Government
was allegedly not entitled to forfeit anything more than the laundered funds themselves, Defs.'
TRO Mem. at 20; Defs.' TRO Reply Mem. at 8-11, and the Protective Order restrained property
abroad, Defs.' TRO Mem. at 16-18; Defs.' TRO Reply Mem. at 13-14,

  At an oral argument on January 7, 2014, this Court denied the Defendants' motion to
vacate the Protective Order in its entirety.  In doing so, it expressed the view that counsel for the
Defendants were not characterizing the complaint accurately:

> THE COURT: It seems to me that the complaint in the action is
> completely different than what you've characterized.  The
> complaint in the action is an enormously detailed complaint going
> back to the fraud on the Russian government, and then carrying on
> with detailed allegations about money laundering.  And those
> detailed allegations about money laundering involve Prevezon.
> MR. CYMROT: No, your Honor.  I'm sorry.
> THE COURT: And that's what it says.  And to sit there and say it
> doesn't say that, it doesn't help me one bit.

Jan. 7, 2014 Tr. (D.I. 81-12) at 12.  When counsel for the Defendants persisted, this Court
strongly rejected their strained characterizations of the Complaint, which it found "shocking":

> THE COURT: Please. Please.  Do you think I'm somebody sitting
> here that can't read?
> MR. CYMROT: No, your Honor.
> THE COURT: What you say is – it isn't that there's no merit in
> anything you say, but most of it is contrary to what is in the record,
> flatly contrary to what is in the record.  Do you think I can't read?
> MR. CYMROT: Could Mr. Moscow address that, your Honor.
> THE COURT: This is just shocking.

Jan. 7, 2014 Tr. at 24.  The Court declined to vacate the Protective Order, rejecting Defendants'
claims that the Complaint was insufficient:

> THE COURT: Contrary to what the defense argues vigorously, the
> Court believes that the government has come forward in the
> complaint and other papers with allegations which are sufficient
> for present purposes to the effect that the defendants, Prevezon
> entities, Ferencoi, Kolevins, participated in laundering of funds
> which were originally obtained from the Russian government
> through fraud.  Now, however – starting again.  That is the basis
> properly for believing that the government can ultimately obtain
> forfeiture, and in the meantime, it is the basis for restraint.

Jan. 7, 2014 Tr. at 30-31.

As to the Defendants' requests to modify the Protective Order, the Court reserved

decision, authorizing the Government to conduct limited discovery regarding the extent to which

the Protective Order caused substantial hardship to the Defendants' legitimate businesses, as the

Defendants claimed.[5]  The Government and the Defendants ultimately each submitted proposed

modifications to the Protective Order, which are pending.

The Prevezon Defendants moved to dismiss the Complaint for failure to state a claim on

December 24, 2013.  In their motion, the Prevezon Defendants asserted, among other claims, that

the Complaint failed to state a claim because it purportedly failed to allege their intent, Mem.

Supp. Mot. Dismiss (D.I. 50) at 11-15; failed to identify a specified unlawful activity, *id.* at 15-

18; and failed to trace crime proceeds to the Defendants, *id.* at 18-27.[6]  On February 13, 2014,

after the January 7, 2014 conference where the Court sharply rejected largely the very same

---

[5] As the Government explained in a letter to the Court, Defendants' only response to these
discovery requests was insufficient to establish hardship.  Government Letter, Feb. 25, 2014.

[6] Kolevins and Ferencoi also moved to dismiss the Complaint on December 20, 2013 (D.I. 44-
45), claiming that they are not subject to personal jurisdiction under New York law; that their
assets are beyond the in rem jurisdiction of this Court; and that the Complaint fails to state a
claim upon which relief can be granted.  The proposed Amended Complaint would not seek in
rem forfeiture of the assets of Kolevins and Ferencoi and would thus moot much of their motion,
but it would continue to seek money laundering penalties against those companies.

arguments, the Prevezon Defendants withdrew their motion to dismiss.  D.I. 67.

       3.     <u>The Defendants' Abandonment of Their Good-Faith Proposal for a
Discovery Schedule and the Proposed Amended Complaint</u>

      On January 29, 2014, pursuant to Federal Rule of Civil Procedure 26(f), which requires the parties to meet and "attempt[] in good faith to agree on the proposed discovery plan," counsel for Defendants proposed to counsel for the Government a discovery plan that would provide six months for fact discovery, two months for expert discovery, and two months for pretrial motions. The Government proposed a somewhat longer schedule, pursuant to which motions would be fully briefed in March of 2015, about four months later than Defendants' proposal.  At the Rule 26(f) conference, counsel for the Defendants indicated that the parties would likely agree to disagree on their competing proposals for discovery plans and stated that they would consult with their client regarding the competing schedules.  At no time did the Defendants suggest that they wished to rescind their previous good-faith proposal for a ten-month discovery period and replace it with a two-month schedule for discovery, motions, and trial.

      At the conclusion of the Rule 26(f) conference, counsel for the Defendants handed counsel for the Government a notice of the virtually immediate deposition of the case agent, Special Agent Todd Hyman, seeking his deposition prior to receiving any documents.  The Government asked the Court to delay the deposition of Special Agent Hyman, and in a conference on February 14, 2014, the Court canceled the notice of deposition.  At the February 14, 2014 conference, however, Defendants abandoned their good-faith proposal without warning and demanded that the Court set a trial to begin in six weeks.  They did not advise the Court that under their own previous good-faith discovery proposal, they had allotted ten months for discovery and pretrial motions.  At that conference, the Court set a trial date for March 31, 2014.

By letter on February 18, 2014, several days after the February 14 conference, the Government moved for reconsideration of the emergency trial date, informing the Court that the Defendants' own good-faith proposal had contemplated a far longer discovery period. In this letter, the Government moved for permission to file the Amended Complaint in order to respond to concerns the Court had previously expressed about the breadth of the action and to provide additional details regarding the Defendants' mental state. On March 4, 2014, the Court ultimately adjourned the trial *sine die*, noting that the Government's objection to such an early trial date was "well founded." Tr., Mar. 4, 2014 (D.I. 81-3), at 2.

          4.      <u>The First Session of the Deposition of Special Agent Todd Hyman and the Prevezon Defendants' Sanctions Motion</u>

On March 3, 2014, prior to the adjournment of the emergency trial date, counsel for the defendants took the deposition of Special Agent Todd Hyman as a representative of the United States under Federal Rule of Civil Procedure 30(b)(6). As set forth in more detail in Section II.D.1, below, Special Agent Hyman was repeatedly asked contention questions, seeking his lay opinion on legal conclusions such as what evidence supported a contention or what witnesses were competent to describe a fact. When Special Agent Hyman attempted to list his view of what evidence supported certain claims, counsel for the Defendants would repeatedly interrupt him and argue with him. As a result of this process, some of Special Agent Hyman's answers were incomplete and some reflected misunderstandings of legal concepts. As explained in Section II.D.1, on several occasions, confused by the sense of the word "evidence" being used by counsel for the Defendants, Special Agent Hyman said the Government had no evidence on certain points, *see* Dep. Tr. (D.I. 81-1) at 134:13-21; 137:13-138:3; 150:8-14; but at other times, when the questions were phrased in a less confusing fashion or when he was given a chance to

11

explain without being interrupted, he described evidence the Government had on those points, *see* Dep. Tr. (D.I. 81-1) at  138:9-139:4; 139:13-23; 141:5-17; 145:13-17; 154:5-18.  Defense counsel stopped the deposition before it was finished, and the deposition remains incomplete.

At the March 4, 2014 conference at which the Court adjourned the trial date, the Prevezon Defendants complained that Special Agent Hyman purportedly said that the Government had no case, and the Court remarked that "it was a waste of time to take his deposition."  Tr., Mar. 4, 2014 (D.I. 81-3) at 7.  The Court granted the Prevezon Defendants an opportunity to oppose the filing of the Amended Complaint.

On March 21, 2014, the Prevezon Defendants filed this motion, arguing that the Complaint fails to state a claim because it purportedly fails to allege the Prevezon Defendants' culpable mental states, Defs.' Mem. at 15-18;[7] supposedly does not identify a money laundering predicate offense, *id.* at 19-20; and allegedly does not trace fraud proceeds to the Prevezon Defendants, *id.* at 20-21.  Prevezon Defendants also claim that the Government should be sanctioned with dismissal under Rule 11 because the incomplete deposition of Special Agent Hyman purportedly amounts to a concession that the Government committed misconduct in filing the Complaint without a basis, *id.* at 15-21.  Finally, they oppose the filing of the Amended Complaint because it would supposedly be brought in bad faith and share the same defects as the Complaint.  *Id.* at 21-24.  As set forth below, the Government opposes this motion.

---

[7] Citations to "Defs.' Mem." refer to the memorandum in support of Defendants' motion and in opposition to the Government's request to file an Amended Complaint, D.I. 80.

## ARGUMENT

**I.    AS THIS COURT HAS ALREADY DETERMINED, THE COMPLAINT STATES A CLAIM**

In this motion, the Prevezon Defendants recycle objections to the sufficiency of the Complaint that the Court has already rejected as "shocking" mischaracterizations of it. The Complaint is detailed and precise and plausibly alleges that the Prevezon Defendants were involved in money laundering.

### A.    Legal Standards Applicable to Motions to Dismiss

In *Ashcroft* v. *Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544 (2007), the Supreme Court expounded on the pleading requirements necessary to survive a motion to dismiss. A Rule 12(b)(6) motion to dismiss should be granted if the complaint does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 576 U.S. at 678.

On a Rule 12(b)(6) motion to dismiss, the court "must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." *Roth* v. *Jennings*, 489 F.3d 499, 510 (2d Cir. 2007) (internal quotation marks omitted); *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." (citation omitted)). The trial court's task "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Walker* v. *Schult*,

13

717 F.3d 119, 124 (2d Cir. 2013) (internal quotation marks and citations omitted).

In a civil forfeiture action, the complaint must meet the pleading requirements set forth in Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions. Rule G(2) requires, among other things, that the complaint "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." Rule G(2)(f). Thus, a civil forfeiture complaint must do more than satisfy the mere notice pleading standards of the Federal Rules of Civil Procedure. *See, e.g.*, *United States* v. *Daccarett*, 6 F.3d 37, 47 (2d Cir. 1993), *superseded on other grounds by* 18 U.S.C. § 983(c)(3).

The complaint does not, however, need to allege facts sufficient to prove the forfeitability of the defendant property, nor is the Government required to have sufficient evidence to establish the forfeitability of property at the time the complaint is filed. The Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), 106 Pub. L. No. 185, 114 Stat. 202 (2000), expressly provides that "[n]o complaint may be dismissed on the ground that the Government did not have adequate evidence at the time the complaint was filed to establish the forfeitability of the property." 18 U.S.C. § 983(a)(3)(D); *see also* 18 U.S.C. § 983(c)(2) ("[T]he Government may use evidence gathered after the filing of a complaint for forfeiture to establish, by a preponderance of the evidence, that property is subject to forfeiture."); Rule G(8)(b)(ii).

## B.    As this Court Has Already Found, Defendants' Caricature of the Complaint is Baseless

With astounding doggedness, the Prevezon Defendants attempt to repackage old objections to the sufficiency of the Complaint. In this motion, they reiterate their familiar claims that the allegations in the Complaint do not adequately allege money laundering. *See* Defs.' Mem. at 15-17 (claiming Complaint does not allege state of mind); *id.* at 20-21 (claiming

14

Complaint does not allege that Defendants received fraud proceeds).  The Court has already

dismissed such arguments as "shocking" mischaracterizations of the Complaint, Jan. 7, 2014 Tr.

at 24, and has strongly rejected the defendants' claims that the Complaint does not adequately

allege money laundering.  *See* Jan. 7, 2014 Tr. (D.I. 81-12) at 24 ("What you say is – it isn't that

there's no merit in anything you say, but most of it is contrary to what is in the record, flatly

contrary to what is in the record.  Do you think I can't read? . . . This is just shocking.").

       The Prevezon Defendants, apparently aware of the deficiency of their contentions that the

Complaint fails to state a claim, interweave their arguments on this point with efforts to argue the

ultimate factual merits of the case.  *Compare* Defs.' Mem. at 5-6, 9-10, 17, 18, 21, *with Walker*,

717 F.3d at 124 (court's task is "merely to assess the legal feasibility of the complaint, not to

assay the weight of the evidence which might be offered in support thereof").  The Prevezon

Defendants' repeated attempt to shoehorn factual disputes over the merits into a motion to

dismiss for failure to state a claim is all the more notable given that the Court already indicated

its disapproval of the Defendants' informal attempts to reach the merits prematurely.  *See* Tr.,

Mar. 4, 2014 (D.I. 81-3), at 22:19-24; *id.* at 24:14-19.

       1.    <u>The Complaint Alleges that the Defendants Received Fraud Proceeds</u>

       As set forth at length in the Government's response to Defendants' motion to vacate the

Protective Order, *see* Mem. Opp. TRO Mot. (D.I. 47) at 12-16, and in its response to the

Prevezon Defendants' withdrawn motion to dismiss, *see* Mem. Opp. Mot. Dismiss (D.I. 58) at

13-16, the Prevezon Defendants' claim that the complaint does not adequately trace fraud

proceeds into the Prevezon Defendants is incorrect.  The Prevezon Defendants' attempt to liken

the Complaint's pages of detailed tracing allegations, *see* Compl. at 28-37, to a "bald assertion of

traceability," Def. Mem. at 20, is simply an astonishing characterization.  The Prevezon

15

Defendants' specific cavils with the tracing are either nakedly improper attempts to argue the factual merits, *see, e.g.*, Defs.' Mem. at 21 ("The Government *does not have records showing*, as real bank records would, the identity of the person(s) directing the transfers shown on Exhibit B to the Complaint" (emphasis added)), or obtuse attempts to ignore the governing legal standards on tracing funds and the numerous pieces of corroboration alleged in the Complaint.  *Compare* Defs.' Mem. at 21 (disputing that Bunicon and Elenast funds transferred to Prevezon were fraud proceeds) *with United States* v. *Banco Cafetero Panama*, 797 F.2d 1154, 1159-60 (2d Cir. 1986) (setting forth first-in first-out or first-in last-out accounting choices), *and United States* v. *Walsh*, 712 F.3d 119, 124 (2d Cir. 2013) (noting *Banco Cafetero*'s "accounting choices"), *and United States* v. *Contents in Account No. 059-644190-69*, 253 F. Supp. 2d 789, 795 (D. Vt. 2003) (applying *Banco Cafetero* test for traceability), *and* Compl. ¶¶ 107-110 (alleging that transfers from Bunicon and Elenast to Prevezon were falsely described as prepayment for sanitary equipment); *id.* ¶¶ 93-94 & Exs. C-D (alleging Bunicon and Elenast were shell companies); *and id.* ¶¶ 96-98 (alleging that Bunicon wired funds back to tax fraudsters through intermediaries). Contrary to these flawed arguments, the Complaint amply alleges that the funds transferred to Prevezon were fraud proceeds.

> 2.     The Complaint Alleges Specified Unlawful Activity

The Prevezon Defendants' claims that the Complaint does not allege specified unlawful activity is incorrect and careless.  As the Government explained in detail in responding to the Prevezon Defendants' now-withdrawn motion to dismiss, *see* Mem. Opp. Mot. Dismiss at 11-13, the Complaint alleges that the proceeds of the $230 Million Fraud Scheme were the proceeds of wire fraud under United States law, which under Supreme Court and Second Circuit precedent is a specified unlawful activity when the United States wires are used in furtherance of a scheme to

defraud a foreign government of tax revenue, *see id.* at 12 (citing *Pasquantino* v. *United States*, 544 U.S. 349, 353 (2005), and *United States* v. *Trapilo*, 130 F.3d 547, 551 (2d Cir. 1997)).  The Prevezon Defendants complain that the Government's response purportedly did not identify a "specific wire," apparently without reading the response carefully enough to see that it did just that.  *Compare* Defs.' Mem. at 19 ("In response to a motion to dismiss, the Government said it was relying on 'wire fraud' as the specified unlawful activity, again without identifying any specific wire or any fraudulent conduct.") *with* Mem. Opp. Mot. Dismiss at 12 ("[The fraud scheme] involved the use of the United States wires, *see* Compl. ¶ 97 (*alleging wire transfer routed through Southern District of New York* as step to transferring funds to conspirator) . . . ." (emphasis added)).[8]  This carelessness is illustrative of the Prevezon Defendants' overall approach to this motion.

3.    The Complaint Alleges the Defendants' Culpable Mental States

As the Court has already found, the Complaint adequately alleges that the Prevezon Defendants had the requisite guilty mental state for money laundering.  Indeed, the Prevezon Defendants' desperate attempts to supplement their motion with matters outside the pleadings reflect their awareness that the Complaint sets forth highly suspicious facts amply supporting an inference of guilty knowledge.

---

[8] The Prevezon Defendants claim that they may seek to invoke the statute of limitation once they learn of the wire transfer.  No such defense would be viable, let alone evident from the pleadings: *first*, the period of limitation is based on the money laundering offense, not the underlying specified unlawful activity, and *second*, the Government can bring an action either within five years of the money laundering offense (which is alleged to have continued through a series of transactions from the fall of 2009 through the summer of 2013, Compl. ¶¶ 112-18), or within two years of discovering the property's involvement in that offense.  *See* 19 U.S.C. § 1621; 18 U.S.C. § 981(d) (incorporating § 1621 for forfeitures under § 981).

Contrary to the Prevezon Defendants' incorrect statement of the law, *cf.* Defs.' Mem. at 16, far from being required to know the details of the underlying fraud or specifically intending to assist in it, money launderers need not even know the nature of the crime generating the money. *See United States* v. *Maher*, 108 F.3d 1513, 1526 (2d Cir. 1997) (explaining that the money laundering statute "reach[es] a person who knows that [s]he is dealing with the proceeds of some crime[,] even if [s]he does not know precisely which crime" (internal quotation marks omitted)). Moreover, knowledge in money laundering cases may be shown by proof of willful blindness, deliberate ignorance, or conscious avoidance. *United States* v. *Nektalov*, 461 F.3d 309, 314 (2d Cir. 2006) (applying conscious avoidance to money laundering sting); *United States* v. *Tillman*, 419 F. App'x 110, 112 (2d Cir. Apr. 15, 2011) (summary order) (defendant who allowed co-conspirators to make large deposits into her bank account and who then made large withdrawals after these deposits were made was, at the least, willfully blind to the nature of the activity in which she was engaged); *see generally United States* v. *Svoboda*, 347 F.3d 471, 480 (2d Cir. 2003) ("[K]nowledge consciously avoided is the legal equivalent of knowledge actually possessed."). The Complaint, which alleges that Defendants received $857,354 from two shell companies that did not have legitimate businesses by wire transfers that falsely described the funds as prepayment for sanitary equipment, when a representative of Katsyv stated that the funds were third-party payments in consideration for an investment in New York real estate, Compl. ¶¶ 93-94, 101-02, 107-10,[9] plainly permits the circumstantial inference that the $857,354

---

[9] Given that these facts are incorporated into each cause of action, Compl. ¶¶ 119, 127, 132, 136, 139, 142, 146, it is remarkable that the Prevezon Defendant can maintain a straight face while representing to the Court that the "seven Claims contain nothing but quotes from statutes and formulaic recitation of the elements of the causes of action," Defs.' Mem. at 16.

transferred to Prevezon Holdings was traceable to the Russian tax fraud scheme, and that the launderers, including Prevezon Holdings, whether or not they knew such details, knew or were willfully blind to the fact that the funds were proceeds of some sort of crime.

Moreover, contrary to the Prevezon Defendants' repeated incorrect assertions that the Government has "conceded" that they did not have a guilty mental state or know of the rest of the fraud scheme, *see, e.g.*, Defs.' Mem. at 1, the allegations of the Complaint also raise the requisite reasonable inference that the Prevezon Defendants had more extensive knowledge regarding the nature of the fraud scheme and the activities of the Organization.  These allegations show not only the suspicious circumstances of Prevezon's receipt of the $857,354, Compl. ¶¶ 93-94, 101-02, 107-10, but also the similarity between those transfers and transfers to a member of the Organization, Compl. ¶¶ 95-100, and the repeated and ongoing nature of the Organization's conduct, Compl. ¶¶ 46-54, 71.  Such facts easily permit a reasonable circumstantial inference that these suspicious transactions did not simply happen out of the blue, but instead evinced a meeting of the minds between the Defendants and the other individuals engaged in laundering the funds, or even the members of the Organization who committed the underlying fraud.

Although the Prevezon Defendants make repeated attempts to ask the Court to pass upon the ultimate facts, *see* Defs.' Mem. at 5-6, 9-10, 17, 18, 21, the relevant inquiry on a motion to dismiss is whether the complaint sets forth facts giving rise to a "reasonable inference that the defendant is liable for the misconduct alleged," *Iqbal*, 576 U.S. at 678, and in light of the highly suspicious and coordinated web of transactions that the Defendants participated in, it is plain that that standard is met.  The Federal Rules do not require certainty that a claim will prevail before a plaintiff is allowed to assert it; indeed, they do not even "impose a probability requirement at the

19

pleading stage," *Twombly*, 550 U.S. at 556.  Instead, all that is required is that the facts alleged

give rise to a reasonable circumstantial inference.  *Id.*; *see also Iqbal*, 576 U.S. at 678.

      Given the apparently pervasive and repeated nature of the fraudsters' conduct, the

suspicious nature of the transfers to Prevezon, and their striking similarity to transfers that

ultimately were used to return ill-gotten gains to the fraudsters, the inference that Prevezon's

transfers were also destined back to the fraudsters for use in their fraud schemes is certainly

reasonable.  Indeed, in criminal cases, conspirators' actions in entrusting a defendant with

property about as valuable as the $857,354 at issue here can be the principal evidence supporting

an inference—beyond a reasonable doubt—that the defendant must have had a trust relationship

with the conspirators that would have entailed knowledge of their criminal purpose.  *Cf. United

States* v. *Anderson*, --- F.3d ----, 2014 WL 814889, at *13-18 (2d Cir. Mar. 4, 2014) (finding that

conspirators' actions in entrusting criminal defendant with bag containing $900,000 of drugs,

together with other evidence about practices of conspiracy, was sufficient evidence to permit

inference that conspirators must have informed defendant of the contents of the bag).[10]  Thus, the

---

[10] For similar reasons, the Prevezon Defendants are wrong to claim that the references to the Organization's lethal retaliatory actions against Sergei Magnitsky, a lawyer who uncovered the fraud scheme, are irrelevant, let alone improper.  *See* Defs.' Mem. at 11-12 & n.8; *id.* at 22-23. Although the Government does not contend that the Prevezon Defendants were directly involved in Magnitsky's death, the extremely suspicious circumstances of the Prevezon Defendants' receipt of the funds through a channel also used to send funds back to a member of the Organization, certainly permit—at an absolute minimum—a reasonable inference that the Organization's activities and retaliatory actions were reasonably foreseeable to the Prevezon Defendants.  As comparably large transfers can support proof beyond a reasonable doubt, *Anderson*, 2014 WL 814889, at *13-18, the suspicious transfers here certainly suffice to let discovery proceed.  The Prevezon Defendants' knowledge or ability to foresee such conduct, in turn, bears directly on whether any forfeiture against the Prevezon Defendants would be disproportionate under the Eighth Amendment, a multi-factor inquiry including an assessment of the gravity of the offense.  *See von Hofe v. United States*, 492 F.3d 175, 186 (2d Cir. 2007).

questions whether this theory ultimately withstands a motion for summary judgment or prevails at trial are properly left to those stages. As this Court has already found, under the standards applicable at this stage, these claims are plausibly alleged and should not be dismissed.

## II.   DEFENDANTS' MOTION FOR RULE 11 SANCTIONS IS DEFECTIVE AND MERITLESS AND SHOULD BE STRUCK

The Prevezon Defendants ask this Court to dismiss the Complaint as a sanction against the Government for purportedly filing it without conducting adequate investigation. Despite the seriousness of its accusation, this sanctions motion is simply shoddy, failing to comply with the procedures prescribed in Rule 11 and failing to even cite the rule correctly. Not only is the motion procedurally defective, it is utterly devoid of merit. The Prevezon Defendants attempt to impose a legal standard that is flatly contradicted by clear law, and in any event the Government has ample evidence supporting the allegations of the Complaint. The Prevezon Defendants would have learned this had they waited for the Government's document production, which the Government expects to include thousands of pages, instead of rushing into court with a slipshod sanctions motion.

### A.   Although Incorrectly Citing Rule 11(a), Defendants Seek to Dismiss the Complaint as a Rule 11(b) Sanction

Counsel for the Prevezon Defendants, despite asking this Court to take the extraordinary step of dismissing the complaint for violation of Rule 11, apparently has not recently read Rule 11. The Prevezon Defendants incorrectly claim to make their motion under Rule 11(a), but in fact they seek dismissal of the Complaint as a sanction for purported violation of Rule 11(b). Rule 11(a) requires that each pleading "must be signed by at least one attorney of record in the attorney's name . . . [and] must state the signer's address, e-mail address, and telephone number." Fed. R. Civ. P. 11(a). The Complaint and the proposed Amended Complaint, which

21

are each signed by an attorney of record and include the signer's address, e-mail address, and telephone number, comply with Rule 11(a).  *See* Compl. at 54; Am. Compl. (D.I. 81-5) at 55.

It is Federal Rule of Civil Procedure 11(b) that states that an attorney who presents a pleading, written motion or other paper to the court certifies that to the best of his knowledge, information and belief formed after a reasonable inquiry, the filing is "supported in facts known or likely to be discovered on further investigation." *Lawrence* v. *Richman Group of CT LLC*, 620 F.3d 153, 156 (2d Cir. 2010) (internal quotation marks omitted).  A court may impose sanctions for violating this rule, but "Rule 11 sanctions are an extraordinary remedy and a movant must therefore meet a 'high bar' before sanctions are imposed on an adversary." *Gortat* v. *Capala Bros., Inc.*, 07-CV-3629 (ILG), 2008 WL 5273960, at *2 (E.D.N.Y. Dec. 18, 2008) (quoting *E. Gluck Corp. v. Rothenhaus,* 252 F.R.D. 175, 178-79 (S.D.N.Y. 2008)).

Despite citing to Rule 11(a) exclusively, Defendants plainly seek sanctions under Rule 11(b).  *Compare* Defs.' Mem. at 15 ("Under Rule 11(a), the Government certified that to the best of its knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, . . . the allegations and other factual contentions have evidentiary support." (internal quotation marks and brackets omitted)) *and id.* at 17 (similar) *and id.* at 1 (similar) *with* Fed. R. Civ. P. 11(b)(3) (certifying that "factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery").  The apparent failure of counsel for the Prevezon Defendants to read the rule they accuse the Government of violating is just sloppy.

### B.    Defendants Have Failed to Comply With Rule 11(c)(2)

Had they troubled to read Rule 11, counsel for the Prevezon Defendants would have seen that their motion for sanctions blatantly fails to comply with Rule 11(c)(2)'s requirements of a

22

separate filing served on the party and a 21-day safe harbor before presentation to the court.  On

that basis alone, the motion should be struck.  Rule 11(c)(2) provides:

> A motion for sanctions must be *made separately from any other motion* and must describe the specific conduct that allegedly violates Rule 11(b).  The motion must be served under Rule 5, but it *must not be filed or be presented to the court* if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets.

Fed R. Civ. P. 11(c)(2) (emphasis added).

The Second Circuit has explained that "[t]his section provides filers with a 'safe harbor'

from sanctions, in that a Rule 11(c)(2) motion not only must specify the conduct for which

sanctions are sought but must not be presented to the court until the alleged violator is afforded

twenty-one days to withdraw or correct the offending document."  *Lawrence*, 620 F.3d at 156.

The requirements of Rule 11(c)(2) "underscore the seriousness of a motion for sanctions and

serve to define precisely the conduct claimed to violate the rule.  Failure to observe them is *fatal

to a party-initiated motion for sanctions*."  *Diamonds.net LLC* v. *Idex Online, Ltd.*, 254 F.R.D.

475, 476 (S.D.N.Y. 2008) (internal quotation marks and citations omitted, emphasis added); *see

also, e.g.*, *Lawrence*, 620 F.3d at 159 (vacating sanctions for noncompliance with Rule 11(c)(2)).

The Prevezon Defendants have not even tried to comply with Rule 11(c)(2).  This

slapdash advocacy is irresponsible.  Their motion for sanctions is defective and should be struck.

### C.   Counsel for Defendants are Aware that Defendants' Attempt to Dismiss the Complaint on the Grounds of Insufficient Evidence is Contrary to Law

The Prevezon Defendants claim that the Government should be sanctioned with dismissal

for the purported misconduct of bringing a Complaint that, according to them, does not have

admissible evidence sufficient to prove its claims.  *See* Defs.' Mem. at 5-6 (arguing that

Government had no "basis" to plead claims based on deponent's negative response when asked about "evidence"); *id.* at 6 (complaining that Government's records purportedly "cannot be authenticated"); *id.* at 9-10 (complaining that Government purportedly does not have "competent" or "[a]dmissible" evidence); *id.* at 17 (urging dismissal because of deponent's negative answer when asked for "evidence"); *id.* at 18 (urging dismissal because of purported "absence of any facts to support properly pled claims"); *id.* at 21 (urging dismissal because the Government purportedly "relies on bank records from USB that the Russian government claims have been destroyed," or the Government supposedly "does not have records showing" identities of persons directing transfers); *id.* at 22 (claiming verification is "false" because Government source is purportedly "not a competent witness").  Even if the Prevezon Defendants' contrived claims about the lack of evidence were all accurate (and, as set forth in Section II.D, below, they are not), the lack of admissible evidence at the pleading stage simply does not constitute grounds for dismissal, let alone as a sanction for misconduct.

The Prevezon Defendants' position—that a forfeiture complaint can be dismissed based on a lack of admissible evidence before the close of discovery—flies in the face of the plain text of the federal forfeiture statutes.  The Prevezon Defendants claim that the Complaint should be dismissed because the Government purportedly does not have adequate "competent" or "admissible" evidence to establish the forfeitability of the property.  *See* Defs.' Mem. at 5-6, 9-10, 17-18, 21-22.  The governing forfeiture statute, however, expressly provides that "*[n]o complaint may be dismissed* on the ground that the Government did not have adequate evidence at the time the complaint was filed to establish the forfeitability of the property."  18 U.S.C. § 983(a)(3)(D) (emphasis added); *see also* 18 U.S.C. § 983(c)(2) ("[T]he Government may use

evidence gathered after the filing of a complaint for forfeiture to establish, by a preponderance of

the evidence, that property is subject to forfeiture."); Rule G(8)(b)(ii).  In a civil forfeiture action,

Rule G(2)(f) requires a complaint to "state sufficiently detailed facts to support a reasonable

belief that the government will be able to meet its burden of proof at trial," a standard that has

been met by the Government in this case.

      The Government is not required to have admissible evidence in its possession before it

files a civil in rem forfeiture complaint and is entitled to take discovery to develop its case.

Defense counsel's repeated representations that there is something improper about this process

are patently incorrect.  *Compare* Defs.' TRO. Mem. (D.I. 39) at 24 (Prevezon memorandum

claiming complaint is deficient because it does not explain how government will "authenticate"

records) *and* Defs.' Mem. Supp. Mot. Dismiss (D.I. 50) at 22 (Prevezon memorandum urging

dismissal "[i]f the Government lacks admissible evidence to support a key element of its

claims") *and* Prevezon Letter, Feb. 24, 2014, at 5 ("The Government should have prepared a

case before filing the complaint.  Now, it admits it filed a deficient complaint but wants the

Court to save it from its improper conduct by allowing the Government to conduct an

investigation using civil discovery.") *with* 18 U.S.C. § 983(a)(3)(D) ("No complaint may be

dismissed on the ground that the Government did not have adequate evidence at the time the

complaint was filed to establish the forfeitability of the property.") *and* Supp. R. G. 8(b)(ii)

(similar) *and* 18 U.S.C. § 983(c)(2) ("[T]he Government may use evidence gathered after the

filing of a complaint for forfeiture to establish, by a preponderance of the evidence, that property

is subject to forfeiture.").

      This statute that governs civil forfeiture proceedings is well known to counsel for the

defendants.  The Government has repeatedly explained this statute in its filings, Mem. Opp. TRO

Mot. (D.I. 47) at 13 n.8; Mem. Opp. Mot. Dismiss (D.I. 58) at 16-17, and counsel for the

defendants themselves have even acknowledged that the Government is entitled to "prove its

case at trial with after-acquired evidence," Defs.' TRO Reply Mem. (D.I. 53) at 4 n.4.

In the face of this clear law permitting the Government to file a forfeiture complaint and

obtain evidence to support it through civil discovery, it is frankly surprising that counsel for the

Prevezon Defendants continues to assert to this Court that such a course is improper.[11]

### D.    In Any Event, the Government Has Substantial Evidence Supporting the Complaint

It is ironic that the Prevezon Defendants ask the Court to impose sanctions on the

Government on the basis of purportedly having so little evidentiary support for the Complaint

that presenting it to the Court constituted misconduct.  Even though the Government is not

required to have admissible evidence at this stage, in this case the Government in fact has

voluminous evidence supporting its allegations.  The Government presently expects that it will

---

[11] Defendants' accusations of "plagiarism" are just bizarre.  *See, e.g.*, Defs.' Mem. at 5, 9.  A civil complaint is not a college term paper.  Its purpose is not to invent novel contributions to academic literature, but to allege facts.  As such, the academic norms against paraphrasing or quoting without citation simply do not apply.  *See, e.g.*, *VNB Realty, Inc.* v. *Bank of America Corp.*, No. 11 Civ. 6805 (DLC), 2013 WL 5179197, at *4 (S.D.N.Y. Sep. 16, 2013) ("There is no evidentiary rule against plagiarism, and each plaintiff is not required to craft anew elementary background material describing how the securitization process works, to take but one example. That VNB's lawyer's chose to copy the wording used by FHFA's lawyers does not mean that substantial portions of their FAC must be stricken."); *cf., e.g.*, *Rose* v. *Bethel*, No. 03 Civ. 1241 (GBD), 2007 WL 2476389, at *14 (S.D.N.Y. Aug. 29, 2007) ("A complaint need not prove the claim; a plaintiff need not allege evidence in the complaint.").  In any event, the referenced text made quite clear that the statements at issue were made to reporters, not directly to the Government, *see* Compl. ¶¶ 83(a), 84(a), and the chart attached to the Complaint contains substantial differences from the one the Prevezon Defendants accuse the Government of copying, including information not contained on the supposed source chart, as would have been evident had the Prevezon Defendants bothered to examine it.

produce thousands of pages of documents in its initial document production.[12]  This volume—which is substantial for a civil plaintiff in the position of the Government—alone gives the lie to the Defendants' baseless allegation that the Government committed misconduct by conducting an insufficient investigation.[13]

Although the Government intends to obtain more evidence in discovery, from the Defendants themselves and through treaty requests to several countries, the information already in the Government's possession supports the specific allegations made in the Complaint.  Some of it is in admissible form already; some of it may require the testimony or certifications of document custodians, which the Government is attempting to secure; and of the documents the Government has, there may be some that ultimately cannot be admitted at a trial.  But these are issues for summary judgment or trial, not for a pre-discovery sanctions motion.

It is preposterous on its face to claim that the Government should be sanctioned for bringing a complaint based "only" on thousands of pages of documents supporting the essential

---

[12] The parties have not yet exchanged documents due to disagreements on the content of a confidentiality order, which are still being negotiated in the hopes of avoiding the need for Court intervention.

[13] Moreover, the Prevezon Defendants' attempts to impeach the credibility of William Browder, the CEO of Hermitage Capital, are both procedurally improper and absurdly one-sided.  In stressing that a Russian court convicted Mr. Browder of fraud, Defs.' Mem. at 10, the Prevezon Defendants never inform the Court of the following facts: (1) that Mr. Browder's conviction was rendered in absentia, *see* N.Y. Times, *Dead Lawyer, a Kremlin Critic, is Found Guilty of Tax Evasion* (July 11, 2013), http://www.nytimes.com/2013/07/12/world/europe/russian-court-convicts-a-kremlin-critic-posthumously.html; (2) that Mr. Browder's conviction was rendered together with an unprecedented posthumous conviction of Mr. Magnitsky, *see id.* ("By all accounts, it was Russia's first trial of a dead man . . . ."); and (3) that Interpol took the rare step of refusing to assist the Russian Federation in tracking Mr. Browder, concluding that the Russian proceedings against him were "of a predominantly political nature," Interpol, *INTERPOL Cannot be Used by the Russian Federation to Seek the Arrest of Mr. William Browder* (July 26, 2013), http://www.interpol.int/News-and-media/News/2013/N20130726.

factual allegations.  The Prevezon Defendants find themselves in the embarrassing position of having made such a claim because they did not wait until the Government's discovery responses made clearer how much information and evidence the Government had.  Instead, they rushed into court with a baseless accusation cobbled together from misuse of a still-unfinished Rule 30(b)(6) deposition and wanton mischaracterization of remarks made by counsel for the Government at a court conference.  This irresponsible conduct should be rejected.

> 1.    <u>Defendants' Attempt to Wring Legal Concessions from a Nonlawyer is an Improper Use of a Rule 30(b)(6) Deposition</u>

The Prevezon Defendants rest their motion principally on the still-incomplete Rule 30(b)(6) deposition of Special Agent Todd Hyman, a deposition which the Prevezon Defendants largely used as an instrument to extract legal concessions from a nonlawyer.  This tactic is an inappropriate use of a Rule 30(b)(6) deposition, and doubly so when it is used to contrive a basis for an accusation of misconduct.  In any event, nothing that Special Agent Hyman said undercuts the substantial evidence the Government has supporting the Complaint.

As an initial matter, the deposition is not complete.  The Defendants have not completed their examination of Special Agent Hyman, the Government has not yet had the opportunity to ask clarifying questions on cross-examination, and the deponent has not yet received the final transcript and had the opportunity to submit errata under Rule 30(e)(1).  These matters take on special significance where, as here, the deposition was largely an exercise in asking a nonlawyer to make a number of legal conclusions about what constitutes admissible evidence or who would be a "competent" witness, and there is a heightened risk of confusion and need for clarification.

Counsel for the Defendants rely on Special Agent Hyman's inability to identify "evidence" of several contentions that are the ultimate issues at trial.  *See* Defs.' Mem. at 5-6.

28

The Defendants' presentation is extraordinarily selective, however. When the witness was asked very similar questions in a slightly less confusing way, or was given an opportunity to explain, he gave answers that were worlds apart from Defendants' gross mischaracterization of them here, and that show that the Government had ample basis to bring this case. *Compare* Defs.' Mem. at 5 (quoting Dep. Tr. (D.I. 81-1) at 150:8-14 for the proposition that the Government "now admits it had no basis" to allege that the defendants knew about or intended to promote or conceal the $230 Million Fraud Scheme) *with* Dep. Tr. (D.I. 81-1) at 154:5-18 (describing defendants' knowledge of illegal activities); *compare* Defs.' Mem. at 5 (quoting Dep. Tr. (D.I. 81-1) at 134:13-21 for the proposition that the Government "further admits that it had no basis to plead that the Defendants committed any acts to promote the alleged Organization or its mission") *with* Dep. Tr. (D.I. 81-1) at 138:9-139:4 (describing evidence relevant to Defendant's intent to promote) *and* Dep. Tr. 145:13-17 (clarifying previous answers and saying that there is evidence of a number of matters inquired about previously); *compare* Defs.' Mem. at 5-6 (quoting Dep. Tr. (D.I. 81-1) at 137:13-138:3 for the proposition that "[t]he Government also had no basis to plead that Defendants intended to conceal the activities of the Organization") *with* Dep. Tr. (D.I. 81-1) at 139:13-23 (describing evidence of concealment) *and id.* at 141:5-17 (further describing evidence of concealment).

Moreover, the manner in which the deposition was taken consisted in large part of counsel for the Defendants asking a number of contention questions asking the nonlawyer witness to opine on "evidence" without defining that term and then interrupting the witness's answers to argue with him. When asked if it was "the position of the United States that you will be able to prove" certain wire transfers, after conferring with counsel, the witness stated "as far

as proving my case, I'm not an attorney, but it's my assumption that we are going to prove our

case at trial." Dep. Tr. (D.I. 81-1) at 72:7-10.  This response was met with the following

argumentative question, which was the first use of the word "evidence" in the deposition:

> Q: You are not speaking as an investigator, you are not speaking as
> an attorney, you are speaking as a spokesman for the United States.
> The question was whether you intend to – what is the evidence to
> prove the transfers to USB from the Russian Treasury?
>
> A: Well, we have obtained copies of the wire transfers.  But we
> expect to get further – further evidence through the discovery
> process, as well as responses from the Russian government.

Dep. Tr. (D.I. 81-1) at 72:12-24.

Further questioning did nothing to dispel the connotation that evidence was being

referred to in a sense closely connected with its use at trial, and thus inappropriate to expect a

nonlawyer to opine on.  In fact, counsel for the Defendants repeatedly interrupted the witness

when he was listing what he thought might be evidence to argue with him about whether it was

actually evidence:

> Q: You have no evidence to tie the payment from Krainiy Sever
> through Bunicon to Prevezon; is that correct?  You have an
> accounting assumption, because you can show that money went
> from Krainiy Sever to Bunicon and from Bunicon to Prevezon.
>
> A: Right.
>
> Q: But you do not have any evidence whatever to show that it was
> a member of the organization who directed it; is that right?
>
> A: No, we do not. The only thing that we would have would be
> statements made by Prevezon's owner, Den[]is Katsyv, through a
> representative that this money as mischaracterized, and that Mr.
> Katsyv would – first Mr. Katsyv would be aware of money
> laundering statutes through his prior interactions with –
>
> Q: Excuse me.  I'm asking you what evidence you have.  We'll get
> to those other points later.

Dep. Tr. (D.I. 81-1) at 89:16-90:12.

Moreover, counsel for the Defendants would repeatedly interrupt the deponent to actively prevent him from finishing listing what he believed to be evidence:

> Q: What is the evidence that eleven defendants accused engaged in financial transactions involving the proceeds of the $230 million scheme?
>
> A: Well, we have the tracing to Prevezon Holdings, and we have Prevezon Holdings forming these entities and then using funds to purchase property.  So those would be financial transactions.
>
> Q: But the funds that came from Bunicon and Elenast are the funds at issue; are they not?
>
> A: Yes.
>
> Q: And they were all from Europe; were they not?
>
> A: Yes.
>
> Q: So these other companies were founded with other money; correct?
>
> A: Correct.  Well, we have the statement from Mr. Katsyv's –
>
> Q: We will get to the statement.  You've said it now four times, it reflects your preparation, just as your failure to comment on the bank records does.

Dep. Tr. (D.I. 81-1) at 133:10-134:9.  Counsel for the Defendants was so eager to cut off the deponent's listing of evidence that counsel for the Government had to repeatedly ask defense counsel to give the deponent a chance to answer the question:

> Q: And you represented to the court, did you not, that you had a case?
> A: Yes, I did.
>
> Q: Do you have evidence that the defendants intended to promote the organization's underlying acts of mail fraud, wire fraud, corruption and money laundering?
>
> A: Well, we have evidence of the wires, so if there is evidence –
>
> Q: I'm asking about the intent.  The defendants' intent, not the organization's wire fraud.  Do I make myself clear?
>
> A: Of his intent to commit?
>
> Q: I'm asking about my clients.  Do you have any evidence that

31

my clients intended to promote the organization's underlying acts of mail fraud, wire fraud, corruption and money laundering?

A: Other than the previously discussed conversation with Mr. Petrov and Mr. Kim.

Q: And you don't say that either Mr. Petrov or Mr. Kim is part of the organization; is that correct?

A: We don't know.

Q: And you don't say that the defendants are members of the organization?

A: We don't know.  But you're correct in saying we don't say that.

Q: Do you have any evidence that the defendants acted to conceal – acted to conceal or disguise the nature, location, source, ownership or control of the proceeds of the $230 million fraud?

A: Well, we have evidence to the mischaracterization of the wires from Mr. Kim, Bunicon and Elenast.  Even by his own admission, the agent, Mr. Katsyv's agent admitted that they didn't engage in this business with them.  And the—

Q: We'll get back to that.

A: Okay.

MR. ADAMS: He's answering your question.

MR. MOSCOW: I understand.

MR. ADAMS: He gave one piece of evidence, I think he was about to offer some others.

MR. MOSCOW: Fine.

Q: Please do.

A: So we have evidence that he engaged in the con—

Q: Who is he?

A: Mr. Katsyv.  And by Mr. Katsyv, through his entities Prevezon. He has an agent that made a statement that we talked about earlier.

Q: No, I'm sorry.  You didn't speak to the agent, did you?

A: I did not.

Q: Did you speak to anyone who spoke to the agent?

A: I did not.

MS. MAGDO: Were you finished with your answer?

32

THE WITNESS: I would like to continue on.

Q: Sure.

A: The evidence would be that he engaged to conceal because he's aware through his – at least his representative says he's aware he's going to receive payment that's due to him for investment in New York property from Mr. Petrov by way of Mr. Kim sending him money, two wires. The two wires are then mischaracterized as sanitary equipment. And he receives them, he then does whatever he does with his money, knowing full well that this money is not for its stated purpose. So that would be evidence of concealment.

Dep. Tr. (D.I. 81-1) at 138:6-141:17. As this exchange shows, the witness was aware of damning evidence of knowledge on the part of the Defendants—their receipt of wire transfers from shell companies with false descriptions of their purchase—but was repeatedly actively prevented from saying it by the questioning of counsel for the Defendants. It is simply astonishing that counsel for the Defendants now presents this still-incomplete deposition as a basis for saying that "the Government has conceded that it has no basis for alleging that the Prevezon Defendants or their owner knew about or intended to promote or conceal the $230 Million Fraud Scheme." Defs.' Mem. at 1.

Even beyond the extraordinarily one-sided nature of their presentation of Special Agent Hyman's testimony, however, counsel for the Prevezon Defendants quite plainly are attempting to use the Rule 30(b)(6) deposition for the improper purpose of trying to secure legal concessions from a nonlawyer. *See* Defs.' Mem. at 17 (characterizing selected deposition testimony as "binding admissions"); *id.* at 1 (describing Government's purported concessions); *id.* at 3 (similar); *id.* at 5-6 (similar); *id.* at 9-10 (describing deposition testimony regarding "competent witnesses"); *id.* at 22 (claiming that deposition testimony renders verification "false"). This is evident from the fact that counsel for the Defendants repeatedly asked the deponent to itemize evidence and then interrupted him before he could do so, Dep. Tr. (D.I. 81-1) at 138:6-141:17,

and repeatedly told the witness that he had to answer questions—including those calling for legal conclusions—on behalf of the United States.[14]  In fact, however, the legal conclusions of a lay Rule 30(b)(6) witness are not binding on a party. [15]  Moreover, deposition questions that call for evidence supporting a contention, essentially attempts to turn a Rule 30(b)(6) deposition into a substitute for a contention interrogatory, are disfavored.  *See Byrd* v. *Wal-Mart Transp., LLC*, CV609-014, 2009 WL 3055303, at *4 & n.7 (S.D. Ga. Sept. 23, 2009) (forbidding questions that are the functional equivalent of contention interrogatories, remarking, "[A]sking a lay 30(b)(6) witness to undertake on-the-spot legal analysis in order to respond to contention questions is asking too much, especially since the company's lawyer is far better equipped to formulate full and complete responses for his client to sign.").

---

[14] There are numerous examples of such questions.  *See, e.g.*, Dep. Tr. (D.I. 81-1) at 11:4-8; 34:4-11 (asking deponent whether United States has "any way of authenticating" documents without legal assistance by Russia); 41:17-25 (asking deponent his position, on behalf of United States, regarding who directed a wire transfer); 42:20-43:7 (similar); 59:24-61:10 (asking deponent whether United States has "witnesses" or "competent witnesses"); 71:6-72:24 (asking deponent whether it is "the position of the United States that you will be able to prove" certain wire transfers); 78:11-13 (asking whether United States knows whether Russian law imposes certain bank secrecy requirements); 108:25-109:5 (asking whether United States has "evidence" supporting proposition); 127:3-7 (asking what position the United States represented to the Netherlands); 128:25-129:5 (asking for position of United States on where money was directed); 132:25-133:9 (asking whether United States is familiar with Supplemental Rule G); 146:5-8; 163:15-164:5 (asking witness to speak for the United States regarding the legal standard set forth in the Sergei Magnitsky Rule of Law Accountability Act of 2012); 178:19-24 (asking whether United States was relying on certain "accounting presumptions and legal treatment").

[15] *See, e.g.*, *AstenJohnson, Inc.* v. *Columbia Cas. Co.*, 562 F.3d 213, 229 n.9 (3d Cir. 2009) ("This type of legal conclusion is not binding on American, and American was entitled to produce contrary evidence at trial.  *See R & B Appliance Parts, Inc.* v. *Amana Co.*, 258 F.3d 783, 787 (8th Cir. 2001) (distinguishing between matters of fact and conclusions of law in regard to Rule 30(b)(6) depositions); *see also Briese Lichttechnik Vertriebs GmbH* v. *Langton*, No. 09 Civ. 9790 (LTS) (MHD), 2012 WL 5457681, at *5 (S.D.N.Y. Nov. 8, 2012) (noting that there was no basis for court action when Rule 30(b)(6) witnesses were unable to answer questions that "were overly general, vague, or improperly calling for legal conclusions").

Indeed, the Prevezon Defendants' eagerness to take this deposition before obtaining any documents—as if hoping that the thousands of pages of documents would vanish if Special Agent Hyman did not remember each and every one of them at his deposition—shows the inappropriateness of their approach.[16]  This Court was right to call this deposition a "waste of time to take" at this stage of the litigation.  *See* Tr., Mar. 4, 2014 (D.I. 81-3) at 12:6-7.[17]  One court has strongly criticized the practice of rushing right to a Rule 30(b)(6) deposition as a substitute for a contention interrogatory, in terms fully applicable to the Prevezon Defendants:

> As a method for finding out facts known to an organization, Rule 30(b)(6) is not perfect, but it can be reasonably effective if all parties act in good faith.
>
> In this case, Lawyers [i.e., the party Lawyers Title Insurance Company] tried to use Rule 30(b)(6) in a very different way, *by asking about legal theories and fact supporting the allegations in the complaint.*  In essence, this was an effort to use Rule 30(b)(6) as contention interrogatories are most often used.  Lawyers *noticed First Internet's Rule 30(b)(6) deposition early on in this litigation, before First Internet had the opportunity to complete its own discovery and develop fully its legal theory.*  Not surprisingly, the deponent's answers about the factual basis for the lawsuit and the legal theories were incomplete.  Both the factual basis and the legal theories evolved.  But Lawyers seeks to bind First Internet to the

---

[16] At the time the deposition was noticed, a trial date was imminent, but no documents had been exchanged and this haphazard situation was caused entirely by defense counsel's inexplicable abandonment of their own good-faith discovery schedule.  The timing of this deposition and the questions asked also suggest that defense counsel's strategy was largely to fish for legal admissions.  In any event, after the adjournment of the trial date, the Prevezon Defendants trumpet this partial deposition as a purported concession by the Government.  In light of this presentation, and the Defendants' repeated attempts to take the testimony of Special Agent Hyman before the exchange of any documents, the Prevezon Defendants appear to have viewed the deposition not just as a response to the (self-created) emergency of the imminent trial but as a tool for trying to extract legal concessions from a lay witness.

[17] Even a contention interrogatory, which would at least be answered by a lawyer with the opportunity to consult documents, is premature at this stage of the litigation under the local rules. *See* SDNY Local Civil Rule 33.3(c).

first incomplete answers.

> *This tactic has little to recommend it as a method for trying to lock an opponent into flawed and incomplete contentions and legal theories.* A Rule 30(b)(6) deposition produces evidence, not judicial admissions. A Rule 30(b)(6) deponent testifies as if she is the corporation, but Rule 30(b)(6) does not absolutely bind a corporate party to its designee's recollection.

*First Internet Bank of Indiana* v. *Lawyers Title Ins. Co.*, 07 Civ. 869 (DFH) (DML), 2009 WL 2092782, at *4 (S.D. Ind. July 13, 2009) (emphasis added, internal quotation marks omitted). However "little" this tactic has "to recommend it as a method for trying to lock an opponent into flawed and incomplete contentions and legal theories," *First Internet Bank*, 2009 WL 2092782, at *4, it has far less to recommend it as a means to contrive an accusation of sanctionable misconduct. The Prevezon Defendants' attempt to misuse the incomplete Rule 30(b)(6) deposition of Special Agent Hyman is egregious and should not be rewarded.

      2.    <u>Defendants' Characterization of the Government's Legal Position is Tendentious</u>

In addition to their improper use of the Rule 30(b)(6) deposition of Special Agent Hyman, the Prevezon Defendants claim that at a court conference on February 14, 2014, counsel for the Government has conceded that the Complaint does not adequately plead the defendants' culpable mental states. Defs.' Mem. at 17; *see also* Prevezon Letter, Feb. 24, 2014, at 2 (claiming that Government "concede[d]" this at oral argument). This contention is meritless. In the course of explaining the need for discovery, the attorney for the Government explained that there was more information that the Government wished to seek regarding the mental states of the key participants, and acknowledged that it did not currently have a "great deal" of evidence in that area. *See* Tr., Feb. 14, 2014 (D.I. 81-11), at 46, 47. However, contrary to the representations made by counsel for the Defendants, the Government has steadfastly

36

maintained—including at that same conference—that the Complaint amply alleges the Defendants' intent. *Compare* Defs.' Mem. at 17 *and id.* at 1 *and* Prevezon Letter, Feb. 24, 2014 at 2 (claiming that the Government "concedes" the "absence of scienter") *with* Tr., Feb. 14, 2014 (D.I. 81-11) at 40 (Q: "I take it that the government says here that these defendants were not that totally innocent, pure, they were knowingly involved in the money laundering, right?" A: "Yes, knowingly or with willful blindness, but with the requisite mental state to commit the crime.") *and* Mem. Opp. Mot. Dismiss (D.I. 58) at 17-22 (arguing that Complaint alleges culpable mental state) *and* Mem. Opp. TRO Mot. (D.I. 47) at 15-16 (same).

The Government has evidence supporting the claims of the Complaint, which amply allege the Prevezon Defendants' culpable mental states, and the Government is entitled to proceed with discovery, which is likely to reveal more evidence on that subject. The Prevezon Defendants' apparent suggestion is that an attorney who consistently maintains, orally and in writing, that a complaint adequately alleges a culpable mental state must also claim at all times that he is in possession of a "great deal" of information as to the specifics of that mental state or else he will be sanctioned under Rule 11. This, of course, is preposterous.

## III.    DEFENDANTS ARTICULATE NO BASIS FOR DENYING LEAVE TO AMEND THE COMPLAINT

The Government's proposed Amended Complaint would significantly narrow the action, implementing many modifications the Prevezon Defendants themselves purported to desire. With one telling exception, the only response the Prevezon Defendants make to this proposal is the same barrage of meritless objections they hurl at the Complaint. Indeed, the Prevezon Defendants' opposition to the filing of the Amended Complaint is actually quite revealing, as it illustrates the opportunistic nature of many of their objections to the Complaint. The Prevezon

Defendants articulate no basis this Court should not grant leave to file the Amended Complaint.

Under Rule 15(a)(2), "the court should grant leave to amend 'freely . . . when justice so requires.'" *Oliver Schools, Inc.* v. *Foley*, 930 F.2d 248, 252 (2d Cir. 1991) (quoting Fed. R. Civ. P. 15(a)). "Although the decision whether to grant leave to amend is within the discretion of the district court, refusal to grant leave must be based on a valid ground." *Id.* (internal quotation marks omitted). The only aspect of the Amended Complaint that the Prevezon Defendants take specific issue with is a strikingly probative fact going directly to the central factual dispute—the Prevezon Defendants' knowledge of the laundering purpose of the transactions. The Amended Complaint alleges that Katsyv, the owner of the Prevezon Defendants, had previous knowledge of Israel's money laundering laws—which are similar to the United States laws—due to a previous case in which he paid millions of dollars to settle an Israeli money laundering proceeding. *See* Am. Compl. (D.I. 81-5) ¶ 111. The Prevezon Defendants' only objection to this damning allegation is their weak observation, buried in a footnote, that knowledge of the law is not an element of money laundering. *See* Defs.' Mem. at 13 n.9. While it is true that knowledge of the money laundering laws is not *necessary* for a finding of money laundering, however, it can certainly be *probative* of it. Katsyv's previous exposure to the prohibitions on money laundering makes it far harder to credit the Prevezon Defendants' claim that they had no idea there was anything suspicious about receiving hundreds of thousands of dollars from shell companies in falsely-described wire transfers. *See* Fed. R. Evid. 404(b) (permitting proof of prior acts for such purposes as "intent," "knowledge," and "absence of mistake, or lack of accident").

Other than their objection to the clearly relevant allegation going to Katsyv's knowledge, the Prevezon Defendants' objections to the filing of the Amended Complaint are the same

meritless grounds they rely on in seeking dismissal of the Complaint.  In fact, the Prevezon

Defendants' bitter opposition to an Amended Complaint is quite telling.  While complaining

loudly about the fact that the Complaint and the original Protective Order sought to restrain "any

and all" assets of the Defendants, including assets not individually enumerated and assets abroad

that were not being held by a foreign government, the Prevezon Defendants are vehemently

opposed to the Amended Complaint, which *removes* such assets from the claim for in rem

forfeiture.  As set forth in the Government's prior papers, the Government's original Complaint

and Protective Order were proper under the forfeiture laws.  Mem. Opp. TRO Mot. (D.I. 47) at

16-27; Mem. Opp. Mot. Dismiss (D.I. 58) at 22-33; *see also United States* v. *All Assets of GPS

Auto. Corp.*, 66 F.3d 483, 486 (2d Cir. 1995); Tr., Jan. 7, 2014 (D.I. 81-12) at 31 (finding

Complaint sufficient, stating, "That is the basis properly for believing that the government can

ultimately obtain forfeiture, and in the meantime, it is the basis for restraint.").  However, the

Government is now seeking to narrow and focus the action by omitting such properties.[18]  It is

telling that the Prevezon Defendants' response is both to oppose the Complaint as in bad faith for

these reasons, Defs.' Mem. at 11, 22-23, and to oppose the Amended Complaint, which removes

these properties from the case, as also in bad faith, *see* Defs.' Mem. at 24.

The mental gymnastics needed to claim that it is bad faith for the Government to include

---

[18] The ultimate proportionality of a forfeiture can only be determined after discovery on the issue has revealed the full gravity and magnitude of the offense, Supp. R. G(8)(e); *United States* v. *8 Gilcrease Lane*, 587 F. Supp. 2d 133, 148 n.10 (D.D.C. 2008), but the approximately $15 million in equity that would remain subject to forfeiture under the Amended Complaint, though greater than the $857,354 in fraud proceeds, is comparable to a ratio of forfeiture to crime proceeds that has been upheld as proportionate.  *See, e.g.*, *United States* v. *Wyly*, 193 F.3d 289, 303 (5th Cir. 1999) (upholding forfeiture of over $4 million in assets in addition to a $4.8 million fine, where approximately $175,000 was laundered and a $340,000 bribe was paid).

such properties and also bad faith to remove them are apparently not beyond counsel for the

Prevezon Defendants.  But these opportunistic accusations provide no basis to bar the filing of

the Amended Complaint, which would both make a number of narrowing changes the Prevezon

Defendants have claimed to want and also include an additional highly probative allegation

going to their knowledge, the key issue in the case.

<u>**CONCLUSION**</u>

For the foregoing reasons, the Government respectfully requests that the Court deny the

Prevezon Defendants' motion to dismiss the Complaint and grant leave to file the Amended

Complaint.

Dated: New York, New York
      April 7, 2014

                                Respectfully submitted,

                                PREET BHARARA
                                United States Attorney
                                for the Southern District of New York

                By:    <u>/s/ Paul M. Monteleoni</u>
                         Paul M. Monteleoni
                         Christine I. Magdo
                         Andrew C. Adams
                         Assistant United States Attorneys
                         Tel.:  (212) 637-2219/2297/2340
                         E-mail: paul.monteleoni@usdoj.gov
                                christine.magdo@usdoj.gov
                                andrew.adams@usdoj.gov