UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
                                 :

UNITED STATES OF AMERICA,      :

           Plaintiff,        :

                                 :

      v.              :     Civil Action No. 13-cv-06326 (TPG)

                                 :

PREVEZON HOLDINGS, LTD., et al.,  :

           Defendants.     :

--------------------------------------------------------x


**<u>MEMORANDUM OF LAW OF WILLIAM BROWDER AND THE OTHER AFFECTED
NON-PARTIES IN SUPPORT OF THEIR MOTION TO QUASH, FOR SANCTIONS,
AND FOR A PROTECTIVE ORDER</u>**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................................. 1

FACTUAL BACKGROUND................................................................................................. 6

I.     WILLIAM BROWDER AND HERMITAGE CAPITAL.................................................. 6

II.    DEFENDANTS COUNSEL PREVIOUSLY REPRESENTED BROWDER
       AGAINST DEFENDANTS' CO-CONSPIRATORS AND, THEREFORE, HAS
       A DISABLING CONFLICT OF INTEREST..................................................................... 8

III.   DEFENDANTS ISSUED *EIGHT* IMPROPER NON-PARTY SUBPOENAS TO
       OR ABOUT BROWDER ............................................................................................... 11

       A.   Defendants Refuse To Withdraw The Hermitage Global Subpoenas ..................... 11

       B.   The New Subpoena To Browder Was Not Effectively Served And Is Even
            More Abusive, Invasive, And Unduly Burdensome.................................................. 13

       C.   The Other Affected Non-Parties And The Requests To Them Have No
            Connection To The Claims, Defenses, Or Parties In This Case .............................. 16

       D.   The Lack Of Party Discovery Highlights The Subpoenas' Impropriety ................. 17

ARGUMENT ........................................................................................................................ 18

I.     THE ABUSIVE SUBPOENAS MUST BE QUASHED.................................................. 18

       A.   Defendants Have Issued The Subpoenas For The Wholly Improper Purposes
            Of Intimidating And Impeaching Browder............................................................. 18

       B.   The Subpoenas Are Absurdly Overbroad And Unduly Burdensome...................... 24

       C.   The Browder Subpoena Violates Rule 45's Procedural Limits............................... 26

            1.   Defendants Never Effectively Served Browder............................................ 26

            2.   The Browder Subpoena Defies Rule 45's 100-Mile Limit............................ 28

II.    DEFENDANTS AND THEIR COUNSEL MUST BE SANCTIONED FOR
       THEIR BAD FAITH IN IMPOSING UNDUE BURDENS AND EXPENSES ON
       THE AFFECTED NON-PARTIES ................................................................................ 30

III.   DEFENDANTS MUST BE ENJOINED FROM ISSUING ANY ADDITIONAL
       DISCOVERY TO OR CONCERNING BROWDER TO PREVENT FURTHER
       DISCOVERY ABUSES ................................................................................................ 33

CONCLUSION...................................................................................................................... 35

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams.,*
   262 F.R.D. 293 (S.D.N.Y. 2009) ......................................................................... 27

*Concord Boat Corp. v. Brunswick Corp.,*
   169 F.R.D. 44 (S.D.N.Y. 1996) ...................................................................... 25, 26

*Corbett v. eHome Credit Corp.,*
   No. 10-CV-26 (JG)(RLM), 2010 WL 3023870 (E.D.N.Y. Aug. 2, 2010) ............................. 24

*Crosby v. City of New York,*
   269 F.R.D. 267 (S.D.N.Y. 2010) ......................................................................... 18

*DeFazio v. Wallis,*
   459 F. Supp. 2d 159 (E.D.N.Y. 2006) .................................................................. 32

*Echostar Comm'cns Corp. v. News Corp. Ltd.,*
   180 F.R.D. 391 (D. Colo. 1998) ............................................................... 18, 21, 26, 33

*Fox Indus., Inc. v. Gurovich,*
   No. CV 03-5166 TCP WDW, 2005 WL 2133595 (E.D.N.Y. Sept. 1, 2005) .................. *passim*

*In re Application of Yukos Hydrocarbons Invs. Ltd.,*
   No. 5:09-MC-0078 (NAM/DEP), 2009 WL 5216951 (N.D.N.Y. Dec. 30, 2009) ................. 29

*In re Biovail Corp. Sec. Litig.,*
   247 F.R.D. 72 (S.D.N.Y. 2007) .......................................................................... 25

*In re Edelman,*
   295 F.3d 171 (2d Cir. 2002) .............................................................................. 28

*In re Lazaridis,*
   865 F. Supp. 2d 521 (D.N.J. 2011) ..................................................................... 26

*In re Subpoena Issued to Dennis Friedman,*
   350 F.3d 65 (2d Cir. 2003) .......................................................................... 18, 33

*In re Vivendi Universal, S.A. Sec. Litig.,*
   No. 02 Civ. 5571 (RJH)(HBP), 2009 WL 8588405 (S.D.N.Y. July 10, 2009) ..................... 29

*Jade Apparel, Inc. v. Steven Schor, Inc.,*
   No. 11-CV-2955 (KNF), 2012 WL 3578593 (S.D.N.Y. Aug. 15, 2012) ............................. 27

*Jennings v. Peters,*
   162 F.R.D. 120 (N.D. Ill. 1995) ......................................................................... 33

*JPMorgan Chase Bank, N.A. v. The IDW Grp., LLC,*
   No. 08 Civ. 9116 (PGG), 2009 WL 1313259 (S.D.N.Y. May 11, 2009) ............................. 27

*Kadic v. Karadzic,*
   70 F.3d 232 (2d Cir. 1995) ............................................................................... 27

*Kenney, Becker LLP v. Kenney*,
  No. 06 Civ. 2975 (JSR), 2008 WL 681452 (S.D.N.Y. Mar. 6, 2008) ...................................... 30

*KGK Jewelry LLC v. ESDNetwork*,
  No. 11 Civ. 9236 (LTS) (RLE), 2014 WL 1199326 (S.D.N.Y. Mar. 26, 2014) ..................... 33

*Kirschner v. Klemons*,
  No. 99 Civ. 4828 (RCC), 2005 WL 1214330 (S.D.N.Y. May 19, 2005)................................. 18

*Leser v. U.S. Bank Nat'l Ass'n*,
  No. 09-CV-2362 (KAM)(ALC), 2011 WL 1004708 (E.D.N.Y. Mar. 18, 2011).............. 26, 27

*Mitchell v. Metro. Life Ins. Co.*,
  No. 01 Civ. 2112 (WHP), 2002 WL 441194 (S.D.N.Y. Mar. 21, 2002).......................... 31, 32

*Molefi v. Oppenheimer Trust*,
  No. 03 CV 5631 (FB)(VVP), 2007 WL 538547 (E.D.N.Y. Feb. 15, 2007)............................ 30

*Murphy v. Bd. of Educ.*,
  No. 00-CV-6038, 2000 WL 33945849 (W.D.N.Y. Sept. 11, 2000)................................... 22, 34

*Murray v. Geithner*,
  No. M8-85 (LAK), 2010 WL 1257324 (S.D.N.Y. Mar. 25, 2010) ......................................... 26

*Nova Biomed. Corp. v. i-STAT Corp.*,
  182 F.R.D. 419 (S.D.N.Y. 1998)........................................................................................... 26

*Premer v. Corestaff Servs., L.P.*,
  232 F.R.D. 692 (M.D. Fla. 2005) ......................................................................................... 22

*Revson v. Cinque & Cinque, P.C.*,
  221 F.3d 71 (2d Cir. 2000) ................................................................................................... 33

*Singletary v. Sterling Transp. Co.*,
  289 F.R.D. 237 (E.D. Va. 2012)........................................................................................... 22

*Straight Path IP Group, Inc. v. Blackberry Ltd.*,
  No. Civ. 14-80150 WHA, 2014 WL 3401723 (N.D. Cal. July 8, 2014)................................ 25

*Syposs v. United States*,
  181 F.R.D. 224 (W.D.N.Y. 1998) ........................................................................................ 22

*U.S. Football League v. Nat'l Football League*,
  605 F. Supp. 1448 (S.D.N.Y. 1985) ..................................................................................... 31

*United States v. Int'l Bus. Machs. Corp.*,
  83 F.R.D. 92 (S.D.N.Y. 1979)............................................................................................... 20

*Wultz v. Bank of China Ltd.*,
  293 F.R.D. 677 (S.D.N.Y. 2013) .......................................................................................... 28

**Statutes**

28 U.S.C. § 1927 .................................................................................................................. 1, 30

**Rules**

Colo. R. Civ. P. 45(b)(2) ............................................................................. 27, 28

Fed. R. Civ. P. 1 ............................................................................................... 26

Fed. R. Civ. P. 26(b)(2)(C) ............................................................................. 24

Fed. R. Civ. P. 26(c) ......................................................................................... 1

Fed. R. Civ. P. 26(f) ......................................................................................... 17

Fed. R. Civ. P. 4(e) ..................................................................................... 27, 28

Fed. R. Civ. P. 45(a)(1)(A)(iii) ....................................................................... 29

Fed. R. Civ. P. 45(b)(1) ................................................................................... 26

Fed. R. Civ. P. 45(c)(1) ................................................................................... 30

Fed. R. Civ. P. 45(c)(2)(A) ............................................................................. 30

Fed. R. Civ. P. 45(d)(1) ............................................................................... 1, 30

Fed. R. Civ. P. 45(d)(3) ..................................................................................... 1

Fed. R. Civ. P. 45(d)(3)(A)(ii) ....................................................................... 29

Fed. R. Civ. P. 45(d)(3)(A)(iv) ....................................................................... 24

Fed. R. Civ. P. 5(b)(2)(B) ........................................................................... 27, 28

Fed. R. Civ. P. 5(b)(2)(C) ............................................................................... 28

N.Y. C.P.L.R. § 308 .................................................................................... 27, 28

N.Y. Rules of Prof. Con. 1.9(a) ....................................................................... 31

N.Y. Rules of Prof. Con. 1.9(c)(1) ................................................................. 31

**Other Authorities**

Fed. R. Civ. P. 45 at Advisory Comm. Notes on Rules—2013 Amendment ............................. 30

Non-parties William Browder ("Browder"), Sundance Aspen LLC ("Sundance"), Michael Cassidy Foley ("Foley"), Acme Property Management, Inc. ("Acme"), Victoria Tarantino ("Tarantino"), and Victoria Tarantino Consulting LLC ("Tarantino Consulting") (collectively, the "Affected Non-Parties") respectfully submit this memorandum of law in support of their motion, pursuant to Federal Rule of Civil Procedure 45(d)(3), to quash the subpoenas purportedly served on Browder on July 29, 2014 (the "Browder Subpoena"), and served on Sundance, Foley, and Acme on July 30 and 31, 2014, in Colorado, and on Tarantino and Tarantino Consulting on August 15, 2014, in Nevada (collectively, with the Browder Subpoena, the "Subpoenas"); for the imposition of sanctions on Defendants and their counsel pursuant to Rule 45(d)(1) and 28 U.S.C. § 1927; and for a protective order pursuant to Federal Rule of Civil Procedure 26(c) enjoining Defendants from issuing any additional third-party discovery to or about Browder until the occurrence of certain events, as outlined herein.

## PRELIMINARY STATEMENT

This is a motion brought to quash a wave of non-party subpoenas issued by Defendants to target a potential witness in the Government's civil forfeiture case, William Browder, for harassment and intimidation.  Browder is an internationally-renowned entrepreneur who was among the first and most prominent Western investors in Russia.  Since his lawyer, Sergei Magnitsky, was unlawfully arrested, imprisoned, and ultimately murdered by Russian authorities for reporting the massive theft and tax fraud underlying this civil forfeiture action, Browder has become a strong, steadfast advocate against the human rights abuses and government corruption that plague Russia, even at the risk of his own personal safety.

For years, Defendants and their co-conspirators have relentlessly targeted Browder through any means possible, including sham lawsuits, baseless investigations and defamatory

1

public relations tactics.  Yet Defendants' politically-motivated campaign to smear Browder has now reached a new, egregious low through their simultaneous issuance of the six abusive, overreaching Subpoenas to Browder and the other Affected Non-Parties.  Defendants then deployed their U.S. lawyers—including conflicted counsel who previously represented Browder in a substantially related matter—to attack Browder in the international press, falsely claiming that he must either "appear for questioning" or "be subject to punishment *up to and including arrest*." Ex. 1 (emphasis added).[1]  And last week, in a grotesque preemptive strike to get ahead of this scheduled motion, Defendants, through their conflicted lawyers, filed what they called a "second supplemental" brief on an unrelated issue to defame Browder as a "criminal tax cheat" in "full evasion mode."  Dkt. 107 at 4–5.  Ominously, and perhaps not coincidentally, shortly before the Subpoenas were issued, Browder became aware, through confidential and reliable sources, of potential threats against him, *see* Rubin Decl., ¶ 2, while, at the same time, these invasive subpoenas outrageously seek information about his security arrangements and bodyguards.  *See* Ex. 2 at Request Nos. 31–32.

Each of these Subpoenas should be quashed immediately, with the fees and costs associated with this motion imposed on Defendants and their U.S. lawyers for issuing them.

*First*, the Subpoenas constitute a transparent attempt to threaten and harass Browder "about the circumstances of his activities in Russia," among other subjects inappropriate and irrelevant to this civil forfeiture action.  Ex. 1.  The requests to Browder—which concern, among other things, his security arrangements to protect himself and his family from Defendants and their co-conspirators; passport, visa, and travel-related information, including his flights and accommodations, that would identify his whereabouts and travel patterns; financial account

---

[1]   References to "Ex." are to the exhibits referenced in the Declaration of Lisa H. Rubin, Esq. ("Rubin Decl.").

numbers; and the amounts and sources of his income—appear to have been formulated for no purpose other than harassment and intimidation.  That those requests were crafted by a legal team that includes Browder's former and now Defendants' conflicted counsel (John Moscow at BakerHostetler)—and are premised upon confidences shared through that engagement— highlights how far Defendants and their co-conspirators will go to target those who dare to speak out against them.  Indeed, the requests were not made in a vacuum; rather, as detailed here, they followed a series of terrifying events in Russia and abroad, including Magnitsky's murder, the Russian government's fabricated, politically-motivated convictions of Magnitsky posthumously and Browder in absentia for tax evasion, and Russia's ongoing appeal to Interpol to include Browder on the "internationally wanted" list.  *See* Ex. 3.  Defendants' counsel knows full well how frightening these events have been for Browder.  Scrawled on the cover letter of a BakerHostetler invoice issued days after Magnitsky's arrest is John Moscow's handwritten sympathy:  "We're thinking of you and your colleagues and hoping for the best, while we work." Ex. 50.  Thus, because a principal purpose of the Subpoenas now issued here appears to be to undermine Browder's safety and security, they should be quashed on that basis alone.

*Second*, even if the intent of these Subpoenas is to "make it obvious that [Browder] is lying," as Defendants and their counsel have bragged to the Russian press, that too is insufficient justification for these many non-party Subpoenas.  Ex. 4.  The U.S. Congress, State Department, and Department of Justice have all found Browder to be a truth-teller and crime victim who has exposed a major international scandal of corruption and murder at the highest levels of the Russian government.  But leaving that aside, Defendants' counsel cannot justify these invasive Subpoenas on that hollow charge alone, especially where, as here, they themselves have argued

that he has no relevant evidence to provide and "no first-hand knowledge of" the " key issues" in this civil forfeiture case.  Dkt. 94 at 1, 6–7, 9.

Incredibly, one of Defendants' lawyers from BakerHostetler, the firm that previously represented Browder in subpoenaing bank records and tracking the flow of funds illegally procured from the massive tax fraud—documents that the Government reviewed in bringing this case—has boasted to the international press that Defendants intend to ask Browder "difficult questions regarding his own tax evasions in Russia and additional aspects of his activity, to show his unreliability and prove he doesn't need to be a witness or even a source on which the prosecution can base its case." Ex. 5.  But Defendants cannot show—in part, from their own refusal to cooperate in party discovery—that the overbroad discovery they seek through these Subpoenas bears any relationship to the claims or defenses in this civil forfeiture action, including how the Government intends to prove its case.  Instead, Defendants believe that impugning Browder is an end in and of itself.  Federal courts have held squarely that it is not.

*Third*, these Subpoenas are absurdly overbroad and impose needless burdens on the Affected Non-Parties.  Even assuming that the Subpoenas have some legitimate purpose—which they do not—the Browder Subpoena alone implicates every request already made in two prior subpoenas still being contested through pending motions before this Court, not to mention decades' worth of information, a range of entities not under Browder's control, and vast quantities of information more readily accessible through party discovery.  The other Subpoenas are based entirely on the speculation that their requested documents will tie Browder—a U.K. citizen who works in London—to Colorado, where Defendants attempted to serve him while he attended a conference of leaders "committed to making a positive difference in the world."  Ex. 6 at 1.  And Defendants' failure to engage in party discovery—or to seek documents from publicly

available or other, more direct and convenient sources—further highlights the unfairness and gamesmanship of their attempts to saddle the Affected Non-Parties with broad and invasive discovery.  Especially given the irrelevance of the requested documents to the parties' claims and defenses in this civil forfeiture action, these Subpoenas—virtually limitless in scope, source, and applicable time frames—should be quashed.

*Fourth*, the Browder Subpoena flouts the Federal Rules of Civil Procedure.  Whether or not Browder was properly served—and he was not—Rule 45 imposes independent limits on third-party discovery.  Browder cannot be forced to testify or produce documents unless he lives, works, or regularly transacts business in person within 100 miles of Aspen.  None of this is true of him.  Defendants' attempt to transform Browder's attendance of a three-day conference and a family vacation into an end-run around Rule 45 should not be countenanced.

Defendants are trying to transform the Government's civil forfeiture case against them into a court-sanctioned smear campaign against Browder.  In the international press, Defendants even have insisted that Browder needs "the legitimization in court . . . of his version of the events" underlying the massive tax fraud and sought extensions here just to "look[] for new evidence against the Russian side."  Ex. 7.  Nothing could be farther from the truth.  Browder wants to be free from the constant persecution, intimidation, and potential physical danger that Defendants, their co-counsel, and their co-conspirators pose.  To prevent further abuse, this Court should enter a protective order prohibiting Defendants and their counsel from issuing any further non-party discovery to or about Browder unless and until this Court resolves the conflict of interest posed by Browder's former counsel's representation of Defendants, decides this motion and other pending motions about two prior, non-party subpoenas relating to Browder,

and even then, only after meaningful party discovery and only if any new discovery is narrowly tailored to issues relevant to the resolution of this civil forfeiture action.

Accordingly, for all of the reasons explained here, this Court should quash these abusive, overreaching Subpoenas, force Defendants and their counsel to pay the Affected Non-Parties' fees and expenses associated with this motion, and enter a protective order to prevent further discovery abuses by Defendants and their counsel.

## FACTUAL BACKGROUND

### I.      William Browder and Hermitage Capital

William Browder is an internationally-renowned entrepreneur and British citizen who is the Chief Executive Officer of Hermitage Capital Management Ltd. ("Hermitage Capital"), a global investment advisory firm specializing in emerging markets, which Browder co-founded in 1996. Beginning in the mid-1990s, Browder led a wave of Western investments in Russia, becoming the country's largest foreign portfolio investor at one time. *See* Exs. 8 & 9. Indeed, by the end of 2005, companies run by Hermitage Fund—which Hermitage Capital advised— were collectively one of Russia's largest taxpayers. While initially embraced by Russian politicians and elites, the Russian government barred Browder from Russia that year in retaliation for his corporate governance and anti-corruption campaigns and declared him a threat to national security. *See* Exs. 9, 48 at 3.

Thereafter, fearful of further retaliation, a fund advised by Browder liquidated its Russian assets, leaving behind shells of its holding companies. His fears were realized nonetheless. In June 2007, Russian law enforcement seized corporate documents from Browder's and his lawyers' Moscow offices in raids. Compl. ¶¶ 24–26. Months later, Browder and Hermitage Fund's lawyers discovered, to their shock, that the three holding companies had been

fraudulently transferred to an unknown entity owned by a convicted killer.  *Id.* ¶ 26.  The raiders—aided by Russian police and tax officials—then instigated sham lawsuits against the stolen entities premised on documents that were seized by the police, and through collusive court proceedings, filed amended tax returns purporting to reduce the previous year's profits to zero. *Id.* ¶¶ 29–37.  That allowed them to obtain—through a single approval in December 2007—a fraudulent refund of $230 million in taxes paid by the holding companies in 2006.  *Id.* ¶ 40.

In 2008, Browder's tax lawyer, Sergei Magnitsky, testified about the involvement of certain Russian police officers in the $230 million theft.  *Id.* ¶ 60.  One month later, those police officers arrested him at his home.  *Id.* ¶ 62.  Magnitsky was then put in pre-trial detention, where he was tortured and ultimately killed.  *Id.* ¶ 64–66.  Since then, Browder has sought to hold Magnitsky's murderers responsible for their heinous actions.  *See, e.g.*, Exs. 10–11.  That work has come at a cost to Browder and his family.  In July 2013, after Browder successfully advocated for the passage of the landmark Magnitsky Act—which requires the U.S. government to prohibit travel into the U.S. by and freeze the assets of those found to be responsible for the conspiracy Magnitsky uncovered and his death—Browder was convicted in absentia alongside Magnitsky in the "first posthumous trial in [Russia]'s history."  Ex. 12 at 13.  The State Department immediately decried the "unprecedented posthumous criminal conviction" Ex. 9 at 2, as a "discredit to the efforts of those who continue to seek justice in [Magnitsky's] case," Ex. 49 at 1, while U.S. senators of both parties called the verdict "shameful," Exs. 13–14.  Indeed, in May 2014, the United States placed Igor Alisov, the judge who presided over this "shameful" trial, on the so-called "Magnitsky List."  *See* Ex. 15.  To this day, Russian authorities are appealing to Interpol to return Browder to Russia to serve his sentence, despite Interpol twice rejecting such applications as politically motivated.  *See* Exs. 3, 5, & 16.

Moreover, Browder has withstood a persistent, worldwide campaign to silence and harass him, ranging from further civil and criminal cases against him in Russia to a constant barrage of accusations against him in the press, including by Defendants' counsel.  *See* Exs. 1, 4–5, 16. Most recently, he has learned from confidential and reliable sources of potential threats against him, causing him to consult with law enforcement in the U.K. and the U.S. both before and after the Subpoenas were issued.  *See* Rubin Decl., ¶ 2–3.[2]

## II.   Defendants Counsel Previously Represented Browder Against Defendants' Co-Conspirators And, Therefore, Has A Disabling Conflict Of Interest

Defendants and their co-conspirators' campaign against Browder has also involved Defendants' hiring of the same lawyer and law firm who represented Browder in a substantially related engagement—and whose knowledge of Browder's business arrangements, defense strategy, discovery efforts, and global advocacy to win justice for his lawyer now compromise Browder's confidences and endanger the integrity of this proceeding.  Specifically, in September 2008, Browder met with BakerHostetler partner and former prosecutor John Moscow ("Moscow"), who specializes in money laundering and complex corporate fraud.  *See* Ex. 17. Browder provided Moscow with a "detailed briefing" about the $230 million tax fraud underlying this case, and the ways in which those actually responsible for the crime were attempting to "fraudulently create apparent criminal liability on Hermitage Capital."  Ex. 18 at 1. As Moscow himself documented, Browder asked Moscow to "analyze the behavior at issue with a view to causing criminal prosecutions where appropriate in New York," to "structure a presentation of evidence on these potential frauds that will be easily understood by prosecutors in this country," and "to suggest their taking action," including "forfeiture by the Department of

---

[2]   While Browder is not at liberty to reveal his sources publicly, counsel will make this information available *in camera* at this Court's request.

Justice." *Id.* The engagement letter between Browder and BakerHostetler similarly confirms

that Moscow agreed to represent Browder "in connection with certain apparent frauds committed

by and through Renaissance Capital," which Browder believed was involved in the $230 million

tax fraud, and that, among other tasks, Moscow and his team would undertake "extensive

analysis of the factual and legal background of the events in question," and "prepar[e] and

present[] . . . prosecution memoranda, if appropriate," to the Department of Justice.  Ex. 19 at 1.

      While BakerHostetler now characterizes its representation of Browder and Hermitage

Capital as "very limited" to "getting subpoenas relating to Renaissance," Dkt. 77 at 28–29, or

"obtain[ing] records . . . from a broker-dealer in aid of the defense of a Russian criminal

proceeding" over "several weeks," Ex. 20 at 1, their invoices tell a different story.  *See generally*

Exs. 21–26.  BakerHostetler's invoices reflect that for nearly a year, their work included:

- Investigating the facts and legal requirements for a "criminal case," including a "criminal RICO" case, Exs. 21 at 4 & 22 at 3;

- Reviewing the facts and legal circumstances surrounding "Russian tax filings and lawsuits," *e.g.*, Ex. 22 at 6;

- Drafting talking points and PowerPoint presentations to be used in communications with the U.S. Attorney's Office for this District and other law enforcement agencies, *see id.* at 4–5, 8, 11;

- Developing an understanding of the funds and people involved in Hermitage Capital's investments, *see id.* at 5;

- Constructing a "case timeline" concerning various criminal complaints and tax fraud and building an "information database," *id.* at 8;

- Analyzing bank records, *see, e.g.*, *id.* at 8; and

- Preparing document subpoenas, pursuant to 28 U.S.C. § 1782, to trace the proceeds of the fraud and to assist in the defense of criminal cases in Russia, including to secure Magnitsky's release from unlawful pre-trial detention, and "drafting declarations for Mr. Browder and Mr. Moscow" and others in connection with the same.  *Id.* at 6–10; *see also* Ex. 23 at 3; Ex. 24 at 3; Ex. 25 at 3.

During the engagement, Moscow personally had numerous in-person and telephone conversations with Browder, *see, e.g.*, Exs. 21 at 3; 22 at 4–6, 10, 24 at 3; "formulate[d] disclosure of the criminal enterprises," Ex. 22 at 5; met with former Southern District AUSA Marcus Asner on Hermitage Capital's behalf for nearly five hours, *id.* at 9; *see also id.* at 6, traveled to the British Virgin Islands to attend a meeting at its Attorney General's office, *id.* at 11; and even spoke with Jamison Firestone, the head of Browder's Russian law firm, Firestone Duncan, where Magnitsky was employed prior to his arrest, Ex. 24 at 3.  Overall, BakerHostetler's prior representation of Browder and Hermitage Capital broadly entailed helping to tracing the proceeds of the massive tax fraud and developing ways to hold any and all wrongdoers accountable for their theft and laundering of stolen funds under U.S. law.  Those are, of course, the very issues that gave rise to, and are at the heart of, the instant litigation.

In October 2013, when Hermitage Capital learned of Moscow and BakerHostetler's appearance for Defendants in this litigation, it demanded that BakerHostetler recuse itself.  *See* Ex. 27.  BakerHostetler refused, contending that Hermitage Capital is neither a party to this case nor a victim of any alleged wrongdoing by Defendants.  *See* Ex. 20 at 2.  Hermitage Capital subsequently filed grievances with the disciplinary committees of this Court and the First Department about this irreconcilable conflict of interest.  *See, e.g.*, Rubin Decl., ¶ 5; Dkt. 106-1 at 2–3.  This Court's disciplinary committee recently informed Hermitage Capital that it would not take any action, but "without prejudice to [Hermitage Capital's] right as a non-party to raise [its] concerns about the potential conflict of interest with Judge Griesa."  Ex. 28.  Upon information and belief, the First Department's investigation is ongoing.  *See* Rubin Decl., ¶ 6.

In a March 2014 letter to the Court, the Government also raised BakerHostetler's conflict, explaining that, although the Government "[n]ormally . . . does not become enmeshed in

opposing-counsel conflicts in civil matters," "the prejudicial effect" that "th[e] conflict will have

on [deposition and trial] testimony . . . in this case," required raising "the conflict" with this

Court "as soon as possible." Dkt. 106-1 at 1. In particular, the Government expressed concern

that Moscow's deposition of a federal agent involved in the pre-suit investigation revealed the

"unfair advantage" Moscow and his firm would have as a result of confidential information

shared by Browder and Hermitage Capital, including "knowing what to ask for in discovery,

which witnesses to seek to depose, [and] what questions to ask them." *Id.* at 4 (quoting *Ullrich

v. Hearst Corp.*, 809 F. Supp. 229, 236 (S.D.N.Y. 1992)). Through the Subpoenas, the

Government's fear—that Moscow could exploit privileged and confidential information to

"attack the credibility of Mr. Browder"—has been realized. *Id.*

### III. Defendants Issued *Eight* Improper Non-Party Subpoenas To Or About Browder

#### A. Defendants Refuse To Withdraw The Hermitage Global Subpoenas

This civil forfeiture action aims to redress Defendants' alleged laundering of under $1

million from the $230 million tax fraud. *See, e.g.*, Dkt. 77 at 8. Despite the limited scope of this

case, Defendants have demanded the same improper, irrelevant, and burdensome discovery from

and about Browder for months. Specifically, in April and May 2014, Defendants issued two

subpoenas—to Hermitage Global Partners LP, a non-operating Delaware partnership whose

general partner is a Cayman Islands company and which holds residual assets for a small number

of limited partner investors, and to Browder in his purported capacity as a director of that entity

(collectively, the "Hermitage Global Subpoenas")—for documents and testimony to be given in

Washington, D.C. *See* Exs. 29 & 30. Neither Hermitage Global nor its general partner had any

involvement in or connection to any of the events relevant to this case. *See* Ex. 31 at 2–3. Nor is

Browder a director of Hermitage Global. *Id.* at 3. Hermitage Global also has no relationship

with Hermitage Capital or Hermitage Fund, whose investment companies were stolen by corporate raiders in Russia. *See id.*

Like the Subpoenas here, the Hermitage Global Subpoenas demand an incredible amount of material—from a vast and at times unlimited number of sources—wholly irrelevant to the claims and defenses in this action. Exs. 29 & 30. Hermitage Global has moved to quash those two subpoenas, arguing that service was not effective as to Browder, who is not and has never been a director of Hermitage Global; that the subpoenas impermissibly seek information solely for use against Browder in other, foreign proceedings; that Hermitage Global itself has no connection to this case or control over any of the requested documents; and that the Hermitage Global subpoena exceeds Rule 45(c)(1)(A)'s 100-mile-radius requirement. *See generally* Ex. 32. Hermitage Global also opposed Defendants' "wildly overbroad and unduly burdensome" document requests, especially given Defendants' "clear intent to target Browder personally," the complete absence of any relationship between the documents sought and the parties' claims and defenses here, and the documents available to—but inexplicably not yet sought by—Defendants through party discovery or publicly-accessible sources. Ex. 33 at 2–5.

After extensive briefing this past spring and summer, on August 8, 2014, the U.S. District Court of the District of Columbia transferred all of the motions relating to the Hermitage Global Subpoenas to this Court. *See* Exs. 34 & 35. Defendants have refused to withdraw the Hermitage Global Subpoenas, arguing that if Browder contests service of the Browder Subpoena, "it is obviously premature to withdraw [the Hermitage Global S]ubpoenas as to which service is not contested." Ex. 36 at 1. Defendants further stated that given that briefing about the Hermitage Global Subpoenas is complete, there is "little marginal cost" in continuing to litigate their validity and enforceability. *Id.* Accordingly, those motions await this Court's resolution.

**B.    The New Subpoena To Browder Was Not Effectively Served And Is Even More Abusive, Invasive, And Unduly Burdensome**

Between late July 2014 and mid-August 2014, Defendants struck again, issuing *six* additional, abusive Subpoenas.  The first, issued to Browder personally, was thrust at him by two unknown, unidentified, and hostile people as he exited a conference center at the Aspen Institute on July 29, 2014, and while vacationing with his family.  *See* Ex. 16.  Given his awareness of potential threats against him, Browder and his minor son understandably ran as the process servers approached, yelling his name and snapping photos.  The process servers then threw the Subpoena on the windshield of a car, and his minor son rejected it.

Recognizing their failure to successfully serve him personally, Defendants subsequently tried to serve Browder the next day by leaving the Subpoena on the doorstep of an Aspen residence.  Defendants also attempted to serve the Browder Subpoena to that same Aspen residence via Federal Express and by emailing a copy to Hermitage Global's counsel, who made clear months earlier that he was not authorized to accept service for Browder.  *See* Ex. 37 at 1.  None of these service attempts was effective.

More fundamentally, the Browder Subpoena violates every *substantive* limit imposed by Rule 45 to protect non-parties.  *First*, it repeats—often, verbatim—each and every request made in the Hermitage Global Subpoenas, including wholly improper, irrelevant, or at the very least, absurdly burdensome and overbroad, requests for:

- Browder's passports, visas, and other sensitive personal and travel-related information, including that which would reveal his flights, accommodations, whereabouts, and travel patterns, *compare* Ex. 2 at Request Nos. 18, 19, 20 *with* Exs. 29 & 30 at Request No. 18;

- Private and confidential financial information, including Browder's and numerous businesses' tax returns, financial account numbers, and amounts and sources of income, regardless of jurisdiction, *compare* Ex. 2 at Request No. 7 *with* Exs. 29 & 30 at Request No. 5;

13

- Private and confidential investments and trading by Browder and a slew of other entities, including Dalniaya Step and Saturn Investments, through which Browder and Magnitsky are alleged to have perpetrated the tax fraud of which they were falsely convicted in Russia in absentia and posthumously, respectively, *compare* Ex. 2 at Request Nos. 4–5, 7, 16, 25 *with* Exs. 29 & 30 at Request Nos. 3–4, 16;

- All discovery Browder obtained to aid in his and others' defense against sham foreign cases being pursued against him by Defendants' co-conspirators, including all documents that Browder and his purported "Affiliated Persons" received in response to 28 U.S.C. § 1782 applications and as a result of Defendants' now-conflicted counsel's preparation thereof, *compare* Ex. 2 at Request No. 24 *with* Exs. 29 & 30 at Request No. 21;

- All documents concerning Dmitry Baranovsky—an individual currently serving a 12-year sentence in Russia for allegedly extorting money from Prevezon's owner, Denis Katsyv—including communications between Browder and Baranovsky, *compare* Ex. 2 at Request No. 11 *with* Exs. 29 & 30 at Request No. 7;

- Browder's communications with various newspapers and non-governmental organizations, including those combatting human rights abuses and government corruption in Russia, or any member, contributor, reporter, or agent thereof, *compare* Ex. 2 at Request No. 12 *with* Exs. 29 & 30 at Request Nos. 8–9;

- All documents reflecting Browder's lobbying efforts and contacts with the U.S. government, including anything related to the Magnitsky List, *compare* Ex. 2 at Request Nos. 21–22 *with* Exs. 29 & 30 at Request Nos. 19–20; and

- All documents exchanged between Browder and any officer, agent, or affiliate of multiple foreign governments—including the U.K., the British Virgin Islands, Switzerland, and Russia—concerning "the subject matter of the Complaint," *compare* Ex. 2 at Request No. 15 *with* Exs. 29 & 30 at Request No. 15.

*Second*, the Browder Subpoena contains several new requests, which also appear to target

Browder and his intimates and are so irrelevant and overbroad as to be farcical. Among other

issues, those requests also demand all documents concerning:

- Browder's security arrangements since 1998, including Browder's relationship with certain purported security companies, their management, employees, and contractors—about whom Defendants only could have learned through stolen files, *see* Ex. 2 at Request Nos. 31–32;

- "[T]he structure, holdings, and investments of Hermitage [Capital]" between 1998 and 2007, including documents "related to Hermitage's investors [and] their entities," which would essentially give Defendants and their co-conspirators an atlas of Hermitage's finances and relationships, *id.* at Request No. 28;

14

- Information Browder has provided to U.S. immigration officials upon entering the U.S., which would encompass his travel itineraries, lodging arrangements, and any information about his baseless Russian criminal conviction, *see id.* at Request No. 20;

- Browder's employees, myriad entities and funds purportedly connected to him, and a virtually unlimited universe of purported "Affiliated Persons," including information relating to all such persons' citizenship, passports and visas, their personal addresses, and their communications with the U.S. Government concerning the "subject matter of the Complaint," *id.* at Request Nos. 29–30;

- Additional, unrelated foreign proceedings, including other sham and/or remote Russian lawsuits brought to justify Defendants and their co-conspirators' theft from Browder and frame him as a criminal, *see id.* at Request Nos. 10, 14;

- Browder's communications about the Swiss proceeding relating to the massive tax fraud, and with and about Alexander Perepilichnyy, who reportedly cooperated with the Swiss government to implicate Russian state officials in that fraud and who died in 2012, under mysterious circumstances, and Perepilichnyy's affiliates, *see id.* at Request Nos. 14, 23;

- Browder and his alleged affiliates' relationship with Benjamin Steinmetz, Browder's former business partner of nearly two decades ago, *see id.* at Request No. 27;

- Russian veterans' groups, including the Fighting Brotherhood of Afghan War Veterans, whose members' employment by Browder was alleged to be part of the fabricated tax evasion scheme for which he was convicted in Russia, *see id.* at Request No. 6;

- All payments by Browder to "fund any entity . . . concerning the subjects of the Complaint," which would even encompass Browder's payments to BakerHostetler for its prior representation, *see id*. at Request No. 33; and

- "All transcripts and recordings made by you or your Affiliated Persons"—the potential existence of which Defendants would know about only from information shared by Browder and Hermitage Capital with their former and Defendants' current counsel—concerning each and every subject of the other, thirty-plus document requests, *id.* at Request No. 25.

Defendants have openly admitted that certain of these new requests have nothing to do with this lawsuit.  For example, the Subpoena broadly demands all documents about Magnitsky's death and his "capacity, functions, duties, and/or responsibilities as [Browder's] employee," *id.* at Request No. 26, yet Moscow told the press last month that "the death of Mr. Magnitsky is an event that led to . . . diversion of attention from the substance of the case."  Ex. 16.

*Third*, the Browder Subpoena requests countless documents that are publicly available, more readily obtainable from the Government directly through the exchange of party discovery, and/or equally accessible to Browder and Defendants, including lobbying registration forms and reports; *see id.* at Request Nos. 21–22, and even statements admittedly published on freely accessible websites, *see id.* at Request No. 17.

*Fourth*, the impropriety and sheer oppressiveness of the Browder Subpoena is compounded by Defendants' expansion of the applicable time frames, including some dating back to the mid-1990s,[3] and the expansive, unworkable definitions of "you," "your," and "Affiliated Persons," which are used liberally throughout the requests.  Under the Browder Subpoena, Browder is Hermitage Capital; any corporation Browder directly or indirectly controls, including nine specifically named entities; any fund he advises; any predecessor or successor companies of any included entity; "all related entities (including but not limited to entities in Russia, Cyprus, Jersey, Guernsey, and any other jurisdiction, whether owned or controlled by you or your investors)"; and "any Affiliated Persons," meaning "all employees, consultants, agents, representatives, entities, or persons acting on" behalf of "you."  Ex. 2 at 1. By virtue of these never-ending, circular definitions alone, the Subpoenas are oppressive.

### C.    The Other Affected Non-Parties And The Requests To Them Have No Connection To The Claims, Defenses, Or Parties In This Case

The remaining Subpoenas—to Colorado limited liability company Sundance, Colorado resident Foley and his company, Acme, and Nevada resident Tarantino and her company, Tarantino Consulting, respectively—are no less abusive.  None of these entities or individuals has any connection to this litigation or any of its parties, nor were they even aware of this

---

[3]  For example, while the Hermitage Global Subpoenas seek tax returns from 2005 through the present, the Browder Subpoena seeks them from 1997 through the present.  *Compare* Exs. 29 & 30 at Request No. 5 *with* Ex. 2

litigation before being subpoenaed.  *See* Ex. 38, ¶¶ 3–5; Ex. 39, ¶¶ 3–5; Ex. 40, ¶¶ 3–5.

Incredibly, however, these Subpoenas seek all documents concerning the ownership and/or

holdings of Sundance and the source of funds for any property owned by it; all documents

"concerning Browder," a lengthy list of companies purportedly controlled by him, any fund

advised by him, any person acting or purporting to act on his behalf, and his so-called "Affiliated

Persons;" and all documents concerning Sundance and/or Tarantino, and even people loosely

related to them.  Ex. 41 at Request Nos. 1–2 & 4–5; Exs. 42 & 43 at Request Nos. 1, 3–4; Exs.

44 & 45 at Request Nos. 1–2 & 4–5.  The exhaustiveness of these requests stands in stark

contrast to the burdens that would be imposed on the Affected Non-Parties in collecting,

reviewing, and producing hard-copy and electronic documents.  Indeed, Foley and Tarantino are

the sole proprietors of their home-based businesses, Acme and Tarantino Consulting,

respectively.  *See* Ex. 39, ¶ 1 & Ex. 40, ¶ 1.

> **D.** **The Lack Of Party Discovery Highlights The Subpoenas' Impropriety**

To date, there is no discovery schedule in place, nor have the parties submitted a

discovery plan to this Court, as required by Federal Rule of Civil Procedure 26(f).  *See* Dkt. 81-4

at 2–3.  Moreover, after some negotiations with the Government about a protective order to

govern discovery, Defendants have not responded to the Government about that order since late

March 2014, "giv[ing] no indication that they are in a rush to . . . begin the process of reciprocal

document production" and effectively preventing any party discovery.  Ex. 46 at 1.  Indeed, the

only party discovery that has occurred is Defendants' "incomplete" deposition of Special Agent

Todd Hyman, which was taken and terminated early by Moscow, *see* Dkt. 88 at 11–12, and

which this Court subsequently characterized as a "waste of time."  *See* Dkt. 77 at 7.

---

at Request No. 8.  The Browder Subpoena also seeks a wide array of documents concerning Browder's travel dating
back to 1996 instead of 2005.  *Compare* Exs. 28 & 29 at Request No. 18 *with* Ex. 2 at Request No. 18.

Incredibly, even as they have launched *eight* non-party subpoenas to and about Browder, Defendants have not produced a *single piece of paper or witness* to the Government, *see* Ex. 46 at 1–2 (asserting that the parties "have not yet exchanged initial document productions"), other than a single unsworn, conclusory affidavit about the purported effect of the existing protective order on Defendants' business operations.  *See* Rubin Decl., ¶ 7.  In the meantime, the Government has tried to move the case forward, issuing mutual legal assistance treaty requests to a "number of different countries, including Russia, Moldova, and Dubai."  Dkt. 77 at 18.

## ARGUMENT

I.     **The Abusive Subpoenas Must Be Quashed**

   A.     **Defendants Have Issued The Subpoenas For The Wholly Improper Purposes Of Intimidating And Impeaching Browder**

"It is axiomatic that a party cannot take [discovery] for purposes unrelated to the lawsuit at hand."  *Echostar Comm'cns Corp. v. News Corp. Ltd.*, 180 F.R.D. 391, 396 (D. Colo. 1998) (citation omitted).  Under Second Circuit law, a party subpoenaing a non-party "must demonstrate that the information sought is relevant and material to the allegations and claims at issue in the proceedings."  *Crosby v. City of New York*, 269 F.R.D. 267, 282 (S.D.N.Y. 2010) (citation and internal quotations omitted); *see also In re Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 69 (2d Cir. 2003) (discovery must be "relevant to the claim or defense of *any* party").  Conversely, where a non-party subpoena "pursues material with little apparent or likely relevance to the subject matter," that subpoena "is likely to be quashed as unreasonable even where the burden of compliance would not be onerous."  *Kirschner v. Klemons*, No. 99 Civ. 4828 (RCC), 2005 WL 1214330, at *2 (S.D.N.Y. May 19, 2005) (citation and internal quotations omitted).  Here, because Defendants seek non-party discovery from and about Browder for ulterior motives "utterly irrelevant to the issues in this lawsuit," the Subpoenas must be quashed.

*Fox Indus., Inc. v. Gurovich*, No. CV 03-5166 TCP WDW, 2005 WL 2133595, at *4 (E.D.N.Y.

Sept. 1, 2005).

*First*, the Subpoenas appear to have a truly insidious aim: to intimidate and target

Browder.  Indeed, the Subpoenas were unleashed after a series of frightening events that have

been increasingly focused on Browder:

- In 2009, Magnitsky, Browder's lawyer, was killed, with no one held responsible despite what the State Department has called "widely publicized, credible evidence of criminal conduct" by Russian authorities, Ex. 12 at 40;

- In 2012, Russian businessman Alexander Perepilichnyy, who sought exile in the U.K. and cooperated with other governments' investigations of the fraud and money laundering, died in England at age 44 under mysterious circumstances, *see* Ex. 47;

- Last year, Browder, in absentia, and Magnitsky, posthumously, were convicted after a Russian trial the U.S. State Department called a "discredit to the efforts of those who continue to seek justice in [Magnitsky's] case," Ex. 49 at 1;

- In 2012 and 2013, Dmitry Baranovsky, another Russian businessman and human rights activist, who attempted to report fraudulent activity by Defendants' affiliates, was convicted of extorting Denis Katsyv, Prevezon's owner, and Katsyv's father, among others, and is now serving a 12-year Russian prison sentence, *see* Ex. 7; and

- To this day, Russia is appealing to Interpol to declare Browder "internationally wanted."  *See* Ex. 3.

Browder, his lawyer, and his associate have also received "numerous death threats, by text, [and]

by e-mail," including messages asking, "What's worse: prison or death?"  *See* Ex. 48 at 3.

Indeed, shortly before the Subpoenas were issued, Browder learned—from confidential and

reliable sources—of potential threats against him.  *See* Rubin Decl., ¶ 2.  And after issuing the

Subpoenas, Defendants and their counsel made a series of disturbing public statements to the

press, including a warning that his failure to comply with the Browder Subpoena would result in

"*punishment up to and including arrest*."  Ex. 1 (emphasis added).

Against this backdrop, and given the actual claims in this civil forfeiture case, there is no rationale for Defendants requesting, among other things, roughly ten—and in some cases nearly 20—years' worth of:

- Sensitive personal and travel-related information, *see* Ex. 2 at Request Nos. 18, 19, 20;

- Private and personal details about Browder and his businesses' security arrangements, including the involvement of specific individuals therein, *see id.* at Request Nos. 31–32;

- Private and confidential financial information, ranging from tax returns, financial account numbers, amounts and sources of income, and investment and trading history, to documents sufficient to show "the structure, holdings and investments of Hermitage Capital" and its investors; *id.* at Request Nos. 4–5, 7, 28;

- Browder's communications with a variety of Defendants' and their co-conspirators' known enemies, including Baranovsky, Perepilichnyy, and various anti-corruption media outlets and human rights groups; *see id.* at Request Nos. 11–12, 14, 23;

- Documents about Browder's employees and alleged "Affiliated Persons," including information relating to those people's citizenship, passports and visas, and their personal addresses, *see id.* at Request Nos. 29–30; and

- "All documents concerning Browder (and his Affiliated Persons)," *see* Ex. 41 at Request No. 4; Exs. 42 & 43 at Request No. 3; Exs. 44 & 45 at Request No. 4.

Overall, the startling invasiveness of the Browder Subpoena has exacerbated Browder's grave concerns for himself and his family.  *See* Rubin Decl., ¶ 4.

"It need hardly be stated that a purpose to harass a witness . . . by abuse of the court's process will not be countenanced."  *United States v. Int'l Bus. Machs. Corp.*, 83 F.R.D. 92, 94 (S.D.N.Y. 1979).  For example, in *Fox Industries*, an Eastern District court quashed non-party subpoenas and imposed sanctions for abuse of process where the subpoenas were designed to embarrass and harm an executive by "gather[ing] information on unproven, inflammatory claims" against him.  2005 WL 2133595, at *5.  Similarly, in *Echostar*, the District of Colorado denied a motion to compel, in part, because of its "healthy suspicion" that plaintiff's true aim

was to use the discovery sought in connection with its contemplated "wide-ranging anti-trust lawsuit" against the subpoenaed entities.  180 F.R.D. at 395–96.

The document requests at issue here—as well as the demand for Browder's testimony—are more menacing.  The crime underlying this civil forfeiture action is a corporate identity theft based on the misuse of documents collected in legal proceedings.  *See* Dkt. 1 ¶¶ 18, 24–45.  Now Defendants—who are alleged to have financially benefited from that crime—are seeking new, wide-ranging corporate and financial documents to misuse.  Moreover, the litany of personal, private, and sensitive information Defendants request—which has zero relevance to this civil forfeiture action—would allow Defendants, their co-conspirators, and their associates to attack Browder personally in order to stop his crusade against corruption and human rights abuses.  This is not an irrational fear.  The harms to others caught in Defendants and their co-conspirators' web are well-known—and the potential threat to Browder has been communicated and corroborated by legitimate sources.  *See* Rubin Decl., ¶¶ 2, 4.

*Second*, the Subpoenas should also be quashed because, as amply demonstrated by their statements to the press and this Court, Defendants want to discredit Browder simply for the sake of doing so.  Among other things, the Browder Subpoena dredges up age-old lawsuits, burrows for more details relating to his invalid Russian tax fraud conviction, probes his communications with suspected informants against and enemies of Defendants and their co-conspirators and Browder's own former business partners, and interrogates his immigration and citizenship-related information, presumably to find potential inconsistencies.  *See, e.g.*, Ex. 2 at Request Nos. 2–3, 5–6, 10, 16, 18–20, 23, 25, & 27.

Yet even in the context of discovery concerning a party's credibility, courts in this Circuit have characterized "wholesale invasion[s] of privacy as a means of generating 'impeachment

material'" as "deplorable." *Murphy v. Bd. of Educ.*, No. 00-CV-6038, 2000 WL 33945849, at *3

(W.D.N.Y. Sept. 11, 2000).  Defendants may not, consistent with the Federal Rules of Civil

Procedure, "delve without restriction or restraint into the most private and personal aspects of an

individual's life" simply by claiming a need for the materials for impeachment purposes.  *Id.*

Rather, at the very least, Defendants must show "some legitimate, good faith basis for

[Browder's] lack of credibility."  *Singletary v. Sterling Transp. Co.*, 289 F.R.D. 237, 243 (E.D.

Va. 2012); *Premer v. Corestaff Servs., L.P.*, 232 F.R.D. 692, 693 (M.D. Fla. 2005) (quashing

subpoena and granting protective order where defendants failed to "provide[] any supporting

information substantiating such a broad search" to "shed light on [plaintiff's] credibility").

Moreover, where evidence of an inconsistency is not relevant to any substantive issue in the

litigation *other* than a witness's credibility, such discovery is not permitted.  *Syposs v. United

States*, 181 F.R.D. 224, 228 (W.D.N.Y. 1998).

Here, especially given the standstill in party discovery, any claimed need to impeach

Browder is premature at best.  Neither party believes, at this time, that Browder is the central or

even a critical witness.  In June 2014, the Government clarified that it does not expect Browder

"to authenticate significant volumes, *if any*, of documentary evidence."  Dkt. 95-1 at 1–2

(emphasis added).  The Government also stated that although it views Browder's potential

testimony as "important, its significance to the trial is correspondingly diminished by the

availability, as we anticipate, of *additional sources of evidence as to most of the subject matter* of

that testimony."  Dkt. No. 95-2 at 2 (emphasis added).  Defendants have gone even further to

minimize his role.  In moving to vacate or modify the protective order freezing their assets, they

have argued that Browder "was not in Russia when the key events in the Verified Complaint are

alleged to have occurred," and that he has only "limited competent evidence on peripheral

subjects, with *no competent evidence* about both key issues affecting Defendants: (1) the transfer of the funds in the $230 Million Russian Treasury Theft; and (2) the state of knowledge or intention of Defendants and their owner, Denis Katsyv." Dkt. 94 at 1, 6–7 (emphasis added).

Notwithstanding Defendants' insistence that Browder's testimony has "limited" and "peripheral" relevance and that he has "no first-hand knowledge" of facts relating to the theft or the transfer of funds to Defendants, *id.* at 1, 9, they continue to press for discovery to impeach him. Defendants' Russian counsel has claimed publicly, for example, that Browder was the primary source of information for the Complaint, and therefore, his testimony is necessary to "make it obvious that he is lying." Ex. 4. Another lawyer from Defendants' conflicted firm shockingly told a press outlet that Browder should be forced to answer "difficult questions regarding his own tax evasion in Russia and additional aspects of his activity, *to show his unreliability and prove he doesn't need to be a witness or even a source on which the prosecution can base its case*." Ex. 5 at 4 (emphasis added). And even within this Court, Defendants and their counsel have complained that Browder, a U.K. national, "chooses not to appear in the United States to be examined about his criminal conviction for tax fraud, other nefarious activities, and the indifference with which he wrongfully accuses others of misconduct in the death of Sergei Magnitsky." Dkt. 94 at 2 n.1. In fact, just last week, Defendants preemptively and retributively filed a "second supplemental" brief nominally regarding the existing protective order to argue that Browder must be "cross-examined about his tax evasion conviction in Russia and the multiple stories he has told different governments about his purported tracing of Russian Treasury funds." Dkt. 107 at 2.

A host of U.S. diplomats and policymakers have publicly stated that Browder's conviction was a travesty of justice. *See, e.g.*, Exs. 9; 13–14. More significantly, however,

Defendants' allegation that Browder is a criminal is irrelevant to the issues here—and reflects

Defendants' attempted subversion of the discovery process to achieve their "collateral objective"

of disgracing Browder and harming him and his business interests.  *Fox Indus.*, 2005 WL

2133595, at *5 (internal quotations omitted).  Because the Subpoenas were issued for the

improper purposes of intimidating and impeaching Browder, they must be quashed.

### B.     The Subpoenas Are Absurdly Overbroad And Unduly Burdensome

Under Rule 45, a court "must quash or modify" a subpoena that "subjects a person to

undue burden."  Fed. R. Civ. P. 45(d)(3)(A)(iv).  In determining whether a subpoena imposes

such a burden, courts must consider whether "the discovery sought is unreasonably cumulative

or duplicative, or is obtainable from some other source that is more convenient, less burdensome,

or less expensive"; whether "the party seeking discovery has had ample opportunity" to obtain

the information through discovery in the case; or whether "the burden or expense of the proposed

discovery outweighs its likely benefit, taking into account the needs of the case, the amount in

controversy, the parties' resources, the importance of the issues at stake in the litigation, and the

importance of the proposed discovery in resolving the issues."  *Corbett v. eHome Credit Corp.*,

No. 10-CV-26 (JG)(RLM), 2010 WL 3023870, at *3 (E.D.N.Y. Aug. 2, 2010) (citing Fed. R.

Civ. P. 26(b)(2)(C)).  Here, each of these considerations weighs in the Affected Non-Parties'

favor:  Without even attempting to engage in party discovery or consult public sources,

Defendants have saddled the Affected Non-Parties with *six* Subpoenas of virtually no relevance

to the claims and defenses in this action.  Indeed, there are only two possible explanations for the

other Subpoenas.  Either Defendants have cavalierly dragged five Affected Non-Parties into this

case in a misguided attempt to show that Browder—another non-party—should be forced to

comply with a Rule 45 subpoena in Colorado, or worse, these Subpoenas reflect a bottomless

exploration of Browder's associations, finances, and whereabouts.  In either case, given the requested documents' lack of probative value, the Subpoenas cannot be justified.  The Subpoenas are also duplicative of the Hermitage Global Subpoenas and one another.

Defendants may not force the Affected Non-Parties—who include two home-based business owners and their companies—to shoulder the burden of their fishing expedition.  Each of the Subpoenas seeks "virtually limitless financial and other information" about Browder, Hermitage Capital, and a slew of affiliates and unrelated entities that is "unnecessary and irrelevant" to the defense of the Government's civil forfeiture claims.  *In re Biovail Corp. Sec. Litig.*, 247 F.R.D. 72, 74 (S.D.N.Y. 2007).  As Defendants have told this Court, the "key issues" here are "the transfer of the funds in the $230 Million Russian Treasury Theft" and "the state of knowledge or intention of Defendants and their owner, Denis Katsyv."  Dkt. 94 at 6–7.  Browder has no personal knowledge of these issues, nor any ability to authenticate relevant documents.  *See id.* at 1, 6–7; Dkt. 95-1.  Nor do any of the other Affected Non-Parties even have such documents.  Given the acknowledged futility of the Subpoenas, it is unfair to burden the Affected Non-Parties with their unending requests.

The Subpoenas are unduly burdensome for many other reasons as well:

- Even the most narrow requests call for nearly ten years' worth of information, *see Concord Boat Corp. v. Brunswick Corp.*, 169 F.R.D. 44, 50 (S.D.N.Y. 1996) (subpoena "overbroad on its face" where requested documents encompassed "every transaction undertaken by [nonparty] for [defendant] during the last ten years") (internal quotations omitted), and import such "exhaustive definitions" of Browder and his alleged "Affiliated Persons" that the Subpoenas are facially overbroad.  *Straight Path IP Group, Inc. v. Blackberry Ltd.,* No. Civ. 14-80150 WHA, 2014 WL 3401723, at *1–5 (N.D. Cal. July 8, 2014) (quashing subpoena that, among other things, defined the defendant "to cover eleven entities").

- Defendants cannot, as a matter of law, show a "substantial need" for the information they seek when they have hardly "exhausted [their] efforts to obtain these materials, first, from [the Government]."  Indeed, Defendants have "barely commenced discovery with regard to [the Government]," despite that the discovery of "greatest relevance to this lawsuit is .

. . as readily available from [the Government] as [it is] from non-parties." *Echostar*, 180 F.R.D. at 393–95.  Nor have Defendants established a need to burden the Affected Non-Parties with "intrusive" requests seeking documents that are "publicly available," including by "searching the internet," *In re Lazaridis*, 865 F. Supp. 2d 521, 527–28 (D.N.J. 2011), or equally accessible to all sides.

- The Browder Subpoena also is "repetitive," incorporating, in many cases, verbatim, each and every one of the document requests in the Hermitage Global Subpoenas, which Defendants refuse to withdraw.  *E.g.*, *Nova Biomed. Corp. v. i-STAT Corp.*, 182 F.R.D. 419, 423 (S.D.N.Y. 1998).

- And finally, this Court should take into serious "consideration" the "expense and inconvenience" of production on Sundance, Foley, Acme, Tarantino, and Tarantino Consulting—otherwise complete strangers to the parties and claims in this case— especially given the lack of probative value associated with the discovery sought from them.  *Concord Boat*, 169 F.R.D. at 52 (citation and internal quotations omitted).

Because the Federal Rules of Civil Procedure are "to be applied so as to achieve 'the just, speedy, and inexpensive determination of every action,'" parties "have a responsibility to frame discovery requests with that in mind."  *Murray v. Geithner*, No. M8-85 (LAK), 2010 WL 1257324, at *3 (S.D.N.Y. Mar. 25, 2010) (quoting Fed. R. Civ. P. 1).  Defendants' abject failure to abide by that responsibility—and that the burdens they would impose on the Affected Non-Parties outweigh *any* foreseeable benefit to Defendants in defending against this civil forfeiture case—further demands that the Subpoenas be quashed.

### C.     The Browder Subpoena Violates Rule 45's Procedural Limits

#### 1.     Defendants Never Effectively Served Browder

Beyond the Subpoenas' substantive deficiencies, the Browder Subpoena should be quashed for noncompliance with the *procedural* aspects of Rule 45.  As an initial matter, Rule 45 requires that a subpoena be served by "delivering a copy to the named person."  Fed. R. Civ. P. 45(b)(1).  Yet Defendants failed to make in-hand, personal service of the Browder Subpoena.  In similar circumstances, the courts of this District have held that service was not effected.  *See, e.g.*, *Leser v. U.S. Bank Nat'l Ass'n*, No. 09-CV-2362 (KAM)(ALC), 2011 WL 1004708, at *3 &

n.8 (E.D.N.Y. Mar. 18, 2011) (finding, in the context of 35 failed personal service attempts, that service was not effected when witness refused to accept UPS delivery of subpoena and drove away when approached by process server); *cf. Kadic v. Karadzic*, 70 F.3d 232, 246 (2d Cir. 1995) (affirming order for alternative means of service where attempted personal service resulting in complaint falling on the floor two feet from defendant was unsuccessful).

None of Defendants' other attempts to serve Browder was effective either.  Although Second Circuit courts occasionally have allowed service of Rule 45 subpoenas through methods other than personal delivery, they have done so only where the serving party has already made at least several diligent attempts to personally serve the subpoena.  *See, e.g., Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams.*, 262 F.R.D. 293, 304 (S.D.N.Y. 2009) (substitute service may be used after personal service was "attempted . . . several times"); *JPMorgan Chase Bank, N.A. v. The IDW Grp., LLC*, No. 08 Civ. 9116 (PGG), 2009 WL 1313259, at *3 (S.D.N.Y. May 11, 2009) (granting party's request to serve non-party by alternative means after nine attempts at personal service and witness appeared to be aware of such attempts).  And in most cases, courts have required the serving party to expressly seek court approval to use alternative service methods.  *See, e.g., Jade Apparel, Inc. v. Steven Schor, Inc.*, No. 11-CV-2955 (KNF), 2012 WL 3578593, at *2 (S.D.N.Y. Aug. 15, 2012); *Leser*, 2011 WL 1004708, at *3.

Here, by contrast, Defendants never sought court authorization to serve Browder via alternative means.  And even if they had, none of their other attempts at service comply with the applicable federal and state rules:

- Defendants' attempted service on July 30, 2014, was ineffective because Defendants left the Subpoena on the doorstep of a private residence that is not Browder's "dwelling or usual place of abode," and, in any event, did not leave it "with someone of suitable age and discretion who resides there."  *See* Fed. R. Civ. P. 4(e); Fed. R. Civ. P. 5(b)(2)(B); *see also* N.Y. C.P.L.R. § 308; Colo. R. Civ. P. 45(b)(2).

27

- Defendants' July 31, 2014 attempt to send the Subpoena to the same Aspen residence via Federal Express was similarly ineffective.  Even assuming that service by FedEx is allowed, that Aspen residence is not Browder's "last known address."  *See* Fed. R. Civ. P. 5(b)(2)(C) (providing for alternative service of "pleadings and other papers" to an individual by "mailing it to the person's last known address").

- Finally, Defendants' emailing of the Browder Subpoena to Hermitage Global's outside counsel cannot—and did not—constitute service because Hermitage Global's counsel told Defendants they were not authorized to accept service on Browder's behalf, and absent such consent, the applicable rules do not otherwise provide for such service.  *See* Fed. R. Civ. P. 4(e); *id.* at 5(b)(2); N.Y. C.P.L.R. § 308; Colo. R. Civ. P. 45(b)(2).

### 2.    The Browder Subpoena Defies Rule 45's 100-Mile Limit

Even if the Browder Subpoena was effectively served—and it was not—"a court must quash or modify a [Rule 45] subpoena that 'requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person.'"  *Wultz v. Bank of China Ltd.*, 293 F.R.D. 677, 679 (S.D.N.Y. 2013) (citing *In re Edelman*, 295 F.3d 171, 178 (2d Cir. 2002)).  Defendants do not dispute that Browder is a U.K. national who lives and works in London.  Nor do they allege that he regularly transacts business in person in Aspen.  Instead, Defendants assert—without any support—that "they personally served Browder at an international conference in Aspen, Colorado, where he *owns* a residence through a shell corporation."  Dkt. 107 at 4 (emphasis added).

Contrary to Defendants' assertions, Browder does *not* directly or indirectly own Sundance, the so-called shell corporation.  *See* Ex. 38, ¶ 7.  Even if he did, ownership has no bearing on the Rule 45 analysis, as it is not tantamount to residence, and, therefore, cannot serve as the basis for requiring a foreign non-party's subpoena compliance.  At no time relevant to this Court's consideration has Browder resided within a 100-mile radius of Aspen.  Indeed, even where a non-party has been properly served and has "significant contacts"[4] with the district in

---

[4]  Because the Subpoenas must be quashed on multiple grounds under Rule 45, this Memorandum does not discuss personal jurisdiction over Browder.  For the avoidance of doubt, Browder does not waive and expressly

which his testimony is sought, including owning property, registering a vehicle, and maintaining

a driver's license there, the question of residency turns on whether that non-party "had remained

in [that district] for some length of time with a genuine intent to make [it] his residence with

some degree of regularity." *In re Application of Yukos Hydrocarbons Invs. Ltd.*, No. 5:09-MC-

0078 (NAM/DEP), 2009 WL 5216951, at *5 (N.D.N.Y. Dec. 30, 2009).  Therefore, in *Yukos*, the

court quashed a Rule 45 subpoena, despite the non-party witness's six-month stay in New York,

because he had continuously lived and worked in Russia for ten years immediately prior to his

stay, had resumed living and working in Moscow by the time of the court's disposition of the

challenged subpoena, and all along, had a "clear intent to return to Moscow and not to remain

within this district with any permanency."  *Id.* at *6.  Similarly here, because of Browder's "clear

intent" to return to London and not remain in Aspen, where he was vacationing with his family,

Defendants cannot establish that he "resides" in Aspen within the meaning of Rule 45.  *See id.*

   Further, Defendants' attempt to use Rule 45 to extract documents from Browder and

purported affiliated entities is equally invalid.  Rule 45 not only necessitates that any documents

sought must be in the affected non-party's "possession, custody, or control," Fed. R. Civ. P.

45(a)(1)(A)(iii), but also plainly forbids requiring a non-party to comply where he is "beyond the

geographical limits specified."  Fed. R. Civ. P. 45(d)(3)(A)(ii).  On both accounts, the Browder

Subpoena fails.  Defendants cannot show that Browder maintains "the practical ability to obtain

[many, if not most of] the documents" sought, *In re Vivendi Universal, S.A. Sec. Litig.*, No. 02

Civ. 5571 (RJH)(HBP), 2009 WL 8588405, at *3 (S.D.N.Y. July 10, 2009), given the Browder

Subpoena's outrageously broad definition of "you," "your," and "Affiliated Persons."  *See* Ex. 2

at 1; *see also supra* at 16.  More significantly, a Rule 45 subpoena for documents is only valid

---

preserves any and all jurisdictional defenses and reserves his right to argue that he is not subject to personal
jurisdiction in the District of Colorado, this District, or any other judicial district in the United States.

when the subpoenaed person resides, works, or regularly conducts business in person within 100 miles of where compliance is demanded.  *See* Fed. R. Civ. P. 45(c)(2)(A); *see also id.* at Advisory Comm. Notes on Rules—2013 Amendment.  Browder is outside those geographic limits.  Accordingly, he cannot be forced to testify *or* produce documents in Colorado.

## II.   DEFENDANTS AND THEIR COUNSEL MUST BE SANCTIONED FOR THEIR BAD FAITH IN IMPOSING UNDUE BURDENS AND EXPENSES ON THE AFFECTED NON-PARTIES

Under Rule 45, this Court has the power to impose sanctions on Defendants and their counsel for failing "to take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena."  Fed. R. Civ. P. 45(d)(1).  Indeed, where a party or its attorneys issue a subpoena that serves an improper purpose and is unduly burdensome, "[t]he issuing court *must* . . . impose an appropriate sanction."  *Kenney, Becker LLP v. Kenney*, No. 06 Civ. 2975 (JSR), 2008 WL 681452, at *2 (S.D.N.Y. Mar. 10, 2008) (emphasis added) (quoting Fed. R. Civ. P. 45(c)(1)), *reconsid. denied*, 2008 WL 1849544 (S.D.N.Y. Apr. 22, 2008).  So too may a court force counsel who "multiplies the proceedings in any case unreasonably and vexatiously" to "satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred" because of those lawyers' conduct.  28 U.S.C. § 1927.

Especially where, as here, third-party discovery is used as a "way of 'getting back'" at a political nemesis, sanctions are not only appropriate but imperative.  *Molefi v. Oppenheimer Trust*, No. 03 CV 5631 (FB)(VVP), 2007 WL 538547, at *2–3 (E.D.N.Y. Feb. 15, 2007).  *First*, Defendants and their counsel have needlessly multiplied costs for the Affected Non-Parties.  After forcing costly and extensive motion practice over the Hermitage Global Subpoenas, Defendants refused to wait for the disposition of those motions.  *See* Exs. 34–35 (transferring motions to this court).  Instead, they issued *six* new, abusive, and largely duplicative subpoenas for the improper purposes of intimidating and impeaching Browder—and with complete

disregard for the undue burdens those subpoenas would impose on the other Affected Non-Parties.[5]  And still, they refuse to withdraw the Hermitage Global Subpoenas.  *See* Ex. 36 at 1.

*Second,* Defendants and their counsel's conduct is even more galling given that the Subpoenas exploit information obtained through Defendants' counsel's representation of Browder in a prior, related matter.  Under New York law, counsel may not represent and subsequently oppose a client on "a substantially related matter" where the interests of counsel's current client are "materially adverse" to those of the former client.  N.Y. Rules of Prof. Con. 1.9(a).  Nor, with limited exceptions not applicable here, may "[a] lawyer who has formerly represented a client in a matter . . . use confidential information of the former client protected by Rule 1.6 to the disadvantage of the former client."  *Id.* at 1.9(c)(1); *see also U.S. Football League v. Nat'l Football League*, 605 F. Supp. 1448, 1452 (S.D.N.Y. 1985) (disqualification warranted when "the attorney's successive representation of adverse interests raises the possibility that . . . he will improperly use confidences gained in the prior representation to the detriment of his former client").  As courts in this District have explained—and as the Government said in its March 2014 letter to this Court—successive representations are prohibited precisely because of the lawyer's potential "unfair advantage" in using information communicated by a former client in confidence *against* that client, including by "knowing what to ask for in discovery, which witnesses to seek to depose, what questions to ask them, what lines of attack to abandon and what lines to pursue."  *Mitchell v. Metro. Life Ins. Co.*, No. 01 Civ. 2112 (WHP), 2002 WL 441194, at *4 (S.D.N.Y. Mar. 21, 2002) (citation omitted); *see also* Dkt. 106-1 at 4.

Further, where, as here, "the *same individual lawyer* participated in the prior and current representation, the movant is not required to make a specific showing that confidences were

---

[5]  Defendants also negotiated but ultimately refused to agree to more than a week's extension of the Affected Non-Parties' time to respond to their abusive Subpoenas, necessitating applications to this Court and exacerbating

passed to counsel." *DeFazio v. Wallis*, 459 F. Supp. 2d 159, 164–65 (E.D.N.Y. 2006) (emphasis added).  Rather, "the movant is entitled to the benefit of an irrebuttable presumption that confidences were shared."  *Id.* at 165.  Indeed, the Second Circuit has held that "a court should not require proof that an attorney actually had access to or received privileged information while representing the client in a prior case" because to do so would "put the former client to the Hobson's choice of either having to disclose his privileged information in order to disqualify his former attorney or having to refrain from [moving to] disqualif[y] . . . altogether."  *Mitchell*, 2002 WL 441194, at *5 (internal quotation and citation omitted).

As detailed both above and through prior submissions to this Court, *see* Dkt. 106-1, BakerHostetler's subsequent representation of Defendants is not only substantially related to its prior work for Browder and Hermitage Capital, but their interests are "materially adverse" to those of Defendants.  Whether or not Browder or Hermitage Capital would receive any monies recovered from this suit is beside the point; critically, the Subpoenas—carefully signed only by Baker Botts—implicate confidential information shared by Browder and Hermitage Capital with their former counsel, including Moscow personally.[6]

*Third*, both firms' lawyers, have threatened Browder in the press—a U.K. national who lives and works in London under potential threats to his personal security—with "punishment up to and including arrest" for doing exactly what the Federal Rules allow: seeking relief from the improperly served, flagrantly abusive Browder Subpoena.  Ex. 1, *see also* Exs. 4–5, 7, 16.  In the days following Magnitsky's arrest, Moscow reached out to Browder to let him know, "we're thinking of you, even as we work;" now, Moscow and his firm disparage their former client as a

---

the Affected Non-Parties' fees and expenses before the briefing of this motion.  *See* Dkt. 99, 100, & 102.

[6]  BakerHostetler did not sign the Browder Subpoena, but they, including Moscow, have signed most filings and correspondence in this case, including ones disparaging Browder.  *E.g.*, Dkt. 107 at 2, 4–5; Dkt. 94 at 2 n.1.

"criminal tax cheat" in "full evasion mode," Dkt. 107 at 4–5, despite having previously

represented him in connection with "certain apparent [tax] frauds . . . which may have been

designed to fraudulently create apparent criminal liability on Hermitage Capital Management,"

Ex. 19 at 1, and notwithstanding that neither the United States nor Interpol has recognized his

conviction in absentia as valid. *See, e.g.*, Exs. 3, 5, 9, 16.

Collectively, these actions are "so completely without merit as to require the conclusion

that they have been undertaken for some improper purpose." *KGK Jewelry LLC v. ESDNetwork*,

No. 11 Civ. 9236 (LTS) (RLE), 2014 WL 1199326, at *4–5 (S.D.N.Y. Mar. 21, 2014) (quoting

*Revson v. Cinque & Cinque, P.C.*, 221 F.3d 71, 79 (2d Cir. 2000)) (granting § 1927 sanctions

motion where defendants' counsel's actions in issuing four non-party subpoenas at issue were

"taken entirely without merit" and "for the improper purpose of harassment").  Accordingly, this

Court should impose the Affected Non-Parties' fees and costs associated with this motion and

the related objections and responses to the Subpoenas on Defendants and their counsel.

**III.   DEFENDANTS MUST BE ENJOINED FROM ISSUING ANY ADDITIONAL
DISCOVERY TO OR CONCERNING BROWDER TO PREVENT FURTHER
DISCOVERY ABUSES**

"[F]or good cause shown," a court may issue "any order which justice requires to protect

a party or person from annoyance, embarrassment, oppression, or undue burden or expense,"

Fed. R. Civ. P. 26(c), including "that the discovery not be had."  *In re Subpoena Issued to Dennis*

*Friedman*, 350 F.3d 65, 69 (2d Cir. 2003) (internal quotations omitted).  Courts have not

hesitated to impose protective orders "closely regulat[ing]" nonparty discovery efforts, *Echostar*

*Commc'ns Corp. v. News Corp. Ltd.*, 180 F.R.D. 391, 396 (D. Colo. 1998), where, as here,

Defendants' conduct gives rise to a "healthy suspicion" that they intend to use the requested

materials "for purposes other than preparing for trial or settlement," *Jennings v. Peters*, 162

F.R.D. 120, 122–23 (N.D. Ill. 1995) (prohibiting defendants from "misusing materials obtained

through the court's process").

Even accepting that the sole purpose of the Subpoenas is to impeach Browder—and it is

not—on the theory that he is the Government's "key witness"—and he is not—a protective order

is essential when the requested non-party discovery amounts to "a wholesale invasion of privacy

as a means of generating 'impeachment material.'" *Murphy v. Bd. of Educ. of Rochester City

Sch. Dist.*, No. 00-CV-6038, 2000 WL 33945849, at *3 (W.D.N.Y. Sept. 11, 2000).  In *Murphy*,

for example, the plaintiffs, who claimed employment discrimination, issued a dozen non-party

subpoenas to obtain defendant's private medical, mental health, drug and alcohol treatment,

employment, motor vehicle, and criminal records.  *Id*.  After quashing those subpoenas based on

the "marginal relevance" of the materials sought and plaintiff's "delv[ing] without restriction or

restraint into the most private and personal aspects of [defendant's] life," the court prohibited

either party from "serv[ing] any thirdparty subpoenas . . . without the [court's] prior written

approval."  *Id*.  *Fox Industries, Inc. v. Gurovich* is even more analogous.  There, after quashing

the non-party subpoenas because their purpose—namely, to collect information that allegedly

would prove allegations against a non-party unrelated to the litigation and "thus allow them to

impeach [that non-party's] credibility"—was improper, the court ordered that any future non-

party subpoenas by defendants must "first be submitted to the court for approval."  No. CV 03-

5166 TCP WDW, 2005 WL 2133595, at *4 (E.D.N.Y. Sept. 1, 2005).

As in *Murphy* and *Gurovich*, the Subpoenas here were designed purportedly to impeach

Browder—or worse, through far-reaching discovery, to expose him to physical and financial

harm.  Especially given that the requests therein are "utterly irrelevant to the issues in this

lawsuit," this Court should preclude any additional non-party discovery to or about Browder to

ensure that Defendants do not "turn this lawsuit into a[nother] [sham] trial of [him]."  *Id.*  Such protective order should remain in place unless and until this Court decides this motion and the prior motions concerning the Hermitage Global Subpoenas *and* resolves the conflict of interest posed by BakerHostetler's successive representation of Browder and Hermitage Capital, on the one hand, and Defendants, on the other.  Once these conditions are met, the protective order also should allow non-party discovery only after meaningful party discovery has occurred and only if the document requests are narrowly tailored to issues relevant to the resolution of this action.

## **<u>CONCLUSION</u>**

For all of the foregoing reasons, the Affected Non-Parties request that this Court enter an order quashing the Subpoenas; imposing such sanctions on Defendants and their U.S. counsel as the Court deems appropriate, including, but not limited to, the fees and costs associated with this motion and the preparation of the objections and responses to the Subpoenas; and enjoining Defendants from issuing any further non-party subpoenas to or about Browder unless and until (a) the conflict of interest issue posed by BakerHostetler's successive representation is resolved, (b) this motion and the pending motions concerning the Hermitage Global Subpoenas are decided, and (c) meaningful party discovery has occurred, and subsequently allowing such non-party discovery only if the document requests in any future subpoenas are narrowly tailored to the key issues presented by this civil forfeiture action, namely, the flow of proceeds from the massive tax fraud into and through the United States and the knowledge and intent of Defendants and their owner, Denis Katsyv.

Dated:  New York, New York
         September 12, 2014

                                    GIBSON, DUNN & CRUTCHER LLP

                                    By:  */s/ Randy M. Mastro*
                                    Randy M. Mastro
                                    Lisa H. Rubin
                                    Sarah L. Kushner
                                    200 Park Avenue
                                    New York, NY  10166-0193
                                    Telephone:  (212) 351-4000
                                    Facsimile:  (212) 351-4035

                                    *Attorneys for William Browder, Sundance Aspen
                                    LLC, Michael Cassidy Foley, Acme Property
                                    Management, Inc., Victoria Tarantino, and Victoria
                                    Tarantino Consulting, Inc.*