IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>PREVEZON HOLDINGS LTD. *et al*, )<br>)<br>Defendants. )<br>)<br>) | Case No. 1:13-cv-06326 (TPG)<br><br>ECF CASE |

**DEFENDANTS' OPPOSITION TO THE**
**MOTION TO QUASH OF WILLIAM BROWDER**

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................................................. 2

FACTUAL BACKGROUND .................................................................................................... 5

ARGUMENT ............................................................................................................................. 9

   I.    Service on Browder Was Effective ................................................................................. 10

       A.    Browder Was Personally Served by In-Hand Delivery. ........................................ 10

       B.    Browder Was Also Effectively Served Through Alternative Process ..................... 12

   II.   Browder Resides in Aspen Under Colorado Law. ......................................................... 15

CONCLUSION ....................................................................................................................... 20

# TABLE OF AUTHORITIES

Page(s)

CASES

*B. Fernandez & Hnos., Inc. v. Int'l Bhd. of Teamsters*,
    285 F.R.D. 185 (D.P.R. 2012) ...............................................................................9

*Beare v. Millington*,
    No. 07-CV-3391(ERK) (MDG), 2010 WL 234771 (E.D.N.Y. Jan. 13, 2010) ................12, 13

*Briarpatch Ltd., LP v. Geisler Roberdeau, Inc.*,
    No. 99-Civ. 9623, 2006 WL 1311967 (S.D.N.Y. May 12, 2006) ...........................13

*Carlson v. Dist. Court of City & Cnty. of Denver*,
    116 Colo. 330 (1947) ...............................................................................16

*E.A. Renfroe & Co., v. Moran*,
    No. CIV.A. 08-CV-00733-REB-MJW, 2008 WL 1806200 (D. Colo. Apr. 21, 2008)......13, 14

*First Am. Corp. v. Price Waterhouse LLP*,
    154 F.3d 16 (2d Cir. 1998)......................................................................3, 19

*Flanagan v. Wyndham Int'l Inc.*,
    231 F.R.D. 98 (D.D.C. 2005).......................................................................9

*Gambone v. Lite-Rock Drywall Corp.*,
    No. CIV.A. 01-1071, 2003 WL 21891584 (E.D. Pa. Aug. 7, 2003) *aff'd*, 124 F.
    App'x 78 (3d Cir. 2005)......................................................................10, 12

*In re Application for Order Quashing Depositions*,
    No. M8-85, 2002 WL 1870084, at *3 n.2 (S.D.N.Y. Aug. 14, 2002). ...................18

*In re Application of Yukos Hydrocarbons Investments Ltd.*
    No. 5:09-MC-0078, 2009 WL 5216951 (N.D.N.Y. Dec. 30, 2009)........................18

*In re Kolomoisky*,
    No. M19-116, 2006 WL 2404332 (S.D.N.Y. Aug. 18, 2006) ...........................18, 19

*In re Neves*,
    No. 09-33043-BKC-LMI, 2011 WL 3502770 (Bankr. S.D. Fla. Aug. 8, 2011) ....................15

*In re Vivendi Universal, S.A. Sec. Litig.*,
    No. 02CIV5571RJHHBP, 2006 WL 3378115 (S.D.N.Y. Nov. 16, 2006) ............................19

*Jones v. Hirschfeld*,
    219 F.R.D. 71 (S.D.N.Y. 2003) ...................................................................9

*JPMorgan Chase Bank, N.A. v. IDW Group, LLC*,
    No. 08 Civ. 9116 (PGG), 2009 WL 1313259 (S.D.N.Y. May 11, 2009) ...............................13

*King v. Crown Plastering Corp.*,
    170 F.R.D. 355 (E.D.N.Y. 1997) ...........................................................................................13

*Leser v. U.S. Bank Nat. Ass'n*,
    No. 09-CV-2362 KAM ALC, 2011 WL 1004708 (E.D.N.Y. Mar. 18, 2011) .......................12

*M'Baye v. New Jersey Sports Prod., Inc.*,
    246 F.R.D. 205 (S.D.N.Y. 2007) ...........................................................................................18

*Mangla v. Univ. of Rochester*,
    168 F.R.D. 137 (W.D.N.Y. 1996)...........................................................................................9

*Martinez v. City of Pittsburg*,
    No. C 11-01017 (SBA) (LB), 2012 WL 699462 (N.D. Cal. Mar. 1, 2012)...........................10

*Montgomery v. Douglas*,
    388 F. Supp. 1139 (D. Colo. 1974) *aff'd*, 422 U.S. 1030, 95 S. Ct. 2645, 45 L. Ed. 2d
    687 (1975) ..............................................................................................................................15

*Old Republic Nat. Title Ins. Co. v. Kornegay*,
    292 P.3d 1111 (Colo. App. 2012) ..........................................................................................16

*Rand v. Am. Ins. Co.*,
    No. 11-CV-3040 (CBA) (MDG), 2012 WL 628321 (E.D.N.Y. Feb. 27, 2012)....................12

*Sabell v. Pac. Intermountain Express Co.*,
    36 Colo. App. 60 (1975) ........................................................................................................15

*Ultradent Products, Inc. v. Hayman*,
    No. M8-85 RPP, 2002 WL 31119425 (S.D.N.Y. Sept. 24, 2002)..........................................13

**STATUTES**

28 U.S.C. § 1782..............................................................................................................................18

**OTHER AUTHORITIES**

Black's Law Dictionary 1423 (9th ed. 2009)...................................................................................16

Fed. R. Civ. P. 4 ........................................................................................................................4, 13

Fed. R. Civ. P. 45 ...........................................................................................1, 4, 12, 13, 15–16, 19–20

Defendants[1] respectfully submit this opposition to the Motion to Quash filed by William F. Browder, Sundance Aspen, LLC, Michael Cassidy Foley, Acme Property Management, Inc., Victoria Tarantino, and Victoria Tarantino Consulting, LLC.  On November 5, 2014, the Court ordered that this briefing be limited to two issues:  (1) whether Browder was in fact served with a subpoena in Aspen, Colorado, and (2) whether, if he was properly served, he can be compelled to give evidence under Rule 45 despite his claim that he lives in London.  Ex. 1, Hr'g Tr. 39:3–9, Nov. 5, 2014.[2]  The Court reserved issues of scope and burden for a later date.  *Id.*

Pursuant to the Court's order, Defendants do not address here Browder's arguments that the subpoenas are overbroad, unduly burdensome, or abusive.[3]  It is notable, though, that Browder's Declaration tells in detail the same story as set forth in the Government's Amended Complaint, confirming that he has discoverable information.  Browder Decl. ¶¶ 19–27.  His briefing further acknowledges that he has information about "communications with whistleblowers who helped expose the $230 million criminal conspiracy and Defendants' knowing receipt of ill-gotten gains," and that he has had "contacts with law enforcement

---

[1] For purposes of this Motion, "Defendants" refer to Prevezon Holdings Ltd., Prevezon Alexander, LLC, Prevezon Soho USA, LLC, Prevezon Seven USA, LLC, Prevezon Pine USA, LLC, Prevezon 1711 USA, LLC, Prevezon 1810, LLC, Prevezon 2009 USA, LLC, and Prevezon 2011 USA, LLC.  The Government also named as Defendants Ferencoi Investments, Ltd. ("Ferencoi") and Kolevins, Ltd. ("Kolevins").  These companies have no relationship to this litigation and intend to file a motion to dismiss for lack of personal jurisdiction, among other deficiencies.

[2] Citations to "Exhibit __" refer to the exhibits attached to the Declaration of Seth T. Taube in Opposition to Affected Non-Parties' Motion to Quash.

[3] Defendants also do not address here (except to deny) Browder's absurd and unsupported suggestions that the subpoenas—which Defendants have been attempting to serve since March 2014 in aid of their defense—are somehow intended to aid the Russian Federation and/or Russian criminals in kidnapping him for trial in Russia, or otherwise intended to harm Browder or his sources.  *See* Browder Decl. ¶¶ 7, 30–33, 61.  Defendants do note, however, that Browder's actions in taking a summer vacation with his family in Aspen, while attending a well-publicized conference that listed him as a speaker on its website, are not consistent with his supposed concerns.

agencies in multiple countries around the world" about the alleged money laundering at issue. ECF No. 186 ("Supp. Mem.") at 4–5. The Court should reject his attempt to keep this information from Defendants.

## PRELIMINARY STATEMENT

William F. Browder and his Hermitage network of companies have been instrumental in causing this case to be brought against Defendants. Browder became a self-described public crusader after he was convicted of tax fraud in Russia and Russia issued an international warrant for his arrest. Browder himself proudly asserts that he has conducted a worldwide investigation into the 2007 Russian tax refund fraud and the location of its proceeds, and that he has provided information from that investigation to various law enforcement authorities, including the Government. The Government has admitted that Browder and Hermitage are the source of most if not all of the information in the Complaint. Indeed, the Government has said that it plans to call Browder as a significant witness.

Despite his deep involvement in this action, Browder has sought to dodge service at every turn:

- On March 20, 2014, Defendants first attempted to obtain his deposition through the Government and through Browder's lawyers at Brown Rudnick, but Browder refused to appear or to accept service through either of them. *See* Taube Decl. ¶¶ 2–3.

- On May 5, 2014, Defendants served Browder through Hermitage Global, a Delaware company whose filings with the Securities and Exchange Commission listed him for years as a director or officer. *See* Ex. 2, Hermitage Global Subpoena; Ex. 3, William Browder Director Subpoena. Browder, after being served, denied being a director or officer despite four years of SEC filings saying the opposite. *See* Ex. 4, Hermitage Global Mot. to Quash at 7–9; Ex. 5, Prevezon Opp. to Hermitage Global Mot. to Quash at 4–5.

- On July 29, 2014, Defendants served a subpoena personally on Browder at a conference in Aspen, Colorado. Browder first reacted by filing a Motion to Quash the subpoenas without any supporting Declaration. ECF No. 111. Soon

after, Browder again stalled proceedings by filing a meritless Motion to Disqualify the law firms representing Defendants.  ECF No. 124.

- On November 5, 2014, the Court found Browder's Motion to Quash deficient because he had not submitted any evidence to support his claims that he was not properly served and could not be compelled to testify in Colorado.  The Court gave Browder the opportunity to correct this deficiency, and also narrowed the scope of the Motion to Quash to the issues of whether Browder was properly served.  Ex. 1, Hr'g Tr. 38:7–12, 39:3–9, Nov. 5, 2014.

Browder has now filed a Declaration, as well as a Supplemental Memorandum, in support of his Motion to Quash.  Both fail to show that the service of the subpoena on him was either defective or improper.

*First*, Browder claims that that he was never properly served despite the sworn testimony of no fewer than three process servers.  Process servers approached Browder in Colorado, confirmed his identity by observing his nametag and asking if he was William Browder, and then attempted to hand him the subpoena.  Only after looking at the documents in the process server's hand did Browder flee on foot in an attempt to evade service.  Even after Browder attempted to leave the scene, the process servers were able to place a second copy of the subpoena under the windshield wiper of his vehicle.  Browder's son then got out of the car, ran around it, threw the papers to the ground, and re-entered the car.  Browder's Declaration does not contest the sworn testimony of the process servers, instead asserting that he "ha[s] no recollection" of those facts and that he "paid no attention" when the process servers told him he was being served.  Browder Decl. ¶¶ 45–46.  If service of process could be defeated through such chicanery, hand delivery of a subpoena to an unwilling witness would be impossible.

Process servers also left a copy of the subpoena at Browder's home and mailed a copy to his Aspen address.  Browder denies the effectiveness of this service as well, claiming that alternative service was not authorized, and that these attempts did not meet the requirements of

3

Rule 4.  But service of a subpoena under Rule 45 need not be pre-authorized or meet the Rule 4 requirements for service of a complaint.  The touchstone of Rule 45 service is whether it was calculated to put a reasonable deponent on notice that he is being served.  Browder clearly had reasonable notice.

*Second*, Browder claims that he cannot be compelled to testify by the subpoena because he does not reside within 100 miles of Aspen.  To the contrary, Browder resides at an address within ten miles of where the subpoena demands compliance.  Browder has registered two vehicles in his name listing that residence as his legal address—a fact he does not mention, let alone deny, in his Declaration—and admits that he regularly spends time there.  The subpoena thus fully comports with the requirements of Rule 45.  And there is no requirement that discovery must proceed through the Hague Convention when a person is validly personally served in the United States.

If the Court finds, despite Browder's admissions in legal filings with the state of Colorado, that there is insufficient evidence that Browder resides in Aspen, the Court has a simple means of obtaining that evidence.  Anticipating that Browder might challenge the subpoena on the grounds of the 100-mile rule, as he did in the related subpoenas served on Hermitage Global Partners LP in D.C. (the "D.C. Litigation"), Defendants also served several individuals and entities in Colorado believed to have information regarding Browder's residence and business in Colorado.  *See infra* at 9 n.5.  If the Court finds that Browder was served, but that the proof of his residence was inadequate, the Court should direct these subpoenaed persons, who helped Browder conceal the ownership, control, and source of funds for the house and cars Browder was using, to comply with the subpoenas issued to them so that Defendants and the Court may ascertain information about Browder's residence and/or business in Colorado.

4

## FACTUAL BACKGROUND

This matter arises from a Russian tax refund fraud[4] in which members of a Criminal Organization—in which Defendants are <u>not</u> alleged to have been members—defrauded the Russian Government of roughly $230 million in 2007.  ECF No. 174, ("Am. Compl.") ¶¶ 18–21; Ex. 6, Mar. 3, 2014 Dep. of Agent Todd Hyman ("Hyman Dep.") at 139:9–12.  The Government alleges the Criminal Organization assumed the identities of certain Hermitage investments, requested improper tax refunds, and then dissipated the funds.  Am. Compl. ¶¶ 38–45.  A portion of the funds—less than 1%—allegedly ended up in an account of Prevezon Holdings under its previous ownership.  *Id.* ¶ 123.   The Government asserts that some of these funds were eventually invested in New York from 2009 to 2012.  *Id.* ¶¶ 124–37.

The Government has admitted that Browder convinced it to bring this action by providing documents and statements allegedly supporting the Complaint.  Ex. 6, Hyman Dep. at 16:20–17:4, 55:25–56:3 (describing the Government's investigation prior to bringing the Complaint and stating that Browder and Hermitage associates were the only witnesses interviewed).   The Government acknowledged, in a letter to this Court, that "[t]he Complaint relies heavily on information and documents that have been provided to the Government by individuals associated with Hermitage, including its Chief Executive Officer and founder, William Browder."  Ex. 7, Mar. 4, 2014 Letter From Government to the Court.  Although Browder was not in Russia at all during the time period relevant to the Complaint, he claims he investigated the events underlying the Complaint and is thus assuredly a source of leads to discoverable evidence, *see* Fed. R. Civ. P. 36(b)(1), or to evidence that his statements are unfounded.

---

[4] Browder claims to be a victim of the fraud many times in his Declaration, but provides no supporting evidence that the fraud occurred or that he or Hermitage paid the $230 million that was allegedly stolen from the Russian government.

Though the Government has wavered on how central Browder will be as a witness, its latest position is that Browder and other Hermitage witnesses will testify regarding multiple subjects, including Hermitage's business practices in Russia, Browder's involvement in lodging complaints to the Russian Government about the tax refund fraud, and the tracing of assets to Prevezon.  ECF No. 152 (Oct. 22, 2014 Letter from the Government to the Court); Ex. 8, Hr'g Tr. 65:2–18, Oct. 23, 2014.   Browder himself acknowledges his importance to this case by announcing that he and his employees investigated the events underlying this action and that they have caused "the initiation of criminal money laundering proceedings in many countries around the world" against people he believes have "profited from the $230 million tax fraud."  Browder Decl. ¶¶ 21–22, 26, 30.  Nevertheless, Browder has resisted at every turn Defendants' attempts to secure his testimony.  *See supra* at 2–3.

Defendants sent process servers to the Aspen Action Forum in Colorado after learning about Browder's attendance at the conference through the Aspen Action Forum's publicity for the event.  Two process servers saw Browder exiting a building on the evening of July 29.  Ex. 9, July 29 Affidavit of Craig Janis ("Janis July Aff.").   One of the servers, upon Browder's confirmation of his identity, told him she needed to deliver him some papers and reached out to hand him the subpoena.  Ex. 10, July 29 Affidavit of Jennifer Hoar ("Hoar July Aff.").  Browder looked at the papers in her hand but refused to take them.  *Id.*  The process server dropped the subpoena at his feet.  *Id.*  Browder began running away from the first process server, so the second process server followed him, announcing that Browder had been served and that he had two weeks to respond.  Ex. 9, Janis July Aff.  That process server then watched Browder get in a black SUV.  *Id.*  The process server placed a second copy of the subpoena under the passenger side windshield wipers of the SUV.  *Id.*  The SUV then stopped, and the process server observed

as the individual accompanying Browder—apparently Browder's son—got out of the car, removed the subpoena from under the windshield wipers, and threw it to the ground. *Id.* In total, the vehicle remained in the vicinity for approximately a minute after the subpoena was placed there. *See* Ex. 11, Dec. 10 Affidavit of Craig Janis ("Janis Dec. Aff.") ¶ 13. As the SUV pulled away, the process server took a picture of the license plate. Ex. 9, Janis July Aff.

Browder's version of events corroborates the testimony of the process servers. Browder does not dispute that the process servers identified themselves and stated that they had papers for him. Browder Decl. ¶¶ 43–44. He does not deny that they told him he was being served or that the subpoena was dropped at his feet; instead, he claims not to recall any of this happening and says he was not listening to what the process servers were saying to him. *Id.* ¶¶ 44–47. Though he now asserts that he thought he and his minor son were in "imminent danger," *id.* ¶ 45, he ran ahead of his son to get in his car, and then allowed—or directed—his son to get out of the rear left door of the vehicle and run *around* the car to remove and discard the papers, while Browder remained in the vehicle. *Id.* ¶ 47; Ex. 11, Janis Dec. Aff. ¶¶ 8, 12. Nor did Browder contact law enforcement or the U.S. Attorney's Office to tell them of the incident—which he supposedly thought was a kidnapping attempt—until after he returned to London, having left his wife and children in Aspen for a supposedly preexisting trip even though Browder was scheduled to appear the next two days at the Aspen conference. Browder Decl. ¶ 48; ECF No. 115-10 (published Aspen Action Forum schedule for Browder).

Browder's presence in Colorado was no accident, as he maintains a residence and at least two cars in Colorado. Defendants have obtained, from a records search through the Colorado Motor Vehicle Division, documents showing that Browder has had, since 2012, two vehicles registered in the state of Colorado. *See* Ex. 12, GMC Registration Papers; Ex. 13, Nissan

Registration Papers.  One of those vehicles is the same black SUV that Browder used to retreat from the Aspen Action Forum, and which was parked the next day at ███████████. *Compare* Ex. 9, Janis July Aff., *with* Ex. 12, GMC Registration Papers at 1, 2.  The registration papers for both cars state that Browder's legal address is ███████████████. Ex. 12, GMC Registration Papers at 1, 2, 6; Ex. 13, Nissan Registration Papers at 1, 2, 4, 6.

Browder claims that he does not own the residence, and that it is instead beneficially owned by a member of the family.  Browder Decl. ¶ 52.  Browder does not, however, deny that he provided the funds to purchase the $11.2 million residence (purchased in 2011).  He also does not deny that he uses the residence, that he keeps multiple cars in Colorado that are registered at the residence, or that he intends to keep using the residence in the future.  Browder states only that he has no "immediate" plans to visit the residence.  *Id.* ¶ 53.

In addition to serving Browder in person, on July 30, 2014, a process server physically delivered another copy of the subpoena to Browder's residence at ██████████e. Ex. 14, July 30, 2014 Declaration of Brian O'Shea ("O'Shea July 30 Aff.").  The process server observed three children playing at the house and an adult woman in a window of the home, but no one came to the door despite his knocking for several minutes.  *Id.*  The process server left the subpoena standing upright against the front door of the residence.  *Id.*  The next day, process servers mailed a copy of the subpoena to ████████.  Ex. 15, July 31, 2014 Declaration of Brian O'Shea ("O'Shea July 31 Aff.").  To further ensure that Browder would receive notice of the contents of the subpoena, Defendants sent a copy of the subpoena by electronic mail to Browder's attorneys at Brown Rudnick, who have represented one or more Hermitage entities since 2009, and who are counsel to Hermitage Global in the D.C. Litigation and spoke on Browder's behalf in that action.  Taube Decl. ¶ 3; Ex. 4, Hermitage Global Mot. to Quash at 3–4,

7–8.   Browder clearly received notice of the subpoena, as he immediately retained new counsel to represent him in responding to it, and that counsel reached out to Defendants' counsel to discuss a briefing schedule within days.   Taube Decl. ¶ 4.

Anticipating that Browder might challenge the subpoenas, after serving Browder, Defendants also served subpoenas on several entities and individuals that Browder uses to conceal his connection to the residence at ███████████ and the vehicles registered there. Indeed, Browder's ████████ Property and the two automobiles Browder stores at that residence all appear to be managed by Victoria Tarantino and her entity, Tarantino Consulting, LLC, on his behalf; Browder even has even signed two notarized statements that affiliate him with Ms. Tarantino's address.   *See* Ex. 12 at 4; Ex. 13 at 3.   Given these connections, it is hardly surprising that counsel for Browder appeared for all of the Non-Browder Parties, as well.[5]

## ARGUMENT

"The party moving to quash a subpoena bears a heavy burden of proof."   *Mangla v. Univ. of Rochester*, 168 F.R.D. 137, 140 (W.D.N.Y. 1996); *Jones v. Hirschfeld*, 219 F.R.D. 71, 74–75 (S.D.N.Y. 2003).   Quashing a subpoena in its entirety "is an extraordinary measure, and is usually inappropriate absent extraordinary circumstances."   *Flanagan v. Wyndham Int'l Inc.*, 231 F.R.D. 98, 102 (D.D.C. 2005); *see also B. Fernandez & Hnos., Inc. v. Int'l Bhd. of Teamsters*,

---

[5]   Specifically, Defendants served subpoenas on Sundance Aspen, Michael Foley, Acme Management, Victoria Tarantino, and Victoria Tarantino Consulting (collectively, the "Non-Browder Parties"), all of whom are likely to have information establishing Browder's residence in Colorado.   Defendants served Sundance Aspen LLC, ██████████████████████ ███████████████████████████████.   Ex. 17.   That same website also contains an address for 54 Colleton River Road in Henderson, Nevada.   *Id.*   A review of the Clark County Property Assessor's website showed that property belongs to Victoria Tarantino. Ex. 18.   According to LinkedIn and the Nevada Secretary of State, Ms. Tarantino appears to own Tarantino Consulting LLC.   Ex. 19; ECF No. 115-5; ECF No. 115-6.   Not coincidentally, Ms. Tarantino's address is repeatedly listed as an additional address in Browder's car registration. Ex. 12, GMC Registration Papers at 1, 2, 6; Ex. 13, Nissan Registration Papers at 1, 2, 3.

285 F.R.D. 185, 186 (D.P.R. 2012) ("[A] party seeking to quash a deposition in its entirety must show 'extraordinary' or 'exceptional' circumstances").

There are no exceptional circumstances here: Browder was personally served in Colorado within ten miles of one of his residences, and service was also accomplished through alternative service that put Browder on full notice that he was served.[6]

## I.    Service on Browder Was Effective.

Browder contends that he was never effectively served because he did not accept service of the subpoena and supposedly did not understand he was being served.  In fact, Browder was effectively served both by personal hand-to-hand service as well as alternative methods of service.  In total, Browder received four copies of the subpoena.  Browder cannot feasibly claim that he is not subject to this Court's subpoena power because he refused to extend his hand to take the subpoena in front of him.

### A.    Browder Was Personally Served by In-Hand Delivery.

An individual's attempt to evade service by refusing to accept process does not render personal service ineffective.  *See Martinez v. City of Pittsburg*, No. C 11-01017 (SBA) (LB), 2012 WL 699462, at *1, 2 (N.D. Cal. Mar. 1, 2012) (finding personal service effective where the witness "refused to keep the papers, placed them on the process server's vehicle, and stated that he would not appear for his deposition"); *Gambone v. Lite-Rock Drywall Corp.*, No. CIV.A. 01-1071, 2003 WL 21891584, at *4 (E.D. Pa. Aug. 7, 2003) *aff'd*, 124 F. App'x 78 (3d Cir. 2005) (service was completed by leaving papers on doorstep after defendant refused to accept them). Rather, "[e]ven though a defendant refuses physical acceptance of a summons, service is complete if a defendant is in close proximity to a process server under such circumstances that a

---

[6] Browder has also been served as a director of Hermitage Global Partners, LP, and has moved to quash that subpoena as well.  *See* Ex. 4, Hermitage Global Mot. to Quash.

reasonable person would be convinced that personal service of the summons is being attempted."
*Gambone*, 2003 WL 21891584, at *4.

Browder was personally served on the evening of July 29, 2014, by two process servers who identified themselves and handed Browder a copy of the subpoena, causing him to flee. *See* Ex. 9, Janis July Aff.; Ex. 10, Hoar July Aff.  One of the process servers pursued him, stating loudly that Browder was being served, and then placed a copy of the subpoena under the windshield wiper of his car, *id.*, after which Browder's son ran around the vehicle to discard the subpoena. *Id.*[7]

Browder contests hardly any of the facts sworn to by the process servers.  He does not dispute that the papers were handed to him or that the process servers announced that Browder was being served.  Rather, he states only that he does not recall having papers dropped at his feet and did not understand what the process servers were saying to him as he fled.  Browder Decl. ¶¶ 44–46.  This account is simply not credible.  Browder's story—that he was so frightened at the specter of someone handing papers to him that he failed to understand what the papers were or what the process servers were saying—is inconsistent not only with the testimony of the process servers, see Ex. 20, Hoar Dec. Aff.; Ex. 11, Janis Dec. Aff., but with common sense. According to Browder's version of the facts, when Browder heard the first process server call his name, he ran ahead of his son to get to his car, and later allowed or directed his son to get out of the car and run around the vehicle to remove the second subpoena from the windshield.  Browder Decl. ¶ 44–47.  Despite the supposed grave risks to his safety, he left town the next day, but his family remained behind in Aspen.  *Id.* ¶ 48.  Though Browder now claims he believed he was in

---

[7] Although Browder previously characterized this as "rejecting" the subpoena, *see* ECF No. 113, Memorandum in Support of Motion to Quash ("Mem. to Quash") at 13, such a rejection is not effective. *See Martinez*, 2012 WL 699462, at *1.

imminent danger, he did not contact local police and did not alert the U.S. Attorney's Office about these events until he returned to the United Kingdom.  *Id.*  These actions are inconsistent with a man claiming that he feared for himself and his family when offered subpoena papers. Rather, they show that Browder was primarily concerned with avoiding service of a subpoena that might subject him to a deposition regarding his allegations in this case.  Browder had ample reason to know that Defendants were trying to serve him, given Defendants' many efforts to serve him in this case.  *See supra* at 2–3.

Under these circumstances, Browder was clearly aware that he was being served and was attempting—unsuccessfully—to evade service.  *See Leser v. U.S. Bank Nat. Ass'n*, No. 09-CV-2362 KAM ALC, 2011 WL 1004708, at *3 n. 7 (E.D.N.Y. Mar. 18, 2011) (non-party witness was served, albeit with a stale subpoena, when he was confronted by a process server and the witness "pushed the papers to the ground and drove away in his car").  And even if he was not, any *reasonable* person would have been "convinced that personal service of the summons [was] being attempted," not that he was being chased by Russian kidnappers waving papers at him at a crowded conference in Aspen.  *Gambone*, 2003 WL 21891584, at *4 (service is complete if a reasonable person would realize service was being attempted).

## B.    Browder Was Also Effectively Served Through Alternative Process.

The keystone of alternative service under Rule 45 is "delivery which reasonably ensures actual receipt."  *Rand v. Am. Ins. Co.*, No. 11-CV-3040 (CBA) (MDG), 2012 WL 628321, at *1 n.1 (E.D.N.Y. Feb. 27, 2012) ("The process server made three attempts to deliver the subpoena to Mr. Grossman before affixing it to the outside door of his house and mailing it. This Court agrees with the reasoning of the courts in the Second Circuit holding that Rule 45 only requires delivery which reasonably ensures actual receipt by a witness.") (collecting cases); *Beare v.*

*Millington*, No. 07-CV-3391(ERK) (MDG), 2010 WL 234771, at *4 (E.D.N.Y. Jan. 13, 2010)

("Rule 45 requires only delivery which reasonably ensures actual receipt by a witness.");

*Ultradent Products, Inc. v. Hayman*, No. M8-85 RPP, 2002 WL 31119425, at *4 (S.D.N.Y. Sept.

24, 2002) (service by certified mail sufficient under Rule 45 where it reasonably ensured actual

receipt by the witness); *see also E.A. Renfroe & Co., Inc. v. Moran*, No. CIV.A. 08-CV-00733-

REB-MJW, 2008 WL 1806200, at *6 (D. Colo. Apr. 21, 2008) (holding that "effective service

under Rule 45 is not limited to hand-to-hand personal service in every case").  Contrary to

Browder's claim, "there is no Second Circuit case law interpreting the Rule 45 requirement of

delivery as requiring personal service."  *JPMorgan Chase Bank, N.A. v. IDW Group, LLC*, No.

08 Civ. 9116 (PGG), 2009 WL 1313259, at *2 (S.D.N.Y. May 11, 2009) (internal citations and

quotation marks omitted).[8]

In addition to being personally served at the conference on July 29, Browder was

effectively served under this standard when Defendants' process servers (1) left a copy of the

subpoena at the door of his residence in Aspen, Colorado and (2) mailed a second copy of the

subpoena to the same residence.[9]  Ex. 14, O'Shea July 30 Aff.; Ex. 15, O'Shea July 31 Aff.  Both

---

[8] Nor were Defendants required to first seek permission from the Court before using these
alternative methods of service.  Courts in both New York and Colorado have upheld service of
Rule 45 subpoenas by alternative methods even though the serving party did not first seek
authorization for such service.  *See Beare*, 2010 WL 234771 at *4 (holding that the non-party
witness was "served subpoenas when the first subpoena was affixed to his door and mailed to
him after three attempts to serve him personally and the second subpoena was mailed to him by
certified mail at his home"); *King v. Crown Plastering Corp.*, 170 F.R.D. 355, 356 (E.D.N.Y.
1997) (finding that subpoenas were adequately served when they were delivered to the
witnesses' residence and mailed to the same address, reasonably ensuring actual receipt); *E.A.
Renfroe*, 2008 WL 1806200 at *6 (holding that a subpoena was served where "the alternative
service used . . . accomplished the goal of actual receipt of the subpoena by the witness").

[9] Browder complains that this service did not comply with Rule 4 of the Federal Rules, but fails
to cite to any case holding that alternative service may only be achieved by the methods set out
in Rule 4.  The court in *Briarpatch* merely observed that courts have *authorized* alternative
service "similar to that permitted under Rule 4," not that it is required in every case—and more

of these methods reasonably ensured actual receipt by Browder—in fact, Browder's new counsel reached out to Defendants' counsel within days of service to discuss their timeline for responding to the subpoenas.  Taube Decl. ¶ 4 (describing call from Gibson Dunn on August 5, 2014).  Although Browder denies that he was present when those subpoenas were served, he admits that his family was there at the time the process server posted the subpoena.  Browder Decl. ¶ 48; *see also* Ex. 14, O'Shea July 30 Aff. (stating that he saw an adult woman and several children at home when he went to the Aspen residence).  Defendants also served copies of the subpoena by electronic mail to Browder's attorneys at Brown Rudnick, who claimed in the D.C. Litigation to be speaking on Browder's behalf in their brief for Hermitage Global.  Taube Decl. ¶ 3; Ex. 4, Hermitage Global Mot. to Quash at 3–4, 7–8.[10]

Browder states, unconvincingly, that he never received "any of the papers that Defendants' process servers claim to have left at the door of the house in Aspen at which [his] family was staying or claim to have mailed to that house."  Browder Decl. ¶ 49.  If Browder did not receive the subpoena from either his family or his attorneys, it can only be because he consciously avoided receiving them, as he did on the evening of July 29 when handed a physical copy of the subpoena.  Indeed, lest the Court be concerned that Browder did not receive the subpoena, Browder immediately hired new counsel specifically to represent him to respond to the subpoena, and that counsel was negotiating a briefing schedule within a week of the service

---

importantly, found that service on the witness's business manager was not reasonably calculated to provide timely notice to the witness.  *Briarpatch Ltd., LP v. Geisler Roberdeau, Inc.*, No. 99-Civ. 9623, 2006 WL 1311967, at *1 (S.D.N.Y. May 12, 2006).

[10]  Browder's other attorneys, at Gibson Dunn, have conceded that Browder is "the owner/operator, he is Hermitage."  Ex. 21, Hr'g Tr. at 31:23–32:2, Oct. 14, 2014.  That Browder is the alter ego of the Hermitage entities confirms that he was also appropriately served through service on Hermitage Global at its registered address in Delaware, and that Browder "is employed or regularly transacts business" in Delaware where his company is domiciled (within 100 miles of Washington, D.C., where the Delaware subpoena commanded him to appear).

date.  *See Renfroe*, 2008 WL 1806200, at *6 (declining to require personal service where "the very filing of the motion [protesting the subpoena] reflect[s] that the petitioner did, in fact, receive 'delivery' of the subpoena which he was able to contest on its merits").  Because the documents were delivered so as to reasonably ensure actual receipt by Browder, and did in fact accomplish actual receipt, they met the requirements of Rule 45.

Because Browder was served in Aspen, he must produce documents and give testimony in Aspen, as the subpoenas require.

## II.   Browder Resides in Aspen Under Colorado Law.

Rule 45(c) provides that a subpoena may command a person to travel up to 100 miles from where the non-party "resides, is employed or regularly transacts business in person."  Fed. R. Civ. P. 45(c)(1)(A).  Rule 45(c) does not provide a definition of the term "resides."  Thus, courts look to state law to determine where a subpoenaed individual resides for purposes of that rule.  *See In re Neves*, No. 09-33043-BKC-LMI, 2011 WL 3502770, at *1 (Bankr. S.D. Fla. Aug. 8, 2011) (looking to state law to determine the definition of the term "resides" as it is used in Rule 45, and concluding that the non-party witness resided in Miami although it was not her permanent home).

The subpoena served on Browder compels him to appear for a deposition and produce documents in Aspen, Colorado.  Although Browder's supplemental memorandum primarily cites New York cases, it is Colorado that has the paramount interest in determining what constitutes a Colorado "residence" and whether those within its borders are subject to service of process based on their contacts with the forum.  *See, e.g.*, *Montgomery v. Douglas*, 388 F. Supp. 1139, 1144 (D. Colo. 1974) *aff'd*, 422 U.S. 1030, 95 S. Ct. 2645, 45 L. Ed. 2d 687 (1975) (Colorado has a "legitimate interest" in determining the legal residence of a student applying for state-subsidized

education); *Sabell v. Pac. Intermountain Express Co.*, 36 Colo. App. 60, 69 (1975) ("Colorado, as the state of the forum has a legitimate interest in applying its laws and policies not only to the conduct of its residents, but also to those who seek relief in its courts."). Accordingly, the Court should look to Colorado law to determine whether Browder "resides" in Colorado for purposes of service under Rule 45.

Under Colorado law, to establish a residence "requires only 'personal presence at some place of abode with no present intention of definite and early removal therefrom and with a purpose and intent to remain for an undetermined period.'" *Old Republic Nat. Title Ins. Co. v. Kornegay*, 292 P.3d 1111, 1115 (Colo. App. 2012) (quoting *Carlson v. Dist. Court of City & Cnty. of Denver*, 116 Colo. 330, 338 (1947) (pastor temporarily serving church in Colorado was resident of Colorado for service purposes). A person "may have more than one residence at a time." *Old Republic*, 292 P.3d at 1116 (quoting Black's Law Dictionary 1423 (9th ed. 2009)). The Colorado standard is met here.

Browder has told the state of Colorado that ██████████ is his legal address, and he should not be permitted to deny it now. Since 2012, Browder has maintained two vehicles in Colorado. Legal documents filed with the Colorado DMV list Browder's "legal address" as ██ ██████████. That address is the same as the residence to which Browder retreated after being served at the Aspen conference, Browder Decl. ¶ 47, and the same address at which process servers left an additional copy of the subpoena after witnessing his children playing in the yard. *Id.* ¶ 48; Ex. 14, O'Shea July 30 Aff.

Browder tellingly does not mention his two vehicles in his Declaration despite the fact that one of them was discussed in Defendants' Rule 45 submissions. *See* ECF No. 115 ¶ 9 (Declaration of Mark Cymrot in Support of Defendants' Rule 45(b)(4) Statement). The presence

16

of *two* vehicles registered to Browder at ████████████ in Aspen strongly suggests that Browder regularly resides in Aspen and intends to remain there.

Despite his prior statements acknowledging ████████████ as his legal address, Browder now denies that he resides at this house.  Browder Decl. ¶ 52.  But he notably avoids saying how frequently he stays at the house, acknowledging only that he stays there "from time to time."  *Id*.  This is not the first time that Browder has abruptly changed his story in an attempt to avoid discovery.  From 2010 to 2013, Hermitage Global asserted to the SEC that Browder was an officer or director of that company.  *See* Ex. 5, Prevezon Opposition to Hermitage Global Motion to Quash at 4.  Only when Browder was served with a subpoena in Delaware did Hermitage Global assert on Browder's behalf that he had never been an officer or director.  *Id.*; Ex. 22, May 20, 2014 Declaration of Andrew Pucher ¶ 7.  The Court should not credit Browder's conclusory and self-serving assertion that he does not maintain a residence in Aspen in the face of his prior binding statements to the contrary.

Even if Browder's current position were not directly contrary to his statements to the Colorado authorities, the facts strongly suggest that Browder purchased and maintains the home in Aspen for his own regular use.  The home was purchased in 2011 for $11.2 million, a princely sum except for a multi-millionaire like Browder.  See Ex. 23, Chad Abraham, Aspen Plays Role in Alleged $230M Russian Fraud Case, Aspen Daily News (Oct. 23, 2014), http://www.aspendailynews.com/section/home/164328.  Browder's Declaration, although based on his own personal knowledge, tellingly avoids stating who purchased the house or who owns it, other than to say it is "indirectly" owned by members of his family.  Browder Decl. ¶¶ 40, 52. Yet Browder fails to include any of the details regarding the complex ownership structure he has set up for both his house and automobiles.  Both of the cars and the house appear to be managed

by Tarantino, and sworn statements made by Browder affiliate himself with that address.  *See* n. 5, *supra*.  Given this evidence, the Court should deny Browder's motion; at a minimum, it should permit Defendants to take their requested discovery against the Non-Browder parties to rebut Browder's declaration statements.

Browder's inapplicable New York cases are not to the contrary.  In *Yukos Hydrocarbons*, the unreported magistrate judge case on which Browder principally relies, the deponent had a "clear intent to return to Moscow" with his family and give up his home in New York.  *In re Application of Yukos Hydrocarbons Investments Ltd.*  No. 5:09-MC-0078 (NAM/DEP), 2009 WL 5216951, at *6 (N.D.N.Y. Dec. 30, 2009).  Indeed, the witness left the district with no intention to remain "within th[e] district with any permanency."  *Id*.  The witness's "genuine intent" to definitively give up his home was the key factor in the court's analysis.  Here, Browder gives no indication that he does not intend to maintain his legal address in Aspen or that he and his family have no intention to remain in Aspen—only that he does not plan to travel there in the "*immediate* future."  Browder Decl. ¶ 53 (emphasis added).

Browder's other cases are also inapposite.  In *In re Application for Order Quashing Depositions*, the party seeking the deposition presented insufficient evidence the witness had regularly done business in New York, having come to New York for business only four times in five years.  No. M8-85, 2002 WL 1870084, at *3 n.2 (S.D.N.Y. Aug. 14, 2002).  The party did not argue that the witness resided in New York.  *See id.*  In *M'Baye*, another "regularly transact[ing] business" case, the witness in question had traveled to New York and Philadelphia on only five occasions over the course of two years.  *M'Baye v. New Jersey Sports Prod., Inc.*, 246 F.R.D. 205, 206 (S.D.N.Y. 2007).  Unlike Browder, that witness did not reside in the district, return to the same address each time, or submit official documents listing that address to

satisfy legal requirements.  Likewise, in *In re Kolomoisky*—a case interpreting residence under 28 U.S.C. § 1782, not Rule 45—only the witness's family resided in New York, and the witness's statement that he did not reside in or own any property in the district was uncontroverted.  *In re Kolomoisky*, No. M19-116, 2006 WL 2404332, at *3 (S.D.N.Y. Aug. 18, 2006).  Moreover, the only evidence of the witness's presence in the district was his passport indicating that he had spent ten to twelve days in the United States, not New York specifically.  *Id.*  By contrast, the evidence here shows—at a minimum—that Browder owns several cars in Colorado and has stayed in Aspen, at the same family home, on multiple occasions.[11]

Finally, if the Court finds it does not have sufficient evidence of Browder's residency in Aspen at this time, it should order compliance with the other non-party subpoenas served by Defendants.  The purpose of those document requests is to obtain information establishing Browder's presence in Aspen, his ownership of the Aspen home, and his business activities.  As detailed in footnote 5, *supra*, both Browder's cars and his house are associated with these other non-parties.  Completion of that discovery would supply the Court with additional evidence regarding Browder's residence in Aspen.[12]

---

[11]  Browder asserts that even if he was validly served in Aspen, discovery can only be taken of him in London under the Hague Convention because he is a U.K. citizen (having renounced his U.S. citizenship) and primarily lives and works in London.  Supp. Mem. 14–17.  The Second Circuit has held that "[t]he Hague Convention is not the exclusive means for obtaining discovery from a foreign entity."  *First Am. Corp. v. Price Waterhouse LLP*, 154 F.3d 16, 21 (2d Cir. 1998) (upholding service of a subpoena on a U.K. partnership where a partner was served by hand while physically present in New York); *see also In re Vivendi Universal, S.A. Sec. Litig.*, No. 02CIV5571RJHHBP, 2006 WL 3378115, at *2 (S.D.N.Y. Nov. 16, 2006) ("It is beyond cavil that the Hague Convention is not the exclusive means for obtaining discovery from a foreign entity.").  Nor is there any reason for the Court to require discovery in England; the Second Circuit has concluded that England's narrow discovery rules weigh *against* requiring Hague Convention discovery, rather than for it.  *Price Waterhouse*, 154 F.3d at 23.

[12]  Browder is also employed or regularly transacts business in Aspen.  Browder describes himself as a "businessman who became an unlikely human rights activist," Browder Decl. ¶ 14, and admits that he "devote[s] a substantial proportion of [his] time to the global justice campaign

**CONCLUSION**

For the foregoing reasons, Defendants respectfully request that this Court deny the Motion to Quash.

---

for Sergei Magnitsky." *Id.* ¶ 16; *see also id.* ¶ 26; Ex. 24 (screenshot of Browder's Twitter account identifying him as "Head of Global Magnitsky Justice Campaign"). In participating in the Aspen forum, Browder was participating in his ongoing effort to promoting the "global justice movement for Sergei Magnitsky," at the time he was served with Defendants' Rule 45 subpoena. *See* Ex. 25 (Aspen Action Forum Bill Browder Profile); Ex. 26 (Aspen Action Forum Anatomy of a Revolution Panel Participants); Ex. 16 (Aspen Action Forum Free Speech Panel Participants); *see also* ECF No. 115-10 (Aspen Action Forum schedule for Bill Browder). Browder and Hermitage also have investors in the United States, which may include investors in Aspen. Discovery from the non-Browder subpoenaed parties may reveal additional evidence that Browder is employed in or regularly transacts business in Aspen.

Dated:  December 10, 2014
New York, New York

<table>
<tr>
<td>

John W. Moscow
BAKER & HOSTETLER L.L.P.
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile:  (212) 589-4201

</td>
<td>

/s/ Seth T. Taube
Seth T. Taube
Richard B. Harper
BAKER BOTTS L.L.P.
30 Rockefeller Plaza
New York, NY 10112
Telephone: (212) 408-2500
Facsimile:  (212) 408-2501
seth.taube@bakerbotts.com

</td>
</tr>
<tr>
<td>

Mark A. Cymrot
BAKER & HOSTETLER L.L.P.
Washington Square, Suite 1100
1050 Connecticut Ave.,
Washington, D.C.  20036
Telephone:  (202) 861-1677
Facsimile:   (202) 861-1783

</td>
<td>

Vernon Cassin
BAKER BOTTS L.L.P.
1299 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 639-1313
Facsimile:  (202) 639-1189
vernon.cassin@bakerbotts.com

</td>
</tr>
</table>

*Attorneys for Prevezon Holdings Ltd., Prevezon Alexander, LLC, Prevezon Soho USA, LLC,*
*Prevezon Seven USA, LLC, Prevezon Pine USA, LLC, Prevezon 1711 USA, LLC,*
*Prevezon 1810 LLC, Prevezon 2009 USA, LLC, and Prevezon 2011 USA, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on the 10th day of December 2014, a true and correct copy of this Defendants' Opposition to the Motion to Quash of William Browder was electronically filed with the Clerk of the Court, Southern District of New York and sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).


<u>/s/ Seth Taube</u>
Seth T. Taube