UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- x
                                                      :
UNITED STATES OF AMERICA,                             :
                                                      :          13 Civ. 6326 (TPG)
                            Plaintiff,                :
                                                      :
        - against -                                   :
                                                      :
PREVEZON HOLDINGS LTD., et al.,                       :
                                                      :
                            Defendants,               :
                                                      :
        - and -                                       :
                                                      :
ALL RIGHT, TITLE AND INTEREST IN THE REAL             :
PROPERTY AND APPURTENANCES KNOWN AS                   :
THE 20 PINE STREET CONDOMINIUM, 20 PINE               :
STREET, NEW YORK, NEW YORK 10005, UNIT 1816,          :
et al.,                                               :
                                                      :
                            Defendants in Rem.        :
                                                      :
-------------------------------------------------------------------- x


## MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA
## IN OPPOSITION TO MOTIONS BY DEFENDANTS
## TO DISMISS THE AMENDED COMPLAINT


                                    PREET BHARARA
                                    United States Attorney
                                    Southern District of New York
                                    One St. Andrew's Plaza
                                    New York, New York 10007


Paul M. Monteleoni
Andrew C. Adams
Margaret Graham
Assistant United States Attorneys
- Of Counsel -

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ...................................................................................................... 2

    A.    The $230 Million Fraud Scheme ................................................. 3

    B.    The Defendants' Involvement in Laundering the Proceeds of the Fraud Scheme ............................................................................. 4

    C.    Procedural History .................................................................... 9

        1.    The Original Complaint and Protective Order ............... 9

        2.    The Defendants' Abandonment of Their Good-Faith Proposal for a Discovery Schedule ................................. 10

        3.    The First Session of the Deposition of Special Agent Todd Hyman and the Defendants' Sanctions Motion ....... 10

        4.    The Amended Complaint, This Motion, and the Interlocutory Appeal ................................................... 12

ARGUMENT ........................................................................................................ 14

    I.    THE PROCEEDINGS IN THE SECOND CIRCUIT MAY BE DISPOSITIVE OF THESE MOTIONS ....................................................... 14

    II.    THE AMENDED COMPLAINT STATES A CLAIM ........................... 16

        A.    Legal Standards Applicable to Motions to Dismiss .................. 16

        B.    The Amended Complaint Is Not Extraterritorial ...................... 17

            1.    The Complaint Alleges a Money Laundering Predicate .............. 17

            2.    The Defendants Laundered Money in Manhattan ....... 22

            3.    Kolevins and Ferencoi Participated in The New York Money Laundering ................................................... 23

        C.    The Amended Complaint Alleges that the Defendants Received Fraud Proceeds ....................................................................... 25

        D.    The Amended Complaint Alleges a Substantial Connection Between the Properties Used to Launder the Money and Money Laundering ............. 29

        E.    The Amended Complaint Alleges the Defendants' Culpable Mental States ............................................................................. 30

    III.    THE AMENDED COMPLAINT IS PROPERLY VERIFIED ............... 35

        A.    A Verification Is Not a Warranty of Admissible Evidence ....... 35

B.    The Verification is Entirely Accurate ........................................................ 37

1.    Defendants' Attempt to Misuse Special Agent Hyman's Deposition Should be Rejected ...................................................... 37

2.    Moreover, There Has Been Additional Investigation Since the Deposition ................................................................................ 44

**CONCLUSION** ............................................................................................................... **45**

The Government respectfully submits this Memorandum of Law in opposition to the motion by Prevezon Holdings, Ltd. ("Prevezon Holdings"), Prevezon Alexander, LLC, Prevezon Soho USA, LLC, Prevezon Seven USA, LLC, Prevezon Pine USA, LLC, Prevezon 1711 USA, LLC, Prevezon 1810, LLC, Prevezon 2009 USA, LLC, and Prevezon 2011 USA, LLC (collectively the "Prevezon Subsidiaries") (Prevezon Holdings and the Prevezon Subsidiaries collectively the "Prevezon Defendants"), to dismiss the Amended Verified Complaint (the "Amended Complaint") for failure to state a claim, D.I. 212-14, and in opposition to the motion by Ferencoi Investments Ltd. ("Ferencoi") and Kolevins Ltd. ("Kolevins," Ferencoi and Kolevins together with the Prevezon Defendants the "Defendants") to dismiss the Amended Complaint for lack of jurisdiction and failure to state a claim, D.I. 210-11.[1]

## PRELIMINARY STATEMENT

In a motion that is largely verbatim with arguments they are simultaneously presenting to the Second Circuit in an expedited appeal, the Defendants level a number of unpersuasive objections at the Amended Complaint. They contend that this Court cannot exercise jurisdiction over the purchase of property several blocks away from the courthouse with the proceeds of a crime that involved the use of the United States financial system. They contend that the highly detailed and specific allegations tracing fraud proceeds through numerous shell companies are not detailed enough. They claim that at the motion to dismiss stage this Court should grant them the benefit of the facially implausible inference that they were innocently unaware of the activity in their own corporate bank accounts. In addition to these factual contortions, the Defendants

---

[1] Citations to "D.I. __" refer to docket items in the above-captioned case. Citations to "Defs.' Mem. __" refer to the memorandum of law in support of the Prevezon Defendants' motion, D.I. 213, and citations to "Kol. Mem. __" refer to the memorandum of law in support of the Kolevins and Ferencoi motion, D.I. 211.

distort the law as well, misstating the legal requirement that property (here real estate) have a substantial connection to the crime for which forfeiture is sought (here, money laundering through the purchase of that real estate). Most flagrantly, the Defendants attempt to use the requirement that a forfeiture complaint be verified as a means of imposing an admissible-evidence requirement at the pleading stage, a requirement that is explicitly contrary to statute. That they do so by baselessly accusing an affiant of deception is all the more inappropriate, and should not be rewarded.

The Court should not reach the Defendants' motions until the Second Circuit has ruled on their expedited appeal raising substantially the same issues. Should the motions remain open after that point, this Court should swiftly deny them.

## <u>BACKGROUND</u>

This case seeks the forfeiture of certain assets of the Prevezon Defendants, nine corporations (the assets the "Defendants in Rem") and the imposition of civil money laundering penalties against them, as well as Ferencoi and Kolevins. The basis for this relief is the Defendants' participation in laundering a portion of the proceeds of an elaborate Russian tax fraud scheme into commercial and luxury residential real estate located in Manhattan.

As alleged in the Amended Complaint, in 2007 a Russian criminal organization including corrupt Russian government officials (the "Organization") defrauded Russian taxpayers of approximately 5.4 billion rubles, or approximately $230 million in United States dollars, through an elaborate tax refund fraud scheme. After perpetrating this fraud, members of the Organization, and associates of those members, have engaged in a broad pattern of money laundering in order to conceal the proceeds of the fraud scheme, including the purchase of Manhattan real estate using funds that had been commingled with fraud proceeds.

### A.    The $230 Million Fraud Scheme

As alleged in the Amended Complaint, members of the Organization stole the corporate identities of three companies (OOO Rilend, OOO Parfenion, and OOO Makhaon, collectively the "Hermitage Companies"), which were portfolio companies of the Hermitage Fund, a foreign investment fund investing in Russia in the early 2000s.  Am. Compl. ¶¶ 14, 16, 18.  The members of the Organization used these stolen identities to make fraudulent claims for tax refunds.  Am. Compl. ¶ 18.

In order to steal the corporate identities of the Hermitage Companies, members of the Organization caused officers from the Interior Ministry to search the Russian offices of the Hermitage Fund and its Russian law firm in mid-2007, and to confiscate the original corporate stamps and documents of the Hermitage Companies.  Am. Compl. ¶¶ 24-25.  Using these items, members of the Organization fraudulently re-registered ownership of the Hermitage Companies away from their rightful owner (an HSBC entity as trustee for the Hermitage Fund) into the names of three convicted criminals, Am. Compl. ¶¶ 26, 28, based on an order from an arbitration court that appears not to be a genuine court of any kind.  Am. Compl. ¶ 27 & Ex. A.

With the stolen corporate identities of the Hermitage Companies in hand, members of the Organization forged backdated contracts with fake commercial counterparties, pursuant to which it appeared that the Hermitage Companies owed the counterparties huge sums of money.  Am. Compl. ¶¶ 29-32.  The counterparties, also controlled by members of the Organization, sued the stolen Hermitage Companies based on the forged contracts.  Am. Compl. ¶¶ 33-34.  These lawsuits were sham proceedings in which members of the Organization represented both the counterparties and the Hermitage Companies, orchestrating the proceedings so as to fraudulently procure huge judgments against the Hermitage Companies.  Am. Compl. ¶¶ 34-36.

The members of the Organization used the fraudulently-procured judgments to apply for tax refunds on behalf of the stolen Hermitage Companies, claiming that these judgments constituted losses negating the profits the companies had made the previous year, entitling the companies to a refund of the taxes the Hermitage Companies had paid for 2006 (i.e., before the companies were stolen). Am. Compl. ¶¶ 40-41. Tax officials working for the Organization corruptly approved those refund requests, totaling U.S. $230 million within one business day of the requests, and the $230 million was paid just two days later. Am. Compl. ¶¶ 43-45. The refunds were paid from the Russian treasury to accounts the Organization had set up in the name of the Hermitage Companies. Am. Compl. ¶ 45.

### B. The Defendants' Involvement in Laundering the Proceeds of the Fraud Scheme

After members of the Organization caused the $230 million in tax refunds to be paid, they, directly and through associates, engaged in a series of laundering transactions that dispersed the money to different countries through various shell companies. Am. Compl. ¶ 45. Ultimately, a portion of the fraud proceeds—approximately $1,965,444.55—was transferred, through intermediaries, to Prevezon Holdings, which commingled these fraud proceeds with other funds and laundered them into the purchase of Manhattan real estate.[2]

The Complaint alleges that approximately $230 million was paid from the Russian

---

[2] Members of the Organization also undertook illegal means to retaliate against those who uncovered the fraud scheme, culminating in the arrest of Sergei Magnitsky, a lawyer who exposed the scheme, and his death in detention. Am. Compl. ¶¶ 55-65. Although these retaliatory actions are relevant, inter alia, as evidence of the willingness of members of the Organization to hide their fraud through illegal means, and to eventual analysis of the proportionality of any forfeiture, *see infra* note 35, the Amended Complaint does not allege that the Defendants were directly involved in the arrest, detention, or death of Magnitsky.

treasury to accounts in the name of the Hermitage Companies at two very small Russian banks. Am. Compl. ¶ 77-79. The accounts had been opened by members of the Organization just days before the refund payments were made, Am. Compl. ¶¶ 78-79, and were closed less than two months later, after they had transferred the money on to other accounts, Am. Compl. ¶ 88.

From the Hermitage Company accounts, the stolen funds were transferred on to a number of other accounts. The Amended Complaint does not trace all of the money after it left the Russian treasury, but sets forth that large volumes of it passed through accounts for several layers of shell companies. *See* Am. Compl. ¶ 83(a) (shell company named ZhK); *id.* ¶ 84(a) (shell company named Fausta); *id.* ¶ 86(a) (shell company named Anika); *id.* ¶ 87(a) (shell company named Univers). Some of these, the first-tier shells, received money directly from the Hermitage Companies, *see* Am. Compl. ¶¶ 84 (Fausta), 86 (Anika), and some, the second-tier shells, received money both from the first-tier shells and from the Hermitage Companies directly, *see* Am. Compl. ¶¶ 83 (Parfenion to ZhK directly), 84-85 (Parfenion to Fausta to ZhK); *id.* ¶ 87 (Rilend to Univers directly); *id.* ¶¶ 84, 89 (Parfenion to Fausta to Univers); *id.* ¶ 86, 89 (Makhaon to Anika to Univers).

After a portion of the money had been transferred to the second-tier shells, both directly and indirectly, those funds converged into a single account held by Bank Krainiy Sever. Am. Compl. ¶¶ 90-91. Bank Krainiy Sever, in turn, was sending the money, commingled with other funds, abroad to two Moldovan shell companies, Bunicon-Impex SRL ("Bunicon") and Elenast-Com SRL ("Elenast"), which both had accounts at a bank in Moldova. Am. Compl. ¶ 91. On the day it made its last transfer to Elenast, the Bank Krainiy Sever account was seized pursuant to a Russian court order, and approximately one month later Bank Krainiy Sever's banking

license was canceled by Russian authorities for money laundering. Am. Compl. ¶ 92.

After being split up into the Bunicon and Elenast accounts, a portion of the funds transferred from Bank Krainiy Sever, approximately $857,354, converged on an account held by Prevezon Holdings in two February 2008 wire transfers. Am. Compl. ¶¶ 101-02. Among the suspicious indicia surrounding these transfers were the fact that Bunicon and Elenast were shell companies without real business addresses, *see* Am. Compl. ¶¶ 93-94 & Exs. C-D, and that the bank records reflecting the transfers to Prevezon Holdings describe the transfers as prepayment for sanitary equipment, Am. Compl. ¶ 110, which is false, Am. Compl. ¶¶ 107-09. Moreover, both Bunicon and Elenast submitted forged contractual documents to Banca De Economii in Moldova in order to justify these wire transfers. *See* Am. Compl. ¶¶ 111-12. These documents, which specified the type and quantity of sanitary equipment Prevezon was supposedly supplying Bunicon and Elenast, were signed by representatives of Bunicon and Elenast, respectively, and by an unnamed purported representative of Prevezon. Am. Compl. ¶¶ 111-12.

Beyond receiving $857,354 from Bunicon and Elenast directly, Prevezon Holdings also received an additional $1,108,090.55 from Bunicon through multiple additional levels of intermediaries using two different routes.[3] Specifically, on February 5, 2008 (the day before it sent funds to Prevezon directly, Am. Compl. ¶ 101), Bunicon wired $951,400 to an Estonian bank account held by the New Zealand company Megacom Transit Ltd. ("Megacom Transit"), which was another apparent shell company with no known business activities and directed by a

---

[3] This additional $1,108,090.55 was not alleged in the initial Complaint, which based its claims on the laundering of the $857,354 directly sent from Bunicon and Elenast to Prevezon. In October of 2014, additional investigation revealed that the additional $1,108,090.55 constituted proceeds of the $230 Million Fraud Scheme. *See* D.I. 167 at 1-2 (letter motion to amend complaint, explaining recent discovery of additional $1,108,090.55).

nominee listed as a director of over 200 New Zealand companies. *See* Am. Compl. ¶¶ 115-16.[4] Of this $951,400, Megacom Transit transferred $390,000 to the bank account of a British Virgin Islands company ("Company-1") on February 20, 2008, described as being payments for auto spare parts. Am. Compl. ¶ 117. Bunicon also sent money to Company-1 through a different intermediary. On February 6, 2008 (the same day it sent funds to Prevezon directly), Bunicon sent $942,700 to an account in the name of Castlefront LLP ("Castlefront"), a United Kingdom apparent shell company controlled through yet another company by the same nominee director of Megacom Transit. Am. Compl. ¶¶ 118-19.[5] Castlefront then sent a total of $1,986,000 to Company-1, also described as for auto spare parts. Am. Compl. ¶ 121.

Accordingly, between the transfers from Megacom Transit and from Castlefront, Company-1 received a total of at least $1,332,700 in fraud proceeds from Bunicon described as being for auto spare parts. Company-1, in turn, transferred $1,108.090.55 of the fraud proceeds to Prevezon Holdings through multiple transactions spanning almost a month. From February 28, 2008 to March 20, 2008, Company-1 made seven transfers of funds totaling $1,108,090.55 to the real estate company Prevezon Holdings, all also for "auto spare parts." Am. Compl. ¶ 122.

At the time that Prevezon Holdings received the $857,354 from the Bunicon and Elenast accounts in Moldova and the $1,108,090.55 from Bunicon through Company-1, it was officially owned by Timofey Krit (at that time already a business associate of Prevezon Holdings's current owner Denis Katsyv), but its Swiss bank accounts were beneficially owned by a different

---

[4] This transfer was supported by a purported contract between Bunicon and Megacom Transit for heating devices. *See* Am. Compl. ¶ 115.

[5] As with its transfers to Castlefront and to Prevezon directly, Bunicon submitted a purported contract to its bank to justify its wire transfer, this time for goods described as "Laser level Geo-Fennel." *See* Am. Compl. ¶ 120.

associate of Katsyv, Alexander Litvak.  Am. Compl. ¶ 105.  Several months later, Katsyv officially purchased Prevezon from Krit.  Am. Compl. ¶ 106.  Katsyv, for his part, was well aware of the prohibitions on money laundering by 2007, having paid millions of dollars to the Israeli government just two years prior to settle an allegation of money laundering in violation of an Israeli money laundering statute that has provisions similar to the United States money laundering laws.  Am. Compl. ¶ 113.

Starting in November of 2009 and continuing to September of 2012, first Prevezon Holdings, and then other Prevezon Subsidiaries, began to purchase Manhattan real estate.  Am. Compl. ¶¶ 125-35.  The funds came from the Prevezon Holdings account, other Prevezon-owned accounts, Ferencoi (owned by Katsyv) and Kolevins (with Krit as sole shareholder and Litvak as beneficial owner).  Am. Compl. ¶¶ 12, 13, 106(a), 125-35.  A public relations representative of Katsyv stated that the $857,354, which he claimed was sent to Prevezon by a "Mr. Kim" on behalf of a third party named Petrov, was invested in various New York real properties, and was due to be returned to Petrov.  Am. Compl. ¶¶ 109, 124.  The purchase price of the New York real properties substantially exceeds $1,965,444.55.  Am. Compl. ¶¶ 125-35.

Both before and shortly after Katsyv purchased Prevezon Holdings, Prevezon Holdings transferred funds to the Netherlands for a joint investment with a different company, AFI Europe, N.V.  Am. Compl. ¶ 103.  AFI Europe subsequently returned a portion of funds to Prevezon to fund the purchase of some of the New York real estate.  Am. Compl. ¶ 125.  In 2013, AFI Europe repurchased the remainder of Prevezon's interest in the joint investment, and in doing so incurred a debt to Prevezon Holdings.  Am. Compl. ¶ 136.  That debt has been restrained by the Netherlands pursuant to a treaty request.  Am. Compl. ¶ 136.

8

### C.    Procedural History

#### 1.    The Original Complaint and Protective Order

On September 10, 2013, the Government filed an original complaint (the "Complaint"), seeking forfeiture of any and all assets of the Defendants and money laundering penalties against the Defendants.  On September 11, 2013, this Court entered a Post-Complaint Protective Order Pursuant to 18 U.S.C. § 983(j)(1) (the "Protective Order"), restraining the transfer of these assets absent authorization from the Government or further order of the Court.  D.I. 2.

On December 11, 2013, Defendants moved to vacate or modify the Protective Order because, among other reasons, the Complaint purportedly failed to allege that fraud proceeds were transferred to Prevezon Holdings, Defs.' TRO Mem. (D.I. 39) 22-26, or to allege the Defendants' culpable mental state, *id.* at 11-13, 17-18.  At oral argument, this Court denied the Defendants' motion to vacate the Protective Order.  In doing so, it expressed the view that counsel for the Defendants were not characterizing the complaint accurately.  *See* Jan. 7, 2014 Tr. (D.I. 81-12) at 12 ("THE COURT: It seems to me that the complaint in this action is completely different than what you've characterized.").  When counsel for the Defendants persisted, this Court strongly rejected their strained characterizations of the Complaint, which it found "shocking."  *See id.* at 24 ("THE COURT: What you say is – it isn't that there's no merit in anything you say, but most of it is contrary to what is in the record, flatly contrary to what is in the record.  Do you think I can't read?  . . . This is just shocking.").

The Court declined to vacate the Protective Order, rejecting Defendants' claims that the Complaint was insufficient.  Jan. 7, 2014 Tr. at 30-31.  As to the Defendants' request to modify the Protective Order, the Court reserved decision, authorizing the Government to conduct limited

discovery into the Defendants' claims that the order caused hardship to legitimate businesses.[6]

2.    The Defendants' Abandonment of Their Good-Faith Proposal for a
Discovery Schedule

On January 29, 2014, pursuant to Federal Rule of Civil Procedure 26(f), which requires the parties to meet and "attempt[] in good faith to agree on the proposed discovery plan," counsel for Defendants proposed a discovery plan that would provide six months for fact discovery, two months for expert discovery, and two months for pretrial motions. At a February 14, 2014 court conference, however, Defendants abandoned their good-faith proposal without warning and demanded that the Court set a trial to begin in six weeks.[7] They did not advise the Court that under their own previous good-faith proposal, they had allotted ten months for discovery and pretrial motions. At that conference, the Court set a trial date for March 31, 2014. By letter on February 18, 2014, the Government moved for reconsideration of the emergency trial date, informing the Court of the Defendants' own good-faith proposal. The Court adjourned the trial *sine die*, finding the Government's objection "well founded." Tr., Mar. 4, 2014 (D.I. 81-3), at 2.

3.    The First Session of the Deposition of Special Agent Todd Hyman and the
Defendants' Sanctions Motion

On March 3, 2014, prior to the adjournment of the emergency trial date, counsel for the defendants began the deposition of Special Agent Todd Hyman as a representative of the United States under Federal Rule of Civil Procedure 30(b)(6). As set forth in more detail in Section III.B.1, below, Special Agent Hyman was repeatedly asked contention questions seeking his lay

---

[6] As the Government explained in a letter to the Court, Defendants' only response to these discovery requests was insufficient to establish hardship. Gov. Letter, Feb. 25, 2014 (D.I. 216).

[7] The court conference was called to discuss the Government's motion to delay the deposition of the case agent, which the Prevezon Defendants had noticed at the Rule 26(f) conference to take place virtually immediately, prior to any document discovery.

10

opinion on legal conclusions such as what evidence supported a contention or what witnesses were competent to describe a fact.  When Special Agent Hyman attempted to list his view of what evidence supported certain claims, counsel for the Defendants repeatedly interrupted and argued with him.  As a result, some of Special Agent Hyman's answers were incomplete and some reflected misunderstandings of legal concepts.  As explained in Section III.B.1, on several occasions, confused by the sense of the word "evidence" being used by counsel for the Defendants, Special Agent Hyman said the Government had no evidence on certain points, *see* Dep. Tr. 134:13-21; 137:13-138:3; 150:8-14;[8] but at other times, when the questions were phrased in a less confusing fashion or when he was given a chance to explain without being interrupted, he described evidence the Government had on those points, *see* Dep. Tr.  138:9-139:4; 139:13-23; 141:5-17; 145:13-17; 154:5-18.  Defense counsel stopped the deposition before it was finished, and it remains incomplete.

The Prevezon Defendants then filed a motion to dismiss the complaint, both for failure to state a claim and as a Rule 11 sanction because Special Agent Hyman's responses to their questions at the deposition purportedly evidenced that the complaint was filed without adequate factual support.  The demand for Rule 11 sanctions, which the Prevezon Defendants took the extraordinary step of making before having even received an initial document production from the Government, has now been effectively withdrawn by their refusal to renew it after their sanctions motion was "mooted," Defs.' Mem. 16.[9]

---

[8] Citations to "Dep. Tr. __" refer to the transcript of the first session of Special Agent Hyman's deposition, D.I. 214-1.

[9] Defendants also made no effort to comply with the mandatory procedural requirements of Rule 11(c)(2) that a Rule 11 motion must be made separately from any other motion and only after a

Contrary to their representations about their desire for an immediate trial, the Prevezon Defendants put party discovery "on hold" while they awaited a ruling on this motion and sought third-party discovery through subpoenas claimed to be served in the District of Columbia and in Colorado.  *See* Defs.' Opp. Mot. Quash (D.D.C. D.I. 22) 5.[10]

            4.     <u>The Amended Complaint, This Motion, and the Interlocutory Appeal</u>

On October 31, 2014, after further investigation revealed the additional $1,108,090.55 Prevezon received from Bunicon through Company-1, as well as more detail on the fraudulent paperwork supporting the transfers from Bunicon and Elenast, the Government made a letter-motion for permission to file an amended complaint and an amended protective order, both to narrow the scope of the forfeiture sought and to allege additional facts supporting the forfeiture. *See* Gov.'s Letter-Motion, Oct. 31, 2014 (D.I. 167) 1-4.[11]  The Amended Complaint differed from the Complaint in the following ways:

- It narrowed the scope of assets being sought, forgoing claims to the forfeiture of any and all assets of the Defendants and instead seeking in rem forfeiture only of the New York properties purchased by Prevezon and their sale and rental proceeds, as well as a debt to Prevezon incurred by AFI Europe, Prevezon's partner in the investment in the Netherlands, related to the joint investment there.

- It included the allegation that Katsyv had previous awareness of the prohibition on money laundering due to his 2005 settlement of a confiscation proceeding under Israel's money laundering laws, which are materially similar to those of the United States.

---

21-day safe harbor period to allow the adversary to correct any alleged errors, *see* Gov.'s Opp. Sanctions Mot. (D.I. 88) 22-23, and cited the wrong subsection of Rule 11 in their motion, *see id.* at 21-22.

[10] Citations to "D.D.C. D.I. __" refer to docket items in No. 14 Misc. 551 (ESH) (AK) (D.D.C.), a miscellaneous action related to certain of their subpoenas which has been ordered transferred to this Court.

[11] On February 18, 2014, the Government had sought leave to file an earlier version of the amended complaint.  This request was not ruled on and is moot.

- It included the allegations that the $857,354 transfers directly from Bunicon and Elenast to Prevezon Holdings were supported by sham contractual documentation purportedly signed by an unnamed representative of Prevezon Holdings.

- It included the allegations that Prevezon Holdings received an additional $1,108,090.55 of fraud proceeds from Bunicon through extra layers of intermediaries, for a total of $1,965,444.55 laundered.

The Government also proposed an Amended Protective Order reducing, which simply narrowed the Protective Order by limiting the assets restrained to those specified in the Amended Complaint. *See* Gov.'s Letter-Motion, Oct. 31, 2014 (D.I. 167) 5-7. The Prevezon Defendants stated that they opposed amendment, but did not make any substantial written opposition, claiming in a brief letter that they did not understand that the Government sought to amend the complaint. *See* Defs.' Letter, Nov. 1, 2014 (D.I. 180) 3. On November 5, 2014, the Court granted the Government's motion to amend the complaint and protective order, without prejudice to any motion the Prevezon Defendants may make to dismiss the Amended Complaint or vacate the Amended Protective Order, Tr., Nov. 5, 2014 at 12-13, 15.[12]

The Defendants make the instant motions for dismissal of the Amended Complaint for failure to state a claim and lack of jurisdiction. Kolevins and Ferencoi (now only defendants in personam, with no in rem claims asserted against their assets) claim they are not subject to personal jurisdiction, Kol. Mem. 3-7, and that the Amended Complaint does not allege their involvement in money laundering, Kol. Mem. 7-10. The Prevezon Defendants, joined by Kolevins and Ferencoi, claim that the Amended Complaint should be dismissed because it supposedly requires extraterritorial application of the wire fraud statute, Defs.' Mem. 18-20;

---

[12] In response to a request from the Prevezon Defendants, the Court also reiterated its denial of their motion to vacate the original Protective Order, Tr., Nov. 5, 2014 at 15.

because it allegedly does not trace any fraud proceeds to Prevezon, Defs.' Mem. 20-24; it

purportedly does not allege that any of the Defendants invested any fraud proceeds in New York,

Defs.' Mem. 25-27, or that certain Prevezon Subsidiaries invested fraud proceeds in New York,

Defs.' Mem. 27-28, or that the Defendants had a guilty mental state, Defs.' Mem. 28-30, or that

there is a substantial connection between the Defendants and the $230 Million Fraud Scheme,

Defs.' Mem. 30-31; and because it is supposedly not properly verified, Defs.' Mem. 31-33.[13]

The Prevezon Defendants also, instead of moving to vacate or modify the Amended

Protective Order, immediately filed an interlocutory appeal of the order, claiming 28 U.S.C.

§ 1292(a)(1) as the basis for appellate jurisdiction. *See* D.I. 187. The Prevezon Defendants'

appeal brief reiterates each and every argument made in the Prevezon Defendants' motion here,

in large part verbatim. Briefing of the Prevezon Defendants' interlocutory appeal is expedited.

## <u>ARGUMENT</u>

## I. THE PROCEEDINGS IN THE SECOND CIRCUIT MAY BE DISPOSITIVE OF THESE MOTIONS

With the exception of the motion of Kolevins and Ferencoi relating to jurisdiction and

their own involvement, literally every argument in these motions is currently being presented to

the Court of Appeals for the Second Circuit for expedited decision in an appeal brief that is

largely verbatim with the memorandum of law the Prevezon Defendants have submitted to this

Court. Just like this Court, the Second Circuit is being asked to resolve whether the Amended

Complaint is impermissibly extraterritorial, *compare* App. Br. 25-28 *with* Defs.' Mem. 18-20;[14]

---

[13] Kolevins and Ferencoi adopt these arguments by reference. Kol. Mem. 7.

[14] Citations to "App. Br. __" refer to the Prevezon Defendants' brief on appeal, Docket Item 37, No. 14-4407-cv, (2d Cr. Jan 15, 2015).

traces funds to Prevezon, *compare* App. Br. 31-35 *with* Defs.' Mem. 20-24; alleges that the

Defendants invested fraud proceeds in New York, *compare* App. Br. 36-38 *with* Defs.' Mem. 25-

28; alleges the Defendants' culpable mental state, *compare* App. Br. 38-40 *with* Defs.' Mem. 28-

30; alleges a substantial connection to the fraud scheme, *compare* App. Br. 40 *with* Defs.' Mem.

30-31; and was improperly verified, *compare* App. Br. 40-43 *with* Defs.' Mem. 31-33.  Although

there may be grounds for the Second Circuit not to reach the merits, if it does resolve these

issues one way or the other, its ruling will likely be dispositive of them in this Court.  *See, e.g.*,

*United States* v. *Ben Zvi*, 242 F.3d 89, 95 (2d Cir. 2001) ("The mandate rule compels compliance

on remand with the dictates of the superior court and forecloses relitigation of issues expressly or

*impliedly* decided by the appellate court." (emphasis in original, internal quotation marks

omitted)).  Even with respect to the remaining issues raised by Kolevins and Ferencoi—the only

issues in these motions not being presented to the Second Circuit currently—a decision by the

Second Circuit favorable to the Defendants would likely moot these issues as well.

Accordingly, judicial economy counsels deferring decision on these motions until the

Second Circuit decides the Prevezon Defendants' expedited appeal.  This Court does retain

jurisdiction to proceed if it wishes to, *see N.Y. State Nat'l Org. for Women* v. *Terry*, 886 F.2d

1339, 1350 (2d Cir. 1989), and the Government has no strong objection if the Court wishes to

immediately decide the issues that the Second Circuit is about to pass on in an expedited appeal,

but it would disserve judicial economy for this Court to decide these issues only for the Second

Circuit to make a controlling ruling on them shortly thereafter.  The Prevezon Defendants have

indicated their desire to proceed expeditiously, but they have been willing to inject substantial

delay into the proceedings when they believe it serves their interests, most notably by putting

party discovery "on hold" for over ten months (the majority of the duration of this case so far) while they file motions, so that they do not have to disclose their documents.  D.D.C. D.I. 22 at 5.  If the Prevezon Defendants' desire for speedy resolution can be outweighed by their own tactical advantage, it should certainly not compel this Court to engage in the potentially wasteful exercise of deciding the very issues that are currently being presented to the Second Circuit for a controlling decision in an expedited appeal.

## II.    THE AMENDED COMPLAINT STATES A CLAIM

### A.    Legal Standards Applicable to Motions to Dismiss

In *Ashcroft* v. *Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544 (2007), the Supreme Court expounded on the pleading requirements necessary to survive a motion to dismiss.  A Rule 12(b)(6) motion to dismiss should be granted if the complaint does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twomby*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 576 U.S. at 678.

On a Rule 12(b)(6) motion to dismiss, the court "must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally."  *Roth* v. *Jennings*, 489 F.3d 499, 510 (2d Cir. 2007) (internal quotation marks omitted); *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." (citation omitted)).  The trial court's task "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof."  *Walker* v. *Schult*,

16

717 F.3d 119, 124 (2d Cir. 2013) (internal quotation marks and citations omitted).

In a civil forfeiture action, the complaint must meet the pleading requirements set forth in Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions.  Rule G(2) requires, among other things, that the complaint "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial."  Rule G(2)(f).  Thus, a civil forfeiture complaint must do more than satisfy the mere notice pleading standards of the Federal Rules of Civil Procedure.  *See, e.g.*, *United States* v. *Daccarett*, 6 F.3d 37, 47 (2d Cir. 1993), *superseded on other grounds by* 18 U.S.C. § 983(c)(3).

The complaint does not, however, need to allege facts sufficient to prove the forfeitability of the defendant property, nor is the Government required to have sufficient evidence to establish the forfeitability of property at the time the complaint is filed.  The Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), 106 Pub. L. No. 185, 114 Stat. 202 (2000), expressly provides that "[n]o complaint may be dismissed on the ground that the Government did not have adequate evidence at the time the complaint was filed to establish the forfeitability of the property."  18 U.S.C. § 983(a)(3)(D); *see also* 18 U.S.C. § 983(c)(2) ("[T]he Government may use evidence gathered after the filing of a complaint for forfeiture to establish, by a preponderance of the evidence, that property is subject to forfeiture."); Rule G(8)(b)(ii).

### B.   The Amended Complaint Is Not Extraterritorial

#### 1.   The Complaint Alleges a Money Laundering Predicate

The Defendants are wrong to claim that United States law permits them to launder the proceeds of the $230 Million Fraud Scheme in Manhattan.  The Amended Complaint alleges that the Defendants laundered, in this district, the proceeds of the specified unlawful activity of wire fraud, and also of multiple offenses under Russian law which are money laundering predicates

17

under 18 U.S.C. § 1956(c)(7)(B).

The Defendants claim that a scheme to defraud a foreign government out of tax revenue is not against United States law even if it involves the use of the United States wires.  Defs.' Br. 18-20.  Reading the Defendants' motion, one would hardly guess that this claim has been rejected by the Second Circuit and the Supreme Court.  In *Pasquantino* v. *United States*, 544 U.S. 349, 353 (2005), a case that the Defendants never cite, the Supreme Court held the wire fraud statute prohibited the use of "U.S. interstate wires to execute a scheme to defraud a foreign sovereign of tax revenue," *id.* at 371.  The Supreme Court squarely rejected the contention that such a prosecution would be impermissibly extraterritorial.  *Id.* ("[O]ur interpretation of the wire fraud statute does not give it extraterritorial effect." (internal quotation marks omitted)).  On the contrary, it observed that the statute punished the domestic use of the United States wires themselves:

> Petitioners used U.S. interstate wires to execute a scheme to defraud a foreign sovereign of tax revenue.  Their offense was complete the moment they executed the scheme inside the United States; the wire fraud statute punishes the scheme, not its success.  This domestic element of petitioners' conduct is what the Government is punishing in this prosecution, no less than when it prosecutes a scheme to defraud a foreign individual or corporation, or a foreign government acting as a market participant.

*Pasquantino*, 544 U.S. at 371 (internal quotation marks and citations omitted).  So too here, the "domestic element of [the Organization's] conduct," *id.* at 371, in using the United States wires to execute a scheme to defraud a foreign sovereign of tax revenue by transmitting the ill-gotten revenue to the fraudsters, is wire fraud punishable under § 1343.  Indeed, in the very case the Defendants rely on, *Morrison* v. *National Australia Bank Ltd.*, 561 U.S. 247 (2010), the Supreme Court expressly cited to *Pasquantino* and distinguished it due to the difference between the

18

wording of the wire fraud statute (applicable here) and the securities fraud statute (which was at issue in *Morrison*). *See Morrison*, 561 U.S. at 271-72.[15]  Indeed, long before *Pasquantino*, it has been the law in this Circuit that the use of the United States wires in a fraud scheme is wire fraud, even if that scheme was aimed at defrauding a foreign government of tax revenue. *See United States* v. *Trapilo*, 130 F.3d 547, 551 (2d Cir. 1997).

Contrary to the Defendants' attempt to minimize the significance of the United States wires, Defs.' Br. 20, the Amended Complaint alleges that the wires played an integral role.  As alleged, hundreds of thousands of dollars of fraud proceeds were wired through the United States financial system in order to pay back one of the Russian tax officials who had corruptly approved the fraudulent tax refund.  Am. Compl. ¶ 97-98.  Since the fraud scheme was plainly financially motivated, the fact that the United States wires were used to pay its perpetrators is hardly some tangential detail—instead, the United States wires were used to further the core aim of the fraud, which was to enrich the fraudsters.  Moreover, the fact that these were United States wires is itself significant; the extensive pattern of financial transfers used to pay the fraudsters, and the fact that they passed through jurisdictions outside of Russia, were plainly used to hide the fraudsters from detection and thus allow the scheme to succeed (and indeed continue, Am. Compl. ¶ 71).  This use of the United States wires—to transfer the fruits of the fraud back to the

---

[15] *Morrison* did reject some dicta in *Pasquantino*, which had suggested that the use of the term "interstate or foreign commerce" in the wire fraud statute meant that the statute was meant to apply extraterritorially.  *See European Cmty.* v. *RJR Nabisco, Inc.*, 764 F.3d 129, 141 n.11 (2d Cir. 2014).  This observation has no relevance here, however, because interpreting the wire fraud statute to punish the "domestic element" of a fraud scheme using United States wires to defraud a foreign sovereign of tax revenue "does not give it extraterritorial effect."  *Pasquantino*, 544 U.S. at 371 (internal quotation marks omitted).  Indeed, the fact that this application is not extraterritorial is why the remark in *Pasquantino* was dicta.

fraudsters while insulating them from detection—is at least as significant and material to the fraud as was the use of the United States wires in *Pasquantino*, where a United States phone call was made to place an order for the items as to which Canadian tax was to be avoided. *See Morrison*, 561 U.S. at 271-72.[16] Whether the use of the United States wires was to procure the taxable item (as in *Pasquantino*) or to surreptitiously transmit fraudulent tax refunds to the fraudsters (as here), in either case it was integral to the success of the scheme and was a "domestic aspect of [the fraudsters'] conduct" properly punishable under the wire fraud statute. *Pasquantino*, 544 U.S. at 371; *accord Morrison*, 561 U.S. at 272 (quoting *id.*).[17]

Moreover, unlike in *Morrison*, here the Defendants' actual money laundering took place in Manhattan. They invested funds in Manhattan real estate. Those funds are still in Manhattan, either in the United States's custody due to court-approved sales of Manhattan real estate or in the real estate itself. Am. Compl. ¶¶ 128, 132-35. Regulating money laundering in the United States is far from an exercise of extraterritorial jurisdiction.

Indeed, the money laundering statute expressly prohibits laundering, in the United States, funds that were the proceeds of a crime under purely foreign law. While here the funds laundered were proceeds of a violation of the United States wire fraud statute, even if that were

---

[16] The United States conduct is thus far more central to the fraud scheme than in *Petroleos Mexicanos* v. *SK Engineering & Construction Co., Ltd.*, 572 F. App'x 60 (2d Cir. 2014) (summary order), where the only activity in the United States was ministerial processing of payments that did nothing to disguise the participants of the fraud scheme or permit them to continue operating. *See id.* at 61.

[17] The Defendants' observation that the wire transfers did not benefit the Defendants, Defs.' Mem. 20, is a non sequitur. The Defendants may not have been involved in the $230 Million Fraud Scheme directly, but as alleged they directly laundered its proceeds, and did so in Manhattan. Even if they had no involvement in the underlying fraud, they are properly held accountable for that money laundering.

not the case the money laundering claim could proceed.  The funds were also the proceeds of

offenses against the law of the Russian Federation that qualify as money laundering predicates.

Under the money laundering statute, offenses against Russian law that involved "the

misappropriation, theft, or embezzlement of public funds by or for the benefit of a public

official" are money laundering predicates.  18 U.S.C. § 1956(c)(7)(B)(iv).  So are Russian

offenses involving "fraud, or any scheme or attempt to defraud, by or against a foreign bank (as

defined in paragraph 7 of section 1(b) of the International Banking Act of 1978)."  *Id.*

§ 1956(c)(7)(B)(iii).  The Amended Complaint refers to these provisions, Am. Compl. ¶ 143, and

sets forth ample facts making out violations of Russian law involving misappropriation, theft or

embezzlement of public funds by or for the benefit of public officials, *see* Am. Compl. ¶¶ 21, 38

(alleging that members of the Organization who were tax officials "corruptly approved" tax

refunds); *id.* ¶¶ 95-98 (noting that tax refund proceeds were transferred to tax official through her

then-husband), and fraud on a foreign bank, *id.* ¶¶ 15, 26-28 (alleging that registered ownership

of Hermitage companies was fraudulently transferred away from HSBC Guernsey to

conspirators).[18]

Accordingly, the Defendants are wrong to claim impunity under United States law for

their laundering of almost $2 million of crime proceeds in Manhattan.

---

[18] These allegations amply support a reasonable belief that the Government would be able to
prove at trial that this conduct violates multiple provisions of Russian law, including Article 159
of the Russian criminal code, which prohibits theft by fraud.  Indeed, the Russian courts
themselves rendered verdicts convicting two of the participants in this scheme, Am. Compl. ¶ 69,
and the Government should have the opportunity at a trial to show that these convictions, though
providing a somewhat different narrative of events, are under Article 159.

2.    <u>The Defendants Laundered Money in Manhattan</u>

The Defendants claim that the $1,965,444.55 they received from Bunicon, Elenast, and Company-1 never reached New York.  Contrary to their attempts to read it in the light least favorable to the Government, the Amended Complaint alleges that the funds invested in New York real estate were traceable to these transfers.  The statement of a representative of Katsyv— which is a party admission—indicates that the $857,354 received from Bunicon and Elenast was "invested in various New York real properties" on behalf of the third-party investor Petrov.  Am. Compl. ¶ 124.  This alone suffices at the motion to dismiss stage to establish a reasonable belief that fraud proceeds were invested in Manhattan.

The Defendants attempt to contradict the statement of their own representative— apparently as a matter of law—by claiming that bank records show that the funds were invested with AFI Europe in the Netherlands, Defs.' Mem. 25-26, and by noting that the funds to purchase some of the New York properties came from a separate bank account, Defs.' Mem. 27- 28.  On a motion to dismiss, the Court should not engage in a credibility assessment.  *See Walker*, 717 F.3d at 124 (trial court's task is "not to assay the weight of the evidence" supporting complaint ((internal quotation marks omitted)).  The Amended Complaint alleges that some funds from AFI Europe were used to purchase two of the New York real properties, Am. Compl. ¶ 125,[19] and in any event it is entirely plausible that funds from the Netherlands were allocated to

---

[19] This transfer is sufficient to invoke the Court's jurisdiction even if a portion of the funds remained in the Netherlands.  The funds in the Netherlands are subject to the in rem jurisdiction of the Court given the cooperation of the Government of the Netherlands.  *See United States* v. *All Funds on Deposit in Any Accounts Maintained in Names of Meza or De Castro*, 63 F.3d 148, 153-54 (2d Cir. 1995) (finding cooperation of a foreign government in restraining assets sufficient to give court in rem jurisdiction over those assets).

the various real estate transactions through an off-the-books agreement with Petrov. Given the deeply secretive nature of the transfers through which Prevezon received the $1,965,444.55—involving false descriptions for the purposes of the funds, Am. Compl. ¶¶ 110-12, 122, transfers directly from shell companies, Am. Compl. ¶¶ 93-94, 101-02, and transfers from one of the shell companies through more layers of intermediaries, Am. Compl. ¶¶ 114-22—such an informal accounting mechanism seems particularly likely. In any event, the Government is entitled at the pleading stage to take the Defendants' agent at his word that the funds were "invested in various New York real properties," Am. Compl. ¶ 125, and to attempt to gain more information on the arrangements Prevezon made with Petrov through discovery.

3. Kolevins and Ferencoi Participated in The New York Money Laundering

In their separate motion to dismiss, Kolevins and Ferencoi attempt to distance themselves from the activities of the Prevezon Defendants, despite the fact that their own money was commingled with fraud proceeds and invested in Manhattan by the Prevezon Defendants, who share the same principals with them. On a motion to dismiss, this Court should not draw inferences in their favor. The Amended Complaint states that these entities were fully involved in Prevezon's money laundering and therefore subject to specific jurisdiction in this district.

The Amended Complaint alleges that Kolevins and Ferencoi put money into New York real estate to be held in the name of the Prevezon companies, which were run by the same three individuals—Katsyv, Krit, and Litvak—that ran Kolevins and Ferencoi. *See* Am. Compl. ¶¶ 7-13, 105-06 (noting overlapping ownership between Ferencoi, Kolevins, and Prevezon entities).[20]

---

[20] The allegation is not that the owners of Kolevins and Ferencoi are "business associates" with those of Prevezon, *cf.* Kol. Mem. 5—it is that they are all the same people. Katsyv, owner of the Prevezon entities, beneficially owns Ferencoi. Am. Compl. ¶ 12. Litvak, beneficial owner of the

Contrary to Kolevins and Ferencoi's attempts to draw inferences in their favor on a motion to dismiss, the Amended Complaint plainly alleges, under the tracing presumptions discussed in Section II.C, below, that these funds were used to purchase real property in New York.  Am. Compl. ¶ 125, 126, 138.  These allegations (together with those discussed in Sections II.C, II.D, and II.E, below, showing the elements of money laundering as to Prevezon's funds), plainly support an inference that Kolevins and Ferencoi commingled their assets with the tainted funds to purchase real property in New York jointly with the Prevezon Defendants, and thus participated in money laundering by facilitating it.[21]

Kolevins and Ferencoi's investments amply constitute transaction of business in New York and form the basis of this lawsuit, subjecting them to personal jurisdiction under New York's long-arm statute and the Constitution.  *See* N.Y. C.P.L.R. 302(a)(1) ("As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent . . . transacts any business within the state").  Indeed, Kolevins and Ferencoi's contacts with New York are far more substantial than the Second Circuit has held sufficient under New York's long-arm statute and the constitution.  In *Licci ex rel. Licci* v. *Lebanese Canadian Bank, SAL*, 732 F.3d 161 (2d Cir. 2013), the Second Circuit found a foreign bank subject to personal jurisdiction for using a

_____

Prevezon bank account, founded and beneficially owns Kolevins.  Am. Compl. ¶ 13.  Krit, past sole shareholder and present director of Prevezon, is sole director and shareholder of Kolevins. Am. Compl. ¶¶ 9, 13.  Krit is apparently a science graduate student in his 20s.  Am. Compl. ¶ 104.

[21] For that reason, Kolevins and Ferencoi are also wrong to contend that the Amended Complaint fails to state a claim against them.  Their overlapping ownership and participation in the same transactions as the Prevezon Defendants—transactions involving money obtained from shell companies under false descriptions and ultimately traceable to a massive fraud scheme—subjects them to civil money laundering penalties under 18 U.S.C. § 1956(b)(1).

correspondent account in New York dozens of times. *Id.* at 165.[22]  Here, far more than move

money through the district swiftly using a correspondent account, Kolevins and Ferencoi actively

invested funds into the purchase of real estate that remains in this district and owned by the other

Defendants, companies related to Kolevins and Ferencoi.[23]  Even if Kolevins and Ferencoi do

not retain formal ownership interests in the New York real property they helped purchase (and

the Amended Complaint's allegations permit the inference that they do), their provision of funds

to allow related companies to purchase them is at least tantamount to such ownership and

certainly constitutes the transaction of business in New York.[24]  Since the purchase of these

pieces of New York real estate is the "very wrong alleged" in this lawsuit, *Licci*, 732 F.3d at 171,

it is plainly reasonable under the Constitution that Kolevins and Ferencoi be subject to personal

jurisdiction in this district so that they may be answerable for it.

### C.    The Amended Complaint Alleges that the Defendants Received Fraud Proceeds

The Defendants argue at length that the Amended Complaint fails to allege that they

received crime proceeds.  This contention ignores the pages of detailed allegations setting forth

---

[22] This case is nothing like *Ljungkvist* v. *Rainey Kelly Campbell Roalfe/Young & Rubicam, Ltd.*, No. 01 Civ. 1681 (HB), 2001 WL 1254839, at *3 (S.D.N.Y. Oct. 19, 2001), where defendants who "seemingly did everything possible to avoid New York altogether" were contractually obligated to send payments to an unrelated counterparty in New York, *id.* at *3.  Kolevins and Ferencoi's decision to invest money in New York and leave it there, appreciating in value with the New York real estate market under the dominion of their own principals, plainly constitutes purposefully availing themselves of the forum.

[23] Some of the real property has been sold since the complaint was filed, but the proceeds of those sales remain in this district as a substitute res.

[24] Indeed, merely forming a relationship with a New York entity can give rise to specific jurisdiction.  *See, e.g.*, *Gramercy Advisors, LLC* v. *Ripley*, No. 13 Civ. 9070 (VEC), 2014 WL 4188099, *5 (S.D.N.Y. Aug. 25, 2014) (retaining New York lawyer by phone and email for Oregon case sufficed for jurisdiction (citing *Fischbarg* v. *Doucet*, 9 N.Y. 3d 375 (2007)).

the flow of funds through shell companies to Prevezon and should be rejected.

The Amended Complaint alleges precise details establishing traceability under the governing legal standards. Where crime proceeds are commingled with other funds in a bank account, either the funds that remain in the account or the funds that leave the account can be treated as traceable proceeds, up to the extent of the crime proceeds. *See United States* v. *Banco Cafetero Panama*, 797 F.2d 1154, 1159-60 (2d Cir. 1986); *see also, e.g.*, *United States* v. *Walsh*, 712 F.3d 119, 124 (2d Cir. 2013) (noting *Banco Cafetero*'s "accounting choices"); *United States* v. *Contents in Account No. 059-644190-69*, 253 F. Supp. 2d 789, 795 (D. Vt. 2003) (applying *Banco Cafetero* test for traceability). Indeed, these assumptions can be used in combination to track the flow of funds through multiple accounts and multiple transactions. *See United States* v. *Corey*, No. 04 Cr. 349 (EBB), 2006 WL 1281824, at *9 & n.11 (D. Conn. May 9, 2006).[25]

The tracing allegations in the Amended Complaint, appropriately using these "accounting choices," *see Walsh*, 712 F.3d at 124, show that the funds were transferred from the Russian treasury through multiple levels of shell companies and ultimately to Prevezon. The Defendants' characterization of the tracing analysis is scarcely recognizable given the Amended Complaint's pages and pages of detailed tracing analysis, which provide date, amount, originator, and beneficiary information for numerous transfers grouped into small and precise groupings. *See*

---

[25] The Defendants overstate the amount of detail that a complaint must contain. Contrary to the Defendants' demands that the complaint plead "a fulsome record of all of the account transactions, including account balances, withdrawals, transfers, and deposits," Defs.' Mem. 22, courts will sustain forfeiture complaints against motions to dismiss even without resolving challenges to their tracing analysis. *See, e.g.*, *United States* v. *All Funds on Deposit in Dime Savings Bank of Williamsburg Account No. 58-400738-1*, 255 F. Supp. 2d 56, 68 (E.D.N.Y. 2003) (rejecting argument that "the government is required to allege facts showing that each transfer can be traced to specific deposits of criminally derived monies," holding "the court need not pass on the government's ultimate burden of proof regarding traceability").

Am. Compl. ¶¶ 77-82 (tracing funds from Russian treasury to stolen companies); *id.* ¶¶ 83-90 (tracing funds through first-tier and second-tier shell companies to Bank Krainiy Sever); *id.* ¶¶ 91-94 (tracing funds from Bank Krainiy Sever to Moldovan shell companies Bunicon and Elenast); *id.* ¶¶ 101-02 (tracing funds from Bunicon and Elenast to Prevezon directly); *id.* ¶¶ 114-22 (tracing funds from Bunicon to Prevezon through two additional layers of intermediaries); *see also id.* ¶¶ 95-98 (tracing funds from Bunicon back to the Organization). This is fully sufficient. *See United States* v. *All Funds on Deposit in Dime Savings Bank of Williamsburg Account No. 58-400738-1*, 255 F. Supp. 2d 56, 70 & n.21 (E.D.N.Y. 2003) (finding amended complaint not futile where it contains "amounts and dates of the transfers and the properties purchased").[26]

Indeed, despite their strained attempts to claim that the Amended Complaint provides too little detail, the Defendants only really dispute a small portion of the tracing analysis—the allegation that the funds received by Bunicon and Elenast from the Bank Krainiy Sever account were proceeds of the fraud. *See* Defs.' Mem. 22-24. Leaving aside patently improper attempts to ask the Court to speculate on the Government's trial evidence at the motion to dismiss stage, *see* Defs.' Mem. 22,[27] the Defendants' dispute relies entirely on two incorrect premises. The

---

[26] Given this detail, the Defendants' observations that a complaint cannot rely upon mere "conclusory allegations," Defs.' Mem. 21, unsupported generalized assertions of a "'pattern' suggestive of money laundering," *id.* 22, or "mere suspicion," *id.* (internal quotation marks omitted), are pure non sequiturs. As even brief reference to its pages of detail will confirm, the Amended Complaint does nothing of the kind.

[27] As noted in Section III.A, below, this argument is entirely inappropriate at this stage. The fact that counsel for the Defendants, despite being well aware of this, try to shoehorn factual disputes into a motion to dismiss is a tacit admission of the weakness of their motion. *Compare* Defs.' Mem. 22 (claiming that Government "does not have records") *with Walker*, 717 F.3d at 124 (court's task is "merely to assess the legal feasibility of the complaint, not to assay the weight of

first is their claim that because the Bank Krainiy Sever account transferred out, in total, more funds than the fraud proceeds it is alleged to have received, there is purportedly only a chance that the funds used by Bunicon and Elenast were crime proceeds. *See* Defs.' Mem. 22-23.[28]  The second is their claim that the Bank Krainiy Sever account is a "concentration account" and that they are therefore entitled to speculate that the funds coming from it issued from a different customer account. *See* Defs.' Mem. 23-24.

Neither of Prevezon's objections is persuasive.  Far from the Defendants being able to choose the least favorable tracing methodology (let alone devise a new "only a chance" methodology for this case), the Government is entitled to the benefit of any of the "accounting choices" under this Circuit's precedent, *Walsh*, 712 F.3d at 124, and the first-in first-out analysis clearly indicates that the funds flowing from Bank Krainiy Sever to Bunicon and Elenast (and to the post-Bunicon intermediaries Megacom Transit Limited, Castlefront, and Company-1) to Prevezon were traceable to the fraud.  Though the accounting choice alone suffices, the Amended Complaint pleads far more.  Numerous facts corroborate the inference that the funds Prevezon accepted were fraud proceeds.  The fact that Bunicon wired back a portion of those funds to the very tax official who authorized many of the fraudulent tax refunds plainly shows that Bunicon received fraud proceeds. *See* Am. Compl. ¶¶ 95-98.  The funds Prevezon received from Bunicon were sent using false wire transfer descriptions and false contractual

---

the evidence which might be offered in support thereof" (internal quotation marks omitted)), *and* 18 U.S.C. § 983(a)(3)(D) ("No complaint may be dismissed on the ground that the Government did not have adequate evidence at the time the complaint was filed to establish the forfeitability of the property.").

[28] Even if that premise were correct, it would not support dismissal of the complaint, as the applicable pleading standards do not "impose a probability requirement at the pleading stage." *Twombly*, 550 U.S. at 556.  In any event, it is not correct.

documentation, corroborating that they were fraud proceeds.  *See* Am. Compl. ¶¶ 110-12, 122.

The funds Elenast sent to Prevezon, in turn, were sent using false contractual documentation

bearing the same false payment description—down to the same type of purported sanitary

equipment—as the funds Bunicon sent, and thus also fraud proceeds.  *See* Am. Compl. ¶¶ 111-

12.[29]  Accordingly, the allegations of the Amended Complaint certainly raise a reasonable belief

that the funds traced to Prevezon were fraud proceeds.[30]

> **D.      The Amended Complaint Alleges a Substantial Connection Between the
> Properties Used to Launder the Money and Money Laundering**

The Defendants' claim that the Amended Complaint does not allege a "substantial

connection" between the property and the $230 Million Fraud Scheme is specious.  The

Government's theory of forfeiture is that the Defendants used their assets to *launder* the proceeds

of the $230 Million Fraud Scheme, not to *carry out* the fraud scheme.  *See* Am. Compl. ¶ 1

(seeking "the forfeiture of certain property involved in laundering the proceeds of a Russian tax

refund fraud scheme and the imposition of civil money laundering penalties"); *see also id.*

¶¶ 137-71.  As counsel for the Defendants must know, the crime the property must have a

"substantial connection" to is thus the money laundering, not the underlying fraud.  *See* 18

U.S.C. § 983(c)(3) ("[I]f the Government's theory of forfeiture is that the property was used to

commit or facilitate the commission of a criminal offense, or was involved in the commission of

a criminal offense, the Government shall establish that there was a substantial connection

---

[29] Additionally, of course, the fact that Bunicon, Elenast, Megacom Transit, and Castlefront are shell companies without legitimate business, Am. Compl. ¶¶ 93(a), 94, 116, 119, further supports the inference that the funds they received from Bank Krainiy Sever were crime proceeds.

[30] Even if the Court deemed this detail insufficient, and required the further itemization of the movement of funds within the Bank Krainiy Sever account or other tracing particulars, the Government should be granted leave to replead to provide such additional detail.

between the property and the offense.").

The Defendants in Rem properties and bank accounts had an extremely "substantial connection" to the money laundering, as the money was laundered directly into those assets. *See, e.g.*, *In re 650 Fifth Ave. and Related Properties*, 777 F. Supp. 2d 529, 565 (S.D.N.Y. 2011) ("[R]eal property is involved in a money laundering offense if laundered funds are used to pay for improvements." (internal quotation marks, brackets and ellipsis omitted)).  Moreover, the Defendants in Rem served a crucial role in allowing the crime proceeds, after being shuttled quickly through numerous shell companies, Am. Compl. ¶¶ 77-122, to fully reenter the financial system and be held for long periods in apparently legitimate assets, *id.* ¶¶ 124-36.[31]  This meets the substantial connection test, under which the property must have "more than an incidental or fortuitous connection to criminal activity," but "need not be integral, or essential, or indispensable" to the crime.  *United States* v. *Schifferli*, 895 F.2d 987, 990 (4th Cir. 1990); *see also United States* v. *Borromeo*, 995 F.2d 23, 26 (4th Cir.) ("The hurdle imposed by the 'substantial connection' requirement is not . . . a particularly high one."), *vacated in part on other grounds*, 1 F.3d 219 (4th Cir. 1993).

E.    **The Amended Complaint Alleges the Defendants' Culpable Mental States**

The Amended Complaint amply alleges that the Defendants had the requisite guilty mental state for money laundering.  The Defendants' claim that the Amended Complaint does not allege their knowledge of the details of the underlying fraud, Defs.' Mem. 28, is irrelevant

---

[31] Indeed, recent news reporting suggests the utility of investments in United States real estate as a means of obscuring the source or origin of funds.  *See generally* Louise Story & Stephanie Saul, *Stream of Foreign Wealth Flows to Elite New York Real Estate*, N.Y. TIMES (Feb. 7, 2015), *available at* http://www.nytimes.com/2015/02/08/nyregion/stream-of-foreign-wealth-flows-to-time-warner-condos.html.

and not fully correct.

Far from being required to know the details of the underlying fraud or specifically intending to assist in it, money launderers need not even know the nature of the crime generating the funds. *See United States* v. *Maher*, 108 F.3d 1513, 1526 (2d Cir. 1997) (explaining that the money laundering statute "reach[es] a person who knows that [s]he is dealing with the proceeds of some crime[,] even if [s]he does not know precisely which crime" (internal quotation marks omitted)). Moreover, knowledge may be shown by proof of conscious avoidance. *United States* v. *Nektalov*, 461 F.3d 309, 314 (2d Cir. 2006) (applying conscious avoidance to money laundering sting); *United States* v. *Tillman*, 419 F. App'x 110, 112 (2d Cir. Apr. 15, 2011) (summary order) (evidence that defendant allowed co-conspirators to make large deposits into her bank account and who then made large withdrawals was sufficient to support conscious avoidance theory); *see generally United States* v. *Svoboda*, 347 F.3d 471, 480 (2d Cir. 2003) ("[K]nowledge consciously avoided is the legal equivalent of knowledge actually possessed.").

The allegations in the Amended Complaint amply establish the Defendants' guilty mental states. The Amended Complaint alleges that Defendants received $857,354 from two Moldovan shell companies that did not have legitimate businesses by wire transfers that falsely described the funds as prepayment for sanitary equipment, when a representative of Katsyv stated that the funds were third-party payments in consideration for an investment in New York real estate. Am. Compl. ¶¶ 93-94, 101-02, 107-10.[32]  It alleges that one of these shell companies also sent

---

[32] Given that these facts are incorporated into each cause of action, Am. Compl. ¶¶ 137, 145, 150, 154, 157, 160, 164, it is tendentious for the Defendants to represent that the seven Claims "do no more than quote from the underlying statutes in violation of the Government's pleading requirements under *Twombly* and *Iqbal*," Defs.' Mem. 2.

Prevezon an additional $1,108,090.55 through multiple layers of additional intermediaries using two different routes, and that these transfers were reflected on bank records as serving a different false purpose.  Am. Compl. ¶¶ 114-22.[33]  It further alleges that the Moldovan shell companies forged contractual documentation—purportedly signed by a Prevezon representative—and submitted it to a bank in their jurisdiction to justify the wire transfers.  Am. Compl. ¶¶ 111-12.  If it was in fact signed by a Prevezon representative (an inference the Government is entitled to on a motion to dismiss, *see Roth*, 489 F.3d at 510), it is plainly damning.  But even if not, the fact that the Moldovan money launderers were comfortable affixing Prevezon's name to the forged paperwork speaks volumes to their confidence that Prevezon, unlike an innocent party, could be counted on to raise no questions about the false nature of the transaction.

These highly suspicious facts plainly permit the circumstantial inference that the $1,965,444.55 transferred to Prevezon Holdings was traceable to the Russian tax fraud scheme, and that the launderers, including Prevezon Holdings, whether or not they knew such details, knew or consciously avoided the fact that the funds were proceeds of some sort of crime.  The Defendants' only rejoinder to this straightforward inference is their implausible claim that they were unaware of the nature of their counterparties or of the activity in their own bank accounts.  *See* Defs.' Mem. 28-29.  The contention that Prevezon had no idea its counterparties were shell companies is unlikely, and the idea that every employee of Prevezon was innocently unaware of the activity in Prevezon's own bank account is preposterous.  A business remaining unaware of

---

[33] Moreover, the Amended Complaint alleges that Katsyv—a close business partner of the director and beneficial owner of Prevezon at the time of the transfers and soon to become the sole owner, Am. Compl. ¶¶ 9, 10, 104-05, 106(a), 107—was aware of the prohibitions on money laundering from his settlement of an Israeli case for millions of dollars just two years before, Am. Compl. ¶ 113.

the activity in its own operating account would face tremendous obstacles to day-to-day

reconciliation, let alone to any accounting.  And ignorance of the stated purposes for wire

transfers would not only interfere with everyday activities but could open Prevezon up to

contractual liability upon accepting payments marked as for goods they had no intention of

supplying.[34]  That a company would choose to do business in this fashion—even if true—would

be a telltale sign of conscious avoidance.  *See, e.g.*, *Tillman*, 419 F. App'x at 112 (accepting

deposits of funds from criminals into bank account evidence of at least willful blindness).

Moreover, the other allegations of the Amended Complaint strongly support the inference

that the criminals providing the funds would not have done so to an innocent party.  Indeed, in

criminal cases, conspirators' actions in entrusting a defendant with property only half as valuable

as the $1,965,444.55 at issue here can be the principal evidence supporting an inference—

beyond a reasonable doubt—that the defendant must have had a trust relationship with the

conspirators entailing knowledge of their criminal purpose.  *See United States* v. *Anderson*, 747

F.3d 51, 66-73 (2d Cir. 2014) (finding that conspirators' actions in entrusting criminal defendant

with bag containing $900,000 of drugs, together with evidence about practices of conspiracy,

was sufficient to permit inference that conspirators must have informed defendant of the contents

of the bag, which he never received); *see also id.* at 66-67 (citing cases).

Not only do the facts regarding the direct transfers to Prevezon strongly suggest the

Defendants' guilty knowledge, the details of the more extensive scheme may properly be

---

[34] Bunicon or Elenast, as shell companies, would hardly sue Prevezon to force it to deliver them
sanitary equipment, but a legitimate counterparty might.  Prevezon's blitheness about accepting
funds while either knowing or not bothering to check that the listed purposes for those funds
were false is telling as to Prevezon's level of trust and understanding with the shell companies.

considered as well.  Factors such as "the complexity and scale of the money laundering scheme," whether or not there is direct evidence of the defendant's participation in all aspects of it, can help establish such a fact, even beyond a reasonable doubt.  *United States* v. *Huezo*, 546 F.3d 174, 182 (2d Cir. 2008); *see also id.* at 181-82 (describing aspects of "large-scale conspiracy to launder money" beyond the direct participation of the defendant, relying on such complexity to sustain knowledge inference in criminal case).[35]  Here, the systematic, extensive, and ruthless nature of the criminal Organization, *see, e.g.*, Am. Compl. ¶¶ 18-74, shows the unlikelihood that such sophisticated criminals would trust almost $2 million to the Defendants without some level of trust and understanding between them.  And there are notable connections between the behavior of the money launderers that dealt with Prevezon and the underlying fraud scheme.  Both the fraudsters and the launderers sending money to Prevezon made extensive use of shell companies, *compare* Am. Compl. ¶¶ 26-27, 30-31, 42, 47, 96-97 & Ex. A *with id.* ¶¶ 83(a), 84(a), 86(a), 87(a), 93, 94, 116, 119 & Exs. C, D; nominee directors or employees, *compare* Am. Comp. ¶¶ 26, 28, 32, 34, 50, 80 *with id.* ¶¶ 83(a), 84(a), 86(a), 87(a), 93, 94, 116, 119; and

---

[35] For similar reasons, the Defendants are wrong to claim that the references to the Organization's lethal retaliatory actions against Sergei Magnitsky, a lawyer who uncovered the fraud scheme, are irrelevant, let alone improper.  *See* Defs.' Mem. 6 & n.3.  Although the Government does not contend that the Defendants were directly involved in Magnitsky's death, the extremely suspicious circumstances of Prevezon's receipt of the funds through a channel also used to send funds back to a member of the Organization, certainly permit—at an absolute minimum—a reasonable inference that the Organization had enough of a trust relationship with the Defendants that their activities and retaliatory actions were reasonably foreseeable or even known to the Defendants.  As transfers half as large can support proof beyond a reasonable doubt, *Anderson*, 747 F.3d at 66-73, the suspicious transfers here certainly suffice to let discovery proceed.  The Defendants' knowledge or ability to foresee such conduct, in turn, bears directly on whether any forfeiture against the Defendants would be disproportionate under the Eighth Amendment, a multi-factor inquiry including an assessment of the gravity of the offense.  *See von Hofe v. United States*, 492 F.3d 175, 186 (2d Cir. 2007).

forged contractual paperwork, *compare* Am. Compl. ¶¶ 29-33, 49 *with id.* ¶¶ 110-12, 115, 117, 120, 122.  In light of such similarities and the other suspicious facts, the inference that the Defendants had some level of guilty knowledge is not just reasonable.  It is overwhelming.

## III.    THE AMENDED COMPLAINT IS PROPERLY VERIFIED

The Defendants' claim that the Amended Complaint is not properly verified is baseless. Unable to specify any statement in the verification that is incorrect, they instead attempt to transmute the requirement that a complaint be verified into a means to induce the court to dismiss a complaint because of speculation about a lack of admissible evidence at the pleading stage.  This attempt is contrary to statute and involves baselessly accusing an affiant of misleading conduct.  It should be swiftly rejected.

### A.    A Verification Is Not a Warranty of Admissible Evidence

The Defendants make no demonstration that there was anything false about Special Agent Hyman's statement that the Amended Complaint was true "to the best of his knowledge, information, and belief," Am. Compl. at 63, or that his information and belief came from "official records and files of the United States, information obtained directly by the deponent, and information obtained by other law enforcement officials and representatives during an investigation of alleged violations of Title 18, United States Code," *id.*  They merely complain that, in their view, the Government does not now have sufficient admissible evidence to prevail at trial.  *See* Defs.' Mem. 32 ("Agent Hyman did not say 'I have spoken to no competent witnesses, I have no admissible bank records, and the money tracing is based on a series of assumptions without authentic records.'  But that is what he said, in substance, when being deposed.").  As explained in Section III.B, below, their factual contention is tendentious.  But more fundamentally, their entire argument relies on an inappropriate attempt to impose an

35

admissible-evidence requirement at the pleading stage. This requirement is not only no part of Supplemental Rule G; it is flatly contradicted by that rule and by 18 U.S.C. § 983(a)(3)(D).

Instead of requiring a warranty that a complaint could be taken to trial next week, "[t]he sole purpose of verification is to cause an authorized official of the government to satisfy himself that the averments in the complaint are true, based either upon his own knowledge or upon information and belief." *United States* v. *Banco Cafetero Int'l*, 608 F. Supp. 1394, 1400 (S.D.N.Y. 1985) (internal brackets and quotation marks omitted). Indeed, the cases are explicit that the affiant may rely on information that would not be admissible evidence. Under Supplemental Rule G(2)(a), "verification does not have to be made on personal knowledge; verification pursuant to 28 U.S.C. § 1746 may be made on 'information and belief.'" *United States* v. *Any and All Funds Contained in BancorpSouth Account No. xxxx-581-3*, No. 12 Civ. 735 (SLB), 2013 WL 840042, at *7 (N.D. Ala. Mar. 6, 2013) (citing *United States* v. *8 Gilcrease Lane*, 587 F. Supp. 2d 133, 139 (D.D.C. 2008)); *accord, e.g.*, *United States* v. *$22,010.00 in U.S. Funds*, No. 09 Cv. 198 (CAR), 2010 WL 1050410, at *1-2 (M.D. Ga. Mar. 18, 2010).

Moreover, the rule the Defendants attempt to shoehorn into the verification requirement—that every element of a complaint must be supported by admissible evidence at the time of filing—is directly contrary to law. The governing forfeiture statute expressly provides that "*[n]o complaint may be dismissed* on the ground that the Government did not have adequate evidence at the time the complaint was filed to establish the forfeitability of the property." 18 U.S.C. § 983(a)(3)(D) (emphasis added); *see also* 18 U.S.C. § 983(c)(2) ("[T]he Government may use evidence gathered after the filing of a complaint for forfeiture to establish, by a preponderance of the evidence, that property is subject to forfeiture."). Supplemental Rule G

explicitly repeats this language.  *See* Rule G(8)(b)(ii).

Counsel for the Defendants is well aware of the rule that a complaint may not be dismissed at the pleading stage on the grounds of a lack of evidence.  It has been explained to them in numerous Government filings, *see* Mem. Opp. TRO Mot. (D.I. 47) 13 n.8; Mem. Opp. Mot. Dismiss (D.I. 58) 16-17; Mem. Opp. Sanctions Mot. (D.I. 88) 24-26, and they have even acknowledged that the Government is entitled to "prove its case at trial with after-acquired evidence," Defs.' TRO Reply Mem. (D.I. 53) 4 n.4.  That they attempt now to smuggle the contrary rule into the verification requirement—and that they do so by baselessly attempting to accuse an affiant of "misleading" conduct, Defs.' Mem. 32, and "deception," *id.*—is improper and should not be rewarded.

## B.    The Verification is Entirely Accurate

The Prevezon Defendants rest their claim of improper verification entirely on the still-incomplete Rule 30(b)(6) deposition of Special Agent Todd Hyman, which they largely used as an instrument to try to extract legal concessions from a nonlawyer.  This is an inappropriate use of a Rule 30(b)(6) deposition, and doubly so when it is used to contrive a basis for an accusation of "misleading" conduct, Defs.' Mem. 32, or "deception," *id.*  In any event, nothing that Special Agent Hyman said at his deposition undercuts the substantial evidence the Government has supporting the Amended Complaint, and the Government has conducted additional investigation after the deposition and before the Amended Complaint was filed in any event.

### 1.    Defendants' Attempt to Misuse Special Agent Hyman's Deposition Should be Rejected

The Defendants' characterization of Special Agent Hyman's deposition is extraordinarily selective.  Counsel for the Defendants rely on Special Agent Hyman's inability to identify

"evidence" of several contentions that are the ultimate issues at trial, *see* Defs.' Mem. 11-12, but when the witness was asked very similar questions in a slightly less confusing way, or was given an opportunity to explain, he gave answers that were worlds apart from Defendants' characterization of them here, and that show that the Government had ample basis to bring this case. *Compare* Defs.' Mem. 11-12 (quoting Dep. Tr. 150:8-14 for the proposition that the Government "admitted that it had no evidence" that the defendants knew about or intended to promote or conceal the $230 Million Fraud Scheme) *with* Dep. Tr. 154:5-18 (describing defendants' knowledge of illegal activities); *compare* Defs.' Mem. 11-12 (quoting Dep. Tr. 134:13-21 to contend the Government had no evidence of promotion) *with* Dep. Tr. 138:9-139:4 (describing evidence relevant to Defendant's intent to promote) *and* Dep. Tr. 145:13-17 (clarifying previous answers and saying that there is evidence of a number of matters inquired about previously); *compare* Defs.' Mem. 11-12 (quoting Dep. Tr. 137:13-138:3 for the proposition that the Government has no evidence of concealment) *with* Dep. Tr. 139:13-23 (describing evidence of concealment) *and id.* at 141:5-17 (further describing evidence of concealment).[36]

The manner in which the deposition was taken consisted in large part of counsel for the Defendants asking a number of contention questions requiring the nonlawyer witness to opine on "evidence" without defining that term, and then interrupting the witness's answers to argue with

---

[36] Additionally, the deposition is not complete, the Government has not yet had the opportunity to ask clarifying questions on cross-examination, and the deponent has not yet received the final transcript and had the opportunity to submit errata under Rule 30(e)(1). This takes on special significance in light of the Defendants' attempts to force a nonlawyer to make legal conclusions about what constitutes admissible evidence or who would be a "competent" witness, creating a heightened risk of confusion and need for clarification.

him.  When asked if it was "the position of the United States that you will be able to prove"

certain wire transfers, after conferring with counsel, the witness stated "as far as proving my

case, I'm not an attorney, but it's my assumption that we are going to prove our case at trial."

Dep. Tr. 72:7-10.  This response was met with the following argumentative question, which was

the first use of the word "evidence" in the deposition:

> Q: You are not speaking as an investigator, you are not speaking as
> an attorney, you are speaking as a spokesman for the United States.
> The question was whether you intend to – what is the evidence to
> prove the transfers to USB from the Russian Treasury?
>
> A: Well, we have obtained copies of the wire transfers.  But we
> expect to get further – further evidence through the discovery
> process, as well as responses from the Russian government.

Dep. Tr. 72:12-24.

Further questioning did nothing to dispel the connotation that evidence was being

referred to in a sense closely connected with its use at trial, and thus inappropriate to expect a

nonlawyer to opine on.  In fact, counsel for the Defendants repeatedly interrupted the witness

when he was listing what he thought might be evidence to argue with him about whether it was

actually evidence:

> Q: You have no evidence to tie the payment from Krainiy Sever
> through Bunicon to Prevezon; is that correct?  You have an
> accounting assumption, because you can show that money went
> from Krainiy Sever to Bunicon and from Bunicon to Prevezon.
>
> A: Right.
>
> Q: But you do not have any evidence whatever to show that it was
> a member of the organization who directed it; is that right?
>
> A: No, we do not. The only thing that we would have would be
> statements made by Prevezon's owner, Den[]is Katsyv, through a
> representative that this money as mischaracterized, and that Mr.
> Katsyv would – first Mr. Katsyv would be aware of money
> laundering statutes through his prior interactions with –
>
> Q: Excuse me.  I'm asking you what evidence you have.  We'll get

to those other points later.

Dep. Tr. 89:16-90:12.

Indeed, counsel for the Defendants would repeatedly interrupt the deponent to actively

prevent him from finishing listing what he believed to be evidence:

> Q: What is the evidence that eleven defendants accused engaged in financial transactions involving the proceeds of the $230 million scheme?
>
> A: Well, we have the tracing to Prevezon Holdings, and we have Prevezon Holdings forming these entities and then using funds to purchase property.  So those would be financial transactions.
>
> Q: But the funds that came from Bunicon and Elenast are the funds at issue; are they not?
>
> A: Yes.
>
> Q: And they were all from Europe; were they not?
>
> A: Yes.
>
> Q: So these other companies were founded with other money; correct?
>
> A: Correct.  Well, we have the statement from Mr. Katsyv's –
>
> Q: We will get to the statement.  You've said it now four times, it reflects your preparation, just as your failure to comment on the bank records does.

Dep. Tr. 133:10-134:9.  Counsel for the Defendants was so eager to cut off the deponent's listing

of evidence that counsel for the Government had to repeatedly ask defense counsel to give the

deponent a chance to answer the question:

> Q: Do you have any evidence that the defendants acted to conceal – acted to conceal or disguise the nature, location, source, ownership or control of the proceeds of the $230 million fraud?
>
> A: Well, we have evidence to the mischaracterization of the wires from Mr. Kim, Bunicon and Elenast.  Even by his own admission, the agent, Mr. Katsyv's agent admitted that they didn't engage in this business with them.  And the—
>
> Q: We'll get back to that.
>
> A: Okay.

40

MR. ADAMS: He's answering your question.

MR. MOSCOW: I understand.

MR. ADAMS: He gave one piece of evidence, I think he was about to offer some others.

MR. MOSCOW: Fine.

Q: Please do.

A: So we have evidence that he engaged in the con—

Q: Who is he?

A: Mr. Katsyv. And by Mr. Katsyv, through his entities Prevezon. He has an agent that made a statement that we talked about earlier.

Q: No, I'm sorry. You didn't speak to the agent, did you?

A: I did not.

Q: Did you speak to anyone who spoke to the agent?

A: I did not.

MS. MAGDO: Were you finished with your answer?

THE WITNESS: I would like to continue on.

Q: Sure.

A: The evidence would be that he engaged to conceal because he's aware through his – at least his representative says he's aware he's going to receive payment that's due to him for investment in New York property from Mr. Petrov by way of Mr. Kim sending him money, two wires. The two wires are then mischaracterized as sanitary equipment. And he receives them, he then does whatever he does with his money, knowing full well that this money is not for its stated purpose. So that would be evidence of concealment.

Dep. Tr. 138:6-141:17. As this exchange shows, the witness was aware of damning evidence of

knowledge on the part of the Defendants—their receipt of wire transfers from shell companies

with false descriptions of their purchase—but was repeatedly actively prevented from saying it

by counsel for the Defendants. It is remarkable that counsel for the Defendants now presents this

still-incomplete deposition as grounds for the claim that "the Government readily admitted that

41

its investigation did not support many of the allegations" in the complaints.  Defs.' Mem. 11.[37]

Even beyond their one-sided presentation of Special Agent Hyman's testimony, however, counsel for the Defendants plainly attempted to use the Rule 30(b)(6) deposition for the improper purpose of securing legal concessions from a nonlawyer.  *See* Defs.' Mem. 3 ("the Government's verification, required by Supp. R. G for a forfeiture action, is inaccurate and misleading as revealed by the Governments [sic] admissions in its Fed. R. Civ. P. 30(b)(6) testimony").  This is evident from the fact that counsel for the Defendants repeatedly asked the deponent to itemize evidence and then interrupted him before he could do so, Dep. Tr. 138:6-141:17, and repeatedly told the witness that he had to answer questions—including those calling for legal conclusions—on behalf of the United States.[38]  In fact, however, the legal conclusions of a lay Rule 30(b)(6) witness do not bind a party.[39]  Moreover, deposition questions calling for evidence supporting a contention, essentially attempts to turn a Rule 30(b)(6) deposition into a substitute for a contention interrogatory, are disfavored.  *See Byrd* v. *Wal-Mart Transp., LLC*, CV609-014, 2009

---

[37] For the avoidance of doubt, the Government has substantial documentation supporting the allegations of the complaint.  Some of it is in admissible form already, some may require testimony or certifications from custodians, and some may ultimately not be admitted at trial.  But these are patently issues for summary judgment or trial, not a motion to dismiss.

[38] There are numerous examples of such questions.  *See, e.g.*, Dep. Tr. 11:4-8; 34:4-11; 41:17-25; 42:20-43:7; 59:24-61:10; 71:6-72:24; 78:11-13; 108:25-109:5; 127:3-7; 128:25-129:5; 132:25-133:9; 146:5-8; 163:15-164:5; 178:19-24.

[39] *See, e.g.*, *AstenJohnson*, *Inc.* v. *Columbia Cas. Co.*, 562 F.3d 213, 229 n.9 (3d Cir. 2009) ("This type of legal conclusion is not binding on American, and American was entitled to produce contrary evidence at trial.  *See R & B Appliance Parts, Inc.* v. *Amana Co.*, 258 F.3d 783, 787 (8th Cir. 2001) (distinguishing between matters of fact and conclusions of law in regard to Rule 30(b)(6) depositions)."); *see also Briese Lichttechnik Vertriebs GmbH* v. *Langton*, No. 09 Civ. 9790 (LTS) (MHD), 2012 WL 5457681, at *5 (S.D.N.Y. Nov. 8, 2012) (finding no basis for court action when Rule 30(b)(6) witnesses were unable to answer questions that "were overly general, vague, or improperly calling for legal conclusions").

WL 3055303, at *4 & n.7 (S.D. Ga. Sept. 23, 2009) (forbidding questions that are functional

equivalent of contention interrogatories, remarking, "[A]sking a lay 30(b)(6) witness to

undertake on-the-spot legal analysis in order to respond to contention questions is asking too

much, especially since the company's lawyer is far better equipped to formulate full and

complete responses for his client to sign.").

Indeed, the Defendants' eagerness to take this deposition before obtaining any

documents—as if hoping that the thousands of pages of documents in the Government's

possession would vanish if Special Agent Hyman did not remember each and every one of them

at his deposition—shows the inappropriateness of their approach.[40]  This Court was right to call

this deposition a "waste of time to take" at this stage of the litigation.  *See* Tr., Mar. 4, 2014 (D.I.

81-3) at 12:6-7.[41]  One court has criticized the practice of rushing to a Rule 30(b)(6) deposition

as a substitute for a contention interrogatory, in terms fully applicable to the Defendants:

> As a method for finding out facts known to an organization, Rule
> 30(b)(6) is not perfect, but it can be reasonably effective if all
> parties act in good faith.
>
> In this case, Lawyers [i.e., the party Lawyers Title Insurance
> Company] tried to use Rule 30(b)(6) in a very different way, *by
> asking about legal theories and fact supporting the allegations in*

---

[40] At the time the deposition was noticed, a trial date was imminent, but no documents had been exchanged and this haphazard situation was caused entirely by defense counsel's inexplicable abandonment of their own good-faith discovery schedule.  This timing and the questions asked suggest that defense counsel's strategy was to fish for legal admissions.  In any event, after the adjournment of the trial date, the Defendants trumpet this partial deposition as a purported concession by the Government.  In light of this, the Defendants appear to view the deposition not just as a response to the (self-created) emergency of the imminent trial but as a tool to extract legal concessions from a lay witness.

[41] Even a contention interrogatory, which would at least be answered by a lawyer with the opportunity to consult documents, is premature at this stage of the litigation under the local rules. *See* SDNY Local Civil Rule 33.3(c).

> *the complaint.* In essence, this was an effort to use Rule 30(b)(6)
> as contention interrogatories are most often used. Lawyers *noticed*
> *First Internet's Rule 30(b)(6) deposition early on in this litigation,*
> *before First Internet had the opportunity to complete its own*
> *discovery and develop fully its legal theory.* Not surprisingly, the
> deponent's answers about the factual basis for the lawsuit and the
> legal theories were incomplete. Both the factual basis and the legal
> theories evolved. But Lawyers seeks to bind First Internet to the
> first incomplete answers.
>
> *This tactic has little to recommend it as a method for trying to lock*
> *an opponent into flawed and incomplete contentions and legal*
> *theories.* A Rule 30(b)(6) deposition produces evidence, not
> judicial admissions. A Rule 30(b)(6) deponent testifies as if she is
> the corporation, but Rule 30(b)(6) does not absolutely bind a
> corporate party to its designee's recollection.

*First Internet Bank of Indiana* v. *Lawyers Title Ins. Co.*, 07 Civ. 869 (DFH) (DML), 2009 WL

2092782, at *4 (S.D. Ind. July 13, 2009) (emphasis added, internal quotation marks omitted).

However "little" this tactic has "to recommend it as a method for trying to lock an opponent into

flawed and incomplete contentions and legal theories," *First Internet Bank*, 2009 WL 2092782,

at *4, it has far less to recommend it as a means to contrive an accusation that an affiant engaged

in "deception" or "misleading" conduct. The Defendants' attempt to misuse the incomplete Rule

30(b)(6) deposition of Special Agent Hyman is improper and should not be rewarded.

    2. <u>Moreover, There Has Been Additional Investigation Since the Deposition</u>

  Even if the first session of Special Agent Hyman's deposition had revealed anything

wanting in the Government's investigation, the Government has since conducted additional

investigation. The further investigation has revealed the sham contractual documentation

submitted by Bunicon and Elenast to their bank in Moldova—including supposed contractual

documents purportedly signed by a representative of Prevezon. It has also revealed that

Prevezon laundered an extra $1,108,090.55, received in seven transactions spread out over a

month from a different company and under different false descriptions. This additional investigation, which was well known to counsel for the Defendants,[42] underscores how inappropriate it is for them to accuse the verification of being misleading or deceptive.

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court wait until the Second Circuit decides the Defendants' expedited appeal, and, if any of Defendants' motions remain outstanding at that point, deny them in full.

Dated: New York, New York
        February 9, 2015

                                   Respectfully submitted,

                                   PREET BHARARA
                                   United States Attorney
                                   for the Southern District of New York

                        By:    /s/ Paul M. Monteleoni
                               Paul M. Monteleoni
                               Andrew C. Adams
                               Margaret Graham
                               Assistant United States Attorneys
                               Tel.: (212) 637-2219/2340/2923
                               E-mail: paul.monteleoni@usdoj.gov
                                       andrew.adams@usdoj.gov
                                       margaret.graham@usdoj.gov

---

[42] As the Government has explained, the added allegations were derived in large part from sources of information independent of and apparently not even known to the main source of the initial information. *See* Gov.'s Letter-Motion, Oct. 31, 2014 (D.I. 167) 4. Thus even if there were any merit to Prevezon's apparent specification of how many sources an investigation must employ (and there is not), multiple independent sources appear even on the public record.