1

2              UNITED STATES DISTRICT COURT

3            SOUTHERN DISTRICT OF NEW YORK

4    --------------------------------X
     UNITED STATES OF AMERICA,
5
                        Plaintiff,
6
                VS.           Case No. 1:13-CV-06326(TPG)
7                             ECF CASE
     PREVEZON HOLDINGS LTD.,
8    et al.,

9                        Defendants.
     --------------------------------X
10

11

12

13            VIDEOTAPED DEPOSITION

14                   OF

15            WILLIAM F. BROWDER

16          Wednesday, April 15, 2015

17            30 Rockefeller Plaza

18              New York, New York

19

20

21   Reported by:
     AYLETTE GONZALEZ, RPR, CLR, CCR
22   JOB NO. 91742

23

24

25

1

2              DATE:  April 15, 2015

3              TIME:  9:30 a.m.

4

5

6      Videotaped Deposition of WILLIAM F.

7   BROWDER, held at the offices of BAKER BOTTS,

8   LLP, 30 Rockefeller Plaza, New York, New

9   York  10112, pursuant to NOTICE, before

10   AYLETTE GONZALEZ, a Registered Professional

11   Reporter, Certified LiveNote Reporter,

12   Certified Court Reporter and Notary Public

13   of the States of New York and New Jersey.

14

15

16

17

18

19

20

21

22

23

24

25

1

2   A P P E A R A N C E S:

3

4   UNITED STATES DEPARTMENT OF JUSTICE

5   Counsel for Plaintiff

6           One St. Andrew's Plaza

7           New York, New York  10007

8   BY:    PAUL MONTELEONI, ESQ.

9   BY:    ANDREW ADAMS, ESQ.

10

11

12

13   BAKER & HOSTETLER

14   Counsel for Defendants

15           1050 Connecticut Avenue, N.W.

16           Washington, District of Columbia  20036

17   BY:    MARK CYMROT, ESQ.

18   BY:    PAUL LEVINE, ESQ.

19   BY:    MORITZ ABRAMOVITZ, ESQ.

20

21

22

23

24

25   ///

1

2  A P P E A R A N C E S:  (Continued)

3

4  BAKER BOTTS

5  Counsel for Defendants

6         30 Rockefeller Plaza

7         New York, New York  10112

8  BY:    SETH TAUBE, ESQ.

9  BY:    JOYCE YOUNG, ESQ.

10

11

12

13  KOBRE & KIM

14  Counsel for the Witness

15         800 Third Avenue

16         New York, New York  10022

17  BY:    MICHAEL KIM, ESQ.

18  BY:    LINDSEY WEISS, ESQ.

19

20

21

22  ALSO PRESENT:

23     LEM LATTIMER, Videographer

24

25

1

2          THE VIDEOGRAPHER:  This is the

3  Tape No. 1 for the videotaped

4  deposition of William Browder in the

5  matter of United States of America vs.

6  Prevezon Holdings Ltd., et al.

7          We are now going on the record.

8  The time is 9:35 a.m.

9          Will counsel please state their

10  appearances for the record.

11          MR. KIM:  This is Michael Kim and

12  Lindsay Weiss of Kobre & Kim for the

13  witness, William Browder.

14          MR. MONTELEONI:  Paul Monteleoni

15  and Andrew Adams for the Southern

16  District of New York U.S. Attorney's

17  Office.

18          MR. TAUBE:  Seth Taube and

19  Joyce Young, Baker Botts, for

20  Defendants.

21          MR. CYMROT:  Mark Cymrot and

22  Paul Levine for Defendants.

23          THE VIDEOGRAPHER:  Will the Court

24  Reporter please swear the witness in.

25          *********************

1           WILLIAM F. BROWDER (4/15/15)

2    W I L L I A M   F.   B R O W D E R,

3        called as a witness, having been

4        first duly sworn by a Notary Public

5        of the State of New York, was

6        examined and testified as follows:

7    EXAMINATION BY

8    MR. CYMROT:

9        Q.   Mr. Browder, my name is

10   Mark Cymrot.  I represent the Defendants in

11   this action.

12              You're here pursuant to Subpoena?

13       A.   I'm sorry, is that a question?

14       Q.   Yes.  Are you here pursuant to a

15   Subpoena?

16       A.   Yes.

17       Q.   And a court order?

18       A.   I think so.

19       Q.   Let me show you what I'll mark as

20   Browder Exhibit 1.

21              MR. KIM:  Sorry, Mark, can I do

22        the confidentiality?

23              MR. CYMROT:  Oh, I'm sorry, yes, I

24        skipped that.  Yes.

25              MR. KIM:  All right.  Sorry about

1    WILLIAM F. BROWDER (4/15/15)

2    that.

3         So this is Michael Kim.  So we

4    still do not have a Confidentiality

5    Agreement or Order from the court.

6    I'm not faulting anybody, that's just

7    objectively the situation we're in.

8         It would be our preference to

9    obviously have this deposition only

10   when covered by a court ordered

11   Confidentiality Order.  But given that

12   we're under Subpoena, we will proceed

13   in the manner that -- that Plaintiff

14   wishes.

15        And as I understand it, and I

16   discussed this with Mr. Cymrot before

17   the deposition began, there are other

18   people listening in who, I believe,

19   has identified three names, and I'll

20   ask him to just state what his

21   understanding is for the record.

22   We -- we, on Mr. Browder's part, were

23   made to understand that certain client

24   representatives would be attending.

25        I did not understand the word

1      WILLIAM F. BROWDER (4/15/15)

2    "attending" to mean unnamed persons or

3    persons I can't verify who's listening

4    in or listening in.  That's fine.

5    Given we're under Subpoena, we're

6    willing to proceed based on the

7    understanding that the contents of

8    this Subpoena are covered by the same

9    arrangements that was in the

10   March 20th letter from us, which was

11   subsequently agreed to by Defendants,

12   with the exception that the client

13   representatives who will be identified

14   as listening in would be allowed to

15   access this deposition on the

16   undertaking by all that the contents

17   of the deposition will not be passed

18   on to any other persons pending

19   further order of the Court.

20       And I think after the deposition

21   we understand we'll try to get the

22   Confidentiality Agreement finalized

23   and submitted to Judge Griesa as soon

24   as we're able to.

25       MR. CYMROT:  Right.  I would just

1      WILLIAM F. BROWDER (4/15/15)

2    say that we've gotten this far in our

3    discussions as the point where the

4    judge has before him on the Government

5    confidentiality proposal the same

6    issues, so they'll be resolved when he

7    resolves them.

8        In terms of people looking in,

9    there are other attorneys and others

10   associated with our law firm;

11   Gabriella Volshteyn as client

12   representative, Nataliya Vaselnitskaya

13   and Denis Katsyv, the client

14   representatives.  And those are the

15   ones I'm aware of.

16       But anybody looking in will be

17   subject to the same restrictions, that

18   it cannot be used for any other

19   purpose other than this lawsuit as we

20   set forth in that letter.

21     MR. KIM:  Just one question.  Are

22   you able to verify who's actually

23   listening and who's not to a degree of

24   certainty.

25     MR. CYMROT:  I am not sitting

```
 1          WILLIAM F. BROWDER (4/15/15)
 2       here, no.
 3          MR. KIM:  Okay.  So we object to
 4       proceeding, but given we're under
 5       Subpoena, we'll just note the
 6       objection and proceed as we just
 7       discussed.  So thank you.  Sorry to
 8       interrupt.  Proceed.
 9          MR. CYMROT:  Okay.  Exhibit 1.
10          All right.  So I'm marking for
11       identification as Browder Exhibit 1 a
12       letter dated December 4, 2012 to the
13       New York County District Attorney's
14       office, I believe Mr. Browder signed
15       this, and attachments.
16          Let's get the Court Reporter to
17       initial it, I'm sorry.
18          Why don't you use this copy which
19       has tabs.
20          (Browder Exhibit 1, document Bates
21       stamped PREV_000003127_001 through
22       '166 was marked for identification, as
23       of this date.)
24   BY MR. CYMROT:
25       Q.  All right.  Mr. Browder, can you
```

1           WILLIAM F. BROWDER (4/15/15)

2     tell us what that letter is?

3           A.   Can I correct a statement that you

4     made, is that --

5           Q.   I guess you can.

6           A.   This is not a letter that I signed.

7           Q.   Who signed it?

8           A.   This was signed by Brown Rudnick,

9     LLP.

10          Q.   Do you recognize that as a letter

11    you authorized?

12          A.   This was a letter that I'd

13    authorized, yes, on -- yeah.

14          Q.   Okay.

15               MR. CYMROT:  And let me mark as

16          Exhibit 2 the Verified Claimant, the

17          original.  The original.

18     BY MR. CYMROT:

19          Q.   So how did -- while we're waiting

20    for that, how did that letter come about,

21    Mr. Browder?

22          A.   This letter came about based on

23    a -- an investigation that we did into the

24    proceeds of the Magnitsky crime.

25          Q.   And who is "we"?

1          WILLIAM F. BROWDER (4/15/15)

2      A.   My -- my legal team and myself.

3      Q.   And who's your legal team or who

4  was your legal team at the time?

5      A.   My legal team started out with

6  John Moscow from BakerHostetler and included

7  Neil Micklethwaite from Brown Rudnick,

8  Jonathan Weiner from APCO, John Ashcroft from

9  Ashcroft Associates, various Russian lawyers.

10     Q.   Brown Rudnick?

11     A.   Brown Rudnick; Neil Micklethwaite I

12 mentioned.

13     Q.   Okay.  And who at Hermitage was

14 working on this?

15     A.   Pretty much Vadim Kleiner,

16 Ivan Cherkasov.

17     Q.   And yourself?

18     A.   And my- -- well, yeah.

19     Q.   You were working on it, right?

20     A.   Yeah.

21     Q.   So you sent this letter to the U.S.

22 Attorney, and what happened next, or it

23 actually went to the State District Attorney,

24 correct?

25     A.   So John Moscow introduced me to

1            WILLIAM F. BROWDER (4/15/15)

2   Adam Kaufmann, who was head of investigations

3   division of the New York District Attorney's

4   office.  I walked it into his office on the

5   4th of December 2012 or maybe possibly one or

6   two days later, and then they took up the

7   case.

8        Q.   John Moscow wasn't representing you

9   at this time?

10       A.   No, he wasn't, but he did introduce

11  me to Adam Kaufmann earlier.

12       Q.   When was that?

13       A.   I can't recall exactly, but one or

14  two -- I met Adam Kaufmann through John Moscow

15  at the Cambridge crime conference in

16  Cambridge, England.

17       Q.   And when was that?

18       A.   I can't recall exactly.

19       Q.   And John Moscow represented you

20  for, what, six months in 2007 and '8, was it?

21       A.   And sort of informally afterwards,

22  after we -- after he got called on to another

23  case and didn't have time for us.

24       Q.   Well, all right, we don't need to

25  get into the subject, but isn't it true that

1          WILLIAM F. BROWDER (4/15/15)

2    you discharged John Moscow and BakerHostetler?

3          A.   I wouldn't -- I wouldn't -- no.

4          Q.   You stopped relying upon

5    BakerHostetler's advice, correct?

6          A.   BakerHostetler -- John Moscow

7    stopped returning our phone calls because he

8    got busy on another case.

9          Q.   And you stopped relying upon his

10   advice?

11         A.   No, not true.

12         Q.   Never, to this day?

13         A.   Well, when he became adverse to us

14   in this case, obviously his advice was no

15   longer objective.

16         Q.   I see.  And when was the last time

17   before -- what would it be, December,

18   November of 2013 that you spoke to

19   John Moscow?

20         A.   I don't recall.

21         Q.   Years before that?

22         A.   I think it was at the Cambridge

23   crime conference that I last spoke to him.

24         Q.   Which was when?

25         A.   I -- I don't remember which --

```
 1              WILLIAM F. BROWDER (4/15/15)
 2   which year it was.
 3         Q.   2012, 2011?
 4         A.   I'd have to --
 5         Q.   No idea?
 6         A.   I would have to look at the -- at
 7   the Cambridge crime conference schedule and
 8   see, see when he was there and Adam Kaufmann
 9   was there.
10         Q.   So at the time of this letter,
11   December 4, 2012, you walked into the New York
12   County District Attorney's office; is that
13   what I understand?
14         A.   That's correct.
15         Q.   With whom?
16         A.   On my own.
17         Q.   I see.  And you presented this
18   letter?
19         A.   Correct.
20         Q.   And what was that -- what happened
21   after that?
22         A.   At that point they accepted the
23   letter.
24         Q.   And was there a conversation?
25         A.   And then perhaps a few weeks later
```

1              WILLIAM F. BROWDER (4/15/15)

2    I was informed that the -- they were taking up

3    the case.

4         Q.    In the New York County District

5    Attorney's office?

6         A.    That's correct.

7         Q.    All right.  And what happened in

8    terms of the case after that?

9         A.    They -- I'm trying -- I can't

10   remember the name of the investigator --

11   started to do some work on it and then

12   eventually decided that it was a real case.

13        Q.    And when did it get to the U.S.

14   Attorney's Office?

15        A.    After that.

16        Q.    When after that?

17        A.    I don't recall.

18        Q.    How much work was done in the

19   D.A.'s office in New York?

20        A.    I don't work in the D.A.'s office.

21        Q.    How much work did they tell you

22   they did?

23        A.    They don't -- I'm not a member of

24   their staff, they don't -- they don't tell me

25   what they're doing or not doing.

```
 1            WILLIAM F. BROWDER (4/15/15)
 2       Q.   After the first conversation, did
 3   you have additional conversations with the
 4   investigator?
 5       A.   I did.
 6       Q.   How many?
 7       A.   I can't recall.
 8       Q.   Did you record them?
 9       A.   No.
10       Q.   Did you take notes?
11       A.   No.
12       Q.   So what were they about?
13       A.   Just status reports.
14       Q.   What did he tell you about the
15   status?
16       A.   They were working on it.
17       Q.   Nothing more?
18       A.   That it was a real case.
19       Q.   How long did the conversations
20   last?
21       A.   I don't recall.
22       Q.   No idea; hour, two hours, three
23   hours?
24       A.   No.
25       Q.   Less than that?
```

1           WILLIAM F. BROWDER (4/15/15)

2      A.   Less than that.

3      Q.   Fifteen minutes?

4      A.   Perhaps.  I don't recall.

5      Q.   How many of these conversations did

6  you have?

7      A.   I don't remember exactly.

8      Q.   All right.  When did it go to the

9  U.S. Attorney's Office, approximately?

10      A.   After the -- sometime after we

11  submitted this, but I -- but I can't remember

12  the dates.

13      Q.   I see.  How long before it was

14  filed in federal court?

15      A.   It was filed in federal court I

16  think a year later or some- -- maybe in the

17  fall of 2013.

18      Q.   It was filed in, I believe,

19  November or December of 2013, so it's about a

20  year later; so how long before the Complaint

21  was filed did you first have your conversation

22  with the U.S. Attorney's Office?

23      A.   Quite a bit.

24      Q.   Months?

25      A.   Yes.

1           WILLIAM F. BROWDER (4/15/15)

2      Q.   Nine months?

3      A.   Perhaps.

4      Q.   So it was about three months in the

5  D.A.'s office and then nine months in the U.S.

6  Attorney's Office?

7      A.   I don't know the timing.

8      Q.   All right.  Who did you talk to in

9  the U.S. Attorney's Office?

10      A.   I spoke to Sharon Levin,

11  Paul Monteleoni.

12      Q.   Did you speak to Todd Hyman, the

13  investigator?

14      A.   He might have been present, but my

15  first contact was with Sharon Levin.

16      Q.   All right.  And what were your

17  conversations with Sharon Levin?

18      A.   That they had taken over the case

19  from the New York D.A.'s office.

20      Q.   Anything else?

21      A.   That they were proceeding with the

22  case.

23      Q.   Did they tell you that they were

24  investigating?

25      A.   They weren't sharing with me their

1           WILLIAM F. BROWDER (4/15/15)

2    internal conversations.

3           Q.   Did they ask you for more

4    information?

5           A.   Not at that meeting.

6           Q.   The first meeting?

7           A.   At the first meeting they just --

8    it was just a very simple meeting.

9           Q.   So you were there alone?

10          A.   I don't remember if anyone was

11   there with me or not.

12          Q.   I see.  And there were three people

13   on the side of the United States?

14          A.   There were more than three people,

15   but I don't know who else was there.

16          Q.   I see.  Did there come a time when

17   they --

18          A.   Actually let me correct that.

19   Somebody from the New York D.A.'s office was

20   there as well.

21          Q.   Okay.  And who was that?

22          A.   That -- I don't remember the name

23   of the person.

24          Q.   Investigator or a lawyer?

25          A.   I don't know.

1           WILLIAM F. BROWDER (4/15/15)

2      Q.   Did they give you cards?

3      A.   I don't remember.

4      Q.   How many meetings between the first

5  meeting and the filing of the Complaint did

6  you have with the U.S. Attorney's Office?

7      A.   I can't say for certain, but I

8  think there was maybe one more in-person

9  meeting.

10     Q.   Other people from Hermitage or your

11  lawyers meet with the U.S. Attorney's Office

12  before the case was filed?

13     A.   No.

14     Q.   So it was just you?

15     A.   Yes.

16     Q.   Did there come a time when they

17  asked you for more information other than

18  what's in this letter?

19     A.   Yeah.

20     Q.   When was that?

21     A.   Spring or summer of 2013, I can't

22  remember exactly.

23     Q.   What did they ask you?

24     A.   They asked -- well, they didn't --

25  didn't ask me personally; they asked people on

1          WILLIAM F. BROWDER (4/15/15)

2    my team for more information.

3          Q.    Who did they ask?

4          A.    Vadim Kleiner.

5          Q.    How did they get to meet people on

6    your team if they weren't at the meetings?

7          A.    I maybe introduced them on the

8    phone, I don't re- -- I don't recall.

9          Q.    So they asked Mr. Kleiner for more

10   information?

11         A.    Yes.

12         Q.    What more information?

13         A.    I wasn't part of those

14   conversations.

15         Q.    Did their files at Hermitage about

16   what was given the U.S. Attorney's Office?

17         A.    Surely there are files.

18         Q.    But you haven't given them to us in

19   response to the Subpoena; is that right?

20         A.    I don't know.

21         Q.    Who's responsible for that?

22         A.    There's a whole team of people

23   responsible for that.

24         Q.    Well, you're ultimately responsible

25   for your Subpoena to you, isn't it?

1          WILLIAM F. BROWDER (4/15/15)

2      A.   Subpoena is to me.

3      Q.   Are you supervising the production

4   of the documents?

5      A.   I've got a whole team of people

6   who's working on that, and they report to me

7   from time to time.

8      Q.   I see.  And have they reported to

9   you that they provided us with files that you

10  gave the U.S. Attorney's Office?

11     A.   They've reported to me lots of

12  stuff, but I -- you know, I don't know the

13  details.

14     Q.   I see.  So you have no idea what

15  you gave the U.S. Attorney's Office --

16  Hermitage gave the U.S. Attorney's Office in

17  response to their request; is that right?

18          MR. KIM:  Objection to form.

19          MR. CYMROT:  Yeah, I'll restate

20     it.

21     Q.   You have no idea what Mr. Kleiner

22  gave to the U.S. Attorney's Office in response

23  to their request; is that correct?

24     A.   That's correct.

25     Q.   And he didn't tell you at the time?

1          WILLIAM F. BROWDER (4/15/15)

2          A.   He told me he was in conversations,

3    but he didn't tell me specifically what he was

4    providing.

5          Q.   Did he tell you what the substance

6    of the conversations was?

7          A.   Just backing up different parts of

8    the Complaint.

9          Q.   What parts of the Complaint?

10         A.   I don't know.

11         Q.   Did you see a draft of the

12   Complaint before it was filed?

13         A.   I think we might have, but I can't

14   remember for sure.

15         Q.   Did you tell the U.S. Attorney's

16   Office that the allegations in the Complaint

17   were accurate as far as you knew?

18         A.   I was never asked or never told.

19         Q.   Did you ever see anything that you

20   saw in -- you've read the Complaint, correct?

21         A.   I have.

22         Q.   And did you see anything that --

23   that you felt was inaccurate?

24         A.   No.

25         Q.   So as far as you're concerned,

1              WILLIAM F. BROWDER (4/15/15)

2    everything in the original Complaint was

3    accurate?

4         A.   It seemed to me that it was

5    accurate.  I should point out that some --

6    there -- there are parts of the Complaint that

7    I wasn't familiar with that I wouldn't -- not

8    know about.

9         Q.   But the parts that you were

10   familiar with, as far as you're concerned is

11   accurate?

12        A.   The parts I was familiar with

13   are -- I was thinking is accurate.

14        Q.   For instance, Mr. Magnitsky is an

15   attorney; you think that's accurate?

16        A.   He was my attorney.

17        Q.   He was your attorney?

18        A.   Yes.

19        Q.   Acting as --

20        A.   Acting in court representing me.

21        Q.   I see.  And he had a law degree in

22   Russia?

23        A.   I'm not aware that he did.

24        Q.   I see.  And -- and he had -- he

25   went to law school?

1           WILLIAM F. BROWDER (4/15/15)

2        A.   No.

3        Q.   He didn't go to law school, he

4   didn't have a law degree, but he was your

5   lawyer?

6        A.   And he represented me in court.

7        Q.   I see.

8        A.   I should say represented Hermitage

9   Fund Companies in court.

10       Q.   Okay.  And he did other work; he

11   gave you advice on taxes?

12       A.   Correct.

13       Q.   And he was given a power of

14   attorney to do certain things for certain of

15   your companies, correct?

16       A.   I believe so.

17       Q.   All right.  So he acted not just as

18   an attorney, he acted in other capacities?

19            MR. KIM:  Objection to form.

20       Q.   Do you know who drafted the

21   Complaint?

22       A.   I would imagine that the U.S.

23   attorney drafted the Complaint.

24       Q.   And you had no idea what

25   investigation the U.S. attorney did beyond the

```
 1              WILLIAM F. BROWDER (4/15/15)
 2    information that you and Mr. Kleiner gave to
 3    the U.S. attorney?
 4         A.   I don't work in the U.S. Attorney's
 5    Office.
 6         Q.   Well, you're aware that Mr. Hyman
 7    says that's the investigation that was done,
 8    took documents from your company, talked to
 9    you and Mr. Kleiner, so this case arises from
10    your information; that's news to you?
11         A.   I don't understand the question.
12         Q.   You didn't understand when the
13    Complaint was being filed that it was based
14    upon information that you and Mr. Kleiner
15    provided to the U.S. Attorney's Office?
16         A.   Yes.
17         Q.   You understood that?
18         A.   Yeah.
19         Q.   All right.  Let me show you the
20    Complaint we're talking about that I'll mark
21    as Browder Exhibit 2.  It's a Verified
22    Complaint.  It was filed on
23    September 10, 2013.
24              (Browder Exhibit 2, Verified
25              Complaint, Filed on 9/10/13 was marked
```

1          WILLIAM F. BROWDER (4/15/15)

2          for identification, as of this date.)

3     BY MR. CYMROT:

4          Q.   So Exhibit 2 is the Complaint we've

5     been talking about, correct?

6          A.   This?

7          Q.   Yes.

8          A.   Yes.

9          Q.   And that's the Complaint that you

10    read and saw nothing inaccurate in it; is that

11    right?

12              MR. KIM:  Objection to form.

13         Q.   You could answer.

14         A.   Sorry?

15              MR. KIM:  When I say objection to

16         form, that doesn't mean don't answer;

17         it's just a legal objection I'm

18         stating to the form of the question.

19              THE WITNESS:  Right.

20         A.   If -- if we go back to what I said

21    before, the parts of the Complaint that I'm

22    familiar with are accurate.

23         Q.   And we're talking about that

24    Complaint, Exhibit 2, right?

25         A.   Correct.

1          WILLIAM F. BROWDER (4/15/15)

2     Q.   Going back to Exhibit 1, which is

3  the letter to the D.A.'s office, all right?

4          If you take a look at Tab 8.

5     A.   Tab A?

6     Q.   Eight.

7     A.   Eight.

8     Q.   Can you tell us what these

9  documents are, the cover says "Bank

10 Transactions"?

11    A.   Yeah.

12    Q.   By the way, if you find some

13 illegible, that's because that's the way it

14 was produced to us.

15         So let's start with '3128096.  Can

16 you tell me what that is?

17    A.   Where is this?

18    Q.   It's the first document.  If you

19 look at the lower right-hand corner, it has

20 numbers.

21    A.   I don't know.

22    Q.   Well, who put these documents

23 together?

24    A.   My team.

25    Q.   Who on your team?

1          WILLIAM F. BROWDER (4/15/15)

2        A.    My lawyers, Vadim Kleiner.

3        Q.    And which lawyers?

4        A.    My -- I've got a team of Russian

5   lawyers.  I think Neil nickel weight was

6   involved, his people on his team.

7        Q.    Okay.  So you have no idea what

8   this is, it says "Refund decision"; you have

9   no idea what it is?

10       A.    No.

11       Q.    And page '97, '097, "Refund

12  decision," you have no idea what that is?

13       A.    No.

14       Q.    '98, '99, going all the way through

15  '102, you have no idea what they are?

16       A.    No.

17       Q.    So when it comes to a document

18  that's in Russian -- do you read Russian?

19       A.    No.

20       Q.    Who do you rely upon if the

21  translation is in Russian?

22       A.    I have a team of people who are

23  Russian nationals.

24       Q.    Working in Hermitage?

25       A.    Yep.

1           WILLIAM F. BROWDER (4/15/15)

2      Q.   And where are they, in London?

3      A.   Yep.

4      Q.   Okay.  So --

5      A.   I should say working in Hermitage

6  or external counsel from Russia.

7      Q.   Right.  So you have no idea what

8  this is?

9      A.   No.

10     Q.   Is it an official Russian document?

11     A.   I don't know.

12     Q.   Do you know how you obtained it?

13     A.   No.

14     Q.   No idea?

15     A.   No.

16     Q.   Do you know whether it's fake?

17     A.   I would assume it's real.

18     Q.   But you have any -- any idea

19  whether it's fake?

20     A.   I don't think my team would have

21  put together fake documents.

22     Q.   But you don't know?

23     A.   I trust my team to put together

24  real documents.

25     Q.   Do you know where they got them?

Page 32

1                    WILLIAM F. BROWDER (4/15/15)

2          A.   No.

3          Q.   Do you know whether they stole

4    them?

5          A.   I don't think my team -- no.  No,

6    they didn't steal them.

7          Q.   Do you know whether they bribed

8    somebody to get them?

9          A.   They didn't bribe anybody to get

10   them.

11              MR. KIM:  Sorry.  Objection to

12         form.  What's the "them" we're talking

13         about.

14              MR. CYMROT:  '103, '104, 105 are

15         examples.

16         Q.   Do you have any idea?

17         A.   '104; nobody bribed anybody, we

18   haven't bribed anybody.

19         Q.   Well, Mr. Kleiner says he has

20   contacts within Moscow -- this is in your

21   books, he has contacts within Moscow and then

22   he shows up with some documents, right?

23              MR. KIM:  Objection to form.

24         Q.   Central Bank documents.

25              MR. KIM:  Objection to form.

```
 1      WILLIAM F. BROWDER (4/15/15)
 2   Q.   How did he get them?
 3        MR. KIM:  Objection to form.
 4   Q.   How did he get them?
 5        MR. MONTELEONI:  Could I have a
 6   moment to discuss -- discuss with
 7   counsel whether or not there's a
 8   privilege objection?
 9        MR. CYMROT:  On whose behalf.
10        MR. MONTELEONI:  On behalf of the
11   U.S.
12        MR. KIM:  All right.  I think we
13   should step out because I'm wearing a
14   microphone.
15        MR. CYMROT:  And you're keeping
16   track of the time, please.
17        THE VIDEOGRAPHER:  The time is
18   10:01 a.m.  We are coming off the
19   record.
20        (Whereupon, an off-the-record
21   discussion was held.)
22        THE VIDEOGRAPHER:  The time is
23   10:03 a.m.  We are back on the record.
24        MR. KIM:  Okay.  So apologies for
25   the break.  Just on certain topics we
```

1            WILLIAM F. BROWDER (4/15/15)

2       want to be prudent and just check if

3       any party had a privilege objection.

4       We understand that there is not, so

5       you can proceed.

6            MR. CYMROT:  Is that right.

7            MR. MONTELEONI:  That's correct.

8    BY MR. CYMROT:

9       Q.   Okay.  So the question is, where

10   did Mr. Kleiner get, for instance, Documents

11   '104 and '105?

12       A.   I don't know.

13       Q.   Did he tell you at the time?

14       A.   No.

15       Q.   Was there a reason he wouldn't tell

16   you at the time?

17       A.   He has lots of sources.  I don't

18   ask him.

19       Q.   He has lots of sources in Moscow

20   that give him information?

21       A.   Correct.

22       Q.   Is it legal under Russian law for

23   him to have, for instance, the information on

24   pages '104 and '105?

25            MR. KIM:  Objection to form.

```
 1              WILLIAM F. BROWDER (4/15/15)

 2         A.   I'm not a lawyer, I don't know the

 3    answer to that question.

 4         Q.   Would it concern you if it were

 5    legal?

 6         A.   We try to obey the law in all

 7    situations.

 8         Q.   Would it concern you if it weren't

 9    legal?

10         A.   Would it -- would it -- I'm sorry?

11         Q.   Would it concern you if it weren't

12    legal to have, for instance, the documents

13    that are on pages '104 and '105?

14         A.   Would it concern me?  I don't

15    understand.  What are you saying?

16         Q.   Would it bother you?  Would you --

17    bother you if you had documents that were

18    illegal to have under Russian law?

19         A.   Sure.

20         Q.   It would bother you?

21         A.   Um-hum.

22         Q.   You wouldn't pass that along to the

23    United States then?

24         A.   If I was aware that it was

25    violating Russian law I wouldn't.
```

1         WILLIAM F. BROWDER (4/15/15)

2     Q.   But you didn't ask Mr. Kleiner?

3     A.   No.

4     Q.   So you were sort of closing your

5  eyes to where he got the information; is that

6  what you're saying?

7         MR. KIM:  Objection to form.

8     A.   No.

9     Q.   So then why didn't you ask him?

10    A.   I didn't.

11    Q.   You gave -- you gave this

12  information and similar information to law

13  enforcement authorities in Switzerland, in

14  Latvia, in Russia and other locations and you

15  didn't check to see whether you had obtained

16  the information legally --

17    A.   No.

18    Q.   -- is that your testimony?

19    A.   No.

20    Q.   Is that a yes, I didn't hear you?

21        MR. KIM:  Objection to form of the

22        question.

23    A.   Could you ask the question again?

24    Q.   You didn't check whether it was

25  legal, correct?

1           WILLIAM F. BROWDER (4/15/15)

2      A.   I didn't check if it was legal.

3      Q.   All right.  Let's go to page '111

4   of the same exhibit.

5           What is this document?

6      A.   I don't know.

7      Q.   You have no idea?

8      A.   No.

9      Q.   You gave it to the U.S. attorney?

10     A.   Yes.

11     Q.   Did you explain it to the U.S.

12  attorney?

13     A.   No.

14     Q.   What did you tell the U.S. attorney

15  about this document?

16     A.   Nothing.

17     Q.   Just delivered the letter and told

18  them nothing?

19     A.   Correct.

20     Q.   And you have no idea who created

21  this document?

22     A.   No.

23     Q.   Now these documents that follow,

24  this document and the ones that follow

25  supposedly traced money from the Russian

Page 38

1          WILLIAM F. BROWDER (4/15/15)

2    Treasury into various accounts; you know that,

3    right?

4          A.   Yes.

5          Q.   You don't know how the tracing was

6    done?

7          A.   No.

8          Q.   Who did it?

9          A.   Vadim Kleiner and the team of

10   lawyers that worked with him.

11         Q.   And they never told you how they

12   did it?

13         A.   No.

14         Q.   And they never told what you this

15   document was?

16         A.   No.

17         Q.   And they never told you how this

18   document works?

19         A.   No.

20         Q.   Did they tell you what these

21   account numbers are, say, in the fourth column

22   to the left, from the left?

23         A.   No.

24         Q.   No idea?

25         A.   No idea.

1              WILLIAM F. BROWDER (4/15/15)

2       Q.   So you yourself have no idea

3  whether it's accurate that money was traced?

4       A.   I relied on the professionalism of

5  my team who had been very professional over a

6  long period of time in tracing money.

7       Q.   They've "been very professional

8  over a long period of time in tracing money."

9            Before 2007?

10      A.   Yes.

11      Q.   What kind of money tracing did they

12  do before 2007?

13      A.   My firm was a shareholder activist

14  in Russia, and so we were looking at

15  situations involving fraud, big Russian

16  companies we invested in, Gazprom, et cetera.

17  And so the team that I worked with were

18  involved in those investigations, those

19  tracings and various actions after those, that

20  information was gathered.

21      Q.   You do know it would be illegal in

22  Russia for you to be in possession of bank

23  account information for accounts other than

24  your own?

25            MR. KIM:   Objection to form.

1          WILLIAM F. BROWDER (4/15/15)

2     Q.   Do you know that?

3     A.   No, I didn't know that.

4     Q.   You have no idea that bank

5 information was secret?

6         MR. KIM:  Objection to form.

7     A.   I had no idea.

8     Q.   So anybody can go to Hermitage's

9 bank in Russia and ask for copies of the

10 account statements?

11     A.   I'm sorry?

12     Q.   Did you believe that anybody off

13 the street could walk into your bank in

14 Russia, say I want the bank statements for

15 Hermitage?

16     A.   What, is there a question?

17     Q.   Yes.

18     A.   What's the question?

19     Q.   Do you believe that's true?

20     A.   No.

21     Q.   So there must be some law that says

22 it's not true, right, that bank information is

23 not open to the public?

24         MR. KIM:  Objection to form.

25     A.   I guess it's a practice that bank

1          WILLIAM F. BROWDER (4/15/15)

2    information's not open to the public.

3          Q.   You have no idea whether it's a

4    legal practice or based upon a law or not?

5          A.   I'm not a lawyer.

6          Q.   So you have no idea about any law?

7          A.   I've got ideas about certain laws.

8          Q.   And whether your information, your

9    bank information is secret within Russia, you

10   have no idea about that law?

11         A.   I don't know which countries have

12   bank secrecy and which ones don't.

13         Q.   So as far as you knew, that anybody

14   could walk up to a bank in Russia and get

15   account information?

16         A.   No.

17         Q.   So then how did Mr. Kleiner and

18   your team get what purports to be or what has

19   been represented to us to be bank information

20   on, for instance, page '111 of Exhibit 1?

21         A.   I don't know.

22         Q.   And you have no idea whether it's

23   legal or not?

24         A.   I have no idea.

25         Q.   Do you know whether this document

1            WILLIAM F. BROWDER (4/15/15)

2    was created by a bank?

3         A.   I don't know.

4         Q.   Was it created by somebody on your

5    team?

6         A.   I don't know.

7         Q.   Do you know what information it was

8    based upon?

9         A.   I don't know.

10         Q.   Do you know whether they had

11    account statements?

12         A.   I don't know.

13         Q.   Do you know whether they knew the

14    daily balance in those accounts that are

15    represented here?

16         A.   I don't know.

17         Q.   So you have no idea whether -- you

18    have no idea how the money was traced?

19         A.   I have -- I have a vague idea, but

20    not -- not a detailed idea.

21         Q.   All right.  So what's your vague

22    idea?

23         A.   That the team gathered information

24    from various sources and were able to connect

25    the dots to trace the money.

```
 1            WILLIAM F. BROWDER (4/15/15)

 2       Q.   "Connect the dots."

 3            Does it take any amount of

 4   expertise to connect the dots?

 5            MR. KIM:  Objection to the form.

 6       A.   I think it takes analysis to

 7   connect the dots.

 8       Q.   What's Mr. Kleiner's education?

 9       A.   Ph.D.

10       Q.   In what?

11       A.   Economics.

12       Q.   Is he the one who connected the

13   dots?

14       A.   He and a team of other people

15   connected the dots.

16       Q.   Who specifically did he rely upon

17   to connect the dots?

18       A.   Various lawyers.

19       Q.   It was all lawyers?

20       A.   Lawyers and people who had

21   experience in this type of -- lawyers with

22   experience in this type of issue.

23       Q.   He didn't have any bankers,

24   accountants, anybody of those -- that

25   background?
```

1          WILLIAM F. BROWDER (4/15/15)

2          A.    I don't know the background of

3    lawyers before they were lawyers.

4          Q.    I see.  And you can't tell me a

5    list of people who worked on connecting the

6    dots?

7          A.    They're lawyers and Vadim --

8          Q.    No, the names, names, names, do you

9    have names?

10          A.    Names of lawyers?

11          Q.    The names of the people who

12    connected the dots.

13          A.    Sure.  We have Vladimir Pastukhov,

14    he's a lawyer; Edward Hardinov, a lawyer;

15    Jonathan Weiner, lawyer; Neil Micklethwaite,

16    lawyer; Olga Bischof, a lawyer; Martin

17    Gillett, a lawyer; John Ashcroft, lawyer.  And

18    then we also worked with various investigative

19    reporters.

20          Q.    They connect the dots for you,

21    reporters connected these dots?

22          A.    In some cases reporters connected

23    some dots.

24          Q.    I see.  And you relied upon

25    reporters to put together the information

1              WILLIAM F. BROWDER (4/15/15)

2    that's in Exhibit 1, particularly say

3    page '111?

4              MR. KIM:  Objection to form.

5         A.   Not on that page, no.  I don't even

6    know what that page says.

7         Q.   Well, it's right in front of you.

8         A.   I know, but it doesn't mean

9    anything to me.

10        Q.   Did it mean anything to the U.S.

11   Attorney's Office, as far as you know?

12        A.   I don't know.

13        Q.   So what reporters did you rely upon

14   to connect the dots?

15        A.   Bill Alpert at Barron's in

16   New York.

17        Q.   Anybody else?

18        A.   Roman Onin, Novilla Gazzetta.  I

19   shouldn't say I relied on them; they worked

20   with our team.

21        Q.   Anybody else?

22        A.   The Organized Crime and Corruption

23   Reporting Project.

24        Q.   Which you supported with a

25   substantial amount of money, correct?

1              WILLIAM F. BROWDER (4/15/15)

2        A.   No.

3        Q.   You never contributed any money to

4   the OCCRP?

5        A.   Zero.

6        Q.   Zero money?

7        A.   Zero.

8        Q.   All right.  What other reporters

9   did you rely upon to connect the dots?

10       A.   Those were the principal reporters.

11   If there were others, I don't know their

12   names.

13       Q.   Anybody else help you connect the

14   dots?

15       A.   Yeah.  Yeah, we also subpoenaed,

16   with the help of your colleague, John Moscow,

17   New York banks, Citibank and JPMorgan in -- I

18   think it was 2009, 2010 -- 2009.

19       Q.   Actually it was somebody else who

20   actually filed that pleading, correct?

21       A.   Someone else filed the pleading,

22   but BakerHostetler came up with the idea and

23   helped us prepare the original filings with

24   the Court.

25       Q.   Okay.  That was relating to a prior

```
 1              WILLIAM F. BROWDER (4/15/15)
 2   fraud, correct?
 3        A.   No, it was relating to the overall
 4   fraud.
 5        Q.   The overall fraud includes
 6   230 million, but by your definition 11 point
 7   something million dollars?
 8             MR. KIM:  Objection to form.
 9        Q.   A billion dollars, I'm sorry, or a
10   billion roubles?  What does it include?  When
11   you say "the overall fraud," what are you
12   referring to?
13        A.   At the time it was the criminal
14   enterprise that -- that perpetrated the
15   $230 million fraud and other frauds.
16        Q.   All right.  So going back to this,
17   anybody else help you connect the dots?
18        A.   So the -- yes, the Swiss -- Swiss
19   Attorney General.
20        Q.   I see.  Gave you information?
21        A.   Correct.
22        Q.   I see.  Pursuant to a Subpoena --
23   I'm sorry.  Pursuant to a proceeding that you
24   initiated in Switzerland, correct?
25        A.   Correct.
```

1            WILLIAM F. BROWDER (4/15/15)

2       Q.    And you gave that information to

3   the U.S. Attorney's Office?

4       A.    Yes.

5       Q.    All right.  Was it legal for you to

6   give it to the U.S. Attorney's Office?

7            MR. KIM:  Objection to form.

8       A.    I'm not a lawyer, but we asked for

9   permission from the -- from the prosecutor at

10  the time and she gave it to us.

11      Q.    The prosecutor in Switzerland?

12      A.    Correct.

13      Q.    And when was that?

14      A.    Prior to filing this document.

15      Q.    Prior to --

16      A.    Prior to December of --

17      Q.    -- December of 2012?

18      A.    Correct.

19      Q.    So is there information in this

20  document from Switzerland?

21      A.    I would assume so.

22      Q.    But you don't know?

23      A.    No.

24      Q.    I see.  And you say "she"; who are

25  you referring to?

1          WILLIAM F. BROWDER (4/15/15)

2     A.   Ms. Bino.

3     Q.   How do you spell that?

4     A.   B-I-N-O.

5     Q.   All right.  And what was her

6  position?

7     A.   She was a prosecutor.

8     Q.   In what capacity, what was her

9  title?

10     A.   Federal prosecutor.  I don't know

11  her title.

12     Q.   In what canton?

13     A.   We met with her in Losone, so

14  whatever canton Losone is in.

15     Q.   So the Swiss proceeding was a

16  proceeding that you initiated, correct?

17          MR. KIM:  Objection to form.

18     A.   Correct.

19     Q.   And were you ever told that

20  information in that proceeding was to be

21  maintained secret?

22     A.   We asked her for permission; she

23  gave it to us.

24     Q.   Were you ever told that information

25  in that proceeding was by law secret?

1          WILLIAM F. BROWDER (4/15/15)

2          A.   Subsequently when the new

3     prosecutor took over it became secret.

4          Q.   It became secret?

5          A.   In other words, she gave us

6     permission.

7          Q.   Written permission?

8          A.   I don't know whether it was written

9     or oral.

10          Q.   So you --

11          A.   We asked --

12          Q.   But if it was written, there would

13     be a document that you should have produced in

14     response to the Subpoena, right?

15          MR. KIM:  Objection to the form.

16          A.   If -- I don't know.

17          Q.   And you've never seen a letter

18     giving you permission?

19          A.   I don't know whether there was a

20     letter or not.

21          Q.   And you were never told that Swiss

22     law requires information in that proceeding to

23     be secret?

24          A.   No.

25          Q.   And you have a lawyer in

1          WILLIAM F. BROWDER (4/15/15)

2   Switzerland?

3          A.   We do.

4          Q.   Who's your lawyer in Switzerland?

5          A.   It's Lenz -- Lenz & Staehelin.

6          Q.   And you said there was a new

7   prosecutor, it became secret; who was the new

8   prosecutor?

9          A.   Lamal.

10          Q.   So as for as you know, you can't

11   identify within Exhibit 1 any documents that

12   came from the Swiss proceeding; was that

13   right?

14          A.   I don't know what's in the exhibit.

15          Q.   Well, take a look.

16          A.   Okay.

17          MR. KIM:  For the record, are you

18          talking about Exhibit 1 to Exhibit 1

19          or the entire deposition Exhibit 1.

20          MR. CYMROT:  The entire deposition

21          Exhibit 1.

22          MR. KIM:  The entire document.

23          MR. CYMROT:  Yes.

24   BY MR. CYMROT:

25          Q.   Do you know what you obtained from

Page 52

1           WILLIAM F. BROWDER (4/15/15)

2     Switzerland?

3               MR. KIM:  I believe there's a

4          question pending.

5               MR. CYMROT:  I'll withdraw it.

6          Q.   Do you know what you obtained from

7     Switzerland?

8          A.   No, not exactly.

9          Q.   So you wouldn't know if it were in

10    here anyway, right?

11         A.   No.

12         Q.   So why waste time?

13              MR. KIM:  It's your time to waste.

14              MR. CYMROT:  Don't want to waste

15         it.

16              MR. KIM:  I don't blame you.

17     BY MR. CYMROT:

18         Q.   All right.  So let's look at -- I

19    think you have a lot of lines and a lot of

20    numbers, but they're all meaningless to you,

21    right?

22         A.   I don't know what's in these

23    documents.

24         Q.   All right.  Let's take a look at

25    page '113, just a short sentence, top of the

1          WILLIAM F. BROWDER (4/15/15)

2     page.

3          A.    Sure.

4          Q.    All right.  So it has an account

5     number from the Russian Treasury, correct?

6          A.    Yep.

7          Q.    Do you know where that account

8     number came from?

9          A.    No.

10          Q.    Do you know if it's legal to have

11    it?

12          A.    No, I don't know if it's legal to

13    have it.

14          Q.    And then there's an account number

15    for Rilend with Universal Savings Bank; do you

16    know where that account number came from?

17          A.    No.

18          Q.    All right.  Let's go to, for

19    instance, '121, same exhibit, Exhibit 1.

20          Do you know what this document is?

21          A.    No.

22          Q.    Do you know where it was obtained?

23          A.    No.

24          Q.    Do you know whose hand that is?

25          A.    No.

1           WILLIAM F. BROWDER (4/15/15)

2      Q.   Do you know whether it's legal for

3  you to have it?

4      A.   I don't know.

5      Q.   And you didn't ask?

6      A.   No.

7      Q.   Did Mr. Kleiner get this document?

8      A.   I don't know.

9      Q.   So let's take a look at the

10  Verified Complaint.  Let's take a look at

11  paragraph 24.

12           Is it -- 24, you've read that?

13      A.   Just give me a chance to read it.

14           Yes.

15      Q.   Okay.  So it refers to a search of

16  Hermitage's offices on June 4, 2007, correct?

17      A.   Correct.

18      Q.   Is it your view that Russia had

19  absolutely no basis for investigating

20  Hermitage at that time?

21           MR. KIM:  Objection to form.

22      A.   Yes, my view.

23      Q.   And no basis for investigating you?

24      A.   Yes.

25      Q.   And no basis for investigating

Page 55

1           WILLIAM F. BROWDER (4/15/15)

2    Mr. Magnitsky?

3           A.   Yes.

4           Q.   And that it was solely a political

5    investigation then?

6                MR. KIM:   Objection to form.

7           A.   No, I think it was a criminal and

8    political.

9           Q.   Criminal in what sense?

10          A.   It was a design to perpetrate a

11   fraud.

12          Q.   In other words, this search, the

13   sole reason for this search in your view was

14   to perpetrate the $230 million fraud that's

15   described in the Complaint?

16          A.   I said that it's political and

17   fraudulent.

18          Q.   Okay.  So the fraud is the

19   $230 million fraud?

20          A.   Correct.

21          Q.   And that the investigators went in

22   with the intent of aiding that fraud; is that

23   your view?

24          A.   Yes.

25          Q.   And what's the political angle of

Page 56

1            WILLIAM F. BROWDER (4/15/15)

2    it?

3            A.    I think that I was considered to be

4    an enemy of the Russian state.  And on the

5    back of that there was sort of a cart blanche

6    for various arms of the FSB, the Interior

7    Ministry and criminal elements working with

8    them to victimize me.

9            Q.    All right.  So your companies,

10   while operating in Russia, always paid all the

11   taxes that were due; is that --

12           A.    That's correct.

13           Q.    That's correct?

14                 And even when a Court found that

15   there were additional taxes due, you always

16   paid those taxes?

17           A.    Yes.

18           Q.    And you, Hermitage, set up a

19   company called Saturn in a region called

20   Kalmykia, correct?

21           A.    Yes.

22           Q.    And what was the business of

23   Saturn?

24           A.    Investments.

25           Q.    What does that mean?

Page 57

1                WILLIAM F. BROWDER (4/15/15)

2         A.    Saturn invested.

3         Q.    Invested in what?

4         A.    Stock market companies.

5         Q.    In other words, Hermitage Fund --

6    let me ask it this way:  Where is Kalmykia?

7         A.    Kalmykia is a region in southern

8    Russia.

9         Q.    Remote from Moscow?

10        A.    Correct.

11        Q.    And what was the usefulness of

12   investing funds in Kalmykia?

13        A.    After -- after the Soviet Union

14   broke up, in order to promote regions of

15   Russia, a law was passed which allowed regions

16   to have their own tax regimes similar to what

17   happens with Delaware or Puerto Rico.  And

18   Kalmykia and about somewhere between ten or 15

19   other regions set up their own tax incentives

20   to attract companies to come there.

21        Q.    And so you set up Saturn in

22   Kalmykia to invest in Russian stock market

23   companies, right?

24        A.    I didn't set it up; Hermitage Fund

25   set it up.

1              WILLIAM F. BROWDER (4/15/15)

2         Q.   Well, you were the general

3    director, right?

4         A.   No, I was the investment advisor.

5         Q.   You were never the general

6    director?

7         A.   I was not the general director --

8              MR. KIM:  Objection to form.

9         A.   I was not the general director of

10   the Hermitage Fund.

11        Q.   No, you were the general director

12   of Saturn?

13        A.   I was in 2001.

14        Q.   And for how long?

15        A.   I don't know.

16        Q.   So you were the general director of

17   Saturn when it was set up, correct?

18        A.   I'm not sure if I was the general

19   director of Saturn when it was set up.  I was

20   the general director of Saturn in 2001.

21        Q.   I see.  As general director, you

22   were personally responsible for filing the tax

23   returns, correct?

24        A.   That's correct.

25        Q.   And personally responsible to make

1              WILLIAM F. BROWDER (4/15/15)

2     sure they were accurate?

3          A.    That's correct.

4          Q.    And what Saturn was doing, it was

5     taking stocks that you were investing from

6     Moscow and holding those stocks, correct?

7          A.    Saturn was an investment company

8     holding shares in Russian stock market-traded

9     companies.

10         Q.    Did it have capital of its own?

11         A.    I don't understand the question.

12         Q.    Did it have capital to buy stock?

13    You need money to buy stock, right?

14         A.    Correct.

15         Q.    The money came from Hermitage Fund,

16    correct?

17         A.    Correct.

18         Q.    And --

19         A.    Yeah, it came -- it came from -- it

20    came indirectly from the Hermitage Fund.

21         Q.    Through a number of shell

22    companies, right?

23              MR. KIM:  Objection to form.

24         A.    No, through one Cyprus-based

25    company.

Page 60

1          WILLIAM F. BROWDER (4/15/15)

2     Q.   So you created a company in Cyprus?

3     A.   I didn't create it.

4     Q.   Hermitage created it?

5     A.   Hermitage Fund created a company in

6 Cyprus.

7     Q.   And you're the investment advisor

8 of Hermitage Fund?

9     A.   No.  I'm the investment advisor to

10 HSBC Management Guernsey.  HSBC Management

11 Guernsey was the investment manager of the

12 Hermitage Fund.

13    Q.   So you had no idea that Hermitage

14 Fund was setting up a company in Cyprus?

15    A.   No, I knew that.

16    Q.   Of course you did, right?

17    A.   I knew that.

18    Q.   Yeah, you knew that?

19    A.   I knew that.

20    Q.   You approved the structure?

21    A.   I wasn't the one to approve it or

22 disapprove it.  The manager was the

23 decision-maker.

24    Q.   But you made the decision where --

25 let's put it this way:  You agreed with the

1              WILLIAM F. BROWDER (4/15/15)

2    decision?

3         A.   I didn't object to the decision.

4         Q.   You knew it was happening?

5         A.   I was aware of it.

6         Q.   And Cyprus, according to you, is a

7    jurisdiction that often used for money

8    laundering; that's your view, isn't it?

9         A.   No.

10         Q.   You've never said that?

11         A.   I think many jurisdictions are used

12   for money laundering.

13         Q.   Cyprus being one?

14         A.   Cyprus being one of many.

15         Q.   But you -- you set up a corporation

16   there, right?

17         A.   Just about every Russian company

18   set up -- every Russian investor invested

19   through Cyprus.

20         Q.   And not every Russian investor who

21   invests through Cyprus is doing things

22   illegally, right?

23         A.   There are many legitimate investors

24   in Cyprus.

25         Q.   All right.  So Cyprus -- this

1          WILLIAM F. BROWDER (4/15/15)

2    Cyprus company, which was, what, Kone or

3    Glendora?

4          A.   I don't remember the names of the

5    Cyprus companies.

6          Q.   Okay.  Was holding Saturn?

7          A.   A Cyprus company was holding -- was

8    the -- was the shareholder in Saturn.

9          Q.   Right.  And the funds for Saturn's

10   investment came indirectly from the Hermitage

11   Fund?

12         A.   Correct.

13         Q.   Cyprus -- Saturn didn't create any

14   funds of its own?

15         A.   It did through the appreciation of

16   shares.

17         Q.   But in the initial purchase of

18   shares, it needed to get money from the

19   Hermitage Fund?

20         A.   So the Hermitage Fund funded Saturn

21   Investments.

22         Q.   Right.  And then Saturn purchased

23   stock or Hermitage Fund purchased stock and

24   transferred it to Saturn?

25         A.   Saturn purchased stock.

1           WILLIAM F. BROWDER (4/15/15)

2         Q.    All right.   And held it and if

3    there was an appreciation, it would go to the

4    benefit of Saturn?

5         A.    Yes.

6         Q.    Fine.   And then the taxes due on

7    that were paid by Saturn?

8         A.    Correct.

9         Q.    And you were the general director?

10        A.    In 2001.

11        Q.    And you had to sign the tax

12   returns?

13        A.    I did.

14        Q.    Fine.   And the tax regimes in --

15   that were set up in Kalmykia required the

16   hiring of basically Afghan war veterans who

17   had disabilities, right?

18        A.    No.

19        Q.    What did it -- what did it require?

20        A.    Could you repeat the question?

21        Q.    Yeah.   What were the tax regimes

22   you were relying upon?

23        A.    There were -- there were two tax

24   incentives in Kalmykia.   There were two tax

25   incentives that we relied on or that Hermitage

1          WILLIAM F. BROWDER (4/15/15)

2  Fund relied on.  The first was the Kalmykian

3  tax regime, which allowed the companies to pay

4  lesser tax than in other regions, and the

5  handicapped tax benefit which allowed a

6  reduction in the federal tax rate.

7          Q.   In other words, one was that a

8  majority of your employees in Kalmykia had to

9  be physically challenged persons?

10         A.   Handicapped tax regime required

11  that more than 50 percent of the employees

12  qualify under certain rules of definition of

13  handicapped individuals.

14         Q.   Right.  And the other tax regime

15  was that you had to -- Saturn had to invest

16  in -- in the Kalmykian region, correct?

17         A.   No.

18         Q.   What was the other tax regime?

19         A.   That you had to be registered, had

20  to subscribe for a public offering, and then

21  you had to make a -- a regular payment to the

22  Kalmykian authorities.

23         Q.   For the purpose of investing in the

24  region?

25         A.   No.

1              WILLIAM F. BROWDER (4/15/15)

2         Q.    You just made a regular payment?

3         A.    You make a regular payment on an

4    annual basis.  It could have been a quarterly

5    basis, I don't remember.

6         Q.    For what basis, for what purpose?

7         A.    To maintain your tax status.

8         Q.    So you represented on the Saturn

9    tax returns that a majority of your Kalmykian

10   employees were physically challenged persons?

11             MR. KIM:  Objection to the form.

12        Q.    Correct?

13             MR. KIM:  Is that an exhibit or

14        you're asking him just to recall.

15             MR. CYMROT:  I'm just asking him

16        to recall.

17        A.    Yes.

18             MR. CYMROT:  He recalled.

19             MR. KIM:  Good recall.

20             MR. CYMROT:  Good.

21    BY MR. CYMROT:

22        Q.    And you listed those people as

23   expert analysts division, working in the

24   expert analyst division; do you remember that?

25        A.    No.

1          WILLIAM F. BROWDER (4/15/15)

2      Q.   What did you list them as?

3      A.   I didn't list them as anything.

4      Q.   Well, who did the listing then?

5      A.   We contracted out the management of

6  these companies to Firestone Duncan, an

7  American law and accounting firm.

8      Q.   And you gave power of attorney to

9  Sergei Magnitsky to file the tax returns

10 right?

11     A.   No.

12     Q.   Who did you give a power of

13 attorney to?

14     A.   Firestone -- I don't know who I

15 gave it to you, but Sergei Magnitsky wasn't

16 working on -- on this at that time.

17     Q.   I see.  He was working at Firestone

18 Duncan, right?

19     A.   He was, but not on this situation

20 until 2002.

21     Q.   I see.  So in 2001 he wasn't

22 working on it, but in 2002 he was?

23     A.   Yes.

24     Q.   And he was the one that filed the

25 tax returns?

1          WILLIAM F. BROWDER (4/15/15)

2     A.   No.

3     Q.   Who filed the tax returns?

4     A.   Some other employees of Firestone

5  Duncan.

6     Q.   When you say he was working on it,

7  what was he doing it?

8     A.   When -- there was a challenge in

9  the court over -- over the tax payments, so he

10  represented us in court.

11     Q.   And he never had a power of

12  attorney from you to do the tax returns?

13     A.   Not in 2001, not that I'm aware of.

14     Q.   How about in 2002?

15     A.   I don't think so, but I --

16     Q.   2003?

17     A.   I don't know.

18     Q.   How about 1999?

19     A.   I don't know.

20     Q.   Who came up with the idea that you

21  could use this tax regime?

22     A.   This was a common market practice.

23  There was more than 15,000 companies

24  registered in Kalmykia doing this, and this

25  was -- we were advised by Arthur Andersen,

Page 68

1              WILLIAM F. BROWDER (4/15/15)

2    Firestone Duncan, Ernst & Young and various

3    other firms that this was a proper way of

4    organizing our affairs.

5         Q.   But the courts in Kalmykia didn't

6    agree with you, correct?

7              MR. KIM:  Objection to form.

8         A.   There was -- there was -- they did

9    and they didn't.

10             MR. CYMROT:  So let's have Tab 38.

11        All right.  I'm marking as Browder

12        Exhibit 3 a Decision No. 205,

13        February 26, 2003; Case

14        No. A22-1022/02/6/105.

15        Q.   I'm handing you the English, and I

16   think the Russian is attached on the back.

17             (Browder Exhibit 3, document Bates

18        stamped BrowderDepo0001471 through

19        '477 was marked for identification, as

20        of this date.)

21    BY MR. CYMROT:

22        Q.   So have you seen this decision

23   before?

24        A.   No.

25        Q.   Were you informed of it?

1          WILLIAM F. BROWDER (4/15/15)

2          A.   No.

3          Q.   Do you see on the second page it

4    says in the middle that -- it names three

5    employees were engaged with the position of

6    expert analyst division; do you see that?

7               MR. KIM:  Where on the page?

8          A.   Where is that?

9          Q.   It's -- one, two, three, four,

10   five, six, seven, eight, nine, ten, 11, --

11   12 lines down.

12         A.   Yes, I see that.

13         Q.   You didn't use them as expert

14   analysts, did you?

15         A.   I wasn't managing the employees.

16         Q.   Who was managing the employees?

17         A.   Firestone Duncan.

18         Q.   And who at Firestone Duncan was

19   managing the employees?

20         A.   I don't know.

21         Q.   You have no idea who was -- you

22   were the general director and you have no idea

23   who was managing these employees?

24         A.   That's correct.

25         Q.   And it wasn't Mr. Magnitsky?

1                WILLIAM F. BROWDER (4/15/15)

2          A.   It wasn't Mr. Magnitsky.

3          Q.   I see.  And it said that -- if you

4     go further down, that these three employees

5     were disabled, they were working at other

6     locations as physical laborers.  Do you see

7     that?

8          A.   Where does it say that?

9          Q.   If you go down to "In such

10    circumstance," last full paragraph, I think.

11               "The arbitration court finds that

12    all economic activities of 000" -- which is

13    referring to Saturn -- "was carried out at its

14    actual address.  And the above-specified

15    persons" -- and it names four of them --

16    bearing in mind their education and

17    qualification."

18         A.   I'm sorry, I'm having a hard time

19    finding where you started, if you can just

20    point it out to me on this document.

21         Q.   Right here.

22         A.   Okay.

23         Q.   "Bukayev has no education or

24    qualifications.  Badykov is a worker.

25    Byatkiyev is a machine engineer.  It had

Page 71

1              WILLIAM F. BROWDER (4/15/15)

2     nothing to do with Saturn and were only used

3     by the Claimant to get the income tax relief."

4     Do you see that?

5          A.   Yes.

6          Q.   And that's what the Court found,

7     right?

8          A.   Yep.

9          Q.   And then if you go to the last

10    page, it's decided that there's additional tax

11    due.  Taxing authority had fined the company

12    basically 903,000 roubles.  There were arrears

13    of 4.6 million roubles.  There's penalty

14    interest of 487,000 roubles, an additional

15    payment of 252,000 roubles.  And in the end,

16    the Court wiped out the fine and the

17    additional payment, but said the arrears and

18    penalty interest were due.

19              Do you see that in the last

20    paragraph?

21         A.   Yes.

22         Q.   All right.  Did you pay the taxes

23    that were due?

24         A.   I believe -- and I -- I'm -- this

25    is long, long time ago, that there was an

Page 72

1              WILLIAM F. BROWDER (4/15/15)

2     appeal.

3          Q.   All right.  Let's go to the appeal.

4               (Browder Exhibit 4, document Bates

5          stamped BrowderDepo0001478 through

6          '484 was marked for identification, as

7          of this date.)

8               MR. CYMROT:  All right.  I'm

9          marking as Exhibit 4 a decision,

10         May 5, 2003, of the Arbitration Court

11         of the Republic of Kalmykia.

12    BY MR. CYMROT:

13         Q.   Have you ever seen this before?

14         A.   No.

15         Q.   You were informed of the result?

16         A.   No.

17         Q.   Well, if you look to the end, the

18    result is that the decision -- the prior court

19    decision of February 26, 2003 was upheld; do

20    you see that?

21         A.   Yes.

22         Q.   Did you pay this?

23              MR. KIM:  Objection to form.

24         Q.   Did Saturn pay this?

25         A.   Not that I'm aware of.

Page 73

1          WILLIAM F. BROWDER (4/15/15)

2          Q.   You don't think these judges --

3    there are three judges here, you don't think

4    they were corrupt, do you?

5          A.   I don't know anything about these

6    judges.

7          Q.   You don't have any information to

8    suggest they were politically motivated, do

9    you?

10         A.   I don't know anything about these

11   judges.

12         Q.   Isn't it true you bankrupted Saturn

13   rather than pay the taxes?

14              MR. KIM:  Objection to form.

15         A.   No.

16         Q.   Saturn was put into bankruptcy,

17   wasn't it?

18         A.   Not that I'm aware of.

19         Q.   These taxes paid?

20         A.   There was an audit done by the

21   federal tax service in 2003 which gave Saturn

22   a clean audit.

23         Q.   On May 5, 2003, the Arbitration

24   Court of Kalmykia said there were additional

25   taxes due.  Does that override an order, an

1          WILLIAM F. BROWDER (4/15/15)

2    audit?

3          A.   Yes.

4          Q.   That's your view?

5          A.   Yes.

6          Q.   Okay.  And let's look at the other

7    company that you've created in Kalmykia.  By

8    the way, did Saturn have income?  Must have

9    had income if it had taxes due?

10         A.   I would imagine so.

11         Q.   Was the income removed from Russia?

12         A.   I don't know.  I would imagine so.

13         Q.   And what do you have to do, what

14   did you have to do or what did Saturn have to

15   do to remove its income from Russia?

16         A.   I don't know.

17         Q.   Did it have to make representations

18   to the taxing authority?

19         A.   I don't know.

20         Q.   Did it have to make representations

21   to the Central Bank?

22         A.   I don't know.

23         Q.   By the way, the audit that you

24   refer to, the federal audit in 2003 of Saturn,

25   do you have a copy of that?

1              WILLIAM F. BROWDER (4/15/15)

2        A.    Not with me.

3        Q.    But you should have produced it to

4   us as part of the Subpoena?

5              MR. KIM:  Objection to the form.

6        Q.    You didn't produce it to us as part

7   of the Subpoena.  Will you produce it to us?

8              MR. KIM:  Objection to form.

9        A.    If it's part of the Subpoena, I'm

10  obliged to then of course.

11       Q.    And we can invite you back to ask

12  you questions about it because it should have

13  been produced before today.

14             MR. KIM:  Objection to form.

15             Actually I'm not sure what I'm

16             objecting to because it's not a

17             question.

18             MR. CYMROT:  You're objecting to

19             the fact that we're inviting him

20             back --

21             MR. KIM:  Okay.

22             MR. CYMROT:  -- I'm sure.  But we

23             are.

24   BY MR. CYMROT:

25       Q.    So, you set up another company,

```
 1            WILLIAM F. BROWDER (4/15/15)

 2   Dalnaya Step, D-A-L-N-A-Y-A, Step, correct?

 3        A.   No.

 4        Q.   Who set it up?

 5        A.   Hermitage Fund.

 6        Q.   And that was through a Cyprus

 7   company?

 8        A.   Correct.

 9        Q.   So the Cyprus company owned Dalnaya

10   Step, correct?

11        A.   It owned some share capital in

12   Dalnaya Step.

13        Q.   And what was the business of

14   Dalnaya Step?

15        A.   Investments.

16        Q.   Again, from Hermitage Fund -- funds

17   to buy the investments came from the Hermitage

18   Fund, directly or indirectly?

19        A.   Indirectly.

20        Q.   And Dalnaya Step purchased Russian

21   stock basically, right?

22        A.   Yes.

23        Q.   And then when there was income

24   there were taxes due, correct?

25        A.   Correct.
```

Page 77

1              WILLIAM F. BROWDER (4/15/15)

2        Q.   And you were the general director

3   of Dalnaya Step?

4        A.   In 2001.

5             MR. CYMROT:  Let's look at '121.

6        Q.   And Mr. Ivan Cherkasov -- I didn't

7   pronounce that correctly.  How do you

8   pronounce his name?

9        A.   That's how you -- you pronounced it

10  correctly.

11       Q.   Oh, okay.  He was the general

12  director also at -- at a certain period of

13  time?

14       A.   I'm not sure.

15            MR. CYMROT:  I'm marking as

16       Exhibit 5 a Spark report for Dalnaya

17       Step, LLC.

18            (Browder Exhibit 5, Spark Report

19       for Dalnaya Step, LLC was marked for

20       identification, as of this date.)

21   BY MR. CYMROT:

22       Q.   All right.  Does that refresh your

23  recollection that you were the general

24  director in 2002?

25       A.   Yes.

1          WILLIAM F. BROWDER (4/15/15)

2      Q.   And Mr. Cherkasov was in 2004?

3          MR. KIM:  Can we stop for a

4      moment?  We don't have a copy yet.

5      Thank you.

6      Q.   Is that true?

7      A.   Is this -- I don't know.  I mean,

8  I --

9      Q.   You don't know what that --

10     A.   I don't know what a Spark report

11  is, but I was general director if -- if I --

12  without confirmation from Ivan, he could be,

13  could be not.

14     Q.   All right.  And as general

15  director, you had personal responsibility for

16  the tax returns, correct?

17     A.   That is correct.

18     Q.   Let me go back to Saturn a minute,

19  because the court found that the employees who

20  were listed as those with handicaps in fact

21  did not work for the company or were not

22  capable of doing the work that the tax returns

23  said they were capable of doing.  You remember

24  that quote I gave you?

25     A.   Yes.

1          WILLIAM F. BROWDER (4/15/15)

2      Q.   So who signed the tax returns that

3  made those representations?

4      A.   I did.

5      Q.   And those were incorrect

6  representations --

7      A.   No.

8      Q.   -- according to the court?

9      A.   No, but the -- as I mentioned

10  before, the ultimate decision was with the tax

11  authority's who gave a clean audit.

12      Q.   That tax court found there were

13  incorrect representations on those tax

14  returns, weren't there?

15      A.   And then the subsequent Plaintiff,

16  the tax authorities did an audit and found

17  everything to be correct.

18      Q.   So you say, but you haven't given

19  it to us.  According to the court, there were

20  incorrect representations.  That's right, and

21  that's where we leave it in terms of the

22  documents we have here today, right?

23      A.   I'm sorry.  What -- what's the

24  question?

25      Q.   The question is that the court

Page 80

1              WILLIAM F. BROWDER (4/15/15)

2    found there were improper representations

3    about the employees of Saturn on the tax

4    returns?

5         A.   Right.  You showed me those

6    documents.

7         Q.   Yes.  And do you have any

8    information that would suggest those employees

9    were capable of being analysts for Saturn?

10        A.   I -- I have an audit from the tax

11   authorities of Kalmykia giving a clean

12   audit -- giving a clean bill of health to both

13   companies in late 2003.

14        Q.   After the court decided otherwise?

15        A.   That's correct.

16        Q.   All right.  And you're going to

17   produce that to us?

18        A.   Sure.

19             MR. KIM objection to form.

20        Q.   Okay.  So let's go Dalnaya --

21   Dalnaya Step.  There was a decision

22   December 9, 2005, which I marked as --

23             MR. CYMROT:  -- what, Exhibit 4?

24             THE REPORTER:  5.

25             MR. CYMROT:  5?  No, that's --

Page 81

1            WILLIAM F. BROWDER (4/15/15)

2       have I marked it yet?  I haven't

3       marked it yet.  Let's give you that.

4            (Browder Exhibit 6, document Bates

5       stamped BrowderDepo0001518 through

6       '521 was marked for identification, as

7       of this date.)

8    BY MR. CYMROT:

9       Q.   Have you seen this decision before?

10   It's December 9, 2005, Arbitration Court,

11   Republic of Kalmykia, and it's Case No.

12   A22-1398-05-13-172.

13            Actually, read this stuff later.

14      A.   What's the question?

15      Q.   Have you seen this before?

16      A.   No.

17      Q.   Were you informed of it?

18      A.   No.

19      Q.   So this is the first time you're

20   aware that the Arbitration Court of Kalmykia

21   found unpaid taxes in the amount of 5155 --

22   I'm sorry -- 551 million roubles?

23      A.   What's the question?

24      Q.   Is this the first time that you've

25   learned that the Kalmykian arbitration court

Page 82

1              WILLIAM F. BROWDER (4/15/15)

2    found unpaid taxes for Dalnaya Step of

3    551 million roubles?

4         A.   Yes.

5         Q.   That's almost, what, $20 million?

6         A.   I don't have my calculator, so...

7         Q.   Take my word for it.  I checked the

8    exchange rate and used my calculator.  It's

9    19 million and something.

10             All right.  And isn't it true that

11   after this decision Hermitage bankrupted

12   Dalnaya Step?

13        A.   No.

14        Q.   Okay.  Let's look at Tab 63.

15             (Browder Exhibit 7, document Bates

16             stamped BrowderDepo0001522 through

17             '530 was marked for identification, as

18             of this date.)

19    BY MR. CYMROT:

20        Q.   Have you ever seen this opinion

21   before?

22             This is Arbitration Court of the

23   Republic of Kalmykia, June 9, 2007.  It's

24   entitled "Judgment Case No.

25   A22-941-06-15-133."  It is a bankruptcy

```
 1            WILLIAM F. BROWDER (4/15/15)

 2   judgment for Dalnaya Step.

 3            Do you see that?

 4       A.   I'm sorry.  Where -- where are you

 5   reading from?

 6       Q.   I'm just reading from the title

 7   "Decree in Bankruptcy Proceedings."  It says

 8   that the end order and the judge, Dalnaya

 9   Step, shall be considered an absent debtor.

10   Absent debtor Dalnaya Step shall be declared

11   insolvent.  A trustee appointed.  The

12   information is to be published.  The federal

13   tax service shall be compensated for -- shall

14   compensate the trustee.

15            You see that?  Three judges.

16       A.   Where is that?

17       Q.   The last two pages.

18       A.   Yes.

19       Q.   All right.  So Dalnaya Step is put

20   into bankruptcy.  Judgment is entered.  You

21   see that?  That's news to you?

22       A.   No.

23       Q.   Didn't know that?

24       A.   No.

25       Q.   All right.  Did you know that the
```

Page 84

```
 1              WILLIAM F. BROWDER (4/15/15)
 2    tax authority was the only creditor of Dalnaya
 3    Step?
 4         A.   I wasn't aware of this judgment, so
 5    I didn't know that.
 6         Q.   And were you aware -- how did this
 7    get a -- how did this -- let me ask you
 8    another question.
 9              Are you aware of an appeal of this
10    judgment?
11         A.   No.
12         Q.   Well, let's show you that.
13              MR. CYMROT:  64.
14              (Browder Exhibit 8, document Bates
15         stamped BrowderDepo0001531 through
16         '535 was marked for identification, as
17         of this date.)
18    BY MR. CYMROT:
19         Q.   All right.  I put in front of you
20    Exhibit 8, which is a decree, October 22,
21    2007.  Same case number for Dalnaya Step.
22    Report of the bankruptcy trustee is affirmed.
23    Bankruptcy -- bankruptcy proceeding against
24    absent debtor Dalnaya Step shall be concluded.
25              It goes on to describe various
```

1              WILLIAM F. BROWDER (4/15/15)

2      steps there.

3              But on the first page, last two

4      sentences, the court found that the UFNS of

5      Russia for the Republic of Kalmykia was the

6      only creditor.

7              Do you see that?

8      A.   I do.

9      Q.   So in other words there were taxes

10     due.  Is that the way you would understand

11     that?

12     A.   Yes.

13     Q.   And you were totally unaware of

14     these events?  You weren't aware of this

15     decree, aware of the appeal, aware of the fact

16     that Dalnaya Step was placed in bankruptcy,

17     and that taxes were owed?

18     A.   Totally unaware.

19     Q.   How would that happen within

20     Hermitage?

21             MR. KIM objection to form.

22     A.   I don't understand your question.

23     Q.   How could it happen that one of

24     your companies is placed in bankruptcy and has

25     taxes due and you don't even know about it?

1              WILLIAM F. BROWDER (4/15/15)

2              MR. KIM objection to form.

3         A.   This wasn't one of our companies at

4    that point.

5         Q.   Whose company was it?

6         A.   We had transferred this company to

7    be liquidated in 2004.

8         Q.   Without paying the taxes,

9    apparently.

10        A.   No.  We paid the taxes and had it

11   confirmed.

12        Q.   Confirmed by what?

13        A.   By the person we transferred the

14   companies to.

15        Q.   Who did you transfer the companies

16   to?

17        A.   We transferred it a firm called

18   VMRG [sic].

19        Q.   What is VMRG?

20        A.   Visao Risk Management Group.

21        Q.   Visao?  How do you spell that?

22        A.   V-I-S-A-O.

23        Q.   And who runs that group?

24        A.   It's run by a man named Jakir

25   Shaashoua.

1           WILLIAM F. BROWDER (4/15/15)

2      Q.   Where is he?

3      A.   I don't know.

4      Q.   Well, where is his company located?

5      A.   Moscow.

6      Q.   And how did you transfer the

7  company?

8      A.   We registered his -- his corporate

9  name or his personal name or something.

10     Q.   Was there a compensation paid?

11     A.   I don't know the details.  It

12  wasn't my responsibility.

13     Q.   Whose responsibility was it?

14     A.   The manager of the fund HS -- HSBC.

15     Q.   HSBC Guernsey?

16     A.   Yes.

17     Q.   And it was transferred, you said,

18  to be liquidated?

19     A.   Correct.

20     Q.   And I think I asked you:  Was there

21  compensation paid?

22     A.   I don't know the details.

23     Q.   In any case -- do you know a man --

24  man named Ariel Bus- -- Busaka?

25     A.   No.

1          WILLIAM F. BROWDER (4/15/15)

2     Q.   Busada?

3     A.   No.

4     Q.   Isn't that a name you use in Red

5  Notice?

6     A.   Yes.

7     Q.   So you know who that is?

8     A.   Yes.

9     Q.   So who is it?

10    A.   That's Jakir Shaashoua.

11    Q.   How do you spell his name,

12  Shaashoua?

13    A.   I don't know.

14    Q.   So as of October of 2007, there

15  were taxes due -- just a second.

16         When did you make the transfer?

17         MR. KIM objection to form.

18    A.   I didn't make any transfer.

19    Q.   To Mr. Shaashoua?

20    A.   I -- I didn't make any transfer.

21    Q.   When did Hermitage transfer Dalnaya

22  Step to Mr. Shaashoua?

23    A.   Sometime in 2004.

24    Q.   Okay.  In 2000- -- thereafter do

25  you know whether Dalnaya Step had any

1          WILLIAM F. BROWDER (4/15/15)

2     business?

3          A.   I don't know.

4          Q.   Why do you use a pseudonym for

5     Mr. Shaashoua in your book?

6          A.   I used pseudonyms for a lot of

7     people.

8          Q.   Why did you use a pseudonym for

9     him?

10         A.   I don't recall.

11         Q.   Is he in danger in some way?

12         A.   I don't know.

13         Q.   Do you know what -- for -- for what

14    tax years this $20 million is due?

15         A.   No.

16         Q.   Do you know whether it's when you

17    hold -- held the company?

18         A.   I'm sorry.

19         Q.   Do you know whether it was due for

20    time periods when you owned or Hermitage Fund

21    owned the company?

22         A.   I don't know.

23         Q.   Well, if you look at the decision

24    in No. 6.

25         A.   In Exhibit 6?

Page 90

1              WILLIAM F. BROWDER (4/15/15)

2        Q.   Yes, Exhibit 6.

3        A.   Yes.

4        Q.   It says that, as of May 3, 2005, it

5   is suggested that Dalnaya Step voluntarily pay

6   the taxes sanctioned in the amount of

7   91 million roubles.

8             So that would have been for a prior

9   tax year, wouldn't it?

10       A.   I'm not an accountant.  I don't

11  know.

12       Q.   You don't have a decision in 2005

13  for the tax year 2005, do you, to file the tax

14  for 2005 at the end of 2005?

15            So we're talking about prior tax

16  years when Hermitage Fund owned this

17  company --

18            MR. KIM objection to form.

19       Q.   -- there were taxes found to be due

20  by this Court.  And that's news to you?

21       A.   Yes.

22       Q.   And the company ultimately is

23  bankrupt without paying the taxes.  That's

24  what happened isn't it?

25       A.   I don't know.

1              WILLIAM F. BROWDER (4/15/15)

2       Q.    So at the time that the search

3   warrant was executed in June of 2007, the

4   situation was that the courts had found that

5   you had taken advantage of the tax regime in

6   Kalmykia, had taxes due, they were unpaid, the

7   company was bankrupt.

8              You say that's not a grounds to

9   conduct an investigation?

10             MR. KIM:  Objection --

11      A.    So you're --

12             MR. KIM:  -- to form.

13      A.    -- you're -- you're -- break it

14   down into smaller pieces.  I don't -- I don't

15   know what you're -- you're trying to say here.

16      Q.    What I'm trying to say is you've

17   said that the investigative authorities had

18   absolutely no basis for conducting an

19   investigation of Hermitage Fund in 2007.

20             MR. KIM:  Objection to the form.

21      Q.    And what these decisions show is

22   there were false statements on tax returns,

23   there were taxes due, they went unpaid, and

24   the company was placed in bankruptcy.

25             MR. KIM:  Objection to the form

Page 92

1              WILLIAM F. BROWDER (4/15/15)

2         and the characterization of the

3         documents.

4         Q.   Don't you agree that that would be

5    a basis for the investigative authorities to

6    investigate whether there had been any

7    wrongdoing?

8         A.   In -- in 2006, after I was expelled

9    from the country, we wrote to the Interior

10   Ministry and Federal Border Service of Russia

11   to inquire about whether there was any

12   criminal investigations open into -- into me

13   in relation to any activities in the

14   Federation of Russia in order to determine

15   whether my expulsion from Russia was due to

16   any criminal investigations.  And we were

17   informed that there were no criminal

18   investigations inside the Russian Federation.

19        Q.   At that time.

20        A.   In 2006.

21        Q.   And you're sure they would have

22   told you?

23        A.   Yes.

24        Q.   You have that letter?

25        A.   I have that letter.

1          WILLIAM F. BROWDER (4/15/15)

2      Q.   You haven't given us that letter.

3          I'll tell you, you haven't given us

4  that letter.  So we have to take your word for

5  it?  Is that the idea?

6      A.   Well, in -- in due course I'm sure

7  that, when we get to producing, I think we

8  produced about half a million documents for

9  you so far, so I can't tell you what we

10 will -- we have and haven't produced yet.

11     Q.   So if the facts are as the way I

12 described them, would you dispute that the

13 investigative -- the Ministry of Interior had

14 grounds to investigate Hermitage Fund for tax

15 evasion?

16     A.   Yes.  Because -- because the facts

17 how you've -- how you've represented them

18 aren't correct.  There was no -- no

19 investigation open into me in 2006, and

20 subsequent to that -- and we've learned this

21 recently, that some -- that the

22 investigation -- there had been an

23 investigation in 2004 that was closed into --

24 that had looked into Dalnaya Step and had been

25 closed due to lack of crime.  So --

Page 94

1              WILLIAM F. BROWDER (4/15/15)

2        Q.    You have that document?

3        A.    Yes.

4        Q.    You're going to give us that

5    document?

6        A.    Of course.

7        Q.    By the way, Saturn became

8    Parfenion?

9        A.    I don't know.

10            MR. CYMROT:  Let's take about a

11       15-minute break.

12            MR. KIM:  Sure.

13            THE VIDEOGRAPHER:  The time is

14       11:10 a.m.  We're coming off the

15       record.

16            (Whereupon, at this time, a short

17       break was taken.)

18            THE VIDEOGRAPHER:  The time is

19       11:24 a.m.  We are back on the record.

20    BY MR. CYMROT:

21       Q.    Okay.  So, Mr. Browder, the

22    investigation that led to the search in 2007

23    started before 2007, didn't it?

24       A.    Not that I'm aware of.

25       Q.    You weren't aware there was a -- an

1            WILLIAM F. BROWDER (4/15/15)

2    investigation of Hermitage for tax fraud in

3    2004 and 2005?

4        A.   I became aware of that recently.

5        Q.   You weren't aware of it at the

6    time?

7        A.   No.

8        Q.   But -- so the Ministry of Interior

9    was investigating Hermitage for tax fraud from

10    2004 and finally searched its offices with a

11    search warrant in 2007, correct?

12        A.   No.

13        Q.   What happened?

14        A.   The Interior Ministry was

15    investigating Hermitage in 2004; closed the

16    case in 2005.

17        Q.   Who told you that?

18        A.   I got information in 2000- -- some

19    recent year.

20        Q.   From whom?

21        A.   I can't remember where it came

22    from.

23        Q.   So just this amorphous information

24    that it was closed?

25        A.   Yes.

1          WILLIAM F. BROWDER (4/15/15)

2          Q.   But you don't know whether it's

3    true for not.  It's just what somebody told

4    you?

5          A.   No, no.  I'm pretty sure it's true.

6          Q.   Was it a person in a position to

7    know?

8          A.   I can't remember.

9          Q.   So we have this anonymous person

10   who says the investigation was closed, but

11   then there's a search warrant in 2007, and

12   that we know.  So we know that there was an

13   investigation in 2004 and 2005 and a search

14   warrant in 2000- -- search warrant executed in

15   2007, and then we have this amorphous "but I

16   was told it was close."

17               That's all we know right now; is

18   that right?

19               MR. KIM:  Objection to form.

20         A.   No.

21         Q.   What more do we know?

22         A.   We know that it was closed in 2005.

23         Q.   From this source -- unidentified

24   source says it was closed in 2005?

25         A.   Yes.

Page 97

1          WILLIAM F. BROWDER (4/15/15)

2     Q.   No documents?

3     A.   There might be.

4     Q.   But you don't have any?

5     A.   I don't remember.

6     Q.   Okay.  Was Mr. Shaashoua who bought

7  Dalnaya Step?

8     A.   Yes -- no.  His firm did, I think.

9     Q.   All right.  Well --

10     A.   Maybe him.  I don't remember.

11     Q.   Could you speak up a little?

12     A.   I don't know exactly who bought it.

13  I think it was him or his firm.

14     Q.   All right.  And when did you first

15  meet him?

16     A.   1998.

17     Q.   And did you do business with him in

18  any other ways?

19     A.   He provided security for Republic

20  National Bank, who was the business partner of

21  my investment advisory firm.

22     Q.   Mr. Safra.  So that -- you met him

23  through Mr. Safra?

24     A.   Correct.

25     Q.   Edmond Safra?

Page 98

1              WILLIAM F. BROWDER (4/15/15)

2         A.   Correct.

3         Q.   Okay.  So he provided security

4    services, you say?

5         A.   Security and risk management

6    services.

7         Q.   All right.

8         A.   And -- and various legal services

9    as well.

10        Q.   And you knew him from 2000- -- from

11   1998 until when?

12        A.   I guess till after I was kicked out

13   of Russia in 2005.

14        Q.   You lost touch with him?

15        A.   Yes, now I have.

16        Q.   When did you lose touch with him?

17        A.   I don't -- I don't remember.

18        Q.   And so did he do any due diligence

19   to buy Dalnaya Step?

20        A.   I wasn't involved in the si- -- in

21   the situation.

22        Q.   Sale of a company would generally

23   generate a tax liability, wouldn't it?

24        A.   Correct.

25        Q.   Do you know whether that tax

1          WILLIAM F. BROWDER (4/15/15)

2    liability was ever paid?

3          A.    He confirmed it was.

4          Q.    Who confirmed it was?

5          A.    Shaashoua.

6          Q.    In writing?

7          A.    I think so.

8          Q.    You've seen the writing?

9          A.    I've not personally, but I'm -- I'm

10   sure someone on my team has.

11         Q.    You have the writing?

12         A.    I would assume so.  I don't know.

13         Q.    All right.  Well, we'll -- we'd

14   like that writing also.

15               So in 2005, you were quite a

16   supporter of Vladimir Putin's, right?

17         A.    Correct.

18         Q.    And so at the time the

19   investigation began, it wasn't politically

20   motivated, because you were a big supporter of

21   the government at that point?

22               MR. KIM:  Objection to form.

23         Q.    Isn't that true?

24         A.    No.

25         Q.    2004 you weren't a big supporter of

Page 100

1            WILLIAM F. BROWDER (4/15/15)

2     the government?

3          A.    In 2004 I was a big supporter of

4     the government.

5          Q.    And the investigation started at

6     that time?

7          A.    Yeah.

8          Q.    So you wouldn't say the

9     investigation started for political reasons,

10    right?

11         A.    I would say it did.

12         Q.    At -- in 2004?

13         A.    Yes.

14         Q.    Even though you're a big supporter

15    of the government?

16         A.    Yes.

17         Q.    What were the political reasons in

18    2004?

19         A.    We were a big critics of corruption

20    at Gazprom, one of the most important

21    government-connected companies in the country.

22         Q.    And they were criticizing -- the

23    government was criticizing you for buying

24    internal shares of Gazprom when you were a

25    foreign company, right?

WILLIAM F. BROWDER (4/15/15)

1

2      A.   No.

3      Q.   That never happened?

4      A.   It did, but not then.

5      Q.   I see.  When did that happen?

6      A.   It happened in 2013.

7      Q.   All right.  Well, we'll get back

8  into that.

9           MR. CYMROT:  So we need, let's

10          see, Tab 61.

11          I'm going to mark as Exhibit 9 a

12          PowerPoint, "Seven Big Myths About

13          Russia."

14          (Browder Exhibit 9, document Bates

15          stamped BrowderDepo0001485 through

16          '517 was marked for identification, as

17          of this date.)

18  BY MR. CYMROT:

19     Q.   Do you recognize this document?

20          Just for the record, it says "By

21  William Browder, Chief Executive Officer,

22  Hermitage Capital Management, April 2005."

23          Okay.  So do you recognize that

24  document?

25     A.   I do.

Page 102

1              WILLIAM F. BROWDER (4/15/15)

2         Q.    You put it together, right?

3         A.    Yes.

4         Q.    And I don't want to go through all

5    of it, but basically the theme here is that

6    Mr. Putin's critics are wrong about you,

7    right?

8         A.    I think the -- no.

9         Q.    Okay.  You describe it.  What's the

10   theme?

11        A.    The theme is that the Russian

12   market is overly discounting the negative

13   sentiment about Putin.

14        Q.    Okay.  So that the market itself is

15   more valuable because Putin's doing a good

16   job?

17        A.    No.

18        Q.    All right.  Explain it to me then.

19   Why is the market discounting --

20        A.    The market is --

21        Q.    -- overly discounting?

22        A.    The market is overly discounting,

23   as you just said, the Russian stocks because

24   they're too pessimistic about Putin's

25   governing for Russia.

1              WILLIAM F. BROWDER (4/15/15)

2         Q.   I see.  And so people ought to

3    invest in Russia.  That's kind of the point of

4    this, right?

5         A.   The point of this was that the

6    market prices should be higher.

7         Q.   I see.  So that your stocks will be

8    worth more.  Stocks that Hermitage Funds own

9    will be worth more?

10        A.   Yes.

11        Q.   And you'll make more money?

12        A.   Correct.

13        Q.   Okay.  Did you know Mr. Kasyanov?

14        A.   Vaguely.  He was a prime minister

15   of Russia.

16        Q.   Right.  Did you have personal

17   contact with him?

18        A.   Recently I have.

19        Q.   When was that?

20        A.   Three months ago.

21        Q.   Where was that?

22        A.   In London.

23        Q.   And what was the occasion?

24        A.   It was the fifth anniversary of

25   Sergei Magnitsky's death.

```
1              WILLIAM F. BROWDER (4/15/15)

2      Q.   And there was an event?

3      A.   Yes.

4      Q.   And he was there?

5      A.   Yes.

6      Q.   And you and he spoke?

7      A.   We spoke on the same panel.  We --

8   he joined for dinner afterwards.

9      Q.   You had dinner with him?

10     A.   I had dinner with him and 30

11  people.

12     Q.   Did you speak to him directly?

13     A.   Yes.

14     Q.   What did you talk about?

15     A.   We talked about the Putin regime.

16  Talked about Ukraine.  Talked about Sergei

17  Magnitsky.

18     Q.   And did you and he agree on these

19  subjects?

20     A.   Yes.

21     Q.   You did.

22          Did you know him back when he was

23  prime minister?

24     A.   No.

25     Q.   Never met him?
```

Page 105

1          WILLIAM F. BROWDER (4/15/15)

2      A.   I think I shook his hand once.

3      Q.   Did you meet Vladimir Putin at any

4  point in time?

5      A.   Never.

6      Q.   Now, when were you denied entry

7  into Russia?

8      A.   November 13, 2005.

9           (Whereupon, an off-the-record

10   discussion was held.)

11     Q.   All right.  And when were you

12  convicted?

13     A.   Sometime in July 2013.

14     Q.   How about July 11, 2011?  No?

15          Is there an appeal you're referring

16  to?

17     A.   (Shaking.)

18     Q.   All right.  Let me pull it out.

19          (Browder Exhibit 10, document

20          Bates stamped BrowderDepo0001408

21          through '470 was marked for

22          identification, as of this date.)

23  BY MR. CYMROT:

24     Q.   You're right; '13.

25          So this is an English translation

```
 1              WILLIAM F. BROWDER (4/15/15)

 2   along with the Russian in the back, a judgment

 3   in the name of the Russian Federation.  And if

 4   you go to the end of it, it convicts you of

 5   tax evasion, correct?

 6        A.   Yes.

 7        Q.   And you have said many times that

 8   Mr. Magnitsky was convicted posthumously.

 9             You've said that?

10        A.   Yes.

11        Q.   And on the first page it appears

12   that it's dismissed against Mr. Magnitsky,

13   correct?

14        A.   No.

15        Q.   Under paragraph 4 of Article 24 of

16   the Code of Criminal Procedure of the Russian

17   Federation.

18             Do you see that?

19        A.   Yes.

20        Q.   So he wasn't convicted

21   posthumously, right?  You were wrong about

22   that?

23        A.   No.  I don't -- I don't read it as

24   such.

25        Q.   Let's see.  Well, let's look at the
```

1          WILLIAM F. BROWDER (4/15/15)

2    sentence which is 28 of 30.

3          A.    Where is that?

4          Q.    Page 28 of 30.  If you look at the

5    top, there are page numbers on the top.

6               I'd give you a Bates number, but

7    mine is not Bates-numbered.  Just look at the

8    top of the page there.

9               All right.  It says "Sentenced."

10   So on Bates No. 1434, the sentence only refers

11   to you, correct?

12         A.    I see my name here.

13         Q.    "William Felix Browder found guilty

14   of committing two crimes" and -- and then it

15   goes on, right?

16         A.    Correct.

17         Q.    And there's nothing about

18   Mr. Magnitsky being convicted of anything,

19   correct?

20         A.    I'm not a Russian criminal lawyer,

21   so I couldn't make a judgment about this --

22   about this conviction.

23         Q.    Well, it appears from these two

24   entries that you were wrong.  That he was

25   never convicted posthumously, right?

1          WILLIAM F. BROWDER (4/15/15)

2     A.   No.

3     Q.   You -- your sticking to your

4   position even though the document says

5   otherwise?

6     A.   Yes.

7     Q.   Because you're not a Russian

8   lawyer?

9     A.   That's correct.

10     Q.   All right.  But you have Russian

11   lawyers working for you, right?

12     A.   I do.

13     Q.   And they've reviewed this

14   conviction, and they've said there's somewhere

15   someplace in this conviction that it refers to

16   Mr. Magnitsky as being convicted of something?

17          MR. KIM:  Objection.  I think

18          communications with his lawyers are

19          topics that we should not answer.

20          MR. CYMROT:  All right.

21     Q.   So do you have any basis for saying

22   that Mr. Magnitsky is convicted of anything?

23     A.   Yes.

24     Q.   What's that?

25     A.   Advice from my lawyers.

1          WILLIAM F. BROWDER (4/15/15)

2     Q.   Okay.  You know, he just claimed

3 privilege for you.

4          I'm reading the document.  It says

5 "Case is dismissed.  The individual decision

6 to dismiss the crime case on the basis of

7 paragraph 4 of Article 24."

8          Do you see that?

9          It's at the beginning.  Then at the

10 end, "Sentenced.  Only Felix -- William Felix

11 Browder."

12          You're sticking by your position no

13 matter what, right?

14     A.   Is there a --

15          MR. KIM:  Objection to form.

16     A.   My analysis is different than

17 yours.

18     Q.   Do you have anything in the

19 document that you can point me to that

20 suggests he's convicted?

21     A.   I'm not a lawyer.

22     Q.   Well, you read English, right?

23     A.   I do read English, but I'm not a

24 specialist on Russian law and Russian proc- --

25 criminal procedure.

1          WILLIAM F. BROWDER (4/15/15)

2          Q.   So based upon what you've read

3     here, you might question what your lawyers

4     told you then?

5          A.   Without a full analysis, I wouldn't

6     be able to make a judgment on this document.

7          Q.   I see.  But you would agree this is

8     the conviction?  This is your conviction?

9          A.   Apparently so.

10          Q.   Right.  And it says what it says,

11     so we'll let the judge or jury decide whether

12     Mr. Magnitsky was ever convicted of anything,

13     right?

14          A.   I'm sorry?

15          Q.   We'll allow the judge and jury to

16     decide whether Mr. Con- -- Mr. Magnitsky was

17     convicted of anything or whether you got it

18     wrong.

19          MR. KIM:  Objection to form.

20          A.   What -- what -- so is there a

21     question?

22          Q.   Perhaps you got -- perhaps you got

23     it wrong.  Can you consider that?

24          A.   I don't think I got it wrong.

25          Q.   You think you ever get anything

1            WILLIAM F. BROWDER (4/15/15)

2    wrong?

3         A.   I get lots of things wrong.

4         Q.   Okay.  Good.  It seems like you

5    might have gotten this wrong.

6              When you told people

7    Mr. Magnitsky's a lawyer, did you also tell

8    them he never went to law school and never had

9    a law license?

10        A.   I'm sorry.  I . . .

11        Q.   When you tell -- how many times

12   have you said, "Mr. Magnitsky is a lawyer"?

13        A.   I don't know.

14        Q.   50?  100?  200?

15        A.   I don't know.

16        Q.   Many, many times, right?

17        A.   Yes.

18        Q.   Have you ever told anybody that he

19   didn't go to law school and didn't have a law

20   degree?

21        A.   No.

22        Q.   Did you tell them that he was

23   working for you for many years and he was

24   working capa- -- in capacities other than

25   legal?

1           WILLIAM F. BROWDER (4/15/15)

2           A.    Yes.

3           Q.    Did you tell these gentlemen over

4    here that?

5           A.    Yes.

6                 MR. CYMROT:  And I was pointing

7           Mr. Monteleoni.

8           Q.    All right.  Let's go to the

9    Complaint.

10          A.    Which one?  Our Complaint to the

11   govern -- to the government or the

12   government's Complaint?

13          Q.    The government's Complaint, which I

14   think is Exhibit 2, right?

15          A.    Yes.

16          Q.    All right.  All right.  Take a look

17   at paragraph 25.

18                So I'll read it.  Paragraph 25,

19   Exhibit 2, the Complaint:

20                "Among the items seized in the

21   search of Hermitage and Firestone Duncan's

22   offices were the corporate stamps, the

23   official charters, the original tax

24   certificates, and the original registration

25   certificates, which are defined as corporate

1             WILLIAM F. BROWDER (4/15/15)

2  documents and seals, for Rilend, Parfenion,

3  and that Makhaon."

4           You see that?

5     A.   Yes.

6     Q.   And then paragraph 26 says,

7  "Unbeknownst to Hermitage or HSBC Guernsey,

8  members of the organization used the seized

9  corporate documents and seals to fraudulently

10 reregister ownership of Rilend, Parfenion, and

11 Ma- -- Makhaon with the Russian corporate

12 registry."  Right?

13          Did I read that right?

14    A.   Yes.

15    Q.   And then on pa- -- on paragraph 29,

16 it says, "On information and belief, the

17 members of the organization have had stolen

18 the corporate identities of Hermitage

19 companies, used the seized corporate documents

20 and seals to forge backdated contracts with

21 sham commercial counterparts for use in sham

22 lawsuits against the Hermitage companies."

23 Right?

24    A.   Yes.

25    Q.   So, in other words, this is what

1              WILLIAM F. BROWDER (4/15/15)

2    you told the U.S. Attorney's Office, right?

3         A.   Yes.

4         Q.   And as you describe it, then, the

5    raid -- through the raid, the Ministry of

6    Interior got the seals, correct?

7         A.   Yes.

8         Q.   The June 2007 raid, the Ministry of

9    the Interior got the seals?

10        A.   Yes.

11        Q.   And then those seals were the same

12   seals used to transfer the three Hermitage

13   companies, Parfenion, Rilend, and Makhaon,

14   right?

15        A.   No.  Go back to the -- if you go

16   back to the -- what you read, let's just read

17   it again.

18             "25.  Among the items seized in the

19   search for Hermitage and Firestone's offices

20   were the corporate stamps, the original

21   charters, the original tax certificates, the

22   original registration certificates, quote,

23   corporate documents and seals for Rilend,

24   Parfenion, and Makhaon."  That's -- that's

25   what I said.

1          WILLIAM F. BROWDER (4/15/15)

2          Q.   Right.

3          A.   And those documents, all those

4     documents -- some or all of those documents

5     were used in the fraud.

6          Q.   And one of the things that you've

7     said is the seals were used in the fraud,

8     right?

9          A.   Yes.

10          Q.   The seals that were seized by the

11     Ministry of Interior were used in the fraud.

12     You said it repeatedly, right?

13          A.   I've said the stamps, seals, and

14     certificates were used in the frauds.

15          Q.   But you said the seals were used in

16     the fraud, correct?

17          A.   Correct.

18          Q.   But you've known for many years

19     that there are -- that there is an analysis

20     that shows the same seals were not used in the

21     fraud.  Isn't that true?

22          A.   No.

23          Q.   You're not aware of that?

24          A.   No.

25          Q.   Never heard that?

 1          WILLIAM F. BROWDER (4/15/15)

 2      A.   Vaguely.  Never the criminals using

 3  that argument.

 4      Q.   Really?  What criminals?

 5      A.   Members of the Interior Ministry.

 6      Q.   Have used that argument?

 7      A.   Yes.

 8      Q.   Mr. Kleiner never informed you that

 9  there was a forensic analysis that showed the

10  same seals were not used?

11      A.   No.

12          MR. CYMROT:  I need to talk to you

13      out -- outside.

14          MR. KIM:  Okay.  Right now?

15          MR. CYMROT:  We need a --

16          MR. KIM:  We need a break?

17          MR. CYMROT:  Yes.  Right now.

18          THE VIDEOGRAPHER:  The time is --

19      the time is 11:47 a.m.  We are off the

20      record.

21          (Whereupon, an off-the-record

22      discussion was held.)

23          THE VIDEOGRAPHER:  The time is

24      11:53 a.m.  We are back on the record.

25  BY MR. CYMROT:

1          WILLIAM F. BROWDER (4/15/15)

2          Q.   Mr. Browder, let me first ask you

3    that Mr. Kleiner never told you that he was

4    aware of a forensic analysis showing that the

5    same seals were not used.

6          A.   Correct.

7          Q.   Is that your testimony?

8          A.   Correct.

9          Q.   I have materials that are unsealed

10   that I want to examine you about that I can't,

11   and I'm going to seek to have the Court unseal

12   those.  And I'll proceed with my examination

13   at this point.

14          MR. KIM:  Okay.  At least our

15          position is that the witness has

16          already testified to what he knows,

17          and so such documents would not be

18          relevant.  And if you want to ask

19          other questions about the witness'

20          knowledge, you're welcome to.

21          MR. CYMROT:  Well, it may refresh

22          his recollection or other things.  In

23          any case, we'll argue about it when

24          the witness is not here and we're not

25          wasting his time.

1                  WILLIAM F. BROWDER (4/15/15)

2                  MR. KIM:  Yes.

3    BY MR. CYMROT:

4        Q.   All right.  So, Mr. Browder, it is

5    the seals and these other corporate documents,

6    according to this Complaint, that ties the

7    Ministry of Interior into the scheme to

8    defraud.  Isn't that true?

9        A.   Correct.

10                 MR. KIM:  Objection to form.

11       Q.   And it's the only thing that ties

12   the Ministry of Interior into the scheme to

13   steal $230 million?

14                 MR. KIM:  Objection to form.

15       A.   Incorrect.

16       Q.   What else is it?

17       A.   Many other things that are listed

18   in the Complaint.

19       Q.   Well, show me something, because

20   it's the only thing I can find.

21       A.   Okay.  Why don't we look -- first

22   of all, I'm not a lawyer here, but let me --

23   let me try to make the government --

24       Q.   Well, it's your story?

25       A.   Well, let me -- no, it's the

1          WILLIAM F. BROWDER (4/15/15)

2   government's story.

3          Q.   You -- oh, it's the government's

4   story and you don't support it?

5          A.   No.  The government is making the

6   case.

7          Q.   I know, but the government --

8          A.   I'm -- I'm -- I'm just here to --

9   you know.  Let -- let me --

10          Q.   No, let's stick with that point for

11   a minute, Mr. Browder.  This is the

12   government's case, and I thought you told me

13   that you read this and everything that you

14   knew about was accurate?

15          A.   I told you that everything that I

16   was familiar with in this Complaint was

17   accurate.

18          Q.   And the $230 million theft from the

19   Russian tref- -- treasury, that's a story that

20   came from you, and you've told to several law

21   enforcement agencies, correct?

22          A.   Correct.

23          MR. KIM:  Objection to form.

24          Q.   And you started a proceeding in

25   Switzerland based upon that story, right?

Page 120

1          WILLIAM F. BROWDER (4/15/15)

2          MR. KIM:  Objection to form.

3      A.   Correct.

4      Q.   And the seals were part of your

5  story from the very beginning, right?

6      A.   The stamps, seals --

7      Q.   And other --

8      A.   -- certificates --

9      Q.   -- other --

10     A.   -- and original items of

11  incorporation and also other documents seized

12  from during the raid were part of the fraud.

13          I don't know how the -- exactly how

14  the -- the tactics were used to execute the

15  fraud, but I know many of these documents were

16  used in the fraud.

17     Q.   All right.  And you're saying

18  they're the same documents and that's what

19  ties the criminal investigation of you into

20  the $230 million fraud, correct?

21     A.   Yes.

22     Q.   And so if it wasn't the same

23  documents, then the criminal investigation of

24  you is not tied into the $230 million fraud,

25  correct?

Page 121

1          WILLIAM F. BROWDER (4/15/15)

2          MR. KIM:  Objection to the form.

3     A.   I -- I don't understand the

4 question.

5     Q.   Very simple.  What ties the two

6 events together, the $230 million fraud and

7 the criminal investigation of you, are these

8 corporate documents and seals that are alleged

9 here to be the same used -- taken from

10 Hermitage in the search and used in the

11 $230 million fraud, correct?

12          MR. KIM:  Objection to the form.

13     A.   I -- I'm -- I'm still having a

14 tr- -- hard time following you.

15     Q.   I just read you three paragraphs --

16     A.   Right.

17     Q.   -- that say the corporate documents

18 and seals were seized by the Ministry of

19 Interior in the search in June of 2007, and

20 then those same documents and seals were used

21 to commitment the $230 million fraud, right?

22     A.   We -- yes.

23     Q.   We just went through that.

24     A.   Yes.

25     Q.   Okay.  And that is the link between

1              WILLIAM F. BROWDER (4/15/15)

2     the Ministry of Interior and the investigation

3     of you and the $230 million fraud.

4              If the $230 million fraud were done

5     with other documents, there is no tie between

6     the $230 million fraud and the criminal

7     investigation of you; isn't that correct?

8              MR. KIM:  Objection to form.

9         A.   No, no.

10        Q.   Why not?

11        A.   Your mischaracterizing the whole --

12    your simplifying and mischaracterizing the --

13    the whole story.

14        Q.   Well, I'm just going on the facts

15    in the Complaint.  The facts in the Complaint

16    are as we read them.

17        A.   You read them selectively without

18    reading other factual --

19              MR. KIM:  I don't think there's a

20         question pending.  I'm starting to

21         watch a debate.  So maybe you can ask

22         a question.

23        Q.   Is there any other tie other than

24    those documents between the $230 million fraud

25    and the Ministry of Interior?

1           WILLIAM F. BROWDER (4/15/15)

2           A.    Yes.  Give me a moment to find the

3      relevant paragraph.

4           Q.    Go ahead.

5           A.    Paragraph 22:  "On information and

6      belief" --

7                 Should I read it out loud?

8           Q.    Go ahead.

9           A.    "-- the $230 million fraud scheme

10      began on or about 28 April 2007 when key

11      members of the organization flew to Larnaca,

12      Cyprus, to plan the crime.  On that date,

13      Artem Kuznetsov -- who was one of the Interior

14      Ministry officers, and he was investigating

15      us -- "and a lieutenant colonel in the Russian

16      Interior Ministry flew with Dmitry Klyuev, a

17      convicted fraudster, the owner of universe --

18      Universal Savings Bank and, on information and

19      belief, the mastermind of the organization,

20      from Moscow to Larnaca on a private jet.

21                 "On information and belief, they

22      were met in Larnaca two days later by Pavel

23      Karpov, then a major in Russia's Interior

24      Ministry, as well as two lawyers, Andrey

25      Pavlov and his wife, Yulia Mayorova, all of

1            WILLIAM F. BROWDER (4/15/15)

2    whom flew together from Moscow on Aeroflot

3    SU 487.

4            "Pavlov had known Klyuev since 2001

5    and provided him with legal services from time

6    to time.

7            "On May 5th and May 6th, 2007,

8    Interior Ministry officers Kuznetsov and

9    Karpov and the lawyers Pavlov and Mayorova

10   returned to Moscow.

11           "On May 8th, 2007, the convicted

12   fraudster Klyuev was met in Larnaca by Olga

13   Stepanova, the head of Moscow Tax Office

14   No. 28, and her then-husband Vladlen Stepanov

15   flew to Larnaca together on Aeroflot SU 237.

16           "Subsequently, Klyuev, Stepanova,

17   and Stepanov returned to Moscow.

18           "Approximately one month later, on

19   or about June 4th, Kuznetsov led approximately

20   25 officers in a search of Hermitage's office

21   in Moscow.  The officers removed Hermitage's

22   computer server, virtually all of its

23   computers, and dozens of boxes of confidential

24   documents and records.

25           "Later that day, Kuznetsov joined

1           WILLIAM F. BROWDER (4/15/15)

2    approximately 25 officers in the search of the

3    offices of Firestone Duncan, a law firm that

4    advises Hermitage -- HSBC Guernsey and

5    Hermitage."

6           Let me skip to other relevant parts

7    of this whole thing.

8           Paragraph 31:

9           "The forged contracts contained

10   multiple suspicious features.  The contracts

11   between Lotus+ and the Hermitage companies

12   purported to require prior Lotus+, a company

13   with a total capital at the time of U.S. $300

14   to pay Hermitage companies approximately U.S.

15   500 million to buy securities.

16           "Additionally, the forged contracts

17   included extensive confidential information

18   about the Hermitage companies, including bank

19   account information, information on assets and

20   holdings, custodian banks, and addresses of

21   registration and incorporation of the

22   Hermitage companies.

23           "Such information was confidential,

24   but was contained in the records that had been

25   seized from the Hermitage and Firestone Duncan

1              WILLIAM F. BROWDER (4/15/15)

2    on or about June 4, 2007.

3              "Moreover, although referencing

4    confidential information, the contracts

5    contained various mistakes and inaccuracies,

6    including referencing bank accounts that had

7    not been opened and using addresses that were

8    incorrect at the relevant time."

9              I could study this more carefully

10   to find other links.

11       Q.   All right.  Well, let's go with

12   what you said.

13              So, first of all, the investigation

14   of you started in 2004 not in 2007, right?

15       A.   The investigation started in 2004

16   and closed in 2005.

17       Q.   According to some anonymous,

18   unnamed person, right?

19       A.   Wrong.  Accorded -- according to my

20   knowledge.

21       Q.   And your knowledge comes from an

22   anonymous, unnamed person who you won't tell

23   us who it is because you can't remember,

24   right?

25              That's what you told us before,

Page 127

1            WILLIAM F. BROWDER (4/15/15)

2    right?

3         A.    I don't recall who -- who told me

4    that.

5         Q.    So this an anonymous, unnamed

6    person who told you it was closed in 2005

7    can't be checked, can't be proven.  Right?

8              MR. KIM:  Objection to form.

9         Q.    The investigation started in 2004.

10   You acknowledge that.  So let's go to

11   Mr. Kuznetsov -- Kuznetsov and Mr. Pavlov.

12   They are investigators in the Ministry of

13   Interior, correct?

14        A.    Incorrect.

15        Q.    What are they?

16        A.    Kuznetsov is.  Pavlov is a

17   criminal.

18        Q.    I'm sorry.  Karpov.  I misspoke.

19   Pavlov is a lawyer, right?

20        A.    He was a member of the criminal

21   enterprise.

22        Q.    Exactly.  I misspoke.  Mr. Karpov.

23   They're both investigators, right?

24        A.    One is a field operative and the

25   other is a investigator.

Page 128

1                    WILLIAM F. BROWDER (4/15/15)

2          Q.   Right.  As you've told us, there

3    are a lot of Cyprus corporations, right,

4    that -- for people investing in Russia?

5          A.   Correct.

6          Q.   They have good reason to be in

7    Cyprus, correct?

8          A.   Um-hum.

9          Q.   So -- that was a yes?

10         A.   Yes.

11         Q.   All right.  So what witness is

12   going to testify to the fact that

13   Mr. Kuznetsov went to Cyprus with Mr. Klyuev?

14         A.   What witness is going to testify?

15         Q.   Yes.  What witness?

16         A.   I'm -- I'm not sure.

17         Q.   All right.  So how do you know

18   Mr. Kuznetsov went with Mr. Klyuev?

19         A.   I've seen copy's of travel records

20   where they were on the same flight.

21         Q.   And where did you get those travel

22   records?

23         A.   We got them from an anonymous

24   source in Moscow.

25         Q.   And who's your anonymous source?

Page 129

1             WILLIAM F. BROWDER (4/15/15)

2        A.   I don't know.

3        Q.   You don't know?

4        A.   No.

5        Q.   It's not you're not going to tell

6   us; you don't know?

7        A.   I don't know.

8        Q.   This is another mysterious, unnamed

9   person, right?  Another mysterious, unnamed

10  person gives you documents?

11       A.   I -- I would describe this person

12  as a whistle-blower who gave us documents.

13       Q.   I see.  But that's just a label.

14  We don't know the name, we don't know the

15  address, we don't know who it is, and we don't

16  know where he got documents and we don't

17  whether the documents are real, right?

18       A.   I don't know.

19       Q.   Any of that?

20       A.   I don't know.

21       Q.   But you relied upon it?

22       A.   My team did.

23       Q.   And you ultimately went to the U.S.

24  Attorney's Office and said, "This happened"?

25            MR. KIM:  Objection to form.

Page 130

1              WILLIAM F. BROWDER (4/15/15)

2      Q.    Right?

3      A.    I provided this Complaint to the

4  U.S. Attorney's Office.

5      Q.    With this information, where you

6  don't know the name of the person who gave you

7  the information, you don't know where he got

8  the information, you don't know if -- whether

9  it's real, and you don't know whether in --

10  these eventually happened, right?

11             MR. KIM:  Objection to form.

12      A.    Um-hum.  I trusted my team, who did

13  the analysis of the information and concluded

14  that it was credible.

15      Q.    And do you know how they concluded

16  it was credible?

17      A.    No.

18      Q.    So what we have is a story about

19  people going to Cyprus where Interior Ministry

20  officers would logically go to conduct an

21  investigation, different kinds of

22  investigations, correct?

23      A.    No.

24      Q.    Why not?

25      A.    We have an Interior Ministry

1          WILLIAM F. BROWDER (4/15/15)

2    officer going to Cyprus on the private jet

3    of -- of a -- a convicted fraudster who he was

4    involved in convicting -- or who he -- who he

5    was investigating then and he was involved in

6    convicting in a previous criminal case.

7          Q.   But that connection comes from an

8    anonymous source, from documents that you

9    don't know what they are, you don't know

10   whether they're real, and you don't know

11   whether somebody was setting you up, right?

12             MR. KIM:  Objection to form.

13         A.   I trusted my team to -- to -- to

14   verify the credibility of those documents.

15         Q.   And you haven't given us those

16   documents, right?

17         A.   I think I --

18         Q.   Once again.

19         A.   No, no.  Those documents I think I

20   have.  They're in public domain.  Those

21   documents are on the Russian Untouchables

22   website, and I think you have them.

23         Q.   And that's your website?

24         A.   You -- you have the -- you have the

25   documents from our website, yes.

Page 132

1          WILLIAM F. BROWDER (4/15/15)

2      Q.   Okay.  So we have, then, a meeting,

3   you say, of a tax official.

4          MR. KIM:  Objection to form.  To

5      the "you say."

6          MR. CYMROT:  Im sorry.  Correct.

7      Q.   The Complaint says that on May 8,

8   2007, Mr. Klyuev met with Ms. Olga

9   Stepanov- -- nova -- Stepanova.

10          And how do you know that?

11          MR. KIM:  Objection to form.

12      A.   How do I know that?

13      Q.   Yes.  How do you know that?  You

14   told the U.S. attorney this, right?

15      A.   No.

16      Q.   Who told the U.S. -- U.S. attorney

17   this?

18      A.   We provided information about the

19   travel records of these individuals to the

20   U.S. attorney.

21      Q.   From an anonymous source of unknown

22   authenticity, right?

23      A.   From a source that my team believed

24   to be credible.

25      Q.   Um-hum.  And you have no idea who

Page 133

1              WILLIAM F. BROWDER (4/15/15)

2    the source was?

3         A.   No.

4         Q.   Have you introduced this source to

5    the U.S. Attorney's Office?

6         A.   I'm not aware if they have or have

7    not.

8         Q.   Um-hum.  So what we have that we

9    can put our hands on are the seals and the

10   other documents that we used in the fraud,

11   right?

12             MR. KIM:  Objection to form.

13        Q.   You don't know what was said in

14   these meetings, right?

15             MR. KIM:  Objection to form.

16        Q.   These alleged meetings?

17        A.   No.

18             MR. KIM:  Objection to form.

19        Q.   You have no idea what was said in

20   these alleged meetings?

21        A.   No.

22             MR. KIM:  Objection to form.

23        Q.   You don't know if it had to do with

24   an investigation of Mr. Klyuev, right?

25        A.   I'm -- I'm sorry.  What's the

1              WILLIAM F. BROWDER (4/15/15)

2    question?

3         Q.   Do you know whether these alleged

4    meetings involved an investigation of

5    Mr. Klyuev?

6         A.   I wasn't at the meetings.

7         Q.   You don't know from a -- another

8    anonymous source?

9              MR. KIM:  Objection to form.

10        A.   There is -- there are no anonymous

11   sources about the actual contents of the

12   meetings.

13        Q.   So you don't know if it involved

14   the $230 million fraud?

15        A.   I don't know.

16        Q.   The only thing we know that

17   definitely involved the $230 million fraud

18   were the corporate documents and seals?

19             MR. KIM:  Objection to form.

20        A.   No.  There was also the -- I just

21   read it to you.  Should I read it again?

22        Q.   Well, you said --

23        A.   I can read it again.  It's no

24   problem.

25        Q.   I think we all remember.

1           WILLIAM F. BROWDER (4/15/15)

2      A.   Okay.

3      Q.   You like reading it?

4      A.   I don't -- I don't care.

5      Q.   I mean, if it makes you feel

6  better, you can read it, but I don't think

7  your -- anybody's forgotten what you read.

8      A.   Okay.

9      Q.   That there was some information,

10  but it was incorrect information, right?

11      A.   No.

12      Q.   That's what you read.

13      A.   No, I didn't.

14      Q.   You said there were bank accounts

15  that weren't opened and things like that,

16  right?

17      A.   I'd be --

18           MR. KIM:  Objection to form.

19      A.   I'd be happy to read it again if --

20  if you don't un- -- understand what was

21  writ- -- written there.

22      Q.   I understand it, believe me.

23           By the way, how do you know they

24  even met in -- in Larnaca?

25           We can go back to that.

1              WILLIAM F. BROWDER (4/15/15)

2              How do you -- how do you know

3    Mr. Kuznetsov and Mr. Klyuev or Mr. Pavlov and

4    Mr. -- and Yulia Mayorova met in Larnaca?

5         A.   What we do know is that Klyuev and

6    Kuznetsov traveled on the same flight.

7         Q.   That's all you know?

8         A.   To -- to Larnaca.

9         Q.   Right.  All you know is these

10   people flew on the same flight?

11        A.   On the same private jet that

12   belonged to --

13        Q.   No, not as to Mr. Pavlov and the

14   others.  They flew on an Aeroflot flight.

15        A.   Right.

16        Q.   They happened to be on the same

17   plane.

18        A.   Could be.

19             MR. KIM:  Mark, if there's no

20        question pending, I'd like to just

21        take two minutes to advise Mr. Browder

22        about something.

23             MR. CYMROT:  Yes.

24             MR. KIM:  There's no question

25        pending.

1          WILLIAM F. BROWDER (4/15/15)

2          MR. CYMROT:  Yes.

3          THE VIDEOGRAPHER:  The time is

4     12:11 p.m.  We are off the record.

5          (Whereupon, at this time, a short

6     break was taken.)

7          THE VIDEOGRAPHER:  The time is

8     12:13 p.m.  We are back on the record.

9   BY MR. CYMROT:

10     Q.   All right.  Mr. Browder, according

11   to paragraph 22, Mr. Kuznetsov -- Kuznetsov

12   and Mr. Klyuev flew on a private jet.  That's

13   what it says, right?

14     A.   Correct.

15     Q.   Did you ever say they travelled on

16   an Aeroflot flight?

17          THE REPORTER:  Excuse me?

18     Q.   Did you ever say they flew on an

19   Aeroflot flight?

20     A.   I don't remember.

21     Q.   It's possible you said that?

22     A.   I don't know.

23     Q.   So going back to your

24   investigation, are you saying there was no

25   investigation of you in 2006?

1          WILLIAM F. BROWDER (4/15/15)

2          A.   Well, we received a document from

3     the Russian authorities saying that there are

4     no criminal investigations in 2006.

5          Q.   Now, let me show you testimony of

6     Mr. Magnitsky in -- in 2006.

7                MR. CYMROT:   What number are we up

8          to?  What number are we on?

9                (Browder Exhibit 11, document

10         Bates stamped BrowderDepo0000685

11         through '690 was marked for

12         identification, as of this date.)

13    BY MR. CYMROT:

14         Q.   So this is a record of evidence,

15    October 18, 2006.  It's an examination of

16    Mr. Magnitsky.

17               Is that what it appears to be?

18         A.   I don't know.

19         Q.   Well, take your time to look at it.

20         A.   Okay.

21            (Whereupon, an off-the-record

22      discussion was held.)

23    BY MR. CYMROT:

24         Q.   Okay.  So let me help you.  You see

25    the top, October 18, 2006?

Page 139

1              WILLIAM F. BROWDER (4/15/15)

2        A.   Um-hum.

3        Q.   You see it's -- there's a witness,

4   Mr. Magnitsky?

5        A.   Yes.

6        Q.   Do you see on the next page he's

7   being asked about Saturn Investments?

8        A.   Yes.

9        Q.   And about you and Mr. Shaashoua?

10            Do you see that?

11       A.   Um-hum.

12       Q.   Same subject matter of -- that we

13  went over from the Kalmykian civil court,

14  right?

15       A.   I'm not sure if it's the same or

16  not.

17       Q.   Well, it's about Saturn, and he's

18  asking about Mr. S- -- Shaashoua, and he's

19  asking about power of attorney dated

20  February 10, 2005, and about him being the

21  general director of Saturn Investments at that

22  point.

23            Do you see that?

24       A.   Um-hum.

25       Q.   Yes?

Page 140

1             WILLIAM F. BROWDER (4/15/15)

2       A.   Yes.

3       Q.   Okay.  So there was an

4   investigation in 2006 going on of the same

5   events that we went over with the civil case,

6   right?

7       A.   I'm not sure if they're the same

8   events.

9       Q.   All right.  There was an

10  investigation of how Hermitage Fund operated

11  Saturn, and the investigation was going fourth

12  in 2006, correct?

13      A.   I'm not sure that's what this says.

14      Q.   What does it say in your view?

15      A.   I'm not a lawyer.

16      Q.   Well, you can read it, though.

17      A.   I'm not a Russian lawyer, and I

18  don't know the significance of this document.

19      Q.   It's only three pages.  It's in

20  English.

21           "Investigator For Particularly

22  Important Cases of Tax Crimes Investigation

23  Department."

24           That's what it says, right?

25      A.   Um-hum.

1              WILLIAM F. BROWDER (4/15/15)

2       Q.    It's questioning Mr. Magnitsky?

3       A.    Correct.

4       Q.    Did you know about that at the

5   time?

6       A.    No.

7       Q.    You had no idea about this in this

8   2006?

9       A.    No.

10      Q.    So maybe you were just wrong that

11  the investigation didn't exist in 2006?

12      A.    Or maybe the other information that

13  I got is correct.

14      Q.    But somehow they were still

15  examining Mr. Magnitsky in 2006?

16            You think the two are consistent?

17      A.    I don't understand the question.

18      Q.    They were -- they were questioning

19  about a closed investigation?

20      A.    They weren't questioning me.

21      Q.    As far as you know, Mr. Magnitsky

22  was being questioned on an investigation of

23  Saturn in 2006, right?

24      A.    I don't know that.

25      Q.    Well, that's what this document

1             WILLIAM F. BROWDER (4/15/15)

2    shows you.  This is --

3         A.   I don't know -- I don't -- I don't

4    know anything about --

5         Q.   -- what it purports to be.

6         A.   I don't know anything about the

7    providence of this document or the

8    significance of this document, and I have not

9    taken any advice on what this means; so it

10   would be inappropriate --

11        Q.   So you're not going to venture an

12   opinion on it?

13        A.   I would -- it would be

14   inappropriate as a layman to venture an

15   opinion on what this says.

16        Q.   And you're sticking to your view

17   that the investigation closed in 2005 even

18   though we have this document?

19        A.   Yes.

20        Q.   Okay.  By the way, if you look in

21   the middle of the page, the investigator's

22   question:

23             "Where do you currently work?  The

24   post?

25             "ANSWER:  At the moment I'm working

1          WILLIAM F. BROWDER (4/15/15)

2    on a labor contract at CJSC Firestone Duncan

3    as an auditor."

4              That's his answer, right?

5         A.   Um-hum.

6         Q.   Yes?

7         A.   Yes.

8         Q.   You still say he's a lawyer?

9         A.   Yes.

10        Q.   Have you ever seen Mr. Magnitsky's

11   signature?

12        A.   I probably have, but I...

13        Q.   Well, let me show you the last

14   page, two -- three signatures and then one

15   different one at the bottom.  Three

16   signatures.  That look like Mr. Magnitsky's

17   signature?

18        A.   I don't know.

19        Q.   How many times have you seen

20   Mr. Magnitsky's signature?

21        A.   Zero.

22        Q.   It says here, paragraph 25, second

23   sentence:  "In denying requests from Hermitage

24   to return the corporate documents and seals,

25   the Russian Interior Ministry subsequently

```
1              WILLIAM F. BROWDER (4/15/15)

2      confirmed that these documents and seals,

3      which were seized in the search lead by

4      Kuznetsov, remained in the custody of his

5      colleague Karpov."

6              Do you see that?

7         A.   I do.

8         Q.   Isn't it true, Mr. Browder, that

9      Mr. Karpov offered to return the documents and

10     seals and Mr. Kleiner and Mr. Chinesco

11     [phonetic] -- Kuznetsov told him to keep them

12     until the end of the investigation?

13        A.   I don't know.

14        Q.   You've never heard that?

15        A.   Vaguely, but I don't know the

16     details.

17        Q.   Vaguely?  What have you heard

18     vaguely?

19        A.   I don't -- I mean, I've -- I --

20     I vaguely recall some conversation of that

21     nature, but I don't know the details.

22        Q.   With whom?  Mr. Kleiner?

23        A.   I don't even know with whom, at

24     what point, when.

25        Q.   So that somebody told you that
```

1          WILLIAM F. BROWDER (4/15/15)

2    Mr. Karpov offered to return the seals and

3    that your colleagues turned them down?

4          A.    Perhaps, but...

5          Q.    And this is a man who you're saying

6    used those seals to commit a massive fraud?

7                MR. KIM:  Objection to form.

8          A.    Yes, I'm saying that.

9          Q.    And --

10         A.    But I -- no, I'm not -- I'm not

11   saying that.  I'm saying that he -- he used

12   the seals, the stamps, the certificates of

13   incorporation, and the other document -- that

14   whole paragraph that I read to you, along with

15   a group of coconspirators to commitment the

16   fraud.

17         Q.    Did you tell the U.S. Attorney's

18   Office that Mr. Karpov had offered to return

19   the seals and other documents?

20         A.    Well, since I'm not acutely aware

21   of it, I didn't.

22         Q.    Somebody else told you -- you said

23   that somebody told you that Mr. Karpov offered

24   to return the seals and your colleagues turned

25   them down.

Page 146

1          WILLIAM F. BROWDER (4/15/15)

2          MR. KIM:  Objection.

3      Characterization.

4      Q.   Did you tell the U.S. Attorney's

5  Office that Mr. Kaffov -- Karpov had offered

6  to return the seals?

7      A.   No.

8      Q.   All right.

9          (Whereupon, an off-the-record

10         discussion was held.)

11         MR. CYMROT:  All right.  So --

12         yes.  Okay.  I'm marking as Exhibit 12

13         the record of evidence, June 5, 2008,

14         of Mr. Magnitsky.  And it says Bates

15         number -- it starts at 721.

16         (Browder Exhibit 12, document

17         Bates stamped BrowderDepo0000721

18         through '742 was marked for

19         identification, as of this date.)

20   BY MR. CYMROT:

21     Q.   All right.  I'm going to direct

22  your attention to page '727.

23         First of all, Mr. Browder, have you

24  ever seen this document before?

25     A.   No.

1              WILLIAM F. BROWDER (4/15/15)

2         Q.   I'm going to direct your attention

3    to page '727.  It's the Bates number on the

4    right -- lower right-hand side.

5              So I'm going to direct your

6    attention specifically to what I think is the

7    fourth paragraph.  Starts "in November and

8    December 2007" and says the following:

9              "In November and December 2007, a

10   representative of Firestone Duncan Limited,

11   V.Y. Yelin, visited the investigator,

12   P.A. Karpov, a few times to retrieve from

13   Karpov documents and seals impounded during

14   the search on the 4th of June 2007."

15             "From what V.Y. Yelin said, I'm

16   aware that P.A. Karpov was also ready to give

17   out documents and seals of Parfenion Limited

18   Liability Company, Rilend Limited Liability

19   Company, and Makhaon Limited Liability

20   Company; however, V.G. Kleiner and

21   I.S. Cherkasov requested the seals from Karpov

22   be not retrieved unless criminal proceedings

23   are instituted to investigate into illegal

24   re-registration of the companies and lawsuits

25   based on forged evidence and powers of

Page 148

1              WILLIAM F. BROWDER (4/15/15)

2    attorney, and the documents be received solely

3    in accordance with the detailed inventory

4    spef- -- specifying each document transfer.

5              "As a result, those seals and

6    documents would stay with P.A. Karpov."

7              Do you see that?  It goes on.

8         A.   Yes.

9         Q.   Is this the first time -- it's not

10   the first time you've heard this, right?

11             You've told us somebody told you

12   that.

13        A.   It's the first time I've read this

14   document.

15        Q.   It's not the first time you've

16   heard that Karpov offered to return the seals

17   and your colleagues turned him down, right?

18        A.   No.  Correct.

19        Q.   Okay.  And you never told the U.S.

20   Attorney's Office.  We've established that,

21   right?

22        A.   I never told the U.S. Attorney's

23   Office, correct.

24        Q.   Let me go back to a couple points

25   we handled before.

Page 149

1          WILLIAM F. BROWDER (4/15/15)

2              You said you worked with reporters.

3     Did you give out information to reporters?

4          A.   Could you be more specific?

5          Q.   Well, for instance, the information

6     you got that the Swiss prosecutor said you

7     could give to the United States.  Did you give

8     it to reporters?

9          A.   No.

10         Q.   You knew you shouldn't give it to

11    reporters?

12         A.   I don't know whether I should or

13    shouldn't have, but I didn't.

14         Q.   Did you post any of it on your

15    website?

16         A.   No.  We posted our Complaint on the

17    website.

18         Q.   Did you -- is any of the

19    information in Exhibit 1, which was the letter

20    to the Manhattan D.A. -- was that from the

21    Swiss prosecutor?

22         A.   I don't know.

23         Q.   So the Cyprus companies that own

24    Satin -- Saturn and Dalnaya Step were Kone and

25    Glendora.  You're not aware of that?

1          WILLIAM F. BROWDER (4/15/15)

2          A.   I don't know the names of the

3     companies.

4          Q.   All right.  So who controlled those

5     companies, The Cyprus Companies?

6          A.   The manager of the fund, HSBC

7     Management Guernsey.

8          Q.   And who gave the manager of the

9     fund instructions?

10          A.   They took decisions on their own.

11          Q.    Investment decisions?

12          A.   They took investment decisions and

13     structural decisions.

14          Q.   So it wasn't Hermitage Fund that

15     set up Saturn and Dalnaya Step to take

16     advantage of the tax regime in Kalmykia, it

17     was HSBC on their own?

18          A.   No, HSBC was the manager of the

19     Hermitage Fund.  The Hermitage Fund didn't

20     take a decision.  It's a -- it's a

21     corporate --

22          Q.   I understand.  And you're the

23     advisor?

24          A.   Right.  So the advice probab- --

25     most likely came from -- I don't know exactly,

1              WILLIAM F. BROWDER (4/15/15)

2   but it probably came from professional

3   accountants and lawyers.

4        Q.    That you directed to HSBC Guernsey?

5        A.    No.

6        Q.    So your role as advisor didn't

7   include the tax structure in Kalmykia?

8        A.    My role as advisor -- as advisor

9   was focused on picking stocks, doing company

10  analysis and doing corporate governance

11  activism.  I wasn't a specialist in taxes and

12  other such things.

13       Q.    All right.  So that HSBC Guernsey

14  didn't decide what stocks that these companies

15  would be investing in, right?

16       A.    So I provided the investment advice

17  to the manager.

18       Q.    Right.  And they followed your

19  advice?

20       A.    Sometimes, mostly.

21       Q.    So HSBC Guernsey is a trustee,

22  correct?

23       A.    No, HSBC Trust Guer- -- HSBC Trust

24  Company is the trustee.  HSBC Management

25  Guernsey is the investment manager.

Page 152

1           WILLIAM F. BROWDER (4/15/15)

2           Q.    So HSBC Trust Guernsey -- is that

3     what you said it was?

4           A.    Is the trustee.

5           Q.    "Is the trustee."

6                 And they -- and the trustee

7     actually has the ownership of the two Cyprus

8     companies, which are Glendora and Kone?

9           A.    The unit trust of which they're the

10    trustee has the --

11          Q.    They're the trust entity?

12          A.    No, they're the trustee of a unit

13    trust.

14          Q.    Yes.

15          A.    The unit trust owns various assets

16    directly and through other vehicles.

17          Q.    Okay.  So the unit trust owned

18    Glendora and Kone, Cyprus companies?

19          A.    Correct.

20          Q.    And they owned Saturn and Dalnaya

21    Step?

22          A.    Yes.  I believe so, I'm not sure if

23    those were the two owners, I don't have that

24    in front of me.

25          Q.    And HSBC Guernsey Trust set up a

1          WILLIAM F. BROWDER (4/15/15)

2    trust that also owned Parfenion, Rilend

3    Makhaon?

4          A.    No, HSBC didn't set up a trust.

5    HSBC --

6          Q.    Was the trustee of a trust?

7          A.    -- was the trustee that owned --

8    owned Cyprus Companies.  And I can't remember

9    who the holding companies were who -- who set

10   up those companies.

11         Q.    Okay.  So the trust owns Cyprus

12   Companies, which then owned the Russian

13   companies?

14         A.    Correct.

15         Q.    All right.  And Parfenion, and

16   Rilend and Makhaon were the Russian companies?

17         A.    Correct.

18         Q.    And at the time of the $230 million

19   fraud, they had no stock in them?

20         A.    Who had no?

21         Q.    Parfenion, Rilend and Makhaon?

22         A.    Correct.

23         Q.    All right.  And so the Cyprus

24   Companies, when these companies were

25   reregistered, lost their money because there

1              WILLIAM F. BROWDER (4/15/15)

2    no assets in the three Russian companies,

3    correct?

4         A.   No.

5         Q.   They lost no value, the net worth

6    of Parfenion, Rilend and Makhaon was zero,

7    they had no assets, correct?

8         A.   No.

9         Q.   They had assets?

10        A.   Correct.

11        Q.   What assets did they have?

12        A.   They had bank accounts.

13        Q.   Which had no money in them?

14        A.   Is that a question?

15        Q.   Yes.

16        A.   No, they did have money in them.

17        Q.   How much money did they have?

18        A.   I can't be sure, but I think 10-,

19   $15,000.

20        Q.   Do you have bank records that show

21   that?

22        A.   I'm not sure.

23        Q.   Have you given any bank records of

24   Parfenion, Rilend and Makhaon to the U.S.

25   attorney?

Page 155

1           WILLIAM F. BROWDER (4/15/15)

2           A.   I'm not -- I don't know.

3           Q.   So when the companies were

4    reregistered, was there money removed from the

5    bank accounts?

6           A.   I'm not sure.

7           Q.   They wanted the companies; they

8    weren't interested in 10- or $15,000, right?

9    They opened new bank accounts, correct?

10          A.   Yes.

11          Q.   With the reregistered companies?

12          A.   Correct.

13          Q.   So the 10- or $15,000 was still

14   there in the bank accounts, as far as you

15   know?

16          A.   I don't know where that -- what

17   the -- what the status of that 10- or $15,000

18   was.

19          Q.   As far as you know, that money was

20   still there and was not taken when the money

21   was -- when the banks -- when the companies

22   were reregistered, correct?

23          A.   No.

24          Q.   What?  Am I wrong or am I right?

25          A.   You're wrong.

1              WILLIAM F. BROWDER (4/15/15)

2       Q.   You just told me you don't know?

3       A.   I don't know.

4       Q.   Okay.  So the answer is you don't

5  know?

6       A.   I don't know.

7       Q.   All right.  So the money might very

8  well have been -- still been there, correct?

9       A.   "Very well" suggests that it's

10  still there.  I don't -- I don't know.

11      Q.   You don't know either way?

12      A.   I don't know either way.

13      Q.   As far as you know, that money

14  wasn't stolen?  You don't know?

15      A.   I don't know.

16      Q.   Okay.  So we've established that;

17  as far as you know, the money wasn't stolen.

18            In which case The Cyprus Companies

19  didn't lose anything of value?

20            MR. KIM:  Objection to form.

21      A.   I don't know.

22      Q.   Okay.  We'll leave it at that.

23            Just to complete the chain, as far

24  as you know, the trust didn't lose anything,

25  right?

1              WILLIAM F. BROWDER (4/15/15)

2        A.   No, I don't know that.

3        Q.   Right.  And the money belonged to

4   the trust; it didn't belong to HSBC Guernsey,

5   correct?

6        A.   It belonged to HSBC Trust Company.

7        Q.   A trust that the trust company

8   oversee as trustee owns -- owned those assets,

9   the companies and whatever bank accounts they

10  have?

11       A.   The trustee owned them as the

12  trustee.

13       Q.   The trustee was the trustee of a

14  trust, I think you told me that at the

15  beginning?

16       A.   Right, but the trustee was the

17  formal owner of the -- of the assets.

18       Q.   All right.

19            MR. CYMROT:  Why don't we take

20       lunch.  Is this a good time?

21            MR. KIM:  Sure, if you want to.

22            THE WITNESS:  Can we go until 1:00

23       just to --

24            MR. KIM:  If you want.  It's

25       12:40, if you want to go ten,

1            WILLIAM F. BROWDER (4/15/15)

2         15 minutes s and then we can break.

3            MR. CYMROT:  Sure, I'll do it.

4    BY MR. CYMROT:

5         Q.   So going back to Exhibit 1, if you

6    look at Tab 7, there's a chart, correct?

7         A.   Correct.

8         Q.   You've seen this chart before,

9    right?

10        A.   Yes.

11        Q.   Who created this chart?

12        A.   Vadim Kleiner.

13        Q.   And do you know what from

14   documents -- from what documents he created

15   this chart?

16        A.   No.

17        Q.   And you don't know where he got the

18   documents that he used to create the chart,

19   right?

20        A.   Right.

21        Q.   Right?

22        A.   Right.

23        Q.   And you don't know whether in

24   Russia -- there are a number of Russian banks

25   here, correct?

Page 159

1            WILLIAM F. BROWDER (4/15/15)

2       A.    Correct.

3       Q.    Intercommerz, USB, right?

4       A.    Correct.

5       Q.    Sberbank?  You don't know whether

6  it's legal for Mr. Kleiner to have information

7  about these accounts from those banks, right?

8       A.    I don't know.

9       Q.    And then you don't know how he did

10  the tracing?

11       A.    No, I don't know.

12       Q.    But you've relied upon it?

13       A.    I have.

14       Q.    And you've given it to the U.S.

15  Attorney's Office, right?

16       A.    I have.

17       Q.    And so, for instance --

18       A.    Actually, no, that's incorrect.  I

19  gave it to the New York -- the New York

20  District Attorney's office.

21       Q.    All right.  And they gave it to --

22  as far as you know, they gave it to the U.S.

23  Attorney's Office?

24       A.    That's correct.

25       Q.    Let me go back.

```
 1              WILLIAM F. BROWDER (4/15/15)

 2              How many times did you meet

 3    Todd Hyman?

 4         A.   Several.  I can't remember.

 5         Q.   More than five?

 6         A.   I don't recall.

 7         Q.   Is it more than ten?

 8         A.   No.

 9         Q.   Did you talk to him on the

10    telephone?

11         A.   Yes.

12         Q.   He had your telephone number?

13         A.   I'm not sure how -- how the

14    telephone connection was made.

15         Q.   Did you call him or he call you?

16         A.   I don't remember.

17         Q.   He had your e-mail address?

18         A.   I don't know.

19         Q.   Do you have his e-mail address?

20         A.   I don't know.

21         Q.   Do you have the e-mail address of

22    anybody in the U.S. Attorney's Office?

23         A.   I know for sure I have

24    Paul Monteleoni's and Sharon Levin's.

25         Q.   And you've exchanged e-mails with
```

Page 161

1          WILLIAM F. BROWDER (4/15/15)

2    them?

3          A.   Yes.

4          Q.   On -- approximately how many?

5          A.   I don't recall.

6          Q.   Hundred?

7          A.   I doubt it.

8          Q.   Fifty?

9          A.   No.

10         Q.   But you haven't given those -- you

11   have those, right, you have access to those

12   e-mails?

13         A.   Yes.

14         Q.   You haven't given them to us, so I

15   can't question you about them today.

16              MR. KIM:  Objection to form.

17         A.   Isn't there a --

18         Q.   Just yes or no for now.  If they're

19   going to claim the privilege, they can --

20         A.   I need to get some advice on -- on

21   whether there's a privilege issue here.

22              MR. MONTELEONI:  Let's take a few

23         moments to discuss.

24              MR. CYMROT:  All I'm asking is yes

25         or no whether he has the e-mails.  I

Page 162

1          WILLIAM F. BROWDER (4/15/15)

2      mean, the fact that he hasn't produced

3      them we can get into a fight later

4      about whether you're going to claim

5      privilege.

6          And we haven't gotten to privilege

7      logs, we haven't gotten any of that.

8          MR. MONTELEONI:  Fair enough, but

9      the witness says that he has a concern

10     that he wants to discuss whether or

11     not there's something privileged, and

12     we request an opportunity to discuss

13     whether or not there's a privilege.

14         MR. KIM:  So if you want to take a

15     break now, I guess --

16         MR. CYMROT:  No, that's -- I mean,

17     why don't you guys do it over lunch.

18     I'll -- I'll hold the question so that

19     we can keep going.

20         MR. KIM:  Okay.

21  BY MR. CYMROT:

22     Q.   All right.  So I'm looking at this

23  chart, which is Exhibit 1, Tab 7, and I see

24  that between the ZhK account at Sberbank and

25  the Univers account at Mosstroieconomybank,

1          WILLIAM F. BROWDER (4/15/15)

2     the amount of money that you're tracing

3     increases from, in dollars, 33 million to

4     53 million; do you see that?

5               MR. KIM:  Objection to form.

6          Q.   So you've got No. 11, 12 million;

7     No. 12 -- I'm sorry, No. 11 is in roubles,

8     525, but in dollars the conversion's here,

9     it's 21 million.  Number 12 is 12 million.

10              And then you get down to the next

11    level, Krainiy Sever Bank, and you've got

12    26 million, 27 million coming out of Krainiy

13    Sever Bank; that's 53 million, right?

14         A.   Right.

15         Q.   Can you explain to us how you would

16    trace and know that it was the Russian

17    Treasury money that was going through Krainiy

18    Sever to Bunicon and Elenast and not some

19    unassociated, as far as we know clean money,

20    $20 million of clean money; can you explain

21    that?

22              MR. KIM:  Objection to form.

23         Q.   So you have no information about

24    that?

25         A.   I didn't do the tracing.

Page 164

1          WILLIAM F. BROWDER (4/15/15)

2          Q.   So I have to go to Mr. Kleiner for

3    that?

4               MR. KIM:  Objection to form.

5          Q.   Right.  I have to ask the question

6    of Mr. Kleiner?

7          A.   I don't know who -- I don't know

8    who can explain this to you, but I can't.

9          Q.   Well, Mr. Kleiner did it, right?

10         A.   He did the analysis, correct.

11         Q.   So if I want to understand this

12   chart, shouldn't I be asking Mr. Kleiner?

13              MR. KIM:  Objection to form.

14         A.   I don't know.  You have to decide

15   in your own team how you want to give your own

16   explanations.

17         Q.   I'm asking for the name of the

18   person who can explain it me; how you went to

19   the U.S. Attorney's Office with a case where

20   there's $20 million of clean money going into

21   accounts and you say it's dirty money that

22   went to our clients.

23              MR. KIM:  Objection to form; the

24         use of "you."

25         A.   Is there a question?

Page 165

1           WILLIAM F. BROWDER (4/15/15)

2       Q.   Yes.

3       A.   What's the question?

4       Q.   How do you explain the $20 million

5    in apparently clean money going to Bunicon and

6    Elenast and the $800,000 coming out and you

7    say it had to be dirty money that went to

8    Prevezon?

9            MR. KIM:  Objection to form.

10      Q.   Do you have an explanation?

11      A.   I didn't do the tracing.

12      Q.   But you had the meeting, you've

13   been the one going around writing books,

14   touting it, trying to get our client on the

15   Magnitsky list, haven't you?

16      A.   No.

17      Q.   You've never tried to put

18   Mr. Katsyv on the Magnitsky list?

19      A.   No.

20      Q.   Never talked to anybody about that?

21      A.   Not that I'm aware of.

22      Q.   Did you talk to the U.S. attorney

23   about that?

24      A.   No.

25      Q.   But you did file a lawsuit in

1          WILLIAM F. BROWDER (4/15/15)

2   New York against Prevezon owned by Mr. Katsyv,

3   right?

4          A.   I filed a -- I provided to the

5   New York District Attorney's office a

6   Complaint about suspected money laundering in

7   New York in which there was -- I asked U.S.

8   Government to investigate.

9          Q.   So you had no idea what the logic

10  was for saying that where there's $20 million

11  of identified clean money going through the

12  accounts and only $800,000 coming out, that we

13  had to say it was dirty money and Mr. Katsyv

14  got dirty money; you have -- you can't give me

15  any explanation for that at all?

16          MR. KIM:  Objection to form.

17          A.   I didn't do the tracing.

18          Q.   So you have no explanation?  Yes or

19  no, you have an explanation or you don't?

20          A.   I didn't do the tracing.

21          MR. KIM:  Objection to form.

22          Q.   Do you have an explanation or not?

23          A.   Do I have an explanation?

24          MR. KIM:  Objection to form.  I'm

25          not sure what we're talking about.

1          WILLIAM F. BROWDER (4/15/15)

2          Q.   We're talking about on this chart

3    showing $33 million of supposedly Russian

4    Treasury money going to Krainiy Sever, the

5    corresponding account, and coming out

6    $20 million of -- at least $20 million of

7    clean money, at least, and only $800,000 going

8    to Prevezon.  If there's $20 million of clean

9    money going into those accounts, normally

10   $800,000 coming out, you have no explanation

11   for why that had to be Russian Treasury money

12   that went to Prevezon?

13         A.   This is not my area of expertise.

14         Q.   I'm asking whether you have any

15   explanation from anybody?

16         A.   I -- I -- I don't have an

17   explanation.

18         Q.   Then who would have the explanation

19   in your organization?

20         A.   I think our entire legal team would

21   have an explanation.

22         Q.   Mr. Kleiner is the one who did

23   this?

24         A.   He was the one who produced the

25   piece of paper.

1           WILLIAM F. BROWDER (4/15/15)

2      Q.   Oh, he didn't do the work?

3      A.   I think he did it as a member of a

4  team.

5      Q.   I see.  So you have the same

6  disaffection for testifying that you have?

7           MR. KIM:  Objection to form.

8      Q.   Is that why you're not naming him?

9           MR. KIM:  Objection to form.

10     A.   No.

11     Q.   He's willing to come to New York

12 and testify?

13          MR. KIM:  Objection to form.

14     A.   I have no idea what he's willing to

15 do or not do.

16     Q.   He works for you, right?

17     A.   No.

18     Q.   He works for Hermitage Fund of

19 which you are the chief executive officer,

20 right?

21     A.   No.

22     Q.   Who does he work for?

23     A.   He works for Hermitage Capital LLP.

24     Q.   Of course.  Okay, I keep getting

25 the entities wrong.

1          WILLIAM F. BROWDER (4/15/15)

2               And you are the CEO of that

3     company?

4          A.   Let me correct myself.  He is a

5     partner at Hermitage Capital LLP.

6          Q.   And you're the CEO, right?

7          A.   No.

8          Q.   Who's the CEO?

9          A.   There's a partnership, there's no

10    CEO of the partnership.

11         Q.   I see.  Are you willing to advise

12    Mr. Kleiner he should come to New York and

13    testify about this?

14              MR. KIM:  Objection to form.

15         A.   It's not my place to advise him on

16    what to do or not do.  The lawyers will advise

17    him on what to do or not do.

18         Q.   But you wouldn't tell him to come,

19    would you?

20              MR. KIM:  Objection to form.

21         A.   I wouldn't tell him to come or not

22    come.  It's not my place to tell him.  The

23    lawyers will advise him on what the -- what

24    the right --

25         Q.   You're not willing to go back and

1          WILLIAM F. BROWDER (4/15/15)

2    say, Mr. Kleiner, I put my reputation on the

3    fact that $20 million came, went into Bunicon

4    and Elenast and $800,000 came out and we're

5    saying it's dirty money, Hermitage has its

6    reputation on this, I recommend you go to

7    New York and explain this to these people; you

8    wouldn't say that?

9          MR. KIM:  Objection to form.

10        A.   I would go to our lawyers and ask

11   them to advise him on what the right legal

12   position is to take in this case.

13        Q.   So the answer is no, I wouldn't

14   give him that advice myself?

15        MR. KIM:  Objection to form.

16        A.   I would go to our lawyers.

17        MR. CYMROT:  I think we better

18        stop.

19        MR. KIM:  Okay.

20        MR. CYMROT:  All right.

21        THE VIDEOGRAPHER:  The time is

22        12:50 p.m.  We're off the record.

23            (Whereupon, at this time, a lunch

24        break was taken.)

25

1     WILLIAM F. BROWDER (4/15/15)

2     A F T E R N O O N    S E S S I O N

3

4          (Time noted:  1:50 p.m.)

5

6          THE VIDEOGRAPHER:  The time is

7     1:50 p.m.  We are back on the record.

8          MR. KIM:  Mr. Cymrot, before you

9     begin your questioning again -- this

10    is Michael Kim -- over the break, as

11    we agreed with the Defendants, we

12    obtained from the Defendants' counsel

13    a copy of the sealed document that

14    Mr. Cymrot referred to earlier in the

15    examination, we've shown it to the

16    witness.

17         And my understanding is, it does

18    not refresh the witness's recollection

19    on any of the answers he gave.

20         But since I'm not the witness,

21    I'll just ask Mr. Browder to confirm

22    that for the record?

23         THE WITNESS:  I confirm that for

24    the record.

25         MR. KIM:  Thank you.  Go ahead,

1          WILLIAM F. BROWDER (4/15/15)

2      Mr. Cymrot.

3  W I L L I A M   F.   B R O W D E R, resumed

4  and testified as follows:

5  EXAMINATION BY (Cont'd.)

6  MR. CYMROT:

7      Q.   Okay.  Good afternoon, Mr. Browder.

8           You're still under oath, do you

9  know that?

10      A.   I do.

11      Q.   All right.  So I'm going to show

12  you what we're going to mark as Browder

13  Exhibit 13.

14           (Browder Exhibit 13, Document

15      Entitled "Plaintiff's Responses to

16      Defendants' First Set of

17      Interrogatories" was marked for

18      identification, as of this date.)

19  BY MR. CYMROT:

20      Q.   This is "Plaintiff's Responses to

21  Defendants' First Set of Interrogatories."

22  Basically what this is, is a list of questions

23  we gave the Government and they responded.

24           And I want to direct your attention

25  to page 4, which is the response to

Page 173

1          WILLIAM F. BROWDER (4/15/15)

2    Interrogatory 1.

3              And to summarize it, it says that

4    tell us what persons have knowledge or

5    information on certain subjects.  And you see

6    your name there, right?

7          A.   Yes.

8          Q.   All right.  So it says you have

9    knowledge of the $230 million fraud,

10   Defendants' knowledge of the $230 million

11   fraud, which would be the Prevezon Defendants

12   referring to that, membership and operation of

13   the organization, Defendants' contacts with

14   the organization and Defendants' knowledge of

15   the organization and the Defendants' intent to

16   knowledge for the purpose of the money

17   laundering statutes, the transfers described

18   in the Verified Complaint, additional

19   transfers that support the allegations in the

20   Verified Complaint, the tracing methodology,

21   tracing funds from the Russian Treasury to the

22   Defendants, nature of the businesses operated

23   by the Defendants, and other information

24   including information relevant to the gravity

25   and magnitude of the offense.  Do you see

Page 174

1              WILLIAM F. BROWDER (4/15/15)

2    that?

3         A.   I do.

4         Q.   All right.  So did you talk to the

5    Government before -- about this answer before

6    it was given?  And it was given in March --

7    24th of March, 2014.  Did you talk to the

8    Government about this answer before it was

9    given?

10        A.   No.

11        Q.   Did they show it to you?

12        A.   No.

13        Q.   Did they tell you that -- did they

14   tell you in February of 2014 the judge had set

15   a trial date of March 30th or 31st of 2014;

16   did they tell you that?

17        A.   Yes.

18        Q.   Who told you that?

19        A.   I don't recall who, but somebody in

20   the Government.

21        Q.   Well, somebody in the U.S.

22   Attorney's Office?

23        A.   Yes.

24        Q.   Was it Mr. Monteleoni?

25        A.   Could have been, but it might have

```
 1            WILLIAM F. BROWDER (4/15/15)

 2   also been one of the other people in his

 3   office.

 4        Q.   Okay.  And was this a telephone

 5   conversation or an e-mail?

 6        A.   Telephone conversation.

 7        Q.   All right.  What else was said in

 8   that conversation about the trial date?

 9        A.   Just that there was a trial date

10   coming up.

11        Q.   Did they ask whether you would

12   appear as a witness?

13        A.   I believe so.

14        Q.   And what did you tell them?

15        A.   Yes.

16        Q.   And did they tell you that they

17   were informing the judge that you were their

18   chief witness?

19        A.   No.

20        Q.   So did you talk about what you

21   would testify to?

22        A.   No.

23        Q.   Just you would show up and you

24   would testify?

25        A.   Yes.
```

1          WILLIAM F. BROWDER (4/15/15)

2          Q.   And that was -- how long was the

3    conversation?

4          A.   Ten minutes.

5          Q.   Approximately when was it?

6          A.   Sometime around the time period you

7    specified.

8          Q.   February of 2014?

9          A.   Yes, I guess.  I mean, I don't

10   remember the dates, so...

11         Q.   Did they express concern about the

12   trial date?

13              MR. MONTELEONI:  To the extent

14         that this question is just calling for

15         the witness's impressions of the

16         opinions and mental impressions of

17         counsel for the Government I'm going

18         to request that the witness not answer

19         on the grounds of work product

20         protection.

21         Q.   Are you going to answer?

22         A.   I'm going to respect the

23   Government's request.

24              MR. CYMROT:  Are you instructing

25         him not to answer?

Page 177

1              WILLIAM F. BROWDER (4/15/15)

2              MR. KIM:  Since a party has

3         claimed privilege we have no position

4         on the matter, but I'll instruct the

5         witness not to answer until the

6         privilege is resolved.

7              MR. CYMROT:  Okay.

8    BY MR. CYMROT:

9         Q.   So what information did you tell

10   the Government that you had about the

11   Defendants' knowledge of the $230 million

12   fraud scheme?

13        A.   None.

14        Q.   What information did you tell the

15   Government about Defendants' contacts with the

16   organization?

17        A.   I don't remember.

18        Q.   Do you have any information about

19   Defendants' contacts with this so-called

20   organization?

21        A.   Not -- no specific information.

22        Q.   Okay.  So to be clear, the

23   organization is the organization that is

24   described in the Complaint, the criminal

25   organization that committed the $230 million

1             WILLIAM F. BROWDER (4/15/15)

2    fraud, right?

3         A.   Right.

4         Q.   You understood that?

5         A.   Yes.

6         Q.   Okay.  So you have no specific

7    information; do you have any general

8    information about Defendants' contacts with

9    the organization?

10        A.   There was some theories that -- I

11   can't remember the details, but there were

12   some theories about their contact with the

13   organization.

14        Q.   Who had these theories?

15        A.   People on my legal team.

16        Q.   And who are you referring to now?

17        A.   Lawyers.

18        Q.   Yeah, what lawyers?

19             THE WITNESS:  Can I ask a

20        privilege -- is this a privilege?

21             MR. KIM:  You can say the names of

22        the lawyers.

23             THE WITNESS:  Okay.

24             MR. KIM:  And I think you've

25        previously testified.

1          WILLIAM F. BROWDER (4/15/15)

2             THE WITNESS:  Right.

3       A.   So -- so the -- Edward Hardinov,

4   Vladimir Pastukhov.

5   BY MR. CYMROT:

6       Q.   So they have theories; do they have

7   any facts to support their theories?

8             MR. MONTELEONI:  I'm going to

9        request that the witness not answer to

10       the extent that any answer might

11       reveal communications pertaining to

12       ongoing criminal investigations.

13            MR. KIM:  And on a separate note,

14       I'm going to instruct the witness not

15       to answer as to the contents of any of

16       his discussions with lawyers, which

17       are attorney-client privileged, which

18       I believe your last question would

19       invade that territory.

20            So I would instruct the witness

21       not to reveal the contents of the

22       communications, including as to

23       what -- what, if any, facts they have.

24            MR. CYMROT:  Well, Mr.- -- well,

25       that raises a whole series of

Page 180

1          WILLIAM F. BROWDER (4/15/15)

2      questions.

3  BY MR. CYMROT:

4      Q.   What information do you have about

5  ongoing criminal investigations relating to

6  the $230 million fraud?

7          MR. MONTELEONI:  I'm going to

8          request that the witness not answer

9          any questions about the witness's

10         knowledge of ongoing criminal

11         investigations related to the

12         $230 million fraud scheme except to

13         the extent that that information is

14         already public.  So as to that, he can

15         answer.

16         MR. KIM:  So we have no position

17         on the matter, but since a party is

18         claiming a privilege, I will give the

19         same instruction to the witness.

20         MR. CYMROT:  Okay, just so our

21         position's clear, that if these

22         privilege claims don't stand up in

23         court, then Mr. Browder will have to

24         come back and testify to these things.

25         MR. KIM:  Well, there's no sense

Page 181

1          WILLIAM F. BROWDER (4/15/15)

2       debating that now.  I think there's

3       another form to debate that, so

4       continue your questioning.

5           MR. CYMROT:  I'm just reserving

6       our position.

7           MR. KIM:  I understand.

8           MR. CYMROT:  But I agree with you,

9       there's no point in debating that.

10  BY MR. CYMROT:

11      Q.   All right.  What facts do you have

12  about Defendants' contacts with the

13  organization?

14      A.   None.

15      Q.   What facts do you have about

16  Defendants' knowledge of the organization?

17      A.   No.

18      Q.   Do you have anybody in the

19  organization with a theory about Defendants'

20  knowledge of the organization; yes or no you

21  can answer that?

22      A.   Yes.

23      Q.   And who's that?

24      A.   Lawyers.

25      Q.   And who are they, just the names?

1          WILLIAM F. BROWDER (4/15/15)

2     A.    Edward Hardinov and

3  Vladimir Pastukhov.

4     Q.    And have they told you what their

5  theories are?

6          MR. KIM:  Same objection about

7          privilege, the content of

8          communications.

9          MR. CYMROT:  So you're

10          instructing -- to be clear, you're

11          instructing him not to answer?

12          MR. KIM:  Correct, I'm instructing

13          him not to answer this or any other

14          questions that call for the contents

15          of his conversations with his lawyers.

16          MR. CYMROT:  Okay.  So we might

17          speed this up so I don't have to ask a

18          whole series of questions, if you'll

19          agree that anything on the subject

20          matter you'll give the same

21          instruction.

22          MR. KIM:  No.  My objection is

23          simply to the attorney-client

24          privilege nature of the contents of

25          the communications, not to the subject

Page 183

1              WILLIAM F. BROWDER (4/15/15)

2         matter of what information he

3         possesses.

4              MR. CYMROT:  Then I'll keep asking

5         questions.

6    BY MR. CYMROT:

7         Q.   So it says the Defendants' intent

8    or knowledge of the purpose -- for the purpose

9    of money laundering; what do you know about

10   the Defendants', being the Prevezon companies,

11   intent or knowledge of the $230 million fraud?

12        A.   So are you asking me based on this

13   sentence here or the $230 million fraud?

14        Q.   Well, for the purpose of -- let me

15   interpret that because that's legalese.

16              So the Defendants' intent or

17   knowledge for hiding the proceeds of the

18   $230 million fraud?

19        A.   I'm sorry, could you repeat the

20   question?

21        Q.   Sure.  I said what facts do you

22   have related to the Defendants' intent or

23   knowledge to cover up the proceeds or hide the

24   proceeds of the $230 million fraud?

25        A.   What I've -- what I've read in the

Page 184

1          WILLIAM F. BROWDER (4/15/15)

2    Government's Amended Complaint.

3          Q.   Well, we've all read that.  What do

4    you have independent of that?

5          A.   I don't have personally anything

6    independent of that.

7          Q.   All right.  Do people in your

8    organization have theories about the

9    Defendants' intent or knowledge for the

10   purpose of covering up the $230 million fraud?

11         A.   I believe so.

12         Q.   And who's that?

13         A.   Lawyers.

14         Q.   Same lawyers?

15         A.   Same lawyers.

16              MR. CYMROT:  Are you instructing

17         him not to answer as to the substance

18         of those conversations?

19              MR. KIM:  There's no question

20         about it pending, but to --

21              MR. CYMROT:  I understand.

22              MR. KIM:  -- the extent you ask

23         it, I'll make the same objection.

24              MR. CYMROT:  Okay.

25    BY MR. CYMROT:

Page 185

1          WILLIAM F. BROWDER (4/15/15)

2     Q.   So what did they tell you?

3          MR. KIM:  I object on the

4     attorney-client privilege is.

5          MR. CYMROT:  All right, but you're

6     instructing him not to answer?

7          MR. KIM:  I'm instructing him not

8     to answer that specific question, but

9     I'm not objecting generally to the

10    subject matter, you're free to ask

11    more questions.

12         MR. CYMROT:  Understood.

13  BY MR. CYMROT:

14    Q.   So did you have conversations with

15 the Government about the Defendants' knowledge

16 of the organization?

17    A.   Yes.

18    Q.   All right.  When were those

19 conversations?

20    A.   They were -- they are and were

21 ongoing.

22    Q.   I see.  Are you still collecting

23 information related to this lawsuit?

24    A.   If it -- as it becomes available,

25 sure.

Page 186

                    WILLIAM F. BROWDER (4/15/15)

1          Q.    So you are still collecting

2    information?

3          A.    Any information that becomes

4    available, yes.

5          Q.    Comes available how?

6          A.    Through any or -- every and any

7    means.

8          Q.    So do you have people out asking

9    questions for information?

10          A.    There are investigations going on

11    in other countries.

12          Q.    That --

13          A.    That involve the Defendants or

14    information, more information becomes -- is

15    becoming available.

16          Q.    All right.  Which countries?

17               MR. MONTELEONI:  Again, I'm going

18          to request that the witness not answer

19          to the extent that that information is

20          not already public.

21               MR. CYMROT:  I'm asking -- to be

22          clear, I'm asking what investigations

23          is he aware of, of the Defendants in

24          other countries.

```
 1            WILLIAM F. BROWDER (4/15/15)
 2            MR. MONTELEONI:  Right.  And to
 3       the extent that the existence of those
 4       investigations is public he can
 5       answer.  And to the extent that it's
 6       not, we're requesting that he not
 7       answer.
 8            MR. KIM:  So on this, this is --
 9       we have no position on it, but since a
10       party has claimed privilege over that
11       potential response to that question,
12       we will -- I will instruct the witness
13       not to answer until that's resolved.
14            MR. CYMROT:  All right.
15  BY MR. CYMROT:
16       Q.   So what information do you have
17  about other investigations of Prevezon or
18  Mr. Katsyv?
19            MR. KIM:  Isn't that what you just
20       asked?
21            MR. CYMROT:  Same question, yeah.
22            MR. MONTELEONI:  To the extent
23       it's public, you can answer.
24            MR. KIM:  The public part of it,
25       sorry.  Go ahead.
```

Page 188

1           WILLIAM F. BROWDER (4/15/15)

2       A.   So could you just repeat the

3   question so I know what I'm answering?

4    BY MR. CYMROT:

5       Q.   Yes.   What information do you have

6   about investigations in countries other than

7   the United States about Prevezon or

8   Mr. Katsyv?

9               MR. KIM:   That is public.

10               THE WITNESS:   That's public.

11               MR. CYMROT:   That is public.

12    BY MR. CYMROT:

13       Q.   Well, that's the instruction you've

14   been given.

15       A.   These two people have been -- or

16   the Prevezon and Katsyv and Litvak are, I

17   believe, subjects to criminal investigation in

18   Switzerland.

19       Q.   Have they been named as the subject

20   of that investigation?

21       A.   I don't know the formalities of the

22   Swiss proceeding.

23       Q.   Haven't they been denied a role as

24   interested parties in that proceeding?

25       A.   I don't know.

Page 189

```
 1              WILLIAM F. BROWDER (4/15/15)

 2         Q.   Well, so what makes you believe

 3    that they are under criminal investigation in

 4    Switzerland as I will tell you they've been

 5    denied access to that investigation as

 6    interested parties?

 7              MR. KIM:  Objection to form.

 8         A.   Could you rephrase the question,

 9    please?

10         Q.   Yes.  What makes you believe

11    they're under criminal investigation in

12    Switzerland?

13         A.   Because their names are on

14    documents in the court where they're

15    requesting that Hermitage didn't have access

16    to the file.

17         Q.   Their names are on documents in the

18    court where Hermitage does not have access to

19    the file?

20         A.   No.  Let's just start again.

21         Q.   Yes.

22         A.   So they -- they -- they made a

23    filing with the Swiss criminal tribunal to

24    deny Hermitage access to the criminal case

25    file, both Mr. Katsyv and Mr. Litvak.
```

1               WILLIAM F. BROWDER (4/15/15)

2        Q.   And from there you conclude they

3   are under criminal investigation?

4        A.   Why would two people unrelated to

5   this -- so my assumption --

6             MR. KIM:  Mr. Browder, you should

7        answer a question, not ask a question.

8             MR. CYMROT:  Yeah, because I'm not

9        going to answer your questions.

10            MR. KIM:  He's not obligated to

11       answer.

12            THE WITNESS:  Sorry.  My mistake.

13   BY MR. CYMROT:

14       Q.   That's the basis for your

15   conclusion that they're under criminal

16   investigation in Switzerland?

17       A.   And I -- I'm trying to remember

18   what other reasons.  Off the top of my head I

19   can't remember any other reasons.

20       Q.   All right.  What other countries

21   have them under criminal investigation

22   according to you?

23            MR. MONTELEONI:  To the extent

24       that it's public.

25       A.   They were under criminal

1          WILLIAM F. BROWDER (4/15/15)

2     investigation in Israel for money laundering.

3          Q.    And what happened with that?

4          A.    Their money was seized and they

5     walked away.

6          Q.    They worked out a settlement and

7     then the Court found there was no money

8     laundering?

9          A.    I'm not a legal expert, but that's

10    not how I read it.

11         Q.    So what did you read?

12         A.    That they had to give the money to

13    the Israeli government as a penalty for money

14    laundering.

15         Q.    What did you read?

16         A.    I read the Israeli money laundering

17    document.

18         Q.    Did you read the document that said

19    the banker who supposedly was the one money

20    laundering was acquitted because there was no

21    money laundering?

22         A.    That's not how I read it, but I'm

23    not a lawyer.

24         Q.    I see.  Were you the one that gave

25    that document to the U.S. attorney?

Page 192

1          WILLIAM F. BROWDER (4/15/15)

2     A.    No.

3     Q.    Who gave that document to the U.S.

4 attorney?

5     A.    Someone on my team.

6     Q.    Who?  Somebody on your team

7 provided it?

8     A.    Yes.

9     Q.    And who provided it to your team?

10    A.    I don't know.

11    Q.    Who on your team had that document?

12    A.    I don't know.

13    Q.    Who did you see -- who gave it to

14 you?

15    A.    I don't remember.

16    Q.    When did they give it to you?

17    A.    I don't remember.

18    Q.    You know, we read your book and you

19 have all sorts of details going back, I don't

20 know, 15 years about what people were wearing

21 and what people did and you had a great memory

22 where it came to things you wanted to talk

23 about, but you can't even tell me who gave you

24 a document just, what, last year, this year?

25    A.    Is there a question?

1           WILLIAM F. BROWDER (4/15/15)

2      Q.   Yeah.  You're telling me you can't

3   remember who gave you that document this year?

4      A.   Yes.

5      Q.   It was somebody within your

6   organization?

7      A.   Yes.

8      Q.   All right.  Are you aware of any

9   other criminal investigations of the

10  Defendants?

11          MR. MONTELEONI:  To the extent

12          they're public.

13     Q.   Or Mr. Katsyv or Mr. Litvak?

14     A.   There's no other information that's

15  not public that I can share.

16     Q.   And the information that you got,

17  you got from the U.S. attorney?  In other

18  words, where did you get the information about

19  other criminal investigations of the

20  Defendants, Mr. Katsyv and Mr. Litvak?

21          MR. MONTELEONI:  To the extent

22          that that question is asking about

23          whether he got information about some

24          type of nonpublic investigation, if

25          any, I'm going to request that the

1       WILLIAM F. BROWDER (4/15/15)

2    witness not answer that question.

3       MR. KIM:  So because a party is

4    claiming privilege over the ans- --

5    potential answer to that particular

6    question, I'm going to ask the witness

7    or instruct the witness not to answer

8    to the extent it reveals the

9    information that the U.S. Attorney's

10   Office just mentioned.

11      MR. CYMROT:  So to be clear, if he

12   didn't get it from you but he got it

13   from somebody else, you're saying we

14   can't have that information; you're

15   asserting what privilege?

16      MR. MONTELEONI:  The -- the law

17   enforcement privilege with respect to

18   ongoing investigation -- ongoing

19   criminal investigations that are not

20   public.

21      MR. CYMROT:  And he got the

22   information from a third party?

23      MR. MONTELEONI:  We -- any

24   information about an ongoing law

25   enforcement investigation that's not

1     WILLIAM F. BROWDER (4/15/15)

2  public is something that's covered by

3  the law enforcement privilege.  And

4  the interaction that he had with that

5  information and he came into that

6  investigation any knowledge he may of

7  that investigation, to the extent that

8  it's about something that's ongoing,

9  it's criminal, it's not public under

10  the law enforcement privilege.

11      MR. CYMROT:  Worldwide?

12      MR. MONTELEONI:  Well, I guess,

13  yes, including with respect to --

14  to -- I mean, if you're asking for a

15  list of -- of countries, then yes.  If

16  you wanted to ask country by country,

17  I suppose he could answer on that --

18  on that basis, but...

19      MR. CYMROT:  I'm asking are you

20  asserting this privilege worldwide,

21  any law enforcement agency anywhere,

22  information coming from a third party,

23  you're claiming the law enforcement

24  privilege?

25      MR. MONTELEONI:  Based on the

1      WILLIAM F. BROWDER (4/15/15)

2      information that we have, we think

3      that the answer to questions about the

4      witness's knowledge of ongoing

5      nonpublic criminal investigations

6      conducted by other countries would

7      implicate the United States's law

8      enforcement privilege.

9           The United States I can say has

10     been working with other countries in

11     conducting investigations and has law

12     enforcement interests in nonpublic

13     criminal investigations conducted by

14     other countries not being jeopardized

15     by premature disclosure.

16          MR. CYMROT:  Okay.  And you're

17     instructing him not to answer on that

18     basis, right?

19          MR. KIM:  This is not my privilege

20     call, I'm not here to adjudicate.

21          MR. CYMROT:  I understand.

22          MR. KIM:  I'm just going to

23     respond to specific questions.  I

24     understand that the last question

25     elicited a privilege objection, and

1          WILLIAM F. BROWDER (4/15/15)

2          it's our position and I'm instructing

3          the witness not to answer while a

4          party claims privilege until it has

5          been adjudicated.

6     BY MR. CYMROT:

7          Q.   Okay.  So let me ask you this:  Are

8     you familiar with a Mutual Legal Assistance

9     Treaty request from the United States to

10    Russia?

11         A.   I've read about it in -- in either

12    the Complaint or some of the docket filings.

13         Q.   Okay.  And do you have any

14    knowledge about how the Russian Federation

15    responded to the United States with respect to

16    that MLAT request?

17         A.   I don't.

18         Q.   Have you ever seen that MLAT

19    request?

20         A.   No.

21         Q.   Have you seen the United States'

22    request to the Netherlands?

23         A.   No.

24         Q.   Are you aware of any United States'

25    request under mutual legal assistance treaties

Page 198

1              WILLIAM F. BROWDER (4/15/15)

2    to any other country related to this case?

3         A.   Only what I've read in the public

4    documents on the docket.

5         Q.   Okay.  Are you aware of any other

6    informal requests from the United States to

7    other countries in connection with this case?

8         A.   No.  No.

9         Q.   Do you know whether a Grand Jury

10   has been paneled to investigate the

11   $230 million fraud?

12        A.   Only what I've read on the public

13   docket.

14        Q.   Have you testified before a Grand

15   Jury?

16             THE WITNESS:  Is this a privilege?

17             MR. CYMROT:  No.  The witness

18        doesn't have a privilege.

19             MR. KIM:  I think the witness just

20        asked the question.  We're not

21        asserting a privilege.

22             MR. CYMROT:  No, but...

23             MR. MONTELEONI:  No, the witness

24        can answer.

25        A.   Okay, no.

1          WILLIAM F. BROWDER (4/15/15)

2    BY MR. CYMROT:

3          Q.   Do you know anybody who's testified

4    before a Grand Jury in connection with the

5    $230 million fraud?

6          A.   No.

7          Q.   So according -- going back to

8    Exhibit 13, the United States represents that

9    you have information concerning the transfers

10   described in to the Verified Complaint; do you

11   see that?

12         A.   Could you just further me to which

13   subject matter this is?

14         Q.   It's No. 7.

15         A.   Yes, I see that.

16         Q.   Do you have information about the

17   transfers?  Do you know what transfers that

18   that refers to?

19         A.   I'm not sure, no.

20         Q.   All right.  So generally, it's the

21   transfers from the Russian Treasury through

22   the various accounts, the chart that we were

23   looking at getting to allegedly the Prevezon

24   accounts with...

25         A.   Right.

Page 200

1              WILLIAM F. BROWDER (4/15/15)

2         Q.    Do you have any information about

3    those transfers?

4         A.    No.

5         Q.    Did you ever tell the United States

6    you had information about those transfers?

7         A.    We provided a Complaint or I should

8    say actually I -- I submitted a Complaint to

9    the New York District Attorney's office with

10   all that stuff attached, so maybe they --

11        Q.    But you have no -- you have no

12   understanding about what those transfers are

13   or what they mean?

14        A.    No.  No, I don't.

15        Q.    And it says "Additional transfers

16   that support the allegations in the Verified

17   Complaint."

18              Now this time I can't help you, I

19   don't know what additional transfers, but do

20   you know what additional transfers you're

21   referring to?

22        A.    No.

23        Q.    Do you have information about

24   additional transfers of funds that would

25   support the allegations in the Verified

1          WILLIAM F. BROWDER (4/15/15)

2   Complaint?

3          A.    No.

4          Q.    Do you know anything about the

5   tracing methodology -- methodology tracing

6   funds from the Russian Treasury to the

7   Defendants?

8          A.    Just what I've read in our

9   Complaint.

10          Q.    In the Exhibit 1 that we looked at

11   at the beginning?

12          A.    I read the text of the Complaint.

13          Q.    Of the Verified Complaint?

14          A.    I read the text or at least what we

15   provided to the Govern- -- to the New York

16   USDA's office and I read the Verified

17   Complaint.

18          Q.    Okay.  When you say "our

19   Complaint," you're talking about the one that

20   went to the D.A.?

21          A.    Correct.  The Hermitage Capital

22   Complaint.

23          Q.    All right.  You read it, but you

24   don't really understand it; is that accurate?

25          A.    I read it, but I can't explain the

Page 202

1          WILLIAM F. BROWDER (4/15/15)

2    documents in the back.

3          Q.   So information about the nature of

4    businesses operated by the Defendants, do you

5    have knowledge about that?

6          A.   I have a little bit of knowledge

7    about that.

8          Q.   What do you know about the nature

9    of businesses operated by the Defendants?

10         A.   That the Defendants operate a -- or

11   I should say the Peter -- or Denis Katsyv

12   operates a transportation company in Moscow.

13         Q.   And what else?

14         A.   I think he has a hotel in Kozelsk

15   or someplace like that.

16         Q.   That's in Russia?

17         A.   Yes.

18         Q.   What else?

19         A.   Off the top of my head that's what

20   I remember.

21         Q.   Have you given that information to

22   the U.S. Attorney's Office?

23         A.   I don't remember if I did or

24   didn't.

25         Q.   And how do you know that

```
 1              WILLIAM F. BROWDER (4/15/15)
 2   information?
 3        A.   I read it somewhere.
 4        Q.   Read it where?
 5        A.   It's online.
 6        Q.   What website?
 7        A.   I don't know.
 8        Q.   Did you ever meet Denis Katsyv?
 9        A.   No.
10        Q.   Have you --
11             (Whereupon, an off-the-record
12        discussion was held.)
13             MR. CYMROT:  I'm told there's a
14        problem with the audio.  We're being
15        told there's a problem with the audio.
16             (Whereupon, at this time, a short
17        break was taken.)
18   BY MR. CYMROT:
19        Q.   All right.  Have you conducted any
20   investigation of the businesses operated by
21   Defendants?
22        A.   No.
23        Q.   Has anybody in your organization?
24        A.   Yes.
25        Q.   Who is that?
```

```
 1            WILLIAM F. BROWDER (4/15/15)
 2       A.   My legal team.
 3       Q.   And what's the nature of the
 4  investigation?
 5            MR. KIM:  I give the same
 6            objection, that I believe that
 7            question would call for the contents
 8            of Mr. Browder's conversations with
 9            his legal team and subject to
10            attorney-client privilege, so I
11            instruct the witness not to answer
12            that particular question.
13       Q.   Did you give information about the
14  nature of the businesses operated by
15  Defendants to the Government?
16       A.   Yes.
17       Q.   And documents?
18       A.   Yes.
19       Q.   And what documents are those?
20       A.   Information about their
21  transportation company, et cetera.
22       Q.   And where -- where -- and you got
23  all this information online; is that what
24  you're saying?
25       A.   Yes.
```

Page 205

1          WILLIAM F. BROWDER (4/15/15)

2          Q.   Did you get any information from

3    Dmitry Baranovsky?

4          A.   No.

5          Q.   You produced documents in response

6    to a document request for information from

7    Dmitry Baranovsky and it included all the

8    property records of Prevezon.  Did you get

9    that from Mr. Baranovsky?

10         A.   No.

11         Q.   Did you get it from Mr. Stolbunov?

12         A.   No.

13         Q.   Do you know Mr. Stolbunov?

14         A.   No.

15         Q.   Andrei Stolbunov?

16         A.   I don't know him.

17         Q.   Do you know Mr. Baranovsky?

18         A.   No.

19         Q.   You called him in one of your

20   pleadings a human rights campaigner; do you

21   remember doing that?

22         A.   Vaguely.

23         Q.   And what's the basis for doing

24   that?

25         A.   The -- his background story.

Page 206

1              WILLIAM F. BROWDER (4/15/15)

2         Q.   His background story being he's in

3    prison for trying to extort $20 million in

4    property from Mr. Katsyv; is that the

5    background story you're talking about?

6         A.   No.

7         Q.   You're aware that he's been

8    convicted of extortion, right?

9         A.   I am.

10        Q.   Not just from Mr. Katsyv on several

11   occasions at least more than one you're aware

12   of that?

13        A.   No.

14        Q.   Have you had any communications

15   with Mr. Bern move ski?

16        A.   No.

17        Q.   Have you had any communications

18   with Andre stove move?

19        A.   No.

20        Q.   Have you had any communications

21   with Mr. Pavlov who's in the Complaint?

22        A.   No.

23        Q.   What made you think about that?

24   You may have?

25        A.   I'm trying to give you a correct

Page 207

1          WILLIAM F. BROWDER (4/15/15)

2   answer.

3          Q.   Do you know whether members of your

4   team have had communications with

5   Mr. Baranovsky?

6          A.   I'm not aware of them having

7   communications with him.

8          Q.   Do you know whether members of your

9   team had communications with Mr. Stolbunov?

10         A.   I'm not aware.

11         Q.   Do you know whether Brown Rudnick

12  has had communications with Mr. Stolbunov?

13         A.   I'm not aware.

14         Q.   Do you know whether Mr. Stolbunov

15  has met with Brown Rudnick?

16         A.   I'm not aware.

17         Q.   Do you get reports on the

18  investigation going on by your team in

19  connection with this case?

20         A.   Sometimes.

21         Q.   Are they in writing?

22         A.   No.

23         Q.   Oral?

24         A.   Yes.

25         Q.   So you intentionally keep them from

Page 208

1              WILLIAM F. BROWDER (4/15/15)

2    being written down?

3         A.   No.

4         Q.   So why are they only giving you --

5    you don't exchange e-mails about this case?

6         A.   We exchange e-mails about lots of

7    things.

8         Q.   And about this case?

9         A.   About -- sometimes we do, yes.

10        Q.   So there are writings about this

11   case?

12        A.   That wasn't your -- that wasn't

13   your question before.

14        Q.   All right.  Are there any writings

15   that your team has given you about this case?

16        A.   Yes.

17        Q.   And they're in e-mails?

18        A.   I believe so.

19        Q.   All right.

20             MR. CYMROT:  All right.  So let's

21        go to the Amended Complaint, which

22        we're going to mark as a new exhibit.

23             (Browder Exhibit 14, Verified

24        Amended Complaint was marked for

25        identification, as of this date.)

```
 1            WILLIAM F. BROWDER (4/15/15)

 2    BY MR. CYMROT:

 3        Q.    So this is Exhibit 14, the Verified

 4    Amended Complaint, which was filed on

 5    November 5, 2014.  All right.

 6              You're familiar with that document,

 7    right?

 8        A.    Yes.

 9        Q.    You read it more than once, I

10    imagine?

11        A.    What's the question?

12        Q.    Have you read it more than once?

13    You've read it?

14        A.    I read the document.

15        Q.    Okay.  Did you discuss it with

16    anybody in the U.S. Attorney's Office?

17        A.    I don't recall.

18        Q.    Did you review it before it was

19    filed?

20        A.    No.

21        Q.    Did anybody on your team review it

22    before it was filed?

23        A.    Not that I'm aware of.

24        Q.    Let's look at paragraph 39.  Okay.

25              Okay.  If you look at the last
```

Page 210

1              WILLIAM F. BROWDER (4/15/15)

2    sentence in paragraph 39, it says "During the

3    relevant period, the head of Moscow, Tax

4    Office No. 25 was Yelena Khimina, who on

5    information and belief is a member of the

6    organization, and the head of the Moscow Tax

7    Office No. 28 was Stepanova, who had traveled

8    to Larnaca in May of 2007 and on information

9    and belief met with Klyuev to plan the

10   $230 million fraud scheme."

11             Do you see that?

12        A.   I do.

13        Q.   Do you know where the -- do you see

14   that Ms. Khimina is described on information

15   and belief as a member of the organization; do

16   you see that?

17        A.   Yes.

18        Q.   But Ms. Stepanova is not; do you

19   see that?

20        A.   Um-hum.

21        Q.   Did you discuss that with the U.S.

22   Attorney's Office?

23        A.   No.

24        Q.   So as far as you're concerned,

25   Ms. Stepanova is not a member of the

Page 211

1            WILLIAM F. BROWDER (4/15/15)

2    organization?

3        A.    No.

4        Q.    To be clear, I am correct that in

5    your view, Ms. Stepanova's not a member of the

6    organization?

7        A.    You're incorrect.

8        Q.    I am incorrect.

9              So in your view, Ms. Stepanova is a

10   member of the organization?

11       A.    Yes.

12       Q.    And what facts lead you to believe

13   Ms. Stepanova is a member of the organization?

14       A.    Well, there's a number of facts.

15       Q.    Go ahead.  What are they?

16       A.    First of all, she was one of the

17   people who approved the tax refund in one day,

18   on November or December 24, 2007.  The lar- --

19   lion's share of the tax refund.

20       Q.    Anything else?

21       A.    That her husband or ex-husband,

22   depending on whose version you believe,

23   received around -- somewhere between 7 and

24   $10 million in his account at Credit Suisse

25   from the fraud -- following the fraud.

1          WILLIAM F. BROWDER (4/15/15)

2          Q.    Okay.  Anything else?

3          A.    That the two of them, husband and

4     wife, purchased real estate in Dubai.

5          Q.    Anything else?

6          A.    And the travel records of the

7     Stepanova's -- Stepanova, Stepanova.

8          Q.    To Larnaca.  The ones we referred

9     to before?

10         A.    Also the travel records to Dubai

11    and various other places.

12         Q.    What other places?

13         A.    I don't remember off the top of my

14    head.

15         Q.    Anything else?

16         A.    That's all I can recall at the

17    moment.

18         Q.    Okay.  So, first of all, you said

19    this is the Klyuev organization; is that

20    right?

21         A.    That's correct.

22         Q.    And who's in the Klyuev

23    organization?

24         A.    Olga Stepanova, Yelena Khimina.

25         Q.    Well, these are just the

```
 1              WILLIAM F. BROWDER (4/15/15)

 2    functionaries.  I mean, who -- isn't that

 3    true?  These aren't the planning people?

 4         A.   Is -- is -- what's the question?

 5         Q.   Who is -- let me amend the

 6    question.

 7              Who's at the top of the Klyuev

 8    organization?

 9         A.   Dmitry Klyuev.

10         Q.   And who are his deputies?

11         A.   Andrey Pavlov.

12         Q.   Anybody else?

13         A.   Yes.

14         Q.   Who else?

15         A.   Artem Kuznetsov.

16         Q.   All right.  Anybody else?

17         A.   Oleg Urzhumstev.

18         Q.   Who is that?

19         A.   Oleg Urzhumstev.

20         Q.   How do you spell that?

21         A.   I don't know.

22         Q.   Urzhumstev?

23         A.   You can ask your clients.  They'll

24    know.

25         Q.   Why would my clients know?
```

```
 1              WILLIAM F. BROWDER (4/15/15)

 2        A.    Seems like they would know how to

 3   spell a Russian name like that.

 4        Q.    That's just a crack, right?  You

 5   were just being sarcastic?

 6        A.    Just -- just...

 7        Q.    You think it's funny being here,

 8   them having all their property attached in the

 9   United States?  It's worth being sarcastic

10   about?  Is that what you think?

11        A.    What's the question?

12        Q.    Whether you think it's appropriate

13   to be sarcastic in a situation like this?

14              Do you have an answer for my

15   question?

16        A.    I'm thinking.

17        Q.    Of another sarcastic remark?

18        A.    No.

19        Q.    You're not suggesting

20   Mr. Urzhumstev has any relationship to

21   Mr. Katsyv, do you?

22        A.    I don't know.

23        Q.    What's his profession?

24        A.    He's in the Interior Ministry --

25   was in the Interior Ministry.
```

1              WILLIAM F. BROWDER (4/15/15)

2      Q.   Anybody else in the Klyuev

3  lieutenant circle?

4      A.   Yes.  Pavel Karpov.

5      Q.   Yes?

6      A.   Viktor Markelov.

7      Q.   The sawmill operator?

8      A.   Yes.

9      Q.   Who else?

10      A.   Vyacheslav Khlebnikov.

11      Q.   The other person who was convicted?

12      A.   He was convicted, yes.

13      Q.   Who else?

14      A.   The deputies of Stepanova and

15  Khimina, whose names escape me at the moment.

16      Q.   Anybody else?

17      A.   There are probably others, but I

18  don't have them on top of my hand.

19      Q.   Have you traced any of the

20  $230 million to Mr. Klyuev?

21      A.   It went through Universal Savings

22  Bank, which was his bank.

23      Q.   Any of it stay there and he

24  pocketed it?

25      A.   I don't know.

1          WILLIAM F. BROWDER (4/15/15)

2          Q.   You have no information to suggest

3     that happened, right?

4          A.   He was involved in the

5     money-laundering operations.

6          Q.   How was he involved?

7          A.   By providing the bank.

8          Q.   Did he actually order money moved?

9          A.   I don't know what his -- I don't --

10    I wasn't a witness to his actions.

11         Q.   So you don't have any information

12    about him receiving money or ordering the

13    movement of money?

14         A.   No.

15         Q.   Mr. Pavlov, have you traced any

16    money to the $230 million fraud to Mr. Pavlov?

17         A.   Actually, let me correct my

18    previous statement.  I believe there was some

19    money that was traced to -- to Klyuev and

20    Pavlov in site -- into companies they were

21    involved in in Cyprus.

22         Q.   Traced by who?

23         A.   By my team.

24         Q.   Did you give that information to

25    the U.S. Attorney's Office?

1              WILLIAM F. BROWDER (4/15/15)

2        A.   I don't remember.

3        Q.   Is it anywhere in Exhibit 1?

4        A.   I don't know.

5        Q.   Did you trace any -- well, if it's

6    not in Exhibit 1, where would it have been

7    given?

8        A.   I don't know.

9        Q.   Well, if you look at the tracing

10   which is exhibit -- Tab 8 -- and take your

11   time, but it makes no reference, that I'm

12   aware, to companies being controlled by Klyuev

13   or Pavlov.

14       A.   Which -- which section should I be

15   looking at?

16       Q.   Any section you want, but the

17   tracing -- the bank transactions are in Tab 8.

18            (Whereupon, an off-the-record

19    discussion was held.)

20       A.   No, you -- not in this -- the

21   document.

22            THE WITNESS:  Could I ask for a

23       break?

24            MR. CYMROT:  Sure.

25            THE VIDEOGRAPHER:  The time is

Page 218

1          WILLIAM F. BROWDER (4/15/15)

2          2:38 p.m.  We are off the record.

3              (Whereupon, at this time, a short

4     break was taken.)

5              THE VIDEOGRAPHER:  The time is

6          2:42 p.m.  We are back on the record.

7     BY MR. CYMROT:

8          Q.   All right.  So, Mr. Browder,

9     there's nothing in Exhibit 1 about any tracing

10    to Mr. Klyuev or Mr. Pavlov to Cyprus

11    Companies.  So is there somewhere else that

12    you provided this to the U.S. government?

13         A.   No, not -- I don't remember what we

14    provided in -- in relation to this issue.

15         Q.   Do you re -- are you sure there --

16         A.   I think I -- let me -- let me

17    rephrase.  I didn't provide anything to the

18    U.S. government on this issue.

19         Q.   Did anybody on your team provide

20    information to the U.S. government on this

21    issue?

22         A.   Not that I'm aware of.

23         Q.   Are you sure that that tracing

24    occurred to Cyprus Companies for Pavlov and

25    Klyuev?

```
 1              WILLIAM F. BROWDER (4/15/15)

 2       A.   Yes.

 3       Q.   You're sure?

 4       A.   Yes.

 5       Q.   And So you have information of that

 6  nature?

 7       A.   I don't personally.  My team has

 8  it.

 9       Q.   I see.

10            And you haven't produced it to us

11  one more time; is that right?

12            Was that intentional?

13       A.   No.

14       Q.   How did you get the information?

15       A.   I don't know.

16       Q.   Who got the information?

17       A.   My team.

18       Q.   Who on your team got this

19  information?

20       A.   Lawyers and my staff.

21       Q.   What lawyers and what staff?

22       A.   Vladimir Pastukhov and Vadim

23  Kleiner and other lawyers.

24       Q.   How much money went to Mr. Klyuev

25  and Mr. Pavlov?
```

Page 220

1          WILLIAM F. BROWDER (4/15/15)

2          A.   I don't know.

3               And let me -- let me -- well, yes.

4     I don't know.  Let's stick with that answer.

5          Q.   Have you traced any money to

6     Mr. Kuznetsov?

7          A.   Not to my personal knowledge.

8          Q.   Can you speak up, please.

9          A.   Not to my personal knowledge.

10         Q.   Have you traced any money from the

11    $230 million fraud to Mr. Urzhumstsev?

12         A.   Who?

13         Q.   This fellow we had this little go

14    around about how you spell list name.

15    Urzhumstsev?  Urzhumstsev?

16         A.   Oh, you mean -- you mean Urzh- --

17    Urzhumstsev.

18         Q.   Urzhumstsev.  I won't be able to

19    spell it in.

20         A.   Right.  I --

21         Q.   Did you trace any money to him?

22         A.   Not in my personal knowledge.

23         Q.   Trace any money from the fraud to

24    Mr. Karpov?

25         A.   Not to my personal knowledge.

1          WILLIAM F. BROWDER (4/15/15)

2     Q.   And Mr. Markelov?

3     A.   Yes.  He was the -- he was the

4  owner of the stolen companies.

5     Q.   Did you trace any money into a bank

6  account from Mr. Markelov --

7     A.   He was --

8     Q.   -- from the $230 million fraud?

9     A.   Yes.

10    Q.   How much money?

11    A.   About two-thirds of the

12 $230 million went to his accounts at USB.

13    Q.   Okay.  So he was the account holder

14 at USB for the money that came through USB?

15    A.   No.  He was the -- he was the owner

16 of the company -- I believe a director, but

17 I'm not sure about that -- of -- of the -- he

18 was the owner of the three stolen Hermitage

19 companies and director of one of them, I

20 believe.

21    Q.   And did any of the money stay in

22 bank accounts that he had access to?

23    A.   Not to my personal knowledge.

24    Q.   Mr. Khlebnikov, the other fellow

25 who was convicted, did you trace any money to

1          WILLIAM F. BROWDER (4/15/15)

2     him?

3          A.   He was the director of one of the

4     companies that received part of the

5     $230 million.

6          Q.   And did any money stay in that

7     account for his use?

8          A.   Not to my personal knowledge.

9          Q.   Did you trace any money to

10    Ms. Khimina, the head of Tax Office No. 25?

11         A.   Yes.

12         Q.   How much money did you trace to

13    Ms. Khimina?

14         A.   I don't remember the exact amount,

15    but she used money to buy apartments in Dubai

16    that was wired by Credit Suisse.

17         Q.   And how do you trace that back to

18    the Russian $230 million fraud?

19         A.   I didn't do the tracing.

20         Q.   You don't have any idea?

21         A.   No.

22         Q.   And Mr. -- Ms. Stepanova you say

23    got money because Mr. Stepanov, her husband,

24    got money, according to you.

25         A.   That's correct.

Page 223

1          WILLIAM F. BROWDER (4/15/15)

2     Q.   Right?

3     A.   Yes.

4     Q.   Right.  You say husband or

5  ex-husband, there's a dispute about that.

6     A.   Correct.

7     Q.   What's the dispute?

8     A.   Whether they're divorced or not.

9     Q.   Whether they've ever been divorced?

10    A.   Whether they're divorced or not

11  or -- or legitimately divorced or whether it

12  means anything.

13    Q.   I see.  So Mr. Step -- Stepanov

14  claims they were divorced in the 1990s, right?

15    A.   I don't remember when -- when they

16  were supposed to have been divorced, no.  I

17  don't know the details.

18    Q.   I see.  You traced any money into

19  her name?

20    A.   No.

21    Q.   So it's all to Mr. Stepanov?

22    A.   Again, so the -- so you have the

23  Olga Stepanova, who is the head of Tax Office

24  No. 28, approving the tax refunds.

25    Q.   Right.

Page 224

1                WILLIAM F. BROWDER (4/15/15)

2          A.   And then that money going to

3    accounts in her husband's name at Credit

4    Suisse.

5          Q.   According to you.

6          A.   I'm sorry.  I'm sorry.

7    Ex-husband's name.  Excuse me.

8          Q.   Husband or ex-husband, depending on

9    how you resolve the dispute.

10         A.   Correct.

11         Q.   Okay.  So if you look at the

12   Amended Complaint, paragraph 69.  This relates

13   to the conviction of Mr. Markelov and

14   Mr. Khlebnikov.  And if you look at the

15   second-to-last sentence, it says, "The verdict

16   announcing Markelov sentence claim that the

17   tax authorities were deceived by Markelov and

18   not complicit."

19              Do you see that?

20         A.   Um-hum.

21         Q.   That would be refer- --

22              You have to give me a yes for that.

23         A.   Oh, I'm sorry.  Yes.

24         Q.   Okay.  So that would be referring

25   to Ms. Stepanova and Ms. -- Ms. Khimina,

1         WILLIAM F. BROWDER (4/15/15)

2    right?

3         A.   Yes.

4         Q.   All right.  Are you saying that the

5    judge was corrupt?

6              MR. KIM:  Objection to form.  You

7         talking about the Complaint or him?

8              MR. CYMROT:  No.  I'm talking

9         about whether he's saying the judge

10        that made that finding.

11        Q.   Are you saying that judge was

12   corrupt?

13        A.   Could you just rephrase.

14        Q.   Are you saying that the judge that

15   made that finding that the tax authorities

16   were deceived by Markelov and not complicit --

17   that's contrary to your theory, right?  Your

18   theory is they were complicit?

19        A.   Yes.  They were complicit.

20        Q.   Right.  So are you saying that the

21   judge was corrupt?

22        A.   I don't know whether he was corrupt

23   or whether he was threatened or whether he was

24   stupid, but he --

25        Q.   Do you know?

Page 226

1              WILLIAM F. BROWDER (4/15/15)

2        A.    I don't -- I don't know.

3        Q.    Do you know whether he was corrupt?

4        A.    I -- I don't know whether he was

5    corrupt.

6        Q.    Do you know whether he was

7    threatened?

8        A.    I don't know whether he was

9    threatened.

10        Q.    Do you know whether he was stupid?

11        A.    I don't know whether he was stupid,

12    but I do know one of the three.

13        Q.    Because you want to believe that,

14    right?

15              You don't have any facts that would

16    support that, right?

17              MR. KIM:  Objection to form.  Is

18         it the last question you want him to

19         answer, or the --

20        Q.    So -- so do you have any facts that

21    would support that the judge who made that

22    finding was corrupt, threatened, or stupid?

23        A.    The information available on this

24    case is clear and overwhelming that the tax

25    authorities were complicit.  And for a judge

1              WILLIAM F. BROWDER (4/15/15)

2    to ignore that information, he would have had

3    to be either corrupt, threatened, or stupid.

4         Q.   So let me -- so the information

5    available on the Markelov case makes it clear

6    that the tax authorities were complicit?

7         A.   No.  The information available on

8    the -- yes.  The information that's

9    available -- the information that's in -- in

10   the case file makes it pretty clear to me that

11   the tax authorities were complicit.

12        Q.   And you're talking about the

13   Markelov case file?

14        A.   Yes.

15        Q.   And you reviewed the Markelov case

16   file?

17        A.   No.

18        Q.   But you made the conclusion even

19   though you didn't review the file?

20        A.   I have information from the file

21   that was presented to me.

22        Q.   By whom?

23        A.   By my team.

24        Q.   The lawyers that you're referring

25   to?

1             WILLIAM F. BROWDER (4/15/15)

2        A.    Yes.

3        Q.    And how did they get access to the

4   criminal file of Mr. Markelov?

5        A.    I don't know.

6        Q.    Is it legal for them to have that

7   information?

8        A.    They -- I would assume, yes.

9        Q.    You're sure about that?

10       A.    Yes.

11       Q.    And what information are you

12  referring to?

13       A.    I'm referring to checks that took

14  place -- there's actually docu- -- I can -- I

15  can read you from the Complaint, if you want.

16       Q.    Sure.

17       A.    Would that -- would that be helpful

18  to you?

19       Q.    If there's something in the

20  Complaint you want to refer to, be my guest.

21       A.    It might -- might take me a few

22  minutes to find it, but just bear with me.

23       Q.    Well, if you tell me what it is, I

24  might help you.

25       A.    Okay.  I want to -- hold on.  No,

Page 229

1            WILLIAM F. BROWDER (4/15/15)

2    I'll find it.

3            Paragraph 42.  Should I read it out

4    loud to you?

5       Q.   If you want.  It talks about how

6    the tax authority said they verified.

7       A.   Let me read it out loud to you:

8            "In sub- -- in subsequent

9    investigation, officials of Tax Offices No. 25

10   and 28 made witness statements claiming that

11   amended tax returns were submitted in or about

12   November of 2007 and claim to have taken

13   certain steps to verify the legitimacy of

14   claimed losses.

15           "These statements do not appear to

16   be fully accurate.  One official claimed,

17   among other things, to have checked with the

18   corresponding tax authorities whether the

19   Plaintiff's in the sham lawsuits had reported

20   receivables corresponding to the fraudulently

21   obtained judgments and have found positive

22   receivables reported.  However, the forms in

23   Star and grant acts you've actually filed with

24   the tax authority show zero receivables over

25   all relevant time periods.

Page 230

1          WILLIAM F. BROWDER (4/15/15)

2               "One of the judgments on which the

3     refund applications were based, by its own

4     terms, did not go into legal effect until

5     January 11, 2008.  Nevertheless, on

6     December 24, 2007, the same day that the most

7     of -- of the refund applications were filed

8     and one business day after the others were

9     filed, Khimina and Stepanova, as head of

10    Moscow Tax Office 25 and 28, approved the

11    $230 million in refunds which, on information

12    and belief, amounted to the largest known tax

13    refund in Russian history."

14          Q.    Is that what you're referring to?

15          A.    Yes.

16          Q.    And this is information your team

17    got from the tax authorities?

18          A.    (No verbal response.)

19          Q.    Where did you get this information?

20          A.    I don't know.

21          Q.    Is it legal for you to have tax

22    information from taxpayers other than your

23    own?

24          A.    Yes.

25          Q.    It's legal?

Page 231

1           WILLIAM F. BROWDER (4/15/15)

2      A.    Yes.

3      Q.    Anybody can have access to tax

4  information in Russia?

5      A.    No.

6      Q.    So why is it legal for you to have

7  it?

8      A.    Because we got it legally.

9      Q.    How did you get it legally?

10     A.    I don't know.

11     Q.    You're sure you got it legally, but

12  you don't know how you got it?

13     A.    Yes.

14     Q.    And what makes you so sure you got

15  it legally?

16     A.    Because I work with reliable people

17  who do things by the law.

18     Q.    Now, Mr. Kleiner, according to your

19  book, went into Moscow.  He has sources, you

20  say, and he got information.

21           So why wouldn't he tell you who the

22  sources are if he has information that's

23  legally obtained?

24     A.    What's the question?

25     Q.    Why wouldn't he tell you who the

1            WILLIAM F. BROWDER (4/15/15)

2    sources are if he has information that's

3    legally obtained?

4         A.   The question -- you're making an

5    assumption with a question.

6         Q.   I'm quoting your book which says,

7    "Mr. Kleiner said, 'I have sources in -- in

8    Moscow, and he came back with information, I

9    think, from the Central Bank.'"

10            Why would he need sources if it was

11   legal to have the information?

12        A.   Are you asking about this

13   information or are you asking about different

14   information?

15        Q.   I'm asking about the information in

16   the book.

17        A.   Which -- which information?

18        Q.   That Mr. Kleiner got from the

19   Central Bank --

20        A.   Okay --

21        Q.   -- from sources?

22        A.   Okay.  So you're -- you're not --

23   you're asking about the Central Bank, not --

24   not about the tax records now.

25        Q.   That's right.

Page 233

1          WILLIAM F. BROWDER (4/15/15)

2          A.    Okay.  So what is the question

3     about the Central Bank records?

4          Q.    How -- why would he need sources to

5     get legal information?

6          A.    I don't know.

7          Q.    Okay.  And you have no idea how the

8     tax information came in possession of your

9     team because they never do anything wrong,

10    right?

11         A.    I -- I don't know how my team got

12    this information, and I'm -- I assume and I'm

13    confident that it was obtained legally.

14         Q.    Because that's what you want to

15    believe.  But you can't give us any facts.

16              Give me a fact.  Give me a fact.

17    Rather than your belief, your general belief,

18    give me a fact that would tell me this stuff

19    was obtained legally.

20         A.    Is that a question?

21         Q.    Yes.  Give me a fact.

22         A.    I have -- I am -- I have no facts

23    to give you.

24         Q.    So the best thing to say was, "I

25    believe it was obtained legally," right?

1          WILLIAM F. BROWDER (4/15/15)

2          MR. KIM:  Objection to the form.

3     A.    What's the question?

4     Q.    I'll withdraw it.

5          So you claim that Ms. Stepanova got

6   a lot of money, right?

7     A.    I claim that she and her husband

8   profited from this crime in large amount, yes.

9     Q.    Right.  And you make the conclusion

10  that she and her husband profited from the

11  fact that -- you say -- he got money in his

12  name?

13    A.    That's one of the -- one of the --

14  one of the assumptions about her wealth.

15    Q.    Is -- one of the assumptions is

16  that he got money from the $230 million fraud?

17    A.    Correct.

18    Q.    And the other assumption is they're

19  still married?

20    A.    Another assumption is they live in

21  a -- in a $20 million house in Moscow on a

22  salary of $38,000 a year.

23    Q.    I see.  And it shouldn't be very

24  hard, if she lives there, for somebody to

25  knock at that -- knock on the door and say,

1              WILLIAM F. BROWDER (4/15/15)

2    "Hello, Ms. Stepanova.  We want to ask you

3    some questions," but nobody's ever done that,

4    right?

5         A.   I'm not sure who has or hasn't

6    knocked on her door.

7         Q.   I see.  Has anybody on your team

8    ever spoken to Ms. Stepanova?

9         A.   No.

10         Q.   Has anybody on your team ever

11    observed her at that $20 million house?

12         A.   Nobody on my team has, but I --

13    I've some -- received information from people

14    who have --

15         Q.   Okay.

16         A.   -- observed her.

17         Q.   "People."  Can you give me some

18    names?

19         A.   Alexander Perepilichny.

20         Q.   Who is deceased?

21         A.   Correct.

22         Q.   Did he give you the information in

23    writing?

24         A.   He gave us a bunch of bank

25    documents about Ms. -- or Ms. Stepanova's

Page 236

```
 1              WILLIAM F. BROWDER (4/15/15)

 2   husband's account.

 3        Q.   Right.  About the husband's

 4   accounts.  But none of these documents

 5   mentioned Ms. Stepanova, correct?

 6        A.   I'm not sure.

 7        Q.   Well, why don't we take a look at

 8   them.  You sent the documents to the Swiss

 9   authorities, right?

10        A.   Correct.

11             MR. CYMROT:  Let me mark an

12        exhibit.  This is Exhibit 15.  It's a

13        letter dated 28 January 2011 to the

14        attorney general of Switzerland and

15        others.  It's signed by Neil

16        Micklethwaite.

17             (Browder Exhibit 15, document

18        Bates stamped PREV_000002326 was

19        marked for identification, as of this

20        date.)

21   BY MR. CYMROT:

22        Q.   Can you identify that document?

23             (Whereupon, an off-the-record

24        discussion was held.)

25        A.   Yes.
```

Page 237

1              WILLIAM F. BROWDER (4/15/15)

2      BY MR. CYMROT:

3          Q.    All right.  Do you recognize it.

4      What is it?

5          A.    This is the Complaint that was

6      filed by Brown Rudnick on behalf of Hermitage

7      Capital Management to the Swiss attorney

8      general in January 2011 in relation to the --

9      part of the --

10         Q.    Speak up a little.

11         A.    You want me to repeat what I said

12     or just --

13         Q.    No, no.  Keep going.

14         A.    -- in relation to the money that

15     showed up in Switzerland from the $230 million

16     tax-rebate fraud.

17         Q.    Okay.  So let's go to the Verified

18     Complaint first and then go -- did you provide

19     this Swiss document to the U.S. government?

20         A.    I don't remember.

21         Q.    Do you know what the -- well, let's

22     go to the Amended Complaint, paragraph 97.

23               So you say -- you didn't say -- the

24     U.S. government said.  And actually starts in

25     96 and it's...

Page 238

1              WILLIAM F. BROWDER (4/15/15)

2              All right.  So in 96 it says, "For

3    example, Arivust Holdings is a Cyprus-based

4    company with a bank account at Swiss bank

5    Credit Suisse."  Right?

6        A.   Um-hum.  Yes.

7        Q.   And you say -- and, well, the

8    government says that it was beneficially owned

9    by Stepanov, that then-husband of Stepanova,

10   right?

11       A.   Yes.

12       Q.   All right.  And then 97 says

13   there -- "On February 5, 2008, there was a

14   wire transfer route -- routed through the

15   Southern District of New York, the Banca

16   de Economii account transferred 726,000 to an

17   account at a Latvian bank in the name of

18   Nomirex Trading Limited, right?

19       A.   Um-hum.

20       Q.   And then in two transfers in

21   February 2008 the Nomirex account transferred

22   almost 4 million euros to an account in the

23   name of the British Virgin Island Company

24   Quartell Trading Limited, which promptly

25   transferred over 150,000 of that money to

Page 239

1          WILLIAM F. BROWDER (4/15/15)

2    Baikonur Worldwide Limited, also a Virgin

3    Island company.

4               And in five transfers from on or

5    about May 26, 2- -- 2008, through on or about

6    June 17, 2008, Baikonur, which on information

7    and belief was shared ownership with Quartell,

8    sent 7.1 million euros to Arivust.

9               And then it concludes that Stepanov

10   received the 7.1 because, according to the

11   Complaint, he owned Arivust right?

12        A.   That's what it says.

13        Q.   Okay.  And that information -- does

14   that information come from this letter -- what

15   -- what is this?  -- which is -- been marked

16   as Exhibit 15.

17        A.   I -- I'm not able to

18   cross-reference these two documents to -- to

19   certify that everything there came from one

20   place or another.

21        Q.   And you don't know whether this

22   information in Exhibit 15 was given to the

23   U.S. government, right?

24        A.   I don't know if it was or wasn't.

25   Well -- yeah.

Page 240

```
 1            WILLIAM F. BROWDER (4/15/15)

 2       Q.   And this information came from

 3  Mr. Pere- -- Perepilichny?

 4       A.   Perepilichny.

 5       Q.   Perepilich --

 6       A.   Perepilichny.

 7       Q.   I'm sorry.  I'll have trouble

 8  saying it.

 9            And who was he?

10       A.   He was a whistle-blower from

11  Russia.

12       Q.   So he was a whistle-blower.  That's

13  your description of him?

14       A.   Yes.

15       Q.   What's his first name?

16       A.   Alexander.

17       Q.   Right.  And what job did he have in

18  Russia?

19       A.   He was some type of finan- --

20  financier.

21       Q.   And he got the information from

22  somebody else, right?

23       A.   I believe he got the -- was

24  managing the accounts of Stepanova.

25       Q.   And so was it -- you were going to
```

1              WILLIAM F. BROWDER (4/15/15)

2    tell me it's legal for him to be managing

3    accounts of a private client and turn

4    information over to your organization and

5    that's legal in Russia?

6         A.   I don't know.

7         Q.   Are you -- would you be concerned

8    if it wasn't legal?

9         A.   Yes.

10        Q.   But you didn't explore whether it

11   was legal.

12             Is that true?  You didn't explore

13   whether it was legal?

14        A.   This had nothing to do with Russia.

15        Q.   Well, he was managing the accounts

16   with --

17        A.   He was managing the accounts of --

18   in Switzerland.

19        Q.   I see.  Well, we certainly know

20   that Swiss banking information is secret,

21   right?

22        A.   Right.

23        Q.   And he gave you information, right,

24   banking information?

25        A.   Correct.

Page 242

1              WILLIAM F. BROWDER (4/15/15)

2        Q.   So you know it's illegal when you

3   got it.  Isn't that true?

4        A.   No.

5        Q.   Swiss banking information is

6   private and subject to privacy laws.  He gives

7   you the information.  But what makes it legal

8   then?

9        A.   For who?

10       Q.   For you to possess it.

11       A.   We didn't disclose any confidential

12   secrets.

13       Q.   You didn't disclose any

14   confidential secrets?  What's this letter all

15   about?

16       A.   This is a letter of complaint to

17   the Swiss -- to the Swiss government.

18       Q.   He disclosed it to you.  Isn't that

19   illegal?

20       A.   I don't know.

21       Q.   And you didn't explore whether it

22   was legal or not?

23       A.   I assumed it was legal.

24       Q.   You assumed it was legal.  Even

25   though it was Swiss -- you're in the finance

Page 243

1           WILLIAM F. BROWDER (4/15/15)

2  business.  You can just give up client

3  information and it's legal to anybody in the

4  world?

5       A.   If it's not your client.

6       Q.   How many -- but this was his

7  client.

8       A.   He didn't -- are you a- -- so

9  could -- could you rephrase the question,

10 please.

11      Q.   You're in finance business.  You've

12 been in it for how many years?

13      A.   Since 1992.

14      Q.   So a lot of years.

15           If you have client information, you

16 can just give it up to anybody and it's legal?

17      A.   I didn't say that.

18      Q.   You know it's illegal?

19      A.   For who?

20      Q.   For you to give up client

21 information.

22           MR. KIM:  Objection to form.

23      A.   I wasn't giving any client

24 information.

25      Q.   You know the law because you

Page 244

1          WILLIAM F. BROWDER (4/15/15)

2    participated in the industry for years.  Your

3    client information is confidential.  Isn't

4    that true?

5          A.   My client information is.

6          Q.   And his client information,

7    Mr. Perepilichny's client information was

8    private to him and his client.  Isn't that

9    true?

10         A.   I don't know what his arrangements

11   were with his client.

12         Q.   You think his arrangement was that

13   he could just give up what you're claiming is

14   information about a fraud to you and it's

15   legal for him to do that?

16         A.   I didn't do a legal -- I didn't do

17   a legal analysis.

18         Q.   Are you really serious about this?

19   Come one.  Do we have to fence about this?

20   You knew it was illegal to receive -- for him

21   to give up the information, and maybe you had

22   a little thought about whether it was legal

23   for you to receive the information, but you

24   didn't do anything to find out.

25              MR. KIM:  Objection to form.

Page 245

1           WILLIAM F. BROWDER (4/15/15)

2      Q.   Isn't that the situation?

3           MR. KIM:  Objection to form.

4      A.   Could you rephrase the question,

5  please.

6      Q.   No.

7           MR. KIM:  Okay.

8      Q.   You knew it was illegal for him to

9  give up the information.

10      A.   Is that a question?

11      Q.   Yes.

12      A.   It sounded look a statement.

13      Q.   Did you know it was illegal for him

14  to give up the information?

15      A.   No.

16      Q.   All right.  And that's your --

17  you're under oath and you're sticking with

18  that answer.

19      A.   I didn't know -- I didn't even

20  know -- yes -- that that was --

21      Q.   You didn't even think about it,

22  right?  You were thrilled to get it.  Private

23  information from a private citizen, and you

24  were thrilled to get it.  Isn't that true?

25      A.   What's the question?

1              WILLIAM F. BROWDER (4/15/15)

2         Q.    You were thrilled to get it,

3    weren't you?

4         A.    The question was I -- was I

5    thrilled to get it?

6         Q.    Yes.

7         A.    I was -- it was a breakthrough in

8    our investigation to get this information.

9         Q.    Right.  And you knew it was illegal

10   for him to give it up, and it was illegal for

11   you to receive it, but you didn't care because

12   he's a whistle-blower and that makes it all

13   okay.  Right?

14              MR. KIM:  Objection to form to the

15         multiple questions.

16         A.    Could you rephrase the question and

17   break them down into simple questions.

18         Q.    Because, according to you, he's a

19   whistle-blower, you were happy to get

20   illegally obtained information, right?

21              MR. KIM:  Objection to form.

22         A.    Could you rephrase the question,

23   please.

24         Q.    No.  Can you answer it?

25         A.    I don't understand the question.

1          WILLIAM F. BROWDER (4/15/15)

2      Q.   I'll do it one more time, but

3  you're just fencing and we both know that you

4  know the answer to this.

5          It was illegal for Mr. Perepilichny

6  to give up that information from a private

7  client to you.  True?

8      A.   I don't know.

9      Q.   And you knew it was illegal for you

10  to obtain the information.  Isn't that true?

11      A.   No.

12      Q.   But you did nothing to find out

13  whether it was legal or illegal, correct?

14      A.   We assumed it was legal.

15      Q.   How could it possibly be legal in

16  your industry?

17          MR. KIM:  Objection to form.

18      Q.   How could it possibly be legal in

19  your industry for Mr. Perepilichny to give up

20  client information?

21      A.   Is there another way you can

22  rephrase that question?

23      Q.   No.

24      A.   The answer is many ways.

25      Q.   Okay.  So you pass the in --

Page 248

1           WILLIAM F. BROWDER (4/15/15)

2    information along to the Swiss authorities,

3    right?  And you made -- your lawyers made an

4    argument on your behalf about why this showed

5    it was money from the $230 million fraud,

6    right?

7         A.   We've -- the -- the lawyers

8    representing Hermitage filed a complaint with

9    the Swiss attorney general on the 28th of

10   January, 2011, alleging money laundering in

11   relation to the $230 million.

12        Q.   All right.  So let's go to page 3

13   of the letter.

14             MR. KIM:  Talking about

15        Exhibit 15?  That letter?

16             MR. CYMROT:  Yes, that's --

17             MR. KIM:  Okay.

18             MR. CYMROT:  Yes.

19    BY MR. CYMROT:

20        Q.   So you describe -- your lawyers

21   describe red flags:  Aikate was established as

22   a shell company in the British Virgin Islands

23   on 29 January 2007.  BVI is a jurisdiction

24   that's considered to be a high risk for money

25   laundering due it's minimal due diligence

Page 249

1              WILLIAM F. BROWDER (4/15/15)

2    requirements in connection with corporate

3    registrations."

4              You see where I'm reading?

5         A.   I do.

6         Q.   You registered companies in the

7    BVI?

8         A.   I have.

9         Q.   For the purpose of money

10   laundering?

11        A.   No.

12        Q.   So not everybody who registers

13   companies in the BVI are for -- engaged in

14   money laundering, right?

15        A.   Yes.

16        Q.   So how did you establish that

17   Mr. Stepanov had an interest in Aikate?

18        A.   I'd have to go back to the back of

19   the Complaint to find the documents.  Would

20   you like me to do that?

21        Q.   Yes.

22        A.   I'm on page 2326 of 2- -- I'm

23   sorry.  I don't know how to refer you to

24   pages.  Is it on the right-hand side or the

25   left-hand side?

Page 250

1          WILLIAM F. BROWDER (4/15/15)

2              MR. LEVINE:  The left-hand side.

3      Q.    The left-hand side.

4      A.    On the left-hand side would be

5    0002438.

6      Q.    2438.  Okay.  Thank you.

7              All right.  And how does this

8    establish that?

9      A.    This is a document from Aikate

10   Properties signed by the director saying,

11   "Interior service.  I herewith confirm in --

12   in confidence and on the understanding that

13   this statement is made on the basis of

14   information data which I have with respect to

15   the underwritten company.  As on date of this

16   letter, that name and citizenship, Mr. Vladlen

17   Stepanov, Russian Federation, passport details

18   51 No. 2034225 DD 16122003, date of birth 17

19   July 2 -- 1962, is the sole and ultimate

20   beneficial owner of Aikate Properties Inc., a

21   company incorporated in the British Virgin

22   Islands, and that the above-referenced company

23   isn't involved in any money-laundering

24   activities to the best of our knowledge.  No

25   action has been taken to wind up the affairs

```
 1              WILLIAM F. BROWDER (4/15/15)

 2    of this company."

 3         Q.    So where did you get this document?

 4         A.    Alexander Perepilichny.

 5         Q.    Did you pay him anything for that?

 6         A.    No.

 7         Q.    Anybody pay him anything for that?

 8         A.    No.

 9         Q.    And how do you know he didn't

10    create this document?

11         A.    We don't know for sure whether he

12    did or didn't.

13         Q.    Okay.  And the signatures, you

14    don't know whether they are real people or

15    real signatures?

16         A.    I -- I don't know.

17         Q.    So he gives you a document out of

18    the blue, and you're going to rely upon that,

19    right?

20         A.    No.

21         Q.    All right.  So then how did you

22    determine whether it was an authentic

23    document?

24         A.    We tried to test different

25    documents that he gave to us that could be
```

1           WILLIAM F. BROWDER (4/15/15)

2    tested, to see whether they were authentic, to

3    make a generalization about everything he

4    provided to us.

5           Q.   All right.  So what did you test?

6           A.   We were given information by

7    Alexander Perepilichny about the real estate

8    in Dubai that belongs to Vladlen Stepanov, and

9    we were able to cross-reference that with

10   Dubai property databases.

11          Q.   Anything else?

12          A.   We were given information about the

13   property that Vladlen Stepanov and his wife,

14   Olga Stepanova, owned in Moscow, and we were

15   able to cross-reference that with property

16   databases.

17          Q.   And the Moscow property databases,

18   that's nowhere in this exhibit, right?

19          A.   I don't know.

20          Q.   You want to check?  I mean, I

21   don't -- I haven't seen it.  I've seen Dubai

22   records that are towards the back here in the

23   name Mr. Stepanov, but I haven't seen anything

24   related to Moscow.

25          A.   Would you like me to go through the

Page 253

1          WILLIAM F. BROWDER (4/15/15)

2    document?

3          Q.    No.  I don't want you to take the

4    time.

5                You have, you claim, records from

6    Moscow databases showing Ms. Stepanova --

7    Stepanova owned property in Moscow.  Is that

8    what you're saying?

9          A.    No.

10         Q.    That Mr. Stepanov owned property in

11   Moscow?

12         A.    We've -- we have records that show

13   his properties registered to the name of his

14   mother.

15         Q.    His mother.  And there's no record

16   of Ms. Stepanova having any property in

17   Moscow, correct?

18         A.    No.

19         Q.    The assumption is that they're

20   married, that they share assets, they get

21   along, and that somehow she will someday

22   benefit from this property.  That's the

23   assumption?

24         A.    Is that a question?

25         Q.    Yes.

1              WILLIAM F. BROWDER (4/15/15)

2         A.    What's the question?

3         Q.    What's your assumption?

4         A.    Our assumption is that the

5    property -- the properties in Dubai, the

6    properties in Moscow, and the bank accounts

7    are all collectively owned by Olga Stepanova

8    and her husband Vladlen.

9         Q.    And there's no fact that would

10   support that assumption?  That's just your

11   assumption?

12        A.    Yes.

13        Q.    Okay.  So there's another -- going

14   back to page 4, there's another reference

15   to -- there's a reference to Arivust.

16             "Cyprus is another jurisdiction

17   that's considered to be high risk for money

18   laundering due to it's low due diligence

19   requirements in connection with corporate

20   registrations."

21        A.    Could you just alert me to where

22   you reading from.

23        Q.    Paragraph 2.

24        A.    Okay.

25        Q.    No. 2.

Page 255

1            WILLIAM F. BROWDER (4/15/15)

2       A.   Okay.

3       Q.   So you use Cyprus, correct, as a

4  jurisdiction for corporations, right?

5       A.   Correct.

6       Q.   And you've told us that you don't

7  use it for money laundering, right?

8       A.   Correct.

9       Q.   And So people who use Cyprus don't

10  necessarily use it for money laundering,

11  correct?

12       A.   Correct.

13       Q.   All right.  So Arivust -- there's a

14  similar document in the back for Arivust that

15  you got from Mr. Perepilichny?

16       A.   Correct.

17       Q.   And your assumption is that it's a

18  legitimate document even though you can't do

19  anything to confirm it other than what you've

20  described already, right?

21       A.   It's -- when we filed the

22  Complaint; that's correct.

23       Q.   Is there anything you can do now?

24            MR. MONTELEONI:  A moment to

25       discuss regarding privilege, please.

Page 256

1            WILLIAM F. BROWDER (4/15/15)

2              MR. CYMROT:  Take a break.

3              THE VIDEOGRAPHER:  The time is

4         3:26 p.m.  We are off the record.

5              (Whereupon, at this time, a short

6         break was taken.)

7              THE VIDEOGRAPHER:  The time is

8         3:39 p.m.  We are back on the record.

9    BY MR. CYMROT:

10        Q.   Mr. Browder, I want you to refer to

11   Exhibit 15, page 4.  That's where we were.

12   The paragraph -- at the end of paragraph 3.

13   Paragraph 3 refers to two companies, Quartell

14   and Baikonur.  All right?

15              And you're saying -- it says here,

16   "Our clients" -- that's Hermitage, right? --

17   "have discovered that both of these accounts

18   are controlled by the same entities."

19              You see that?

20        A.   Could you just give me a better --

21        Q.   Yeah.  It said --

22        A.   Which paragraph is it.

23        Q.   Paragraph No. 3.

24        A.   Okay.

25        Q.   It says, "Both of these accounts

Page 257

1              WILLIAM F. BROWDER (4/15/15)

2      are controlled by the same entities."

3              Wow, wait a minute.  We had a

4      question pending and a consideration of --

5              MR. CYMROT:  Could you read back

6         my last question before the break.

7              (Whereupon, the referred to

8         question was read back by the

9         Reporter.)

10             MR. CYMROT:  Is there anything

11        that -- (inaudible.)

12             Well, I asked him the source of

13        information and you were going to

14        consider --

15             MR. MONTELEONI:  It may make sense

16        to just re-ask the question.  I don't

17        know that I remember the specifics.

18             MR. CYMROT:  What was it?  Oh.

19        Okay.  Yes.

20      BY MR. CYMROT:

21        Q.   We were talking about Arivust, and

22      the question is:  Do you have any recent

23      information that would show that Mr. Stepanov

24      controls Arivust?

25        A.   Not to my personal knowledge.

Page 258

1              WILLIAM F. BROWDER (4/15/15)

2        Q.    Does your team have information?

3        A.    I'm not -- I'm not aware.

4        Q.    Did you provide any information

5   beyond the information in this letter to the

6   U.S. attorney?

7        A.    Not that I'm aware of.

8        Q.    Could you speak up.

9        A.    Not -- not that I'm aware of.

10        Q.    All right.  Okay.  So we go to

11   paragraph 3.  Then it says, "Our client had --

12   our clients have discovered that both of these

13   accounts are controlled by the same entities."

14              We're referring to Quartell and

15   Baikonur.  I don't see any information in this

16   letter or the attachments that would show that

17   both of these accounts are controlled by the

18   same entities.

19              Do you have any facts that would

20   demonstrate that Quartell and Baikonur are

21   controlled by the same entity?

22        A.    No, not to my personal knowledge.

23        Q.    Does your team have any

24   information?

25        A.    I'm not sure.

Page 259

1            WILLIAM F. BROWDER (4/15/15)

2        Q.    Did you dis -- ever discuss this

3    with U.S. Attorney's Office?

4        A.    No.

5        Q.    All right.  So then we go down to

6    what is described here as Step 1:  "The elicit

7    proceeds were first transferred to Quartell's

8    account.  A payment of 2 million euros was

9    made on January 23rd from a company

10   incorporated New Zealand Bristoll Export

11   Limited."

12            Do you see that?

13       A.    Yes.

14       Q.    And I think you can find that

15   information in the exhibits on page 75.  So

16   what's the Bates number?  2478.

17            Would you take a look at that?

18       A.    Sure.

19       Q.    230108.  Do you see that?

20       A.    Yes.

21       Q.    So what is this document?  It

22   says -- just let me read what it says.

23   There's -- appears to be the letterhead of

24   Credit Suisse.  There's a current account

25   number, but a name or something above the

1           WILLIAM F. BROWDER (4/15/15)

2    current account number -- below the current

3    account number is crossed out.  And it says

4    "Extract of account 01.01.2008 to 31.01.2008."

5               So what is this document?

6         A.   It's a Credit Suisse statement.

7         Q.   And who typed in "extract of

8    account"?

9         A.   I don't know.

10        Q.   And who crossed out the

11   information?

12        A.   Perepilichny.

13        Q.   Do you know why he crossed it out?

14   Did he tell you why?

15        A.   No.

16        Q.   All right.  So this supposedly is

17   money that came to Quartell from the

18   $230 million fraud, right?

19        A.   I -- I assume so.  I'm not -- I'm

20   not a specialist.

21        Q.   No, but isn't that what that says?

22   Isn't that what the letter says?

23               The whole point is that Stepanov

24   got money from the $230 million fraud, right?

25        A.   Um-hum.  Yes.

Page 261

1              WILLIAM F. BROWDER (4/15/15)

2         Q.    All right.  So Bristoll Export

3    Limited is not anywhere on your other charts.

4    So what company is that?  Who owns that?

5         A.    I'm not sure.

6         Q.    And how did that company get the

7    $2 million --

8         A.    I don't know.

9         Q.    -- 2 million euros?

10        A.    I don't know.

11        Q.    So you don't know what the path of

12   the money went to demonstrate that this came

13   from the $230 million theft of the Russian

14   Treasury right?

15        A.    Right.

16        Q.    So is this another assumption that,

17   because there's $2 million that came in on

18   January 28th it must be from the Russian

19   Treasury?

20        A.    No.

21        Q.    So then how do you say this is the

22   elicit proceeds?

23        A.    I didn't do the tracing.

24        Q.    And you have no understanding of

25   the tracing conducted by your team?

Page 262

1                WILLIAM F. BROWDER (4/15/15)

2        A.   No.

3        Q.   So you have no explanation for how,

4    somewhere, 2 million euros shows up,

5    transferred from Bristoll Export to a company

6    called Quartell, and you have no way, as far

7    as you know, of tying it to the $230 million?

8        A.   I'm sorry.  What's the question?

9        Q.   You have no way of tying this

10   transaction, shown on this page, which is

11   Bates No. 2478, to the $230 million?

12       A.   Personally, I don't.

13       Q.   Do you know whether members of your

14   team have it?

15       A.   I would assume so.

16       Q.   Have you given it to U.S. attorney?

17       A.   What?

18       Q.   The information tying this to the

19   $230 million?

20       A.   I'm -- I'm confused.  What --

21   what -- what -- what are we tying to the

22   $230 million?

23       Q.   The payment from Bristoll Export

24   Limited to Quar- -- what you are claiming is

25   the Quartell account.

Page 263

1              WILLIAM F. BROWDER (4/15/15)

2         A.   I don't know.

3         Q.   And you haven't given us any

4    documents that would show that, right?

5         A.   I don't know.

6         Q.   So then tracing through this or

7    following this letter, there are two more

8    transfers that are shown on page 79, which is

9    Bates No. 2482.  This is from Nomirex.  It's

10   1.999 million.  I assume, although there's no

11   denomination here, from the letter it says

12   it's euros.

13             So how did Nomirex get money from

14   the $230 million?

15        A.   I have no personal knowledge.

16        Q.   And, of course, if you can't trace

17   this back to the $230 million, the whole idea

18   that Mr. Stepanov got money from the

19   $230 million falls apart, doesn't it?

20        A.   I'm sorry.  What's the question?

21        Q.   Isn't it true that, if you can't

22   trace money into Bristoll Trading and Nomirex

23   Trading from the $230 million, that the whole

24   idea that Mr. Stepanov got money from the

25   $230 million falls apart?  Nothing on these

Page 264

1                WILLIAM F. BROWDER (4/15/15)

2      documents that shows it comes from the

3      230 million.

4          A.   Is that a question or a statement?

5          Q.   Ask it again:  Is there -- if you

6      don't have any evidence that Bristoll Trading

7      and Nomirex Trading received money from the

8      $230 million, there's no basis for -- to say

9      that Mr. Stepanov received money from the

10     230 million?

11         A.   That's incorrect.

12         Q.   What's the basis?

13         A.   I don't have a basis, but other

14     people do.

15         Q.   You're the one that took this to

16     the U.S. Attorney's Office.  You've taken this

17     public.  You've talked about it all over the

18     world.  You have no idea how this works?

19              Is that true?

20         A.   Could you rephrase the question.

21         Q.   No.  You have no idea how it works?

22              MR. KIM:  Object to the form.

23         What's the "this"?

24              MR. CYMROT:  How this tracing

25         works.

1             WILLIAM F. BROWDER (4/15/15)

2        A.   I'm not a specialist on money

3   tracing.

4        Q.   So you have no idea how it works?

5        A.   I didn't say that.

6        Q.   Well, explain to me how it works.

7   Let's not use the letter of the documents or

8   whatever.  Explain how you get money from

9   $230 million into an account that you say is

10  controlled by Mr. Stepanov.

11       A.   I have a team of people who work

12  for me who are specialists in this area, who I

13  trust, who are credible, who put this

14  information together.

15       Q.   And you have no idea how they

16  bridged the gap between the 230 and Bristoll

17  and Nomirex?

18       A.   That's correct.

19       Q.   And none of them are accountants by

20  the way, right?

21       A.   There are no accountants on our

22  team.

23       Q.   And none of them ever testified in

24  a U.S. proceeding about tracing money, right?

25       A.   That's correct.

Page 266

1          WILLIAM F. BROWDER (4/15/15)

2          Q.    Nobody -- none of them have

3     testified anywhere in the world about tracing

4     money, right?

5          A.    That's incorrect.

6          Q.    Who's testified about tracing

7     money?

8          A.    Vadim Kleiner has testified.

9          Q.    And where has he testified?

10         A.    In Switzerland.

11         Q.    Do you have that testimony?

12         A.    It's -- no.  I don't believe we're

13    allowed to keep it.

14         Q.    Did you give it to the U.S.

15    Attorney's Office?

16         A.    No.

17         Q.    And he's testified about tracing

18    what money?

19         A.    The money you're referring to here,

20    I believe.

21         Q.    This -- this exact money?

22         A.    I don't know.

23         Q.    Have you seen his testimony?

24         A.    No.

25         Q.    Have the Swiss gone forward with a

1              WILLIAM F. BROWDER (4/15/15)

2    criminal case against anybody trying a case --

3    charges against anybody based upon

4    Mr. Kleiner's testimony?

5         A.   I don't know.

6         Q.   Well, okay.  So you get money

7    from -- your team gets money from Bristoll and

8    Nomirex into an account with a name crossed

9    out that they tell us is the Quartell account,

10   but they don't have any money going to

11   Mr. Stepanov based upon that.  Instead,

12   there's another series of account statements

13   that start on page 81, which is deposition

14   exhibit -- I'm sorry -- Bates No. 2484 and

15   No. 15, Exhibit 15, and these accounts -- do

16   you know what these accounts are?

17        A.   Yes.

18        Q.   What are they?  Starting on 2484

19   and going over the next subsequent pages, what

20   are they?

21        A.   2484, 2485, and 2486 are bank

22   details that come from Citibank.

23        Q.   So they're bank details of -- of

24   what?  I -- I read here Raiffeisen

25   Zentralbank, with a Z, account name.  So where

1              WILLIAM F. BROWDER (4/15/15)

2    did you get -- I mean, what -- first, what is

3    it, if you know?

4         A.    These are account statements.

5         Q.    For Raiffeisen Zentralbank?

6         A.    Held at Citibank New York.

7         Q.    Okay.  And what does Raiffeisen

8    Zentralbank have to do with this case?

9         A.    I'm not sure.  I think they were --

10   they were -- they were the correspondent bank.

11   They were the correspondent bank for Universal

12   Savings Bank, Intercommerz Bank.  I can't

13   remember which one.

14        Q.    Okay.  Well, we got 6 million euros

15   into Quartell, and I don't see any transfers

16   from Quartell into this account, at least

17   nothing of substance.  Am I missing something?

18        A.    I don't know.

19        Q.    Well, take a look.  Do you see any

20   transfers from Quartell?

21        A.    I'm not sure what -- what to be

22   looking for here.

23        Q.    Well, your team is saying that the

24   money went from the Russian Treasury, somehow

25   got to Bristoll and Nomirex and into what they

Page 269

1           WILLIAM F. BROWDER (4/15/15)

2    say is a Quartell account, and then the next

3    thing they say, if we look at the letter, is

4    that "wire transfer statistics obtained as a

5    result of the court's ruling show that the

6    following payments were made to Bristoll and

7    Nomirex immediately prior to the payments to

8    Quartell."

9           A.   Could you just alert me to what

10   page your on.

11          Q.   Yes.  Page 5 of the letter, Bates

12   No. 2397.

13          A.   And which paragraph?

14          Q.   It's the one with the three

15   bullets.

16               Have you read it?

17          A.   Yes.

18          Q.   Okay.  So they say, "Bristoll and

19   Quartell, immediately prior to the payments to

20   Quartell" -- "Bristoll and Nom- -- Nomirex,

21   immediately prior to the payments to Quartell,

22   got $498,955 U.S. transferred to Bristoll from

23   Roland Management Limited."

24               Do you see that?

25          A.   Yes.

Page 270

1                    WILLIAM F. BROWDER (4/15/15)

2        Q.   And that's a U.K. company.

3             What does Roland Management Limited

4    have to do with this case?

5        A.   I don't know.

6        Q.   And why is it relevant that

7    Bristoll got money from Roland Management

8    Limited?

9        A.   I don't know.

10       Q.   And then on February 5th the amount

11   of 491,585 was transferred to Bristoll from

12   Bunicon.

13            Do you see that?

14       A.   Yes.

15       Q.   Why is it relevant that, prior to

16   Bristoll and Nomirex making payments to

17   Quartell, it got money, less than $500,000

18   from Bris- -- from Bunicon?

19       A.   I don't know.

20       Q.   And on the 5th, the amount of

21   $726,000 was transferred to Nomirex from

22   Bunicon.

23            Why is that relevant?

24       A.   I don't know.

25       Q.   And who would know -- be able to

1              WILLIAM F. BROWDER (4/15/15)

2   answer these questions?

3        A.   My team.

4        Q.   Who on your team?

5        A.   Lawyers and Vadim.

6        Q.   So if we go back to the account

7   statements.

8        A.   Which page?

9        Q.   Well, wait a minute.  It goes

10  "Step 2" -- the same letter, page 5 -- "Four

11  months after the funds were transferred to

12  Quartell, sim- -- simmer -- similar amounts

13  were transferred from Baikonur account to

14  Arivust."

15           So how do you get the money from

16  Quartell to Baikonur?

17       A.   I don't know.

18       Q.   All right.  And I think we've had

19  enough.  You're not going to be able to help

20  us with any of this?  Fill the gaps that

21  don't and aren't explained in these documents,

22  right?

23           MR. KIM:  Objection to form.

24           MR. CYMROT:  That's editorial.

25       I'll withdraw it.

Page 272

1          WILLIAM F. BROWDER (4/15/15)

2     Q.   So if you can go to Bates

3   No. 2489 -- 2488.

4          Do you know what this document is?

5     A.   Bank statement.

6     Q.   From what account?

7     A.   Credit Suisse.

8     Q.   What account?  Who's the account

9   holder?

10     A.   I don't know.

11     Q.   It's crossed out here, right?

12   Correct?

13     A.   Correct.

14     Q.   Where did you get this document?

15     A.   Alexander Perepilichny.

16     Q.   So there's a payment made from

17   whatever account this is to Arivust, but you

18   don't know how the money got into this

19   account, right?

20     A.   I don't know.

21     Q.   You don't know.  And you can't

22   trace this -- you don't know how to trace this

23   to the $230 million fraud, right?

24     A.   I don't know.

25     Q.   So they're payments here to

Page 273

1          WILLIAM F. BROWDER (4/15/15)

2    Quartell and payments to Arivust, right?

3          A.   I don't know.

4          Q.   Well, I'm just looking at the

5    document.

6          A.   I see two payments on the 26th of

7    May, 2008, for 1.5 million to Arivust, and it

8    looks like a payment from -- I'm sorry -- a

9    payment to Ar- -- and a payment to and payment

10   from Quartell on the 26th of May.

11         Q.   130,000?

12         A.   130,000.

13         Q.   All right.  And the 1.5 million

14   that appears to cover the payment from Arivust

15   is a foreign exchange transaction outright

16   short, meaning it's a loan from the bank,

17   right?  Is that how you interpret that?

18         A.   No.

19         Q.   "Foreign exchange outright short."

20   How would you interpret that?

21         A.   I would -- I'm not an expert on

22   bank state -- Credit Suisse bank statements.

23   So I'd rather not try to interpret it.

24         Q.   But whatever that is, that seems to

25   cover the 1.5 that was made to Arivust?

Page 274

1            WILLIAM F. BROWDER (4/15/15)

2       A.   I don't know.

3       Q.   So we don't know where that came

4   from then, right?

5       A.   I don't know.

6       Q.   There's nothing showing this money

7   coming from Quartell and then being

8   transferred from whatever account this is to

9   Arivust, right?

10      A.   I don't know.

11      Q.   So there's no chain here that you

12  can perceive, right?

13      A.   I don't know.

14      Q.   So the next series of documents --

15  you wouldn't -- you don't have any idea what

16  any of these transactions are, right?

17           MR. KIM:  Objection to form.

18      Which transactions?

19           MR. CYMROT:  The ones that are on

20      the Credit Suisse bank statements for

21      the account where the name has been

22      crossed out.

23      A.   Which transaction are you referring

24  to?

25      Q.   2488, 2489.

1          WILLIAM F. BROWDER (4/15/15)

2          A.   Which -- which ones are you asking

3     me about?

4          Q.   Can you give me any or -- anymore

5     information about where the money came, for

6     instance, on the --

7               MR. CYMROT:   No.   Keep that.

8          Q.   2491, where did the money come from

9     that went to Aikate Properties?

10    250,000-something?

11         A.   Which payment are we looking at

12    now?

13         Q.   2491.

14         A.   And which one on -- on 2491?

15         Q.   The first transaction at the top.

16         A.   So payment order, electronic

17    banking, Aikate Properties, debit $250,000.

18         Q.   Right.   That's --

19         A.   It would have been a -- been a

20    to -- this looks like a payment to Aikate

21    Properties on the first of July 2009.

22         Q.   Right.   Do you know where that

23    money came from?

24         A.   I don't know.

25         Q.   Okay.   So the next series of

Page 276

1              WILLIAM F. BROWDER (4/15/15)

2    documents starts on Credit Sui- -- Suisse

3    documents that look like transfer -- wire

4    transfers, right?

5         A.   What page?

6         Q.   2493.  So that's a transfer of

7    629,000 to something called Emerald Palace

8    Group Limited, right?

9         A.   Yes.

10        Q.   And the payment is for the benefit

11   of Mr. Stepanov, right?

12        A.   That's correct.

13        Q.   Makes no mention of Stepanova,

14   right?

15        A.   Yes.

16        Q.   And the next payment on March 6th,

17   that's for the benefit of Mr. Stepanov, right?

18        A.   March 26th.

19        Q.   Next page.

20        A.   March 26th.  You said "March 6th."

21        Q.   I meant March 26th.

22        A.   Okay.

23        Q.   It's for the benefit of

24   Mr. Stepanov, correct?

25        A.   That's correct.

1          WILLIAM F. BROWDER (4/15/15)

2          Q.   June 8th, for the benefit -- keep

3     going -- benefit of Mr. Stepanov.  No mention

4     of Stepanova, right?

5          A.   Correct.

6          Q.   September, same thing.  Investment

7     of building.  It says "for the benefit of

8     Mr. Stepanov," correct?

9          A.   Correct.

10          Q.   Appears to be a unit in the

11     building.

12               Then you get to the next one, Sunny

13     Beach Properties, 25th of April 2007, right?

14          A.   Correct.

15          Q.   So that's before the $230 million

16     fraud, right?

17          A.   Yes.

18          Q.   Mr. Stepanov -- and this doesn't

19     mention Mr. Stepanov.  Sunny Beach Properties,

20     right?

21          A.   Yes.

22          Q.   There's one in October of '07.

23     Doesn't mention anybody other than Sunny Beach

24     Properties.

25               Do you know who owns Sunny Beach

1          WILLIAM F. BROWDER (4/15/15)

2     Properties?

3          A.   I'm not sure.

4          Q.   Well, if you go to the next page,

5     Sunny Beach Properties, details of payment,

6     payment for real estate for Mr. Stepanov,

7     right?

8          A.   Yes.

9          Q.   So you have a couple of

10    transactions where he's buying substantial

11    apartments -- $252,000, $277,000 -- before the

12    $230 million fraud occurred, right?

13         A.   No.

14         Q.   And he continues that afterwards?

15         A.   On page 90 -- 2499.  This was

16    April 15, 2008.

17         Q.   Right.

18         A.   The fraud occurred in December of

19    2007.

20         Q.   Yes.  But the two prior ones were

21    March -- October 18, 2007, and April 25, 2007,

22    and at that point he's spending a substantial

23    amount of money for Sunny Beach Properties.

24    Looks like he's buying properties, unit --

25    Unit 424.  The other one doesn't have a unit

Page 279

1              WILLIAM F. BROWDER (4/15/15)

2    attached to it.

3              So before the fraud, he's spending

4    substantial amount of money buying real

5    estate, right?

6         A.    Correct.

7         Q.    And none of this ever mentions

8    Ms. Stepanova, right?

9         A.    So far, no.

10        Q.    So far.  Is there any that mess --

11   mention Ms. Stepanova?

12        A.    Not that I'm aware of.

13              The next one --

14        Q.    Keep going.

15        A.    The next one mentions Elena

16   Anisimova, who is the deputy of Ms. Stepanova

17   in the Tax Office No. 28.

18        Q.    Okay.  But there's nothing there

19   that mentions Ms. Stepanova either, right?

20        A.    This woman was also involved in the

21   tax refunds.

22        Q.    So have you gone to the real estate

23   records in Dubai?

24        A.    Yes.

25        Q.    Did you find any evidence of

Page 280

1             WILLIAM F. BROWDER (4/15/15)

2    ownership of this property in real estate --

3    of the properties that Mr. Stepanov bought?

4         A.   There's an ownership of a property

5    in Dubai that he's bought.

6         Q.   And is there any indication that

7    Ms. Stepanova has an interest in that

8    property?

9         A.   Not that I'm aware of.

10        Q.   So be to be clear, there's not a

11   single document that you've been able to come

12   up with anywhere where Ms. Stepanova owns a

13   bank account that received money from the

14   $230 million fraud or owns real estate from

15   the $230 million fraud or has any other asset

16   that she's received from the $230 million

17   fraud, right?

18        A.   She's not a direct recipient in any

19   of the documents that we have.

20        Q.   And she's not -- and there are no

21   documents indicating she's an indirect

22   recipient either; is that correct?

23        A.   There's no documents, but we

24   believe that the assets that belong to her

25   husband are jointly owned by her.

1          WILLIAM F. BROWDER (4/15/15)

2      Q.   And you have no facts that would

3   support that belief, correct?

4      A.   Common sense.

5      Q.   Your common sense?

6      A.   And a lot of other people's.

7      Q.   There are no documents, there are

8   no facts, other than this assumption, that

9   Ms. Stepanova received anything from the

10   $230 million fraud; isn't that true?

11      A.   There's no documents with her name

12   on them.

13      Q.   And Mr. Stepanov and Ms. Stepanova

14   are divorced, correct?

15      A.   I'm not sure.

16      Q.   Have you checked the records in

17   Moscow?

18      A.   There's some question about those

19   records.

20      Q.   Are there records that indicate

21   they are divorced?

22      A.   There are.

23      Q.   And what is the question about

24   those records other than the fact that you

25   don't like them?

Page 282

1          WILLIAM F. BROWDER (4/15/15)

2          A.   The timing of the records and the

3     voracity of the records, but I'm not an expert

4     on these records.

5          Q.   Is there something on the records

6     that give somebody -- strike that.

7               Do you have the records?

8          A.   I don't.

9          Q.   Does your team have the records?

10         A.   I don't know.

11         Q.   Don't you think if you're going to

12    accuse somebody of a huge fraud, that you

13    ought to collect the relevant documents?

14         A.   What's the question?

15         Q.   Don't you think that if you're

16    going to accuse somebody, as you have, of

17    enormous fraud, you ought to collect the

18    relevant documents?

19         A.   My team has collected the relevant

20    documents, which were submitted to the Swiss

21    prosecutor and submitted to the New York

22    District Attorney's office about this fraud.

23         Q.   But you haven't gotten the divorce

24    records?

25         A.   I'm not -- not to my knowledge.

Page 283

1          WILLIAM F. BROWDER (4/15/15)

2          Q.   So anything that might upset your

3    theory, you decide you don't need?

4               MR. KIM:  Objection to form.

5          Q.   Is that right?

6          A.   Could you rephrase the question?

7          Q.   Yes.  Isn't it true that any

8    document that might upset your theory, you

9    don't go and get it?

10         A.   No.

11         Q.   Well, you didn't get the divorce

12   records, right?

13         A.   I didn't.

14         Q.   And your team didn't, as far as you

15   know?

16         A.   I just said that not to my

17   knowledge do they have them.  I didn't say

18   they didn't.

19         Q.   Well, you don't know they have

20   them, right?

21         A.   I don't know.  Not to my knowledge.

22         Q.   Right.  Mr. Stepanov has challenged

23   you, sir, in court, hasn't he?

24         A.   I've never been to court with

25   Mr. Stepanov.

Page 284

1          WILLIAM F. BROWDER (4/15/15)

2          Q.   He's sued a reporter who

3   republished the information on your website;

4   isn't that true?

5          A.   No.

6          Q.   No?

7          A.   No.

8          Q.   You're not aware of that?

9          A.   He didn't sue a reporter.

10          Q.   Who did he sue?

11          A.   He sued an activist.

12          Q.   I see.  This is like a

13   whistleblower, another label you give people.

14               Who's this activist?

15          A.   Aleksei Navalny.

16          Q.   And Mr. Stepanov sued

17   Aleksei Navalny, right?

18          A.   Yes.

19          Q.   And it was Mr. Stepanov who -- who

20   won, right?

21          A.   That's correct.

22          Q.   Got a judgment for defamation

23   against Mr. Navalny, right?

24          A.   Correct.

25          Q.   For republishing the information on

Page 285

1           WILLIAM F. BROWDER (4/15/15)

2    your website?

3           A.    That's correct.

4           Q.    Are you aware of any information

5    that the U.S. Attorney's Office has collected

6    beyond the information in Exhibit 46 related

7    to the Stepanov -- Stepanov payment?

8           A.    Could you show me Exhibit 46.

9           Q.    That's the one we've been looking

10   at.  Oh, I'm sorry, my mistake.  It's my

11   Tab 46, but it's Exhibit 15.

12          A.    Could you repeat the question?

13          Q.    Yes, thank you.  Are you aware of

14   any information other than the information in

15   Exhibit 15 that the U.S. Attorney's Office has

16   corrected with respect to whether Mr. Stepanov

17   received funds from the $230 million fraud?

18          A.    I'm not aware.

19          Q.    Is it your belief that the

20   allegations in the Complaint were based upon

21   the information in Exhibit 15?

22          A.    I don't know.

23          Q.    In your conversations with Agent

24   Hyman, did he ever talk to you about how you

25   trace money to Mr. Stepanov?

Page 286

1          WILLIAM F. BROWDER (4/15/15)

2     A.   No.

3     Q.   Anybody in the U.S. Attorney's

4  Office have a conversation with you on that

5  subject?

6     A.   Not to my recollection.

7     Q.   According to paragraph 100 of the

8  Amended Complaint -- and you've already

9  referred to this -- Mr. Stepanov tax returns

10 show income of $38,000 basically, right?

11    A.   I'm sorry, which paragraph is that?

12    Q.   100.

13    A.   Yes.

14    Q.   So Mr. Kleiner got the tax returns

15 for Mr. Stepanov?

16    A.   I'm not sure where they came from.

17    Q.   I believe your book says

18 Mr. Kleiner got them, but you don't know?

19    A.   I'm not sure.

20    Q.   Let's look at in Exhibit 15, Bates

21 Nos. '2451 through '2460.

22         Do you know what these documents

23 are?

24    A.   No.

25    Q.   Do you know whether it would be

Page 287

1            WILLIAM F. BROWDER (4/15/15)

2    legal in Russia for Mr. Kleiner to have income

3    tax returns from of Mr. Stepanov?

4        A.   I'm not sure.

5        Q.   You're not sure?

6        A.   I don't know.

7        Q.   Are income tax returns public in

8    Russia?

9        A.   I don't know.

10       Q.   Did you ask Mr. Kleiner where he

11   got income tax returns?

12       A.   No.

13       Q.   Because you didn't want to know?

14       A.   No.

15       Q.   Aren't you curious?  You got

16   $38,000 from income tax returns; that's an

17   unusual fact, isn't it?  It's unusual to have

18   that kind of information, isn't it?

19       A.   No.

20       Q.   Do you have income tax returns for

21   other people?

22       A.   Lots of people have income tax

23   returns.

24       Q.   Lots of people have other people's

25   income tax returns?

1          WILLIAM F. BROWDER (4/15/15)

2          A.   Sure.  Politicians, et cetera.

3          Q.   Politicians have other people's

4     income tax returns?

5          A.   No, politicians' income tax

6     returns.

7          Q.   Lots of people have politicians'

8     income tax returns; Mr. Stepanov is not a

9     politician, is he?

10         A.   No.

11         Q.   What business is he in?

12         A.   I'm not sure.

13         Q.   Did you investigate what business

14    he was -- he was in?

15         A.   My team did.

16         Q.   And what did they discover?

17         A.   He was a smalltime businessman.

18         Q.   "Smalltime" being what?

19         A.   Having average earnings of -- with

20    his wife of $38,000 a year.

21         Q.   Do income tax returns in Russia

22    require reporting of foreign income?

23         A.   I'm not a Russian accountant.

24         Q.   Do you file income tax returns in

25    Russia?

Page 289

1            WILLIAM F. BROWDER (4/15/15)

2       A.   My firm did on my behalf.

3       Q.   Did they report foreign income?

4       A.   I don't know.

5       Q.   In the United States, you know we

6   have to report foreign income, right?

7       A.   I don't know.

8       Q.   You gave up your U.S. citizenship

9   in 1998, right?

10       A.   Correct.

11       Q.   Just as the laws about reporting

12   foreign income came into effect; is that

13   right?

14       A.   I don't know.

15       Q.   Why did you give up your U.S.

16   citizenship in 1998?

17       A.   I immigrated to the U.K. ten years

18   earlier.

19       Q.   So the U.K. required you to give up

20   your U.S. citizenship?

21       A.   No.

22       Q.   So why did you give up your U.S.

23   citizenship?

24       A.   Personal reasons.

25       Q.   And what are those personal

1              WILLIAM F. BROWDER (4/15/15)

2    reasons?

3         A.   My family was persecuted during the

4    McCarthy era.

5         Q.   And your father is the head of the

6    economics department where, what university?

7         A.   He's not --

8         Q.   Where was he?

9         A.   My father was a professor of

10   mathematics at the University of Chicago.

11        Q.   Was the head of the department at

12   some point?

13        A.   Yes.

14        Q.   And your uncle, what position did

15   he have?

16        A.   He was a mathematician at

17   Princeton.

18        Q.   Head of the department at one

19   point?

20        A.   Yes.

21        Q.   But your concern that your family

22   was persecuted, but they made it to the head

23   of the department of two prestigious

24   universities and that's why you gave up your

25   U.S. citizenship?

Page 291

1                WILLIAM F. BROWDER (4/15/15)

2          A.   Yes.

3          Q.   What kind of persecution did you

4   face?

5          A.   My grandmother was sick with cancer

6   and the U.S. Government tried to deport her to

7   Russia when she was dying.

8          Q.   What year was that?

9          A.   In 1950 something.

10         Q.   I see.  And so 1998, this all came

11  back as a rush of emotion and you decided to

12  give up your U.S. citizenship?

13         A.   No.

14         Q.   So as far as you're concerned, it

15  was fine for Mr. Kleiner to have

16  Mr. Stepanova's -- Mr. Stepanov's tax returns,

17  right, nothing illegal about that, as far as

18  you know?

19         A.   No.

20         Q.   Let me ask you this:  Money comes

21  out of the treasury, Russian Treasury, and

22  goes to USB and Intercommerz, right?

23         A.   Yes.

24         Q.   Who controlled the money at that

25  point?

Page 292

1                WILLIAM F. BROWDER (4/15/15)

2        A.    I don't know.

3        Q.    At what point -- but once it's in

4  USB and it's in Intercommerz, the fraud is

5  accomplished, as far as you're concerned,

6  right?

7        A.    I don't know.

8        Q.    Wasn't it the organization that

9  transferred the money to those two banks?

10        A.    Yes.

11        Q.    So at that point they have control

12  over the money, right?

13        A.    I don't know.

14        Q.    Well, under your theory at what

15  point does the organization get control over

16  the money?

17        A.    I don't know.

18        Q.    And you don't know who's directing

19  the money?

20        A.    I don't know.

21        Q.    Well, do you know why the transfers

22  were made further down the line to other

23  accounts?

24        A.    I don't know.

25        Q.    To your knowledge, were there any

Page 293

1          WILLIAM F. BROWDER (4/15/15)

2    U.S. citizens or residents involved in the

3    theft?

4          A.   I don't know.

5          Q.   You're not aware of any?

6          A.   I don't know.

7          Q.   You're not aware of any -- you are

8    not aware of any U.S. citizens or residents

9    involved in the theft, are you?

10         A.   I just don't know.

11         Q.   Well, do you have theories about

12   U.S. citizens or residents who are involved in

13   the theft?

14         A.   No.

15         Q.   And there are no events to steal

16   the money that occurred in the United States,

17   right?

18         A.   I don't know.

19         Q.   You're not aware of any, right?

20         A.   I don't know.

21         Q.   And as far as you know, the people

22   who stole the money were Russians?  As far as

23   you know, the people you named were all

24   Russian, right?

25         A.   Yes.  Yes.

Page 294

1          WILLIAM F. BROWDER (4/15/15)

2          Q.   And the acts to steal the money all

3    occurred in Russia, as far as you know, right?

4          A.   No.

5          Q.   To steal the money?  In other

6    words, to get the money out of the treasury,

7    there are acts that occurred outside of

8    Russia?

9          A.   In the Amended Complaint and the

10   original Complaint there's a whole series of

11   arguments about planning of the -- of the

12   fraud in Cyprus.

13         Q.   I see.  Okay.  There are no

14   planning events described in the United States

15   though?

16         A.   I don't know.

17         Q.   None that you know of?

18         A.   I don't know.

19         Q.   You received a Subpoena from the

20   United States in February of 2014?

21         A.   I did, yes.

22         Q.   We're pulling it out.  Well, while

23   we're waiting, trial was scheduled by the

24   judge on February 4, 2014, for the end of

25   March 2014; do you remember that?

Page 295

1          WILLIAM F. BROWDER (4/15/15)

2      A.   I do.

3      Q.   You were at The White House that

4  day, February 4, 2014; do you remember that?

5      A.   No.

6      Q.   You were at The White House at the

7  beginning of 2014?

8      A.   I don't remember.

9      Q.   How many times have you been to The

10  White House?

11      A.   Once.

12      Q.   When was that?

13      A.   2000, 2002, something like that.

14      Q.   Okay.  We'll have to pull out some

15  records.  All right.  We'll go back to the

16  Subpoena.

17           (Browder Exhibit 16, Subpoena was

18           marked for identification, as of this

19           date.)

20  BY MR. CYMROT:

21      Q.   So can you identify -- what number

22  are we up to?  What number was that?

23           MR. LEVINE:  Sixteen.

24      Q.   Sixteen.

25           It is for the record what appears

Page 296

1          WILLIAM F. BROWDER (4/15/15)

2   to be a Subpoena to William Browder, Hermitage

3   Capital Management, Grafton House in London.

4   And it calls for appearance in New York on

5   31st of March 2014 at 10:00 a.m., Bates

6   Nos. '266 to '268.

7            Sir, do you recognize this

8   document?

9        A.   Yes.

10       Q.   Did you receive this?

11       A.   I believe so.

12       Q.   By e-mail?

13       A.   I don't remember.

14       Q.   How did you get it?

15       A.   I don't remember.

16       Q.   Did you have a conversation with

17  U.S. Attorney's Office before you received it?

18       A.   I don't remember.

19       Q.   You don't remember.  Would you

20  speak up, please?

21       A.   I don't remember.

22       Q.   It calls for "Please provide any

23  and all records in your possession relating to

24  any USB [sic] Bank account held in the name of

25  Prevezon Holding Ltd."

Page 297

1              WILLIAM F. BROWDER (4/15/15)

2         A.   I'm sorry, where it does it say

3    that?

4         Q.   UBS?

5         A.   Where -- where's that?

6         Q.   On the second page, rider.

7              "Related to UBS Bank account held

8    in the name of Prevezon Holding."

9         A.   Yes.

10        Q.   Did you provide records to the

11   United States in response to the Subpoena?

12        A.   No.

13        Q.   No?

14        A.   No.

15        Q.   Do you ever provide records of UBS

16   Bank accounts held by Prevezon Holdings, its

17   affiliates, parents, directors or employees to

18   the United States?

19        A.   Not to my knowledge.

20        Q.   This is the -- did you receive such

21   records in connection with the Swiss

22   proceeding?

23        A.   Yes.

24        Q.   And didn't you turn over records

25   from the Swiss proceeding to the U.S.

Page 298

1              WILLIAM F. BROWDER (4/15/15)

2    Attorney's Office?

3         A.   We did.

4         Q.   And didn't they include these bank

5    records?

6         A.   Not to my knowledge.

7         Q.   What did they include?

8         A.   Different records.

9         Q.   What records?

10         A.   Records in connection with Stepanov

11   and Stepanova.

12         Q.   So you never disclosed any UBS Bank

13   account records for Prevezon Holding to the

14   United States?

15         A.   Not to my knowledge.

16         Q.   Well, would somebody else within

17   your team have done it?

18         A.   I don't know.

19         Q.   Wouldn't they tell you before they

20   did it?

21         A.   No.

22         Q.   Wouldn't that be a significant

23   thing for you to know as the head of the

24   company?

25         A.   No.

Page 299

1             WILLIAM F. BROWDER (4/15/15)

2          Q.   You mean people can just turn over

3    records from one court proceeding to another

4    on a matter in which you have been personally

5    involved for years and not tell you?

6          A.   Could you rephrase the question?

7          Q.   Yes.  It's possible that your team

8    would turn over records from the Swiss

9    proceeding to the United States without

10   telling you?

11         A.   I kind of doubt it, but I don't

12   know.

13         Q.   So you don't think it happened?

14         A.   I don't -- I just don't know.

15         Q.   Do you see the next sentence, "Due

16   to this ongo-" -- "Due to the ongoing nature

17   of the investigation, we request that you do

18   not disclose any information related to this

19   Grand Jury Subpoena request or to any third

20   party"; do you see that?

21         A.   Yes.

22         Q.   Did you understand that you were

23   going to appear in front of a Grand Jury?

24         A.   I made no assumptions.

25         Q.   Did you agree to appear?

1          WILLIAM F. BROWDER (4/15/15)

2     A.   No.

3     Q.   Did you have conversations with

4  U.S. Attorney's Office about whether you would

5  appear?

6     A.   No.

7     Q.   Did anybody have conversations on

8  your behalf about whether you would appear?

9     A.   No.

10    Q.   Well, there were a series of

11 letters, first U.S. described you as their key

12 witness; you're aware of that, right?

13    A.   Yes.

14    Q.   And then there were a series of

15 letters where they cut back on what it would

16 be you might testify about; you're aware of

17 those, correct?

18    A.   Yes, I am.

19    Q.   And how did those letters come

20 about?

21    A.   They followed one another.

22    Q.   Who had the conversations that led

23 to those letters?

24    A.   Lots of people.

25    Q.   Who were the lots of people?

Page 301

1             WILLIAM F. BROWDER (4/15/15)

2        A.   Lawyers.

3        Q.   What lawyers?

4        A.   I can't remember which lawyers,

5   I've had a lot of lawyers.

6        Q.   Did you talk to Brown Rudnick about

7   the Subpoena?

8        A.   I've talked to Brown Rudnick about

9   this.

10       Q.   Did they have conversations with

11  the United States about whether you would

12  appear or not?

13       A.   I would imagine they did.

14       Q.   Weren't you informed?

15       A.   I've been informed.

16       Q.   What did they tell you?

17       A.   I don't remember.

18       Q.   You have no idea?

19       A.   No idea.

20       Q.   Not a clue?

21       A.   No, a clue.

22       Q.   You have a clue?

23       A.   I have a clue.

24       Q.   All right.  So what's your clue

25  about what you were told?

1          WILLIAM F. BROWDER (4/15/15)

2              MR. KIM:  Are you -- I'm sorry.

3          Are you now referring to a

4          conversation between the D.A.'s office

5          and Mr. Browder or Mr. Browder and his

6          lawyers?

7              MR. CYMROT:  Mr. Browder and his

8          lawyers.

9              MR. KIM:  Okay.  I object on the

10         basis of attorney-client privilege.

11             MR. CYMROT:  Are you instructing

12         him --

13             MR. KIM:  I'm instructing him not

14         to answer that particular question,

15         but you can continue.

16  BY MR. CYMROT:

17     Q.   Did you inform the U.S. Attorney's

18  Office what you were capable of testifying

19  about?  Let me ask a different question.

20          You've read those letters, right?

21     A.   Yes.

22     Q.   Were you capable of testifying

23  about the subjects that are set forth in those

24  letters?

25     A.   We have to refer to each letter so

```
 1            WILLIAM F. BROWDER (4/15/15)
 2  I can answer that question.
 3       Q.   Well, before the letter went from
 4  your lawyer to the U.S. Attorney's Office, did
 5  you conclude yourself that you were capable of
 6  testifying about what was in the letter?
 7       A.   I'd have to look at the letter.
 8       Q.   You have no idea?
 9       A.   I don't know which letter you're
10  talking about.
11            MR. CYMROT:  Do we have his visit
12       to The White House?
13            (Browder Exhibit 17, Document
14       Entitled "White House Visitor Records
15       Requests" was marked for
16       identification, as of this date.)
17  BY MR. CYMROT:
18       Q.   I'm marking for identification as
19  Exhibit 17 the document entitled "White House
20  Visitor Records Requests."
21       A.   Yes.
22       Q.   It says "Name:  Last, Browder"?
23       A.   Yes.
24       Q.   "Name:  First, William"?
25       A.   Yes.
```

Page 304

1          WILLIAM F. BROWDER (4/15/15)

2          Q.   "Middle initial F; appointment date

3     February 12, 2014"; you see that?

4          A.   Yes.

5          Q.   So does this refresh your

6     recollection that you had a meeting at The

7     White House with a Mr. Carpenter on

8     February 12, 2014?

9          A.   Could you break down the question?

10    There's several questions there.

11         Q.   Did you have a meeting at The White

12    House on February 14, 2014?

13         A.   No, I had a meeting at the old

14    executive office building.

15         Q.   I see.  Within The White House

16    complex?

17         A.   Yes.

18         Q.   So when I asked you when you'd been

19    to The White House, you weren't talking about

20    The White House complex?

21         A.   Correct.

22         Q.   So I have to be very careful in

23    asking my questions; is that right?

24              Did you meet with Mr. Carpenter?

25         A.   Yes.

Page 305

1           WILLIAM F. BROWDER (4/15/15)

2      Q.    Who else was present?

3      A.    Juleanna Glover.

4      Q.    Who's Juleanna Glover?

5      A.    She was my lobbyist.

6      Q.    She was your lobbyist?

7      A.    Correct.

8      Q.    When did you discharge her from

9   being your lobbyist?

10      A.    She left her firm to join a new

11   firm, and that's when the relationship -- the

12   business relationship ended.

13      Q.    When was that?

14      A.    I can't remember, maybe a year ago.

15      Q.    Well, she was present when you were

16   served with a Subpoena just a couple months

17   ago, right?

18      A.    Correct.

19      Q.    But that wasn't part of a business

20   relationship?

21      A.    No.

22      Q.    Okay.  So other than Mr. Carpenter

23   and Ms. Glover, who else was present?

24      A.    Nobody.

25      Q.    And why did you ask for this

1              WILLIAM F. BROWDER (4/15/15)

2    appointment?

3         A.   Part of our advocacy for

4    implementing Sergei Magnitsky Rule of Law

5    Accountability Act sanctions.

6         Q.   What were you asking for?

7         A.   More people to be added to the

8    list.

9         Q.   And who did you want added to the

10   list?

11        A.   I can't remember the names.

12        Q.   Mr. Katsyv was not on your list?

13        A.   No.

14        Q.   Did you ever talk to the U.S.

15   Attorney's Office whether Mr. Katsyv should be

16   added to the list?

17        A.   No.

18        Q.   Anybody in your team have that

19   conversation?

20        A.   No.

21        Q.   So how long did you meet with

22   Mr. Carpenter?

23        A.   Forty-five minutes.

24        Q.   And what was the conversation?

25        A.   About putting people on the

1          WILLIAM F. BROWDER (4/15/15)

2     Magnitsky list.

3          Q.   And what did you say and did he say

4     during that conversation?

5          A.   I said "We should put more people

6     on the Magnitsky list."

7          Q.   And what did he say?

8          A.   "We're working on it."

9          Q.   And who are the people you wanted

10    to add to the list?

11         A.   I can't remember.

12         Q.   Did he say how he's working on it?

13         A.   No.

14         Q.   One point you learned that

15    John Kerry, secretary of state, stopped

16    additions to the list, right?

17         A.   What are you -- what point are you

18    referring to?

19         Q.   In 2014.

20         A.   I think it was The White House, but

21    I can't remember who was stopping it, somebody

22    was stopping it.

23         Q.   Didn't you call Mr. Kerry the

24    lapdog of Mr. Putin?

25         A.   I might have.  Are you referring to

1           WILLIAM F. BROWDER (4/15/15)

2   a specific quote or document?

3           Q.   I'm referring to a quote.  Did you

4   call Mr. Kerry a lapdog of Putin?

5           A.   Can I see that document and confirm

6   it?

7           Q.   No, I'm asking you whether you said

8   it.

9           A.   I don't remember.

10          Q.   If I showed you the document, you

11  would remember?

12          A.   It would refresh my memory.

13          Q.   I see.  So you have no recollection

14  of calling Secretary of State Kerry the lapdog

15  of Putin?

16          A.   Maybe your colleague can show me

17  the document and it will refresh my memory.

18          Q.   But unless I show you a document,

19  you're not going to admit to the statement?

20          A.   I've made a lot of statements about

21  a lot of people.  I'd like to see the

22  statement.

23          Q.   Do you feel Mr. Kerry is the lapdog

24  of Putin?

25          A.   Let me see the statement.

1          WILLIAM F. BROWDER (4/15/15)

2      Q.   Do you think Mr. Kerry is the

3  lapdog of Putin?

4      A.   Do I think -- yes.

5      Q.   And why?

6      A.   Because in my opinion he's

7  following a policy of appeasement towards

8  Russia.

9      Q.   Including not adding people to the

10  Magnitsky list?

11      A.   Among other things.

12      Q.   What other things are you referring

13  to?

14      A.   Sanctions policy, more generally,

15  arms to Ukraine, Syria, Iran, et cetera.

16      Q.   An interesting subject, but not

17  part of the lawsuit, so we'll pass.

18          So when you heard there was a trial

19  date in this case, were you concerned by that?

20      A.   No.

21      Q.   Did you talk to Mr. Carpenter about

22  it?

23      A.   No.

24      Q.   Never even brought it up?

25      A.   No.

Page 310

1              WILLIAM F. BROWDER (4/15/15)

2         Q.   Did you talk to anybody within The

3    White House complex about it?

4         A.   No.

5         Q.   Did you talk to anybody in the

6    justice department about it?

7         A.   No.

8         Q.   Okay.  So do you have any idea

9    where the United States got records of

10   Prevezon Holdings' UBS Bank account?

11        A.   No.

12        Q.   Has -- has your team traced --

13   allegedly traced $230 million or any part of

14   that to Prevezon Holdings?

15        A.   Isn't this the whole basis for our

16   Complaint?

17        Q.   Right.  So how did you do that?

18        A.   My team conducted the

19   investigation.

20        Q.   And how did they do that?

21        A.   Gathering information from

22   different sources.

23        Q.   What sources?  What sources?

24        A.   1782 Subpoena, OCCRP.

25        Q.   What's that, OCCRP?

Page 311

1          WILLIAM F. BROWDER (4/15/15)

2     A.   The Organized Crime and Corruption

3  Reporting Project.

4     Q.   They had records?

5     A.   Yes.

6     Q.   Do they have records of Prevezon

7  Holdings account and UBS?

8     A.   No.

9     Q.   Now I want to focus -- and I

10 understand, I'm looking now at the chart,

11 Exhibit 1, Tab 7.  We talked about the part up

12 through Bunicon and Elenast.  We're now at,

13 according to this chart, $410,000 that went

14 from Bunicon to Prevezon Holdings and four

15 $447,000 that went from Elenast to Prevezon

16 Holdings.  Do you see that?

17    A.   Yes.

18    Q.   So how did your team trace those

19 funds?

20    A.   I don't know.

21    Q.   Are there any documents within this

22 exhibit as far as you know that trace those

23 funds?

24    A.   I don't know.  I think these

25 numbers, these tab numbers refer to different

Page 312

1              WILLIAM F. BROWDER (4/15/15)

2    documents, but I couldn't --

3         Q.    What's that?

4         A.    I think these numbers, these 1, 2,

5    3, 4, 5 refer to different documents here, but

6    I don't know how that works.

7         Q.    Give me a second.  All right.

8              So if we look at '151, that's the

9    Bates number on the bottom.

10        A.    I'm sorry, what are you referring

11   to?

12        Q.    It's in Tab 8, lower right-hand

13   corner, 3128-151.

14        A.    Okay.

15        Q.    So it talks about a transfer of 447

16   from -- Elenast to Prevezon; do you see that?

17        A.    Yes.

18        Q.    And on the opposite page, that's

19   the Bunicon payment, I suppose we have to turn

20   the page.

21              I don't know, do you see the

22   447,000 because I don't?

23        A.    So what is your question?

24        Q.    Where is the basis for the

25   statement on page '151 that there was a

1          WILLIAM F. BROWDER (4/15/15)

2     $447,000 payment from Elenast to Prevezon?

3          A.   I don't know.

4          Q.   And you have no idea what these

5     little boxes are that are on the opposite

6     page?

7          A.   I have no idea.

8          Q.   And you have no idea where they

9     came from?

10         A.   No idea.

11         Q.   And who on your team should I ask

12    about the transfers from UBS and Switzerland

13    into the UBS account in Switzerland?

14              MR. KIM:  Objection to the form.

15         Q.   Let me start again.

16              Who on your team should I ask about

17    the transfers from Bunicon and Elenast to

18    Prevezon?

19              MR. KIM:  Objection to form.

20         A.   Could you rephrase the question?

21         Q.   Yes.  There's a statement here that

22    Elenast transferred $447,000 to Prevezon.  Who

23    on your team would know how that transfer

24    occurred?

25         A.   I imagine either lawyers or Vadim.

1            WILLIAM F. BROWDER (4/15/15)

2       Q.   The lawyers, the same lawyers

3   you've been talking about?

4       A.   Yes.

5       Q.   And you don't know where they got

6   the records?

7       A.   No.

8       Q.   Do they have any other source of

9   the records other than the Swiss proceeding?

10      A.   I don't know.

11      Q.   Did somebody steal the records?

12      A.   No.

13      Q.   You're sure about that?

14      A.   Yes.

15      Q.   Do you have a whistleblower for

16  this, for these records?

17      A.   I don't know where these records

18  came from.

19      Q.   What do you know about the company

20  called AFI Europe?

21      A.   I read something in the Complaint

22  about them joint venturing with your clients

23  on German real estate.

24      Q.   Do you know anything else about

25  them?

1          WILLIAM F. BROWDER (4/15/15)

2          A.   It's a large Israeli real estate

3    investment company listed on the Tel Aviv

4    Stock Exchange.

5          Q.   Has it ever been subject of a

6    criminal investigation, to your knowledge?

7          A.   I don't know.

8          Q.   Not to your knowledge?

9          A.   I just don't know.

10         Q.   Do you know Mr. Loviev?

11         A.   I know of him.

12         Q.   Never met him?

13         A.   I have.

14         Q.   You met him how many times?

15         A.   Twice.

16         Q.   When was that?

17         A.   In 1996 and sometime in the early

18   2000s.

19         Q.   What were the circumstances of

20   meeting Mr. Loviev?

21         A.   Social.  He was at a party.

22         Q.   Both occasions?

23         A.   Yes.

24         Q.   Never did any business with him?

25         A.   No.

Page 316

1           WILLIAM F. BROWDER (4/15/15)

2       Q.    Do you know people who did business

3   with him?

4       A.    No.

5       Q.    Do you know Mr. Guidimac?

6       A.    No.

7       Q.    Know anything about a structure for

8   holding real estate in Europe called "the

9   Dutch sandwich"?

10      A.    No.

11      Q.    You don't own any real estate in

12  Europe?

13      A.    I'm sorry?

14      Q.    Do you own any real estate in

15  Europe?

16      A.    No.

17            MR. CYMROT:  Why don't we take a

18      short break.

19            THE VIDEOGRAPHER:  The time is

20      4:52 p.m.  We're off the record.

21            (Whereupon, at this time, a short

22      break was taken.)

23            THE VIDEOGRAPHER:  The time is

24      5:12 p.m.  We're back on the record.

25  BY MR. CYMROT:

1          WILLIAM F. BROWDER (4/15/15)

2          Q.    Okay.  So Mr. Browder, you're the

3    head of the Global Magnitsky Justice Campaign;

4    is that right?

5          A.    Yes.

6          Q.    And what's that devoted to?

7          A.    Getting justice for

8    Sergei Magnitsky.

9          Q.    And where does it get its funding?

10         A.    It's a loose cooperation of

11   individuals, it's mostly self-funded.

12         Q.    "Self-funded"; you pay for most of

13   it?

14         A.    Most people contribute their time

15   and effort for free.

16         Q.    And the expenses?

17         A.    They're -- the expenses aren't

18   significant, but I pay some of them.

19         Q.    Do you know something called The

20   Journalism Development Network?

21         A.    No.

22         Q.    Operates OCCRP; you're aware of

23   that?

24         A.    No.

25         Q.    Do you make contributions to the

Page 318

1          WILLIAM F. BROWDER (4/15/15)

2   Journalism Development Network?

3        A.   No.

4        Q.   Never?

5        A.   Never.

6        Q.   You've never made contributions

7   directly or indirectly to OCCRP?

8        A.   No.

9        Q.   How did you come to know OCCRP?

10       A.   We met them -- I met them, my

11   colleagues met them in the course of our work.

12            MR. CYMROT:  So I'm going to mark

13       as Exhibit 18 a return of organization

14       exempt from income tax Journalism

15       Development Network, Inc.

16            (Browder Exhibit 18, document

17       Bates stamped BrowderDepo0000548

18       through '581 was marked for

19       identification, as of this date.)

20   BY MR. CYMROT:

21       Q.   And this is for the year 2012, and

22   it shows in 2011 it received contributions of

23   $19,000.  And in 2013, I'm looking at line 8

24   on the first page, received contributions of

25   $1,015,542.

Page 319

1            WILLIAM F. BROWDER (4/15/15)

2            Do you have any idea how its

3   contributions jump so significantly in 2012?

4        A.   No.

5        Q.   And that's not due to any

6   contributions you made?

7        A.   I made no contributions.

8        Q.   And Hermitage?

9        A.   No contributions.

10        Q.   And nobody on your team that you

11   know of?

12        A.   No.

13        Q.   So you have no explanation for that

14   jump in contributions?

15        A.   No.

16        Q.   So in 2012, the OCCRP approached

17   Denis Katsyv; you're aware of that?

18        A.   No.

19        Q.   You weren't aware of that?

20        A.   No.

21        Q.   So according to your letter, which

22   is Exhibit 1 to the New York D.A., there were

23   transactions by Prevezon, and you list 13 of

24   them.  I think I misspoke just a second.

25            It was 13 transactions and the last

Page 320

1              WILLIAM F. BROWDER (4/15/15)

2    two were the ones to Prevezon.

3         A.   Could you just alert me to the

4    right page here?

5         Q.   Yes, page 5.

6         A.   Page 4 or page 5.

7         Q.   Page 5.  Well, it starts on page 4,

8    there are a list of transactions, but the last

9    two are Transaction 15 and 16; do you see

10   that?

11        A.   Yes.

12        Q.   And where did you get that

13   information?

14        A.   I don't know.

15        Q.   So then it goes "Acquisition of

16   Defendants' assets" further down the page.

17   "Prevezon acquired the Defendant assets on

18   November 30, 2009."

19             What do you mean by "Defendant

20   assets"?

21        A.   Where is the -- what are we

22   referencing?

23        Q.   Paragraph numbered 16.

24        A.   I don't know.

25        Q.   So you don't know how you came into

Page 321

1              WILLIAM F. BROWDER (4/15/15)

2    information about Prevezon?

3         A.   No.

4         Q.   Unit 2009 was acquired by Prevezon

5    on November 30, 2009 for 1,231,148.  Do you

6    see that?

7         A.   Yes.

8         Q.   Where did you get that information?

9         A.   That information came from

10   Bill Alpert at Barron's magazine.

11        Q.   Do you know where he got it?

12        A.   No.

13        Q.   Unit 1810 was acquired on

14   November 30th for 829; did that come from

15   Bill Alpert also?

16        A.   I believe so.

17        Q.   How did Bill Alpert become

18   interested in Denis Katsyv?

19        A.   He's a part of the OCCRP network.

20        Q.   Well, but how did Denis Katsyv come

21   to the attention of the OCCRP?

22        A.   I don't know.

23        Q.   How did they come to your

24   attention?

25        A.   I don't know.

1          WILLIAM F. BROWDER (4/15/15)

2          Q.   Do you know whether this

3    information is accurate in 17 and 18?

4          A.   I don't know.

5          Q.   Look, this is a letter that you

6    delivered to New York D.A. personally and you

7    did no due diligence to see whether it was

8    accurate?

9          A.   I trusted my team.

10         Q.   That's totally -- you trusted your

11   team, but you did nothing yourself to

12   understand the information and to check

13   whether it was accurate; is that true?

14         A.   What's the question?

15         Q.   You did nothing yourself in the way

16   of due diligence to determine whether this

17   information that you're presenting to the

18   New York D.A. is accurate?

19         A.   My team did the due diligence and I

20   trusted their work.

21         Q.   Did you ever find -- so it sets

22   conclusion, "As set forth, Prevezon, its major

23   shareholder, Denis Katsyv, the son of Piotr

24   Katsyv, Russian senior official, has acquired

25   the vast corporate and personal wealth in

1              WILLIAM F. BROWDER (4/15/15)

2    excess of $857,000 through corrupt schemes";

3    that's what it says, right, paragraph 19?

4         A.   Yes.

5         Q.   So what were the corrupt schemes

6    referred to right here, corrupt schemes?

7         A.   I don't know.

8         Q.   You have no idea?

9         A.   No.

10        Q.   "Prevezon and Denis Katsyv have

11   also taken significant steps to conceal the

12   source and ownership of their funds and

13   assets."

14             What significant steps did they

15   take?

16        A.   I don't know.

17        Q.   So you go out there and you tell

18   the world that Denis Katsyv is a crook and you

19   don't have any idea how he's a crook; is that

20   what you're telling us?

21             MR. KIM:  Objection to form.

22        A.   Could you rephrase the question,

23   please?

24        Q.   You go out and you tell the world

25   that Denis Katsyv is a crook and you have no

1              WILLIAM F. BROWDER (4/15/15)

2     idea what acts he committed that were crooked;

3     is that your testimony?

4          A.    No.

5          Q.    And what did he do that was crooked

6     in your view, corrupt?

7          A.    My team did an analysis which led

8     to apartments being purchased using funds from

9     the $230 million tax rebate fraud that

10    Sergei Magnitsky uncovered.  The rigor and

11    quality of the work that my team did gave me

12    confidence to supply our suspicions to the

13    New York District Attorney's office to

14    investigate and they chose to investigate.

15         Q.    "Rigor and quality."

16               What rigor did they use?

17         A.    The same rigor they've used all

18    throughout my experience with them.

19         Q.    So you have no idea what due

20    diligence they do to make sure their

21    information is accurate?

22         A.    They've been doing this work for a

23    long time, and the work that they do is high

24    quality and I have confidence in it.

25         Q.    And nobody has been prosecuted,

1              WILLIAM F. BROWDER (4/15/15)

2    although you've been at this for years, other

3    than Mr. Katsyv based on the rigor and quality

4    of your information; is that right?

5          A.   No.

6          Q.   Who's been prosecuted?

7          A.   You had five different questions in

8    your question, so can you --

9          Q.   No.  Nobody has been prosecuted

10   based upon the rigger and quality of the work

11   of your team, five years of doing work?

12         A.   Is your question whether anyone has

13   been prosecuted?

14         Q.   Yes.

15         A.   If your question is has anyone been

16   prosecuted --

17         Q.   As a result of your work?

18         A.   As a result of our work; not yet.

19         Q.   And it's been how many years you've

20   been at this?

21         A.   Since Sergei Magnitsky was killed.

22         Q.   When was that?

23         A.   November 16, 2009.

24         Q.   So that's six years now?

25         A.   Five and a half.

Page 326

```
 1              WILLIAM F. BROWDER (4/15/15)

 2      Q.   And you presented to how many

 3  different prosecutors?

 4           MR. MONTELEONI:  To the extent

 5       that that question calls for

 6       communications with government

 7       agencies that are engaged in ongoing

 8       criminal investigations that aren't

 9       public, I'm going to again request

10       that the witness not answer it.

11           But obviously to the extent that

12       its existence of investigations that

13       are public, we have no objection.

14           MR. CYMROT:  Are you instructing

15       him not to answer?  To be clear, I

16       asked for the number.  I didn't ask

17       for names.  So I don't know how the

18       number could be privileged.

19           MR. MONTELEONI:  Yes, that's fine.

20       If it's just the number, you can

21       answer.

22           MR. KIM:  Yes, Mr. Cymrot, I

23       understood you to be asking for the

24       number.  And if the witness knows the

25       number, I do not have an independent
```

1          WILLIAM F. BROWDER (4/15/15)

2          objection other than what the

3          Government stated, which I understand

4          they're withdrawing their objection to

5          a question about the number if the

6          witness knows.

7    BY MR. CYMROT:

8          Q.   How many prosecutors have you

9    submitted information to?

10         A.   I don't know the exact number, more

11   than ten.

12         Q.   And when your rigorous and

13   high-quality information has been challenged

14   in court, you've lost; isn't that true?

15         A.   No.

16         Q.   Well, Mr. Stepanov won in court,

17   you already testified to that; and weren't you

18   sued by Mr. Karpov?

19         A.   Yes.

20         Q.   In London?

21         A.   Yes.

22         Q.   The judge there was highly critical

23   of your analysis, wasn't he?

24         A.   No.

25         Q.   Really?

Page 328

```
 1              WILLIAM F. BROWDER (4/15/15)

 2      A.    Yes.

 3      Q.    Okay.   I wouldn't want a judge

 4   saying this about me, so I'll show it to you.

 5              (Browder Exhibit 19, document

 6         Bates stamped BrowderDepo0001643

 7         through '670 was marked for

 8         identification, as of this date.)

 9              MR. CYMROT:   I'm marking as

10         Exhibit 19 an opinion, approved

11         judgment in the High Court of Justice

12         Queens Bench Division, Royal Court of

13         Justice, Strand, London before

14         Mr. Justice Simon between Pavel Karpov

15         and -- as Claimant and

16         William Felix Browder as Defendants,

17         Hermitage Capital Management Ltd.,

18         Hermitage Capital Management U.K.

19         Ltd., Jamison Reed Firestone.

20   BY MR. CYMROT:

21      Q.    Do you know what this document is?

22      A.    Yes.

23      Q.    What is it?

24      A.    This is the judgment on the libel

25   suit.
```

Page 329

1          WILLIAM F. BROWDER (4/15/15)

2          Q.    What did Mr. Karpov accuse you of

3     in this lawsuit?

4          A.    Libel.

5          Q.    For what statements?

6          A.    Statements made in the videos that

7     were published on russianuntouchables.com.

8          Q.    That says he had arrested, tortured

9     and murdered Mr. Magnitsky?

10         A.    The statements didn't say that on

11    the website.

12         Q.    Really?  Well, let's see about

13    that.

14              Episode 2 on page '1645, that's the

15    Bates number.

16              2008, after Sergei Magnitsky

17    testified against the same criminal group for

18    an even larger crime, the same officers

19    arrested, tortured and eventually killed

20    Sergei to hide their crime.  Unless they are

21    stopped, the same criminal group will continue

22    to murder and steal.  And it's time for the

23    Russian government to prosecute the officers

24    responsible for the arrest and death of

25    Sergei Magnitsky, Major Pavel Karpov uses his

Page 330

1          WILLIAM F. BROWDER (4/15/15)

2     position to steal, destroy lives.  He's become

3     a very rich man and believes his uniform makes

4     him untouchable.  It's time to prove him

5     wrong.  Did you make that statement in your

6     website?

7          A.    That statement was made on the

8     Russian Untouchables video, Episode 2.

9          Q.    That was -- you were responsible

10    for that?

11         A.    Yes.

12         Q.    You approved it?

13         A.    Yes.

14         Q.    Episode 3, top of page '1646,

15    "Instead of stopping Sergei Magnitsky and

16    recognizing him as a hero, the Government

17    allowed Interior Ministry Officers Kuznetsov,

18    Karpov...to arrest, torture and kill him."

19              You said that?

20         A.    No.  There's three dots in between

21    those -- those -- those words.

22         Q.    The Court felt that this was an

23    accurate statement of what was said?

24         A.    No.  There's three dots there, so I

25    didn't -- the video said something more than

Page 331

1          WILLIAM F. BROWDER (4/15/15)

2    that.

3          Q.   I see.  But the Court felt that

4    this was an accurate -- this is written by a

5    judge, right, this opinion, correct?

6          A.   Yes.

7          Q.   The judge felt that was an accurate

8    representation of what was said, correct?

9          A.   No.

10         Q.   He didn't?

11         A.   The judge is paraphrasing for

12   whatever purposes.

13         Q.   I see.  So you think the judge got

14   it wrong?

15         A.   No, I just see that there's three

16   dots there.

17         Q.   So did you say in words or in

18   substance that Karpov had arrested, tortured

19   and killed Magnitsky?

20         A.   No.

21         Q.   Well, we just read it in Episode 2,

22   you said it?

23         A.   No, I didn't.  Should we read it

24   again?

25         Q.   Yes.  We'll read it again.

1          WILLIAM F. BROWDER (4/15/15)

2          A.   "In 2008 after Sergei Magnitsky

3    testified against the same criminal group for

4    an even larger crime, the same officers

5    arrested, tortured --

6               MR. KIM:  Slow down, it's being

7          typed up.

8               THE WITNESS:  Sorry.

9          A.   "And eventually killed Sergei to

10   hide their crime.  Unless they are stopped,

11   the same criminal group will continue to

12   murder and steal.  It's time for the Russian

13   government to prosecute the officers

14   responsible for the arrest and death of

15   Sergei Magnitsky.  Major Pavel Karpov uses his

16   position to steal and destroy lives.  He's

17   become a very rich man and believes his

18   uniform makes him untouchable.  It's time to

19   prove him wrong."

20          Q.   So you're saying the Court got it

21   wrong when on the next page, '1646, "Instead

22   of supporting Sergei Magnitsky and recognizing

23   him as a hero, the Government allowed Interior

24   Ministry Officers Kuznetsov, Karpov...to

25   arrest, torture and kill him"; so the Court

1          WILLIAM F. BROWDER (4/15/15)

2     got it wrong?

3          A.   Yes.   I'm saying that there's three

4     dots there.   No, the Court didn't get it

5     wrong.   I'm saying that you're reading out of

6     context, there's three dots there and there's

7     a longer sentence.

8          Q.   But this is what the Court wrote,

9     this is what the judge wrote, we're looking at

10    a judge's opinion, right?   I didn't get it

11    wrong.   You're saying the judge got it wrong

12    when he put three dots there because it

13    changed the meaning according to you?

14         A.   I'm not sure the judge intended --

15    no, I disagree.

16         Q.   You disagree.   What do you disagree

17    with?

18         A.   I disagree that there's three dots

19    there.   So if you want to use this, you should

20    retrieve the full sentence.

21         Q.   I'm talking about what Judge Simon

22    said about what you said about Mr. Karpov.

23    And Judge Simon said Kuznetsov Karpov -- three

24    dots -- to arrest, torture and kill him. "

25    That's what I'm reading.

1                WILLIAM F. BROWDER (4/15/15)

2          A.   So I didn't say that.  I said more

3    words than are listed there, which is why

4    there's three dots.

5          Q.   Al righty.  Okay, paragraph 128 --

6    starting on 127, actually.

7               So 127 has your case, Defendants'

8    case on the ill-treatment and/or torture of

9    Sergei Magnitsky, correct?

10         A.   Let me read it properly.  Yes,

11   correct.

12         Q.   So it says that your case is for

13   "the avoidance of doubt, it is not alleged

14   that the Claimant" -- which would be

15   Mr. Karpov -- "personally took part in the

16   ill-treatment and/or torture and killing of

17   Mr. Magnitsky.  The case against Claimant is

18   that he was, however, one of those culpable

19   and complicit in it because of his part in the

20   fraud and coverup."

21               And then it says "It would have

22   been reasonably foreseeable to any reasonable

23   or blameless official in the Claimant's

24   position (not least based on the high

25   mortality rates in Russian prisons), a person

1              WILLIAM F. BROWDER (4/15/15)

2    in Mr. Magnitsky's position could well die in

3    prison.  Notwithstanding this, the claimant

4    participated in the arrest and detention in

5    the manner alleged above," correct?

6         A.   Yes.

7         Q.   And then the judge says "This is an

8    unsatisfactory plea of justification for at

9    least two reasons.  First, it focuses on

10   Claimant's motive and motive alone is not

11   sufficient to support a plea of torture and

12   murder.  Second, the only overt act relied on

13   is the Claimant's involvement in the arrest

14   and imprisonment of Sergei Magnitsky.  The

15   link which is made between the arrest and

16   imprisonment on the one hand and

17   Sergei Magnitsky's death on the other, is that

18   the latter was reasonably foreseeable

19   consequence of the former, not least because

20   of high mortality rates in Russian prisons.

21   The causal link which one would expect from

22   such a serious charge is wholly lacking and

23   nothing is said about torture or murder";

24   that's what the judge said about your

25   statements concerning Mr. Karpov, correct?

1          WILLIAM F. BROWDER (4/15/15)

2      A.   Yes.

3      Q.   And yet you continue to go around

4  and associate people with the death of

5  Sergei Magnitsky who were not directly

6  involved in his death, don't you?

7      A.   I believe that people I make

8  statements about being involved in his death

9  were involved in his death.

10     Q.   And you think Mr. Karpov -- despite

11  the disagreement the judge had with you, you

12  think Mr. Karpov is responsible?

13     A.   I believe that Mr. Karpov was a

14  member of a criminal enterprise that was

15  responsible.

16     Q.   I'm asking you whether you disagree

17  with the judge, that because he arrested him

18  that necessarily Magnitsky -- Mr. Magnitsky

19  was going to die; that's what you've said?

20     A.   Why don't we just read a little

21  further in the same document.  If you go to --

22     Q.   Why don't we answer my question.

23          "The causal link which one would

24  expect from the serious charges wholly lacking

25  and nothing is said about torture or murder."

1          WILLIAM F. BROWDER (4/15/15)

2               He doesn't agree that because he

3    supposedly was the arresting officer that he

4    was responsible for his death, correct?

5          A.    No.

6          Q.    The judge doesn't agree?

7          A.    No, that's incorrect.

8          Q.    Oh, the judge agrees with you?

9          A.    No, the judge doesn't -- repeat

10   your question and I'll tell you --

11         Q.    You said the judge thinks "the

12   causal link which one would expect from such a

13   serious charge" -- the charge being that he

14   was involved in the arrest and therefore he

15   was involved in the death -- "is wholly

16   lacking and nothing is said about torture or

17   murder."  That's what the judge said.  Do you

18   disagree with the judge?

19         A.    No.

20         Q.    Okay.  So in this Complaint, in

21   this case, there's a reference to the death of

22   Mr. Magnitsky and you've associated Mr. Katsyv

23   with the death of Mr. Magnitsky, haven't you?

24         A.    No.

25               MR. CYMROT:  I'm going to mark as

Page 338

1          WILLIAM F. BROWDER (4/15/15)

2          Exhibit 20 a press release, which I

3          believe is from Hermitage on

4          September 11, 2013, regarding the

5          Complaint.

6               (Browder Exhibit 20, Press Release

7          was marked for identification, as of

8          this date.)

9     BY MR. CYMROT:

10         Q.   So can you identify Exhibit 20?

11         A.   Yes.

12         Q.   What is it?

13         A.   Press release.

14         Q.   By whom?

15         A.   Website called Law and Order in

16    Russia.

17         Q.   And who issued the press release?

18         A.   The Justice Campaign for

19    Sergei Magnitsky.

20         Q.   Which is your organization?

21         A.   Which is my organization.

22         Q.   So you approved this press release?

23         A.   I did.

24         Q.   It states, middle of the first

25    paragraph, "This is the first action in the

Page 339

1          WILLIAM F. BROWDER (4/15/15)

2    U.S. to seize assets connected to the

3    Magnitsky case, said a Hermitage capital

4    representative.  It's a significant

5    escalation, the campaign, to bring justice for

6    Sergei Magnitsky and his family.  Sergei's

7    family, colleagues and friends" -- "colleagues

8    and family will continue to pursue all of the

9    recipients of the blood money to make sure

10   they are parted with the elicit proceeds

11   whoever and wherever they are."

12          And the Complaint you're referring

13   to is against Prevezon Holdings, and you refer

14   to Mr. Katsyv on the second page.

15          So you're saying Mr. Katsyv

16   received blood money from the death of

17   Sergei Magnitsky; is that what you're saying?

18       A.   According to the press release,

19   it's "Sergei's friends, colleagues and family

20   will continue to pursue all of the recipients

21   of the blood money to make sure they're parted

22   with the elicit proceeds whenever and wherever

23   they are."  That's exactly what was said.

24       Q.   And you think it's appropriate to

25   refer to blood money received by Mr. Katsyv

1          WILLIAM F. BROWDER (4/15/15)

2   through 104 transactions over months and

3   months where he's denied to you that he

4   received it and gave you a perfectly

5   reasonable explanation for where it came from?

6          MR. KIM:  Objection to form.

7       A.   There's a lot of questions there.

8       Q.   I'll -- I'll -- Yeah, well, we'll

9   get to all five of them.

10          So it's re- -- you think it's

11   appropriate to refer to Mr. Katsyv as having

12   received blood money?

13       A.   I believe that the -- anybody who

14   received proceeds of the $230 million tax

15   rebate fraud which led to the murder of

16   Sergei Magnitsky is blood money.  If he

17   received that money, he was a recipient of

18   blood money.

19       Q.   You testified earlier today that

20   you had no knowledge of facts that would show

21   that Mr. Katsyv had knowledge or intent to

22   participate in the scheme described in the

23   Complaint; do you remember that testimony?

24       A.   I do.

25       Q.   And yet you're willing to describe

Page 341

1                WILLIAM F. BROWDER (4/15/15)

2    what he allegedly received as blood money,

3    implying he was involved in the death of

4    Magnitsky?

5         A.    There's three questions there.  Do

6    you want to break them down?

7         Q.    Are you implying with blood money

8    that the person that received it, Mr. Katsyv

9    was involved in the death of Mr. Magnitsky?

10        A.    No.

11        Q.    And so what is blood money referred

12   to?

13        A.    The money from the $230 million tax

14   rebate fraud.

15        Q.    The allegation in the Complaint is

16   Mr. Katsyv's companies, Prevezon, are

17   conspirators and they are responsible for the

18   whole scheme of the $230 million; were you

19   aware of that?

20        A.    No.

21        Q.    You read it, you read the

22   Complaint, didn't you?

23        A.    Didn't say that they were

24   responsible.

25        Q.    Of course it did.

1          WILLIAM F. BROWDER (4/15/15)

2          A.   It didn't say that.

3          Q.   It asked to recover the

4     $230 million.

5          A.   I'm sorry?

6          Q.   I'm not going to go back to the

7     Complaint.  It's getting late in the day.

8               You're telling me you didn't have

9     any idea when you read that Complaint that

10    Mr. Katsyv's companies are being accused of

11    being responsible for the whole $230 million

12    scheme?

13         A.   Let's go back to the document.

14         Q.   Just tell me.  You don't know it?

15         A.   I'd like to see the -- I'd like to

16    see what you're referring to.

17         Q.   I'd like to not spend time on that.

18              So you think this is an appropriate

19    press release and an appropriate Complaint

20    referring to the Magnitsky Act, it's

21    appropriate press release associating

22    Mr. Katsyv with blood money?

23         A.    Mr. Katsyv, according to our

24    analysis and our suspicions, received a

25    portion of the proceeds of the $230 million

1              WILLIAM F. BROWDER (4/15/15)

2    tax rebate fraud.  That fraud, the discovery

3    of that fraud by Sergei Magnitsky led to his

4    false arrest, torture and murder in prison and

5    therefore -- so therefore --

6         Q.   Go ahead, finish?

7         A.   And therefore, the person that

8    received that, in my opinion, would be the

9    recipient of blood money.

10        Q.   Based upon your suspicions, you

11   just said, "suspicions" was the word?

12        A.   That's correct.

13        Q.   So based upon suspicions, you

14   broadcast to the world that Mr. Katsyv is

15   involved in the death of Mr. Magnitsky?

16        A.   No.

17        Q.   That's adequate for your point of

18   view?

19        A.   No.

20        Q.   You just said that?

21        A.   No, I didn't.

22        Q.   You said based upon our suspicions

23   he received money?

24        A.   That's correct.

25        Q.   And therefore, it's blood money,

Page 344

1          WILLIAM F. BROWDER (4/15/15)

2    and therefore he's responsible for having

3    blood money?

4          A.   There's three questions there.  You

5    want to break them down?

6          Q.   No.  You think it's perfectly

7    appropriate based upon suspicions to accuse

8    somebody of having blood money?

9          A.   Could you rephrase the question,

10   please?

11         Q.   No.  I said you believe based upon

12   suspicions that it is a proper basis to accuse

13   somebody of having blood money?

14         A.   We had suspicions, I had

15   suspicions, and I took those suspicions to the

16   New York D.A.'s office to investigate.

17              They investigated and believed that

18   my suspicions were credible.  And on the back

19   of that, they handed the Complaint to the U.S.

20   Attorney's Office, who also believed that our

21   suspicions were credible based on their own

22   investigation and then seized the properties.

23         Q.   Mr. Hyman testified that the

24   information he got was from you to Mr. Kleiner

25   and some websites you directed him to.  It was

Page 345

1           WILLIAM F. BROWDER (4/15/15)

2    your information and you knew that, didn't

3    you?

4           MR. KIM:  Objection to form.

5    A.   No.

6    Q.   Let me show you another press

7    release -- article.

8           MR. CYMROT:  I'm marking as

9           Exhibit 21 a Radio Free Europe/Radio

10          Liberty article of September 18, 2013.

11          (Browder Exhibit 21, Radio Free

12          Europe/Radio Liberty Article of

13          September 18, 2013 was marked for

14          identification, as of this date.)

15   BY MR. CYMROT:

16   Q.   "Could U.S. Assets Seizure Lead to

17   Expansion of Magnitsky Blacklist?"

18          First sentence reads "As shady

19   Russian businessmen snapped up luxury

20   apartments in New York City, lawyer

21   Sergei Magnitsky was confined to the few

22   square meters of a Moscow jail cell.  He would

23   die there under suspicious circumstances."  It

24   refers to the lawsuit and refers to Mr. Katsyv

25   as the supposedly shady Russian businessman.

Page 346

1           WILLIAM F. BROWDER (4/15/15)

2           Do you think there is a sufficient

3     causal link between Mr. Katsyv's activities in

4     the Complaint and the death of

5     Sergei Magnitsky?

6       A.   I don't know.

7       Q.   Do you think it's appropriate for a

8     U.S. government company Radio Free Europe/

9     Radio Liberty to broadcast that around the

10    world?

11      A.   I have no judgment on

12    their journalistic standards one way or

13    another.

14      Q.   You think that's an appropriate

15    association of Mr. Katsyv, with the death of

16    Mr. Magnitsky?

17      A.   It's not my place to judge somebody

18    else's article.

19      Q.   Why not?  You have an opinion,

20    don't you?  Don't you have an opinion?

21      A.   Yeah.

22      Q.   What's your opinion?

23      A.   About what?

24      Q.   About that statement, beginning of

25    that article.

Page 347

1            WILLIAM F. BROWDER (4/15/15)

2       A.    Looks like it's based on the

3   Complaint.

4       Q.    You think it's -- that's an

5   appropriate way to interpret the Complaint?

6       A.    I've got -- I make no judgment

7   on -- on this guy.

8       Q.    Do you have an opinion about

9   whether that's an appropriate way to describe

10  the Complaint?

11      A.    Without more information about

12  his -- how he was basing his article, it would

13  be -- I have no opinion.

14      Q.    Do you think that is an appropriate

15  description of the Complaint?  That's what you

16  said.  You said it's a description of the

17  Complaint.  Do you think that's an appropriate

18  description of the Complaint?

19      A.    I don't know.

20      Q.    So is it fair to say that you

21  didn't learn anything from Justice Simon's

22  criticism that you had an inadequate causal

23  link between somebody who arrested, allegedly,

24  Mr. Magnitsky and his death?

25      A.    In paragraph 141 --

1           WILLIAM F. BROWDER (4/15/15)

2           Q.   I'm asking you about --

3           A.   And I'm -- and I'm --

4           Q.   -- paragraph 128.

5           A.   And I'm answering you with

6    paragraph 141.

7                In paragraph 141, Justice Simon

8    says, "I have" -- "I have used the expression

9    'presently' --

10          Q.   Why don't you start at the

11   beginning of the paragraph if you want to talk

12   about 141.

13          A.   Sure.

14               "Thirdly, the claimant has achieved

15   a measure of vindication as a result of" --

16   "as a result of the views I've expressed in

17   this application.  Defendants are not in a

18   position to justify the allegations that he

19   caused or was party of the torture, death of

20   Sergei Magnitsky, or continued to kit --

21   commit" --

22          Q.   Slow down and speak out loud --

23          A.   Or to be --

24          Q.   If you want to -- if you want to

25   read this, make sure people can hear it.

1           WILLIAM F. BROWDER (4/15/15)

2       A.   Would you like me to start --

3       Q.   I would look you to start at the

4   beginning, slow down, and speak out loud.

5       A.   "Thirdly, the claimant has achieved

6   a measure of vindication as a result of the

7   views I've expressed on his application.  The

8   Defendants are not in a position to justify

9   the allegations that he caused or was party to

10  the torture and death of Sergei Magnitsky or

11  would continue to commit or be party to

12  covering up crimes.  To use the expression in

13  Olswang's letter of the first of August 2012,

14  the record, at least insofar as it is

15  presently set out in the pleadings, has been

16  set straight.  I recognize this will not

17  prevent a repetition of the libel which, in

18  order of the court, would do, at least in

19  the -- in this jurisdiction; however, nothing

20  in -- in this judgment is intended to suggest

21  that, if the Defendants were to continue to

22  publish unjustified defamatory material about

23  the claimant, the Court would be powerless to

24  act.  I've used the expression 'presently' set

25  out in the pleadings because I've not

1              WILLIAM F. BROWDER (4/15/15)

2      overlooked the possibility of an application

3      to amend the particulars of the plea of

4      justification to rely on participation in a

5      broad conspiracy and/or joint enterprise."

6           Q.   And you feel that justifies

7      associating Mr. Pavlov -- Mr. Karpov --

8      sorry -- with the death of Mr. Magnitsky which

9      you just read?

10          A.   I -- I believe that -- that

11     Mr. Karpov was a member of a joint enterprise

12     or broad conspiracy that led to the murder and

13     death of Sergei Magnitsky.

14          Q.   And you have yet to come up with a

15     single fact that would justify that.

16          A.   No.  Incorrect.

17          Q.   We're not going back over the

18     pleadings.  We're talking about this case now.

19          A.   Which case --

20          Q.   You're --

21          A.   Which case are we talking about?

22     We're talking about the libel case or --

23          Q.   No.  We're talking about this

24     lawsuit.

25          A.   Okay.

Page 351

1              WILLIAM F. BROWDER (4/15/15)

2       Q.    Against Mr. Katsyv.

3       A.    Right.

4       Q.    Who's not accused of being involved

5   in the arrest, the death, the torture, or

6   anything else of Mr. Magnitsky.  But you and

7   the United States have associated him with

8   that death, and you think that's appropriate?

9       A.    I -- I think that's the -- the

10  United States Government has taken a complaint

11  that we filed, investigated it, and found a

12  link between the crimes that Sergei Magnitsky

13  uncovered and the purchase of property in

14  New York and have ceased that property.

15      Q.    And you think it's appropriate,

16  based upon this link of 104 transactions, to

17  say that Mr. Katsyv was associated with the

18  death of Mr. Magnitsky?

19      A.    I think it's appropriate to say

20  that Mr. Katsyv received proceeds.

21      Q.    No.  Answer my question, not your

22  question.

23            Do you think it's appropriate,

24  based upon what your avest -- investigation

25  allegedly found, to associate Mr. Katsyv with

Page 352

1               WILLIAM F. BROWDER (4/15/15)

2      the death of Mr. Magnitsky?

3          A.   Yes.

4          Q.   Other people will have a judgment

5      on that, but I would suggest you've learned

6      nothing from Justice Simon.

7          A.   Is that a question?

8          Q.   No.  It's my own editorializing.

9               You tape conversations?

10         A.   I don't permanently, no.

11         Q.   Never?

12         A.   I have in the past.

13         Q.   In the past.  How far in the past?

14         A.   In specific instances where

15     somebody is involved in something suspicious.

16         Q.   Have you taped any conversations in

17     connection with your investigation of the

18     $230 million theft from the Russian Treasury?

19         A.   I haven't personally.

20         Q.   Do you know if anybody in your team

21     has?

22         A.   Has specifically taped

23     conversations?

24         Q.   Yes.

25         A.   I don't know.

1          WILLIAM F. BROWDER (4/15/15)

2     Q.   Do you keep a calendar?

3     A.   Do I keep a calendar?

4     Q.   Yes.  Do you keep a calendar?

5     A.   Yes.

6     Q.   Do you keep your e-mails?

7     A.   Yes.

8     Q.   Who keeps your files?

9     A.   What do you mean?

10    Q.   Who keeps your files?  Who

11    maintains your files?

12    A.   I don't understand the question.

13    Q.   You have files in connection with

14    the $230 million fraud.  Who maintains them?

15    A.   People doing the investigation.

16    Q.   Who is that?

17    A.   My lawyers and Vadim Kleiner.

18    Q.   You don't keep anything yourself?

19    A.   No.

20    Q.   Nothing?

21    A.   No.

22    Q.   Not a shred?

23    A.   No.

24    Q.   Except the e-mails?

25    A.   Yes.

1              WILLIAM F. BROWDER (4/15/15)

2        Q.    It's alleged in the Complaint and

3   the Amended Complaint that, when Mr. Katsyv

4   was approached by a reporter about the funds

5   that was in the Prevezon Holdings account,

6   that he said he had received them from an

7   investor.  You're aware of that?

8        A.    Could you show me the -- the line.

9        Q.    Let's go to the Amended Complaint.

10       A.    Is that Exhibit 14?

11       Q.    So it's paragraph 108 and 109.

12             Says the money that came in

13   February of 2008 -- and I'm paraphrasing

14   here -- from Bunicon and Elenast derived from

15   the deal between Mr. Krit and his friend or

16   Mr. Petrov.

17             You see that?

18       A.    I'm sorry.  Say it -- could you

19   repeat your question.

20       Q.    Let me read from page 41,

21   paragraph 108, first full sentence.

22             "Representative One stated that the

23   funds involved in the February 2008 Bunicon

24   and Elenast transfers derived from a deal

25   between Mr. Krit and his friend, a

1          WILLIAM F. BROWDER (4/15/15)

2    Mr. Petrov."

3              Do you see that?

4        A.   Yes.

5        Q.   So the 2008 Bunicon and Elenast

6    transfers are the ones that your investigation

7    claimed were from the Russian fraud, right?

8        A.   I don't know.

9        Q.   Well, you can look at Exhibit B.

10       A.   Exhibit B?

11       Q.   Yes, to this Complaint.

12       A.   Yes.

13       Q.   Which by the way is similar to

14   Exhibit 1, the chart that you showed us.

15       A.   Which -- which document is that?

16       Q.   Well, let's go to your chart.

17   Okay?  Which is Exhibit 1, the letter to the

18   U.S. Attorney's Office.

19       A.   Exhibit 1.

20       Q.   This letter to the U.S., right on

21   the top.

22       A.   This one.  Which tab?

23       Q.   Seven.

24       A.   Okay.

25       Q.   So this is your information?

Page 356

1              WILLIAM F. BROWDER (4/15/15)

2        A.    Yes.

3        Q.    You have transfers of 410,000;

4    447,000 in February 2008, from Bunicon and

5    Elenast, right?

6        A.    Um-hum.  Yes.

7        Q.    And that's what Representative One

8    was talking about February 2008, Bunicon

9    Elenast transfers.

10       A.    Um-hum.

11       Q.    Yes?

12       A.    I'm sorry?  I --

13       Q.    All right.  So Representative One,

14   on behalf of Mr. Katsyv, says that those

15   transfers came from a deal between Mr. Petrov

16   and Mr. Krit, right?  That's what the

17   Complaint says?

18       A.    That's what it says, yes.

19       Q.    Okay.  And you had that information

20   before the Complaint was filed, right?

21       A.    No.

22       Q.    You had that information actually

23   before you even made the Complaint to the U.S.

24   Attorney's Office, didn't you?

25       A.    I don't know.

1          WILLIAM F. BROWDER (4/15/15)

2          Q.   Did you ever investigate whether it

3     was true that the 2008 transfers came from a

4     Mr. Petrov?

5          A.   I didn't personally.

6          Q.   Did anybody?

7          A.   I don't know.

8          Q.   Don't you think it's reasonable if

9     there's an explanation to investigate the

10    explanation?

11         A.   If -- if -- in general terms?  Yes.

12         Q.   Okay.  And so we have, according to

13    your chart, $20 million of clean money going

14    into Bunicon and Elenast, $800,000 coming out.

15    Don't you think it's possible that that was

16    clean money that came out?

17         A.   I don't know.

18         Q.   Don't you think it's possible that

19    Mr. Katsyv's explanation that it came from a

20    Mr. Petrov is a reasonable explanation when

21    there's $20 million of clean money going

22    through those accounts at the same time?

23         A.   I don't know.

24         Q.   You have no opinion about that?

25         A.   I just don't know.

Page 358

1          WILLIAM F. BROWDER (4/15/15)

2          Q.    You're willing to accuse Mr. Katsyv

3    of having blood money, but you don't know

4    whether it's reasonable to think that the

5    $800,000 came from clean money?  Is that your

6    testimony?

7          A.    Could you repeat the question.

8          Q.    Yes.  You don't think that -- you

9    don't know whether you should check whether

10   the 410- and the $447,000 came from Mr. Petrov

11   as a reasonable changes, a reasonable and

12   innocent explanation for the transfers from

13   Bunicon and Elenast?

14         A.    I don't know when that information

15   came, and I don't know whether people who did

16   the tracing had that information.

17         Q.    No.  They had the information

18   before this Complaint was filed.  This is in

19   the original complaint also.

20              Should we look at the paragraph in

21   the original Complaint?  This is before the

22   Complaint was filed.

23              Exhibit 2, the original Complaint.

24         A.    Where -- where am I looking?

25         Q.    Looking at...

Page 359

1              WILLIAM F. BROWDER (4/15/15)

2         A.    You're talking about the Complaint

3    that we filed with New York D.A.'s office?

4         Q.    No.   This is the United States

5    Complaint against Prevezon.

6         A.    Which exhibit number is this?

7         Q.    I think it's 2.

8         A.    Bear with me for a second.  I need

9    to find this.

10             Would this be Exhibit 2?  It

11    doesn't have a number -- it doesn't have a --

12    a sticker on it.

13        Q.    That's it.  Let's put a sticker on

14    it.

15             So Exhibit 2, the original Verified

16    Complaint, in paragraph 108.

17        A.    Okay.

18        Q.    It's the same statement in 108.

19    Representative on stated funds involved in the

20    February 2008 transfer derived from a deal

21    between Mr. Krit and his friend, a Mr. Petrov.

22        A.    So what's the question?

23        Q.    So this information came from your

24    team?

25        A.    The Petrov story?

Page 360

1          WILLIAM F. BROWDER (4/15/15)

2      Q.   Yes.

3      A.   Are you sure?

4      Q.   Yes.  It came from the OCCRP.

5      A.   So I -- I don't see it in here.  Is

6  it -- can you show me in here where -- where

7  that statement is?

8      Q.   I don't think it's in there.

9      A.   So how did it come from me?

10      Q.   It came from the OCCPR [sic] that

11  you gave to the U.S. attorney.

12      A.   No.  The OCCRP gave us information,

13  not the other way around.

14      Q.   Yes.  And then you gave it to the

15  U.S. attorney.  So you had, from the OCCRP,

16  this quote from Representative One.

17      A.   I'm -- I'm not sure that's the

18  case.  I don't believe it.  Not -- not to my

19  knowledge.

20      Q.   You think it would have been

21  irresponsible to make a complaint against

22  Prevezon without checking out the explanation

23  given by Representative One?

24      A.   I don't know.  I haven't assessed

25  that statement.

Page 361

1              WILLIAM F. BROWDER (4/15/15)

2        Q.   Well, let's assess it right now.

3   You have $20 million going through an account,

4   $800,000 coming out, and the person who's

5   accounts received the money says, "I have a

6   perfectly good explanation.  It came from

7   Mr. Petrov."

8             And you don't think it's your

9   obligation, before you accuse him of having

10  blood money, to check out his story?

11       A.   I'm not sure we have that

12  information.

13       Q.   Obviously you had it, because it's

14  in the Complaint, the first -- very first

15  Complaint?

16       A.   It's not in this Complaint.

17       Q.   Mr. Hyman says that he got

18  information for this complaint from you and

19  Mr. Kleiner and some websites you directed him

20  to.  So you had the information.

21       A.   I -- not -- not -- not to my

22  knowledge.

23       Q.   Well, let me ask you this:  Let's

24  assume that you're aware of this explanation.

25  Would it be irresponsible not to check it out

1          WILLIAM F. BROWDER (4/15/15)

2    before making a complaint against Mr. Katsyv's

3    companies?

4          A.   I can't make a judgment about some

5    piece of information taken out of context.

6          Q.   It's perfectly well in context.  It

7    is his explanation for the $800,000.

8               It's not obvious to you that you

9    ought to check it out?

10         A.   I don't believe we had that

11   information.  Not to my knowledge.

12         Q.   Well --

13         A.   Because I don't see it in -- I

14   don't see that in -- in this document.

15         Q.   After this was filed, you had the

16   information because you had the Complaint.  As

17   a matter of fact, you had the Complaint before

18   it was filed, so you would have read it in the

19   drafts.

20               So you had the information.  Did

21   you check it out?

22         A.   I don't know.

23         Q.   Don't you think you had an

24   obligation to check it out?

25         A.   I don't know.

Page 363

1          WILLIAM F. BROWDER (4/15/15)

2          Q.   It's not obvious to you, if there's

3     an inner -- innocent explanation, you don't

4     choose -- accuse somebody of having blood

5     money?

6          A.   The U.S. Attorney's Office have

7     kept it in two Complaints, so obviously they

8     believe that it's true.

9          Q.   Did you ever try to reach

10    Mr. Petrov?

11         A.   No, not to my knowledge.  I didn't

12    personally.

13         Q.   Did anybody in your team attempt to

14    reach Mr. Petrov?

15         A.   I don't know.

16         Q.   Who's Mark Fagan?

17         A.   He's a Russian lawyer.

18         Q.   Do you know him?

19         A.   No.

20         Q.   Didn't you come to the

21    United States with him when you returned with

22    Pussy Riot?

23         A.   No.

24              (Whereupon, an off-the-record

25     discussion was held.)

Page 364

1              WILLIAM F. BROWDER (4/15/15)

2     BY MR. CYMROT:

3          Q.    Do you know what the Pussy Riot is?

4          A.    Of course.

5          Q.    What is it?

6          A.    It's a punk rock band.

7          Q.    What's the significance of it in

8     Russia?

9          A.    An anti-Putin -- they're an

10    anti-Putin punk rock band.

11         Q.    And do you support the Pussy Riot

12    in any way?

13         A.    I took them to meetings in Capitol

14    Hill.

15         Q.    And wasn't Mark Fagan there also?

16         A.    Not with us.

17         Q.    You've never met Mark Fagan?

18         A.    I've shaken his hand at a event in

19    London, public event.

20         Q.    When was that?

21         A.    It was 2013, November 2013.  I

22    think.  I'd have to ask some people to

23    remember.

24         Q.    What event was it?

25         A.    I think it was a book-launch event

Page 365

1           WILLIAM F. BROWDER (4/15/15)

2    for a book about Sergei Magnitsky.

3           Q.    Not your book?

4           A.    No.

5           Q.    Another book?

6           A.    Yes.

7           Q.    Do you have Mr. Fagan's telephone

8    number?

9           A.    No.

10          Q.    So are you familiar with a lawyer

11   by the name of Oleg Lurie?

12          A.    No.

13          Q.    You've heard about -- I'm sorry.

14   He's not a -- I said lawyer.

15          A.    You did.

16          Q.    Too many lawyers.  A reporter by

17   the name of Oleg Lurie?

18          A.    Yes.

19          Q.    How do you know Mr. Lurie?

20          A.    I don't.

21          Q.    Well, you said in a pleading in

22   this court that he was pursuing you for years.

23   You remember saying that?

24          A.    I remember the -- I remember saying

25   that.

Page 366

1            WILLIAM F. BROWDER (4/15/15)

2       Q.   Pursuing you in what way?

3       A.   There's a documentary that the

4  Russian government made about me in which Oleg

5  Lurie is one of their principal attracters.

6       Q.   That was in 2014?

7       A.   I think that was last year.  I

8  can't remember exactly when.  Could have been

9  this year.

10       Q.   And you say it was the Russian

11  government who put that out?  You're just

12  assuming that, right?

13       A.   I'm -- I'm assuming that, yes.

14       Q.   Okay.  You don't know who put it

15  out?

16       A.   No.  But I know it was the Russian

17  government.  Excuse me.  I -- I do know.

18       Q.   How do you know that?

19       A.   Because it was put on the Russian

20  government's television station MTV.

21       Q.   So this program was on Russian

22  government TV?

23       A.   Correct.

24       Q.   Do you know if they put together

25  the video?

1          WILLIAM F. BROWDER (4/15/15)

2          A.   I don't know how it was

3     constructed.

4          Q.   Okay.  And you said Mr. Lurie was

5     pursuing you for years.  That's just recently.

6     How has he been pursuing you for years?

7          A.   I'd have to go back and do a

8     search.  I'm sure we could find something.

9          Q.   In other words, you put in an

10    affidavit to Judge Griesa but you don't have

11    anything to say he was pursuing you for years?

12         A.   Not on the tip of my tongue.

13         Q.   And you didn't at the time you

14    wrote that and signed the affidavit, right?

15         A.   I'm sure I did at the time.

16         Q.   You can't recall it now?

17         A.   No.

18         Q.   It's just a month or two ago?

19         A.   Yes.

20         Q.   Do you have notes you could review

21    to see how Mr. Lurie's been pursuing you for

22    years?

23         A.   I could do the research to come up

24    with them.

25         Q.   You can go back and do research to

                    WILLIAM F. BROWDER (4/15/15)

1    support a statement that you swore to before

2    and presented to Judge Griesa, right?  Did you

3    have anything at the time?

4         A.   I don't have any notes.

5         Q.   So you just said it?

6         A.   I said it based on my belief at the

7    time.

8         Q.   Do you have any facts that support

9    your belief?

10        A.   Not on the tip of my tongue.

11        Q.   And you didn't have any at the

12   time, right?

13        A.   Wrong.

14        Q.   But you don't remember them now?

15        A.   Right.

16        Q.   Did you go out and check

17   Mr. Lurie's accusation?

18             Did you do any investigation about

19   Mr. Lurie's accusation that somebody used your

20   name to attempt to bribe him and change the

21   storey about Sergei Magnitsky?

22        A.   That's complete nonsense.

23        Q.   You did -- did you do any

24   investigation?

1           WILLIAM F. BROWDER (4/15/15)

2           A.   My team did.  It's complete

3    nonsense.

4           Q.   What investigation did your team

5    do?

6           A.   They -- they compared his

7    statements with the facts and came up with a

8    conclusion that it was nonsense.

9           Q.   And what facts did they compare

10   them to?

11          A.   I don't know.

12          Q.   It's easy to say it's nonsense.  Do

13   you have any facts to support that statement?

14          A.   My team does.

15          Q.   But you have no idea, and you can't

16   tell us here what facts would support the idea

17   that Mr. Lurie's accusation is nonsense?

18          A.   I don't remember exactly what his

19   accusation was, and I don't remember exactly

20   what their rebuttal was, but -- but I -- but

21   my -- I trust my team to do the analysis.

22          Q.   Mr. Lurie said that -- that

23   somebody using your name contacted him.  He

24   produced recordings of those conversations.

25   People using your name offered him $160,000 to

Page 370

1              WILLIAM F. BROWDER (4/15/15)

2    change his story about meeting Sergei

3    Magnitsky in jail.

4         A.   That's a lie.

5         Q.   And how do you know it's a lie?

6         A.   Because I never gave anyone any

7    money to do anything of the sort.

8         Q.   He never took the money.  He turned

9    it down.

10        A.   I never instructed anybody to do

11   anything of the sort.

12        Q.   Did you investigate whether

13   Mr. Lurie was in prison at the same time as

14   Mr. Magnitsky?

15        A.   He is a convicted -- he's convicted

16   exconvict that spent four years in jail for

17   extortion.  And so -- and than he come up --

18   came and lied about this thing.

19        Q.   I see.  So you investigated whether

20   he had been in prison.  Was he in prison at

21   the same time as Mr. Magnitsky?

22        A.   I don't know the details of his

23   imprisonment.

24        Q.   Did you check whether his prison

25   term overlapped with Mr. Magnitsky?

1              WILLIAM F. BROWDER (4/15/15)

2       A.    No.

3       Q.    And nobody on your team did?

4       A.    My team did a full analysis.

5       Q.    Did they write it down?

6       A.    I don't know.

7       Q.    So what was this full analysis?

8       A.    They looked at his allegations and

9  looked at the facts and concluded it was

10  complete nonsense, his statements about his

11  knowledge of Sergei Magnitsky.

12       Q.    Can you give me any facts that

13  would support the very easy statement to say

14  that it's nonsense?  Do you have any facts?

15       A.    To -- to support which part of the

16  statement?

17       Q.    Any part of the statement.

18       A.    Well, the first fact is that I

19  didn't -- I've never bribed or authorized

20  anybody to bribe anybody in relation to him or

21  anything to do with him.  And I can say that

22  with 100 percent certainty.  That's a fact.

23       Q.    Did you check whether anybody --

24  did you check whether he was in prison at the

25  same time, in the same prison, as

1          WILLIAM F. BROWDER (4/15/15)

2     Mr. Magnitsky?

3          A.    I didn't personally.

4          Q.    Do you know whether anybody on your

5     team did?

6          A.    Yes.

7          Q.    And they discovered what?

8          A.    That his statements were

9     inconsistent with the truth.

10         Q.    In what way?

11         A.    I'd have to ask them to get the

12    details.  I don't know.

13         Q.    You didn't get briefed on the

14    details of an accusation that you had bribed a

15    witness to change his testimony.  Does that

16    say you -- you never got briefed on this?

17         A.    I -- I was briefed on it, but I

18    don't remember the details.

19         Q.    When you were briefed on it?

20         A.    Whenever it happened.

21         Q.    It happened just a few weeks ago.

22         A.    Yes.

23         Q.    You were briefed on it a few weeks

24    ago, and you have no specifics to tell us?

25         A.    That's correct.

Page 373

1           WILLIAM F. BROWDER (4/15/15)

2      Q.   When you met with Mr. Kasyanov, did

3  you talk to him about Mr. Lurie?

4      A.   No.

5      Q.   Do you know whether Mr. Kasyov --

6  Kasyanov is attempting to bring a claim

7  against Mr. Lurie?

8      A.   I read that on the internet.

9      Q.   Where did you read that?

10     A.   On the internet.

11     Q.   Where on the internet?

12     A.   Some news article.

13     Q.   You can't tell me more than that?

14     A.   No.

15     Q.   Did you investigate anything about

16  Mr. Lurie's background?

17     A.   No.

18     Q.   Did you investigate him as a

19  reporter?

20     A.   No.

21     Q.   Did you investigate whether he's

22  won awards in the west for his reporting?

23     A.   No.

24     Q.   So you're unaware of any of that?

25     A.   Unaware.  Yes, I'm unaware.

1              WILLIAM F. BROWDER (4/15/15)

2         Q.    Okay.   You're unaware that he has

3    spent many years trying to determine how the

4    IMF money that went into Republic National

5    Bank in 1998 ended up stolen?

6         A.    I wasn't aware of that.

7         Q.    Mr. Safra was your partner, and he

8    owned the bank, right?

9         A.    Correct.

10        Q.    You're unaware that Mr. Lurie was

11   looking into that?

12        A.    That's correct.

13        Q.    Has the U.S. Attorney's Office

14   asked you about Mr. Lurie's affidavit?

15        A.    No.

16        Q.    Has anybody in the government asked

17   you about Mr. Lurie's affidavit?

18        A.    No.

19        Q.    Mr. Lurie says that he had two

20   meetings with Sergei Magnitsky while they were

21   in prison, right?

22        A.    I don't know.

23        Q.    Didn't you read his affidavit?

24        A.    No.

25        Q.    You didn't even read it?

Page 375

1              WILLIAM F. BROWDER (4/15/15)

2         A.    No.

3         Q.    Isn't it true that Mr. Magnitsky

4    turned down legal assistance from you?

5         A.    No.

6         Q.    He always accepted your legal

7    assistance?

8         A.    Yes.

9         Q.    So you provided him with lawyers?

10        A.    His firm did and we reimbursed

11   them.

12        Q.    Firestone and Duncan?

13        A.    Correct.

14        Q.    And they would periodically provide

15   him with statements -- provide Mr. Magnitsky

16   with statements that he should sign?

17        A.    Who?

18        Q.    Firestone Duncan or his lawyers

19   hired by Firestone Duncan.

20        A.    I'm -- I'm not -- I don't know what

21   you're talking about.

22        Q.    Did you consult with

23   Mr. Magnitsky's lawyers from time to time?

24        A.    No.

25        Q.    Somebody on your team do that?

Page 376

1             WILLIAM F. BROWDER (4/15/15)

2        A.    Possibly.  I don't know.

3        Q.    People at Firestone Duncan would

4   have, right?

5        A.    Surely.

6        Q.    Did you have Brown Rudnick

7   representing you at the time?

8        A.    No.

9        Q.    So Firestone Duncan was your lawyer

10   at the time?

11        A.    Not the only ones.  We had other

12   lawyers.

13        Q.    So did anybody coordinate on your

14   behalf with Firestone Duncan about the

15   death -- the defense of Mr. Magnitsky?

16        A.    I don't know.

17        Q.    You don't know?

18        A.    I don't remember.

19        Q.    You were being criminally

20   prosecuted along with Mr. Magnitsky at that

21   time.  You didn't pay attention?

22        A.    I don't know.  I don't remember.

23        Q.    Did you ever have somebody suggest

24   to Mr. Magnitsky that he should take

25   responsibility for the Saturn and Dalnaya Step

Page 377

1            WILLIAM F. BROWDER (4/15/15)

2     tax returns?

3          A.   I don't remember.

4               MR. CYMROT:  Okay.  Why don't we

5          take a break.

6               THE VIDEOGRAPHER:  The time is

7          6:24 p.m.  We're off the record.

8               (Whereupon, at this time, a short

9          break was taken.)

10              THE VIDEOGRAPHER:  The time is

11         6:34 p.m.  We are back on the record.

12    BY MR. CYMROT:

13         Q.   I asked you about taping.  We

14    talked about specific taping, but does

15    Hermitage have a taping system for taping

16    incoming and outgoing calls generally for

17    regulatory purposes or otherwise?

18         A.   Yes.

19         Q.   And how long do you keep those

20    tapes?

21         A.   I don't know the details.

22         Q.   Do you know whether those tapes

23    have been searched for any relevant

24    conversations?

25         A.   I don't know.

Page 378

1    WILLIAM F. BROWDER (4/15/15)

2       MR. CYMROT:  All right.  As we

3    discussed off the record, we have

4    12 minutes left or something on the

5    seven hours.  We believe we're

6    entitled to many additional documents,

7    and we also have insufficient time to

8    finish another major subject.

9       So what we're going to do is

10   suspend the deposition at this point.

11   We're going to reserve our right to --

12   to ask the judge for additional time

13   once we get the documents and keep the

14   deposition open.

15      MR. KIM:  Okay.  Well, I disagree.

16   I think, for the record, we offered to

17   reschedule the deposition at the

18   Defendants' convenience if they felt

19   it was necessary.  The Defendants

20   wanted to proceed, as was their right,

21   so we showed up here.

22      I think, regardless whether you

23   wanted to ask more questions about

24   other documents, you chose to ask

25   approximately 6 hours and 48 minutes

Page 379

```
 1      WILLIAM F. BROWDER (4/15/15)
 2  worth of questions about the documents
 3  you had, and I think it's improper to
 4  make a witness from England try to sit
 5  for another deposition over 12
 6  minutes.
 7       So we're willing to sit here for
 8  another 12 minutes if you wish, but I
 9  think anything else is improper.
10       So thank you.
11       MR. CYMROT:  Okay.  All right.
12       All right.  I understand the
13  government has no questions; is that
14  right?
15       MR. MONTELEONI:  That's correct.
16       MR. CYMROT:  All right.  So we're
17  going to reserve our rights.  There's
18  no point in arguing.  As we both know,
19  the judge will decide whatever he
20  decides.
21       So thank you, Mr. Browder, for
22  coming, and we'll expect another
23  session.
24       MR. KIM:  All right.  Have a good
25  evening.
```

Page 380

1          WILLIAM F. BROWDER (4/15/15)

2            THE VIDEOGRAPHER:  The time is

3        6:36 p.m.  We're off the record.

4            (Whereupon, at 6:36 p.m., the

5        Examination of this Witness was

6        adjourned, sine die.)

7

8          _____

9              WILLIAM F. BROWDER

10

11   Subscribed and sworn to before me

12   This _____ day of _____, 2015.

13   _____

14          NOTARY PUBLIC

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2   ------------------I N D E X------------------

 3   WITNESS:  WILLIAM F. BROWDER

 4   EXAMINATION BY                      PAGE

 5   MR. CYMROT                           6

 6

 7   ----------------E X H I B I T S--------------

 8    BROWDER EXHIBIT              FOR I.D.

 9    Browder Exhibit 1,              10

10    Document Bates stamped

11    PREV_000003127_001 through '166

12    Browder Exhibit 2,              27

13    Verified Complaint, Filed on

14    9/10/13

15    Browder Exhibit 3,              68

16    Document Bates stamped

17    BrowderDepo0001471 through '477

18    Browder Exhibit 4,              72

19    Document Bates stamped

20    BrowderDepo0001478 through '484

21    Browder Exhibit 5,              77

22    Spark Report for

23    Dalnaya Step, LLC

24

25
```

Page 382

1

2    Browder Exhibit 6,              81

3    Document Bates stamped

4    BrowderDepo0001518 through '521

5    Browder Exhibit 7,              82

6    Document Bates stamped

7    BrowderDepo0001522 through '530

8    Browder Exhibit 8,              84

9    Document Bates stamped

10   BrowderDepo0001531 through '535

11   Browder Exhibit 9,              101

12   Document Bates stamped

13   BrowderDepo0001485 through '517

14   Browder Exhibit 10,             105

15   Document Bates stamped

16   BrowderDepo0001408 through '470

17   Browder Exhibit 11,             138

18   Document Bates stamped

19   BrowderDepo0000685 through '690

20   Browder Exhibit 12,             146

21   Document Bates stamped

22   BrowderDepo0000721 through '742

23

24

25

Page 383

```
 1

 2   Browder Exhibit 13,              172

 3   Document Entitled "Plaintiff's

 4   Responses to Defendants' First

 5   Set of Interrogatories"

 6   Browder Exhibit 14,              208

 7   Verified Amended Complaint

 8   Browder Exhibit 15,              236

 9   Document Bates stamped

10   PREV_000002326

11   Browder Exhibit 16,              295

12   Subpoena

13   Browder Exhibit 17,              303

14   Document Entitled "White House

15   Visitor Records Requests"

16   Browder Exhibit 18,              318

17   Document Bates stamped

18   BrowderDepo0000548 through '581

19   Browder Exhibit 19,              328

20   Document Bates stamped

21   BrowderDepo0001643 through '670

22   Browder Exhibit 20,              338

23   Press Release

24

25
```

1

2  Browder Exhibit 21,                345

3  Radio Free Europe/Radio Liberty

4  Article of September 18, 2013

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 385

1

2                C E R T I F I C A T E

3

4    STATE OF NEW YORK        )
                              :  SS.:
5    COUNTY OF RICHMOND       )

6

7            I, AYLETTE GONZALEZ, a Notary Public

8    for and within the State of New York, do

9    hereby certify:

10           That the witness, WILLIAM F.

11   BROWDER, whose examination is hereinbefore

12   set forth was duly sworn and that such

13   examination is a true record of the testimony

14   given by that witness.

15           I further certify that I am not

16   related to any of the parties to this action

17   by blood or by marriage and that I am in no

18   way interested in the outcome of this matter.

19           IN WITNESS WHEREOF, I have hereunto

20   set my hand this 15th day of April, 2015.

21

22           _____
                     AYLETTE GONZALEZ
23

24

25

Page 386

1

2    ERRATA SHEET FOR THE TRANSCRIPT OF:

3    Case Name:
     Dep. Date:
4    Deponent:

5    Pg. Ln.  Now Reads        Should Read      Reason

6    ___ ___  _____    _____    _____

7    ___ ___  _____    _____    _____

8    ___ ___  _____    _____    _____

9    ___ ___  _____    _____    _____

10   ___ ___  _____    _____    _____

11   ___ ___  _____    _____    _____

12   ___ ___  _____    _____    _____

13   ___ ___  _____    _____    _____

14   ___ ___  _____    _____    _____

15   ___ ___  _____    _____    _____

16   ___ ___  _____    _____    _____

17   ___ ___  _____    _____    _____

18   ___ ___  _____    _____    _____

19   ___ ___  _____    _____    _____

20                 _____

21

     SUBSCRIBED AND SWORN BEFORE ME,
22
     This___ day of_____, 2015.
23
     _____
24            Notary Public

25   My Commission Expires:_____