Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- X

UNITED STATES OF AMERICA,

               Plaintiff,

     -against-

PREVEZON HOLDINGS LTD., *et al.*,

            Defendants.

------------------------------------------------------- X

    CASE NO. 1:13-CV-06326 (TPG)

     ECF CASE


## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED VERIFIED COMPLAINT


BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
jmoscow@bakerlaw.com
John W. Moscow
Loura L. Alaverdi

BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Ave.,
Washington, D.C. 20036
Telephone: (202) 861-1677
Facsimile: (202) 861-1783
mcymrot@bakerlaw.com
Mark A. Cymrot

BAKER BOTTS LLP
30 Rockefeller Plaza
New York, NY 10112
Telephone: (212) 408-2500
Facsimile: (212) 408-2501
seth.taube@bakerbotts.com
Seth T. Taube
Richard B. Harper

*Attorneys for Defendants*

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ..................................................................................... 1

II.    BACKGROUND ....................................................................................... 4

     A.     FACTUAL BACKGROUND ...................................................... 4

         1.     The Defendants ................................................................. 4

         2.     Theft of US$230 Million from the Russian Treasury ................. 4

         3.     Tracing the Stolen Funds Through 104 Transactions in Five Foreign Countries to the Prevezon 8160 Account ..................... 6

         4.     Defendants' Alleged Use of Russian Funds to Buy Interests in The Netherlands ...................................................................... 7

         5.     Mr. Katsyv's Explanation for the Funds Received .................... 8

         6.     Description of the Business of Prevezon Holdings .................... 9

         7.     The Deficient Claims ........................................................ 11

     B.     THE ORIGINAL VERIFIED COMPLAINT LACKED A FACTUAL BASIS ........................................................................................ 11

         1.     The Government Admitted In Its Fed. R. Civ. P. 30(b)(6) Deposition that There Is No Basis to Allege that Defendants Acted with Knowledge or Intent ................................................... 11

         2.     The Government Relied on Information from William F. Browder, Which It Did Not Verify ...................................................... 12

         3.     The Government Cannot Trace Proceeds of the US$230 Million Fraud Scheme to Defendants ............................................... 13

     C.     PROCEDURAL HISTORY ........................................................ 13

III.   ARGUMENT ........................................................................................... 16

     A.     PLEADING STANDARDS ........................................................ 16

     B.     THE GOVERNMENT'S MONEY LAUNDERING CLAIMS ARE BARRED BECAUSE THEY REQUIRE EXTRATERRITORIAL APPLICATION OF THE WIRE FRAUD STATUTE ........................ 18

     C.     THE GOVERNMENT CANNOT SHOW THAT PREVEZON HOLDINGS RECEIVED FUNDS "TRACEABLE" TO FRAUD ...................... 20

# TABLE OF CONTENTS
## (continued)

                                                                                        **Page**

D.    THE GOVERNMENT FAILS TO ALLEGE THAT DEFENDANTS
      LAUNDERED ANY FUNDS THEY RECEIVED ...............................................25

      1.    The Government Has Not Demonstrated that Tainted Funds Were
            Invested in New York Real Estate.............................................................25

      2.    The Government Has Not Sufficiently Alleged Knowledge or
            Intent to Commit Money Laundering.......................................................28

      3.    The Government Has Not Shown a Substantial Connection
            Between Defendants and the Specified Unlawful Activity......................30

E.    THE AMENDED VERIFIED COMPLAINT IS NOT PROPERLY
      VERIFIED AS REQUIRED BY SUPPLEMENTAL RULE G...........................31

IV.   CONCLUSION ....................................................................................................33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 650 Fifth Ave. & Related Prop's*,
 777 F. Supp. 2d 529 (S.D.N.Y. 2011) ............................................................... 16, 30

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) ..................................................................... 2, 17, 18, 26

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007) ............................................................................................... 2

*Benzman v. Whitman*,
 523 F.3d 119 (2d Cir. 2008) ................................................................... 18, 29

*Bigio v. Coca-Cola Co.*,
 675 F.3d 163 (2d Cir. 2012) ............................................................................... 18

*European Cmty. v. RJR Nabisco, Inc.*,
 764 F.3d 129 (2d Cir. 2014) ............................................................................... 19

*Marine Midland Bank, N.A. v. United States*,
 93-0307, 1993 WL 158542 (S.D.N.Y. May 11, 1993)........................................ 24

*Morrison v. National Austrialia Bank Ltd.*,
 130 S.Ct. 2869 (2010) ............................................................................... 19, 20

*Norex Petroleum Ltd. v. Access Indus., Inc.*,
 631 F.3d 29 (2d Cir. 2010) ....................................................................... 19, 20

*One United States v. White Crystal Covered Bad Tour Glove & Other Michael Jackson Memorabilia*,
 No. 11-3582, 2012 WL 8455336 (C.D. Cal. Apr. 12, 2012)............................... 21

*Petroleos Mexicanos v. SK Eng'g & Constr. Co. Ltd.*,
 572 F. App'x. 60 (2d Cir. 2014)................................................................. 19, 20

*Puerto Rico Ports Auth. v. BARGE KATY-B*,
 427 F.3d 93 (1st Cir. 2005)................................................................................ 17

*Ridge Chrysler Jeep, LLC v. DaimlerChrysler Servs. N. Am. LLC*,
 No. 03-760, 2006 WL 2808158 (N.D. Ill. Sept. 6, 2006)............................... 31, 32

*Saltz v. First Frontier, L.P.*,
 485 F. App'x 461 (2d Cir. 2012)....................................................................... 29

*United States v. $22,173.00 in U.S. Currency*,
 716 F. Supp. 2d 245 (S.D.N.Y. 2010) ............................................................... 17

# TABLE OF AUTHORITIES
## (continued)

Page

*United States v. $448,342.85*,
969 F.2d 474 (7th Cir. 1992) ....................................................................... 27

*United States v. 74.05 Acres of Land*,
428 F.Supp.2d 57, 64 (D. Conn. 2006) ........................................................ 17

*United States v. All Right, Title and Interest in Real Property and Appurtenances
Thereto Known as 785 St. Nicholas Ave. and 789 St. Nicholas Ave.*,
983 F.2d 396 (2d Cir. 1993) ......................................................................... 22

*United States v. Certain Accounts, Together With All Monies On Deposit Therein*,
795 F. Supp. 391 (S.D. Fla. 1992) .................................................. 14, 17, 20, 21

*United States v. Contents of Accounts*,
629 F.3d 601 (6th Cir. 2011) ........................................................................ 32

*United States v. Contents of Accounts*,
No. 3:10-cv-228-H, 2010 WL 2556849 (W.D. Ky. June 18, 2010) ............... 32

*United States v. Contents in Account No. 059-644190-69*,
253 F. Supp. 2d 789 (D. Vt. 2003) ............................................... 21, 22, 27

*United States v. Daccarett*,
6 F.3d 37 (2d Cir. 1993), *superseded by statute*, Civil ............................... 16

*United States v. Farrington*,
58 F. App'x 919 (3d Cir. 2003) ..................................................................... 11

*United States v. Funds Held in the Name or for the Benefit of Wetterer*,
210 F.3d 96, 110 (2d Cir. 2000) ............................................................. 17, 31

*United States v. Gotti*,
459 F.3d 296 (2d Cir. 2006) ......................................................................... 25

*United States v. Melrose East Subdivision*,
357 F.3d 493 (5th Cir. 2004) ........................................................................ 32

*United States v. Miles*,
360 F.3d 472 (5th Cir. 2004) ........................................................................ 30

*United States v. Nicolo*,
597 F. Supp. 2d 342 (W.D.N.Y. 2009) .......................................................... 27

*United States v. One Tyrannosauraus Bataar Skeleton*,
No. 12-4760 (PKC), 2012 WL 3947563 (S.D.N.Y. Sept. 7, 2012) ............... 31

# TABLE OF AUTHORITIES
## (continued)

**Page**

*United States v. Santos*,
  20 F.3d 280 (7th Cir. 1994) ................................................................. 11

*United States v. Sokolow*,
  91 F.3d 396 (3d Cir. 1996) ................................................................. 11

*United States v. Sum of $185,336.07 U.S. Currency Seized from Citizen's Bank
  Account L7N01967*,
    731 F.3d 189, 196 (2d Cir. 2013) ("*Sum of $185,336.07*") ............................ 16, 17

**Statutes**

18 U.S.C. § 981 ........................................................................ 1, 3, 18, 21

18 U.S.C. § 983 ........................................................................ *passim*

18 U.S.C. § 1343 ............................................................................. 19

18 U.S.C. § 1956 ..................................................................... 18, 21, 28

18 U.S.C. § 1957 ..................................................................... 18, 21, 28

**Rules**

Fed. R. Civ. P. 12(b)(6) ...................................................................... 17

Supp. R. E ................................................................................... 16

Supp. R. G ........................................................................ 3, 16, 21, 31

**Other Authorities**

David B. Smith, PROSECUTION & DEFENSE OF FORFEITURE CASES § 915.01[1][c]
  n.36 (2013) ............................................................................... 25

# I.    INTRODUCTION

Defendants Prevezon Holdings Ltd. ("Prevezon Holdings") and its eight affiliates[1] have been subject to a protective order restraining their properties for 16 months based upon a Verified Complaint and now an Amended Verified Complaint that does not allege that Defendants did anything culpable to satisfy the most basic elements of forfeiture law, 18 U.S.C. §§ 981, *et seq.*, and the Money Laundering Control Act, 18 U.S.C. §§ 1956 & 1957. Each of the Claims must be dismissed.

The Amended Verified Complaint tells two stories: one story about a US$230 million Russian tax refund fraud, and another separate story about the Prevezon Defendants' legitimate real estate business. The Amended Verified Complaint fails to connect the two. The Government's allegations can be divided into four parts:

The first section tells a graphic and disturbing story about the US$230 million tax refund fraud from the Russian Treasury by the so-called "Organization" and the death of Mr. Sergei Magnitsky. Am. Compl. ¶¶ 18-82. Those allegations are irrelevant to Defendants, who are not mentioned once, and are highly prejudicial, designed to inflame the reader and to create prejudice against Defendants. The Government has admitted that Defendants were not members of the Organization, did not know about the Organization or the fraud, and played no role in Mr. Magnitsky's death.

The next section – also making no mention of Defendants' conduct − contains highly attenuated allegations purporting to trace US$1,965,444.55 of the US$230,000,000 defrauded funds through 104 transactions at nine (9) banks across five (5) countries, and into a Zurich bank

---

[1] The eight New York affiliates, together with Prevezon Holdings, are referred to as the "Prevezon Defendants" and with Defendants Ferencoi Investments Ltd. ("Ferencoi") and Kolevins, Ltd. ("Kolevins"), they are referred to as "Defendants." Ferencoi and Kolevins have filed separate motions to dismiss, Dkt. No. 201, but incorporate the arguments in this motion by reference.

account of Prevezon Holdings. Am. Compl. ¶¶ 83-100, 114-123. The Government does not allege that any member of the Organization directed funds to Defendants; instead, the entire case turns on the improper use of accounting assumptions. The tracing is flawed in numerous ways. For example, Exhibit B shows a transfer of 1,185 million Rubles, of which 487.6 million Rubles (equivalent of US$19.5 million) were untainted funds. The Government proffers no explanation for asserting that the US$1.96 million received by Prevezon came from tainted rather than untainted funds. The sole link between the claimed Russian refund fraud scheme and Defendants, thus, is a fatally defective tracing exercise.

The Court should focus its attention particularly on the third section of the Amended Verified Complaint, consisting of only 13 paragraphs that mention Defendants' conduct but do not identify any as wrongful. *Id.* ¶¶ 101-113. The Prevezon Defendants are an investment company and its affiliates, which were primarily focused on investing funds of their owner, Denis Katsyv, in real estate. Before Mr. Katsyv purchased Prevezon Holdings, it accepted funds from one client, Mr. Petrov, for the purpose of investing those funds, and invested those funds (including the purported US$1.96 million in tainted funds) in The Netherlands where the Government seized the funds in February 2013, after the original Verified Complaint was filed. Twenty-one months later, the Prevezon Defendants began to invest in eight condominiums in New York in ordinary and regular transactions, but the Government traces no tainted funds into these New York investments. This is the entire story the Amended Verified Complaint tells about Defendants.

The fourth section contains seven Claims that should explain how these factual allegations present a case under United States law but do no more than quote from the underlying statutes in violation of the Government's pleading requirements under *Twombly* and *Iqbal*.

Each of the Claims is founded upon allegations of knowledge and intent even though the Government has admitted that it has no information suggesting Defendants knew about or intended to promote or conceal the Russian tax refund fraud or any other crime.

Based upon these wholly defective allegations, the Government has put the Prevezon Defendants out of business, seizing "any and all assets" amounting to approximately US$15 million. In a civil forfeiture action, the Government must meet the heightened pleading standards required by 18 U.S.C. § 981(a)(1)(A), § 983(j), and Rule G of the Supplementary Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supp. R."), which require the complaint to "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." Supp. R. G(2)(f). However, the Amended Verified Complaint is based upon three flawed factual allegations, each alone fatal to the case: the Government (1) has not traced any tainted funds into Prevezon Holdings' account in Zurich; (2) has not traced any tainted funds into the eight Prevezon affiliates in New York; and (3) has not alleged facts sufficient for a finding of knowledge and intent, which are fundamental to each of the Claims.

The Claims are also legally deficient for at least four reasons: (1) the Government has not identified a Specified Unlawful Activity ("SUA") actionable in the United States; (2) the Government has not alleged facts demonstrating that any funds "traceable to" Defendants were derived from the fraudulent transaction; (3) the Government has not alleged facts demonstrating that the Defendants laundered any funds they received; and (4) the Government's verification, required by Supp. R. G for a forfeiture action, is inaccurate and misleading as revealed by the Governments admissions in its Fed. R. Civ. P. 30(b)(6) testimony.

This injustice should be remedied immediately by dismissal of the Amended Verified Complaint.

## II.     BACKGROUND

### A.     FACTUAL BACKGROUND

This factual background, unless otherwise indicated, is taken from the Government's allegations in the Amended Verified Complaint, which are presumed to be true for the purpose of this motion only.  Defendants strongly contest these allegations and deny any wrongdoing.

### 1.     The Defendants

Defendants are a group of companies currently engaged in real estate investments.  Am. Compl. ¶¶ 103, 108-109.  Defendant Prevezon Holdings is a foreign holding company organized under the laws of Cyprus that invested in real estate projects in The Netherlands and New York. *Id.* ¶¶ 7, 103, 124; Claim for Property, Dkt. No. 204.  Mr. Katsyv, a Russian citizen, owns Prevezon Holdings and runs the company along with Alexander Litvak and Timofey Krit, the former owner and now a director.  Am. Compl. ¶¶ 9-11.  Prevezon Holdings acquired a 30% interest in a series of Dutch companies held in partnership with AFI Europe, a major international real estate company.[2]  Prevezon Holdings also owns the eight Defendant Prevezon companies, each a New York limited liability company that held separate real estate investments in New York.  *Id.* ¶¶ 11, 124-136.

### 2.     Theft of US$230 Million from the Russian Treasury

On December 26, 2007, a Russian tax office allegedly transferred the equivalent of US$230 million (in Rubles) to corporate accounts in the names of three affiliates of Hermitage Capital at two Russian banks, Universal Savings Banks ("USB") and Intercommerz.  *Id.* ¶ 77.

---

[2] According to its webpage, API Europe, N.V. is a major real estate developer with projects in eight countries, including Germany, the Czech Republic, Latvia, and Poland. *See* AFI-Europe, http://afieurope.eu/ Aboutus/Pages/Company.aspx (last visited January 12, 2015).

The transfers were part of an "elaborate" scheme orchestrated by a criminal "Organization" to defraud the Russian Treasury by creating fictitious tax refunds. *Id.* ¶¶ 2, 18-21, 44-45. In or about November 2008, an accountant investigating the fraud, Sergei Magnitsky, was arrested and a year later, in November 17, 2009, died of heart failure while still in pretrial detention. *Id.* ¶¶ 17, 56, 59, 62, 64. To put the internal conflict within the Amended Verified Complaint into context, the Government has admitted on numerous occasions that Defendants are not alleged:

- To be members of the Organization, to know any members of the Organization, to have participated in any way in the Russian tax refund fraud, or even to have known about the Organization or the fraud; or

- To have had anything to do with Mr. Magnitsky's detention or death, or even to have known about it.

The Government has admitted in two separate filings and at two separate court hearings that Defendants had nothing to do with the alleged "Organization" or the Russian tax refund fraud. *See* Dkt. No. 47 at 5 n.3; Dkt. No. 58 at 5 n.3; Hr'g Tr. Feb. 14, 2014, 47:12-15; Hr'g Tr. Mar. 4, 2014, 12:14-16. At the February 14, 2014 hearing, AUSA Paul Monteleoni had the following exchange with the Court:

> **The Court:** Were these defendants part of – I mean were they part of that group that you're talking about?
>
> **AUSA Monteleoni:** We do not definitely allege that they are in the complaint.

Hr'g Tr. Feb. 14, 2014, 47:12-15. At the March 4, 2014, hearing, the Government had this further exchange with the Court:

> **The Court:** I don't understand the government to claim that the defendants participated in or engineered or conceived of or anything like that the original tax fraud on the Russian government. Can the government attorney respond? Am I right?
>
> **AUSA Christine Magdo:** That's correct, your Honor.

Hr'g Tr. Mar. 4, 2014, 8:1-5.  Even after these admissions and more than a year to further

investigate, the Amended Verified Complaint continues to make allegations about this theft and

the notorious death without connecting them to Defendants in any way.[3]

### 3. Tracing the Stolen Funds Through 104 Transactions in Five Foreign Countries to the Prevezon 8160 Account

Following the transfer of the US$230 million from the Russian Treasury, the

Organization allegedly "engaged in a complicated series of transactions" to launder the funds.

Am. Compl. ¶ 75.  As reflected in Exhibit B to the Amended Verified Complaint, the

Government purports to trace US$1.96 million from the Russian Treasury in 104 transfers

through nine (9) banks across five (5) countries: Russia, Moldova, Estonia, and the British

Virgin Islands into Switzerland.  Except for one wire transfer, all of the wire transfers took place

between banks outside of the United States.  *See generally* Am. Compl. ¶¶ 77-102, 114-123 &

Ex. B.  That one transfer took place on February 5, 2008, when $726,000 was allegedly routed

through the Southern District of New York from the account in Moldova of a Moldavian

company, Bunicon-Impex SRL ("Bunicon"), to a Latvian bank, eventually reaching a third party

unrelated to Defendants.  *Id.* ¶¶ 97-98.  This one transfer is not included on Exhibit B and is not

alleged to have ever reached Defendants.  The Amended Verified Complaint does not:

- Identify a person(s) who masterminded the transfers or directed funds to Defendants;

- Disclose the basis for this tracing or follow the basic guidelines of *Banco Cafetero Panama*; or

---

[3] The allegations regarding Magnitsky's death, in addition to being wholly immaterial to the claims against Defendants, are extraordinarily prejudicial, describing at great length Magnitsky's arrest, detention, and death, including allegations that he was "beaten by 8 guards with rubber batons on the last day of his life," Am. Compl. ¶ 66, and that an ambulance crew "was deliberately kept outside of his cell for one hour and 18 minutes until he was dead." *Id.* The presence of such allegations in the Amended Verified Complaint is particularly outrageous as the Government has admitted that Defendants had nothing to do with these alleged events. Dkt. No. 47 at 5 n.3. If this case proceeds to trial, Defendants intend to move to exclude evidence and argument concerning these scandalous allegations.

- Allege that Defendants knew about any of the transfers, any of the businesses or the banks named in the tracing analysis, or the unnamed persons who ordered the transfers.

### 4. Defendants' Alleged Use of Russian Funds to Buy Interests in The Netherlands

The Amended Verified Complaint's factual allegations section finally mentions Defendants on page 38, paragraph 101.  In February 2008, Defendants are alleged to have received US$1.96 million of the allegedly stolen funds into Prevezon Holdings' account in Switzerland ("Prevezon 8160 Account"), but the Amended Verified Complaint never distinguishes these allegedly tainted funds from the US$19.5 million (487.6 Rubles) in untainted funds going through the same accounts.  The many deficiencies in the tracing allegations are set forth below.  *See infra.* at Part III(C).[4]

As alleged in the Amended Verified Complaint, the US$1.96 million never reached property in the United States, which would be the only way to bring the funds within the jurisdiction of this Court.  In May and June of 2008, Prevezon Holdings "converted millions of dollars" in the Prevezon 8160 Account into Euros in the Prevezon 8170 Account and transferred "over 3 million euros to AFI Europe. N.V." for the purpose of purchasing interests in Dutch companies that held property interests in Germany.  Am. Compl. ¶ 103.  The Government's purported tracing stops at the Dutch companies with the exception of one vague allegation that on an unknown date an unspecified amount of funds was transferred from AFI Europe to the Prevezon 8170 Account.  *Id.* ¶ 125.  The Amended Verified Complaint provides no basis for linking this transfer to funds from the Russian Treasury because the purportedly tainted funds had been invested in interests in Dutch companies that Prevezon Holdings still held.  In 2013, AFI Europe purchased Prevezon Holdings' interest in the Dutch companies but never transmitted

---

[4] The Government sought confirmation of its tracing from the Russian Federation through an MLAT request, received a response, but has refused to provide Defendants with the response. Without this sole alleged link between Defendants and the Russian fraud scheme, there would be no case.

payment to Prevezon Holdings; instead, the funds were frozen by a Dutch court pursuant to an MLAT request from the United States.[5] *Id.* ¶ 136.

### 5. Mr. Katsyv's Explanation for the Funds Received

The Amended Verified Complaint even alleges a wholly innocent explanation for Defendants' conduct. When a news reporter approached Mr. Katsyv asking about the February 2008 transfers, Mr. Katsyv did not react like a criminal participant in a massive fraud scheme might. Instead Mr. Katsyv "undertook a full review" of the source and use of the funds transferred, which occurred before he became owner of Prevezon Holdings. *Id.* ¶ 108. His representative − designated Representative-1 as if he were a confidential informant − publicly reported that the February 2008 transfers had been made on behalf of a third party investor, Mr. Petrov, who was a friend of Mr. Krit's, the prior owner and still a Prevezon Holdings director. *Id.* Mr. Petrov agreed to transfer the funds to Prevezon Holdings for the purpose of jointly developing "a business based on investments in and management of property." *Id.* ¶ 108. Representative-1 reported that funds were invested in New York real estate. *Id.* ¶ 124.

- Representative-1's statement about the source of the funds for the New York investments is inconsistent with the Government's tracing of Russian Treasury funds set forth just paragraphs before, but the Amended Verified Complaint makes no effort to reconcile the inconsistency;

- The Government presents no facts challenging Mr. Katsyv's statement about the third party investor and never attempted to interview Mr. Katsyv or Representative-1 prior to filing the original Verified Complaint.

As the Amended Verified Complaint acknowledges, the purchases of New York real estate started 21 months after the US$1.96 million was deposited into the Prevezon 8160 Account (between November 2009 and September 2012) and 16 months after Prevezon Holdings spent those funds to purchase interests in Dutch companies. *Id.* ¶ 103. The Amended Verified

---

[5] The Government also is withholding this MLAT request from Defendants even though its representations to the Dutch government would appear to be inconsistent with its jurisdictional allegations in this case.

Complaint simply alleges that six of Defendants' New York properties were purchased, in whole

or in part, with funds from the Prevezon 8160 Account totaling approximately $7 million, as if

the account were forever tainted by once allegedly holding Russian Treasury funds.  *Id.* ¶¶ 124-

29.  But the Amended Verified Complaint also alleges that two Defendant properties (purchased

by Prevezon Soho and Prevezon Alexander) were acquired entirely with funds from sources

other than the Prevezon 8160 Account.  *Id.* ¶ 127, 130.  No Treasury funds are traced to these

companies, although their assets are restrained in the Amended Protective Order.  Dkt. No. 173 ¶

4.  As of the date of the filing of the original Verified Complaint, all but two of the eight

properties were still held by Defendants.  The properties held by Defendants Prevezon 1810,

LLC and Prevezon Soho USA, LLC ("Prevezon Soho") were sold in 2013 prior to the filing of

the Complaint.  *Id.* ¶¶125c, 127a.

 The Amended Verified Complaint has no allegations that:

- Attempt to rebut Mr. Katsyv's explanation, Am. Compl. ¶ 108, that the funds came from an independent investor, and, thus, Prevezon Holdings had nothing at all to do with the alleged Russian fraud;

- Explain why the US$1.96 million transferred into the Prevezon 8160 Account had to be stolen funds when the Amended Verified Complaint alleges that the Bank Krainiy Sever Account had transferred at least the equivalent of US$19.5 million in untainted funds; or

- Explain how the Government connects the allegedly stolen funds to any New York real estate.

 By contrast, the real estate business depicted in the Amended Verified Complaint

conducts transactions in an ordinary and legal fashion, including collecting rents, paying taxes,

employing people, and providing housing or offices for numerous tenants.

### 6. Description of the Business of Prevezon Holdings

 The Amended Verified Complaint describes the business of Prevezon Holdings as an

ordinary real estate investment business.  It bought real estate, held it, and sold it at a profit.

There are no allegations of false statements, false books and records, or any other irregularities. Nowhere in the Amended Verified Complaint is there an allegation that any of Messrs. Katsyv, Krit, Litvak, or Petrov engaged in any unlawful conduct.

The Amended Verified Complaint makes much of the US$50,000 purchase price paid by Mr. Katsyv for Prevezon Holdings when US$2 million allegedly was in the Prevezon 8160 Account.  *Id.* ¶ 106.  But the Amended Verified Complaint provides its own explanation — the funds in the account were those invested by Mr. Petrov.  *Id.* ¶ 108.  These allegations are entirely consistent with Mr. Katsyv's explanation: an investment company would have a liability to offset the assets in the bank account.

The Amended Verified Complaint also attempts to discredit the explanation by Mr. Katsyv's representative of funds transferred into the Prevezon 8160 Account with the allegation that the transfers were identified in bank records as "prepayment for sanitary equipment or for automotive spare parts."  *Id.* ¶ 123.  The Amended Verified Complaint further alleges that Bunicon had a "purported contract" "purportedly signed by an unnamed representative of Prevezon Holdings" in connection with the $410,000 February 6, 2008, transfer and that Elenast had a "purported invoice" "purportedly signed by an unnamed director of Prevezon Holdings" in connection with the $447,354 February 13, 2008 transfer.  *Id.* ¶¶ 111-12.  There is no allegation that Prevezon Holdings had anything to do with these descriptions: the entries were made by the bank in Moldova and the two Moldavian companies.  In any case, Mr. Katsyv did not own the company at the time, and these facts in no way associate Prevezon Holdings or Mr. Katsyv with the Russian tax refund fraud.  In fact, the Government has admitted in Court and under oath that

it knows little about the knowledge or intent of Defendants or their principal, an essential element of each Claim.[6]

### 7.      The Deficient Claims

The Amended Verified Complaint concludes by asserting seven civil Claims, which allege that Defendants engaged in money laundering by concealing or knowingly transferring the stolen proceeds from the Russian Treasury by the Organization.  *Id.* ¶¶ 137-71.  Each Claim merely quotes the relevant statutory language without identifying factual allegations that allegedly support the elements of the Claims, for instance what constitutes an SUA or what facts provide a basis for the *scienter* allegations.

## B.      THE ORIGINAL VERIFIED COMPLAINT LACKED A FACTUAL BASIS

On March 3, 2014, Defendants conducted a Fed. R. Civ. P. 30(b)(6) deposition of the Government.  The Government designated Special Agent Todd Hyman of the Department of Homeland Security as its witness.  The Government readily admitted that its investigation did not support many of the allegations in the original Verified Complaint, which are repeated in the Amended Verified Complaint.

### 1.      The Government Admitted In Its Fed. R. Civ. P. 30(b)(6) Deposition that There Is No Basis to Allege that Defendants Acted with Knowledge or Intent

Each of the Claims alleges that Defendants had knowledge of the alleged fraud and intended to promote or conceal it.  However, the Government admitted that it had no evidence that:

---

[6] The Government now seeks to smear Defendants with a prejudicial, irrelevant, and highly misleading allegation regarding a money laundering proceeding in Israel. Am. Compl. ¶ 113. The Amended Verified Complaint omits the fact that the Israeli court found that no money laundering had occurred. The Government's excuse for this allegation – knowledge of Israeli money laundering laws – is irrelevant and inadmissible. *See United States v. Sokolow*, 91 F.3d 396, 408–09 (3d Cir. 1996); *accord United States v. Farrington*, 58 F. App'x 919, 924 (3d Cir. 2003); *United States v. Santos*, 20 F.3d 280, 284 n.3 (7th Cir. 1994). If this lawsuit continues, Defendants will seek to have this information excluded also.

- "Dennis Katsyv, Timofey Krit or Alex Litvak knew that there was a US$230 million fraud as of . . . June 2008."  Rule 30(b)(6) Deposition of the Government (Gov't Dep.)[7] at 150:8–14.

- Defendants "intended to promote the organization" or that they "intended to promote and perpetuate the organization's acts of fraud, corruption and money laundering."  *Id.* at 134:13–21.

- Defendants "knew that the financial transactions were designed in whole or part to conceal or disguise the nature, location, source, ownership or control of the proceeds of the $230 million fraud scheme."  *Id.* at 137:13–138:5.

- The Government knows little about the knowledge or intent of Defendants or their principal and needs discovery to provide evidence of this essential element of each Claim.  Hr'g Tr. Feb. 14, 2014 at 45:23-46:19 (evidence going to scienter is "something that we hope that discovery will reveal.").

Despite these admissions, the same allegations are found in the Amended Verified Complaint without any additional facts to supports its conclusory allegations of knowledge and intent.

### 2. The Government Relied on Information from William F. Browder, Which It Did Not Verify

William F. Browder, principal owner of Hermitage Capital Management ("Hermitage Capital"), is the Government's primary source of information for this case.  Gov't Dep. at 53:6–55:4.  The Government's entire investigation involved interviewing Browder—who was previously convicted of fraud in Russia, and who was not in Russia during the time of the events in the Amended Verified Complaint; interviewing Browder's associates at Hermitage Capital; and reviewing purported bank records and charts provided by Browder or obtained from public sources.  *Id.* at 16:17–17:4, 19:20–21:10, 31:4–13, 107:14-108:8.  The Government admitted that it did not interview any witnesses who have direct knowledge of any of the facts in the original Verified Complaint.  *Id.* at 19:8–19.  The Government made no attempt to confirm Browder's information independently.  *Id.* at 47:22-48:8.

---

[7] A true and correct copy of the Gov't Dep. is attached as Exhibit 1 to the Declaration of Mark A. Cymrot in Support of Defendants' Motion to Dismiss the Amended Verified Complaint, filed concurrently herewith.

3.      **The Government Cannot Trace Proceeds of the US$230 Million Fraud Scheme to Defendants**

The tracing alleged in Exhibit B is based solely on documents that Browder said were

bank records and charts his associates derived from these purported records.  *Id.* at 32:19–33:2.

The Government has admitted that:

- The purported records cannot be authenticated because Browder refused to tell the Government where he got them.  *Id.* at 177:5–16.

- The Government has not obtained copies of the actual records from the banks themselves. *Id.* at 31:4–13.

- The Government has no witnesses to support these tracing allegations.  In its investigation the Government did not identify the individual(s) who directed the transfer of funds to the Prevezon 8160 Account.  *Id.* at 91:9–92:8.

- As the Government admitted, every transfer on Exhibit B "is based on copies that are not authenticated, of records that are incomplete, based on an accounting assumption."  *Id.* at 92:4–8.  The Government's Fed. R. Civ. P. 30(b)(6) witness admitted that his work product would have been more "comprehensive." *Id.* at 39:13.

Even the Amended Verified Complaint admits that the Russian government has already stated

that it cannot trace the funds from the US$230 million fraud scheme because some of the bank

records were destroyed in a fire.  Am. Compl. ¶ 82.  The Government cites to these records in

Exhibit B as though they existed, while denying possession of them.

## C.      PROCEDURAL HISTORY

On September 10, 2013, more than five years after the Prevezon 8160 account allegedly

received US$1.96 in tainted funds, the Government filed a Verified Complaint against

Defendants *in personam*, as well as against *in rem* properties allegedly associated with the

Defendants.  Dkt. No. 1.  The Government sought to restrain and forfeit any and all assets

worldwide specified and not specified of eleven separate companies.  *Id.* The Government's

Application for the *ex parte* Protective Order did not disclose that the Protective Order would

restrain properties worldwide, such as a hotel in Russia and land in Cyprus, and provided no

legal basis for such an overbroad restraint.  When Defendants' counsel informed the Court at the

January 7, 2014, hearing that the Protective Order restrained foreign businesses, the Court said:

> I believe there is a strong possibility that some of what I have
> restrained is legitimate business.  I do not know the facts about
> that.  I've said that. . . . I do not want to restrain legitimate business
> activity.  And I'm concerned that I'm doing that to some extent
> now.

Hr'g Tr. Jan. 7, 2014, 41:6-15.  The Application also made no reference to a foreign seizure or to

the allegations that the allegedly tainted funds were transferred to and stayed in The Netherlands.

Instead, the Application represented that Defendants used the $857,354, "commingled with other

funds," to purchase multiple properties in New York.  *Compare* Ex Parte Application for a Post-

Complaint Protective Order Pursuant to 18 U.S.C § 983(j)(1), September 10, 2013, at 8, *with*

Am. Compl. ¶ 103.  Because (among other deficiencies) the scope of the original Verified

Complaint and the corresponding Protective Order were extraordinary and unlawful, Defendants

sought to vacate the Protective Order and dismiss the claims against them.  Dkt. Nos. 37, 44, 49.[8]

When Defendants noticed the deposition of the Special Agent that verified the original Verified

Complaint, the Court set aside that notice on February 14, 2014.  Hr'g Tr. Feb. 14, 2014, at 4:12-

16.  Defendants thereafter conducted a Fed. R. Civ. P. 30(b)(6) deposition of the Government,

which revealed additional serious issues with the verification and the original Verified

Complaint.  *See supra* Part II(B).

     Defendants withdrew their omnibus motion to dismiss on February 13, 2014, in order to

get an early trial, which the court scheduled for March 31, 2014.  Dkt. Nos. 67, 70.  At that point,

the motion to vacate the protective order was pending and undecided.  On February 18, 2014, the

Government requested that the Court continue the March 31, 2014 trial date to allow the

Government to file an amended complaint.  *See* Monteleoni Letter to Hon. Thomas P. Griesa,

---

[8] Ferencoi and Kolevins filed a separate motion to dismiss for lack of jurisdiction. Dkt. No. 45.

Feb. 18, 2014.  On March 4, 2014, the Government submitted another letter informing the Court that Browder and other Hermitage representatives "will be key witnesses" in the case and asking the Court to address Browder and Hermitage's claim of a prior-client conflict against Defendants' counsel, Baker & Hostetler LLP.  Dkt. No. 106-1.  At the March 4, 2014 hearing, the Court stated:  "as far as I am concerned, Baker Hostetler is properly representing its clients in this case, and that's the way we'll leave it.  If there's some other development that changes things, well, that's something that I do not know anything about right now."  Dkt. No. 77, 29:20-24.  However, the Court continued the trial date indefinitely.  Thereafter, on March 21, 2014, Defendants renewed their motions for dismissal of the Complaint and for an order denying leave to file the proposed amended complaint.  Dkt. No. 79.  A separate motion to dismiss the claims against Defendants Kolevins and Ferencoi remained pending.  *Id.*  That motion was never considered, granted, or denied.

Based on the Government's identification of Hermitage and Browder as its key witnesses, Defendants issued subpoenas to Browder, one of his companies, and his agents.  The deponents filed motions to quash the subpoenas.  Dkt. No. 111.  The Government supported the motions asserting Browder was entitled to its work product and law enforcement privileges.  *Hermitage Global Partners LP et al v. Prevezon Holdings Ltd.*, *et al.*, No. 1:14-mc-00318-TPG, Dkt. No. 1-14.  At a hearing on September 18, 2014, the Court did not address Defendants' motion to vacate the protective order but instead granted Browder leave to file a motion to disqualify Baker & Hostetler LLP.  The Court stayed the case pending resolution of the motion to disqualify counsel, which the deponents later filed.  Dkt. No. 124.  The Government supported the motion to disqualify counsel.  Dkt. No. 141.  After two lengthy hearings on October 14 and

October 23, 2014, the Court denied Hermitage and Browder's motion to disqualify counsel.  Dkt.

No. 158.  Briefing on the motion to quash continues.

On October 27, 2014, Defendants again requested a hearing on their pending motion to

vacate and the Court set a hearing for November 5, 2014.  Dkt. Nos. 162 & 178.  On October 31,

2014, the Government requested leave to file a new Amended Verified Complaint and also

submitted an amended protective order.  Dkt. No. 167.  At the November 5, 2014, hearing, the

Court granted the Government leave to file its Amended Verified Complaint and entered the

Government's amended protective order, which limited the properties subject to restraint to

US$15 million in identified property and funds.  The Court denied Defendants' motion to vacate

the original protective order.  Dkt. No. 173.  The Government filed the Amended Verified

Complaint that same day.  Dkt. No. 174.  Doing so mooted the motions to dismiss, including the

motion by Defendants Kolevins and Ferencoi that was filed eleven months earlier.

## III.    ARGUMENT

### A.    PLEADING STANDARDS

Civil forfeiture is a "drastic" remedy requiring a heightened pleading standard that the

Government has not met in the Amended Verified Complaint.  *United States v. Daccarett*, 6 F.3d

37, 47 (2d Cir. 1993), *superseded by statute*, Civil Asset Forfeiture Reform Act (CAFRA), Pub.

L. No. 106–185, 114 Stat. 202, *as recognized in United States v. Sum of $185,336.07 U.S.

Currency Seized from Citizen's Bank Account L7N01967*, 731 F.3d 189, 196 (2d Cir. 2013)

("*Sum of $185,336.07*").  The Government asserts claims against Defendants *in rem* (the First

Claim) and *in personam* (the Second through Seventh Claims), all based on alleged violations of

the money laundering statutes.  The assertion of these claims imposes a heightened pleading

standard on the Government.  *See In re 650 Fifth Ave. & Related Prop's*, 777 F. Supp. 2d 529,

542 (S.D.N.Y. 2011); *see also* 18 U.S.C. § 983(a)(3)(A); Supp. R. E(2)(A) & G(2) (stating that

16

the complaint in a forfeiture action must, among other things, be verified, state the grounds for subject-matter jurisdiction, describe the property with reasonable particularity, and state sufficiently detailed facts to support a reasonable belief that the government will be able to meet it burden of proof at trial).

Under this heightened standard, "the Government's complaint must assert specific facts supporting an inference that the property is subject to forfeiture." *United States v. $22,173.00 in U.S. Currency*, 716 F. Supp. 2d 245, 248 (S.D.N.Y. 2010) (marks and citation omitted).[9]  These pleading requirements are not mere formalities; they provide constitutionally required due process and are in place so that the United States cannot, without sufficient basis, take advantage of "the unique and drastic remedies" that are available in forfeiture proceedings.  *Puerto Rico Ports Auth. v. BARGE KATY-B*, 427 F.3d 93, 105 (1st Cir. 2005); *see also United States v. Certain Accounts, Together with all Monies on Deposit Therein*, 795 F. Supp. 391, 394 (S.D. Fla. 1992).

On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court must also assess whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A court need not credit "a legal conclusion couched as a factual allegation." *Id.*  The plausibility standard is met only when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the

---

[9] The Civil Asset Forfeiture Reform Act ("CAFRA") was enacted to remedy the overly broad scope of the Government's authority to bring civil forfeiture cases. *See* Sum *of $185,336.07*, 731 F.3d at 196. The civil forfeiture laws are subject to abuse because the Government has a direct pecuniary interest in the proceedings. *See United States v. Funds Held in the Name or for the Benefit of Wetterer*, 210 F.3d 96, 110 (2d Cir. 2000) (recognizing that "forfeited funds are kept by the Department of Justice as a supplement to its budget."), *superseded by statute*, CAFRA, Pub. L. No. 106–185, 114 Stat. 202 (2000), *as recognized in United States v. 74.05 Acres of Land*, 428 F. Supp. 2d 57, 64 (D. Conn. 2006); *see also* H.R. Rep. No. 106-192, at 6-11 (2000) (quoting Second Circuit opinion that expressed concern about "the government's increasing and virtually unchecked use of the civil forfeiture statutes," detailing examples of government "abuses" of civil forfeiture law, and stating that CAFRA is "designed to make federal civil forfeiture procedures fair to property owners").

misconduct alleged." *Id.*; *see also Bigio v. Coca-Cola Co.*, 675 F.3d 163, 173 (2d Cir. 2012). "[A] bare allegation . . . is not plausible in the absence of some supporting facts." *Benzman v. Whitman*, 523 F.3d 119, 129 (2d Cir. 2008).

To state a claim for forfeiture or civil money penalties, the Government must show that the property it seeks to forfeit was "involved in" or "traceable to" a money laundering transaction in violation of 18 U.S.C. §§ 1956 or 1957. *See* 18 U.S.C. § 981(a)(1)(A). For each Claim, the Government must identify a "specified unlawful activity" ("SUA") under section 1956, which it has not done in any of its Claims. A violation of these statutes occurs when the defendant conducts a financial transaction:

- "With the *intent to promote* the carrying on of specified unlawful activity," 18 U.S.C. § 1956(a)(1)(A)(i);

- "*Knowing* that the transaction is designed in whole or in part -- (i) to *conceal or disguise* the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity," 18 U.S.C. § 1956(a)(1)(B)(i) (emphasis added); or

- "*Knowingly* engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity." 18 U.S.C. § 1957(a) (emphasis added).

The Government has admitted it lacks sufficient facts to satisfy this burden; it hopes to find evidence of Defendants' knowledge and intent through discovery. *See infra* Part II(B)(1). The Government's speculation is not an adequate basis for a complaint, particularly one that seizes US$15 million of Defendants' property and puts them out of business.

## B. THE GOVERNMENT'S MONEY LAUNDERING CLAIMS ARE BARRED BECAUSE THEY REQUIRE EXTRATERRITORIAL APPLICATION OF THE WIRE FRAUD STATUTE

Each of the Government's Claims requires the Government to prove that Defendants engaged in, or conspired to engage in, money laundering. Am. Compl. ¶¶ 138, 146, 151, 155, 158, 161, & 165. In turn, each money laundering allegation requires the Government to prove an

SUA. Am. Compl. ¶¶ 141, 147, 151, 155, 158, 161, & 166. None of the Claims identify an SUA with specificity; however, in prior briefing, the Government has identified wire fraud as the applicable SUA. *See* 18 U.S.C. § 1343; Dkt. No. 88 at 16-17; Hr'g Tr. Jan. 7, 2014, 10:4-9 ("The specified unlawful activity is wire fraud."). The Amended Verified Complaint, thus, must fail because the Second Circuit has held that the wire fraud law statutes do not have extraterritorial effect, and this case involves only foreign schemes to defraud.

In *Morrison v. National Austrialia Bank Ltd.*, the Supreme Court held that U.S. federal statutes are presumed not to apply to foreign conduct, but only to domestic conduct. 130 S.Ct. 2869, 2877 (2010). That presumption is only defeated when Congress has specifically indicated its intention that the statute apply extraterritorially. *Norex Petroleum Ltd. v. Access Indus., Inc.*, 631 F.3d 29, 31 (2d Cir. 2010) (citing *Morrison*, 130 S. Ct. at 2877-78) ("absent an express intention by Congress of extraterritorial effect, a statute applies only domestically."). Applying *Morrison*, the Second Circuit has held that the extraterritorial reach of a statute that incorporates a predicate offense is limited to the extraterritorial reach of the statute criminalizing the underlying predicate offense. *European Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 129, 139 (2d Cir. 2014). Further, the Second Circuit has held that the wire fraud statute, 18 U.S.C. § 1343, does "not indicate a congressional intent that the statute[] apply extraterritorially" and therefore only applies to domestic, but not to foreign, schemes. *Id.* at 141; *Petroleos Mexicanos v. SK Eng'g & Constr. Co. Ltd.*, 572 F. App'x. 60, 61 (2d Cir. 2014) (summary order).

Here, the Government's money laundering claims and forfeiture claim apply the wire fraud statute to a wholly foreign scheme. *See* Am. Comp. ¶¶ 137-71. The US$230 million Russian fraud allegedly was planned and executed in Russia and neighboring states, the allegedly tainted funds were transferred through multiple layers of banks in Russia and other foreign

locales, the witnesses and records are foreign, and the Defendants are Russian-owned.  The sole

connection the Government has alleged to the United States is the routing of one wire transfer

from a Moldavian bank account to a Latvian bank account that was routed through New York.

Am. Compl. ¶ 97; Dkt. No. 58, Gov't Opp. to Motion to Dismiss, at 12 (identifying "use of the

United States wires" alleged in ¶ 97 as the act underlying the Organization's SUA of wire fraud).

Notably, that transfer had nothing to do with Defendants; instead it was allegedly part of a chain

that traced Russian funds to a third party with no relationship to Defendants.  *See infra* Part

II(B)(3).

The lone pleaded contact with the United States is wholly insufficient to render the

US$230 million fraud scheme "domestic."  A single wire transfer through New York does not

convert a foreign scheme into a domestic wire fraud.  *See Norex*, 631 F.3d at 33 (holding

"numerous acts in the United States" to be "insufficient to support extraterritorial application of

the RICO statute" with a predicate offense of wire fraud); *Petroleos Mexicanos*, 572 F. App'x at

61 (finding the "allegations of domestic conduct" – which included obtaining financing in the

U.S., sending invoices to a U.S. bank for payment, and a U.S. bank issuing payment – to be

"simply insufficient to sustain RICO jurisdiction"); *cf. Morrison*, 130 S. Ct. at 2874 ("It is a rare

case of prohibited extraterritorial application that lacks *all* contact with United States territory.").

Because the alleged US$230 million Russian fraud was foreign, the Government's

Amended Verified Complaint must be dismissed.

## C.   THE GOVERNMENT CANNOT SHOW THAT PREVEZON HOLDINGS RECEIVED FUNDS "TRACEABLE" TO FRAUD

All of the Government's Claims rely upon money laundering offenses that require the

Government to trace to Defendants the proceeds of a specified unlawful activity − as alleged, the

US$1.96 million from the Russian tax refund fraud.  The Government, in conclusory fashion,

alleges that the US$1.96 million deposited in the Prevezon 8160 Account were tainted funds but fails to provide any reasonable basis for that conclusion given that the Amended Verified Complaint identifies US$19.5 million (Rubles equivalent) of untainted funds that were transferred out of the Bank Krainiy Sever Account at the same time.  This omission is fatal to the Government's claims.

While the Government need not establish money laundering at this stage, it must at minimum "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial."  *See* 18 U.S.C. §§ 981(a)(l)(A), 1956(a), 1957; Supp. R. G(2)(f).  The Government may not simply rely upon conclusory allegations to establish that the funds are traceable to a money laundering transaction.  *See, e.g., $1,399,313.74 In United States Currency*, 591 F. Supp. 2d, 365 at 376 (S.D.N.Y. 2008) (the Government "cannot premise forfeiture based simply on conclusory allegations."); *One United States v. White Crystal Covered Bad Tour Glove & Other Michael Jackson Memorabilia*, No. 11-3582, 2012 WL 8455336, at *3 (C.D. Cal. Apr. 12, 2012) (complaint failed to "plead sufficient facts to support a reasonable belief that such ill-gotten gains were involved in some way with the Defendant Assets").  Rather, the allegations must be based on facts showing the receipt of tainted funds.  *See, e.g., United States v. Certain Accounts, Together With All Monies On Deposit Therein*, 795 F. Supp. 391, 398-99 (S.D. Fla. 1992); *United States v. Contents in Account No. 059-644190-69*, 253 F. Supp. 2d 789, 795-967 (D. Vt. 2003).

"If the tracing requirement in § 981 is to be given any effect – as, indeed, it must – then the Government is required to demonstrate something more than the fact of commingling, even across a series of complicated transactions, to establish that legitimate money is forfeitable by virtue of its commingling with tainted funds."  C*ontents of Accounts Nos in Account No. 059-*

*644190-69*, 253 F. Supp. 2d at 799-800. The Government cannot rely on the argument that the funds moved toward Defendants in a "pattern" suggestive of money laundering in order to establish that Defendants received tainted funds. *See United States v. All Right, Title and Interest in Real Property and Appurtenances Thereto Known as 785 St. Nicholas Ave. and 789 St. Nicholas Ave.*, 983 F.2d 396, 405 (2d Cir. 1993) ("[T]he connection must be supported by proof amounting to more than 'mere suspicion.'" (citation and marks omitted)).

In *Banco Cafetero Panama*, the Second Circuit found: "[I]f such proceeds were, for example, commingled with other assets, involved in intervening legitimate transactions, or otherwise changed in form: they would still be subject to forfeiture, *but only to the extent that it could be shown that a traceable connection to an illegal transaction in controlled substances existed*." 797 F.2d 1154 (2d Cir. 1986) (emphasis added). Since *Banco Cafetero Panama*, Congress has enacted CAFRA which has increased the Government's pleading burden. *See* Supp. R. G. However, even the Second Circuit's extended discussion of various accounting methodologies in *Banco Cafetero Panama* demonstrates that tainted funds can only be traced if there is a fulsome record of all of the account transactions, including account balances, withdrawals, transfers, and deposits. Here, the Government has even admitted it does not have records to conduct a proper accounting. Gov't Dep. 66:3–14, 81:4–9, 92:23–93:8. And the Amended Complaint acknowledges that some of the records have been destroyed. Am. Compl. ¶ 82.

The Amended Complaint provides no reasonable basis for concluding that the US$1.96 million received by the Defendants was tainted. In February 2008, the Prevezon 8160 Account at UBS Bank in Zurich (not to be confused with USB in Russia) received transfers of $410,000 and $447,354 from two Moldavian companies named Bunicon and SC Elenast-Com SRL

("Elenast"), respectively ("February 2008 Transfers"). Am. Compl. ¶¶ 11 101-102 and Ex. B.
The Amended Verified Complaint does not allege funds were directed by the Organization to
Defendants, but instead, identifies 24 transfers over eighty-seven (87) days into an account at a
major Russian Bank, Alfa Bank, in the name of Bank Krainiy Sever. *Id.* ¶ 190 and & Ex. B.
The Amended Verified Complaint does not specify which customers of Bank Krainiy Sever
received the transfers or directed the transfers to Bunicon and Elenast, or even whether they were
the same or different customers. Exhibit B acknowledges that the Bank Krainiy Sever Account
transferred at least 487.6 million rubles in non-Treasury (and thus non-tainted) funds (which
equates to US$19.5 million) in the account when it made transfers totaling 1,185 billion Rubles
to Bunicon and Elenast. *See id.* at Ex. B. The Amended Verified Complaint never explains how
the Government can associate the US$1.96 that was transferred into the Prevezon 8160 Account
with Russian stolen funds, rather than the US$19.5 million in untainted non-Treasury funds
shown on the Government's chart.



Between February 28 and March 20, 2008, the Prevezon 8160 Account allegedly received – in addition to the $857,354 from Bunicon and Elenast – an additional US$1,108,090.55 through seven (7) transfers from an unknown bank account belonging to an unknown company referred to in the Amended Verified Complaint as simply "Company-1" ("February-March 1980 Transfers"). *Id.* ¶ 117. The Government does not name the company and the bank account from which these funds were transferred to the 8160 Account. Similar to the transfers from Bunicon and Elenast, the Government fails to describe a basis for alleging that US$1.1 million in Russian funds were transferred into the Prevezon 8160 Account from tainted funds rather than from the US$19.5 million in untainted funds contained in the Bank Krainiy Sever Account – an account that itself appears to be a bank's omnibus account, which by definition would contain funds with "a merely incidental or fortuitous connection to illegal activity." *Marine Midland Bank, N.A. v. United States*, 93-0307, 1993 WL 158542, at *7 (S.D.N.Y. May 11, 1993) (citation and marks omitted).



At most, the Amended Verified Complaint establishes commingling of tainted and non-tainted funds through a series of transactions, but not that tainted funds ever reached Defendants. The Government, thus, does not trace any funds from the Russian fraud into the Prevezon 8160 Account, a fundamental fallacy in its case. The need for a flawed tracing further highlights the Government's failure to allege facts rebutting Mr. Katsyv's explanation that the company received investor funds prior to his purchase of the company. The Amended Verified Complaint, thus, must be dismissed.

### D.   THE GOVERNMENT FAILS TO ALLEGE THAT DEFENDANTS LAUNDERED ANY FUNDS THEY RECEIVED

The Amended Verified Complaint seeks to forfeit properties of the Prevezon Defendants and impose monetary penalties equivalent to the entire US$230 million Russian fraud on the basis that Defendants engaged in money laundering.  Am. Compl. ¶¶ 137-71.  To make these Claims, the Government must allege not only that Defendants received tainted funds, but also that Defendants then laundered those funds by engaging in monetary transactions with the intent to promote an SUA or to conceal the nature of SUA proceeds.  *See* 18 U.S.C. §§ 981(a)(1)(A), 1956(a)(1)(A)(i), 1956(a)(1)(B)(i), 1956(a)(2)(A), 1956(a)(2)(B), 1956(h), 1957(a); *United States v. Gotti*, 459 F.3d 296, 334 (2d Cir. 2006).  The Government's theory fails because the Amended Verified Complaint does not adequately allege that: (1) Defendants invested any tainted funds in New York real estate; (2) Defendants had the requisite knowledge or intent to commit money laundering; or (3) Defendants' properties had a "substantial connection" to the Russian income tax refund fraud.[10]

### 1.   The Government Has Not Demonstrated that Tainted Funds Were Invested in New York Real Estate

#### a.   The Government Tracing Fails to Identify Any Tainted Funds That Went Into the New York Properties

Exhibit B to the Amended Verified Complaint stops tracing funds once they reach the Prevezon 8160 Account.  It does not trace tainted funds to the Prevezon properties in the United States.  *See* Am. Compl. Ex. B.

The Amended Verified Complaint concedes that in May and June of 2008, Prevezon Holdings converted "millions of dollars into euros," which were then transferred to another

---

[10] *See* David B. Smith, PROSECUTION & DEFENSE OF FORFEITURE CASES § 915.01[1][c] n.36 (2013) (observing that "the government frequently ignores the law and seeks forfeiture of the entire account with no factual or legal basis for its position," and that "[t]his has become one of the most common abuses of the money laundering forfeiture provisions").

Prevezon Holdings account at UBS – the euro-denominated Prevezon 8170 account. Am. Compl. ¶ 103. From there, the 8170 account "transferred over 3 million euros to AFI Europe, N.V.," which used those funds to acquire a 30% interest in Dutch companies that held interests in "German partnerships holding property in Germany." *Id*. The Amended Verified Complaint contains no allegations regarding any specific transfers of these funds from AFI Europe back to Defendants. There is one vague allegation that the funds in the Prevezon 8160 Account, which were used to purchase a piece of property in New York, included funds from AFI Europe. *Id*. ¶ 125. This allegation, which includes neither a date nor an amount, does not challenge the fact, urged by the United States to the Dutch court, that the US$1.96 million never left Europe. *Iqbal*, 556 U.S. at 678. In fact, the Amended Verified Complaint fails to allege, even in conclusory fashion or otherwise, that the funds transferred from AFI Europe to the Prevezon 8170 Account included tainted funds. There is therefore no allegation whatsoever that tainted funds came to the United States.

As the Amended Verified Complaint acknowledges, the Prevezon Defendants' purchases of New York real estate were separated in time by eighteen months to four years from the date of the Dutch investment and were conducted with other, untainted funds. *Id*. ¶¶ 125-130. Between November 2009 and September 2012, Prevezon Holdings purchased eight commercial and residential properties. *Id*. Six of the properties were purchased with funds from the Prevezon 8160 Account; two properties (purchased by Prevezon Soho and Prevezon Alexander) were purchased with funds from other unrelated or unspecified accounts. *Id*. ¶¶ 127, 130.

The Government's case is built entirely on the idea that once allegedly tainted funds went into the Prevezon 8160 Account, all funds coming out of that account were somehow tainted. This theory contradicts settled case law. *See Banco Cafetero Panama*, 797 F.2d at 1159-60.

"[T]he presence of one illegal dollar in an account does not taint the rest—as if the dollar obtained from fraud were like a drop of ink falling into a glass of water." *United States v. $448,342.85*, 969 F.2d 474, 476 (7th Cir. 1992). "Innocent funds are not forfeitable simply because they have been commingled with tainted funds," and the Government must "demonstrate something more than the mere fact of commingling." *Contents in Account No. 059-644190-69,* 253 F. Supp. 2d at 799-800; *United States v. Nicolo,* 597 F. Supp. 2d 342, 352, 357 (W.D.N.Y. 2009).

The Government was able to freeze the money in the Netherlands because the allegedly tainted funds never left the Netherlands. Am. Compl. ¶¶ 103, 136. The Government has, nevertheless, brought this case and frozen US$15 million in Defendants' properties without showing any tainted funds were used to purchase those properties or were otherwise involved in money laundering.

### b. The Government Does Not Allege the Source of the Funds to Defendants Prevezon Soho or Prevezon Alexander

Even the Government's one vague allegation that AFI Europe transferred an unspecified amount to the Prevezon 8170 Account does not explain the seizure of assets of Prevezon Alexander and Prevezon Soho. Am. Compl. ¶ 125. With respect to Prevezon Alexander, the Amended Verified Complaint alleges only that it purchased 250 East 49th Street, Unit Comm3, for approximately US$6.25 million, on September 13, 2012. Am. Compl. ¶ 130. The Amended Verified Complaint does not identify the source of the funds used to make this purchase, much less trace those funds to the allegedly tainted funds. *See id.* The same is true of Prevezon Soho; the Amended Verified Complaint alleges only that Prevezon Soho purchased property ("160 Wooster Street, Unit Com-1") for approximately US$6.286 million with funds from the Prevezon Holdings Marfin Account located in Cyprus. *Id.* ¶ 127. The Amended Verified

27

Complaint does not allege that the Marfin account received tainted funds or that any tainted funds were used in the purchase. *Id*.

> ## 2. The Government Has Not Sufficiently Alleged Knowledge or Intent to Commit Money Laundering

The Amended Verified Complaint's meager 13 paragraphs regarding Defendants depict a very ordinary real estate investment operation; yet, the Government seeks to forfeit millions in Defendants' assets. The Government admits that it knows little about Defendants' knowledge and intent, *see supra* Part II(B)(1), but nonetheless alleges that Defendants knowingly laundered tainted funds in violation of 18 U.S.C. §§ 1956 and 1957. *See* Dkt. No. 58 at 23. The Government does not allege that Defendants were part of the Organization or even knew a single member of the Organization, knew about the Russian tax refund fraud, or knew Prevezon Holdings had received unlawful funds (rather than funds from an investor). *See id.* The Government, thus, must articulate how Defendants intended to promote the SUA of wire fraud, attempted to conceal or disguise the proceeds of the SUA, or knowingly engaged in transactions involving criminally derived property. 18 U.S.C. §§ 1956(a)(1), 1957. The Government has not presented any factual allegations to support these offenses, let alone its allegation of conspiracy to commit them.

To satisfy its statutory burden, the Government can point only to acts of third parties, not acts of Defendants. The Government purports to trace tainted funds from the Russian Treasury through multiple banks but does not allege that Defendants had anything to do with or knew about this flow of funds. The entries regarding sanitary equipment or automotive spare parts are the statement of a third party, a bank, and not attributed by the Government to Defendants. More puzzling still is how the Government intends to rely on a "supposed contract" and "supposed invoice" – submitted by third parties to third parties and "purportedly signed" by an unnamed

representative of Prevezon Holdings – to show Defendants' *scienter*. Am. Compl. ¶ 111. The Government does not allege that these documents were signed by anyone from Prevezon, let alone that the existence of the documents were known to Defendants. Instead, as with the original Verified Complaint, this new complaint contains nothing but allegations that people *other than Defendants* did things and knew things.

Not only are those "suspicious facts" the alleged acts of third parties—Defendants are not alleged to have known those facts in the first place. The Government, apparently, hopes that this Court will overlook the obvious point that suspicious facts not known to the Defendants are irrelevant to their mental state and therefore that the complaint is silent on the key issue of Defendants' knowledge. *See, e.g.*, *Saltz v. First Frontier, L.P.*, 485 F. App'x 461, 465 (2d Cir. 2012) (affirming dismissal because plaintiff failed to allege the defendant's awareness of alleged red flags); *Benzman v. Whitman*, 523 F.3d 119, 129 (2d Cir. 2008) ("Although the complaint contains numerous allegations that various employees within EPA were aware of data indicating health risks, there is no allegation that Whitman, from whom damages are sought in her personal capacity, was herself aware of such information."). The Government may point to the newly-added allegation concerning Israeli proceedings in which it was found that money laundering did not occur, Am. Compl. ¶ 113, but that allegation, as the Government itself argues, only establishes Mr. Katsyv's knowledge of money laundering laws in general—which, if sufficient to substantiate a charge of money laundering in this case, should put the entire subscriber lists of THE WALL STREET JOURNAL, THE NEW YORK TIMES, and FINANCIAL TIMES on red alert.

Once the funds are in the Prevezon 8160 Account, the Government acknowledges that the funds were handled in a straightforward and transparent manner, like any other real estate company. Am. Compl. ¶¶ 101-103. After six years, the Government has not traced a single

dime from Defendants back to any member of the Organization.  This omission is particularly important as the court in *United States v. Miles* said:

> The crime of money laundering promotion is aimed not at maintaining the legitimate aspects of a business nor at proscribing all expenditures of ill-gotten gains, but *only at transactions which funnel ill-gotten gains directly back into the criminal venture.*  To hold otherwise would be to ignore *Brown's* warning that the money laundering statute is not a mere money spending statute.

360 F.3d 472, 479 (5th Cir. 2004) (citing *United States v. Brown*, 186 F.3d 661 (5th Cir.1999)).

The Government has failed to present sufficient factual allegations to demonstrate that the Prevezon Defendants had the requisite *scienter* to be involved in money laundering liability.  The Amended Verified Complaint, thus, must be dismissed.

### 3.    The Government Has Not Shown a Substantial Connection Between Defendants and the Specified Unlawful Activity

The Government's claims fail for a third reason: neither Defendants nor their property were substantially connected to alleged wire fraud, which relates to the Russian tax refund fraud and the single wire transfer through New York.  There must be a substantial connection between the property the Government seeks to forfeit and the underlying offense.  18 U.S.C. § 983(c)(3); *In re 650 Fifth Ave. & Related Props.,* 777 F. Supp. 2d at 558.  The single wire transaction was totally unrelated to Defendants; the funds allegedly were in transit to a third party.  Am. Compl. ¶¶ 97-98.  And none of the funds from the Russian Treasury have been traced into the eight Prevezon Defendants in New York.  Even the one unspecified transfer from AFI Europe into the Prevezon 8160 Account does not cause that account to have a substantial connection to the Russian theft when Prevezon Holdings made legitimate investments in New York real estate.

By the Government's own accounting, two New York properties – Prevezon Soho and Prevezon Alexander – were not purchased with funds from the Prevezon 8160 Account and, thus, had no connection to the alleged tainted Treasury funds.  Am. Compl. ¶¶ 125, 130.  The

Government simply deems them as culpable as any of the other Defendants.  This is another case of Government overreaching, like *Wetterer*, in which the Second Circuit saw "aggressive but marginal claims asserted on dubious jurisdiction ...." *Funds Held in the Name or for the Benefit of Wetterer,* 210 F.3d at 110.

## E.    THE AMENDED VERIFIED COMPLAINT IS NOT PROPERLY VERIFIED AS REQUIRED BY SUPPLEMENTAL RULE G

The Amended Verified Complaint was not properly verified as required by Supp. R. G(2)(a), which governs forfeiture actions *in rem*, the First Claim in the Amended Verified Complaint.  The Rule says unambiguously that "[t]he Complaint must be verified."  And not surprisingly, the Verification must be true both as to the facts of the complaint, and as to the sources of the information and the basis of belief that the facts are correct.

The failure to submit a proper verification is a fatal defect.  Where discovery shows that statements in a verified complaint are not supported by the evidence, the court may dismiss the complaint with prejudice.  *See, e.g.*, *Ridge Chrysler Jeep, LLC v. DaimlerChrysler Servs. N. Am. LLC*, No. 03-760, 2006 WL 2808158, at *9-10 (N.D. Ill. Sept. 6, 2006) (dismissing complaint based on false statements that were unsupported); *see also United States v. One Tyrannosauraus Bataar Skeleton*, No. 12-4760 (PKC), 2012 WL 3947563, at *1-2 (S.D.N.Y. Sept. 7, 2012). Discovery has shown that many of the allegations in the Amended Verified Complaint are not supported by any evidence or reasonable belief.

The Amended Verified Complaint was verified by Todd Hyman, Special Agent for the Department of Homeland Security. Am. Compl. p. 63.  Agent Hyman swore: "that he has read the foregoing Verified Complaint and knows the contents thereof, and that the same is true to the best of his knowledge, information, and belief."  *Id.*  However, when Agent Hyman testified on behalf of the United States, his testimony directly contradicted his verification.  *See ante* II(B).

31

His testimony demonstrated that he did not have a basis to state that the complaint was true to the "best of his knowledge, information and belief."

The Verification goes on to say that "[t]he sources of deponent's information and the ground of his belief are official records and files of the United States, information obtained directly by the deponent, and information obtained by other law enforcement officials and representatives..." *Id.* That statement is highly misleading. It entirely omitted the affiant's complete reliance on William Browder. What Agent Hyman did not say in the Verification was that he spoke with William Browder, read documents provided by William Browder, examined the contents of a website maintained by Browder, conducted no further investigation, and verified the Complaint as though it were the result of a thorough Government-run investigation. Agent Hyman did not say "I have spoken to no competent witnesses, I have no admissible bank records, and the money tracing is based on a series of assumptions without authentic records." But that is what he said, in substance, when being deposed. This is the type of "deception" that "so taint[s] the litigation that the very allegations set forth in the Complaint can not be trusted as being valid." *Ridge Chrysler Jeep, LLC*, 2006 WL 2808158, at *8.

Defendants' Due Process protection for the seizure of any and all of their properties under 18 U.S.C. 983(j) comes from the verification of the AmendedVerified Complaint. *See United States v. Contents of Accounts*, No. 3:10-cv-228-H, 2010 WL 2556849, at *10 (W.D. Ky. June 18, 2010); *United States v. Melrose East Subdivision*, 357 F.3d 493, 500 (5th Cir. 2004) (recognizing that due process may require post-deprivation hearing); *United States v. Contents of Accounts*, 629 F.3d 601, 609 (6th Cir. 2011) (same).

Claim one, the forfeiture count, specifically requires a proper verification. The Amended Verified Complaint was not properly verified and, therefore, the forfeiture count must be dismissed for lack of a proper verification.

## IV.   CONCLUSION

For the foregoing reasons, the Amended Verified Complaint must be dismissed with prejudice.

Dated:  January 12, 2015
         New York, New York


Respectfully Submitted,

/s/ Mark A. Cymrot                              Seth T. Taube
Mark A. Cymrot                                 Richard B. Harper
BAKER & HOSTETLER LLP              BAKER BOTTS L.L.P.
Washington Square, Suite 1100          30 Rockefeller Plaza
1050 Connecticut Ave.,                       New York, NY 10112
Washington, D.C. 20036                     Telephone: (212) 408-2500
Telephone: (202) 861-1677               Facsimile: (212) 408-2501
Facsimile: (202) 861-1783                 seth.taube@bakerbotts.com

John W. Moscow
Loura L. Alaverdi
BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
jmoscow@bakerlaw.com

*Attorneys for Defendants*