UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------

                                          :
                                          :
                                          :
UNITED STATES OF AMERICA,                 :
                                          :
                  Plaintiff,              :          13 Civ. 6326 (TPG)
                                          :
           -against-                      :            ECF CASE
                                          :
PREVEZON HOLDINGS LTD., *et al.*,         :            **OPINION**
                                          :
                  Defendants.             :
                                          :
                                          :
                                          :

------------------------------------------

This case arises from an elaborate $230 million fraud on the Russian Treasury—the largest tax fraud in Russian history.

On November 5, 2014, the United States of America (the "Government") filed an Amended Verified Complaint (the "AVC") seeking the forfeiture of certain property allegedly involved in laundering the proceeds of the $230 million fraud. The Government also seeks the imposition of civil money laundering penalties.

In the AVC, the Government alleges that Prevezon Holdings, LTD. and eight of its corporate subsidiaries[1] (collectively, "Prevezon") laundered approximately $1.9 million in proceeds from the $230 million fraud through real estate purchases in Manhattan. The Government further alleges that defendants Kolevins Ltd. ("Kolevins") and Ferencoi

---

[1] The Prevezon subsidiaries are Prevezon Alexander, LLC, Prevezon Soho USA, LLC, Prevezon Seven USA, LLC, Prevezon Pine USA, LLC, Prevezon 1711 USA, LLC, Prevezon 1810, LLC, Prevezon 2011 USA, LLC, and Prevezon 2009 USA, LLA.

Investments Ltd. ("Ferencoi"), two British Virgin Islands companies, were involved in laundering the proceeds of the same fraud scheme. The Government seeks the forfeiture of certain assets held by Prevezon, and the imposition of civil money laundering penalties against Prevezon, Kolevins, and Ferencoi (collectively, "the defendants").

Two motions to dismiss are pending before the court. First, Prevezon argues that the AVC fails to state a claim. Second, Kolevins and Ferencoi claim that the court lacks personal jurisdiction over them, and that the AVC fails to state a claim.

For the reasons that follow, both motions are denied.

## BACKGROUND

### A. The Amended Verified Complaint

The AVC is vast. It spans 62 pages and more than 171 paragraphs, and describes a series of complicated financial transactions across the globe. Essentially, it tells two stories: (1) that of a complex $230 million tax fraud perpetrated in 2007 by members of a Russian criminal organization (the "Organization") against the Russian Treasury, and (2) that of the defendants' alleged laundering of approximately $1.9 million in proceeds from the larger fraud. The question here is not whether the Government has *proven* the defendants' liability for laundering proceeds of the $230 million scheme. Rather, the question is whether the Government has sufficiently connected these two stories to satisfy its pleading requirements on a motion to dismiss in a civil forfeiture action. As discussed below, the court finds that the Government has done so with respect to all defendants.

The facts below are taken from the AVC, and are assumed to be true for purposes of the instant motions.

## 1. **The $230 Million Fraud on the Russian Treasury**

As alleged, members of the Organization engaged in a complex web of fraud and deceit, ultimately defrauding the Russian Treasury of approximately $230 million.

The scheme began when members of the Organization stole the corporate identities of three companies (the "Hermitage Companies"), which were portfolio companies of the Hermitage Fund. Until 2006, the Hermitage Fund was the largest foreign portfolio investor in Russia. (AVC ¶¶ 14, 16, 18.) The Organization managed to steal the Hermitage Companies' identities by enlisting officers from the Russian Interior Ministry to search the offices of those companies, and to confiscate their original corporate stamps and documents. (AVC ¶¶ 24-25.) Using these items, the Organization re-registered ownership of the Hermitage Companies away from their proper owner—an HSBC Guernsey entity which was trustee for the Hermitage Fund—into the names of three convicted criminals. (AVC ¶¶ 26-28.)

Next, members of the Organization forged backdated contracts with sham commercial counterparties, pursuant to which the Hermitage Companies appeared to owe such counterparties large sums of money. (AVC ¶¶ 29-32.) These counterparties, who were also controlled by members of the Organization, then filed sham lawsuits in Russian arbitration courts against the (now-stolen) Hermitage Companies based on the forged contracts. (AVC ¶¶ 33-34.) Members of the Organization purporting to represent the Hermitage Companies acknowledged the validity of the sham contracts and conceded full liability, resulting in huge fraudulent judgments against the Hermitage Companies. (AVC ¶¶ 34-36.)

Subsequently, members of the Organization used these judgments to make fraudulent claims for tax refunds totaling 5.4 billion rubles, or approximately $230 million. The basis for the requested refunds was that the cumulative judgments from the sham lawsuits represented

3

losses negating the profits the Hermitage Companies had made during the previous tax year, entitling the Hermitage Companies to a refund of all taxes paid on those profits. (AVC ¶¶ 40-41.) Within one business day of this refund application, Russian tax officials—also working for the Organization—approved the refund requests. (AVC ¶¶ 44-45.)

## 2. The Alleged Path of the Fraud Proceeds to Prevezon Holdings

Prevezon Holdings, Ltd. is a holding company incorporated and registered in Cyprus, which invests in real estate in New York. (AVC ¶¶ 7, 103, 124.) The eight Prevezon subsidiaries are New York limited liability companies owned by Prevezon, which each hold (or once held) real estate investments in New York. (AVC ¶¶ 11, 124-36.)

After members of the Organization orchestrated the $230 million tax refund, they "engaged in a complicated series of transactions" to launder the funds through various shell companies. (AVC ¶ 75.) The AVC includes a long, detailed analysis tracing these laundering transactions, with approximately $1.9 million allegedly landing with Prevezon. (*See generally* AVC ¶¶ 77-102, 114-123, & Ex. B.)

First, on December 26, 2007—just after the tax refunds were approved—all $230 million was transferred to accounts in the name of the Hermitage Companies at two Russian banks named Intercommerz Bank ("Intercommerz") and USB Bank ("USB"). At the time, Intercommerz and USB were, respectively, the 432nd largest and 920th largest banks in Russia, and USB was owned by a convicted fraudster. (AVC ¶¶ 22, 77-79.) Members of the Organization opened the accounts at these banks just days before receiving the refund payments. These accounts were closed less than two months later, shortly after transferring the funds out. (AVC ¶¶ 77-79, 88.)

4

After these initial transfers, the AVC does not trace every dollar of the $230 million once those funds left the Russian Treasury. But the AVC does detail the movement of large volumes of the tax refund moneys passed through accounts held by multiple shell companies and intermediaries. From the accounts at Intercommerz and USB, the AVC traces funds through shell companies and intermediaries to a correspondent account at the Russian bank Alfa Bank, which account was held in the name of Bank Krainiy Sever (another Russian bank). (AVC ¶¶ 90-91.) Specifically, beginning February 5, 2008, two intermediaries (the ZhK Account and the Univers Account) made 24 transfers totaling over 800 million rubles into the Bank Krainiy Sever account. Bank Krainiy Sever then sent the money, comingled with other funds, to two Moldovan shell companies, Bunicon-Impex SRL ("Bunicon") and Elenast-Com SRL ("Elenast"), which both had accounts at the same bank in Moldova (Banca De Economii). (AVC ¶ 91.)

On the same day that it made its last transfer to Elenast, the Bank Krainiy Sever account was seized by the Russian authorities pursuant to a Russian court order. Approximately one month later, the Russian authorities cancelled Bank Krainiy Sever's banking license due to money laundering violations. (AVC ¶ 92.)

On or about February 6, 2008, approximately $410,000 was wired from Bunicon to a U.S. dollar account (the "Prevezon 8160 Account") held by Prevezon at the Swiss bank UBS. (AVC ¶ 101.) On or about February 13, 2008, approximately $447,000 was wired from Elenast to the Prevezon 8160 Account. (AVC ¶ 102.) The AVC highlights the following suspicious indicia surrounding these two transfers ("the February 2008 Transfers"), which totaled approximately $857,000: (1) Bunicon and Elenast were shell companies without real business addresses (AVC ¶ 93 & Ex. C; AVC ¶ 94 & Ex. D); (2) bank records reflecting the transfers to

5

Prevezon falsely describe the transfers as a prepayment for sanitary equipment (AVC ¶ 110); and (3) both Bunicon and Elenast submitted false contracts or invoices to their Moldovan bank to justify these transfers, including one purportedly signed by an unnamed representative of Prevezon. (AVC ¶¶ 111-12.)

The February 2008 Transfers were described in the original complaint. The AVC further alleges that Prevezon received an additional $1,108,090.55 from Bunicon, which also represented proceeds of the $230 million fraud. (AVC ¶¶ 114-23.) Specifically, on February 5, 2008, Bunicon wired $951,400 to an Estonian bank account held by the New Zealand company Megacom Transit Ltd ("Megacom"). Like Bunicon, Megacom was an apparent shell company with a nominee administrator. (AVC ¶¶ 115-16.) On February 20, 2008, the same Megacom account transferred $390,000 to the bank account of a British Virgin Islands company (identified as "Company-1"). (AVC ¶ 117.) The bank records for this wire transfer describe it as payment for "auto spare parts completing." (*Id.*) Additionally, on February 6, 2008, Bunicon sent $942,700 to an account in the name of Castlefront LLP ("Castlefront"), a United Kingdom shell company controlled by the same nominee administrator as Megacom. (AVC ¶¶ 118-19.) The same Castlefront account then sent $1,986,000 to Company-1. This transfer was also described in bank records as being for "auto spare parts completing." (AVC ¶ 121.) Thus, through the transfers from Megacom and Castlefront, approximately $1.3 million in proceeds from the $230 million fraud is allegedly traced from Bunicon to Company-1. Company-1 then transferred approximately $1.1 million of these funds to the Prevezon 8160 Account, through seven transfers made from February 28, 2008 to March 20, 2008. (AVC ¶ 122.) These transfers were all described in bank records as concerning "auto spare parts." (*Id.*)

6

When combining the approximately $857,000 previously alleged through the February 2008 Transfers and the new allegations of approximately $1.1 million, the AVC ultimately alleges that Prevezon had received—as of March 20, 2008—$1,965,444.55 in proceeds from the $230 million fraud scheme. These transfers were all falsely described as prepayment for either sanitary equipment or auto parts.

All of the wire transfers described above, with one exception, took place between banks outside of the United States. (*See generally* AVC ¶¶ 77-94; 99-102, 114-123 & Ex. B.) The AVC does allege one wire transfer through the Southern District of New York: a February 5, 2008 transfer of $726,000 from the Bunicon account in Moldova to an account at a Latvian bank in the name of Nomirex Trading Ltd. (AVC ¶¶ 95-98.) This transfer is not alleged to have ever reached or benefited Prevezon. However, these funds were moved through intermediaries in May and June 2008 to a company owned by Vladlen Stepanov, a Russian national and the then-husband of Olga Stepanova ("Stepanova"). Stepanova was the head of the Moscow tax office that had allegedly authorized millions of dollars of fraudulent refunds as part of the $230 million fraud scheme. Despite filing tax returns indicating a combined annual income of less than $40,000, Stepanova and her then-husband purchased millions of U.S. dollars' worth of real estate in Dubai after the fraud scheme was completed. (AVC ¶¶ 23, 44, 96, 99-100.)

### 3. The Ownership Structure of Prevezon Holdings, Kolevins, and Ferencoi

Dennis Katsyv, a Russian citizen, is the current owner of Prevezon, which he purchased on June 19, 2008. (AVC ¶ 8.) However, at the time of the February 2008 Transfers, Timofey Krit, a twenty-two year old Russian graduate student who was Katsyv's business associate, was the sole publicly listed shareholder of Prevezon Holdings. (AVC ¶¶ 9, 104-05.) Additionally, from August 2006 through June 2008, another Russian national, Alexander Litvak, was the

7

beneficial owner of the Prevezon 8160 Account at UBS, as well as a Euro account at the same bank (the "Prevezon 8170 Account"). (AVC ¶¶ 10, 105.)

On June 19, 2008, Krit sold his 100% interest in Prevezon to Katsyv for $50,000. (AVC ¶ 106.) He did so despite the fact that at the time of the sale, the Prevezon accounts at UBS in Switzerland held over $2 million in assets. After the sale of Prevezon from Krit to Katsyv, Krit remained a director of Prevezon, and Litvak remained beneficial owner of the Prevezon UBS accounts. (*Id.*)

Before the February 2008 Transfers, Katsyv, Litvak, and Krit had been "business associates" in other ventures, including Kolevins. (AVC ¶ 106(a).) Kolevins, a British Virgin Islands company, was founded in 2004. (AVC ¶ 13.) From October 2007 through at least October 2012, Krit was listed as sole director and shareholder of Kolevins, but Kolevins' bank accounts at UBS have been beneficially owned by Litvak and Katsyv during this time, and an internal UBS document has referred to Kolevins as Litvak's company. (AVC ¶¶ 13, 106(a).)

Ferencoi, also a British Virgin Islands company, was founded in 2003. It is beneficially owned by Katsyv, who, as stated, also owns Prevezon. (AVC ¶ 12.).

#### 4. **The Defendants' Alleged Laundering of the Fraud Proceeds**

Beginning in November 2009, Prevezon purchased a number of parcels of Manhattan real estate. (AVC ¶¶ 125-35.) The funds to purchase most of this real estate came from the Prevezon 8160 Account, which allegedly held, among other funds, the approximately $1.9 million in proceeds from the $230 million fraud. (AVC ¶¶ 125-26, 128-29.) The funds to purchase one additional piece of real estate—held by Prevezon subsidiary Prevezon Soho—did not come from

8

the Prevezon 8160 Account, but rather from a different account in the name of Prevezon Holdings at Marfin Popular Bank PCL in Cyprus.[2] (AVC ¶ 127.)

When a news reporter approached Katsyv about the allegations of money laundering based on the February 2008 Transfers, Katsyv's public relations representative confirmed that the February 2008 Transfers "really had occurred, and although they did so prior to [Katsyv's] involvement and ownership, [Katsyv] undertook a full review of where they had come from and how the funds were used." (AVC ¶¶ 107-08.) The representative then claimed the February 2008 Transfers had been sent to Prevezon on behalf of a third party investor named Petrov, who had agreed with Krit (Prevezon's previous owner) "jointly to develop a business based on investments in and management of property[.]" (*Id.*) The representative further explained that the funds involved in the February 2008 Transfers "were invested in various New York properties, and it was agreed that Prevezon would manage these assets for five years and then transfer the properties to Mr. Petrov in full." (AVC ¶ 124.)

The AVC also details an investment made by Prevezon Holdings in the Netherlands, when it acquired a 30% interest in a series of Dutch companies held in partnership with a legitimate real estate company called AFI Europe, N.V. ("AFI Europe"). On May 23 and June 23 of 2008—shortly before and after Katsyv purchased Prevezon Holdings—the Prevezon 8160 Account converted millions of dollars into euros, which were then transferred to the Prevezon 8170 Account. (AVC ¶ 103.) The Prevezon 8170 Account then transferred over 3 million euros to AFI Europe, in order to purchase Prevezon's interest in the joint investment with AFI Europe. Later, in early November 2009, funds from AFI Europe were transferred back into the Prevezon

---

[2] Additionally, the AVC does not specify the source of the funds used for the purchase of a $6.25 million parcel by subsidiary Prevezon Alexander. (AVC ¶ 130.)

9

8170 Account in euros, and then subsequently converted into dollars and transferred into the Prevezon 8160 Account. These funds were allegedly included in the Prevezon 8160 Account by November 20, 2009, when the account was used to purchase two pieces of New York real estate. (AVC ¶ 125.)

With respect to the role of Kolevins and Ferencoi in any money laundering, the Government's allegation is that at the time Prevezon purchased certain Manhattan real estate in 2009 and 2010, the Prevezon 8160 Account "included funds from Kolevins [and] funds from Ferencoi." (AVC ¶¶ 125–26; 128-29.)

## B. Relevant Procedural History

On September 10, 2013, the Government filed a verified complaint seeking forfeiture of any and all assets of Prevezon, Kolevins, and Ferencoi, as well as the imposition of civil money laundering penalties. (Dkt. No. 1.) The Government also sought a protective order to preserve the availability of these assets for forfeiture. The next day, the court entered a protective order, pursuant to 18 U.S.C. § 983(j), restraining any and all assets of Prevezon, Kolevins, and Ferencoi (the "Original Protective Order"). (Dkt. No. 2.)

On December 11, 2013, defendants filed a motion to vacate or modify the Original Protective Order. (Dkt. No. 39.) On December 20, 2013, Kolevins and Ferencoi filed a motion to dismiss for lack of jurisdiction and failure to state a claim. (Dkt. No. 44.) Prevezon filed its own motion to dismiss on December 24, 2013. (Dkt. No. 49.) The motions to dismiss were mooted when the Court granted the Government leave to file the AVC, which the Government filed on November 5, 2014. (Dkt. No. 174.) That same day, the court denied the defendants' motion to vacate the Original Protective Order, but entered a modified protective order (the "Amended Protective Order"). The Amended Protective Order tailored the property restrained to

10

that for which the AVC seeks forfeiture, or approximately $15 million. (*See* Dkt. Nos. 173, 178.) The Amended Protective Order also removed all restraints on assets held by Kolevins and Ferencoi.

On November 24, 2014, Prevezon filed a notice of interlocutory appeal, seeking reversal of the court's denial of their motion to vacate the Original Protective Order. (Dkt. No. 187.) On January 12, 2015, Prevezon filed a motion to dismiss the AVC, as did Kolevins and Ferencoi. (Dkt. Nos. 212, 210.) The court stayed Prevezon's motion to dismiss pending the outcome of the interlocutory appeal.

On July 8, 2015, the Second Circuit dismissed the interlocutory appeal, noting that "[j]udicial economy is better served by the District Court expeditiously ruling" on Prevezon's pending motion to dismiss. *United States v. Prevezon Holdings Ltd., et al.*, No. 14-4407, Dkt. No. 77-1 (2d Cir. July 8, 2015) (summary order). This opinion followed.

## LEGAL STANDARDS

### 1. Motions to Dismiss *In Rem* Forfeiture Actions

"Motions to dismiss *in rem* forfeiture actions are governed by Federal Rule of Civil Procedure 12(b) and Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions." *In re 650 Fifth Ave. & Related Properties*, 777 F. Supp. 2d 529, 541 (S.D.N.Y. 2011); *see also* Fed. R. Civ. P. 12(b); Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions (the "Supplemental Rules" or "Supp. R."). When considering such a motion, the court must "draw all reasonable inferences in Plaintiff's favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *United States v. Any & all Funds on Deposit in Account No. 0139874788, at Regions Bank, held in the name of Efans Trading Corp.*, No. 13

11

Civ. 7983, 2015 WL 247391, at *5 (S.D.N.Y. 2015) (internal citation omitted). A plaintiff will survive a motion to dismiss if he alleges "enough facts to state a claim to relief that is plausible on its face." *Id.* (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 569 (2007)).

Under Supplemental Rule G(2)(f), a complaint must "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." *United States v. $32,507.00 in U.S. Currency,* No. 14 Civ. 5118, 2014 WL 4626005, at *1 (S.D.N.Y. Sept. 16, 2014). At trial, under the Civil Forfeiture Act of 2000 ("CAFRA"), the burden of proof will be "on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture." *See* 18 U.S.C. § 983. The Government's complaint must therefore "assert specific facts supporting an inference that the property is subject to forfeiture." *United States v. $22,173.00 in U.S. Currency,* 716 F. Supp. 2d 245, 248 (S.D.N.Y. 2010) (internal citation omitted). However, the Government is not required to allege in the complaint all of the facts and evidence at its disposal. "The issue is one of pleading, not proof, and '[n]o complaint may be dismissed on the ground that the Government did not have adequate evidence at the time the complaint was filed to establish the forfeitability of the property.'" *$32,507.00 in U.S. Currency*, 2014 WL 4626005, at *1-2 (quoting 18 U.S.C. § 983(a)(3)(D)).

With the above pleading standards in mind, the court turns to defendants' arguments on the motion.

## DISCUSSION

### I. Prevezon's Motion to Dismiss

The AVC includes a claim for forfeiture under 18 U.S.C. §§ 981(a)(A), and also seeks civil money laundering penalties for violations of 18 U.S.C. § 1956(a)(1)(A), 18 U.S.C. §

12

1956(a)(1)(B), 18 U.S.C. § 1956(a)(2)(A), 18 U.S.C. § 1956(a)(2)(B), 18 U.S.C. § 1956(b), 18 U.S.C. § 1956(h), and 18 U.S.C. § 1957.

The basis for the forfeiture claim under Section 981 is a violation of the money laundering statutes, 18 U.S.C. §§ 1956 and 1957. To state a claim under Section 1956, the government must allege:

> that the defendants, (1) knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, (2) conducted or attempted to conduct a financial transaction (3) which in fact involved the proceeds of that unlawful activity, (4) either (a) with the intent to promote the carrying on of that unlawful activity or (b) with the knowledge that the transaction was designed at least in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the unlawful activity.

*In re 650 Fifth Ave.*, 777 F. Supp. 2d at 558-59 (citing *United States v. Gotti,* 459 F.3d 296, 334 (2d Cir. 2006)). To state a claim under Section 1957, the Government must allege that the defendants "knowingly engage[d] or attempt[ed] to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity[.]" 18 U.S.C. § 1957.

Prevezon argues that the AVC fails to state any claim for money laundering, because it does not trace any tainted funds substantially connected to the $230 million fraud to the Prevezon account in Zurich or to the Prevezon subsidiaries in New York; does not identify a specified unlawful activity actionable in the United States; and does not allege facts sufficient for a finding of knowledge or intent. Prevezon further argues that the Government's verification of the original complaint was inaccurate and misleading, justifying dismissal.

The court addresses these arguments below. None merit dismissing the action.

13

## A. **The AVC Adequately Traces The Allegedly Laundered Funds**

"When the Government seizes property under § 981, it must prove that the property is itself involved in, or traceable to property involved in, a proscribed transaction." *In re 650 Fifth Ave.*, 777 F. Supp. 2d at 571 (internal citation omitted). Prevezon claims that the AVC does not trace any tainted funds substantially connected to the $230 million fraud into the Prevezon 8160 Account in Switzerland, or into Prevezon's real estate holdings in New York. According to Prevezon, the Government has failed to follow the allegedly tainted money in anything but a conclusory fashion.

Prevezon's tracing arguments highlight the "particular problems in the case of [tracing] money or other fungible property . . . since identifying the particular funds traceable to the criminal violation is nearly impossible." *In re 650 Fifth Ave.*, 777 F. Supp. 2d at 571 (internal citation omitted). To help solve these problems, the Second Circuit has sanctioned certain accounting assumptions that the Government may use to trace tainted funds. *See United States v. Banca Cafatero Panama*, 797 F.2d 1154 (2d Cir. 1986). One, the "first in, last out" assumption, or the "lowest intermediate balance" rule, states that "as long as the balance in an account where illicit proceeds are deposited remains higher than the amount of the proceeds deposited, the government can trace funds equal to that amount." *In re 650 Fifth Ave.*, 777 F. Supp. 2d at 571 (citing *Banco Cafatero*, 797 F.2d at 1159). Another, the "first in, first out" assumption, "'consider[s] 'traceable proceeds' to be any one withdrawal, or any asset purchased with such withdrawal, to the extent of' the amount of the deposited tainted funds." *United States v. Walsh*, 712 F.3d 119, 124 (2d Cir. 2013) (quoting *Banco Cafatero*, 797 F.2d at 1159).

Under these accounting assumptions, the AVC sufficiently traces the $1.9 million in tainted funds from the Russian Treasury to the Prevezon 8160 Account. The AVC contains

14

numerous paragraphs detailing when funds from the $230 million fraud were transferred into an account and when they were transferred out. (AVC ¶¶ 77-102; 114-122; Ex. B.) This tracing analysis includes an adequate tracking of the funds at issue from Bank Krainiy Sever to Elenast and Bunicon (and to the additional Bunicon intermediaries Megacom, Castlefront, and Company-1), and from there to the Prevezon 8160 Account. It includes dates, amounts, and information regarding both the originator and beneficiary of each transfer. Under the methodology outlined in *Banco Cafatero*, this pleading is sufficient.[3] *See Walsh*, 712 F.3d at 124 (affirming district court's application of *Banco Cafatero*'s "first-in, first-out" approach in civil forfeiture proceeding based on a commingled account).

Prevezon argues that the Government has not provided a basis to infer that the approximately $1.9 million wired to them was tainted money, when—according to a version of Exhibit B prepared by Prevezon—the same source account (at Bank Krainiy Sever) held more than $19 million in untainted funds. Even if true, this objection is unpersuasive, given that the Government is entitled to use the *Banco Cafatero* accounting assumptions, and given the fact that there is no "probability requirement at the pleading stage." *Twombly*, 550 U.S. at 556. Moreover, the AVC pleads more than mere accounting assumptions. As alleged, the same shell company (Bunicon) that was used to transfer money from the Bank Krainiy Sever account to the Prevezon 8160 Account was also used to wire a kickback to the then-husband of Stepanova, the Russian tax official who helped to perpetrate the $230 million fraud. Combined with all of the suspicious indicia surrounding the transfers of the $1.9 million at issue—described further below

---

[3] Prevezon does not cite, and the court is not aware of, any case holding that *Banco Cafatero*'s tracing assumptions do not apply to a correspondent or concentration account. This makes sense: the implication of such a rule would be that a money launderer could escape the reach of the money laundering statutes by merely funneling illicit proceeds through a correspondent account. The court declines to take such a position here.

15

|

with regard to *scienter*—the allegations raise a reasonable belief that the funds accepted by Prevezon were proceeds of the $230 million fraud.

Emphasizing documents obtained through discovery that are not cited in the AVC, and noting that the AVC itself acknowledges that certain bank records in Russia were destroyed in a fire, Prevezon argues that the Government cannot prove its tracing allegations with authenticated or admissible evidence. But this goes to the Government's ultimate trial burden, not its pleading requirements. When limited to what is required in a pleading, the AVC has alleged sufficient facts to meet the pleading requirements of Rule 12(b) and Supplemental Rule G. *See United States v. All Funds on Deposit in Dime Sav. Bank of Williamsburg Account No. 58-400738-1*, 255 F. Supp. 2d 56, 69-70 (E.D.N.Y. 2003) (on motion to dismiss, court "need not pass on the Government's ultimate burden of proof regarding traceability").

With regard to whether the fraud proceeds are traced into the Prevezon real estate purchased in New York, Prevezon argues that the Government cannot prove that the allegedly tainted funds in the Prevezon 8160 Account were used to purchase New York real estate, because bank records show that Prevezon invested those funds with AFI Europe in the Netherlands. But the AVC cites to the statement of Katsyv's representative, who publicly confirmed that after receiving funds transferred from Bunicon and Elenast, Prevezon "invested [the funds] in various New York real properties." And, the AVC states that some funds from AFI Europe were transferred back to the Prevezon account in early November 2009 to fund the purchase of two properties in New York later that month. (AVC ¶ 125.)

As noted, the issue before the court is one of pleading, not proof. The statements of Katsyv's representative, combined with the allegations that moneys were transferred from AFI Europe to fund the purchase of properties in New York, permit the reasonable belief that the

16

New York properties were purchased with illicit funds "substantially connected" to the underlying fraud scheme. 18 U.S.C. § 983(c)(3). That is all that is required at this stage to allow the claims to move forward.[4]

## B. The AVC Adequately Pleads a Specified Unlawful Activity

Under Section 1956, the Government must allege that a specified unlawful activity ("SUA") occurred, and that Prevezon then laundered the proceeds of that SUA. The term "specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7). First, that section defines an SUA as "any act or activity constituting an offense listed in [18 U.S.C. § 1961(1)]," which includes wire fraud. 18 U.S.C. § 1956(c)(7)(A). Second, with respect to a financial transaction "occurring in whole or in part in the United States," that section defines an SUA as "an offense against a foreign nation involving . . . (iii) fraud, or any scheme or attempt to defraud, by or against a foreign bank (as defined in paragraph 7 of section 1(b) of the International Banking Act of 1978); [or] (iv) bribery of a public official, or the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official[.]" 18 U.S.C. § 1956(c)(7)(B).

The AVC includes a list of potential SUAs that apply. (AVC ¶ 143.) Initially, the Government took the position that the relevant SUA is wire fraud under 18 U.S.C. § 1956(c)(7)(A), based on facts alleging a violation of 18 U.S.C. § 1343 (the wire fraud statute). (1/7/14 Tr. at 10:7-9; Dkt. No. 58 at 11-13; Dkt. No. 88 at 16-17.) However, the legal landscape changed in April 2014, when the Second Circuit clarified that the wire fraud statute does not apply extraterritorially. *See European Cmty. v. RJR Nabisco, Inc.*, 764 F. 3d 129 (2d Cir. 2014).

---

[4] The court notes that this tracing analysis may not necessarily apply to assets held by two Prevezon subsidiaries: Prevezon Soho and Prevezon Alexander. These assets are not explicitly linked in the AVC to the allegedly tainted Prevezon 8160 Account, but are restrained by the Amended Protective Order. Prevezon has filed a recent motion to vacate or modify the Amended Protective Order. (Dkt. No. 298.) The court reserves judgment on that motion, which is not yet fully briefed.

17

Since that time, the Government has argued in the alternative that the AVC pleads facts to support two additional SUAs, both actionable under 18 U.S.C. § 1956(c)(7)(B): (1) misappropriation, theft, or embezzlement of public funds by or for the benefit of public officials; or (2) fraud against a foreign bank.

The court finds that the wire fraud alleged here cannot qualify as the relevant SUA, because the alleged scheme is not sufficiently domestic and is therefore not actionable under U.S. law. However, the Government has adequately alleged at least one alternative SUA: an offense against a foreign nation involving the misappropriation, theft, or embezzlement of public funds by or for the benefit of public officials.

### 1. Wire Fraud

Citing to *Pasquantino v. United States*, 544 U.S. 349 (2005), the Government first argues that domestic wire fraud under 18 U.S.C. § 1343 qualifies as the relevant SUA.[5] In *Pasquantino*, a phone call was made in the United States to place an order for liquor, which was later smuggled into Canada in violation of Canadian tax laws. The Supreme Court held that the wire fraud statute applied to this conduct, noting that it prohibited the use of "U.S. interstate wires to execute a scheme to defraud a foreign sovereign of tax revenue." *Id.* at 371.

However, *Pasquantino* was decided in 2005, before the Supreme Court articulated a presumption against extraterritoriality in *Morrison* v. *National Australia Bank Ltd.*, 561 U.S. 247 (2010). It is true that the *Morrison* court distinguished, rather than overruled, *Pasquantino*. But it did so by noting that that the wire fraud at issue in *Pasquantino* "'was complete *the moment*

---

[5] Under 18 U.S.C. § 1343, the "elements of wire fraud include: (1) the formation of a scheme to defraud victims (2) of money or other property (as the object of the scheme), and (3) the use of the mails or interstate or foreign wire communications in furtherance of the scheme." *Laydon v. Mizuho Bank, Ltd.*, No. 12 CIV. 3419, 2015 WL 1515487, at *8 (S.D.N.Y. Mar. 31, 2015) (internal citation omitted).

18

*they executed the scheme inside the United States*,'" and further noting that it was "[t]his *domestic element* of petitioners' conduct [that] the Government is punishing.'" *Morrison*, 561 U.S. at 272 (quoting *Pasquantino*, 544 U.S. at 371) (emphases added). Four years later, applying *Morrison* in the RICO context, the Second Circuit explicitly held that the wire fraud statute does not apply extraterritorially. *See RJR Nabisco, Inc.*, 764 F.3d 129, 139 (2d Cir. 2014) ("[W]e conclude that the wire fraud and money fraud statutes . . . do not overcome *Morrison*'s presumption against extraterritoriality"). In light of the *Morrison* presumption, the Second Circuit has also rejected as dicta the language in *Pasquantino* that implied the wire fraud statute could apply to non-domestic schemes. *RJR Nabisco, Inc.*, 764 F.3d at 141 n.11.

Still, this does not end the inquiry. In *RJR Nabisco, Inc.*, the Second Circuit held that even where the criminal enterprise is foreign, a predicate act of wire fraud may allow for extraterritorial application where "all elements of the wire fraud . . . were completed in the United States or while crossing U.S. borders[.]" 764 F. 3d at 139. The Second Circuit therefore found that the wire fraud statute could still apply to the conduct at issue in *RJR Nabisco, Inc.*, where the extensive allegations detailed that the scheme was allegedly both hatched in *and* directed at the U.S. In so ruling, the Second Circuit stated: "We need not decide whether domestic conduct satisfying fewer than all of the [wire fraud] statute's essential elements could constitute a violation of such a statute." *Id.* at 142 n.14. The Second Circuit added: "We need not now decide precisely how to draw the line between domestic and extraterritorial applications of the wire fraud statute . . . because wherever that line should be drawn, the conduct alleged here clearly states a domestic cause of action." *Id.* at 142.

In the court's view, this case sits on the wrong side of that line. The Government argues that the wire fraud scheme is sufficiently domestic based on the allegation that U.S. wires were

19

used in one instance to send a kickback to the then-husband of Stepanova, the Russian tax official. (*See* AVC ¶¶ 95-98.) The court sees things differently. Unlike in *RJR Nabisco, Inc.*, the Government does not plead that the wire fraud scheme here was formed in the United States, let alone that all of the elements of wire fraud were completed in the United States. In an otherwise wholly foreign wire fraud scheme, the only domestic contact is a single wire transfer directed from a shell company with a Moldovan bank account (Bunicon) to a shell company with a Latvian bank account (Nomirex), with the transfer routed through New York. Nomirex then transferred funds to a British Virgin Islands company (Quartell Trading, Ltd.), which promptly transferred funds to yet another British Virgin Islands company (Baikonur Worldwide, Ltd.). Then, Baikonur Worldwide, Ltd., the last British Virgin Islands company in the chain, transferred funds to the Swiss bank account of a Cyprus-based company (Arivust Holdings, Ltd.) held by a Russian national. (AVC ¶¶ 96-97.) On these facts, the court cannot conclude that this single transfer is sufficient to overcome the presumption against the wire fraud statute's extraterritorial application.

This is particularly so in light of the Second Circuit's holding in *Petroleos Mexicanos v. SK Engineering & Const. Co. Ltd.,* 572 F. App'x 60, 61 (2d Cir. July 16, 2014) (summary order), decided after *RJR Nabisco, Inc.* In *Petroleos Mexicanos*, the wire fraud scheme had *three* contacts with the United States: the foreign defendants obtained financing in the United States, transmitted seven false invoices for over \$159 million via facsimile through New York, and made payments through a trust in New York. Nevertheless, the Second Circuit reaffirmed that "wire fraud cannot serve as … an extraterritorial predicate," and then rejected the application of the wire fraud statute to the scheme at issue. 572 F. App'x at 61 ("The activities involved in the alleged scheme—falsifying the invoices, the bribes, the approval of the false invoices—took

place outside of the United States. The allegations of domestic conduct are simply insufficient[.]"); *see also Laydon*, 2015 WL 1515487, at \*8 (rejecting application of wire fraud statute when allegations were "far too attenuated to sufficiently plead that the scheme to defraud came about in the U.S"); *Loginovskaya v. Batratchenko*, 764 F.3d 266, 275 (2d Cir. 2014) (holding in the context of Section 10(b) that "the direction to wire transfer money to the United States is insufficient to demonstrate a domestic transaction.").[6] Here, as in *Petroleos Mexicanos*, the wire fraud scheme is extraterritorial, involving "a foreign conspiracy against a foreign victim conducted by foreign defendants participating in foreign enterprises." *Petroleos Mexicanos v. SK Eng'g & Const. Co.*, No. 12 Civ. 9070, 2013 WL 3936191, at \*3 (S.D.N.Y. July 30, 2013), *aff'd*, 572 F. App'x 60 (2d Cir. 2014). The one minimal contact alleged is not enough.

The Government also argues that this scheme is sufficiently domestic because the actual money laundering by Prevezon took place in Manhattan, and the funds at issue remain invested in Manhattan real estate. (Dkt. No. 229 at 20 (citing AVC ¶¶ 128, 132-35).) But this argument confuses the underlying SUA (by the Organization) with the later alleged money laundering (by Prevezon). For purposes of wire fraud as the relevant SUA, the Government has only pleaded one domestic contact by the perpetrators of the larger fraud, and it was not sufficiently central to the overall fraud scheme to convert this foreign scheme into a domestic one.

---

[6] In a letter to the court, the Government cites to a recent Second Circuit opinion in support of its position that the wire fraud scheme here is sufficiently domestic. *See* Dkt. No. 293 at 1 (citing *United States v. Rutigliano*, 790 F.3d 389 (2d Cir. 2015)). But *Rutigliano* does not help the Government here. That case addressed whether venue in this district was proper in a wire fraud case brought for a completely domestic scheme. The Second Circuit concluded that venue was proper for wire fraud "in any district in which the offense began, continued, or concluded." However, there is nothing in that opinion that contravenes the recent precedents, articulated in *RJR Nabisco* and *Petroleos Mexicanos*, that the wire fraud statute cannot apply to an insufficiently domestic scheme.

## 2. <u>An Offense Against a Foreign Nation</u>

Although wire fraud cannot apply as the SUA here, the AVC adequately pleads facts supporting another SUA: an "offense against a foreign nation involving . . . bribery of a public official, or the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official[.]" 18 U.S.C. § 1956(c)(7)(B)(iv). This, standing alone, is enough to allow the claims to proceed.

The text of Section 1956(c)(7)(B) is clear that money laundering can be prosecuted where the laundered funds are the proceeds of a specified "offense against a foreign nation" and part of a financial transaction "occurring in whole or in part in the United States." This language rebuts the *Morrison* presumption of extraterritoriality. *See United States v. Real Prop. Known as Unit 5B of Onyx Chelsea Condo.*, No. 10 Civ. 5390, 2012 WL 1883371, at *3 (S.D.N.Y. May 21, 2012) ("Congress clearly intended Section 1956(c)(7) to prohibit the laundering in this country of proceeds of 'foreign crimes' committed entirely abroad.") And, as noted above, the AVC's tracing of fraud proceeds to real estate in this district is sufficient to satisfy the requirement that the financial transactions at issue occurred "in whole or in part in the United States."

The question remaining for the court is whether the AVC includes facts sufficient to allege an "offense against a foreign nation"—in other words, whether there are facts alleged to support a reasonable belief that the Government will be able to prove violations of foreign (Russian) law under at trial. The court concludes that the facts alleged adequately support such a belief. The AVC includes allegations that members of the Organization who were officials at two Russian tax offices "corruptly approved" the tax refund requests within one business day, even though the $230 million request represented the largest tax refund in Russian history. (AVC ¶¶ 21, 38.) The AVC further alleges that some of the refund proceeds were kicked back

to a public official (Stepanova) through her then-husband, after that same public official and her husband flew to a meeting in Cyprus with the owner of USB bank—the first bank in the laundering chain. (AVC ¶¶ 22-23; 95-100.) After the refund money was paid out, that public official and her then-husband purchased millions of U.S. dollars' worth of real estate in Dubai, despite filing tax returns showing a combined annual income of under \$40,000. And, Russian courts have already rendered guilty verdicts against two of the participants in this \$230 million fraud scheme for violations of Russian law. (AVC ¶ 69.)[7] These allegeations are sufficient to support a reasonable belief that the Government will be able to prove violations of Russian law involving misappropriation, theft, or embezzlement of public funds by or for the benefit of public officials.

Additionally, the court would also sustain the claims at this stage based on the SUA of "an offense against a foreign nation involving . . . fraud, or any scheme or attempt to defraud, by or against a foreign bank[.]" 18 U.S.C. § 1956(c)(7)(B)(iii). The AVC alleges that "HSBC Private Bank (Guernsey) Limited ('HSBC Guernsey') is a Guernsey-based entity that served as trustee to the Hermitage Fund during all relevant periods," and that "[u]nbeknownst to Hermitage or HSB Guernsey, members of the Organization used the seized corporate documents and seals to fraudulently re-register ownership of [the Hermitage Companies] with the Russian corporate registry." (AVC ¶¶ 15, 26-28, 34.) The AVC further alleges that Hermitage and

---

[7] Prevezon claims that, if anything, these convictions cut *against* the finding of an SUA under Section 1956(c)(7)(B)(iv), which requires that the theft of public funds be by or for the benefit of public officials. This is because the Russian verdict announcing one of these convictions claimed "that the tax authorities were deceived by [the convicted fraudster] and not complicit," and thus—supposedly—no public officials participated in or benefited from the fraud scheme. However, at this stage, the court is not required accept as credible a finding of a Russian court at odds with the alleged facts described elsewhere in this opinion. (*See* AVC ¶¶ 22-25, 61-63 (alleging involvement of Russian Interior Ministry officials in the fraud scheme); 95-100 (alleging kickback to Russian tax official).)

HSBC filed criminal complaints with Russian law enforcement agencies about the fraud scheme. (AVC ¶ 59.) Prevezon argues that, because HSBC Guernsey was serving as trustee for the Hermitage Fund, only the Hermitage Fund (or the Russian Treasury) was defrauded. If discovery clarifies that HSBC Guernsey was not in fact defrauded, or that it cannot otherwise qualify as a defrauded "foreign bank" under the statute, the court may exclude this SUA from the case. But at this stage, drawing inferences in the Government's favor, these allegations sufficiently support a reasonable belief that the Government will meet its burden of proof regarding this SUA at trial.

## C. The AVC Adequately Alleges *Scienter*

To satisfy its burden for *scienter* under the money laundering statutes, the Government must plead facts sufficient to support a reasonable belief that Prevezon intended to promote or conceal the proceeds of an SUA, or knowingly engaged in transactions involving criminally derived property. 18 U.S.C. §§ 1956(a)(1), 1957. "The money laundering statute 'reach[es] a person who knows that [s]he is dealing with the proceeds of some crime[,] even if [s]he does not know precisely which crime.'" *United States v. Tillman*, 419 F. App'x 110, 111-12 (2d Cir. Apr. 15, 2011) (summary order) (quoting *United States v. Maher*, 108 F.3d 1513, 1526 (2d Cir. 1997)). Knowledge may be shown by proof of willful blindness or conscious avoidance. *United States* v. *Nektalov*, 461 F.3d 309, 314 (2d Cir. 2006) (affirming conscious avoidance charge in money laundering prosecution).

The Government has amply alleged the requisite mental states for money laundering or conspiracy to commit money laundering under Sections 1956 and 1957. As noted, the AVC alleges that the Prevezon received approximately $857,000 by wire transfer from two Moldovan shell companies, Bunicon and Elenast, which did not have legitimate businesses. Those wire

24

transfers were falsely described as prepayment for sanitary equipment, a description at odds with the public statement of Katsyv's representative, who described the funds as payments from a third-party investor for an investment in New York real estate. Moreover, the AVC alleges that the Prevezon received approximately $1.1 million from Bunicon, in a second transfer through additional intermediaries, and that these transfers were also falsely described. Furthermore, the Moldovan shell companies forged a sham contract, purportedly signed by a Prevezon representative, and submitted it to a bank to justify a wire transfer.[8]

Prevezon attempts to explain away the suspicious indicia surrounding the transfers from Bunicon and Elenast, claiming that the AVC "contains nothing but allegations that people *other than Defendants* did things and knew things." (Dkt. No. 213 at 29 (emphasis in original).) But this is simply inconsistent with the AVC. The Government *does* allege that Prevezon had something to do with these false descriptions: the AVC alleges that a Prevezon representative purportedly signed a sham contract related to one of the fraudulent transfers at issue.

And there is more. Even putting the alleged signature aside, the other circumstances alleged in the complaint—the acceptance, with no questions asked, of almost $2 million in transfers from shell companies based on false wire descriptions—are enough to justify a reasonable belief that the Government will be able to prove *scienter* at trial. The factual pleadings are therefore sufficient, whether Prevezon actually knew that the transfers they were accepting were the proceeds of the larger fraud and a related specified unlawful activity, or

---

[8] In the AVC, the Government adds an allegation with regard to *scienter* that, by 2007, Katsyv was aware of the general prohibitions on money laundering, based on a multi-million dollar settlement of money laundering allegations brought against Katsyv by the Israeli government. (AVC ¶ 113.) Israel's Prohibition of Money Laundering Law 5760-2000 has provisions similar to the United States money laundering statutes. Prevezon has indicated that it will move to strike any reference to the case against Katsyv brought by the Israeli government, but no such motion is currently before the court. In any event, Katsyv's knowledge (or lack thereof) based on the Israeli case has had no bearing on the court's analysis here.

consciously avoided such knowledge. *See Tillman*, 419 F. App'x at 112 (holding that similar behavior, "done without question, at least supports the inference that [the defendant] consciously avoided learning the nature of the activity in which she was involved while being aware of a high probability that she was participating in an illegal scheme"); *see also United States v. Anderson*, 747 F.3d 51, 66-67 (2d Cir. 2014) (collecting cases supporting a knowledge inference when members of a criminal conspiracy trust the defendant to receive large amounts of money or contraband).

The allegations support a reasonable belief that Prevezon—whether or not it knew every detail of the upstream laundering—knew or was willfully blind to the fact that the funds were proceeds of unlawful activity. As alleged, the Prevezon described in the AVC did not operate like a legitimate real estate company, but rather like one with the intent to conceal the proceeds of a fraud. To accept Prevezon's arguments regarding its allegedly pure state of mind, the court would have to draw the less likely inference that it was innocently unaware that its counterparties were shell companies laundering fraud proceeds, and that it had no sense of the activity in its own corporate accounts. But at this stage, plausible inferences must be drawn in favor of the Government, not Prevezon. The AVC therefore adequately alleges *scienter*.

## D. **Prevezon's Verification Argument Lacks Merit**

Supplemental Rule G(2)(a) imposes a requirement that a complaint in a forfeiture action *in rem* must "be verified." 28 U.S.C. § 1746 governs the meaning of the term "verified," and allows that "unsworn verifications may be pled 'on information and belief'"—not only admissible evidence. *United States v. 8 Gilcrease Lane*, 587 F. Supp. 2d 133, 139 (D.D.C. 2008) (quoting *Cobell v. Norton*, 391 F.3d 251, 260 (D.C. Cir. 2004)). Additionally, as noted previously, Supplemental Rule G(2)(f) states that verified complaints must "state sufficiently

26

detailed facts to support a *reasonable belief* that the government will be able to meet its burden of proof at trial." Supp. R. G(2)(f) (emphasis added).

In this case, a Special Agent of the United States Department of Homeland Security verified both the original complaint and the AVC. According to Prevezon, the verification of the original complaint was "misleading, deceptive, and as to what the verifier personally did, simply untrue." (Dkt. No. 239 at 20.) Citing to a still-unfinished Rule 30(b)(6) deposition of this Special Agent taken in March 2014—when this case was on an expedited trial schedule and no documents had been produced—defendants argue that this original sin has so tainted the allegations that they must be dismissed in their entirety.

Defendants' argument lacks merit. To be sure, a number of statements made by the Special Agent at his deposition regarding the state of the Government's evidence are troubling.[9] If still accurate over a year later, such statements could cause serious problems for the Government as it seeks to present admissible proof at summary judgment or trial. However, the Special Agent also did indicate the reasons for his "reasonable belief" that the Government would be able to meet its burden of proof at trial.[10] There is nothing here approaching the type of "contumacious conduct" necessary for the court to take "the extreme sanction of dismissing a case with prejudice"—a sanction which "must be infrequently resorted to by district courts."

---

[9] *E.g.*, 3/3/14 Tr. at 92:2-8 ("Q. So every transfer here is based on copies that are not authenticated, of records that are incomplete, based on an accounting assumption. Is that right? A. That would be correct."); *see also id.* at 131:16-132:9; 137:13-138:5.

[10] *E.g.*, 3/3/14 Tr. at 141:5-17 (A: The evidence would be that [Katsyv] engaged to conceal because he's aware through his – at least his representative says he's aware he's going to receive payment that's due to him for investment in New York property from Mr. Petrov by way of Mr. Kim sending him money, two wires. The two wires are then mischaracterized as sanitary equipment. And he receives them, he then does whatever he does with his money, knowing full well that this money is not for its stated purpose. So that would be evidence of concealment."); *see also id.* at 133:10-134:9.

*See Ridge Chrysler Jeep, LLC v. Daimler Chrysler Servs. N. Am., LLC*, No. 03 Civ. 760, 2006 WL 2808158, at *8 (N.D. Ill. Sept. 6, 2006).

Moreover, in the months since the deposition, the Government has filed the AVC, which includes new allegations of an additional $1.1 million in laundered funds purportedly based on different sources than those at issue in the Special Agent's testimony. So long as the verifier has a reasonable belief that the Government can meet its later burden of proof, this type of scenario—an initial lack of certain admissible evidence, followed by additional investigation—is explicitly contemplated by CAFRA and the Supplemental Rules, and hardly justifies dismissing the complaint. *See* 18 U.S.C. § 983(c)(2) ("[T]he Government may use evidence gathered after the filing of a complaint for forfeiture to establish, by a preponderance of the evidence, that property is subject to forfeiture."); *see also* Supp. R. G(8)(b)(ii).

The court will not dismiss the case based on an unfinished deposition held to undermine the verification of a complaint that is no longer even in force. As with all of the other arguments from Prevezon discussed above, this argument fails. Their motion to dismiss is denied.

## II.    Defendants Kolevins' and Ferencoi's Motion to Dismiss

Kolevins and Ferencoi also move to dismiss, claiming: (1) that the court lacks personal jurisdiction over them under New York law and Fed. R. Civ. P. 12(b)(2); and (2) that the AVC fails to state a claim against them.

"In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167-68 (2d Cir. 2013) (internal citation omitted). In evaluating whether the requisite showing has been made, the court must construe the pleadings in the light most favorable to the plaintiffs. *Id.* "Determining personal jurisdiction over a foreign defendant

28

in a federal-question case is a two-step process." *Id.* First, the court "looks to the law of the forum state to determine whether personal jurisdiction will lie." *Id.* If jurisdiction lies, the court must consider whether its "exercise of personal jurisdiction over a foreign defendant comports with due process protections established under the United States Constitution." *Id.*

Here, without allegations of "continuous and systematic contact" with New York to support general jurisdiction, the Government must establish "specific jurisdiction" over Kolevins and Ferencoi under New York law. New York's long-arm statute allows for the exercise of personal jurisdiction over "any non-domiciliary . . . who in person or through an agent . . . transacts any business with the state[.]" N.Y. C.P.L.R. § 302(a)(1). A defendant transacts business with the state if he has "purposely availed himself of the privilege of conducting activities within New York and thereby invoked the benefits and protections of its laws." *Reich v. Lopez*, 38 F. Supp. 3d 436, 457 (S.D.N.Y. 2014) (internal citation omitted). Whether a defendant has purposely availed itself of the New York forum "is a fact-intensive inquiry inasmuch as it requires the trial court, in the first instance, to closely examine the defendant's contacts for their quality." *Licci*, 732 F.3d at 167 (internal citation omitted).

In *Licci*, the Second Circuit found that the purposeful use of a New York correspondent bank account may be considered the "transaction of business," and therefore subject a defendant to personal jurisdiction. The Government argues that the case for personal jurisdiction here is actually more compelling than in the *Licci*, because "far more than move money through the district swiftly using a correspondent account, Kolevins and Ferencoi actively invested funds into the purchase of real estate that remains in this district and owned by the other Defendants, companies related to Kolevins and Ferencoi." (Dkt. No. 229 at 24-25.)

29

The court agrees. In substance, the Government's allegations with regard to these defendants are that: (1) the owners or directors of Kolevins and Ferencoi—Katsyv, Krit, and Litvak—are also owners or directors of Prevezon (AVC ¶¶ 12–13, 106(a)); and (2) at the time Prevezon purchased certain Manhattan real estate as part of their money laundering scheme, the Prevezon 8160 Account "included funds from Kolevins" and "funds from Ferencoi." (AVC ¶¶ 125–26; 128-29.)

Kolevins and Ferencoi attempt to distance themselves from the alleged scheme, claiming that the AVC alleges only that their owners are "business associates" with those of Prevezon. In fact, the AVC alleges that the owners and directors of Kolevins, Ferencoi, and Prevezon completely overlap. Katsyv, owner of Prevezon, beneficially owns Ferencoi. (AVC ¶ 12.) Litvak, beneficial owner of the Prevezon UBS accounts—and a man who signed documents in connection with the New York real estate purchases—founded and beneficially owns Kolevins. (AVC ¶¶ 13, 125-26, 128-30.) And Krit, past sole shareholder and present director of Prevezon, is sole director and shareholder of Kolevins. (AVC ¶¶ 9, 13.)

On a motion to dismiss, when the court must draw inferences in favor of the Government, it is plausible on these facts that the funds were sent as part of an active investment into New York real estate. In the court's view, this is sufficient for specific personal jurisdiction under New York's long-arm statute.

For similar reasons, Kolevins' and Ferencoi's constitutional due process challenge fails. As the Second Circuit has explained: "It would be unusual, indeed, if a defendant transacted business in New York and the claim asserted arose from that business activity within the meaning of section 302(a)(1), and yet, in connection with the same transaction of business, the defendant cannot be found to have purposefully availed itself of the privilege of doing business

30

in the forum and [to have been able to] foresee being haled into court there, or the assertion of specific jurisdiction would somehow otherwise offend traditional notions of fair play and substantial justice[.]" *Licci*, 732 F.3d at 170 (internal citation omitted). This is not such an unusual case. The court concludes that Kolevins' and Ferencoi's alleged provision of funds to a holding company for purposes of investment in New York real estate constitutes the purposeful availment of the privilege of doing business in New York, so as to permit the subjecting of these defendants to specific jurisdiction here consistent with due process requirements. The court further concludes that that the exercise of personal jurisdiction over Kolevins and Ferencoi would not offend principles of fair play and substantial justice.

Finally, the court rejects Kolevins' and Ferencoi's argument that the AVC fails to state a claim against them. Ferencoi and Kolevins argue that the "mere transfer of non-tainted funds from Kolevins and Ferencoi to Prevezon Holdings cannot render Kolevins and Ferencoi subject to jurisdiction, or liable for money laundering, any more than it would support jurisdiction or liability over any other innocent company that had ever deposited money into the Prevezon Holdings account." (Dkt. No. 210 at 5.) Not so. As alleged, Kolevins and Ferencoi are not mere innocent companies totally unrelated to Prevezon, but companies that share all of Prevezon's owners and directors. Their near-total overlapping ownership and investment in Prevezon's alleged money laundering transactions permits an inference that these defendants facilitated money laundering, which could subject them to civil money laundering penalties.

Ultimately, Kolevins and Ferencoi challenge the premise that Prevezon was acting for their benefit, and with their knowledge and consent, when Prevezon invested their money in New York. They similarly dispute the claim that they knew that Prevezon's account contained the proceeds of an SUA, and that they intended to help facilitate the laundering of these proceeds.

31

Discovery may yet bear out this theory: it is of course possible that, despite the fact that these companies are run by the same individuals as Prevezon, Ferencoi and Kolevins had no intent to participate in Prevezon's alleged money laundering scheme. But at this stage, the pleadings support a plausible inference that they knew about, and intended to facilitate, the alleged money laundering of tainted funds. Their motion to dismiss is therefore denied.

## CONCLUSION

These are only allegations. On a motion to dismiss, the court does not find facts. Instead, the court draws all reasonable inferences in plaintiff's favor, assumes all well-pleaded factual allegations to be true, and determines whether they plausibly give rise to an entitlement to relief. And, with respect to the forfeiture claim, the court determines only whether the AVC alleges facts sufficient to support a reasonable belief that the Government will be able to meet its burden of proof at trial.

Under these standards, the AVC is sufficiently pleaded to allow the claims to proceed. The motions to dismiss are therefore denied.

The Clerk of Court is directed to close the motions listed as docket numbers 210 and 212.

SO ORDERED.

Dated: New York, New York
       August 7, 2015

THOMAS P. GRIESA
U.S. District Judge