UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- x

UNITED STATES OF AMERICA,

                  Plaintiff,

    - against -

PREVEZON HOLDINGS LTD., et al.,

                  Defendants,

    - and -

ALL RIGHT, TITLE AND INTEREST IN THE REAL
PROPERTY AND APPURTENANCES KNOWN AS
THE 20 PINE STREET CONDOMINIUM, 20 PINE
STREET, NEW YORK, NEW YORK 10005, UNIT 1816,
et al.,

                  Defendants in Rem.

------------------------------------------------------------------- x

13 Civ. 6326 (TPG)

**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA
IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT
AS TO SPECIFIED UNLAWFUL ACTIVITY**

PREET BHARARA
United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Paul M. Monteleoni
Margaret Graham
Jaimie L. Nawaday
Cristine I. Phillips
Assistant United States Attorneys
- Of Counsel -

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ....................................................................................... 3

      A.    The Russian Treasury Fraud Scheme .......................................... 3

      B.    HSBC Was Defrauded ............................................................... 5

ARGUMENT ........................................................................................................ 7

I.      LEGAL STANDARDS ............................................................................ 7

      A.    Summary Judgment and Rule 56(g) Findings .............................. 7

      B.    Money Laundering and Specified Unlawful Activity................................. 9

II.     THERE IS NO GENUINE DISPUTE THAT SPECIFIED UNLAWFUL
      ACTIVITY WAS COMMITTED........................................................ 10

      A.    There is No Dispute that the Sum of 5.4 Billion Rubles Was Paid by the
           Russian Treasury as a Result of Fraud....................................... 11

      B.    There is No Genuine Dispute that the Foreign Bank HSBC Was
           Defrauded................................................................................ 12

           1.    HSBC Suffered Harm As An Investor........................... 13

           2.    HSBC Also Suffered Harm As A Manager and Trustee .............. 14

      C.    These Matters Are Suited to Summary Judgment ...................... 15

III.    ALTERNATIVELY, THIS COURT SHOULD FOCUS TRIAL OF THIS
      MATTER BY RULING, PURSUANT TO RULE 56(g), THAT THE FACTS
      REGARDING THE RUSSIAN FRAUD HAVE BEEN ESTABLISHED ......... 17

      CONCLUSION ................................................................................. 18

The Government respectfully submits this Memorandum of Law in support of its motion for partial summary judgment on the legal element, common to all of the Government's Claims, that a specified unlawful activity was committed in Russia.[1]  For the reasons stated below, there is no genuine dispute as to the material facts supporting this element and the motion should be granted, to allow the issues to be tried to be narrowed to those truly and necessarily in dispute.

## PRELIMINARY STATEMENT

This is a case about whether Prevezon Holdings and associated defendant companies were involved in money laundering.  Many issues in this complex case are disputed.  What is not disputed is that a massive tax fraud was committed in Russia in 2007 (the "Russian Tax Fraud"), and that HSBC, a foreign bank, was defrauded by virtue of this scheme.  This fraud on a foreign bank is a "specified unlawful activity," a necessary element of the Government's money laundering allegations.  This Court should grant partial summary judgment on this narrow and undisputed background issue, so that trial of this matter can proceed swiftly and be focused where it belongs—on the actions of the defendants.

In the current complaint, the Government has alleged three alternate specified unlawful activities, all based on the Russian Tax Fraud: (1) that the Russian Tax Fraud constituted fraud on a foreign bank; (2) that the Russian Tax Fraud involved the theft of public funds by or for the benefit of a foreign official; and (3) that the proceeds of the Russian Tax Fraud constituted stolen property that was transported in interstate or foreign commerce.[2]

---

[1] The Government is submitting the motion papers, including a disk containing exhibits, to chambers and to defense counsel, and filing the papers electronically with redactions pursuant to the confidentiality order.  The Government proposes that, as with trial or hearing exhibits, the disk containing exhibits be retained by the parties to avoid docketing voluminous material.

[2] The Government has also alleged that earlier instances of money laundering serve as predicates

In this motion, the Government asks the Court to grant summary judgment on the first theory: that the Russian Tax Fraud constituted the specified unlawful activity of fraud on a foreign bank.  The documentary evidence, all investigative bodies to examine the matter, and the Russian criminal convictions of two of the fraudsters unanimously confirm that the Russian Tax Fraud occurred.  Further, there is incontrovertible evidence from HSBC, a foreign bank, that it suffered over $1.9 million in losses due to the Russian Tax Fraud.  Although this loss alone is sufficient for the Court to find a specified unlawful activity, HSBC also was harmed by the Russian Tax Fraud through its loss of control over the defrauded companies, which were assets of the Hermitage Fund for which HSBC acted as manager and trustee, as detailed below.

Accordingly, the Government respectfully requests that the Court grant summary judgment on this limited and incontrovertible point of whether a specified unlawful activity occurred.  This will allow the trial to focus on the core issues—not on the minute details of the Russian Tax Fraud, but on whether the the proceeds of such fraud were received by the defendants and laundered through their holdings.[3]  As the Court has noted at two prior conferences, it is appropriate to dispose of such issues in advance, so that the Court and the jury may focus on the issues that are truly in dispute.  *See* Tr., Aug. 13, 2015 ("[T]his is not a case in which the Russian government is a defendant . . . .  This case is about Prevezon, and it's not going to do the government any good, the Court any good, or Prevezon any good, unless the

_____

for later money laundering transactions.

[3] The Government is not seeking summary judgment on these two points, to wit, the tracing of the proceeds to Prevezon Holdings, and the circumstances that show the defendants' knowledge or willful blindness to the fact that these were proceeds of a specified unlawful activity.  Instead, the Government will offer proof on those two points at trial.

issues are reasonably defined and don't get into history, which is of interest, but not relevant to Prevezon."); Tr., Oct. 23, 2014 ("We're not going to have a trial about history. We're not going to have a trial about things that are well known as really recent history. That will all be disposed of, as any trial judge in this court would do. We don't sit around and try the discovery of America. We just don't do it.").

## STATEMENT OF FACTS

The Second Amended Complaint describes the Russian Tax Fraud in detail as an elaborate fraud scheme in which an organization including corrupt Russian government officials defrauded the Russian Treasury of approximately 5.4 billion rubles, or approximately $230 million. *See* Second Am. Compl. ¶¶ 22-54. While some details of this fraud may be disputed, the essential facts regarding this fraud scheme are not subject to any genuine dispute. The following recitation includes only those facts that are not subject to genuine dispute.

### A.     The Russian Treasury Fraud Scheme

In early 2007, the Hermitage Fund (the "Fund"), an investment fund focused on investments in Russia, owned three Russian companies: OOO Rilend, OOO Parfenion, and OOO Makhaon (the "Hermitage Companies"). Local Rule 56.1 Statement of Undisputed Facts ("56.1 Stmt.") ¶¶ 1-7. The Hermitage Companies were held in trust for the Hermitage Fund through two Cyprus-based companies. 56.1 Stmt. ¶ 7. Two HSBC entities served as trustee and manager to the Hermitage Fund. 56.1 Stmt. ¶¶ 2-3.

In the second half of 2007, the Hermitage Companies were officially transferred into the control of a company known as OOO Pluton ("Pluton"), directed by the fraudster Viktor Markelov. 56.1 Stmt. ¶ 9-10. In September 2007, the fraudsters named three individuals as the directors of the Hermitage Companies: Markelov, Viacheslav Khlebnikov, and Valery

3

Kurochkin.  56.1 Stmt. ¶ 10.

The fraudsters then carried out the Russian Tax Fraud using the Hermitage Companies as their vehicles.  The Hermitage Companies had paid approximately 5.4 billion rubles in taxes to the Russian government in 2006, before the fraudsters took them over.  56.1 Stmt. ¶ 8.  In late 2007, after the takeover, the fraudsters generated false and backdated contracts[4] in which the Hermitage Companies purportedly promised large amounts of stock to sham counterparties.  56.1 Stmt. ¶¶ 11-12.   These false contracts generated fraudulent liabilities for the Hermitage Companies.  The fraudsters then submitted amended 2006 tax returns to the Russian government, claiming that because these new fraudulent liabilities cancelled out the profits that the Hermitage Companies had earned in 2006, the Hermitage Companies had therefore overpaid their taxes in 2006, and were now entitled to a tax refund of 5.4 billion rubles.  56.1 Stmt. ¶ 13.

On December 21 and 24, 2007, the fraudsters submitted these fraudulent requests for tax refunds to two Moscow tax offices, Nos. 25 and 28, requesting tax refunds totaling approximately 5.4 billion rubles.  56.1 Stmt. ¶ 18.  On December 24, 2007, the directors of Moscow Tax Offices 25 and 28, Yelena Khimina and Olga Stepanova, approved the tax refunds. 56.1 Stmt. ¶¶ 19-20.  The approximately 5.4 billion rubles were paid by the Russian Treasury on December 26, 2007, to bank accounts set up by the fraudsters in the names of the Hermitage Companies at two Russian banks.  56.1 Stmt. ¶¶ 15-17, 21.  These accounts had been opened just weeks before the refunds were processed.  56.1 Stmt. ¶¶ 15-17.

---

[4] These contracts have several telltale features showing they are forged and backdated, such as one contract's reference to a bank account that had not been opened at the time the contract was purportedly signed, and several contracts purportedly signed by a director more than a year before his appointment.  *See, e.g.*, 56.1 Stmt. ¶ 12.

4

Numerous investigations and judicial proceedings have unanimously concluded that these tax refunds were obtained by fraud. Investigating Russian law enforcement officers concluded these refunds were fraudulent. 56.1 Stmt. ¶ 23. The Russian Government criminally prosecuted Markelov and Khlebnikov, two of the fraudulent directors, for the fraud, to which they pleaded guilty.[5] 56.1 Stmt. ¶ 24. The Parliamentary Assembly of the Council of Europe, an intergovernmental organization established by treaty with duties including the investigation of human rights incidents, issued an investigative report after an official investigation, concluding that these refunds were paid as the result of fraud. 56.1 Stmt. ¶ 26. A Russian human rights commission appointed by Russian President Dimitri Medvedev also issued an investigative report concluding that these tax refunds were paid as the result of a fraud on the Russian Treasury. 56.1 Stmt. ¶ 25. No investigative body to examine the matter has ever concluded that the tax refunds were legitimately paid on the basis of real liabilities. To the contrary, all investigators unanimously agree that the 5.4 billion rubles were paid based on fraudulent tax refund applications that rested on forged contracts that established false liabilities, and that conclusion has been confirmed by the admissions of the two directors who pled guilty to fraud.

**B.     HSBC Was Defrauded**

The Russian Tax Fraud operated as a fraud on HSBC, a foreign bank, in several ways. First, the Russian Tax Fraud deprived HSBC Private Bank (Guernsey) Ltd. (the Hermitage Fund's trustee) ("HSBC Guernsey") and HSBC Management (Guernsey) Ltd. (the Fund's manager) ("HSBC Management") of control over the Hermitage Companies. As manager and trustee, these HSBC entities were responsible for safeguarding the Hermitage Companies' assets

---

[5] Kurochkin, the third fraudulent director, died in 2008.

5

and preventing fraud and other irregularities, among other things.  56.1 Stmt. ¶¶ 4-5.  The fraudsters' actions in forging huge liabilities on behalf of the Hermitage Companies thus interfered with HSBC Guernsey and HSBC Management in their discharge of their duties.

Second, the Russian Tax Fraud caused direct out-of-pocket loss to another HSBC entity, HSBC Private Bank (Suisse) S.A. ("HSBC Suisse"), which was a proprietary investor in the Hermitage Fund.  Starting in 2007, the Hermitage Fund set aside fund assets, ultimately totaling over $10 million, for legal fees to regain legal ownership and directorship of the Hermitage Companies.  56.1 Stmt. ¶ 28.

Using this money, the Hermitage Fund took legal action to attempt to undo the actions of the fraudsters.  In December 2007, HSBC representatives and their counsel filed complaints with Russian authorities, claiming that the transfer of the Hermitage Companies to the fraudsters was unauthorized.  56.1 Stmt. ¶ 14.  In early 2008, HSBC-authorized lawyers appeared in Russian court proceedings to argue against the fraudulent liabilities imposed on the Hermitage Companies. 56.1 Stmt. ¶ 22.  These court proceedings were opposed by the fraudsters, who attempted to bar the HSBC-authorized lawyers from the case.  56.1 Stmt. ¶ 22.

The millions of dollars that the Hermitage Fund had to set aside for legal fees decreased the net asset value of the Hermitage Fund.  This decrease in the net asset value of the Fund meant a decrease in the value of shares held by investors in the Fund, including HSBC Suisse.  56.1 Stmt. ¶¶ 29, 31.  HSBC Suisse subsequently engaged in a series of redemptions of its shares in the Fund, in which its recovery was depleted by the provision for legal fees.  As relevant here, HSBC Suisse engaged in five redemptions in 2008, after HSBC had begun filing complaints seeking to regain control of the Hermitage Companies.  56.1 Stmt. ¶¶ 14, 30.  In each of these

redemptions, the net asset value of the Fund was lowered by the set-aside for legal fees associated with the efforts to regain control of the Hermitage Companies.  56.1 Stmt. ¶ 31.  As a result, HSBC Suisse suffered a loss of over $1.9 million compared to what it would have recovered had legal fees not been set aside to regain control of the Hermitage Companies.  56.1 Stmt. ¶¶ 31-32.

## ARGUMENT

## I.    LEGAL STANDARDS

### A.    Summary Judgment and Rule 56(g) Findings

Pursuant to Federal Rule of Civil Procedure 56(a), "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."  Fed. R. Civ. P. 56(a).  Under the rule, a court will grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986); *Anderson* v. *Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986); *Berger* v. *United States*, 87 F.3d 60, 65 (2d. Cir. 1996).  "A fact is material . . . when it might affect the outcome of the suit under the governing law.  An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (internal citation and quotation marks omitted).  In determining whether summary judgment is appropriate, the Court must draw all inferences in favor of the nonmoving party.  *See United States* v. *Collado*, 348 F.3d 323, 327 (2d Cir. 2003).  The moving party meets its burden "by showing that little or no evidence may be found in support of the non-moving party's case." *Gallo* v. *Prudential Residential Servs.,* 22 F.3d 1219, 1223-24 (2d Cir. 1994).

Once the moving party has provided sufficient evidence to support a motion for summary judgment, "the opposing party must proffer admissible evidence that 'set[s] forth specific facts' showing a genuinely disputed factual issue that is material under the applicable legal principles." *Major League Baseball Props., Inc.* v. *Salvino, Inc.,* 542 F.3d 290, 310 (2d Cir. 2008) (quoting Fed. R. Civ. P. 56(e)); *see also Golden Pac. Bancorp.* v. *FDIC*, 375 F.3d 196, 200 (2d Cir. 2004). The nonmoving party may not rely on conclusory allegations or speculation and must show that "its version of the events is not wholly fanciful." *Jeffreys*, 426 F.3d at 554 (internal quotation marks omitted). Evidence presented by the non-moving party that is so "blatantly contradicted by the record . . . that no reasonable jury could believe it" should not be accepted by the court for purposes of defeating a motion for summary judgment. *Scott* v. *Harris*, 550 U.S. 372, 380 (2007); *Zellner* v. *Summerlin*, 494 F.3d 344, 371 (2d Cir. 2007) ("Incontrovertible evidence relied on by the moving party . . . should be credited by the court on [a summary judgment] motion if it so utterly discredits the opposing party's version that no reasonable juror could fail to believe the version advanced by the moving party.").

"[T]he mere possibility that a factual dispute may exist, without more, is not sufficient to overcome a convincing presentation by the moving party." *Quinn* v. *Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980); *see also Wyler* v. *United States*, 725 F.2d 156, 160 (2d Cir. 1983) (conclusory and speculative responses cannot defeat adequately-pled motion for summary judgment). Such a dispute is not "genuine," and the party opposing summary judgment must show that there is more than a "metaphysical doubt." *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial." *Id.* at 587; *see also SEC*

8

v. *Research Automation Corp.*, 585 F.2d 31, 34-35 (2d Cir. 1978) (granting summary judgment to SEC as plaintiff where documentary evidence made clear that fraud was committed).

In addition to granting summary judgment on any "part" of a claim or defense, Fed. R. Civ. P. 56(a), the Court can determine that specific material facts are established.   "[U]nder Federal Rule of Civil Procedure 56(g), a court can determine that certain facts are established and forbid parties from contesting those facts at trial." *UMG Recordings, Inc.* v. *Escape Media Group, Inc.*, No. 11 Civ. 8407 (TPG), 2015 WL 1873098, at *3 (S.D.N.Y. Apr. 23, 2015). Courts often grant Rule 56(g) motions in order to focus the issues for trial on those genuinely in dispute.  *See, e.g.*, *Balestriere PLLC* v. *CMA Trading, Inc.*, No. 11 Civ. 9459 (MHD), 2014 WL 929813, at *27 (S.D.N.Y. Mar. 6, 2014) (making Rule 56(g) findings); *Icebox-Scoops, Inc.* v. *Finanz St. Honore, B.V.*, No. 07 Civ. 544 (NG) (SMG), 2014 WL 66661, at *1 (E.D.N.Y. Jan. 8, 2014) (same); *New Generation Produce Corp.* v. *N.Y. Supermarket, Inc.*, No. 09 Civ. 5536 (ENV) (VMS), 2013 WL 2382970, at *5 (E.D.N.Y. May 30, 2013) (same).  Indeed, courts may entertain motions specifically aimed at declaring the issues remaining for determination at trial under Rule 56(g).  *See L.W. Matteson, Inc.* v. *Sevenson Envt'l Servs., Inc.*, No. 10 Civ. 168 (Sr), 2013 WL 2286217, at *2 (W.D.N.Y. May 23, 2013) (granting Rule 56(g) motion in part).

### B.    Money Laundering and Specified Unlawful Activity

The Government's forfeiture claim (Count One of the Second Amended Complaint) and civil money laundering penalty claims (Counts Two through Seven of the Second Amended Complaint) each require proof of money laundering under 18 U.S.C. § 1956 or 18 U.S.C. § 1957. The existence of specified unlawful activity is an element of money laundering under each section.  *See* 18 U.S.C. § 1956(a)(1) (requiring that transaction "in fact involves the proceeds of

specified unlawful activity"); 18 U.S.C. § 1957(a) (requiring that property in transaction "is derived from specified unlawful activity").

Specified unlawful activity is defined by statute to include several different predicate offenses, including, as relevant here, fraud against a foreign bank. The statute enumerates as a predicate:

> [A]n offense against a foreign nation involving . . . (iii) fraud, or any scheme or attempt to defraud . . . against a foreign bank (as defined in paragraph 7 of section 1(b) of the International Banking Act of 1978).

18 U.S.C. § 1956(c)(7)(B); *see also* D.I. 310 at 23 ("Additionally, the court would also sustain the claims at this stage based on the SUA of 'an offense against a foreign nation involving . . . fraud, or any scheme or attempt to defraud, by or against a foreign bank[.]'").[6]

## II.   THERE IS NO GENUINE DISPUTE THAT SPECIFIED UNLAWFUL ACTIVITY WAS COMMITTED

There is no genuine dispute that the Russian Tax Fraud occurred, and that the foreign bank HSBC was defrauded. This is sufficient to establish the existence of a specified unlawful activity, a necessary element of the Government's case. A ruling granting partial summary judgment on that limited issue will allow the parties, the Court, and the jury to focus on the issues genuinely in dispute: the tracing of the fraud proceeds and the defendants' knowledge of or willful blindness to the receipt of crime proceeds.

If summary judgment is not granted as to this specified unlawful activity, the Government will proceed to trial on its three alternate theories of specified unlawful activities alleged in the current complaint. This will necessitate time-consuming litigation on the precise

---

[6] Citations to "D.I. __" refer to docket items in the above-captioned case.

details of the Russian Tax Fraud, which can be largely or wholly avoided by the Court timely

deciding the Government's summary judgment motion and helpfully narrowing the issues at trial

to those genuinely in dispute.

> **A.     There is No Dispute that the Sum of 5.4 Billion Rubles Was Paid by the Russian Treasury as a Result of Fraud**

It is a matter of public record that on December 26, 2007, approximately 5.4 billion

rubles was paid by the Russian Treasury into bank accounts in the names of Rilend, Parfenion

and Makhaon, the Hermitage Companies.  56.1 Stmt. ¶ 21.  It is also a matter of public record,

and beyond any genuine dispute, that these payments were made as a result of the Russian Tax

Fraud.  56.1 Stmt. ¶ 21.  The proof of the Russian Tax Fraud, as detailed above, includes: (1) the

conclusions of a Russian human rights commission, appointed by Russian President Medvedev

to investigate the fraud; (2) the conclusions of the Council of Europe, an intergovernmental

body, after a lengthy investigation; (3) the documentary evidence showing that the contracts

forming the liabilities were backdated; and (4) the convictions of two fraudsters, who admitted to

their participation in the fraud.  56.1 Stmt. ¶ 21.

The findings of fact of the two publicly-appointed investigative bodies that have

investigated the Russian Tax Fraud are admissible evidence in this civil action.  *See* Fed. R.

Evid. 803(8)(A)(iii); *see also In re Korean Air Lines Disaster of Sept. 1, 1983*, 932 F.2d 1475,

1481-82 (D.C. Cir. 1991) (affirming admission of investigative report of International Civil

Aviation Organization).   The Russian judgments of conviction of the fraudsters, where not

contradicted by other evidence, are prima facie evidence of the supporting facts.  *See Donnelly* v.

*FAA*, 411 F.3d 267, 270-71 (D.C. Cir. 2005) (upholding recognition of foreign judgment as

prima facie evidence subject to rebuttal); *United States* v. *Federative Republic of Brazil*, 748

F.3d 86, 94 (2d Cir. 2014) (citing *id.*); *A.I. Trade Finance Inc.* v. *Centro Internationale Handelsbank A.G.*, 926 F. Supp. 378, 387-88 (S.D.N.Y. 1996) (taking judicial notice of foreign court decisions as prima facie evidence for facts contained therein, subject to rebuttal).[7]  More fundamentally, the defendants do not dispute these convictions, actually relying on them in papers filed in this Court.  *See* D.I. 320 at 15.  There is thus no dispute that the Russian Tax Fraud occurred.

> **B.      There is No Genuine Dispute that the Foreign Bank HSBC Was Defrauded**

Further, there is no real dispute that the Russian Tax Fraud harmed HSBC, a foreign bank,[8] in two ways.  First, the Russian Tax Fraud harmed the investors of the Hermitage Fund, including HSBC, by decreasing the value of the Fund due to the set-aside of funds for legal fees necessitated by the fraud.  Second, the role of HSBC entities as manager and trustee gave them responsibilities that were thwarted when the fraudsters deprived them of control over the assets of the Fund.  As noted in Section I.B, above, fraud against a foreign bank is a money laundering predicate.  This provision is satisfied here, where the fraud scheme caused at least two forms of

---

[7] There are disputes regarding some details of the convictions, which would likely be relevant to other specified unlawful activities that would have to be proved at trial absent the partial summary judgment ruling sought here, but all of the facts relevant to this motion and relied on herein are accurate, admissible, and undisputed.

[8] The HSBC entities at issue here unquestionably qualify as foreign banks under the statute, which defines a "foreign bank" as "any company organized under the laws of a foreign country, a territory of the United States, Puerto Rico, Guam, American Samoa, or the Virgin Islands, which engages in the business of banking, or any subsidiary or affiliate, organized under such laws, of any such company."  Int'l Banking Act of 1978, Pub. L. No. 95-369, 92 Stat. 607, *codified at* 12 U.S.C. § 3101(7).  The entities are members of the HSBC group of companies and ultimately owned by HSBC Holdings PLC, a United Kingdom company, easily qualifying as a foreign bank under the statute.  56.1 Stmt. ¶ 6.

harm to the foreign bank HSBC, both of which are undisputed on the present record.[9]

1.    HSBC Suffered Harm As An Investor

HSBC Suisse, an HSBC entity and an investor in the Hermitage Fund, suffered harm from the Russian Tax Fraud as a Hermitage Fund investor.  This is because the Russian Tax Fraud lowered the value of the Fund by, among other things, requiring the Fund to pay legal fees to attempt to undo the fraud.  The resulting diminution of the value of Fund shares harmed investors who redeemed their shares following the fraud.  In 2008, HSBC Suisse was harmed when it redeemed Fund shares that were worth approximately $1.9 million less than they would have been, had the Fund not been forced to pay legal fees to attempt to undo the fraud.

The evidence of all of these facts is admissible and indeed incontrovertible.  The contemporaneous business records of HSBC and the declaration of an HSBC Suisse witness show the provision of the Fund for legal fees and its impact on HSBC's redemptions, 56.1 Stmt. ¶¶ 27-32, and the fact of HSBC's participation in the various proceedings, and the filings against them, are subject to judicial notice.  56.1 Stmt. ¶¶ 14, 22; *see also LaFleur* v. *Whitman*, 300 F.3d 256, 267 n.1 (2d Cir. 2002) ("'A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.'" (quoting *Liberty Mut. Ins. Co.* v. *Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir. 1992))).

Further, legal expenses of this sort are plainly recognized in law as cognizable harm from an offense.  *See* 18 U.S.C. § 3663A(b)(4) (requiring restitution, in any case arising under United

---

[9] Indeed, the harm described herein is simply a subset of the true extent of harm suffered by HSBC as a result of the fraud scheme.

13

States law, of "expenses incurred during participation in the investigation or prosecution of the offense"); *United States* v. *Amato*, 540 F.3d 153, 162 (2d Cir. 2008) (affirming restitution of attorneys fees spent by corporation in remediating a fraud against corporation and third parties, including fees incurred prior to government investigation); *United States* v. *Maynard*, 743 F.3d 374, 381 (2d Cir. 2014) (noting propriety of investigation expenses where the victim entity "had interests to protect (the integrity of its ongoing operations and reputation, at the least) as well as a duty to protect those interests"); *cf.* U.S. Dep't of Justice, Attorney General Guidelines for Victim & Witness Assistance at 10-11, available at http://www.justice.gov/sites/default/files/olp/docs/ag_guidelines2012.pdf (indicating that, in identity theft cases involving individuals, use of personal identification information in commission of crime can cause pecuniary harms including "out-of-pocket losses as well as time reasonably spent in an attempt to remediate actual or intended harm").

Indeed, the defendants themselves have recognized in their court filings that the Hermitage Fund was defrauded in this offense.  *See* D.I. 239 at 8-9 ("The entity defrauded appears to be a trust that held two unnamed shareholding vehicles which, in turn, owned Parfenion, Makh[ao]n and Rilend."); *see also* D.I. 310 at 23.  Just so—the Hermitage Fund was defrauded, including its investors, which include the foreign bank HSBC Suisse.

### 2.    HSBC Also Suffered Harm As A Manager and Trustee

Moreover, HSBC Guernsey and HSBC Management were each deprived of their right to control the economic activity of the Hermitage Companies, as assets of the Hermitage Fund, which was under their trusteeship and management.  As this loss of control impaired the HSBC entities' ability to fulfill their duties, which included safeguarding the Fund's assets, 56.1 Stmt. ¶ 5, and preventing fraud and other irregularities, 56.1 Stmt. ¶¶ 4-5, it also constituted cognizable

14

fraud against these HSBC entities.  *See United States* v. *Binday*, --- F.3d ----, 2015 WL 6444932, at *6 (2d Cir. Oct. 26, 2015) (noting that the deprivation of the right to control assets through deceit as to economic matters constitutes fraud); *Maynard*, 743 F.3d at 381 (noting harm where victim has "interests to protect (the integrity of its ongoing operations and reputation, at the least) as well as a duty to protect those interests").  Under well-established Second Circuit precedent, this is true even independent of whether any out-of-pocket loss resulted.  *See Binday*, 2015 WL 6444932, at *11 (citing *United States* v. *Chandler*, 98 F.3d 711, 716 (2d Cir. 1996), and *United States* v. *Ferguson*, 676 F.3d 260, 280 (2d Cir. 2011)).

### C.      These Matters Are Suited to Summary Judgment

These matters are readily amenable to summary judgment.  They involve no credibility assessment or disputed mental states, simply the unambiguous terms of business records.  Specifically, the Russian Tax Fraud has been recognized in the reports generated by multiple investigative and fact-finding bodies, both in and out of Russia.  Additionally, two of the fraudsters pleaded guilty to the fraud as reflected in Russian court records.  These records are all admissible and appropriately considered by the Court, for the reasons set forth in Section II.A., *supra.*

The contemporaneous business records evidencing the calculations of HSBC Suisse's loss as an investor are also clear.  *See, e.g., Rosenthal* v. *N.Y. Water Serv. Corp.*, No. 82 Civ. 1778 (RO), 1984 WL 1014, at *1 (S.D.N.Y. Oct. 12, 1984) ("Summary judgment is appropriate for consideration here where the controversy turns on the interpretation of unambiguous documents." (citing *Tokio Marine & Fire Ins. Co.* v. *McDonnell Douglas Corp.*, 617 F.2d 936, 940 (2d Cir. 1980))); *see also MSF Holding Ltd.* v. *Fiduciary Trust Int'l*, 435 F. Supp. 2d 285, 293 (S.D.N.Y. 2006) ("[A]ctions concerning letters of credit are well suited to determination by

15

motion for summary judgment because they normally present solely legal issues relating to an exchange of documents." (internal quotation marks omitted)).

Similarly, the duties and responsibilities of HSBC Guernsey and HSBC Management are set forth unambiguously in the Hermitage Fund's financial statements. *See* 56.1 Stmt. ¶¶ 4-5. The question whether the deprivation of these entities' control over the assets in their charge amounts to harm is thus a pure (and straightforward, under this Circuit's precedents) question of law. *See, e.g.*, *Rosenthal*, 1984 WL 1014, at *1; *Smith* v. *Nat'l Sav. & Trust Co.*, 245 F. Supp. 532, 534 (D.D.C. 1965) (granting summary judgment where terms of trust document were clear as to purpose); *cf. Arcadian Phosphates, Inc.* v. *Arcadian Corp.*, 884 F.2d 69, 73 (2d Cir. 1989) ("Where a question of intention is determinable by written agreements, the question is one of the law, appropriately decided . . . on a motion for summary judgment." (internal quotation marks omitted)).  Here, either the out-of-pocket loss to HSBC Suisse as investor or the deprivation of HSBC Management and HSBC Guernsey's right to control the companies as manager and trustee—neither of which is subject to any real factual dispute—amply amounts to harm to these HSBC entities, each of which qualifies as a foreign bank under the statute.

Therefore, the Russian Tax Fraud constitutes a fraud on the foreign bank HSBC, by virtue of its proprietary interest as an investor in the Hermitage Fund and, independently, by the deprivation of the right to control its economic activity as manager and trustee.  Accordingly, the Court should rule, in the form of the proposed order submitted herewith as Exhibit A to the notice of motion, that the Russian Tax Fraud amounted to a specified unlawful activity.  Doing so will drastically simplify the trial, and place its focus where it belongs—on the defendants' receipt of proceeds of the crime and the laundering of those proceeds.

### III.  ALTERNATIVELY, THIS COURT SHOULD FOCUS TRIAL OF THIS MATTER BY RULING, PURSUANT TO RULE 56(g), THAT THE FACTS REGARDING THE RUSSIAN FRAUD HAVE BEEN ESTABLISHED

Even if the Court does not grant partial summary judgment on the existence of a specified unlawful activity, it should still find, pursuant to Rule 56(g), that the relevant underlying facts have been established.  Doing so will simplify trial of this action considerably.  If the Court does not rule now that the Russian Tax Fraud was a specified unlawful activity that constituted fraud upon a foreign bank, the Government will have to proceed on all of the available specified unlawful activity theories, including those that require analysis of disputed details about the Russian Tax Fraud.  *See* D.I. 310 at 22-23 & n.7.  But a determination by the Court that the underlying facts have been established still will contribute greatly to the efficiency of trial by streamlining the parties' presentation of evidence.  For example, a determination by the Court that the tax proceeds at issue were refunded based upon a fraudulent tax refund application, as opposed to being a refund of legitimately overpaid taxes, will prevent the parties from having to present evidence on this foundational and undisputed fact.

As set forth above and in the Government's Rule 56.1 Statement, a large number of facts concerning the underlying fraud are not in dispute.  It is therefore entirely appropriate, and will maximize efficiency at trial, for the Court to determine, pursuant to Rule 56(g), that those facts have been established.  *See, e.g.*, *Balestriere PLLC*, 2014 WL 929813, at *27; *Icebox-Scoops, Inc.*, 2014 WL 66661, at *1; *New Generation Produce Corp.*, 2013 WL 2382970, at *5.

17

## <u>CONCLUSION</u>

For the foregoing reasons, the Government respectfully requests that the Court grant partial summary judgment to the United States as to the existence of specified unlawful activity, in the form of the proposed order submitted herewith as Exhibit A to the notice of motion, or in the alternative that the Court rule, pursuant to Rule 56(g), that certain essential facts regarding the fraud have been established, in the form of the proposed order submitted herewith as Exhibit B to the notice of motion.

Dated: New York, New York
      November 3, 2015

                         Respectfully submitted,

                         PREET BHARARA
                         United States Attorney
                         for the Southern District of New York

By:    <u>/s/ Paul M. Monteleoni</u>
                         Paul M. Monteleoni
                         Margaret Graham
                         Jaimie L. Nawaday
                         Cristine I. Phillips
                         Assistant United States Attorneys
                         Tel.:  (212) 637-2219/2923/2275/2696
                         E-mail: paul.monteleoni@usdoj.gov
                                  margaret.graham@usdoj.gov
                                  jaimie.nawaday@usdoj.gov
                                  cristine.phillips@usdoj.gov