UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

               Plaintiff,

    v.

PREVEZON HOLDINGS LTD., *et al.*,

               Defendants,

ALL RIGHT, TITLE AND INTEREST IN THE
REAL PROPERTY AND APPURTENANCES
KNOWN AS THE 20 PINE STREET
CONDOMINIUM, 20 PINE STREET, NEW
YORK, NEW YORK 10005, UNIT 1816, *et al.*,

               Defendants *in Rem*.

Case No. 1:13-cv-06326 (TPG)

ECF CASE

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO THE GOVERNMENT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO SPECIFIED UNLAWFUL ACTIVITY

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
jmoscow@bakerlaw.com
John W. Moscow
Loura L. Alaverdi

BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Ave.,
Washington, D.C. 20036
Telephone: (202) 861-1677
Facsimile: (202) 861-1783
mcymrot@bakerlaw.com
Mark A. Cymrot

BAKER BOTTS LLP
30 Rockefeller Plaza
New York, NY 10112
Telephone: (212) 408-2500
Facsimile: (212) 408-2501
seth.taube@bakerbotts.com
Seth T. Taube
Richard B. Harper

*Attorneys for Defendants*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS ....................................................................................4

    I.     Discovery has Discredited the Government's False Narrative ...............................5

          A.     The Hermitage Companies Were Never Stolen.........................................5

          B.     Hermitage and Browder Knew of the "Sham Lawsuits" Before the Refund Requests were Filed ........................................................6

          C.     The Refund Applications Were Made Based Upon the Judgments from the Sham Lawsuits…………………………………………………………..8

          D.     The Search of Hermitage's Offices was Justified by Browder's Tax Fraud ............................................................8

          E.     Hermitage Refused to Accept Return of its Corporate Seals....................10

          F.     The Hermitage Fund Lost No Value........................................................10

          G.     The Explanation for the Legal Reserve Exposes More Hermitage Lies....11

ARGUMENT ....................................................................................12

    I.     THE GOVERNMENT HAS THE BURDEN TO DEMONSTRATE THAT ITS ALLEGATIONS ARE NOT DISPUTED, INCOMPLETE AND LEGALLY INSUFFICIENT ....................................................................12

    II.     THE GOVERNMENT IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE DISPUTED FACTUAL RECORD ........................................13

          A.     The Rule 56.1 Statement is Disputed, Incomplete in Material Ways and Prejudicial ............................................................13

          B.     The Government's Case Is Dependent on Inadmissible Evidence ...........18

          C.     The Government Has Disputed The Validity of the Two Convictions that Form the Backbone of Its Summary Judgment Motion.....................23

    III.    THE GOVERNMENT DOES NOT ESTABLISH THE SPECIFIED UNLAWFUL ACTIVITY OF FRAUD AGAINST A FOREIGN BANK ..........25

          A.     The Alleged "Harm" To HSBC Suisse Does Not Constitute Fraud Against a Foreign Bank ............................................................26

          B.     HSBC Guernsey and HSBC Management Were Not Defrauded .............29

**TABLE OF CONTENTS**
**(continued)**

Page

C.    The Government Has Not Identified the Proceeds from the Bank
      Fraud that Were Laundered ..................................................................32

D.    The Government Has Not Shown an Applicable Violation of Russian
      Law ......................................................................................................33

IV.   THE SUMMARY JUDGMENT MOTION SHOULD BE DENIED
      BECAUSE IT RELIES ON UNPLED FACTUAL ALLEGATIONS AND
      THEORIES OF LIABILITY ................................................................34

CONCLUSION ...............................................................................................................36

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ames v. Stevens,*
  No. 9:12-CV-01487 MAD, 2015 WL 5513021 (N.D.N.Y. Sept. 17, 2015) ..........................22

*Berman v. Royal Knitting Mills,*
  86 F.R.D. 124 (S.D.N.Y. 1980) ...............................................................................12

*Bertuglia v. City of New York,*
  839 F. Supp. 2d 703 (S.D.N.Y. 2012) .......................................................................34

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986).............................................................................................11

*Chappell & Co. v. Frankel,*
  367 F.2d 197 (2d Cir. 1966)..................................................................................12

*Chem. Bank v. Hartford Acc. & Indem. Co.,*
  82 F.R.D. 376 (S.D.N.Y.1979) ..............................................................................19

*City of New York v. Pullman Inc.,*
  662 F.2d 910 (2d Cir. 1981)..................................................................................22

*Debussy LLC v. Deutsche Bank AG,*
  05 Civ. 5550 (SHS), 2006 WL 800956 (S.D.N.Y. Mar. 29, 2006), *aff'd* 242
  Fed. Appx. 735 (2d Cir. 2007)...............................................................................28

*Faulkner v. Arista Records LLC,*
  797 F. Supp. 2d 299 (S.D.N.Y. 2011) ......................................................................20

*First Nat'l Bank of Ariz. v. Cities Serv. Co.,*
  391 U.S. 253 (1968).........................................................................................11, 27

*Goenaga v. Mar. of Dimes Birth Defects Found.,*
  51 F.3d 14 (2d Cir. 1995) .....................................................................................24

*Gummo v. Village of Depew,*
  75 F.3d 98 (2d Cir. 1996) .....................................................................................12

*Hardt v. Reliance Standard Life Ins. Co.,*
  560 U.S. 242 (2010)............................................................................................27

*Holmes v. Securities Investor Protection Corp.,*
  112 S. Ct. 1311 (1992).........................................................................................28

*Holtz v. Rockefeller & Co., Inc.,*
  258 F.3d 62 (2d Cir. 2001)....................................................................................25

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Hunt v. Cromartie,*
   526 U.S. 541 (1999)...........................................................................................11

*Jones v. Niagara Frontier Trans. Auth.,*
   836 F.2d 731 (2d Cir. 1987)...............................................................................28

*Katara v. D.E. Jones Commodities,*
   835 F.2d 966 (2d Cir. 1987)...............................................................................31

*Knight v. U.S. Fire Ins. Co.,*
   804 F.2d 9 (2d Cir. 1986) ..................................................................................12

*Latsis v. Chandris Inc.,*
   No. 91 Civ. 6900 (LAP), 1998 WL 458095 (S.D.N.Y. Aug. 4, 1998)..................12

*Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.,*
   969 F.2d 1384 (2d Cir. 1992).............................................................................23

*In Re Local #46 Metallic Lathers Union,*
   568 F.3d 81 (2d Cir. 2009).................................................................................28

*Montone v. City of Jersey City,*
   709 F.3d 181 (3d Cir. 2013)...............................................................................24

*Morrison v. National Australia Bank, Ltd.,*
   561 U.S. 247 (2010)...........................................................................................34

*Muller-Paisner v. TIAA,*
   528 F. App'x 37 (2d Cir. 2013)...........................................................................24

*Navajo Nation v. United States Forest Serv.,*
   535 F.3d 1058 (9th Cir. 2008) ...........................................................................35

*Raskin v. Wyatt Co.,*
   125 F.3d 55 (2d Cir. 1997).................................................................................20

*Real Property Known as Unit 5B of Onyx Chelsea Condo,*
   2012 WL 1883371 (S.D.N.Y. May 21, 2012) ......................................................32

*Robins v. Whelan,*
   653 F.2d 47 (1st Cir. 1981).................................................................................21

*Sartor v. Ark. Nat'l Gas Corp.,*
   321 U.S. 620 (1944)...........................................................................................19

*Southwick Clothing LLC v. GFT (USA) Corp.,*
   No. 99 CV 10452 (GBD), 2004 WL 2914093 (S.D.N.Y. Dec. 15, 2004)..............35

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Sterling Nat. Bank & Trust Co. of New York v. Federated Dep't Stores, Inc.*,
  612 F. Supp. 144 (S.D.N.Y. 1985)........................................................................19

*Thibodeaux-Woody v. Houston Cmty. Coll.*,
  593 F. App'x 280 (5th Cir. 2014)........................................................................24

*Toole v. McClintock*,
  999 F.2d 1430 (11th Cir. 1993) ..........................................................................22

*TypeRight Keyboard Corp. v. Microsoft Corp.*,
  374 F.3d 1151 (Fed. Cir. 2004)...........................................................................19

*United States v. Amato*,
  540 F.3d 153 (2d Cir. 2008).................................................................................29

*United States v. Awad*,
  No. 06 CR. 600 (DLC), 2007 WL 1988382 (S.D.N.Y. July 3, 2007) ..................20

*United States v. Awan*,
  459 F. Supp. 2d 167 (E.D.N.Y. 2006) .................................................................33

*United States v. Bindlay*,
  --- F.3d ---, 2015 WL 6444932 (2d Cir. Oct 26, 2015).......................................31

*United States v. Gotti*,
  459 F.3d 296 (2d. Cir. 2006)................................................................................32

*United States v. Grundhoefer*,
  916 F.2d 788 (2d Cir. 1990).................................................................................28

*United States v. Laljie*,
  184 F.3d 180 (2d Cir. 1999).................................................................................27

*United States v. Loughrin*,
  134 S. Ct. 2384 (2014).........................................................................................27

*United States v. Mackey*,
  117 F.3d 24 (1st Cir. 1997)..................................................................................20

*United States v. Maynard*,
  743 F.3d 374 (2d Cir. 2014)...........................................................................29, 31

*United States v. One 1997 E35 Ford Van*,
  50 F. Supp. 2d 789 (N.D. Ill. 1999).....................................................................33

*United States v. One Gulfstream G-V Jet Aircraft*,
  941 F. Supp. 2d 1 (D. D.C. 2013)........................................................................33

**TABLE OF AUTHORITIES**
(continued)

**Page**

*United States v. Xu,*
  No. 2:02-CR-00674-PMP-LRL, 2008 WL 1315632 (D. Nev. Apr. 10, 2008)......................32

*Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,*
  373 F.3d 241 (2d. Cir. 2004)..............................................................................................12

**Statutes**

12 U.S.C. § 1841 .................................................................................................................17

18 U.S.C. § 1344 .................................................................................................................27

18 U.S.C. § 1956 ............................................................................................................. passim

18 U.S.C. § 3663A(a)(2) .....................................................................................................28

International Banking Act of 1978 ......................................................................................17

**Rules**

Fed. R. Civ. P. 44.1 .............................................................................................................33

Fed. R. Civ. P. 56(a) .....................................................................................................11, 12

Fed. R. Civ. P. 56(d) .......................................................................................................3, 35

Fed. R. Evid. 803 ...............................................................................................20, 21, 22, 23

Fed. R. Evid. 803(8) ............................................................................................................22

Local Rule 56.1 .............................................................................................................. *passim*

Rule 30(b)(6)........................................................................................................................23

## PRELIMINARY STATEMENT

The version of the fraud on the Russian Treasury (the "Treasury Fraud") told in the first, second and third complaints has been exposed by discovery to be false.  It was contrived and skillfully sold by William F. Browder to politicians here and abroad to thwart his arrest for a tax fraud conviction in Russia.  This public relations narrative was swallowed whole by the Government, which incorporated it into its complaint without investigation, a situation this Court has described as "troubling."  When placed under oath, however, Browder's own witnesses revealed that he authorized the supposedly unauthorized acts alleged in the three complaints and knew about the events that the complaints allege he was unaware of.  From this discovery, it is plausible Browder stole the money from the Russian Treasury or, at least, knew about the fraud before it occurred.  The Government's motion seeks to avoid the embarrassment of presenting at trial a story Defendants have proven to be untrue.  If this Court grants summary judgment on disputed facts and legal theories, Browder will broadcast his victory worldwide as undeserved vindication.  The Court has repeatedly stated that this case is about Defendants' conduct – whether they engaged in money laundering.  However, the statute requires the Government to prove a predicate act to money laundering, a Specified Unlawful Activity.  18 U.S.C. § 1956(a)(1) & (c)(7).  The unlawful proceeds that are allegedly laundered must come from this Specified Unlawful Activity, and the defendant must know the proceeds are criminal in nature and intend to conceal or disguise them.

A foreign fraud on the Russian Treasury is not a predicate act to money laundering.   The manner in which the Treasury Fraud was carried out thus is an essential element of the Government's claims.  Defendants have repeatedly said that the Government has not identified conduct constituting a Specified Unlawful Activity – and the Government is now on its sixth and seventh theories, which are as much without merit as the prior five.  The two new theories are

based upon demonstrably false facts and fail to state a claim as a matter of law.  This case is about fraud on the Russian Treasury; it is not about fraud on an investor or trustee of Browder's Hermitage Fund.  Shortening the trial by relieving the Government of its obligation to prove a Specified Unlawful Activity would deprive Defendants of an important, meritorious defense.

Defendants have repeatedly pointed out that the Government conducted no material investigation before filing the complaint and application for a worldwide protective order.  (*E.g.*, Dkt. 80.)  After discovery disproved Browder's storyline, the Government implicitly acknowledged Defendants have been right all along; it has substantially abandoned the fact statement and Specified Unlawful Activity contained in the Second Amended Complaint that this Court found sufficiently alleged to deny Defendants' Motion to Dismiss the Amended Complaint.  (Dkt. 310.)  In other words, the Government represented to this Court that it had evidence to prove a case that justified the Amended Protective Order and the continuation of this lawsuit, but once again, the Government misled the Court.[1]  The Government's new factual narrative in this motion demonstrates that it now realizes the illusory nature of its complaint, yet this new story contains numerous disputed factual contentions, including many that are demonstrably false.[2]

Defendants can agree that the Treasury Fraud occurred (but not in the amounts the Government alleges), and Sergei Magnitsky died in detention (although that fact lacks any relevance to this lawsuit).  However, beyond those facts, the Government's motion for partial summary judgment must be denied for the following reasons:

---

[1] The Government should not have been surprised by Defendants' discovery that put the lie to Browder's story.  In an exchange of diplomatic notes with the Russian Federation, the U.S. Attorney was informed that the Russian prosecutors had investigated the same allegations and found them to be without merit.  *See* Declaration of Natalya Veselnitskaya filed concurrently herewith.

[2] See Defendants Opposition to the Government's Rule 56.1 Statement submitted herewith.

- The facts asserted in the Government's Rule 56.1 Statement are disputed, incomplete, irrelevant, and prejudicial.

- In its Rule 56.1 Statement, the Government relies upon inadmissible hearsay statements by politicians who imbibed Browder's story and regurgitated it without any investigation.

- The Government's new theories of Specified Unlawful Activity—fraud on a foreign bank—fail because they do not satisfy the essential elements of this theory and produced no proceeds that could be laundered.

- Defendants are prejudiced by new factual allegations and legal theories that are not even made in the Second Amended Complaint filed on October 23, 2015, just five weeks before trial.  Pursuant to Fed. R. Civ. P. 56(d), Defendants are entitled to discovery or if discovery is impractical at this late date, to have these new allegations stricken.

Prevezon and its owner Denis Katsyv are nothing but collateral damage to Browder's flight from justice and the Government's irresponsible failure to investigate.  Prevezon never received any stolen proceeds from the Russia Treasury (as confirmed by the Government's "tracing expert," who at his deposition testified he could not be sure Defendants received any stolen Treasury funds) (Ex. 43[3] at 8:14-10-25); Prevezon was not willfully blind to the source of funds from its independent investor; and Prevezon did not seek to conceal or disguise unlawful proceeds (proceeds it never received).  As the Government has admitted, Prevezon engaged in perfectly ordinary real estate investments.  (Ex. 44 at 300:13-301:7.)  Prevezon will be deeply prejudiced if it is forced to tell an abbreviated story at trial of how it got caught in the Government's nightmarish web.

Rather than summary adjudication based upon an incomplete, inadmissible and disputed factual record and legal theories, this matter should proceed to trial, so that a jury can fairly and fully evaluate the Government's claims.  (*See* Tr., Oct. 21, 2015 Hr'g at 43 "the important thing,

---

[3] Citation to exhibits to the Declaration of Mark A. Cymrot in Support of Defendants' Memorandum of Law in Opposition to the Government's Motion for Summary Judgment is indicated by "Ex.__."

for the sake of both the government and Prevezon, is to have a trial . . . because if Prevezon is innocent of what it's doing, it needs to get this off its back . . .").

## **STATEMENT OF FACTS**

The Government now tells a completely different story from the one it told in its complaints, each one breathlessly repeating Browder's story of corrupt Russian tax officials, state-sanctioned torture and murder, a puppet judicial system, and a nefarious and entirely undefined criminal "Organization."  The Government's original story was that members of the "Organization" *fraudulently re-registered* three Hermitage Companies (Parfenian, Rilend and Makhaon), created contracts to establish false liabilities, enforced those liabilities through sham lawsuits, and then submitted fraudulent amended tax returns based upon *judgments from the sham lawsuits* to recover a refund for taxes these three companies paid the prior year.

Now, mere weeks before it must prove that story with competent witnesses and admissible evidence, the Government jettisons the so-called "Organization" (of which it admits Defendants were never a part).  (Dkt. 213 at 4-6.)  The new story turns an about-face and asserts that its *entire case* is based on the actions of two individuals: Markelov and Khlebnikov, the individuals convicted in Russia of hoodwinking the Russian Treasury out of billions of rubles. Casually abandoning scores of allegations in its complaints, most importantly, the Government now claims for the first time that the role of Browder's companies in the Treasury Fraud is immaterial to its case.  That admission kills the Specified Unlawful Activity of fraud against a foreign bank—HSBC Private Bank (Guernsey) Ltd. ("HSBC Guernsey")—alleged in the Second Amended Complaint.

The Government's attempt to cut Browder out of the picture is no accident.  Discovery has shown that Browder had a motive to commit the Treasury Fraud, which was to steal back the money his companies paid in taxes to the Russian Federation for the 2006 tax year.  He had the

opportunity to commit the Treasury Fraud, as he had been expelled from Russia, had nothing to

lose and had all the information he needed about the three Hermitage Companies and their tax

payments.  And his agents took affirmative acts that furthered the Treasury Fraud, contrary to the

narrative in the Government's filed complaints.  Browder also had no reason to be transferring

any stolen proceeds to Prevezon and Mr. Katsyv, who he did not know.

After discovery, in which Browder and his agents have been subjected to U.S. civil

discovery procedures, Defendants have proven that Browder and his agents engaged in a series

of misrepresentations to execute the fraud, to distance themselves from it, and to pin it on the

Russian officials investigating Browder for a separate tax fraud his companies committed. They

perpetuated the same fraud on the prosecution here, as the Government now implicitly admits.

## I.   DISCOVERY HAS DISCREDITED THE GOVERNMENT'S FALSE NARRATIVE

### A.   The Hermitage Companies Were Never Stolen

The Government's case as well its motion requires the Government to establish that the

Hermitage Companies were stolen from Hermitage by fraudsters and were then used to execute

the Treasury Fraud.  (Dkt. ¶ 381 ("the Organization *fraudulently re-registered* the Hermitage

Companies in the names of members of the Organization" in order to "orchestrate[] sham

lawsuits against these companies").)  When examined under oath, however, the agents from

Browder's corporate service provider, Georgiades & Pelides, testified that: (1) powers of

attorney used to authorize the transfer of the three Hermitage Companies bore their signatures,

which thus means the re-registrations were authorized; and (2) they also signed false affidavits

stating those signatures were forgeries.  Ex. 18 at 73:19-74:5, Ex. 66 at 62:21-64:6.  Concerning

the key false affidavits, the agents testified:

Q.   This was a document that your employer asked you to sign; is that correct?

5

A.     Yes. . . .

Q.     Prior to signing this document, you did not do any investigation into the contents of this document.

A.     No. I am informed by my employer. . . .

Q.     Prior to being informed about this document by your employer, did you have personal knowledge of any of the statements in this document?

A.     No.

*Id.* at 74:18-76:24; *see also* Ex. 66 at 109:8-21.  This testimony demonstrates that the re-registration of the three Hermitage companies was done, not by some undefined "Organization," but *by Browder's own organization*.  The companies were therefore never "stolen" from Browder's organization, nor were their re-registrations fraudulent as the Government has alleged.

More importantly, this testimony establishes that Browder, whose word the Government uncritically accepted when bringing this lawsuit, solicited false affidavits in an effort to conceal Hermitage's connection to the acts underlying the Treasury Fraud.

**B.     Hermitage and Browder Knew of the "Sham Lawsuits" Before the Refund Requests were Filed**

The Government alleges that the fraudulently re-registered Hermitage companies filed "sham lawsuits" on fraudulent contracts in order to generate losses that would substantiate the Treasury Fraud tax refund requests.  (Dkt. 381 ¶ 19.)  Key to this version of events is that Hermitage did not learn of the "sham lawsuits" until October 2007, which was after the judgments were entered.  (*Id.* ¶ 55.)

Essential to Browder's narrative as set forth in the Second Amended Complaint has been that a company by the name of Logos Plus, unbeknownst to Hermitage, filed lawsuits in July 2007 against Rilend, Parfenion, and Makhaon in St. Petersburg seeking millions in liability.  As Browder testified to the U.S. Helsinki Commission:

> LogosPlus then sued our companies in St. Petersburg Arbitration Court, claiming huge damages.  Neither we nor HSBC were notified of these claims since the registered address for the companies had been fraudulently changed along with the other details.  A team of lawyers we had never met appeared in St. Petersburg claiming to represent the (former) Hermitage companies in the proceedings.  These lawyers pleaded guilty, "fully accepting" all of the claims and consent to the court's judgment of $380 million in damages against the Hermitage companies.[4]

Ex. 49 at 3.  Browder's testimony, however, is false.  Rilend, Parfenion, and Makhaon received notice of the Logos Plus lawsuits against via registered mail sent to the same mailboxes where these companies received its HSBC Bank Statements.  Rilend is exemplary:

- Logos Plus initiated lawsuit P-51203-2 against Rilend on July 24, 2007.  The address listed on the face of the statement of the claim for Rilend was 13/2 Staropimenovsky Lane, Moscow, 121099.  See Ex. 37 at 154:8-13 (stating Rilend's registered address is listed on first page of lawsuit); Ex. 60.

- A registered mailing receipt dated July 24, 2007 was generated for this lawsuit with the tracking number of "191015 (85) 144778 0."  *See also* Ex. 38 at 168:23-172:20.  Ex. 61.

- The envelope for this lawsuit was sent to Rilend at 13/2 Staropimenovsky Lane, Moscow, 121099.  The envelope contains a tracking number of "191015 (85) 144778 0."  Ex. 61.

- At all relevant times, including during 2006-07, HSBC Bank listed the address for Rilend on its account statements at 13/2 Staropinmovsky Lane, Moscow 121099.  Ex. 62.

- Firestone Duncan (one of Browder's Russian law firms) had property at 13/2 Staropinmovsky Lane, Moscow 121099.  Ex. 39 at 83:16-84:7.

- Jamison Firestone, Browder's lawyer, testified that "provisions were always made to make sure that we could receive legal notices" via "systems in place . . . designed to make sure that we got notice for anything we responsible for."  Ex. 39 at 84:21-86:24.

Hermitage also received notice of a Logos Plus lawsuit brought against Parfenion,[5] and similarly received notices for a Logos Plus lawsuit brought against Makhaon.[6]

---

[4] *See also* Dkt. 381 ¶¶ 33-37 (describing supposedly sham lawsuits brought by Logos Plus against Hermitage companies); Ex. 51 at 2 (claiming to have discovered the St. Petersburg lawsuits via a phone-call from a Russian bailiff in mid-October 2007).

[5] Logos Plus initiated lawsuit P-51201-2 against Parfenion on or around July 24, 2007; Parfenion's address was listed as 19/9 Obraztsova Street in Moscow, 121099.  Ex. 57.  A registered mailing receipt dated July 24, 2007 was generated for this lawsuit with the tracking number "191014 (85) 14783 4."  Ex. 57.  An envelope for this lawsuit

This evidence demonstrates that Firestone Duncan received notice of the lawsuits in July of 2007—not October of 2007 as publicly claimed—which was well before the tax refund requests were filed.  (Def's Rule 56.1 Resp. to ¶ 13.)  Browder could have then run into court and stopped the lawsuits and the Treasury Fraud but he did nothing.  The documents demonstrate that the "sham lawsuits" proceeded with Hermitage's knowledge and acquiescence, suggesting that Hermitage and Browder were involved in obtaining the judgments that were essential to the Treasury Fraud tax refunds.

### C.    The Refund Applications were Made Based Upon the Judgments from the Sham Lawsuits.

The Second Amended Complaint alleges the amended tax returns that resulted in the fraudulent refunds were based upon the fraudulent judgments from the sham lawsuits that Browder had notice of.  Now, in its Rule 56.1 Statement the judgments from the sham lawsuits played no role, but instead, the Government contends that the refunds were paid from based upon the forged contracts.  This statement is demonstrably false.  Def.'s Rule 56.1 Resp. to ¶¶ 11-13.

### D.    The Search of Hermitage's Offices was Justified by Browder's Tax Fraud

The Government alleges that members of the Organization conducted illegal raids on Hermitage's office and that of its attorneys, in the law firm of Firestone Duncan, in order to obtain the documents and seals necessary to carry out the Treasury Fraud.  (Dkt. 381 ¶¶ 24-26.) However, the Rule 56.1 Statement makes no mention of the "Organization."

---

was sent to Parfenion at 19/9 Obraztsova Street in Moscow, 121099; the envelope contains a tracking number 191014 (85) 14783 (4)."  Ex. 58.  At all relevant times, including during 2006-07, HSBC Bank listed the address for Parfenion on its account statements as 19/9 Obraztsova Street in Moscow, 121099.   Ex. 59.

[6] Logos Plus initiated lawsuit P-51202-1 against Makhaon on or July 24, 2007; Makhaon's address was listed as 19/9 Obraztsova Street in Moscow, 121099.  Ex. 54.  A registered mailing receipt dated July 24, 2007 was generated for his lawsuit with the tracking number "191014 (85) 14781 0."  Ex. 55.  An envelope for this lawsuit was sent to Makhaon at 19/9 Obraztsova Street in Moscow, 121099; the envelope contains a tracking number "191014 85 14781 0."  *Id.*  At all relevant times, including during 2006-07, HSBC Bank listed the address for Makhaon on its account statements as 19/9 Obraztsova Street in Moscow, 121099.  Ex. 56.

Discovery has shown that those searches were conducted in connection with an investigation into Browder's own criminal tax fraud, for which he was convicted—and the underlying facts of which were resolved in civil disputes by Russian courts that Browder ignored. *See* Ex. 50 at 4. These civil judgments were entered against Browder's companies for falsely claiming they were employing disabled Afghan war veterans. Ex. 46 at 68:17-72:25, 78:18-79:4, 72:3-25, 78:18-79:4, 81:9-82:9, 82:14-90:25; *see also* Exs. 21, 23-24, 63-64. Rather than pay those judgments, Browder sold the companies to his security firm which bankrupted the companies liable for the judgments. (Ex. 46 at 73:12-92:20.) The criminal tax investigation thus followed. The police search on the Hermitage and Firestone Duncan offices was justified by a legitimate criminal tax investigation.

The truncated story without the "Organization" appears to be an effort to protect Browder from charges that he sold out Sergei Magnitsky. A reporter, Oleg Lurie, who spoke to Mr. Magnitsky on two occasions reported that Mr. Magnitsky feared he had been sold out by his superiors at Hermitage. When asked in his deposition whether he had asked Mr. Magnitsky to take responsibility for the fraudulent tax returns, Browder did not object vehemently, he replied:

Q:      Did you ever have somebody suggest to Mr. Magnitsky that he should
        take responsibility for the Saturn and Dalnaya Step tax returns?

A:      I don't remember.

(Ex. 25 at 376:23-377:3). Lurie also reported that he was approached by a person identifying himself as coming on Browder's behalf who offered him a bribe to change his story. Ex. 35 ¶¶ 67-69. The Government has not even asked Browder whether he was making an effort to suborn perjury. Ex. 36 at 374:13-18.

E.       **Hermitage Refused to Accept Return of its Corporate Seals**

When the Russian police searched Hermitage's offices, the Government alleges that the investigators confiscated Hermitage's corporate seals and certificates during this search, "den[ied] requests from Hermitage to return the corporate documents and seals," and used those certificates and seals to effectuate the fraud.  (Dkt. 381 ¶ 25.)  This story is key to Browder's version of events, as it discredits those investigating Browder's own frauds while simultaneously pinning the Treasury Fraud on someone other than Hermitage.

This story too is false.  As even Browder admitted, Russian authorities in fact offered to return the documents and seals to Hermitage, but Browder's people refused to accept them until the investigation was closed (and thus after the refunds had issued).  (Ex. 45 at 144:8-146:8.) What is more, Browder acknowledged that he had heard of a forensic study showing that the certificates and seals used in the tax refund applications were *different* from those that were in the custody of Russian officials—blowing a gaping hole in the Government's theory of the case and suggesting that the tax refund applications were prepared by someone who, like Browder at the time the applications were prepared, did not possess the actual seals and documents but who nevertheless had knowledge of their contents.  *Id.*

F.       **The Hermitage Fund Lost No Value**

The Government's new claim is that an investor in the Hermitage Fund, HSBC Suisse, was defrauded by a legal reserve created to recover the re-registered companies.  However, the Government's narrative omits Browder's admission that the Hermitage Fund suffered no financial loss in connection with the change of ownership of the Hermitage Companies.  Ex. 26 at 149:23-156:21 (testifying that Parfenion, Makhaon, and Rilend's only assets were "bank accounts" with "$10,000-$15,000" but that he "[didn't] know" whether the shareholding vehicles [Kone and Glendora] or Parfenion, Makhaon, and Rilend lost anything of value).  If, as Browder

admitted, the Hermitage Fund lost no value, the fraud on a foreign bank fails because HSBC

Private Bank (Suisse)'s ("HSBC Suisse") share did not lose any value.

### G.    The Explanation for the Legal Reserve Exposes More Hermitage Lies

According to the Government's new theory of fraud, HSBC Suisse was an investor of its

own funds in the Hermitage Fund.  The Fund supposedly in July of 2007 (before the Russian

Treasury Fraud occurred in December 2007) took a reserve on its financial statements in

anticipation of paying legal fees to recover ownership of Parfenian, Rilend and Mahkoan.  (Dkt.

403 ¶ 9.)  That reserve allegedly reduced the value of the HSBC Suisse interest when it redeemed

its shares. (*Id*. ¶ 32.)  Thus, the theory of fraud on HSBC Suisse is dependent upon the transfer of

ownership being unauthorized (which the Government acknowledges is a disputed fact).  (Dkt.

415 at 4 n.2.)  If the transfers were authorized, the legal reserve was unnecessary for the purpose

that the Government now claims.

But this new factual theory also exposes more Browder lies.  Browder is on record as

stating that the Hermitage Fund did not realize the companies had been stolen until three months

after the legal reserve as taken, in October of 2007.  (Ex. 51 at 2.)  These statements are in

irreconcilable conflict.  If the reserve was taken in July to fight the theft, Hermitage had to know

about the theft; their story about October is a false statement.  And if the reserve was taken after

the tax police raided the offices and seized corporate records on June 4, 2007, then the provision

for legal services was actually to fight off a tax investigation in which Hermitage was the target,

and not to recover three shell companies that Browder acknowledges had no value.  (*See* Dkt.

381 ¶ 24.)  Indeed, an entry on Hermitage's financials demonstrating just that was redacted

without explanation in an exhibit submitted by the Government in support of this motion.

*Compare* Dkt. 400 Ex. D3 at ¶ 18 *with* Ex. 2 at ¶ 18.

## ARGUMENT

**I.    THE GOVERNMENT HAS THE BURDEN TO DEMONSTRATE THAT ITS ALLEGATIONS ARE NOT DISPUTED, INCOMPLETE AND LEGALLY INSUFFICIENT**

Summary judgment is appropriate only if the court determines that there is no genuine issue of material fact to be tried.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); Fed. R. Civ. P. 56(a).  The Government, as movant, has the burden of demonstrating that there are no genuine issues of material fact.  *Id.*  "[A]ll that is required [from a nonmoving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); *see also Hunt v. Cromartie*, 526 U.S. 541, 552 (1999).

Summary judgment is also improper where "it is unclear that the moving party is entitled to judgment as a matter of law."  *Chappell & Co. v. Frankel*, 367 F.2d 197, 203 (2d Cir. 1966); Fed. R. Civ. P. 56(a).  That is, the motion should not be granted where the "facts fail to show that the moving party is entitled to judgment as a matter of law."  *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d. Cir. 2004).

"If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper."  *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996).  Any ambiguities must be resolved and all inferences must be drawn against the moving party. *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir. 1986).

Although the rules permit the consideration of partial summary judgment, it should not be entertained where the evidence is "incomplete and support[s] competing inferences."  *Latsis v. Chandris Inc.*, No. 91 Civ. 6900 (LAP), 1998 WL 458095, at *7 (S.D.N.Y. Aug. 4, 1998) (citation omitted).  Partial summary judgment is also inappropriate where the issues subject to

the motion are intertwined with issues that will necessarily need to be resolved at trial.  *Berman*

*v. Royal Knitting Mills*, 86 F.R.D. 124, 127 (S.D.N.Y. 1980).

## II.   THE GOVERNMENT IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE DISPUTED FACTUAL RECORD

### A.   The Rule 56.1 Statement is Disputed, Incomplete in Material Ways and Prejudicial

The Government's recitation of supposedly undisputed facts is disputed and incomplete

in material ways that are directly relevant to the two new Specified Unlawful Activity claims,

fraud on a foreign bank.  The Government's attempt to sweep Browder's lies under the rug

through entry of its misleading story on summary judgment is inappropriate and must be denied,

because even this truncated story is hotly contested.

### 1.   The Hermitage Companies Were Not "Held" by HSBC Guernsey

The Treasury Fraud story begins with the Hermitage Companies—Rilend, Parfenion, and

Makhaon—that were indirectly owned by the Hermitage Fund, a trust.  (Ex. 26 at 152:17-

153:17.)  The Government now wants to claim the Hermitage Companies were "held" by HSBC

Guernsey in order to support its theory that HSBC Guernsey was "harmed" (significantly, not

defrauded, which is what the statute requires) when those companies were fraudulent re-

registered.  (Dkt. 399 ¶ 7.)  This assertion is demonstrably inaccurate.  None of the evidence the

Government cites—not the Hermitage Fund financial statements, not the excerpts from the

Russian corporate registry entries on the Hermitage Companies, and not a *non sequitur*

deposition of a Government witness—even suggests that HSBC Guernsey "held" the Hermitage

Companies.

The evidence produced in discovery actually disproves the Government's assertion in

two ways.  First, the uncontested record demonstrates that holding companies Kone and

Glendora, not any HSBC entity, owned the Hermitage Companies.  (Ex. 26 at 152:17-153:17.)

(showing that Kone and Glendora own the Hermitage Companies).  And second, a trustee does not hold assets, the trust owns the assets, and it is the trust, not the trustee that may be "harmed" when assets are transferred.  Thus, the Rule 56.1 Statement, para. 7 is both incorrect and disputed.

### 2.    The Hermitage Companies Were Never Stolen

As described above, evidence obtained in discovery shows that the Hermitage companies were never "stolen" from the Hermitage Fund, nor were their re-registrations fraudulent.  (*See* pp 5-6, *supra*.)  The Government admits now that the manner of the re-registration—whether it was authorized or not—is a disputed issue.  (Dkt. 408 n.7.)  The Government argues that the manner of the re-registration is not relevant to its fraud on a foreign bank theory, but, the Rule 56.1 Statement, para. 14 states that the re-registrations were "unauthorized" and the unauthorized nature of the transfers is a material fact to both new legal theories.  The recitations in the Rule 56.1 Statement, paragraphs 9 and 14 are, thus, incomplete, misleading and disputed.

### 3.    Hermitage and Browder Knew of the "Sham Lawsuits" Before the Refund Requests were Filed

In yet another obvious attempt by the Government to excise Browder and his culpability from this case, the Government's Rule 56.1 Statement now omits any reference to the sham lawsuits.  (Dkt. 399 ¶¶ 10-14.)  The Government's Rule 56.1 Statement omits the sham lawsuits because discovery shows that they were conducted with Hermitage's knowledge—they were served upon Hermitage's law firm, Firestone Duncan, raising the inference that Hermitage and Browder were involved in procuring the judgments that led to the Treasury Fraud.  (*See* pp. 6-8, *infra*.)

### 4.      The Refunds Were Made Based Upon Judgments from Sham Lawsuits, Not Forged Contracts

The Statement in the Government's Rule 56.1 Statement that the tax refunds were based upon forged contracts is demonstrably false and thus disputed.  (*See* Dkt. 399 ¶ 10-14 and 20.) The refunds were based upon purportedly sham lawsuits as the complaint alleges.  (Dkt. 381 ¶¶ 19-20.)  Those false and disputed paragraphs are belied by the Second Amended Complaint itself, which alleges that the tax refund applications were based upon *judgments from lawsuits*, which in turn were based upon the alleged forged contracts.  (*Id*.)  The Government's artful but inaccurate omission of the lawsuits from its Rule 56.1 Statement is an implicit admission that a grant of summary judgment in this case requires an incomplete and incorrect recitation of the facts.  Thus, the Rule 56.1 Statement paragraphs 10-14 and 20 are materially incomplete and disputed.

### 5.      The So-Called "Organization" is Omitted from the Government's New Story

The three complaints center their story on an amorphous and undefined criminal "Organization" that stole the Hermitage Companies, orchestrated the "sham lawsuits," sought and obtained the refunds, distributed a part of the proceeds to Prevezon through a complex chain of 109 transfers, and murdered Sergei Magnitsky.  The Government has admitted that Defendants were not members of this "Organization," but the "Organization" supposedly transferred $1.97 million to the Prevezon bank account in Zurich.  (Dkt. 213 at 4-6; Dkt. 381 Ex. B.)  Yet the "Organization" is *nowhere to be found* in the Government's Rule 56.1 Statement, which asserts that the fraud was carried out by just three unsophisticated individuals.  (Dkt 399 ¶¶ 15-18.)  Those individuals could not have been acting alone, according to the Second Amended Complaint.  (Dkt. 381 ¶¶ 2-3, 21.)  The variance between the Government's prior

pleadings and its Rule 56.1 Statement itself establishes a material issue of fact as to those paragraphs.

The "Organization's" existence and activities—or lack thereof—remain "relevant to several aspects of this case" even if the Government's summary judgment motion is granted, and thus the Government's motion will not have the desired effect of shortening the trial as the Government incorrectly claims.  (Dkt. 311 at 4 n.1.)  The Government has consistently maintained this position.   (*E.g.*, Dkt. 229 at 4 n.2 & 34 n.35 (Organization's acts relevant to Defendants' receipt of funds and proportionality of forfeiture); Dkt. 88 at 4-5 n.3 & 20 n.10 (same).)  According to the Government, then, the "Organization's" scope and activities are inextricably intertwined with multiple aspects of this case.  Because of this, Defendants are of course entitled to introduce proof concerning the "Organization" at trial—including whether the "Organization" was involved in the Treasury Fraud.  As the Government is certainly aware, a grant of summary judgment will do nothing to shorten the trial.

### 6.      Hermitage Refused to Accept Return of its Corporate Seals

The Rule 56.1 Statement, para. 7-22 is materially incomplete and disputed.  The Government's account of the alleged fraud ignores the facts that Hermitage refused to accept return of its corporate documents and seals, further evidence that the re-registrations were authorized.  (*See* pp. 9-10, supra.)

### 7.      The Hermitage Fund Lost No Value

The Government's Rule 56.1 statement sets forth a series of facts regarding the trading activities of HSBC Suisse, but omits Browder's admission that the Hermitage Fund suffered no financial loss in connection with the (authorized or unauthorized) change of ownership of the Hermitage Companies.  (*See* p. 10, *supra*.)  As explained in further detail below, without any loss, theories of "fraud" against HSBC Suisse fail.

16

### 8.     The Purpose of the Legal Reserve is Disputed

The Rule 56.1 Statement's description of the reserve taken by Hermitage is disputed. (*See* Dkt. 399 ¶¶ 27-32.); *see supra*. at 10-11.  The reserve could not have been taken for the stated purpose – for legal fees to recover the re-register companies − since it would have been taken supposedly before Hermitage learned that the ownership of Parfenion, Rilend and Makhaon were transferred from Kone and Glendora to Pluton.  The purpose of the reserve seems to have been to defend Hermitage and Browder from a legitimate criminal tax investigation. The investor, HSBC Suisse, thus, was not "harmed" by a reserve to recover the re-registered company and the whole theory of fraud on a foreign bank collapses.

### 9.     The Government has Not Identified a "Foreign Bank"

The Rule 56.1 Statement includes no factual support for the proposition that any one of the HSBC entities is a foreign bank within the meaning of the International Banking Act of 1978. The Statement identifies at least three HSBC entities but some of them are clearly not banks, such as HSBC Management (Guernsey) Ltd. ("HSBC Management"), for which the Government's own witness has testified is not a bank.  (Ex. 34 at 77:23-78:4.)  The Government's brief states that HSBC Holdings plc is "clearly" a bank but provides no factual support which is of course required on summary judgment.  In law a bank is a bank and a bank holding company is not a bank but a holding company subject to a vastly different set of regulators, regulations, and statutes, and with wholly different powers.  *See* 12 U.S.C. § 1841(a) & (c) (defining "bank" and "bank holding company" separately).

As for HSBC Guernsey, it was not acting as a bank but as a trustee and HSBC Suisse was acting as an investor, and not a bank.  The Government has submitted no evidence that these entities were regulated as a bank when in these non-bank roles.  Indeed, the Government's proposed order omits to find fraud *against a foreign bank* altogether, instead stating: "it has been

17

established as a matter of law that the fraud described in Exhibit A constituted specified unlawful activity." (Dkt. 397-1.)  This omission of a required finding—that an enumerated specified unlawful activity is established—is not just sloppy: it is prejudicial to meaningful appellate review.  This critical element of the Government's showing of *fraud against a foreign bank* is, for these reasons, lacking and thus must be proved at trial.

> ### 10.   HSBC Suisse, HSBC Guernsey, and HSBC Management Were Not "Defrauded"

The Government's assertion that HSBC Suisse was "defrauded" is contradicted by the testimony of its own witness.  HSBC Suisse never reported the alleged "fraud" to regulators, never informed its chief accounting officer that there was fraud, and never wrote down (or discounted) the value of its investment.  (Ex. 27 at 102:11-105:8; Ex. 28 at 8:11-9:5.)  The Government does not even try to claim that HSBC Suisse sold its shares in the Hermitage Fund because of "fraud."  Separately, the Government's 56.1 Statement does not have any factual support whatsoever for the Government's argument that HSBC Guernsey or HSBC Management were "harmed."

> ### B.   The Government's Case Is Dependent on Inadmissible Evidence

The Government has admitted that this case is a product of Browder's advocacy and is based almost entirely on his say-so.  It is a single-source case, from a source with no personal knowledge.  As the Government conceded in a deposition, it used its interviews with Browder and his associates at Hermitage, and bank documents provided by them, as the basis for its complaint.  (Dkt. No 81-1, Hyman Dep., at 16:17-17:4, 19:2-20:8, 28:7-33:2.)  The Government's 56.1 Statement relies upon "Findings of Fraud by Investigative Authorities." (Dkt. 399 ¶¶ 23-26.)

The evidence submitted in support of the Government's motion comes almost entirely from Browder and his associates, either directly or once removed.  Indeed, everything aside from Russian court decisions and HSBC documents can be traced to Browder.  This includes:

1.   Multiple reports from various non-governmental organizations and other bodies that are based almost exclusively on information provided to them from Browder and his affiliates. (Dkt. 402 Ex. F; Dkt. 400 Exs. C1-C4.)[7]; and

2.   Excerpts from depositions of people who worked for Browder or his agents (Dkt. 400 Exs. E3-E4.);[8]

The Government's case is utterly reliant on a story and evidence proffered by a source who has been completely discredited by recent sworn evidence.

Summary judgment is improper when specific facts call into question the credibility of the moving party's witness.  *Sterling Nat. Bank & Trust Co. of New York v. Federated Dep't Stores, Inc.*, 612 F. Supp. 144, 146 (S.D.N.Y. 1985) ("If the credibility of the movant's witness is challenged by the opposing party and specific bases for possible impeachment are shown, summary judgment should be denied."); *TypeRight Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151, 1158 (Fed. Cir. 2004) ("summary judgment is not appropriate where the opposing party offers specific facts that call into question the credibility of the movants witnesses.").  This is particularly the case where, as here, the party seeking summary judgment bears the burden of proof, *see Chem. Bank v. Hartford Acc. & Indem. Co.*, 82 F.R.D. 376, 378–79 (S.D.N.Y.1979)

---

[7] Very few of the documents the Government relies upon in support of its summary judgment motion were actually filed with the Court.  Defendants have repeatedly requested that the Government file the documents on which it relies in order to create a proper record, *see* Ex. 11, but the Government has refused to do so, without justification. The unfiled documents are therefore not properly before the Court and may not be considered on summary judgment.  While Defendants analyze the improper documents when explaining why summary judgment is improper, Defendants do not waive their objection to the Court's consideration of those documents on this motion. The unfiled exhibits not properly before the Court include: Exhibits A through N to the Declaration, Dkt. 403, as well as all of the exhibits referenced in the Monteleoni and Hyman declarations, Dkts. 400 & 401.

[8] In addition, the Government's case relies on photographs that a confidential witness associated with Browder purportedly took of portions of a Russian criminal court file (Dkt. 400 Ex. B1-31), and Hermitage Fund reports and consolidated financial statements.  (Dkt. 400 Ex. D3, D4; HSBC Suisse 30(b)(6) Decl. Exs. A-B, D, F, H, J, L, N.)

and where, also the case here, the witness is "interested in the result of the suit." *Sartor v. Ark. Nat'l Gas Corp.*, 321 U.S. 620, 628 (1944).

Browder and his agents *created* (or are the ultimate sources for) the vast majority of the evidence the Government offers in support of summary judgment.  It is inconceivable that a summary judgment motion based on evidence both *manipulated* and *created* by a convicted tax cheat and his agents would warrant summary judgment—particularly so when the evidence concerns a tax fraud case that the convicted tax cheat has repeatedly lied about.  Because of the specific, articulable deficits in Browder's credibility, this Court cannot enter the proposed findings of fact that the Government requests without making impermissible credibility determinations concerning Browder and his associates.

The Government's summary judgment motion is also improper because it is reliant on inadmissible evidence, which should not be considered.  *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) ("only admissible evidence" need be considered on summary judgment); *Faulkner v. Arista Records LLC*, 797 F. Supp. 2d 299, 306 (S.D.N.Y. 2011) (granting motion to strike hearsay exhibits and paragraphs of Local Rule 56.1 statement based on the hearsay exhibits). Rather than do a competent investigation of the facts, or base its case on reliable documents and testimony, the Government instead relies upon inadmissible hearsay and evidence that it cannot authenticate.

### 1.     The Andreas Gross Report is Inadmissible

The Government's 56.1 Statement heavily relies upon a declaration and report by Andreas Gross, a rapporteur to the Council of Europe.  (Dkt. 398 at at 5, 11; Dkt. 399 ¶¶ 8, 9, 14-21, 26; Dkt. 402.)  The Government concedes his report is hearsay, but incorrectly argues that it is admissible as a public record.  (Dkt. 398 at 11 (citing Fed. R. Evid. 803(8)(A)(iii)).)  The public records exception does not sanction the admission of hearsay statements contained within

a public record, and Gross's report is based entirely upon them.  *United States v. Awad*, No. 06 CR. 600 (DLC), 2007 WL 1988382, at *4 (S.D.N.Y. July 3, 2007); *United States v. Mackey*, 117 F.3d 24, 28 (1st Cir. 1997) ("Decisions in this and other circuits squarely hold that hearsay statements by third persons . . . are not admissible under this exception merely because they appear within public records).

Gross's report largely consists of double and triple hearsay.  He did not interview participants in the relevant events.  His report is based on hearsay conversations with Browder and his associates at Hermitage (who *claim* that they not involved directly in the relevant events) rather than a proper investigatory source.  (Dkt. 402-6 at Sec B.1.1.).  Indicative of this utter dependence on Hermitage's agents who disclaim personal knowledge is his extensive account of his conversations with Edward Khareitdinov, an attorney for Hermitage.  Nearly three full pages of Gross's report—pages 21 through 23—contain nothing but a regurgitation of what he claims Khareitdinov told him.  Passages such as these, where Gross simply recounts what he claims others told him, are classic examples of inadmissible hearsay and cannot be admitted.

So too are Gross's conversations with law enforcement personnel from various jurisdictions inadmissible.  Gross admits that his report is based extensively on such conversations with individuals who have no personal knowledge of the events at issue.  (Dkt. 402-6 at Sec B.1.1; Dkt 402 ¶ 23); *Robins v. Whelan*, 653 F.2d 47, 52 (1st Cir. 1981) ("reporting agency must have firsthand knowledge of the investigation by which it accumulates the published factual findings").  Gross's compilation of a report from separate hearsay sources does not qualify as an admissible public record.

Separately, the public records exception does not apply if the circumstances indicate a lack of trustworthiness.  Fed. R. Evid. 803(8)(B).  Gross's purported investigation occurred in

2013, six years after the alleged tax fraud at issue.  He apparently did not have access to persons with direct knowledge of the relevant events.  Gross is a career politician without any training in Russian law, and who has expressed anti-Russia views in the past.  (Ex. 40.)  Gross has also been accused of bias with regard to his reporting by a British House of Commons member, and by Azerbaijan.  (Ex. 41, 42.)  Rather than conducing an objective investigatory assessment, Gross's charge from the Council of Europe was to put together a report "refusing impunity for the killers" of "whistleblower Sergei Magnitsky" (after Gross previously wrote a report covering the same subject matter and reaching the same conclusions). (Dkt. 402-2.).

The Government submitted an affidavit from Andreas Gross in support of this motion, but Gross refused to be deposed for fear of Defendants' cross-examination and will not appear as a witness at trial.  (Dkt. 408.).  On this ground alone, his affidavit and report should be stricken.

The Gross report should thus be stricken and the portion of the Rule 56.1 Statement that relies upon it should be deemed contested.

## 2.      The Human Rights Council Report and Annex is Inadmissible

The Government also relies upon an annex to a report prepared by the Russian Presidential Human Rights Council in support of its narrative.  (Dkt. 399 ¶¶ 8, 9, 14, 19-21, 25 (citing Dkt. 400 Ex. C3).)  This is also inadmissible hearsay. The findings of the Human Rights Council were just "preliminary conclusions" of the working groups of the Council, and thus are not admissible under Rule 803(8).  (Dkt. 400 Ex. C1 at 1; Declaration of Kirill Kabanov ("Kabanov Decl.") ¶ 6, submitted herewith); *City of New York v. Pullman Inc.*, 662 F.2d 910, 914-15 (2d Cir. 1981) (refusing admission of preliminary report); *Toole v. McClintock*, 999 F.2d 1430, 1434-35 (11th Cir. 1993) (noting Rule 803 makes no exception for "tentative or interim reports").

In addition, the annex cited by the Government was not even authored by members of the

Human Rights Council—rather, it was written by a NGO called the "National Anti-Corruption

Committee."  (Dkt 400 Ex. C3; Kabanov Decl. ¶ 19.)  An NGO's report is not produced by a

"public office," nor is it the product of a "legally authored investigation," and it is therefore not

admissible under 803(8).  *See, e.g.*, *Ames v. Stevens*, No. 9:12-CV-01487 MAD, 2015 WL

5513021, at *7 (N.D.N.Y. Sept. 17, 2015) (excluding report by non-profit organization)

Additionally, the annex to the Human Rights Council report suffers from the same

hearsay and trustworthiness problems as the Gross's report, as it largely based on information

supplied by Browder and Hermitage.  (*See* Dkt. 400 Ex. C1 at 1 ("[T]he facts presented in the

materials submitted by Hermitage Capital . . . have still not been examined."); Kabanov Decl. ¶¶

8-10, 13.)[9]

### C.   The Government Has Disputed The Validity of the Two Convictions that Form the Backbone of Its Summary Judgment Motion.

The Government's motion places a newfound reliance on the Russian convictions of

Markelov and Khlebnikov, but only on highly edited portions of those convictions.   In other

words, the Government is attempting to rely upon portions of the convictions that support its

case but ignore portions that tell a different story than the Government's newest version.   The

Government cites the two convictions (Exhibits F1 and F2 to the Hyman Declaration) to

establish: that ownership of the Hermitage Companies was transferred to OOO Pluton; that

---

[9] The Government also places extensive reliance on photographs allegedly taken of documents within a Russian court file by a Government witness.  (Dkt. 400, Exs. B1-B31.)  These documents are inadmissible, because the Government cannot rely on the photographs to prove that the documents therein are actually what they purport to be (the first level of hearsay), or that the contentions and transactions referenced in the documents ever occurred (the second layer of hearsay).  The Government identifies no hearsay exception for these documents, nor can it prove the documents' authenticity under Fed. R. Evid. 901(a).  The Government also relies upon "commercially reported" Russian court decisions, but does not establish the reliability of the purported source, preventing the Court from taking judicial notice of these documents.  (Dkt. 399 ¶ 22; Dkt. 400 Exs. A1-A9); *Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir. 1992).  Defendants intend to file motions *in limine* seeking the exclusion at trial of the inadmissible evidence relied upon in the Government's submission, that will address these issues in greater depth.

Markelov and Khlebnikov were appointed as directors of those companies; that Markelov forged backdated contracts with sham counterparties; that Markelov submitted fraudulent amended tax returns on behalf of the Hermitage Companies based on the forged contracts; that Markelov and Khlebnikov submitted refund applications; and that those refunds were issued.  In other words, the Government relies on the convictions to establish each and every critical aspect of the Treasury Fraud.

The Government's principal reliance on the findings in those documents is astounding in light of Special Agent Hyman's unequivocal testimony as a Rule 30(b)(6) witness speaking for the United States just weeks ago that *the Government rejects those findings and those convictions*:

> Q.    Do you accept the Russian findings?
>
> A.    No, we do not.
>
> Q.    Do you reject the Russian findings?
>
> A.    Yes. . . .
>
> Q.    And do you accept the Russian court decisions or not?
>
> A.    Which court decisions are you talking about?
>
> Q.    The conviction of Markelov?
>
> A.    No, we do not.
>
> Q.    The conviction of Khlebnikov?
>
> A.    No, we do not. … we're not relying on their conviction.

Ex. 48.  The Government now asks this Court to rely upon the very findings that, under oath, the Government rejected.  This clear statement by a party opponent that the convictions' findings are not credible itself creates an issue of material fact as to the reliability of those findings, thus precluding summary judgment as to any paragraph of the Government's 56.1 Statement citing to

those documents for support.  (*See* Dkt. 399 ¶¶ 9, 10, 11, 13, 18, 19, 20, & 21); *Muller-Paisner v. TIAA*, 528 F. App'x 37, 41 n.2 (2d Cir. 2013) (party opponent admission considered on summary judgment); *Thibodeaux-Woody v. Houston Cmty. Coll.*, 593 F. App'x 280, 282 n.1 (5th Cir. 2014) (statement of party opponent admissible as summary judgment evidence); *Montone v. City of Jersey City*, 709 F.3d 181, 200 n.11 (3d Cir. 2013) (opposing party's deposition testimony "is admissible as a party-opponent admission, and thus should have been considered in resolving the summary judgment motions.").

The Government, as the party that bears the burden of proof, has the affirmative burden adduce evidence supporting its contentions, which it has failed to do.  *Goenaga v. Mar. of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) ("A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists.").  Where "the cited materials do not support the factual assertions in the [56.1 statement], the Court is free to disregard the assertion."  *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73-74 (2d Cir. 2001).  Summary judgment in favor of an unsupported factual record is improper.

## III.   THE GOVERNMENT DOES NOT ESTABLISH THE SPECIFIED UNLAWFUL ACTIVITY OF FRAUD AGAINST A FOREIGN BANK

The Government's motion is based on the incorrect premise that "harm" to HSBC (Suisse), HSBC Guernsey, and HSBC Management suffered in connection with the fraud from the Russian Treasury constitutes "fraud . . . against a foreign bank, " a Specified Unlawful Activity enumerated in the money laundering statute.  18 U.S.C. § 1956(c)(7)(B)(iii).  The Government asserts in its motion that it is seeking summary judgment on grounds that "a specified unlawful activity was committed in Russia."  (Dkt. 398 at 1.)  It goes on to argue that the Treasury Fraud "constituted fraud on a foreign bank."  (*Id*.)  However, the Russian Treasury is not a foreign bank.  The Government is trying to fit an inapplicable statute into its scheme.

25

Under the money laundering statute, "an offense against a foreign nation involving . . . fraud, or any scheme or attempt to defraud . . . against a foreign bank" constitutes a Specified Unlawful Activity.  18 U.S.C. § 1956(c)(7)(B)(iii).  However, the Government's motion is deficient for multiple reasons:

- The Government alleges false statements were made to the Russian Treasury.  Nowhere does the Government allege—because it cannot—that the perpetrators of the Treasury Fraud committed a fraud on HSBC (Suisse), HSBC Guernsey or HSBC Management.

- The Government alleges that the Russian Treasury relied upon false tax refund applications.  The Government has not alleged that HSBC Suisse, HSBC Guernsey, or HSBC Management relied upon any acts of the perpetrators of the Treasury Fraud.

- The intended victim of the fraud was the Russian Treasury.  The Government alleges no facts that would justify a finding that the perpetrators of the Treasury Fraud intended to defraud an investor or trustee in the Hermitage Fund, including HSBC Suisse.

- Browder's concession that the Hermitage Fund lost no value by the transfer of Parfenion, Rilend and Makhaon eliminates any possibility that HSBC Suisse, HSBC Guernsey, or HSBC Management were injured by the Treasury Fraud, another essential element of a fraud claim.

- Since there was no injury, the Government cannot allege that Defendants laundered the proceeds of the fraud against a foreign bank, rather than the proceeds of a fraud on the Russian Treasury (which is denied, of course).  The Government makes the leap between the two alleged frauds without any factual predicate or even reasoning.

- The Government also has not identified a bank that was defrauded since HSBC Suisse, HSBC Guernsey, and HSBC Management were not acting in the role of a bank in connection with the Hermitage Fund.

These deficiencies are fatal to the Government's new and untimely Specified Unlawful Activity theories.

## A.  The Alleged "Harm" To HSBC Suisse Does Not Constitute Fraud Against a Foreign Bank

The Government's contention is that HSBC Suisse as investor in the Hermitage Fund was "defrauded" by the Treasury Fraud.  As an initial matter, the victim of the fraud was the Russian Treasury, and not the Hermitage Fund.  The Government alleges that the Hermitage Fund took a

write down of $7 million as a reserve against legal fees for recovering Parfenion, Rilend and

Makhaon.  (Dkt. 399 ¶ 28.)  HSBC (Suisse), as an investor of its own funds in the Hermitage

Fund, was allegedly "harmed" when it redeemed its shares because the reserve reduced the value

of HSBC (Suisse)'s interest.  (*Id*. ¶ 29.)

These facts are disputed.  *See supra*. p. 18.  But this legal theory also satisfies none of the

elements of bank fraud.  If the transfer of the three companies were unauthorized, the

Government has conceded that summary judgment must be denied because that fact is contested.

(Dkt. 408 n.7.)  If the transfers were authorized, there was no fraud on the Hermitage Fund.  In

either case, an investor in the Hermitage Fund would have no standing to assert fraud; the Fund

would have to make the claim.

The Government also cannot show that the perpetrators intended to defraud HSBC

Suisse.  The closely analogous domestic federal bank fraud statute, 18 U.S.C. § 1344, imposes

liability on whoever "knowingly executes, or attempts to execute, a scheme or artifice . . . to

defraud a financial institution."  18 U.S.C. § 1344(1).  This provision requires specific intent to

defraud a bank.  As the Second Circuit has stated:

> [A]lthough a bank need not be the immediate victim of the fraud,
> the government is required to prove that a bank was *an actual or
> intended victim* . . . i.e., that the defendant engaged in or attempted
> to engage in a pattern or course of conduct designed *to deceive a
> [bank]* into releasing property, with the intent to victimize the
> institution by exposing it to actual or potential loss.

*United States v. Laljie*, 184 F.3d 180 (2d Cir. 1999) (internal citations and quotations omitted)

(emphasis added); *see also United States v. Loughrin*, 134 S. Ct. 2384, 2389-90 (2014) (noting

that § 1344(1), "as all agree, includes the requirement that a defendant *intend* to 'defraud a

financial institution') (emphasis added).  These concepts apply with equal force to the "fraud . . .

against a foreign bank" provision of 18 U.S.C. § 1956(c)(7)(B)(iii).  *See Hardt v. Reliance*

*Standard Life Ins. Co.*, 560 U.S. 242, 251 (2010) (when interpreting a statute, courts "begin by analyzing the statutory language, assuming that the ordinary meaning of that language accurately expresses the legislative purpose."). The Government has not, and cannot, provide any admissible evidence showing that the perpetrators of the Russian theft intended to defraud Hermitage Fund investor HSBC Suisse, rather than the Russian Treasury.

The Government's claim of "harm" is a contested fact. See supra. p. 18. The reduced share value of HSBC Suisse's interest is contested by Browder's testimony that Hermitage did not lose any money when the Hermitage shell companies were re-registered. (Ex. 45 at 149:23-156:21.) HSBC Suisse never reported the alleged "fraud" to regulators, never informed its chief accounting officer that there was fraud, or wrote down the value of its investment. (Ex. 27 at 102:11-105:8; ex. 28 at 8:11-9:5.) These facts alone bar summary judgment. However, the legal theory is also contested.

HSBC Suisse's asserted "injury" is no more cognizable than that of a shareholder, who expressing a grievance with a corporation for a harm that equally affects all shareholders, attempts to maintain a claim. Just as a shareholder in that instance would not have a redressable injury under basic corporate law, so does HSBC Suisse's claim fail here as well. *See, e.g. Debussy LLC v. Deutsche Bank AG*, 05 Civ. 5550 (SHS), 2006 WL 800956, at *3 (S.D.N.Y. Mar. 29, 2006) (dismissing complaint and noting that "a claim for diminution in value of shares is an indirect harm" and thus plaintiff lacks standing to bring claim), *aff'd* 242 Fed. Appx. 735 (2d Cir. 2007); *Jones v. Niagara Frontier Trans. Auth.*, 836 F.2d 731, 736 (2d Cir. 1987) ("A shareholder—even the sole shareholder—does not have standing to assert claims alleging wrongs to the corporation").

The restitution statute cited by the Government is inapplicable; it provides that restitution is only available where the victim is "directly and proximately" harmed by the offense at issue. 18 U.S.C. § 3663A(a)(2).  (*See* Dkt. 398 at 13-14.)  Where, as here, the aggrieved party is multiple steps removed from the theft from the Russian Treasury at issue, it is not a victim of fraud.  *United States v. Grundhoefer*, 916 F.2d 788, 794 (2d Cir. 1990) (finding direct restitution to loan recipients "wholly inappropriate" for fraud against U.S. Government that had indirectly affected loan recipients); *In Re Local #46 Metallic Lathers Union,* 568 F.3d 81, 88 (2d Cir. 2009) (employees of company that had engaged in fraud and therefore suffered losses when salaries went unpaid were not "victims" entitled to restitution); *see also Holmes v. Securities Investor Protection Corp.*, 112 S. Ct. 1311, 1318 (1992) (noting that at common law, "a plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person . . . was generally said to stand at too remote a distance to recover").[10]

### B.    HSBC Guernsey and HSBC Management Were Not Defrauded

The Government further argues that HSBC Guernsey and HSBC Management were defrauded when their duties as trustee and manager of Hermitage Fund were "interfered" with in some unspecified way.  Interference does not equate to fraud and the Government cites no law or any facts in its Rule 56.1 Statement to support its argument.

Neither HSBC Guernsey as Trustee nor HSBC Management is a bank, according to the Government's evidence and witness.  (Dkt. 399 ¶ 2,5; Ex. 34 at 77:23-78:4.)

In responding to Defendants' motion to dismiss, the Government argued that HSBC Guernsey was the victim of fraud on a foreign bank because "the registered ownership of

---

[10] The inapposite case law cited by the Government concerns cases where injured parties themselves—and not investors in companies allegedly affected by misconduct of third parties—expended money.  (Dkt. 398 at 13-14); *United States v. Amato*, 540 F.3d 153, 162 (2d Cir. 2008) (approving restitution of legal fees spent by corporation in remediating a fraud against a corporation by its personnel); *United States v. Maynard*, 743 F.3d 374, 381 (2d Cir. 2014) (approving restitution of certain expenses incurred by bank after bank robbery).

Hermitage companies was *fraudulently* transferred away from HSBC Guernsey to conspirators."

(Dkt. 229 at 21 (citing Dkt. 174. ¶¶ 15, 26-28).)  The Court relied on this representation in

denying the motion, stating:

> Additionally, the court would also sustain the claims at this stage based on the
> SUA of "an offense against a foreign nation involving ... fraud, or any scheme or
> attempt to defraud, by or against a foreign bank[.]" 18 U.S.C. § 1956(c)(7)(B)(iii).
> The AVC alleges that "HSBC Private Bank (Guernsey) Limited ('HSBC
> Guernsey') is a Guernsey-based entity that served as trustee to the Hermitage
> Fund during all relevant periods," and that *"[u]nbeknownst* to Hermitage or HSB
> Guernsey, members of the Organization used the seized corporate documents and
> seals to *fraudulently* re-register ownership of [the Hermitage Companies] with
> the Russian corporate registry." (AVC ¶¶ 15, 26-28, 34.)

(Dkt. 310 at 23-24.)  (emphasis added).  Confronted with evidence obtained in discovery that the

companies were not in fact fraudulently re-registered, the Government abandons this position

and represents that it does not "assert or rely" on the theory that the companies were fraudulently

re-registered.  (Dkt. 408 n.7.)

Instead, the Government relies on a new theory that HSBC Guernsey and HSBC

Management were the victims of fraud because had their duties as trustee and manager

"interfered" with by the fraud on the Russian treasury.  The Government's new theory is unpled,

inchoate, and frankly incomprehensible. The Government identifies no facts in its Rule 56.1

Statement that describe how these entities were defrauded, because indeed it cannot.  HSBC

Guernsey was acting as a trustee for a trust that indirectly owned Hermitage shell companies

called Parfenion, Makhaon, and Rilend.  These three companies were not owned by HSBC

Guernsey but, rather, by Cypriot Holding companies named Glendora and Kone.  (Ex. 26 at

149:23-156:21.)  The Holders of the Fund, not HSBC Guernsey, are the beneficiaries of the trust.

(Ex. 3 at 32).  And the discovery shows that HSBC's client Hermitage had knowledge of the re-

registration of Parfenion, Makhaon, and Rilend, debunking the notion that there was any

wrongful "interference." (Def's Rule 56.1 Resp. to ¶ 13.)

Likewise, HSBC Management—itself not a bank, but a management company—did not own the assets in the trust, but instead was designated the official manager.  But as Browder explained in his deposition, Browder, and not HSBC, was the one actually providing investment management for the Hermitage Fund.  (Ex. 26 at 149:23-156:21.)  Browder testified that neither Hermitage nor the trust lost anything as a result of the alleged re-registration of companies.  (*Id*.)  And again, HSBC's client Hermitage had knowledge of the re-registration of the Hermitage Companies.  (Def's Rule 56.1 Resp. to ¶ 13.)  As a factual matter, HSBC Guernsey and HSBC Management did not have their duties "interfered" with by the theft from the Russian treasury in a manner that constitutes fraud.

Additionally, the Government identifies no legal principle that provides that the trustee and manager of a trust suffer cognizable injury where the corpus of the trust is damaged.  (*See* Dkt. 398 at 14-15.)  *United States v. Bindlay*, --- F.3d ---, 2015 WL 6444932 (2d Cir. Oct 26, 2015) cited by the Government, stands for the unremarkable proposition that defendants who personally engage in a fraud scheme involving deceit can be held liable when they deny a victim the right to control his or her own assets.  *United States v. Maynard*, 743 F.3d 374, 381 (2d Cir. 2014) merely notes that the expenses associated with an internal investigation may be properly considered to eligible for restitution.  Neither stands for the proposition that HSBC Guernsey or HSBC Management became victims of fraud when a trust they were officially administering allegedly suffered harm. And obviously there are no proceeds of any fraud on either.

The Government also has set forth no facts demonstrating the other elements of a fraud claim, including showing that the perpetrators of the fraud in Russia intended to defraud HSBC Guernsey as Trustee or HSBC Management.  Because the Government cannot show specific

intent to defraud the HSBC entities in question, the Government's new Specified Unlawful Activity fails.

C.   **The Government Has Not Identified the Proceeds from the Bank Fraud that Were Laundered**

The Government's new Specified Unlawful Activity theories fail for the independent reason that the Government cannot establish that the alleged "fraud against a foreign bank" produced any proceeds.  In order to sustain a claim for money laundering, the Government is required to show that the property at issue constitutes proceeds of a Specified Unlawful Activity. That is, "the government is required to link the moneys in question to specified unlawful activities."  *United States v. Gotti*, 459 F.3d 296, 337 (2d. Cir. 2006).  In its zeal to prosecute this case, the Government ignores this essential requirement.

The Government's essential case is that the money stolen from the Russian Treasury was laundered through a series of transactions, and that the Defendants allegedly knowingly received a portion of the proceeds of that money.  HSBC is entirely collateral to that series of alleged events.  It cannot be said that the "harm" to HSBC Suisse—as an investor in the Hermitage Fund—produced any proceeds alleged to be at issue in this case.  Rather, any harm that HSBC Suisse experienced in the diminution of its investment value was entirely separate from the proceeds of the Treasury Fraud.

Likewise, there is no credible assertion that the "interference" that HSBC Guernsey as Trustee and HSBC Management allegedly experienced in their roles as manager and trustee of the Hermitage Fund produced any proceeds of fraud.  The Government has explicitly disclaimed any reliance on the theory that HSBC Guernsey was harmed when companies it held were allegedly "fraudulently re-registered," (Dkt. 408 at n.7.), and the Government identifies no harm to these companies in its 56.1 statement.

Indeed, the case law concerning Section 1956(c)(7)(B) makes plain that this sub-section intended to authorize the Government to pursue the proceeds of specific, enumerated crimes—such as fraud against a foreign bank or bribery of a foreign public official.  *United States v. Xu*, No. 2:02-CR-00674-PMP-LRL, 2008 WL 1315632, at *1-*2 (D. Nev. Apr. 10, 2008) (use of fraud against a foreign bank predicate to recover proceeds of money allegedly stolen from Bank of China); *Real Property Known as Unit 5B of Onyx Chelsea Condo*, 2012 WL 1883371, at *5 (S.D.N.Y. May 21, 2012) (use of bribery of a foreign public official predicate to recover proceeds of alleged bribe to former First Lady of Taiwan). But where the proceeds of such enumerated crimes cannot be traced to the property at issue, the claim cannot be sustained.  *E.g.*, *United States v. One Gulfstream G-V Jet Aircraft*, 941 F. Supp. 2d 1, 5 (D. D.C. 2013) (dismissing complaint seeking forfeiture of aircraft where the complaint did not set forth a "specific indication that the Jet is derived from or traceable to illicit activity.").  There is no plausible basis for concluding that the property at issue in this case is the proceeds of any fraud upon HSBC.  Therefore, summary judgment should be denied.

### D.        The Government Has Not Shown an Applicable Violation of Russian Law

The Government's fraud against a foreign bank theories fail for the additional reason that it has not shown a violation of applicable Russian law.  In order to sustain this SUA, the Government must put forth evidence showing "*an offense against a foreign nation involving . . . fraud, or any scheme or attempt to defraud . . . against a foreign bank.*"  18 U.S.C. § 1956(c)(7)(B)(iii). (emphasis added).  Significantly, "an 'offense against a foreign nation' refers to an offense which is 'prohibited under the law of the foreign nation in which it is committed.'"  *United States v. Awan*, 459 F. Supp. 2d 167, 182-83 (E.D.N.Y. 2006) (quoting *United States v. One 1997 E35 Ford Van*, 50 F. Supp. 2d 789, 802 (N.D. Ill. 1999)).

The Government asserts in its motion that the alleged fraud against HSBC (collectively, without identifying entity in question) was committed in Russia, and asserts in the operative complaint that the alleged fraud against HSBC (Guernsey) constituted a violation of Russian law. (Dkt. 398 at 1; Dkt. 381 at ¶ 151.)

Astonishingly, the Government does not set forth in its motion or operative complaint what law of Russia was violated, despite the requirement that a party seeking to use foreign law provide reasonable notice to the opposing party.  Fed. R. Civ. P. 44.1.  Defendants fail to understand how any Russian law is violated when a Swiss-based private bank suffers an alleged diminution in value in its interests in a Guernsey-based fund due to their legal expenses.  Nor do Defendants understand how Russian law is violated when a Guernsey-based administrator and manager suffer alleged "interference" to their administrative duties with regard to a Guernsey-based fund.[11]  The Government has not carried its burden on this point and is not entitled to summary judgment on this specified unlawful activity.[12]

## IV.    THE SUMMARY JUDGMENT MOTION SHOULD BE DENIED BECAUSE IT RELIES ON UNPLED FACTUAL ALLEGATIONS AND THEORIES OF LIABILITY

The assertion of new theories of Specified Unlawful Activity, on November 3, 2015, for a trial on December 7, 2015, is untimely and constitutes trial by ambush.

---

[11] In addition, because this Specified Unlawful Activity relies upon both conduct and a violation of law that is entirely foreign, it is barred by the presumption against extraterritoriality.  *See Morrison v. National Australia Bank, Ltd.*, 561 U.S. 247 (2010).

[12] Nor should the Government be entitled to brief its vague, conclusory allegation of a Russian law violation on reply, thus depriving Defendants the opportunity to fairly respond.  *See Bertuglia v. City of New York*, 839 F. Supp. 2d 703, 737 (S.D.N.Y. 2012) (new arguments raised on reply should not be considered).

The Government never mentioned HSBC Suisse in the first complaint, the amended complaint or the Second Amended Complaint, filed on October 23, 2015.[13] (Dkts. 1, 174, 381.) Indeed a witness from HSBC Suisse testified on November 14 that the Government only reached out to HSBC Suisse at some point after June 30, 2015.  (Ex. 47 at 123:25-124:15.)  The instant motion, filed on November 3, was the first time Defendants received any information concerning the factual contentions accompanying the Government's new theory.

Likewise, the Government presents an equally brand new theory that HSBC Guernsey and HSBC Management were "defrauded" when their respective duties as trustee and manager were "interfered." (Dkt. 398 at 5-6.)  In its previous submissions, the Government has represented that its fraud on a foreign bank theory was based upon pleaded allegations that the registered ownership of the Hermitage Companies was fraudulently transferred.  (Dkt. 229 at 21 (citing Dkt. 174 ¶¶ 15, 26-28).).  In light of contrary evidence produced in discovery, the Government now represents that its summary judgment motion does not "assert or rely on" the fraudulent re-registration theory. (Dkt. 408 at 4 & n.7.)

It is fundamentally improper for the Government to introduce new factual allegations and legal theories on the eve of trial in the form of a summary judgment motion, and the motion should just be denied out of hand.  *Southwick Clothing LLC v. GFT (USA) Corp.*, No. 99 CV 10452 (GBD), 2004 WL 2914093, at *6 (S.D.N.Y. Dec. 15, 2004) ("A complaint cannot be amended merely by raising new facts and theories in [briefing], and hence such new allegations and claims should not be considered in resolving the [summary judgment] motion."); *Navajo Nation v. United States Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir. 2008) ("[Where] the

---

[13] The statement by AUSA Monteleoni to the Court that HSBC Suisse was in the Complaints was untrue. His suggestion that we should have known about it because there is a reference to Hermitage having hired attorneys is risable.  (*See* 11/6/15 Hr'g Tr. at 13-14.)

complaint does not include the necessary factual allegations to state a claim, raising such claim in a summary judgment motion is insufficient to present the claim to the district court.").[14]

## CONCLUSION

For the reasons stated above, Defendants respectfully request that the Court deny the Government's motion for partial summary judgment in its entirety.

Dated: November 17, 2015　　　　　　Respectfully submitted,
　　　　　New York, New York


　　　　　　　　　　　　　　　　s/ Mark A. Cymrot

　　　　　　　　　　　　　　**BAKER & HOSTETLER LLP**
　　　　　　　　　　　　　　45 Rockefeller Plaza
　　　　　　　　　　　　　　New York, NY 10111
　　　　　　　　　　　　　　Telephone:  (212) 589-4200
　　　　　　　　　　　　　　Facsimile:  (212) 589-4201
　　　　　　　　　　　　　　John W. Moscow
　　　　　　　　　　　　　　Mark A. Cymrot

　　　　　　　　　　　　　　**BAKER BOTTS LLP**
　　　　　　　　　　　　　　30 Rockefeller Plaza
　　　　　　　　　　　　　　New York, NY 10112
　　　　　　　　　　　　　　Telephone: (212) 408-2500
　　　　　　　　　　　　　　Facsimile: (212) 408-2501
　　　　　　　　　　　　　　Seth Taube

　　　　　　　　　　　　　　*Attorneys for Defendants*

---

[14] In the alternative, the motion should be denied and Defendants should be granted leave to conduct additional discovery in support of their opposition to the motion. Fed. R. Civ. P. 56(d). The Defendants understand that the Court wants this case to proceed to trial, but suggests that the Government is seeking to deprive the Defendants of due process of law in the interests of expediency. *See* Eulogy by Dean Norman Redlich on January 19, 1989 on the death of United States District Court Judge Edward Weinfeld ("First and foremost, despite all of the cynicism and overcommercialization of the profession, we continue to believe in the moral basis of law, and no one better symbolized that moral basis than Edward Weinfeld. He did not propound an over-arching moral philosophy. Rather he lived a moral life and understood the importance of process in reaching the moral decision. He understood that morality in law starts with the way the system treats individual persons with whom it comes in contact. When he said 'There is no such thing as an unimportant case,' he made an important moral statement. The process of adjudication—respect for litigants, lawyers, witnesses and jurors—intellectual rigor, impartiality, all of these were essential ingredients of his moral calculus.").