# EXHIBIT 4-Part 1



**U.S. Department of Justice**

Criminal Division

*Office of International Affairs*

MEW:MDR:JEC:BEB:AML:aml
182-44601 (Please repeat when responding)

Washington, D.C. 20530

March 21, 2014

**BY HAND DELIVERY**

Mr. A.S. Kupriyanov
Head of the Department of Legal Assistance
Main Department for International Legal Cooperation
Prosecutor General's Office of the Russian Federation
15-A, Bolshaya Dmitrovka,
125993, GSP-3, Moscow

      RE:    Request for Assistance in the Matter of Prevezon Holdings

Dear Mr. Kupriyanov,

      Please see the attached request for assistance in the above-referenced matter. This request is forwarded on behalf of the U.S. Attorney's Office for the Southern District of New York pursuant to the 1999 U.S.-Russian Federation Mutual Legal Assistance Treaty. Please forward this request to the appropriate authorities at your earliest convenience.

      If you have any questions concerning this matter, please contact me at (202) 514-0023 or by email at Betsy.Burke@usdoj.gov or Andrew Lewczyk, at (202) 353-8433 or by email at Andrew.Lewczyk@usdoj.gov. Thank you for your assistance.

                  Sincerely,

                  Mary Ellen Warlow
                  Director
                  Office of International Affairs
                  Criminal Division

      By:

                  Betsy E. Burke
                  Senior Trial Attorney

Enclosure:    Request for Assistance



**U.S. Department of Justice**

Criminal Division
*Office of International Affairs*

MEW:MDR:JEC:BEB:AML:aml
182-44601 (Please use when responding)

*Washington, D.C. 20530*

TO:   **The Central Authority of the Russian Federation**

SUBJECT:   **Request for Assistance in the Matter of Prevezon Holdings**

The Central Authority of the United States requests the assistance of the appropriate

Russian authorities pursuant to the 1999 U.S.-Russian Federation Mutual Legal Assistance

Treaty.  The United States Attorney's Office for the Southern District of New York (the "U.S.

prosecutor") is litigating an *in rem* non-conviction based forfeiture action seeking the assets of

Prevezon Holdings Ltd. ("Prevezon"), as well as related entities, which are believed to have been

involved in money laundering. The U.S. prosecutor's investigation has revealed that a Russian

criminal organization (the "Organization") defrauded Russian taxpayers of approximately 5.4

billion rubles, or approximately $230 million United States dollars.  Members of the

Organization, and its associates, have also engaged in a broad pattern of money laundering in

order to conceal the proceeds of the fraud scheme. This money laundering activity includes the

purchase of real property in the United States using, in part, fraud proceeds.

The U.S. prosecutor seeks the assistance of the Russian Federation in obtaining

authenticated certified copies of documents showing the existence of the fraud scheme and

permitting the tracing of portions of the fraud proceeds to Prevezon.

## I. REQUEST FOR EXPEDITED EXECUTION

The U.S. prosecutor is currently litigating an *in rem* non-conviction based forfeiture

action in New York. Prevezon and its related entities are seeking an expedited schedule for

1

*2086*

disclosure of documents and evidence. The U.S. prosecutor requests the assistance of the

Russian Federation as soon as possible to permit the U.S. prosecutor to comply with the schedule

the Court will set and make timely disclosure of relevant evidence to Prevezon and its entities.

## II. CONFIDENTIALITY

Pursuant to Article 7.5 of the Treaty, due to the nature of the forfeiture and the fact that

U.S. authorities are seeking to gather evidence of criminal activity, the United States requests

that you not disclose information contained herein except as is necessary to execute this request.

Further, the United States requests that you ask the persons to whom you disclose this

information to keep it confidential. Should it become impossible to execute any portion of this

request without breaching such confidentiality, please contact the points of contact listed at the

end of the request prior to doing so, in order to discuss how to proceed.

## III. FACTS

### A. The Russian Tax Fraud

Hermitage Capital Management Limited ("Hermitage") is an investment advisory firm

based in London. Hermitage has primarily advised the Hermitage Fund, an investment fund

focused on investments in Russia. Until 2006, the Hermitage Fund was the largest foreign

portfolio investor in Russia.[1] In 2007, the Organization engaged in an elaborate tax refund fraud

scheme resulting in a fraudulently-obtained tax refund of approximately $230 million. As part of

the fraud scheme, members of the Organization stole the corporate identities of the Hermitage

portfolio companies Rilend, Parfenion, and Makhaon (the "Hermitage Companies"), and then

used these stolen identities to make fraudulent claims for tax refunds.

In or about April and May 2007, key members of the Organization met in Larnaca,

---

1 HSBC Private Bank (Guernsey) Limited ("HSBC Guernsey") is a Guernsey-based entity that served as trustee to
the Hermitage Fund during all relevant periods.

2



Cyprus, to plan the crime. The individuals who are believed to have participated in planning the fraud scheme include: 1) Artem Kuznetsov, then a Lieutenant Colonel in Russia's Interior Ministry; 2) Dmitry Klyuev, a convicted fraudster, owner of the Russian bank Universalniy Bank Sberezheniy ("USB"), and the mastermind of the Organization; 3) Pavel Karpov, then a Major in Russia's Interior Ministry; 4) Andrey Pavlov, a lawyer; 5) Pavlov's wife, Yulia Mayorova, also a lawyer; 6) Olga Stepanova, the head of Moscow Tax Office No. 28; and 7) Vladlen Stepanov, Stepanova's husband at the time of the fraud scheme.

About a month later, on or about June 4, 2007, Kuznetsov led approximately 25 officers from the Moscow branch of the Russian Interior Ministry in a search of Hermitage's office in Moscow. The officers removed Hermitage's computer server, virtually all of its computers, and dozens of boxes of confidential financial documents and records. Later that day, Kuznetsov joined approximately 25 officers in searching the offices of Firestone Duncan, a law firm that was advising HSBC Guernsey and the Hermitage Companies. Among the items seized in the searches of Hermitage's and Firestone Duncan's offices were corporate stamps, official charters, original tax certificates, and original registration certificates for the Hermitage Companies.

Without Hermitage's or HSBC Guernsey's knowledge or authorization, members of the Organization used the seized corporate documents and seals to fraudulently re-register ownership of the Hermitage Companies. The ownership of these companies was fraudulently transferred to OOO Pluton ("Pluton"), a Russian company wholly owned by Victor Markelov, a former sawmill operator who had been convicted of manslaughter in 2002. Part of the process of transferring ownership of the Hermitage Companies to Pluton involved obtaining a court judgment confirming the change of ownership. On June 15, 2007, a body purporting to be the permanent arbitration court of a corporation known as OOO Detoks ("Detoks") issued a ruling

stating that full ownership of the Hermitage Companies was transferred to Pluton. On July 30, 2007, the arbitration court of the Tatarstan Republic confirmed the purported Detoks arbitration court ruling transferring ownership of the Hermitage Companies to Pluton. However, Detoks does not operate a genuine arbitration court. Detoks has no discernible presence on Russian legal databases, and the registered headquarters for Detoks is a dilapidated residential building. Nevertheless, after this transfer of ownership, Markelov became fraudulently listed as director of Parfenion. Viacheslav Khlebnikov, a convicted extortionist and burglar, became fraudulently listed as director of Makhaon. Valery Kurochkin, a convicted thief, became fraudulently listed as director of Rilend.

In order to procure tax refunds, the Organization orchestrated sham lawsuits against the fraudulently re-registered companies. These sham lawsuits involved members of the Organization as both the plaintiffs and defendants. The sham lawsuits were brought on the basis of forged contracts involving three sham counterparties, OOO Logos Plus, OOO Instar, and OOO Grand Aktive. The three forged contracts were all virtually identical in form, requiring the Hermitage Companies to supply securities to the relevant sham counterparty and to compensate the relevant sham counterparty for its lost profits should the Hermitage Companies fail to supply the securities.

The forged contracts contained multiple suspicious features. For example, the contracts between OOO Logos Plus and the Hermitage Companies purported to require OOO Logos Plus, a company with total capital at the time of approximately U.S. $300, to pay the Hermitage Companies approximately U.S. $500 million to buy securities. Additionally, the forged contracts included extensive confidential information about the Hermitage Companies including bank account information, information on assets and holdings, custodian banks, and addresses of

4

registration and incorporation of the Hermitage Companies. Such information was confidential, but was contained in the records that had been seized from Hermitage and Firestone Duncan on or about June 4, 2007. Moreover, although referencing confidential information, the contracts contained various mistakes and inaccuracies, including referencing bank accounts that had not yet been opened, and using addresses that were incorrect as of the relevant time.

Further, the OOO Logos Plus contracts referred to a power of attorney giving an individual named Alexandr Strazhev authority to sign on behalf of OOO Logos Plus. This power of attorney identified Strazhev by reference to a passport number. The passport number corresponded to a passport not issued to Strazhev but to a third person, who had reported the passport as missing in 2005.

In addition, in the sham lawsuits, the Hermitage Companies were purportedly represented by its attorneys—but these attorneys were, in fact, entirely unknown to Hermitage or HSBC Guernsey. These attorneys included Pavlov and Mayorova, the lawyers who had flown to Larnaca in approximately April 2007 with Karpov. Hermitage and HSBC had no prior knowledge of, or acquaintance with, the attorneys that purported to represent the Hermitage Companies in these sham lawsuits, and had never hired them or authorized their appointment in any way. In each case, the members of the Organization purporting to represent Hermitage Companies confessed full liability in court, leading the courts to award large money judgments to the plaintiffs. Particularly suspicious was the fact that Pavlov, appearing to represent the Hermitage Companies in one lawsuit, also appeared to represent one of the counterparties suing the Hermitage Companies in another lawsuit.

The purpose of the sham lawsuits was to fraudulently generate money judgments against the Hermitage Companies. In total, the courts in Moscow awarded judgments totaling $973

5

million against Hermitage Companies. Members of the Organization purporting to represent the Hermitage Companies then used those money judgments to seek tax refunds. The basis of these refund requests was that the money judgments constituted losses counteracting the profits the Hermitage Companies had earned, and thus the Hermitage Companies were entitled to a refund of the taxes that had been paid on these profits. The requested refunds totaled 5.4 billion rubles, or approximately $230 million dollars.

Members of the Organization who were officials at two Russian tax offices approved the requests on the same day that they were made or on the next business day, and $230 million was disbursed to members of the Organization, purporting to represent the Hermitage Companies, just two days later.

**B.  Laundering the Proceeds of the $230 Million Fraud Scheme**

Once the fraudulent tax refund was authorized, the Organization's members and its associates engaged in a complicated series of international transactions in order to launder the fraud proceeds and distribute them among the members and associates of the Organization. On December 26, 2007, two days after members of the Organization made – and the Moscow Tax Offices 25 and 28 approved – the fraudulent refund applications, the Russian treasury made a series of transfers totaling approximately 5.4 billion rubles to accounts that were set up in the name of the Hermitage Companies at two banks, Intercommerz and USB. Each of these accounts was opened within two weeks of the transfers from the Russian Treasury. Account number 40702810000000002761 at Intercommerz Bank, held in the name of OOO Parfenion (the "Parfenion Account") was opened on December 20, 2007, six days before the transfers from the Russian Treasury, by Markelov. Account number 40702810200000000376 at USB, held in the name of OOO Rilend (the "Rilend Account") was opened on December 17, 2007, nine days

6



before the transfers from the Russian Treasury, by Kurochkin. Additionally, account number 40702810900000000375 at USB, held in the name of OOO Makhaon (the "Makhaon Account"), was opened on December 12, 2007, two weeks before the transfers from the Russian Treasury, by Khlebnikov.

From approximately January 21, 2008, to approximately January 25, 2008, a series of six transfers were made from the Parfenion Account to account number 40702810640330102750 at the Russian bank Sberbank Rossi, held in the name of a shell company called ZhK.  These six transfers totaled approximately 430 million rubles.  In approximately November 2008, ZhK was merged into a new commercial entity along with two other companies.

The Parfenion Account also made a series of six transfers to account number 40702810000000002792 at Intercommerz Bank, held in the name of a shell company called Fausta (the "Fausta Account").  These six transfers, made between January 18, 2008, and February 3, 2008, totaled approximately 1.108 billion rubles. After receiving the money from the Parfenion Account, the Fausta Account made a series of ten transfers into the ZhK Account totaling approximately 513 million rubles. Fausta was dissolved in March of 2008, approximately one month after receiving the money from Parfenion.

From January 11, 2008 to January 21, 2008, the Rilend Account made a series of seven transfers to account number 40702810056000014979 at the Russian bank Mosstroieconombank, held in the name of a shell company called Univers (the "Univers Account"). These seven transfers totaled approximately 3.6 million rubles. In addition to receiving transfers from the Rilend Account, the Univers Account then also received transfers from the Fausta Account and from account 40702810800030001158 at ZAO Okean Bank, held in the name of another shell company called Anika (the "Anika Account"), which had received funds from the Makhaon

26 *g2*

Account.

The ZhK Account and the Univers Account then made transfers to a correspondent account at the Russian bank Alfa Bank, account number 30109810800000000449, which was held in the name of Bank Krainiy Sever (the "Bank Krainiy Sever Account"). As it received these funds from the ZhK and Univers Accounts, the Bank Krainiy Sever Account was in turn transferring funds to two bank accounts opened at Banca De Economii in Moldova on behalf of two shell companies, Bunicon-Impex SRL ("Bunicon") (account number , referred to below as the "Bunicon Account") and SC Elenast-Com SRL ("Elenast") (account number 22513018404162, referred to below as the "Elenast Account"). On February 13, 2008, the day that the Bank Krainiy Sever Account made the last transfer to the Elenast Account, a Russian court ordered the Bank Krainiy Sever Account seized. Approximately one month later, the Central Bank of the Russian Federation canceled Bank Krainiy Sever's banking license for money laundering violations.

A shell company called Bunicon received approximately 528 million rubles in transfers. Bunicon was registered in approximately July 2007, with its administrator listed as Vladimir Bunichovschi. Bunichovschi was twenty-four years old at the time that Bunicon received the transfers from Bank Krainiy Sever. The U.S. prosecutor believes that Bunicon's listed headquarters was a residential house in Chisinau, Moldova. The residential house listed as Bunicon's headquarters was also the headquarters of two other companies, which also appear to be shell companies.

Elenast was also a shell company. Elenast was registered in approximately October 2007, with its administrator listed as Stinga Elena. The U.S. prosecutor believes that Elenast's listed headquarters was a residential apartment building in Chisinau, Moldova.

8

On February 6, 2008, the Bunicon Account made a wire transfer to an account with the Swiss bank UBS in the name of Prevezon Holdings and with an account number ending in -381-01 (the "Prevezon Holdings Account"). The amount of the wire transfer was approximately U.S. $410,000.  On February 13, 2008, the Elenast Account made a wire transfer to the Prevezon Holdings Account. The amount of the wire transfer was approximately U.S. $447,354.  At the time of the February 2008 transfers, the sole shareholder of Prevezon Holdings was a twenty-two year old man named Timofey Krit, according to Cyprus public records.  A personal webpage Krit maintains currently lists him as a science graduate student in Russia. Although Krit was publicly listed as the sole shareholder of Prevezon Holdings, the beneficial owner of Prevezon's accounts at UBS was an individual named Alexander Litvak. On June 19, 2008, an individual named Denis Katsyv purchased a 100% interest in the Prevezon Holdings from Krit for $50,000. The Prevezon Holdings Accounts at UBS had over $2 million in assets at the time.  Although Litvak and Katsyv are not, to date, known to have participated in the planning of the tax refund scheme described above, these individuals are relevant to the investigation as recipients of the proceeds of that scheme.  Specifically, the Prevezon companies that they control have profited from the receipt of these proceeds by investing those funds in New York and European real estate.  Notably, the wire descriptions for the fund transfers from the Bunicon Account and the Elenast Account put the managers and directors of Prevezon on notice of the illicit source of those funds insofar as that description falsely described the wires as pertaining to "prepayment" for, among other things, sanitary equipment that Prevezon is plainly not in the business of selling.

## C. The Non-Conviction-Based Forfeiture Complaint filed in New York

On September 10, 2013, the U.S. prosecutor filed an *in rem* non conviction-based money

9

laundering complaint (the "Complaint") against Prevezon Holdings, Ltd., and its affiliated companies, Ferencoi Investments, Ltd., and Kolevins, Ltd., seeking the forfeiture of any and all assets derived from criminal proceeds traceable to the tax fraud scheme, including luxury residential apartments and high-end commercial retail space in Manhattan. As the complaint alleges, the proceeds from the tax fraud scheme were laundered through a series of transfers involving bank accounts held in the name of nominee shell companies in Russia and Moldova, as described in Section III. B above, before being deposited into the Prevezon Holdings Account. The Prevezon Holdings Account was used to purchase, in whole or in part, the real properties named for forfeiture in New York. In connection with the Complaint, the U.S. prosecutor filed *lis pendens* against the real properties in New York, and served orders on Bank of America to restrain three bank accounts containing criminal proceeds from the tax fraud and money laundering scheme.

## IV. OFFENSES

**18 U.S.C. § 981. Civil Forfeiture.**

(a)(1) The following property is subject to forfeiture to the United States:

(A) Any property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property.

**18 U.S.C. § 1956. Laundering of Monetary Instruments.**

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity--

(A)(i) with the intent to promote the carrying on of specified unlawful activity; or

(ii) with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986; or

(B) knowing that the transaction is designed in whole or in part—

10