EXHIBIT 5



**Генеральная прокуратура
Российской Федерации**

ул. Б. Дмитровка, 15а
Москва, Россия, ГСП-3, 125993

12.08.2014   № 35/87-9с-2014

На № 182-44601 от 20.03.2014

Министерство юстиции
Соединенных Штатов Америки

Директору Бюро по
международным делам

г-же Мери Эллен Варлоу

Office of International Affairs
U.S. Department of Justice
1301 New-York Avenue, N.W.,
Suite 800, Washington, DC 20005

Уважаемая госпожа директор!

Генеральная прокуратура Российской Федерации свидетельствует свое уважение Министерству юстиции Соединенных Штатов Америки и направляет ответ на запрос о правовой помощи № 182-44601, а также прилагаемые к нему материалы.

Выражаем надежду на дальнейшее плодотворное сотрудничество между нашими ведомствами по оказанию правовой помощи по уголовным делам.

Приложение: на 255 л.

С уважением,

Начальник Главного управления
международно-правового сотрудничества                    С.А. Карапетян

С.Г.Титов, тел.+7(495)982-76-07, факс. .+7(495)692-81-49

АП № 021119

Генеральная прокуратура Российской
Федерации

# РЕЗУЛЬТАТЫ
рассмотрения запроса США по делу «Prevezon Holdings»

## СОДЕРЖАНИЕ

ПРЕДМЕТ ЗАПРОСА ......................................................................................................... 1

ОБСТОЯТЕЛЬСТВА ДЕЛА ............................................................................................... 2

СОСТОЯТЕЛЬНОСТЬ ИСКА ........................................................................................... 6

ПРИЧАСТНОСТЬ «PREVEZON HOLDINGS» И КАЦЫВА Д.П. .............................. 12

ЗАКЛЮЧЕНИЕ ................................................................................................................ 14

## ПРЕДМЕТ ЗАПРОСА

Министерство юстиции Соединенных Штатов Америки обратилось к Генеральной прокуратуре Российской Федерации с ходатайством об оказании содействия в расследовании дела компании «Prevezon Holdings», к которой Правительством США предъявлен гражданский иск о конфискации.

Из представленных документов следует, что Правительство США в сентябре 2013 г. обратилось в суд Южного округа штата Нью-Йорк к группе компаний «Prevezon Holdings» и к их владельцу Кацыву Д.П. с требованием о конфискации имущества, которое, по мнению США, было приобретено с целью легализации ранее похищенных денежных средств.

В исковом заявлении утверждается, что преступная организация, включающая российских коррумпированных чиновников, обманным путем в июле-декабре 2007 г. осуществила кражу принадлежащих Браудеру У.Ф. российских компаний «Рилэнд» (ООО), «Парфенион» (ООО), «Махаон» (ООО), управляя которыми завладела 5,4 млрд. руб. или 230 млн. долларов США из российского бюджета, ранее уплаченных в качестве налога на прибыль.

После этого, как полагает Правительство США, члены организации и их партнеры занялись отмыванием похищенных денег. В частности, через счета ряда молдавских фирм («Bunicon-Impex» и «Elenast-Com») они в феврале 2008 г. перечислили компании «Prevezon Holdings» 857 тыс. долл. США, которые затем потратили на покупку недвижимости в Нью-Йорке на общую сумму, превышающую 22 млн. долл. США.

С учетом этого, Соединенные Штаты Америки просят Российскую Федерацию предоставить связанную с изложенными в иске обстоятельствами финансовую, банковскую и налоговую документацию, материалы судебных заседаний, регистрационные документы российских компаний и другие данные.

Генеральной прокуратурой Российской Федерации изучен иск Правительства США к «Prevezon Holdings» и связанных с ней структур. Изложенные в нем сведения сопоставлены с результатами проведенного на

территории России и ряда других стран расследования. Некоторые обстоятельства, указанные в иске, дополнительно проверены следственным путем.

По итогам установлено, что основную часть иска составляет уже проверенная и опровергнутая как ложная версия Браудера У.Ф., которая им выдвинута и широко тиражируется в целях сокрытия своей причастности к совершению в Российской Федерации ряда тяжких преступлений в сфере экономики и дискредитации правоохранительных и судебных органов России, расследующих его преступную деятельность. Поэтому предъявленные Правительством США требования к «Prevezon Holdings» не представляют собой иска в юридическом смысле этого слова. Они выступают квазииском, поскольку не содержат самостоятельных оснований и достоверных данных.

Поскольку, как видно из иска, Соединенные Штаты Америки не располагают полными и достоверными данными о Браудере У.Ф. и подконтрольных ему лицах, а также об ответчиках и их отношении к обстоятельствам, связанным с хищением из бюджета 5,4 млрд. руб., Генеральная прокуратура Российской Федерации полагает возможным сообщить о результатах проведенного на ее территории расследования.

Вышеотмеченное отношение Российской Федерации к иску Правительства США против «Prevezon Holdings» всецело и исключительно основано на объективных данных, которые в любое время могут быть проверены и найти свое подтверждение.

## ОБСТОЯТЕЛЬСТВА ДЕЛА

Расследованием деятельности Браудера У.Ф. установлено, что в 1996 г. он, будучи подданным Соединенного Королевства Великобритании и Северной Ирландии, в нарушение миграционного законодательства прибыл в г. Москва (Россия), где принял решение заниматься незаконным приобретением акций российских предприятий, которые были запрещены для продажи нерезидентам – иностранным лицам.

Для реализации своих планов Браудер У.Ф. привлек Файерстоуна Д.Р., Магнитского С.Л. и других лиц, которые разработали для него преступную схему завладения акциями крупных российских компаний, обогащения за счет незаконного оборота этих акций, неуплаты налогов и их мошеннического возврата из бюджета Российской Федерации.

Во исполнение преступного плана на территории Российской Федерации соучастниками указанных лиц – Черкасовым И.С. и Клейнером В.Г. было организовано учреждение фиктивных обществ – «Махаон», «Риленд», «Парфенион», «Дальняя степь», «Сатурн Инвестментс», «Камея», «Рифл», «Ориент-К» и других, которые были зарегистрированы по одному адресу: Республика Калмыкия, г. Элиста, ул. Ленина, д. 301, где также числилось еще свыше одной тысячи различных фиктивных компаний.

Однако по данному адресу вышеприведенные организации не находились, фактическое управление их деятельностью осуществлялось

2

компаниями «Hermitage Capital» и «Файерстоун Данкен» в г. Москве. Руководителем учрежденных обществ первоначально являлся Браудер У.Ф., а затем эту должность занимали доверенные ему лица –Ренч П., Уилсон М., Черкасов И.

Используя указанные общества в преступных целях, Браудер У.Ф. скрывал от контрагентов и реестродержателей акций свое фактическое участие как нерезидента в скупке акций российских предприятий. Скупая акции, формально на российские юридические лица, Браудер У.Ф. уклонился от получения обязательного для нерезидентов разрешения Федеральной комиссии по ценным бумагам и Правительства Российской Федерации и в итоге без их согласия в период с 1999 по 2004 противоправно приобрел не менее 131 574 722 акций ОАО «Газпром».

Названными действиями Браудера У.Ф. и его соучастниками причинен ущерб на сумму не менее 2 млрд. 985 млн. руб. По данному факту возбуждено и расследуется уголовное дело, по которому Браудер У.Ф. от дачи показаний уклоняется, объявлен в федеральный и международный розыск.

В 2004 году по результатам налоговых проверок было выявлено, что формально зарегистрированные в Республике Калмыкия общества, деятельности на этой территории не ведут, инвалиды в обществах не работают, оформлены фиктивно, в налоговый орган представлялись поддельные свидетельства резидентов особой экономической зоны, содержащие подложные подписи министра экономики Республики Калмыкия. Было установлено, что использованная схема налогообложения позволяла компаниям Браудера У.Ф. незаконно получать льготы по уплате налогов, снижая свое налоговое бремя с 35% до 5,5 % только по налогу на прибыль.

Используя разработанную Магнитским С.Л. схему ухода от налогов, принадлежащие Браудеру У.Ф. компании представляли в налоговые органы Российской Федерации ложные сведения, что позволило компаниям Браудера У.Ф. (компаниям «Hermitage Capital») только за один налоговый период 2001 года уклониться от уплаты налога на прибыль в размере 522 595 514 руб.

По данному факту в 2004 году возбуждены уголовные дела, расследование по которым неоднократно приостанавливалось в связи с розыском Браудера У.Ф. В 2012 г. расследование было завершено, дело передано в суд.

Вступившим в законную силу приговором Тверского районного суда г. Москвы от 11 июля 2013 года Браудер У.Ф. признан виновным в многомиллионном умышленном уклонении от уплаты налогов и приговорен к 9 годам лишения свободы, объявлен в федеральный и международный розыск.

Также установлено, что и после продажи в 2006 году незаконно приобретенных акций со всех подконтрольных Браудеру У.Ф. компаний, этой же группой лиц применялись незаконные схемы налогообложения, а впоследствии уплаченные по таким схемам налоги на прибыль возвращались из бюджета мошенническим путем.

По одному из фактов умышленно заниженной ставки удержания налога на доходы, в мае 2007 года было возбуждено уголовное дело в отношении

Черкасова И.В., в ходе расследования которого выявлен ущерб Российской Федерации в размере около 600 000 000 рублей.

В ходе расследования этого уголовного дела в феврале 2008 года правоохранительными органами России было выявлено, что уплаченные обществами «Рилэнд», «Махаон» и «Парфенион», контролируемыми Браудером У.Ф., налоги на прибыль с продаж акций в размере 5,4 млрд. рублей, путем введения налоговых органов в заблуждение, были на основании заранее подготовленных фиктивных соглашений, образующих убытки у названных обществ ровно на сумму уплаченных налогов, похищены из российского бюджета под видом возврата излишне уплаченного налога на прибыль.

С реализацией именно этой схемы связан упомянутый в иске США эпизод с 5,4 млрд. рублей.

Расследование данных обстоятельств показало, что к хищению 5,4 млрд. руб. причастна группа лиц, состоявшая из Хлебникова В.Г., Маркелова В.А., Курочкина В.Н., Коробейникова С.М., Гасанова О.Г., а также Магнитского С.Л. и Хайретдинова Э.М., действовавших в интересах Браудера У.Ф.

План по хищению ранее уплаченных в 2006 году налогов от продажи акций, возникший не позднее мая 2007 года, предусматривал замену владельцев налогоплательщиков – «Рилэнд», «Махаон», «Парфенион» на подставных лиц, формально никак не связанных с кем-либо из «Hermitage Capital», с тем, чтобы организаторы преступной схемы могли беспрепятственно получить на счета контролируемых ими лиц за рубежом похищенные денежные средства, а в последующем заявить о краже у них этих компаний, тем самым отвести от себя подозрения.

В ходе совершения названного преступления и с целью сокрытия участия в нем Браудера У.Ф., была осуществлена смена владельцев российских обществ на подставных лиц путем переоформления 100 % долей этих обществ на «Плутон» (ООО). Для этого директорами кипрских компаний «Kone Holdings» и «Glendora Holdings», входящих в структуру «Hermitage Capital» и принадлежащих Браудеру У.Ф., 2 июля 2007 года выдана доверенность Гасанову О.Г. с полномочиями заключать от их имени сделки с долями в уставных капиталах обществ, в том числе, самостоятельно определять условия сделок. На основании этой доверенности Гасанов О.Г. заключает 31 июля 2007 года договор купли-продажи долей обществ «Рилэнд», «Махаон», «Парфенион» с подставным лицом, формально не связанным с фондом «Hermitage Capital» и Браудером У.Ф., лицом, но подконтрольному им обществом «Плутон», возглавляемым Маркеловым В.А.

После переоформления учредительных документов, на должности директоров указанных обществ были назначены привлеченные Гасановым О.Г. лица – Хлебников В.Г., Маркелов В.А. и Курочкин В.Н., которые в последующем принимали непосредственное участие в обмане налоговых органов относительно наличия у них оснований для возвращения ранее уплаченного налога на прибыль в размере 5,4 млрд. рублей.

Копия верна
Российской Федерации

4

Будучи соисполнителем схемы хищения и располагая самыми полными данными о финансовой деятельности «Махаон», «Рилэнд», «Парфенион», Магнитский С.Л. произвел расчет размера якобы излишне уплаченного в бюджет налога, изготовил недостоверные налоговые декларации и подтверждающие их первичные бухгалтерские документы, удостоверил их дубликатами печатей, после чего передал их Гасанову О.Г. и Маркелову В.А., которые они совместно с Курочкиным В.Н. и Хлебниковым В.Г. использовали для введения в заблуждение налоговых органов и завладения 5,4 млрд. руб.

В свою очередь Коробейников С.М., являясь владельцем КБ «Универсальный банк сбережений», предоставил счета этой организации, прием на них изъятых из бюджета под видом возврата налога денег и их последующую легализацию (перевод в другие банковские и иные кредитные учреждения Российской Федерации и последующий вывод их за рубеж).

На основании подготовленных Магнитским С.Л. документов, инспекции Федеральной налоговой службы № 25 и 28 приняли решения о возврате налогов в сумме 5 409 503 006, 48 руб., которые 26.12.2007 управление федерального казначейства Министерства финансов РФ перечислило на счета обществ.

Осознавая, что вышеуказанная преступная деятельность Браудера У.Ф. и подконтрольных ему лиц может быть выявлена правоохранительными органами России, один из адвокатов Браудера У.Ф. - Хайретдинов Э.М. начинает осуществлять заранее предусмотренные преступным планом меры к выводу Браудера У.Ф. из числа лиц, которые могли быть заподозрены в хищении 5,4 млрд. руб.

С декабря 2007 года он распространяет сведения о хищении у Браудера У.Ф. (у «Hermitage Capital») названных фирм и о причастности к этим событиям сотрудников российских правоохранительных органов, обосновывая это тем, что в июне 2007 г. они в ходе обыска изъяли учредительные документы «Рилэнд», «Махаон», «Парфенион» и в последующем использовали их для переоформления этих фирм на других лиц.

После очередной смены номинального владельца обществ «Рилэнд», «Махаон», «Парфенион» («Плутон») на новое подставленное лицо компанию «Boily Systems» (Британские виргинские острова) Хайретдинов Э.М. организовывает тайное изъятие в налоговых органах и последующее хранение у себя подложных документов, которые были изготовлены Магнитским С.Л. и использованы Гасановым О.Г. и Маркеловым В.А. для совершения хищения 5,4 млрд. руб. После обнаружения ряда из указанных налоговых документов в ходе обыска у Хайретдинова Э.М., последний спешно покинул территорию Российской Федерации и по имеющейся информации до сих пор находится в Великобритании, где с 2006-2007 года скрываются большинство лиц из группы Браудера У.Ф., задействованных им в многолетней системно-организованной мошеннической деятельности.

Приговорами Тверского районного суда г. Москвы от 28.04.2009 и 10.03.2011 Маркелов В.А. и Хлебников В.Г. признаны виновными в совершении преступления, предусмотренного ч.4 ст.159 УК РФ,

5



(мошенничество, совершенное группой лиц в особо крупном размере). Им назначено наказание в виде лишения свободы сроком на пять лет. В доход государства обращены денежные средства на сумму 685 024 893, 29 руб.

Расследование в отношении Курочкина В.Н., Коробейникова С.М., Гасанова О.Г. и Магнитского С.Л. по обстоятельствам хищения ими 5,4 млрд. руб. прекращено в связи со смертью. Хайретдинов Э.М. объявлен в розыск.

## НЕСОСТОЯТЕЛЬНОСТЬ ИСКА

Выявленные несоответствия всех ключевых и сопутствующих им обстоятельств совершения хищения бюджетных средств в 2007 году в Российской Федерации результатам расследования, подтвержденными вступившими в законную силу решениями судов, указывают на несостоятельность иска Правительства США.

1) Утверждения о совершении хищения 5,4 млрд. руб. «российской преступной организацией, включающей коррумпированных правительственных чиновников», не соответствуют действительности.

Следствием установлено, что к указанному преступлению причастна группа лиц, состоявшая из Браудера У.Ф., Магнитского С.Л., Хлебникова В.Г., Маркелова В.А., Курочкина В.Н., Коробейникова С.М., Гасанова О.Г. и Хайретдинова Э.М., которые должностными лицами не являлись.

В ходе расследования проверялась причастность к хищению 5,4 млрд. руб. сотрудников налоговых органов. Они подвергались допросам и очным ставкам. По месту их работы и жительства проведены обыска и выемки. Осуществлен контроль телефонных разговоров соответствующих лиц. Однако доказательств связи должностных лиц с вышеназванной преступной группой не найдено. В момент принятия решений о выплате 5,4 млрд. они находились под влиянием обмана.

Причастность иных лиц, в т.ч. сотрудников органов внутренних дел – Карпова П.А. и Кузнецова А.К., также проверена и подтверждения не нашла. Установлено, что имеющееся у них имущество приобретено ими и их родственниками за счет средств, полученных из легальных источников, и значительно раньше совершения хищения.

2) Доводы о том, что члены «организации» – Карпов П.А. и Кузнецов А.К., с целью хищения «корпоративного образа компаний «Hermitage Capital», инициировали проведение в середине 2007 г. обыска в российском офисе фонда «Hermitage Capital», в ходе которого сотрудники полиции конфисковали подлинные печати, налоговые и учредительные документы «Рилэнд», «Махаон», «Парфенион», а затем использовали их для перерегистрации этих обществ на имя трех членов «организации», являются недостоверными.

Следствием установлено, что Карпов П.А. решений о производстве обыска, а также об изъятии указанных предметов и документов не принимал, в самом обыске не участвовал. К моменту принятия следователем Карповым П.А. соответствующего уголовного дела к своему производству,

6

регистрационные документы и печати «Рилэнд», «Махаон», «Парфенион» уже были изъяты предыдущим следователем и хранились в упакованном и опечатанном виде, в помещении, приспособленном для хранения изъятого имущества. Упаковки Карпов П.А. не вскрывал и не использовал указанные предметы и документы.

Проведёнными экспертными исследованиями установлено, что оттиски печатей «Рилэнд», «Махаон», «Парфенион» в документах, которые были использованы при совершении хищения 5,4 млрд. руб., выполнены не теми печатями, которые были изъяты следователями МВД в российских офисах компаний «Hermitage Capital» и «Файерстоун Данкен».

При совершении мошенничества использовались дубликаты, которые, как признал сам Магнитский С.Л., он по указанию руководства компаний изготовил после проведения правоохранительными органами обыска. Эти дубликаты, согласно показаниям Магнитского С.Л., находились в распоряжении сотрудников «Файерстоун Данкен», в том числе самого Магнитского С.Л.

3) Утверждения о том, что участники «организации» совершили кражу принадлежащих компании «Hermitage Capital» обществ - «Махаон», «Рилэнд», «Парфенион», на основании решения третейского суда при ООО «Детокс» от 15 июня 2007 года, изъяв в ходе обысков 4 июня 2007 года их учредительные документы и печати, используя которые перерегистрировали общества на других членов «организации» и в последующем использовали эти фирмы для хищения бюджетных средств, не соответствуют действительности.

Расследованием установлено, что хищения прав на «Рилэнд», «Махаон», «Парфенион» не было. Составной частью плана хищения 5,4 млрд. рублей являлась смена владельцев российских обществ.

Факт изъятия следственными органами учредительных документов и печатей обществ 4 июня 2007 и оформление сделок купли-продажи долей датой 31 июля 2007 года позволил Браудеру У.Ф. подкрепить свою версию о краже у «Hermitage Capital» российских обществ, публично заявив о причастности к этому сотрудников правоохранительных органов.

О том, что факт изъятия и хранения сотрудниками правоохранительных органов документов и печатей «Рилэнд», «Махаон», «Парфенион» использовался в интересах Браудера У.Ф. лицами из ближайшего окружения, подтверждал и Магнитский С.Л. в своих показаниях.

Будучи допрошенным по уголовному делу в отношении адвоката Хайретдинова Э.М., Магнитский С.Л. в июне 2008 года показал, что следователь Карпов П.А. еще в ноябре-декабре 2007 года готов был вернуть печати и документы «Рилэнд», «Махаон», «Парфенион», изъятые в ходе обыска 4 июня 2007 года, однако Клейнер В.Г. и Черкасов И.С. просили не получать их до того момента, пока следствие не возбудит уголовное дело по их же заявлению о краже у группы Браудера У.Ф. российских компаний.

Позднее факт нахождения у следствия учредительных документов и печатей «Рилэнд», «Махаон», «Парфенион» группой Браудера У.Ф. будет использоваться как единственное обоснование причастности сотрудников правоохранительных органов к якобы совершенной краже у «Hermitage Capital» российских обществ и последовавшему за этим хищению бюджетных средств.

Отсутствие хищения российских обществ у «Hermitage Capital» также следует и из заявлений представителей компаний «Hermitage Capital» в десятках инициированных ими же арбитражных делах со схожими требованиями, формально направленными на возврат корпоративного управления над российскими обществами.

Ни в одном из этих арбитражных дел лица, контролируемые Браудером У.Ф. (компаниями «Hermitage Capital»), не заявляли, что они не заключали сделки, по которым сначала 31.07.2007 владельцем обществ стало «Плутон», а затем с 08.02.2008 – компания «Boily Systems», и что доверенность, по которой были заключены сделки, ими не выдавалась.

Единственным основанием для судебного возврата им 100 % долей российских обществ, являлось неапостилирование доверенности на Гасанова О.Г., которое не было сделано ими же самими.

Данные обстоятельства неоднократно исследовались в арбитражных процессах, большинство которых было прекращено в связи с отказами от исков.

По единственному рассмотренному по существу делу о правах на доли «Рилэнд», «Махаон», «Парфенион», по которому компании Браудера У.Ф. от иска не отказались, суд сначала в 2010 году, а затем окончательно в мае 2011 года установил, что переход прав на российские общества от кипрских компаний «Kone Holdings» и «Glendora Holdings» к «Плутон», а затем от «Плутон» к компании «Boily Systems» осуществлен в результате волеизъявления компаний «Kone Holdings» и «Glendora Holdings», выраженного ими в доверенности от 02.07.2007, выданной гражданину Гасанову О.Г., заключившему сделки в их интересах и по их поручению.

Неапостилирование же доверенности на Гасанова О.Г., положенное в основу исковых требований компаний «Kone Holdings» и «Glendora Holdings», даже при наличии признания иска со стороны ответчика (конечного владельца долей - компании «Boily Systems»), суд не признал нарушением требований международного и российского законодательства, и поскольку заявлений о фальсификации или иной подделки доверенности истцами не заявлялось, а иных доводов о неуполномоченности Гасанова О.Г. не приводилось, постановлением Десятого арбитражного апелляционного суда от 31 мая 2011 года по делу № А41-8992/09 в иске было отказано. Данный судебный акт оставлен без изменения всеми судебными инстанциями, вплоть до Высшего Арбитражного Суда РФ.

Фактически, доли обществ «Рилэнд», «Махаон», «Парфенион», называемые Правительством США «корпоративной идентичностью компаний «Hermitage Capital», не только не были похищены у компаний «Hermitage

8

Capital», но и ими же были переоформлены сначала на «Плутон», а затем на «Boily Systems», оставаясь все это время под контролем Браудера У.Ф.

Все судебные акты арбитражной системы судов Российской Федерации размещены вместе с картотекой движения соответствующих дел в открытом доступе на официальном сайте Верховного Суда Российской Федерации (www.kad.arbitr.ru).

4) Доводы о том, что участники «организации» – чиновники налоговых органов утвердили требования о возврате налога в тот же день, когда они были поданы, и через два дня участникам «организации» было выплачено 230 млн. долл. США, не соответствуют действительности.

Из материалов следствия следует, что Хлебников В.Г., Маркелов В.А. и Курочкин В.Н. обратились в налоговые органы с уточненными налоговыми декларациями, подготовленными Магнитским С.Л., в октябре-ноябре 2007 г., положительные решения по которым налоговыми органами были приняты только 26.12.2007.

В указанный период налоговые инспекторы не бездействовали, как об этом безосновательно утверждается в иске, а в соответствии с Налоговым кодексом Российской Федерации провели камеральную проверку, в ходе которой истребовали и изучали регистры налогового учета, бухгалтерские справки, договора купли-продажи, счета-фактуры, платежные и иные финансовые документы, а также опросили руководителей «Махаон», «Рилэнд», «Парфенион».

Также инспектора известили представительства в РФ «CITIBANK» и «HSBC-Bank», являющегося управляющей компанией фонда «Hermitage Capital», о проводимой ими проверке и запросили у них подтверждающие необходимость возврата налога сведения, на что «HSBC-Bank» представил соответствующие документы.

Однако средств налогового контроля оказалось недостаточно для выявления преступных намерений Браудера У.Ф. и его соучастников, а также подложности изготовленных ими документов, что в результате привело к возврату из бюджета денежных средств.

Кроме того, заявленные требования в иске о конфискации 230 000 000 долларов США, как суммы, равной сумме похищенных средств из бюджета Российской Федерации, не соответствуют сумме в валюте хищения, равной 5 409 503 006, 48 руб. или 218 834 569 долларов США по курсу на день совершения мошенничества (26 декабря 2007 года), установленного Центральным Банком РФ и подлежащего применению в силу статьи 53 Федерального закона от 10.07.2002 N 86-ФЗ «О Центральном банке Российской Федерации (Банке России)» и пункта 9 Положения об установлении и опубликовании Центральным банком Российской Федерации официальных курсов иностранных валют по отношению к рублю, утвержденного Центральным Банком РФ от 18.04.2006 г. N 286-П.

5) Сведения о том, что Магнитский С.Л. являлся адвокатом, сотрудником юридической фирмы, разоблачил причастность

48

сотрудников российских правоохранительных органов к мошенничеству, недостоверны.

Расследованием установлено, что Магнитский С.Л., имея специальность бухгалтера и статус индивидуального предпринимателя, будучи экономистом по образованию, оказывал услуги компаниям Браудера У.Ф. по ведению бухгалтерского и налогового учета. Магнитский С.Л. никогда не являлся адвокатом и не имел юридического образования.

Каких-либо доказательств того, что Магнитский С.Л. проводил собственное расследование и выявил какие-либо преступления, в том числе хищение 5,4 млрд. рублей из российского бюджета, к которым были бы причастны сотрудники государственных органов Российской Федерации, не установлено. Это также не следует и из его показаний по разным уголовным делам.

6) Утверждения о том, что Магнитский С.Л. был несправедливо, на основании ложного обвинения и по распоряжению члена «организации» арестован, не соответствуют действительности.

Расследование преступной деятельности Браудера У.Ф. и его соучастников, в т.ч. Магнитского С.Л., началось в 2004 году, т.е. задолго до совершения хищения в 2007 г. и до его задержания 24.11.2008 г. В связи с этим отсутствуют объективные основания утверждать, что преследование Магнитского С.Л. начато и в дальнейшем производилось в качестве ответной меры со стороны членов «организации» и связано с выявлением им фактов мошенничества, которого он в действительности не выявлял, а являлся его соучастником.

Задержание Магнитского С.Л. произведено 24.11.2008 в установленном законом порядке следователем Следственного комитета при МВД России Сильченко О.Ф., который не входил в так называемую «организацию», не находился в подчинении или иных отношениях с Карповым П.А. и Кузнецовым А.К.

Следователь Карпов П.А. не осуществлял уголовного преследования Магнитского С.Л. по факту уклонения от уплаты налогов. В его производстве находилось уголовное дело в отношении другого соучастника Браудера У.Ф. – Черкасова И.В.

Оперативное сопровождение уголовного дела по обвинению Магнитского С.Л. осуществлялось Кузнецовым А.К. только на первоначальном этапе. В период заключения и содержания Магнитского С.Л. под стражей Кузнецов А.К. оперативных мероприятий уже не проводил и отношения к его делу не имел.

На основании совокупности собранных по делу доказательств 25.11.2008 Магнитскому С.Л. было предъявлено обвинение по пп. «а» и «б» ч. 2 ст. 199 УК РФ (уклонение от уплаты налогов в особо крупном размере).

26.11.2008 Тверской районный суд г. Москвы, после проверки обоснованности предъявленного Магнитскому С.Л. обвинения, заключил его под стражу, поскольку установил, что от него исходят угрозы свидетелям, он

10

принимает меры по сокрытию и уничтожению доказательств, имеет намерение скрыться от органа следствия и суда за рубежом.

7) Сведения о том, что Магнитский С.Л. умер в тюрьме вследствие ложного обвинения, пыток, а в последствии посмертно признан виновным, не соответствуют действительности.

Расследованием обстоятельств смерти Магнитского С.Л. установлено, что с 24.11.2008 он содержался под стражей по вышеуказанному обвинению. 16.11.2009 на стадии ознакомления с материалами дела его состояние здоровья резко ухудшилось и наступила смерть от острой сердечной недостаточности, развившейся на фоне вторичной дилятационной кардиомиопатии.

Судом проверены действия должностных и медицинских сотрудников изолятора, в котором содержался Магнитский С.Л.. По итогам судебного разбирательства 28.12.2012 заместитель начальника СИЗО, отвечающий за лечебную часть, оправдан в виду отсутствия причинно-следственной связи между имевшимися заболеваниями Магнитского С.Л., качеством оказываемого ему лечения и наступлением смерти.

В ходе расследования обстоятельств смерти Магнитского С.Л. исследовались все версии и предположения о причине его смерти, изложенные в средствах массовой информации и обращениях граждан, в т.ч. его родственников, членов Совета при Президенте РФ по развитию гражданского общества и правам человека и других. Однако подтверждения не нашли.

Также не нашло подтверждение возможное совершение сотрудниками МВД России Сильченко О.Ф., Карповым П.А., Кузнецовым А.К. при содействии иных лиц незаконного задержания Магнитского С.Л., необоснованного избрания в отношении него меры пресечения в виде заключения под стражу и создание таких условий содержания указанного лица в следственных изоляторах, которые прямо повлекли наступление его смерти.

К аналогичным выводам российского следствия и суда пришел и Высокий Суд Лондона (Соединенного Королевства Великобритании и Северной Ирландии) по иску Карпова П.А. к Браудеру У.Ф. и Файерстоуну Д.Р., указав, в п. 127-129 своего решения от 14.10.2013, что причинно-следственная связь, которую можно было бы ожидать от ареста и тюремного заключения, с одной стороны, и смертью Магнитского С.Л., с другой стороны, полностью отсутствует, и «ничто не говорит о пытках и убийстве», а также, что «Ответчики не привели фактов, доказывающих их оправдание в клевете».

С учетом разъяснений Конституционного Суда РФ о правах умерших обвиняемых на реабилитацию и в связи с многочисленными жалобами, публикациями, заявлениями в прессе и в различных официальных органах, в том числе, со стороны родственников Магнитского С.Л., скончавшегося в статусе обвиняемого, дело для проверки оснований его реабилитации было

11

передано в единственно компетентный орган, к полномочиям которого в любом современно-цивилизованном, правовом государстве отнесено установление причастности или непричастности к противоправным событиям конкретного лица — орган судебной власти. В данном случае исходя из правил подсудности и подведомственности таким органом являлся Тверской районный суд г. Москвы, который в открытом публичном заседании, длящемся более полугода, проверил каждое доказательство, на которое ссылался в своем заключении орган предварительного расследования и прокурор, и, выявив полную причастность Магнитского С.Л. к событиям вмененных преступлений Браудеру У.Ф., отказал в посмертной реабилитации Магнитского С.Л., прекратив в отношении него уголовное дело (постановление Тверского районного суда г. Москвы от 11 июля 2013 года).

## ПРИЧАСТНОСТЬ «PREVEZON HOLDINGS» И КАЦЫВА Д.П.

Проведением продолжительного и всестороннего расследования, а также комплекса оперативно-розыскных мероприятий не установлена связь Кацыва Д.П. и его компаньонов (Т. Крита, А. Литвака) с лицами, которые каким-либо образом причастны к хищению и легализации 5,4 млрд. руб. Владельцы «Prevezon Holdings» никогда не знали установленных соучастников Браудера У.Ф.. Их даже опосредованно ничто не связывало.

Изучение банковских операций и иных документов, показало, что компания «Prevezon Holdings» не получала денежных средств со счетов обществ – «Рилэнд», «Парфенион», «Махаон» и иных лиц, использованных в ходе хищения и легализации 5,4 млрд. руб.

Получение «Prevezon Holdings» от «Bunicon-Impex» и «Elenast-Com» в феврале 2008 г. 857 354 долл. США было обусловлено наличием договорных отношений между Петровым Л.Д., как инвестором, с одной стороны, и Критом Т., как бенефициаром «Prevezon Holdings», с другой стороны. Согласно возникшим между ними обязательствам, указанные денежные средства передавались «Prevezon Holdings» в виде займа, использовались в качестве инвестиционных вложений сначала по внутрибанковским проектам, а в последствии были конвертированы в другую валюту и направлены в качестве оплаты приобретения корпоративного пакета инвестиционного проекта в Нидерландах.

Причастные к хищению и легализации 5,4 млрд. руб. лица не имели прямого либо косвенного отношения к достижению указанных соглашений, к их заключению и последующей реализации.

Проверкой источников формирования капитала Кацыва Д.П., ставшего с июня 2008 года единственным владельцем компании «Prevezon Holdings», установлено, что направленный начиная с конца 2009 года на приобретение имущества в США инвестиционный капитал компании он сформировал за счет собственных средств от деятельности на территории России.



12

Излагаемая в иске схема транзакций не соответствует действительности и не имеет никакого отношения к деятельности компании «Prevezon Holdings» на территории запрашивающей стороны – США.

Утверждения о том, что в указанные в иске дни прошли конкретные трансакции между такими компаниями, как «ЖК» (РФ) и «Буникон» (Молдова), или ЖК» (РФ) и «Крайний Север» (РФ), «Крайний Север» (РФ) и «Буникон» (Молдова), а также между «Юниверс» (РФ) и «Эленаст» (Молдова), или «Юниверс» (РФ) и Крайний Север» (РФ), «Крайний Север» (РФ) и «Эленаст» (Молдова), подтверждения не нашли. Доказательств существования описанных сделок не обнаружено.

Проверкой молдавских фирм – «Bunicon-Impex» и «Elenast-Com», со счетов которых «Prevezon Holdings» получил 857 тыс.долл. США, также установлено, что они имели достаточно доказательств, подтверждающих их правомочность и дееспособность (представителя, распорядителей счетов, правоустанавливающие документы, ликвидность, государственную регистрацию, уплаченные налоги и комиссионные сборы).

У обслуживающих эти фирмы банков не возникало сомнений в их наличности и действительности осуществляемой ими деятельности, в связи с чем они открыли им счета и в дальнейшем продолжительное время их обслуживали. С компаниями «Bunicon-Impex» и «Elenast-Com» тесно взаимодействовали крупнейшие банки США (в т.ч. CitiBank), которые за продолжительный период своей работы с ними не обнаруживали в их деятельности признаков противоправности, в т.ч. легализации преступных доходов.

Накануне перечисления фирмами «Bunicon-Impex» и «Elenast-Com» 857 тыс. долл. США на счет компании «Prevezon Holdings» в банке «UBS» (Цюрих), долларовые счета этих молдавских обществ пополнялись за счет других источников, в том числе, от прямых транзакций CitiBank (США):

| дата транзакции | сумма списания | сумма зачисления | валюта | номер счета получателя/плательщика | получатель/плательщик |
|---|---|---|---|---|---|
| | | Выписка по счету SC BUNICON-IMPEX SRL. Счет: 22511018404106 | | | |
| 05.02.2008 | | 904 815 | USD | 10322008402Z | CITIBANK N.A, NEW YORK, SUA |
| 06.02.2008 | | 1 911 300 | USB | 10322008402Z | CITIBANK N.A, NEW YORK, SUA |
| 06.02.2008 | 410 000 | | USD | CH780023023046738160X | (N PREVEZON HOLDINGS LTD GOUDION STREET AGIOS ANDREAS 1095 |
| | | Выписка по счету SC ELENAST-COM SRL. Счет: 22513018404162 | | | |
| 12.02.2008 | | 1 196 575 | USD | 10322008402Z | CITIBANK N.A, NEW YORK, SUA |
| 13.02.2008 | 1 447 353 | | USD | CH780023023046738160X | (N PREVEZON HOLDINGS LTD GOUDION STREET AGIOS ANDREAS 1095 |

С фирмами «Bunicon-Impex» и «Elenast-Com» также активно сотрудничали многочисленные резиденты Европейского Союза (в т.ч. Соединенного Королевства Великобритании и Северной Ирландии) и ни один из них не усомнился в добропорядочности «Bunicon-Impex» и «Elenast-Com».

Со счетов названных молдавских компаний в рассматриваемый период были перечислены денежные средства в общей сумме свыше 102 000 000 долл. США 88-ми компаниям из 21-ной страны мира путем совершения 206-ти транзакций. Причем 42 % из этих средств (43 386 226 долл. США) были направлены компаниям, зарегистрированным в Великобритании.



Само по себе ненахождение «Bunicon-Impex» и «Elenast-Com» по месту их регистрации не указывает на то, что они занимались легализацией похищенного имущества, а все их сделки заведомо имеют сомнительное происхождение, поскольку данное обстоятельство не противоречит гражданскому законодательству Молдавской Республики. Согласно установленным в Молдавии правилам, юридическое лицо может быть зарегистрировано по одному адресу (юридический адрес), а фактически находиться по другому адресу (фактический адрес).

Таким образом, никаких косвенных и прямых доказательств наличия связи между мошенническим завладением бюджетными средствами и приобретением от имени «Prevezon Holdings» как европейского пакета компаний, так и недвижимости в США не добыто, равно как и доказательств какой-либо осведомленности владельцев и руководителей «Prevezon Holdings» о предполагаемом преступном характере поступивших от молдавских компаний средств.

## ЗАКЛЮЧЕНИЕ

Вышеприведенные данные, основанные на результатах официальных расследований и судебных разбирательств, в т.ч. в судах иностранных государств, свидетельствуют, что Российская Федерация не располагает запрашиваемыми Министерством юстиции США документами, которые бы могли подтвердить изложенные в иске сведения о существовании махинаций и участии «Prevezon Holdings» в легализации части преступных доходов.

Поскольку недостоверность приведенных в иске сведений об обстоятельствах хищения и легализации 5,4 млрд. руб. указывает на возможное использование компетентных органов США в неправосудных целях, Российская Федерация предлагает запрашивающей стороне провести совместное или раздельное расследование обстоятельств их получения, а также намерений источника этой информации, причины ее искажения.

Принятие положительного решения американской стороной способно существенным образом повлиять на исход иска, прояснить и вскрыть подлинные основания изложенных в нем обстоятельств.

В случае согласия на проведение расследования, Российская Федерация готова принять в нем участие и представить необходимые документы.

US Department of Justice

Director of Office of International Affairs

Ms. Mary Ellen Warlow

08/12/2014    35/87-9C-2014
182-44601 dated 03/20/2014

Office of International Affairs
U.S. Department of Justice
1301 New-York Avenue, N.W.,
Suite 800, Washington, DC 20005

Dear Ms. Warlow,

The Office of the Prosecutor General of the Russian Federation presents its compliments to the Department of Justice of the United States of America and sends response to request No. 182-44601 under MLAT, as well as the attached materials.
We hope for further fruitful cooperation between our agencies in the sphere of legal assistance in criminal cases.

Exhibits: 255 pages.

Yours respectfully,

Chief of the International Legal Cooperation Directorate          *signed*          S.A. Karapetyan


S.G. Titov, Tel. +7(495)982-76-07, Fax +7(495)692-81-49          *signed*          12.08.2014

08/12/2014    *signed*          08/12/2014    *signed*          08/12/2014    *signed*

Office of the Prosecutor General of the Russian Federation
No. Isorg-87-11355.14/

**RESULTS**

of consideration of the US request in respect of the case of Prevezon Holdings

CONTENTS

SUBJECT MATTER OF THE REQUEST

FACTUAL BACKGROUND

CONSISTENCY OF THE COMPLAINT

INVOLVEMENT OF PREVEZON HOLDINGS AND D.P. KATSYV

CONCLUSION

## SUBJECT MATTER OF THE REQUEST

US Department of Justice addressed the Office of the Prosecutor General of the Russian Federation with a request for assistance in the investigation of the case of Prevezon Holdings, against which the Government of the United States filed a civil forfeiture claim.

It follows from the submitted documents that in September 2013 the US Government filed a complaint with the SDNY Court against Prevezon Holdings group of companies and the owner thereof D.P. Katsyv seeking forfeiture of property which according to the US was purchased in order to launder and legitimize the previously stolen funds.

It is alleged in the complaint that in July-December 2007 a criminal organization, including Russian corrupt officials, fraudulently stole Russian companies Rilend, Parfenion and Makhaon owned by W.F. Brouwder, controlling which defrauded the Russian Treasury of 5.4 bln rubles or $230 mln previously paid as income tax.

After that, according to the US Government, the organization participants and their partners engaged in laundering the stolen money. In particular, through the accounts of a number of Moldovan companies (Bunicon-Impex and Elenast-Cot) in February 2008 they transferred to Prevezon Holdings $857,000, which were then spent to purchase real estate in New York for a total amount exceeding USD 22 mln.

Taking this into account, the United States request that the Russian Federation provides them with financial, banking and tax documents related to the circumstances set forth in the complaint, as well as with the court records, registration documents of Russian companies and other information.

The Office of Prosecutor General of the Russian Federation studied the complaint of the US Government filed against Prevezon Holdings and their related companies. Information contained therein was compared to the results of the investigation carried out in the territory of Russia and a number of other countries. Some of the circumstances specified in the complaint were further verified in the course of investigation.

It was found that the main part of the complaint was the version of W.F. Browder already reviewed and refuted as false, put forward by him and widely replicated for the purpose of concealing his involvement in the commission of a number of serious offences in economics in Russia and discrediting the law enforcement and judicial authorities in Russia investigating his criminal activities. Therefore the claims brought by the US Government against Prevezon Holdings do not constitute a claim in the legal sense of the word. They serve as a quasi-claim because they do not contain independent grounds and reliable information.

Since, as can be seen from the claim, the United States do not have complete and reliable data on W.F. Browder and structures and individuals controlled by him, as well as on the defendants and their connection with the circumstances related to the embezzlement of 5.4 billion rubles from the budget, the Office of Prosecutor General of the Russian Federation finds it possible to report on the results of the investigation carried out in its territory.

Aforementioned attitude of the Russian Federation towards the claim of the US Government filed against Prevezon Holdings is entirely and exclusively based on objective data which at any time can be verified and confirmed.

## FACTUAL BACKGROUND

It was found in the course of investigation of Browder's activities that in 1996 he, being a citizen of the United Kingdom of Great Britain and Northern Ireland, came to Moscow (Russia) in violation of the migration legislation, and decided to start illegal acquisition of stock of Russian companies that fell under restraint of being sold to non-residents – foreign citizens.

To implement his plans W.F. Browder involved D.R. Firestone, S.L. Magnitsky and other people, who developed a criminal scheme designed to seize the stock of large Russian companies, derive enrichment by illicit stock turnover, tax evasion and fraudulent tax refund from the budget of the Russian Federation.

Pursuant to the criminal plan accomplices of the aforementioned persons – I.S. Cherkasov and V.G. Kleiner incorporated shell companies in the territory of the Russian Federation – Makhaon, Rilend, Parfenion, Dalnaya Step, Saturn Investments, Kameya, Rifl, Orient-K and others, which were registered at the same address: Republic of Kalmykia, Elista, 301 Lenins str., where over one thousand other different shell companies were registered.

However, the aforementioned companies were not seated at that address, they were actually managed by Hermitage Capital and Firestone Duncan in Moscow. Initially W.F. Browder was the head of the incorporated companies, later the position was occupied by persons he authorized – P.Wrench, M. Wilson, I. Cherkasov.

Using these companies for criminal purposes, W.F. Browder concealed from their counterparties and registrars his actual participation as a non-resident in purchasing shares of Russian companies. Purchasing shares, formally in the names of Russian legal entities, W.F. Browder avoided getting the permit mandatory for non-residents, from the Federal Commission on Capital Market and Securities and from the Government of the Russian Federation, and eventually, during the period of 1999 through 2004 unlawfully acquired at least 131,574,722 of Gazprom shares without their consent.

The aforementioned actions by W.F. Browder and his accomplices caused damage amounting to no less than 2 billion 985 million rubles. A case was initiated and an investigation was opened into this fact, under which W.F. Browder has been avoiding testimony, and has been put on the federal and international wanted lists.

In 2004 it was found in the course of tax audits that companies formally registered in the Republic of Kalmykia, did not carry on business in that territory, no disabled people were employed in the companies, they were fictitiously taken on the staff, fake certificates of special economic zone residents containing fake signatures of the Minister of Economy of the Republic of Kalmykia were submitted to the tax authorities. It was found out that the employed taxation scheme allowed W.F. Browder's companies illegally getting tax benefits, reducing their tax burden from 35% to 5.5 % with income tax alone.

Using the tax evasion scheme designed by S.L. Magnitsky, the companies owned by W.F. Browder submitted false information to the Russian tax authorities, which allowed Browder's companies (Hermitage Capital companies) to evade paying income tax in the amount of 522,595,514 rubles for the taxable period of 2001 alone.

Criminal cases were initiated over this fact in 2004, investigation of which was repeatedly suspended due to search for Browder. In 2012 the investigation was completed, the case was taken to court.

By the final decision of Tverskoy District Court of the City of Moscow dated July 11, 2013 W.F. Browder was found guilty of a multimillion deliberate tax evasion and sentenced to 9 years of imprisonment, and put on the federal and international wanted lists.

It was also found out that after the sale in 2006 of illicitly acquired shares held by all the companies controlled by W.F. Browder, the same group of persons employed illegal tax schemes, and subsequently income taxes paid under such schemes were fraudulently refunded from the budget.

In respect of one case of deliberately low income tax withholding rate, in May 2007 criminal proceedings were initiated against I.V. Cherkasov, in the course of investigation it was established that damage was inflicted on the Russian Federation in the amount of about 600,000,000 rubles.

In the course of investigation of this criminal case in February 2008 Russian law enforcement authorities revealed that tax on income from sales of shares in the amount of 5.4 billion rubles paid by Rilend, Makhaon and Parfenion – companies controlled by Browder, were stolen from the Russian budget under the guise of returning overpaid income tax by way of misleading the tax authorities, based on pre-arranged sham contracts forming losses in these companies precisely for the amount of taxes paid.

The episode with 5.4 billion rubles mentioned in the US complaint was related to the implementation of exactly that scheme.

Investigation of these circumstances revealed that a group of persons composed of V.G. Khlebnikov, V.A. Markelov, V.N. Kurochkin, S.M. Korobeinikov, O.G. Gasanov, and S.K. Magnitsky and E.M. Khairetdinov acting for the benefit of W.F. Browder was involved in the embezzlement of 5.4 billiom rubles.

The plan for stealing the taxes on the sale of shares paid in 2006, developed no later than May 2007, provided for the replacement of the owners of the taxpayers – Rilend, Makhaon, Parfenion by fronts formally unrelated to anyone from Hermitage Capital, so that the organizers of the criminal scheme are free to receive the stolen money to the accounts of entities controlled by them abroad, and subsequently say that the companies were stolen from them, thereby diverting suspicion from themselves.

In the course of the committing the specified offense and for the purpose of concealing the involvement of W.F. Browder, the owners of Russian companies were substituted by front men by way of re-registration of 100% of shares of those companies to the name of Pluton, Limited Liability Company. To that effect, directors of Cypriot companies Kone Holdings and Glendora Holdings which were constituent parts of Hermitage Capital owned by W.F. Browder, on July 2, 2007 issued a power of attorney to O.G. Gasanov authorizing him to make transactions with shares in the Companies' authorized capitals on their behalves, including to determine the conditions of transactions independently. Based on that power of attorney on July 31, 2007 O.G. Gasanov makes a contract of sale and purchase of shares of Rilend, Makhaon and Parfenion with a front formally unrelated to Hermitage Capital fund and to W.F. Browder, but controlled by them – Pluton, Limited Liability Company with V.A. Markelov in charge of it.

After re-registration of constituent documents people engaged by O.G. Gasanov were appointed to the positions of directors of these companies - V. Khlebnikov, V. Markelov and V. Kurochkin, who subsequently took part in the deception of the tax authorities as to their having reason for the return of previously paid income tax in the amount of 5.4 billion rubles.

As co-executor of the fraudulent scheme and having the most complete data on financial activities of Makhaon, Rilend and Parfenion, S.L. Magnitsky calculated the sum of the tax allegedly overpaid to the budget, prepared false tax returns and primary accounting documents confirming them, certified them with duplicate seals, then handed them to O.G. Gasanov and V.A. Markelov, who together with V.N. Kurochkin and V.G. Khlebnikov used them to misinform tax authorities and steal the 5.4 billion rubles.

S.M. Korobeynikov in his turn, as the owner of CB "Universal Savings Bank", opened accounts for that organisation, deposited the money stolen from the budget under the guise of tax refund and contributed to subsequent legitimization thereof (transfer to other banks and other credit institutions of the Russian Federation and the subsequent transfer of the money abroad).

Based on the documents prepared by S.L. Magnitsky, Federal Tax Service Inspectorates No.25 and No.28 made a decision on tax refund in the amount of 5,409,503,006.48 rubles, which on December 26, 2007 were transferred to the accounts of the companies by the Federal Treasury of the Ministry of Finance of the Russian Federation.

Realizing that the above criminal activities of W.F. Browder and his controlled persons can be detected by law enforcement authorities of Russia, one of the lawyers of W.F. Browder – E.M. Khairetdinov – starts taking steps prearranged in the criminal action plan to take W.F. Browder out of the range of people who could be suspected of stealing the 5.4 billion rubles.

Since December 2007 he starts spreading information that the specified companies were stolen from W.F. Browder (from Hermitage Capital), and that Russian law enforcement officers were involved in these events, justifying it by the fact that in June 2007 in the course of a search they had seized the constituent documents of Rilend, Makhaon and Parfenion, and later used them to re-register these firms in the names of other persons.

After another change of legal owner of Rilend, Makhaon and Parfenion (Pluton, LLC) to a new front – "Boily Systems" (British Virgin Islands) E.M. Khairetdinov arranges secret withdrawal from tax authorities of the forged documents prepared by S.L. Magnitsky and used by O.G. Gasanov, V.A. Markeliv to steal the 5.4 billion rubles and subsequently keeps them at his place. Following the discovery of a number of the specifies tax documents during a search at E.M. Khairetdinov, the latter left the territory of the Russian Federation and according to the available information is still in the UK, where since 2006-2007 the majority of people from Browder's group engaged in a multi-year system-organized fraudulent activity have been hiding out.

By decisions of Tverskoy District Court of the city of Moscow dated April 28, 2009 and March 10, 2011 V.A. Markelov and V.G. Khlebnikov were found guilty of committing a crime specified in Part 4 of article 159 of the Criminal Code of the Russian Federation (large scale complex fraud). They were sentenced to five years imprisonment. Money in the amount of 685,024,893.29 rubles was forfeited to the State.

Investigation into the stealing of 5.4 billion rubles in respect of V.N. Kurochkin, S.M. Korobeinikov, O.G. Gasanov and S.L Magnitsky was discontinued owing to their deaths. E.M. Khairetdinov was put on the wanted list.

## INCONSISTENCY OF THE COMPLAINT

The identified non-compliances of all the key circumstances and accompanying circumstances of the embezzlement of funds from the Russian budget in 2007 with the investigation results confirmed by legally effective court decisions indicate the failure of the claim of the US Government.

1)      Allegations of embezzlement of 5.4 billion rubles by a "Russian criminal organization, including corrupt government officials" are incorrect. It was established in the course of investigation that the crime was committed by a group of persons including W.F. Browder, S.L. Magnitsky, V.G. Khlebnikov, V.A. Markelov, V.N. Kurochkin, S.M. Korobeinikov, O.G. Gasanov and E.M. Khairetdinov who were not government officials.

Involvement of employees of tax authorities into the embezzlement of 5.4 billion rubles was checked in the course of investigation. They were interrogated and undergone face-to-face questioning. Searches and seizures were conducted at their place of work and residence. Telephone calls of relevant persons were monitored. However, no evidence linking government officials to the above-mentioned criminal group was found. At the time of the decision to refund the 5.4 billion rubles they were mislead.

The involvement of other persons, including police officers – P.A. Karpov and A.K. Kuznetsov, was also checked and was not supported by evidence. It was found that their existing property was purchased by them and their families using the funds received from legal sources, and long before the embezzlement.

2)      The arguments that the members of the "organization" – P.A. Karpov and A.K. Kuznetsov, for the purpose of stealing "the corporate image of the «Hermitage Capital» companies, in 2007 actuated a search at the Russian office of the «Hermitage Capital», in the course of which the police officers seized the original corporate seals, tax documents and constituent documents of Rilend, Makhaon and Parfenion, and then used them to re-register these companies in the names of the three members of the "organization", are incorrect.

It was found out in the course of the investigation that P.A. Karpov did not make the decision of conducting a search and of seizing the specified items and documents, and did not take part in the search. By the time P.A. Karpov took up the case, constituent documents and stamps of Rilend, Makhaon and Parfenion had already been seized by the previous investigator and were stored, packed and sealed, in a place designed and suitable for storing seized property. P.A. Karpov did not open the packages and did not use the specified items and documents.

It was established in the course of expert studies that the seal impressions of Rilend, Makhaon and Parfenion in the documents used for the embezzlement of the 5.4 billion rubles, were not made by the seals that had been seized by MIA investigators in the Russian offices of "Hermitage Capital" and "Firestone Duncan".

In the fraud duplicate seals were used, which, as admitted by S.L. Magnitsky, he had made following the instructions of the management of the companies after the search conducted by the law enforcement agencies. Those duplicates, according to S.L. Magnitsky's testimony, were at the disposal of the "Firestone Duncan" employees, including S.L. Magnitsky himself.

3)      Allegations that members of "organization" committed theft of companies owned by "Hermitage Capital" – Makhaon, Rilend and Parfenion, based on the decision of the arbitral tribunal at Detox, LLC as of June 15, 2007, having seized their constituent documents and stamps during searches conducted on June 4, 2007, and using them re-registered the companies in the names of other members of the "organization" and subsequently used these companies to steal money from the budget, are not true.

It was found out in the course of the investigation that the theft of rights to Rilend, Makhaon, Parfenion never took place. An integral part of the plan of stealing 5.4 billion rubles was a change of owners of the Russian companies.

The fact of seizure by the investigating authorities of constituent documents and company seals on June 4, 2007 and effecting transactions of shares sale and purchase on July 31, 2007 allowed W. F. Browder

supporting his version of Russian companies being stolen from Hermitage Capital, by publicly accusing the law enforcement officers of being involved into that offense.

The fact that the seizure and storage by the law enforcement officers of documents and corporate seals of Rilend, Makhaon and Parfenion were used for the benefit of W.F. Browder by persons from his inner circle, was confirmed by S.L Magnitsky's testimony.

Being interrogated on the criminal case against E.M. Khairetdinov, a lawyer, S.L. Magnitsky testified in June 2008 that investigator P.A. Karpov back in November and December 2007 was ready to return the corporate seal and the documents of Rilend, Makhaon and Parfenion seized in the course of a search conducted on June 4, 2007, but V.G. Kleiner and I.S. Cherkasov asked him not to return them until the investigators initiate criminal proceedings upon their own complaint of Russian companies being stolen from Browder's group.

Later, the fact of constituent documents and corporate seals of Rilend, Makhaon and Parfenion being seized by the investigators would be used by Browder's group as the only justification for the involvement of law enforcement officers into the alleged theft of Russian companies from Hermitage Capital, and for the subsequent embezzlement of budget funds.

Lack of theft of Russian companies from Hermitage Capital also follows from the statement of representatives of Hermitage Capital in dozens of arbitration cases instigated by them with similar claims, formally aimed at getting back corporate governance of Russian companies.

In none of these arbitration cases persons controlled by W.F. Browder (Hermitage Capital companies), stated that they had not entered into the transactions in which first on July 31, 2007 Pluton, LLC became the owner of the companies and then from February 08, 2008 it was Boily Systems, and that the power of attorney under which the transactions were effected was not issued by them.

The only ground for a judicial return of 100 % of shares of the Russian companies to them was the failure to apostilize the power of attorney issued in the name of O.G. Gasanov, which failure was committed by themselves.

These circumstances were repeatedly considered in arbitration proceedings, most of which were closed due to the abandonment of claims.

In the only case considered on its merits, relating to the rights to shares of Rilend, Makhaon and Parfenion where the claim was not abandoned by Browder's companies, the court first in 2010 and then in May 2011 found that the transfer of rights to the Russian societies from the Cypriot companies Kone Holdings and Glendora Holdings to Pluton, LLC and then from Pluton to Boily Systems was implemented at the will of Kone Holdings and Glendora Holdings, expressed by them in the power of attorney dated July 02, 2007, issued to Mr. O.G. Gasanov who effected the deals to the best of their interests and on their behalves.

The non-apostilized powers of attorney issued to O.G. Gasanov, that served as the ground for the claims on the part of Kone Holdings and Glendora Holdings, even subject to recognition of the claim by the defendant (ultimate owner of shares– "Boily Systems"), were not recognized by the court as violation of international and Russian legislation, and since no allegations of falsification of power of attorney or other form of forgery were made by the claimants, and no other arguments on the lack of authority of O.G. Gasanov was produced, by the ruling of the Tenth arbitration court of appeal dated May 31, 2011 in respect of case No.A41-8992/09 the claim was dismissed. This judicial act was upheld by all courts, including the Supreme Arbitration Court of the Russian Federation.

In fact, the shares of Rilend, Makhaon and Parfenion, referred to by the US Government as "corporate identities of the Hermitage Capital companies", not only were not stolen from Hermitage Capital companies, but rather they were re-registered by themselves in the name of Pluton, LLC and then in the name of "Boily Systems", remaining under control of W.F. Browder.

All judicial acts of arbitration courts of the Russian Federation together with the catalogue of progress of relevant cases are available to the public at the official web-site of the Supreme Court of the Russian Federation (www.kad.arbitr.ru).

4)      Arguments that the participants of the "organization" – the officials of the tax authorities approved the claims for refund of tax the day they were filed, and within two days 230 million US dollars were paid to the participants of "organization", are not true.

It follows from the investigation materials that V.G. Khlebnikov, V.A. Markelov and V.N. Kurochkin filed amended tax returns prepared by S.L. Magnitsky with the tax authorities in October and November 2007, favourable decisions on them were only passed by the tax authorities on December 26, 2007.

During this period the tax inspectors were not idle, as it is wrongly asserted in the complaint, but according to the Tax Code of the Russian Federation they conducted an in-office audit, in the course of which they

subpoenaed and studied the tax ledgers, accounting statements, contracts of sale and purchase, invoices, payment documents and other financial documents, and interviewed the managers of Makhaon, Rilend and Parfenion.

Inspectors also notified the RF representative offices of CITIBANK and HSBC-Bank, which is the holding company of Hermitage Capital, of the ongoing audit and requested data confirming the need for a tax refund, in response to which request HSBC-Bank provided relevant documents.

However, the means of tax control were not enough to identify the criminal intent of W.F. Browder and his accomplices, as well as the forged documents they made that resulted in the refund of money from the budget.

Furthermore the claims asserted in the complaint seeking forfeiture of 230,000,000 US dollars as an amount equal to the amount of funds stolen from the budget of the Russian Federation, do not match the amount in the currency of theft, which is equal to 5,409,503,006.48 rubles or 218,834,569 US dollars at the exchange rate on the day of fraud (December 26, 2007), set by the Central Bank of the Russian Federation and applicable by virtue of Article 53 of Federal Law No.86-FZ of July 10, 2002 "Concerning the Central Bank of the Russian Federation" and clause 9 of the of the Regulation No. 286-P on establishing official rates of foreign currencies to Russian ruble by the Central Bank of the Russian Federation, approved by the Central Bank of the Russian Federation on April 18, 2006.

5)      Information that S.L. Magnitsky was a lawyer, an employee of a law firm, that he exposed the involvement of the Russian law enforcement officers in the fraud, is inaccurate.

It was found out in the course of the investigation that S.L. Magnitsky, being qualified as an accountant and having the status of a private entrepreneur, and a degree in economics, rendered services to the companies of W.F. Browder of maintaining the accounting records and tax records. S.L. Magnitsky never was a lawyer and had no legal training or degree in law.

No evidence was found to the fact that S.L. Magnitsky conducted his own investigation and revealed any offense, including the embezzlement of 5.4 billion rubles from the budget of the Russian Federation, in which government officials of the Russian Federation were involved. It also follows from his testimonies in various criminal cases.

6)      Allegation that S.L. Magnitsky was unjustly arrested on a false charge and by order of a member of the 'organization' is not true.

The investigation of criminal activity of W.F. Browder and of his accomplices, including Magnitsky, was initiated in 2004, i.e. long before the theft of 2007 and his arrest on November 24, 2008. Therefore, there are no objective reasons to believe that prosecution of S.L. Magnitsky was initiated and continued in response to the actions of the members of the "organization" and was related to the revealing of fraud, which he did not actually reveal, rather he participated in the fraud himself.

S.L. Magnitsky was arrested in November 24, 2008 in the manner prescribed by law, by investigator of the Investigative Committee of the Russian Interior Ministry O.F. Silchenko, who was not a member of the so-called "organization", not a subordinate of or otherwise connected with P.A. Karpov and A.K. Kuznetsov.

Investigator P.A. Karpov did not prosecute S.L. Magnitsky for tax evasion. He conducted a case against another accomplice of W.F. Browder – I.V. Cherkasov.

The criminal case against S.L Magnitsky was only conducted by A.K. Kuznetsov at its initial stage. During the period of imprisonment and detention of S.L. Magnitsky A.K. Kuznetsov no longer conducted operational activities and had nothing to do with the case.

Based on the totality of the evidence collected in the case, on November 25, 2008 charges were served on S.L. Magnitsky under sub-clauses "a" and "b" of part 2 of article 199 of the Criminal Code of the Russian Federation (tax evasion on a large scale).

On November 26, 2008 Tverskoy District Court of the city of Moscow, after verifying the reasonableness of charges served on S.L. Magnitsky, took him into custody, since it was established that he threatened witnesses, took steps to conceal and destroy evidence, had the intention of hiding from the investigation and judicial bodies abroad.

7)      Information that S.L. Magnitsky died in prison as a result of false accusations, tortures, and was later found guilty posthumously, is not true.

The investigation into the death of S.L. Magnitsky revealed that since November 24, 2008 he was retained in custody on the above charges.

On November 16, 2009 at the stage of familiarization with the case materials the state of his health deteriorated sharply and he died of congestive heart failure developed against secondary dilated cardiomyopathy.

The court reviewed the actions of officials and of the medical staff of the pre-trial detention centre where S.L. Magnitsky was kept. At the end of the trial on December 28, 2012 deputy chief of the pre-trial detention centre in charge of medical department was declared not guilty in the absence of a causal link between the diseases S.L. Magnitsky had, and the quality of treatment he received, and his death.

During the investigation into the death of S.L. Magnitsky all versions and speculations about the cause of his death set out in the media and in the citizens' appeals, including those of his relatives, members of the Presidential Council for the development of civil institutions and human rights and others, were considered. However none of them was adequately proved.

The illegal arrest of S.L. Magnitsky allegedly committed by the officers of the Russian Ministry of Interior O.F. Silchenko, P.A. Karpov, A.K. Kuznetsov with the assistance of other persons, improper imposition of a measure of pre-trial restraint in the form of detention and the creation of such conditions of detention of the said person in detention centres, which directly resulted in his death were also not proved.

Conclusions similar to the conclusion made the Russian investigation and court were made by the High Court in London (United Kingdom of Great Britain and Northern Ireland) in respect of the case in the action by P.A. Karpov against W.F. Browder and J.R. Firestone, stating in clauses 127-129 of its ruling dated October 14, 2013, that the causal link, which would be expected to be found between the arrest and imprisonment, on the one hand, and the death of S.L. Magnitsky, on the other hand, is lacking completely, and "there is no evidence of torture and murder", and that "The defendants adduced no evidence to prove their warrant in libel".

In view of the clarification by the Constitutional Court on the rights of decedent defendants to rehabilitation, and in response to numerous complaints, publications, statements in the press and in various official authorities, including the relatives of S.L. Magnitsky who died in the status of defendant, for the purpose of reviewing the grounds for his rehabilitation the case was referred to the only competent authority whose powers in any modern-civilized, rule-of-law state include establishment of involvement or non-involvement of a specific person in illegal events – the judicial authority. In this case, based on the rules of judicial and administrative jurisdiction over cases such authority is Tverskoy District Court of the City of Moscow, which in an open public hearing lasting over six months, reviewed each evidence to which the preliminary investigation agency and the prosecutor referred in their report, and, revealing the full involvement of S.L. Magnitsky to the offenses W.F. Browder was accused of, denied S.L. Magnitsky posthumous rehabilitation having terminated the criminal case against him (ruling of the Tverskoy District Court of the City of Moscow dated July 11, 2013).

## INVOLVEMENT OF PREVEZON HOLDINGS AND D.P. KATSYV

In the course of a lengthy and thorough investigation, as well as of a set of special investigation activities no connection was traced between D.P. Katsyv and his partners (T. Krit, A. Litvak) on the one hand and the persons which are in any way involved in the embezzlement and laundering of 5.4 billion rubles. The owners of Prevezon Holdings never knew the established accomplices of W.F. Browder. They were not even indirectly connected.

Study of banking operations and other documents revealed that Prevezon Holdings receive no funds from the accounts of Rilend, Parfenion, Makhaon and other persons employed for the purpose of embezzlement and laundering the 5.4 billion rubles.

The fact that Prevezon Holdings received 857,354 US dollars from "Bunicon-Impex" and "Elenast-Com" in February 2008 was due to contractual relations between L.D. Petrov, as investor, on the one hand, and T. Krit, as the beneficiary of Prevezon Holdings, on the other hand. According to the obligations arisen between them the specified funds were transferred to Prevezon Holdings as a loan, they were used as investments first for the intrabank projects, and subsequently converted into a different currency and transferred as payment for the acquisition of corporate package of investment project in the Netherlands. Persons involved into embezzlement and laundering of 5.4 billion rubles had nothing to do, directly or indirectly, with reaching these agreements, with delivery and implementation thereof.

It was established in the course of reviewing the sources of capital of D.P. Katsyv, who since June 2008 is the only owner of Prevezon Holdings, that investment capital of the company steered since the end of 2009 into property in the United States was formed from their own funds received from their activities in the territory of the Russian Federation.

The transaction scheme set forth in the complaint is untrue and has no relation to the activities of Prevezon Holdings on the territory of the requesting party – the USA.

Allegations that on the days specified in the complaint certain transactions were effected between such companies as "ZhK" (RF) and "Bunicon" (Moldova), or "ZhK" (RF) and "Krainy Sever" (RF), "Krainy Sever" (RF) and "Bunicon" (Moldova), as well as between "Unvers" (RF) and "Elenast" (Moldova), or "Unvers" (RF) and "Krainy Sever" (RF), "Krainy Sever" (RF) and "Elenast" (Moldova), were not provided support for. No evidence of the existence of the specified transactions was found.

It was also established in the course of audit of the Moldovan firms – "Bunicon-Impex" and "Elenast-Com", from whose accounts Prevezon Holdings received 857 thousand US dollars, that they had enough evidence to prove their competence and capacity (representative, account holder, legal documents, liquidity, state registration, taxes and fees paid).

Banks providing services to these companies had no doubts in their cash and validity of their activities, for which reason they opened accounts for them and provided services to them for a long period of time. Biggest banks in the US worked closely with "Bunicon-Impex" and "Elenast-Com" (including CitiBank), and over a period of their working with them found in their activities no signs of illegality, including laundering crime proceeds.

On the eve of transfer by "Bunicon-Impex" and "Elenast-Com" of 857 thousand US dollars to the account of "Prevezon Holdings" in the "UBS" bank (Zurich), dollar accounts of these Moldovan companies replenished from other sources, including direct transactions with CitiBank (USA):

| Date of transaction | Amount of write-off | Amount received | currency | Beneficiary/Payer Account Number | Beneficiary / Payer |
|---|---|---|---|---|---|
| **Account statement of SC BUNICON-IMPEX SRL. Account: 22511018404106** | | | | | |
| 02/05/2008 | | 300,815 | USD | 103220084027 | CITIBANK N.A. NEW YORK, SUA |
| 02/06/2008 | | 1,191,300 | USD | 103220084027 | CITIBANK NA, NEW YORK, SUA |
| 02/06/2008 | 410,000 | | USD | CH780023023046738169Y | (N) PREVEZON HOLDINGS LTD, GOUDION STREET, AGIOS ANDREAS, P.S. 1095 |
| **Account statement of SC ELENAST-COM SRL. Account: 22513018404162** | | | | | |
| 02/12/2008 | 410,000 | 1,196,575 | USD | 103220084027 | CITIBANK NA, NEW YORK, SUA |
| 02/13/2008 | 447,353 | | USD | CH780023023046738160Y | (N) PREVEZON HOLDINGS LTD, GOUDION STREET, AGIOS ANDREAS, P.S. 1095 |

Numerous residents of the European Union (including the United Kingdom of Great Britain and Northern Ireland) also worked closely with "Bunicon-Impex" and "Elenast-Com" and none of them ever questioned the integrity of "Bunicon-Impex" and "Elenast-Com".

Funds totalling over 102 million US dollars were transferred in 206 transactions from the accounts of the specified Moldovan companies to over 88 companies in 21 countries of the world during the period in question. And 42 % of those funds (43,386,226 US dollars) were transferred to companies registered in the UK.

The fact that "Bunicon-Impex" and "Elenast-Com" were not found at the place of registration does not indicate that they were involved in laundering the stolen property, and that all their transactions are

necessarily of dubious origin, because this circumstance does not contradict the civil law of the Republic of Moldova. According to Moldovan rules, a legal entity may be registered at one address (legal address), but actually be located at a different address (actual address).

Therefore, no indirect and direct evidence of a link between the fraudulent embezzlement of budgetary funds and acquisition on behalf of Prevezon Holdings of both European companies package, and real property in the USA was procured, as well as evidence of any knowledge of owners and the management of Prevezon Holdings of the alleged criminal nature of the funds received from the Moldovan companies.

## CONCLUSION

The above data based on the results of official investigations and judicial proceedings, including in the courts of foreign countries, indicate that the Russian Federation does not have the documents requested by the US Department of Justice that could confirm the information contained in the complaint of the existence of fraud and of involvement of Prevezon Holdings into the process of laundering part of the crime proceeds.

Since inaccuracy of the information contained in the complaint relating to the details of the embezzlement and laundering of the 5.4 billion rubles indicates possible use of the competent authorities of the United States for illegal purposes, the Russian Federation offers to the requesting party to hold a joint or separate investigation into the circumstances of receiving such information, as well as into the intentions of the source of this information, and the reasons of misrepresentation of the information.

The consent of the US can significantly affect the outcome of the complaint, clarify and reveal the true basis of the circumstances set forth therein.

In the case of consent to investigation, the Russian Federation is ready to participate and to submit the required documents.