# EXHIBIT 6

**РЕЗУЛЬТАТЫ**
рассмотрения запроса США по делу «Prevezon Holdings»

СОДЕРЖАНИЕ

ПРЕДМЕТ ЗАПРОСА ........................................................................................................ 1

ОБСТОЯТЕЛЬСТВА ДЕЛА ............................................................................................ 2

СОСТОЯТЕЛЬНОСТЬ ИСКА ........................................................................................ 6

ПРИЧАСТНОСТЬ «PREVEZON HOLDINGS» И КАЦЫВА Д.П. .............................. 12

ЗАКЛЮЧЕНИЕ ................................................................................................................ 14

**ПРЕДМЕТ ЗАПРОСА**

Министерство юстиции Соединенных Штатов Америки обратилось к Генеральной прокуратуре Российской Федерации с ходатайством об оказании содействия в расследовании дела компании «Prevezon Holdings», к которой Правительством США предъявлен гражданский иск о конфискации.

Из представленных документов следует, что Правительство США в сентябре 2013 г. обратилось в суд Южного округа штата Нью-Йорк к группе компаний «Prevezon Holdings» и к их владельцу Кацыву Д.П. с требованием о конфискации имущества, которое, по мнению США, было приобретено с целью легализации ранее похищенных денежных средств.

В исковом заявлении утверждается, что преступная организация, включающая в российских коррумпированных чиновников, обманным путем в июле-декабре 2007 г. осуществила кражу принадлежащих Браудеру У.Ф. российских компаний «Рилэнд» (ООО), «Парфенион» (ООО), «Махаон» (ООО), управляя которыми завладела 5,4 млрд. руб. или 230 млн. долларов США из российского бюджета, ранее уплаченных в качестве налога на прибыль.

После этого, как полагает Правительство США, члены организации и их партнеры занялись отмыванием похищенных денег. В частности, через счета ряда молдавских фирм («Bunicon-Impex» и «Elenast-Com») они в феврале 2008 г. перечислили компании «Prevezon Holdings» 857 тыс. долл. США, которые затем потратили на покупку недвижимости в Нью-Йорке на общую сумму, превышающую 22 млн. долл. США.

С учетом этого, Соединенные Штаты Америки просят Российскую Федерацию предоставить связанную с изложенными в иске обстоятельствами финансовую, банковскую и налоговую документацию, материалы судебных заседаний, регистрационные документы российских компаний и другие данные.

Генеральной прокуратурой Российской Федерации изучен иск Правительства США к «Prevezon Holdings» и связанных с ней структур. Изложенные в нем сведения сопоставлены с результатами проведенного на

территории России и ряда других стран расследования. Некоторые обстоятельства, указанные в иске, дополнительно проверены следственным путем.

По итогам установлено, что основную часть иска составляет уже проверенная и опровергнутая как ложная версия Браудера У.Ф., которая им выдвинута и широко тиражируется в целях сокрытия своей причастности к совершению в Российской Федерации ряда тяжких преступлений в сфере экономики и дискредитации правоохранительных и судебных органов России, расследующих его преступную деятельность. Поэтому предъявленные Правительством США требования к «Prevezon Holdings» не представляют собой иска в юридическом смысле этого слова. Они выступают квазииском, поскольку не содержат самостоятельных оснований и достоверных данных.

Поскольку, как видно из иска, Соединенные Штаты Америки не располагают полными и достоверными данными о Браудере У.Ф. и подконтрольных ему лицах, а также об ответчиках и их отношении к обстоятельствам, связанным с хищением из бюджета 5,4 млрд. руб., Генеральная прокуратура Российской Федерации полагает возможным сообщить о результатах проведенного на ее территории расследования.

Вышеотмеченное отношение Российской Федерации к иску Правительства США против «Prevezon Holdings» всецело и исключительно основано на объективных данных, которые в любое время могут быть проверены и найти свое подтверждение.

## ОБСТОЯТЕЛЬСТВА ДЕЛА

Расследованием деятельности Браудера У.Ф. установлено, что в 1996 г. он, будучи подданным Соединенного Королевства Великобритании и Северной Ирландии, в нарушение миграционного законодательства прибыл в г. Москва (Россия), где принял решение заниматься незаконным приобретением акций российских предприятий, которые были запрещены для продажи нерезидентам – иностранным лицам.

Для реализации своих планов Браудер У.Ф. привлек Файерстоуна Д.Р., Магнитского С.Л. и других лиц, которые разработали для него преступную схему завладения акциями крупных российских компаний, обогащения за счет незаконного оборота этих акций, неуплаты налогов и их мошеннического возврата из бюджета Российской Федерации.

Во исполнение преступного плана на территории Российской Федерации соучастниками указанных лиц – Черкасовым И.С. и Клейнером В.Г. было организовано учреждение фиктивных обществ – «Махаон», «Риленд», «Парфенион», «Дальняя степь», «Сатурн Инвестментс», «Камея», «Рифл», «Ориент-К» и других, которые были зарегистрированы по одному адресу: Республика Калмыкия, г. Элиста, ул. Ленина, д. 301, где также числилось еще свыше одной тысячи различных фиктивных компаний.

Однако по данному адресу вышеприведенные организации не находились, фактическое управление их деятельностью осуществлялось

2

US-PREV093813

компаниями «Hermitage Capital» и «Файерстоун Данкен» в г. Москве. Руководителем учрежденных обществ первоначально являлся Браудер У.Ф., а затем эту должность занимали доверенные ему лица –Ренч П., Уилсон М., Черкасов И.

Используя указанные общества в преступных целях, Браудер У.Ф. скрывал от контрагентов и реестродержателей акций свое фактическое участие как нерезидента в скупке акций российских предприятий. Скупая акции, формально на российские юридические лица, Браудер У.Ф. уклонился от получения обязательного для нерезидентов разрешения Федеральной комиссии по ценным бумагам и Правительства Российской Федерации и в итоге без их согласия в период с 1999 по 2004 противоправно приобрел не менее 131 574 722 акций ОАО «Газпром».

Названными действиями Браудера У.Ф. и его соучастниками причинен ущерб на сумму не менее 2 млрд. 985 млн. руб. По данному факту возбуждено и расследуется уголовное дело, по которому Браудер У.Ф. от дачи показаний уклоняется, объявлен в федеральный и международный розыск.

В 2004 году по результатам налоговых проверок было выявлено, что формально зарегистрированные в Республике Калмыкия общества, деятельности на этой территории не ведут, инвалиды в обществах не работают, оформлены фиктивно, в налоговый орган представлялись поддельные свидетельства резидентов особой экономической зоны, содержащие подложные подписи министра экономики Республики Калмыкия. Было установлено, что использованная схема налогообложения позволяла компаниям Браудера У.Ф. незаконно получать льготы по уплате налогов, снижая свое налоговое бремя с 35% до 5,5 % только по налогу на прибыль.

Используя разработанную Магнитским С.Л. схему ухода от налогов, принадлежащие Браудеру У.Ф. компании представляли в налоговые органы Российской Федерации ложные сведения, что позволило компаниям Браудера У.Ф. (компаниям «Hermitage Capital») только за один налоговый период 2001 года уклониться от уплаты налога на прибыль в размере 522 595 514 руб.

По данному факту в 2004 году возбуждены уголовные дела, расследование по которым неоднократно приостанавливалось в связи с розыском Браудера У.Ф. В 2012 г. расследование было завершено, дело передано в суд.

Вступившим в законную силу приговором Тверского районного суда г. Москвы от 11 июля 2013 года Браудер У.Ф. признан виновным в многомиллионном умышленном уклонении от уплаты налогов и приговорен к 9 годам лишения свободы, объявлен в федеральный и международный розыск.

Также установлено, что и после продажи в 2006 году незаконно приобретенных акций со всех подконтрольных Браудеру У.Ф. компаний, этой же группой лиц применялись незаконные схемы налогообложения, а впоследствии уплаченные по таким схемам налоги на прибыль возвращались из бюджета мошенническим путем.

По одному из фактов умышленно заниженной ставки удержания налога на доходы, в мае 2007 года было возбуждено уголовное дело в отношении

3

US-PREV093814

Черкасова И.В., в ходе расследования которого выявлен ущерб Российской Федерации в размере около 600 000 000 рублей.

В ходе расследования этого уголовного дела в феврале 2008 года правоохранительными органами России было выявлено, что уплаченные обществами «Рилэнд», «Махаон» и «Парфенион», контролируемыми Браудером У.Ф., налоги на прибыль с продаж акций в размере 5,4 млрд. рублей, путем введения налоговых органов в заблуждение, были на основании заранее подготовленных фиктивных соглашений, образующих убытки у названных обществ ровно на сумму уплаченных налогов, похищены из российского бюджета под видом возврата излишне уплаченного налога на прибыль.

С реализацией именно этой схемы связан упомянутый в иске США эпизод с 5,4 млрд. рублей.

Расследование данных обстоятельств показало, что к хищению 5,4 млрд. руб. причастна группа лиц, состоявшая из Хлебникова В.Г., Маркелова В.А., Курочкина В.Н., Коробейникова С.М., Гасанова О.Г., а также Магнитского С.Л. и Хайретдинова Э.М., действовавших в интересах Браудера У.Ф.

План по хищению ранее уплаченных в 2006 году налогов от продажи акций, возникший не позднее мая 2007 года, предусматривал замену владельцев налогоплательщиков – «Рилэнд», «Махаон», «Парфенион» на подставных лиц, формально никак не связанных с кем-либо из «Hermitage Capital», с тем, чтобы организаторы преступной схемы могли беспрепятственно получить на счета контролируемых ими лиц за рубежом похищенные денежные средства, а в последующем заявить о краже у них этих компаний, тем самым отвести от себя подозрения.

В ходе совершения названного преступления и с целью сокрытия участия в нем Браудера У.Ф., была осуществлена смена владельцев российских обществ на подставных лиц путем переоформления 100 % долей этих обществ на «Плутон» (ООО). Для этого директорами кипрских компаний «Kone Holdings» и «Glendora Holdings», входящих в структуру «Hermitage Capital» и принадлежащих Браудеру У.Ф., 2 июля 2007 года выдана доверенность Гасанову О.Г. с полномочиями заключать от их имени сделки с долями в уставных капиталах обществ, в том числе, самостоятельно определять условия сделок. На основании этой доверенности Гасанов О.Г. заключает 31 июля 2007 года договор купли-продажи долей обществ «Рилэнд», «Махаон», «Парфенион» с подставным лицом, формально не связанным с фондом «Hermitage Capital» и Браудером У.Ф., лицом, но подконтрольному им обществом «Плутон», возглавляемым Маркеловым В.А.

После переоформления учредительных документов, на должности директоров указанных обществ были назначены привлеченные Гасановым О.Г. лица – Хлебников В.Г., Маркелов В.А. и Курочкин В.Н., которые в последующем принимали непосредственное участие в обмане налоговых органов относительно наличия у них оснований для возвращения ранее уплаченного налога на прибыль в размере 5,4 млрд. рублей.

4

US-PREV093815

Будучи соисполнителем схемы хищения и располагая самыми полными данными о финансовой деятельности «Махаон», «Рилэнд», «Парфенион», Магнитский С.Л. произвел расчет размера якобы излишне уплаченного в бюджет налога, изготовил недостоверные налоговые декларации и подтверждающие их первичные бухгалтерские документы, удостоверил их дубликатами печатей, после чего передал их Гасанову О.Г. и Маркелову В.А., которые они совместно с Курочкиным В.Н. и Хлебниковым В.Г. использовали для введения в заблуждение налоговых органов и завладения 5,4 млрд. руб.

В свою очередь Коробейников С.М., являясь владельцем КБ «Универсальный банк сбережений», предоставил счета этой организации, прием на них изъятых из бюджета под видом возврата налога денег и их последующую легализацию (перевод в другие банковские и иные кредитные учреждения Российской Федерации и последующий вывод их за рубеж).

На основании подготовленных Магнитским С.Л. документов, инспекции Федеральной налоговой службы № 25 и 28 приняли решения о возврате налогов в сумме 5 409 503 006, 48 руб., которые 26.12.2007 управление федерального казначейства Министерства финансов РФ перечислило на счета обществ.

Осознавая, что вышеуказанная преступная деятельность Браудера У.Ф. и подконтрольных ему лиц может быть выявлена правоохранительными органами России, один из адвокатов Браудера У.Ф. - Хайретдинов Э.М. начинает осуществлять заранее предусмотренные преступным планом меры к выводу Браудера У.Ф. из числа лиц, которые могли быть заподозрены в хищении 5,4 млрд. руб.

С декабря 2007 года он распространяет сведения о хищении у Браудера У.Ф. (у «Hermitage Capital») названных фирм и о причастности к этим событиям сотрудников российских правоохранительных органов, обосновывая это тем, что в июне 2007 г. они в ходе обыска изъяли учредительные документы «Рилэнд», «Махаон», «Парфенион» и в последующем использовали их для переоформления этих фирм на других лиц.

После очередной смены номинального владельца обществ «Рилэнд», «Махаон», «Парфенион» («Плутон») на новое подставленное лицо компанию «Boily Systems» (Британские виргинские острова) Хайретдинов Э.М. организовывает тайное изъятие в налоговых органах и последующее хранение у себя подложных документов, которые были изготовлены Магнитским С.Л. и использованы Гасановым О.Г. и Маркеловым В.А. для совершения хищения 5,4 млрд. руб. После обнаружения ряда из указанных налоговых документов в ходе обыска у Хайретдинова Э.М., последний спешно покинул территорию Российской Федерации и по имеющейся информации до сих пор находится в Великобритании, где с 2006-2007 года скрываются большинство лиц из группы Браудера У.Ф., задействованных им в многолетней системно-организованной мошеннической деятельности.

Приговорами Тверского районного суда г. Москвы от 28.04.2009 и 10.03.2011 Маркелов В.А. и Хлебников В.Г. признаны виновными в совершении преступления, предусмотренного ч.4 ст.159 УК РФ

5

US-PREV093816

(мошенничество, совершенное группой лиц в особо крупном размере). Им назначено наказание в виде лишения свободы сроком на пять лет. В доход государства обращены денежные средства на сумму 685 024 893, 29 руб.

Расследование в отношении Курочкина В.Н., Коробейникова С.М., Гасанова О.Г. и Магнитского С.Л. по обстоятельствам хищения ими 5,4 млрд. руб. прекращено в связи со смертью. Хайретдинов Э.М. объявлен в розыск.

## НЕСОСТОЯТЕЛЬНОСТЬ ИСКА

Выявленные несоответствия всех ключевых и сопутствующих им обстоятельств совершения хищения бюджетных средств в 2007 году в Российской Федерации результатам расследования, подтвержденными вступившими в законную силу решениями судов, указывают на несостоятельность иска Правительства США.

1) Утверждения о совершении хищения 5,4 млрд. руб. «российской преступной организацией, включающей коррумпированных правительственных чиновников», не соответствуют действительности.

Следствием установлено, что к указанному преступлению причастна группа лиц, состоявшая из Браудера У.Ф., Магнитского С.Л., Хлебникова В.Г., Маркелова В.А., Курочкина В.Н., Коробейникова С.М., Гасанова О.Г. и Хайретдинова Э.М., которые должностными лицами не являлись.

В ходе расследования проверялась причастность к хищению 5,4 млрд. руб. сотрудников налоговых органов. Они подвергались допросам и очным ставкам. По месту их работы и жительства проведены обыска и выемки. Осуществлен контроль телефонных разговоров соответствующих лиц. Однако доказательств связи должностных лиц с вышеназванной преступной группой не найдено. В момент принятия решений о выплате 5,4 млрд. они находились под влиянием обмана.

Причастность иных лиц, в т.ч. сотрудников органов внутренних дел – Карпова П.А. и Кузнецова А.К., также проверена и подтверждения не нашла. Установлено, что имеющееся у них имущество приобретено ими и их родственниками за счет средств, полученных из легальных источников, и значительно раньше совершения хищения.

2) Доводы о том, что члены «организации» – Карпов П.А. и Кузнецов А.К., с целью хищения «корпоративного образа компаний «Hermitage Capital», инициировали проведение в середине 2007 г. обыска в российском офисе фонда «Hermitage Capital», в ходе которого сотрудники полиции конфисковали подлинные печати, налоговые и учредительные документы «Рилэнд», «Махаон», «Парфенион», а затем использовали их для перерегистрации этих обществ на имя трех членов «организации», являются недостоверными.

Следствием установлено, что Карпов П.А. решений о производстве обыска, а также об изъятии указанных предметов и документов не принимал, в самом обыске не участвовал. К моменту принятия следователем Карповым П.А. соответствующего уголовного дела к своему производству,

6

US-PREV093817

регистрационные документы и печати «Рилэнд», «Махаон», «Парфенион» уже были изъяты предыдущим следователем и хранились в упакованном и опечатанном виде, в помещении, приспособленном для хранения изъятого имущества. Упаковки Карпов П.А. не вскрывал и не использовал указанные предметы и документы.

Проведёнными экспертными исследованиями установлено, что оттиски печатей «Рилэнд», «Махаон», «Парфенион» в документах, которые были использованы при совершении хищения 5,4 млрд. руб., выполнены не теми печатями, которые были изъяты следователями МВД в российских офисах компаний «Hermitage Capital» и «Файерстоун Данкен».

При совершении мошенничества использовались дубликаты, которые, как признал сам Магнитский С.Л., он по указанию руководства компаний изготовил после проведения правоохранительными органами обыска. Эти дубликаты, согласно показаниям Магнитского С.Л., находились в распоряжении сотрудников «Файерстоун Данкен», в том числе самого Магнитского С.Л.

3)  Утверждения о том, что участники «организации» совершили кражу принадлежащих компании «Hermitage Capital» обществ - «Махаон», «Рилэнд», «Парфенион», на основании решения третейского суда при ООО «Детокс» от 15 июня 2007 года, изъяв в ходе обысков 4 июня 2007 года их учредительные документы и печати, используя которые перерегистрировали общества на других членов «организации» и в последующем использовали эти фирмы для хищения бюджетных средств, не соответствуют действительности.

Расследованием установлено, что хищения прав на «Рилэнд», «Махаон», «Парфенион» не было. Составной частью плана хищения 5,4 млрд. рублей являлась смена владельцев российских обществ.

Факт изъятия следственными органами учредительных документов и печатей обществ 4 июня 2007 и оформление сделок купли-продажи долей датой 31 июля 2007 года позволил Браудеру У.Ф. подкрепить свою версию о краже у «Hermitage Capital» российских обществ, публично заявив о причастности к этому  сотрудников правоохранительных органов.

О том, что факт изъятия и хранения сотрудниками правоохранительных органов документов и печатей «Рилэнд», «Махаон», «Парфенион» использовался в интересах Браудера У.Ф. лицами из ближайшего окружения, подтверждал и Магнитский С.Л. в своих показаниях.

Будучи допрошенным по уголовному делу в отношении адвоката Хайретдинова Э.М., Магнитский С.Л. в июне 2008 года показал, что следователь Карпов П.А. еще в ноябре-декабре 2007 года готов был вернуть печати и документы «Рилэнд», «Махаон», «Парфенион», изъятые в ходе обыска 4 июня 2007 года, однако Клейнер В.Г. и Черкасов И.С. просили не получать их до того момента, пока следствие не возбудит уголовное дело по их же заявлению о краже у группы Браудера У.Ф. российских компаний.

7

US-PREV093818

Позднее факт·нахождения у следствия учредительных документов и печатей «Рилэнд», «Махаон», «Парфенион» группой Браудера У.Ф. будет использоваться как единственное обоснование причастности сотрудников правоохранительных органов к якобы совершенной краже у «Hermitage Capital» российских обществ и последовавшему за этим хищению бюджетных средств.

Отсутствие хищения российских обществ у «Hermitage Capital» также следует и из заявлений представителей компаний «Hermitage Capital» в десятках инициированных ими же арбитражных делах со схожими требованиями, формально направленными на возврат корпоративного управления над российскими обществами.

Ни в одном из этих арбитражных дел лица, контролируемые Браудером У.Ф. (компаниями «Hermitage Capital»), не заявляли, что они не заключали сделки, по которым сначала 31.07.2007 владельцем обществ стало «Плутон», а затем с 08.02.2008 — компания «Boily Systems», и что доверенность, по которой были заключены сделки, ими не выдавалась.

Единственным основанием для судебного возврата им 100 % долей российских обществ, являлось неапостилирование доверенности на Гасанова О.Г., которое не было сделано ими же самими.

Данные обстоятельства неоднократно исследовались в арбитражных процессах, большинство которых было прекращено в связи с отказами от исков.

По единственному рассмотренному по существу делу о правах на доли «Рилэнд», «Махаон», «Парфенион», по которому компании Браудера У.Ф. от иска не отказались, суд сначала в 2010 году, а затем окончательно в мае 2011 года установил, что переход прав на российские общества от кипрских компаний «Kone Holdings» и «Glendora Holdings» к «Плутон», а затем от «Плутон» к компании «Boily Systems» осуществлен в результате волеизъявления компаний «Kone Holdings» и «Glendora Holdings», выраженного ими в доверенности от 02.07.2007, выданной гражданину Гасанову О.Г., заключившему сделки в их интересах и по их поручению.

Неапостилирование же доверенности на Гасанова О.Г., положенное в основу исковых требований компаний «Kone Holdings» и «Glendora Holdings», даже при наличии признания иска со стороны ответчика (конечного владельца долей - компании «Boily Systems»), суд не признал нарушением требований международного и российского законодательства, и поскольку заявлений о фальсификации или иной подделки доверенности истцами не заявлялось, а иных доводов о неуполномоченности Гасанова О.Г. не приводилось, постановлением Десятого арбитражного апелляционного суда от 31 мая 2011 года по делу № А41-8992/09 в иске было отказано. Данный судебный акт оставлен без изменения всеми судебными инстанциями, вплоть до Высшего Арбитражного Суда РФ.

Фактически, доли обществ «Рилэнд», «Махаон», «Парфенион», называемые Правительством США «корпоративной идентичностью компаний «Hermitage Capital», не только не были похищены у компаний «Hermitage

8

US-PREV093819

Capital», но и ими же были переоформлены сначала на «Плутон», а затем на «Boily Systems», оставаясь все это время под контролем Браудера У.Ф.

Все судебные акты арбитражной системы судов Российской Федерации размещены вместе с картотекой движения соответствующих дел в открытом доступе на официальном сайте Верховного Суда Российской Федерации (www.kad.arbitr.ru).

4) Доводы о том, что участники «организации» – чиновники налоговых органов утвердили требования о возврате налога в тот же день, когда они были поданы, и через два дня участникам «организации» было выплачено 230 млн. долл. США, не соответствуют действительности.

Из материалов следствия следует, что Хлебников В.Г., Маркелов В.А. и Курочкин В.Н. обратились в налоговые органы с уточненными налоговыми декларациями, подготовленными Магнитским С.Л., в октябре-ноябре 2007 г., положительные решения по которым налоговыми органами были приняты только 26.12.2007.

В указанный период налоговые инспекторы не бездействовали, как об этом безосновательно утверждается в иске, а в соответствии с Налоговым кодексом Российской Федерации провели камеральную проверку, в ходе которой истребовали и изучали регистры налогового учета, бухгалтерские справки, договора купли-продажи, счета-фактуры, платежные и иные финансовые документы, а также опросили руководителей «Махаон», «Рилэнд», «Парфенион».

Также инспектора известили представительства в РФ «CITIBANK» и «HSBC-Bank», являющегося управляющей компанией фонда «Hermitage Capital», о проводимой ими проверке и запросили у них подтверждающие необходимость возврата налога сведения, на что «HSBC-Bank» представил соответствующие документы.

Однако средств налогового контроля оказалось недостаточно для выявления преступных намерений Браудера У.Ф. и его соучастников, а также подложности изготовленных ими документов, что в результате привело к возврату из бюджета денежных средств.

Кроме того, заявленные требования в иске о конфискации 230 000 000 долларов США, как суммы, равной сумме похищенных средств из бюджета Российской Федерации, не соответствуют сумме в валюте хищения, равной 5 409 503 006, 48 руб. или 218 834 569 долларов США по курсу на день совершения мошенничества (26 декабря 2007 года), установленного Центральным Банком РФ и подлежащего применению в силу статьи 53 Федерального закона от 10.07.2002 N 86-ФЗ «О Центральном банке Российской Федерации (Банке России)» и пункта 9 Положения об установлении и опубликовании Центральным банком Российской Федерации официальных курсов иностранных валют по отношению к рублю, утвержденного Центральным Банком РФ от 18.04.2006 г. N 286-П.

5) Сведения о том, что Магнитский С.Л. являлся адвокатом, сотрудником юридической фирмы, разоблачил причастность

US-PREV093820

сотрудников российских правоохранительных органов к мошенничеству, недостоверны.

Расследованием установлено, что Магнитский С.Л., имея специальность бухгалтера и статус индивидуального предпринимателя, будучи экономистом по образованию, оказывал услуги компаниям Браудера У.Ф. по ведению бухгалтерского и налогового учета. Магнитский С.Л. никогда не являлся адвокатом и не имел юридического образования.

Каких-либо доказательств того, что Магнитский С.Л. проводил собственное расследование и выявил какие-либо преступления, в том числе хищение 5,4 млрд. рублей из российского бюджета, к которым были бы причастны сотрудники государственных органов Российской Федерации, не установлено. Это также не следует и из его показаний по разным уголовным делам.

6) Утверждения о том, что Магнитский С.Л. был несправедливо, на основании ложного обвинения и по распоряжению члена «организации» арестован, не соответствуют действительности.

Расследование преступной деятельности Браудера У.Ф. и его соучастников, в т.ч. Магнитского С.Л., началось в 2004 году, т.е. задолго до совершения хищения в 2007 г. и до его задержания 24.11.2008 г. В связи с этим отсутствуют объективные основания утверждать, что преследование Магнитского С.Л. начато и в дальнейшем производилось в качестве ответной меры со стороны членов «организации» и связано с выявлением им фактов мошенничества, которого он в действительности не выявлял, а являлся его соучастником.

Задержание Магнитского С.Л. произведено 24.11.2008 в установленном законом порядке следователем Следственного комитета при МВД России Сильченко О.Ф., который не входил в так называемую «организацию», не находился в подчинении или иных отношениях с Карповым П.А. и Кузнецовым А.К.

Следователь Карпов П.А. не осуществлял уголовного преследования Магнитского С.Л. по факту уклонения от уплаты налогов. В его производстве находилось уголовное дело в отношении другого соучастника Браудера У.Ф. — Черкасова И.В.

Оперативное сопровождение уголовного дела по обвинению Магнитского С.Л. осуществлялось Кузнецовым А.К. только на первоначальном этапе. В период заключения и содержания Магнитского С.Л. под стражей Кузнецов А.К. оперативных мероприятий уже не проводил и отношения к его делу не имел.

На основании совокупности собранных по делу доказательств 25.11.2008 Магнитскому С.Л. было предъявлено обвинение по пп. «а» и «б» ч. 2 ст. 199 УК РФ (уклонение от уплаты налогов в особо крупном размере).

26.11.2008 Тверской районный суд г. Москвы, после проверки обоснованности предъявленного Магнитскому С.Л. обвинения, заключил его под стражу, поскольку установил, что от него исходят угрозы свидетелям, он

10

US-PREV093821

принимает меры по сокрытию и уничтожению доказательств, имеет намерение скрыться от органа следствия и суда за рубежом.

7) Сведения о том, что Магнитский С.Л. умер в тюрьме вследствие ложного обвинения, пыток, а в последствии посмертно признан виновным, не соответствуют действительности.

Расследованием обстоятельств смерти Магнитского С.Л. установлено, что с 24.11.2008 он содержался под стражей по вышеуказанному обвинению. 16.11.2009 на стадии ознакомления с материалами дела его состояние здоровья резко ухудшилось и наступила смерть от острой сердечной недостаточности, развившейся на фоне вторичной дилятационной кардиомиопатии.

Судом проверены действия должностных и медицинских сотрудников изолятора, в котором содержался Магнитский С.Л. По итогам судебного разбирательства 28.12.2012 заместитель начальника СИЗО, отвечающий за лечебную часть, оправдан в виду отсутствия причинно-следственной связи между имевшимися заболеваниями Магнитского С.Л., качеством оказываемого ему лечения и наступлением смерти.

В ходе расследования обстоятельств смерти Магнитского С.Л. исследовались все версии и предположения о причине его смерти, изложенные в средствах массовой информации и обращениях граждан, в т.ч. его родственников, членов Совета при Президенте РФ по развитию гражданского общества и правам человека и других. Однако подтверждения не нашли.

Также не нашло подтверждение возможное совершение сотрудниками МВД России Сильченко О.Ф., Карповым П.А., Кузнецовым А.К. при содействии иных лиц незаконного задержания Магнитского С.Л., необоснованного избрания в отношении него меры пресечения в виде заключения под стражу и создание таких условий содержания указанного лица в следственных изоляторах, которые прямо повлекли наступление его смерти.

К аналогичным выводам российского следствия и суда пришел и Высокий Суд Лондона (Соединенного Королевства Великобритании и Северной Ирландии) по иску Карпова П.А. к Браудеру У.Ф. и Файерстоуну Д.Р., указав, в п. 127-129 своего решения от 14.10.2013, что причинно-следственная связь, которую можно было бы ожидать от ареста и тюремного заключения, с одной стороны, и смертью Магнитского С.Л., с другой стороны, полностью отсутствует, и «ничто не говорит о пытках и убийстве», а также, что «Ответчики не привели фактов, доказывающих их оправдание в клевете».

С учетом разъяснений Конституционного Суда РФ о правах умерших обвиняемых на реабилитацию и в связи с многочисленными жалобами, публикациями, заявлениями в прессе и в различных официальных органах, в том числе, со стороны родственников Магнитского С.Л., скончавшегося в статусе обвиняемого, дело для проверки оснований его реабилитации было

11

US-PREV093822

передано в единственно компетентный орган, к полномочиям которого в любом современно-цивилизованном, правовом государстве отнесено установление причастности или непричастности к противоправным событиям конкретного лица – орган судебной власти. В данном случае исходя из правил подсудности и подведомственности таким органом являлся Тверской районный суд г. Москвы, который в открытом публичном заседании, длящемся более полугода, проверил каждое доказательство, на которое ссылался в своем заключении орган предварительного расследования и прокурор, и, выявив полную причастность Магнитского С.Л. к событиям вмененных преступлений Браудеру У.Ф., отказал в посмертной реабилитации Магнитского С.Л., прекратив в отношении него уголовное дело (постановление Тверского районного суда г. Москвы от 11 июля 2013 года).

## ПРИЧАСТНОСТЬ «PREVEZON HOLDINGS» И КАЦЫВА Д.П.

Проведением продолжительного и всестороннего расследования, а также комплекса оперативно-розыскных мероприятий не установлена связь Кацыва Д.П. и его компаньонов (Т. Крита, А. Литвака) с лицами, которые каким-либо образом причастны к хищению и легализации 5,4 млрд. руб. Владельцы «Prevezon Holdings» никогда не знали установленных соучастников Браудера У.Ф.. Их даже опосредованно ничто не связывало.

Изучение банковских операций и иных документов, показало, что компания «Prevezon Holdings» не получала денежных средств со счетов обществ – «Рилэнд», «Парфенион», «Махаон» и иных лиц, использованных в ходе хищения и легализации 5,4 млрд. руб.

Получение «Prevezon Holdings» от «Bunicon-Impex» и «Elenast-Com» в феврале 2008 г. 857 354 долл. США было обусловлено наличием договорных отношений между Петровым Л.Д., как инвестором, с одной стороны, и Критом Т., как бенефициаром «Prevezon Holdings», с другой стороны. Согласно возникшим между ними обязательствам, указанные денежные средства передавались «Prevezon Holdings» в виде займа, использовались в качестве инвестиционных вложений сначала по внутрибанковским проектам, а в последствии были конвертированы в другую валюту и направлены в качестве оплаты приобретения корпоративного пакета инвестиционного проекта в Нидерландах.

Причастные к хищению и легализации 5,4 млрд. руб. лица не имели прямого либо косвенного отношения к достижению указанных соглашений, к их заключению и последующей реализации.

Проверкой источников формирования капитала Кацыва Д.П., ставшего с июня 2008 года единственным владельцем компании «Prevezon Holdings», установлено, что направленный начиная с конца 2009 года на приобретение имущества в США инвестиционный капитал компании он сформировал за счет собственных средств от деятельности на территории России.

12

US-PREV093823

Излагаемая в иске схема транзакций не соответствует действительности и не имеет никакого отношения к деятельности компании «Prevezon Holdings» на территории запрашивающей стороны – США.

Утверждения о том, что в указанные в иске дни прошли конкретные трансакции между такими компаниями, как «ЖК» (РФ) и «Буникон» (Молдова), или ЖК» (РФ) и «Крайний Север» (РФ), «Крайний Север» (РФ) и «Буникон» (Молдова), а также между «Юниверс» (РФ) и «Эленаст» (Молдова), или «Юниверс» (РФ) и Крайний Север» (РФ), «Крайний Север» (РФ) и «Эленаст» (Молдова), подтверждения не нашли. Доказательств существования описанных сделок не обнаружено.

Проверкой молдавских фирм – «Bunicon-Impex» и «Elenast-Com», со счетов которых «Prevezon Holdings» получил 857 тыс.долл. США, также установлено, что они имели достаточно доказательств, подтверждающих их правомочность и дееспособность (представителя, распорядителей счетов, правоустанавливающие документы, ликвидность, государственную регистрацию, уплаченные налоги и комиссионные сборы).

У обслуживающих эти фирмы банков не возникало сомнений в их наличности и действительности осуществляемой ими деятельности, в связи с чем они открыли им счета и в дальнейшем продолжительное время их обслуживали. С компаниями «Bunicon-Impex» и «Elenast-Com» тесно взаимодействовали крупнейшие банки США (в т.ч. CitiBank), которые за продолжительный период своей работы с ними не обнаруживали в их деятельности признаков противоправности, в т.ч. легализации преступных доходов.

Накануне перечисления фирмами «Bunicon-Impex» и «Elenast-Com» 857 тыс. долл. США на счет компании «Prevezon Holdings» в банке «UBS» (Цюрих), долларовые счета этих молдавских обществ пополнялись за счет других источников, в том числе, от прямых транзакций CitiBank (США):

| ДАТА ТРАНЗАКЦИИ | СУММА СПИСАНИЯ | СУММА ЗАЧИСЛЕНИЯ | ВАЛЮТА | НОМЕР СЧЕТА ПОЛУЧАТЕЛЯ/ПЛАТЕЛЬЩИКА | ПОЛУЧАТЕЛЬ/ПЛАТЕЛЬЩИК |
|---|---|---|---|---|---|
| Выписка по счету SC BUNICON-IMPEX SRL. Счет: 22511018404106 | | | | | |
| 05.02.2008 | 300 845 | | USD | 103220084027 | CITIBANK N.A. NEW YORK SUA |
| 06.02.2008 | 1 491 300 | | USD | 103220084027 | CITIBANK N.A. NEW YORK SUA |
| 06.02.2008 | | 410 000 | USD | CH78002302304678316Y | (PREVEZON HOLDINGS LTD GOUDION STREET AGIOS ANDREAS P.S.4095 |
| Выписка по счету SC ELENAST-COM SRL. Счет: 22513018404162 | | | | | |
| 12.02.2008 | 2 195 775 | | USD | 103220084027 | CITIBANK N.A. NEW YORK SUA |
| 13.02.2008 | 1 447 553 | | USD | CH78002302304678316Y | (PREVEZON HOLDINGS LTD GOUDION STREET AGIOS ANDREAS P.S.4095 |

С фирмами «Bunicon-Impex» и «Elenast-Com» также активно сотрудничали многочисленные резиденты Европейского Союза (в т.ч. Соединенного Королевства Великобритании и Северной Ирландии) и ни один из них не усомнился в добропорядочности «Bunicon-Impex» и «Elenast-Com».

Со счетов названных молдавских компаний в рассматриваемый период были перечислены денежные средства в общей сумме свыше 102 000 000 долл. США 88-ми компаниям из 21-ной страны мира путем совершения 206-ти транзакций. Причем 42 % из этих средств (43 386 226 долл. США) были направлены компаниям, зарегистрированным в Великобритании.

13

US-PREV093824

Само по себе ненахождение «Bunicon-Impex» и «Elenast-Com» по месту их регистрации не указывает на то, что они занимались легализацией похищенного имущества, а все их сделки заведомо имеют сомнительное происхождение, поскольку данное обстоятельство не противоречит гражданскому законодательству Молдавской Республики. Согласно установленным в Молдавии правилам, юридическое лицо может быть зарегистрировано по одному адресу (юридический адрес), а фактически находиться по другому адресу (фактический адрес).

Таким образом, никаких косвенных и прямых доказательств наличия связи между мошенническим завладением бюджетными средствами и приобретением от имени «Prevezon Holdings» как европейского пакета компаний, так и недвижимости в США не добыто, равно как и доказательств какой-либо осведомленности владельцев и руководителей «Prevezon Holdings» о предполагаемом преступном характере поступивших от молдавских компаний средств.

## ЗАКЛЮЧЕНИЕ

Вышеприведенные данные, основанные на результатах официальных расследований и судебных разбирательств, в т.ч. в судах иностранных государств, свидетельствуют, что Российская Федерация не располагает запрашиваемыми Министерством юстиции США документами, которые бы могли подтвердить изложенные в иске сведения о существовании махинаций и участии «Prevezon Holdings» в легализации части преступных доходов.

Поскольку недостоверность приведенных в иске сведений об обстоятельствах хищения и легализации 5,4 млрд. руб. указывает на возможное использование компетентных органов США в неправосудных целях, Российская Федерация предлагает запрашивающей стороне провести совместное или раздельное расследование обстоятельств их получения, а также намерений источника этой информации, причины ее искажения.

Принятие положительного решения американской стороной способно существенным образом повлиять на исход иска, прояснить и вскрыть подлинные основания изложенных в нем обстоятельств.

В случае согласия на проведение расследования, Российская Федерация готова принять в нем участие и представить необходимые документы.

14

US-PREV093825



**TRANSPERFECT**

City of New York, State of New York, County of New York

I, Alitasha Younger, hereby certify that the document "US-PREV093812 – US-PREV093825" is to the best of my knowledge and belief, a true and accurate translation from Russian into English.

_____
Alitasha Younger

Sworn to before me this
July 27, 2015

_____
Signature, Notary Public

AMY LEONG
Notary Public - State of New York
No. 01LE6314554
Qualified in Richmond County
Commission Expires Nov 10, 2018

_____
Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS

THREE PARK AVENUE, 39TH FLOOR, NEW YORK, NY 10016 | T 212.689.5555 | F 212.689.1059 | WWW.TRANSPERFECT.COM

OFFICES IN 90 CITIES WORLDWIDE

**RESULTS**

of the examination of the inquiry of the USA in the case of Prevezon Holdings

CONTENTS

Subject matter of the inquiry……………………………………………………………1
Circumstances of the case……………………………………………………………..2
Substance of the complaint ……………………………………………………………6
Involvement of Prevezon Holdings and D.P. Katsyv ……………………………12
Conclusion……………………………………………………………………………14

## SUBJECT MATTER OF THE INQUIRY

The Department of Justice of the United States of America requested the General Prosecutor's Office of the Russian Federation to assist in the investigation of the case of Prevezon Holdings, which has been subjected to civil forfeiture by the Government of the United States.

The documents that have been submitted indicate that in September, 2013, the US Government filed a complaint in the Court of the Southern District of New York State against the Prevezon Holdings group of companies and their owner, D.P. Katsyv seeking the forfeiture of assets, which, according to the United States, were acquired in order to launder illegally acquired funds.

The complaint affirms that in July-December, 2007, a criminal organization, including corrupt Russian officials, fraudulently carried out the theft of Russian companies – Riland (Ltd.), Parfenion (Ltd.), Makhaon (Ltd.) owned by W.F. Browder; and being in control of these companies, the organization misappropriated RUB 5.4 billion, or USD 230 million from the Russian treasury that was previously paid as a profit tax.

According to the Government of the United, the members of the organization and their accomplices then started laundering the stolen money. In particular, in February, 2008, they transferred USD 857,000 to Prevezon Holdings through the accounts of certain Moldovan companies (Bunicon-Impex and Elenast-Com). This money was then used to purchase real estate in New York totaling more than USD 22 million.

In light of the above, the United States of America has asked the Russian Federation to provide financial, banking and tax records, court records, and the registration documents of the Russian companies, and other data relating to the circumstances set forth in the complaint.

The Prosecutor General of Russia investigated the complaint of the Government of the United States against Prevezon Holdings and its related entities. The information contained therein was compared with the results of the investigation in the territory

of Russia and other countries. Some of the circumstances specified in the complaint were subject to further investigation.

US-PREV093812

It was found that the body of the complaint is constituted by W.F. Browder's version, which has already undergone examination, been disposed of as false, and which was put forth by him and widely replicated in order to conceal his involvement in the commission of a number of serious economic crimes in the Russian Federation, and to discredit the law enforcement and judicial authorities of Russia investigating his criminal activities. Therefore, the charges brought by the US Government against Prevezon Holdings do not constitute a claim in the legal sense. They form a kind of quasi-claim because they do not represent a separate action nor do they contain verifiable information.

Since, as evident from the complaint, the United States of America does not have complete and verifiable information on W.F. Browder and the entities controlled by him, nor on the defendants and their connection to the circumstances surrounding the theft of RUB 5.4 billion from the treasury, the General Prosecutor's Office of the Russian Federation regards a report on the results of the investigation executed in Russian territory as permissible.

The aforementioned attitude of the Russian Federation to the complaint of the US Government against Prevezon Holdings is entirely and exclusively based on objective data, which can be checked and confirmed at any time.

## CIRCUMSTANCES OF THE CASE

The investigation of W.F. Browder's activities established that in 1996, as a citizen of the United Kingdom of Great Britain and Northern Ireland, he arrived in Moscow (Russia) in violation of immigration law, where he decided to engage in the illegal acquisition of shares in Russian companies, which had been banned from sale to non-residents (foreigners).

To realize his plans, W.F. Browder engaged D.R. Firestone, S.L. Magnitsky and others who developed a criminal scheme whereby he would acquire stock in large Russian companies, profit through the illegal trading of these shares, tax evasion and fraudulent refunds from the treasury of the Russian Federation.

In pursuit of their criminal plan, the accomplices of the indicated individuals (I.S. Cherkasov and V.G. Kleiner) formed fictitious companies Makhaon, Riland, Parfenion, Dalnyaya Step, Saturn Investments, Kameya, Rifl, Oriental-K and others, registered in Russia at the same address: 301 Lenina St., Elista, Republic of Kalmykia, where there were more than one thousand other fictitious companies listed.

However, the abovementioned organizations were not located at that address, and the actual management of their activity was executed

US-PREV093813

by the companies Hermitage Capital and Firestone Duncan in Moscow. W.F. Browder was initially the head of the fictitious companies, and then this position was held by his elected agents, P. Rench, M. Wilson, I. Cherkasov.

Using these companies for criminal purposes, W.F. Browder concealed his actual status as a non-resident in the purchase of shares in Russian companies from counterparties and registrars of shares. Acquiring shares formally through Russian legal entities, W.F. Browder managed to avoid obtaining the mandatory permit of the Federal Commission on Securities and the Government of the Russian Federation for non-residents and, as a result, between 1999 and 2004, he illegally acquired at least 131,574,722 shares in Gazprom without its consent.

These actions of W.F. Browder and his accomplices resulted in damages totaling at least RUB 2, 985 million. On the basis of the foregoing, a criminal case has been opened and is ongoing in which W.F. Browder has been evading testifying, and has been placed on the federal and international wanted list.

In 2004, according to the results of tax audits, it was revealed that the companies were formally registered in the Republic of Kalmykia, they did not operate as businesses in the territory of the Republic, disabled persons were hired fictitiously and did not work, and companies provided tax authorities with fabricated documents of residents of the special economic zone containing counterfeit signatures of the Minister of Economic Affairs of the Republic of Kalmykia. It was found that this tax scheme allowed W.F. Browder's companies to receive tax benefits illegally, reducing their tax burden from 35% to 5.5% in income tax alone.

Using this scheme developed by S.L. Magnitsky to avoid paying taxes, W.F. Browder's companies provided the Russian Federation tax authorities with false information. This, in turn, allowed W.F. Browder's company Hermitage Capital to avoid paying income tax in the amount of RUB 522,595,514 during the tax period of 2001 alone.

This fact led to the opening of criminal cases in 2004. The investigation was suspended several times because of the search for W.F. Browder. In 2012, the investigation was completed, and the case went to trial.

According to the verdict of Tverskoy District Court of Moscow, which entered into force on 07/11/2013, W.F. Browder was found guilty of committing a multimillion [dollar] illegal tax evasion scheme and sentenced to nine years in prison, and was put on the federal and international wanted list.

It was also found that, after the sale of illicitly acquired shares of all the companies controlled by W.F. Browder in 2006, the same group of persons was also engaged in illegal tax schemes resulting in the fraudulent refund by the treasury of the income taxes paid under the schemes.

The factual evidence indicating an intentionally underestimated income tax rate led to the launch of a criminal case against I.V. Cherkasov in May, 2007.

The investigation revealed damage to the Russian Federation in the amount of about RUB 600 million.

US-PREV093814

During the investigation of this criminal case in February, 2008, Russian law enforcement agencies found that Riland, Makhaon, and Parfenion, under the control of W.F. Browder, paid profit taxes from the sales of shares in the amount of RUB 5.4 billion through a fraud perpetrated on the tax authorities, whereby under the pretence of the payment of excessive income tax under fictitious agreements resulting in losses suffered by these companies precisely for the amount of taxes paid, tax refunds were fraudulently-obtained from the Russian treasury.

The RUB 5.4 billion mentioned in the U.S. complaint is connected with the implementation of this scheme.

The investigation of these circumstances revealed that the theft of RUB 5.4 billion was perpetrated by a group of persons consisting of V.G. Khlebnikov, V.A. Markelov, V.N. Kurochkin, S.M. Korobeinikov, O.G. Gasanov, S.L. Magnitsky and E.M. Khairetdinov, who were acting in the interests of W.F. Browder.

The scheme to fraudulently obtain refunds on taxes paid in 2006 on the sale of shares, which materialized not later than in May 2007, provided for the replacement of the owners of the taxpayers of Riland, Makhaon, Parfenion, with figureheads formally unrelated to anybody from Hermitage Capital, so that the organizers of the criminal scheme were free to fraudulently receive money in the accounts of entities controlled by them abroad and then claim the perpetration of theft from them of their companies, thereby diverting suspicion from themselves.

During the commission of this offense and to conceal the participation of W.F. Browder, the owners of the Russian companies were replaced with figureheads through the re-registration of full ownership in these companies to Pluton (Ltd.). To do this, the directors of the Cypriot companies Cope Holdings and Glendora Holdings, which were part of the Hermitage Capital structure and belonged to W.F. Browder, on 07/02/2007, granted power of attorney to O.G. Gasanov to enter into transactions on their behalf involving shares in the authorized capital of the companies, including control over the terms of the transactions. On the basis of this power of attorney, on 07/31/2007, O.G. Gasanov concluded a contract for the sale of shares in Riland, Makhaon, and Parfenion with a figurehead formally not associated with Hermitage Capital and W.F. Browder, but connected with Pluton, controlled by them and headed by V.A. Markelov.

After the re-registration of the constituent documents, individuals engaged by O.G. Gasanov were appointed directors of the abovementioned companies – V.G. Khlebnikov, V.A. Markelov, and V.N. Kurochkin, and subsequently took part in the intentional deception of tax authorities through claims of legal grounds for refunds on income tax that had been paid in the amount of RUB 5.4 billion.

US-PREV093815

S.L. Magnitsky was a co-executor of this theft plan and possessed the most accurate information on the financial performance of Makhaon, Riland, Parfenion. He calculated the amount of the excess tax that allegedly had been paid to the treasury, produced fraudulent tax returns and primary accounting documents to support them, and certified them using duplicate seals, after which he handed them over to O.G. Gasanov and V.A. Markelov, who then, along with V.N. Kurochkin and V.G. Khlebnikov, used them to defraud tax authorities in the amount of RUB 5.4 billion.

In his turn, S.M. Korobeynikov, being the owner of Universal Savings Bank CB, provided accounts for this organization that were used to receive funds from the treasury in the form of tax refunds and in their subsequent laundering (through transfers to other banks and credit institutions of the Russian Federation with further transfers abroad).

Based on the documents prepared by S.L. Magnitsky, the Federal Tax Service Inspectorates No. 25 and 28 decided in favor of a tax refund in the amount of RUB 5,409,503,006.48, which was transferred to the accounts of these companies on December 26, 2007 by the Federal Treasury of the Ministry of Finance of the Russian Federation.

One of W.F. Browder's lawyers, E.M. Khairetdinov, realizing that the criminal activities carried out by W.F. Browder and persons under his control could be detected by Russian law enforcement agencies, started carrying out a criminal plan that had been worked out in advance. Its aim was to exclude W.F. Browder from the persons who might be suspected of the theft of RUB 5.4 billion.

Beginning in December, 2007, he circulated information on the theft of these firms from W.F. Browder (Hermitage Capital) and the involvement of Russian law enforcement agencies therein. His evidence of this included a claim that the constituent documents of Riland, Makhaon, Parfenion had been seized by the authorities in June 2007 during a search and were then used to re-register the companies in the names of other persons.

After the next change in the figurehead owners of Riland, Makhaon, Parfenion (Pluton) to a new figurehead, Boily Systems) (British Virgin Islands), E.M. Khairetdinov organized the clandestine seizure in the tax authorities and subsequent safekeeping of false documents prepared by S.L. Magnitsky and used by O.G. Gasanov and V.A. Markelov to commit the theft of RUB 5.4 billion. Following the discovery of a number of these tax documents during a search, E.M. Khairetdinov hurriedly left the territory of the Russian Federation and is the available information indicates he is in the UK. The majority of persons related to W.F. Browder and his long-term systematic fraudulent activity also are believed to be in hiding in the UK since 2006-2007.

The judgments of the Tverskoy District Court of Moscow of 04/28/2009 and 03/10/2011 found V.A. Markelov and V.G. Khlebnikov guilty of crimes under Part 4 of Art. 159 of the Criminal Code of the Russian Federation

US-PREV093816

(large scale fraud perpetrated by a group of people). They were sentenced to imprisonment for a term of five years. Funds in the amount of RUB 685,024,893.29 were returned to the state.

The investigation against V.N. Kurochkin, S.M. Korobeinikov, O.G. Gasanov and S.L. Magnitsky concerning the theft of RUB 5.4 bln was terminated due to their death. E.M. Khairetdinov has been placed on the wanted list.

## GROUNDLESSNESS OF THE COMPLAINT

The inconsistencies found in all the key and associated circumstances of the theft of funds from the treasury in Russia in 2007 compared to the results of the investigation and confirmed by legally effective court rulings point to the groundlessness of the complaint of the U.S. Government.

1) The allegations of the theft of RUB 5.4 billion by a "Russian criminal organization, including corrupt government officials" do not correspond to the facts.

The investigation established that the crime involved a group of persons consisting of W.F. Browder, S.L. Magnitsky, V.G. Khlebnikov, V.G. Markelov, V.P. Kurochkin, S.M. Korobeinikov, O.G. Gasanov, E.M. Khairetdinov who were not officials.

The investigation verified the involvement of tax officials in the theft of RUB 5.4 billion. They were interrogated and placed in a line-up. Searches and seizures were made at their places of work and residence. The telephone conversations of the persons concerned were monitored. However, there was no evidence of a connection between any officials and the above-mentioned criminal group. At the time of their decision to refund RUB 5.4 billion they were under the influence of the deception.

The alleged collusion of other persons, including police officers P.A. Karpov and A.K. Kuznetsov, was also checked, and no evidence was found of this. It was established that the possessions held by them and their families were purchased using funds received from legal sources well before the theft was committed.

2) The arguments that the members of the "organization" P.A. Karpov and A.K. Kuznetsov, for the purposes of stealing the "corporate identity of Hermitage Capital," initiated a search in the middle of 2007 of the Russian office of Hermitage Capital, during which police confiscated the original seals, tax and constituent documents of Riland, Makhaon, Parfenion, and then used them to re-register these companies in the names of the three members of the "organization," are unreliable.

The investigation established that P.A. Karpov did not decide on the search and seizure of these objects and documents, and did not take part in the search. By the time Investigator P.A. Karpov undertook the handling of the corresponding criminal case,

US-PREV093817

the registration documents and seals of Riland, Makhaon, Parfenion had been removed by the previous investigator and, after being packaged and put under seal, they were stored in the facilities designated for the storage of seized property. P.A. Karpov did not open the packages or use the said objects and documents.

An expert investigation found that the seals used by Riland, Makhaon, Parfenion in the documents associated with the theft of RUB 5.4 billion were other than those seized by the investigators of the Interior Ministry in the Russian offices of Hermitage Capital and Firestone Duncan.

In perpetrating the fraud, duplicates were used, which, as S.L. Magnitsky himself admitted, he had made per the instructions of the management of the companies after the law enforcement agencies had performed the search. These duplicates, according to the testimony of S.L. Magnitsky, were at the disposal of the employees of Firestone Duncan, including S.L. Magnitsky himself.

3) The allegations are false that the members of the "organization" had carried out the theft of the companies owned by Hermitage Capital (Makhaon, Riland, Parfenion on the basis of the decision of the arbitral tribunal under Detox LLC of June 15, 2007, and that the constituent documents and seals seized during searches on June 04, 2007 were used by them for re-registration of the companies in the names of other members of the "organization," and later used by the same companies for the theft of funds from the treasury.

The investigation established that there was no theft of rights to Riland, Makhaon, Parfenion. The change in the ownership of the Russian companies was an integral part of the planned theft of RUB 5.4 billion.

The fact of the seizure by the investigating authorities of the constituent documents and seals of the companies on June 04, 2007, and execution of the transactions for the sale and purchase of shares dated July 31, 2007 allowed W.F. Browder to support his version of the theft of the Russian companies from Hermitage Capital by publicly declaring the involvement of law enforcement officers therein.

The fact that the seizure and storage of documents and seals of Riland, Makhaon, Parfenion by law enforcement officers was used for the benefit of W.F. Browder by persons from his inner circle was also confirmed by S.L. Magnitsky in his testimony.

In June 2008, during his interrogation in the criminal case against the lawyer E.M. Khairetdinov, S.L. Magnitsky testified that in November-December 2007, Investigator P.A. Karpov was ready to return the seals and documents of Riland, Makhaon, Parfenion seized during the search on June 04, 2007, but V.G. Kleiner and I.S. Cherkasov requested that they not be returned until the investigators had opened a criminal case in response to their own report of the theft of the Russian companies from W.F. Browder's group.

US-PREV093818

The subsequent fact of the investigators' possession of the constituent documents and seals of Riland, Makhaon, Parfenion would be used by W.F. Browder's group as the sole grounds for the involvement of law enforcement officers in the alleged theft of the Russian companies from Hermitage Capital and subsequent theft of treasury funds.

The non-theft of the Russian companies from Hermitage Capital also follows from statements of representatives of Hermitage Capital in dozens of arbitration cases initiated by them with similar claims formally aimed at the return of corporate governance over the Russian companies.

In none of these arbitration cases of entities controlled by W.F. Browder (Hermitage Capital companies) did they declare that they had not entered into transactions, in which firstly, Pluton had become the owner of the companies on 07/31/2007, and then Boily Systems on 02/08/2008, and that the power of attorney under which the transactions were made had not been issued by them.

The sole grounds for a judicial return to them of ownership in the Russian companies was the failure to apostille the power of attorney for O.G. Gasanov, which they themselves had not done.

These circumstances were repeatedly subject to consideration in arbitration proceedings, most of which were closed due to abandonment of the claims.

In the single consideration of the merits of the rights in shares of Riland, Makhaon, Parfenion, in respect of which W.F. Browder's companies did not abandon action, the court, first in 2010 and then finally in May 2011, found that the transfer of rights in the Russian companies from the Cypriot companies Copa Holdings and Glendora Holdings to Pluton and then from Pluton to Boily Systems, was voluntarily undertaken by Copa Holdings and Glendora Holdings as expressed by them in the power of attorney of 07/02/2007 issued to citizen O.G. Gasanov, who carried out the transactions in their interests and on their behalf.

The failure to apostille the power of attorney for O.G. Gasanov, which was used as the basis for the claims of Copa Holdings and Glendora Holdings, even with the recognition of the claim by the defendant (the final owner of the shares - Boily Systems), was not found by the court to be in breach of the requirements of international and Russian law, and as the claimants made no allegations of falsification or other counterfeiting of the power of attorney, and there were no other arguments brought about the absence of authority held by O.G. Gasanov, under the ruling of the Tenth Arbitration Court of Appeal of May 31, 2011 in case No. A41-8992/09 the claim was rejected. This judicial act has been upheld by all courts, including the Supreme Arbitration Court of the Russian Federation.

In fact, the stakes in Riland, Makhaon, Parfenion, referred to by the US Government as the "corporate identity of Hermitage Capital"

US-PREV093819

were not only not stolen from Hermitage Capital, they were re-registered by the latter, firstly in the name of Pluton, and then [in the name of] Boily Systems, all the while remaining under the control of W.F. Browder.

All judicial acts of arbitration courts of the Russian Federation, along with the database of the relevant cases are placed in the public domain on the official website of the Supreme Court of the Russian Federation (www.kad.arbitr.ru).

4) The arguments that the members of the "organization," tax authorities, approved the applications for a tax refund on the very day they were submitted, and that after two days the members of the "organization" had been paid USD 230 million, do not correspond with reality.

The investigation materials show that V.G. Khlebnikov, V.A. Markelov, and V.N. Kurochkin applied to the tax authorities with revised tax returns prepared by S.L. Magnitsky in October-November 2007, and these were approved by the tax authorities only on 12/26/2007.

During this period, tax inspectors were not inactive, as wrongly stated in the complaint, but in accordance with the Tax Code of the Russian Federation they conducted a desk audit, during which they obtained and studied tax ledgers, accounting certificates, sales contracts, invoices, billing documents and other financial documents, and interviewed executives from Makhaon, Riland, Parfenion.

Also, the inspectors notified the Russian representative offices of CITIBANK and HSBC-Vapk, which is the management company of Hermitage Capital fund, of the inspection and requested confirmation of the necessity of the tax refund, in reply to which HSBC-Vapk presented the relevant documents.

However, tax control resources were not enough to expose the criminal intent of W.F. Browder and his accomplices, as well as the spuriousness of the documents produced by them, which resulted in the refund from the treasury.

In addition, the stated claim in the complaint that the damages totaling USD 230 million are equivalent to the amount stolen from the treasury of the Russian Federation do not match the amount of currency in the theft, which totaled RUB 5,409,503,006.48 or USD 218,834,569 at the exchange rate on the day of the fraud (December 26, 2007), set by the Central Bank of the Russian Federation and which is applicable in correspondence with Article 53 of the Federal Law No. 86-FZ of 07/10/2002, "On the Central Bank of the Russian Federation (Bank of Russia)" and with Para. 9 of Regulation No. 286-P of 04/18/2006, "On the Establishment and Publication by the Central Bank of the Russian Federation of Official Exchange Rates for Foreign Currencies against the Ruble," approved by the Central Bank of the Russian Federation.

5) Information that S.L. Magnitsky was a lawyer, an employee of the law firm, and exposed the involvement of employees of the Russian law enforcement agencies in fraud, is unreliable.

US-PREV093820

The investigation found that S.L. Magnitsky, having trained as an accountant, possessing the status of an individual entrepreneur, and educated as an economist, provided accounting and tax accounting services to W.F. Browder's companies. S.L. Magnitsky never was a lawyer and had no legal education.

No evidence was found that S.L. Magnitsky conducted his own investigation and uncovered criminal activity, including the theft of RUB 5.4 billion from the Russian treasury, with the involvement of government officials of the Russian Federation, neither does this follow from his testimony in various criminal cases.

6) The allegations that S.L. Magnitsky was unfairly arrested on the basis of false allegations and by order of a member of the "organization" do not correspond to the facts.

The investigation into the criminal activity perpetrated by W.F. Browder and his accomplices, including S.L. Magnitsky, began in 2004, long before the theft in 2007 and prior to his arrest on 11/24/2008. In this regard, there are no objective reasons behind allegations that the prosecution of S.L. Magnitsky was initiated and sustained as a means of retaliation on the part of members of the "organization" and was associated with his uncovering evidence of fraud, which in fact he did not uncover, rather, he himself was an accomplice in it.

The arrest of S.L. Magnitsky on 11/24/2008 was carried out in the manner prescribed by the law, by Investigator O.F. Silchenko of the Investigative Committee of the Ministry of Internal Affairs of Russia, who was not included in the so-called "organization" and was not subordinated or otherwise related to P.A. Karpov and A.K. Kuznetsov.

Investigator P.A. Karpov did not prosecute S.L. Magnitsky for tax evasion. He conducted a criminal case against I.V. Cherkasov, another accomplice of W.F. Browder.

Operational support for the criminal case against S.L. Magnitsky was provided by A.K. Kuznetsov only initially. During the period of the detention and incarceration of S.L. Magnitsky w, A.K. Kuznetsov did not perform any operational activities and was not involved in any manner in his case.

Based on the totality of the evidence collected on the case, on 11/25/2008, S.L. Magnitsky was charged under paragraphs a and b of Part 2 of Article 199 of the RF Criminal Code (large-scale tax evasion).

On 11/26/2008, Tverskoy District Court of Moscow, after checking the validity of the charges brought against S.L. Magnitsky, remanded him in custody, having established that he had posed threats to witnesses, had taken steps to conceal and destroy evidence, and was planning on evading the investigation and trial by fleeing abroad.

US-PREV093821

7) Information on the fact that S.L. Magnitsky had died in prison as a result of false accusations and torture and was posthumously declared guilty does not correspond with reality.

Through an investigation of the circumstances of S.L. Magnitsky's death, it was established that from November 24, 2008, he had been held in custody under the abovementioned charges. On November 16, 2009, while familiarizing himself with the case materials, his health worsened dramatically, with death occurring from acute heart failure that had developed alongside secondary dilated cardiomyopathy.

The court reviewed the actions of the officials and medical personnel at the infirmary where S.L. Magnitsky was being held. Based on the results of judicial proceedings, on December 28, 2012, the deputy head of the pretrial detention facility who oversaw the medical division was exonerated due to the absence of a cause and effect relationship between the affliction suffered by S.L. Magnitsky, the quality of the care he was provided and the onset of death.

An investigation of the circumstances surrounding the death of S.L. Magnitsky was conducted in which all versions and hypotheses published in the media and provided by the public regarding the cause of his death were examined, including from relatives, members of the Russian Presidential Council for Civil Society and Human Rights, and others. However, these could not be corroborated.

It could also not be confirmed that employees of Russia's Ministry of Internal Affairs – O.F. Silchenko, P.A. Karpov, and A.K. Kuznetsov – with the assistance of other persons had illegally detained S.L. Magnitsky, that they had unjustifiably taken measures in relation to him by remanding him in custody and by creating such conditions in the pretrial detention facility as to directly trigger his death.

The High Court in London (United Kingdom of Great Britain and Northern Ireland) came to conclusions similar to those of the Russian investigation and court on the lawsuit of P.A. Karpov against W.F. Browder and D.P. Firestone, indicating in Clauses 127-129 of its Decision of October 14, 2013 that a cause and effect relationship that could have been expected following the arrest and detention on the one hand, and the death of S.L. Magnitsky on the other hand, is completely absent, that "nothing speaks of torture and murder," nor did the "defendants provide evidence to justify their defamation."

Taking into account the explanations of the Constitutional Court of the Russian Federation on the rights of the accused who have died to exoneration, and in connection with the numerous complaints, publications, and statements in the press and in various official agencies, including from the relatives of S.L. Magnitsky, who died while facing charges, proceedings initiated to review grounds for his exoneration were transferred to the sole competent authority which is

US-PREV093822

empowered in any state governed by the rule of law to establish the complicity or lack thereof in illegal events perpetrated by a specific individual, namely, the judiciary. In this case, based on the rules governing jurisdiction, this authority was the Tverskoy District Court of Moscow, which in a public court session lasting more than half a year examined each piece of evidence that the agency responsible for the preliminary investigation and the prosecutor had referred to in their report, and, having determined the full complicity of S.L. Magnitsky in the events imputing the crimes of W.F. Browder, rejected the posthumous exoneration of S.L. Magnitsky, closing the criminal proceedings in relation to him (Ruling by the Tverskoy District Court of Moscow of July 11, 2013).

## COMPLICITY OF PREVEZON HOLDINGS AND D.P. KATSYV

The extensive, comprehensive investigation, as well as the series of special investigative actions that were carried out failed to establish a connection between D.P. Katsyv and his companions (T. Krit and A. Litvak) and those who in any way were accessories to the theft and laundering of RUB 5.4 billion. The owners of Prevezon Holdings never knew the persons established as accessories to W.F. Browder. There was nothing that even connected them indirectly.

A review of bank transactions and other documents showed that Prevezon Holdings did not receive funds from the accounts of Rilend, Parfenion, and Makhaon and other entities used during the embezzlement and laundering of RUB 5.4 billion.

The receipt by Prevezon Holdings from Bunicon-Impex and Elenast-Com in February 2008 of USD 857,354 resulted from contractual relations between L.D. Petrov, as an investor, on the one hand, and T. Krit, as a beneficiary of Prevezon Holdings, on the other. In accordance with their obligations to each other, the indicated funds were transferred to Prevezon Holdings as a loan and were used as investments initially for intrabank projects; thus, they were converted into another currency and sent as a payment for the purchase of a corporate package related to an investment project in the Netherlands.

The persons involved in the theft and laundering of RUB 5.4 billion had neither a direct nor an indirect relation to securing the indicated agreements, concluding them, or to their subsequent implementation.

Through an investigation into the sources of the capital formation of D.P. Katsyv, who in June 2008 had become the sole owner of Prevezon Holdings, it was established that the investment capital sent beginning in late 2009 to purchase property in the U.S. was taken from his own funds generated by business activities in Russia.

The transaction scheme set out in the complaint does not correspond with reality and does not have any relation to the activities of Prevezon Holdings on the territory of the requesting party, the U.S.A.

Confirmation of the fact that on the days indicated in the lawsuit concrete transactions were carried out between such companies as ZhK (Russia) and Bunicon (Moldova), or ZhK (Russia) and Krainey Sever (Russia), Krainey Sever (Russia) and Bunicon (Moldova), as well as between Univers (Russia) and Elenast (Moldova), or Univers (Russia) and Krainey Sever (Russia) or Krainey Sever (Russia) and Elenast (Moldova) was not found. No evidence was found that the transactions described had taken place.

An examination of the Moldovan companies Bunicon-Impex and Elenast-Com, from whose accounts Prevezon Holdings had received USD 857,000, established that they had enough evidence attesting to their competence and legal capacity (from representatives, escrow agents, title documents, liquidity, state registration, paid taxes and commission fees).

The banks servicing these companies did not have any doubts about their existence and the validity of the activities carried out by them; and in connection with this they opened accounts for them and serviced them for an extended period of time. Large banks in the U.S. (including Citibank) cooperated closely with Bunicon-Impex and Elenast-Com and during their extended period of cooperation did not discover any indications of illegal activity, including the laundering of the proceeds of crime.

On the eve of the transfer of USD 857,000 by Bunicon-Impex and Elenast-Com to the account of Prevezon Holdings at UBS (Zurich), the dollar accounts of these Moldovan companies received deposits from other sources, including from direct transactions of Citibank (U.S.):

| Date of Transaction | With-drawal amount | Amount of Deposit | Currency | Account Number of Recipient/Payer | Recipient/Payer |
|---|---|---|---|---|---|
| Account statement of SC BUNICON-IMPEX SRL, Account: 22511018404106 | | | | | |
| 02/05/2008 | - | 330,815 | USB | 103220084027 | CITIBANK N.A. NEW YORK, SUA |
| 02/06/2008 | - | 1,191,300 | USB | 103220084027 | CITIBANK N.A. NEW YORK, SUA |
| 02/06/2008 | 410,000 | - | USD | CH780023023046738169Y | (N) PREVEZON HOLDINGS LTD. GOUDION STREET, AGIOS ANDREAS, P.S.1095 |
| Account statement for SC ELENAST-COM SRL, Account: 22513018404162 | | | | | |
| 02/12/2008 | 447,353 | 1,196,575 | USD | 103220084027 | CITIBANK N.A. NEW YORK, SUA |
| 02/13/2008 | | | USD | CH780023023046738160Y | (N) PREVEZON HOLDINGS LTD. GOUDION STREET, AGIOS ANDREAS, P.S.1095 |

Residents of the European Union (including the United Kingdom of Great Britain and Northern Ireland) also collaborated closely with Bunicon-Impex and Elenast-Com, and not one of them had any doubts as to the integrity of Bunicon-Impex and Elenast-Com.

During the period under review, funds totaling more than USD 102,000,000 were transferred from the accounts of the Moldovan companies to 88 companies in 21 countries around the world through 206 transactions. Of these funds, 42% (43,386,226 U.S. dollars) were sent to companies registered in Great Britain.

US-PREV093824

In and of itself, the fact that Bunicon-Impex and Elenast-Com were not located in their place of registration does not suggest that they were engaged in the laundering of stolen property in that this fact does not contradict the civil law of the Republic of Moldova. According to the prescribed regulations of Moldova, a legal entity can be registered at one address (legal address) but have an actual location at another address (actual address).

Thus, no indirect or direct evidence of the existence of a connection between the fraudulent acquisition using public funds and purchase on behalf of Prevezon Holdings both of a European group of companies and real estate in the U.S., just as there was no evidence that the owners and directors of Prevezon Holding were aware of the alleged criminal nature of the funds coming from the Moldovan companies.

## CONCLUSION

The above information, which is based on the results of official investigations and judicial proceedings, including in foreign courts, confirms that the Russian Federation does not possess documents requested by the U.S. Department of Justice that could confirm the information contained in the complaint on the existence of machinations and the participation of Prevezon Holdings in the laundering of criminal proceeds.

Insofar as the unreliability of the information on the circumstances of the theft of RUB 5.4 billion alleged in the complaint suggests the possible employment of the competent authorities of the U.S. for iniquitous aims, the Russian Federation proposes to the requesting party the conduction of a joint or independent investigation of the circumstances of their receipt, as well as the intent of the source of this information and reasons for its falsification.

A positive decision by the American side can significantly influence the outcome of the complaint, as well as make clear and reveal the actual causes of the relevant circumstances.

In the event of an agreement to conduct an investigation, the Russian Federation is prepared to take part in it and provide the required documents.