UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

Plaintiff,

v.

PREVEZON HOLDINGS LTD., *et al.*,

Defendants,

ALL RIGHT, TITLE AND INTEREST IN THE REAL PROPERTY AND APPURTENANCES KNOW AS THE 20 PINE STREET CONDOMINIUM, 20 PINE STREET, NEW YORK, NEW YORK 10005, UNIT 1816 ("20 PINE STREET, UNIT 1816"), *et al.*,

Defendants *in Rem.*

Case No. 1:13-cv-06326 (TPG)

ECF CASE

**DECLARATION OF KIRILL KABANOV**

I, KIRILL KABANOV, hereby declare as follows:

1. I am the Head of the National Anti-Corruption Committee ("Anti-Corruption NGO"), a Russian non-governmental organization ("NGO") established in 1999 to assess corruption, work out countering measures, study corruption practices, and support anti-corruption activities. The Committee was founded by many people, including Sergei Vadimovich Stepashin (who later became the Chairman of the Accounts Chamber of the Russian Federation exercising financial control over state expenditures), former Deputy Chairman of the Government of the Russian Federation Boris Nemtsov and Henry Markovich Reznik, the Head of the Moscow College of Lawyers. Committee members include known Russian journalists and political figures, including deputies of the State Duma of Russia. I have been the Head of the Committee since 2005 via election, which requires the vote of at least two-thirds of all the committee members.

2. Since 2004, the Russian Presidential Council for Civil Society and Human Rights (hereinafter "Human Rights Council") established on the basis of the Committee for Human Rights founded in the 1990s has been conducting its activities. According to the effective Statute on the Council "On the Russian Presidential Council for Civil Society and Human Rights" approved by Decree No. 120 of the President of the Russian Federation dated February 1, 2011, the Council is a consultative body under the head of the Russian state. It was established to provide assistance to the head of the state in implementing his constitutional powers in the domain of ensuring and protecting human and citizen rights and freedoms, to keep the President of the Russian Federation informed on the situation in the said domain, facilitate the development of civil society institutions, work out proposals to the head of the state regarding issues within the competence of the Council.

3. I have been a member of the Council for Human Rights since 2008 till the present time.

4. 4. Due to a massive public outcry caused by the death of Sergei Magnitsky in the medical premises of the Matrosskaya Tishina pretrial detention facility (a detention center for persons accused of offences) who was an auditor of the firm Firestone Duncan accused by the Investigative Office of the Main Department of the Ministry of Internal Affairs for the Central Federal Region of offences provided for by para 2, Article 199 of the Criminal Code of the Russian Federation (tax evasion on an especially large scale committed by a group of individuals in collusion), the Working Group of the Human Rights Council prepared the Preliminary Conclusion dated July 4, 2011 concerning the circumstances of the death of Sergei Magnitsky (hereinafter the "Working Group Preliminary Conclusion"). A copy of that preliminary report is attached hereto as Exhibit 1.

CONFIDENTIAL

5. The Working Group Preliminary Conclusion was signed by three members of the Human Rights Council, including myself as the Head of the Working Group on public participating in prevention of corruption and on public safety.

6. As stated in Exhibit 1, the conclusions of the Human Rights Council were preliminary. The Preliminary Conclusion states that the "comprehensive investigation by authorized agencies of all circumstances of the death of S.L. Magnitsky is not complete and that "preliminary findings" are based on reports of other NGOs.

7. Exhibit 1 includes only preliminary findings that were made by the Working Group, rather than the Human Rights Council as a constitutional body under the President of the Russian Federation. The said document does not represent a decision or an opinion made by the whole Council and it was not adopted by the Council. The Working Group is just a portion of the Human Rights Council.

8. The documents provided to the Human Rights Council that have become the main basis for the preliminary findings came from two sources: (1) Valery Borschev; and (2) William F. Browder, represented by his lawyers working on his behalf (including Jamison Firestone and REDACTED, who represented the interests of the Magnitsky's family but provided documents that were duplicates of the papers submitted by Firestone) – this fact was highlighted in our document. Those were the only documents the Working Group of the Anti-Corruption NGO received to prepare the preliminary analysis.

9. Borschev is the head of a separate NGO dealing with the study of prison conditions, so the documents received from Borschev concerned the death of Magnitsky, including the prison conditions. Borschev provided no documents regarding any other issues, such as the alleged theft of funds from the Russian Treasury.

10. The documents submitted by Browder were related to a purported investigation conducted by Sergei Magnitsky into the alleged embezzlement of funds from the Russian Treasury. It was those particular documents, which we essentially copied verbatim, which we relied upon to make some of our preliminary findings.

11. The work of the Human Rights Council as of the time we published Exhibit 1 was a preliminary statement of the Working Group and did not constitute a final conclusion of the Human Rights Council. The report was subject to later investigation and hearings with concerned parties so that the full Human Rights Council could issue a final report concerning the subject matter of the conducted investigation. No hearings were ever conducted prior to the publication of the preliminary report; on the contrary, we conducted hearings and meetings with concerned parties after the preliminary report was published. Our preliminary report was just a step to commence a more comprehensive investigation by the entire Human Rights Council.

12. Upon the publication of the Working Group's Preliminary Findings (Exhibit 1), the Human Rights Council continued its work until 2012. Among other things, the Human Rights Council started to work with Russian investigatory agencies and meet with concerned parties.

13. For example, the Working Group made an assumption in its preliminary report that Magnitsky had investigated the alleged theft of the tax refund of over 5.4 billion rubles. Thus, we stated in our preliminary findings that there had been a conflict of interests among the persons whom Magnistky accused of being involved in the fraud since those particular persons were engaged in the investigation with regard to Magnitsky. However, from my longtime experience as the Head of the Anti-Corruption NGO, the investigation which was represented to us as allegedly conducted by Magnitsky could only be conducted by persons with relevant

experience, skills and education in the legal domain. The documents provided by Browder indicated that Magnitsky was a lawyer. However, after our preliminary findings were published, we found out that Magnitsky had never been a lawyer and had never been authorized to conduct such an investigation. Furthermore, none of the documents provided to the Working Group had been generated by Magnitsky either as a whistleblower or an initiator of any fraud discoveries or investigations. It was lawyers of Browder who provided the information that Magnitsky had made somewhat investigations.

14. The Human Rights Council also discussed those issues with representatives of the United States Department of Justice, as Browder's representatives started to point out that some traces of the funds stolen from the Russian Treasury were noticed in the United States among the companies related to the Renaissance Group. The United States Department of Justice refused to cooperate with us and failed to provide the requested information. Later Browder's representatives refused to provide any additional explanations on the issue too.

15. Nowhere in the working group's preliminary findings it was even attempted to state who had allegedly stolen the money from the Russian Treasury. Doing so would be far beyond the jurisdiction of the working group of the Human Rights Council. Our preliminary investigation focused on the procedural aspects of how Magnitsky had been detained and on the investigation into the alleged crime, but not on whether and by whom the alleged crime had actually been committed. The determination by a Russian governmental entity of whether an alleged crime was actually committed remains solely the competence of the authorized investigatory bodies and, ultimately, the Russian courts.

16. I have reviewed a translation of Paragraph 8 of the Sergei Magnitsky Rule of Law and Accountability Act of 2012 passed by the United States, which references the Report of the

CONFIDENTIAL

Human Rights Council. As I already stated before, the Council has not however issued any reports, statements or conclusions in this respect. That paragraph may only be correlated with the Human Rights Council's Working Group Preliminary Conclusion attached by me as Exhibit 1.

17.     I have also reviewed paragraph 66 of the Amended Complaint in this action which was translated for me. That paragraph also relies upon the working group's some preliminary descriptions and findings.

18.     I have never met Andreas Gross, a Rapporteur of the Parliamentary Council of Europe ("PACE") who issued a report called "Refusing Impunity for the Killers of Sergei Magnitsky." I cannot admit the information included by him in that report because I have not seen such evidence, and his allegations in respect of the circumstances of the death of Magnitsky contradict the initially issued and non-contested orders for calling him to account as an accused dated November 25, 2008 (Exhibit 5 to hereto), court order for arresting Magnitsky dated November 26, 2008 (exhibit 6 hereto) as well as the acquitting sentence of the Tverskoy District Court of Moscow dated December 28, 2012 (exhibit 7 hereto) and the order dated March 19, 2013 of the investigator of the Investigative Committee of the Russian Federation (exhibit 8 hereto) which I became aware of already after the Working Group Preliminary Conclusion and the report of the Anti-Corruption Committee headed by me were signed. I do not know on the basis of what documents Mr. Gross stated in his report the information contradicting the evidence and findings of the investigative and judicial bodies of the Russian Federation.

19.     The Human Rights Council's Working Group cited a report signed by me on behalf of the Anti-Corruption NGO as Annex 2 to its report. A copy of that report, entitled "Report of the National Anti-Corruption Committee on Analysis of the Cause-and-Effect that Led to the Death of S.L. Magnitsky in the Pre-Trial Detention Center" is attached hereto as

Exhibit 3. My name is at the bottom of that report on behalf of the Anti-Corruption NGO. Exhibit 3 is nothing more than the Anti-Corruption NGO's work product which is not confirmed or issued by any other Russian governmental authority.

20. Exhibit 3 relied solely upon the information received from Browder, Hermitage, and their attorneys, and the information largely relied upon the report of the Moscow Public Oversight Commission (Exhibit 2). The Anti-Corruption NGO simply relied upon those materials, conducted no other analysis or research, and prepared the report. Our report, like the remainder of the research in Exhibit 1, were preliminary. The Working Group of the Human Rights Council merely cited and acknowledged the existence of Exhibit 3 (and two other reports) as a reason to issue a preliminary conclusion. The Human Rights Council had nothing to do with preparing Exhibit 3, nor it confirmed or endorsed any findings made in it.

21. The statements in paragraphs 19 and 20 are also true for the other two documents annexed to Exhibit 1, which are attached hereto as Exhibit 2 and Exhibit 4. Exhibit 2 is a report prepared by a NGO, the Moscow Public Oversight Commission which was examining the conditions of Magnitsky's detention. At that, I do not however know anything and it has not been represented to us that during the period of the almost one year detention of Magnitsky the public body was notified of any infringements upon his rights as a detained person, nor I know anything about any checks during Magnitsky's life.

22. Exhibit 4 is an advisory legal opinion report prepared by another NGO, the Independent Legal Advisory Council that examined whether the procedural aspects of Magnitsky's prison detention were proper (but not who committed and whether there was an alleged theft of the funds from the Russian Treasury).

23. As stated above , Exhibit 1 is a preliminary report. The Human Rights Council has since gathered additional information (beyond that which was submitted by Messrs. Browder, Firestone, and REDACTED) but no final report has been presented yet. At this point, the Human Rights Council cannot state what its factual findings will be after obtaining additional evidence. As the circumstances and causes of Magnitsky's death have now been ascertained, but the preliminary investigation of the law-enforcement bodies into a number of criminal cases connected with activities of the entities and persons who Magnitsky worked for has not been completed yet, I think it is a little too previous to speak about the final findings in respect of all the events connected with the name of Magnitsky and his activities.

24. The use of the working materials based on a limited number of evidence obtained from one source which is the Preliminary Conclusion under review as a proof of any fact would be a breach of the effective legislation on the rights and authority of the Human Rights Council and the criminal procedural law of Russia.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct:

Dated: November 16, 2015
City of Moscow, Russia

*(signature)*
Kirill Kabanov

CONFIDENTIAL

9

ОКРУЖНОЙ СУД США
ЮЖНЫЙ ФЕДЕРАЛЬНЫЙ СУДЕБНЫЙ ОКРУГ ШТАТА НЬЮ-ЙОРК

| | |
|---|---|
| СОЕДИНЕННЫЕ ШТАТЫ АМЕРИКИ,<br><br>Истец,<br><br>против<br><br>Компании «ПРЕВЕЗОН ХОЛДИНГС ЛТД.», *и др.*,<br><br>Ответчики,<br><br>ВСЕ ПРАВА, ТИТУЛ, ДОЛИ В НЕДВИЖИМОСТИ И ПРИНАДЛЕЖНОСТИ, ИЗВЕСТНЫЕ КАК «10005 ШТАТ НЬЮ-ЙОРК, Г. НЬЮ-ЙОРК, ПАЙН СТРИТ, 20, КОНДОМИНИУМ ПАЙН СТРИТ, 20, КВАРТИРА 1816 («ПАЙН СТРИТ, 20, КВАРТИРА 1816»), *и др.*,<br><br>Ответчики *по делу против имущества.* | Дело № 1:13-cv-06326 (TPG)<br><br>ДЕЛО ВНЕСЕНО В ЭЛЕКТРОННЫЙ АРХИВ ДЕЛ<br><br>**ЗАЯВЛЕНИЕ КИРИЛЛА КАБАНОВА** |

Я, КИРИЛЛ КАБАНОВ, настоящим заявляю следующее:

1. Я являюсь главой Национального антикоррупционного комитета («НАК») российской общественной неправительственной организации,»), учрежденной в 1999 году для оценки коррупции, выработки мер по противодействию, изучения коррупции и поддержки борьбы с коррупцией. В числе основателей комитета были такие люди, как Сергей Вадимович Степашин (впоследствии стал председателем Счетной палаты России, занимающейся финансовым контролем за государственными расходами), бывший заместитель председателя Правительства России Борис Немцов и Генри Маркович Резник, глава Адвокатской палаты города Москвы. Членами комитета являются известные российские журналисты и политические деятели, в том числе депутаты Государственной Думы России. Я являюсь главой комитета с 2005 года, и был избран на эту должность по

CONFIDENTIAL

итогам голосования, для чего необходимы, как минимум, две трети от общего числа голосов членов комитета.

2. С 2004 года в России действует образованный на базе созданного в 90-х годах Комитета по правам человека, Совет при Президенте Российской Федерации по развитию гражданского общества и правам человека (Далее – Совет по правам человека, Совет). Согласно действующему Положению о Совете, утвержденного Указом Президента Российской Федерации № 120 от 01.02.2011г. «О Совете при Президенте Российской Федерации по развитию гражданского общества и правам человека", Совет является консультативным органом при главе российского государства. Он образован в целях оказания содействия главе государства в реализации его конституционных полномочий в области обеспечения и защиты прав и свобод человека и гражданина, информирования Президента Российской Федерации о положении дел в этой области, содействия развитию институтов гражданского общества, подготовки предложений главе государства по вопросам, входящим в компетенцию Совета.

3. Я являюсь членом Совета по правам человека с 2008 года по настоящее время.

4. В связи с широким общественным резонансом смерти 16 ноября 2009 года в медицинской части СИЗО (следственный изолятор, в котором содержатся арестованные лица, обвиняемые с преступлениях) «Матросская тишина» Сергея Магнитского, аудитора компании "Файерстоун Данкен", обвиняемого Следственной частью Главного управления МВД России по Центральному федеральному округу в совершении преступлений, предусмотренных ч. 2 ст. 199 Уголовного кодекса Российской Федерации (уклонение от уплаты налогов в особо крупном размере, совершенное группой лиц по предварительному



CONFIDENTIAL

сговору), рабочая группа Совета по правам человека подготовила Предварительное заключение по изучению обстоятельств гибели Сергея Магнитского от 4 июля 2011 года (далее – Предварительное заключение рабочей группы). Копия этого предварительного отчета прилагается к настоящему заявлению в качестве Приложения 1.

5. Предварительное заключение рабочей группы было подписано тремя членами Совета по правам человека, в том числе мною, как Руководителя рабочей группы по участию общественности в борьбе с коррупцией и обеспечению общественной безопасности.

6. Как указано в Приложении 1, выводы Рабочей группы Совета по правам человека являлись предварительными. В Предварительном заключении говорится, что «всестороннее расследование уполномоченными органами всех обстоятельств смерти С.Л. Магнитского не завершено, и что «предварительные выводы» основаны на отчетах других неправительственных организаций.

7. В Приложении 1 содержатся только предварительные выводы, сделанные Рабочей группой, а не Советом по правам человека, как консультационным органом при Президенте России. Данный документ не является решением или мнением всего Совета, не принимался Советом. Рабочая группа является только частью Совета по правам человека.

8. Документы, представленные Совету по правам человека, и ставшие основанием для предварительных выводов, были получены из двух источников: (1) от Валерия Борщева; и (2) от Уильяма Ф. Браудера, в лице его адвокатов действующих от его имени (в том числе Джеймисона Файерстоуна и REDACTED, который представлял интересы семьи Магнитского, но представил документы, дублирующие те, что были



CONFIDENTIAL

получены от Файерстоуна) – этот факт отмечен в нашем документе. Эти документы были единственными, которые получила рабочая группа НГО «Антикоррупционный комитет» при подготовке предварительного анализа.

9. Борщев возглавляет отдельную неправительственную организацию, занимающуюся условиями содержания в тюрьмах, поэтому документы, полученные от Борщева, касались смерти Магнитского, в том числе условий содержания в тюрьме. Борщев не представлял никаких других документов, касающихся каких-либо других тем, таких как предполагаемое хищение денежных средств из российского бюджета.

10. Документы Браудера касались предполагаемого расследования, проведенного Сергеем Магнитским, в связи с предполагаемым хищением средств из российского бюджета. Именно на эти документы, которые мы привели практически дословно, мы полагались при подготовке некоторых наших предварительных выводов.

11. Работа Совета по правам человека на момент опубликования нами Приложения 1 представляла собой предварительное заявление рабочей группы, и не являлась окончательным выводом Совета по правам человека. Отчет предполагал проведение дальнейшего расследования и слушаний заинтересованных сторон, чтобы Совет по правам человека в полном составе мог подготовить окончательный отчет по существу проведенного расследования. Никакие слушания до опубликования предварительного отчета не проводились; наоборот, мы провели слушания и встречи с заинтересованными сторонами только после оглашения предварительного отчета. Наш предварительный отчет был просто способом начать более всестороннее расследование Советом по правам человека в полном составе.

CONFIDENTIAL

12. После опубликования предварительных выводов рабочей группы (Приложение 1), Совет по правам человека продолжал работать до 2012 года. Среди прочего, Совет по правам человека начал работать с российскими следственными органами и встречаться с заинтересованными сторонами.

13. Например, в предварительном отчете рабочей группы было высказано предположение о том, что Магнитский расследовал предполагаемое хищение возврата налогов в размере свыше 5,4 млрд. рублей. Поэтому мы отметили это в наших предварительных выводах, что имел место конфликт интересов лиц, которых Магнитский обвинял в участии в мошенничестве, поскольку именно эти лица занимались расследованием в отношении Магнитского. Однако на основании моего длительного опыта работы в качестве главы НО «Антикоррупционный комитет», расследование, представленное нам, как якобы проводимое Магнитским, в России могло проводиться только лицами, обладающими соответствующим опытом, навыками и образованием в юридической сфере. В документах, представленных Браудером, указано, что Магнитский был юристом. Однако после опубликования наших предварительных выводов мы выяснили, что Магнитский никогда не был юристом, и что он никогда не имел полномочий на проведение такого расследования. Кроме того, ни один из документов, представленных Рабочей группе, не исходил от Магнитского, как заявителя либо инициатора каких-либо разоблачений и расследований. Сведения о том, что Магнитский провел какое-либо расследование были представлены адвокатами Браудера.

14. Совет по правам человека также обсуждал эти вопросы с представителями Министерства юстиции США, поскольку представители Браудера начали указывать на наличие следа похищенных у российского бюджета денег в США со стороны компаний,



имеющих отношение к группе «Ренессанс». Министерство юстиции США отказалось от сотрудничества с нами и не представило запрашиваемую информацию. В последствие и представители Браудера также отказались от дополнительных объяснений по данному поводу.

15. Нигде в тексте предварительных выводов рабочей группы даже не высказывалось предположение о том, кто якобы похитил деньги из российского бюджета. Подобная попытка выходила бы далеко за пределы юрисдикции рабочей группы Совета по правам человека. Наше предварительное расследование было сосредоточено на процессуальных аспектах содержания Магнитского, и на расследовании предполагаемого преступления, а не на том, было ли действительно совершено предполагаемое преступление, и если да, то кем. Определение российского государственного органа по поводу того, было ли предполагаемое преступление совершено в действительности, остается исключительно компетенцией уполномоченных следственных органов и, в конечном счете, российских судов.

16. Я ознакомился с переводом Пункта 8 Закона об ответственности за соблюдение верховенства закона имени Сергея Магнитского 2012 г., принятого США, в котором упоминается Доклад Совета по правам человека. Однако, как я уже указывал ранее, Совет никаких докладов, отчетов либо заключение по данному поводу не принимал. Этот пункт можно соотнести только с представленным мною в приложении 1 Предварительным заключением Рабочей группы Совета по правам человека.

17. Я также ознакомился с пунктом 66 Измененного искового заявления по данному делу, текст которого был переведен для меня. Данный пункт также опирается некоторые предварительные описания и выводы рабочей группы.



CONFIDENTIAL

18. Я никогда не встречался с Андреасом Гроссом, Докладчиком Парламентского Совета Европы («ПАСЕ»), опубликовавшим доклад под названием «Недопущение безнаказанности для убийц Сергея Магнитского». Сведения, которые им размещены в этом докладе я не могу подтвердить, так как подобных доказательств не видел, его утверждения в части обстоятельств смерти Магнитского входят в противоречие с изначально принятыми в отношении и не оспоренными постановлениями о привлечении его в качестве обвиняемого от 25 ноября 2008 года (Приложение 5 к настоящему заявлению), постановлением суда об аресте Магнитского от 26 ноября 2008 года (приложение 6 к настоящему заявлению), а также с состоявшимся оправдательным приговором Тверского районного суда г.Москвы от 28 декабря 2012 года (приложение 7 к настоящему заявлению) и постановлением следователя Следственного комитета РФ от 19 марта 2013 года (приложение 8 к настоящему заявлению), о которых мне стало известно уже после подписания Предварительного заключения рабочей группы и отчета возглавляемого мною Антикоррупционного комитета. На основании каких документов г-н Гросс указал в своем докладе сведения, противоречащие доказательствам и выводам следственных и судебных органов Российской Федерации, мне неизвестно.

19. Рабочая группа Совета по правам человека сослалась на отчет за моей подписью от имени НО «Антикоррупционный комитет» в качестве Приложения 2 к своему докладу. Копия этого отчета, озаглавленного «Отчет Национального антикоррупционного комитета по исследованию причинно-следственных связей, повлекших смерть С.Л. Магнитского в СИЗО» прилагается к настоящему документу в виде Приложения 3. Мое имя поставлено под этим отчетом от имени НО «Антикоррупционный комитет». Приложение 3 представляет собою не более, чем



CONFIDENTIAL

результаты работы НО «Антикоррупционный комитет», не подтвержденные и не выполненные каким-либо другим российским государственным органом.

20. Приложение 3 основывалось исключительно на информации, полученной от Браудера, компании «Эрмитаж» и их юристов, а также в большинстве своем сведения основывались на отчете Общественной наблюдательной комиссией города Москвы (приложение 2). НО «Антикоррупционный комитет» основывался на этих материалах, не проводил никакого другого анализа или исследования, и подготовил отчет. Наш отчет, как и остальные исследования в Приложении 1, были предварительными. Рабочая группа Совета по правам человека просто сослалась на Приложение 3 и признала его существование (и двух других отчетов) в качестве причины для представления предварительного заключения. Совет по правам человека не имел отношения к подготовке Приложения 3 и не подтверждал и не удостоверял никаких выводов, сделанных в нем.

21. Заявления, сделанные в пунктах 19 и 20 справедливы также и в отношении двух других документов, прикрепленных к Приложению 1, которые прикреплены к настоящему документу в качестве Приложения 2 и Приложения 4. Приложение 2 – это отчет, подготовленный неправительственной организацией, Общественной наблюдательной комиссией города Москвы, которая изучала условия, в которых Магнитский содержался под стражей. При этом, однако, мне ничего не известно и нам не было представлено, что в период почти годового содержания под стражей Магнитского данный общественный орган был уведомлен о каких-либо нарушениях его прав, как лица, содержащегося под стражей, о каких-либо проверках при жизни Магнитского мне также ничего не известно.



CONFIDENTIAL

22. Приложение 4 – это отчет о консультативном юридическом заключении, подготовленный другой неправительственной организацией, Независимым консультативным советом по правовым вопросам, которая изучила вопрос о том, надлежащими ли были процессуальные аспекты содержания Магнитского под стражей (а не вопрос о том, кто совершил предполагаемое хищение средств из российского бюджета и было ли оно совершено вообще).

23. Как указано выше Приложение 1 представляет собой предварительный отчет. Совет по правам человека с тех пор собрал дополнительную информацию (помимо той, что была предоставлена господами Браудером, Файерстоуном и REDACTED), но окончательный отчет еще не был представлен. На данный момент Совет по правам человека не может утверждать, каковы будут его фактические выводы, после получения дополнительных свидетельств. Поскольку в настоящее время обстоятельства и причины смерти Магнитского установлены, однако предварительное следствие правоохранительных органов по факту ряда уголовных дел, связанных с деятельностью организаций и лиц, на кого работал Магнитский, еще не завершено, говорить об окончательных выводах о всех событиях, связанных с именем Магнитского и его деятельностью считаю преждевременным.

24. Использование рабочих материалов, основанных на ограниченном количестве свидетельств, полученных из одного источника, коим является рассматриваемое Предварительное заключение, как доказательство какого-либо факта являлось бы нарушением действующего законодательства о правах и полномочиях Совета по правам человека и уголовно-процессуального закона России.



CONFIDENTIAL

Я заявляю под страхом наказания за дачу ложных показаний в соответствии с законами Соединенных Штатов Америки, что все вышесказанное является достоверным и правильным:

Дата: 16 ноября 2015 г.
город Москва, Россия

Кирилл Кабанов