quinn emanuel trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010-1601 | TEL (212) 849-7000 FAX (212) 849-7100

WRITER'S DIRECT DIAL NO.
**(212) 849-7229**

WRITER'S EMAIL ADDRESS
**adamabensohn@quinnemanuel.com**

February 15, 2017

The Honorable William H. Pauley III
United States District Judge
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street, Room 1920
New York, NY 10007

Re:     <u>United States of America v. Prevezon Holdings Ltd. et al.</u>, 1:13-cv-06326

Dear Judge Pauley:

We write on behalf of Defendants in response to the Government's February 10, 2017 letter requesting that the Court "re-open discovery" to allow for what the Government portrays as merely the completion of a "limited" number of "open matters." ECF 553 at 1. In fact, the Government's "open matters" are not "limited" and, for the most part, do not relate to items that were "outstanding" at the time this action was stayed shortly before trial. *See id.* Rather, they arise from efforts the Government made after the close of discovery and/or during the stay to bolster its insufficient case with new evidence, including more than 43,000 pages of material and entirely new expert analyses produced in the last two weeks. If granted, the Government's requests would manifestly prejudice Defendants, who would need to analyze and respond to this large volume of late discovery, while at the same time learning the existing record and preparing for the May 15 trial in this case. As detailed below, the Government has not and cannot justify its requests to introduce a large volume of new discovery into this case, and those requests should be denied.

## BACKGROUND

The Government filed its initial Complaint in this action on September 10, 2013. It subsequently became apparent, though the testimony of the case agent, Todd Hyman, that the Government filed suit—and froze millions of dollars of Defendants' assets—with no evidence to support key elements of its claims. In testimony that Judge Griesa found "troubling" (ECF 310 at 27), Special Agent Hyman acknowledged that the Government brought suit based largely on an account presented by a single individual, without independent investigation of any of his allegations. ECF 214-1 (Hyman Dep. Tr.) at 16:24-19:19, 37:17-38:9, 47:18-51:15, 92:2-8, 103:15-105:20. Special Agent Hyman also admitted that the Government had no evidence at all that Defendants or their principals possessed the intent necessary to sustain the Government's

quinn emanuel urquhart & sullivan, llp
LOS ANGELES | NEW YORK | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | HOUSTON | SEATTLE
LONDON | TOKYO | MANNHEIM | MOSCOW | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS | ZURICH

claims, and offered only that the Government "hoped to develop" such evidence through discovery. *Id.* at 131:16-132:9, 137:13-138:5 ("Q. Do you have evidence that the defendants . . . knew that the financial transactions were designed in whole or part to conceal or disguise the nature, location, source, ownership or control of the proceeds of the $230 million fraud scheme? A. I do not . . . Again, we hope to develop that evidence when discovery is completed."). Even today there is no claim or allegation that Defendants were part of, or even aware of, the "criminal organization" (ECF 553 at 1) that purportedly defrauded the Russian Treasury of $230 million.

The Government has spent the past three years attempting to find evidence to justify its "shoot first and ask questions later" Complaint. Over the course of that effort, the Government has repeatedly conceded that its original theories were faulty or unsupported. For example, the Government has twice amended its complaint, including by abandoning certain of the alleged "specified unlawful activities," and adding others. ECF 1, 174, 381. Just two months prior to when trial was to begin, the Government filed a motion for summary judgment asserting yet another theory of liability not alleged in the operative second amended complaint.[1] *Compare* ECF 398 at 12-16 *with* ECF 381. That motion for summary judgment was denied. In a similar fashion, the Government's tracing expert, Mr. John Rollins, has amended his findings on *four different occasions*—which includes one formal amendment and three errata sheets (one of which was 17 pages long). In short, both the Government's theory and evidence have been moving targets.

In its letter, the Government portrays the proceedings before Judge Griesa as "chaotic," and attempts to re-litigate the discovery parameters he set for all parties. ECF 553 at 2. But contrary to the Government's suggestion, the Court did not set an unreasonably "expedited" discovery period, and did not unreasonably "accommodate Defendants' request for a prompt trial date." *Id*. In fact, trial was originally set for March 31, 2014, but adjourned for several months (and ultimately for well over a year) at the Government's request, based on its assertion that its claims were "complicated." *See* Mar. 16, 2015 Tr. 3:16-23, 14:24-15:3; Aug. 21, 2015 Tr. at 2:2-3:19; Mar. 6, 2014 Min. Entry. In the discovery period, which closed in November 2015 (ECF 431), the parties made sizeable document productions and deposed numerous witnesses and experts. As the Government acknowledges, it received more than 30,000 pages of disclosures from Defendants, and additional documents from third parties. The Government itself produced 220,000 pages of material. More than 20 witnesses were deposed, 15 by the Defendants and 9 by the Government, including 3 expert depositions on each side.

The Court ultimately set a trial date of January 27, 2016. Jan. 12, 2016 Min. Entry. Two days before trial, however, a stay was instituted, as a result of the disqualification proceedings against prior counsel. *See* ECF 535; Jan. 12, 2016 Min. Entry. That stay was lifted on December 13, 2016. ECF 540. New defense counsel entered the case on January 12, 2017 (ECF 542-45), and, at a January 25, 2017 conference, this Court set trial for May 15, 2017 (Jan. 25, 2017 Tr. at 24:25-25:1). Since that conference, the Government has produced several thousand documents, totaling more than 43,000 pages; it has produced a thoroughly re-worked report from its tracing

---

[1] The Government's case has shifted from a theory of specified unlawful activity of wire fraud (ECF 310 at 17-18), to one of an offense against a foreign nation (*id.* at 22), to finally—in its summary judgment motion made just two months before trial—a theory premised on supposed fraud on a foreign bank, HSBC (ECF 398 at 12). *See also* ECF 313 at 2.

expert; and it has identified a new witness, and witness statement, that it hopes to present at trial. As set forth below, this newly proffered discovery, as well the Government's demands for additional discovery from the defense, should have been pursued on the schedule set by Judge Griesa, and its introduction into this case now would impose substantial and unreasonable burdens on the defense.

## ARGUMENT

Defendants confirm that the matters listed by the Government under the heading "Discovery Matters Not in Dispute" are agreed upon. ECF 553 at 3-5. Additionally, having now had an opportunity to investigate the first disputed matter identified by the Government, "Defendants' Production of Documents Previously Identified as Defense Trial Exhibits" (*id.* at 5-6), Defendants will agree to produce any of the requested materials in their possession. The remainder of this Argument section addresses the unresolved disputed matters.

The parties agree that the Court's decision as to whether to re-open discovery in the manner the Government has requested should be guided by the following six factors:

> (1) whether a trial is imminent; (2) whether the request to re-open discovery is opposed; (3) whether the party opposing the request would suffer prejudice; (4) whether the party seeking to re-open discovery was diligent in obtaining discovery pursuant to the scheduling order set by the Court; (5) the foreseeability of the need for additional discovery in light of the time allowed for discovery; and (6) the likelihood that the discovery will lead to relevant evidence.

ECF 553 at 3 (citing cases). The first of these factors, whether trial is imminent, is undisputed. Indeed, trial was set to begin two days after this case was stayed last year, and the new May 15 trial date—just three months away—is itself an abbreviated period meant to afford new counsel the time it requires to learn the case and prepare a defense. The second factor is also clear; Defendants oppose each of the requests.

The third factor, prejudice, is addressed with particularity below, but the prejudice to Defendants is considerable.

As to the fourth and fifth factors—whether the Government was diligent in seeking discovery and the foreseeability of the need for the requested additional discovery—the Government does not even attempt an individualized explanation of why each of the items of discovery it now asks the Court belatedly to sanction could not have been identified and completed during the discovery period. Instead, the Government asks the Court simply to accept a blanket assertion that "the Government pursued as many avenues of discovery as possible with maximum diligence during the expedited discovery period." ECF 553 at 11. But the Government makes that assertion without claiming that it sought the requested discovery during the discovery period, and without offering any reason it could not have done so. Indeed, as acknowledged in its letter, the Government did not even seek to obtain much of the material it now seeks to include in discovery

3

until it issued MLAT requests *last year—i.e.,* months after the close of discovery—in what it claims is a parallel criminal investigation. ECF 553 at 7. Additionally, though it complains that the discovery period overseen by Judge Griesa was compressed and disorderly (*id.* at 2), the Government does not claim that it raised any objection to Judge Griesa or sought any relief from him with respect to the items it is now pursuing. If the Government believed Judge Griesa did not afford it ample opportunity for discovery during the nearly *two and a half years* between the filing of this case and the imposition of the stay, it was incumbent on the Government to make that known at the time.[2] The Government had no legitimate expectation of receiving a "do over" on discovery when this case was stayed days before trial, and it has not offered any persuasive reason why it should be granted one now.

With regard to the sixth factor—the relevance of the requested discovery—it is impossible in the limited time available for the Defendants to assess to what extent, if any, the Government's new production includes relevant material. That, of course, is part of the problem. *United States v. Mason*, No. S2 06 Cr. 80, 2008 WL 281970, at *2-*4 (S.D.N.Y. Jan. 25, 2008) (emphasis added) (precluding late evidence regardless of its importance to government's case). It rings hollow, moreover, for the Government to complain that the jury will be deprived of a "complete picture" without the Government's new documents (ECF 553 at 11) when the Government was prepared to try this case, with an exhibit list exceeding 600 entries, on the record as it stood in January 2016.

We address the Government's individual requests with specificity below.

I.  **The Government's Newly Produced Documents And Expert Report Relating To Tracing Should Be Precluded**

A key and hotly contested issue in the upcoming trial will be whether the Government can trace funds stolen from the Russian Treasury into a Prevezon bank account. Prior to the close of discovery, the Government produced tens of thousands of pages of financial records to support its tracing theory, as well as a report by its tracing expert, John Rollins. Defendants took Mr. Rollins' deposition and worked with their tracing expert, Anthony Milazzo, to analyze the financial records and develop a rebuttal of Mr. Rollins' theory and, more generally, of the Government's tracing argument. Earlier this month, the Government produced some 43,000 pages of new bank records and similar documents, many relating to the tracing issue. The Government has represented that it obtained these materials pursuant to grand jury subpoenas and MLAT requests served in a parallel criminal investigation after the stay was imposed in this civil case.[3]

---

[2] The Government not only could have pursued its discovery in the time allotted, but it also could —and should—have started its investigation well before filing this case. As noted, *supra*, Judge Griesa found the case agent's testimony "troubling" on account of repeated admissions that the Government filed its Complaint with minimal investigation of the allegations and despite its admitted absence of evidence that Defendants possessed the requisite intent. ECF 310 at 27.

[3] The Government correctly notes that materials gathered in the course of a criminal investigation may be disclosed to an attorney for the Government for use in a civil forfeiture action under 18 U.S.C. 1322(a). At the same time, it is well settled that the Government may not use the criminal

The Government also this month disclosed a new expert report by Mr. Rollins. Mr. Rollins' report is not merely a supplementation that addresses the newly produced documents; rather, Mr. Rollins has re-visited and expanded his prior opinions as well. Indeed, when Defendants asked for a black-line of the new report against Mr. Rollins' prior report, the Government indicated that would not be possible, as the new report was not an update but a new analysis. The Government's letter acknowledges that Mr. Rollins "conducted further analysis of the earlier-produced documents" and thus "expand[ed]" his prior opinions. ECF 553 at 7-8. That is, if anything, an understatement. In his prior report, Mr. Rollins relied on a total of 73 identified documents to trace money transfers from the Russian Treasury through 27 entities, with a small portion purportedly reaching Prevezon. Now, Mr. Rollins relies on ***800 documents***, and incorporates ***an additional 102 entities*** into his tracing analysis. He has also added a ***123-page textual appendix*** elaborating on the conclusions set out in his 83-page report. The magnitude of the expansion of the scope of Mr. Rollins' analysis can easily be seen by comparing the tracing map appended to his most-recent prior report (attached as hereto as **Exhibit 1**) with the tracing map appended to his just-disclosed report (attached hereto as **Exhibit 2**).

Defendants respectfully submit that the unfair prejudice that would result from permitting the Government to produce a large volume of new documents, while also having its tracing expert revisit and substantially expand his opinions, is both obvious and severe. Merely reviewing the additional 43,000 pages is an enormous task that new defense counsel should not be forced to undertake at the same time they are mastering the existing sizable record, preparing dispositive motions and *in limine* motions, and otherwise preparing for a May 15 trial. But the burden on the defense would go well beyond merely having to review those newly produced materials. Once that review is completed, Defendants' tracing expert, Anthony Milazzo, would have to evaluate Mr. Rollins' analysis, *again*; Mr. Milazzo would need to issue an expert report addressing Mr. Rollins' new and revised opinions, *again*; Defendants would need to depose Mr. Rollins, *again*; and the Government would likely seek to depose Mr. Milazzo, *again*. This second phase of expert discovery would impose enormous expense and burden on Defendants during the exact period in which they will be preparing motions and developing their presentation for trial. *See Allen v. Dairy Farmers of America, Inc.*, No. 5:09-cv-230, 2014 WL 2040133, at *7-*8 (D. Vt. May 16, 2014) (preclusion where additional depositions and motion practice was no "cure to the substantial prejudice to Defendants and ignores the proximity of trial").

The Government dismisses Defendants' concerns by suggesting that the burden on defense counsel of reviewing the 43,000 newly produced pages is merely "incremental" to the burden the defense faces in reviewing the existing 220,000 page record. ECF 553 at 10. In other words, the

---

process for the specific purpose of developing a civil case or as a means to circumvent limitations on civil discovery. *United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 432 (1983). Defendants have concerns on that score, particularly in light of the recent disclosure that the same AUSA is spearheading both this case and the related criminal investigation. Defendants reserve the right to raise those questions to the Court at an appropriate time. For now, Defendants note that the mere fact that the Government has obtained new documents in a related criminal investigation does not make it appropriate for the Government to use those documents in this civil case, particularly where the Government made no effort to obtain those materials through civil discovery during the time the Court prescribed for that purpose.

Government's position is that Defendants already have over 220,000 pages to get through, so what's another 43,000. That, of course, is precisely backwards; the fact that defense counsel is in the difficult position of having to master the sizable existing record in a short time before trial is a reason *not* to impose further unwarranted burdens. The Government also argues that the burden occasioned by its recent production is lessened by virtue of the fact that the Government has identified the most relevant 12,000 pages of the new documents. But defense counsel must make its own judgment as to what material is most relevant to its clients' defense and cannot rely on the Government to make that determination (however well-intentioned). Moreover, even assuming the Government has correctly identified the most-relevant new documents, it still a universe of 12,000 pages that must be reviewed and analyzed.

The Government also ignores the burdens associated with having to evaluate the new expert opinions from Mr. Rollins. As noted above, Mr. Rollins' newest report introduces hundreds of new documents and dozens of new companies into his analysis. It would require a substantial effort by Defendants, and their tracing expert, to unpack this new analysis and embark on the cycle of new expert reports and depositions the process would entail. And, burden aside, Mr. Rollins' new report should also be precluded because it represents precisely the sort of improper "continual[] bolster[ing]" that the law disapproves. *Sandata Techs., Inc. v. Infocrossing, Inc.*, Nos. 05-cv-09546 & 06-cv-01896, 2007 WL 4157163, at *6-*7 (S.D.N.Y. 2007) (precluding a revised expert report). Mr. Rollins has already revised his expert report multiple times,[4] and now he has produced what is essentially a new report that contains what the Government admits is "further analysis of the earlier-produced documents," as well as opinions premised on a trove of materials obtained after the close of discovery. ECF 553 at 7-8.

The Government contends that it is "fair and appropriate" to allow Mr. Rollins' new report because it will allow Mr. Rollins to (a) use the Government's untimely-obtained documents to present what the Government claims is "the most complete and accurate factual picture in general" and (b) address criticisms of his earlier report levied by the defense. *Id.* at 8. Those justifications are unpersuasive. The mere happenstance (assuming it was that) that a parallel criminal investigation revealed additional documents the Government deems relevant to this civil case after the close of discovery is not a justification for admitting such evidence in this case when doing so would work unfair prejudice on Defendants. Likewise, the mere fact that Mr. Rollins found merit in some of the defense experts' criticisms is not a basis to permit him to belatedly revise his analysis, again. "Experts are not free to continually bolster, strengthen, or improve their reports by endlessly researching the issues they already opined upon, or to continually supplement their opinions," as "[i]f that were the case, there would never be any closure to expert discovery, and the parties would need to depose the same expert multiple times." *Sandata*, 2007 WL 4157163, at *6-*7 (S.D.N.Y. 2007) (preclusion of report where there was no reason that new, previously undisclosed documents relied upon "could not have been found and reviewed" earlier, but rather,

---

[4] Mr. Rollins provided his first errata on September 29, 2015, which identified 17 errors in his report and exhibits. On November 11, 2015, he provided his first addendum, which included a 12-page analysis of additional transactions that he did not cover in his initial report. Concurrently, he provided a second errata identifying a further 10 errors in his initial report. On December 15, 2015, Mr. Rollins provided a third errata, 17 pages in length, identifying numerous errors in his report and exhibits attached thereto.

6

expert "merely continued to 'investigate'"). Mr. Rollins has had ample and repeated opportunity to finalize his opinions, and he should not be afforded yet another chance to do so.

In sum, the Government should not be permitted to introduce 43,000 new pages of material into this case, particularly where it did not even seek those materials until after the close of discovery, and after this action was stayed shortly before trial. Further, the Government should not be permitted to use its new production as a pretext for its tracing expert to re-do his analysis—yet again—and thereby substantially alter and expand his opinions.

## II.     The Government's New Handwriting Expert Should Be Precluded

The Government should also be precluded from introducing a new expert, George Virgin, to perform a handwriting analysis. The Government attempted to introduce Mr. Virgin into the case in January 2016, two weeks before trial was set to commence (*see* ECF 532), and well after the close of expert discovery (*see* ECF 431). There is no "good cause" for the introduction of this new expert at this late stage in the proceedings, and the Government's request should be denied. *Allen*, 2014 WL 2040133, at *7-*8.

The Government's justification for Mr. Virgin's late entry into the case is not persuasive, and rewrites the pertinent facts. The Government reports that it was surprised by Defendants' "unexpected argument that two signatures on sham corporate documents" were authentic. ECF 553 at 8. In fact, the Government's own witnesses, the two corporate agents whose signatures were supposedly forged, testified upon being shown the documents in deposition that they were not aware of any basis to doubt that they in fact signed them. ECF 421-18 at Tr. 73-76; ECF 422-35 at Tr. 62-64, 109. It can hardly be "unexpected" for Defendants to take the position that two signatures in the names of corporate officials who saw no indication that their names were forged were in fact authentic. The Government should not be afforded an opportunity to enlist an expert, after the close of discovery, to attempt to undo testimony it apparently did not like or expect from its own witnesses. And if the Government was not surprised by that testimony, it had ample opportunity to engage a handwriting expert, within the authorized discovery schedule, to offer the opinion that its relevant fact witnesses would not.

In any event, the Government argues against itself when it insists that "there is voluminous circumstantial evidence and testimony that these documents . . . were fabricated." ECF 553 at 8 n. 10. If that is true, the Government has no need to introduce a new expert, and yet more evidence, on the identical issue now. *See In re Zyprexa Prods. Liability Litg.*, Nos. 04-md-1596 & 08-cv-955, 2009 WL 1310890, at *2 (E.D.N.Y. May 8, 2009) (denying late document discovery that was "cumulative . . . and could have been obtained at an earlier date"). Just as with the introduction of the revised tracing report, the introduction of a new handwriting expert would mean additional discovery on both sides, and would be incompatible with the current trial schedule. The defense would need to depose Mr. Virgin, and would need the option of engaging its own handwriting expert, whom the Government would then presumably seek to depose. On an issue where the Government already purports to have "voluminous" evidence to support its position, that new and burdensome discovery is simply not warranted. ECF 553 at 8 n. 10.

### III.  The Government's New Fact Witness Should Be Precluded

The Government also proposes to introduce at trial a written statement of a Latvian individual, Mr. Stanislav Gorins, whom the Government apparently located pursuant to an MLAT request. The Government reported during the parties' meet and confer calls that it issued its request *after* the close of discovery; and, although the interview apparently occurred last September (ECF 553 at 9), the Government did not provide Defendants with a copy of the statement until February 3, and a translated copy until February 10. As an alternative to having the written statement entered into evidence, the Government has proposed that the defense depose Mr. Gorins, who is based in Latvia. The Government's proposals are not reasonable and should be rejected.

Once again, the Government cannot justify its untimely discovery and disclosure of this purported evidence. That failure, together with the prejudice of forcing the defense to travel halfway around the world to depose a new fact witness and incorporate the results into its strategy at this late date, requires the exclusion of Mr. Gorins from the case. The Government's position that Defendants need not depose Mr. Gorins, because his hearsay witness statement is admissible for purposes other than its truth, borders on frivolous. The Government's heads-they-win-tails-we-lose theory is that if Mr. Gorins is telling the truth that his signature on corporate documents was forged, that is proof that the corporation was an illicit shell company, and if Mr. Gorins is lying about his signature being forged, that, too, is proof that the corporation was an illicit shell company. That is flawed logic, as Mr. Gorins could have any number of reasons for disavowing his signature. And it ignores that there is no allegation that Defendants had any knowledge of the subject company. But whatever Mr. Gorins' testimony, and whatever its possible relevance, Defendants would surely be entitled to test and probe it before it was admitted at trial. defense counsel would be remiss not to do that, but the burden of doing it at this unjustifiably late juncture requires that the Government be precluded from using Mr. Gorins' testimony, whatever it is.

### IV.  The Government's Demand For Defendants To Produce New Documents Should Be Denied

In addition to itself providing a large volume of new discovery for defense counsel to review and absorb, the Government demands that Defendants provide additional document discovery. Specifically, the Government demands that the defense produce documents on behalf of two entities, IKR and Martash Holdings. This issue also should have been addressed by the Government, if at all, during the discovery period allotted by Judge Greisa.

The Government asks specifically for the "corporate formation documents and financial statements" for these two entities. ECF 553 at 6. But the Government did not identify these entities in its first two sets of document requests, though they had already been named as claimants. On May 1, 2015, the Government served a third request for documents, which for the first time included Martash Holdings and IKR in its definition of "defendants." Those requests, however, did not seek production of the corporate formation documents or financial statements the Government now belatedly demands. Defendants' Responses & Objections to Plaintiff's Third Set of Requests for the Production of Documents (May 4, 2015). Moreover, in the nearly two years between its initial document requests and the close of discovery, the Government neither

raised this issue with Defendants directly nor sought relief from the Court. It is too late for Defendants to do so now. *Duvall v. Infinity Sales Group, LLC*, No. 13-cv-80768, 2014 WL 11412751, at *1 (S.D. Fla. 2014) (a party waives its ability to challenge objections to a discovery demand where it fails to timely assert the challenge).

\* \* \*

Reopening discovery in the manner the Government proposes, across the several issues it has raised, would impose burdens on Defendants that would jeopardize their ability to prepare properly for a May 15, 2017 trial. Given that severe prejudice, and given the Government's failure to justify its untimeliness in seeking and obtaining the various materials it has now finally produced, the Government's request to again reconfigure the record and its case should be denied. Additionally, the Government should not be heard to argue that the prejudice occasioned by its request could be alleviated by a delay of the trial. As Judge Griesa observed, it is "very important, in fairness to the defense, to have as prompt a trial as possible." *See* Aug. 21, 2015 Tr. at 6:5-8. This case has been pending for 3 years. The delay that resulted from the disqualification proceedings occurred through no fault of Defendants, who had no basis to anticipate that prior counsel would be conflicted. Throughout the years these proceedings have been pending, Defendants' assets have been frozen and their business, as a result, has been paralyzed.[5] In these circumstances, "[t]he government's eleventh hour effort to change the evidentiary landscape of this case in a way that prejudicially impacts the defendants should not be remedied by a scheduling change which has a concomitant, adverse impact on the defendants, defense counsel, and the Court." *Mason*, 2008 WL 281970, at *4.

## CONCLUSION

For the foregoing reasons, the Government's newly produced documents, newly identified fact witness, and newly formulated opinions by its tracing and handwriting experts should be precluded. The Government's demand for Defendants to produce additional discovery, which the Government failed to pursue during the allotted discovery period, should be denied as well.

Very truly yours,

*/s/ Adam M. Abensohn*

Adam M. Abensohn

---

[5] At the Government's request, the Court entered a protective order that operates to freeze approximately $15 million in assets. ECF 173. That is far more than the amount, approximately $1.9 million, which the Government alleges that Defendants received out of the proceeds of the alleged fraud on the Russian Treasury. ECF 381 at ¶ 116.

9