**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA,

                Plaintiff,

      v.

PREVEZON HOLDINGS LTD., *et al.*,

                Defendants,

ALL RIGHT, TITLE AND INTEREST IN THE
REAL PROPERTY AND APPURTENANCES
KNOWN AS THE 20 PINE STREET
CONDOMINIUM, 20 PINE STREET, NEW
YORK, NEW YORK 10005, UNIT 1816, *et al.*,

             Defendants *in Rem*.

Case No. 1:13-cv-06326 (WHP)

ECF CASE

---

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF**
**THEIR MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................................1

BACKGROUND ...................................................................................................................2

      A.     The Russian Treasury Fraud ....................................................................3

      B.     The Alleged Money Laundering ...............................................................5

      C.     Procedural History ....................................................................................5

ARGUMENT ........................................................................................................................6

I.      THE GOVERNMENT DOES NOT HAVE EVIDENCE OF A SPECIFIED
      UNLAWFUL ACTIVITY ........................................................................................6

      A.     The Government Cannot Prove Fraud On A Foreign Bank ....................6

      B.     The Government Cannot Prove Transportation of Stolen Property.....................11

            1.     Section 2314 Does Not Apply Extraterritorially ......................11

            2.     The Four Transfers Occurred Outside The United States.........................12

      C.     The Government Cannot Prove Bribery Of A Public Official .............................15

II.     THE GOVERNMENT'S TRACING ANALYSIS FAILS TO ESTABLISH
     THAT DEFENDANTS TRANSACTED WITH TAINTED PROCEEDS .....................17

      A.     The Government's Tracing Analysis .......................................................19

      B.     The Tracing Analysis Is Contrary To Law ............................................20

      C.     The Tracing Analysis Is Unreliable ........................................................23

CONCLUSION....................................................................................................................26

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u> <u>Page</u>

*In re 650 Fifth Ave. & Related Props.*,
    777 F. Supp. 2d 529 (S.D.N.Y. 2011) ..................................................17

*Allison Engine Co. v. United States*,
    553 U.S. 662 (2008)............................................................................9

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002)...................................................9, 18, 25

*Arizona v. California*,
    460 U.S. 605, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983).........................14

*In re Bankr. Estate of Midland Euro Exch. Inc.*,
    347 B.R. 708 (Bankr. C.D. Cal. 2006)...............................................14

*EEOC v. Arabian American Oil Co.*,
    499 U.S. 244, 111 S. Ct. 1227, 113 L. Ed. 2d 274 (1991).....................11

*Etheridge v. AlliedBarton Sec. Servs., LLC*,
    No. 12-cv-05057, 2013 WL 1832141 (S.D.N.Y. May 1, 2013) ..............9

*Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
    513 B.R. 222 (S.D.N.Y. 2014)...........................................................14

*Kiobel v. Royal Dutch Petroleum Co.*,
    133 S. Ct. 1659, 185 L. Ed. 2d 671 (2013) ........................................13

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
    732 F.3d 161 (2d Cir. 2013)...............................................................15

*Morrison v. Nat'l Australia Bank Ltd.*,
    561 U.S. 247, 130 S. Ct. 2869, 177 L. Ed. 2d 535 (2010)...........11, 12, 15

*Northrop Grumman Overseas Serv. Corp. v. Banco Wiese Sudameries*,
    No. 03-cv-1681, 2004 WL 2199547 (S.D.N.Y. Sept. 29, 2004) .............13

*Plaintiff A v. Schair*,
    No. 2:11-CV-00145, 2014 WL 12495639 (N.D. Ga. Sept. 9, 2014) ........12

*RJR Nabisco, Inc. v. European Community*,
    136 S. Ct. 2090, 195 L. Ed. 2d 476 (2016) ....................................11, 12

*In re Refco Capital Markets, Ltd. Brokerage Customer Sec. Litig.*,
    No. 06-cv-643, 2007 WL 2694469 (S.D.N.Y. Sept. 13, 2007) ..............9

*Regalado Cuellar v. United States*,
    553 U.S. 550, 128 S. Ct. 1994, 170 L. Ed. 2d 942 (2008).........20, 21, 22

*Russul Corp. v. Zim Am. Integrated Shipping Servs. Co.,*
  No. 06 CIV. 0037, 2009 WL 3247141 (S.D.N.Y. Oct. 5, 2009) ...........................14

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,*
  513 B.R. 222 (S.D.N.Y. 2014) ......................................................................14

*Shaw v. United States,*
  137 S. Ct. 462 (2016) ........................................................................7, 8, 9

*Soliman v. Gonzales,*
  419 F.3d 276 (4th Cir. 2005) .............................................................................9

*Sound N Light Animatronics Co., LTD v. Cloud b, Inc., No. CV1605271,*
  2016 WL 7635950, No. CV1605271(C.D. Cal. Nov. 10, 2016) ...........................12

*TRW Inc. v. Andrews,*
  534 U.S. 19, 122 S. Ct. 441, 151 L. Ed. 2d 339 (2001) ......................................10

*United States v. Approximately Six Hundred & Twenty Thousand*
  *Three Hundred & Forty-Nine Dollars & Eighty-Five Cents,*
  No. 13-cv-3966, 2015 WL 3604044 (E.D.N.Y. June 5, 2015) ...........................23

*United States v. Autuori,*
  212 F.3d 105 (2d Cir. 2000) .............................................................................7

*United States v. Banco Cafetero Panama,*
  797 F.2d 1154 (1986) ......................................................................22, 23

*United States v. Bouchard,*
  828 F.3d 116 (2d Cir. 2016) .............................................................................7

*United States v. Contents in Account No. 059-644190-69,*
  253 F. Supp. 2d 789 (D. Vt. 2003) ...................................................................22

*United States v. Davidson,*
  175 F. App'x 399 (2d Cir. 2006) ....................................................................13

*United States v. Finnerty,*
  533 F.3d 143 (2d Cir. 2008) .............................................................................8

*United States v. Gilboe,*
  684 F.2d 235 (2d Cir. 1982) ...........................................................................15

*United States v. Laljie,*
  184 F.3d 180 (2d Cir. 1999) .............................................................................8

*United States v. Lloyds TSB Bank PLC,*
  639 F. Supp. 2d 314 (S.D.N.Y. 2009) .........................................................6, 14

*United States v. Napoli,*
  54 F.3d 63 (2d Cir. 1995) .................................................................................9

*United States v. Ness,*
  565 F.3d 73 (2009) .........................................................................................21

iii

*United States v. Nicolo,*
   597 F. Supp. 2d 342 (W.D.N.Y. 2009) ...................................................................23

*United States v. Prevezon Holdings LTD,*
   122 F. Supp. 3d 57 (S.D.N.Y. 2015) .....................................................................14

*United States v. Real Prop. known as 2291 Ferndown Lane,*
   *Keswick VA 22947-9195,*
   No. 3:10-CV-0037, 2011 WL 2441254 (W.D. Va. June 14, 2011) ........................10

*United States v. Richardson,*
   658 F.3d 333 (3d Cir. 2011) ..................................................................................11

*United States v. Rodriguez,*
   140 F.3d 163 (2d Cir. 1998) ....................................................................................7

*United States v. Sells Eng'g, Inc.,*
   463 U.S. 418 (1983) .................................................................................................3

*United States v. Sidorenko,*
   102 F. Supp. 3d 1124 (N.D. Cal. 2015) .................................................................12

*United States v. Turner,*
   624 F. Supp. 2d 206 (E.D.N.Y. 2009) .............................................................14, 15

## Statutes

18 U.S.C. § 1343 ...............................................................................................................14

18 U.S.C. § 1344 .................................................................................................................9

18 U.S.C. § 1956 .......................................................................................................6, 9, 17

18 U.S.C. § 1956(a) .............................................................................................................6

18 U.S.C. § 1956(a)(2)(B)(i) ........................................................................................20, 21

18 U.S.C. § 1956(c)(7)(A) ....................................................................................................6

18 U.S.C. § 1956(c)(7)(B)(iii) .........................................................................................6, 10

18 U.S.C. § 1956(7)(B)(iv) ...................................................................................................6

18 U.S.C. § 1956(c)(7)(iv) .............................................................................................15, 16

18 U.S.C. § 1956(f)(1) .........................................................................................................6

18 U.S.C. § 2314 ....................................................................................................11, 12, 15

18 U.S.C. § 3322(a) .............................................................................................................3

Fed. R. Civ. P. 56(a) ............................................................................................................6

Fed. R. Evid. 702 ...............................................................................................................18

## **<u>Miscellaneous</u>**

*Statement of Eric Holder, Jr., Deputy Attorney General, Before the Subcommittee on Criminal Justice Oversight, Committee on the Judiciary, United States Senate, Concerning the Need for Reform of the Asset Forfeiture Laws, July 21, 1999,* 1999 WL 535840 ........................................................................................................................3

OLIVER WENDELL HOLMES, THE COMMON LAW 132 (1881) ........................................8

*Hearings on the Role of U.S. Correspondent Banking in International Money Laundering before the Subcomm. on Invs. of Senate Comm. on Gov't Affairs,* 107th Cong. (2001) (opening statements of Senator Susan M. Collins, Subcomm. Chairman) ............................................13

## INTRODUCTION

The Government has admitted that it brought this case based on the account of a single witness, William Browder, without investigation or corroboration—an approach Judge Griesa found "troubling." Docket Item ("D.I.") 310 at 27. After the Complaint was filed, the Government's case agent, Special Agent Todd Hyman, testified it was the Government's "hope" that discovery would substantiate the Government's claims and provide a basis to proceed to trial. Sharma Decl., Ex. 45 at 131:21-132:9. Discovery has since been completed, with the opposite result: There is no evidence to support the Government's claims and defendants are entitled to judgment as a matter of law.

The Government seeks forfeiture and laundering penalties on the theory that Prevezon laundered less than one percent of the proceeds of a $230 million fraud against the Russian Treasury. The Government never claims that Defendants had a role in that fraud, or were even aware of it. D.I. 470 (Nov. 30, 2015 Hr'g Tr.) at 27:5-12. The Government also offers no theory or explanation as to why Defendants were supposedly given any proceeds of the Treasury Fraud or how or when the perpetrators were to reclaim the proceeds Defendants supposedly laundered. Nonetheless, the Government contends that $1.9 million of the proceeds reached Defendants through an elaborate web of transfers, and that Defendants laundered a portion of those funds by making a partial payment for two apartments in New York City.

The Government's claims fail for two independent reasons. *First*, there is no evidence that Defendants transacted with the proceeds of "specified unlawful activity" ("SUA"). The Government has attempted to establish that element through a number of shifting theories, but its current theories all fail:

- The Government cannot prove "fraud against a foreign bank" because there is no evidence that any bank was deceived or relied on any misrepresentations, which are the most basic requirements of bank fraud.

- The Government's "transfer of stolen property" theory fails because it rests on transactions between foreign entities using their foreign bank accounts, and thus constitutes extraterritorial conduct beyond the reach of 18 U.S.C. § 2314, upon which the Government relies.

- The Government cannot prove "bribery of a public official" because there is no competent evidence of it, just the same inadmissible hearsay the Government relied on when it filed its Complaint hoping to substantiate its allegations later.

Without proof of an SUA, the Government cannot establish the purported money laundering on which it bases its forfeiture claims, and Prevezon is entitled to judgment as a matter of law.

*Second*, the Government cannot establish that Prevezon obtained and transacted with proceeds of the Russian Treasury Fraud. The Government's tracing expert assumes that a series of supposedly "unusual" transactions among some 24 companies in a purported chain linking Prevezon to the Russian Treasury were conducted for the purpose of laundering stolen Treasury funds. That assumption is speculation, without evidentiary support. Moreover, the Government's evidence demonstrates several breaks in the chain of transactions through which Treasury funds allegedly reached Prevezon.

The Government has deprived Defendants of access to nearly all of their assets, and severely damaged their reputations, throughout the three-plus years this case has been pending. The Government's backwards approach—charge first and look for evidence later—has now failed. The Government cannot support its claims, and it is time for this action to end. Defendants respectfully request that summary judgment be granted on all claims.

## BACKGROUND

In its Second Amended Complaint, filed on October 23, 2015, the Government advances seven counts against Defendants, seeking forfeiture and civil money laundering penalties. D.I.

2

381 (the "SAC") ¶¶ 153-191.  The Government's claims all "arise out of the [alleged] laundering of proceeds of a criminal enterprise in Russia," in which "a Russian criminal organization including corrupt Russian government officials (the 'Organization') [allegedly] defrauded Russian taxpayers of approximately 5.4 billion rubles, or approximately $230 million in United States dollars, through an elaborate tax refund fraud scheme."  SAC ¶ 2.  Most of the SAC concerns the $230 million fraud itself (the "Russian Treasury Fraud"), with no allegations that Defendants participated in that scheme or were even aware of it.  Defs. Statement of Undisputed Material Facts ("SUF"), *filed herewith*, at ¶ 12.[1]

A.    **The Russian Treasury Fraud**

The Government has acknowledged, through the testimony of Special Agent Hyman, that it based its allegations describing the Russian Treasury Fraud on an unverified account provided by Mr. Browder, who the Government has identified as a possible witness for trial.  Sharma Decl., Exs. 17; 45 at 16:17-17:4.  Based on Mr. Browder's account, the Government alleges that, in June 2007, members of "the Organization" raided the Moscow offices of Hermitage Capital Management Limited ("Hermitage"), a Russian investment advisory firm that Mr. Browder

---

[1]    The Government collected much of its evidence, meant to substantiate these allegations, through grand jury subpoenas and MLAT requests, rather than civil discovery.  Defendants reserve the right to seek to preclude that evidence.  As then-Deputy Attorney General Eric Holder testified, 18 U.S.C. § 3322(a), which allows the use of documents gathered in criminal investigations in forfeiture matters, should be limited to allowing "the government's civil attorneys to have access to the grand jury materials already in the possession of its criminal prosecutors."  *See* Statement of Eric Holder, Jr., Deputy Attorney General, Before the Subcommittee on Criminal Justice Oversight, Committee on the Judiciary, United States Senate, Concerning the Need for Reform of the Asset Forfeiture Laws, July 21, 1999, 1999 WL 535840.  Here, the grand jury is overseen by the same Assistant United States Attorney handling this civil matter (Feb. 17, 2017 Tr. 10:2-13), and it appears the grand jury may have been used specifically for the purpose of collecting evidence in this civil case.  *See United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 432 (1983) ("grand jury's powerful investigative tools" should not be manipulated "to root out additional evidence useful in the civil suit").

headed.  SAC ¶¶ 14, 24.  The Government claims that the Organization used materials stolen

during the raid—including corporate stamps, tax certifications, and registration certifications for

three Hermitage portfolio companies, OOO Rilend, OOO Parfenion, and OOO Makhaon (the

"Portfolio Entities")—to transfer ownership of the Portfolio Entities to Victor Markelov.  The

Organization then allegedly pursued sham arbitration proceedings that resulted in large

judgments against the Entities.  SAC ¶¶ 29-37.  The Organization allegedly used those

judgments to secure approximately $230 million in tax refunds from the Russian Treasury, paid

on December 26, 2007.  SAC ¶¶ 38-45.

    With discovery now completed, Mr. Browder has proven not to be a reliable source.[2]

Nevertheless, even if his account, as adopted by the Government, were fully credited, it is

undisputed that none of the Government's evidence implicates Defendants in the Russian

Treasury Fraud.  D.I. 470 (Nov. 30, 2015 Hr'g Tr.) at 27:5-12.  The Government has never

contended Defendants had any role in or knowledge of the Russian Treasury Fraud or any

connection to those who perpetrated it, nor has the Government ever offered a reason why

Defendants would have been given any proceeds of the fraud.  *See, e.g.,* SUF ¶¶  12-16.

---

[2]  Mr. Browder, who himself has been convicted of tax fraud in Russia (Sharma Decl.,
Exs. 45 at 107:14-21; 46 at 105:11-106:6; 47 at 3-8, 15-17, 28), reported the Hermitage Fund
was unaware that the Portfolio Entities were being used by the "Organization" in connection
with sham lawsuits (Sharma Decl., Ex. 31 at 3).  Two Hermitage employees whose signatures
were supposedly forged as part of the scheme by the Organization to assume control over the
Portfolio Entities, however, both testified that they saw no indication that their signatures were
anything other than authentic.  Sharma Decl., Exs. 43 at 73-76; 44 at 62-64, 109.  Moreover,
while Mr. Browder's account rests on the notion that the Hermitage Fund was unaware that the
Portfolio Entities had become defendants in sham lawsuits, the evidence confirms that notice of
those suits was mailed to the registered addresses of the Hermitage Fund companies in advance
of a court hearing.  *See* Sharma Decl., Exs. 32-37; 42; 51 at 154:8-13.  And the evidence also
demonstrates that the Hermitage Fund ████████████████████████████████████
████████████████████████████████████████████, before the Treasury Fraud took place.  SUF ¶ 7.

4

**B.    The Alleged Money Laundering**

The Government's allegations against Defendants relate solely to their purported role in laundering a small portion of the proceeds of the Russian Treasury Fraud.  SAC ¶¶ 103-104, 124.  The Government relies principally on bank records, as analyzed by its tracing expert, John Rollins.  According to Mr. Rollins, the proceeds of the Russian Treasury Fraud were deposited, first, into accounts of the three Portfolio Entities that were purportedly stolen.  From there, Mr. Rollins describes at least 8 additional layers of transfers, through more than 30 companies and 5 countries, with approximately $1.9 million reaching an account held by Defendants at UBS.  *See* Sharma Decl., Ex. 21.  The Government claims money in that account was then invested in AFI Europe, and the returns used in financing the purchase of two apartments in New York City. *See, e.g.,* SAC ¶¶ 105, 130.  The Government offers no evidence that those apartments were purchased on behalf of anyone associated with the Treasury Fraud.  In fact, the apartments were purchased with funds from innocent sources; the evidence shows, for instance, that one of the apartments was purchased ███████████████████████████, who the Government has not linked to the Treasury Fraud.  Sharma Decl., Ex. 48 at 135:9-136:10.

**C.    Procedural History**

The Government initiated this action in September 2013, and has twice amended its complaint.  Throughout the more than three years this case has been pending, Defendants' assets have been frozen pursuant to a protective order entered by the Government when it first brought suit.  D.I. 2; D.I. 173.  At that time, the Government, by its own admission, had no evidence to support key elements of its claims; rather, as Special Agent Hyman put it, the Government "hope[d] to develop" such evidence in discovery.  Sharma Decl., Ex. 45 at 131:21-132:9.  With discovery now largely concluded (and Defendants' assets still frozen), the evidence still does not support the Government's claims.

## ARGUMENT

A party is entitled to summary judgment where it "shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). As set forth below, Defendants have made that showing and are entitled to judgment as a matter of law.

## I.    THE GOVERNMENT DOES NOT HAVE EVIDENCE OF A SPECIFIED UNLAWFUL ACTIVITY

In order to prove money laundering, the Government must prove that Prevezon entered into transactions with the proceeds of an SUA, or for the purpose of promoting an SUA. 18 U.S.C. § 1956(a). The Government has invoked the following SUA's as money laundering predicates here: i) fraud against a foreign bank; ii) transport of stolen property; and iii) bribery of a public official.[3] 18 U.S.C. §§ 1956(c)(7)(A), (7)(B)(iii), (7)(B)(iv), 2314. As set forth below, the Government does not have evidence to establish these SUAs.

### A.    The Government Cannot Prove Fraud On A Foreign Bank

The Government claims its evidence demonstrates fraud against three foreign banks. SAC ¶ 149, 18 U.S.C. § 1956(c)(7)(B)(iii). Specifically, the Government maintains that the Russian Treasury Fraud constituted fraud against HSBC Private Bank (Guernsey) Limited, HSBC Management (Guernsey) Ltd., and HSBC Private Bank (Suisse) S.A. (collectively, the

---

[3]    The Government also claims that each phase of the purported money laundering qualifies as an SUA for each subsequent phase. SAC ¶ 155. The Government has acknowledged, however, that "[a]t some point some other [SUA] must be proven, or else there would be no initial money laundering offense." D.I. 477 at 7. As explained in text, there is no proof of any other SUA. The Government cannot rely on the earliest round of transfers as a predicate for each subsequent round of alleged laundering transactions for the added reason that the earliest transfers, as discussed *infra* (Section I(B)), occurred outside the United States. By its terms, Section 1956 permits "extraterritorial jurisdiction," in a case involving non-US citizens, only where "the conduct occurs in part in the United States." 18 U.S.C. § 1956(f)(1); *see also United States v. Lloyds TSB Bank PLC*, 639 F. Supp. 2d 314, 319 (S.D.N.Y. 2009) (no jurisdiction over foreign bank where the only conduct in the United States was perpetrated by others in the money laundering chain).

"HSBC Entities"), which were serving, respectively, as trustee, manager and investor to the Hermitage Fund. *See* D.I. 398.[4]  But the Russian Treasury Fraud, fully crediting the Government's evidence for purposes of this motion, was a fraud against the Russian Treasury (which the Government concedes is not a bank), not a fraud against the HSBC Entities. Accordingly, the Government cannot establish a "fraud against a foreign bank," as Section 1956(c)(7)(B)(iii) requires.

None of the requirements for establishing fraud against a bank can be established here. *First*, perhaps the most basic requirement is evidence of a misrepresentation or omission aimed at deceiving a bank.  *See Shaw v. United States*, 137 S.Ct. 462, 469 (2016) ("The parties agree, as do we, that the scheme must be one *to deceive the bank* and deprive it of something of value") (emphasis added); *United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000) ("The fraud statutes are violated by affirmative misrepresentations or by omissions of material information that the defendant has a duty to disclose"); *United States v. Rodriguez*, 140 F.3d 163, 168 (2d Cir. 1998) ("because no rational trier of fact could have found that Rodriguez engaged in a deceptive course of conduct as to the bank, an essential element of the crime of federal bank fraud, the conviction cannot stand.").  There is no evidence that any member of the Organization sought to deceive any of the HSBC Entities. SUF ¶ 17.  There is no evidence of any representation at all directed towards the HSBC Entities.  *Id.*  Rather, the Government's claim is that the Organization deceived the Russian Treasury.  SAC ¶¶ 40-41.

*Second*, there is no evidence of any scheme to cause the HSBC Entities to *rely* on a misrepresentation, another basic requirement for proving those entities were defrauded.  SUF ¶

---

[4]    The Government presented this theory, as to two of the HSBC Entities, only after Judge Griesa dismissed another of its proposed SUAs, a purported wire fraud.  D.I. 397.  As demonstrated in text, the Government fails in its effort to devise a viable SUA years into its case.

17; *Shaw*, 137 S. Ct. at 467 ("'a man is liable to an action for deceit if he makes a false representation to another, knowing it to be false, but intending that the other should believe and act upon it'") (quoting OLIVER WENDELL HOLMES, THE COMMON LAW 132 (1881)); *United States v. Laljie*, 184 F.3d 180, 189 (2d Cir. 1999) (bank fraud requires a "course of conduct designed to deceive a federally chartered or insured financial institution into releasing property"). If the HSBC Entities lost control of the Portfolio Entities, as the Government contends, that loss occurred as a result of theft, not because the HSBC Entities relied on any misrepresentations. SUF ¶ 17. The Government's evidence purportedly demonstrates that members of the Organization raided "Hermitage's office in Moscow," and seized materials they used to assume control over the Portfolio Entities, including "the corporate stamps, the official charters, the original tax certificates, and original registration certificates." SAC ¶¶ 24-25.

The Government's evidence, if credited, shows that the Portfolio Entities were not deceived into consensually handing over these materials, as might constitute fraud, but had those materials taken from them without consent, which is the hallmark of theft.[5] *See United States v. Finnerty*, 533 F.3d 143, 148 (2d Cir. 2008) ("'Theft not accomplished by deception (*e.g.*, physically taking and carrying away another's property) is not fraud absent a fiduciary duty.'") (quoting *In re Refco Capital Markets, Ltd. Brokerage Customer Sec. Litig.*, No. 06-cv-643, 2007 WL 2694469, at *8 (S.D.N.Y. Sept. 13, 2007) (Lynch, J.)); *Soliman v. Gonzales,* 419 F.3d 276,

---

[5]   It would have been impossible for the HSBC Entities to have been deceived by the Treasury Fraud. The misrepresentation at the core of that fraud was the Organization's misrepresentation to the Russian Treasury that it controlled the Portfolio Entities. Hermitage (and the HSBC Entities serving as its trustee and manager) obviously would not rely on such a misrepresentation, since, as the owner of the Portfolio Entities, Hermitage would never believe such a misrepresentation. This is borne out by the Government's evidence that purportedly shows that, upon learning that the Organization asserted control over the Portfolio Entities, Hermitage complained to criminal authorities. D.I. 399 ¶ 14.

282 (4th Cir. 2005) ("The key and controlling distinction between [theft and fraud] is therefore

the 'consent' element—theft occurs without consent, while fraud occurs with consent that has

been unlawfully obtained").  This is dispositive, as mere theft is not a predicate for money

laundering.  *See United States v. Napoli*, 54 F.3d 63, 68 (2d Cir. 1995) ("despite the broad range

of criminal offenses designated by the money laundering statute, the crime of theft, standing

alone, is not a specified unlawful activity."); *see also Etheridge v. AlliedBarton Sec. Servs., LLC*,

No. 12-cv-05057, 2013 WL 1832141, at *2 (S.D.N.Y. May 1, 2013) (denying motion for leave

to amend to add, *inter alia*, predicate acts for RICO claim because theft is not a specified

unlawful activity).

    *Third*, there was no fraud against the HSBC Entities because there is no evidence that the

members of the Organization, who purportedly committed the Treasury Fraud, knew or had any

reason to know that the HSBC Entities would be harmed.  SUF ¶ 18; *Shaw*, 137 S. Ct. at 464,

467, 469 (holding that bank fraud statute "requires a state of mind equivalent to knowledge, not

purpose," and finding that defendant "knew he was entering into a scheme to defraud a bank" in

part because he believed that his "false statements would lead the bank to release . . . funds.").[6]

As a threshold matter, there is no evidence that at the time they purportedly stole the corporate

identity of the Portfolio Entities, the members of the Organization were aware that the HSBC

---

    [6]  The Court in *Shaw* was applying 18 U.S.C. § 1344, which prohibits defrauding a bank *or* obtaining bank funds by means of fraudulent representations.  18 U.S.C. § 1956, by contrast, requires "fraud *against* a foreign bank."  (Emphasis added).  That terminology thus requires a more direct link between the fraud and the victim bank than the statute in *Shaw*, and thus requires a showing that it was the *purpose* of the scheme to harm a bank.  *Allison Engine Co. v. United States*, 553 U.S. 662, 668-69 (2008) (holding that, under statute meant to prohibit "fraud against the Government," it was necessary to establish that defendant acted for the purpose of harming the Government).  Regardless of whether "purpose" or "knowledge" applies here, the Government falls short since there is no evidence to support even the lesser showing that the Organization knew that its actions were likely to harm a bank.

Entities were associated with Hermitage.  But even if the Organization knew that much, there is no evidence that they knew that the HSBC Entities—who had only an indirect relationship with the Portfolio Entities—would or could be harmed by the Treasury Fraud.  Based on ███ █████████████, Hermitage itself ███████████ did not expect to suffer harm as a result of the Treasury Fraud.  SUF ¶¶ 8-11.

In sum, the Government is attempting to shoehorn its evidence of a purported fraud against the Russian Treasury into a fraud against the HSBC Entities, for the sake of being able to invoke Section 1956(c)(7)(B)(iii) as an SUA.  The evidence does not fit.  The Government's theory is that the Organization stole control of the Portfolio Entities and misrepresented their finances to the Russian Treasury, indirectly harming the HSBC Entities insofar as they lost control of the Portfolio Entities and expended resources to get them back.  D.I. 398 at 5-7.  But Section 1956 requires fraud "*against* a foreign bank," and to allow the Government to rest on fraud against another entity (the Russian Treasury), with only indirect harm to a bank, would render that language superfluous.  *See TRW Inc. v. Andrews*, 534 U.S. 19, 31, 122 S. Ct. 441, 449, 151 L. Ed. 2d 339 (2001) ("It is a cardinal principle of statutory construction that a statute ought … be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant") (quotation omitted).[7]

---

[7]   To the extent Russian law controls for purposes of determining whether the Russian Treasury Fraud involved a "fraud against a foreign bank," *see United States v. Real Prop. known as 2291 Ferndown Lane, Keswick VA 22947-9195*, No. 3:10-CV-0037, 2011 WL 2441254, at *4 (W.D. Va. June 14, 2011), it would be the Government's burden to make that showing.  *See United States v. Richardson*, 658 F.3d 333, 337-38 (3d Cir. 2011) (noting it is the government's burden to prove that proceeds are from a specified unlawful activity).  The Government has not produced any evidence or expert opinion to demonstrate that under Russian law, unlike United States law, it is possible to commit fraud "against" a foreign bank without deceiving that bank, without reliance by that bank, and without knowledge, on the part of the perpetrators of the fraud, that their actions would harm that bank.

There was no fraud "against" the HSBC Entities for the straightforward reason that none of the elements of fraud were directed "against" them.[8]  Section 1956(c)(7)(B)(iii) does not apply.

### B.    The Government Cannot Prove Transportation of Stolen Property

The Government invokes 18 U.S.C. § 2314, which criminalizes the interstate transportation of stolen property, as its next SUA.  SAC ¶¶ 149, 150.  According to the Government, that provision was violated through four transfers, in February 2008, of funds purportedly derived from the Russian Treasury Fraud (the "Four Transfers").  But Section 2314 does not apply extraterritorially.  And, while the Government misleadingly labels the Four Transfers as "U.S. Transfers" (SAC ¶ 150)—no doubt to create the impression they were domestic transactions cognizable under Section 2314—those transfers actually occurred between foreign companies using foreign bank accounts.  They are not covered by Section 2314.

### 1.    Section 2314 Does Not Apply Extraterritorially

"It is a 'longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'"  *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255, 130 S. Ct. 2869, 2877, 177 L. Ed. 2d 535 (2010) (quoting *EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 248, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991)).  Thus, "[w]hen a statute gives no clear indication of an

---

[8]    The Government's theory fails for the added reason that the HSBC Entities, in their roles as trustee, manager and investor, were not engaged in the "core functions" of a "banking system."  *See, e.g.*, *United States v. Bouchard*, 828 F.3d 116, 126 (2d Cir. 2016) (overturning conviction for bank fraud where, *inter alia*, any property obtained was in the custody of bank subsidiary that was "engaged in activities far afield of the core functions of our federal banking system.").  A representative of the HSBC Entities, Albert Dabbah, acknowledged that HSBC Management (Guernsey) Ltd. was a "nonbank."  SUF  ¶ 5.

extraterritorial application, it has none." *RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090, 2100, 195 L. Ed. 2d 476 (2016) (citing *Morrison*, 561 U.S. at 255).

Section 2314 does not overcome this presumption. The statute's only reference to international conduct is its use of the phrase "interstate or foreign commerce." 18 U.S.C. § 2314. The Supreme Court, however, has "repeatedly held" that a "general reference to foreign commerce" is insufficient to "defeat the presumption against extraterritoriality." *Morrison*, 561 U.S. at 263 (citing *EEOC*, 499 U.S. at 251). Instead, a statute that refers to "interstate or foreign commerce" will only apply to conduct that "engage[s] in, or affect[s] in some significant way, commerce directly involving the United States." *RJR Nabisco*, 136 S.Ct. at 2105.

Consistent with this authority, courts have repeatedly held that statutes with similar "interstate or foreign commerce" language as appears in Section 2314 apply only domestically. *See, e.g.*, *Sound N Light Animatronics Co., LTD v. Cloud b, Inc.*, No. CV1605271, 2016 WL 7635950, at *7 (C.D. Cal. Nov. 10, 2016) (finding that U.S. copyright law did not apply extraterritorially); *United States v. Sidorenko*, 102 F. Supp. 3d 1124, 1133 (N.D. Cal. 2015) (finding that wire fraud statute did not apply extraterritorially); *Plaintiff A v. Schair*, No. 2:11-CV-00145, 2014 WL 12495639, at *1 (N.D. Ga. Sept. 9, 2014) (finding that Trafficking Victims Protection Act of 2003 did not apply extraterritorially).

As in those cases, there is no indication that Congress intended for Section 2314 to apply extraterritorially, and that provision therefore "appl[ies] only within the territorial jurisdiction of the United States." *Morrison*, 561 U.S. at 255.

### 2.    The Four Transfers Occurred Outside The United States

Where a statute does not overcome the presumption against extraterritorial application, it applies only where the conduct relevant to the statute's "focus" occurred in the United States.

*RJR Nabisco*, 136 S. Ct. at 2101.  Here, however, "all the relevant conduct" "took place outside

the United States."  *Id.* (quoting *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1663,

185 L. Ed. 2d 671 (2013)).  The Four Transfers comprise the following transactions:

- On or about February 6, 2008, a transfer of approximately $410,000 in U.S. dollars from an account at Banco Di Economii (a Moldovan bank) held by Bunicon (a Moldovan company) to an account at UBS (a Swiss bank) held by Prevezon Holdings (a Cypriot company) (SUF ¶ 65, 69, 72, 73, 78, 79);

- On or about February 13, 2008, a transfer of approximately $447,354 in U.S. dollars from an account at Banco Di Economii (a Moldovan bank) held by Elenast (a Moldovan company) to an account at UBS (a Swiss bank) held by Prevezon Holdings (a Cypriot company) (SUF ¶¶ 66, 69, 74, 75, 78, 79);

- On or about February 5, 2008, a transfer of $951,400 in U.S. dollars from an account at Banco Di Economii (a Moldovan bank) held by Bunicon (a Moldovan company) to an account at either AS Sampo Bank or Dankse (Estonian banks) held by Megacom Transit Limited (a New Zealand company) (SUF ¶¶ 67, 69, 70, 71, 72, 77, 78, 79); and;

- On or about February 6, 2008, a transfer of $942,700 in U.S. dollars from an account at Banco Di Economii (a Moldovan bank) held by Bunicon (a Moldovan company) to an account at either AS Sampo Bank or Dankse (Estonian banks) held by Castlefront LLP (a United Kingdom company) (SUF  ¶¶ 68, 69, 70, 71, 72, 73, 76, 78, 79).

Though the Government calls the Four Transfers "U.S. Transfers," it is undisputed that they

moved funds between bank accounts in Estonia, Moldova and Switzerland, held by companies in

Cyprus, Moldova, New Zealand and the United Kingdom.  SUF ¶¶ 66-79.

The Government tries to characterize the Four Transfers as domestic on grounds that they

"moved the funds through the United States" (SAC ¶ 150), purportedly because they were

processed, in part, using correspondent bank accounts in the United States.[9]  SAC ¶¶ 103, 104,

---

[9]  "Correspondent banking is the means by which one bank—the 'correspondent'— provides financial services to another bank, often referred to as the 'respondent' bank."  *United States v. Davidson*, 175 F. App'x 399, 402 n.2 (2d Cir. 2006) (quoting *Hearings on the Role of U.S. Correspondent Banking in International Money Laundering before the Subcomm. on Invs. of Senate Comm. on Gov't Affairs*, 107th Cong. (2001) (opening statements of Senator Susan M.

117, & 120.  The Government made a similar argument when it sought to preserve, as one of its

SUAs, an alleged wire fraud.  However, Judge Griesa rightly concluded that the fact that funds

were "routed through New York" was not "sufficient to overcome the presumption against the

wire fraud statute's extraterritorial application."  *United States v. Prevezon Holdings LTD*, 122 F.

Supp. 3d 57, 71 (S.D.N.Y. 2015).  The same logic still applies.  *See Russul Corp. v. Zim Am.

Integrated Shipping Servs. Co.*, No. 06 CIV. 0037, 2009 WL 3247141, at *3 (S.D.N.Y. Oct. 5,

2009) ("The law of the case doctrine holds that 'when a court decides upon a rule of law, that

decision should continue to govern the same issues in subsequent stages in the same case.'")

(quoting *Arizona v. California*, 460 U.S. 605, 618, 103 S.Ct. 1382,1391, 75 L.Ed.2d 318 (1983)).

Law of the case aside, Judge Griesa's ruling was correct.  Many courts have held that the

mere fact that a foreign bank uses "correspondent banks in the United States to process dollar-

denominated transfers [is not] sufficient to make these foreign transfers domestic."  *Sec. Inv'r

Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 513 B.R. 222, 228 n.1 (S.D.N.Y. 2014); *United

States v. Turner*, 624 F. Supp. 2d 206, 229 (E.D.N.Y. 2009) ("Given that literally thousands, if

not millions of such domestic correspondent bank contacts occur daily, a determination that such

use, alone, if coupled with a foreign scheme to defraud, could constitute a predicate for a § 1343

prosecution, would extend the extraterritorial reach of the statute exponentially without any

corresponding interest of the United States being advanced."); *United States v. Lloyds TSB Bank

PLC*, 639 F. Supp. 2d 314, 324, n.4 (S.D.N.Y. 2009) (holding that transfers by Lloyd Bank

through its U.S. correspondent account were too "peripheral and transitory" to support subject

matter jurisdiction for money laundering claims); *In re Bankr. Estate of Midland Euro Exch.*

Collins, Subcomm. Chairman); *Northrop Grumman Overseas Serv. Corp. v. Banco Wiese
Sudameries*, No. 03-cv-1681, 2004 WL 2199547, at *8 (S.D.N.Y. Sept. 29, 2004) (correspondent
banks "are used to facilitate international financial transactions and money transfers").

*Inc.*, 347 B.R. 708, 715 (Bankr. C.D. Cal. 2006) (movement of funds between foreign accounts, with the funds routed through a New York account, was insufficient to render the transaction domestic).[10]

This precedent confirms that the involvement of correspondent accounts in the Four Transfers is not enough to overcome the presumption against extraterritoriality. *Id.*; *see also Morrison*, 561 U.S. at 266 (reasoning that "it is a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United States," and the presumption against extraterritoriality would have little meaning if it were overcome "whenever *some* domestic activity is involved in the case"). That the Four Transfers "essentially ricochet[ed] off the United States via the happenstance of a domestic correspondent bank," *Turner*, 624 F. Supp. 2d at 229, is insufficient to convert those transactions into domestic conduct to which Section 2314 can be applied. Accordingly, the Government cannot rely on Section 2314 as the predicate for its money laundering claims.

### C.    The Government Cannot Prove Bribery Of A Public Official

The Government also invokes, as an SUA, "an offense against a foreign nation" "involving bribery of a public official or the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official." SAC ¶ 149; 18 U.S.C. § 1956(c)(7)(iv). The

---

[10]    The only circumstance in which the use of a New York correspondent bank could give rise to an actionable domestic transaction is "if the defendant's use of the correspondent account was purposeful." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168 (2d Cir. 2013); *see also United States v. Gilboe*, 684 F.2d 235, 238 (2d Cir. 1982) (affirming conviction on wire fraud charges where defendant purposefully caused funds "to be electronically transferred through Manhattan banks"). There is no evidence that the members of the Organization, when directing their foreign banks to make the Four Transfers to other foreign accounts, intended or even knew that those banks would route the transactions through United States correspondent accounts. *See Turner*, 624 F. Supp. 2d at 227 (stating, of a transaction utilizing a correspondent bank, that the defendants' "involvement in the process ended upon his asking the Australian bank to initiate the process").

Government claims that Russian tax official Olga Stepanova received approximately $650,000 and €7.85 million through payments made to Arivust Holdings ("Arivust") and Alkate Properties ("Alkate"), two companies associated with her husband, Vladden Stepanov, "of which at least a portion was directly traceable to the fraudulent refunds." SAC ¶¶ 100, 100(a). The Court previously relied largely on this allegation to hold, at the motion to dismiss stage, that the Government had adequately pled this SUA. D.I. 310, at 22-23. It is now clear that the Government's evidence does not support its allegations.

No "portion" of the proceeds from the Treasury Fraud can be traced to Arivust or Aikate. In deposition, the Government's tracing expert Mr. Rollins admitted that the supposedly tainted funds that he asserts went to those companies had actually been previously disbursed to other entities.[11]  (Rollins Dep. 262:15-20; 267:8-13; SUF ¶¶ 80-84.) There is thus no evidence that Mr. Stepanov's companies, Arivust and Aikate, received funds from the Russian Treasury, which makes it impossible for the Government to prove the "misappropriation, theft, or embezzlement of *public funds . . . for the benefit of a public official*." 18 U.S.C. § 1956(c)(7)(iv) (emphasis added). Mr. Rollins' admission also fatally undercuts the Government's theory that Ms. Stepanova was bribed in connection with the Treasury Fraud, which, as set forth in the SAC (¶¶ 100-02, 152), could supposedly be inferred on the basis that funds from that fraud were paid to her husband.

Absent evidence that she received tainted funds, any finding of a bribe paid to Ms. Stepanova rests on innuendo and speculation. The Government's theory requires an inference that, because Ms. Stepanova's husband received payments into his business accounts between May 2008 and August 2009, those amounts must have been paid as a bribe to Ms. Stepanova in

---

[11]  This error was repeated elsewhere in Mr. Rollins' analysis. *See infra,* Section II(C).

connection with refund payments she had a role in approving months earlier. But there are multiple logical leaps needed to make that connection, including that Mr. Stepanov did not obtain the funds from legitimate business activity or investment; that a payment to Mr. Stepanov, who had actually been divorced from Ms. Stepanova since 1992 (SUF ¶ 85), was intended for the benefit of Ms. Stepanova; and that, even assuming that Ms. Stepanova was corrupt, the payments were linked to her supposed misconduct in connection with these refunds—even though the payments did not consist of proceeds from that crime, and some of the payments were made nearly two years later. A jury could not reasonably infer on this showing that Ms. Stepanova was bribed.[12]

## II.    THE GOVERNMENT'S TRACING ANALYSIS FAILS TO ESTABLISH THAT DEFENDANTS TRANSACTED WITH TAINTED FUNDS

The Government's forfeiture claim and all of its claims for civil money laundering penalties depend on tracing proceeds of the Treasury Fraud to Defendants. *See* 18 U.S.C. § 1956; *In re 650 Fifth Ave. & Related Props.*, 777 F. Supp. 2d 529, 571 (S.D.N.Y. 2011) ("When the government seizes property under § 981, it must prove that the property is itself involved in, or traceable to property involved in, a proscribed transaction.") (quotation omitted). The

---

[12]    The Government also relies on travel records to show that Ms. Stepanova traveled to a resort town in Cyprus at the same time as Mr. Klyuev, whom the Government deems the "mastermind" of the Russian Treasury Fraud. Sharma Decl., Ex. 49. As a threshold matter, the Government cannot prove Mr. Klyuev's supposed role in the Treasury Fraud. The Government relies on the allegation that Mr. Klyuev once owned USB, a bank that allegedly received disbursements from the Russian Treasury. The Government's own evidence demonstrates, however, that *Mr. Klyuev did not own USB at the time of those payments*. Sharma Decl., Ex. 50. Further, while the Government repeatedly calls Mr. Klyuev a "convicted fraudster" (SAC ¶¶ 22, 23, 54), they omit that his conviction was unrelated to the Russian Treasury Fraud. Sharma Decl., Ex. 50. In any event, Ms. Stepanova's purported travel to the same resort town as Mr. Klyuev, seven months before the Russian Tax Office approved the refunds, does not support a reasonable inference—even if Klyuev was the Fraud's "mastermind"—that her ex-husband's receipt of non-tainted funds amounted to a bribe.

Government relies on a tracing analysis by its expert, John Rollins, as proof that, during a roughly two-month period commencing in late December 2007, $1.9 million of the $230 million stolen from the Russian Treasury filtered through the Hermitage Portfolio Entities, then through bank accounts maintained by 24 other companies (the "2nd Level Companies"), and landed in an account held by Prevezon Holdings Limited ("Prevezon") at UBS Switzerland.

Mr. Rollins' analysis is deeply flawed and appears to be an attempt by the Government to burnish the third-party accusations that it accepted wholesale when it filed its complaint with the gloss of an "expert" opinion.  As detailed below, Mr. Rollins opines that a set of transactions look suspicious to him and on that basis alone, and, with no evidence that the persons conducting the transactions were connected to the Russian Treasury Fraud or those who committed it, he deems the transactions to have laundered proceeds of that scheme.  The Supreme Court has expressly rejected this "I-know-it-when-I-see-it" method of proving money laundering, so it must be rejected here.  Additionally, even if Mr. Rollins' methodology were not forbidden, it fails to produce a reliable result.  The same records Mr. Rollins relied on show that, at key points in the supposed laundering chain, purportedly "tainted" funds he maintains filtered down to Prevezon were, in fact, disbursed to other parties.  Since Mr. Rollins' unlawful and demonstrably unreliable opinion is the only evidence the Government has identified as proof that Defendants transacted in proceeds of the Russian Treasury Fraud, summary judgment should be granted in Defendants' favor on this basis too.[13]

---

[13]   The unreliability of Mr. Rollins' opinion, in addition to providing grounds for summary judgment, also require that the opinion be excluded under FRE 702.  *Amorgianos*, 303 F.3d at 266 ("[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony.").

## A.    The Government's Tracing Analysis

By the Government's telling, during the same two month period in which $1.9 million of tainted funds allegedly reached the Prevezon account, well more than $200 million of funds having nothing to do with the Treasury Fraud also passed through the 2nd Level Companies. SUF ¶ 20.  The Government cannot, and does not, claim that it can distinguish a discrete $1.9 million stolen from the Russian Treasury from this much larger mass of "innocent" funds and watch it fall to Prevezon like a ball in a Pachinko game.  Instead, Mr. Rollins purports to demonstrate how Treasury funds were commingled in and out of the accounts of the Portfolio Entities and the 2nd Level Companies in a deliberate effort to steer the sum of $1.9 million to Prevezon.  The tracing map produced by Mr. Rollins is attached to his report as Exhibit A.

Mr. Rollins employed what he labels a "flow of funds" analysis.  As he describes it, the methodology entailed (i) examining bank records and, where available, other corroborating documents, to identify a universe of transactions that could possibly involve the proceeds of the Russian Treasury Fraud, and (ii) evaluating the characteristics of the transactions and the entities that conducted them to distinguish "innocent" transactions from transactions bearing what he considers indicia of money laundering.[14]  When he found a transaction that in his opinion bore indicia of money laundering and could be linked to other such transactions, Mr. Rollins concluded that the transaction was used to launder proceeds of the Russian Treasury Fraud and thus involved such proceeds and/or funds used to facilitate the laundering of such proceeds.  In sum, Mr. Rollins' identified transactions that in his opinion looked like money laundering; he

---

[14]    The criteria Mr. Rollins used in his evaluation included such factors as the timing of when accounts were opened and entities where established, how long accounts remained open and entities remained extant, and the number, timing and amount of transfers.  *See, e.g.,* Sharma Decl. Ex. 21 (Rollins Report) ¶¶ 84, 91, 97.

then assumed that those transactions *were* money laundering; and then assumed that what was being laundered were proceeds of the Russian Treasury Fraud. Mr. Rollins has never previously employed this methodology as a qualified expert in any court. SUF ¶ 19. Indeed, he has never been qualified as an expert for any purpose. *Id.*

Notably, the flow of funds methodology used by Mr. Rollins does *not* consider the knowledge or intent of any person involved in the transactions he reviewed. Sharma Decl. Ex. 18 (Rollins Dep. Tr.) at 49-50 ("[M]y analysis wasn't based upon any attempts to analyze or understand what a hypothetical person was thinking . . . I did not consider the intentions of anybody directing the funds. I simply performed an analysis of information reported on various bank records."). He could not have considered any such information even if he had wanted to, because the Government does not have it. The record is entirely devoid of evidence as to the identity of the persons who directed the transactions examined by Mr. Rollins; the relationship—if any—such persons had to the perpetrators of the Treasury Fraud; or whether such persons intended to launder the proceeds of the Treasury Fraud or even knew of the Treasury Fraud.

### B.    The Tracing Analysis Is Contrary To Law

Mr. Rollins identification of transactions involving proceeds of the Russian Treasury Fraud based solely on what he claims are the unusual characteristics of those transactions is directly contrary to the Supreme Court's decision in in *Regalado Cuellar v. United States*, 553 U.S. 550, 128 S. Ct. 1994, 170 L. Ed. 2d 942 (2008).

The defendant in *Cuellar* was charged with money laundering in violation of 18 U.S.C. § 1956(a)(2)(B)(i), which prohibits cross-border transportation of illicit proceeds "knowing that such transportation was designed . . . to conceal and disguise the nature, the location, the source, the ownership, or the control . . ." of the funds. The defendant was convicted on the basis of evidence that he had transported $81,000 in cash by concealing it in a car that had a secret

compartment covered with animal hair. *Cuellar*, 553 U.S. at 554. On appeal, the defendant argued that the evidence that he had concealed the cash in that manner proved only concealment and did not establish that the concealment had been done for a statutorily prohibited purpose. *Id.* at 562. The Supreme Court agreed and vacated the defendant's conviction. *Id.* at 563, 568. As the Court explained, "*how* one moves the money is distinct from *why* one moves the money. Evidence of the former, standing alone, is not sufficient to prove the latter." *Id.* at 2566. The Second Circuit has since applied *Cuellar* in similar circumstances. *See United States v. Ness*, 565 F.3d 73, 75-76, 78 (2009) (vacating defendant's conviction under 18 U.S.C. § 1956(a)(1)(B)(i) for engaging in a financial transaction designed to conceal the nature and source of SUA proceeds; evidence showing that drug proceeds were comingled with other valuables did not establish concealment for a prohibited purpose).

The same logic applies here. The Government does not know who directed the transactions cited by Mr. Rollins. It has no evidence that those persons had any connection to the perpetrators of the Russian Treasury Fraud or even knew that the Russian Treasury Fraud occurred. Nonetheless, the Government wants a jury to find that those unknown persons conducted the transactions cited by Mr. Rollins for the purpose of laundering proceeds of the Russian Treasury Fraud based solely on the characteristics of those transactions, *i.e.,* because they bore what Mr. Rollins opines are indicia of money laundering, such as being conducted in round dollar amounts or through accounts open for only a short duration.

But just as proof that cash was concealed in a secret compartment covered by animal hair cannot suffice to prove that the cash was concealed for the purpose of money laundering, proof that funds were moved through transactions that Mr. Rollins claims look like money laundering cannot suffice to establish that those transactions were conducted for the purpose of money

laundering. The Government's attempt to prove *why* the funds traced to Prevezon moved (*i.e.*, to launder proceeds of the Russian Treasury Fraud) solely through Mr. Rollins' analysis of *how* the funds moved, without any evidence of criminal intent on the part of the persons who moved the funds, is precisely the sort of bootstrapping that the Supreme Court forbade in *Cuellar*.

Moreover, since Mr. Rollins' analysis cannot as a matter of law prove that the transactions cited by Mr. Rollins were money laundering, it *a fortiori* fails to prove that they were money laundering transactions involving proceeds of the Russian Treasury Fraud. And since Mr. Rollins' (and the Government's) circular logic is that the $1.9 million received by Prevezon is traceable to money laundering of the Russian Treasury Fraud proceeds solely because it was conveyed through transactions that constituted money laundering, the Government's whole tracing argument collapses when Mr. Rollins' conclusion that the suspicious transactions were money laundering is thrown out, as it must be under *Cuellar*.

In prior briefing, the Government has suggested that it is entitled to use certain assumptions in tracing funds for money laundering purposes. The Government has referenced the so-called *Banco Cafetero* assumptions that permit the Government flexibility to assume that tainted funds were either the first out or the last out of a particular account. *See United States v. Banco Cafetero Panama*, 797 F.2d 1154 (1986). The Government has also referenced "facilitation" assumptions that permit the Government to deem funds used to launder tainted funds to be tainted themselves, such that the Government may consider any commingled funds to be tainted for forfeiture and money laundering purposes and need not trace the original tainted funds.

Those assumptions only make sense, and have only been applied, however, where there is evidence that money laundering has occurred, and the Government cannot identify the specific

proceeds at issue because of the fungibility of money. *See, e.g.*, *Banco Cafetero* , 797 F.2d at

1157, 1159, 1161; *United States v. Contents in Account No. 059-644190-69*, 253 F. Supp. 2d

789, 792, 799-800 (D. Vt. 2003). In such a scenario, there is evidence that the person directing

the transfer from a commingled account intended to transfer tainted funds, which supports an

assumption treating the funds that person removed from the commingled account as tainted.

Courts have not permitted the use of tracing assumptions to prove that the charged money

laundering occurred, rather than merely to identify the funds in an established series of

purposeful laundering transactions. In fact, the law is to the contrary: Even where (unlike here)

the Government can prove that criminal proceeds were commingled with other funds, the

Government cannot establish money laundering unless it can also prove that the party that

commingled the funds did so "to hide the nature of the tainted funds." *Id.* at 799; *see also United*

*States v. Approximately Six Hundred & Twenty Thousand Three Hundred & Forty-Nine Dollars*

*& Eighty-Five Cents*, No. 13-cv-3966, 2015 WL 3604044, at *3 (E.D.N.Y. June 5, 2015) ("[T]he

government must establish 'more than a mere showing that tainted and untainted funds were

pooled together.'") (quoting *United States v. Nicolo*, 597 F. Supp. 2d 342, 352 (W.D.N.Y.

2009)).

### C.     The Tracing Analysis Is Unreliable

Mr. Rollins' tracing analysis is also unreliable. *Amorgianos v. Nat'l R.R. Passenger*

*Corp.*, 303 F.3d 256, 265-66 (2d Cir. 2002) (affirming exclusion of expert's testimony

where, *inter alia*, an "opinion rested on a faulty assumption due to [the expert's] failure to apply

his stated methodology 'reliably to the facts of the case'" (quoting Fed. R. Evid. 702)). Even if

the Government's accounting assumptions could apply, they would require a showing that each

commingled account used to disburse purportedly tainted funds had not, prior to that

disbursement, already gone below the balance it had when it first received the tainted funds.

23

*Banco Cafetero*, 797 F.2d at 1159-60 & n.5.  But Mr. Rollins failed to guard against the possibility that tainted funds had been entirely disbursed from a particular entity in the chain before that entity received new untainted funds that it sent to Prevezon.

The records Mr. Rollins relied on show clear and material examples of this error. According to Mr. Rollins, $1.1 million of the $1.9 million in Treasury funds supposedly went to Prevezon in the manner illustrated below:



Sharma Decl. Ex. 22 (Rollins Rpt. Ex. A) (excerpt).  Bank records for Castlefront and Megacom, however, conclusively demonstrate that the $1.1 million received by Prevezon from Reaton did not come from the Russian Treasury, but instead from unrelated third parties.  *See* SUF ¶¶ 23-64.

The ▮▮▮▮ bank account statements show that ▮▮▮▮ had an opening balance of ▮▮ on February 7, 2008.  *Id.* ¶ 46; *see also* Sharma Decl. Ex. 25 at US-PREV127126 . Between February 7, 2008 and February 12, 2008, ▮▮▮▮ received ▮▮▮▮ from ▮▮▮▮ which was allegedly tainted, and ▮▮▮▮ from other third parties.  SUF ¶¶ 47-48.  In addition, between February 7 and February 12, 2008, ▮▮▮▮ made payments to other third parties, which reduced ▮▮▮▮ account balance to ▮▮ on February 12, 2008.  *Id.* ¶¶ 48-51.  Thus, the ▮▮▮▮ of allegedly tainted Treasury funds that came in from ▮▮▮▮ had been transferred out of the ▮▮▮▮ account to third parties by February 12, 2008.  *Id.* ¶¶ 43-64. Rollins testified that he did not trace those funds further.  *Id.*  Between February 13 and March 3,

2008, ███████ received ███████ of new funds from other third parties, made payments of ███████ to other third parties, and made payments of ███████ to ███████ *Id.* ¶¶ 52-63. Mr. Rollins admits none of those funds have been traced to the Russian Treasury. *Id.* ¶¶ 46-64.

The same is true for the transfers from Megacom to Reaton. *See id.* ¶¶ 25-42; *see also* Sharma Decl. Ex. 25, 27 at US-PREV132165. Bank records show that on February 7, 2008, ███████ had an opening account balance of ███████. SUF ¶ 28. Between February 7 and February 19, 2008, ███████ received ███████ from ███████ which was allegedly tainted, and ███████ from other third parties. *Id.* ¶¶ 28-33. In addition, between February 7 and February 19, 2008, ███████ made payments to other third parties including ███████ ██████████████████████████████████████████████ ███████—which brought the ███████ balance down to ███ on February 19, 2008. *Id.* ¶¶ 34-36. Thus, as of February 19, 2008, the allegedly tainted Treasury funds had been transferred out of the ███████ account. *Id.* ¶¶ 36-42. On February 20, 2008, ███████ received ███████ of new funds from ███████, a third party. *Id.* ¶ 38. Also on February 20, 2008, ███████ made payments of ███████ to other third parties and a payment to ███████ of ███████. *Id.* ¶¶ 39-40. Mr. Rollins admits that none of those funds have been traced to the Russian Treasury. *Id.* ¶ 26. Thus, the funds that moved from Megacom to Reaton, and then to Prevezon, did not come from the Russian Treasury.[15]

The above examples make clear that Mr. Rollins' methodology does not produce reliable tracing results and could not be the basis for a reasonable finding of liability by a jury.

---

[15] The same exercise can be conducted for the funds that allegedly went through the Quartell and Biakonur accounts to Mr. Stepanov's alleged Arivust and Aikate accounts. *Id.* ¶¶ 80-84; *supra* Section I(C).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court enter summary judgment on all claims.

Dated:  March 3, 2017
       New York, New York

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By:   */s/ Adam Abensohn*
       Faith E. Gay
       Kevin S. Reed
       Adam M. Abensohn
       Renita Sharma
       51 Madison Avenue, 22nd Floor
       New York, New York 10010
       Tel. (212) 849-7000
       Fax (212) 849-7100
       faithgay@quinnemanuel.com
       kevinreed@quinnemanuel.com
       adamabensohn@quinnemanuel.com
       renitasharma@quinnemanuel.com

       *Attorneys for Defendants*