**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                              Plaintiff,<br><br>   - against -<br><br>PREVEZON HOLDINGS LTD., et al.,<br><br>                              Defendants,<br><br>   - and -<br><br>ALL RIGHT, TITLE AND INTEREST IN<br>THE REAL PROPERTY AND<br>APPURTENANCES KNOWN AS THE<br>20 PINE STREET CONDOMINIUM, 20<br>PINE STREET, NEW YORK, NEW<br>YORK 10005, UNIT 1816, et al.,<br><br>Defendants in Rem. | 13 Civ. 6326 (WHP)<br><br>ECF Case |

**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA**
**IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

JOON H. KIM
Acting United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Paul M. Monteleoni
Cristine I. Phillips
Tara M. La Morte
Assistant United States Attorneys
- Of Counsel -

## TABLE OF CONTENTS

INTRODUCTION .......................................................................................................... 1

BACKGROUND .......................................................................................................... 3

ARGUMENT .............................................................................................................. 3

I.    THE GOVERNMENT WILL PROVE SPECIFIED UNLAWFUL ACTIVITIES 3

    A.    The Government Will Prove An Offense Under Russian Law Involving Fraud Against a Foreign Bank ............................................................... 3

    B.    The Government Will Prove Transportation of Stolen Property and Money Laundering as Specified Unlawful Activities ........................................... 7

    C.    The Government Will Prove a Foreign Corruption Offense .................... 10

II.    THE GOVERNMENT WILL PROVE CRIME PROCEEDS ARE TRACEABLE TO THE DEFENDANTS ................................................................................... 13

    A.    The Applicable Tracing Presumptions Are A Matter of Law, Not of Expert Opinion .................................................................................................. 13

    B.    The *Banco Cafetero* Tracing Presumptions Demonstrate that Prevezon Received Hundreds of Thousands of Dollars of Fraud Proceeds ............. 14

    C.    The Money Laundering Tracing Presumptions Demonstrate that Prevezon Received the Full Amount of Fraud Proceeds Alleged .......................... 17

        1.    Outflows From a Money Laundering Conduit are All Traceable Without Regard to the Intermediate Balance .............................. 17

        2.    The Government Will Prove That the Applicable Accounts Are Money Laundering Conduits ...................................................... 20

CONCLUSION ......................................................................................................... 26

# TABLE OF AUTHORITIES

## Cases

*Beras* v. *Coakley*, No. 13 Civ. 971,
  2013 WL 5507497 (N.D. Ohio Oct. 2, 2013) .......................................................................... 25

*Eur. Cmty.* v. *RJR Nabisco, Inc.*, 783 F.3d 123 (2d Cir. 2015) ..................................................... 8

*Guastella* v. *United States*, No. 06 Civ. 2924 (SAS),
  2009 WL 1286382 (May 8, 2009) .............................................................................................. 9

*Hygh* v. *Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992) .................................................................. 13

*In re 650 Fifth Ave.*, 777 F. Supp. 2d 529 (S.D.N.Y. 2011) ................................................. 15, 20

*In re Moffitt Zwerling & Kemler P.C.*, 875 F. Supp. 1152 (E.D. Va. 1995) ............................... 16

*In re Restraint of Bowman Gaskins Fin. Group Accounts*,
  345 F. Supp. 2d 613 (E.D. Va. 2004) ...................................................................................... 20

*In re Warrant to Search a Certain E-Mail Account Controlled &
  Maintained by Microsoft Corp.*, 829 F.3d 197 (2d Cir. 2016) .................................................. 9

*Lavastone Capital LLC* v. *Coventry First LLC*, No. 14 Civ. 7139,
  2015 WL 1939711 (S.D.N.Y. Apr. 22, 2015) ............................................................................. 4

*Licci ex rel Licci* v. *Lebanese Canadian Bank, SAL*, 834 F.3d 201 (2d Cir. 2016)..................... 10

*Magluta* v. *United States*, 660 F. App'x 803 (11th Cir. 2016) ................................................... 25

*Morrison* v. *National Australia Bank*, 561 U.S. 247 (2010) ......................................................... 8

*Neder* v. *United States*, 527 U.S. 1 (1999)................................................................................... 6

*Regalado Cuellar* v. *United States*, 553 U.S. 550 (2008)........................................................... 24

*Shaw* v. *United States*, 137 S. Ct. 462 (2016)............................................................................ 7

*United States* v. *$7708.78 in U.S. Currency*, No. 08 Civ. 1463,
  2011 WL 3489835 (S.D. Miss. Aug. 9, 2011).......................................................................... 20

*United States* v. *Adekanbi*, 675 F.3d 178 (2d Cir. 2012).............................................................. 6

*United States* v. *Adigun*, 567 F. App'x 708 (11th Cir. 2014) ....................................................... 7

*United States* v. *Akinkoye*, 185 F.3d 192 (4th Cir. 1999) ............................................................. 7

*United States* v. *All Assets of G.P.S. Auto. Corp.*, 66 F.3d 483 (2d Cir. 1995) ........................... 20

*United States* v. *Amato*, 540 F.3d 153 (2d Cir. 2008)................................................................... 6

*United States* v. *Approximately $620,349.85 Seized from Wachovia Bank
  Account Numbers Ending *6176 & *6189*, No. 13 Civ. 3966 (RJD) (SMG),
  2015 WL 3604044 (E.D.N.Y. June 5, 2015) ...................................................... 11, 18, 19, 21

*United States* v. *Banco Cafetero Panama*, 797 F.2d 1154 (2d Cir. 1986)............................. 14, 15

*United States* v. *Baxter*, 761 F.3d 17 (D.C. Cir. 2014)................................................. 25

*United States* v. *Beech-Nut Nutrition Corp.*, 871 F.2d 1181 (2d Cir. 1989) ......................... 5

*United States* v. *Bikundi*, No. 14 Cr. 30 (BAH),
2016 WL 912169 (D.D.C. Mar. 7, 2016) ......................................................... 25

*United States* v. *Bilzerian*, 926 F.2d 1285 (2d Cir. 1991) ............................................ 14

*United States* v. *Binday*, 804 F.3d 558 (2d Cir. 2015)................................................. 6

*United States* v. *Braxtonbrown-Smith*, 278 F.3d 1348 (D.C. Cir. 2002) ............................ 19

*United States* v. *Budovsky*, No. 13 Cr. 368,
2015 WL 5602853 (S.D.N.Y. Sept. 23, 2015)................................................... 9

*United States* v. *Capoccia* ("*Capoccia I*"), No. 03 Cr. 35,
2009 WL 2601426 (D. Vt. Aug. 19, 2009)...................................................... 16

*United States* v. *Capoccia* ("*Capoccia II*"), 402 F. App'x 639 (2d Cir. 2010) ..................... 16

*United States* v. *Certain Funds on Deposit in Account No. 01-0-71417,
Located at the Bank of New York*, 769 F. Supp. 80 (E.D.N.Y. 1991) ..................... 20

*United States* v. *Contents in Account No. 059-644190-69*,
253 F. Supp. 2d 789 (D. Vt. 2003) .................................................. 16, 20, 21, 24

*United States* v. *Corey*, No. 04 Cr. 349 (EBB),
2006 WL 1281824 (D. Conn. May 9, 2006)..................................................... 16

*United States* v. *Eleven Vehicles*, 836 F. Supp. 1147 (E.D. Pa. 1993) ............................. 20

*United States* v. *Faulkenberry*, 614 F.3d 573 (6th Cir. 2010) ....................................... 24

*United States* v. *Gilboe*, 684 F.2d 235 (2d Cir. 1982) ................................................ 8

*United States* v. *Hayes*, 118 F. Supp. 3d 620 (S.D.N.Y. 2015) ..................................... 8, 9

*United States* v. *Hoskins*, 73 F. Supp. 3d 154 (D. Conn. 2014)...................................... 8

*United States* v. *Huezo*, 546 F.3d 174 (2d Cir. 2008)................................................. 25

*United States* v. *Kim*, 246 F.3d 186 (2d Cir. 2001) ................................................... 9

*United States* v. *Kowal*, No. 06 Cr. 133 (LRR),
2007 WL 2903194 (N.D. Iowa Oct. 2, 2007) ................................................... 7

*United States* v. *Lloyds TSB Bank PLC*, 639 F. Supp. 2d 314 (S.D.N.Y. 2009) ................... 9

*United States* v. *Marbella*, 73 F.3d 1508 (9th Cir. 1996) ............................................ 19

*United States* v. *Maynard*, 743 F.3d 374 (2d Cir. 2014) ............................................. 6

*United States* v. *Mellor*, No. 07 Cr. 3,
2010 WL 3585892 (W.D. Va. Sept. 9, 2010) ................................................... 7

*United States* v. *Moffitt, Zwerling & Kemler, P.C.*, 83 F.3d 660 (4th Cir. 1996)................... 16

ii

*United States* v. *Ness*, 565 F.3d 73 (2d Cir. 2009)........................................................ 24

*United States* v. *Nicolo*, 597 F. Supp. 2d 342 (W.D.N.Y. 2009).......................................... 18, 21

*United States* v. *Portillo*, No. 09 Cr. 1142,
    2014 WL 97322 (S.D.N.Y. Jan. 8, 2014) ...................................................... 8

*United States* v. *Puche*, 350 F.3d 1137 (11th Cir. 2003) ...................................... 21, 24

*United States* v. *S. Side Finance*, 755 F. Supp. 791 (N.D. Ill. 1991).......................... 20

*United States* v. *Schlesinger*, 261 F. App'x 355 (2d Cir. 2008) .................................. 20

*United States* v. *Silver*, 184 F. Supp. 3d 33 (S.D.N.Y. 2016)...................................... 18

*United States* v. *Swank*, 797 F. Supp. 497 (E.D. Va. 1992)........................................ 20

*United States* v. *Tencer*, 107 F.3d 1120 (5th Cir. 1997)...................................... 21, 24

*United States* v. *Walsh*, 712 F.3d 119 (2d Cir. 2013) ...................................... 14, 15

*United States* v. *Weisberg*, No. 08 Cr. 347 (NGG) (RML),
    2011 WL 4345100 (E.D.N.Y. Sept. 15, 2011) .............................................. 18

*United States* v. *Zarrab*, No. 15 Cr. 867,
    2016 WL 6820737 (S.D.N.Y. Oct. 17, 2016) .............................................. 5, 9

## Statutes

12 U.S.C. § 1841(k) ...................................................................................... 4

12 U.S.C. § 3101(7) ...................................................................................... 4

18 U.S.C. § 1344(1) ...................................................................................... 7

18 U.S.C. § 1956(c)(7)(B)(iii) ................................................................ 3, 4, 7

18 U.S.C. § 1956(c)(7)(B)(iv)...................................................................... 10

18 U.S.C. § 1956(f)....................................................................................... 9

18 U.S.C. § 1957 ........................................................................................ 18

18 U.S.C. § 2314 .......................................................................................... 8

18 U.S.C. § 981(a)(1)(A) ............................................................................. 20

18 U.S.C. § 983(a)(3)(D) ............................................................................... 1

## INTRODUCTION

The defendants' motion, while styled as one for summary judgment, is largely a vehicle for meritless legal arguments having little to do with the Government's evidence, which is amply sufficient on all points to establish forfeitability by a preponderance of the evidence.

As an initial matter, the motion utterly fails to live up to its billing as a demonstration that there is "no evidence to support the Government's claims." Mem. 1.[1] The defendants' repeated claim that the Government had insufficient evidence at the time of filing the complaint is factually incorrect, *see* D.I. 88 at 26-36; legally irrelevant, *see* 18 U.S.C. § 983(a)(3)(D); and based on a highly misleading presentation of the record. Reading defendants' motion, which denigrates the case agent's unexceptionable statement that the Government "hope[d]" to develop additional evidence through discovery, Mem. 1, and claims that discovery yielded the "opposite result," *id.*, one would hardly guess (a) that the agent's statement referred solely to evidence of the defendants' intent, Sharma Decl. Ex. 45 at 131:21-32:9; (b) that Judge Griesa already ruled the complaint's allegations—which are fully supported by evidence the Government had before discovery—provided a strong inference of the defendants' criminal intent, D.I. 310 at 26 (referring to "Prevezon's arguments regarding its allegedly pure state of mind" as the "less likely inference"); or (c) that in discovery, the Government did indeed obtain damning additional evidence of defendants' criminal intent—including sham loan documents they signed, which even a defense expert acknowledged were false, Phillips Decl. Ex. 1 at 82:22-85:24. Indeed, the defendants' actions speak louder than their words—*they are not moving for summary judgment*

---

[1] Citations to "Mem." refer to the defendants' memorandum of law in support of their motion, Docket Item ("D.I.") 575.  Citations to "Sharma Decl." refer to the Declaration of Renita Sharma filed therewith, D.I. 576. Citations to "Phillips Decl." refer to the Declaration of Cristine I. Phillips, and citations to "Hyman Decl." refer to the Declaration of Todd Hyman, filed herewith.

*on the issue of intent*.  In this motion, the defendants thus *do not dispute* that the Government has sufficient evidence to enable a reasonable jury to find they had criminal intent.

Stripped of its highly unreliable framing, this motion levels a set of meritless challenges to whether the undisputedly-committed fraud on the Russian Treasury detailed in the Second Amended Complaint (the "Russian Treasury Fraud") and the later laundering transfers amount to money laundering predicates, and to the Government's asset tracing methodology. The Government will present voluminous evidence proving that the Russian Treasury Fraud was a specified unlawful activity as (1) an offense against Russian law involving corruption, and (2) a Russian offense involving fraud against the foreign bank HSBC. The Government will also prove that wire transfers of fraud proceeds through the United States were predicate offenses as (3) transportation of stolen property, and (4) earlier layers of money laundering as predicate offenses for later layers of money laundering by shell companies and the defendants.

As to tracing, the defendants seemingly misunderstand both the source and applicability of the accounting principles the Government uses to trace the fraud proceeds to Prevezon Holdings, Ltd. (together with the remaining defendant corporations, "Prevezon"). These principles—allowing tracing with certain account-balance-related limits in all cases, and tracing without such limits from money laundering vehicles—derive not from the opinion of the Government's tracing expert but from the law of the Second Circuit. As such, it is for the Court to instruct the jury on the principles and for the experts to *apply*, not to *justify*, the principles. The defendants make only a feeble attempt to dispute the applicability of the correct tracing principles, and an extraordinary volume of circumstantial evidence will allow a reasonable jury to conclude, under those principles, that certain bank accounts were money laundering vehicles

2

and thus the full amount of funds are traceable through them to Prevezon.

## BACKGROUND

As set forth in the Second Amended Complaint in this action, the Government seeks forfeiture of property and the imposition of civil money laundering penalties against Prevezon for laundering a portion of the proceeds of the Russian Treasury Fraud. In 2007, a Russian criminal organization defrauded Russian taxpayers of approximately $230 million by stealing the corporate identities of three companies held by the Hermitage Fund (the "Fund"), manufacturing false liabilities against them, and claiming tax refunds on that basis. *See* D.I. 381 ¶¶ 18- 45. These stolen funds were then moved through an elaborate network of shell companies, and a small portion—approximately $1.96 million—was ultimately transferred by shell companies to defendant Prevezon Holdings. *See* D.I. 381 ¶¶ 75-128. Prevezon then laundered these funds into European real estate and invested money derived from these funds in various pieces of New York real estate in additional money laundering transactions. *See* D.I. 381 ¶¶ 105-10, 129-42.

## ARGUMENT

### I.    THE GOVERNMENT WILL PROVE SPECIFIED UNLAWFUL ACTIVITIES

#### A.    The Government Will Prove An Offense Under Russian Law Involving Fraud Against a Foreign Bank

Contrary to the defendants' claims, the Russian Treasury Fraud defrauded not merely Russian taxpayers but also the foreign bank HSBC, [2] which served through three entities as trustee, manager, and investor in the Fund.

---

[2] The defendants are wrong to imply that the fraud can only have one victim. *See* 18 U.S.C. § 1956(c)(7)(B)(iii) (emphasis added) ("offense against a foreign nation *involving* . . . (iii) fraud, or any scheme or attempt to defraud, by or against a foreign bank.").

The defendants are incorrect to claim the fraud did not involve deceptive conduct directed at HSBC.[3] The fraud began with Russian police raids on the offices of both investment adviser Hermitage Capital Management Ltd. ("Hermitage"), and Firestone Duncan, Hermitage's law firm, both agents of the HSBC entities holding and managing the fund. Phillips Decl. Ex. 3 at 65:2-69:11; Hyman Decl. Ex. 2. These raids, which obtained the materials that would be used to wrest away control of Rilend, Parfenion, and Makhaon (the "Stolen Companies"), were conducted under false pretenses. They were represented to pertain to alleged tax crimes by the company Kameya, but in fact they involved the seizure of materials of the entirely separate Stolen Companies for use in identity theft.[4]

Thee false pretenses and culpable omissions regarding the raids' true purpose hid the scheme from HSBC and facilitated its execution. *See, e.g.*, *Lavastone Capital LLC* v. *Coventry First LLC*, No. 14 Civ. 7139, 2015 WL 1939711, *4 (S.D.N.Y. Apr. 22, 2015) (no need for affirmative misrepresentation; "the [mail, wire, and bank] fraud statutes are also satisfied if a

---

[3] The HSBC entities were all foreign banks under the meaning of the statute, which applies to a "foreign bank (as defined in paragraph 7 of section 1(b) of the International Banking Act of 1978)," 18 U.S.C. § 1956(c)(7)(B)(iii), which in turn includes "any subsidiary or affiliate" of any foreign company "which engages in the business of banking." 12 U.S.C. § 3101(7); *see also* 12 U.S.C. § 1841(k) (defining affiliate as "any company that controls, is controlled by, or is under common control with" another). Each of these HSBC entities is under common control with the entire HSBC Group, which includes numerous entities engaged in the business of banking, such as HSBC Private Bank (Suisse) S.A. and its subsidiaries, *see* Phillips Decl. Ex. 2 at 58:7-59:14, and HSBC (RR) Ltd, *see, e.g.*, Hyman Decl. Ex. 1.

[4] The search protocol provided to Firestone Duncan described the purpose as "finding and seizing items and documents material to the criminal case" against Kameya and reported that the documents were "submitted voluntarily" as a result of these pretenses. Hyman Decl. Ex. 2 at 2. Hermitage and HSBC persons knew at the time that the search was being conducted illegally, but not that the seized documents would be used to transfer the Stolen Companies away from HSBC control. Indeed, the day after the raids, Hermitage informed its investors that it believed—based on these false pretenses—that the raids concerned tax issues with Kameya and, though a form of bureaucratic harassment, could be resolved quickly. Phillips Decl. Exs. 4, 5 at 89:7-90:13.

fraudulent scheme premised on false or deceptive 'pretenses' is shown"); *United States* v. *Zarrab*, No. 15 Cr. 867, 2016 WL 6820737, at *13 (S.D.N.Y. Oct. 17, 2016) ("[T]he language of the bank fraud statute [should] be broadly construed so as to reach anyone engaged in a scheme or artifice to defraud, including a scheme to actively conceal material information through deceptive conduct, with intent to mislead and suppress the truth, *even in the absence of an independent legal duty to disclose such information*." (internal quotation marks omitted, emphasis added)). These false pretenses were highly material—had HSBC been aware of this scheme, it could have acted during the critical juncture when the fraudsters were executing the theft and collusive lawsuits.

The fraudsters then made false representations to HSBC agents to delay the bank's ability to unravel the scheme. After discovering that sham lawsuits had been filed against the Stolen Companies, HSBC hired lawyers to contest them in court. Representatives of the fraudsters appeared opposite the bank lawyers, falsely claiming to represent the true owners of the Stolen Companies, and attempted to bar the bank lawyers from the case, Hyman Decl. Exs. 3-6. Russian authorities also represented to agents of HSBC that the seized materials had not been given to anyone, Hyman Decl. Exs. 7-8,[5] when in fact the fraudsters used corporate charters with the same typographical errors as pre-fraud versions, showing they had used the electronic copies from Firestone Duncan's seized servers, Hyman Decl. Exs. 9-14 (charters); *id.* Ex. 2 at 5 (noting server seizure).[6]

---

[5] Whether or not the specific persons making these representations believed them is immaterial, as the fraudsters still caused the false representations to be transmitted to HSBC either way.

[6] These post-refund representations were still part and parcel of the same scheme. *See, e.g.*, *United States* v. *Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1199 (2d Cir. 1989) (statements

That these post-search affirmative misrepresentations did not induce reliance is irrelevant, as reliance is not an element of criminal fraud. *Neder* v. *United States*, 527 U.S. 1, 24-25 (1999).[7] In any event, these false statements effectively impeded HSBC's attempts to recover its assets. *Cf. United States* v. *Adekanbi*, 675 F.3d 178, 182 (2d Cir. 2012) (a statement "capable of distracting government investigators's attention away from a critical matter" is material).

This misleading conduct towards HSBC, coupled with the theft of the corporate identities of the HSBC-held Russian companies Rilend, Parfenion, and Makhaon, defrauded HSBC entities in multiple ways. HSBC Management (Guernsey), Ltd., the Fund's manager, and HSBC Private Bank (Guernsey), Ltd., the Fund's trustee, were deprived of control of the Stolen Companies, interfering with their duties to preserve the fund's assets. Phillips Decl. Exs. 6-7; *see United States* v. *Binday*, 804 F.3d 558, 570-71 (2d Cir. 2015); *United States* v. *Maynard*, 743 F.3d 374, 381 (2d Cir. 2014) (noting harm where victim has "interests to protect (the integrity of its ongoing operations and reputation, at the least) as well as a duty to protect those interests"). And HSBC Private Bank (Suisse), S.A., an investor in the Fund, saw the value of its stake diminished by millions of dollars due to the legal reserve set aside to remediate the fraud. Phillips Decl. Ex. 8. *See United States* v. *Amato*, 540 F.3d 153, 162 (2d Cir. 2008); *Maynard*, 743 F.3d at 381.[8]

Finally, in somewhat analogous circumstances, courts have recognized that identity theft

---

covering up conspiracy were in furtherance of it).

[7] All that is required is materiality, which is present even if a statement was not "capable of influencing" decisionmaking, so long as it had a "natural tendency to influence" it. *Id.* at 16.

[8] The legal reserve was started in response to the police raids before HSBC became aware that they were part of a fraud scheme, a fact it learned later after discovering the sham lawsuits. *See* Phillips Decl. Ex. 5 at 90:8-13, Ex. 9 at 82:2-83:13.

defrauds the victim, even without any representations by the fraudster. *See, e.g.*, *United States* v. *Akinkoye*, 185 F.3d 192, 196 (4th Cir. 1999) (defendant who took out credit cards under others' names had "an intent to defraud the persons whose names appear on the cards" where scheme was effected by reviewing files and stealing mail of clients of defendant's employer); *see also, e.g.*, *United States* v. *Kowal*, No. 06 Cr. 133 (LRR), 2007 WL 2903194, at *7 n.10 (N.D. Iowa Oct. 2, 2007) (using birth certificates "defrauded the dead children out of their credit"); *United States* v. *Adigun*, 567 F. App'x 708, 715-16 (11th Cir. 2014) (summary order) (stealing mail); *United States* v. *Mellor*, No. 07 Cr. 3, 2010 WL 3585892, at *2 (W.D. Va. Sept. 9, 2010) (credit card skimming).[9] Accordingly, the Government will prove a Russian offense involving fraud, or a scheme or attempt to defraud, against the foreign bank HSBC.[10]

### B.    The Government Will Prove Transportation of Stolen Property and Money Laundering as Specified Unlawful Activities

The defendants claim that transportation of stolen property cannot serve as a predicate because this would be extraterritorial. In fact, the U.S. wire transfers underpinning the stolen property and money laundering offenses are domestic under established law.

The Government will establish that several shell companies sent and received fraud proceeds in wire transfers through the United States. The portion that led to funds to Prevezon involved (1) the transfer of $410,000 from Moldovan shell company SC Bunicon-Impex SRL

---

[9] These misrepresentations and false pretenses easily satisfy the requirement that a scheme "must be one to deceive the bank," *Shaw* v. *United States*, 137 S. Ct. 462, 469-70 (2016), if that requirement even applies in view of the fact that the money laundering statute uses less direct language of a scheme "against" the foreign bank, 18 U.S.C. § 1956(c)(7)(B)(iii), not one that directly "defraud[s]" a bank, 18 U.S.C. § 1344(1).

[10] Defendants' arguments of lack of intent to harm a bank are unpersuasive, given that the fraudsters had access to copious seized files showing HSBC's role in the Fund and plainly intended the natural and probable consequences of their actions.

("Bunicon"), through the U.S. banks of Citibank in the Southern District of New York and UBS Stamford, to Prevezon's Swiss bank account, (2) the transfer of $447,354 from Moldovan shell company SC Elenast-Com SRL ("Elenast"), through Citibank and UBS Stamford; (3) the transfer of $951,400 from Bunicon through Citibank and Deutsche Bank U.S., to the Estonian bank account of shell company Megacom Transit Ltd.; and (4) the transfer of $942,700 from Bunicon, through Citibank and Deutsche Bank U.S., to the Estonian bank account of shell company Castlefront LLP (the "U.S. Transfers"). Hyman Decl. Exs. 15-18. These transfers were part of a larger pattern of transfers through the U.S., including not just the further transfer of $2.3 million from Megacom Transit and Castlefront to shell company Reaton Ltd. (over $1 million of which was destined for Prevezon), *id.* Ex. 18, but also *forty* transfers from Bunicon to apparent shell companies through Citibank and Deutsche Bank U.S., totaling over $25 million, within just four days of the U.S. Transfers destined for Prevezon, Hyman Decl. Exs. 15, 16.

Wire transfers of stolen property from a foreign bank account to another foreign bank account constitute domestic transportation of stolen property in violation of 18 U.S.C. § 2314 if they pass through New York banks. *See United States* v. *Gilboe*, 684 F.2d 235, 238 (2d Cir. 1982). This holding has been applied to money laundering, stolen property and other offenses both before and after the decision in *Morrison* v. *National Australia Bank*, 561 U.S. 247, 262-63 (2010), on which defendants rely. *See United States* v. *Hayes*, 118 F. Supp. 3d 620, 628 (S.D.N.Y. 2015) (relying on *Gilboe*, rejecting argument that *Morrison* or *Eur. Cmty.* v. *RJR Nabisco, Inc.*, 783 F.3d 123 (2d Cir. 2015), alter result as to wire fraud); *United States* v. *Hoskins*, 73 F. Supp. 3d 154, 167 (D. Conn. 2014); *United States* v. *Portillo*, No. 09 Cr. 1142, 2014 WL 97322, at *5 (S.D.N.Y. Jan. 8, 2014); *Guastella* v. *United States*, No. 06 Civ. 2924

8

(SAS), 2009 WL 1286382, at *13 (May 8, 2009); *United States* v. *Kim*, 246 F.3d 186, 190 (2d Cir. 2001).[11] Indeed, courts have repeatedly sustained claims of criminal conduct premised on wire transfers through the United States. *Zarrab*, 2016 WL 6820737, at *4; *see also United States* v. *Budovsky*, No. 13 Cr. 368, 2015 WL 5602853, at *2, 5 (S.D.N.Y. Sept. 23, 2015).

The defendants, in arguing that Judge Griesa's prior decision rejecting wire fraud should control, misunderstand the test for whether a statute's application is extraterritorial. The court proceeds by "identifying the statute's focus and looking at the facts presented through that prism." *In re Warrant to Search a Certain E-Mail Account Controlled & Maintained by Microsoft Corp.*, 829 F.3d 197, 210 (2d Cir. 2016). Judge Griesa, in finding a single wire transfer "not sufficiently central to the overall fraud scheme to convert this foreign fraud scheme into a domestic one," D.I. 310 at 21, evidently located the wire fraud statute's focus on the scheme or artifice to defraud.[12] There is no question, however, that the focus of the transportation of stolen property statute is on the *act of transportation*, which is the domestic wire transfer itself.[13]

Moreover, the wire transfers in the offenses here involve far more domestic contact than

---

[11] The defendants also cursorily claim that money laundering would be an extraterritorial predicate because the initial transactions took place in Russia. However, the earliest money laundering transactions alleged as predicate acts are the U.S. Transfers described in the complaint, D.I. 381 ¶¶ 153, and thus they stand on the same footing as the stolen property offense. Indeed, the money laundering statute applies extraterritorially so long as only a "part" of the transactions occurred in the United States, 18 U.S.C. § 1956(f). The defendants mention *United States* v. *Lloyds TSB Bank PLC*, 639 F. Supp. 2d 314, 324 n.4 (S.D.N.Y. 2009), but this case appears unaware of *Gilboe*, simply asserting—without citation and contrary to the Second Circuit's holding—that correspondent bank transfers are irrelevant to jurisdiction.

[12] Other courts have disagreed and sustained wire fraud claims, *see Hayes*, 118 F. Supp. 3d at 628, but the Government does not seek to revisit Judge Griesa's contrary ruling.

[13] Similarly, the focus of the money laundering statutes is plainly on the money laundering transactions, which in this case also constitutes domestic wire transfers.

Judge Griesa considered previously. Unlike a single transfer of approximately $700,000, there were four U.S. transfers alleged in the Second Amended Complaint as transportation of stolen property resulting in traceable proceeds to Prevezon. These four transactions came from two different companies, amounted to over $2.75 million, and were only part of a pattern of over *forty* wire transfers through U.S. banks amounting to over $25 million more in property derived from the Russian fraud and subsequent money laundering. Hyman Decl. Exs. 15-16.

Indeed, these contacts are similar to those found sufficient to support a domestic application by the Second Circuit in *Licci ex rel Licci* v. *Lebanese Canadian Bank, SAL*, 834 F.3d 201, 217 (2d Cir. 2016). In that case, the Second Circuit found that the use of several dozen correspondent account transfers in New York totaling several million dollars were a sufficient domestic predicate for an Alien Tort Statute claim of aiding Hezbollah's rocket attacks in the Middle East. Notably, these contacts were sufficient in *Licci* even though the focus of that offense—abetting a violation of the law of nations—was surely more strongly in the Middle East, where the rocket attacks took place.[14] *A fortiori*, here, where the focus of the statutes is not on aiding foreign terrorism but on conducting a financial transaction, the wire transfers through the United States violate the domestic stolen property and money laundering laws.

### C.    The Government Will Prove a Foreign Corruption Offense

The Government will prove that the Russian Treasury Fraud involved "bribery of a public official, or the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official," 18 U.S.C. § 1956(c)(7)(B)(iv), with substantial evidence including

---

[14] Defendants attempt to distinguish this case as involving "purposeful" conduct, but the pervasive pattern of domestic wire transfers here is clearly at least as purposeful.

kickbacks to perpetrators and the circumstances of the offense itself.

The Government will show that Vladlen Stepanov, the husband or ex-husband of Olga Stepanova (head of the tax office that approved most of the refunds),[15] received a kickback traceable to the Russian Treasury Fraud. The defendants claim that these funds cannot be traced because they believe the Government's expert John Rollins testified at his deposition that an account balance dropped to zero along the way. They are wrong—Rollins later clarified that the applicable account appeared to briefly experience a negative balance because the money was instead transferred to a linked short-term fiduciary investment account, which his charts did not aggregate with the account's balance. Phillips Decl. Ex. 10 at 294:21-300:2. Under the proper analysis, the aggregate balance of the two linked accounts remained positive prior to the transfer of proceeds destined for Stepanov. Phillips Decl. Ex. 11; *see United States* v. *Approximately $620,349.85 Seized from Wachovia Bank Account Numbers Ending *6176 & *6189*, No. 13 Civ. 3966 (RJD) (SMG), 2015 WL 3604044, at *2 (E.D.N.Y. June 5, 2015) (for overnight transfers between linked accounts, "the lowest intermediate balance is measured as the accounts' combined total"). Moreover, the questioned account also made payments, shortly *before* receiving the fraud proceeds the Government was able to trace, for the purchase of real estate for the benefit of Elena Anisimova and Olga Tsareva, two deputies of Stepanova at the tax office, further corroborating the kickback scheme. Hyman Decl. Exs. 20, 21.

Even if the intermediate balance had gone negative, that would still not render the funds

---

[15] The two received a divorce order 1992 but did not give it effect by registering it until 2010. Moreover, during the time period of the fraud they lived together and traveled together. Hyman Decl. Ex. 19; Sharma Decl. Ex. 30 at 29 n.73. Accordingly, a jury could easily conclude that the payment to Stepanov was a kickback to Stepanova.

untraceable given the assumptions discussed in Section II.C, *infra*. And even if the funds were not legally traceable, the fact that Stepanov received a payment from an account that had recently received funds from the Russian Treasury Fraud would still, taken together with the other circumstances, strongly support an inference of a kickback.

More fundamentally, even were there no direct proof of a kickback, there would be ample circumstantial evidence of corruption. First, the fraudsters used materials seized from Firestone Duncan by Russian law enforcement. Most strikingly, the fraudsters produced charters of the Stolen Companies that contained the same typographical error that appeared in the original charters, proving that the fraudsters were working from the seized electronic copies. Hyman Decl. Exs. 9-14. Other confidential information, such as bank account numbers, was used in the sham lawsuits, but with obvious errors such as referring to accounts that had not yet been opened, corroborating the use by outsiders of seized confidential materials. Hyman Decl. Exs. 1 (account opening), 22 (claim including account numbers).

The circumstances of the tax refunds themselves also strongly indicate corruption. The refunds, totaling over $200 million U.S. dollars, were requested in one-page letters. Hyman Decl. Exs. 23-26. These one-page applications were submitted on December 21 and 24, 2007, and were all approved on December 24, 2007—the next business day or *same day*. Hyman Decl. Exs. 27-33. The refunds were then paid on December 26, 2007, just two days later. Hyman Decl. Ex. 34.

Moreover, the tax officials obviously conducted no due diligence, instantaneously approving the refunds to the Stolen Companies despite the fact that HSBC representatives had reported their theft to the authorities weeks before. Phillips Decl. Ex. 5 at 75:16-80:13. This was

no coincidence—the two tax offices approving these refunds had been pre-selected by the fraudsters, who changed the registered addresses of the Stolen Companies in late 2007 so that they fell into the territorial jurisdiction of those two offices. Hyman Decl. Exs. 35-37.[16]

With or without the kickback, the evidence of corruption is overwhelming.

## II.     THE GOVERNMENT WILL PROVE CRIME PROCEEDS ARE TRACEABLE TO THE DEFENDANTS

### A.     The Applicable Tracing Presumptions Are A Matter of Law, Not of Expert Opinion

Prevezon's tracing argument suffers from a fundamental misunderstanding of the source of the assumptions the Government relies upon to trace fraud proceeds to the defendants. These assumptions come not from the opinion of the Government's tracing expert John Rollins, but from the law of the Second Circuit. *See infra* Sections II.C-D. It is for the Court to decide the tracing standards and instruct the jury, and for Rollins not to *justify* these standards, but to *apply* them. Accordingly, much of the defendants' argument—claiming that Rollins supposedly cannot justify these assumptions—is simply misplaced. By the same token, the defendant's tracing expert opined that these tracing assumptions were inappropriate, but admitted both that he was unfamiliar with the governing caselaw on their appropriateness, and that his view that they were inappropriate depended in part on discussions with defense counsel in this case. Phillips Decl. Ex. 12 at 82:8-83:20, 85:19-86:7. Of course, the proper way to contest the appropriateness of these assumptions is not by asking nonlawyers to justify them on the stand but by providing legal authority in court papers. *See, e.g.*, *Hygh* v. *Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992) (expert

---

[16] The fact that Hermitage's complaints to the Russian government generated not redress but a cover-up and retaliatory prosecution also powerfully supports the inference of corruption.

testimony may not "communicat[e] a legal standard—explicit or implicit—to the jury"); *United States* v. *Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) (legal conclusions inadmissible even if "presented in terms of industry practice").[17] As set forth below, the defendants fail at this endeavor.

### B.    The *Banco Cafetero* Tracing Presumptions Demonstrate that Prevezon Received Hundreds of Thousands of Dollars of Fraud Proceeds

The defendants seriously misunderstand the Second Circuit's framework for tracing crime proceeds. They claim that the standard paradigm, derived from the Second Circuit's decision in *United States* v. *Banco Cafetero Panama*, 797 F.2d 1154 (2d Cir. 1986), applies only in money laundering cases. Mem. 22-23. This is simply incorrect. The *Banco Cafetero* presumptions—which let the Government trace funds at its option, but limited to the lowest intermediate balance between the inflow and outflow of crime proceeds in each account—are not limited to money laundering cases but instead are available for *all* cases in which the Government seeks to trace the proceeds of crime. As set forth in Section II.C, below, in money laundering cases the Government has the benefit, at its option, of *additional* tracing presumptions in which traceable outflows are *not* limited by the lowest intermediate balance.

As to the first point, Judge Griesa has already recognized that, when tracing crime proceeds the United States is entitled to use the methodologies set forth in the Second Circuit's opinions in *Banco Cafetero*, 797 F.2d 1154, and *United States* v. *Walsh*, 712 F.3d 119 (2d Cir. 2013).[18] These well established methodologies are employed to "solve" the "particular problems

---

[17] Accordingly, the Government has moved *in limine*, D.I. 596-97, for the Court to preclude all opinion or other evidence purporting to contradict the correct legal standards on tracing.

[18] Though they now ask the Court to deem the *Banco Cafetero* options inapplicable, the

in the case of tracing money or other fungible property." D.I. 310 at 14 (internal quotation marks

omitted, citing *Banco Cafetero*, 797 F.2d 1154). One of the available options, the "drugs-in, last

out" rule, *Banco Cafetero*, 797 F.2d at 1159, or "the 'lowest intermediate balance' rule, states

that 'as long as the balance in an account where illicit proceeds are deposited remains higher than

the amount of the proceeds deposited, the government can trace funds equal to that amount.'"

D.I. 310 at 14 (quoting *In re 650 Fifth Ave.*, 777 F. Supp. 2d 529, 571 (S.D.N.Y. 2011)). Another

option, the so-called "drugs-in, first-out approach," *Walsh*, 712 F.3d at 124, "'consider[s]

"traceable proceeds" to be any one withdrawal, or any asset purchased with such withdrawal, to

the extent of the amount of the deposited tainted funds.'" D.I. 310 at 14 (quoting *Walsh*, 712

F.3d at 124).

Significantly, the so-called "drugs-in, first out" rule does not require a rigid assignment

of all funds out of the account in the order they were deposited in. Instead of being applied on an

account-by-account basis, it may be applied to "'*any one withdrawal*, or any asset purchased

with such withdrawal.'" *Walsh*, 712 F.3d at 124 (quoting *Banco Cafetero*, 797 F.2d at 1159)

(emphasis added); *accord* D.I. 310 at 14 (quoting *id.*). Since it can be applied on a withdrawal-

by-withdrawal basis, the "first out" assumption can be used in combination with the "last out"

assumption to trace crime proceeds being deposited into an account, remaining there for a time,

and then being withdrawn.

Indeed, numerous courts have recognized the flexibility these accounting assumptions

afford the Government to trace crime proceeds into withdrawals or to deem them to remain in

---

defendants provide no basis to revisit Judge Griesa's ruling. *See* D.I. 566 at 3 (noting that
reassignment does not reopen issues already decided).

bank accounts. In the analogous context of criminal forfeiture, the *Banco Cafetero* assumptions

"permit[] the United States to deduct debits in a checking account from the balance of monies

not linked to the counts of conviction. When that balance is depleted, debits must be deducted

from the indicted proceeds balance. *So long as the account retains a balance of indicted*

*proceeds, that balance can be traced to subsequent transfers*." *See United States* v. *Capoccia*

("*Capoccia I*"), No. 03 Cr. 35, 2009 WL 2601426, at *11 (D. Vt. Aug. 19, 2009) (emphasis

added); *aff'd by United States* v. *Capoccia* ("*Capoccia II*"), 402 F. App'x 639 (2d Cir. 2010)

(summary order); *see also Capoccia II*, 402 F. App'x at 640 ("We find no basis to disturb the

district court's finding that the assets . . . were, at the very least, property traceable to the

property obtained directly or indirectly as a result of the offenses");[19] *see also, e.g.*, *United States*

v. *Corey*, No. 04 Cr. 349 (EBB), 2006 WL 1281824, at *9 n.11 (D. Conn. May 9, 2006)

(debiting fraud balance in account by amount of specified withdrawal even though there had

been intervening withdrawals since deposit of crime proceeds); *In re Moffitt Zwerling & Kemler*

*P.C.*, 875 F. Supp. 1152, 1159 (E.D. Va. 1995) ("when tracing commingled funds, the

government is accorded flexibility to choose among various accounting approaches," citing

*Banco Cafetero*), *rev'd in part on other grounds sub nom. United States* v. *Moffitt, Zwerling &*

*Kemler, P.C.*, 83 F.3d 660 (4th Cir. 1996).[20]

        Accordingly, the fact that an account may contain other funds—even in large

---

[19] Just like in this civil case, the criminal forfeiture inquiry required the Government to prove tracing by a preponderance of the evidence. *Capoccia I*, 2009 WL 2601426, at *11; *see also id.* at *2-5 (tracing withdrawals out of accounts despite intervening withdrawals).

[20] As Judge Griesa recognized, D.I. 310 at 14-15, the *Banco Cafetero* assumptions allow the tracing of money through multiple accounts in succession. *See United States* v. *Contents in Account No. 059-644190-69*, 253 F. Supp. 2d 789, 794 (D. Vt. 2003).

quantities—does not prevent tracing. As Judge Griesa held, "the Government is entitled to use the *Banco Cafetero* accounting assumptions" while tracing through accounts containing substantial unrelated funds. D.I. 310 at 15. Applying the *Banco Cafetero* presumptions, the Government can trace the alleged fraud proceeds all the way through the layers of Russian shell companies and through the first round of U.S. Transfers, including tracing over $857,354 of fraud proceeds to Prevezon's bank account.[21]

### C.    The Money Laundering Tracing Presumptions Demonstrate that Prevezon Received the Full Amount of Fraud Proceeds Alleged

#### 1.    Outflows From a Money Laundering Conduit are All Traceable Without Regard to the Intermediate Balance

In tracing funds through bank accounts involved in money laundering, the Government has additional options at its disposal beyond those set forth in *Banco Cafetero*. This is because money laundering can involve the use of *other* property, besides the property derived from the underlying crime, to facilitate the offense. This facilitation principle means that the tainted outflows from an account are not limited to the original traceable inflows, or to the lowest intermediate balance between the inflows and the outflows, because even previously untainted funds in an account become involved in and traceable to money laundering when they are used to facilitate money laundering transactions. This rule, among other purposes, prevents launderers from immunizing their conduct by repeatedly flushing their accounts with unrelated funds.

---

[21] The supposed "breaks in the chain," Mem. 2, that defendants claim invalidate Rollins' methodology are really situations in which the intermediate balance of an account drops quite low (but not to zero). These concern only the additional approximately $1,108,090 that Prevezon received from the shell company Reaton. by way of shell companies Castlefront and Megacom Transit, and are addressed in Section II.C, below.

The money laundering statute authorizes the forfeiture not merely of proceeds but of all property involved in the offense. *See Approximately $620,349.85*, 2015 WL 3604044, at *2. In accounts where crime proceeds are commingled with other funds, "any funds that are laundered are subject to forfeiture, as are any funds that 'facilitated' money laundering 'even if they were not part of the money-laundering transaction.'" *Approximately $620,349.85*, 2015 WL 3604044, at *2  (quoting *United States* v. *Nicolo*, 597 F. Supp. 2d 342, 351-52 (W.D.N.Y. 2009))).

Accordingly, the law imposes reduced tracing requirements for the purposes of proving later money laundering. Where the funds in a money laundering transaction under 18 U.S.C. § 1956(a)(1) come from a bank account containing commingled tainted and untainted money, "courts have uniformly held that the Government need not 'trace' the funds used in the transaction to the charged unlawful conduct." *United States* v. *Weisberg*, No. 08 Cr. 347 (NGG) (RML), 2011 WL 4345100, at *2 (E.D.N.Y. Sept. 15, 2011). "In other words, *whether or not the money used in the particular charged transaction itself is considered clean or dirty*, where there is a commingled account, and where the clean money facilitates the existence or concealment of the dirty money, the charged transaction can be said to have 'involved' dirty money." *Id.* (emphasis added); *see also United States* v. *Silver*, 184 F. Supp. 3d 33, 51-52 (S.D.N.Y. 2016) (applying rule to cases under 18 U.S.C. § 1957; finding it sufficient that a deposit of crime proceeds was made into the account and funds were subsequently withdrawn).

As a result, tracing of funds from accounts used for money laundering is not limited to the *Banco Cafetero* assumptions. *See Approximately $620,349.85*, 2015 WL 3604044, at *3-4 (distinguishing tracing methodologies). Instead, courts treat a withdrawal of funds from an account into which fraud proceeds have been deposited as money laundering—even if the

18

balance has dropped to zero before the withdrawal. *See United States* v. *Marbella*, 73 F.3d 1508, 1516 (9th Cir. 1996) ("The government *need not prove the account used to pay the fees maintained a positive balance* between the time the illegal proceeds were deposited and when the referral fees were paid." (emphasis added)); *United States* v. *Braxtonbrown-Smith*, 278 F.3d 1348, 1353 (D.C. Cir. 2002) (rejecting rule that any individual transaction "must include illegal proceeds in some amount").[22] This is because "[a] contrary rule would permit laundering the proceeds of an unlawful activity through a bank account by the simple expedient of flushing the account with clean money as an intermediary step in the money laundering cycle," which is precisely "the kind of activity Congress targeted in enacting the money laundering statute." *Marbella*, 73 F.3d at 1516. Accordingly, the lowest intermediate balance is not a limit when the inquiry is whether a later transaction constituted money laundering.

The traceable outflows from a bank account used for money laundering can also exceed the traceable inflows. *See Approximately $620,349.85*, 2015 WL 3604044, at *3 (allowing tracing and forfeiture of over $700,000 used to facilitate the laundering of approximately $41,000 by commingling in bank account).[23] Where the accounts serve as conduits for crime proceeds, or are held by shell companies that serve that purpose, all of the assets of the accounts or companies, including any untainted funds, are involved in money laundering. *See United*

---

[22] As the D.C. Circuit has explained, this rule's reach is limited by the need to prove intent, which would be impossible for transactions unrelated to long-ago unlawful transactions. *See Braxtonbrown-Smith*, 278 F.3d at 1354. As noted above, in this motion the defendants do not contest that the Government has legally sufficient evidence of their criminal intent.

[23] Relatedly, there is no minimal amount or percentage of crime proceeds a transaction must contain in order to constitute money laundering. *See, e.g.*, *United States* v. *McGauley*, 279 F.3d 62, 71 (1st Cir. 2002) (upholding money laundering conviction for transfer of $49,000, of which only $155 was fraud proceeds, rejecting "*de minimis* exception" to money laundering statute).

*States* v. *All Assets of G.P.S. Auto. Corp.*, 66 F.3d 483, 486 (2d Cir. 1995) (affirming forfeiture of all assets of corporation that "served as a conduit for the proceeds of the illegal transactions"); *United States* v. *Schlesinger*, 261 F. App'x 355, 361 (2d Cir. 2008) (summary order) (similar); *United States* v. *Certain Funds on Deposit in Account No. 01-0-71417, Located at the Bank of New York*, 769 F. Supp. 80, 84 (E.D.N.Y. 1991) ("[18 U.S.C. § 981(a)(1)(A)] has been construed by the district courts as authorizing the forfeiture of an entire bank account or business which was used to 'facilitate' the laundering of money" (citing cases)).[24]

As a result, where a bank account or business is used for money laundering, forfeiture is appropriate not merely of the account or business, but also of all of the funds that are transmitted out from it, even if they exceed the traceable inflows. *See, e.g.*, *In re Restraint of Bowman Gaskins Fin. Group Accounts*, 345 F. Supp. 2d 613, 621, 624 (E.D. Va. 2004) (because entire business is forfeitable as property involved in fraud and money laundering offenses, all property derived from the business was forfeitable, even if not traceable to the underlying offense); *United States* v. *Eleven Vehicles*, 836 F. Supp. 1147, 1154-55 (E.D. Pa. 1993) (similar); *Contents of Account No. 208-06070*, 847 F. Supp. at 335 (where second account received funds from a first account that was forfeitable as facilitating property, ordering forfeiture of second account).

### 2. The Government Will Prove That the Applicable Accounts Are Money Laundering Conduits

The Government will show that these money laundering tracing principles apply to the

---

[24] There are numerous additional examples of forfeitures of business entities and all their assets. *See, e.g.*, *In re 650 Fifth Ave.*, 777 F. Supp. 2d at 567; *United States* v. *$7708.78 in U.S. Currency*, No. 08 Civ. 1463, 2011 WL 3489835, at *3 (S.D. Miss. Aug. 9, 2011); *United States* v. *Swank*, 797 F. Supp. 497, 502 (E.D. Va. 1992); *United States* v. *S. Side Finance*, 755 F. Supp. 791, 797-98 (N.D. Ill. 1991).

bank accounts defendants identify in which the lowest intermediate balance drops low—the bank accounts of Castlefront LLP and Megacom Transit Ltd.—and thus that the full amounts of the outflows are traceable proceeds despite the accounts' intermediate balances.[25]

It is true that the mere fact that crime proceeds were deposited in an account where other money was found, with nothing more, is not enough to show that the other money was involved in the money laundering. *Nicolo*, 597 F. Supp. 2d at 352. Instead, the "innocent funds must have been used in some way to hide the nature of the tainted funds." *Contents in Account No. 059-644190-69*, 253 F. Supp. at 799; *see also Nicolo*, 597 F. Supp. 2d at 352 (quoting *id.*). However, courts recognize that this is common, as "in many cases it is precisely the commingling of tainted funds with legitimate money that facilitates the laundering and enables it to continue." *Approximately $620,349.85*, 2015 WL 3604044, at *3 (internal quotation marks and brackets omitted).[26] Courts rely on circumstantial evidence such as the timing of account openings, *see Contents of Account No. 208-06070*, 847 F. Supp. at 335, the rapidity of transfers, *see United States* v. *Tencer*, 107 F.3d 1120, 1135 (5th Cir. 1997), or the use of international money transfers, *see United States* v. *Puche*, 350 F.3d 1137, 1153 (11th Cir. 2003), to demonstrate that the commingling of funds served a laundering purpose.

The type of circumstantial evidence courts rely on is abundant here, in Megacom Transit

---

[25] The defendants do not claim in this motion that there is a lowest intermediate balance problem with tracing funds up to Megacom Transit and Castlefront, or with tracing the $857,354 of funds that reached Prevezon without passing through those two companies. The issue thus only arises beginning after the U.S. Transfers to Megacom Transit and Castlefront identified in the complaint.

[26] This is because "legitimate money serves to further disguise the source of the illegitimate funds and make the proceeds of the criminal scheme more difficult to trace, and thereby facilitate a claimant's money laundering scheme." *Id.* at *3 (internal quotation marks and brackets omitted).

and Castlefront as well as throughout the laundering network. Both Megacom Transit and

Castlefront had their bank accounts opened just a few months before the transfers at issue, at the

same bank on the same day, Hyman Decl. Exs. 38-39, and both had a strikingly similar pattern of

activity in their bank accounts. Despite supposedly being in unrelated business lines (Castlefront

represented its business to its bank as "construction materials wholesale trade," while Megacom

Transit claimed to deal in "furniture textiles, consumer goods"), *id.*, Castlefront and Megacom

Transit had remarkably similar, and unusual, patterns of activity in their bank accounts during

the relevant timeframe. The overwhelming majority of their incoming transfers—i.e., the

supposedly "clean" money that replenished the balance of the Castlefront and Megacom Transit

accounts after outgoing transfers that repeatedly brought the account balances very low—came

from the same three senders. Hyman Decl. Exs. 42-43. One of those senders, Carwit Ltd., had its

account at CredExBank, a Belarusian bank that the U.S. Treasury would later designate as

having been an institution of primary money laundering concern during the relevant time period.

Hyman Decl. Exs. 40, 41. The funds from these senders were often almost identical in date and

amount, Hyman Decl. Exs. 42-43, strongly suggesting that—as with the transfer of fraud

proceeds to Castlefront and Megacom Transit—the senders were simply breaking up larger

transactions among the two supposedly separate companies.

 Not only were the senders to Castlefront and Megacom Transit almost entirely the same,

many of their recipients were as well over the same time period—an inexplicable set of

coincidences for two companies supposedly in different industries. Indeed, three additional

companies with accounts at the same bank also received funds from the same senders and

disbursed to the same set of recipients during the same few weeks. Sharma Decl. Ex. 31 ¶¶ 185-

88; Phillips Decl. Ex. 14. All five of these accounts—i.e., Megacom Transit, Castlefront, and the three others with similar activity—were repeatedly accessed from the same IP address within minutes of one another during this time period. Hyman Decl. Exs. 44-48.[27]

Not only were the inflows and outflows in the Megacom Transit and Castlefront accounts apparently coordinated, they were also apparently false. All of the transfers during this time bore suspicious payment descriptions for an eclectic combination of purposes such as "equipment," "electronics equipment," "securities," and "auto spare parts completing." Hyman Decl. Exs. 42-43. These often-identical descriptions are especially suspicious because highly similar payment descriptions accompanying other shell companies' transfers in the network—including all of the questioned transfers of funds to Prevezon—were flatly false. Phillips Decl. Ex. 13 at 199:2-13. Indeed, Castlefront and Megacom Transit, along with the companies that they received fraud proceeds from and sent fraud proceeds to, all had accounts that did not reflect any ordinary business expenses such as payroll, utilities and maintenance costs, building and rental costs, or legal fees. Hyman Decl. Exs. 42-43. Castlefront's registered address, oddly for a construction materials company, is an apparent residential apartment block in London, Hyman Decl. Ex. 49, and Megacom Transit's registered address, strangely for a consumer goods company, seems to be a suburban house with a swimming pool in New Zealand, *id.* Ex. 50. Indeed, several of Castlefront and Megacom Transit's counterparties during that time period were under shared directorship and had shared addresses, further indicating coordination. Sharma Decl. Ex. 21¶¶ 180-84 & tbl. 73.

---

[27] Indeed, on 42 days in February and March 2008 alone, all five of the entities were accessed by the same IP address on the same day. Hyman Decl. Exs. 44-48.

There is thus ample circumstantial evidence for a reasonable jury to infer that these are simply shell companies with no legitimate business activities at all. To hold this volume of circumstantial evidence—which far exceeds what has been relied on in other cases, *see, e.g.*, *Contents of Account No. 208-06070*, 847 F. Supp. at 335; *Tencer*, 107 F.3d at 1135; *Puche*, 350 F.3d at 1153—insufficient would be to all but immunize money launderers sophisticated enough to use shell companies that regularly flush their accounts.

Faced with this evidence, the defendants resort to a reading of the Supreme Court's decision in *Regalado Cuellar* v. *United States*, 553 U.S. 550, 566 (2008) that would preclude ever establishing money laundering intent circumstantially. Mem. 20-22. Their reading is insupportable.[28] *Cuellar* held that "'[t]here is a difference between concealing something to transport it, and transporting something to conceal it,'" 553 U.S. at 566, and that evidence of a defendant hiding cash while traveling merely suggested the former, *id.* at 567; *see also United States* v. *Ness*, 565 F.3d 73, 78 (2d Cir. 2009) (similar). Far from holding that intent to conceal could not be proven circumstantially, *Cuellar* stated that it can. 533 U.S. at 567 n.8; *see also United States* v. *Faulkenberry*, 614 F.3d 573, 586 (6th Cir. 2010) ("[D]epending on context, proof that a transaction was structured to conceal a listed attribute of the funds can yield an inference that concealment was a purpose of the transaction."). [29] Instead, *Cuellar* just stands for

---

[28] The issue is also irrelevant; because these transactions all involved financial institutions and were above $10,000, they would still be money laundering under 18 U.S.C. § 1957 and invoke the tracing presumptions even absent intent to conceal. *See Silver*, 184 F. Supp. 3d at 51-52.

[29] As such, the defendants' arguments that they are not alleged to have participated in the underlying fraud, that the other money launderers are supposedly unidentified, and that Rollins himself did not purport to render an expert opinion on their intent all miss the mark.  Mem. 20-22. It is for the jury, not Rollins, to determine whether the other transactions are money laundering. The identities of the launderers, of course, are not relevant but in any event are sufficiently known, as the shell companies themselves may be guilty of money laundering.

the commonsense principle that people carrying cash may try to hide it in transit. It says little

about complex schemes involving wire transfers, shell companies, or fictitious payment

purposes, and indeed, courts still routinely permit the inference of concealment in such cases.

*See, e.g.*, *United States* v. *Huezo*, 546 F.3d 174, 182 (2d Cir. 2008) (based on "common sense

and experience" in light of the "complexity and scale of the money laundering scheme"); *United*

*States* v. *Baxter*, 761 F.3d 17, 33 (D.C. Cir. 2014) (defendant sent checks to front company and

nominee before transfer to personal account); *Beras* v. *Coakley*, No. 13 Civ. 971, 2013 WL

5507497, at 4 (N.D. Ohio Oct. 2, 2013) (deposit of funds, international transfer using false

payment documents, currency conversion and redeposit); *Magluta* v. *United States*, 660 F. App'x

803, 807-08 (11th Cir. 2016) (summary order) (false name on checks and circuitous route of

fund transfers).[30] Accordingly, the Government will prove that the relevant accounts were money

laundering vehicles and that the full amount of their outflows was traceable to the laundering.[31]

---

[30] Courts are explicit that such factors can prove intent to conceal. *United States* v. *Bikundi*, No.
14 Cr. 30 (BAH), 2016 WL 912169, at *42 (D.D.C. Mar. 7, 2016) (factors such as "the existence
of more than one transaction, coupled with either direct evidence of intent to conceal or
sufficiently complex transactions that such an intent could be inferred; funnelling illegal funds
through various fictitious business accounts" (internal quotation marks omitted))

[31] Even limited to the *Banco Cafetero* rules, this would only limit the traceable proceeds from
these accounts, not—as defendants claim, Mem. 23-24—undermine the expert's entire analysis.

## <u>CONCLUSION</u>

For the foregoing reasons, the Government respectfully requests that the Court deny the

defendants' motion in its entirety so that this matter can proceed expeditiously to trial.

Dated: New York, New York
      March 24, 2017

                        Respectfully submitted,

                        JOON H. KIM
                        Acting United States Attorney
                        for the Southern District of New York

By:    /s/ Paul M. Monteleoni
                        Paul M. Monteleoni
                        Cristine I. Phillips
                        Tara M. La Morte
                        Assistant United States Attorneys
                        Tel.: (212) 637-2219/2696/2746
                        E-mail: paul.monteleoni@usdoj.gov
                                  cristine.phillips@usdoj.gov
                                  tara.lamorte@usdoj.gov

26