UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------x
                                             :
UNITED STATES OF AMERICA,         :

                        Plaintiff,    :       No. 13-cv-6326 (WHP)

                           v.              :       OPINION & ORDER

PREVEZON HOLDINGS, LTD., *et al.*,    :

                        Defendants.   :

---------------------------------------------x

WILLIAM H. PAULEY III, United States District Judge:

        The Government moves <u>in limine</u> to admit the contents of a Russian criminal case file and copies of documents from various Russian arbitration proceedings for non-hearsay purposes. The Government also seeks to admit copies of bank records from the Russian criminal case file for their truth. For the reasons that follow, the Government's motion is granted.[1]

## BACKGROUND

        Many of the bank records that the Government intends to use as evidence in this action are derived from a Russian criminal case file. The Government, as an initial matter, directly requested these records and other forms of evidence from the Russian Federation. (Gov't Motion in Limine No. 1 ("Mot."), ECF No. 593, at 3.) But the Russian Federation declined to accede to the request, and instead "provid[ed] a selection of non-germane documents and a letter purporting to exonerate all Russian officials and Prevezon personnel." (Mot. at 3.)

---

[1] This Opinion and Order also addresses and resolves Prevezon's Motion <u>in Limine</u> No. 7, which seeks the exclusion of bank records contained in the Russian criminal case file. For the reasons stated herein, Prevezon's motion is denied.

A. The Criminal Case File

Barred from effectively obtaining evidence through the usual means, the Government resorted to collecting records reflecting the purported "money laundering transactions [that] took place" in Russia from "foreign sources, many without certifications drafted under the Federal Rules of Evidence." (Mot. at 3.) One of those sources, from which a large volume of evidence originates, is a Russian criminal case file (the "Criminal Case File") relating to the prosecution of an individual who allegedly participated in an elaborate tax refund fraud scheme that resulted in a payment of $230 million by the Russian Treasury (the "Russian Treasury Fraud"). (Mot. at 4.) The Government obtained copies of the Criminal Case File from Nikolai Gorokhov, who testified via videotaped deposition that he photographed the files in connection with his work as a lawyer in an unrelated action. (Mot. at 4–5.) Mr. Gorokhov further testified that he took these photographs in a "specially designated room at the [Russian] courthouse, in the presence of the court clerks, over the course of several days." (Mot. at 5 (citing Declaration of Tara La Morte, Ex. 12 at 202:4–05:2).)

The Criminal Case File contains volumes of evidence collected by Russian judicial and law enforcement authorities. Among other things, the file consists of copies of bank records reflecting the purported money laundering transactions at issue in this action.

According to the Government, the bank records were obtained in two different ways. First, the banks produced their records in response to orders issued by Russian criminal investigators, accompanied by transmittal letters identifying the records of the requested bank accounts and bearing the institutions' official seals (the "Attested Records"). (Mot. at 15–16.) Second, Russian authorities visited the banks and physically seized their records (the "Seized Records"). With respect to one bank—Bank Krainiy Sever—the Russian authorities shut it

2

down. The Attested Records and the Seized Records are critical parts of the Criminal Case File. (Mot. at 18.)

  B. The Arbitration Files

In addition to the Criminal Case File, the Government also obtained copies of files from arbitration proceedings commenced as part of the scheme underlying the Russian Treasury Fraud (the "Arbitration Files"). (Mot. at 9–10.) However, the Russian lawyers who provided the Arbitration Files are unavailable to testify at trial. Many of the documents in the Arbitration Files overlap with the Criminal Case File.

## DISCUSSION

"The purpose of an in limine motion is to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial." Palmieri v. Defaria, 88 F.3d 136, 141 (2d Cir. 1996) (internal quotations and citation omitted). Generally, evidence is admissible as long as it is (1) relevant and (2) not otherwise prohibited by the United States Constitution, a federal statute, the Federal Rules of Evidence, or any other rules prescribed by the Supreme Court. See Fed. R. Evid. 402.

  A. Admitting the Criminal Case File for Non-Hearsay Purposes

The Government seeks to admit the Criminal Case File for non-hearsay purposes, claiming that a number of records are relevant "both as verbal acts with legal significance" regarding the Russian Treasury Fraud and "because they contain numerous telltale errors and irregularities that indicate fraud and corruption." (Mot. at 8.) To prevail on its request, the Government must satisfy the threshold requirement of authentication, which requires "evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid.

3

901(a); see also United States v. Maldonado-Rivera, 922 F.2d 934, 957 (2d Cir. 1990) ("In general, a document may not be admitted into evidence unless it is shown to be genuine."). This requirement, however, is not "a particularly high hurdle and is satisfied if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification." Crawford v. Tribeca Lending Corp., 815 F.3d 121, 216 (2d Cir. 2016) (internal quotations and citation omitted).

The Government can authenticate the Criminal Case File for non-hearsay purposes through the videotaped deposition testimony of Mr. Gorokhov who, among other things, will describe the circumstances by which he accessed and copied the Criminal Case File onto SD cards. (Mot. at 7). A Department of Homeland Security agent will also testify that the hard drive used at trial contains accurate copies of the SD cards and their content. (Mot at 7.) The testimony of these two qualified witnesses is sufficient to meet the requirements of Rule 901. See United States v. Vayner, 769 F.3d 125, 130 (2d Cir. 2014) ("The simplest (and likely most common) form of authentication is through the testimony of a witness with knowledge that a matter is what it is claimed to be.") (internal quotations and citation omitted).[2] Accordingly, the Government's motion to admit the Criminal Case File on non-hearsay grounds is granted.

B. Admitting the Arbitration Files for Non-Hearsay Purposes

The Government also moves to admit the Arbitration Files for non-hearsay purposes. As with the Criminal Case File, the Arbitration Files must be authenticated under Rule

---

[2] Prevezon's argument that the Criminal Case File cannot be authenticated under Rule 901 because Mr. Gorokhov was unable to identify certain documents from the Criminal Case File at his deposition (Prevezon Opposition to Gov't Motion In Limine No. 1 ("Opp."), ECF No. 641, at 17 n.9) fails because it attacks the evidence's weight rather than its admissibility. See Vayner, 769 F.3d 125, 131 (2d Cir. 2014) ("As we have said, authentication of course merely renders evidence admissible, leaving the issue of its ultimate reliability to the jury." (internal quotations and citation omitted)). Prevezon is "free to challenge the reliability of the evidence, to minimize its importance, or to argue alternative interpretations of its meaning, but these and similar other challenges go to the weight of the evidence—not to its admissibility." Vayner, 769 F.3d at 131 (internal quotations and citations omitted).

901 prior to their admission and use at trial. The Government relies principally on Rules 901(b)(3) and (b)(4) to satisfy this requirement. Rule 901(b)(3) provides that items of evidence may be authenticated by "[a] comparison with an authenticated specimen by an expert witness or the trier of fact." Rule 901(b)(4), on the other hand, provides that items of evidence may be authenticated by their "appearance, contents, substance, internal patterns, or other distinctive characteristics . . . taken together with all the circumstances."

The Arbitration Files may be authenticated under either Rule 901(b)(3) or (b)(4) because they have the same type of distinctive characteristics as the Criminal Case File. For example, both contain identical, or have substantially similar, pages of "nonpublic information" regarding contracts and bank account numbers. When compared with the Criminal Case File, a reasonable juror could conclude that the Arbitration Files are exactly what they appear to be: a catalogue of photographs depicting documents bearing caption and docket numbers filed in various arbitration proceedings. Accordingly, the Arbitration Files may be authenticated through a comparison with the Criminal Case File and introduced at trial for non-hearsay purposes. See Crawford, 815 F.3d at 216.

C. Admitting the Attested Records and Seized Records for Their Truth

The crux of the parties' dispute hinges on the admissibility of both the Attested Records and Seized Records. The Government seeks admission of such records as accurate depictions of relevant bank account activity. These records are critical to the Government's ability to trace funds through various accounts used to launder the proceeds derived from the Russian Treasury Fraud. To admit these records, the Government relies on three exceptions to the hearsay rule: (1) the foreign business records exception under Rule 803(6); (2) the public

records exception under Rule 803(8); and (3) the residual hearsay exception under Rule 807. Each exception is addressed in turn.

1. The Business Records Exception Under Rule 803(6)

The Government seeks to admit the Attested Records through the exception espoused by Rule 803(6) which provides that business records are admissible if:

> (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge; (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; (C) making the record was a regular practice of that activity; (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

The certification requirement under Rule 902(12), in relevant part, requires that foreign records must be accompanied by a certification "signed in a manner that, if falsely made, would subject the maker to a criminal penalty in the country where the certification is signed."

Fatal to the Government's Rule 803(6) argument is, among other things, the absence of any authority or evidence indicating that the "transmittal paperwork" accompanying the Attested Records is equivalent to an official certification made under the threat of criminal punishment in Russia. The risk of criminal penalties for making a false statement effectively serves as a guarantee that an out-of-court statement—especially the foreign records here—is trustworthy and reliable. It is one of the principal reasons why the exception under 803(6) exists in the first place. And because the Second Circuit has warned courts not to assume, absent any authority, that a foreign country would actually impose criminal sanctions for making false statements to foreign officials, this Court declines to adopt the Government's expansive

6

interpretation seeking to admit the Attested Records under Rule 803(6). See United States v. Doyle, 130 F.3d 523, 547 (2d Cir. 1997).

2. The Public Records Exception Under Rule 803(8)

The Government's argument that the Seized Records should be admitted under Rule 803(8) also fails. Rule 803(8) provides that "[a] record or statement of a public office" may be admissible hearsay "if it sets out in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation" and "the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness." Here, the Government cites numerous public reports by Russian investigators who conducted an inquiry into the Russian Treasury Fraud. (Mot. at 18–19). These investigative reports referenced and incorporated the Seized Records into their "factual findings." (Mot at 18–19.) By virtue of their incorporation into public reports, the Government contends that the Seized Records should also qualify as a public record.

But the Government's interpretation of the rule is too broad and overlooks a double hearsay issue. Even if the investigative reports are admissible under Rule 803(8)—an analysis that need not be undertaken at this point—the underlying bank records must find an independent basis for their admissibility. See Fed. R. Evid. 805; see also Parsons v. Honeywell, Inc., 929 F.2d 901, 907 (2d Cir. 1991) (holding that hearsay is "not admissible merely because [it was] contained in a police report"). Here, the Government improperly conflates the admissibility of the investigative reports with the admissibility of the records cited in such reports under the guise that the reports "incorporate" the records. Accordingly, this Court declines to admit the Seized Records under the public records exception.

3. The Residual Exception Under Rule 807

Finally, the Government relies on the catch-all provision set forth in the residual hearsay exception as a basis to admit both the Attested Records and Seized Records for their truth. Under Rule 807, the residual hearsay exception provides that "a hearsay statement is not excluded by the rule against hearsay even if the statement is not specifically covered by a hearsay exception in Rule 803 or 804." Fed. R. Evid. 807(a). Specifically, hearsay is admissible under Rule 807 when: "(1) the statement has equivalent circumstantial guarantees of trustworthiness; (2) it is offered as evidence of a material fact; (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and (4) admitting it will best serve the purposes of these rules and the interests of justice." Fed. R. Evid. 807(a). In addition, the proponent of the hearsay statement must give the adverse party "reasonable notice of the intent to offer the statement and its particulars, including the declarant's name and address, so that the party has a fair opportunity to meet it."[3] Fed. R. Evid. 807(b).

There is no serious dispute that the bank records, if admitted for their truth, represent evidence of a material fact. The Attested Records and Seized Records are fundamental pieces to the Government's tracing analysis. They will support the Government's theory that proceeds from the Russian Treasury Fraud were laundered through a network of accounts, and that $1.9 million wound up in Prevezon's account.

Further, the Attested Records and Seized Records are more probative on the point for which they are offered—namely the intervening transfers that allegedly facilitated the laundering of proceeds from the Russian Treasury to Prevezon—than any other evidence that the

---

[3] The parties do not dispute that sufficient notice was provided.

Government could obtain through reasonable efforts. Absent the use of such records, it is highly unlikely that the Government could obtain other evidence to establish each transfer within the alleged money laundering chain. The Russian Federation spurned the Government's requests for any relevant evidence. In fact, the Russian Federation's response appeared to ignore the thrust of the Government's request—relevant bank records—and instead provided a counter narrative to the Government's theory of liability. Indeed, that copies of the Attested Records and Seized Records were obtained under unique circumstances—through Mr. Gorokhov's efforts photographing the contents of the Criminal Case File in a Russian courthouse under the supervision of court staff over the course of several days (Mot. at 4–5)—underscores the lengths to which the Government went to secure this highly relevant evidence and the paucity of any reasonable alternatives to obtain it. Moreover, in complex money laundering actions like this one, bank records are virtually the <u>sine qua non</u> of establishing the laundering process, further highlighting their unquestionably probative nature.

    Here, the issue is whether the bank records are accompanied by sufficient "circumstantial guarantees of trustworthiness," and whether admitting them "best serves the purposes of these rules and the interests of justice." Fed. R. Evid. 807(a)(1) and (4). Prevezon disputes that any of the Attested Records and Seized Records are trustworthy, claiming that the Government's attempt at corroborating these records improperly relies on other untrustworthy, unauthenticated foreign records, and that the provenance of these records—the Criminal Case File—militates against imbuing its contents with trustworthiness. (Prevezon Ltr. at 1–2.)

    The "determination of whether a document is sufficiently trustworthy to be admitted under Rule 807 is a highly fact-specific inquiry." <u>United States v. Turner</u>, 718 F.3d 226, 233 (3d Cir. 2013). When "deciding whether evidence is sufficiently trustworthy to be

9

admitted under the residual hearsay rule," the Second Circuit has instructed district courts to "view the evidence in context." Schering Corp. v. Pfizer Inc., 189 F.3d 218, 236 (2d Cir. 1999) (instructing district court on remand to more closely examine whether the evidence in question was sufficiently corroborated by all of its surrounding circumstances).

As an initial matter, the bank records appear to be what the Government says they are—records of account activity created and maintained by financial institutions, and includes each banks' identification of requested accounts on official letterhead. (Mot. at 16, 20.) While these facts standing alone are not dispositive, they nevertheless bear favorably on trustworthiness. Bank records "provide circumstantial guarantees of trustworthiness because" they are relied on by "banks and their customers [for] their accuracy in the course of [] business." United States v. Pellulo, 964 F.2d 193, 202 (3d Cir. 1992); see Chevron Corp. v. Donziger, 974 F. Supp. 2d 362, 692 (S.D.N.Y. 2014) (observing that the bank statements at issue "appear in the exact manner that one would expect").

The circumstances by which the bank records were incorporated into the Criminal Case File also add to the indicia of trustworthiness. As discussed, many of the bank records were produced by banks in connection with a criminal investigation of the Russian Treasury Fraud and bear the responding banks' seals. (Mot. at 15–16). The remaining bank records were secured by investigators "physically travelling to the bank and seizing the records in the presence of witnesses" or obtained as part of a separate investigation into another bank, which ultimately resulted in that bank's shutdown. (Mot. at 18.) Indeed, "that the [Russian authorities] seized the documents from [the banks themselves] . . . weighs in favor of the reliability of the documents— not against [them]." Turner, 718 F.3d at 234.

While the Government has questioned the legitimacy of the conclusions reached by Russian prosecutors, those actions do not conclusively invalidate the trustworthiness of the records underlying the investigations. Put another way, doubts cast on the <u>result</u> of an investigation or prosecution do not necessarily undermine the trustworthiness, reliability, or accuracy of the actual documents on which those proceedings were premised. Here, many of the records were analyzed separately by two experts on the Russian investigation teams for the purpose of "answering certain questions regarding the flow of funds from the Russian Treasury Fraud." (Mot. at 19 (also citing a separate forensic audit of another bank server which "corroborate[d] the Government's tracing analysis").) And that such reports are "consistent with, and largely corroborate[], the Government's [own] tracing analysis," (Mot. at 19) gives credence to the authenticity of the facts borne out by the bank records despite the Russian Federation's conclusion that no wrongdoing ever occurred. <u>See</u> <u>Turner</u>, at 718 F.3d at 235 (court properly admitted records based on "(1) the appearance of the records, including their internal consistency; (2) the contents of the records; and (3) the circumstances surrounding the discovery of the records.").

Moreover, most of the bank records in the Criminal Case File can be corroborated: (1) by reference to one another and (2) by reference to records obtained from other foreign sources that have nothing to do with the Russian criminal investigation. The Criminal Case File, as the Government notes, contains "bank records gathered by two independent criminal investigations from <u>eight</u> different sources . . . which all show over a hundred interlocking transactions." (Gov't Ltr. dated May 6, 2017 ("Gov't. Ltr."), ECF No. 701, at 1 (emphasis original).) And while they do not cover the entirety of the records at issue, there are, "for those records that involved the sending of funds abroad, a number of transactions [that] were

11

corroborated by sources in different countries. Bank accounts located in Latvia, and Moldova contained entries for transactions in the flow of funds," (Mot. at 21) further adding to the aura of trustworthiness that courts look for in assessing records under the residual hearsay exception. Additionally, "of the 152 separate transactions in the flow of funds inside Russia, 116 (approximately 76 percent) appear on two or more sources, and only 36 appear on one source only (because the counterparty records were not available)."[4] (Mot. at 21 (emphasis added).) And because "some records are available for correspondent accounts processing the transactions, 58 of the transactions appear on three or more separate sources." (Mot. at 21 n.16 (emphasis added).)

Further, the trustworthiness of many records—or at least the likelihood that they are trustworthy—is underscored by the intricate form through which they were received by Russian authorities. They were bound together "with twine and—as the Court and jury can examine—sealed." (Gov't Ltr. at 2.) Of course, analyzing inadmissible records for purposes of the residual hearsay exception will always raise the possibility that the records are forged or inauthentic. But that risk is diminished here, where an artificial construction of these records would have required "preternatural abilities to coordinate and reconcile hundreds of transactions in multiple data-rich records kept in different formats with a zero error rate, to say nothing of the

---

[4] Prevezon disputes, however, the propriety of using some of this corroborating evidence as a basis for finding that the bank records meet the trustworthiness requirement under Rule 807. (Prevezon Ltr. at 1–2). Specifically, Prevezon takes issue with the Government's attempt to compare the bank records with one another for proof of their reliability. (Prevezon Ltr. at 2 ("Even if it were theoretically possible to establish trustworthiness by comparing unauthenticated documents, this is not the case for it.").). This "bootstrapping," however, is not improper when deciding preliminary evidentiary questions of admissibility. Fed. R. Evid. 104(a) (providing that "the court is not bound by evidence rules" in deciding "any preliminary question about whether . . . evidence is admissible"); see also Schering Corp., 189 F.3d at 236 (ordering district court on remand to consider, among other things, the fact that the evidence at issue "tended to corroborate one another"). In any event, as the Government notes, the bank records reflecting transactions with off-shore companies can be corroborated with records obtained from foreign sources which, in turn, can corroborate transactions effected by Russian entities sending funds, and so on, "creating an unbroken chain of corroboration ultimately including each of the bank records at issue here." (Gov't Ltr. at 1.)

global reach needed to control what the law enforcement bodies of other countries collect and provide to the United States." (Gov't Ltr. at 2 (emphasis original).)

Thus, this case stands apart from Lakah v. UBS AG, 996 F. Supp. 2d 250 (S.D.N.Y. 2014), which presents similar facts regarding the nature of the records and the immediate source from which they were obtained. Aside from demonstrating that they were foreign bank records possessed by a government agency, the movant in Lakah failed to offer evidence corroborating their reliability and trustworthiness. The indicia of trustworthiness were underwhelming—"official appearance of bank records," produced under "legal compulsion" to "public agency investigators," and derived from "the files of law-enforcement authorities." (See Lakah v. UBS AG, No. 07-cv-2799, Respondents-Cross-Petitioners' Reply Memo. of Law in Support of Their Cross-Motion to Summarily Compel Arbitration Pursuant to FAA § 4 and In Opposition to Petitioners' Motion to Stay Arbitration ("Lakah Br."), ECF No. 221, at 128–37.) In fact, the Lakah movant acknowledged that he "could not independently obtain other evidence of these particular facts from[] the Egyptian banks" or any other third party sources. (Lakah Br. at 133.) Here, the Government offers what the Lakah movant cited as markers of trustworthiness, and more—corroborating evidence which substantially diminishes the likelihood that the Attested Records and Seized Records were forged.

And in Doyle, the Second Circuit did not consider whether the records in that case would have qualified for the residual exception under Rule 807. But even if this Court were to assume that Doyle's reasoning extends to Rule 807, the circumstances surrounding the bank records in this case are distinguishable from the records there. In Doyle, the Second Circuit was concerned with the fact that the customs records, aside from the mere ipse dixit of a Maltese official that such records were collected by the Maltese government, lacked foundation. 130

13

F.3d at 547. But the Doyle court added that "[w]ere there any other evidence that [the customs records] . . . were verified or otherwise reliable," the basis for admission would be stronger. Doyle, 130 F.3d at 547. As discussed, this case has qualified witness testimony and a combination of evidence, including the fact that the records can in part be corroborated by bank records received from other countries, that only serve to enhance the trustworthiness of the Attested Records and Seized Records. See also United States v. Nivica, 887 F.2d 1110 (1st Cir. 1989); Karme v. C.I.R., 673 F.2d 1062 (9th Cir. 1982).

Finally, admitting the bank records would further serve the purposes of the rules of evidence and the interests of justice. One of the principal purposes of the Federal Rules of Evidence is to "ascertain[] the truth and secur[e] a just determination." Fed. R. Evid. 102. This Court is mindful of the policy concerns implicated by reading the residual exception under Rule 807 too broadly. See Parsons, 929 F.2d at 907 (2d Cir. 1991) ("Congress intended that the residual hearsay exceptions will be used very rarely, and only in exceptional circumstances.") (internal quotations and citation omitted). Indeed, an overly broad interpretation of Rule 807 could swallow whole the general rule against hearsay. Or, it could obviate entirely the need for the exceptions expressly enumerated under Rules 803 and 804.

But this case, from the outset, arose from highly unusual and atypical circumstances. It is within this unique context—the Government's limited opportunity and ability to receive certifications, a dearth of qualified and/or willing custodians to authenticate the records, and the absence of well-accepted forms of assurances regarding the authenticity and reliability of the evidence—that this Court analyzes and assesses the necessity and trustworthiness of the evidence. At issue in this action are bank and financial records of foreign

14

entities that are alleged to have participated in a massive fraud spawning numerous criminal investigations into the laundering of proceeds.

Against that backdrop, the purposes of the rules of evidence and the interests of justice are served where, as here, the Russian Federation—the country from which the bank records originated—refused to produce them; a portion of these records have separately been obtained from other countries; many of the records can be corroborated from multiple sources; and these records are highly probative, if not indispensable, to proving the alleged activities that purportedly threatened the integrity of the American financial system.

## CONCLUSION

For the foregoing reasons, this Court grants the Government's Motion <u>in Limine</u> No. 1 and denies Prevezon's Motion <u>in Limine</u> No. 7. The Clerk of Court is directed to terminate the motion pending at ECF No. 591.

Dated: May 9, 2017
      New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.