UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------- x
                                            :
                                            :
UNITED STATES OF AMERICA,                   :
                                            :
                    Plaintiff,              :          No. 13-cv-6326 (WHP)
                                            :
          v.                                :          <u>OPINION & ORDER</u>
                                            :
PREVEZON HOLDINGS, LTD., *et al.*,          :
                                            :
                    Defendants.             :
                                            :
                                            :
------------------------------------------- x

WILLIAM H. PAULEY III, United States District Judge:

   Prevezon Holdings Ltd. and affiliated entities ("Prevezon") move for summary

judgment.[1]  For the following reasons, Prevezon's motion is denied.

BACKGROUND

   This civil forfeiture action arises from the laundering of proceeds derived from a

$230 million fraud in Russia, a portion of which was used to purchase real estate in Manhattan.

Beginning in 2007, a Russian criminal organization (the "Organization") orchestrated an

elaborate hoax designed to defraud the Russian Treasury into issuing tax refunds totaling $230

million (the "Russian Treasury Fraud").  The opening act of the Russian Treasury Fraud

involved a raid on the Moscow offices of Hermitage Capital Management ("Hermitage") and its

law firm, Firestone Duncan.  The purpose of that illegal raid was to obtain corporate documents

and seals belonging to Hermitage's portfolio companies—OOO Rilend, OOO Parfenion, and

OOO Makhaon (the "Portfolio Companies").  In the aftermath of the raid, the Russian

---

[1] This Opinion and Order also addresses the arguments set forth in the Government's Motion In Limine
No. 2 (ECF No. 596), which raises substantially similar issues.

Federation's Interior Ministry rebuffed Hermitage and its trustee HSBC Guernsey's attempt to recover the corporate documents.

In the meantime, the Organization used the corporate documents to transfer ownership of the Portfolio Companies from HSBC Guernsey's shareholding vehicles—held in trust for Hermitage—to a Russian company owned by a member of the Organization. The Organization then orchestrated a series of sham lawsuits against the Portfolio Companies, claiming that those companies had breached contracts that were forged and backdated. Those litigations resulted in default judgments against the Portfolio Companies totaling $973 million.

Then, the Organization used those default judgments to apply for tax refunds claiming that such judgments were equal to the profits the Portfolio Companies had realized in the tax year. Members of the Organization who worked at the Russian Federation tax offices approved the Organization's applications and granted refunds totaling $230 million. In its closing act, the Organization laundered the proceeds through a Byzantine web of conduit accounts. Eventually, approximately $1.9 million made its way into Prevezon's account, and was used to purchase apartments in Manhattan.

This action has a rather convoluted history that includes a year-long trip to the Second Circuit, re-assignment to another district judge, and the disqualification of Prevezon's prior counsel on the eve of trial. With the trial date looming, Prevezon re-asserts its earlier claims that the Government lacks any evidence giving rise to a genuine issue of material fact.

DISCUSSION

I.   Standard

Summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is

no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material "if it might affect the outcome of the suit under the governing law." Holtz v. Rockefeller & Co., 258 F.3d 62, 69 (2d Cir. 2001). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party bears "the initial burden of establishing the absence of any genuine issue of material fact, after which the burden shifts to the nonmoving party to establish the existence of a factual question that must be resolved at trial." United States v. U.S. Currency in Amount of Two Hundred Forty Eight Thousand Four Hundred Thirty Dollars, 2004 WL 958010, at *2 (E.D.N.Y. Apr. 14, 2004). The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), and "may not rely on conclusory allegations or unsubstantiated speculation." Scotto v. Alemenas, 143 F.3d 105, 114 (2d Cir. 1998). If there is any evidence in the record "from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994).

II.    Specified Unlawful Activities

To prove its money laundering claim, the Government must demonstrate "(1) that the defendant conducted a financial transaction; (2) that the transaction in fact involved the proceeds of specified unlawful activity as defined in § 1956(c)(7); and (3) that the defendant knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity." Tymoshenko v. Firtash, 57 F. Supp. 3d 311, 322 (S.D.N.Y. 2014)

(alterations omitted).  The Government offers evidence of four specified unlawful activities ("SUAs"): (1) fraud against a foreign bank; (2) transportation of stolen property; (3) bribery of a public official; and (4) successive money laundering transactions.[2]

      A.  <u>Fraud Against a Foreign Bank</u>[3]

Prevezon principally contends that the fraud alleged by the Government is not a fraud against HSBC, but rather a fraud against the Russian Treasury.  (Mot. at 7.)  "The well established elements of the crime of bank fraud are that the defendant (1) engaged in a course of conduct designed to deceive a federally chartered or insured financial institution into releasing property; and (2) possessed an intent to victimize the institution by exposing it to actual or potential loss."  <u>United States v. Barrett</u>, 178 F.3d 643, 647–48 (2d Cir. 1999).  A scheme to defraud, while "not capable of precise definition" is commonly known as "wronging one in his property rights by dishonest methods or schemes, and usually signif[ies] the deprivation of something of value by trick, deceit, chicanery or overreaching."  <u>United States v. Stavroulakis</u>, 952 F.2d 686, 694 (2d Cir. 1992).

According to Prevezon, if HSBC was the victim of any crime arising from the raid, it was not fraud, but theft of its Portfolio Companies.  Prevezon maintains that there is no evidence to prove any of the elements of bank fraud—no deceptive conduct was directed at

---

[2]      The Government acknowledges that without independently proving some other SUA, the original money laundering offense giving rise to subsequent money laundering transactions would not exist.  (<u>See</u> Prevezon Memo. of Law in Support of Summary Judgment ("Mot."), at ECF No. 575, at 6, n.6.)

[3]      Prevezon claims that HSBC is not a "foreign bank" under the SUA because "the HSBC Entities, in their roles as trustee, manager and investor, were not engaged in the core functions of a banking system."  (Mot. at 11 n.8 (internal quotation marks and citations omitted).)  But under the relevant provision's definition, HSBC qualifies as a "foreign bank (as defined in paragraph 7 of section 1(b) of the International Banking Act of 1978)," including "any subsidiary or affiliate" of any foreign company "which engages in the business of banking."  18 U.S.C. § 1956(c)(7)(B)(iii) (citing 12 U.S.C. § 3107(7)).  The HSBC entities at issue here—HSBC Private Bank (Guernsey) Limited (as trustee); HSBC Management (Guernsey) Ltd. (as manager); and HSBC Private Bank (Suisse) S.A. (as investor)—are subsidiaries or affiliates controlled by the HSBC Group, which is engaged in the business of banking.

HSBC; HSBC was not induced to rely on any misrepresentations; and none of the perpetrators knew that HSBC would be harmed as a result of their actions.

The scheme "to obtain funds from a bank depositor's account normally is also a scheme fraudulently to obtain property from a financial institution, at least where . . . the defendant knew that the bank held the [property], the [property] came from the [customer's account], and the defendant misled the bank in order to obtain" such property. United States v. Shaw, 137 S. Ct. 462, 466 (2016). The bank itself need not be harmed as a result of the fraudulent scheme. Shaw, 137 S. Ct. at 467. Nor is the Government required to prove that the defendant engaged in the fraud with actual knowledge that the bank has an interest in the fraudulently obtained property, Shaw, 137 S. Ct. at 467 ("[t]o require more, i.e., to require actual knowledge of those bank-related property-law niceties, would free (or convict) equally culpable defendants"), or that the purpose of the fraud was to harm the bank. Shaw, 137 S. Ct. at 464–65 ("no relevant authority supporting the view that the bank fraud statute criminalizing the 'knowing execution of a scheme to defraud' requires something more than knowledge") (alterations omitted).

Here, understanding HSBC's distinct role as trustee (among others) of Hermitage and its companies is critical to determining whether it was the victim of bank fraud. HSBC Guernsey served as the trustee to Hermitage. (Statement of Undisputed Material Facts ("SUF"), ECF No. 574, at ¶¶ 3–4, 6).) As trustee, HSBC Guernsey owned the Portfolio Companies through two shareholding vehicles, whose ownership interests were fraudulently re-registered to members of the Organization following the raid. (Counter Statement of Undisputed Material Facts ("Counter SUF"), ECF No. 613, at ¶ 7.) Therefore, while Hermitage certainly had an interest in protecting the Portfolio Companies from the Organization, HSBC Guernsey, in its

fiduciary capacity as trustee to Hermitage, and as the legal owner of the Portfolio Companies, had a vested interest in combating the Organization's fraudulent scheme.

The Government claims that misrepresentations were directed at HSBC in two ways. First, members of the Organization falsely represented to Hermitage and Firestone Duncan that the Russian Federation authorized them to raid Hermitage's offices and seize evidence pertaining to an entity unrelated to the Portfolio Companies. That misrepresentation, according to the Government, formed the basis under which Hermitage and Firestone Duncan consented to the raid. And such misrepresentations were also directed at HSBC by virtue of its agency relationship with Hermitage and Firestone Duncan. (Gov't Memo. of Law in Opposition to Summary Judgment ("Opp."), ECF No. 612, at 4.) Second, following the raid, the Government contends that the Organization deceived HSBC by misrepresenting its ownership interest in the Portfolio Companies, obstructing HSBC's efforts to object to the sham lawsuits, and assuring HSBC that the Portfolio Companies' corporate documents had not been provided to other parties. (Opp. at 5–6.)

Had the Organization's fraud ended with the illegal raid, the Government's contention that HSBC was the victim of a fraud—based solely on HSBC's agency relationship with Hermitage and Firestone Duncan—would be substantially weakened. But the raid was merely the opening act of the fraud. The concatenation of events following the raid precipitated the fraudulent $230 million tax refund. "[A]cts of perpetration" and subsequent "acts of concealment" in wide ranging, complex frauds are often "one and the same." Sec. Exchange Comm'n v. Wyly, 950 F. Supp. 2d 547, 556 (S.D.N.Y. 2013); see also In re Rosenfeld, 543 B.R. 60, 72 (Bankr. S.D.N.Y. 2015) ("concept of false pretenses has been broadly construed by the courts. It typically is found to be the product of multiple events, acts, or representations

undertaken pursuant to a scheme of trickery, deceit, chicanery, or overreaching."). Sham lawsuits, and deflecting Hermitage and HSBC's efforts to stop them, were critical features of the Russian Treasury Fraud. Here, the post-raid deceptive conduct is more direct—the Organization falsely assured HSBC that the Portfolio Companies' documents had not been manipulated or shared with other parties when, in fact, they were used to hijack HSBC's ownership interest. (Counter SUF ¶ 17–18 (citing Declaration of Cristine I. Phillips ("Phillips Decl."), ECF No. 614, Exs. 3, 5; Declaration of Todd Hyman ("Hyman Decl."), ECF No. 615, Exs. 2, 7–8).) These misrepresentations or omissions of fact were directed at HSBC and its representatives as part of a continuing, fraudulent scheme culminating in the diaspora of the $230 million refund in the alleged money laundering network.

Those facts, taken together, suffice to establish that the "scheme [was one] to deceive the bank and deprive it of something of value." Shaw, 137 S. Ct. at 469. While the scheme may have deceived and injured other parties—including, e.g., Hermitage, the Portfolio Companies, the Russian Treasury—HSBC also was deceived. Municipality of Bremanger v. Citigroup Global Mkts. Inc., 2013 WL 1294615, at *19 (S.D.N.Y. Mar. 28, 2013), aff'd sub nom. Mun. Corp. of Bremanger v. Citigroup Global Mkts. Inc., 555 Fed. Appx. 85 (2d Cir. 2014) ("principal may recover for misrepresentations relied on by an agent" so long as reliance is reasonable); Fed. Dep. Ins. Corp. v. Hodge, 50 F. Supp. 3d 327, 337–38 (E.D.N.Y. 2014) ("Atlas, in the normal course of business, did make representations to the agents of banks, if not the banks themselves."); Jay Dees Inc v. Defense Tech. Sys., Inc., 2008 WL 4501652, at *5 (S.D.N.Y. Sept. 30, 2008) ("There is no reason why a misrepresentation to the plaintiff's agent does not suffice."). While Prevezon characterizes the raid as a theft, the Government offers evidence that HSBC and Firestone Duncan only consented to the raid because members of the

Organization misrepresented its purpose. (Counter SUF ¶¶ 17–18.) If true, such misrepresentations could convert an ordinary theft into a fraud.

Prevezon's other arguments fare no better. The Government offers evidence that the Organization attempted to induce HSBC and its agents into relying on misrepresentations about the raid. (Phillips Decl. Exs. 3 at 65:3–69:11, Ex. 4, Ex. 5 at 89:7–90:13.) Other evidence also indicates that the Organization sought to induce reliance on post-raid misrepresentations regarding the use of the Portfolio Companies' documents. (Hyman Decl. Exs. 7–8.) All that Shaw requires for purposes of establishing bank fraud is that the Organization "correctly believe[d] that [its] false statements would lead [HSBC] to release from [its possession property] that ultimately and wrongfully ended up in" the Organization's pockets. Shaw, 137 S. Ct. at 467. Here, HSBC's agents may have been induced—under false pretenses—to allow the Organization to take the Portfolio Companies' documents. Subsequently, HSBC itself may have been induced into acquiescing to the Organization's retention of the documents, or at the very least, lulled into believing that no further action was necessary. But whether HSBC or its agents were actually induced is immaterial—indeed, all that was required is that the Organization made a false representation, "[knew] it to be false, but intending that the other should believe and act upon it." Shaw, 137 S. Ct. at 467 (quoting Oliver Wendell Holmes, THE COMMON LAW 132 (1881)).

Finally, while Prevezon claims that the perpetrators did not "kn[o]w or ha[ve] any reason to know that the HSBC Entities would be harmed," the post-raid events raise a question of material fact regarding their knowledge. While members of the Organization may not have been aware of HSBC's involvement at the time of the raid, they likely were alerted to HSBC's ownership interest when HSBC sought to intervene in the sham proceedings. That the Organization made a series of misrepresentations to hinder HSBC's ability to reclaim ownership,

8

or to deceive HSBC into believing that its interests were not in jeopardy, presents an issue of material fact central to whether the Organization knew that HSBC would be harmed. (Counter SUF ¶ 17 (citing Phillips Decl. Exs. 3–5; Hyman Decl. Exs. 2, 7–8).) This is a quintessential jury question.

B. Transportation of Stolen Property

The Government alleges that 18 U.S.C. § 2314—a statute criminalizing the transportation of property stolen or taken by fraud—constitutes an SUA in support of its money laundering claim. Four transfers of funds allegedly processed, in part, by U.S. bank accounts comprise the core of this SUA (the "Four Transfers").

Prevezon disputes the domestic nature of the Four Transfers, highlighting the fact that they occurred exclusively among foreign companies using foreign bank accounts. (Mot. at 12.) Although the transfers were processed, in part, by correspondent bank accounts in the United States, Prevezon argues that the incidental use of such accounts does not create the domestic nexus necessary to qualify as transfers under § 2314. (Mot. at 13.) The Government counters that the Four Transfers moved through the United States (Hyman Decl. Exs. 15–18) between their origination and destination accounts, and therefore are domestic conduct sufficient to invoke § 2314's application.

Although the text of § 2314 references transportation of property in interstate or "foreign commerce," that language alone is insufficient to rebut the presumption against extraterritoriality. See Morrison v. Nat'l Austl. Bank Ltd., 561 U.S. 247, 248 (2010). If a statute does not, by its terms, apply to extraterritorial conduct, a court must determine which "territorial events or relationships [are] the focus" of the statute. Mastafa v. Chevron Corp., 770 F.3d 170, 183 (2d Cir. 2014). Section 2314's "focus . . . is the transportation or transfer of property."

United States v. All Assets Held at Bank Julius, 2017 WL 1508608, at *12 (D.D.C. Apr. 27, 2017).  In "enacting 18 U.S.C. § 2314, Congress was primarily concerned with the movement of stolen property across state lines."  Bank Julius, 2017 WL 1508608, at *12 (citing Dowling v. United States, 473 U.S. 207, 218–20 (1985)).

To "displace[] the presumption" against extraterritoriality, the relevant conduct must have "sufficiently touch[ed] and concern[ed] the territory of the United States."  Licci by Licci v. Lebanese Canadian Bank, SAL, 834 F.3d 201, 215 (2d Cir. 2016) (internal citations and quotation marks omitted).  Whether a "complaint passes jurisdictional muster [] depends upon alleged conduct by anyone—U.S. citizen or not—that took place in the United States," and that conduct must be assessed under the lens of the charging statute.  Mastafa, 770 F.3d at 189 ("full 'focus' of the [Alien Tort Statute] was on conduct."); RJR Nabisco, Inc. v. European Cmty., 136 S. Ct. 2090, 2101 (2016) ("If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad.").

The use of correspondent banks in foreign transactions between foreign parties constitutes domestic conduct within § 2314's reach, especially where bank accounts are the principal means through which the relevant conduct arises.  Other courts have construed the use of correspondent banks in the United States as "touch[ing] and concern[ing] the United States so as to displace the presumption" against extraterritoriality.  Mastafa, 770 F.3d at 186.  In Licci, for example, the Second Circuit held a "correspondent banking account in New York [used] to facilitate dozens of international wire transfers," which "totaled several million dollars" and "substantially increased and facilitated [a terrorist organization's] ability to" execute attacks established a "sufficient connection[] with the United States" under the Alien Tort Statute.  834

10

F.3d at 206, 215.  In <u>United States v. Zarrab</u>, 2016 WL 6820737, at *3 (S.D.N.Y. Oct. 17, 2016),

the court held that the use of "an international wire transfer from the U.A.E. to a Canadian

company . . . processed by a United States bank" was sufficiently domestic for purposes of

prosecuting the defendant for a conspiracy to defraud the United States.  And in <u>Mastafa</u>, the

foreign bank's role in conducting "numerous New York-based payments and financing

arrangements [] exclusively through a New York bank account" was sufficiently specific and

domestic to establish jurisdiction.  770 F.3d at 191.

   The relevant conduct in this action is the "provision of wire transfers between

[foreign entities and their foreign accounts] through [their] correspondent bank[s] in New York."

<u>Licci</u>, 834 F.3d at 215.  In other words, while each of the Four Transfers was initiated,

transmitted, and received by a foreign bank, each was processed by New York banks.  For

example, on February 6, 2008, approximately $410,000 was transferred from an account at a

Moldovan bank to Prevezon's account at a Swiss bank (SUF ¶¶ 65, 69, 72, 73, 78, 79), but in

effecting that transfer, two U.S. banks processed the wires—Citibank in New York, New York

and UBS in Stamford, Connecticut—before routing the transfer to Prevezon's Swiss account.

(<u>See</u> Hyman Decl. Exs. 15–18.)

   The Four Transfers touch and concern the United States because the U.S.

correspondent banks were necessary conduits to transport proceeds allegedly derived from the

Russian Treasury Fraud.  The use of such accounts is not trivial because the Four Transfers could

not have been completed without the services of these U.S. correspondent banks.  Indeed,

international wire transfers do not merely "ricochet" off of U.S. correspondent banks.  (<u>See</u> Mot.

at 15.)  Rather, each transfer requires "two separate transactions that cross the U.S. border"—

"once upon entering a U.S. account and once upon exiting a U.S. account."  <u>Bank Julius</u>, 2017

11

WL 1508608, at **13, 18.  And because the focus of § 2314 is on the <u>transportation</u> of stolen proceeds, the use of the correspondent banks—as indispensable conduits—suffices to invoke the statute's application.

Moreover, that no wrongdoer purposefully availed himself of the services of a U.S. bank—or knew that such banks were being used—is irrelevant.  Adopting such an interpretation would frustrate the purpose of § 2314 and render the "use of U.S. financial institutions as clearinghouses for criminals."  <u>Bank Julius</u>, 2017 WL 1508608; <u>cf. Weiss v. Nat'l Westminster Bank PLC</u>, 176 F. Supp. 3d 264, 279 (E.D.N.Y. 2016) ("A foreign bank's repeated use of a correspondent account in New York on behalf of a client . . . shows purposeful availment of New York's dependable and transparent banking system.") (internal citations and quotation marks omitted).  In fact, aside from physically carrying currency across the U.S. border, it is hard to imagine what types of domestic conduct other than use of correspondent banks could be alleged to displace the presumption against extraterritoriality in a statute addressing the transportation of stolen property.  Accordingly, Prevezon's motion for summary judgment on this SUA is denied.

C.  <u>Bribery of a Foreign Official</u>

The Government's third SUA—the "bribery of a public official, or the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official" (18 U.S.C. § 1956(c)(7)(B)(iv))—is tied largely to significant kickback payments to Vladden Stepanova, the ex-husband of the Russian tax official, Olga Stepanova, who allegedly approved the $230 million refund.  Prevezon maintains that the funds in the accounts of Mr. Stepanova's two companies—Arivust Holdings and Aikate Properties—cannot be traced to Russian Treasury Fraud because the Government's expert "admitted that the supposedly tainted

funds" had "actually been previously disbursed to other entities" before the kickback payments were made. (Mot. at 16.) Put another way, because none of the tainted funds can be attributed to either Arivust or Aikate's accounts, Prevezon contends that the Government cannot prove misappropriation of public funds for the benefit of a public official. Further, Prevezon claims that Ms. Stepanova could not have benefited from the payment because she has been divorced from Mr. Stepanova for more than twenty years.

At bottom, a genuine dispute of material fact exists regarding the origins of the supposed kickback payments and the nature of the Stepanovas' relationship. In view of this Court's decision to admit bank records (see ECF No. 703), the jury may reasonably infer that tainted funds were wired for Mr. Stepanova's benefit. The jury may consider the Government's tracing analysis, which reveals, for example, that the intermediary account's balance prior to the Arivust transfer only dipped below zero because its funds were transferred to a linked short-term fiduciary investment account. (Counter SUF ¶¶ 82–84.) With such evidence, the jury may reasonably conclude that the intermediary account did not disburse the tainted funds before making a transfer to Arivust and Mr. Stepanova.

Moreover, the Stepanovas' relationship, even after the apparent dissolution of their marriage, raises a genuine issue of material fact. Whether the Stepanovas remain sufficiently close to benefit each other is a jury question. (See Counter SUF ¶ 85.)

D. Money laundering predicate

The Government alleges each successive phase of the purported money laundering scheme qualifies as an SUA. The money laundering predicate cannot exist as an independent SUA, but may only be added if another SUA is proven. Because this Court denies summary judgment on the SUAs involving fraud against a foreign bank, transportation of stolen

property, and bribery of a foreign official, the successive money laundering acts may be considered as an additional SUA. To the extent Prevezon argues that the successive money laundering acts are not an SUA because earlier transfers of illegal proceeds "occurred outside the United States," (Mot. at 6 n.3) this Court holds that the use of U.S. correspondent banks to launder illegal proceeds qualifies as domestic conduct.

"Congress enacted the money laundering statute to criminalize the use of United States financial institutions as clearinghouses for criminal money laundering and conversion into United States currency." <u>Bank Julius</u>, 2017 WL 1508608, at *9. Transferring "millions of dollars to and from accounts in the United States and between foreign bank accounts as [electronic fund transfers] that pass[] through U.S. financial institutions" is precisely the type of conduct that "Congress intended to prevent in enacting the money laundering statutes" and is "conduct that fits well within the statute's requirement of conduct that occurs in part in the United States." <u>Bank Julius</u>, 2017 WL 1508608, at *9.

III. <u>Tracing Analysis</u>

A. <u>Tracing Assumptions</u>

Prevezon further contends that it is entitled to summary judgment because there is no evidence that the "accounts between the Russian Treasury and Prevezon in the Government's tracing map, or any of the unknown persons who controlled those accounts, were connected to the Russian Treasury Fraud or intended to launder its proceeds." (Mot. at 20–21; Reply at 9; Tr. at 30:24–31:2 ("you can't identify money laundering simply because it looks like money laundering without any evidence that somebody intended to launder money.").) And because the Government's tracing report rests on a flawed analysis identifying the intervening transactions based on nothing more than its expert's belief that they bore "indicia of money laundering,"

Prevezon contends that the Government is foreclosed from applying the money laundering

principles it needs to trace each transfer to Prevezon  (Mot. at 22; Reply at 9 n.9.)

Under 18 U.S.C. § 1956, the Government is required to prove that transporting

proceeds derived from the Russian Treasury Fraud was "designed, at least in part, to conceal or

disguise their true nature, location, source, ownership, or control."  Cuellar v. United States, 553

U.S. 550, 562 (2008) (internal quotation marks omitted).  While the "secretive aspects of the

transportation [are] employed to facilitate the transportation," that "secrecy [must be] the

purpose of the transportation."  Cuellar, 553 U.S. at 567.  In other words, "how one moves the

money is distinct from why one moves the money.  Evidence of the former, standing alone, is not

sufficient to prove the latter."  Cuellar, 553 U.S. at 566.

The purpose and intent elements may be established by circumstantial proof.

United States v. Huezo, 546 F.3d 174, 181 (2d Cir. 2008) ("circumstantial evidence [] presented

was sufficient for a rational juror to infer that [defendant] had the requisite criminal knowledge

and intent to support his convictions for money laundering and conspiracy to commit money

laundering."); Cuellar, 553 U.S. 567 n.8 ("In many cases, a criminal defendant's knowledge or

purpose is not established by direct evidence but instead is shown circumstantially based on

inferences drawn from evidence of effect.").

The Government offers circumstantial evidence that the money laundering

scheme was designed to conceal the illegal nature and source of the $1.9 million at issue.  First,

the suspicious timing of transactions—that "transactions in [bank] account[s] occurred in

temporal proximity to the charged money laundering conspiracy"—is one form of circumstantial

evidence that can prove intent.  United States v. Diaz, 2008 WL 4387209, at *1 (S.D.N.Y. Sept.

26, 2008).  Here, some of the accounts of the conduit entities were opened a few months before

the transfers at issue, at the same bank on the same day.  (Hyman Decl. Exs. 38–39).)

Second, both Megacom Transit and Castlefront—two intermediary accounts—had

"strikingly similar pattern[s] of activity in their bank accounts."  (Opp. at 22.)  The majority of

their incoming transfers came from three senders, one of whom routed money from an account at

a bank designated by the U.S. Treasury as money laundering concern.  (Hyman Decl. 40–43.);

see also Diaz, 2008 WL 4387209, at *1 ("money was deposited in the [] account from a variety

of sources").  Further, the funds that Megacom Transit and Castlefront received from these three

senders were substantially identical in date and amount (see Hyman Decl. Exs. 42–43) raising an

inference that they were parceled into smaller transactions and allocated between Megacom

Transit and Castelfront.  Dividing proceeds to avoid detection is a hallmark of money laundering.

See Huezo, 546 F.3d at 181 ("the techniques and individual steps involved in his money

laundering schemes" involved "arrangements he made . . . to launder $1 million that would be

delivered to New York City in two installments of $500,000" and "money being delivered was

packaged in bundled stacks" which was "typical for money laundering transactions"); United

States v. Peña, 2011 WL 902468, at *6 (5th Cir. 2011) ("testimony at trial established that the

proceeds [defendant] deposited were of the same type and amounts as deposited by his co-

conspirator," thus sufficient "to infer [defendant's] knowledge that the transactions involved

proceeds of illegal activity.").

The three senders also wired money to three other companies with accounts at the

same bank during roughly the same time period.  (Phillips Decl. Ex. 14.)  Thus, a total of five

accounts reflecting similar patterns of activity were repeatedly accessed from the same IP

address.  On "42 days in February and March 2008," all "five [accounts] . . . were accessed by

the same IP address on the same day." (Opp. at 23 (citing Hyman Decl. Exs. 44–48).) This circumstantial evidence gives rise to an issue of material fact—whether the web of intermediary accounts were used to conceal funds tainted by the Russian Treasury Fraud.

Third, use of coded language bears on the purpose for which money is concealed. United States v. Gotti, 459 F.3d 296, 337 (2d Cir. 2006) ("the government adduced evidence that the process by which the cash tributes were transmitted as highly complex and surreptitious. For example, the defendants would communicate about the transactions in coded language."). Here, certain fund transfers were designated as payments to the intermediary companies for what appear to be business-related expenses. For example, Castlefront received a significant payment for "electronics equipment" (Hyman Decl. Ex. 42.) even though by all appearances, Castlefront is a shell entity registered to a residential apartment block in London with no apparent business purpose. (Hyman Decl. Ex. 49.) And Megacom Transit, a purported consumer goods company, received a sizeable transfer from another company as payment for "securities." (Hyman Decl. Ex. 43.)

Moreover, if Castlefront and Megacom Transit served as corporate shells for money laundering, that evidence is probative of a design to conceal because it may lead a jury to conclude that the Organization "funneled profits [from the Russian Treasury Fraud] to" those entities and "other fictitious business accounts and then eventually to" Prevezon's account. United States v. Thayer, 204 F.3d 1352, 1354 (11th Cir. 2000). Use of such companies and accounts may be considered as "affirmative acts related to the commercial transaction—acts designed to quell the suspicions of third parties regarding the nature, location, source, ownership or control of the proceeds" of the Organization's illegal conduct. United States v. Kinzler, 55 F.3d 70, 73 (2d Cir. 1995) (citing United States v. Lovett, 964 F.2d 1029, 1034 n.3 (10th Cir.

1992)).  A "reasonable juror could conclude that those transactions involved unlawful proceeds and that those transfers by the fronts were designed to conceal the money's illicit origins." United States v. Baxter, 761 F.3d 17, 32 (D.C. Cir. 2014) (intent to conceal where checks submitted to front company were then routed into personal account).

Thus, while some evidence, by itself, falls short of establishing an intent to conceal, the "existence of more than one transaction, coupled with either direct evidence of intent to conceal or sufficiently complex transactions that such an intent could be inferred; funneling illegal funds through various fictitious business accounts and highly unusual transactions involving cashier's checks, third party deposits, and trust accounts used to disguise the source of funds" can establish that the financial transactions at issue were part of the money laundering scheme.  United States v. Bikundi, 2016 WL 912169, at *42 (D.D.C. Mar. 7, 2016) (emphasis added and internal quotation marks omitted); Johnson, 440 F.3d at 1292 (evidence of design to conceal includes "unusual secrecy surrounding the transaction; structuring the transaction in a way to avoid attention . . . highly irregular features of the transaction; using third parties to conceal the real owner; a series of unusual financial moves cumulating in the transaction") (citing United States v. Garcia-Emanuel, 14 F.3d 1469, 1474 (10th Cir. 1994)).

Use of circumstantial evidence, particularly in complex financial cases such as this, is perhaps the only way to prove money laundering.  It is unsurprising that there is no direct evidence demonstrating that any of the conduit companies knew about, or were associated with, the Russian Treasury Fraud, or that any individuals controlling those accounts had a demonstrable connection to the underlying wrongdoing.  Multiple accounts held by multiple entities far removed from the initial fraud appear to have been used to obscure the illegal origin of the proceeds.  Indeed, that is why "one of the factors to which [courts] look in determining

whether a defendant's behavior constitutes 'concealment' is whether he engages in unnecessary transactions to add extra 'degrees of separation' between himself and the source of the funds." United States v. Blankenship, 382 F.3d 1110, 1129 (11th Cir. 2004); see also United States v. Majors, 196 F.3d 1206, 1213 (11th Cir. 1999). In essence, hamstringing a party's use of circumstantial evidence to prove the design to conceal or disguise the nature, location, source, ownership, or control of a multi-layered money laundering scheme would "immunize money launderers sophisticated enough to use shell companies that regularly flush their accounts." (Opp. at 24.)

The Government's expert, upon reviewing thousands of transactions, constructed a tracing chart outlining the various transactions through which a portion of the fraud proceeds were laundered into Prevezon's account. And while many of the transactions were identified as money laundering transactions based on their structure and characteristics—e.g., time at which they were opened, timing and similar patterns of transactions, fictitious business purposes, shell accountholders, etc.—the evidence also indicates that certain accounts were controlled by a single party using the same IP address. The tracing analysis does not purport to identify the individuals behind the transactions. Nor does it tether the transactions directly to the Russian Treasury Fraud. But there is enough evidence, viewed in a light most favorable to the Government, for the jury to make those determinations. Jurors are "entitled, and routinely encouraged, to rely on their common sense and experience in drawing inferences. Based on the complexity and scale of the money laundering scheme, common sense and experience [could] support an inference" that the Organization constructed a sprawling network for shell companies to hide the purpose of the transfers. Huezo, 546 F.3d at 182; Diaz, 2008 WL 4387209, at *1 (the "bank records presented at trial [may] permit[] a reasonable jury to infer that one of [the

Organization's] purposes was to conceal or disguise the nature, location, source, ownership, or control of [the fraud] proceeds.").

    B.  <u>Tracing Principles</u>

        Prevezon further contends that it is entitled to summary judgment because the Government cannot prove that each account in the tracing map disbursed tainted funds from the Russian Treasury Fraud to the next account in the chain. (Mot. at 23.) In other words, Prevezon claims there is evidence that certain intermediary accounts were commingled with "clean" funds; that such accounts disbursed the entirety of the tainted funds to accounts unrelated to the money laundering scheme; that these accounts were then replenished with clean funds; and that remaining funds were subsequently disbursed to the next identified account in the chain. (Mot. at 24 (Government expert "failed to guard against the possibility that tainted funds had been entirely disbursed from a particular entity in the chain before that entity received new untainted funds that it sent to Prevezon.".) For example, Prevezon notes that one intermediary account had a balance of approximately $800 before $900,000 in tainted funds was wired into it and then commingled with $2.1 million in clean funds. (SUF ¶¶ 46–48.) Subsequently, that account's payments to unrelated third parties reduced the balance to approximately $100—an amount less than its starting balance. Prevezon argues that the $900,000 in tainted funds were therefore disbursed to innocent accounts, and that subsequent payments to the next intermediary account contained only clean funds. (SUF ¶¶ 52–63.)

        But the Government has the benefit of utilizing the tracing principles established by <u>United States v. Banco Cafetero Panama</u>, 797 F.2d 1154 (2d Cir. 1986). Those principles were designed to address the "particular problems in the case of tracing money or other fungible property since identifying the particular funds traceable to the criminal violation is nearly

impossible." United States v. Prevezon Holdings Ltd., 122 F. Supp. 3d 57, 68 (S.D.N.Y. 2015).

Banco Cafetero addresses one issue that Prevezon highlights in its brief—the "[first]-in, first-out" rule, whereby proceeds from the Russian Treasury Fraud are traced to "any one withdrawal, or any asset purchased with such withdrawal, to the extent of the amount of the deposited tainted funds." United States v. Walsh, 712 F.3d 119, 124 (2d Cir. 2013) (citing Banco Cafetero, 797 F.2d at 1159)). Indeed, "[w]here the credit in a depositor's account represents the net results of transactions that include a deposit of [tainted] money, there is a plausible argument to be made … that any withdrawal (in excess of the tainted deposit) contains the 'traceable proceeds' of such a deposit." Banco Cafetero, 797 F.2d at 1160.

The facilitation principle strengthens application of the first-in, first-out rule. That principle covers both laundered funds and "any funds that 'facilitated' money laundering even if they were not part of the money-laundering transaction." United States v. Approx. $629,349.85 Seized from Wachovia Bank Acct. Nos. Ending in *6176 and *6189 in the Name of Ecost.com, and All Proceeds Traceable Thereto, 2015 WL 3604044, at *2 (E.D.N.Y. June 5, 2015). Indeed, the "Second Circuit appears to have embraced the 'facilitation' approach, and has affirmed forfeiture of property as involved in money laundering transactions when it has served as a conduit for the proceeds of the illegal transactions." In re 650 Fifth Ave. and Related Properties, 777 F. Supp. 2d 529, 563 (S.D.N.Y. 2011) (internal citations and quotation marks omitted). Therefore, where the Government can demonstrate that a culpable account in the money laundering chain was commingled with tainted and clean money, it "need not 'trace' the funds used in the transaction to the charged unlawful conduct." United States v. Weisberg, 2011 WL 4345100, at *2 (E.D.N.Y. Sept. 15, 2011) ("whether or not the money used in the particular charged transaction itself is considered clean or dirty, where there is a commingled account, and

where the clean money facilitates the existence or concealment of the dirty money, the charged transaction can be said to have involved dirty money.").

Therefore, if the jury concludes that there is enough evidence linking each account to the money laundering scheme—starting with the Russian Treasury and ending with Prevezon—the Government may apply the <u>Banco Cafetero</u> and the facilitation principles to reclaim the tainted funds at issue in this civil forfeiture action.

C. <u>Government's Motion in Limine No. 2</u>

This Opinion and Order addresses most of the issues raised in the Government's Motion <u>in Limine</u> No. 2. The Government's motion, however, seeks additional relief in the form of an order precluding Prevezon and its tracing expert, Anthony Milazzo, from offering "any evidence or argument contravening the law of the Second Circuit on the tracing of crime proceeds and money laundering proceeds." (Gov't Motion <u>in Limine</u> No. 2, ECF No. 598, at 2.) Of course, Mr. Milazzo may not offer legal opinions or conclusions regarding the tracing principles discussed herein. (Prevezon Opposition to Motion <u>in Limine</u> No. 2, ECF No. 639, at 6 ("Defendants' expert is not going offer legal opinions").); <u>see also</u> <u>United States v. Bilzerian</u>, 926 F.2d 1285, 1294 (2d Cir. 1991) ("as a general rule an expert's testimony on issues of law is inadmissible."). Accordingly, Mr. Milazzo must cabin is testimony to the specific transactions at issue and the evidence offered in support of either the Government's or Prevezon's theory, in accord with the applicable tracing principles discussed in this Opinion and Order. To the extent any issues remain, they can be addressed later as the trial unfolds.

## CONCLUSION

For the foregoing reasons, and in this Court's informed discretion, Prevezon's motion for summary judgment is denied, and the Government's Motion in Limine No. 2 is granted. The Clerk of Court is directed to terminate the motions pending at ECF Nos. 573 and 596.

Dated: May 10, 2017
      New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.