**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 13-cv-06326 (WHP) |
| PREVEZON HOLDINGS LTD., et al., | ) |
| Defendants. | ) |

## MEMORANDUM OF LAW IN SUPPORT OF NON-PARTY HERMITAGE CAPITAL MANAGEMENT LTD.'S MOTION FOR ATTORNEYS' FEES

**TABLE OF CONTENTS**

I.      INTRODUCTION ............................................................................................................1

II.     FACTUAL BACKGROUND .......................................................................................3

        A.      The Russian Treasury Fraud ...............................................................................3

        B.      Hermitage Retains Baker & Hostetler ...............................................................4

        C.      Baker & Hostetler "Switches Sides" and Lies About its Prior
                Representation of Hermitage ...............................................................................6

        D.      BakerHostetler Takes Discovery Against and Publicly Disparages
                Hermitage and Browder.......................................................................................9

        E.      BakerHostetler Attacks Hermitage and Still Refuses to Withdraw ..................11

        F.      The Second Circuit Issues a Writ of Mandamus ................................................13

III.    LEGAL STANDARD ...................................................................................................15

IV.     ARGUMENT .................................................................................................................15

        A.      BakerHostetler's Ethical Conflict Has Been Obvious Since at Least the
                First Motion to Disqualify ...................................................................................16

        B.      BakerHostetler Misrepresented the Scope of Its Representation of
                Hermitage..............................................................................................................19

        C.      BakerHostetler's Acted in Bad Faith When it Refused to Withdraw in
                2015.......................................................................................................................21

        D.      Hermitage is Entitled to Attorneys' Fees............................................................23

V.      CONCLUSION..............................................................................................................23

# TABLE OF AUTHORITIES

## Cases

*Boies, Schiller, & Flexner LLP v. Host Hostels & Resorts, Inc.*,
    603 F. App'x (2d Cir. 2015) ...................................................... 1, 2, 15, 20

*DeFazio v. Wallis*,
    459 F. Supp. 2d 159 (E.D.N.Y. 2006) .................................................... 17, 22

*Emle Indus., Inc. v. Patentex, Inc.*,
    478 F.2d 562 (2d Cir. 1973)...................................................... 17, 22

*Enmon v. Prospect Capital Corp.*,
    674 F.3d 138 (2d Cir. 2012)........................................................ 15

*Gov't of India v. Cook Indus., Inc.*,
    569 F.2d 737 (2d Cir. 1978)........................................................ 22

*Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*,
    409 F.3d 127 (2d Cir. 2005)........................................................ 17

*Kevlik v. Goldstein*,
    724 F.2d 844 (1st Cir. 1984)....................................................... 22

*Madison 92nd Street Assocs., LLC v. Marriot Intern., Inc.*,
    2013 WL 5913382 (S.D.N.Y. Oct. 31, 2013) ..................................... 1, 15, 20

*THOIP v. Walt Disney Co.*,
    2009 WL 125074 (S.D.N.Y. Jan. 20, 2009) ........................................ 15, 21

*United States v. James*,
    708 F.2d 40 (2d Cir. 1983)........................................................ 19, 22

*United States v. Prevezon*,
    839 F.3d .............................................................................. passim

*Zerger & Mauer LLP v. City of Greenwood*,
    751 F.3d 928 (8th Cir. 2014) ....................................................... 22

## Statutes

28 U.S.C. § 1782.......................................................................... passim

28 U.S.C. § 1927 .......................................................................... 15

## Rules

N.Y. Rule of Professional Conduct 1.9(a) ............................................... 16

## I.    <u>INTRODUCTION</u>

On October 17, 2016, the Second Circuit issued a writ of mandamus requiring the disqualification of John Moscow and Baker & Hostetler LLP (collectively "BakerHostetler") as counsel for Defendants. The Second Circuit issued the extraordinary relief because BakerHostetler represented Hermitage Capital Management Ltd. ("Hermitage") to defend it against false allegations that Hermitage had committed a massive Russian Treasury Fraud but then switched sides and, in the service of its new client Prevezon, falsely accused Hermitage of committing that very same fraud.

The disqualification could not have come as a surprise to BakerHostetler. In 2013, when BakerHostetler appeared on behalf of Prevezon to defend it against laundering the proceeds of the Russian Treasury Fraud, Hermitage notified BakerHostetler of the obvious conflict it faced. Hermitage demanded that BakerHostetler withdraw for the very reasons later identified by the Second Circuit as requiring mandamus. BakerHostetler refused. Over the next three years, BakerHostetler fought to avoid disqualification at all costs, including by making factual misrepresentations, ignoring explicit warnings by Judge Griesa, and giving frivolous legal excuses to justify its unprecedented disloyalty.

Where a law firm engages in conduct that even approaches bad faith to avoid disqualification, its former client is entitled to its attorneys' fees. *See Madison 92nd Street Assocs., LLC v. Marriot Intern., Inc.*, 2013 WL 5913382, *12 (S.D.N.Y. Oct. 31, 2013), *aff'd* sub nom *Boies, Schiller, & Flexner LLP v. Host Hostels & Resorts, Inc.*, 603 F. App'x 19 (2d Cir. 2015).  BakerHostetler crossed this line. Baker Hostetler repeatedly told both Judge Griesa and the Second Circuit that it should not be disqualified because its representation of Hermitage did not concern the Russian Treasury Fraud but instead related to an earlier fraud. This statement was false each time it was made. As the Second Circuit found—based on its review of

documents drafted by BakerHostetler during its representation of Hermitage and other sealed material from the representation—BakerHostetler represented Hermitage directly in connection with the Russian Treasury Fraud, including by reviewing privileged documents about the Russian Treasury Fraud, investigating methods to trace the proceeds of that very fraud (some of which Prevezon is alleged to have received), and drafting discovery requests targeting the financial institutions believed to have received the proceeds of the Russian Treasury Fraud. When an attorney provides an "unreasonably narrow description" of a past representation—let alone a misrepresentation—to avoid disqualification, there is sufficient evidence of bad faith to support an award of attorneys' fees. *Boies, Schiller, & Flexner LLP*, 603 F. App'x at 20. Here, BakerHostetler repeatedly misrepresented its defense of Hermitage in order to fend off disqualification.

In 2014, moreover, BakerHostetler successfully avoided disqualification by promising Judge Griesa that there could be no conflict because Hermitage was "innocent" of the Russian Treasury Fraud. Judge Griesa accepted this representation but warned BakerHostetler that, "If Mr. Moscow was now turning on the former client and attacking the former client, I mean, that wouldn't even be a hard case." Nevertheless, BakerHostetler used discovery to prepare to falsely blame Hermitage and its principal, Bill Browder, for the Russian Treasury Fraud and, in November 2015, publicly revealed its strategy to prove that "Hermitage and Mr. Browder did it."

Finally, even after violating Judge Griesa's direct admonition, BakerHostetler still refused to withdraw, instead hiding behind the falsely narrow scope of its earlier work for Hermitage and a flood of frivolous legal positions. Among other arguments, BakerHostetler maintained that it could accuse its former client of the very crime it previously defended it against because the client no longer was present or had assets in Russia, so was not subject to

prosecution or asset seizure there. BakerHostetler also falsely argued that Hermitage had no standing in connection with the Russian Treasury Fraud because it was not a victim of the crime, despite having previously concluded that it was a victim of the crime when representing Hermitage.

During the entirety of BakerHostetler's work for Prevezon, it labored under an obvious and significant conflict that led it to attempt to undermine the very work it had previously done for Hermitage. No client should ever have to watch its former lawyers be so disloyal. And no client should have to bear more than a million dollars in fees and expenses to compel its former lawyers to do what the law requires: withdraw. BakerHostetler forced Hermitage to battle for years over its disqualification, a struggle that only ended after the Second Circuit granted an emergency stay and then, ultimately, a writ of mandamus. BakerHostetler must be held responsible for the costs of that effort.

## II.   FACTUAL BACKGROUND

All the facts necessary to grant Hermitage's motion are established by the Second Circuit's factual findings and BakerHostetler's own writings and statements.

### A.   The Russian Treasury Fraud

The Russian Treasury Fraud was a complex scheme to defraud the Russian Treasury of approximately $230 million. Hermitage is among the victims of the fraud. *See United States v. Prevezon*, 839 F.3d at 230. Hermitage was the investment advisor of the Hermitage Fund, a fund focused on investments in Russia. A group of corrupt Russian officials and other individuals (referred to as the "Organization") raided Hermitage's Moscow office and that of its law firm in 2007. *Id.* The Organization stole corporate documents and seals of companies owned by the Hermitage Fund. *Id.* The Organization transferred the ownership of the companies to its members and then used the control to enter into fake contracts with sham companies. *Id.* The

sham companies—also controlled by the Organization—used the contracts to sue the portfolio companies. Lawyers purporting to represent the portfolio companies appeared and conceded liability, creating the illusion of massive liabilities. *Id.*

The Organization immediately used the sham judgments to apply for tax refunds on behalf of the portfolio companies on the grounds that the liability wiped out profits the companies had earned and therefore necessitated a refund of roughly $230 million. *Id.* Only two days after the application was made, the $230 million was paid out of the Russian Treasury to bank accounts under the Organization's control. *Id.* The government alleges in this case that a portion of those funds were laundered through New York and received by Defendants. *Id.*

After Hermitage learned of the theft of the companies, it hired attorneys in Russia to investigate, including Sergei Magnitsky. *Id.* Hermitage informed the Russian authorities of what had happened and filed six criminal complaints against members of the Organization. *Id.* Instead of helping Hermitage, the Russian authorities—who were connected with the Organization— retaliated against Hermitage and Browder. The Russian authorities opened criminal cases against two Hermitage lawyers, who fled the country, and pursued charges against Browder and other Hermitage representatives and employees. *Id.* at 230-231.

Magnitsky, who publicly disclosed the fraud and gave testimony against corrupt officials alleged to be members of the Organization, was arrested in November 2008. After 358 days of pre-trial confinement, Magnitsky died in custody. *Id.* Russia's Human Rights Council found that Magnitsky's arrest and detention were unlawful, that just prior to his death he was beaten by guards, and that the authorities prevented paramedics from reaching him before he died. *Id.*

### B.       Hermitage Retains Baker & Hostetler

In September 2008, two months before Magnitsky's arrest, Hermitage hired John Moscow and BakerHostetler to help defend Hermitage and its personnel and agents against any

potential false claims that they had participated in the Russian Treasury Fraud, to seek evidence about those who were really responsible, and to cause prosecutions in other jurisdictions against those who were culpable or benefited from the fraud. The retention letter reads as follows:

> In this engagement, we expect to perform the following: extensive analysis of the factual and legal background of the events in question; examination and analysis of evidence in both testimonial and documentary form, including the testimony of expert witnesses; preparation and presentation of prosecution memoranda, if appropriate, to the United States Department of Justice (or other law enforcement  agency); and cooperation and support to the United States Department of Justice if an investigation is pursued by them.

*Id.* The engagement lasted approximately nine months, during which time Moscow and his colleagues "reviewed non-public documents from Hermitage related to the Russian Treasury Fraud, which allowed the firm to create a case timeline and chronology, and discussed potential individuals for depositions in connection with the prosecutions in Russia." *Id.* (internal quotation marks omitted). Moscow met with the United States Attorney's Office for the Southern District of New York and the office of the Attorney General of the British Virgin Islands with the goal of interesting them in prosecuting those responsible for the Russian Treasury Fraud or those who benefited from it. *Id.*

BakerHostetler also prepared a draft subpoena to be filed under 28 U.S.C. § 1782(a), which permits a federal court to order discovery for use in foreign proceedings. *Id.* The twenty-five page draft declaration supporting the request for discovery "details the Russian Treasury Fraud in a manner that closely tracks the allegations of the civil forfeiture complaint ultimately filed by the government." *Id.* (The "Draft Declaration" was filed as sealed Dkt. 125-13; a redacted copy is also attached as Exhibit 1 to the Declaration of Jacob W. Buchdahl submitted in support of this motion.) The Draft Declaration, like the civil forfeiture complaint, also describes a similar 2006 fraud undertaken by the Organization and targeting subsidiaries of Rengaz

Holdings, an investment fund linked to Renaissance Capital (and therefore referred to alternatively as either the "Rengaz Fraud" or "Renaissance Fraud"). *Id.* at 232. The Draft Declaration and civil forfeiture complaint allege that the Organization and same modus operandi were used to perpetuate both the Russian Treasury Fraud and the Rengaz fraud, and that the Organization itself (responsible for both frauds) had links to Renaissance Capital.

During the course of the nine-month engagement, Hermitage paid BakerHostetler roughly $200,000 in fees. Hermitage then engaged new counsel to continue tracing the proceeds of the Russian Treasury Fraud and present evidence to the government. The government eventually undertook its own investigation and, in 2013, brought this civil forfeiture and money-laundering case against the Prevezon Defendants. The Prevezon Defendants immediately hired Moscow and BakerHostetler to defend against the allegations. *Id.*

### C. Baker & Hostetler "Switches Sides" and Lies About its Prior Representation of Hermitage

BakerHostetler agreed to defend Prevezon from allegations that it received proceeds of the Russian Treasury Fraud despite the fact that it previously sought, on behalf of Hermitage, to cause forfeiture claims to be brought against those who benefited from that very fraud. Hermitage notified its former lawyers that their representation of Prevezon violated ethical duties owed to Hermitage and demanded BakerHostetler withdraw immediately. (The Demand is attached as Exhibit 2 to the Buchdahl Decl.) Hermitage refused.

In 2014, BakerHostetler began seeking extensive discovery from the Government, Hermitage, Browder and others focusing on the Russian Treasury Fraud. Soon after the discovery was served, the government raised the conflict posed by BakerHostetler's previous representation of Hermitage. Mark Cymrot, a BakerHostetler partner represented to Judge Griesa that that there could be no conflict because the representation was not about the Russian

Treasury Fraud:

> [W]e were retained in 2008 for a very limited purpose of doing a 1782 subpoena request, which we ended up not doing. And that related to a company called Renaissance. We were retained by Hermitage to get information about a prior tax fraud related to a company called Renaissance. We only acted in that respect for a very short time.

March 4, 2014 Hr'g Tr. at 27. BakerHostetler's description of its prior work for Hermitage, which claimed it related to some fraud *other* than the Russian Treasury Fraud, was false.

On September 29, 2014, at the invitation of the Court, Hermitage moved to disqualify BakerHostetler. BakerHostetler again misrepresented the purpose of the draft Section 1782 petition, telling Judge Griesa that "BakerHostetler's representation largely entailed preparation of what was going to be a 28 U.S.C. § 1782 petition to subpoena documents from Renaissance." *Id.* at 4. Mr. Moscow himself submitted a declaration to the Court in which he stated

> [T]he Russian Federation was investigating a theft of $230 million from the Russian treasury. Hermitage was concerned that it might become a subject or target of that investigation. Hermitage was seeking to collect documents from Renaissance through a petition under 28 U.S.C. § 1782 **regarding a prior alleged theft from the Russian treasury. The focus of our representation was Renaissance and its possible role in the prior theft**.

Dkt. 135 ¶ 10 (emphasis added). At argument on the motion, Mr. Moscow reiterated these untrue statements:

> What I was engaged to do was to get evidence as to a prior similar fraud [the Rengaz Fraud] so that they could reasonably argue that from the commission of and act in 2006 in which they were not involved, one could deduce that they were not involved in the same act in 2007 [the Russian Treasury Fraud].

Oct. 14, 2014 Hr'g Tr. at 28.

These statements are false. Baker Hostetler emailed the draft declaration to Mr. Browder in May 2009, with a copy to Mr. Moscow. That communication describes how Baker Hostetler

intended to serve it on two American financial institutions and the United States branch of Raiffeissen, described in the Declaration as "the sole holder of correspondent accounts for both USB and Intercommerz," the two small Russian banks into which the proceeds of the Russian Treasury Fraud were directly deposited. Draft Decl. ¶ 4. It explained that discovery from the four banks "is necessary here because the proceeds of the [Russian Treasury Fraud][1] were sent through banks located within the Court's jurisdiction." *Id.* It thus sought "wire transfer records of the proceeds of the [Russian Treasury Fraud] through banks in this jurisdiction and the identification of the ultimate recipients of the proceeds of the Russian Treasury Fraud." *Id.* ¶ 77. And contemporaneous privileged communications confirm the scope of BakerHostetler's representation of Hermitage. *See* Dkt. 145 Ex. 1 at 4:15-18, 74:11-17; *id.* Ex. 2; *id.* Ex. 3 at 1.

BakerHostetler also submitted an expert opinion from Roy Simon, Jr. Significantly, Simon was not asked to (and did not) opine on whether there was a substantial relationship between the two representations. Dkt. 136 ¶ 21. The extent of the "factual background" in his opinion is three paragraphs parroting BakerHostetler's falsely narrow scope of its previous representation of Hermitage. Instead of examining whether there was a substantial relationship between the representations, Simon opined that there could be no "material adversity" between Hermitage and BakerHostetler because (a) Hermitage's legal rights were not being directly affected (*id.* ¶¶ 26-29) and that (b) in any event, the Court should craft a new exception to the applicable ethical rules because disqualification in this case (the facts of which he confessed to have not investigated) would not protect Hermitage's confidences because he was informed (falsely) that none of the information shared by Hermitage with BakerHostetler during the nine month representation was confidential. *Id.* ¶¶ 30-34.

At argument on the disqualification motion, BakerHostetler told the Court that no conflict

---

[1] The Declaration refers to the Russian Treasury Fraud as the "Tax Rebate Fraud." *See* Declaration ¶ 3.

existed because both Hermitage and Prevezon were "innocent" of involvement with the Russian Treasury Fraud. *Prevezon*, 839 F.3d at 232. Hermitage warned the Court that it expected that BakerHostetler would try to turn Hermitage from the "victim" of the Russian Treasury Fraud into its perpetrators. Cymrot interrupted the proceedings at that point to call the statement "simply untrue" and Judge Griesa thought it "very speculative." Oct. 14, 2014 Hr'g Tr. at 9-13.

BakerHostetler persuaded the Court that it should not be disqualified by claiming that the facts underlying the Russian Treasury Fraud were "completely unnecessary" to Prevezon's case. It represented to Judge Griesa and Hermitage that "all that history [of the Russian Treasury Fraud] is irrelevant. . . . And I've stood here and said paragraphs 1 through 100 [of the Complaint, which describe the Russian Treasury fraud], all that history is irrelevant, your Honor." *Id.* at 58. BakerHostetler promised that "what we would do is work the Prevezon piece of it, which is the last 20 paragraphs [of the Complaint, which describes the laundering of the proceeds of the fraud]." *Id.* at 58-59.

Judge Griesa accepted BakerHostetler's misrepresentations and found that "the issues in this case are different in all substantial respects from what [Mr. Moscow] dealt with when he represented Hermitage back in 2008 and early 2009." Oct. 23, 2014 Hr'g at 29. He further accepted that "there is no indication that [Mr. Moscow] is in any substantial way taking a position which involves an attack upon or an attempt to hold liability with regard to Hermitage." *Id.* 68-69. Judge Griesa did warn BakerHostetler, however, that "If Mr. Moscow was now turning on the former client and attacking the former client, I mean, that wouldn't even be a hard case." *Id.* at 69.

### D.    BakerHostetler Takes Discovery Against and Publicly Disparages Hermitage and Browder

Both before and after this first motion to disqualify, Prevezon pursued discovery from the

Government, Hermitage and Browder in a campaign to discredit Browder and Hermitage and, ultimately, like the corrupt Russian officials still pursuing Hermitage and Browder to this day, frame them for the Russian Treasury Fraud. In April and May 2014, Prevezon issued subpoenas intended to undermine Browder's account of the raids on Hermitage's offices that kicked off the Russian Treasury Fraud. Buchdahl Decl. Ex. 3.

In July 2014, Prevezon issued a subpoena seeking from Browder, among other things, all documents "related to your tracing of the proceeds from the Russian tax refund fraud" including "documents received by you in response to your application under 28 U.S.C. § 1782"—the work Hermitage had BakerHostetler undertake—as well as all of his tax records, passport and immigration documents, and all documents about the structure of the Hermitage Fund. Dkt. 125-17. In effect, BakerHostetler was hoping to attack the credibility of the fruits of the very Section 1782 subpoena tracing funds that it had drafted.

Finally, in an effort to discredit Hermitage and Browder's evidence about the Russian Treasury Fraud, Prevezon sought information about a separate sham tax conviction against Browder in Russia over a company called Dalnaya Step. See Dkt. 125-22 at 17; Dkt. 125-17 at 4-5; Dkt. 125-26 at 4-5. In March 2014, Moscow raised the issue of the same sham conviction when deposing Special Agent Hyman, a government witness. Moscow asked him whether he determined that Browder was "credible" before accepting evidence from him about the Russian Treasury Fraud and suggested that Browder's conviction should undermine the Government's determination that Browder was credible. Dkt. 137-4 at 53-54, 107-08. When Moscow pursued this discovery, he knew that Interpol refused to honor the conviction because it concluded it was "predominately political in nature." Dkt. 512-4. More strikingly, BakerHostetler itself, when representing Hermitage in 2009, had concluded that the conviction was baseless and naked

retaliation by corrupt Russian officials for Hermitage's reporting of the Russian Treasury Fraud. Draft Declaration ¶¶ 24-27.

At the same time, BakerHostetler attorneys publicly attacked Browder and Hermitage. In April 2014, Cymrot told the publication <u>Barron's</u> that Browder lacked credibility because of his "willingness to cheat on taxes," referring to the sham Russian conviction BakerHostetler had previously found to be unsubstantiated. In September 2014, Cymrot told the <u>Jerusalem Post</u> that Browder must be deposed in connection with this matter so that he could "answer some difficult questions regarding his own tax evasion in Russia and additional aspects of his activity, to show his unreliability and prove he doesn't need to be a witness or even a source on which the prosecution can base its case." Dkt. 125-18. In December 2015, Cymrot told <u>Barron's</u>, on the record, "There is credible evidence that Hermitage and Bill Browder either defrauded the Russian Treasury or at least knew that the fraud was in progress before it happened." Buchdahl Decl. Ex. 4. Thus, while representing Hermitage, BakerHostetler told the US Attorney's office that it should initiate prosecutions in connection with the Russian Treasury Fraud based on Hermitage's evidence and investigation; BakerHostetler was now seeking evidence *from Browder and Hermitage* to prove that such prosecutions based on Hermitage's evidence should not proceed.

### E.     BakerHostetler Attacks Hermitage and Still Refuses to Withdraw

In November 2015, the government moved for partial summary judgment to establish that the Russian Treasury Fraud occurred and that it constituted a "specified unlawful activity" necessary to establish liability under the federal money laundering statute. *See Prevezon*, 839 F.3d at 232. In response, BakerHostetler publicly revealed the strategy it had been developing from the start: to blame Hermitage and Browder for the Russian Treasury Fraud in order to negate the government's theory of fraud on a foreign bank. BakerHostetler argued that the

owners of the Hermitage portfolio companies never lost control of them because no corrupt

Organization ever took them. Instead, it argued:

> The version of the fraud on the Russian Treasury (the "Treasury Fraud") told in the first, second and third complaints has been exposed by discovery to be false. It was contrived and skillfully sold by William F. Browder to politicians here and abroad to thwart his arrest for a tax fraud conviction in Russia. This public relations narrative was swallowed whole by the Government, which incorporated it into its complaint without investigation, a situation this Court has described as "troubling." When placed under oath, however, Browder's own witnesses revealed that he authorized the supposedly unauthorized acts alleged in the three complaints and knew about the events that the complaints allege he was unaware of. From this discovery, it is plausible Browder stole the money from the Russian Treasury or, at least, knew about the fraud before it occurred. . . . This case is about fraud on the Russian Treasury; it is not about fraud on an investor or trustee of Browder's Hermitage Fund.

Dkt. 418 at 1. BakerHostetler went on to argue that it would prove that "Browder and his agents

engaged in a series of misrepresentations to execute the fraud, to distance themselves from it,

and to pin it on the Russian officials investigating Browder for a separate tax fraud his

companies committed." *Id.* at 5-6. At argument, it reiterated its accusations against its former

clients:

> And what it comes down to, Judge, is, the government alleges there was an organization, unnamed, mysterious organization that did all this, and the evidence points that Hermitage and Mr. Browder did it. That is the heart of the dispute."

Nov. 30, 2015 Hr'g Tr. at 36-7.

Upon learning of Baker Hostetler's strategy, which directly violated Judge Griesa's

admonition against "attacking" a former client, Hermitage renewed its motion to disqualify—it

now being obvious that its prior motion had been denied based on BakerHostetler's

misrepresentations to the Court. On December 18, 2015, after an extended argument, Judge

Griesa granted Hermitage's motion and disqualified Moscow and Baker Hostetler, explaining:

> BakerHostetler's change in defense strategy now makes the subjects of its former and current representation "substantially related." There is now a very real possibility that BakerHostetler will be in a position where it would be trying to show that its current clients (the Prevezon defendants) are not liable and showing this by attacking its former client (Hermitage) on the very subject of BakerHostetler's representation of that former client.

Dkt. No. 495 at 1-2.

In a matter of days, however, Judge Griesa began to backtrack. First, Judge Griesa granted Prevezon's request to certify his decision for an interlocutory appeal, and then he *sua sponte* withdrew his disqualification order so that Prevezon could make another written submission. Dkt. Nos. 501, 504. In its written submission, BakerHostetler renewed its specious argument that its representation of Hermitage "largely entailed preparation for what was going to be a 28 U.S.C. § 1782 petition to subpoena documents from Renaissance." Dkt. 506 at 4. It also argued that none of the other requirements for disqualification was met. BakerHostetler did not, however, as it had represented it intended to do at the December 18 hearing, submit the opinion of an expert to defend its position—apparently unable to find any ethics expert willing to endorse its manifest conflict. Dkt. 513 at 27:20-21 (attached as Exhibit 5 to the Buchdahl Decl.).[2] On January 8, 2016, Judge Griesa reversed his earlier order and denied Hermitage's motion to disqualify BakerHostetler.

## F.     The Second Circuit Issues a Writ of Mandamus

Hermitage immediately sought a stay of the district court proceedings from the Second Circuit pending its petition for a writ of mandamus. Among its arguments in opposition, BakerHostetler once again falsely told the Second Circuit that the matters were not "substantially related" because its earlier representation of Hermitage was "a limited subpoena action directed

---

[2] Hermitage submitted comprehensive opinions from Professor Bruce Green in support of each of its motions to disqualify. *See* Dkts. 146, 489.

13

towards Renaissance." App. Dkt. 40-1 at 27. It argued:

> The work BakerHostetler undertook for [Hermitage] mainly concerned a fraudulent scheme in Russia involving Renaissance Capital—a scheme separate and distinct from the Russian Treasury Fraud. The firm assisted in preparing, but never filed, an § 1782 application for a subpoena to obtain documents from Renaissance. While that draft affidavit addressed the Russian Treasury Fraud, it did so as background to demonstrate that the Renaissance fraud was similar and therefore discovery was proper. The affidavit does not contain any confidential material; it was intended to be publicly filed in court and served on a third party, Renaissance.

*Id.* Prevezon retained new counsel to brief and argue the merits of the petition for a writ of mandamus. These lawyers too relied on BakerHostetler and Moscow's false description of the earlier representation of Hermitage. App. Dkt. 51-53.

On October 17, 2016, the Second Circuit issued a writ of mandamus directing this Court to enter an order disqualifying Moscow and BakerHostetler. In so holding, the Second Circuit flatly rejected BakerHostetler's false story about the scope of its prior representation of Hermitage:

> BakerHostetler and Moscow represented Hermitage for roughly nine months. During that time, Moscow and his colleagues reviewed non-public documents from Hermitage related to the Russian Treasury Fraud, which allowed the firm to create a case timeline and chronology, and discussed "potential individuals for depositions in connection with the prosecutions in Russia." App'x at 116. Moscow met with staff at the U.S. Attorney's Office for the Southern District of New York, including a lengthy meeting on December 3, 2008 with former Assistant U.S. Attorney Marcus Asner, and with the office of the Attorney General in the British Virgin Islands. The firm also "review[ed] bank records" and researched a "proper service agent for" a bank involved in routing proceeds of the Russian Treasury Fraud.
>
> * * *
>
> [T]he record makes clear that BakerHostetler's prior representation of Hermitage included investigating the Russian Treasury Fraud. The draft declaration prepared by BakerHostetler discusses how Hermitage's assets were stolen as a result of the Russian Treasury

Fraud, and details the retaliation against Hermitage and its attorneys for reporting the crime to Russian authorities.

*Prevezon*, 839 F.3d at 231, 240.

## III.   <u>LEGAL STANDARD</u>

Courts in the Second Circuit subject lawyers to fee shifting when they refuse to timely recuse themselves in the face of obvious ethical conflicts or engage in other conduct not in good faith to avoid or delay recusal or disqualification. *See Madison 92nd Street Associates, LLC v. Marriot Intern., Inc.*, 2013 WL 5913382, *12 (S.D.N.Y. Oct. 31, 2013), *aff'd* sub nom *Boies, Schiller, & Flexner LLP v. Host Hostels & Resorts, Inc.*, 603 F. App'x 19 (2d Cir. 2015). Courts are vested with such authority both by their inherent powers and by 28 U.S.C. § 1927. Under its inherent authority, fees may be imposed "when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons . . . [or] if a court finds that a fraud has been practiced upon it." *THOIP v. Walt Disney Co.*, 2009 WL 125074, at *4 (S.D.N.Y. Jan. 20, 2009) (citations omitted). Section 1927 provides for fee awards "when there is a finding of conduct constituting or akin to bad faith." *Madison 92nd Street Associates*, 2013 WL 5913382 at *2. There is no meaningful difference between these two standards other than that Section 1927 can only be invoked against attorneys while the Court's inherent authority can be used to award fees against a party as well as its counsel. *Enmon v. Prospect Capital Corp.*, 674 F.3d 138, 143-144 (2d Cir. 2012).

## IV.   <u>ARGUMENT</u>

BakerHostetler never should have agreed to represent Prevezon. From the outset, it agreed to defend Prevezon against allegations it laundered the proceeds of the Russian Treasury Fraud—the exact type of charges that Hermitage (a victim of that crime) had retained BakerHostetler to try to cause the United States to bring. But once BakerHostetler began to

pursue discovery against Hermitage and Browder, challenge their credibility with respect to the Russian Treasury Fraud, and ultimately accuse them of it, the conflict was so clear and so blatant that only BakerHostetler and its clients refused to acknowledge it. As a result, over a period of more than two years, Hermitage was required to pay more than a million dollars in legal fees to enforce BakerHostetler's ethical obligations and safeguard its own confidences.

BakerHostetler's refusal to withdraw in light of its obvious conflict of interest is alone sufficient to justify fee shifting. But BakerHostetler's conduct is particularly egregious in this case for two reasons. First, it lied for more than two years about the scope of its representation of Hermitage, telling Judge Griesa repeatedly that it was really only investigating the so-called "Rengaz Fraud," and not the Russian Treasury Fraud itself. Second, after telling Judge Griesa that it should not be disqualified because Hermitage was "innocent" of the fraud, and being admonished that it must not attack Hermitage, it undertook a covert strategy to do just that and then, when confronted about its attacks, still refused to withdraw.

## A. BakerHostetler's Ethical Conflict Has Been Obvious Since at Least the First Motion to Disqualify

The ethical obligations owed by a New York lawyer to a former client are clear. Absent permission, a lawyer may not represent another person in a substantially related matter in which the person's interests are materially adverse to the interest of the former client. N.Y. Rule of Professional Conduct 1.9(a). The standard for disqualification is nearly identical. In the case of successive representations, an attorney should be disqualified if:

> (1) the moving party is a former client of the adverse party's counsel;

> (2) there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit; and

> (3) the attorney whose disqualification is sought had access to, or was likely to have had access to, relevant privileged information in the course of his prior representation of the client.

*Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*, 409 F.3d 127, 133 (2d Cir. 2005). When, as here, the same attorney handled both matters and a former client establishes the first two elements—adversity and substantial relationship—an irrefutable presumption arises that the attorney obtained relevant privileged information in the prior representation. *Prevezon*, 839 F.3d at 241; *Emle Indus., Inc. v. Patentex, Inc.*, 478 F.2d 562, 570 (2d Cir. 1973); *DeFazio v. Wallis*, 459 F. Supp. 2d 159, 164-65 (E.D.N.Y. 2006) (collecting cases).

BakerHostetler was conflicted at the outset of its representation. BakerHostetler had previously worked for Hermitage to try to convince the US attorneys' office for the Southern District of New York to bring charges against those either responsible for the Russian Treasury Fraud <u>or those who benefited from it</u>, *i.e.*, those charged with laundering its proceeds like Defendants here. *See* Dkt. 145 Ex. 3 at 1; *see also id.* Ex. 4 at 16:20-21, 17:10-15, 18:18-20, 19:3-5.

By the time Hermitage moved to disqualify BakerHostetler in September 2014, the conflict had metastasized. Prevezon pursued aggressive discovery against Hermitage and Browder, seeking to undermine Hermitage and Browder's evidence of the Russian Treasury Fraud itself as well as the work it did tracing the proceeds of that fraud. Prevezon sought discovery:

- to test the veracity of Browder's version of the raids on Hermitage's offices that kicked off the Russian Treasury Fraud. Buchdahl Decl., Ex. 3.

- of all records "related to your tracing of the proceeds from the Russian tax refund fraud" including "documents received by you in response to your application under 28 U.S.C. § 1782"—the work BakerHostetler was hired by Hermitage to undertake—as well as all of his tax records, passport and immigration documents, and all documents about the structure of the Hermitage Fund. Dkt. 125-17 at 4-10; Dkt. 125-26 at 6.

- about a separate sham tax conviction against Browder in Russia over a company

called Dalnaya Step. See Dkt. 125-22 at 17; Dkt. 125-17 at 4-5; Dkt. 125-26 at 4-5. Interpol already refused to honor the conviction because it concluded it was "predominately political in nature." Dkt. 512-4.

BakerHostetler later told Judge Griesa that it did not intend to attack Hermitage until the Government amended its allegations regarding specified unlawful activity. To the contrary, and in contradiction of what BakerHostetler represented to Judge Griesa in October 2014—that it would defend Prevezon based on disproving the allegation it received money derived from the fraud rather than disproving the Russian Treasury Fraud itself, Oct. 14, 2014 Hr'g Tr. at 58-59— the discovery cited above shows that BakerHostetler worked throughout discovery to challenge and discredit Hermitage and Browder's evidence about the Russian Treasury Fraud itself, the very evidence BakerHostetler had advanced while working for Hermitage and pitched to the US Attorneys' office on Hermitage's behalf. To dispel any question that this was its purpose, in opposing summary judgment, BakerHostetler relied on its aggressive questioning of Browder in April 2015 about how the Russian Treasury Fraud was carried out, and about the Dalnaya Step fraud, which BakerHostetler used to argue that the raids on Hermitage's office in 2007 were legitimate. Dkt. 418 at 8-10.

Thus, by the first motion to disqualify, BakerHostetler was (a) defending those accused of laundering the proceeds of the Russian Treasury Fraud, the exact type of charges it had tried to persuade the US Attorney's office to bring when it represented Hermitage; and (b) attempting to seek discovery from Hermitage and Browder to discredit their evidence about the Russian Treasury Fraud and the tracing of its proceeds, which BakerHostetler was specifically tasked with doing when it represented Hermitage. In these circumstances, there could be no reasonable dispute that BakerHostetler's current representation was substantially related to its work for Hermitage and that it was pursuing materially adverse (indeed, directly contrary) positions. As the Second Circuit observed in disqualifying BakerHostetler, both witnesses and crime victims

(like Hermitage) are entitled to be secure in knowing that their former counsel will not switch sides and undermine the position they had previously advanced. *Prevezon*, 839 F.3d at 241 (citing *United States v. James*, 708 F.2d 40, 46 (2d Cir. 1983)).

### B. BakerHostetler Misrepresented the Scope of Its Representation of Hermitage

In addition to BakerHostetler's refusal to withdraw, its bad faith is demonstrated by its repeated misrepresentations about the scope of its work for Hermitage. For more than two years, BakerHostetler repeatedly told Judge Griesa and the Second Circuit that it should not be disqualified because its prior representation of Hermitage was really about investigating the "Rengaz Fraud," not the Russian Treasury Fraud. Among other places, BakerHostetler told Judge Griesa:

- **"We were retained in 2008 for a very limited purpose of doing a 1782 subpoena request, which we ended up not doing. And that related to a company called Renaissance. We were retained by Hermitage to get information about a prior tax fraud related to a company called Renaissance. We only acted in that respect for a very short time." Dkt. 77 at 26 (March 4, 2014 Hr'g Tr.).

- "[T]he Russian Federation was investigating a theft of $230 million from the Russian treasury. Hermitage was concerned that it might become a subject or target of that investigation. Hermitage was seeking to collect documents from Renaissance through a petition under 28 U.S.C. § 1782 **regarding a prior alleged theft from the Russian treasury. The focus of our representation was Renaissance and its possible role in the prior theft**." Dkt. 135 ¶ 10 (Moscow Decl.) (emphasis added).

- "What I [Mr. Moscow] was engaged to do was to get evidence **as to a prior similar fraud** [the Rengaz Fraud] so that they could reasonably argue that from the commission of and act in 2006 in which they were not involved, one could deduce that they were not involved in the same act in 2007 [the Russian Treasury Fraud]." Dkt. 153 (Oct. 14, 2014 Hr'g Tr. at 28) (emphasis added).

These statements were all demonstrably false, as the Second Circuit found after carefully reviewing the factual record.

> BakerHostetler and Moscow represented Hermitage for roughly nine months. During that time, Moscow and his colleagues reviewed non-public documents from Hermitage related to the

Russian Treasury Fraud, which allowed the firm to create a case timeline and chronology, and discussed "potential individuals for depositions in connection with the prosecutions in Russia." App'x at 116. Moscow met with staff at the U.S. Attorney's Office for the Southern District of New York, including a lengthy meeting on December 3, 2008 with former Assistant U.S. Attorney Marcus Asner, and with the office of the Attorney General in the British Virgin Islands. The firm also "review[ed] bank records" and researched a "proper service agent for" a bank involved in routing proceeds of the Russian Treasury Fraud.

* * *

[T]he record makes clear that BakerHostetler's prior representation of Hermitage included investigating the Russian Treasury Fraud. The draft declaration prepared by BakerHostetler discusses how Hermitage's assets were stolen as a result of the Russian Treasury Fraud, and details the retaliation against Hermitage and its attorneys for reporting the crime to Russian authorities.

*Prevezon*, 839 F.3d at 231, 240.

Strikingly similar misconduct—albeit far less severe—was relied upon in awarding attorneys' fees in a similar case. In *Madison 92nd Street Associates, LLC v. Marriott Intern., Inc.*, 2013 WL 5913382 (S.D.N.Y. Oct. 31, 2013*),* Judge McMahon concluded that Boies Schiller & Flexner LLP ("BSF") refused to withdraw despite a clear conflict of interest. When BSF's former client became aware of its involvement, it immediately notified BSF and demanded it withdraw. BSF claimed that it did a conflicts check and there was no conflict. BSF also consulted a legal ethics expert, but misinformed him about the scope of the prior representation in overly narrow terms. In affirming Judge McMahon's award of attorneys' fees, the Second Circuit found that "[t]he court's finding that BSF provided to its outside ethics counsel an unreasonably narrow description of its work for Host **is itself** sufficiently indicative of bad faith" to support an award of fees. *Boies, Schiller & Flexner LLP v. Host Hotels & Resorts, Inc.*, 603 F. App'x 19, 20 (2d Cir. 2015) (emphasis added).

BakerHostetler's conduct here is far worse. Not only did BakerHostetler give its expert

witness an unduly "narrow" description of its work—it also repeatedly misrepresented the primary purpose for which it was hired *to two federal courts*.

### C.     BakerHostetler's Acted in Bad Faith When it Refused to Withdraw in 2015

At an absolute minimum, Hermitage is entitled to the fees it incurred after BakerHostetler disclosed its trial strategy of blaming Hermitage for the Russian Treasury Fraud, which violated Judge Griesa's explicit warning and was so obviously unethical that it required the Second Circuit to issue the extraordinary remedy of mandamus.

BakerHostetler knew that it was prohibited from attacking Hermitage or Browder in any way.  In order to avoid disqualification in 2014, it has assured Judge Griesa that there could be no problem with its representation because Hermitage and Browder were "innocent" of the Russian Treasury Fraud. To avoid any doubt, Judge Griesa warned BakerHostetler that "If Mr. Moscow was now turning on the former client and attacking the former client, I mean, that wouldn't even be a hard case." Oct. 24, 2014 Hr'g Tr. at 69. The failure to follow the Court's instructions when it comes to matters of withdrawal and disqualification is the precise type of conduct that justifies an award of fees. *See THOIP v. Walt Disney Co.*, 2009 WL 125074, at *4-5 (S.D.N.Y. Jan. 20, 2009).

BakerHostetler's arguments against disqualification were not made in good faith. Its positions were contrary to settled law, the facts, and in several instances the very positions it had taken in 2008 and 2009 when it represented Hermitage:

- BakerHostetler argued that a line of cases protecting crime victims in similar circumstances was inapplicable because Hermitage was "not a victim" of the Russian Treasury Fraud. App. Dkt. 40-1 at 3. The Second Circuit found otherwise, *Prevezon*, 829 F.3d at 230. BakerHostetler itself asserted that Hermitage was a victim of the Russian Treasury Fraud in the declaration BakerHostetler drafted on its behalf in May 2009, until switching sides to represent Prevezon. Draft Decl. ¶ 3.

- BakerHostetler repeatedly tried to place the burden on Hermitage to prove the

confidential information that BakerHostetler would be misusing in its new representation. *E.g.*, Dkt. 506 at 22. This is contrary to settled Second Circuit law that conclusively presumes shared confidences in the case of substantially related successive representations. *See Prevezon*, 839 F.3d at 240-41; *Gov't of India v. Cook Indus., Inc.*, 569 F.2d 737, 740 (2d Cir. 1978); *Emle*, 478 F.2d at 570; *DeFazio*, 459 F. Supp. 2d at 164-54 (collecting cases).

- BakerHostetler argued that it could attack Hermitage and Browder about the very subject matter of its previous representation because Hermitage was "not a party." Dkt. 506 at 13. Even before being rejected in *Prevezon*, the position was rejected by the Second Circuit in *United States v. James*, 708 F.2d 40, 46 (2d Cir. 1983) and other circuits in *Zerger & Mauer LLP v. City of Greenwood*, 751 F.3d 928, 929-30 (8th Cir. 2014), and *Kevlik v. Goldstein*, 724 F.2d 844, 851 (1st Cir. 1984). More importantly, no court has ever permitted a lawyer to accuse a former client of committing the crime he was previously retained to defend against.

- BakerHostetler continued to claim Browder was a "tax cheat" based on a Russian prosecution that INTERPOL refused to honor after finding that it was "predominately political in nature." Dkt. 512-4. When representing Hermitage, BakerHostetler took the position in the draft declaration that this very prosecution—involving Dalnaya Step—was baseless and in direct retaliation for Hermitage's reporting of the Russian Treasury Fraud. Draft Decl. ¶¶ 24-26.

- BakerHostetler continued to claim that its prior representation of Hermitage was not about the Russian Treasury Fraud but really about the Rengaz Fraud. *E.g.*, Dkt. 506 at 4.

The Second Circuit's decision to issue mandamus proves the egregiousness of BakerHostetler's refusal to recuse itself. Among other requirements to obtain mandamus, Hermitage established that it had a "clear and indisputable" right to relief, which was layered on top of the Court's already deferential review of decisions on recusal. *Prevezon*, 839 F.3d at 237. Accordingly, the Second Circuit was required to and did find that the trial court's decision not to disqualify BakerHostetler was "a clear and indisputable abuse of its discretion." *Id.*

BakerHostetler will no doubt argue that they proceeded in good faith because the Second Circuit had not previously addressed a situation where a lawyer was trying to prove to a jury that its former client committed the very crime that the client had previously retained the lawyer to refute. That argument is frivolous—the reason that no case on point existed is that

BakerHostetler's conduct was so out of bounds that no lawyer had ever tried it.

### D.   Hermitage is Entitled to Attorneys' Fees

Hermitage was required to incur $1,413,933.61 in attorneys' fees and costs to enforce BakerHostetler's ethical duties and obtain its disqualification. As set forth in the declaration of Jacob W. Buchdahl and accompanying exhibits, those fees break down as follows:

$877,129.90 incurred in connection with the first motion to disqualify filed in 2014.

$484,890.54 incurred in connection with the second motion for disqualification and appeal.

$51,913.18 incurred in connection with the instant motion for attorneys' fees.

## V.   <u>CONCLUSION</u>

For the foregoing reasons, Hermitage seeks an award of attorneys' fees from BakerHostetler in the amount of $1,413,933.61.

Dated: New York, New York
          May 16, 2017

Respectfully submitted,

SUSMAN GODFREY L.L.P.

By:     */s/ Jacob W. Buchdahl*
          Jacob W. Buchdahl
          1301 Avenue of the Americas, 32nd Floor
          New York, NY 10019
          Phone:  (212) 336-8330
          Fax: (212) 336-8340
          jbuchdahl@susmangodfrey.com

          *Counsel for Hermitage Capital Management Ltd.*

23

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on the 16th day of May, 2017, this document was properly served on all counsel of record via electronic filing in accordance with the SDNY Procedures for Electronic Filing.

*/s/ Jacob W. Buchdahl*
Jacob W. Buchdahl
