# EXHIBIT 1

**From:** "Oppenheim, Adam B." [aoppenheim@bakerlaw.com]
**Sent:** 05/02/2009 01:59 AM
**To:** Grant Felgenhauer; William Browder
**Cc:** "Moscow, John W." <jmoscow@bakerlaw.com>
**Subject:** Revised Felgenhauer Statement

Gentlemen:

Attached please find  the current version of the Felgenhauer Statement in support of Hermitage's application for discovery pursuant to 18 USC 1782.

Please note that a  number of items, marked in bold, require additional attention.  I look  forward to discussing this document with you at your earliest convenience, and  can be reached at this email address or at any of the contact numbers provided  below.

Adam  Oppenheim

**My  Bio**   |   **Web site**   |   **V-card**

T 212.589.4606
F 212.589.4201
M  646.594.8154
www.bakerlaw.com

**Adam  Oppenheim**
aoppenheim@bakerlaw.com

Baker  & Hostetler LLP
45 Rockefeller Plaza
New York, New York  10111



This email is intended only for the use of the party to which it is addressed  and may contain information that is privileged, confidential, or protected by law.  If you are not the intended recipient you are hereby notified that any dissemination, copying or distribution of this email or its contents is strictly prohibited. If you have received this message in error, please notify us immediately by replying to the message and deleting it from your computer.

Internet communications are not assured to be secure or clear of inaccuracies as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. Therefore, we do not accept responsibility for any errors or omissions that are present in this email, or any attachment, that have arisen as a result of e-mail transmission.

**Click for attachment:   - Felgenhauer Witness Statement .DOC**

**Attachments removed**
**Felgenhauer Witness Statement .DOC**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re Application of HERMITAGE CAPITAL MANAGEMENT LIMITED to Take Discovery For Use in Actions Pending in Criminal Court of the Russian Federation | : : : : : : | Case No. _____ |

## DECLARATION OF GRANT FELGENHAUER

I, Grant Felgenhauer, pursuant to 28 U.S.C. §1746, declare as follows:

1.      I am counsel to Hermitage Capital Management ("Hermitage").  I make this declaration in support of Hermitage's application for discovery pursuant to 28 U.S.C. § 1782.

2.      Hermitage is an investment advisory firm that, until 2006, was the largest foreign portfolio investor in Russia.  In its work, Hermitage advised the Hermitage Fund, for which HSBC Private Bank (Guernsey) Limited ("HSBC") served as the trustee.

3.      Beginning in 2007, Hermitage, its employees, and four Moscow-based law firms became the victims of a major fraud (the "Tax Rebate Fraud") carried out by an organized criminal group in Russia (the "Criminal Group").  The fraud began with the theft of corporate records from Hermitage's Moscow office and from the offices of its attorneys.  These stolen records were then used to fraudulently register three of the Hermitage Fund's Russian investment companies from HSBC to members of the Criminal Group.  The Criminal Group then used the stolen records to forge contracts creating more than $1 billion of fictitious financial liabilities against the stolen

502421343.1
5/1/09

investment companies. Finally, with the fictitious liabilities in hand, the Criminal Group applied for a rebate for the $230 million in taxes (properly) paid by the investment companies for 2006. The liabilities were officially recognized by collusive Russian courts, and the request for a tax rebate was quickly granted only two days after it was filed by members of the Criminal Group.

4.     The fraudulent $230 million tax refund was subsequently channeled through two small Russian banks, where the funds were converted into US dollars and routed through branches of four banks located in New York: ██████████████████

████████  Citibank, N.A., ██████████████████  and Wachovia Bank, N.A.

████████████████████████████.

5.     As described in detail below, the Criminal Group is composed of: high-level officers from the Moscow and Federal branches of the Russian Interior Ministry; senior executives of Renaissance Capital Holdings ("Renaissance Capital"), the parent company of RenCap Securities, Inc. ("RenCap"), a registered broker-dealer in New York; and numerous private individuals in Russia, including four convicted criminals, two of whom were convicted for manslaughter.

████████████████████████████

6.     The Criminal Group has attempted to conceal its crimes by fabricating criminal cases alleging tax evasion against William F. Browder, the founder and CEO of Hermitage, against Hermitage's lawyers in Russia, and against certain of Hermitage's business partners. One of Hermitage's lawyers, Sergey Magnitsky, a lawyer at the Moscow office of the American-owned law firm Firestone Duncan, was arrested on November 29, 2008, and is currently being held in a pre-trial detention facility in

Page 2

Moscow without bail.  Five other lawyers, who were representing Hermitage in Russia, have fled from the country out of fear for their lives and liberty.

7.     Hermitage has recently initiated civil actions in Russia (the "Foreign Proceedings") to recover the proceeds of the Tax Rebate Fraud.  The accompanying application seeks discovery of documents and information critical to the Foreign Proceedings and which are found uniquely in the possession of individuals and business entities located within this Court's jurisdiction.

### HERMITAGE BACKGROUND

8.     Hermitage was founded by Mr. Browder in April 1996 in order to provide western investors a way to gain access to the Russian stock market.  Hermitage's primary fund, the Hermitage Fund, was successful and grew in size from $25 million in 1996 to more than $4 billion by the end of 2005. ██████████████████████

████ During this period of rapid economic growth, however, corruption inside many large, state-owned companies in Russia became so extreme that it was impossible to ignore.  As a result, Mr. Browder became an anti-corruption shareholder rights activist, and conducted in-depth forensic research into the various ways that corporate managers were defrauding minority shareholders in Russia.  The results of this research were shared with major international and Russian media publications.  Over the past ten years, over 1,000 articles describing Hermitage's anti-corruption work have been published in newspapers and magazines including The New York Times, The Wall Street Journal, Business Week, and The Financial Times.  These efforts have achieved great results: the dismissal of corrupt corporate managers; the exposure (and termination) of numerous

Page 3

fraudulent schemes; and the passage of new laws and regulations protecting the rights of minority shareholders in Russian companies.

█████████████████████████████████████████

9.      While Hermitage's public stance against corruption materially contributed to the positive investment returns of the Hermitage Fund, these efforts also made many high-level enemies within the Russian government and the Russian private sector for both Hermitage and for Mr. Browder.  On November 13, 2005, after living in Russia for nearly ten years, Mr. Browder's Russian visa was abruptly cancelled, and he was declared *persona non grata* and a "threat to national security" by the Russian government.  Following this, Hermitage's main operations were relocated to London, from where its Russian businesses were managed remotely.

## THE FRAUDULENT SCHEME
## PHASE ONE:
## THE THEFT OF HERMITAGE INVESTMENT COMPANIES

10.      Mr. Browder attempted to restore his Russian visa through numerous channels.  On January 27, 2007, Mr. Browder met with First Deputy Prime Minister Dmitri Medvedev (the current President of Russia) at the World Economic Forum in Davos, Switzerland.  ████████  Mr. Browder sought Mr. Medvedev's assistance in regaining his Russian visa.

█████████████████████████████████████████
███████████████████████

11.      On February 17, 2007, Hermitage's Moscow office received a phone call from Artem Kuznetsov, a Lieutenant Colonel in the Tax Crimes Division of Moscow Interior Ministry, requesting an informal meeting.  A transcript of the conversation is attached hereto as Exhibit__.  Curiously, Lieutenant Colonel Kuznetsov would not state

Page 4

the specific reason for the meeting, saying only, "I cannot tell you over the phone.  It's not so simple as that.  We understand the head of your firm wants to visit our country. What I write in my report depends on what you provide and how you behave."  This was no more than an attempt to extort money from us; correspondingly, Hermitage refused to meet with Lieutenant Colonel Kuznetsov.

12.     On June 4, 2007, four months after his request for an "informal meeting" was refused, Lieutenant Colonel Kuznetsov led 25 officers from the Moscow branch of the Russian Interior Ministry in a raid on Hermitage's offices in Moscow.  The officers removed Hermitage's computer server, virtually all of its computers, and dozens of boxes of documents.  That same day ▮▮▮▮▮ Lieutenant Colonel Kuznetsov also participated in a raid of the offices of Firestone Duncan, Hermitage's lawyers in Russia.  Similarly, those officers removed Firestone Duncan's computer server, many of its computers, and enough client-related documents to fill two vans.

13.     Victor Paryugin, a young Russian lawyer with Firestone Duncan, complained that the search violated the rights of Firestone Duncan clients which were not named in the search warrant, but whose files were seized, nonetheless.  While the search was underway, Mr. Paryugin was taken into a conference room, beaten viciously by the raiding officers, and later, arrested.  After posting bail, Mr. Paryugin required hospitalization for two weeks to recover from the beating administered by Lieutenant Colonel Kuznetzov's henchmen.

14.     Hermitage was told that the raids were conducted as part of an investigation into taxes paid by an investment company called Kameya, which had been advised by Hermitage.  The investigation alleged that Kameya had misapplied the terms

Page 5

of the Russia-Cyprus Tax Treaty and owed $44 million in unpaid taxes. As soon as Hermitage learned of these allegations, its lawyers wrote to the Russian Ministry of Finance, the Russian Federal Tax Service, and Moscow Tax Office No. 7 (the office that had processed Kameya's tax returns); each confirmed that Kameya had applied the correct tax rate. In fact, Moscow Tax Office No. 7 notified Hermitage that it had found Kameya had overpaid approximately $140,000 in taxes.

████████████████████████████████████████████████████

15.     Four months later, in October 2007, Firestone Duncan, the administrator of the Hermitage Fund's investment companies, received a notice from the St. Petersburg Arbitrazh Court that three of the investment companies—Rilend, Parfenion, and Makhaon (the "Targeted Hermitage Fund Investment Companies")—were the subject of recent legal proceeding resulting in a $371 million judgment in favor of a company called Logos Plus.

████████████████████████████████████████████████████

16.     This was strange: at the time Hermitage believed the three companies were owned by the Hermitage Fund, yet neither Hermitage nor its lawyers had been notified of any pending lawsuits. As a result, neither Hermitage, nor anyone representing Hermitage, had appeared in court to defend against the claims. Furthermore, Hermitage had no record of having conducted business with Logos Plus.

17.     Further investigation by Eduard Khairetdinov, one of Hermitage's Russian lawyers, revealed that the corporate records and documents seized by the Moscow Interior Ministry in the dual June 2007 raids had been used to first re-register the

502421343.1
5/1/09

Targeted Hermitage Fund Investment Companies—effectively stealing them from the
Hermitage Fund—and then to create a number of forged and back-dated contracts
between the Targeted Hermitage Fund Investment Companies and Logos Plus (the
"Forged Agreements").

18.     Only four items were necessary to change the ownership of the Targeted
Hermitage Fund Investment Companies: the corporate stamp; the official charter of the
company; the original tax certificate; and the original corporate registration certificate.
Each of these items was confiscated by Lieutenant Colonel Kuznetsov in the office raids
of June 4, 2007, and were, allegedly to have remained in the custody of the Moscow
Interior Ministry.

███████████████████████████████████████████████

19.     The Forged Agreements purported to describe the sale of over $500
million in Gazprom shares to Logos Plus (despite the fact that Logos Plus had only $300
of total capital at the time). ████████████████████     In the lawsuits against the
Targeted Hermitage Fund Investment Companies, Logos Plus claimed that the Gazprom
shares had never been delivered, causing $371 million in lost profits attributable to the
rise in price of Gazprom stock.

██████████████████████████████

20.     Even more troubling was the discovery that, according to court records,
lawyers had appeared on behalf of the Targeted Hermitage Fund Investment Companies.
Instead of defending against the bogus claims, those purported lawyers had

Page 7

acknowledged the validity of the Logos Plus contracts.  Unsurprisingly, the judge awarded Logos Plus $371 million in a hearing lasting only five minutes.



21.     The lawsuits brought against the Targeted Hermitage Fund Investment Companies contained obvious signs of fraud: the claims were brought by an unknown individual using a stolen passport; necessary powers of attorney—and the contracts, themselves—were obvious forgeries or photocopies (which are not recognized under Russian judicial procedure) ▮ and the Forged Agreements, themselves, contained obvious mistakes (e.g., bank accounts were referenced in the contact which had not yet been opened), inaccuracies (incorrect addresses), and typographical errors. ▮

**THE FRAUDULENT SCHEME**
**PHASE TWO:**
**RETALIATION FOR CRIMINAL COMPLAINTS FILED BY HERMITAGE**

22.     Soon after discovering this fraud in late October 2007, two of Hermitage's lawyers, Vladimir Pastukhov and Mr. Khairetdinov, drafted a criminal complaint which set forth the details of the fraud—as they were known at the time—and which specifically

named Lieutenant Colonel Kuznetsov and Major Karpov as key participants. █████████

███████████████████████████████████████████████████████████████████████

██████████████████████         By December 14, 2007, Hermitage had filed six criminal

complaints (each comprising 255 pages, including exhibits and witness statements

describing what was known of the fraud in great detail) with the Russian General

Prosecutor's Office, the Russian State Investigative Committee, and the Internal Affairs

Department of the Russian Interior Ministry.

████████████████████████████████████████████████████

     23.     Rather than being shocked by the scope of the fraud and spurred to action

to apprehend the wrongdoers, the official reaction to Hermitage's criminal complaints

was extremely disappointing: two of the complaints were handed to Major Karpov for

further investigation—despite the fact that he was named as a key suspect in the

complaints; one was rejected because "no crime had been committed"; two others were

thrown out without any explanation; and the last was forwarded to a Major Rossokhov

from the Major Crimes Department in the Russian State Investigative Committee.  Major

Rossokhov eventually opened an official in February 2008.  The first people he

interviewed in the course of his investigation were Lieutenant Colonel Kuznetsov and

Major Karpov.

     24.     Retaliation for the filing of the criminal complaints was swift.  Less than a

month after Major Rossokhov opened an investigation in February 2008, Major Karpov

directed his subordinates to re-open a criminal case about Mr. Browder that had been

closed in 2004.

502421343.1
5/1/09

25.     That case had questioned the use of a local tax benefit by a Hermitage investment company called Dalnaya Step.  In 2001, Dalnaya Step had taken advantage of a tax benefit offered by the local government of Kalmykia.  That case had previously been resolved, when on ███, after █████ months of investigation, the Kalmyk Ministry of Interior found that Dalnaya Step had committed no tax violation and consequently closed the case due to the "lack of a crime".

████████████████████████

26.     Nonetheless, the visiting Moscow officers sent by Major Karpov demanded that the case be re-opened.  According to court documents and witness testimony obtained from the Interior Ministry, Major Karpov demanded that the local investigator—Mr. Nuskhinov—return early from his holiday to re-open the case. Although the process of re-opening an investigation normally takes approximately one month (due to certain formalities such as notifying the suspect, interviewing the suspect, arranging for court approvals, and other administrative issues ███████████████), Major Karpov was able to re-open the in only eight hours, bypassing all normal criminal procedures.

█████████████████████████████████████████

27.     Thus, without filing a tax claim or revealing any new evidence against Dalnaya Step, and four years after the statute of limitations for the charged offense had expired, the criminal case against Mr. Browder was re-opened.  As a result, Mr. Browder has been added to the Russian Federal Search list.

28.     Shortly thereafter, on March 28, 2008, Major Karpov formally charged Ivan Cherkasov, the Chief Operating Officer of Hermitage, with tax evasion relating to

Page 10

the Kameya investigation (described previously in paragraph 14).  Like Mr. Browder,

Mr. Cherkasov was placed on the Russian Federal Search list and the Interior Ministry

filed a request with the Russian General Prosecutor requesting his arrest *in absentia* and

his extradition from London.

29.     Finally, before closing the investigation into the criminal complaints

lodged by Hermitage, Mr. Gordievsky ███ began the procedure to open a criminal case

again Mr. Pastukhov and Mr. Khairtedinov—the lawyers who lodged the criminal

complaints on behalf of Hermitage.  This case alleged that both lawyers were acting on

false powers of attorney in their work to reverse the fraudulent judgments against the

Hermitage companies.  The Interior Ministry claimed that the only people who could

issue valid powers of attorney for our lawyers were the listed owners of the companies,

<u>i.e.,</u> the members of the Criminal Group who had stolen the Targeted Hermitage Fund

Investment Companies from Hermitage in the raids of June 2007.

███████████████████████████████

**THE FRAUDULENT SCHEME**
**PHASE THREE:**
**THEFT OF THE 2006 TAX REBATE**

30.     In June 2008 Heritage learned that the Targeted Hermitage Fund

Investment Companies had set up bank accounts at two very small Russian banks in

December 2007 (six months after the companies had been stolen).  Specifically, the

Criminal Group had opened new bank accounts for Rilend and Makhaon at Universal

Savings Bank ("USB"), and for Parfenion at Intercommerz Bank ("Intercommerz").

USB and Intercommerz were tiny banks (USB had $1.5 million of capital and

Intercommerz had $10.5 million).  It was, therefore, conspicuous, when $230 million

Page 11

flowed into the new accounts opened by the Criminal Group.  Stranger still, this spike in deposits (four times higher than average historical deposit levels at the banks) was equal to the amount of taxes that the Targeted Hermitage Fund Investment Companies had paid to the Russian government in 2006.

31.     It was at this moment that the scope of the Tax Rebate Fraud was revealed: the court judgments obtained through the Forged Agreements for the sale of Gazprom shares sought an amount identical to the profit that the Targeted Hermitage Fund Investment Companies had earned from investments in 2006 ($973 million).  The Criminal Group could then claim, in an amended tax return, that the Targeted Hermitage Fund Investment Companies had not, in fact, earned $973 million in 2006, but rather had earned no profits (the Companies' $973 million profits were wiped out by the $973 million liabilities obtained in the suits alleging breach of the Forged Agreements).

32.     As a result, the $230 million in taxes paid by the Targeted Hermitage Fund Investment Companies were refunded by Moscow Tax Bureaus Nos. 25 and 28 (where the Targeted Hermitage Fund Investment Companies had been re-registered by the Criminal Group).  This refund was, incredibly, granted only <u>two days</u> after the Criminal Group's claim was filed.

33.     The money was transferred to the newly opened accounts at USB and Intercommerz.  Subsequently, the amounts were converted into dollars and sent to other banks via correspondent accounts at ██████████████████████ Citibank, N.A., ███████████████████, and Wachovia Bank, N.A. in New York City.

████████████████████████████████

## HERMITAGE FILES ADDITIONAL CRIMINAL COMPLAINTS AND SUFFERS FURTHER RETALIATION

34.     After discovering the Tax Rebate Fraud, on July 28, 2008, Hermitage directed Mr. Khairetdinov to file seven new criminal complaints with the Russian General Prosecutor's Office, the Ministry of the Interior, the Federal Audit Chamber, the Federal Tax Service, the Federal Security Service (FSB), and the Russian State Investigative Committee, notifying each of them of the scope of the Tax Rebate Fraud and providing new details of how the Criminal Group had misused the Targeted Hermitage Fund Investment Companies to steal tax revenues from the Russian government.  Hermitage also shared this information with The New York Times and the Russian daily business newspaper, Vedemosti, both of which published comprehensive articles about the Tax Rebate Fraud.

████████████████████████████████████

35.     The Criminal Group responded by trying to frame Hermitage and its lawyers for orchestrating the fraud.  On August 18, 2008, the Criminal Group dispatched two men from Moscow to London to send a package back to Mr. Khairetdinov's offices in Moscow.  The package contained confidential files related to the Targeted Hermitage Fund Investment Companies.  A London Metropolitan Police investigation found that the two men had listed the return address of Hermitage's London office on the package before depositing it at the DHL Lambeth Depot for delivery to Moscow.  The package arrived at Mr. Khairetdinov's offices at 4:56 pm on August 20, 2008, and, according to the Interior Ministry protocol, four Interior Ministry officers raided the office less than

502421343.1
5/1/09

ninety minutes later.  The officers immediately seized the package and accused Mr.

Khairetdinov of possessing documents instrumental to the Tax Rebate Fraud.

███████████████████████████████████████████████████

### THE APPARENT FRAUD AGAINST RENAISSANCE CAPITAL

36.     On Friday, November 30, 2007, the day after Mr. Khairetdinov notified

Major Karpov that Hermitage had discovered details about the theft of the Hermitage

Fund Investment Companies, Mr. Browder received a telephone call from Igor Sagiryan,

the President of Renaissance Capital.

37.     Mr. Browder was suspicious of the call, having only met Mr. Sagiryan

once, many years earlier, and never having spoken to him since that time.  Hermitage had

a very minor historical commercial relationship with Renaissance, limited to standard

Russian brokerage operations.  Additionally, the call came at a sensitive time: it was only

one day after Mr. Khairetdinov had notified the Interior Ministry of Hermitage's pending

criminal complaint.

38.     The telephone call was recorded, and a transcript is attached hereto as

Exhibit ___.

39.     Mr. Sagiryan explained that he was aware of Hermitage's problems in

Russia.  This, by itself, aroused great suspicion: the only people who knew about

Hermitage's "problems" were certain Hermitage employees, Hermitage's lawyers, and

Major Karpov ██████, and the members of the Criminal Group who had orchestrated

the fraud.  Mr. Sagiryan was not a member of any of these categories.

████████████████████████████████████████████████

502421343.1
5/1/09

40.     Mr. Sagiryan requested a face-to-face meeting with Mr. Browder in London.  Mr. Browder agreed to the meeting, and it was ultimately scheduled for December 11, 2007.

████████████████████████

41.     On the next working business day, December 3, 2007, Mr. Sagiryan called Mr. Jamison Firestone, Managing Partner of Firestone Duncan, Hermitage's lawyers in Moscow.  Mr. Sagiryan requested a meeting with Mr. Firestone.  That meeting took place in Moscow on December 4, 2007.  Mr. Firestone has prepared an affidavit describing the telephone call and his meeting with Mr. Sagiryan which is attached hereto as Exhibit __.

42.     On December 10, Mr. Browder received a telephone call from Stephen Jennings, Chief Executive Officer and main shareholder of Renaissance Capital.  The call was recorded and a transcript of that conversation is attached hereto as Exhibit __.

43.     Mr. Jennings encouraged Mr. Browder to keep an open mind at his forthcoming meeting with Mr. Sagiryan.  Strangely, however, Mr. Jennings emphasized that he did not want to mention Mr. Sagiryan by name on the telephone.  He also refused to elaborate on what it was that Mr. Sagiryan wanted to discuss at the meeting.

44.     On December 11, Mr. Browder and Mr. Sagiryan met at approximately 7:00 pm.  Mr. Sagiryan informed Mr. Browder that he was fully aware of all of the legal problems that Hermitage was experiencing in Russia.  He also said that he believed that Renaissance could help with those problems by arranging for the liquidation of the Targeted Hermitage Fund Investment Companies.  During the conversation, Mr. Sagiryan also offered to help liquidate companies which did not belong to Hermitage.

502421343.1
5/1/09

45.     Mr. Sagiryan was extremely keen that Hermitage agree to the liquidation of the Targeted Hermitage Fund Investment Companies, explaining that Renaissance had experience in liquidating other companies and that doing so gets rid of problems. ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Mr. Sagiryan further explained that once a company is liquidated there are no more records, so no more investigations can take place.

46.     The meeting with Mr. Sagiryan took place approximately two weeks before the $230 million tax rebate was paid to the new accounts of the Targeted Hermitage Fund Investment Companies at USB and Intercommerz.

47.     While investigating the relationship between USB, Intercommerz, and the $230 million Tax Rebate Fraud, Hermitage learned of two additional large spikes in deposits at USB that occurred in January 2007 and March 2007.  Records showing these spikes are attached hereto as Exhibit __.

48.     These additional spikes coincided with new accounts opened at USB by two entities: Selen Securities and Financial Investments Limited.  These entities were formerly wholly-owned investment subsidiaries of Rengaz Holdings Limited ("Rengaz").  Rengaz was a company managed by Renaissance Capital, to provide non-Russian investors with access to local shares of Gazprom.  Selen Securities and Financial Investments Limited (the "Rengaz Subsidiaries") functioned as local investment holding companies of Rengaz, and were therefore registered in Russia and paid tax on capital gains at the rate of 24%.

49.     RenCap Securities is Renaissance's New York-based US SEC-registered broker dealer, and it is a member of the Securities Investor Protection Corporation and the Financial Industry Regulatory Authority.

Page 16

███████████████████████████████████

50.     Renaissance's audited financial statements showed that Rengaz's subsidiaries had paid $106.9 million in capital gains taxes in 2006.  The Rengaz Subsidiaries' filings with the Russian State Statistics Committee (Goskomstat), however, showed a tax payment of just $1.1 million in 2006.  It appeared that the Rengaz Subsidiaries had paid $108 million in taxes in early 2006, and then received a tax refund in late 2006 of approximately $106.9 million leaving a net tax payment of approximately $1.1 million.

███████████████████████████████████

51.     Thus, it initially appeared that the Rengaz Subsidiaries had been victims of a fraud similar to the Tax Rebate Fraud suffered by Hermitage.  Hermitage found judgments against the Rengaz Subsidiaries by the same courts that had issued the judgments against the Targeted Hermitage Fund Investment Companies creating the fictitious liabilities used to obtain the $230 million tax refund.  Those court files also contained backdated contracts in almost exactly the same format as the Forged Agreements used against the Hermitage companies.

52.     Specifically, the complaints claimed that the Rengaz Subsidiaries had sold $980 million of Russian stock to shell companies and had not delivered the shares as required.  Thus, the lawsuits claimed the shell companies were entitled to $980 million in damages.  The lawyers who appeared on behalf of the Rengaz Subsidiaries plead guilty and accepted full liability, just as they had in the cases against the Targeted Hermitage Fund Investment Companies.  Judgments were issued totaling $525 million ($421 million against Financial Investments Limited and $104 million against Selen Securities), which,

Page 17

as against the Hermitage companies, roughly corresponded to the Rengaz Subsidiaries' profits in 2006.

53.    ███████ months after these judgments were issued, upon information and belief, the Rengaz Subsidiaries' accounts at USB – the same bank that had laundered the money received through the fraudulent tax refund from the stolen Hermitage companies – received deposits equaling the amount of tax that would have been paid on the income that had been "overstated" due to the court judgments.  This would explain the extraordinary spike in deposit activity at USB that has been reported to the Central Bank of Russia.

███████████████████████████████████████████
███████████████████

54.    It thus appeared that the Rengaz Subsidiaries had been victims of a tax rebate fraud nearly identical to that perpetrated against the Targeted Hermitage Fund Investment Companies.  The number of similarities is striking:

- both relied on fake securities transactions with shell companies as the basis for lawsuits claiming lost profit against the Hermitage investment companies and the Rengaz Subsidiaries;

- the "Sales and Purchase Agreements" composing the evidentiary basis of the lawsuits were essentially identical documents, with only the names of the parties changed;

- the same lawyer, Andrei Pavlov, appeared as plaintiff's lawyer in both cases;

- the same individual, Alexander Sheshenia (a criminal convicted of manslaughter) was the owner of the shell companies that acted as plaintiff in both frauds;

- the same person, Gennady Plaksin, Chairman of USB, was a director of companies that acted as plaintiff in both frauds;

502421343.1
5/1/09

- the fictitious judgments were awarded by the same two courts in Moscow and Kazan (out of eighty-one possible courts) against both the Hermitage and Renaissance companies;

- in both frauds the defense lawyers simply plead guilty and accepted full liability for the plaintiffs' claims;

- the court judgments in both frauds were used to offset historical profits and subsequently to form the basis for amended tax returns and tax refund requests;

- the tax refunds in both cases were processed by the same tax bureaus in Moscow (Nos. 25 and No. 28), out of ninety-two tax bureaus in the region of Moscow;

- the notary in both cases … ;

██████████████████████████

- the tax refunds in both frauds were sent initially to USB; and

- once the tax refund was fraudulently reclaimed, both the Hermitage and Renaissance companies were re-registered to the Russian region of Novocherkassk and submitted for liquidation.

55.    Owing to the large number of striking similarities between the two frauds, I believed, at the time, the same Criminal Group that orchestrated the fraud against Hermitage also executed the apparent tax fraud at Rengaz.

████████████████████████

**RENAISSANCE CAPITAL'S INVOLVEMENT IN THE RENGAZ TAX FRAUD**

56.    After some aspects of the suspicious Rengaz tax refunds were publicized in Business Week and Vedemosti, Renaissance responded publicly by claiming, '████. In the course of Hermitage's investigation of the criminal actions in Russia, however, it became apparent that this public response was false.  In fact, it appeared that Renaissance had been actively involved in the fraud against the Rengaz Subsidiaries.

502421343.1
5/1/09

█████████████████████████

57.     Hermitage learned that Renaissance employees had helped to create the fake liabilities used to obtain fraudulent tax refunds <u>before</u> the companies were sold.  On November 1, 2005, three months before Rengaz sold the Rengaz Subsidiaries on January 30, 2007, Ms ████ Anisimova, the General Director of Financial Investments, signed a fake sales and purchase agreement, that was one of the key documents used in the creation of the fake court judgments.

█████████████████████████████████████

58.     Renaissance was also connected to the corporate structures that bought the Rengaz Subsidiaries and controlled them when the crimes were committed.  On January 25, 2006, after the Rengaz Subsidiaries paid $108 million in capital gains taxes, Rengaz sold the Rengaz Subsidiaries to a Cyprus company called Connery Holdings ███ ("Connery").  Bruce Gardner, former ██████████ of Renaissance Capital, was a director of Connery between ████ and ████ Richard Olphert, a Managing Director and the Head of Merchant Banking at Renaissance and one of the three largest shareholders of Renaissance, was a director of Connery from April 15, 2002, to December 6, 2004.

████████████████████

59.     On January 30, 2007, Connery again sold the Rengaz Subsidiaries to Jets Ventures Limited ("Jets Ventures"), its 100% parent.  Jets Ventures was incorporated in the British Virgin Islands. █████████████████████ Jets Ventures owned the Rengaz Subsidiaries at the time the fake court judgments against them were issued.

█████████████████████████████████████

502421343.1
5/1/09

60.     Caldierra Holding Limited "(Caldierra"), a Cypriot company, is—like Connery—a wholly-owned subsidiary of Jets Ventures.  Richard Olphert is currently a director of Caldierra.  Stephen Jennings, Chairman of Renaissance and Chief Executive Officer of RenCap Securities until resigning on August 26, 2003.

███████████████████████████████████████████

61.     Another wholly-owned subsidiary of Jets Ventures is Fantley Enterprises Limited ("Fantley"), a Cypriot company.  Richard Olphert was a director of Fantley from May 24, 2002, to April 26, 2005.  Stephen Jennings was a director of Fantley from May 24, 2002, to August 26, 2003.

62.     Another wholly-owned subsidiary of Jets Ventures is Murrini Holdings Limited ("Murrini"), a Cypriot company. Richard Olphert was a director of Murrini until November 30, 2004.

63.     There was, however, no valid commercial rationale for these sales.  The Rengaz Subsidiaries were empty shell companies with no operating business, possessing only legacy obligations from Renaissance.  The sole asset of the Rengaz Subsidiaries was a $329 million note payable from an offshore a Renaissance Cyprus company ████ and the sole liability of these companies was a $63 million dividend withholding tax liability.

███████████████████████████████████████████

64.     Thus, the transaction was irrational: the price purportedly paid for the Rengaz Subsidiaries—$329 million—ignores the $63 liability.  Additionally, an arms-length buyer would not accept a $329 million note from an offshore shell company without some type of security, which was not provided.

502421343.1
5/1/09

65.     Renaissance also had ongoing business relationships with individuals who had laundered the stolen tax money and who had created the fake liabilities that formed the basis for the court judgments.  Gennady Plaskin, the Chairman of USB, the bank which had initially received the misappropriated tax rebate of both the Hermitage and Rengaz entities, was also the beneficial owner of the shell company which had sued both the Hermitage companies and the Rengaz Subsidiaries to create the fake liabilities.

66.     Shortly after suing the Rengaz Subsidiaries, Mr. Plaskin purchased two additional investment companies from Renaissance: Neptune Securities on July 3, 2006, and Rodon Securities on October 26, 2006.  Mr. Plaskin's son, Arkady, also purchased investment companies from Renaissance, buying Nevits Securities on August 14, 2006.



67.     Interestingly, Renaissance executives did not complain when the apparent tax fraud involving the Rengaz Subsidiaries was publicized.  Unlike the criminal complaints we filed immediately after discovering the tax fraud, Renaissance did not file any criminal complaints about the fraud perpetrated against the Rengaz Subsidiaries.

**THE MIKHAILOVSKY GOK FRAUD ALSO INVOLVED RENAISSANCE CAPITAL, USB AND THE SAME CO-CONSPIRATORS**

68.     Further research uncovered a long-term working relationship between USB and Renaissance.

69.     On ▮▮▮ Dimitri Kluev, USB's largest shareholder, ▮▮▮▮▮ USB's CEO, and ▮▮▮▮▮ USB's chief accountant, were convicted of fraud, ▮▮▮▮▮▮ by the ▮▮▮▮▮ in ▮▮▮▮▮  The court found that these individuals had perpetrated a fraud against Mikhailovsky GOK, a large iron ore plant in Russia, and its owner, Alisher Usmanov.

70.     Court documents from that trial reveal that Oleg Kiselov, President of
Renaissance at the time, was ███████ as part of the fraud.  During the court hearings
evidence was presented by ███████ the Deputy CEO of Renaissance, who described
Dmitry Kluev as a "long term partner of Renaissance." ███████████  Most
relevantly for this case, Mr. Kluev was used for his "expertise in recovering taxes using
court judgments." █████████

71.     The court documents also disclosed that Dmitri Kluev relied upon a wide
range of individuals and actors in executing the Mikhailovsky GOK fraud.  These parties
also appear in the apparent Rengaz fraud and the Tax Rebate Fraud perpetrated against
the Targeted Hermitage Fund Investment Companies.  For example, Andrei Pavlov, the
plaintiff's lawyer in both the Tax Rebate Fraud against the Hermitage companies and the
apparent fraud against the Rengaz Subsidiaries, was the ████████ in the Mikhailovsky
GOK fraud and is listed as sharing ████████████████████████████████
the same office as Mr. Kluev.  Gennady Plaksin ██████████

72.     A summary of the common characters in the Mikhailovsky GOK fraud,
the Rengaz fraud and the fraud against the Hermitage investment companies is set forth
below.

|  | Mikhailovsky GOK | Rengaz | Fraud against Hermitage Cos. |
|---|---|---|---|
| Item 1 |  |  |  |
| Item 2 |  |  |  |
| Item 3 |  |  |  |

Page 23

Item 4…

| | | |
|---|---|---|

## ROLE OF U.S. BANKING INSTITUTIONS IN LAUNDERING THE PROCEEDS OF THE FRAUDS AGAINST HERMITAGE AND RENGAZ

73.     Discovery is necessary here because the proceeds of the Tax Rebate Fraud were sent through banks located within this Court's jurisdiction.  As described above (in paragraph 33), the funds were processed and paid to the Criminal Group through accounts at USB and Intercommerz, and were then converted into US dollars and sent overseas.  Raiffeissen Zentralbank Oesterreich Bank AG Austria ("Raiffeissen") is the sole holder of correspondent accounts for both USB (Account ███████████) and Intercommerz (Account ██████████.

74.     Raiffeissen processes all its dollar-denominated transfers and payments through correspondent accounts in the United States.  Those accounts are with ████████████████████████ (Account No. ██████), Citibank, N.A. (Account ███████ ████████████████████████ (Account ██████), and Wachovia Bank, N.A. (Account No. ██████ .  All these accounts are located in New York City (collectively, the "US Correspondent Banks").  The US Correspondent Banks clear payment through their correspondent accounts with the Federal Reserve System (ABA) or CHIPS (ClearingHouse ████████ Processing System) New York.  ████████████████████

75.     In total, $230 million was wired through the US Correspondent Banks in connection with the fraud against Hermitage, and US$108 million was wired through US Correspondent Banks in connection with the Rengaz fraud.

76.     Discovery from the US Correspondent Banks would show the origin and destination of the illicit proceeds of the two frauds and would ultimately lead to the

502421343.1
5/1/09

identification of the members of the Criminal Group who benefited from the fraud against Hermitage.

77.     Key members of the Criminal Group may be found in this jurisdiction, including Stephen Jennings, Richard Olphert and Igor Sagiryan.  They will be able to provide substantial evidence that will illuminate the scope of the fraud and their central role in its conception and execution.  This evidence includes the wire transfer records of the proceeds of the Tax Rebate Fraud through banks in this jurisdiction and the identification of the ultimate recipients of the proceeds of the Tax Rebate Fraud.  This information, of critical importance to the Foreign Proceedings, can only be found here, in the United States, with the banks at which the Criminal Group maintained its dollar-denominated correspondent accounts.


WHEREFORE, I respectfully request the Court grant Applicant's application in its entirety.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

London, England
Dated: May __, 2009


_____

Grant Felgenhauer

