H53VPREA

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          13 CV 6326 (WHP)

5    PREVEZON HOLDINGS, ET AL,

6              Defendants.                 ARGUMENT

7    ------------------------------x

8                                          New York, N.Y.
                                           May 3, 2017
9                                          5:17 p.m.

10
     Before:
11
                     HON. WILLIAM H. PAULEY III,
12
                                           District Judge
13

14                        APPEARANCES

15
     JOON H. KIM,
16        Acting United States Attorney for the
          Southern District of New York
17   PAUL M. MONTELEONI
     CRISTINE I. PHILLIPS
18   TARA M. LaMORTE
          Assistant United States Attorneys
19
     QUINN EMANUEL URQUHART & SULLIVAN
20        Attorneys for Defendants
     BY:  ADAM M. ABENSOHN
21        FAITH E. GAY
          KEVIN S. REED
22        RENITA SHARMA
          CORY STRUBLE
23        -AND-
     NATALIA VESELNITSKAYA

24

25

H53VPREA

1        (Case called)

2        THE COURT:  We have a large agenda this afternoon and

3    I appreciate counsel's accommodation to start at this hour,

4    given the fact that I have a jury trial that's ongoing at the

5    moment.

6        By my count, there are 14 motions *in limine*.  I want

7    to move through all of them and resolve as many of them as I

8    can this afternoon so that the parties will be informed

9    regarding the trial in this case.

10        Second, and just by way of housekeeping, the jury

11    clerk informs me that there are a large number, at this moment,

12    of criminal cases scheduled for jury selection on May 15.

13    Civil cases by custom take a back seat to jury selection in

14    criminal cases.

15        My experience tells me and the advice of the jury

16    administrator -- who I trust very dearly -- tells me that we

17    all might be better off if we selected our jury on Tuesday, May

18    16, and started the trial on Tuesday, May 16.  The jury

19    administrator assures me that I will have a fresh panel.  I

20    would not move to Tuesday if I was going to get rejects from

21    Monday.  But it will be a fresh and animated panel.  So unless

22    things change materially, plan on jury selection on Tuesday,

23    May 16.  We'll save ourselves a lot of aggravation, because

24    otherwise we'll be sitting around into the afternoon waiting to

25    get started.

1            All right.  So, as I say, we have a lot of motions *in*

2     *limine*.  You can be assured that I have reviewed all of the

3     parties' submissions on these motions.  I'll say no menial

4     task.  Therefore, I want to move through them.  You can advance

5     arguments that you think need to be amplified, but let's not

6     reinvent the wheel; you don't have to tell me what's in your

7     motion papers.

8            I'm going to turn first to Prevezon's motions *in*

9     *limine*.  Let's start with motion *in limine* No. 1, evidence

10    gathered through the criminal investigation and the MLAT

11    process.

12            MR. ABENSOHN:  Thank you, your Honor.

13            Adam Abensohn for Prevezon.

14            I will say, your Honor, this is the time of day that

15    I'm usually napping at my desk, so I'll do my best to stay up

16    for the Court.

17            Thirty-five years ago, your Honor, the Supreme Court

18    held that the government cannot use its grand jury powers for

19    purposes of obtaining evidence for use in a civil case.  That

20    was the holding in *United States v. Sells*, which is cited

21    prominently in our papers.

22            The government spends a lot of time in its briefing

23    arguing about whether *Sells* remains good law, what the

24    effective rule change may or may not have been; but, at the end

25    of the day, the government acknowledges that the core holding

H53VPREA

1  of *Sells* continues to apply.

2       THE COURT:  There's not any per se rule or categorical

3  rule, is there, that says the government may not use evidence

4  obtained from a grand jury investigation for a related civil

5  case?

6       MR. ABENSOHN:  There is a categorical rule, your

7  Honor, and I'm quoting the government, that the government may

8  not use grand jury process for the sole or dominant purpose of

9  using the information in a civil forfeiture case.

10      THE COURT:  Do you believe that the government's

11  criminal investigation is a sham?

12      MR. ABENSOHN:  Your Honor, we don't have enough

13  insight to know outright if it's a sham, but we certainly know

14  that they have used grand jury process for the specific purpose

15  of selecting evidence in this case.  There is numerous indicia

16  of it in the record, including a very straightforward

17  acknowledgment by the case agent, which I can read to your

18  Honor.  This is Special Agent Hyman, deposed on October 6,

19  2015.  He was asked the following question:

20       "Did you issue grand jury subpoenas in this case?

21  "A.  Yes, we did."

22       Now, that's about as direct as it gets.  The

23  government was doing exactly what it says it's not entitled to

24  do, which is to use grand jury process to collect evidence for

25  use in a civil forfeiture action.

H53VPREA

| | |
|---|---|
| 1 | Now, there are other clear indicia of this all |
| 2 | throughout the government's briefing.  I'm not going to go into |
| 3 | all of them for reasons your Honor has already alluded to, |
| 4 | given our agenda, but there's a few I think worth pointing out. |
| 5 | The government has this recurring theme, for instance, |
| 6 | that Agent Hyman didn't have enough time to prepare because of |
| 7 | gamesmanship by prior defense counsel that, in the government's |
| 8 | words, forced Judge Griesa to set an abbreviated schedule. |
| 9 | They raise that in their opposition numerous times; pages 2, |
| 10 | 11, 12, 14. |
| 11 | Now, respectfully, that doesn't help the government's |
| 12 | position because what the government is doing, in essence, is |
| 13 | not denying that they used grand jury process for purposes of |
| 14 | this case, they are offering an explanation as to why they did |
| 15 | it.  They are saying, in so many words, Judge Griesa put it to |
| 16 | us in terms of the schedule, and this was our best option in |
| 17 | the difficult circumstances and limited time that we had. |
| 18 | Under *Sells*, however, your Honor, the government did |
| 19 | not have that prerogative; they had the option that we had or |
| 20 | any other civil litigant had, which was to use the standard |
| 21 | tools of civil discovery or to seek appropriate relief from the |
| 22 | Court.  They didn't do that.  They took it into their own hands |
| 23 | and they used grand jury subpoenas to collect evidence for this |
| 24 | case. |
| 25 | There was something else that struck me in the |

1    government's brief.

2              THE COURT:  But isn't the standard that it be the sole

3    and dominating purpose?

4              MR. ABENSOHN:  I think the word that the government

5    uses is "primary."  And we'll live with "primary" because these

6    grand jury subpoenas were issued in this case.  That was Agent

7    Hyman's statement.  And I found it interesting in the

8    opposition papers when the government referred to the stay

9    period.  They said, Well, the fact that we were issuing

10   subpoenas during the stay period shows that we were acting

11   independent of this action.

12             This is one of those instances where, in a sense, we

13   were all in the room; we were here when we were arguing about

14   whether the government could use the materials it generated

15   during the stay period in this case.  And while the government

16   says in its brief now that it was aware of the possibility it

17   wouldn't be able to and it was essentially offering them to us

18   as an afterthought in discovery and it wasn't its primary

19   purpose, your Honor saw the tracing chart that the government's

20   expert in this case had developed around this new grand jury

21   discovery.  And your Honor heard Mr. Monteleoni saying a

22   massive number of hours and resources were devoted in

23   generating that report and doing that analysis.

24             So what occurred in the stay period, your Honor,

25   respectfully, is not indicative of the government working

towards some other end; it is fully consistent with what Agent
Hyman stated on day one, which is grand jury subpoenas have
been getting issued in this case.

The other observation I'll make about the government's
brief is what it doesn't say.  It does not describe any
ordinary civil discovery by the government vis-a-vis third
parties, with the exception of a single Rule 45 subpoena.  This
is a case with evidence being collected from dozens of third
parties, including numerous domestic banks, not more than one
subpoena under Rule 45, your Honor, all the rest collected by
criminal investigative tools.  That is directly contrary to
what the Supreme Court addressed in *Sells*.

I'll quote the case.

"If government litigators in civil matters enjoyed
unlimited access to grand jury material, there would be little
reason for them to resort to their usual more limited avenues
of investigation.  To allow these agencies to circumvent their
usual methods of discovery would not only subvert the
limitations and procedural requirements built into those
methods, but would grant the government a virtual *ex parte* form
of discovery."

That is what we had been operating under in this case,
your Honor.  The government has had virtual *ex parte* discovery,
a single Rule 45 subpoena.

THE COURT:  Is the standard for reviewing the

H53VPREA

 1      propriety of MLATs in civil proceeding the same as the standard

 2      for reviewing the use of grand jury subpoenas?

 3              MR. ABENSOHN:  Your Honor, I would argue under the

 4      language I've just read from *Sells* that it certainly has a lot

 5      in common, because the ultimate holding in *Sells*, one of the

 6      three prongs of the decision, is that the government cannot

 7      avoid the civil rules of discovery and resort to criminal tools

 8      of discovery and, thus, place themselves on an unequal playing

 9      field.

10              With respect to the MLATs, that's exactly what's

11      happened.  Here, the government relies a lot on the presumption

12      of regularity to their criminal investigative matters.

13              I've already talked about Agent Hyman's testimony.

14      Let me talk about how blatant the use of the MLATs were for

15      purposes of this civil case.

16              In the government's opposition, they say repeatedly --

17      I have it at pages 1 and 15 -- that they were using the MLATs

18      in support of their criminal investigation.  I want to read now

19      from the only MLAT that we've had access to, and that was the

20      MLAT that the government submitted to Russia.  This is the

21      second sentence of the MLAT request:

22              "The United States Attorney's Office for the Southern

23      District of New York is litigating an *in rem*

24      nonconviction-based forfeiture action seeking the assets of

25      Prevezon Holdings."

1          So, again, in the brief we were doing this in support

2     of a criminal investigation.  On the face of the MLAT, we're

3     doing this in support of a civil forfeiture action.  Your

4     Honor, this goes to the heart of what *Sells* was concerned

5     about.  The government has essentially spent this entire

6     three-year period gathering its information, collecting its

7     documents through criminal processes, and virtually none of its

8     time doing it through civil processes.  That eliminates

9     transparency from the defense standpoint; it eliminates all

10    variety of protection we would have through the use of Rule 45

11    and standard civil discovery procedures.

12          I'll turn to another very blatant admission.  The

13    government has a footnote in its brief where it says

14    government-to-government legal assistance requests are a more

15    efficient means of obtaining evidence than The Hague

16    Convention.  Here, again, the government is not disagreeing

17    that they relied on criminal process, they are explaining why

18    they did it:  Because it's more convenient.  That's what *Sells*

19    tells the government it can't do.  It can't take the easy route

20    when it's supposed to live by the same strictures of civil

21    discovery rules that we live by.

22          THE COURT:  Let me hear from Mr. Monteleoni.

23          MR. ABENSOHN:  Of course, your Honor.

24          THE COURT:  Thank you.

25          MR. MONTELEONI:  Thank you, your Honor.

1        I'm happy to answer specific questions that the Court

2   has, but --

3        THE COURT:  What evidence have you gathered outside of

4   the grand jury process?

5        MR. MONTELEONI:  What evidence have we gathered

6   outside of the grand jury process?  Most of our evidence came

7   from voluntary provision from various third parties, including

8   the witness whose identity has now been unsealed, Nikolai

9   Gorokhov, who voluntarily provided us with information, just as

10   various parties have voluntarily provided the defendants with

11   information.  We've gotten that when the defendants have deemed

12   appropriate.  Voluntary provision obviously is not a Rule 45

13   subpoena; it's not something that can be objected to; it's just

14   an additional means of gathering evidence that is entirely

15   permissible in a civil case.  So that's really where most of

16   the additional evidence that we've gotten has come from.

17        Additionally, there have been government-to-government

18   requests.  Some have been under treaties, some have been formal

19   requests to countries such as Moldova, with whom there is no

20   treaty.  However, the governments are entirely within their

21   rights to provide information on the basis of reciprocity,

22   their own sovereign decisions.

23        I think that it's actually very telling that defense

24   counsel is seeking to preclude wide swaths of information

25   that's been gathered from government-to-government requests

1   without any authority that actually addresses that.

2          *Sells Engineering* did not in any way address the MLAT

3   process; it actually didn't even create the rule that

4   defendants cited for, which is that the grand jury should not

5   be used for the sole or dominant purpose of other than

6   evaluating a proposed indictment.

7          What *Sells Engineering* concerned was the definition of

8   an attorney for the government and whether that included civil

9   attorneys within the Justice Department.  That holding, the new

10  holding in *Sells*, was entirely superseded in civil forfeiture

11  cases by Section 3322(a) and FIRREA.

12         *Sells* doesn't have some broad principle that if

13  someone like Nikolai Gorokhov comes to us or if someone like

14  Leonid Petrov comes to the defendants, that they can't

15  voluntarily provide information.

16         It also doesn't stand for a principle that a sovereign

17  state, if faced with a request from the U.S. Government, cannot

18  decide whether or not to gather and provide that information.

19  Because that's what happens in each of the treaty requests and

20  in the nontreaty requests.  There are terms of the treaties,

21  but the execution of them is left up to the sovereigns.

22  Whether a request is within the treaty or outside a treaty in

23  force or entirely outside of a treaty relationship, that's a

24  matter in between the sovereigns and it has to be resolved

25  sovereign-to-sovereign.  To do otherwise would actually be to

1    read in suppression terms into the treaties that sovereigns

2    have created.

3          THE COURT:  Do the specific MLAT treaties between the

4    United States and the countries that received MLAT requests in

5    this action specify whether the information is requested and

6    produced for criminal or civil purposes?

7          MR. MONTELEONI:  It depends a little bit based on the

8    instrument and also the interpretation of what constitutes

9    criminal.  It depends on the receiving nation.

10          *In rem* forfeiture actions are under sort of long

11    tradition quasi-criminal proceedings.  So some countries can

12    interpret criminal requests to apply to them, some countries

13    don't interpret criminal requests to apply to them, but have

14    separate forfeiture-specific treaties and some don't have

15    forfeiture-specific treaties and may provide it or not based on

16    whether they want to, either with or without a treaty.

17          What the treaties that are at issue here all have is

18    nonsuppression terms.  So what the defendants are actually

19    asking for is just modifications to all of the treaties.  And

20    as the Second Circuit held in *Romi*, that deprives the

21    contracting parties, the states, of the terms that they

22    bargained for.  And to do that here on the basis really of no

23    law in particular, is entirely inappropriate.

24          So we think that it's actually very clear-cut that

25    certainly there are restrictions on when you can use the grand

jury process, there are restrictions on when you can use other

forms of civil discovery; but there's not a general restriction

on getting something through proper means and then using it in

the case.  And whether or not documents provided by foreign

sovereign were gotten through proper means is between the two

sovereigns.  That's fundamental to the government-to-government

relationships.  So there's no authority to disturb that; in

fact, the Second Circuit's ruling is to the contrary.

THE COURT:  When did you begin issuing MLAT requests

to foreign countries in this case, before or after the Second

Circuit put the stay in place with respect to the

disqualification motion?

MR. MONTELEONI:  The very first MLAT requests went out

shortly after the complaint and the restraining order made

public that we were taking action.  That's where all of the

materials that are actually at issue here in this case are

from, are from MLAT requests that happened in the months

following the filing of the complaint and the restraining order

and the defendants becoming aware thereby of the investigation.

Additionally, once the stay was in place and certain

government personnel like me had a little bit more time, we did

additional requests to foreign sovereigns.  We did additional

grand jury subpoenas.  But the Court has already precluded all

of that just on grounds of coming outside of the discovery

period, so that's not at issue in this motion at all.  It's

H53VPREA

1   really just to the MLATs that began to be filed once the

2   complaint was filed.

3           THE COURT:  Anything further?

4           MR. MONTELEONI:  No, your Honor, not on this motion.

5           THE COURT:  All right.

6           Anything further?

7           MR. ABENSOHN:  Briefly, your Honor?

8           THE COURT:  You can take it right from there where

9   you're standing.  Just keep your voice up in a stentorian way.

10          MR. ABENSOHN:  I will do my best.  And I will look up

11  "stentorian" after today's conference, your Honor.

12          First of all, the Court asked whether there are

13  provisions in the treaties requiring that they be for criminal

14  investigative purposes.

15          I'm reading from the U.S. treaty with Estonia.  It's

16  Article 1, No. 1:  "The parties shall provide mutual assistance

17  in accordance with the provisions of this treaty in connection

18  with the investigation, prosecution, and prevention of offenses

19  in proceedings related to criminal matters."

20          The treaties provide for the reciprocal provision of

21  material in support of criminal investigations, your Honor, not

22  civil forfeiture actions, as the government put on the face of

23  the MLAT requests that it was providing to these countries.

24          Mr. Monteleoni talked about how it's up to the

25  sovereign what information to share.  As between the

H53VPREA

1    sovereigns, that may well be true.  It may be up to the

2    sovereigns what information to share.  But one sovereign, the

3    United States, has a separate obligation to a defendant in a

4    case.  That's what *Sells* speaks to.  The United States as a

5    sovereign has an obligation to play on a level field when it

6    comes to matters of civil discovery.  That was the Court's

7    holding; that's the passage I read.  Whatever any country was

8    permitted to do vis-à-vis the United States, the United States

9    was not permitted to end-run the rules of civil disclosure and

10   discovery by means of using criminal investigative tools.

11          Mr. Monteleoni told us the MLATs started going out

12   shortly after the complaint was filed.  I will add that to the

13   list of clear indicia that these criminal tools were being used

14   for purposes of supporting this action.

15          Finally, Mr. Monteleoni started off assuring the Court

16   that most of the government's evidence was provided voluntarily

17   by third parties.  I think that's great.  It suggests an easy

18   solution here.  Let's preclude the material that was wrongfully

19   obtained vis-à-vis grand jury and MLAT process, and apparently,

20   as the government sees it, it will still have plenty of

21   evidence left.  We don't quite agree with that, but if that's

22   their assessment, we'd certainly invite as the appropriate

23   remedy the preclusion of this improperly obtained material.

24          Thank you, your Honor.

25          THE COURT:  All right.

H53VPREA

```
 1          Mr. Monteleoni, is there any reason that you could not
 2   provide the Court with an affidavit laying out the various
 3   purposes for which the grand jury process has served and is
 4   currently being used?
 5          MR. MONTELEONI:  No, your Honor.  I'd be happy to.
 6          When would you like it?
 7          THE COURT:  When can you provide it?
 8          MR. MONTELEONI:  Juggling a number of things, would
 9   Monday be too late?
10          THE COURT:  No.  It's fine.
11          MR. MONTELEONI:  Thank you, your Honor.
12          THE COURT:  Look, I think it's necessary for me to
13   rule on this now.
14          So Prevezon's motion to exclude evidence obtained
15   through the grand jury process is denied.
16          The law in the Second Circuit regarding the use of
17   grand jury materials in an action unrelated to a pending
18   indictment is simple:  "It is improper for the government to
19   use the grand jury for the sole or dominant purpose of
20   preparing for trial."  *United States v. Leung*, 40 F.3d 577, 581
21   (2d Cir. 1994).
22          Although this proposition applies mainly in situations
23   where post-indictment grand jury evidence is used at trial for
24   previously-filed charges, it applies with equal force when the
25   grand jury process is utilized to build evidence in a civil
```

trial, especially where, as here, the underlying allegations
are substantially similar or may overlap with the possible
criminal case.

One of the principal risks associated with use of the
grand jury process is that it "threatens to subvert the
limitations applied outside the grand jury context on the
government's powers of discovery and investigation" in civil or
administrative settings.  *United States v. Sells Engineering,
Inc.*, 463 U.S. 418, 433 (1983).

But the Supreme Court in *Sells* did not categorically
prohibit evidence procured through the grand jury for use in a
civil case and the standard established by the Second Circuit.
The sole and dominating purpose of preparing for trial is not
inconsistent with *Sells'* admonishment.  Indeed, absent that
improper purpose, "Evidence obtained pursuant to the grand jury
investigation may be offered at the trial on the initial
charges," or here, at a related civil forfeiture and money
laundering action.  *Leung*, 40 F.3d at 581.

Because the presumption of regularity attaches to
grand jury proceedings, the defendant has the burden of
demonstrating that the government's use was improperly
motivated.  Prevezon contends that a confluence of factors has
blurred and violated the line between the government's
litigation and this action and its criminal investigation.

Certain factors that the same AUSA is prosecuting this

H53VPREA

1    action and conducting the grand jury investigation, that the

2    government appeared to issue grand jury subpoenas in criminal

3    MLAT requests shortly after the Court set an expedited

4    discovery schedule, and the government's failure to exhaust

5    many of the civil discovery tools available to it formed the

6    basis for Prevezon's motion.

7              But these factors, standing together, do not overcome

8    the presumption of regularity in grand jury proceedings and do

9    not convincingly establish that the government's sole and

10   dominating purpose for using the grand jury process was to

11   prosecute this civil action.

12             The government began the grand jury proceeding in

13   early 2013, issued grand jury subpoenas and MLAT requests

14   beginning around the same period, and continued the criminal

15   investigation during the Second Circuit's stay in this action.

16             To be sure, the government could perhaps have better

17   managed the optics of its investigation.  Assigning the same

18   prosecutor to run the investigation and litigating this action

19   obviously raises concerns.  But the appearance and timing of

20   the issues relating to the government's use of the grand jury

21   process, without more, cannot surmount the presumption of

22   regularity.  A court must "take at face value the government's

23   word that the dominant purpose of the grand jury proceedings is

24   proper."  *United States v. Meregildo* 876 F. Supp. 2d 445, 449

25   (S.D.N.Y. 2012).

1        The fact that the Second Circuit's stay effectively

2   removed the urgency of an imminent trial date, juxtaposed with

3   the government's continued grand jury investigation, eliminates

4   the concern that the government was improperly motivated to use

5   the expedited methods available to the grand jury to buttress

6   its evidence in this action.

7        However, in an abundance of caution and as a matter of

8   good practice, this Court, as I've already discussed with

9   Mr. Monteleoni, directs the government to submit an affidavit

10  explaining that the grand jury investigation was and is not

11  being conducted for the sole or dominant purpose of trial

12  preparation in this action.  That affidavit should lay out the

13  various purposes for which the grand jury process has served

14  and is currently being used.  *United States v. Blech*, 208

15  F.R.D. 65, 68 (S.D.N.Y. 2002).

16       Prevezon's motion to exclude evidence obtained through

17  the mutual legal assistance treaties fares no better and is

18  also denied.

19       First, the sole and dominant purpose standard

20  governing the government's use of the MLAT process is not the

21  same as its use of the grand jury process.  "Nor should it be

22  extended to do so.  The dominant purpose inquiry is a legal

23  standard that derives from the Court's special concern for the

24  grand jury... to ensure that the grand jury is not misused as a

25  device for trial preparation." *United States v. Blech*, 208

1    F.R.D. at 68.

2           By contrast, the MLAT is designed to provide a

3    procedure for securing assistance in connection with

4    investigations or court proceedings. *Blech*, 208 F.R.D. at 68.

5           While *Blech* did not concern exactly the same issue

6    here, it is instructive to the extent that it distinguished the

7    risks that are traditionally associated with misuse of the

8    grand jury process from those associated with the MLAT process.

9           In *Blech*, while the treaty between Switzerland and the

10   United States -- much like the treaties at issue in this

11   action -- was styled as one dealing with "criminal matters,"

12   the DOJ issued MLAT requests on behalf of the SEC for the

13   purpose of aiding a civil investigation into the underlying

14   misconduct.  This does not mean that the MLAT process can be

15   used exclusively in civil actions prosecuted by the government.

16   After all, MLATs are primarily a criminal discovery device.

17   But so long as there is some criminal investigatory basis

18   underpinning the MLAT request, the government may also use

19   evidence obtained from that process to aid its prosecution of

20   any related civil claims.

21          Let's turn to Prevezon's motion *in limine* No. 2,

22   relating to Sergei Magnitsky.

23          MR. MONTELEONI:  Your Honor, before we move on to

24   that, can I ask a clarifying question about the affidavit?

25          THE COURT:  Yes.

H53VPREA

```
1            MR. MONTELEONI:  May I be permitted to submit it to
2    the Court under seal and subject to the confidentiality order?
3            THE COURT:  Yes.
4            MR. MONTELEONI:  Thank you, your Honor.
5            THE COURT:  All right.
6            Turning to the Magnitsky motion.
7            MR. REED:  Thank you, your Honor.
8            Kevin Reed for the defendants.
9            The government, in its second amended complaint,
10   alleges a number of things about Sergei Magnitsky.  The
11   complaint lays out an inflammatory language about how
12   Mr. Magnitsky, an attorney for Hermitage, investigated the
13   Russian treasury fraud, how he filed complaints against Russian
14   officials for participating in this fraud, how he was
15   subsequently persecuted by those officials and caused to be
16   arrested by those officials, and then beaten in jail and
17   ultimately died there, according to the government's complaint.
18   They then detail how there was a worldwide outcry on the United
19   States' passage of the Magnitsky Act in response to that.
20           THE COURT:  It's fortunate, isn't it, that we don't
21   send complaints into the jury room, like we do with
22   indictments.
23           MR. REED:  Sure.
24           THE COURT:  So let me get to the nub of this with you.
25           MR. REED:  Sure.
```

1          THE COURT:  Why are the events and facts predating

2     Magnitsky's arrest not probative of the government's claims in

3     this case?

4          MR. REED:  Your Honor, we lay this out in our brief

5     and I'll try and summarize it briefly for you.

6          The government's theory is that the fact that

7     government officials were involved in persecuting Magnitsky,

8     evidence is that they were trying to cover up the Russian

9     treasury fraud.  The fact that they were trying to cover up the

10     Russian treasury fraud, in the government's theory, evidences

11     that they were involved in the Russian treasury fraud.  The

12     fact that they were involved in the Russian treasury fraud

13     evidences, by the government's theory, that there must have

14     been bribes paid to some unspecified person which, therefore,

15     creates a foreign corruption SUA.

16          Now, as I recite it, I hope you can see what it is.

17     It is inference upon inference upon inference.  So to the

18     extent it has any probative value at all, it's weak.

19          THE COURT:  Magnitsky clearly played a role in

20     uncovering the Russian treasury fraud, didn't he?  Aren't the

21     findings of his investigation part of the government's theory

22     here?

23          MR. REED:  It may be part of the government's theory.

24     I think from the defendants' perspective, A, we dispute that

25     Mr. Magnitsky played a role in uncovering the fraud.  Our

theory of the case that we'll present at trial is that

Hermitage was involved in the fraud and that Mr. Magnitsky was

not so much involved in discovering it as in participating in

it.  We think, as we lay out in our brief, that that creates a

trial within a trial that's not necessary, since we are not

alleged to have been involved in the fraud in the first place.

But, at the end of the day, the question comes down to

what does this add and what prejudice does it cause.  As I

tried to go through, we think it adds very little because,

again, inference upon inference upon inference adds up to weak

proof, if at all.  And, in fact, even the inferences don't

work, because the first line in that chain, that somehow the

fact that government officials tried to cover up the Russian

treasury fraud means that they were part of the Russian

treasury fraud, doesn't hold up to scrutiny, because people

cover up things for any number of reasons.  They may be trying

to protect somebody, they may be afraid of somebody.  It's not

evidence that they were involved, and it's certainly not

evidence of the three steps down the line that there was a

bribe paid to a government official.  So it has, as we see it,

very weak probative force to begin with.

On the other side of that ledger, it has what we think

is very considerable prejudice, unfair prejudice, to the

defendants.  Because the government acknowledges in their

opposition that putting in evidence that Magnitsky was beaten

H53VPREA

1   to death in jail, again, which we would dispute, but putting in

2   evidence of that would be prejudicial and they offer not --

3           THE COURT:  You don't have to make that argument to

4   me.  I'm convinced.

5           MR. REED:  Okay.

6           The argument I will make, your Honor, is that that

7   concession, while appreciated, doesn't solve the problem.

8   Because what they propose to do is put in evidence that

9   Mr. Magnitsky investigated the fraud, that Mr. Magnitsky was

10   wrongly imprisoned on account of the fraud -- I'm sorry,

11   wrongly imprisoned on account of pursuing the fraud, and then

12   died in jail.  And they propose not to tell the jury why he

13   died; they'll just let him speculate and wonder.

14           THE COURT:  I understand your argument.

15           Let me hear from the government.

16           MR. REED:  Thank you, your Honor.

17           MS. PHILLIPS:  Your Honor, the jury in this case is

18   going to be asked to determine whether the Russian treasury

19   fraud was an offense that, among other things, involved the

20   misappropriation theft or embezzlement of public funds by or

21   for the benefit of a public official.

22           THE COURT:  Why is Magnitsky's death in prison and

23   post-death prosecution important if you could demonstrate that

24   Russian officials wanted to cover up their fraud simply by

25   arresting Magnitsky?

H53VPREA

1          MS. PHILLIPS:  Your Honor, just to be clear, what the

2    government is asking for is not to present evidence that

3    Mr. Magnitsky died in prison; it's simply to present evidence

4    that Mr. Magnitsky was posthumously prosecuted, which requires

5    acknowledging his death.

6          Now, we're not intending to put in evidence about the

7    cause of his death in any way or even necessarily the timing of

8    his death, but simply the fact that he was posthumously

9    prosecuted, which is unheard of in Russia.

10          THE COURT:  Why is any of that relevant?

11          MS. PHILLIPS:  His posthumous prosecution is further

12    evidence of the retaliation that was taken against him by the

13    Russian authorities, which is consistent with their other

14    actions in attempting to conceal the Russian treasury fraud and

15    to retaliate against him for filing the complaints, which they

16    did in the form of arresting him, but also in later prosecuting

17    him posthumously.  It's part of the narrative.

18          Furthermore, your Honor --

19          THE COURT:  A very prejudicial part of a narrative,

20    from the defendants' perspective, right?

21          MS. PHILLIPS:  To be clear though, your Honor, if

22    defendants' concern about prejudice is the fact that

23    Mr. Magnitsky died in prison, that simply doesn't have to come

24    out.  But the fact that the Russian authorities were

25    prosecuting him posthumously is part and parcel of the fact

H53VPREA

1    that he was arrested.  He was arrested; he was put in jail.

2    What was the conclusion of that?  The conclusion of that was

3    something that continued to be highly irregular, but not

4    necessarily prejudicial insofar as the cause of his death is

5    not going to be disclosed.

6          It's also highly relevant to the fact that William

7    Browder's prosecution, which went hand-in-hand with

8    Mr. Magnitsky's prosecution, was itself also highly

9    retaliatory.  That's something that Mr. Browder, the

10   government's witness, will face considerable cross-examination

11   on presumably.

12         THE COURT:  What's the probative value of showing the

13   jury the relationship between Magnitsky and Browder?

14         MS. PHILLIPS:  Your Honor, Mr. Magnitsky is a critical

15   component of Mr. Browder's narrative.  He, on behalf of the

16   Hermitage Foundation, uncovered the Russian treasury fraud.  He

17   was retained by the Hermitage Foundation to determine whether

18   the tax allegations against Hermitage were real or whether they

19   were pretense for some other motivation.  And, in fact, he

20   determined that they were pretense.  He worked hand-in-hand --

21         THE COURT:  That has nothing to do with Browder.

22         MS. PHILLIPS:  Your Honor --

23         THE COURT:  What Magnitsky did, he did, prior to his

24   arrest.

25         MS. PHILLIPS:  Your Honor, the charges against

H53VPREA

1  Mr. Magnitsky for which he was posthumously prosecuted involved

2  the tax fraud of the Hermitage fund, the purported tax fraud as

3  alleged by the Russian authorities.  Mr. Browder was prosecuted

4  right alongside Mr. Magnitsky for the same offense; they were

5  codefendants.  Mr. Browder will certainly be cross-examined on

6  the validity of those charges against him.  And the fact that

7  his codefendant was prosecuted posthumously is highly

8  suggestive that the Russian authorities had an ulterior motive

9  in prosecuting him.

10          THE COURT:  All right.  Anything further?

11          MS. PHILLIPS:  No.  Thank you, your Honor.

12          THE COURT:  Thank you.

13          All right.  Prevezon's motion to exclude evidence

14  pertaining to Magnitsky made principally under Rule 403 is

15  granted in part and denied in part.

16          Rule 403 provides that relevant evidence may be

17  excluded if its probative value is substantially outweighed by

18  the danger of unfair prejudice or confusion, among other risks.

19  This Court finds that some of the Magnitsky evidence is

20  relevant to the government's theory.

21          Magnitsky was an employed accountant of the firm whose

22  companies were allegedly stolen by the Russian criminal

23  organization.  He played a critical role in uncovering the

24  alleged Russian treasury fraud.  He alerted the Russian

25  authorities about his findings.  He testified against certain

Russian members of the organization in a Russian criminal case.
And he was arrested allegedly for tax-related crimes.

The probative value of that evidence is not outweighed
by any unfair prejudice or confusion.  In fact, Magnitsky's
findings played a role in triggering the investigations that
eventually resulted in this civil action.  And that evidence,
at least in part, forms the basis of the government's theory.

But there's no reason to reference Browder's close
relationship with Magnitsky or that Browder somehow felt a
moral obligation to Magnitsky.  It's sufficient simply to show
that Magnitsky worked for Browder and Hermitage, and that
Magnitsky investigated the events and circumstances surrounding
the theft of Hermitage portfolio companies.

More importantly, the evidence pertaining to
Magnitsky's death in prison and posthumous prosecution presents
the real danger that a jury will unfairly attribute those
events to the defendants in this case.

Prevezon, while not a Russian entity, is owned by an
individual who is Russian; and the company stands accused in
this action of receiving laundered proceeds from the Russian
treasury fund.  These two independent, unrelated allegations,
that is, Magnitsky's post-arrest events and Prevezon's
association with Russia, if introduced at trial, could distract
the jury with a John le Carré-like tale of international
intrigue instead of focusing on the real issues, unfairly

prejudicing them with the notion that they must avenge

Magnitsky's death through a verdict against Prevezon.

        Therefore, the evidence regarding Magnitsky's

investigation of the Russian treasury fraud and anything up to

his arrest is admissible.  Moreover, Magnitsky's arrest is also

admissible because it's relevant to the government's theory

that Russian officials sought to cover up their alleged crimes

and silence the person who uncovered those crimes.  However,

this Court excludes any evidence pertaining to Magnitsky after

his arrest, namely, his prolonged incarceration, death in

prison, and posthumous prosecution, on the basis that its

prejudicial effects substantially outweighs its probative

value.

        Moreover, the government has noted in its briefing

that it does not intend to introduce any evidence regarding the

international community's reaction to Magnitsky's death,

including the United States' passage of the Magnitsky Act.

This Court agrees that such evidence should not be introduced

at trial.

        Let's turn to Prevezon's motion *in limine* No. 3,

hearsay reports concerning the Russian treasury fraud, which,

as I understand it, is now narrowed to the report of the

Parliamentary Assembly of the Council of Europe.

        Does anybody have anything to add to the arguments

they've advanced in their papers?

H53VPREA

1          MR. REED:  Thank you, your Honor.

2          May I hand up just one document?

3          THE COURT:  Yes.  What is it?

4          MR. REED:  It's in the record, your Honor, as Exhibit

5    2.  I believe it's a declaration of Andreas Gross.  402-2.

6          Your Honor, in the spirit of being brief, I'll cut

7    right to the four-factor test.

8          Under this rule, 803(22), there is a four-factor test

9    that the court looks at to assess whether there is sufficient

10   trustworthiness, and I just want to quickly tick through them.

11         THE COURT:  I really read all of this in the briefs.

12   I really don't need it.

13         MR. REED:  Okay, your Honor.

14         Then let me just highlight the last factor, which is

15   the risk of an improper motivation or political influence.  We

16   think that weighs heavily and strongly against the admission of

17   this document.  If you look at the very first paragraph of

18   Mr. Gross's --

19         THE COURT:  I agree.

20         MR. REED:  Okay.

21         THE COURT:  Let me hear from the government.

22         MR. REED:  Thank you, your Honor.

23         THE COURT:  I don't mean to be curt, but the fact is

24   that we have to make, as the poet said, concessions to the

25   mortality of man.  And I got your arguments.  Let's see if the

1   government can disabuse me.

2          MR. REED:  Sure.

3          The last thing I want is an opportunity to snatch

4   defeat from the jaws of --

5          THE COURT:  Right.

6          MS. PHILLIPS:  Your Honor, we believe that the report

7   does meet the 803(8) test, and that --

8          THE COURT:  Even though the author of the report is

9   unwilling to stand behind it and submit to a deposition because

10  he'd be humiliated?

11         MS. PHILLIPS:  To be clear, your Honor, that was,

12  first of all, hearsay, in and of itself, based upon a

13  conversation between counsel.  But I can fill out the rest of

14  that, having spoken with his representatives.

15         THE COURT:  But the report is replete, isn't it, with

16  Gross's opinions and personal evaluations of the witness's

17  credibility?

18         MS. PHILLIPS:  It is, your Honor, but we only seek to

19  introduce it for very limited purposes.

20         THE COURT:  The government always says that.  Okay?

21  They always say that.

22         MS. PHILLIPS:  The point is that today it would be

23  inappropriate to exclude it in its entirety.  We're certainly

24  willing to come to the Court on a limited case-by-case basis.

25         THE COURT:  I disagree.

1        MS. PHILLIPS:  Thank you, your Honor.

2        THE COURT:  This Court grants Prevezon's motion to

3   exclude the Gross report primarily on the basis that the

4   report's principal focus is on a subject that this Court has

5   already excluded:  The circumstances surrounding Magnitsky's

6   death.  And it also, in my judgment, suffers from a lack of

7   trustworthiness, having read it.

8        These factors, taken together, present the risk that

9   the jury will be confused by the report's contents and opinions

10   and distracted from the real claims at issue.  Of the four

11   factors that courts look to to determine the trustworthiness of

12   a public report, the factors regarding timeliness of the

13   investigation, whether the assembly or any other of its

14   subcommittees conducted a hearing, and possible motivational

15   problems weigh against finding that the report is trustworthy.

16        First, the parliamentary assembly commissioned this

17   report several years after the events in question.  Even if

18   this Court measured the time from the primary event

19   investigated, Magnitsky's death in November of 2009, almost

20   three years elapsed before the assembly's legal affairs

21   committee passed its resolution appointing Gross as the

22   reporter in November 2012.

23        Second, there doesn't appear to have ever been an

24   actual hearing conducted following the dissemination of Gross's

25   report or any drafts of his report.  While the government

claims that members of the legal affairs committee voted to

adopt the draft resolution formed after Gross's investigation

without objection, there's no evidence that an actual hearing

with the appropriate procedural safeguards was actually

conducted.

Finally, the inception of this report appears to have

been predicated on a series of events that bring into question

certain motivational problems.  The Gross report cites "earlier

work" of the assembly regarding Magnitsky's death.  One of the

events that may have colored the investigation from the outset

is William Browder's interference with the assembly's work.

In June 2011, it appears that Browder "made an

intervention at a parliamentary seminar" at a meeting of the

committee that ultimately authorized Gross's involvement in

conducting his investigation.

Further, the Gross report is replete with statements

from witnesses that are sympathetic to Magnitsky and Browder,

among others.  There's several individuals who were paid and

directed by Hermitage to investigate Magnitsky-related events

who were interviewed by Gross.

While Gross cites certain conversations he had with

Russian officials and the documents he received from them,

those references are eclipsed by the statements and opinions by

Browder, Hermitage, and other self-interested parties.  By

Gross's own admission, he "regrets nevertheless" that he did

1    not "speak directly with the persons most immediately concerned

2    by the allegations of criminal conspiracy," despite having

3    sought them out.  That's the Gross report, paragraph 4.

4            That omission brings into doubt that Gross "heard both

5    sides of the story," a fact that renders his findings and

6    conclusions unreliable.  *In Re Parmalat Securities Litigation*,

7    477 F. Supp. 2d 637, 641 (S.D.N.Y. 2007).

8            Most troubling is that the report's author, Andreas

9    Gross, refused to appear for deposition in this action, citing

10   humiliation as the reason.  He appears unable to stand behind

11   and defend the findings and conclusions of his report, a

12   decision which only undermines the credibility and

13   trustworthiness of that report.  His position, whatever its

14   genesis, has undermined the ability of Prevezon to challenge

15   his conclusions.  *See Parmalat Securities*, 477 F. Supp. 2d 641.

16   In other words, the Gross report is some piece of work, and I

17   mean that in hyperbole.

18           Accordingly, Prevezon's motion to exclude the report

19   is granted.

20           Let's turn to Motion No. 4, witness interviews and

21   summaries.

22           I'll tell you that I don't need to hear argument here.

23   I think that the hearsay statements that are reflected in the

24   interview summaries or declarations may be considered by the

25   Court for appropriate purposes other than proving the truth of

1    the matters asserted therein.  This Court would limit its

2    consideration of this evidence to such nonhearsay purposes.

3    *See Spratt v. Verizon Communications, Inc.*, 2014 WL 4704705 at

4    *4, note 4 (S.D.N.Y. September 17, 2014).

5         One of those purposes may be to prove notice or

6    knowledge of something such as Hermitage's act of filing a

7    complaint at the time its portfolio companies were stolen or

8    simply to "show the context within which the parties were

9    acting."  *Arista Records LLC v. Lime Group LLC,* 784 F. Supp. 2d

10   at 398, 420 (S.D.N.Y. 2011).

11        At this juncture, however, because the government has

12   not specified what it intends to use these interview summaries

13   and declarations for, this Court denies Prevezon's motion

14   without prejudice to reapplying at a later time when the

15   government specifically seeks admission of the evidence for a

16   nonhearsay purpose.  Precluding these summaries and

17   declarations at the outset, based on speculation of which

18   nonhearsay purpose the government might use these materials for

19   would be premature and unhelpful.  So the parties are directed

20   to set these materials aside until the government seeks

21   permission to use them.

22        Let's turn to Motion No. 5, the Israeli money

23   laundering allegations.

24        MR. ABENSOHN:  Thank you, your Honor.

25        Your Honor, bringing in past allegations in a separate

1      unrelated matter is the paradigm for inadmissible evidence

2      under Rule 404.  Since we're talking about allegations, and

3      only allegations that were resolved by settlement, we're also

4      in the paradigm under Rule 408, which precludes the admission

5      of settlements.

6              This is a straight line, in our view, your Honor.

7      This is exactly the sort of evidence the government should not

8      be permitted to introduce.

9              Now, I want to address the government's rationale or

10     its stated rationale.  What it says is that Mr. Katsyv's past

11     experience, having had allegations made in Israel, put him on

12     notice that under United States law, he would have had an

13     obligation not to make misrepresentations to a bank.

14             There's a lot of problems with that.  I want to start

15     with an overarching point which the Second Circuit has

16     emphasized.  I'm reading from *United States v. Gordon*, 987 F.2d

17     902, 908:

18             "Rule 404(b) does not authorize the admission of any

19     and every sort of other-act evidence simply because a defendant

20     proffers an innocent explanation for the charged conduct."

21             As the Second Circuit has also said, and this is in a

22     case called *McCallum*, the courts are to be on the lookout for

23     propensity evidence in sheep's clothing.

24             With that in mind --

25             THE COURT:  I got it.  I love that quote.

1            MR. ABENSOHN:  We do too, your Honor.

2            With that in mind, that's what we are dealing with.

3            THE COURT:  Let me hear from the government.

4            MR. ABENSOHN:  Okay.

5            MS. LaMORTE:  Good evening, your Honor.

6            I want to first start out by noting that the defense

7    is wrong that this is a settlement without an admission.  But,

8    in any event, whether it is or isn't, the case law that we

9    cited in our brief provides for settlements with and without

10   admissions to be entered as 404(b) evidence in appropriate

11   circumstances, and that is including knowledge and intent.

12            Now, in this case --

13            THE COURT:  But isn't the purpose for which the

14   government is offering this evidence, namely, knowledge about

15   the parameters of money laundering, isn't it so general that it

16   really bears on the completely mundane?

17            MS. LaMORTE:  Let me say this, your Honor:  I

18   understand your point as to providing false information to

19   banks as something that's wrong and you should not do.  But

20   there's another --

21            THE COURT:  You don't need this Israeli settlement to

22   demonstrate that.  Everybody, including the jurors who are

23   going to be sitting in the jury box, are going to know that you

24   shouldn't be lying to your bank or financial institution,

25   right?

1           MS. LaMORTE:  That is correct.

2           However, let me add that the other element of this the

3      money laundering is really settlement is relevant to is that

4      banks rely upon the information provided by parties to a

5      transaction for purposes of fulfilling money laundering

6      allegations.

7           In this case, we have testimony from Mr. Katsyv that

8      says, A, it was not his responsibility to confirm the

9      information that UBS is receiving; and, B, that he relied on

10     UBS to figure out the cleanliness and the source of money that

11     was coming into the account.

12          So I would say, your Honor, that the fact that he

13     learned from the Israeli settlement that banks rely upon the

14     information submitted for money laundering purposes completely

15     bears on his testimony that, Well, it wasn't my responsibility;

16     it was that of UBS.  No, it was his responsibility.  And so in

17     that aspect, I think the link is very strong.

18          Now, as to prejudice, there is not unfair prejudice

19     here.  Every 404(b) evidence can be considered prejudicial to

20     some extent; it's other wrongs, other crimes evidence, of

21     course.  But the question is whether it's unfair.  And in the

22     404(b) context, courts will look at how sensational this

23     prior-acts evidence is compared to the conduct that we have at

24     issue here.

25          We submit -- and I don't think that the defendants

disputed this in their reply papers -- that the conduct at

issue in the Israeli settlement is not any more sensational

than the conduct that is at issue here.

So, your Honor, it is directly probative and it is not

unfairly prejudicial.

THE COURT:  All right.  Thank you, Ms. LaMorte.

I will acknowledge to the parties that this motion is

a closer case for the Court than some of the other motions.

Prevezon's motion to exclude evidence of the Israeli

settlement regarding money laundering charges is granted.

Although the government's intended use of the settlement does

not run afoul of Rule 408's prohibition, it does amount to

propensity evidence and, therefore, in my view, does not

qualify under Rule 404(b).  It's also highly prejudicial and

runs the risk of distracting and confusing the jury under Rule

403.

Here, while Katsyv's experience and participation in

settling money laundering charges with Israeli authorities

could show his general knowledge and understanding of what type

of conduct violates money laundering laws, the issues regarding

Katsyv's knowledge are so general that a jury does not need to

see a settlement resolving Israeli charges from nearly a decade

ago to understand that.

There is a concern in this civil money laundering

action that a separate money laundering settlement could cast

H53VPREA

```
1   Prevezon's principal, Denis Katsyv, a money launderer, even
2   though the settlement involved no admission of liability or
3   guilt.  And even if the settlement can properly be admitted for
4   many purposes, it is "propensity evidence in sheep's clothing"
5   and runs the risk of parading unsubstantiated innuendo before
6   the jury.  *United States v. Mostafa*, 16 F. Supp. 3d 236, 253
7   (S.D.N.Y. 2014).
8            I'll say that in *Mostafa*, my colleague, Judge Forrest,
9   has a fine way with words.
10           Now, the purpose for which the government seeks to use
11  the settlement under 404, that it would show that Mr. Katsyv
12  was "aware of the laws against money laundering" is so general
13  that a jury can understand that concept without having to see
14  or know about the settlement.  It's, as I've said, commonly
15  known that lying to one's bank is generally illegal or, at the
16  very least, improper.
17           Finally, the effect of introducing the settlement will
18  unduly prejudice and confuse the jury; it will only waste time
19  in a trial that's already expected to span more than four
20  weeks.  Any probative value offered through the settlement is
21  substantially outweighed by the prejudice of painting Katsyv as
22  a money launderer.
23           Let's turn to Prevezon's Motion No. 6 relating to
24  preclusion of Dr. Louise Shelley.
25           MS. SHARMA:  Thank you, your Honor.
```

1              Renita Sharma for Prevezon.

2              I'd like to make two points primarily in favor of

3       excluding Dr. Shelley's testimony.

4              The first is that she improperly vouches for the

5       credibility of the government's factual allegations, in direct

6       contradiction of numerous Second Circuit cases.

7              The second reason is that her testimony is not helpful

8       to the trier of fact here.  Nothing that she alleges to be

9       typical of Russian organized crime is outside the ken of the

10      average juror.

11             Now, to my first point that her testimony is merely

12      vouching --

13             THE COURT:  But isn't corporate raiding in Russia the

14      so-called *reiderstvo*, isn't that something that the average

15      juror or even the average district judge may not be familiar

16      with?

17             MS. SHARMA:  Your Honor, I would point you to the

18      government's brief in opposition at page 7, where they lay out

19      exactly what Dr. Shelley defines as the components of what she

20      calls *reiderstvo*.

21             She identifies primarily four factors that she

22      considers typical of Russian corporate raiding.  They include,

23      No. 1, criminals might falsify court records or corporate

24      records; No. 2, that criminals might work together, even absent

25      a family relationship; No. 3, criminals might be motivated to

1  work together because they have "common economic interests."

2  And criminals might commit crimes other than drug dealing or

3  prosecution.

4          Respectfully, your Honor, there's nothing specific to

5  Russia or corporate raiding about these facts.  They are very

6  much within the understanding of a juror.  And simply bundling

7  them together and saying because they happened in Russia they

8  are different does not meet the government's burden here to

9  show that this testimony is necessary for the jury.

10         THE COURT:  All right.  Thank you.

11         MS. PHILLIPS:  Your Honor, in fact, the concept of

12  corporate raiding as it exists in Russia is not at all

13  intuitive to a U.S. audience.  And to be perfectly honest, it

14  took the lawyers working for the government in this case some

15  time to wrap our heads around it.  The fact that you can steal

16  a company, that that is possible, and the players involved in

17  that, that's something that while the average Russian may be

18  reading about it in the newspaper with great frequency, the

19  average American is not and, in fact, it's quite a foreign

20  concept.

21         The scope of Dr. Shelley's testimony in this case will

22  be quite limited.  I'll just note, your Honor, that Dr. Shelley

23  gave very similar testimony just this week in a bankruptcy

24  matter in the Southern District in a case in which the debtor

25  alleges that he was the victim of corporate raiding.  She

1    testified for about 30 minutes; she laid out in general terms

2    the concept of *reiderstvo*, which I certainly would not be able

3    to pronounce if she hadn't taught me how.  Her testimony was

4    very informative, but not at all specific to the facts of the

5    case.  That's precisely what we propose that she do here.  We

6    do think that her testimony will be very helpful to the jury.

7            THE COURT:  All right.  Thank you.

8            MS. PHILLIPS:  Thank you.

9            THE COURT:  Prevezon's motion to exclude testimony of

10   expert Louise Shelley is granted in part and denied in part.

11           "Expert testimony on the historical context,

12   operation, composition, and structure of criminal organizations

13   is generally admissible."  *See, e.g., United States v. Matera*,

14   489 F.3d 115, 121 (2d Cir. 2007).  "So long as it provides

15   information on subjects beyond the ken of the average juror."

16   *United States v. Mejia*, 543 F.3d 179, 191 (2d Cir. 2008).

17           Expert testimony is also admissible "on some occasions

18   to explain nonesoteric matters, when the defense seeks to

19   discredit the government's version of events as improbable

20   criminal behavior."  *United States v. Cruz*, 981 F.2d 659, 664

21   (2d Cir. 1992).  But expert testimony cannot be used solely to

22   bolster the credibility of the government's fact witnesses by

23   mirroring their version of the events.  *Cruz*, 981 F.2d at 664.

24   That includes offering an account of a typical crime that

25   mirrors the specific facts provided by the government's

1    witnesses.  *See United States v. Rijo*, 508 Fed. Appx. 41, 45

2    (2d Cir. 2013).

3              Here, Dr. Shelley may testify generally about how

4    criminal organizations operate and function in Russia.  This

5    Court finds that there are issues specific to criminal activity

6    in Russia, like corporate raiding, *reiderstvo*, the structures

7    of organized criminal groups that are uniquely beyond the ken

8    of the average juror.  That includes offering general examples

9    of what corporate raiding in Russia looks like.

10             Her testimony can be used to counter whatever

11   assertions regarding the Russian criminal organization's

12   actions Prevezon may make to the contrary.  But Dr. Shelley may

13   not, as she does her report, provide testimony regarding the

14   testimony of fact witnesses.  She may not comment on the

15   specific allegations asserted by the second amended complaint,

16   nor may she opine on the legal validity of the government's

17   claims.  She may not offer examples of Russian criminal

18   activity that precisely mirror the allegations in this action.

19             Finally, in its summation, I will not permit the

20   government to rely on Dr. Shelley's testimony to connect her

21   statements with the testimony provided by fact witnesses.

22             Let's turn to Prevezon's motion *in limine* No. 7,

23   evidence related to Nikolai Gorokhov.

24             MR. ABENSOHN:  Thank you, your Honor.

25             THE COURT:  Now, this motion is essentially also tied

1   into the government's motion *in limine* No. 1.

2                MR. ABENSOHN:  That's correct.

3                THE COURT:  I'll entertain both at this juncture.

4                MR. ABENSOHN:  Thank you, your Honor.

5                Indeed, the material that's the subject of each motion

6   is the same; it's the so-called Gorokhov material.

7                I want to start with a simple proposition and maybe to

8   contrast it with what the government argues in its brief.

9                The government says it has created complex grounds of

10  authentication.  Let me bring it to something simple.  The

11  rules of evidence are supposed to matter; they are rules.  And

12  in very straight-line bases, the rules that the government

13  cites are not satisfied here.  And I think I can demonstrate

14  that.

15               If your Honor will allow me, I have a few slides that

16  might help keep me oriented in this discussion that I'd like to

17  hand up to your Honor and provide to the government as well.

18               THE COURT:  All right.  Let's proceed.

19               MR. ABENSOHN:  Thank you, your Honor.

20               THE COURT:  Note my concern about Power Point at 6:30.

21               MR. ABENSOHN:  I understand, your Honor.

22               Now, in its opening brief in its Motion No. 1, your

23  Honor, the government identifies two specific rules that it

24  proposes to bring in this Gorokhov material under.  And I

25  should actually orient a bit further.

1          There are two components of this Gorokhov material;

2     there are bank statements or purported bank statements within

3     the material, and then there is everything else.  I want to

4     focus on the bank statements.

5          What the government invokes is 902(12), which is

6     applicable to foreign business records, and 803(8), which

7     applies to public reports.  And then as a fallback in its

8     25-page brief, I think it devoted a page and-a-half at the end

9     to the residual exception.  I submit -- and I think it will be

10    clear as we are talking -- that the tail is now wagging the

11    dog.  The government is all in on the residual exception

12    because, frankly, there's no plausible argument to bring these

13    materials in either under 902(12) or 803(8).

14         I want to start with the language of the rule, and

15    that's the first slide, your Honor, that you have before you.

16    And 902(12) has essentially two critical components.  By its

17    terms, it requires a certification signed in a manner that, if

18    falsely made, would subject the maker to a criminal penalty in

19    the country where the certification is signed.  That's the

20    express requirement of 902(12).  902(12) otherwise incorporates

21    by reference 902(11), which, in turn, requires that the

22    certification demonstrate compliance with the business record

23    criteria under 803(6), which the Court is, of course, familiar

24    with.

25         So really two fundamental requirements:  A

certification that would expose the signer to criminal penalty

in Russia, and a certification adequate to confirm that the

records satisfied the business record criteria.

        Now, I don't want to discuss this in a vacuum; I think

if we actually look at the paperwork the government is relying

on, this comes very becomes very clear.  That's the third slide

your Honor has, or the third page.  It's an example.

        The government points to what it refers to as

transmittal paperwork.  Just to orient the Court, apparently

what happened -- at least according to the government -- is

that its confidential informant photographed pages out of this

Russian criminal case file, including pages like the one your

Honor is looking at, which is marked 201-7D and 7DT, which is

the translation.

        This is the size and sum of it, your Honor.  This is

the "transmittal paperwork" that, according to the government,

and I'm reading from their brief, will easily permit a jury to

plainly conclude that who wrote this was under threat of

criminal sanction if the information were false.  That is an

uncited statement and respectfully, your Honor, there's no

basis for it whatsoever.  There's nothing here resembling an

affirmation; there's no language acknowledging any legal

obligation to be accurate or lawful; there's no Russian law

expert who has come before the Court to identify a provision of

law that would make a, quote/unquote, false statement in a

1    transmittal document criminal.  There's nothing.  This is true

2    across these examples.

3           The next page, which is the 201-8CT, this one even

4    includes a portion of the translation that says it's illegible.

5           THE COURT:  Isn't the larger question here whether it

6    should come in under the residual hearsay exception?

7           MR. ABENSOHN:  Your Honor, ultimately that becomes the

8    question, because so clearly they haven't satisfied the

9    particular rules they are talking about.  And the two

10   particular rules are this foreign records rule, where clearly

11   you don't have the certification subject to criminal penalty;

12   and, in fact, we have the *Doyle* quote on page 6, which says

13   explicitly without a presentation of a foreign law expert to

14   make that confirmation, you don't have it.

15          They also don't satisfy the public records exception,

16   among other reasons, your Honor, because -- and this also goes

17   to why the residual shouldn't apply.  What they are essentially

18   saying on the public records exception is that tracing experts

19   working for the government in Russia used these documents and

20   therefore they have been implicitly adopted as true.

21          Now, sometimes it's easier to think about this in

22   terms of this courthouse.  If we went down to the clerk's

23   office and pulled out a government expert report relying on

24   documents and said to your Honor these should be admitted

25   because a government agent relied on them, we would be

1    summarily rejected.  The idea that because a partisan

2    government agent in Russia made use of these documents in a

3    tracing report is all the more reason that this can't be relied

4    upon.

5              THE COURT:  Can this Court take judicial notice to

6    authenticate the records, especially bank records?

7              MR. ABENSOHN:  Respectfully, your Honor, no.  If these

8    records can be authenticated simply because they are "bank

9    records," 803(6) ceases to have any meaning.  Lawyers in this

10   courthouse who get certifications from banks like Citi and

11   JPMorgan Chase, where we might actually be able to assume

12   validity, would be very surprised to learn that you could look

13   at a record, like the one that appears on page 7 of this slide

14   deck and simply decide on its face that it is sufficiently

15   clear that it was generated near in time to a transaction by

16   someone with authority to do it and maintained as an ordinary

17   part of any bank's business.  If the mere appearance of this

18   document, your Honor, is enough to satisfy that, there is

19   literally no constraint imposed by 803(6) whatsoever.

20             And I'll add, we've heard about Dr. Shelley.  I have a

21   quote from her report on the eighth slide.

22             THE COURT:  But isn't this a case where there's really

23   no other way to obtain these bank records?

24             MR. ABENSOHN:  Respectfully, your Honor, the fact that

25   the government can only hope to prove its case with evidence

H53VPREA

1    that is not competent is not a reason that the government

2    should be permitted to use that evidence.  My client has had

3    assets frozen now for three years.  They've had their

4    reputations demolished.  And here we are three-odd years into

5    this proceeding where the government is literally saying this

6    was found in a case file in Russia, incidentally, in a case

7    they consider corrupt and a coverup; therefore, can't we trust

8    the transactions reflected on the paperwork are accurate.

9            Your Honor, that is not how this is supposed to work.

10   The rules are supposed to matter.  And when we consider these

11   Russian documents, these bank records, consider what Dr.

12   Shelley has had to say.

13           We quote from her report on this slide No. 8.

14           "The money that was allegedly stolen from the Russian

15   treasury could easily be moved through these minor banks of the

16   Russian banking sector because of the criminalization of

17   Russian banking and the absence of controls over the banking

18   sector."

19           So not only is this prosecution in Russia, in the

20   government's view, corrupt -- and incidentally, it's corrupt

21   including through the creation of other documents the

22   government considers forgeries and sham --

23           THE COURT:  But even if there's a coverup, does that

24   mean that the underlying information can't be accurate and

25   authentic?

1            MR. ABENSOHN:  They come in under the residual

2      exception, your Honor, which is a rarely-applied exception.

3      The government has an affirmative burden to show that they are

4      particularized indicia of reliability.  Clearly the fact that

5      these documents are sitting in a case file is not indicia of

6      reliability.  And respectfully, your Honor, when these

7      documents are sitting in a case file in a court the government

8      deems corrupt, it is not indicia of reliability.

9            There is simply no basis in the world to assume that

10     these "minor banks," in Dr. Shelley's words, who are

11     controlled, in Dr. Shelley's view, by organized crime, are

12     generating reliable, genuine account statements that accurately

13     report transactions.  It is pure speculation, your Honor.  And

14     again, all they have in the end is the appearance of the

15     document itself.  If that were enough, these rules simply would

16     not apply.

17            I think the case authority on this issue is really

18     important.  Because after the government more or less abandons

19     803(8) and 902(12), they essentially say, Well, courts do this

20     all the time.  This is standard.

21            THE COURT:  Wouldn't Gorokhov have used these

22     documents on his own claims, on behalf of his own clients?

23            MR. ABENSOHN:  I'm not sure I understand, your Honor.

24            THE COURT:  Isn't this sort of a rare and exceptional

25     circumstance that the government is confounded with here?

1          MR. ABENSOHN:  Your Honor, the only thing that's

2     exceptional here is that the government is trying to put in

3     here say where the rules aren't satisfied.

4          We cite a case in our brief, *Doyle*, that essentially

5     says just because it's hard to do it, just because it's

6     difficult to comply with the rules, don't mean you bend the

7     rules.  There is no 803(6) satisfaction here.  There is no

8     certification by a foreign bank subject to a penalty under

9     perjury.

10          I'll also refer your Honor to the *Lakah* case which we

11     cite in our brief.  The government says courts let this in all

12     the time.  *Doyle* said you can't let in documents furnished to a

13     foreign government by a private actor without some additional

14     foundation.  That's what these are.  And then *Lakah* applied

15     that to bank records, foreign bank records, exactly what we are

16     dealing with.

17          I submit, your Honor, there's no air between what we

18     have here and what we had in *Lakah*.  Contrary to that, there is

19     a fundamental difference between this case and those cases that

20     the government insists are exactly like this one.

21          THE COURT:  Let me hear from the government.

22          First of all, Mr. Monteleoni, why are the Russian

23     investigative reports reliable here, but not elsewhere?

24          MR. MONTELEONI:  Well, the findings that the bank

25     statements that are obtained reflect the account activities,

1   the only finding that we are putting forward here as reliable,

2   that finding is overwhelmingly reliable.  It's not just the

3   appearance of the documents, it's not just that the

4   investigators looked at them.  It's that they corroborate with

5   each other.  They corroborate with records that are from other

6   countries, more than one other country.

7           This is really just worlds apart from defense

8   counsel's description of it.  Let's leave aside that the slide

9   deck doesn't include all of the paperwork that he's saying is

10  sort of the sum and substance of the authentication.

11          Defense counsel is absolutely right that rules matter.

12  There are countries that don't have flexible rules of evidence

13  that require everything to be certified, notarized, before it

14  can be admitted into evidence.  The U.S. is not that system.

15  It has flexible means of authentication and it has the residual

16  hearsay exception.

17          There are also cases -- cases that we cite and that

18  they don't distinguish -- that actually use judicial notice of

19  things that, honestly, everyone here understands about the

20  nature of bank records, to fill in some of the context and let

21  the business records exception apply.

22          So it's absolutely correct that the rules matter.  But

23  we have *Turner*, where bank records that appear to be bank

24  records and that are partly corroborated, are found in a safe.

25  That is the Third Circuit absolutely upholding them under the

residual hearsay exception; this is not some alien outlier that
the government made up.  That's a case.  *Donziger*, also a case.
There is no way of finding these records to be less reliable
than those.

In *Donziger*, an account holder went to the bank, asked
for the statement and got it, and said, This is what I got.
And wasn't a bank employee, didn't talk about the bank's
practices.  That was obviously reliable, even without tying it
out.

In *Turner*, the records were just found in a safe and
they tied out.

Here what you have is records from numerous different
accounts tying out to each other; 78 percent of the
transactions or so are corroborated.  The ones that aren't
corroborated are just where they're transacting with people
whose records weren't obtained.  That level of corroboration
between a number of different entities is extraordinary.  It's
an obviously superior basis for actually concluding that these
are reliable than if there had been one piece of paper with a
certification from someone from the bank in any realistic
sense.

You also have investigators, whatever their overall
motives are, there's no way where even the investigators with
motivation problems that we believe exist, there's no reason to
think that there's any motivation for them to say that bank

1    statements don't say what they say or that they are false.  In

2    fact, they are corroborated by the audit report, the third of

3    the three investigative reports, which is from an entirely

4    different investigation, an investigation into the bank itself

5    that the money exited Russia from, was flagged by Russian

6    authorities for suspected money laundering.  Authorities moved

7    in, froze the accounts.

8            The funds that went to Prevezon are some of the funds

9    that got out a day or two before that freeze came in.  That

10   investigation that they did into the bank was not started about

11   the Russian treasury fraud; there's no indication that there's

12   anything wrong with their motivations.  But it corroborates the

13   genuineness of the bank records that the other investigators

14   do.

15           So you have three different investigative reports from

16   two different investigations that corroborate numerous bank

17   records, which corroborate each other, which corroborate bank

18   records from other countries.

19           THE COURT:  What proportion of the records can be

20   independently corroborated by admissible records the government

21   received from other sources?

22           MR. MONTELEONI:  From other countries?

23           THE COURT:  Yes.

24           MR. MONTELEONI:  Other countries, only from the last

25   two accounts, the ones that actually were exit points from the

1    country.

2          What you have though is a number of files within the

3    overall criminal case file, which plainly there is ample reason

4    for the jury to be able to tie out each of them to a separate

5    bank.  They are sealed with separate bank seals.  Whether or

6    not their certification meets any standard of certification,

7    there's no getting around the fact that these are multiple

8    different -- that there's ample evidence for a jury to conclude

9    there's multiple different institutions that are sealing,

10   binding, tying documents.

11         The thing that defense counsel submitted as the

12   transmittal isn't really the transmittal, it's just the seal.

13   But the seal is they tie the pieces of paper physically

14   together, seal it, and submit it to a Russian criminal

15   investigator.  That happened from multiple different

16   institutions, I want to say about like six to eight Russian

17   banks.  The records corroborate each other.  And some portion

18   of it, the portion that leaves Russia, corroborates records

19   that we got from other countries.

20         All in all, it's really overwhelming compared to

21   *Donziger* or compared to *Turner*.  And there are numerous cases

22   which we cite in the end of our reply brief where uncertified

23   bank records are applied all the time without any indicia that

24   there's this level of reliability.

25         THE COURT:  If the so-called attested and seized

 1    records were excluded as hearsay, do you believe that you'd

 2    still be able to prevail at trial?

 3              MR. MONTELEONI:  Well, we would have other evidence,

 4    but the grounds for putting that in, for having that

 5    admissible, are less strong than for having this admissible.

 6    So we have other evidence.  We think that that other evidence

 7    would also meet the hearsay standard and be admissible.

 8              But if the Court finds that these aren't admissible,

 9    then the Court isn't going to find that those weren't.  So that

10    probably would drastically limit, if not eliminate, our ability

11    to proceed with the case.

12              THE COURT:  All right.  Anything further?

13              MR. MONTELEONI:  I would also point that -- no.

14    Nothing, unless the Court has other questions.  Thanks.

15              MR. ABENSOHN:  May I, your Honor, respond?

16              THE COURT:  Briefly.

17              MR. ABENSOHN:  Thank you.

18              Your Honor, to me, there's a telltale sign in the

19    government's presentation.  I wrote down, as Mr. Monteleoni was

20    talking, "plainly," "ample," "obvious," "overwhelming," "no

21    getting over."

22              Your Honor, there's nothing ample here.

23              First of all, Mr. Monteleoni said I hadn't provided

24    the Court with all the documents.  That's because there's tons

25    of them, Judge.  The government is essentially trying to prove

1    up this massive portion of its case with hundreds of pages of

2    unauthenticated bank records, your Honor.

3            The second point I'll make has to do with what the

4    case law says.

5            First of all, Mr. Monteleoni relies heavily on *Turner*

6    in the Third Circuit, which I'll address; but he ignores *Doyle*

7    and he ignores *Lakah*.

8            What *Doyle* says is:  "It would be a major step

9    judicially to forge a new hybrid exception to the hearsay rule

10   by combining these two distinct varieties of admissible

11   hearsay."

12           The court was talking about the government having

13   failed to satisfy the public reports exception and the business

14   records exception.

15           Same scenario here.

16           And it goes on to say it would be an abuse of

17   discretion to try and marry those two in order to get to the

18   residual.

19           The court in *Lakah*, same circumstance, foreign bank

20   records, says *Doyle* is controlling, and excludes them.

21           Now, *Turner* and *Donziger*, I heard Mr. Monteleoni say

22   there's no way to distinguish *Donziger*.  The court in *Donziger*

23   cited the following testimony.  I'm quoting.  I don't have the

24   page number, I apologize.  But it quotes a question from the

25   attorney:

1          "If you could please take a look at each of these,

2    Mr. Guerrero, are each of those documents a monthly bank

3    statement that you received from your bank concerning your bank

4    account?

5    "A.  Yes, sir, they are.

6    "Q.  Do you recognize them to be true and accurate copies of

7    your bank statements?

8    "A.  Yes.

9    "Q.  Are those documents that you turned over to Chevron in

10   connection with this litigation?

11   "A.  Yes."

12          Your Honor, there is a massive distinction between

13   this case and the government's cited cases.

14          The other cases that were referred to, cases like

15   *Strattinger*, again, you had a bank custodian say:  "The records

16   were of a type normally maintained in the ordinary course of

17   the bank's business."

18          In *Karm*, another case they cite:  "The bank provided

19   the records pursuant to a treaty, and government officials

20   cooperated in turning them over."

21          *Strickland*.  An account holder verified the validity

22   of the accounts.

23          All you have here in comparison to those cases is the

24   document was sitting in a foreign court file.  That is all you

25   have here, your Honor.

H53VPREA

1           THE COURT:  All right.  I think I got it.

2           MR. ABENSOHN:  If I can move on to the point about

3    corroboration.  And I think this is important.

4           He says -- I forget the exact number -- 78 percent are

5    corroborated.  But when your Honor asked the question, we view

6    it as the right question, how many are corroborated with

7    authenticated documents, I think it becomes fewer than ten

8    percent.  And frankly, more importantly, only one bank out of

9    seven can be corroborated on that basis, even assuming it's a

10   sufficient form of corroboration.

11          Now, if someone came in here with documents from

12   Citibank, JPMorgan Chase, and another bank, and presented

13   sufficient authentication as to the JPMorgan documents, that's

14   not a basis to admit the Citibank documents.  So even if this

15   corroboration theory worked where there was corroboration with

16   nonGorokhov materials, it doesn't work as to fully seven out of

17   these eight banks, your Honor.

18          And then finally, Mr. Monteleoni talked about how they

19   were supported by an audit report.

20          One more point I'll make about corroboration.

21   Mr. Monteleoni relies heavily on *Turner*.  *Turner* actually

22   speaks to this issue.  In *Turner*, one of the important

23   considerations was that, in the court's words, there was

24   corroboration -- many of the documents were corroborated with

25   domestic bank records.  That was one of the multiple criteria

H53VPREA

1    that the court in *Turner* ticked off, as well as the fact that

2    the documents were found in the possession of the account

3    holder.  Those are two fundamental differences with what we

4    have here, your Honor.

5         If you are finding a bank account statement in a

6    person's own home, that is a pretty good indication that it's

7    their bank statement reflecting their account activity.  If

8    that bank statement corroborates with domestic authenticated

9    records, that might be a pretty good indication too.  We don't

10   have that here.  What we have is *Lakah*.

11        Finally, your Honor, Mr. Monteleoni talked about the

12   audit report.  This is more of the same problem.  If we walked

13   downstairs and got a tracing report from a government expert,

14   that is not authentication.  If that were authentication, we

15   wouldn't be having this motion and we wouldn't be having this

16   argument.  The government's agents here have relied on these

17   records.

18             THE COURT:  I got it.

19             MR. ABENSOHN:  If that's what we are up against, your

20   Honor, then these rules don't apply.  And, again, I'll agree

21   with Mr. Monteleoni, the rules matter.  And if they matter

22   here, our application should be granted, respectfully, your

23   Honor.

24             THE COURT:  All right.

25             On this motion, on Prevezon's motion No. 7 and the

1    government's motion *in limine* No. 1, I am reserving.  I'll

2    issue an order by the beginning of next week.

3            On the government's motion *in limine* No. 2, concerning

4    evidence and arguments on the asset-tracing law, I agree with

5    Prevezon that this motion is premature and that it may be

6    rendered moot by any decision on Prevezon's summary judgment

7    motion.  So I'm reserving judgment on this motion because it's

8    tied to the summary judgment motion.  I'm also working on that

9    and I'm going to get that out next week.  But, as you can see,

10   I've been busy.

11           Now, the government's motion *in limine* No. 3 regarding

12   the money laundering expert, Daniel Alpert, does the government

13   want to be heard very briefly?

14           MS. LaMORTE:  Very briefly, your Honor.

15           First of all, I realize it's late in the day, but I

16   just want to clarify that Mr. Alpert is not a money laundering

17   expert; he is the defense's real estate expert.

18           THE COURT:  You're right.

19           MS. LaMORTE:  Sorry.  I just wanted to clarify.

20           This is very simple, your Honor; it's very

21   straightforward.

22           THE COURT:  What really is the issue that the

23   government takes exception to with his testimony?

24           MS. LaMORTE:  Sure.

25           Your Honor, he testifies that the foundation of his

1   opinion is the "law, custom, and practice" in Russia.  He also

2   testified repeatedly at his deposition he is not an expert on

3   Russian transactions.

4           So on the one hand, it is okay for him to say that you

5   have to take into account the place a transaction occurs to

6   determine its commercial reasonableness; but he can't then go

7   on to say, By the way, I think these Russian transactions are

8   reasonable, when he has no experience in Russia.

9           That is basically the nub of the argument, your Honor.

10          THE COURT:  I got it.

11          MS. LaMORTE:  Got it.

12          MR. ABENSOHN:  Thank you, your Honor.

13          The government's expert, Mr. Alpert, is not a Russia

14   expert either.  He's looking at these Russian transactions and

15   saying they have red flags for -- Belston, I'm sorry, and

16   saying they have red flags for money laundering.  So there's an

17   equivalency issue here for us, your Honor.

18          THE COURT:  That sounds like you're invoking the

19   goose/gander rule.

20          MR. ABENSOHN:  I'm a fan of the goose/gander rule on

21   this issue in particular, your Honor.

22          THE COURT:  I am too, but I don't see how this expert

23   can be opining on Russian matters.

24          MR. ABENSOHN:  Your Honor, he is not going to be

25   opining on Russian law.  That is not why we've proffered him.

H53VPREA

|   |   |
|---|---|
| 1 | THE COURT:  Okay.  Right.  Because I can assure you |
| 2 | he's not, because I'm prepared to rule on this *in limine* |
| 3 | motion, so we can move on. |
| 4 | MR. ABENSOHN:  If I can at least briefly make clear |
| 5 | what we would propose that he testify about. |
| 6 | He's an expert on real estate investment; 35 years |
| 7 | experience. |
| 8 | THE COURT:  In the United States. |
| 9 | MR. ABENSOHN:  In the United States. |
| 10 | THE COURT:  That's what he's going to testify about. |
| 11 | MR. ABENSOHN:  And we're happy if he does, your Honor, |
| 12 | because he can identify in a number of respects that these |
| 13 | transactions were perfectly typical and were not "red flags" on |
| 14 | the grounds that the government's expert will be suggesting. |
| 15 | THE COURT:  All right. |
| 16 | The government's motion is granted in part and denied |
| 17 | in part. |
| 18 | Both parties acknowledge that Alpert has been |
| 19 | designated as Prevezon's real estate investment expert and that |
| 20 | Prevezon separately retained a money laundering expert. |
| 21 | This Court concludes that Alpert is insufficiently |
| 22 | qualified to opine on money laundering issues based on the |
| 23 | limited experience he's had as a compliance officer of an |
| 24 | investment bank.  Alpert's testimony must be cabined to his |
| 25 | area of expertise:  Financial services and real estate |

1     investment in the United States.

2             This Court precludes Alpert's testimony or opinion to

3     the extent it concerns policy consequences that he believes

4     will result from the standards the government seeks to impose

5     in this case and the disposition of this action or Prevezon's

6     liability in connection with the money laundering allegations

7     or Russian business dealings or anything to do with the Russian

8     markets.  These categories of opinion should be left to

9     Prevezon's money laundering expert.

10            However, to the extent that certain money laundering

11    issues arise as ancillary issues to Alpert's opinion on what

12    real estate investors reasonably should expect or are aware of

13    in a typical New York or U.S.-based real estate transaction

14    such as the risk factors they consider in their due diligence,

15    I'll permit Alpert to provide such testimony.

16            Let's turn to the government's motion *in limine* No. 4.

17            MR. ABENSOHN:  Your Honor, may I briefly?

18            If it's acceptable to the Court, an earlier ruling may

19    have a bearing on our position with respect to this motion and

20    we would ask perhaps five minutes to consult with our client.

21            THE COURT:  On No. 4?

22            MR. ABENSOHN:  Yes, your Honor.

23            THE COURT:  All right.

24            It's probably a good time.  We'll take a

25    five-minute -- but literally --

H53VPREA

1          MR. ABENSOHN:  Understood, your Honor.

2          THE COURT:  -- five minutes.  Okay?

3          (Recess)

4          THE COURT:  Mr. Abensohn.

5          MR. ABENSOHN:  Yes, your Honor.

6          I hope I have the motion numbers right, because I

7     don't want to say this with regard to the wrong motion.  But

8     with respect to the issues surrounding Mr. Lurie, in light of

9     your Honor's ruling that Mr. Magnitsky's imprisonment and

10    related issues is not in the case, we would not anticipate

11    presenting him as a witness.

12          THE COURT:  All right.  Good.

13          Motion *in limine* No. 5.  This concerns evidence of the

14    *in absentia* conviction.

15          MS. LaMORTE:  Yes, your Honor.

16          THE COURT:  Go ahead, Ms. LaMorte.

17          MS. LaMORTE:  Your Honor, we are moving to exclude

18    Mr. Browder's conviction for tax evasion in 2013 in Russia.

19    We've put forward substantial evidence that it was a political

20    persecution and therefore does not meet the reliability

21    standards for a foreign conviction to come into evidence under

22    Rule 803(22) of the Federal Rules of Evidence.

23          THE COURT:  Why can't Prevezon use the existence of

24    the conviction for nonhearsay purposes?

25          MS. LaMORTE:  They can use it.  We don't contest, for

1   example, your Honor, that if they wanted to use it to show

2   bias, for example, they can do that.  But what they can't do is

3   use it to draw any inferences that are based on the reliability

4   of the judgment.  So, for example, they can't use it for the

5   truth, they can't -- you're going to interrupt me because

6   you're on the same wavelength as me.

7            THE COURT:  I got it.

8            MS. LaMORTE:  All right, your Honor.

9            Unless you have any questions.

10            THE COURT:  Thank you.

11            Go ahead, Mr. Reed.

12            MR. REED:  Thank you, your Honor.

13            There are essentially two arguments advanced against

14   the conviction, which, it should be clear, falls within the

15   literal terms of the rule insofar as it's a conviction for an

16   offense punishable by more than one year.

17            The first is that it was a political prosecution.

18   That, we say, is irrelevant.  The motive behind the prosecution

19   doesn't tell you anything about the reliability.  There are

20   people who would have said that the prosecution against our

21   clients here is political.  And if we came to you with that

22   complaint, you would say that's not germane.

23            THE COURT:  Why shouldn't an *in absentia* conviction be

24   treated as sort of the equivalent of a *nolo contendere*?

25            MR. REED:  Your Honor, A, Mr. Browder had notice of

1     the conviction; and if he wanted to resist it or fight it, he

2     could have -- I'm sorry, of the charge.

3                THE COURT:  Was there an actual trial in Russia?

4                MR. REED:  He was convicted *in absentia* after a trial,

5     yes.

6                THE COURT:  What kind of evidence was provided to

7     prove Browder's guilt in the Russian action?

8                MR. REED:  Your Honor, I believe it was primarily

9     documentary.  I don't have the catalog at my fingertips.  We

10    can certainly provide them to you.

11               But our point on this is really that to the extent

12    they want to argue that an *in absentia* conviction is somehow

13    less reliable, for them to make that argument to the jury, they

14    don't have a case that tells you that under this rule we are

15    not permitted to use it.  What they have is a case that says

16    you can't use it for extradition purposes.  And extradition is

17    an entirely different kettle of fish insofar as it comes with a

18    threat of a deprivation of liberty.

19               THE COURT:  What were the due process aspects of the

20    Russian trial that would, in the words of the courts, signify a

21    hallmark of civilized juris prudence?

22               MR. REED:  Your Honor, I guess I would fall back to

23    the burden.  I'm not going to stand here, given our other

24    positions in the case, and defend the due process of the

25    Russian justice system.  On the other hand, it's not my burden

1  to do so; it's theirs if they want to exclude a conviction.  It

2  falls within the literal scope of the rule.

3          THE COURT:  Thank you, Mr. Reed.

4          The government's motion to preclude use of the

5  *absentia* conviction is granted in part and denied in part.

6          Prevezon is precluded from using the conviction for

7  all purposes under Rule 803(22).  While courts do not

8  distinguish domestic and foreign convictions for purposes of

9  Rule 803, a foreign conviction must be assessed with greater

10 scrutiny to ensure that it was the product of "civilized juris

11 prudence."

12          At least one court in this circuit has framed that

13 phrase as referring to "some minimum due process" to reflect

14 "many of the basic rights that accused persons have in American

15 courts also are applicable to defendants in" the Russian

16 courts.  *Strauss v. Credit Lyonnais*, 925 F. Supp. 2d at 448.

17          Here, interpole publicly refused on multiple occasions

18 to honor Russian's request to arrest and extradite Browder on

19 the basis that such requests were politically motivated.

20 Furthermore, the conviction at issue was entered *in absentia*,

21 which means that the parties did not engage in an adversarial

22 process.  Even if Russian courts and trials guaranteed some

23 forms of due process, those procedural safeguards were never

24 utilized because Browder never appeared.  That Browder chose

25 not to appear is immaterial to the fact that the conviction was

H53VPREA

```
1    entered based on only one side's story.  Indeed, although the

2    case law is virtually nonexistent on how courts have treated in

3    absentia convictions under Rule 803, such convictions are akin

4    to criminal charges in the extradition context.  See In Re

5    Extradition of Ferriolo, 126 F. Supp. 3d, 1297, 1300 (M.D.

6    Florida 2015); and In Re Ribaudo, 2004 WL 213021 at *4 (

7    S.D.N.Y. February 3, 2004).

8             And the rationale behind that determination is similar

9    to what this Court has already expressed.  The adversarial

10   process was not engaged and there were no due process

11   protections that are apparent to this Court.

12            However, this Court finds that the in absentia

13   conviction may be used for nonhearsay purposes.  It's entirely

14   appropriate for Prevezon to counter Browder's testimony by

15   seeking to undermine his credibility.  Here, even if the

16   conviction is in absentia, the underlying tax evasion charges

17   involved allegations of fraud and dishonesty, claims that go to

18   the heart of a witness's character for truthfulness.  And that

19   Browder purposely chose not to address or confront these

20   charges may be an additional way for Prevezon to undercut

21   Browder's testimony.

22            Furthermore, the conviction may serve another

23   nonhearsay purpose, which is motive.  Prevezon may explore that

24   issue when cross-examining Browder, especially since Browder

25   has played an outsized role as a nonparty on the sidelines from
```

1        the inception of this litigation.  The government is free to

2        explain the circumstances surrounding the Russian charges and

3        to mitigate the effect of this evidence.

4            Because the jury will be instructed to consider the *in*

5        *absentia* conviction not for its validity, but for these other

6        purposes I've described, the parties are directed to provide

7        this Court with a draft of a limiting instruction that it can

8        approve for use at the close of trial.

9            Let's turn next to the government's motion *in limine*

10       No. 6 regarding the government's motives, legal theories, and

11       pre-discovery evidence.

12           MR. MONTELEONI:  Thank you, your Honor.

13           The defendants have indicated many times that they

14       would like to essentially spend most of their time trying to

15       put the government on trial by making the case not about who

16       did what in Russia or who did what when the funds came to them

17       and in New York, but who did what in the U.S. Attorney's

18       Office.

19           THE COURT:  I would say just one thing.  This is not a

20       criminal case.  So unlike what we instruct jurors in a criminal

21       case, that the government is not on trial, in a certain sense

22       the government is on trial here.

23           MR. MONTELEONI:  The government's evidence is

24       absolutely on trial here.

25           THE COURT:  Right.

1          MR. MONTELEONI:  That is exactly right.

2          However, that's the government's evidence at trial.

3          The government's evidence early in the discovery

4   process, what they had before they had sort of pulled

5   everything together, is no part of any claim and it's no part

6   of any defense.

7          THE COURT:  I understand that.

8          MR. MONTELEONI:  So therefore that should be

9   precluded.

10          The government's changing legal theories in the

11   complaint, those are no part of any claim or defense; in fact,

12   they would confuse the jury.  Any factual changes, the small

13   amendments that we made to facts, we certainly have no

14   objection to them bringing them out if they want to.

15          But we think that anything that goes to what the

16   government is presenting now at trial, that can be tested.  But

17   what the government knew earlier and when did they know it is

18   just not a proper subject, so we would ask that it be

19   precluded.

20          THE COURT:  Thank you.

21          Go ahead, Mr. Abensohn.

22          MR. ABENSOHN:  I know obviously that your Honor has

23   been through the papers.  I'd recommend in particular the

24   excerpts from Agent Hyman's deposition.

25          I think when you read Agent Hyman's deposition, it's

very clear what the real purpose of this government application

is.  It's to prevent us from going after a witness who

performed horribly.  That is not a basis to keep out testimony.

            Now, as far as what is still in play and still

current, what the government basically says is, Well, that was

then; it's water under the bridge.  We've since corroborated

him with all variety of evidence and, therefore, it's no longer

in play.

            Respectfully, your Honor, we have a different view as

to how this all transpired.  We think that this investigation

was tainted at its outset by simply accepting what Mr. Browder

had to say without meaningful investigation, and that it has

colored everything since.

            The Second Circuit has addressed that scenario in a

case called *Watson v. Green*, where it observed that by

accepting someone's account early, it had the effect or could

have had the effect of causing the investigators not to focus

on other possible scenarios.  That's certainly our view of what

happened here.

            Mr. Browder, among other things, had notice of these

cases that he says he had no notice of; among other things, his

company's reserve for litigation fees in relation to this

raiding before they supposedly knew about it; among other

things, he had the tax fraud, which the agent blithely said he

was unconcerned about and hadn't considered.

1          In our view, there was a decision at the outset to

2     credit someone who was popular in the media and had a

3     sympathetic story to tell and it colored everything that

4     followed.

5          Now, there's other ways that his testimony remains

6     valid and current.  He testified that they didn't have

7     authenticated bank records and he understood they should go out

8     and get them.  Well, that's still live.  If your Honor were to

9     permit those records to come in -- and for reasons I described,

10    we strongly think they shouldn't -- we certainly ought to have

11    a crack at the case agent for having more or less said that

12    that's the type of evidence the government should have.

13         So the problem continues.  The problem was born at

14    that time and it continues.

15         THE COURT:  I think I understand your argument.

16         MR. ABENSOHN:  Thank you, your Honor.

17         THE COURT:  All right.

18         This Court grants in part and denies in part the

19    government's motion.

20         Two of the objectionable topics the government seeks

21    to exclude, namely, evidence of the government's motive in

22    bringing this action and evidence regarding the addition or

23    removal of certain legal theories in the amended complaints are

24    simply irrelevant to this action and will distract the jury

25    from its job in evaluating the facts.

1            However, the third topic, sufficiency of the

2     government's pre-suit investigation, is a fair topic on which

3     evidence may be introduced.

4            The investigation is the process through which the

5     government collected the necessary evidence to build its case

6     and ultimately file this action.  If there are holes and

7     vulnerabilities in that process, Prevezon is entitled to expose

8     them.  The government, of course, may counter Prevezon's

9     narrative with proof of its own to show the jury that it's

10    bolstered its case with stronger forms of evidence over time.

11           This Court reserves decision on the use of Agent

12    Hyman's deposition testimony pertaining to the sufficiency and

13    quality of the government's investigation until relevant

14    portions of the testimony have been designated.  I will say,

15    however, that the government's argument regarding the

16    "haphazard circumstances" surrounding Agent Hyman's deposition

17    is not particularly persuasive.  This Court will not excuse any

18    adverse testimony provided by Agent Hyman simply on that

19    ground.

20           Finally, the government's motion *in limine* No. 7, by

21    letter two weeks ago, the government informed me that it would

22    take no further action with regard to this motion.  So is it

23    appropriate for the Court to say that the motion is denied

24    without prejudice as moot?

25           MS. PHILLIPS:  Yes, your Honor.

H53VPREA

1          THE COURT:  Good.

2          Well, we've made it through all 14 motions in just

3    over two hours.

4          Now, I'll get you a decision on Prevezon's Motion No.

5    7 and the government's Motion No. 1, which are interlocked.  I

6    just want to think a little bit more about what's been said.

7          I want you folks, in light of all of these rulings, to

8    be thinking closely about how much time we are going to need to

9    try the case.

10          I think I've told you, and so perhaps I'm reiterating

11    something I've told you previously, we will try the case from

12    10 a.m. until 5 p.m., with a one-hour luncheon recess between 1

13    and 2, and a short mid-morning and mid-afternoon break.  We'll

14    try the case four days a week, unless I find that we're really

15    lagging, and then we may try the case at least for half a day

16    on Friday.

17          But I want to get a better sense from you, before we

18    get real close to the trial date, as to what you think you

19    need.  I'm going to ask you to confer and submit -- you'll

20    submit a letter to me next week, let's say by Wednesday, so

21    that by then you will have had my decision on the other *in*

22    *limine* motions, so that we can get a real sense of where we are

23    in terms of the trial of the case.

24          I hesitate to ask, but are there any issues that

25    counsel want to raise before we recess for the evening?

1              MR. MONTELEONI:  Very briefly, your Honor, with the

2       Court's indulgence.

3              The pretrial order that the parties submitted left

4       open a dispute between the parties about whether two witnesses

5       would be coming in live, as one party wanted, or through

6       deposition, as the other wanted.  I think that we agreed that

7       they could testify by deposition, but as long as there was a

8       few additional days to do the designations, which already

9       happened.  So we have designations that the parties have agreed

10      are timely.  So we want to know whether you'd like us to submit

11      another order or how we should bring those to your attention.

12      Also we'd like to know if you intend to schedule a pretrial

13      conference.

14             THE COURT:  I will schedule a pretrial conference.  I

15      actually thought that I had, but obviously I haven't.

16             So I see that there's a Prevezon technology

17      walk-through at 2 o'clock on May 11th.  Why don't we get

18      together at 2:30 on May 11th, since most of you will be here

19      anyway.  All right?

20             Anything from the defendant?

21             MR. REED:  Your Honor, one more issue.

22             It concerns Mr. Petrov.

23             THE COURT:  Just, if you would, take the podium.

24             It's getting late.  I've been on the bench since 9:30

25      this morning, with about 40 minutes off the bench at lunchtime.

78

1    That's it.

2              MR. REED:  That's a heck of a day.

3              THE COURT:  I'm flagging.

4              So what's the issue?

5              MR. REED:  The issue, your Honor, concerns Mr. Petrov,

6    who was a key witness insofar as he is the person that the

7    defendants have identified as the source of the money here.

8              We had long been concerned that Mr. Petrov wouldn't be

9    able to come to the United States because he has an ailing

10   mother that he's responsible for.  We recently found out that

11   he would be able to come; he would be able to make

12   arrangements.

13             We asked the government for parole documents and a

14   safe passage letter.  We were told by the government that they

15   would do their best to arrange parole, even though it's

16   somewhat short notice.  We were also told that they would not

17   give him a safe passage letter.

18             Not surprisingly, Mr. Petrov has said, Well, if that's

19   the case, I'm not going to leave my mother on the off chance

20   that I come here and I get arrested and she's stuck in Russia

21   with nobody to care for her.

22             So I raise this really, I guess, to ask the Court's

23   help.  I don't know that the Court has the authority or the

24   ability to say to the government, You must issue a safe passage

25   letter.  My understanding is previously in the case, Judge

1    Griesa made a strong recommendation to that effect with respect

2    to Mr. Krit and Mr. Litvak and Mr. Katsyv.

3           If your Honor were so inclined, we would appreciate a

4    similar recommendation.  This is a key witness.  Both parties

5    have designated him as relevant.  He really gets to the nub of

6    it.  Without him here, I think our backup would be having him

7    testify by a live video link from Russia, which would involve a

8    nine-hour time difference, so it would be late in the day for

9    him.  We'd be through an interpreter and through a video.  I

10   just don't think the jury would get the full benefit of the

11   witness that way.

12          So my understanding is the government has said to us,

13   as I would expect, they have no plans to arrest him; we

14   shouldn't take this as a signal one way or another.  I can't

15   believe they do have an actual plan to arrest him at this

16   juncture.  So we would just ask for the Court's help or at

17   least guidance to try and basically work this out so we can get

18   this very important witness here in a way it will be most

19   advantageous to the jury.

20          THE COURT:  Mr. Monteleoni?

21          MR. MONTELEONI:  Yes, your Honor.

22          We didn't say that we had no plans to arrest him; we

23   didn't say we had plans to arrest him.

24          The issue is that for sort of obvious policy reasons,

25   we have to be extraordinarily sparing in when we make

1   statements about what we will or won't do with respect to any

2   type of criminal action with respect to any person, whether

3   it's that we will or we won't.  So there's, I think, a very

4   strong policy against the issuing of these letters absent

5   extraordinary circumstances.

6           We made the determination that with respect to the

7   actual parties to the case, back in 2015, that circumstances

8   existed.  That wasn't something that Judge Griesa asked us to

9   do; that was something that we offered.  He was sympathetic to

10  the idea of trying to issue some type of order, but when we

11  explained that that would sort of implicate our prerogatives,

12  that we would have to fight against it and it could be averted

13  by what we had been proposing to do, which was offer the

14  letter.  He accepted that as an adequate assurance for, again,

15  the parties to the case.

16          We have passed the request along that they made

17  previously for this letter.  And again, to be clear, what this

18  letter is, it would be a statement of the intentions of the

19  chief of the criminal division with respect to what might

20  happen to him while he was in the country or traveling.

21          THE COURT:  Is that the chief of the criminal division

22  of the Southern District or of the Department of Justice?

23          MR. MONTELEONI:  Sorry, of the Southern District.

24  Coupled with a statement of whether or not we were aware of any

25  other bodies as plans.  But we can't bind or speak for anyone

H53VPREA

1    other than this office.

2           So that request was made; it was considered within our

3    office.  We really can't though be in a situation where anytime

4    that a witness asked for this type of thing because they are

5    feeling uncomfortable or for whatever reason that they have,

6    that we will do so.  So I think that there are reasons why,

7    which don't have to do with what our plans are or aren't with

8    respect to him or with anyone.  There are systematic reasons, I

9    think, why that determination was made.

10          We are working on providing the parole paperwork.  We

11   think that testimony through video link or through his

12   deposition, which is also permissible under Rule 32, is

13   certainly available; so it's not that the fact-finders will be

14   deprived of his evidence.  But that's the position that we've

15   explained.

16          THE COURT:  All right.

17          Look, I'm sure that every trial judge's preference is

18   to have a live witness in the courtroom, especially for the

19   assessment of credibility.

20          I would welcome it if something could be worked out

21   that he's here.  I'm not going to tread on the authority of the

22   Executive Branch to make its own decisions and I'm respectful

23   of the separation of powers.  But it would be nice to have him

24   here.

25          Alternatively, if we are going to proceed by video

H53VPREA

1    hookup, with the time differences, I would certainly segment

2    his testimony so that we'd interrupt other witnesses and have

3    his videoconferencing coming in at an early part of the day

4    here so that it wouldn't be that late there.  But I can't see

5    having a witness testifying at 4 o'clock here, when it's 1

6    o'clock in the morning there.  That's for cable news reporters,

7    not witnesses.

8              Anything else?

9              MR. MONTELEONI:  Just with respect to those additional

10   deposition designations, would you like us to submit a new

11   pretrial order?

12             THE COURT:  You know what?  In the end, it's probably

13   best to just submit a new order so that it's all in one place.

14   It's probably not too much effort, right?

15             MR. MONTELEONI:  Yes, that would be fine.

16             THE COURT:  Okay.

17             All right.  Anything else?

18             MR. REED:  No, your Honor.  Thank you for your time.

19             THE COURT:  Thank you for yours.

20             I'll see you all next week.

21             Have a great evening.

22                         *    *    *

23

24

25