```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4                  Plaintiff,

 5          v.                              13 Civ. 6326 (WHP)

 6   PREVEZON HOLDINGS, et al.,

 7                  Defendants.

 8   ------------------------------x
                                        New York, N.Y.
 9                                      May 11, 2017
                                        2:35 p.m.
10
     Before:
11
                         HON. WILLIAM H. PAULEY III,
12
                                               District Judge
13
                              APPEARANCES
14
     JOON H. KIM
15        Acting United States Attorney for the
          Southern District of New York
16   PAUL MONTELEONI
     CRISTINE PHILLIPS
17   TARA LA MORTE
          Assistant United States Attorneys
18
     QUINN EMANUEL URQUHART & SULLIVAN
19        Attorneys for Defendants
     BY:  KEVIN S. REED
20        FAITH E. GAY
          ADAM M. ABENSOHN
21        RENITA SHARMA
          CORY STRUBLE
22

23

24

25
```

1          (Case called)

2          MR. MONTELONI:  Good afternoon, your Honor, Paul

3   Monteloni for the government.  With me at counsel table are my

4   colleagues, Cristy Phillips and Tara La Morte.

5          THE COURT:  Good afternoon.

6          MR. REED:  Good afternoon, your Honor, Kevin Reed,

7   Quinn Emanuel for the defendants.  Here with my colleagues

8   Faith Gay Adam Abensohn, Renita Sharma, and our client, Dennis

9   Katsyv.

10          THE COURT:  We have a number of matters to address.  I

11   would like to begin first with the motion *in limine* concerning

12   the Virgin handwriting expert.  I have reviewed the memoranda

13   submitted on the motion.  Do counsel wish to be heard?

14          Mr. Reed.

15          MR. REED:  Your Honor, I think the papers are fairly

16   comprehensive and I'm happy to answer any questions.

17   Otherwise, we will stand on the argument.

18          THE COURT:  Anything from the government.

19          MS. PHILLIPS:  The same for the government.  We are

20   happy to answer questions.  Otherwise, nothing.

21          THE COURT:  Let me rule on that motion.

22          This Court grants in part and denies in part

23   Prevezon's request to preclude the government's forensic

24   document expert, George Virgin, from testifying at trial.  Rule

25   702 governs the admissibility of qualified expert testimony

allowing testimony that will help the trier of facts to

understand evidence or to determine a fact in issue.  Under

Rule 702, this Court must serve as a gatekeeper for evidence

and is responsible for ensuring that an expert's testimony both

rests on reliable foundation and is relevant to the task at

hand.  *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 42

(S.D.N.Y. 2016)(citing, of course, *Daubert v. Merrell Dow

Pharms., Inc.*, 509 U.S. 579, 597 (1993)).

Prevezon relies largely on a recent opinion authored

by Judge Rakoff in *Almeciga v. Center for Investigative

Reporting, Inc.*, 185, F.Supp. 3d 401 (S.D.N.Y. 2016).  Judge

Rakoff's opinion is thoughtful and assesses an area of

expertise that has long been admitted based on its "historical

pedigree."  But while Judge Rakoff found that the particular

expertise in *Almegica* should be precluded under 702, most

courts across the country and here in the Second Circuit have

declined to exclude the testimony of a handwriting expert based

on a finding that forensic document examination does not pass

the *Daubert* standard.  *A.V. By Versace, Inc. v. Gianni Versace

S.p.A.*, 446 F.Supp.2d 252, 267, n. 14 (S.D.N.Y. 2006).  At

most, the issue of its admissibility and reliability is an open

one in the Second Circuit.  *United States v. Adeyi*, 165 F.App'x

944, 945 (2d Cir. 2006).

Without going into whether Virgin's expertise

qualifies specifically under *Daubert* or *Kumho Tire*, this Court

1    concludes that his testimony would be helpful to the jury.  And

2    that's because determining the authenticity of these two

3    directors' signatures is a material fact to establishing

4    whether one of the Russian Treasury Fraud's objectives, theft

5    and reregistration of the portfolio companies, was achieved.

6    The jury will find it helpful to hear Virgin's testimony as

7    well as anything to the contrary through Prevezon's own witness

8    to make a factual determination regarding the authenticity of

9    the directors' signatures.  And the assistance of Virgin's

10   expertise will provide to the jury outweighs the risk that such

11   testimony would obfuscate the issues in this case, confuse the

12   jury, or amount to a waste of time.  But Virgin's testimony

13   must be limited to informing the jury about what one should

14   look for in identifying forgery or the differences between an

15   authentic signature and a forged signature.  He may not provide

16   an opinion or conclusion on authorship or testify as to the

17   precise levels of confidence in his opinions as to genuineness.

18   *United States v. Rutherford*, 104 F.Supp.2d 1190, 1192 (D. Neb.

19   2000).  This will be consistent with my practice of not

20   qualifying an expert before the jury.  I don't make product

21   endorsements, so I don't tell jurors that someone has been

22   qualified as an expert.  I'll tell jurors that I'm permitting

23   the testimony because it may be helpful to the jury in

24   determining the issue of fact and here, from what I read in all

25   of these motion papers, both proposed experts can offer a good

1  deal to the jury about what they should look for in comparing

2  signatures.  But ultimately that's a fact question for the

3  jury.

4         One of the troubling aspects of Virgin's report is

5  that he qualifies his opinion based on the "limitations of

6  non-original evidence and less than naturally prepared

7  signatures."  He acknowledges that the signatures submitted for

8  examination are not original writings.  And because of that, he

9  was unable to perform a detailed examination of pen movement;

10 the copying process can obscure detail and is subject to

11 manipulation, alterations, tracings, etc.  Those are his words.

12 But these are issues that Prevezon may raise on

13 cross-examination as they relate to Virgin's methods, his

14 analysis, and the reliability of the materials he used.  And

15 those supposed vulnerabilities go to the weight of his

16 testimony, not its admissibility.  See *Orix v. Financial*

17 *Services, Inc.*, 2006 WL 587483 at *19 (S.D.N.Y., Mar. 8, 2006).

18        That constitutes the Court's ruling on the motion *in*

19 *limine*.

20        I want to turn next to the trial date.

21        MR. REED:  Your Honor, before you go on, to make sure

22 I understand your Honor's ruling, and I'll obviously review the

23 transcript, but is the nub of it that Mr. Virgin will not be

24 permitted to offer an opinion as to whether or not the

25 signature is likely genuine or not?

1          THE COURT: That is correct.

2          MR. REED: You will simply advise the jury, because

3 you are making that determination, here are things that you

4 should consider?

5          THE COURT: Right. Here is what I look for, here is

6 what I would suggest you look for in evaluating whether the

7 signatures are forgeries.

8          MR. REED: Thank you, your Honor.

9          MS. PHILLIPS: Your Honor, if I can ask you an

10 additional clarifying question. In telling the jury what he

11 would look for, is he allowed to speak to the individual

12 signatures at issue here, or just signatures generally? In

13 other words, can he say on this character --

14          THE COURT: I'll think about that, but I would think

15 he could look at the signature in order to describe -- the

16 testimony just can't float in a vacuum of abstract principles

17 that later the jury is going to be confounded with. So I would

18 expect that both witnesses are going to be showing and

19 discussing the signatures in their testimony.

20          MS. PHILLIPS: Thank you, your Honor.

21          MS. GAY: Your Honor, do you mind if the interpreters

22 move up into the box?

23          THE COURT: Not at all. Please.

24          MS. GAY: Thank you.

25          THE COURT: With respect to the trial date, unless

 1   something changes shortly, we are going to start on Tuesday,

 2   May 16.  There are still too many trials, criminal trials, set

 3   for Monday.  If one of them falls off, and it might in the next

 4   hour, we can proceed on Monday.  I'll put up an order on the

 5   docket by the close of business today.  Right now we will be

 6   proceeding on Tuesday, May 16, with jury selection and trial.

 7            MR. MONTELONI:  Your Honor, may I be heard on that

 8   briefly?

 9            THE COURT:  Yes.

10            MR. MONTELONI:  It would be very difficult for the

11   government to begin on Monday now.  We have a number of

12   international witnesses.  They have made travel plans at this

13   point.  And we are very close to Monday.

14            THE COURT:  I wouldn't worry about it.  Because even

15   if we are able to start on Monday, we are going to select a

16   jury, we are going to make opening statements.  And jurors,

17   having suddenly been impaneled and finding themselves in a

18   longer-term commitment, might enjoy the opportunity to go home

19   a little early on the first day.

20            MR. MONTELONI:  Thank you, your Honor.

21            THE COURT:  With respect to jury selection itself, my

22   initial thought, subject to your views, is to impanel a jury of

23   10 people to hear and determine this case, to obtain from you a

24   stipulation to a unanimous jury of as few as six, meaning if at

25   the end of the trial we have nine jurors who are deliberating,

```
 1    they are all deliberate and their verdict must be unanimous.

 2    But if we have lost folks along the way, so long as we have six

 3    jurors at the end and their verdict is unanimous, that the

 4    parties agree, that will constitute the verdict in this case.

 5    Is this proposal acceptable to the parties or do they have

 6    another suggestion?

 7              MR. MONTELONI:  It's fine with the government, your

 8    Honor.

 9              MS. GAY:  Your Honor, we need a minute to talk with

10    our client, if we may.

11              THE COURT:  Go ahead.

12              MS. GAY:  Your Honor, I think we are fine with the

13    eventual resolution down to six.  I think we would think, with

14    the case being this long, with it gaining publicity, with the

15    sensitive issues that seem to have gotten more sensitive in the

16    last week or so, we would like to maybe start off with 12 and

17    then certainly winnow down to six if we can.  We would like to

18    try to do that.

19              THE COURT:  Any objection to that?

20              MR. MONTELONI:  We already thought that this trial

21    could and should be tried to eight jurors.  We don't think we

22    have to go all the way to 12.  I think that a cushion of four

23    jurors over the course of a three to four-week trial seems

24    ample.

25              THE COURT:  If it's three to four weeks, I agree with
```

1    you.  But in your submission, in your voir dire submission it

2    said four to six and that frightened me.

3              MR. MONTELONI:  We are obviously still trying to

4    compare and map things out to days.  It seems to me currently

5    likely that it would be in the three to four-week range because

6    I think that the government's case will likely take about 13 or

7    so trial days.  But a lot of it is going to overlap with the

8    defendants' case because each side will be calling sort of the

9    same witnesses concurrently during the plaintiff's case.

10             THE COURT:  We are only going to call witnesses once.

11             MR. MONTELONI:  Exactly.

12             THE COURT:  Whoever calls the witness, the party

13   crossing the witness, their initial cross-examination will not

14   be limited to the scope of direct.  They can -- it will be wide

15   open.  It will only be beginning with redirect and recross that

16   the scope of the inquiry will be narrowed.

17             MR. MONTELONI:  Exactly, your Honor.  Our current

18   estimates, based on that understanding of how we will be going

19   forward, make it seem more like a three to four-week trial.  I

20   certainly don't want to pretend to be a fortune teller, though.

21   Obviously things can happen.  But four jurors extra beyond a

22   quorum certainly seems like an ample cushion.

23             MS. GAY:  Your Honor, I don't think we are far apart.

24   We are assuming they are going to go for about four weeks.  We

25   think we will go some past that.  We are all interested in

1   efficiency.  We think jurors like it better if we are

2   efficient.  So there is no question about that.

3        It doesn't really take into account that it is a

4   sensitive case.  There are going to be people who may or may

5   not become uncomfortable for one reason or the other.  We would

6   very much like to advocate, if you have a four week trial plus

7   us, a week, week and a half, that we start with 12 and fall to

8   eight.

9        THE COURT:  I am going to make it a Solomonic

10   resolution.  11.  We will pick 11.  I will qualify 19 so that

11   each side will have four peremptory challenges.  The

12   peremptories will be exercised in four rounds with the

13   government going first in the first round and the defendant

14   going first in the second round and then alternating.  If a

15   peremptory isn't exercised in a given round, it's deemed lost.

16   But subsequent peremptories in subsequent rounds are not

17   forfeited.  And if not all of the peremptories are exercised,

18   then the lowest seeded 11 jurors of the 19 whom I qualified

19   will comprise the jury.

20        Any questions about how voir dire will proceed?

21        MS. GAY:  Yes, your Honor.  Do you put people in the

22   box?

23        THE COURT:  I do.  We will put 18 in the box and we

24   will probably find another chair so that someone isn't sitting

25   alone on a bench out in the courtroom.  The optics of that are

 1    not right.  We will get another chair in there for that

 2    purpose:  You will know before you have to exercise any

 3    peremptories that I have satisfied myself that all 19 are

 4    qualified to serve and that any challenges for cause have been

 5    exercised already.  It won't be one of those nightmarish

 6    scenarios where you exercise a peremptory to find a vacancy

 7    that brings someone out of the venire that is scarier than the

 8    person you just sent packing.

 9              Remember those days, Ms. Gay?

10              MS. GAY:  Yes, your Honor.  I was quaking while you

11    were speaking.

12              Do you strike and fill?  You qualify everybody.  Do

13    you actually move people?

14              THE COURT:  No, not during selection.  I used to

15    select juries.  And myself as a lawyer and the judges who did

16    that would drive every lawyer crazy because you're constantly

17    trying to move your charts and keep track of people.  No.  If

18    we strike somebody, we will fill that seat.  Once you are

19    exercising your peremptories, nobody is going to be moving.  We

20    will be doing that in the robing room.

21              MS. GAY:  You'll excuse us for asking in an excess of

22    caution.

23              THE COURT:  It's all right.

24              I thought in your joint voir dire that your proposed

25    summary of the case was too long for the Court to get involved

1    in.   I have drafted something.   I will read it to you and I

2    will endeavor to circulate a copy.   This is what I propose to

3    tell the jury.

4          This is a civil asset forfeiture case.   It is not a

5    criminal case.   The United States of America is the plaintiff.

6    The defendants are Prevezon Holdings Limited; Prevezon

7    Alexander, LLC; Prevezon Soho USA, LLC; Prevezon Seven USA,

8    LLC; Prevezon Pine USA, LLC; Prevezon 1711 USA, LLC; Prevezon

9    1810, LLC; Prevezon 2009 USA, LLC; Prevezon 2011 USA, LLC,

10   Ferencoi Investments, Ltd.; and Kolevins, Ltd.

11         A forfeiture case is unlike other lawsuits you may be

12   familiar with because some of the defendants are parcels of

13   real estate or money in bank accounts.   More specifically, the

14   government claims that a condominium unit located at 20 Pine

15   Street in lower Manhattan and various bank accounts should be

16   forfeited to the United States because they represent proceeds

17   of crimes committed overseas in the Russian Federation.   To

18   forfeit a property means to divest the current owner of its

19   ownership in the property and place ownership in the hands of

20   the government.

21         The government also claims that the defendants were

22   involved in laundering monies derived from those crimes in the

23   Russian Federation that found their way to the United States,

24   in other words, money laundering, and are subject to civil

25   penalties.   The federal money laundering statute makes it

1   unlawful in certain circumstances to conduct or attempt to

2   conduct a financial transaction, such as buying real estate or

3   depositing monies into an account that represent the proceeds

4   of some form of unlawful activity.

5          In this case some of the unlawful activities include

6   an offense against a foreign nation involving:  1, bribery of a

7   public official; 2, fraud against a foreign bank; 3,

8   transportation of stolen property; and 4, money laundering.

9          The parties opposing forfeiture are the claimants.  A

10  claimant is a person with an interest in the property who

11  contests the forfeiture.  None of the claimants are defendants

12  in this case nor have they been charged with any crimes.  The

13  issue for you to decide will be whether the defendant

14  properties were involved in transactions to launder the

15  proceeds of the crime committed in the Russian Federation;

16  namely, a tax fraud involving the Russian treasury.

17         If anyone has a comment that jumps to your mind now, I

18  would appreciate it, but I'll circulate this summary to you.

19         MR. MONTELONI:  Your Honor, one point is that we think

20  that the description of the first specified unlawful activity

21  of bribery of a public official, that's only a part of that

22  statutory language.  It's bribery or the misappropriation of

23  theft or embezzlement of public funds by or for a benefit of a

24  public official.  Not that the jury necessarily has to hear all

25  of the statutory language, but we wouldn't want it to hear just

 1    part and think that that's all it was, so I would request some

 2    more general language, such as bribery or theft by a public

 3    official, or something along those lines.

 4              THE COURT:  I just found it hard to swallow the whole

 5    statement.  Bribery or theft?

 6              MR. MONTELONI:  Yes.  I think for voir dire purposes,

 7    that's fine.  The more details will come later.

 8              May I have a moment to consult with cocounsel?

 9              THE COURT:  Yes.

10              MR. MONTELONI:  We wanted to just take a closer look

11    at the language on knowledge, if you'll be sending that around.

12              THE COURT:  I will.

13              MS. GAY:  Judge, with respect to us, we would like to

14    take a look at it.  We wouldn't mind if we could perhaps add in

15    an alleged here and there and --

16              THE COURT:  I have no problem with that.

17              MS. GAY:  And on the other piece of it to somehow make

18    clear that we are not involved in the Russian crimes, which the

19    government has never contended we were.  We will look at the

20    language and suggest something.

21              THE COURT:  That's fine.

22              I also wanted to share with you my thoughts regarding

23    the questions that are specific to the allegations in this

24    case.  And some of my questions are a little broader than what

25    you've suggested and others are a little more specific.  I

 1    would like to review that with you for a moment.

 2          I would first tell the jurors that, obviously, this

 3    case involves defendants and claimants who are Russian.  So the

 4    first inquiry would be whether any of the jurors are of Russian

 5    descent.  After doing that, do any jurors speak or read

 6    Russian, and if they do, then, as you've suggested, the

 7    questions about translations and interpreters.

 8          Then I would ask whether anyone has visited or resided

 9    in the Russian Federation or the former Soviet Union.

10          And then say to them now, essentially, recently there

11    has been a lot of news about Russia and Vladimir Putin.  Is

12    there anyone who believes they couldn't keep what they have

13    read, seen, or heard about Russia separate from what they will

14    see and hear in this courtroom?  Is there anyone who believes

15    that what they have heard about Russia will interfere with

16    their ability to decide this case based solely on the evidence

17    or the lack of evidence presented in the courtroom?  Then I

18    would describe to them that some of the conduct at issue

19    involves the government of the Russian Federation.

20          And is there anything that any juror knows about the

21    government of the Russian Federation that might interfere with

22    their ability to be fair?  Then I would inform them that the

23    defendants and claimants in this case are Russian businesses

24    and Russian citizens and do any of them have feltings about

25    people or businesses from Russia that might affect their

1    ability to be fair and impartial.

2         I would then pick up on your proposed question about

3    opinions, positive or negative, about Russians owning

4    residential real estate in New York or views about Vladimir

5    Putin that might affect their ability to sit.

6         I would ask them whether they have any familiarity

7    with the Magnitsky Act and whether anyone is familiar with

8    sanctions that the United States has imposed on Russian

9    citizens.  And do they have any opinions about the civil

10   forfeiture laws of the United States and the government's

11   ability to seize assets that might interfere with their ability

12   to be fair and impartial here.

13        Then a general question about whether they have read,

14   seen, or heard any news stories regarding money laundering that

15   they think might affect their ability to be fair and impartial.

16        I thought it probably appropriate to at least touch on

17   the Magnitsky law here.  I hesitate and have not asked and I

18   see that you didn't propose that I ask whether any juror has

19   viewed any of the 60 Minutes pieces, among others, that have

20   been broadcast relating to Magnitsky and Browder, etc.  Is

21   there a view about that?

22        MS. GAY:  Yes, your Honor.  Our view is, they will

23   Google it immediately and we would prefer it not be asked.

24   It's one of the reasons we both steered to a questionnaire and

25   steered even father away from that, so we prefer that it not be

 1    asked.

 2           THE COURT:  I won't ask about the 60 Minutes pieces.

 3    Magnitsky's name is going to come up during the course of the

 4    trial, isn't it?

 5           MS. GAY:  Seems that way, your Honor.

 6           THE COURT:  Wouldn't it be better to know who might

 7    have an issue with that before we start?

 8           MS. PHILLIPS:  Your Honor, just to point this out, the

 9    parties submitted, it was drafted by the defendants, a juror

10    questionnaire and the government consented to the questions.

11    That's actually one of them.

12           THE COURT:  I am not using a jury questionnaire.

13           MS. PHILLIPS:  That's fine.  My only point was that

14    the parties had agreed on some level that that should be

15    brought up.

16           THE COURT:  Jury questionnaires generally don't work.

17    If they are going to be used, the real reason to use them is

18    just to test people's availability for the duration of the

19    trial.  I am certainly not going to have people fill out a

20    questionnaire in the middle of voir dire.

21           MS. GAY:  Your Honor, if you are not going to use the

22    questionnaire, which we understand, our feeling for the defense

23    is that we would rather have that question subsumed and we

24    think we will get to it and the other more general questions

25    about Russia.  And for us it seems prejudicial in front of the

1   entire panel to bring out and sort of tempt them to go Google

2   the Magnitsky Act.

3           THE COURT:  I'll think about that.  If that's the

4   defendants' request --

5           MS. GAY:  It is, your Honor.

6           THE COURT:  -- I'll be inclined to grant it.

7           Are there any questions about how voir dire is going

8   to proceed?

9           Obviously, at various times we will be at the side

10  bar.  If we get into any juror who has something sensitive,

11  it's going to be right up at the side bar.  And I share the

12  concern about polluting the entire venire and I'll be watching

13  for it as jurors are speaking.  On some of these questions if I

14  get a yes answer, I am not going to hear the reason for the

15  answer in open court.  I am going to bring that individual up

16  to the side bar.

17          I think that you should reach some understanding as to

18  how many people are going to come up to the side bar for those

19  discussions.  I think it should be limited to two or three from

20  each side at the most.  There is enough for a juror to come up

21  to the side bar without having a crowd.

22          You will have also a chance then, if you want me to

23  pose some further question based upon what you are hearing,

24  either to the panel as a whole or to an individual juror, you

25  will just raise it with me at the side bar.

1          And during the course of voir dire, if you believe you

2     have reason to make a challenge for cause, when you are up at

3     the side bar on some other issue, feel free to raise it and

4     I'll address it then.  Because if I agree with you, we can get

5     rid of that juror early and put someone else in the seat.

6          Any other questions on voir dire?

7          Before we get to the joint pretrial order, a couple of

8     pet peeves.  If you have an objection, please stand and say you

9     have an objection.  Refrain from speaking objections.  You can

10    give me a rule or a word or two.  If I'm not understanding what

11    the basis for your objection is, I am going to bring you up to

12    the side bar.  If you want to publish an exhibit to the jury,

13    ask permission from the Court so that there is a record

14    created.

15         Any exhibit, even those to which the parties are

16    stipulating, must be offered by a party.  I'll ask whether

17    there is any objection and then it will be received in

18    evidence.  And there will be no wholesale dumping of exhibits

19    into the record.  Any exhibit that's being received in evidence

20    should be referenced by at least one witness at some point in

21    the trial.

22         Finally, everyone should be seated when the oath is

23    being administered to a witness.  Don't go to the podium ready

24    to launch into your examination until the witness has been

25    sworn, seated, and then I'll invite you to inquire.

```
 1              I'm sure there are others that I have forgotten, but I

 2    am trying to make things easier.

 3              MR. MONTELONI:  Your Honor, may I ask for

 4    clarification of one of those pet peeves.  With respect to the

 5    publishing of exhibits, there will be several times when we

 6    will be asking a witness to compare one document to another and

 7    we might ask to sort of switch between what gets published to

 8    the jury quickly.  Only the first time?

 9              THE COURT:  Only the first time.

10              MR. MONTELONI:  Thank you, your Honor.

11              THE COURT:  I got this exquisite joint pretrial order.

12    But, among other things, I'm trying to figure out how I am

13    supposed to rule on deposition objections.  My thought would be

14    that it would be helpful to you if the Court ruled on

15    objections in advance of the deposition being played.

16              But I'm really not sure how that's going to work.  Let

17    me give you an example.  I turned to the first deposition

18    transcript, Ms. Alexandrou, and then I turned to the

19    defendants' first objection.  The first objection is at page 81

20    of the transcript and the objection is that the questions being

21    posed for five lines were asked and answered.  Not a very

22    powerful objection, but of course in order for me to rule on

23    that objection I then had to go back and start reading the

24    transcript to discover that at pages 8 and 9, very similar

25    questions had been asked of the witness.
```

1      I guess my point is, even if you are correct and on

2  this objection you are, it's a total waste of time, especially

3  my time.

4      Then I turned to the second objection in the

5  transcript, and that's at page 93, at line 5.  And it purports

6  to be a hearsay objection, except that line 5 is the end of a

7  witness' answer.  Lines 6 and 7 are a question asking the

8  witness asking to look at what's been marked as Government

9  Exhibit 5, and the following lines that are objected to is the

10  court reporter's note as to what some record is.  Then when I

11  go to look at Exhibit 5, it's nowhere here.  I can't find it.

12  It's very difficult for me to rule on a hearsay objection

13  that's in the ether.

14      I'll just give you one more.  And the one more is the

15  very next objection in the very first deposition in this joint

16  pretrial order.  The third objection is page 94, line 18 to 21.

17  As I understand it from the big code of objections that you

18  gave me, the objections are no personal knowledge and not

19  authenticated.  These particular lines, 18 to 21, reflect a

20  question, sort of looking at Government Exhibit 4.  Does that

21  form reflect a power of attorney?

22      Then I go to the exhibit list under B1 of the joint

23  pretrial order to find out what Exhibit 4 is, and it's merely

24  described as Glendora and Kone documents which were used as

25  exhibits to the deposition.  It's completely circular and

 1   unhelpful.  These are just the first three objections and it

 2   took me 20 minutes to figure that out.

 3          We are not going to proceed that way.  If you can't

 4   come up with something better, we are going to have to sit and

 5   do it on the record.  And the time that it takes to do that is

 6   going to cut into your trial time.  It's not going to extend

 7   the trial time.  I don't know how you think I am supposed to

 8   rule on these objections in advance.  And you are going to have

 9   to tell me what recordings you intend to play in what order so

10   we can start to tee them up.  And then you should pack a lunch

11   because we are going to start on this on Monday.

12          I can't rule this way.  Somewhere I'm sure there is a

13   color-coded glossary.  But I don't know what the different

14   colors in the highlighting represent.  I thought I had seen it

15   someplace in an earlier joint pretrial order, but I can't find

16   it now.  There is yellow, green, there is purple, there is

17   light, there is sky blue, there is Tiffany blue.  I don't know

18   what all these colors are.

19          Who can at least tell me what the colors are?

20          MS. SHARMA:  Your Honor, I can.  If you look on the

21   front page of each transcript, there is a code on the bottom.

22          THE COURT:  I'm looking at Yianna Alexandrou.  I don't

23   see any code.

24          MS. SHARMA:  I apologize.

25          THE COURT:  I see a cover page and then it starts on

 1    page 5 with the text.

 2              MS. SHARMA:  I apologize, your Honor.  It must have

 3    fallen off in the version we submitted.

 4              THE COURT:  In dark yellow, light yellow, very dark

 5    blue.  I just don't know what it all means.

 6              MR. MONTELONI:  Your Honor, might I propose, the

 7    parties can confer and we might be able to provide submissions

 8    that reflect the order for each witness that we will be playing

 9    these in and actually attach the exhibits themselves, because I

10    think that very few of the depositions are highly document

11    intensive.

12              THE COURT:  That would be a big help.

13              MR. MONTELONI:  When would you like us to submit that

14    to you?

15              THE COURT:  When do you think you are going to start

16    playing?  I would love to get some tomorrow so I could do some

17    over the weekend.

18              MR. MONTELONI:  For depositions that we might start

19    playing early in the first week we will get you our orders

20    tomorrow.

21              THE COURT:  Newsflash.  I have just been informed that

22    we can begin our jury selection and trial on Monday because the

23    criminal case pled, so that's good.

24              Quite frankly, even assuming that all of this

25    testimony is played, a lot of it, while it's a lot of pages,

1   there is not a lot of highlighted testimony that's actually

2   going to be played in a number of the depositions.  So it seems

3   to me that a lot of this is going to proceed perhaps quicker

4   than you thought.

5           MR. MONTELONI:  We have been thinking that the

6   deposition portions are not going to be extremely lengthy

7   except perhaps with a few of the Prevezon personnel.  I think

8   that the examinations and cross-examinations are going to be

9   the bulk of the time.

10          THE COURT:  To the extent that video depositions

11  involved Russian interpreters, I take it that you'll be in a

12  position to edit out all of the Russian interpreting so that we

13  will just hear the question and answer.

14          MR. MONTELONI:  That's not certainly how we propose to

15  do it.  I can inquire.  I think sometimes there is information

16  conveyed by the way a witness can say something, even in a

17  foreign language, regarding demeanor and everything.  It might

18  be a little confusing to the jury to just hear a question and

19  the interpreter's response.

20          THE COURT:  Fair point.

21          MS. GAY:  Your Honor, we took a look at trying to do

22  it that way to try to speed things along.  It gives a weird

23  impression.

24          THE COURT:  It's a fair point.

25          Are there any other questions that you want to raise?

1

2              A letter came in about 50 minutes before this

3    conference started.  It's raising another issue.  I've only had

4    a moment to glance at it.  I think I'd like to hear for a

5    moment from both sides about it.  I'm not sure that I can rule

6    on it right now.

7              Mr. Abensohn.

8              MR. ABENSOHN:  Thank you, your Honor.  Certainly we

9    weren't expecting or urging the Court to resolve it here and

10   now.

11             THE COURT:  But I'm glad you've raised it.

12             MR. ABENSOHN:  I appreciate that, your Honor.  We got

13   a letter from the government, I think, two evenings ago within

14   a couple of hours after the Court's order on the government's

15   motion *in limine* No. 1 where the government essentially said on

16   the back of that order they were going to seek to move in

17   additional materials under the residual exception.

18             The core of our complaint in the letter is that as to

19   those materials the indicia the Court relied upon in its order

20   are largely nonexistent, so we view this as attempting to

21   bootstrap and, in our view, certainly extended the outer limits

22   of the residual and, respectfully, your Honor, we think perhaps

23   it goes beyond the outer limits, but obviously I am not trying

24   to relitigate that.  We think it goes beyond the Court's order.

25   It goes beyond the parameters that the Court set with the use

1    of the residual here and essentially amounts to a wholesale

2    effort to move in massive portions of the government's case

3    without any recognized exception under the hearsay rules.

4              THE COURT:  Where do those documents come from?

5              MR. MONTELONI:  Thank you, your Honor.  I had wanted

6    to talk to the Court today about how to tee things up before

7    the letter came in.  I was expecting to and I would request the

8    opportunity to submit a letter.

9              There are several sets of documents.  All are from

10   abroad.  And the first set is just a few other documents that

11   are part of the seized records but that I didn't cite by

12   exhibit number in the original motion due to the time that we

13   were compiling the exhibit lists.

14             THE COURT:  Do those documents come from the criminal

15   case file photograph by Gorokhov?

16             MR. MONTELONI:  Yes, those first ones do.  The other

17   ones come from different governments that provided us documents

18   directly, physically handed them to U.S. Government

19   representatives in almost all cases.  But because they

20   collected them using their own procedures, they didn't always

21   provide the certifications that we had asked for.

22             And so upon reviewing the Court's order rejecting the

23   public records and the sort of rejecting the use of certain

24   contexts to fill in business record certifications that weren't

25   explicit, we concluded that we couldn't rely on those

certifications or we weren't going to seek to, so we promptly

provided notice to the defendants and intend to tee this up to

the Court by a letter motion.

          Essentially, we don't control how other governments

talk to their banks and what they get.  We can only ask.  And

so law enforcement agencies in Moldova, Lithuania, Latvia, and

Estonia each provided us records that they represented to us

that they had obtained from the bank as a part of an

investigation that they conducted at our request and gave to

us.

          What they didn't give to us was the particular piece

of paper that we wanted, but these are all corroborated by not

just each other, but by domestic bank records in most

instances.

          And the final category is the defendants' own bank

records, which they should produced to us in discovery but did

not.  And we obtained some of their records from the Swiss bank

UBS through the means of someone who is not a custodian who is

not going to be a witness.  Those records also corroborate

various authenticated bank records.  We think that the context

is a little bit different.  We think that the case for

admission is much stronger and it was less of a complex

question because a lot of the indicia of reliability here.  But

we want to get a chance to present that to you in a letter

category by category where we will lay all that out.

1         THE COURT:  Why did the government wait to just before

2    trial to raise the issue of offering at least the latter

3    documents that you just described?

4         MR. MONTELONI:  The defendants' own bank records?  It

5    is possible that previous defense counsel didn't object to

6    them.  There are certainly some objections that previous

7    counsel didn't make to their own records that current counsel

8    did.  I might be wrong.  If I am wrong, then that was an

9    oversight.

10        THE COURT:  I think you should save it for a letter.

11   Get me a letter by tomorrow.

12        MR. MONTELONI:  Absolutely, your Honor.

13        THE COURT:  Yes, Mr. Abensohn.

14        MR. ABENSOHN:  Your Honor, I hesitate to ask if it

15   would be helpful to the Court, but we have two binders with

16   these materials.  We did not present them as an attachment or

17   appendix to the filing, which is really just the letter, and I

18   think just a short letter from the government to us.  I have

19   these available if your Honor wants them.

20        THE COURT:  Given this dispute, I will take them.

21        MR. ABENSOHN:  I should add, having heard the

22   government's comments, among our problems with this traunch of

23   material is a notice issue.  We find it, frankly, troubling

24   that the government made its presentation in *in limine* 1 and

25   did not include these materials, which we consider more

 1    farfetched than the ones they presented to your Honor.  And now

 2    they are trying to piggyback on the Court's order to go even

 3    further into residual territory, in our view.  So that is among

 4    our concerns here, but I will provide these certainly to the

 5    Court.

 6              THE COURT:  Thank you.

 7              Is there anything further that either party wants to

 8    raise before we recess for the afternoon?

 9              MR. MONTELONI:  Yes, your Honor.  One or two

10    questions.  We understand that the Court doesn't want a witness

11    to be called twice.  We were wondering if there is potentially

12    a carve-out for a particular summary witness.  We had a thought

13    that some documents could be read by a paralegal in our office

14    once and then at another time that same paralegal could take

15    the stand, as opposed to calling multiple people.  We know that

16    that's an exception to the Court's practices.

17              THE COURT:  That would be fine.  Any objection to that

18    from the defense?

19              MS. GAY:  No, your Honor.

20              MR. MONTELONI:  Thank you.

21              We also wanted to inquire of the Court's practices

22    about closing arguments.  I don't know if this is the ordinary

23    way in which you do it in these type of cases.  We think in

24    light of the complexity of the case that the government is

25    making summation first and then a brief time-limited rebuttal

1   makes sense, given the likelihood of complex issues that might

2   require clarification.

3           THE COURT:  That's a ways off.  We can discuss that

4   during the course of the trial.  It is my practice to fix time

5   limits for both opening statements and closing arguments so

6   that there is some balance and one party isn't filibustering

7   the jury.

8           In that regard, with respect to opening statements,

9   who is going to give the opening statement for the government

10  and how much time are you requesting?

11          MS. PHILLIPS:  Your Honor, I'll be giving the opening

12  statement for the government and I would ask for 35 minutes.

13          THE COURT:  And for the defendant.

14          MS. GAY:  Your Honor, it will be me.  I think we would

15  ask for about the equivalent amount of time.

16          THE COURT:  35 minutes.  That's fine.

17          MS. GAY:  May we ask your Honor, if we are going to

18  use slides or demonstratives for opening, perhaps we can

19  resolve any concerns about those during jury selection on

20  Monday.

21          THE COURT:  Certainly.  We can actually resolve it

22  before we bring the jury up because they will have to see a

23  film and we will all be here ready to go at 9:45 or so.  Bring

24  your demonstratives.  Because you will be giving your opening

25  statements, I hope, in the early afternoon.

1          MS. GAY:  I understand.  May I raise one other issue

2     if the government is finished with their list?

3          MR. MONTELONI:  Absolutely.

4          MS. GAY:  This is just in an excess of caution, your

5     Honor.  As you can imagine, we parsed your careful decisions

6     this week sentence by sentence, both us and our clients.

7          One issue that I just wanted to make sure that the

8     government understood as we were getting close to opening, with

9     regard to our argument on the bank SUA where we made an

10    argument about fraud versus theft, we took the government at

11    their word or at their proof in terms of making that argument.

12         We didn't mean to suggest, and I don't think anyone

13    thinks this, that we are saying that Prevezon or any of the

14    entities that we represent has any knowledge of Hermitage, has

15    any knowledge of the bank fraud, of the alleged theft, or

16    anything that Hermitage might have done.

17         To that extent, I just want to be clear for the record

18    that we are making that argument, again, assuming the

19    government's case, and we will not be taking a position that we

20    know anything about Hermitage.  I didn't want the government or

21    the Court to feel otherwise.  I think it's an obvious point.

22    But we are getting close to openings.  I just wanted to be sure

23    of that.

24         THE COURT:  Anything else?

25         MR. REED:  One last logistical issue, your Honor.

 1   Mr. Katsyv will need an interpreter to testify.  Unless your

 2   Honor objects, it would be our plan for us to use our own

 3   interpreters.  It is my understanding that in civil cases we

 4   are not required to use the Court's interpreters, and

 5   Mr. Katsyv will be more comfortable and will give better

 6   testimony from somebody who is used to his speech patterns.

 7             MR. MONTELONI:  Your Honor, we object.  The person who

 8   we understand to be the defendants' --

 9             MR. REED:  It would be two.  It would be Anatoly and

10   one other.  Anatoly Samochoronov is an individual who is a

11   Russian and English speaker who has accompanied defendants to

12   previous depositions and we think is really a member of the

13   defense team in a way that is not appropriate to be providing

14   the principal interpretation.  He has apparently been engaged

15   in lobbying efforts that seem to have some connection to at

16   least the defendants' lawyers in Washington, and he has also

17   had arguments with the official certified interpreters at the

18   time of depositions, all of which is his right.  We are not

19   saying that it's not, but we think that's not appropriate to be

20   the actual interpreter.  We think that we should use a neutral

21   court-certified interpreter.

22             THE COURT:  Mr. Reed.

23             MR. REED:  Your Honor, first, Mr. Samochoronov is a

24   certified interpreter in this courthouse.  Second, he will be,

25   as I think all interpreters would, he will be swearing an oath

 1    to interpret faithfully according to the law.  The fact that

 2    he's been in prior depositions I don't think characterizes him

 3    as a member of the defense team.  He's a member of the defense

 4    team --

 5              THE COURT:  He's no more a member of the defense team

 6    than the interpreters who come in from the U.S. Attorney's

 7    Office with a cooperator who they spent weeks across the street

 8    reviewing and preparing their testimony.  I got your point.

 9              He is certified in this court?

10              MR. REED:  He is, your Honor.

11              MR. MONTELONI:  We understand, he is the officer of a

12    nongovernmental organization founded along with one of defense

13    lawyers.  It's a little different from our interpreters.

14              THE COURT:  But he is certified by the chief

15    interpreter for the Southern District of New York, and this is

16    not a criminal case.  I am going to overrule the government's

17    objection.

18              MR. MONTELONI:  Thank you, your Honor.

19              THE COURT:  Anything else?

20              MR. ABENSOHN:  Your Honor, I would ask perhaps after

21    your Honor leaves the bench, we may have a couple of pages of

22    work product in the binders I handed up.

23              THE COURT:  Do you think only a couple?

24              MR. ABENSOHN:  I'm sorry.  Most of it is the

25    government's exhibits, but I do have a couple of pages to

1  remove, your Honor.

2      THE COURT:  We are going to start on Monday, May 15.

3  I won't need to make any corrective order on the docket for

4  those who are following the case.  And I'll wish you all a good

5  weekend, but I know it won't be a relaxing one.

6      MR. MONTELONI:  Thank you, your Honor.  One or two

7  last clarifying questions.  We understand correctly that we

8  will not proceed to our first witness on Monday?

9      THE COURT:  You are telling me you really don't have

10  one.  Yes.  If you had someone you wanted to call to get

11  started, that would be just fine, but I'm not going to press

12  you on that.

13      MR. MONTELONI:  Thank you, your Honor.  We appreciate

14  it.

15      And what time are we starting in the courtroom?

16      THE COURT:  I said 9:45, but we will make it 10:00.

17  Be here at 9:45.  If you are all here, we can take up any

18  issues relating to demonstratives.  I would expect that we can

19  have a jury up here by about 10:30, 20 to 11.

20      I'm sure something will develop over the weekend.  It

21  always does.  I'll look forward to getting your letter in

22  response to Mr. Abensohn's letter.

23      Who are going to be the witnesses that the government

24  is going to call on Tuesday?

25      MR. MONTELONI:  Right now we think it will just be

1    Jamison Firestone.  It is possible, depending on how long his

2    testimony takes, we might move to potentially play the first

3    video deposition would probably be our next anticipated move,

4    which would be the deposition of Nikolai Gorokhov, the

5    individual who copied the documents.

6         THE COURT:  I'll expect that each day everybody is

7    going to work together, notifying each other of the witnesses

8    who are coming up.  You really should be thinking about what

9    the batting order is for next week so that defense counsel can

10   prepare.  I'll impose the same requirement on defense counsel

11   when they are calling witnesses so that everybody is on notice.

12        MR. MONTELONI:  Yes, your Honor.  Understanding, I

13   think, that we will be making whatever last-minute changes we

14   need to in order to make sure we always have witnesses ready.

15        THE COURT:  It's always in good faith and always

16   subject to the exigencies.  Trials are unpredictable.  I know

17   that.

18        One thing.  Once we start with witnesses on Tuesday,

19   don't run out of witnesses.  Don't tell me somebody is flying

20   in tomorrow, tonight.  They are on the midnight to Moscow.

21   Remember that song, Midnight in Moscow?  They are flying in.

22   Don't tell me that.  Have the witnesses here, ready to go.

23        MR. MONTELONI:  Thank you, your Honor.  Two further

24   questions.  One following up on that.  We may at times, in

25   order to keep the flow, ask to potentially interrupt a witness

 1   if there are scheduling reasons.

 2           THE COURT:  I expect everybody to work together on

 3   that and we regularly can interrupt one witness for another's

 4   testimony.  Sometimes if we are in the midst of a very heated

 5   cross-examination, it may not be fair to interrupt for a

 6   witness.  There has to be some balance there, too.  I'll

 7   explain it all to the jury that it's lawyers working together

 8   to present the case efficiently.

 9           MR. MONTELONI:  Thank you.

10           Finally, do you have a preference, if issues arise,

11   that we want to raise with the Court?  Do you have a preference

12   whether that's the beginning of the trial day, the end of the

13   trial day, or some other way?

14           THE COURT:  I like to have it before the beginning of

15   the trial day.  You can send letters at any time.  I may be

16   asleep, but others are watching.  And then I can hear all about

17   it early in the morning and we can be ready to deal with it.  I

18   much prefer getting a letter alerting me to any issue than

19   having a surprise.  The Federal Rules of Civil Procedure abhor

20   surprises.  So do I.

21           MR. MONTELONI:  Thank you, your Honor.

22           THE COURT:  Anything else?

23           MS. GAY:  Nothing further, your Honor.  Thank you.

24           THE COURT:  Those are the magic words.

25           Have a great afternoon.

oOo