**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Civil Action No. 13-cv-06326 (WHP) |
| | ) |
| PREVEZON HOLDINGS LTD., et al., | ) |
| | ) |
| Defendants. | ) |

<u>**REPLY MEMORANDUM OF LAW IN SUPPORT OF NON-PARTY HERMITAGE**</u>
<u>**CAPITAL MANAGEMENT LTD.'S MOTION FOR ATTORNEYS' FEES**</u>

BakerHostetler's brief confirms exactly why Hermitage should recover its fees: BakerHostetler still refuses to acknowledge its ethical obligations or to be candid about its previous representation of Hermitage. Defying the Second Circuit's mandate, BakerHostetler claims that "to this day, there is no material adversity between Prevezon and non-party HCML." And even after the Second Circuit rejected its false description of its past work for Hermitage, BakerHostetler continues the same pattern of dishonesty here.

No disinterested observer approaching the issue in good faith—let alone a member of the bar—would think it permissible for a lawyer to accuse a former client of committing the very crime the lawyer was previously retained to defend against. BakerHostetler, apparently committed to relitigating this case, still refuses to get it.

## I.     BakerHostetler Refuses to Accept its Ethical Obligations and the Second Circuit's Ruling on Disqualification

### A.     *BakerHostetler Took a Position that is Materially Adverse to Hermitage*

BakerHostetler's focus is on pretending that it never did anything unethical—despite the Second Circuit's decision to the contrary. BakerHostetler's argument goes something like this: New York Rule of Professional Conduct 1.9(a) prohibits lawyers from taking a position materially adverse to a former client in a substantially related matter, and the Second Circuit never expressly stated that it did so. Opp. Br. at 17 ("[T]o this day, there is no material adversity between Prevezon and non-party HCML."). But BakerHostetler was so obviously adverse to Hermitage that Judge Griesa and the Second Circuit were able to make findings of adversity without any discussion, concluding that the first prong of the standard for disqualification (the equivalent of New York's Rule of Professional Conduct 1.9(a)) was satisfied.[1] Prevezon

---

[1] The test the Second Circuit and Judge Griesa used is: "(1) the moving party is a former client of the adverse party's counsel; (2) there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit; and (3) the attorney whose disqualification is sought had access

unsuccessfully attempted the very same argument to the Second Circuit. App. Dkt 140 at 47.

One of BakerHostetler's arguments against this adversity is a claim that Russia does not criminally prosecute corporations, so Hermitage could never face prosecution—and while Browder could be prosecuted, he (personally) was never the client.[2] Opp. Br. at 16. This position resurrects the unsuccessful argument that BakerHostetler's client was Hermitage Capital Management, not Browder personally, and that this distinction excuses its conduct. But this argument gets nowhere. BakerHostetler directly attacked both Hermitage and Browder (telling the Court that "Hermitage and Browder did it"), and there cannot be any real dispute that the Russian Federation could antagonize a corporation, whether criminally or otherwise. Regardless, Hermitage employs individuals (including Browder) and engages agents (including lawyers) to advise and assist the Hermitage Fund. After abetting the fraud against Hermitage, as part of the fraud cover up the Russian authorities advanced false accusations of wrongdoing against Hermitage's employees and agents, which is why Hermitage retained BakerHostetler in 2008.[3] BakerHostetler certainly never asserted that Hermitage was the "wrong client" while accepting nearly $200,000 in order to defend Hermitage, Browder, and Hermitage's other agents and lawyers against the fraud and the false accusations in Russia.

BakerHostetler's continued assertion that it acted ethically shows that it still is not approaching its ethical duties in good faith. BakerHostetler continues to argue that the Second

---

to, or was likely to have had access to, the relevant privileged information in the course of his prior representation of the client." *Evans v. Artek Sys. Corp.*, 715 F.2d 788, 791 (2d Cir. 1983); Dkt. 521 at 6; *Prevezon*, 839 F.3d at 239.

[2] BakerHostetler also challenges the Circuit's assertion that "the Prosecutor General of Russia issued an open letter accusing Browder of committing the Russian Treasury Fraud, along with other crimes and threatening further prosecution." Op. Br. at 16 (citing *Prevezon*, 839 F.3d at 234). The translated letter from the Prosecutor General was part of the appellate record (A-581) and is attached as Exhibit 1 to the Supplemental Buchdahl Declaration.

[3] Mr. Moscow addressed his retention letter to Browder, making clear he was the chief client representative. Cymrot Decl. Ex. E. Baker Hostetler's time records further indicate many discussions with Browder—at least a dozen of which involved Moscow himself—and at least one refers to Browder as the "client." Buchdahl Supp. Decl., Ex. 2 at 5.  And when Prevezon subpoenaed Mr. Browder in this action, its subpoena defined "You" to include Mr. Browder, Hermitage Capital Management Limited, and the Hermitage Fund. May 16, 2017 Buchdahl Decl. Ex. 3 at 13.

Circuit simply got it wrong. *See* Opp. Br. at 12 n.10 (rejecting Second Circuit's finding that Hermitage faced risk of prosecution by a foreign government), 17 n.12 (rejecting Second Circuit's conclusion that Hermitage was a victim of the Russian Treasury Fraud), and 22 n.17 (rejecting Second Circuit's reliance on *United States v. James*, 708 F.2d 40 (2d Cir. 1983), for unclear reasons).

      B.      *The Second Circuit's Ruling Was Not a Surprise*

BakerHostetler also claims it could not have acted in bad faith because it was disqualified only after a "novel" decision by the Second Circuit that could not have been "obviously anticipated." Opp. Br. at 15-16. The Second Circuit did use the word "novel" to explain why it had authority to issue a writ of mandamus. But nothing about its decision was surprising. To issue mandamus relief, the Court was required to conclude that Hermitage's entitlement to relief was "clear and indisputable" and that the decision below was "clearly erroneous." *Prevezon*, 839 F.3d at 237. The only reason no court had previously rendered a decision on all fours with this case is because no law firm, in any jurisdiction, has ever tried to accuse its former client of the same crime it was previously retained to defend against. Engaging in conduct so outrageous as to be unprecedented does not demonstrate good faith.

BakerHostetler argues that four cases constitute the "weight of authority" supporting its conduct. Opp. Br. at 22. None of these cases is remotely on point.[4] Rather, BakerHostetler's ethical obligations were well-settled in light of cases disqualifying lawyers whose former clients were witnesses, *see United States v. James*, 708 F.2d 40, 46 (2d Cir. 1983), non-parties, *see*

---

[4] In *Skidmore v. Warburg Dillon Read LLC*, 2001 WL 504876 (S.D.N.Y. May 11, 2001), the court declined to disqualify a lawyer where the movant and current client had both sued the same former employer for the same conduct; there, the court equated the representations as joint (not successive) representations and found no adversity because both parties had sought to prove the same claims. *Satina v. New York City Human Res. Admin*, 2015 WL 6681203 (S.D.N.Y. Nov. 2, 2015), has the same fact pattern as Skidmore, but was disposed of on the threshold issue that a movant cannot enforce the obligations a lawyer owes to another client. *In Medical Diagnostic Imaging, PLLC v. CareCore Nat.*, LLC, 542 F. Supp. 2d 296, 315-316 (S.D.N.Y. 2008), and *U.S. v. Perrone*, 2007 WL 1575248, at *9, 10 (S.D.N.Y. May 29, 2007), the courts found that the representations at issue were not substantially related.

*Zerger & Mauer LLP v. City of Greenwood*, 751 F.3d 928, 935 (8th Cir. 2014); *Kevlik v. Goldstein*, 724 F.2d 844 (1st Cir. 1984), and victims, *see United States v. Gordon*, 334 F. Supp. 2d 581, 597 (D. Del. 2004); *United States v. Falwell*, 2002 WL 1284388 (N.D. Ill. 2002); *United States v. Alex*, 788 F. Supp. 359, 365 (N.D. Ill. 1992).

C.    *BakerHostetler Still Asks Hermitage to Identify Shared Confidences*

Further evidence that BakerHostetler is still consciously choosing not to "get it" is its continued effort to place the burden on Hermitage to prove the misuse of shared confidences. Second Circuit law has been crystal clear for 40 years that no client should be asked to make such a showing. *See Gov't of India v. Cook Indus., Inc.*, 569 F.2d 737, 740 (2d Cir. 1978); *T.C. Theatre Corp. v. Warner Bros. Pictures*, 113 F. Supp. 265, 268-69 (S.D.N.Y. 1953). Yet BakerHostetler claims that it should be given credit for acting in good faith because, in 2013, Hermitage allegedly failed to produce confidential communications before Judge Griesa. And BakerHostetler likewise claims, without authority, that to prevail on its motion, "HCML would have to provide proof that something, in 2013, was confidential and could be used to its detriment." Cymrot Decl. ¶ 4. For good reason, this burden-shifting is not the law. As the Second Circuit explained: "The danger here is not limited to BakerHostetler overtly using confidences in the litigation. There is risk that BakerHostetler, while not explicitly using confidences, may use such confidences to guide its defense of Prevezon in other ways." *Prevezon*, 839 F.3d at 238. Because BakerHostetler, in bad faith, refused to withdraw when the law required it to do so, the standard for fee shifting has been met.

D.    *BakerHostetler Continues to Unethically Attack its Former Client*

BakerHostetler likewise continues to refuse to abide by its duty of loyalty to Hermitage. N.Y. Rule of Professional Conduct 1.9(a); *Avra Surgical, Inc. v. Dualis Medtech GMBH*, No. 13 Civ. 7863 (DLC), 2014 WL 2198598, at *3-4 (S.D.N.Y. May 27, 2014). Hermitage's opening

brief sets forth BakerHostetler's public attacks on its former client. Hermitage Br. at 9-11. Instead of offering contrition, BakerHostetler's opposition only continues the attack, suggesting that Hermitage's account of the Russian Treasury Fraud was false. *E.g.*, Cymrot Decl. ¶ 10. BakerHostetler disparages Browder in the last page of its brief, misleadingly suggesting that comments he made about his advocacy for change within the corrupt <u>Russian</u> legal system, which was stacked against him, apply to his attempt to defend himself against BakerHostetler's false attacks here. Buchdahl Supp. Decl. Ex. 3 at 9-10. This ad hominem attack illustrates just how far BakerHostetler has strayed from its duty of loyalty.

## II.    BakerHostetler Continues to Misrepresent its Past Work for Hermitage

BakerHostetler still refuses to be candid about the prior work it did for Hermitage, claiming it was asked only to "collect documents from Renaissance through a petition under 28 U.S.C. §1782 regarding a <u>prior</u> alleged theft from the Russian Treasury," Opp. Br. at 6 (emphasis added), and that Moscow "began a project but ceased work before he took any side," *id.* at 20. As explained in Hermitage's opening brief, this is false: Hermitage retained BakerHostetler to help pursue those responsible for the <u>Russian Treasury Fraud</u> and to prepare a defense for Hermitage against false allegations relating to that fraud; to investigate the persons related to Renaissance believed to be responsible for the Russian Treasury Fraud; to seek evidence about the beneficiaries of both the Rengaz fraud and the Russian Treasury Fraud (including by obtaining US correspondent bank records to trace the stolen funds), and to cause prosecutions of those who committed the Russian Treasury Fraud or benefited from it. BakerHostetler has misrepresented the scope of its representation since before its opposition to Hermitage's first motion to dismiss, *e.g.*, Dkt. No. 134 at 23, conclusively demonstrating that its bad faith conduct extends back at least that far.

BakerHostetler claims, falsely, that "<u>the relief [through 1782] was directed at</u>

Renaissance bank records." BakerHostetler's own draft declaration disproves this, clearly identifying that the evidence sought, from the five banks identified (ant not just Renaissance), was in relation to US banks which processed proceeds of the Russian Treasury Fraud:

> Discovery is necessary here because the proceeds of the [Russian Treasury Fraud] were sent through . . . accounts at USB and Intercommerz . . . Raiffeissen Zentralbank Oesterreich Bank AG Austria ("Raiffeissen") is the sole holder of correspondent accounts for both USB . . . and Intercommerz . . ."

> Raiffeissen processes all its dollar-denominated transfers and payments through [American Express Bank Limited, Citibank, J.P. Morgan Chase Bank New York, and Wachovia Bank, N.A.] . . . (collectively, the 'US Correspondent Banks.') . . .

> Discovery from the US Correspondent Banks would show the origin and destination of the illicit proceeds of the two frauds and would ultimately lead to identification of the members of the Criminal Group who benefited from the fraud against Hermitage.

May 16, 2017 Buchdahl Decl., Ex. 1 ¶¶ 73-76. Not only does the declaration expressly state it seeks to trace the proceeds of the Russian Treasury Fraud, but it also seeks records relating to a bank—Intercommerz—that had no involvement with the prior Rengaz fraud.

BakerHostetler's continued attempt to confine its work to the Rengaz fraud is entirely disingenuous. BakerHostetler's declaration concluded (correctly, as the government found when it traced the money) that the same perpetrators were involved in both the Russian Treasury Fraud against the Hermitage companies and the fraud on Rengaz companies, and that the investigation of the perpetrators of these two tax refund frauds was one and the same.[5] Thus, even though Hermitage was not a victim of the Rengaz fraud, Hermitage and BakerHostetler were nonetheless interested in that crime to the extent it could help shed light on those responsible for the Russian Treasury Fraud. The entirety of BakerHostetler's legal work related to the "frauds committed by and through Renaissance Capital" (as Moscow described it in his initial proposal

---

[5] The Government reached the exact same conclusion, devoting nine paragraphs in its complaint to the "striking" similarities between the Russian Treasury Fraud and "what appears to have been a fraud scheme carried out by the [same] Organization in 2005 involving two subsidiaries of Rengaz." Dkt. 381 ¶¶ 46-54.

to Hermitage) therefore related directly to the Russian Treasury Fraud.

BakerHostetler's nearly $200,000 of bills to Hermitage confirm the depth of BakerHostetler's work on the Russian Treasury Fraud, including its work analyzing detailed presentations provided to BakerHostetler by Hermitage and Browder, reviewing non-public documents and materials from them concerning, *inter alia*, the "Russian tax filings and lawsuits," Supp. Buchdahl Decl., Ex. 2 at 3-6, creating a "case timeline" and "review[ing] documents, translations, and chronology regarding . . . tax fraud," and building a related "information database," *id.* at 8-9; and "review[ing] bank records" and researching "proper service agent for" bank involved in routing proceeds of the Russian Treasury Fraud, *id.* at 8.

Moreover, despite having no legal obligation to do so, Hermitage has previously submitted privileged communications showing a small sample of the privileged discussions between lawyer and client about the Russian Treasury Fraud. These show the detailed work BakerHostetler did for Hermitage in order to bring perpetrators of the Russian Treasury Fraud to justice and defend Hermitage against false retaliatory accusations relating to the Russian Treasury Fraud—the same accusations that BakerHostetler later made against Hermitage in service of Prevezon. ██████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████

BakerHostetler misrepresents the record when it states that Judge Griesa "concluded that Baker did not have confidential information from HCML." Opp. Br. at 8. (It made the same argument, unsuccessfully, in the mandamus proceedings. App. Dkt. 140 at 53-54.) He never made such a ruling and, in fact, sealed the privileged communications quoted above.[6]

BakerHostetler's statement that Judge Griesa made a similar finding on the second disqualification motion is false. He concluded only that: "Hermitage has not concretely shown that any of its confidences had anything to do with how, why, or when Prevezon allegedly laundered Russian Fraud proceeds into the United States, or how its confidences would be relevant in the case against Prevezon, in which the Russian Fraud is mere background." Dkt. 521 at 11. The rationale is wholly derivative of the court's clearly erroneous conclusion that how the fraud was carried out is "mere background" and not related to the *Prevezon* case. It even acknowledged that Moscow could have received the precise type of confidential information it denies: "It is of course possible that Moscow gained some knowledge about Hermitage's potential strategy if it were accused of the Russian fraud." *Id.* It mistakenly reasoned, however, "this type of knowledge is irrelevant here, where Hermitage is not a party." *Id.*

III.    **BakerHostetler's Other Excuses Further Evidence its Lack of Good Faith**

A.    *Judge Griesa's Rulings Offer Baker Hostetler No Refuge*

BakerHostetler seeks to hide behind Judge Griesa's statement that it could represent

---

[6] The proceedings were held on an entirely sealed record so that no party could argue "that there had been any sort of waiver of attorney/client privilege" based on the discussions. Oct. 23, 2014 Hr'g Tr. 2:12-14 (Dkt. 164). The Prevezon Defendants confirmed that they would not be claiming waiver, and the court thus decided to unseal most of the transcript. *Id.* at 3:1-2. But the court declined to endorse the Prevezon Defendants' claim that the materials submitted in camera were not confidential, instead simply stating "there's no issue. We'll unseal that record and that's that." *Id.* at 2:7-8. Later, at Hermitage's request, the court issued an order permanently sealing four confidential documents and ordering redaction to portions of the transcript. Dkt. Nos. 168, 175.

Prevezon "without inhibition." Opp. Br. at 9. But Judge Griesa's permission was granted only after Moscow told the Court that Hermitage was "innocent" of the Russian Treasury Fraud; after Cymrot told the Court it was "simply untrue" that BakerHostetler might try to blame Hermitage for the Russian Treasury Fraud; after Moscow told the Court that the prior representation was not about the Russian Treasury Fraud but only the Rengaz fraud; and after BakerHostetler represented that the Russian Treasury Fraud was "irrelevant" to Prevezon's defense and that BakerHostetler would only "work the Prevezon piece of it" (i.e., the money laundering portion). *Id.* at 7, 9, Hermitage Br. at 9. Judge Griesa specifically stated immediately prior to his ruling that "there is no indication that [Mr. Moscow] is in any substantial way taking a position which involves an attack" on Hermitage. *Id.* As to Judge Griesa's (revised) second ruling, the Second Circuit painstakingly explained the decision was "clear error," *Prevezon*, 839 F.3d at 238, and that it was arrived at by a "misapplication" of the governing law, *id.* at 242.

       B.     *BakerHostetler's Claimed Strategy Change in 2015 is Not Credible*

BakerHostetler also seeks to lay the blame for its attacks on Hermitage on an alleged change in government tactics.[7] But BakerHostetler's argument that it had no intention of attacking Browder and Hermitage until November 3, 2015 (in response to the government's motion) is wholly incredible. Opp. Br. at 10. Although the Government added <u>one</u> new specified unlawful activity (fraud as to an investor in the Hermitage Fund, HSBC Suisse), the other predicates that BakerHostetler sought to negate by pointing the finger at Browder and Hermitage (fraud as to HSBC Guernsey, the trustee and fraud as to HSBC Management), Dkt. No. 398 at 14-15, had been in the case since inception, *e.g.*, Dkt. 1 at ¶¶ 16, 26-28, and cited by the government in its opposition to Defendants' motion to dismiss long before, Dkt. No. 229 at 21.

---

[7] Hermitage had no right to appeal Judge Griesa's first ruling, and mandamus relief would have been unlikely given BakerHostetler's false promises that it would not attack Hermitage.

Moreover, a mere two weeks after the government's motion was filed, BakerHostetler filed its opposition using discovery material to lay out a lengthy attack on Hermitage and Browder accusing them of perpetrating the Russian Treasury Fraud. Dkt. No. 418. The idea that this "new" strategy was somehow cobbled together in two weeks—and not developed through the painstaking discovery that BakerHostetler had been taking against Hermitage, Hermitage Br. at 9-11, and its knowledge gleaned from its earlier defense of Hermitage—is not credible.

## IV.    Fees Sought Are Reasonable and Appropriate

"The starting point for determining the presumptively reasonable fee award is the product of a reasonable hourly rate and the reasonable number of hours required by the case" looking to the "market rate[s] prevailing in the community." *Inter-American Dev. Bank v. Venti S.A.*, 2016 WL 642381, at *2 (S.D.N.Y. Feb. 17, 2016). The rates charged by Hermitage's lawyers are within that range. *See* Supp. Buchdahl Decl. ¶¶ 6-9.

BakerHostetler's primary complaint appears to be the number of law firms involved. Putting aside that Hermitage claims less than fifteen hours of work from one of those firms, the number of hours expended is a product of BakerHostetler's refusal to withdraw and strategy of fighting over issues that it should not have challenged if it had been acting in good faith, including the scope of its prior representation, whether Browder or Hermitage was its client, or whether it possessed Hermitage's confidences. *See* Buchdahl Supp. Decl. ¶¶ 10-12. The time records Hermitage has submitted specify the date, number of hours worked, and nature of the work performed. May 16, 2017 Buchdahl Decl., Ex. 7. Those records reveal that the work for which Hermitage claims attorneys' fees was reasonable and not duplicative.

## V.    Conclusion

For the foregoing reasons, Hermitage seeks an award of attorneys' fees to compensate it for the expense of protecting itself from BakerHostetler's unethical conduct.

Dated: New York, New York
       June 9, 2017

                          Respectfully submitted,

                          SUSMAN GODFREY L.L.P.

By:    */s/ Jacob W. Buchdahl*
             Jacob W. Buchdahl
             1301 Avenue of the Americas, 32nd Floor
             New York, NY 10019
             Phone:  (212) 336-8330
             Fax: (212) 336-8340
             jbuchdahl@susmangodfrey.com

             *Counsel for Hermitage Capital Management Ltd.*

11

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on the 9th day of June, 2017, this document was properly served on all counsel of record via electronic filing in accordance with the SDNY Procedures for Electronic Filing.


          */s/ Jacob W. Buchdahl*_____
          Jacob W. Buchdahl