UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------x
                                                     :

UNITED STATES OF AMERICA,              :

                          Plaintiff,      :        13 Civ. 6326 (WHP)

                                         :

    - against -                     :

PREVEZON HOLDINGS LTD., et al.,    :

                        Defendants,   :

    - and -                         :

ALL RIGHT, TITLE AND INTEREST IN THE REAL  :
PROPERTY AND APPURTENANCES KNOWN AS  :
THE 20 PINE STREET CONDOMINIUM, 20 PINE  :
STREET, NEW YORK, NEW YORK 10005, UNIT 1816,  :
et al.,                                :

                     Defendants in Rem.  :

-------------------------------------------------------------------------x

**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA
IN SUPPORT OF MOTION TO ENFORCE SETTLEMENT AGREEMENT**

JOON H. KIM
Acting United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Paul M. Monteleoni
Cristine I. Phillips
Tara M. La Morte
Assistant United States Attorneys
- Of Counsel -

## TABLE OF CONTENTS

INTRODUCTION.................................................................................................... 1

RELEVANT FACTS ............................................................................................... 2

 A. The Complaint and the Restrained Properties ........................................... 2

 B. The 2015 Settlement Negotiations............................................................. 4

 C. The 2017 Settlement Negotiations and Settlement Agreement ................. 7

 D. The Netherlands Release and New Seizure ............................................... 9

ARGUMENT ......................................................................................................... 10

 I. PREVEZON'S PAYMENT WAS DUE ON OCTOBER 31, 2017 ................... 10

 A. Legal Standard ........................................................................................ 10

 B. The Settlement Unambiguously Requires Payment after the Release from the Restraint Imposed in this Case ............................................................. 13

  1. The Releasing Language Refers to "Release" in Terms of the Restraint Imposed in This Case ................................................... 13

  2. The Structure of the Agreement Compels the Conclusion that the Term "Release" in the Payment Language Refers to the Restraint Imposed in this Case ................................................................... 16

  3. Reading the Term Release to Refer to Independent Restraints Creates Absurd Results ............................................................... 19

 C. The Drafting History Makes Clear that Prevezon Bore the Risk the Netherlands Would Seize the AFI Europe Debt ...................................... 19

 II. PREVEZON MUST PAY PREJUDGMENT INTEREST................................... 22

CONCLUSION ...................................................................................................... 23

# **TABLE OF AUTHORITIES**

## **Federal Cases**

*Alt. Thinking Sys., Inc.* v. *Simon & Schuster, Inc.*, 853 F. Supp. 791 (S.D.N.Y. 1994) .............. 20

*Bank of N.Y. Trust, N.A.* v. *Franklin Advisers, Inc.*, 674 F. Supp. 2d 458 (S.D.N.Y. 2009)........ 12

*Brown* v. *City of N.Y.*, No. 2009 Civ. 1809 (RJD)(MDG), 2012 WL 628496 (E.D.N.Y. Sept. 8, 2012) ................................................................................................................................... 11

*Chesapeake Energy Corp.* v. *Bank of N.Y. Mellon Trust Co.*, 773 F.3d 110 (2d Cir. 2014)........ 12

*Elecs. & Telecomms. Research Inst.* v. *Acacia* ("*ETRI*"), No. 15 Civ. 3419 (VSB), 2017 WL 2389699 (S.D.N.Y. June 1, 2017)........................................................................... 11, 12

*Galli* v. *Metz*, 973 F.2d 145 (2d Cir. 1992)........................................................................... 12, 17

*Golden Pacific Bancorp* v. *FDIC*, 273 F.3d 509 (2d Cir. 2001) .................................................. 20

*GPIF-I Equity Co., Ltd.* v. *HDG Mansur Inv. Services, Inc.*, No. 13 Civ. 547 (CM), 2013 WL 3989041 (S.D.N.Y. Aug. 1, 2013) .............................................................................. 13, 17, 18

*Greenough* v. *Hufford*, No. 12 Civ. 8836 (JPO) (SN), 2013 WL 4534997 (S.D.N.Y. Aug. 27, 2013) ................................................................................................................................... 18

*Hendrickson* v. *United States*, 791 F.3d 354 (2d Cir. 2015)........................................................ 11

*InterDigital Commc'ns. Corp.* v. *Nokia Corp.*, 407 F. Supp. 2d 522 (S.D.N.Y. 2005) ......... 12, 13

*K. Bell & Assoc., Inc.* v. *Lloyd's Underwriters*, 97 F.3d 632 (2d Cir. 1996) ............................... 12

*Kasperek* v. *City Wire Works, Inc.*, No. 03 Civ. 3986 (RML), 2009 WL 691945 (E.D.N.Y. Mar. 12, 2009) ............................................................................................................................. 22

*Mastrovincenzo* v. *City of N.Y.*, 435 F.3d 78 (2d Cir. 2006) ................................................ 13, 19

*Meetings & Expositions, Inc.* v. *Tandy Corp.*, 490 F.2d 714 (2d Cir. 1974)................................ 11

*Motion Picture Projectionists* v. *RKO Century Warner Theatres, Inc.*, No. 97 Civ. 4758 (RPP), 1998 WL 477966 (S.D.N.Y. Aug. 14, 1998)................................................................. 20

*Powell* v. *Omnicom*, 497 F.3d 124 (2d Cir. 2007)...................................................................... 11

*Process America, Inc.* v. *Cynergy Holdings, LLC*, No. 12 Civ. 772 (BMC), 2014 WL 3844626 (E.D.N.Y. Apr. 30, 2014) ................................................................................................... 21

*Ramnarain* v. *City of N.Y.*, 474 F. Supp. 2d 443 (E.D.N.Y. 2007)......................................... 11, 22

*United States* v. *U.S. Currency in the Sum of $660,200.00, More or Less*, 423 F. Supp. 2d 14 (E.D.N.Y. 2006)................................................................................................................. 11

*Ursa Minor Ltd.* v. *Aon Financial Products, Inc.*, No. 00 Civ. 2474 (AGS), 2000 WL 1010278 (S.D.N.Y. July 21, 2000) ........................................................................... 12, 13, 17

**<u>State Cases</u>**

*Fourth Branch Assocs.* v. *Niagara Mohawk Power Corp.*, 302 A.D.2d 780 (3d Dep't 2003) .... 12

*Rentways, Inc.* v. *O'Neill Milk & Cream Co.*, 308 N.Y. 342 (1955)............................................ 17

**<u>State Statutes</u>**

N.Y. C.P.L.R. 5001 ........................................................................................................ 22, 23

N.Y. C.P.L.R. 5004 ............................................................................................................. 22

## INTRODUCTION

On May 12, 2017, days before trial, Prevezon Holdings Ltd. (together with its codefendants, "Prevezon") agreed to pay the Government $5,896,333.65, or three times the amount of money that the Government had alleged it had laundered, and to other terms favorable to the Government.  One of those terms was that Prevezon agreed to bear the risk that the Kingdom of the Netherlands (the "Netherlands"), a sovereign nation that had restrained a debt owed to Prevezon (the "AFI Europe Debt") at the Government's request, would seize that debt independently based on alleged violations of Dutch law.  That risk having come to pass, Prevezon now balks, seeking to rewrite the agreement it signed.

This Court should hold Prevezon to the bargain it struck.  The settlement agreement entered in this case on May 15, 2017, D.I. 716 (the "Settlement Agreement")[1] provides that Prevezon's payment of $5,896,333.65 was "due within 15 business days of the release by the Government of the Netherlands of the AFI Europe Debt."  Settlement Agreement ¶ 4.  The entire agreement makes clear that this "release" refers to the release of the restraint the Netherlands imposed at the Government's request—the only release that the settlement provided that the Government would request, and the only release that relates to the action being settled.  That release occurred on October 10, 2017, triggering Prevezon's obligation to pay by October 31, 2017.

Unhappy with the results of the agreement it entered, Prevezon now apparently contends that the "release" in that agreement means the return of the AFI Europe Debt to Prevezon.  That contention should be rejected.  Such an interpretation is not only inconsistent with the terms of

---

[1] Citations to "D.I." refer to docket items in this case.  Citations to "Monteleoni Decl." refer to the Declaration of Paul M. Monteleoni filed herewith.

the entire agreement, but would also lead to absurd results.  If Prevezon's payment is not due until Prevezon obtains the debt from the Netherlands, this case could stay open—and Prevezon's U.S. assets could stay frozen—for years.  Indeed, if the Netherlands is ultimately successful in confiscating the AFI Europe Debt, such a release release would *never* happen, requiring the case to stay open, and Prevezon's other assets to remain frozen, until the end of time.  This absurd result is not what the Settlement Agreement provides.

Moreover, the drafting history shows that Prevezon explicitly contemplated the possibility that the Netherlands would not allow it to reclaim the debt.  Indeed, during settlement negotiations in 2015 and again in 2017, Prevezon repeatedly requested various protections for Prevezon in the event that the Netherlands announced or manifested its intent to retain the AFI Europe Debt following its release of the U.S.-requested restraint.  But, tellingly, the Government *removed* all such provisions from its final settlement offer and Prevezon accepted that offer and agreed to the final settlement *without any such protections*.  Having agreed to bear the risk that the Netherlands would seize the AFI Europe Debt, and having avoided trial in this case as a result of that agreement, Prevezon cannot now try to rewrite the deal.  The Court should require Prevezon to make the payment required by the Settlement Agreement with accrued interest.

## RELEVANT FACTS

### A.     The Complaint and the Restrained Properties

As set forth in the Second Amended Complaint, the Government sought forfeiture of property and the imposition of civil money laundering penalties against Prevezon for laundering a small portion of the proceeds of an elaborate Russian tax fraud scheme (the "Russian Treasury Fraud").  In 2007, a Russian criminal organization defrauded Russian taxpayers of approximately $230 million by stealing the identities of three companies held by the Hermitage Fund (the

2

"Fund"), manufacturing false liabilities against them, and claiming tax refunds on that basis. *See* D.I. 381 ¶¶ 18-45. These stolen funds were then moved through a vast network of shell companies, and a small portion—approximately $1.96 million—was ultimately transferred to defendant Prevezon Holdings. *See* D.I. 381 ¶¶ 75-128. Prevezon then laundered these funds into European real estate and invested money derived from these funds in various pieces of New York real estate in additional money laundering transactions. *See* D.I. 381 ¶¶ 105-10, 129-42.

The AFI Europe Debt—a debt of 3,068,946 euros owed by the Dutch company AFI Europe N.V. to Prevezon Holdings—was covered by the Government's restraint imposed on Prevezon's assets in the original Protective Order entered on September 11, 2013. D.I. 2. On January 22, 2014, law enforcement authorities in the Netherlands, at the request of the Government, gave effect to the Protective Order by freezing the AFI Europe Debt. That restraint was continued when the Protective Order was replaced by the Amended Protective Order, D.I. 173, which named the AFI Europe Debt as one of Prevezon's assets to be restrained.

Since the first Amended Complaint in November of 2014, the basic economics of this case have been unchanged: the Government sought forfeiture of slightly less than $14 million in Prevezon's property (all located in the U.S. except the AFI Europe Debt), which it alleged was involved in the money laundering conduct, and a commensurate amount of civil money laundering penalties, all based on Prevezon's laundering of approximately $1.96 million.[2] Since Prevezon is not known to have any other assets in the U.S., the approximately $14 million in

---

[2] Although the overall Russian Treasury Fraud involved approximately $230 million, Prevezon was only ever alleged to have received approximately $1.96 million of crime proceeds from it. *See, e.g.*, D.I. 708 at 2. Prevezon's $14 million in property was used in the laundering of this $1.96 million, rendering it forfeitable in the event the Government fully prevailed at trial, but the underlying crime proceeds were only $1.96 million.

restrained property effectively represented the Government's likely maximum recovery.

**B.     The 2015 Settlement Negotiations**

The Government engaged in settlement discussions with Prevezon between March and

June of 2015 before commencing discovery in earnest.  During this period, the Government

made settlement offers in the range of $1,965,444.55 to $2 million—that is, offers to settle the

case for approximately 100% of the money Prevezon was alleged to have laundered—in an

attempt to obviate a complex discovery process posing unusual burdens and risks.

During the 2015 settlement negotiations, counsel for Prevezon repeatedly communicated

to counsel for the Government its concern that the Netherlands might not allow the transfer of

the AFI Europe Debt to Prevezon, and repeatedly requested specific language to provide

protections to Prevezon against this risk (the "Protective Language").  *See* Monteleoni Decl. ¶ 4.[3]

- On May 4, 2015, Prevezon's counsel requested language that would have put the burden on the Government to "obtain" the release of the debt.  Monteleoni Decl. Ex. 1 ¶ 2.b ("The Government shall obtain the release of all property of Defendants currently frozen in the Netherlands and any other properties that are or may be restrained as a result of this Lawsuit and the Amended Protective Order.").

- On May 20, 2015, Prevezon's counsel requested language that would have vacated the settlement "if the Government of Netherlands does not release the AFI Europe Debt unconditionally."  Monteleoni Decl. Ex. 2 ¶ 2.2 ("[T]his Lawsuit shall not be suspended and the trial date shall not be continued until the Government of Netherlands releases the AFI Europe Debt unconditionally, and if the Government of Netherlands does not release the AFI Europe Debt unconditionally within thirty (30) days of this Agreement, the Agreement shall be null and void and without any further legal effect . . . .").

- On May 22, 2015, the Government proposed language that would have allowed either party to vacate the settlement if the Netherlands stated its intent to continue to restrain the AFI Europe Debt or if the debt was not released within 120 days.  Monteleoni Decl. Ex. 3 ¶ 11 ("Should the Government of the Netherlands  issue an order or

---

[3] These 2015 requests by Prevezon for particular settlement terms did not all represent offers to settle on those terms.  Indeed, Prevezon's counsel often requested particular terms without committing that Prevezon itself would accept those terms.

statement setting forth its intention to continue the restraint of the AFI Europe Debt, or if 120 days have elapsed from the entry of this Stipulation and Order and the AFI Europe Debt has not been released, upon motion by either party, this Stipulation and Order shall be void . . . .").  This language was continued in Government settlement offers on May 24, 2015, Monteleoni Decl. Ex. 4 ¶ 11; *id.* Ex. 5 ¶ 11; and revised Government settlement offers on June 2, 2015, *id.* Ex. 6 ¶ 11; and June 9, 2015, *id.* Ex. 7 ¶ 12.

- Prevezon's counsel requested on June 9, 2015, Monteleoni Decl. Ex. 8 ¶ 12; and June 10, 2015, Monteleoni Decl. Ex. 9 ¶ 12, that the Government settle the case on terms including similar language.

On June 10, 2015, the Government made a final pre-discovery settlement offer to

Prevezon.  That offer, which was ultimately rejected by Prevezon, was structured in a fashion

similar to the ultimate Settlement Agreement, but with several differences including the

Protective Language.  As relevant here, the June 10, 2015 offer had three key provisions:

1. A paragraph requiring the Government to make a request to the Netherlands to lift the U.S.-requested restraint on the AFI Europe Debt and modifying the Amended Protective Order to allow the release of the AFI Europe Debt (the "Releasing Language");

2. A paragraph requiring Prevezon to make a settlement payment 15 business days after the release of the AFI Europe Debt (the "Payment Language"); and

3. A paragraph containing Protective Language similar to that contained in previous proposals.

The Releasing Language first described the Government's obligation to request that the

Netherlands lift its restraint on the AFI Europe Debt—an obligation carefully limited to the U.S.-

requested restraint—and then provided that the Amended Protective Order would be deemed

modified to permit the release of the AFI Europe Debt:

> 3.       Upon entry of the Stipulation and Order, the Government shall inform the Government of the Netherlands that this matter has been resolved and that the Government withdraws any request for the Government of Netherlands to continue to restrain the AFI Europe Debt, and shall request that the Government of the Netherlands lift the restraint of the AFI Europe Debt that had been implemented at the request of the United States, and the Amended

5

> Protective Order shall be deemed modified to allow the release of
> the AFI Europe Debt.

Monteleoni Decl. Ex. 10 ¶ 3.

The Payment Language, next, required Prevezon to make the payment (in this offer a $2 million settlement payment) within 15 business days of the release:

> 4.      For the purpose of settlement only, [in personam Defendant
> to be named] will make a payment to the United States consisting
> of $2,000,000 in United States currency (the "Payment"). The
> Payment shall be due within 15 business days of the release by the
> Government of the Netherlands of the AFI Europe Debt and shall
> be made by electronic funds transfer pursuant to written
> instructions to be provided by the United States Attorney's Office
> for the Southern District of New York. Upon receipt, the Payment
> shall be deposited into the U.S. Treasury pursuant to the
> Miscellaneous Receipts Act, 31 U.S.C. § 3302, which authorizes
> deposits of public money into the U.S. Treasury.

Monteleoni Decl. Ex. 10 ¶ 4.

Finally, the June 10, 2015 offer contained a version of the Protective Language similar to the parties' previous discussions, which would have allowed the vacatur of the settlement agreement and the resumption of the case if the Netherlands stated or manifested an intent to continue the restraint of the AFI Europe Debt:

> 12.      Should the Government of the Netherlands issue an order
> or statement setting forth its intention to continue the restraint of
> the AFI Europe Debt, or if 120 days have elapsed from the entry of
> this Stipulation and Order and the AFI Europe Debt has not been
> released, upon motion by any Party hereto, this Stipulation and
> Order shall be void, the Action shall resume, and the Court shall
> schedule trial as soon as convenient for the Court on a date no
> sooner than 120 days from the resumption of the Action.

Monteleoni Decl. Ex. 10 ¶ 12. As noted above, Prevezon rejected the Government's June 10, 2015 offer.

C.        The 2017 Settlement Negotiations and Settlement Agreement

Prevezon initiated new settlement discussions in early 2017.  After the disqualification of

Baker & Hostetler LLP as prior counsel for Prevezon, Prevezon not only hired new trial counsel

from Quinn Emanuel Urquhart & Sullivan LLP, but also contacted the Government through a

separately-retained settlement counsel, Michael D. Hess of Dorf & Nelson LLP.

Hess called and met with the Government on multiple occasions beginning on February

22, 2017.  On April 11, 2017, Hess sent a proposed settlement agreement including a

"$850,00[0]" payment by Prevezon, and Protective Language that would have, in the event that

the Netherlands continued to restrain the AFI Europe Debt, effectively obligated the Government

to assist Prevezon's attempts to recover the AFI Europe Debt.  Monteleoni Decl. Ex. 11 ¶ 14

("Should the Government of the Netherlands issue an order or statement setting forth its

intention to continue the restraint of the AFI Europe Debt, the Government shall cooperate with

the *in personam* Defendants and Claimants to obtain release of the Restrained Property.").  The

Government rejected this request.

Hess continued to contact the Government seeking settlement during the lead-up to trial,

and Prevezon retained a second settlement counsel, Louis J. Freeh of Freeh Group International

Solutions, to continue negotiations.  On May 10, 2017, Prevezon proposed a new settlement

agreement including a payment of 10% of the Restrained Properties, or approximately $1.4

million, and similar Protective Language to that contained in the April 11 proposal.  Monteleoni

Decl. Ex. 12 ¶ 9 ("Should the Government of the Netherlands or Switzerland issue an order or

statement setting forth its intention to continue the restraint of the AFI Europe Debt or other

Restrained Properties, the Government shall cooperate with the *in personam* Defendants and

Claimants to obtain release of the Restrained Properties.").  The Government rejected this

7

request as well.

Several hours after this May 10, 2017 proposal, the Court denied the defendants' motion for summary judgment in its entirety.  D.I. 708.  On the morning of May 12, 2017, following an in-person settlement meeting on May 11, the Government made its first and only settlement offer since Prevezon's rejection of the Government's 2015 offer.

The Government's May 12, 2017 offer was similar to its June 10, 2015 offer but with several significant changes.  In particular:

- The Releasing Language was substantially identical, with minor restyling edits.  *See* Monteleoni Decl. Ex. 13 (May 12, 2017 morning offer), *id.* Ex. 14 ¶ 3 (comparison of June 10, 2015 offer and May 12, 2017 morning offer).

- Instead of requiring Prevezon to pay $2 million (*i.e.*, just over the value of the money that Prevezon laundered), the Payment Language required Prevezon to pay $5,896,333.65 (*i.e.*, three times the value of the money that Prevezon laundered).  *See* Monteleoni Decl. Ex. 14 ¶ 4 (comparison of June 10, 2015 offer and May 12, 2017 morning offer).[4]

- Instead of providing for a contingency whereby the parties could cancel the agreement if the Netherlands stated or manifested an intent to retain the property, or any of the Protective Language versions requested by Prevezon, it deleted the Protective Language entirely.  *See* Monteleoni Decl. Ex. 14 at 17 (comparison of June 10, 2015 and May 12, 2017 morning offer).[5]

Prevezon requested several changes to this offer, but did not request the reinsertion of the deleted paragraph or any other Protective Language.  The Government rejected Prevezon's requested changes, with the exception of minor stylistic edits.  *See* Monteleoni Decl. Ex. 15 (comparison of May 12, 2017 morning offer and final).  After review by Prevezon's trial counsel and principals

[4] By comparison, Hermitage Capital Management Ltd. and William Browder, when they initially reported Prevezon's suspected money laundering to U.S. authorities, argued that the authorities should forfeit only approximately $2 million, or approximately 2.4 times the amount Prevezon was then believed to have laundered.  *See* D.I. 281-4 at 1, 3; *see also* D.I. 281-1 at 10-13, 15-16.

[5] The other changes between the June 10, 2015 offer and the May 12, 2017 morning offer were largely stylistic and clarifying, and generally served to make the offer less favorable to Prevezon.

in addition to Prevezon's settlement counsel, Prevezon signed the final Settlement Agreement on the evening of May 12, 2017, D.I. 715, and the Court approved it on May 15, 2017, D.I. 716.

<strong>D.      The Netherlands Release and New Seizure</strong>

The Netherlands has recently complied with the Government's request to release the funds, but has simultaneously seized the funds pursuant to its own investigation.

On May 16, 2017, Hermitage Capital Management Ltd. ("Hermitage"), a victim of the Russian Treasury Fraud and the entity that initially reported this crime to U.S. law enforcement, filed a complaint with the Netherlands based upon similar subject matter to this case.  The Government learned of this investigation on May 24, 2017, on which date Netherlands officials advised the Government that they were considering seizing the AFI Europe Debt in connection with their independent investigation, but had not yet decided whether or not to do so. Monteleoni Decl. ¶ 6.

On June 1, 2017, pursuant to the Releasing Language of the Settlement Agreement, the Government transmitted a request to the Netherlands that "inform[ed] the Government of the Netherlands that this matter has been resolved and that the [U.S.] Government withdraws any request for the Government of the Netherlands to continue to restrain the AFI Europe Debt," Settlement Agreement ¶ 3, "request[ed] that the Government of the Netherlands lift the restraint of the AFI Europe Debt that had been implemented at the request of the United States," *id.*, and informed the Government of the Netherlands that the Amended Protective Order was "deemed modified to allow the release of the AFI Europe Debt," *id.*  The Government requested expedited execution.  Monteleoni Decl. ¶ 7.

During the pendency of the Government's request, the Government met with Netherlands law enforcement officials on July 19 and 20, 2017 regarding their investigation.  At that meeting,

9

the Government reiterated its request for the Netherlands to release the AFI Europe Debt. The Government also provided the officials, at their request, with information regarding the facts underlying this action, though not information it was prevented from disclosing by the confidentiality order or by any other rule. The meeting concluded with the officials advising the Government that they would decide how to proceed with respect to the AFI Europe Debt by the end of September. Monteleoni Decl. ¶ 9.

On October 10, 2017, the Netherlands released the AFI Europe Debt from the U.S.-requested restraint, but seized it in connection with their own investigation. The Government informed Prevezon of this action on October 10. *See* Monteleoni Decl. ¶¶ 10-11 & Ex. 16. On October 27, 2017, counsel for Prevezon sent an email requesting an extension of the October 31, 2017 payment deadline.[6] The Government did not consent to the extension, and Prevezon let October 31, 2017 come and go without paying.

## ARGUMENT

### I.   PREVEZON'S PAYMENT WAS DUE ON OCTOBER 31, 2017

#### A.   Legal Standard

"A district court has the power to enforce summarily, on motion, a settlement agreement reached in a case that was pending before it." *Meetings & Expositions, Inc.* v. *Tandy Corp.*, 490

---

[6] In their October 27, 2017 email, counsel for Prevezon also claimed that Prevezon's owner Denis Katsyv had "in good faith believed" that the release of the AFI Europe Debt would have been for the benefit of the *Government*, not of Prevezon, because it would—he claims to have believed—have been "automatically transferred to the Government's account." Monteleoni Decl. Ex. 17.

F.2d 714, 717 (2d Cir. 1974).[7]  Indeed, it has "not only the power but the duty" to do so.  *Id.*[8]

Although the Second Circuit has left open the question whether the settlement of federal claims is governed by state law or federal common law, New York law and federal common law are materially indistinguishable regarding many aspects of settlement agreements, and the Second Circuit has used them "interchangeably."  *Powell* v. *Omnicom*, 497 F.3d 124, 129 n.1 (2d Cir. 2007).  Courts within the Second Circuit routinely apply New York law to the interpretation of settlement agreements, and even though the Second Circuit has not definitively decided the issue, "[i]n practice . . . the circuit court and various district courts regularly apply New York law in analyzing whether a settlement agreement should be enforced, even in federal-question cases."  *Brown* v. *City of N.Y.*, No. 2009 Civ. 1809 (RJD)(MDG), 2012 WL 628496, at *2 (E.D.N.Y. Sept. 8, 2012) (internal quotation marks omitted).  Similarly, New York law also applies to the award of prejudgment interest under a settlement agreement.  *See, e.g.*, *Ramnarain* v. *City of N.Y.*, 474 F. Supp. 2d 443, 447 (E.D.N.Y. 2007) (awarding prejudgment interest under N.Y. C.P.L.R. § 5001 in federal question case).

New York law provides that "'the initial interpretation of a contract 'is a matter of law for the court to decide.'"  *Elecs. & Telecomms. Research Inst.* v. *Acacia* ("*ETRI*"), No. 15 Civ. 3419 (VSB), 2017 WL 2389699, at *5 (S.D.N.Y. June 1, 2017) (quoting *K. Bell & Assoc., Inc.* v.

---

[7] Although the Federal Rules of Civil Procedure do not list a motion titled a motion to enforce, courts will routinely rule upon and grant such motions, which arise under the court's inherent powers.  *See United States* v. *U.S. Currency in the Sum of $660,200.00, More or Less*, 423 F. Supp. 2d 14, 25-26 (E.D.N.Y. 2006); *see also Hendrickson* v. *United States*, 791 F.3d 354, 357 n.1 (2d Cir. 2015).

[8] In situations where a case has been fully dismissed, the district court will not have ancillary jurisdiction to enforce the settlement agreement unless the dismissal order provides that the court retains such jurisdiction or it incorporates the settlement agreement.  *Hendrickson*, 791 F.3d at 358.  This situation does not arise here, where the case has not yet been dismissed.

11

*Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir. 1996)).  The threshold question is whether or not it is ambiguous, which occurs if its terms "'could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'"  *ETRI*, 2017 WL 2389699, at *5 (quoting *Chesapeake Energy Corp.* v. *Bank of N.Y. Mellon Trust Co.*, 773 F.3d 110, 114 (2d Cir. 2014)).  "'Particular words should be considered . . . in light of the obligation as a whole and the intention of the parties as manifested thereby.'"  *InterDigital Commc'ns. Corp.* v. *Nokia Corp.*, 407 F. Supp. 2d 522, 530 (S.D.N.Y. 2005) (Pauley, J.) (quoting *Fourth Branch Assocs.* v. *Niagara Mohawk Power Corp.*, 302 A.D.2d 780, 782 (3d Dep't 2003)).  "If the court finds that the contract is unambiguous, 'the intent of the parties must be found within the four corners of the contract' and the court should interpret the contract without the aid of extrinsic evidence."  *ETRI*, 2017 WL 2389699, at *5 (quoting *Chesapeake Energy Corp.*, 773 F.3d at 114).

The interpretation of a contract must endeavor to "give full meaning and effect to all of its provisions," *see Chesapeake Energy Corp.*, 773 F.3d at 114, and "reasonable effort must be made to harmonize all of its terms," *Ursa Minor Ltd.* v. *Aon Financial Products, Inc.*, No. 00 Civ. 2474 (AGS), 2000 WL 1010278, at *7 (S.D.N.Y. July 21, 2000).  "'[A]n interpretation that gives a reasonable and effective meaning to all terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect.'"  *Bank of N.Y. Trust, N.A.* v. *Franklin Advisers, Inc.*, 674 F. Supp. 2d 458, 463 (S.D.N.Y. 2009) (quoting *Galli* v. *Metz*, 973 F.2d 145, 149 (2d Cir. 1992)).  Courts thus apply the "presumptions of consistent usage and meaningful variation, which follow from the duty to construe the contract as a whole."  *GPIF-I Equity Co., Ltd.* v.

*HDG Mansur Inv. Services, Inc.*, No. 13 Civ. 547 (CM), 2013 WL 3989041, at *3 (S.D.N.Y. Aug. 1, 2013).

Under New York law, "[u]nless otherwise indicated, words should be given the meanings ordinarily ascribed to them and absurd results should be avoided." *Mastrovincenzo* v. *City of N.Y.*, 435 F.3d 78, 104 (2d Cir. 2006). "It is hornbook law that a contract should be interpreted so as not to render its terms nonsensical." *InterDigital Commc'ns. Corp.*, 407 F. Supp. 2d at 530; *see also id.* at 530 & n.5 (upholding arbitral award that, rather than "uphold the 'plain and ordinary meaning' of the contract," instead "deviate[d] from that meaning to achieve a sensible result"). Absurd results can be found when certain factual situations create gaps that nullify the effect of other terms in the contract. *See, e.g.*, *Ursa Minor, Ltd.*, 2000 WL 1010278, at *7.

## B. The Settlement Unambiguously Requires Payment after the Release from the Restraint Imposed in this Case

Read as a whole, the Settlement Agreement unambiguously provides that Prevezon's payment is due 15 business days after the release of the AFI Europe Debt from the restraint imposed at the request of the United States. While the word "release" standing alone could refer to a release from a specific restraint or to a release from all possible restraints, the text and structure of the Settlement Agreement make clear that, as used in the Payment Language, the term refers to the release from the restraint imposed in connection with this case—the only release the parties could exercise any measure of control over. Moreover, the alternative interpretation of release allows for manifestly absurd results.

### 1. The Releasing Language Refers to "Release" in Terms of the Restraint Imposed in This Case

The term "release" in the Settlement Agreement, as applied to assets, is consistently used

13

to refer to release from the restraints imposed in this case.[9]  The first instance of the term

"release" as applied to assets appears in paragraph 2, characterizing the overall purpose of the

contract, and applies only to release by the *United States*, not any other actor.  *See* Settlement

Agreement ¶ 2 ("The purpose of this Stipulation and Order is to memorialize a settlement

agreement pursuant to which *the United States will* . . . release all Restrained Properties . . . ."

(emphasis added)).  Indeed, this overall summary paragraph describes the final consummation of

the settlement not in terms of the defendants enjoying full possession of or title to the restrained

assets, but simply the vacatur of the Amended Protective Order imposing restraint in this case.

*See id.* ("Upon the completion of the conditions set forth herein, the Amended Protective Order

shall be vacated as to all Defendants and all Restrained Properties . . . .").  Thus, subject to more

specific language elsewhere in the agreement, the overall purposes of the settlement are

described as releasing the assets not from all restraint but from the restraints imposed in

connection with this case.  This of course accords with the commonsense background

understanding that the parties did not undertake to control the actions of independent third

parties, or to settle matters other than the case at hand.

The specific usage of the term "release" with respect to the AFI Europe Debt shows that

the term relates to release from the U.S.-imposed Amended Protective Order and the U.S.-

requested restraint by the Netherlands implementing that restraint.  The first mention of the term

---

[9] The term "release" is also applied to claims and causes of action.  To the extent that this
language is relevant to interpreting the term "release" as to assets, it also supports the
Government's reading.  The releases of causes of action in the Settlement Agreement, ¶¶ 2, 9-10,
are only made on behalf of the parties to the agreement and those in privity with them.  Any
independent cause of action that a non-party such as a separate sovereign nation might bring is of
course not affected by such a release.

"release" as to the AFI Europe Debt, as part of the Releasing Language in paragraph 3, plainly

follows and implements the request the Government was obligated to make to the Netherlands.

This request, in turn, is carefully limited to the restraint in this case.  First, the Releasing

Language obligates the Government to inform the Netherlands that "the Government *withdraws*

*any request* for the Government of the Netherlands to continue to restrain the AFI Europe Debt,"

and to "request that the Government of the Netherlands lift the restraint of the AFI Europe Debt

*that had been implemented at the request of the United States*."  Settlement Agreement ¶ 3

(emphasis added).  The next sentence following this—and the first use of the term "release" in

this connection—implements this language by allowing the Netherlands to grant this request,

providing that "[t]he Amended Protective Order shall be deemed modified to allow the release of

the AFI Europe Debt."  *Id.*

These two sentences are the only sentences in the paragraph, further underscoring the

connection between the Government's carefully-circumscribed request and the Netherlands'

implementing release.  Reading the entire paragraph together makes it unmistakable that the two

provisions are intended to operate in tandem:

> Upon entry of the Stipulation and Order, the Government shall
> inform the Government of the Netherlands that this matter has
> been resolved and that the Government withdraws any request for
> the Government of the Netherlands to continue to restrain the AFI
> Europe Debt, and shall *request that the Government of the*
> *Netherlands lift the restraint of the AFI Europe Debt that had been*
> *implemented at the request of the United States*.  The Amended
> Protective Order shall be deemed modified to *allow the release of*
> *the AFI Europe Debt.*

Settlement Agreement ¶ 3 (emphasis added).  Indeed, the reference to "the" release of the AFI

Europe Debt most sensibly refers to the release that was requested in the previous sentence, not

the release that was requested in the previous sentence as well as release from any other restraints or impediments that may develop subsequent to the signing of this agreement. Moreover, the Amended Protective Order is derived purely from this case, *see* D.I. 173 at 4-5, and does not have the power to compel a sovereign government to restrain or not restrain assets in connection with another case. Thus, modifying the Amended Protective Order to allow a release can only affect the U.S.-imposed restraint; it cannot say anything one way or another about whether another sovereign government may restrain or may not restrain the asset.

Accordingly, there is strong textual reason to read the term "release" in the Releasing Language as referring not to release from any future restraint but only to the release within the power of the parties and the Court, which is the release from the restraint imposed in this case.

> 2.  The Structure of the Agreement Compels the Conclusion that the Term "Release" in the Payment Language Refers to the Restraint Imposed in this Case

The structure of the agreement makes it unmistakably clear that the term "release" in the Payment Language refers to the release by the Netherlands of the restraint imposed in connection with this case. The relationship of the Payment Language to the Releasing Language and the absence of any other Protective Language compel the conclusion that Prevezon's payment obligation ripened when the Netherlands released the debt from the restraint imposed in connection with this case.

The Payment Language triggers Prevezon's obligation to pay upon "the release by the Government of the Netherlands of the AFI Europe Debt," which naturally refers to the similar phrase in the Releasing Language. In the absence of any contrary textual indication, the obvious reading of the phrase "the release by the Government of the Netherlands of the AFI Europe Debt" in the Payment Language, Settlement Agreement ¶ 4, is the same as the nearly identical

16

phrase "the release of the AFI Europe Debt" in the Releasing Language, Settlement Agreement

¶ 3.  *See, e.g.*, *GPIF-I Equity Co.*, 2013 WL 3989041, at *3 (applying presumption of "consistent

usage").  Since, as discussed in Section I.B.1, *supra*, the term in the Releasing Language refers to

release from the restraint requested by the Government, the phrase in the Payment Language

does as well.

The absence of any Protective Language in the Settlement Agreement further confirms

that the "release" in the Payment Language refers only to the release of the Government-

requested restraint.  As will be discussed in Section I.C, below, this absence of any more specific

contingency language is no accident.  But even without regard to drafting history, the lack of any

further expansion on the term compels a harmonizing interpretation:  the Payment Language

should be read consistently with the nearly-identical Releasing Language, and all of these

provisions are harmonized with the overall language in paragraph 2 describing the release of the

Restrained Properties as being performed by the United States—*i.e.*, as excluding unrelated acts

of independent third parties.  *See, e.g.*, *Ursa Minor Ltd.*, 2000 WL 1010278, at *7

("[R]easonable effort must be made to harmonize all of [a contract's] terms." (internal quotation

marks omitted)).  Such a reading "'best accords with the sense of the remainder of the contract.'"

*Galli*, 973 F.2d at 149 (quoting *Rentways, Inc.* v. *O'Neill Milk & Cream Co.*, 308 N.Y. 342, 347

(1955)).

This reading also harmonizes with Paragraph 11, which governs the disposition of the

remaining assets after the release of the AFI Europe Debt and the making of the Payment.  That

paragraph provides that upon the making of the Payment "the Amended Protective Order shall be

vacated as to all the Restrained Properties, the Court shall order the Restrained Properties

17

*returned to the Claimants*, and the Action shall be dismissed against all Defendants with prejudice."  Settlement Agreement ¶ 11 (emphasis added).  That the post-payment provision contemplates an order directing that property be "returned to the Claimants," Settlement Agreement ¶ 11, while the payment is triggered only upon "release" of the AFI Europe Debt, *id.* ¶ 4, further supports the view that the "release" in the Payment Language does *not* require the "return[]" of the AFI Europe Debt to the Claimants.  *See, e.g.*, *GPIF-I Equity Co.*, 2013 WL 3989041, at *3 (applying presumption of "meaningful variation").

This harmonizing reading not only aligns the references to "release" of assets in paragraphs 2, 3, and 4 and contrasts them to the "return" of assets in paragraph 11; it is also entirely consistent with ordinary usage.  It reads the term "release" to mean a release in its ordinary meaning, and it naturally reads the term "the" to refer to a specific release, *i.e.*, the release requested in the first sentence of the Releasing Language.  The fact that this release could be carried out but the property might still not be free from some *other* restraint is also entirely natural—it is not uncommon in the law for persons or property to be under two forms of restraint and thus released from the custody of one authority into another.[10]  This reflects the ordinary meaning of the word "release" in the context where authorities do not have control over separate sovereigns and thus may release a person or property to the best of their ability but still be unable to prevent other authorities from implementing their own seizure.

Finally, it is only natural that Prevezon would bear the risk of effecting "return" of its

---

[10] For example, a defendant serving a state sentence who is transferred into federal custody for prosecution is still "the subject of the state's jurisdiction" and can thus be released into federal custody but remain detained in the same facility when the state sentence expires.  *E.g.*, *Greenough* v. *Hufford*, No. 12 Civ. 8836 (JPO) (SN), 2013 WL 4534997, at *8 (S.D.N.Y. Aug. 27, 2013).

foreign assets after their "release" from this case.  As owner of the AFI Europe Debt, Prevezon

has recourse under Dutch law to seek the return of its funds and defend against any independent

action by the Netherlands against them.  By contrast, the Government has no authority to

terminate or intervene in a foreign sovereign's law enforcement proceedings.  The text, structure

and context thus all support the natural harmonizing reading that "the release" of the AFI Europe

Debt is the release that was requested and that relates to this case, not a release from some

independent act taken by a third party after the signing of this agreement.

> 3.   Reading the Term Release to Refer to Independent Restraints Creates
>      Absurd Results

The harmonizing reading of "release" not only aligns the term throughout the Settlement

Agreement and contrasts it with "return," it avoids truly absurd results.  Not only was the eve-of-

trial settlement not intended to place this case in suspense for years until the termination of

another case, there may not *ever* be a "release" of the AFI Europe Debt from the Netherlands's

independent investigation.  If the Netherlands succeeds in confiscating Prevezon's debt in its

case, it will never "release" the debt.  If such a "release" were required, Prevezon's payment

would *never* be due, Prevezon's property in the United States—including an apartment that,

according to Prevezon's real estate counsel, now stands vacant after the previous tenants left,

Monteleoni Decl. Ex. 18—would *never* be released, and this case would *never* be dismissed.

This result—a case placed into interminable stasis, with assets remaining in permanent "pretrial"

restraint—is obviously absurd.  Accordingly, the meaning of release should be interpreted to

avoid that absurd result.  *See Mastrovincenzo*, 435 F.3d at 104.

**C.    The Drafting History Makes Clear that Prevezon Bore the Risk the
       Netherlands Would Seize the AFI Europe Debt**

If the terms of the Settlement Agreement were ambiguous, even when read as a whole

and to avoid absurd results, the drafting history conclusively shows that Prevezon agreed to bear the risk that the Netherlands would seize the AFI Europe Debt.  Prevezon long sought protections for precisely this contingency, but ultimately abandoned them in order to avert a trial.

In both 2015 and 2017, Prevezon proposed various versions of Protective Language that would have the effect of placing some sort of burden on the Government to obtain or seek to obtain return of the AFI Europe Debt to Prevezon as a condition of Prevezon making a settlement payment.  While the Government was willing to entertain a version of that language in 2015, it deleted all Protective Language from its sole settlement offer of May 12, 2017, which Prevezon accepted with minor stylistic changes.

In this context, the Government's deletion of the Protective Language in its entirety was unmistakable.  *See, e.g.*, *Golden Pacific Bancorp* v. *FDIC*, 273 F.3d 509, 517 (2d Cir. 2001) (holding that rejection of a release in earlier draft supported exclusion of release in final agreement); *Motion Picture Projectionists* v. *RKO Century Warner Theatres, Inc.*, No. 97 Civ. 4758 (RPP), 1998 WL 477966, at *7 (S.D.N.Y. Aug. 14, 1998) (similar as to limiting language in arbitration clause); *cf. Alt. Thinking Sys., Inc.* v. *Simon & Schuster, Inc.*, 853 F. Supp. 791, 800 (S.D.N.Y. 1994) ("By agreeing to delete this language, Simon & Schuster chose to assume the risk that its economic expectations for the book might change, but that such change would not relieve it of its obligations under the contract.").  Moreover, Prevezon's acceptance of this unfavorable term was of a piece with its broader acceptance of Government terms it had previously rejected.  This is reflected most obviously in the payment amount itself.  Prevezon agreed to pay $5,896,333.65, three times the money it was alleged to have laundered.  That was nearly three times the $2 million offer Prevezon had rejected in 2015, and more than four times

20

the amount Prevezon had offered only two days before, on May 10, 2017.  By the time of

settlement, Prevezon was demonstrably willing to settle on terms favorable to the Government,

including the elimination of the Protective Language and the corresponding risk that the AFI

Europe Debt might be held independently by the Netherlands.  Prevezon's buyer's remorse does

not allow it to reintroduce by implication protections it abandoned in order to avoid trial.[11]

       Indeed, though Prevezon claimed at the pre-motion conference that the Government

agreed to "bear the risk" that the Netherlands would seize the AFI Europe Debt, no plausible

reading of the Settlement Agreement could support this conclusion.  Counsel for Prevezon has

represented, surprisingly, that Denis Katsyv "in good faith believed" that the "release" of the AFI

Europe Debt would mean its automatic transfer to the Government's account.  Monteleoni Decl.

Ex. 17.  This supposed belief—perhaps intended to support some request for relief reducing the

amount by which Prevezon has to pay—is utterly at odds with both the terms of the Settlement

Agreement and the prior negotiations of the parties.  There is thus no possible way to view the

text or drafting history as supporting the view that the Government agreed to bear the risk of the

AFI Europe Debt's seizure.  *See, e.g.*, *Process America, Inc.* v. *Cynergy Holdings, LLC*, No. 12

Civ. 772 (BMC), 2014 WL 3844626, at *4 (E.D.N.Y. Apr. 30, 2014) ("[T]he post-hoc and often

self-serving testimony of the parties' witnesses as to their subjective interpretations of the

contract is of little value" in interpreting contract (internal quotation marks, ellipsis and brackets

---

[11] Prevezon's suggestion at its pre-motion conference that there was no meeting of the minds on
this point is ironic, as the Government *deleted* from its offer a provision that would have allowed
the parties to go to trial if the Netherlands seized the debt.  Monteleoni Decl. Ex. 14 at 17.  While
such a result would be preferable to leaving this case in permanent stasis, Prevezon is obviously
not entitled to seek such a provision, abandon it, and then seek the exact same relief due to a
supposed lack of meeting of the minds.

omitted)).  That Prevezon has suggested such fanciful interpretations of the agreement—irreconcilable either with its text or its drafting history—demonstrates the weakness of its position.

## II.     PREVEZON MUST PAY PREJUDGMENT INTEREST

As Prevezon's payment was due on October 31, 2017, the Government is entitled to prejudgment interest dating back to that date.  Prejudgment interest is mandated by New York's C.P.L.R. 5001, which applies to the enforcement of settlements entered in federal courts in New York.  *See Ramnarain*, 474 F. Supp. 2d at 447; *Kasperek* v. *City Wire Works, Inc.*, No. 03 Civ. 3986 (RML), 2009 WL 691945, at *3 (E.D.N.Y. Mar. 12, 2009).  The rate of prejudgment interest is 9 percent per year.  *See* N.Y. C.P.L.R. 5004; *see also Ramnarain*, 474 F. Supp. 2d at 447-48 (applying *id.*).  Accordingly, since Prevezon's breach occurred when Prevezon did not pay on October 31, Prevezon should be ordered to pay with interest back to that date.

## **CONCLUSION**

For the foregoing reasons, the Government respectfully requests that the Court rule that

Prevezon is required to make the Payment forthwith, with prejudgment interest pursuant to N.Y.

C.P.L.R. 5001 back to October 31, 2017.

Dated: New York, New York
        November 15, 2017

                                        Respectfully submitted,

                                        JOON H. KIM
                                        Acting United States Attorney
                                        for the Southern District of New York

                    By:    /s/ Paul M. Monteleoni
                           Paul M. Monteleoni
                           Cristine I. Phillips
                           Tara M. La Morte
                           Assistant United States Attorneys
                           Tel.: (212) 637-2219/2696/1041
                           E-mail: paul.monteleoni@usdoj.gov
                                   cristine.phillips@usdoj.gov
                                   tara.lamorte2@usdoj.gov