Hb9WpreC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    THE UNITED STATES OF AMERICA,

4                    Plaintiff,

5             v.                           13 Civ. 6326 (WHP)

6

7    PREVEZON HOLDINGS LTD., et
     al.,
                                           Conference
8
                    Defendant.
9
     ------------------------------x
10                                         New York, N.Y.
                                           November 9, 2017
11                                         5:00 p.m.

12   Before:

13                   HON. WILLIAM H. PAULEY III,

14                                         District Judge

15
                           APPEARANCES
16
     JOON H. KIM
17        Acting United States Attorney for
          the Southern District of New York
18   PAUL M. MONTELEONI
     TARA M. LaMORTE
19   CRISTINE I. PHILLIPS
          Assistant United States Attorneys
20
     QUINN EMANUEL URQUHART & SULLIVAN
21        Attorneys for Defendant
     BY:  FAITH E. GAY
22        RENITA SHARMA
          CORY STRUBLE (via speakerphone)
23
     Also Present:  Natalia Veselnitskaya
24                  (via speakerphone)

25

Hb9WpreC

```
 1              (Case called)
 2              MR. MONTELEONI:  Good afternoon, your Honor.  Paul
 3     Monteleoni, for the government, and with me at counsel table
 4     are my colleagues Tara LaMorte and Cristine Phillips.
 5              THE COURT:  Good afternoon, Mr. Monteleoni.
 6              MS. GAY:  Good afternoon, your Honor.  Faith Gay and
 7     Renita Sharma, for Prevezon.
 8              THE COURT:  Good afternoon to you, Ms. Gay.
 9              MS. GAY:  I believe our client is on the phone and
10     will, I guess, remain muted; that's if they're already dialed
11     in, your Honor.
12              THE COURT:  I believe they are, but we won't be
13     hearing from them; they can listen.
14              MS. GAY:  That's correct.
15              And your Honor, we're sorry we couldn't get here
16     earlier today when your schedule changed, but I understand that
17     Mr. Kirsch and his colleagues have something after this.
18              THE COURT:  They do.  And they couldn't move theirs
19     either, so it's perfectly fine.
20              MS. GAY:  Thank you, Judge.
21              THE COURT:  Mr. Monteleoni, you requested this
22     conference.  Why don't you take the podium and report to us as
23     to what is going on, because I'm somewhat confused.
24              MR. MONTELEONI:  Yes.  Thank you, your Honor.
25              The settlement that the Court ordered on May 15 of
```

Hb9WpreC

1    this year provided that the first action that would be taken in

2    effecting the settlement was that the government would send a

3    request to the government of the Netherlands to release a debt

4    that the Netherlands government had restrained at our request.

5         Upon that release, Prevezon's payment would be due at

6    which point the remaining properties that were restrained here

7    would be released from restraint and this action would be

8    finally dismissed; so though this case has been closed

9    administratively on the Court's docket, it is still open and

10   nondismissed and within the Court's jurisdiction because the

11   settlement hasn't been fully consummated.

12        Now what happened is that on October 10, the

13   government of the Netherlands released the debt per our

14   request.  We asked them to lift the restraint they'd imposed at

15   our request, but then they concurrently seized it in connection

16   with their own money-laundering investigation of Prevezon,

17   which they commenced after the settlement had been executed.

18   So Prevezon has now not paid by their deadline, which is

19   October 31, 15 business days after the October 10 release of

20   the funds.

21        Now, we seek to file a motion to enforce the

22   settlement agreement, and the basis of that motion is that

23   Prevezon agreed to pay treble damages for the money that they

24   laundered and they had to pay it by October 31, and both the

25   plain text and the lengthy drafting history of this agreement

Hb9WpreC

1   show that Prevezon had actually agreed to bear the risk that

2   the Dutch government would seize this debt in the Netherlands,

3   which is what they did.

4           THE COURT:  Let me interrupt for one second.

5           MR. MONTELEONI:  Sure.

6           THE COURT:  Is there an agreement between the parties

7   with respect to this matter separate and apart from the

8   stipulation and order that was presented to the Court to be so

9   ordered?

10          MR. MONTELEONI:  No.  That is the entire agreement, as

11  the integration clause on it indicates.  We think that if you

12  look at the entire agreement, you can tell that Prevezon's

13  payment is due, but if there were any ambiguity, the drafting

14  history makes it extraordinarily clear, because actually in

15  earlier versions, dating back to 2015, Prevezon had requested a

16  contingency for specifically what would happen if the Dutch

17  government issued a statement or order saying that they were

18  not going to release the funds for various types of protections

19  for them, and at other times in the negotiations, the

20  government had offered various types of protections

21  specifically for this contingency.

22          But back in 2015 in the negotiations, that sort of

23  petered out.  Prevezon restarted the negotiations in 2017 when

24  they hired a separate settlement counsel, not from the Quinn

25  Emanuel firm, a different individual named Mike Hess, who was

Hb9WpreC

1    hired just to pursue a settlement, and he tried to ask the

2    government to sort of dust off some of these older offers or

3    something like it.  But in our view, Prevezon never really got

4    serious in terms of the money until the week before trial.

5         As of the week before trial, they had continued to ask

6    us for offers that included this protection, a protection for

7    what would happen if the Dutch didn't let the money go.  But

8    then after the Court denied their summary judgment motion, they

9    sort of really came to the table.

10        Mike Hess and a different, second separately retained

11   Prevezon settlement attorney, former FBI Director Louie Freeh,

12   met with the government, and it became apparent that there was

13   the possibility of a deal.  The government made an offer, which

14   was similar to some previous versions but with two key changes

15   that reflected Prevezon's collapsed negotiation position by

16   then.

17        First of all, the money amount was much higher.  It's

18   treble damages.  Now, treble damages is just $6 million, which

19   isn't the largest sum of money that's been at issue in a case

20   in this courtroom, but that's three times the amount that

21   Prevezon was ever alleged to have actually even received from

22   the Treasury fraud, and it's actually many times the amount

23   that they put in New York, so it was a significantly higher

24   fund amount that they agreed to than previously reflecting

25   their bargaining position.  And the other indication of their

Hb9WpreC

1    weakened negotiating position is that the government stripped

2    out the provision that specifically provided protections in the

3    event that the Dutch government did not release the funds.  And

4    Prevezon signed it.

5          We think that Prevezon's idea that this isn't

6    contemplated by the agreement, this is some different thing

7    that means that the payment obligation isn't triggered so this

8    case has to go in abeyance until the Dutch proceedings end,

9    possibly years from now, or if the Dutch never return the money

10   to Prevezon, if the Dutch successfully succeed in confiscating

11   the money, then perhaps the case would never end and it would

12   stay on the Court's docket until the end of time, that seems to

13   be the defendant's view, and we think that that's not what the

14   agreement provides.

15         But even if you thought that there was something in

16   the settlement agreement that favored their position, we think

17   that the proper remedy wouldn't be to sort of keep this case in

18   limbo forever; it would be to vacate the agreement and go to

19   trial.  We don't think that's provided for by the settlement

20   agreement.  That's not what we're asking for, but we think that

21   that would be the proper remedy as opposed to something else.

22         THE COURT:  Why did the parties specifically agree

23   that it would be the AFI Europe funds that would be released as

24   part of the agreement as opposed to other property that is

25   frozen?

1          MR. MONTELEONI:  All of Prevezon's property that is

2     frozen was ultimately to be released in the agreement.  It

3     starts with the AFI Europe funds because those are the only

4     funds that weren't in the direct control of the United States

5     and the Court.  Those are the only funds that required action

6     by the Dutch government, a separate sovereign nation, to

7     release, so we started with that.  But ultimately the way that

8     the agreement is structured, upon the release of these funds,

9     Prevezon will wire in, through wire transfer instructions we've

10    provided them, the sum of money and then the remaining funds --

11    we've got 10 million funds restrained in the U.S. -- will be

12    released, so ultimately all of their restrained properties will

13    be released.

14          I should say Prevezon has suggested to us in some

15    discussions that there might be some liquidity problems that

16    they have with this debt not being released.  To be clear, we

17    don't believe that that is a real problem.  They told us

18    earlier this year, months before trial, that they'd already

19    spent $16 million in attorney's fees on this case, so we think

20    that they have the money, but if they didn't have the money,

21    we'd be happy to work out some kind of arrangement where we

22    could just forfeit the $6 million from the restrained property

23    here and Prevezon wouldn't have to go out of pocket at all.

24          Again, we don't think that the precise structuring of

25    where the funds come from is going to be determinative here.

Hb9WpreC

1  Ultimately their obligation to pay, we believe, has been

2  triggered, and we believe that it should be enforced and with

3  interest, because this is something that was contemplated by

4  the parties for years and they have an obligation.  They knew

5  about it since the 10th and they didn't carry it out.

6          Ultimately, we believe we have a contract, we believe

7  it should be enforced, and that's why we're bringing this

8  motion.

9          I should also say the reason that we're seeking to

10 enforce the settlement agreement is both that that's what the

11 law provides, but also we think that it is a favorable

12 agreement to the government and that it is in the public

13 interest, because it provides for a treble-damages recovery off

14 of an amount of money that in the grand scheme of things isn't

15 that large, but we didn't bring the case to maximize our

16 financial recovery.  We brought the case because we believe

17 that tainted funds of the sort alleged here should not be

18 brought into New York in any amount.  And so sort of settling a

19 case for guaranteed treble damages as opposed to doing a

20 month-long trial to attempt to get the sevenfold damages, which

21 is what we would have achieved if we had sort of fully

22 prevailed on trial at all times, that seemed like a very sort

23 of obvious candidate for settlement, so we believe that we have

24 struck a good, favorable bargain that should be enforced, and

25 that's why we're here asking the Court to enforce it.

1          About the briefing schedule, we think that the

2     schedule that we proposed is fully sufficient.  Prevezon knew

3     about this since October 10.  I'm not even sure yet whether

4     they wish to file a motion or just respond to ours, but even if

5     they do, filing a motion on November 15 seems like enough time.

6          THE COURT:  We'll find out in a couple of minutes.

7          MR. MONTELEONI:  Sure.

8          I'm happy to answer any other questions that the Court

9     has about this motion for settlement.

10          THE COURT:  I've been looking at these provisions that

11     you cite from the stipulation and order, and I guess I'd like

12     to hear ever so briefly how you plan to address the provision

13     in paragraph 4 that says that "the payment shall be due within

14     15 business days of the release by the government of the

15     Netherlands of the AFI Europe debt and shall be made by

16     electronic funds transfer pursuant to written instructions to

17     be provided to the U.S. Attorney's Office."

18          MR. MONTELEONI:  Yes.  I sort of led with the drafting

19     history argument.

20          The textual argument is that if you look at the term

21     "release" of the debt, the first time that that appears is in

22     the preceding paragraph, paragraph 3, where it directly follows

23     and gives effect to the preceding sentence, which requires the

24     government to request a very narrow and specific form of

25     release, which is to lift the restraint of the debt that had

1    been implemented at the request of the United States, and then

2    the next sentence expands that the amended protective order is

3    deemed modified to permit the release of the debt.  Between

4    that and the next paragraph, and then the canon against

5    avoiding absurd results, we think that, by far, the most

6    natural reading, to harmonize every provision of this, is to

7    read the term "release" in paragraphs 3 and 4 to refer to the

8    only release that the government was obligated to request, the

9    only release that is sort of related to this case, the one in

10   which the parties are settling here, and the only release that

11   will allow the avoidance of absurd results, because if

12   "release" meant that the Dutch government had to release it

13   from all restraints, then if the Dutch succeed in their action,

14   there's going to be absolutely no way under this agreement to

15   ever get rid of the case.  The properties are going to have to

16   stay frozen until the end of time.

17           THE COURT:  But why not have conditioned payment on

18   the request instead of the release?

19           MR. MONTELEONI:  I think that the thinking was the

20   Dutch government might take some time to actually execute the

21   U.S.'s request and that Prevezon wouldn't need to make that

22   payment until they actually agreed to do it, so that everything

23   would happen sort of all nicely together within a

24   15-business-day span of time from when things started

25   happening.

1          Looking back, in retrospect, that would have been one

2     different way of drafting it.  I think any time a settlement

3     agreement concerns properties where another sovereign, not a

4     signatory to the agreement and not controlled by the signatory,

5     is involved, there's going to be some level of risk, and we

6     think that both for drafting history and textual reasons, the

7     obvious party to bear the risk, the obvious party that has the

8     ability to contact the government of the Netherlands and

9     exercise legal rights with it is going to be Prevezon, the

10    owner of the property.

11          THE COURT:  Without really looking back at it, did the

12    parties specifically contemplate the possibility that the

13    government of the Netherlands would not release it?

14          MR. MONTELEONI:  Yes.  That's what I was sort of

15    trying to get at.

16          Prevezon raised this with us in 2015.  They were

17    concerned that if we did some type of settlement, the

18    government of the Netherlands might hang on to the money, and

19    so they asked for protections which said sort of, If the

20    government of the Netherlands doesn't hang on to the money, the

21    U.S. will undertake to obtain that release, which is something

22    that we could never promise because we don't control the

23    government of the Netherlands.  Or more recently they said, If

24    the government of the Netherlands says it's going to hang on

25    the money, the U.S. will assist the defendant in getting the

Hb9WpreC

1    money from the government of the Netherlands, and we can't make

2    promises of that sort of open-ended character to assist a

3    private party in making a request that's not sort of carefully

4    spelled out, so we didn't do that.

5           What we have done, up until the end, was we had

6    proposed language where if the government of the Netherlands

7    sort of said that they were going to hang on to the money, we

8    could rip up -- either side could for symmetry reasons, but it

9    was Prevezon that was requesting it the whole time -- could rip

10   up the settlement and proceed to trial.  That was the provision

11   that we had offered them; they had requested more protection,

12   but we deleted all of those, because we thought that reading

13   the agreement most naturally with the deletion of all

14   protections for Prevezon in the event, in this specific, very

15   contemplated event that the government didn't release the funds

16   not just from our restraint but also transmit them to Prevezon,

17   that Prevezon should bear the risk.

18          That was the sort of late night of May 11, morning of

19   May 12 drafting that we did of that, because that was when

20   things started to heat up.  I think that, yes, in retrospect,

21   there could have been more, instead of just removing that

22   protection, we could have then added in more language

23   discussing this precise contingency, but ultimately we thought

24   that it adequately conveyed it especially in light of the fact

25   that the parties had been focused on this for years.

```
 1                THE COURT:  Thank you.

 2                Let me hear from Ms. Gay.

 3                MS. GAY:  Thank you, your Honor.

 4                Obviously, Judge, feelings still are running a little

 5   high in this case.  Let me just correct a little bit of what

 6   the government has represented here.

 7                First of all, in terms of whether we pay for money

 8   laundering that happened, the settlement agreement clearly says

 9   that's not what we're paying for.  I don't think we need to

10   belabor that.

11                I am delighted to hear on the record several times

12   over that the government thinks this is a good deal.  There's

13   been suggestion that this deal was somehow obtained by

14   nefarious means and that we got a fabulous deal that we

15   shouldn't have gotten.  I think both sides thought it was a

16   fair deal, and again, I wouldn't go as far as back as has been

17   suggested here, but let me just quickly say that when we came

18   in -- right before trial, both you inherited this case, Judge,

19   and we came in after counsel was conflicted out -- our sense of

20   the case was that it was quite triable.  The government had

21   taken the story of Mr. Browder.  Obviously we deposed him.  He

22   had no knowledge.  He had given up his citizenship in this

23   country because he didn't want to pay taxes.  He'd been thrown

24   out of Russia because he committed crimes, and he was the

25   person who brought this case.
```

1     And we felt good -- and again, I wouldn't address this

2     but for having heard it brought up -- and he had no direct

3     knowledge.  He'd never met our clients, knew nothing about our

4     clients' business, couldn't have picked them out of a lineup,

5     couldn't have picked them out of a store line to buy food.  So

6     with that in mind and with the government committing in a

7     deposition that they had taken his case, one that he brought to

8     them, hook, line and sinker, had not investigated it, we

9     thought it was triable.

10     We, at Quinn, said, as Mr. Monteleoni has said, We're

11     not going to do settlement negotiations, but if you want to

12     hire separate settlement counsel, you can, so Denis Katsyv of

13     Prevezon hired Judge Freeh and former Corporation Counsel Mike

14     Hess, and they conducted settlement negotiations.  Suffice it

15     to say, your Honor, their view of what the settlement says,

16     what it intended to say and what it was all about in 2017 has

17     nothing in common, unfortunately, with what the government's

18     saying here.

19     I guess the first thing I should say is that Baker &

20     Hostetler were conflicted out.  The Second Circuit had written

21     a strong opinion saying they had to be out of this case.  With

22     regard to that, new counsel started over again, and the

23     centerpiece of this settlement agreement, your Honor, has to do

24     with this restrained Dutch asset.  The first time "release" is

25     mentioned is not in paragraph 3.  It's not in paragraph 4.  It

Hb9WpreC

1   starts in paragraph 2 and in some of the "whereas" clauses

2   where the restraint of this central asset is prominently

3   featured.  And with regard, as the Court has pointed out, to

4   the language used in 3 and in 4, it is very different, and we

5   suggest, your Honor, that the burden and the risk of whatever

6   has happened here -- whatever has happened here -- is totally

7   on the government, because it says these funds have to be

8   released.

9          The government provided to us, I guess, right after

10   this so-called release and seizure and the very same

11   transaction happened, a letter that I'd guess has been

12   reprinted -- I don't think it came like this -- but somehow

13   from the Dutch government, which we will provide to the Court

14   in our papers, that suggests, one, that the lift and seizure

15   may not have even have happened yet.  It says, "the lift and

16   seizure today is only possible if there is a competent person

17   on the premises of AFI in Amsterdam."

18          We don't know what has happened.  We have tried hard

19   to figure it out.  I'm not asking at this point, Judge, for

20   formal discovery, because I'm hoping that won't be necessary,

21   but I may come back and ask for it.  But whatever happened at

22   best for the government was a simultaneous lift and seizure at

23   the same time where the money never left the Dutch.

24          On top of that, the government knew about this or knew

25   something about it, and again, I don't want to get into

Hb9WpreC

1   invective here.  I'm hoping it won't be necessary, but our

2   government knew apparently at the time the settlement agreement

3   was negotiated, with this Dutch asset in the middle and in the

4   center of the settlement agreement, as the Court has indicated,

5   that the Dutch were doing something to prepare to seize these

6   assets.  We never knew about it.  If we had known about it, I

7   think we could have pushed along on this.  Our clients' assets

8   have been restrained since 2013, your Honor, all of them,

9   worldwide.  And the $16 million Mr. Monteleoni talks about

10  certainly wasn't paid to our firm.  Our bills have not been

11  paid because assets are frozen, so I think there are some

12  issues.

13          But in any event, if we had known about this, we could

14  have come to the Court and said perhaps there is some way we

15  can rearrange these assets, but to suggest that the payment

16  provision in the settlement agreement is extant right now, when

17  there's this thing that's happened -- we've diligently asked,

18  and we can show the Court the correspondence back and forth,

19  What is going on?  We thought this was a simple settlement

20  agreement.  I'm sure Judge Freeh and Mr. Hess would say the

21  same thing:  It was simply the one asset, where the asset is

22  released, our client pays and then they get all their assets

23  made free.  We've gotten no information, and we still can't

24  figure out what's going on with the Dutch.  We still don't have

25  any paper to tell us what's up.

Hb9WpreC

1          From our perspective, we want this settlement

2     agreement.  We think it's a great deal.  Again, there's been a

3     lot of castigation in the press that we got too good of a deal,

4     but we want it as the agreement that we negotiated, which is

5     that those funds had to be released.  My client has nothing to

6     pay it with.  Everything else is restrained.

7          THE COURT:  What about the possibility of substituting

8     the assets that are restrained here in the United States for

9     the payment to the government?

10         MS. GAY:  Because, your Honor, that is not the deal

11    that was struck, and it seems to me that what we ought to do,

12    and we can do it in an orderly fashion.  I mean, I would

13    suggest a compromise between the materially different but

14    barely materially different briefing schedules that each side

15    has proposed.  Our view is exactly the agreement that we signed

16    put the risk of this behavior on the government, and the terms

17    are clear.  And if there has to be a recitation of what the

18    parties intended by paragraph 4 and the distinction between the

19    language used in 4 and in the preceding paragraph 3, and the

20    government wants to present their view, we certainly, as our

21    settlement counsel, want to present our view as well.  And if

22    there wasn't a meeting of the minds, maybe there's not a

23    contract.

24         I do think both sides want the deal.  We think it's

25    great, now the government says they think it's great, but we

18

Hb9WpreC

1      believe it's the deal that we signed up for.

2              And I will say there's pressure on both sides.

3      Obviously the government doesn't want this to stay in limbo.

4      Obviously they're in touch with the Dutch.  There's pressure on

5      our side because all the assets are restrained.  It would be

6      difficult, your Honor, for us to have a trial even if we wanted

7      to because the client has no money to pay for it.  With that in

8      mind, I think we want to get this resolved, and we

9      unfortunately, I think, are going to have to call upon the

10     Court to determine the proper interpretation of the contract.

11     We would like to brief it because it's a hugely important

12     matter to a client with no funds, a client that thought it got

13     a great settlement and then has been stuck for another, I

14     guess, almost a third of a year.

15             With that in mind, the claims that we would make, I

16     think largely to Mr. Monteleoni's point, we would largely want

17     to respond to whatever the government puts on paper about what

18     this settlement agreement means both on its face and what the

19     parties intended.

20             We would also, Judge, and again, depending on what the

21     government says here, make a separate claimover for the breach

22     of good faith and fair dealing, because we believe the

23     government, and again, I don't know -- let me be very clear on

24     the record, I don't know -- but it appears to us that the

25     government knew about this plan of the Dutch when the

1    settlement agreement was negotiated, and they can shake their

2    heads all they want to, and maybe the Court is going to have to

3    end up looking *in camera* at some of the negotiations back and

4    forth, but regardless of that, the least good and the least bad

5    thing that could be said for the government is that they could

6    have told us about these concerns four months ago.

7              THE COURT:  Is the agreement ambiguous?

8              MS. GAY:  I don't think so, your Honor.  I think it

9    says clearly that the funds have to be released, and it's total

10   sophistry, completely disingenuous to not tell us about this

11   proceeding, also, by the way, this proceeding that's pushed by

12   Browder on the same set of facts, alleged facts.  But the

13   agreement says clearly in paragraph 4 that there has to be a

14   release of the funds.  If you look at the Dutch correspondence,

15   the funds were never released.  It says "simultaneous lift and

16   seizure," and then it says it's only possible if the right

17   mechanisms are in place.

18             We don't know what's happened.

19             THE COURT:  Look, I think I understand what the

20   government wants in a motion.  What does Prevezon want?

21             MS. GAY:  First of all, we believe the settlement

22   agreement's a good one.  It's an agreement that we want, but we

23   believe that it's clear on its face that the payment mechanism

24   is not effectuated until the Dutch funds are released.

25   Certainly my client is scrambling now, scrambling, to try and

Hb9WpreC

1    get funds so this amount can be paid in so that it can get all

2    of its properties released, assuming that there's not other

3    shenanigans that are out there.  But right now we want the

4    settlement agreement that we negotiated for, which is that the

5    payment provision is not yet triggered; that risk falls on the

6    government.

7             We think we can show the Court, both through

8    affidavits and also through the correspondence between the

9    settlement counsel and the government, that the government

10   assumed this risk.  We would like the contract interpreted, and

11   depending on what the Court finds, we may have to ask for

12   alternative relief.

13            THE COURT:  OK, but if it was not triggered, then

14   what?  I mean, Prevezon's other assets remain frozen?

15            MS. GAY:  Correct.

16            To that end, your Honor, we have just been informed of

17   this not long ago.  I mean, a few weeks is not long to find

18   out, and we're still not clear what happened and we're still

19   not clear that maybe we can't get that Dutch money released.

20   We don't know.  There's no record of it anywhere.  There's no

21   press that we can see.  The government hasn't told us anything.

22   We'd like to see what can happen there.  We'd like to get those

23   funds released, and then we have to figure out, because we're

24   in just as bad a position, I would argue worse in some ways, as

25   the government, because as you say, my clients' funds are held.

Hb9WpreC

```
 1    So we need to try to figure out what can possibly happen and
 2    what alternative suggestions we can make to the Court.  We are
 3    happy to brief that promptly.
 4              THE COURT:  All right.  I'm going to fix a briefing
 5    schedule, and I just want to make certain in my own mind that
 6    as part of this briefing schedule, either you want to file some
 7    sort of motion simultaneously with the government or not.
 8              MS. GAY:  Your Honor, I think what we'd like to do is
 9    see what the government's position is, and certainly we'll want
10    to respond to their motion for enforcement of the settlement
11    agreement.  We may at the time we put in our papers, and if I
12    knew the answer to this, I would tell you, your Honor, but we
13    may file a claim for a breach of good faith and fair dealing,
14    and we may have to say to you we need discovery on this.  But
15    I'd like to see what the government has to say because it's
16    still unclear to me how they're taking this position.
17              THE COURT:  All right.  Thank you, Ms. Gay.
18              MS. GAY:  Thank you.
19              THE COURT:  Let's fix a briefing schedule.
20              Mr. Monteleoni, when are you prepared to file your
21    motion?
22              MR. MONTELEONI:  We could file by November 15, as we
23    proposed.
24              THE COURT:  All right.  Ms. Gay, can you file any
25    opposition by December 6?
```

Hb9WpreC

1          MS. GAY:  Yes, your Honor.

2          THE COURT:  I'll take any reply, Mr. Monteleoni, by

3     December 12, and I'll set this matter down for an oral argument

4     on December 14 at 11:30.  Will that be convenient?

5          MS. GAY:  That's fine, your Honor.  Thank you.

6          MR. MONTELEONI:  Yes, your Honor.  Thank you.

7          THE COURT:  All right.  Anything further?

8          MR. MONTELEONI:  Actually, I'm sorry.  I was so busy

9     looking at the date for December 14, I forgot the time.

10          THE COURT:  11:30.

11          MR. MONTELEONI:  11:30.  Thank you.

12          THE COURT:  I'll issue a scheduling order tomorrow

13     with these dates.

14          Anything else?

15          MR. MONTELEONI:  Nothing for the government, your

16     Honor.

17          MS. GAY:  No, your Honor.  Thanks for seeing us.

18          THE COURT:  Sure.  Thank you both for coming in.  Have

19     a good evening.

20          (Adjourned)

21

22

23

24

25