**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>     v.<br><br>PREVEZON HOLDINGS LTD., *et al.*,<br><br>                Defendants,<br><br>ALL RIGHT, TITLE AND INTEREST IN THE<br>REAL PROPERTY AND APPURTENANCES<br>KNOWN AS THE 20 PINE STREET<br>CONDOMINIUM, 20 PINE STREET, NEW<br>YORK, NEW YORK 10005, UNIT 1816, *et al.*,<br><br>                Defendants *in Rem*. | Case No. 1:13-cv-06326 (WHP)<br><br>ECF CASE |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO**
**PLAINTIFF'S MOTION TO ENFORCE THE SETTLEMENT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................................1

FACTS ...................................................................................................................................4

ARGUMENT .........................................................................................................................9

I.     THE SETTLEMENT DOES NOT REQUIRE PAYMENT AT THIS TIME....................9

       A.     The Plain Meaning Of The Term "Release" Has Not Been Met..........................10

       B.     The Structure Of The Settlement Supports Prevezon's Understanding Of The Term "Release"..................................................................................................12

       C.     The Economic Realities Of The Settlement Support Prevezon's Understanding Of The Term "Release"................................................................14

       D.     Enforcing Prevezon's Understanding Of The Term "Release" Will Not Lead To Absurdity ...................................................................................................15

       E.     The Drafting History Of The Settlement Is Consistent With Prevezon's Understanding Of The Term "Release"................................................................18

II.    IF THE SETTLEMENT IS AMBIGUOUS, WHICH IT IS NOT, THERE WAS NO MEETING OF THE MINDS .........................................................................................19

III.   PREVEZON SEEKS DISCOVERY INTO THE GOVERNMENT'S POSSIBLE BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING ...............21

CONCLUSION....................................................................................................................24

# TABLE OF AUTHORITIES

**Cases**                                                                                                            **Page(s)**

*AIM Int'l Trading, L.L.C. v. Valcucine S.p.A.*,
   No. 02-cv-1363(PKL), 2003 WL 21203503 (S.D.N.Y. May 22, 2003)............................ 22, 24

*Alexander & Alexander Servs., Inc. v. These Certain Underwriters at*
*Lloyd's, London*,
   136 F.3d 82 (2d Cir. 1998) ................................................................. 11

*Bank of Crete, S.A. v. Koskotas*,
   No. 88-cv-8412(KMW), 1988 WL 140877 (S.D.N.Y. Dec. 19, 1988) .................................... 11

*Benicorp Ins. Co. v. Nat'l Med. Health Card Sys., Inc.*,
   447 F. Supp. 2d 329 (S.D.N.Y. 2006) .............................................................. 19, 20

*Consumer Advocacy Grp., Inc. v. Exxon Mobil Corp.*,
   128 Cal. Rptr. 2d 454 (Cal. Ct. App. 2002)........................................................... 12

*Cont'l Ins. Co. v. Atl. Cas. Ins. Co.*,
   603 F.3d 169 (2d Cir. 2010) ................................................................. 10

*Dailey v. State*,
   807 N.W.2d 225 (N.D. 2011) ................................................................. 12

*Dreyfuss v. Etelecare Glob. Sols.-U.S. Inc.*,
   349 F. App'x 551 (2d Cir. 2009) ................................................................. 21

*Dweck Law Firm, L.L.P. v. Mann*,
   340 F. Supp. 2d 353 (S.D.N.Y. 2004) ................................................................. 22

*Galli v. Metz*,
   973 F.2d 145 (2d Cir. 1992) ................................................................. 12

*Greenfield v. Philles Records, Inc.*,
   780 N.E.2d 166 (N.Y. 2002)................................................................. 18

*Hudson v. I.R.S.*,
   No. 03-cv-172, 2004 WL 1006266 (N.D.N.Y. Mar. 25, 2004) ................................................ 13

*Hunt Ltd. v. Lifschultz Fast Freight, Inc.*,
   889 F.2d 1274 (2d Cir. 1989) ................................................................. 10

*JA Apparel Corp. v. Abboud*,
   568 F.3d 390 (2d Cir. 2009) ................................................................. 12

*Larson v. Nw. Mut. Life Ins. Co.*,
   855 N.W.2d 293 (Minn. 2014) ................................................................. 12

*Law Debenture Trust Co. of New York v. Maverick Tube Corp.*,
   595 F.3d 458 (2d Cir. 2010) ................................................................. 20

*In re Lehman Bros. Holdings Inc.*,
   761 F.3d 303 (2d Cir. 2014) ................................................................. 10

*Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank*,
   392 F.3d 520 (2d Cir. 2004) ................................................................ 23

*Nat'l Tax Inst., Inc. v. Topnotch at Stowe Resort and Spa*,
   388 F.3d 15 (1st Cir. 2004) ................................................................ 17

*Neal & Co. v. United States*,
   36 Fed. Cl. 600 (1996), *aff'd*, 121 F.3d 683 (Fed. Cir. 1997) ................ 21

*Newmont Mines Ltd. v. Hanover Ins. Co.*,
   784 F.2d 127 (2d Cir. 1986) ................................................................ 14

*In re Ore Cargo, Inc.*,
   544 F.2d 80 (2d Cir. 1976) .................................................................. 13

*People v. Baltzer*,
   762 N.E.2d 1174 (Ill. App. Ct. 2002),
   *case dismissed*, 786 N.E.2d 188 (Ill. 2002) ........................................ 12

*Perna v. Desai*,
   101 A.D.2d 857 (N.Y. App. Div. 1984) ................................................ 16

*Prince of Peace Enterprises, Inc. v. Top Quality Food Mkt., LLC*,
   760 F. Supp. 2d 384 (S.D.N.Y. 2011), *adhered to on
   denial of reconsideration*, No. 07-cv-00349(RJH),
   2011 WL 650799 (S.D.N.Y. Mar. 14, 2011) .................................... 9, 20

*Progress Bulk Carriers v. American S.S. Owners Mut. Prot. &
   Indem. Ass'n*,
   939 F. Supp. 2d 422 (S.D.N.Y. 2013) .................................................. 17

*Quadrant Structured Prod. Co. v. Vertin*,
   16 N.E.3d 1165 (N.Y. 2014) ................................................................ 14

*RUS, Inc. v. Bay Indus., Inc.*,
   322 F. Supp. 2d 302 (S.D.N.Y. 2003) .................................................. 22

*Schurr v. Austin Galleries of Illinois, Inc.*,
   719 F.2d 571 (2d Cir. 1983) ................................................................ 20

*State of New York v. United Parcel Serv., Inc.*,
   160 F. Supp. 3d 629 (S.D.N.Y. 2016) .................................................. 21

*Succo v. First Reliance Standard Life Ins. Co.*,
   16 F. App'x 53 (2d Cir. 2001) ............................................................. 11

*Summit Health, Inc. v. APS Healthcare Bethesda, Inc.*,
   993 F. Supp. 2d 379 (S.D.N.Y. 2014) .................................................. 21

*United States v. Dauray*,
   215 F.3d 257 (2d Cir. 2000) ................................................................ 11

*Vale v. Vermont Mut. Ins. Grp.*,
   112 A.D.3d 1011 (N.Y. App. Div. 2013) .............................................. 16

*Vista Outdoor Inc. v. Reeves Family Tr.*,
    234 F. Supp. 3d 558 (S.D.N.Y. 2017) .................................................................... 23

**Additional Authorities**

DailyKOS, *Prevezon Case Settlement by Dept of Justice: A smoking gun?*,
    (July 19, 2017), https://www.dailykos.com/stories/2017/7/19/1681995/-Prevezon-
    Case-Settlement-by-Dept-of-Justice-A-smoking-gun ............................................... 7

"release," *English Oxford Living Dictionaries,* 2017,
    https://en.oxforddictionaries.com/definition/release (Dec. 6, 2017) ........................ 11

"release," *Merriam-Webster.com*, 2017, https://www.merriam-
    webster.com/dictionary/release (Dec. 6, 2017) ...................................................... 11

1 RESTATEMENT (2D) OF CONTRACTS, § 225 (2017) ..................................................... 16

U.S. House Committee on the Judiciary (Democrats), July 12, 2017 Press Release,
    *Judiciary Dems Demands Answers on DOJ Settlement of Fraud Case Handled by*
    *Russian Lawyer Who Met With Trump Jr.*, https://democrats-
    judiciary.house.gov/news/press-releases/judiciary-dems-demand-answers-doj-
    settlement-fraud-case-handled-russian-lawyer .......................................................... 6

1 WILLISTON ON CONTRACTS, § 4.18-4.24 (Lord 4th ed. 1990) .................................... 19

Defendants Prevezon Holdings Ltd., Prevezon Alexander, LLC, Prevezon Soho USA, LLC, Prevezon Seven USA, LLC, Prevezon Pine USA, LLC, Prevezon 1711 USA, LLC, Prevezon 1810, LLC, Prevezon 2009 USA, LLC, Prevezon 2011 USA, LLC, Ferencoi Investments Ltd., and Kolevins, Ltd. (collectively, "Prevezon") respectfully submit this opposition to the Government's motion to enforce the parties' settlement agreement.

## INTRODUCTION

Prevezon and the Government agreed to settle this case in May 2017, just days before trial was scheduled to begin. The settlement stipulation provides that Prevezon will pay nearly $5.9 million in return for a release of all claims asserted by the Government and the return of over $13 million in assets that had been frozen by or at the behest of the Government. These assets included $9.68 million in properties and cash restrained in the United States, and an asset known as the AFI Europe Debt, which is worth approximately $3.62 million (at current exchange rates) and was restrained by the Netherlands authorities at the request of the Government.

To ensure that Prevezon's settlement payment would secure the release of all of its restrained property, the settlement was structured so that Prevezon's payment was not due until after the AFI Europe Debt—the only restrained asset not directly controlled by the Government—had been released. In particular, the settlement was structured as follows: *first*, the Government would "request that the Government of the Netherlands lift the restraint of the AFI Europe Debt that had been implemented at the request of the United States." D.I. 716 at ¶ 3.[1] *Second*, "15 business days" after "the release by the Government of the Netherlands of the AFI Europe Debt," Prevezon would make its payment to the Government. *Id.* at ¶ 4. And *third*, after the settlement

---

[1] Citations to "D.I." refer to docket items in this case. Citations to "Sharma Decl." refer to the Declaration of Renita Sharma filed herewith. Citations to "Monteleoni Decl." refer to the Declaration of Paul Monteleoni filed in support of the Government's Motion (D.I. 745).

payment had been made, the remaining Restrained Properties would be returned to Prevezon and the case would be dismissed. *Id.* at ¶ 11. Unfortunately, these events did not play out as the parties expected.

Unbeknownst to Prevezon, the day after the parties' settlement was ordered by this Court, William Browder, who instigated this action through the U.S. Attorney's Office, filed a claim against Prevezon in the Netherlands based on the same alleged conduct. Throughout the summer of 2017, while Prevezon repeatedly asked the Government when the Netherlands would release the AFI Europe Debt, Browder and the Government were working with Netherlands authorities on their investigation. Not until October 10, 2017 was Prevezon informed by the Government that this investigation was occurring—and also that the Netherlands had imposed its own restraint on the AFI Europe Debt simultaneously with lifting the restraint it had imposed on that asset at the request of the United States.

Despite what occurred in the Netherlands (with the Government's complicity), the Government now moves to enforce its construction of the settlement and compel immediate payment from Prevezon. The Government contends that the Netherlands' alleged lifting of the restraint placed on the AFI Europe Debt at the Government's behest constitutes a "release" of that asset for purposes of the settlement, notwithstanding that the Netherlands simultaneously imposed a separate restraint on the asset. The Government's position is wrong for at least several reasons.

*First*, the unambiguous language of the settlement stipulation establishes that Prevezon's payment obligation has not been triggered. The settlement requires that Prevezon make payment within "15 business days" after "the release by the Government of the Netherlands of the AFI Europe Debt." D.I. 716 at ¶ 4. The Government of the Netherlands has never released the AFI Europe Debt, so that condition has not been met. The mere lifting of the restraint imposed at the

Government's request did not constitute a "release" of the AFI Europe Debt as, due to the simultaneous imposition of another restraint, the asset has neither been transferred to nor made available to Prevezon. The settlement agreement, in fact, distinguishes between a full release of the AFI Europe Debt and a release of only the restraint imposed on that asset at the Government's request. Moreover, as detailed below, Prevezon's understanding of the term "release" to require a full release is supported by the term's ordinary definition, case law in various contexts, the structure and purposes of the settlement, the parties' economic motivations, and the drafting history of the agreement.

*Second*, even if the settlement agreement were determined to be ambiguous as to whether a "release" has occurred in these circumstances, Prevezon's understanding of the term "release" was clear and consistent. To the extent this Court credits the Government's assertions regarding its intent, there was no meeting of the minds and no agreement was formed between the parties.

*Third*, to the extent the settlement stipulation does require immediate payment—which it does not—the Government appears to have breached the covenant of good faith and fair dealing implied into the settlement stipulation by actively assisting the Netherlands to investigate Prevezon and independently restrain the AFI Europe Debt. In doing so, the Government directly undermined Prevezon's ability to receive the primary benefit it bargained to receive through the settlement— the return of all of its assets that had been restrained in connection with this case. The Government's apparent breach of contract creates, at a minimum, a potential offset against any payment Prevezon owes the Government. Prevezon should be afforded discovery on this claim prior to any enforcement of the settlement stipulation.

**FACTS**

## I.     THE SETTLEMENT

In January 2017, after Prevezon's prior counsel were disqualified for conduct unknown to Prevezon, this case was transferred to Judge Pauley, and Quinn Emanuel entered appearances as counsel to the defendants.  D.I. 542-545.  Although Prevezon's counsel was new to the matter, Prevezon was eager to resolve the case so as to clear its name and obtain the release of over $13 million in assets that had been restrained at the behest of the Government.  Prevezon thus sought, and the Court granted, an expedited trial date of May 15, 2017.  D.I. 549 at 23:15-18.

As the trial date drew close, the parties engaged in settlement discussions.  So as not to interfere with Quinn Emanuel's focus on trial preparations, Prevezon brought in separate counsel to handle settlement negotiations, which began in mid-April 2017.  Prevezon's settlement counsel were Michael Hess and Louis Freeh.  Mr. Hess formerly served as Chief of the Civil Division of the U.S. Attorney's Office for the Southern District of New York and as Corporation Counsel of the City of New York.  Judge Freeh formerly was a United States District Judge in the Southern District of New York and served as the fifth Director of the Federal Bureau of Investigation.

After several weeks of negotiation, Prevezon and the Government agreed to a stipulation of settlement of this case on May 12, 2017.  D.I. 715.  The Court so-ordered the settlement on May 15, 2017.  D.I. 716 (the "Settlement").  The Settlement offered both sides an opportunity to avoid clear risks of trial.  The Government, for its part, alleged Prevezon laundered $1.96 million from the Russian Treasury Fraud, but it conceded that (i) it had no evidence that Prevezon was involved in the Treasury Fraud itself,[2] and (ii) it offered no evidence, or even a theory, that would explain

---

[2]  D.I. 470 at 27:9-12 ("THE COURT: I don't have the idea that the government contends that Prevezon did the initial fraud in Moscow.  MR. MONTELEONI: We do not allege that they committed the basic fraud.").

4

why Prevezon would even have come into possession of proceeds from the Treasury Fraud, much less laundered them. The Government, therefore, faced a trial in which it was going to ask a jury to conclude that Prevezon, an otherwise legitimate business, had laundered what the Government acknowledged was a miniscule percentage of the Treasury Fraud proceeds without any evidence to suggest that Prevezon had any motive whatsoever to do so. Prevezon, on the other hand, was faced with the undesirable prospect of facing a New York jury during a period when the public was inflamed by daily press reports of alleged Russian interference in the United States' electoral process. The flames were being stoked, moreover, by the instigator of this case, William Browder, who in the weeks before trial conducted a public campaign to vilify Prevezon. *See* D.I. 666 (April 12, 2017 Letter from A. Abensohn detailing media campaign by Browder).

The "purpose" of the Settlement, as described in the document, was for each party to "release all of its claims or potential claims against" each other party, for the "United States . . . [to] release all Restrained Properties," and for the parties to thereby "resolve this case." D.I. 716 at 6 and ¶ 2. The Restrained Properties included approximately $9.68 million in assets in the United States, which at the time of the Settlement consisted of eight US bank accounts, the sale proceeds of four properties, and one apartment (the "US Restrained Assets"). Sharma Decl. Ex. 1 at 2. Additionally, the Restrained Properties included a debt owed to Prevezon Holdings, Ltd. worth 3,068,946 Euros (at December 6, 2017 exchange rates, approximately $3,622,706.62) that was located in the Netherlands and that had been restrained by Netherlands authorities at the Government's request (the "AFI Europe Debt"). *Id.* The Settlement provided for the "release [of] all Restrained Properties." D.I. 716 at ¶ 2.

The structure of the Settlement was straightforward. First, upon entry of the Settlement, the Government would promptly "inform the Government of the Netherlands that this matter has

been resolved and that the Government withdraws any request for the Government of the Netherlands to continue to restrain the AFI Europe Debt." *Id.* at ¶ 3 (the "Request Requirement"). Second, "within 15 business days of the release by the Government of the Netherlands of the AFI Europe Debt," Prevezon Holdings, Ltd. would pay the Government a settlement payment of $5,896,333.65 (the "Settlement Payment"). *Id.* at ¶ 4 (the "Release Requirement"). Third, "[u]pon the Government's receipt of the Payment, the Amended Protective Order [would] be vacated as to all Restrained Properties, the Court [would] order the Restrained Properties returned . . . , and the Action [would] be dismissed against all Defendants with prejudice." *Id.* at ¶ 11.

The Settlement was deliberately structured to require the release of the AFI Europe Debt by the Netherlands before the Settlement Payment was made. Prevezon had agreed to pay $5,896,333.65 to secure the release of more than $13 million in assets restrained by the United States or, in the case of the AFI Europe Debt, at the behest of the United States. Prevezon was not willing to risk the occurrence of a scenario in which the Netherlands would determine not to release some or all of the AFI Europe Debt and thereby effectively raise the price of the Settlement for Prevezon to potentially in excess of $9 million. Requiring the release of the AFI Europe Debt before the Settlement Payment was due eliminated that risk. In addition, the release of the AFI Europe Debt as an initial step enabled Prevezon to use that asset as it gathered the nearly $5.9 million required to make the Settlement Payment.

The Settlement was a good outcome for Prevezon. First, the Settlement resolved the case for less than half of the Government's total trial demand of $12.3 million, Sharma Decl. Ex. 2 at 3, and avoided the costs of trying an expensive case to what could well have been a hostile jury.[3]

_____

[3] In fact, the Government was later criticized for agreeing to the terms of the Settlement. *See* U.S. House Committee on the Judiciary (Democrats), July 12, 2017 Press Release, *Judiciary*

Second, the Settlement's Release Requirement provided Prevezon certainty as to the return of its assets by requiring the release of the AFI Europe Debt held by the Netherlands before payment to the United States was due. Third, the Settlement expressly stated that the Government did not allege that Prevezon had been involved in the death of Browder associate Sergei Magnitsky. And fourth, the Settlement stated that Prevezon made no admission of guilt and denied all wrongdoing relating to money laundering or the Russian Treasury Fraud. D.I. 716 at ¶¶ 6, 8.

## II.     WITH THE GOVERNMENT'S ASSISTANCE, THE NETHERLANDS IMPOSES A SEPARATE RESTRAINT ON THE AFI EUROPE DEBT

Shortly after the Settlement was executed, Prevezon began to inquire of the Government about the release of the AFI Europe Debt. It was in Prevezon's interest to see the AFI Europe Debt released expeditiously, both so that it had access to the approximately $3.62 million located in the Netherlands and so that the Settlement could progress and Prevezon could obtain the release of its remaining assets. Prevezon first reached out to the U.S. Attorney's Office for the Southern District of New York on June 15, 2017. In response, Assistant United States Attorney Paul Monteleoni told counsel for Prevezon that the Government had made the Release Request on June 1, but that the Government of the Netherlands was not likely to act on the request "before September." Sharma Decl. Ex. 2. Mr. Monteleoni did not provide any reason for the delay, but

---

*Dems Demands Answers on DOJ Settlement of Fraud Case Handled by Russian Lawyer Who Met With Trump Jr.*, https://democrats-judiciary.house.gov/news/press-releases/judiciary-dems-demand-answers-doj-settlement-fraud-case-handled-russian-lawyer; DailyKOS, *Prevezon Case Settlement by Dept of Justice: A smoking gun*?, (July 19, 2017), https://www.dailykos.com/stories/2017/7/19/1681995/-Prevezon-Case-Settlement-by-Dept-of-Justice-A-smoking-gun. Perhaps in response to that criticism, the Government now asserts that the settlement involved Prevezon paying "treble damages" for money laundering. D.I. 746 at 3:23-24. That assertion is recent invention that is contrary to the Settlement and a regrettable instance of pandering to public opinion by the Government.

Prevezon took his response at face value, understanding that a several-month wait was not unusual in the case of an international request for cooperation.

What the Government failed to tell Prevezon was that the day after this Court ordered the Settlement, William Browder filed a complaint against Prevezon with the government of the Netherlands based on the same allegations that had been settled in this case. By the time Prevezon had contacted Mr. Monteleoni in June 2017, Mr. Monteleoni was aware that the Netherlands had opened an investigation and was considering a seizure of the AFI Europe Debt. *See* Monteleoni Decl. ¶ 6 ("On or about May 24, 2017, I was informed that . . . the Netherlands had, subsequent to the Court's approval of the Settlement Agreement in this action, received a complaint from representatives of Hermitage Capital Management Ltd. regarding Prevezon . . . and was considering seizing the AFI Europe Debt in connection with its independent investigation"). Mr. Monteleoni and the Government said nothing of this to Prevezon.

Prevezon again inquired about the status of the release with Mr. Monteleoni in August. Prevezon now understands that by this time, Mr. Monteleoni was not merely aware of the Netherlands' investigation, he had spent two days meeting with law enforcement officials and providing information regarding Prevezon and filings from this case to assist with the Netherlands investigation. *See* Monteleoni Decl. ¶¶ 8-9. Despite his direct involvement with the Netherlands' investigation of Prevezon, Mr. Monteleoni's only response to inquiries from Prevezon's counsel was to state that the Netherlands "has not yet taken action" and was "unlikely" to do so "before September." Sharma Decl. Ex. 2.

On September 15, 2017, having heard nothing further from the Government, Prevezon's counsel again contacted Mr. Monteleoni to ask about the status of the AFI Europe Debt release. Sharma Decl. Ex 3. This time Prevezon sought "a copy of the request [the Government] made to

the Netherlands regarding the release of Prevezon's assets." *Id.* On September 18, Mr. Monteleoni refused to produce that request and again failed to inform Prevezon that the Government had been aware of and working with Netherlands authorities on their investigation of Prevezon for months. *Id.*

Through the summer of 2017, as Prevezon waited to implement the Settlement, the Government repeatedly failed to disclose to Prevezon that the delay in releasing the AFI Europe Debt was not routine but was instead a result of the Government of the Netherlands undertaking efforts to impose a separate restraint on the Debt. Prevezon only learned of the Netherlands investigation on October 10, 2017 when it received an email from Mr. Monteleoni, attaching correspondence from the Government of the Netherlands stating that the Netherlands had elected to impose their own seizure on the AFI Europe Debt simultaneously with the release of the United States-requested restraint on those funds. Sharma Decl. Ex. 4 at 3 ("[t]oday we will lift the restraint as requested by the U.S. authorities and seize [the AFI Europe Debt] at the same time with respect to our own Dutch investigation . . . . ").

## ARGUMENT

"Like all contracts, a settlement agreement is a contract that is interpreted according to general principles of contract law." *Prince of Peace Enterprises, Inc. v. Top Quality Food Mkt., LLC*, 760 F. Supp. 2d 384, 397 (S.D.N.Y. 2011), *adhered to on denial of reconsideration*, No. 07-cv-00349(RJH), 2011 WL 650799 (S.D.N.Y. Mar. 14, 2011) (citations omitted). Under those general principles of contract law, the Settlement's Release Requirement has not been met and payment is not currently due.

## I. THE SETTLEMENT DOES NOT REQUIRE PAYMENT AT THIS TIME

The Settlement expressly states that Prevezon's Settlement Payment to the Government is required "within 15 business days of the release by the Government of the Netherlands of the AFI

Europe Debt." D.I. 716 at ¶ 4. The AFI Europe Debt is not, and has never been, "release[d]," as the Netherlands imposed a new restraint on that asset simultaneously with lifting the restraint it had imposed at the request of the Government. Accordingly, the unambiguous terms of the Settlement have not been met, and Prevezon's Settlement Payment is not yet due.

The meaning of the term "release" in the Release Requirement can be understood from multiple sources. *First*, dictionary definitions and case law agree that "release" means "to set free from restraint, confinement, or servitude." *Second*, the Settlement's separate Request and Release Requirements make clear that the contemplated "release" was not limited to the release of the restraint requested of the Netherlands by the Government. *Third*, the economic realities of the Settlement make clear that the use of the term "release" was Prevezon's method of eliminating the risk that the AFI Europe Debt would not be released as part of the Settlement. *Fourth*, the drafting history of the Settlement makes clear that payment was not contemplated until the AFI Europe Debt was entirely released. And *fifth and finally*, contrary to the Government's contention, Prevezon's reading of the term "release" does not lead to absurd results.

A.    The Plain Meaning Of The Term "Release" Has Not Been Met

In interpreting a contract under New York law, "the intention of the parties should control, and the best evidence of intent is the contract itself." *Cont'l Ins. Co. v. Atl. Cas. Ins. Co.,* 603 F.3d 169, 180 (2d Cir. 2010) (citations omitted). The terms of a contract should be given their "plain meaning." *In re Lehman Bros. Holdings Inc.*, 761 F.3d 303, 308-09 (2d Cir. 2014). If the terms have "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion," the contract is unambiguous. *Hunt Ltd. v. Lifschultz Fast Freight, Inc.,* 889 F.2d 1274, 1277 (2d Cir. 1989) (citations omitted). "Language whose meaning is otherwise plain does not become

ambiguous merely because the parties urge different interpretations in the litigation." *Id.* An unambiguous provision of the contract should be construed without reference to extrinsic evidence. *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London,* 136 F.3d 82, 86 (2d Cir. 1998).

Under the "plain and ordinary" meaning of the word "release" in the Release Requirement, the AFI Europe Debt has not been "release[d]." As the Second Circuit has recognized, "[a] non-legal dictionary can supply the everyday, common meaning" of a contract term. *Succo v. First Reliance Standard Life Ins. Co.*, 16 F. App'x 53, 55 (2d Cir. 2001) (citing *United States v. Dauray,* 215 F.3d 257, 260 (2d Cir. 2000)). The Merriam-Webster Dictionary defines release as "to set free from restraint, confinement, or servitude." "release," *Merriam-Webster.com*, 2017, https://www.merriam-webster.com/dictionary/release (Dec. 6, 2017). Similarly, the Oxford Dictionary defines release as to "[a]llow (something) to move, act, or flow freely." "release," *English Oxford Living Dictionaries,* 2017, https://en.oxforddictionaries.com/definition/release (Dec. 6, 2017).

The AFI Europe Debt remains inaccessible to Prevezon; the AFI Europe Debt cannot move or flow freely to Prevezon, and Prevezon cannot access those funds. Moreover, this has continually been the case since the Settlement was executed, because the current restraint placed by the Netherlands was imposed simultaneously with the dissolution of the restraint the Netherlands had imposed at the request of the United States. As such, under the plain meaning of the term "release," the AFI Europe Debt has not been released.

Case law in many contexts also makes clear that "release" means "available." For example, in *Bank of Crete, S.A. v. Koskotas*, 88-cv-8412(KMW), 1988 WL 140877 (S.D.N.Y. Dec. 19, 1988), a Southern District of New York court noted, in a case regarding improperly restrained

assets, that "any funds this Court releases *will be available for any use*." *Id.* at \*5 (emphasis added); *see also Larson v. Nw. Mut. Life Ins. Co.*, 855 N.W.2d 293, 302 (Minn. 2014) (holding that documents that were withheld were "not actually released" based on three dictionary definitions of "release"); *Dailey v. State*, 807 N.W.2d 225, 228-29 (N.D. 2011) (holding a prisoner who was no longer being held on a conviction was not "released" from that conviction where he was still being held on unrelated charges); *Consumer Advocacy Grp., Inc. v. Exxon Mobil Corp.*, 128 Cal. Rptr. 2d 454, 458-59 (Cal. Ct. App. 2002) ("These definitions [of release] therefore all convey movement out of a confined space such as a container, not, as plaintiff suggests, simply movement from one point to another."); *People v. Baltzer*, 762 N.E.2d 1174, 1180 (Ill. App. Ct. 2002), *case dismissed*, 786 N.E.2d 188 (Ill. 2002) (holding that criminal defendant was not "released" when he was "permitted to leave jail . . . under the supervision and control of the sheriff," because "[t]he plain and ordinary meaning of 'release' is 'to set free from restraint, confinement, or servitude: set at liberty: let go.'").

The AFI Europe Debt is not available for use, nor has it ever been available for use. Again, not only did the Netherlands impose their independent restraint "at the same time" as the lifting of the US-requested restraint, Sharma Decl. Ex. 4 at 3, but the Government did not inform Prevezon of the Netherlands' actions until after the simultaneous "release" and "restraint" had been effected. *Id.* at 1. As such, the AFI Europe Debt was never "released."

    B.    <u>The Structure Of The Settlement Supports Prevezon's Understanding Of The Term "Release"</u>

When interpreting a contract, courts "must consider the entire contract and choose the interpretation . . . which best accords with the sense of the remainder of the contract." *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992) (citation omitted). Additionally, "the court is to consider [a contract's] '[p]articular words' not in isolation 'but in light of the obligation as a whole and the

intention of the parties manifested thereby.'" *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009). As such, in interpreting the Settlement's Release Requirement, the Court should consider the structure and other provisions of the Settlement.

The structure of the Settlement includes separate two separate requirements related to the AFI Europe Debt: *first*, the Government must "request that the Government of the Netherlands lift the restraint of the AFI Europe Debt *that had been implemented at the request of the United States*." D.I. 716 at ¶ 3 (emphasis added). *Second*, Prevezon must make its payment after "the release by the Government of the Netherlands of the AFI Europe Debt." *Id.* at ¶ 4. In the former provision, the parties specified the release of a specific restraint; in the latter, the parties did not. In other words, Prevezon's payment is not triggered merely by the release of the restraint of the AFI Europe Debt that had been implemented at the request of the United States, but only by a full and complete release of that asset. Compare *id.* ¶ 3 and ¶ 4.

Courts interpreting contracts according to New York law hold that when a term is used in different ways in the same contract, those differences must be given effect. For example, in *In re Ore Cargo, Inc.*, 544 F.2d 80 (2d Cir. 1976), the Second Circuit considered a lending contract which broadly defined a "security" as all "credits, claims, demands and any other property, rights and interests." *Id.* at 82. However, in the clause transferring a "security" to the lender, the contract specified that the only right transferred would be "the 'Security' 'of a secured party under the Uniform Commercial Code.'" *Id.* The lender argued that the transferred "security" should be understood according to its first, broader use. The Second Circuit disagreed, holding that where a contract used a term in two instances—once without limitation, and once with a limitation—the Court would "[a]pply[] the maxim, *expressio unius est exclusio alterius*" ('the expression of one is the exclusion of others') and refuse to construe the terms identically. *Id.*; *see also Hudson v.*

*I.R.S.*, No. 03-cv-172, 2004 WL 1006266, at *8 (N.D.N.Y. Mar. 25, 2004) ("The absence of such an exclusionary clause in the part of the Agreement pertaining to the Hudsons, especially in light of the fact that such an exclusionary clause is present in other portions of the Agreement, . . . indicates that it was intentionally left out with regard to the Hudsons."); *Quadrant Structured Prod. Co. v. Vertin*, 16 N.E.3d 1165, 1172 (N.Y. 2014) ("if parties to a contract omit terms—particularly, terms that are readily found in other, similar contracts—the inescapable conclusion is that the parties intended the omission").

Here, the parties first identified the release of a specific restraint of the AFI Europe Debt (which the U.S. Government would request) and then referred generally to the "release" of the Debt without any such restriction. Compare D.I. 716 at ¶ 3 and ¶ 4. The Government argues that this Court should assume that distinction is without a difference. The Government's position is contrary to the law and to common sense; where the "parties to a contract omit terms . . . the inescapable conclusion is that the parties intended the omission." *Quadrant Structured Prod.*, 23 N.Y.3d at 560. The parties' failure to mention the specific, United States-requested restraint in the Release Provision should be given effect, and the Release Provision must be construed to only require payment by Prevezon when the AFI Europe Debt is "release[d]" without limitation.

C.  The Economic Realities Of The Settlement Support Prevezon's Understanding Of The Term "Release"

The economic realities of the Settlement also support Prevezon's reading of the Release Requirement. Contracts should be examined "in light of the business purposes sought to be achieved by the parties." *Newmont Mines Ltd. v. Hanover Ins. Co.*, 784 F.2d 127, 135 (2d Cir. 1986) (interpreting "occurrence" in insurance policy in light of the policy's goal "to provide financial protection against damage to property") (citation omitted). In this case, the business purpose the parties sought to achieve is clear: a settlement of this action predicated on the return

of the Restrained Properties to Prevezon in exchange for Prevezon's payment of $5,896,333.65 to the Government.

At the time the deal was negotiated and signed, there was no concern as to the Government's ability to secure the release of the Restrained Properties within its direct control. The AFI Europe Debt, however, was not within the Government's direct control, as it was held by the Netherlands. That fact created a risk that, notwithstanding the parties' best efforts, Prevezon's payment of $5,896,333.65 would not result in the release of all of the Restrained Properties; to the extent the Netherlands failed to release some or all of the AFI Europe Debt, Prevezon could end up paying not $5.9 million but in excess of $9 million for the Settlement. The Settlement avoids that risk (and allows the AFI Europe Debt to be used in amassing the Settlement Payment) by specifying that the AFI Europe Debt must be released to Prevezon before the Settlement Payment is due. Indeed, it belies common sense to suggest that Prevezon would *not* address this risk and thus leave itself vulnerable to a scenario in which the price of the Settlement nearly doubled. Thus, when interpreted in light of this business purpose of the Settlement, it is clear that the Release Provision should be construed to require payment by Prevezon when the AFI Europe Debt is "release[d]" without limitation.

D.    Enforcing Prevezon's Understanding Of The Term "Release" Will Not Lead To Absurdity

The Government contends that Prevezon's reading of the Settlement to provide that only a full release of the AFI Europe Debt triggers Prevezon's payment obligation creates the possibility of an absurd result wherein the Netherlands forfeits the AFI Europe Debt, the payment obligation is never triggered, and this case is "a case placed into interminable stasis, with assets remaining in permanent 'pretrial' restraint." D.I. 744 at 19. As a matter of both law and fact, however, that hypothetical outcome would *not* result from Prevezon's reading of the Settlement.

Under New York law, a contract does not persist in "interminable stasis" where the inability of a condition precedent to be satisfied delays or suspends one party's obligation to perform. In that circumstance, courts allow a reasonable time for the satisfaction of the condition to occur, after which the contract may be cancelled. *See Lieberman Properties, Inc. v. Braunstein*, 134 A.D.2d 55, 60, 522 N.Y.S.2d 874, 877 (1987) (contract conditioning obligation to close property sale on regulatory approval but providing no time limit for approval to be granted does not persist indefinitely if approval is not granted; after allowing a reasonable time for approval, contract may be cancelled); *see also* RESTATEMENT (2D) OF CONTRACTS, § 225 (2017) ("Unless it has been excused, the non-occurrence of a condition discharges the duty when the condition can no longer occur."); *Vale v. Vermont Mut. Ins. Grp.*, 112 A.D.3d 1011, 1012 (N.Y. App. Div. 2013) (the "failure to satisfy the notice requirement constitutes a failure to comply with a condition precedent which, as a matter of law, vitiates the contract"); *Perna v. Desai*, 101 A.D.2d 857, 858 (N.Y. App. Div. 1984) (where "the condition precedent could be performed by either party," "[a]fter a reasonable time had elapsed and the condition remained unperformed, either party was free to rescind the contract"). Here, therefore, in the event a failure by the Netherlands to release the AFI Europe Debt unreasonably delays the triggering of Prevezon's obligation to remit the Settlement Payment, the result would be that the Settlement is vacated and the parties return to where they were before it was entered, *i.e.*, with a pending case that would be resolved either through trial or settlement.

The practicalities of this case also are such that an "interminable stasis" is not a realistic possibility in the event the Netherlands fails to release the AFI Europe Debt. As the Government points out, Prevezon has millions of dollars worth of assets under pre-trial restraint. The Government, for its part, has a pending case that remains unresolved unless and until it is tried or

dismissed. Accordingly, in the event the Netherlands does not soon release the AFI Europe Debt, Prevezon and the Government will have a common interest in bringing the case to a resolution, either via a trial or through a renegotiated settlement. An "interminable stasis" will be in nobody's interest and is, therefore, not a reasonably likely outcome under any circumstances.

The bottom line is that the parties did not reach an agreement on what happens in the event the Netherlands fails to release the AFI Europe Debt. The Settlement is simply silent on that issue. However, that silence does not compel an absurd result because the law and the practicalities are such that a failure of the Netherlands to return the AFI Europe Debt will push the parties to find an alternative way to resolve the case. Prevezon respectfully submits that the only absurd outcome on the table here is the one proposed by the Government, in which Prevezon is required both to make the nearly $6 million settlement payment for the return of its assets *and* run the risk of not recovering one of those assets that is worth $3.5 million. The notion that Prevezon would have signed on to such a deal defies common sense and should be rejected. *See Progress Bulk Carriers v. American S.S. Owners Mut. Prot. & Indem. Ass'n*, 939 F. Supp. 2d 422, 428-29 (S.D.N.Y. 2013) ("Common sense is as much a part of contract interpretation as is the dictionary or the arsenal of canons."); *Nat'l Tax Inst, Inc. v. Topnotch at Stowe Resort and Spa*, 388 F.3d 15, 19 (1st Cir. 2004) ("Agreements, especially, commercial agreements, are designed to make sense. If one reading produces a plausible result for which parties might be expected to bargain, that reading has a strong presumption in its favor as against another reading producing an unlikely result (e.g., windfall gains, conditions that cannot be satisfied, dubious incentives).") (holding that since the plaintiffs' reading of an ambiguous contract "makes no [economic] sense" given the defendant's economic interest, ambiguous contract would be read in defendant's favor).

E.     The Drafting History Of The Settlement Is Consistent With Prevezon's Understanding Of The Term "Release"[4]

The drafts of the Settlement exchanged by the parties in 2015 (when negotiations were conducted on Prevezon's behalf by prior counsel) and in 2017 are consistent with Prevezon's understanding of the term "release" in the Release Requirement. The Government's motion claims that "the drafting history conclusively shows that Prevezon agreed to bear the risk that the Netherlands would seize the AFI Europe Debt." D.I. 744 at 20. The drafting history does not support the Government's assertions, however, because the Government cannot show that any "risk" assumed by Prevezon included the risk of premature payment in the event that the Government of the Netherlands restrained the AFI Europe Debt. In fact, the parties' negotiations concerned their obligations to *secure the release*, not their obligations regarding payment in the event there was no release. The Government's attempt to elide this distinction in its motion is a clear indication that the drafting history does not support the Government's position.

In a draft settlement provided to the Government on May 10, 2017, Prevezon sought the inclusion of a provision that stated that "[s]hould the Government of the Netherlands . . . issue an order or statement setting forth its intention to continue the restraint of the AFI Europe Debt . . . the Government shall cooperate with the *in personam* Defendants and Claimants to obtain release of the Restrained Properties." Monteleoni Decl. Ex. 12 at ¶ 9 (the "Cooperation Requirement"). The Government rejected the Cooperation Requirement. Prevezon's request for the Cooperation

---

[4]     Because the Settlement is not ambiguous, the Court does not need to consider extrinsic evidence of the parties' drafting history to determine the meaning of the Release Requirement. *See Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002) ("Extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous") (citation omitted). However, if the Court determines that the Settlement is ambiguous, the extrinsic evidence supports Prevezon's understanding of the Release Requirement as requiring that the AFI Europe Debt be entirely released.

Requirement, however, was consistent with Prevezon's understanding that its payment would not be due until the release of the AFI Europe Debt. If successful, the Government's cooperation in obtaining the release of the AFI Europe Debt would have allowed the Settlement to proceed, which was in Prevezon's interest. As such, contrary to the Government's claims, Prevezon's request for the Cooperation Requirement does not support the Government's reading of the Release Requirement.

Moreover, Prevezon's decision to accept the Settlement *without* the Cooperation Requirement is similarly consistent with Prevezon's understanding of the Release Requirement. The protection offered by the Release Requirement—that Prevezon would not be required to pay under the Settlement until the AFI Europe Debt was released—was a safeguard that limited the impact of the Government's refusal to agree to the Cooperation Requirement. Because the Settlement included the Release Requirement, what Prevezon received in the Settlement was sufficient to protect it against the risk of double payment and the risk of interference by the Netherlands.

## II.     IF THE SETTLEMENT IS AMBIGUOUS, WHICH IT IS NOT, THERE WAS NO MEETING OF THE MINDS

As discussed above, the Settlement is unambiguous and does not require payment until the Release Requirement is met by the release of the AFI Europe Debt. However, if the Settlement's Release Requirement were deemed to be ambiguous, the result would be that no contract was formed, as the parties did not have a meeting of the minds on an important payment term.

"The fundamental basis of a valid, enforceable contract is a meeting of the minds of the parties, and, if there is no meeting of the minds on all essential terms, there is no contract." *Benicorp Ins. Co. v. Nat'l Med. Health Card Sys., Inc.*, 447 F. Supp. 2d 329, 337 (S.D.N.Y. 2006). Payment terms are considered essential or material. 1 WILLISTON ON CONTRACTS, §§ 4.18–4.24

(Lord 4th ed. 1990) (contracts must be definite as to essential terms, covering subject matter, price, payment terms, duration, quantity, and work to be performed). "If the Court finds substantial ambiguity regarding whether both parties have mutually assented to all material terms, then the Court can neither find, nor enforce, a contract." *Benicorp*, 447 F. Supp. 2d at 337 (*citing Schurr v. Austin Galleries of Illinois, Inc*., 719 F.2d 571, 576 (2d Cir. 1983)). Ambiguity exists when "the terms of the contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Law Debenture Trust Co. of New York v. Maverick Tube Corp*., 595 F.3d 458, 466 (2d Cir. 2010) (internal quotation marks omitted).

"In construing settlement agreements, if ambiguities are created by the contract's language, then the court may look to the parties' statements and submissions to resolve the ambiguity by determining the parties' understandings of the ambiguous terms. . . . The burden of establishing that the parties reached a meeting of the minds is on the party seeking to enforce the settlement." *Prince of Peace Enterprises*, 760 F. Supp. 2d at 397-98 (citations omitted).

In this case, Prevezon understood that payment would not be required until the AFI Europe Debt was completely released. Prevezon agreed to a Settlement which contained an explicit requirement of a "release," without limitation. *See supra*, Section I(A). Prevezon structured the Settlement to achieve that outcome, so as to eliminate the risk that it would not secure a full release of its Restrained Properties by paying the Settlement Payment. *See supra*, Sections I(B) and (C). Prevezon's request for additional protections in the event the Netherlands restrained the AFI Europe Debt was consistent with, and an effort to supplement, the protections provided by the Release Requirement. *See supra*, Section I(D). As such, Prevezon's statements and submissions

make clear that it understood that its payment would not be due under the Settlement while the AFI Europe Debt remained subject to restraint.

The Government asserts that it understood the Settlement differently and that the Government "unmistakeabl[y]" understood that payment would be due upon the release by the Government of the Netherlands of the *US-requested* restraint. D.I. 744 at 20. To the extent that this Court finds that the Release Requirement is ambiguous and credits the Government's assertions regarding its intent, the parties did not have a meeting of the minds regarding the Release Requirement. As the Release Requirement concerns payment, it is an essential term of the Settlement—and "[i]f there is no meeting of the minds on all essential terms, there is no contract." *Dreyfuss v. Etelecare Glob. Sols.-U.S. Inc.*, 349 F. App'x 551, 554 (2d Cir. 2009) (citation omitted). As such, to the extent this Court finds that the parties had no agreement regarding the Release Requirement, the Settlement must be vacated.

## III. PREVEZON SEEKS DISCOVERY INTO THE GOVERNMENT'S POSSIBLE BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

The Court should afford Prevezon discovery into a potential counterclaim for breach of the covenant of good faith and fair dealing. The facts known to date strongly suggest that Government acted to frustrate Prevezon's legitimate expectations regarding the Settlement, in violation of the covenant of good faith and fair dealing implied in all contracts under New York law.

Under New York law, all contracts include an implied covenant of good faith and fair dealing. *Summit Health, Inc. v. APS Healthcare Bethesda, Inc*., 993 F. Supp. 2d 379, 399 (S.D.N.Y. 2014). This includes contracts with the Government. *Neal & Co. v. United States*, 36 Fed. Cl. 600, 631 (1996), *aff'd*, 121 F.3d 683 (Fed. Cir. 1997) ("Every contract, including those in which the Government is a party, contains an implied covenant of good faith and fair dealing.") (citation omitted); *State of New York v. United Parcel Serv., Inc.*, 160 F. Supp. 3d 629, 654 (S.D.N.Y.

2016) ("governmental actors" are "subject to basic requirements of contract law" including "the implied covenant of good faith and fair dealing").

The covenant of good faith and fair dealing is breached when one party's actions "would deprive the other party of receiving the benefits under their agreement." *Summit Health, Inc.*, 993 F. Supp. 2d at 399 (citation omitted). Good faith encompasses "any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *Dweck Law Firm, L.L.P. v. Mann*, 340 F. Supp. 2d 353, 358 (S.D.N.Y. 2004) (citation omitted); *see also RUS, Inc. v. Bay Indus., Inc.*, 322 F. Supp. 2d 302, 315 (S.D.N.Y. 2003) ("To breach the implied covenant, the party must act in a way that is inconsistent with the justified expectations of the other party, or act for reasons other than the ones it discloses."). "The implied covenant of good faith and fair dealing prohibits contracting parties from intentionally doing anything to prevent the other party from carrying out his part of the agreement." *Dweck*, 340 F. Supp. 2d at 358. Additionally, "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *AIM Int'l Trading, L.L.C. v. Valcuine S.p.A.*, No. 02-cv-1363(PKL), 2003 WL 21203503, at *9 (S.D.N.Y. May 22, 2003) (citation omitted).

Prevezon had a reasonable expectation that the Government would not act in another forum to frustrate the "fruits" it was to receive from the Settlement, *i.e.*, the full recovery of the Restrained Properties. *See* D.I. 716 at ¶ 2. Instead, after the Settlement was signed, the Government actively worked with the Government of the Netherlands to further efforts by that country—initiated by the instigator of this action, William Browder—to seize a material portion of the assets that the Government had agreed would be released to Prevezon under the terms of the Settlement. Mr. Monteleoni met with investigators from the Netherlands for *two days* for that *precise purpose*. *See* Monteleoni Decl. ¶¶ 8-9. Indeed, Mr. Monteleoni admits that, at the time he aided the

Netherlands authorities, he understood that the Netherlands was considering a seizure of the AFI Europe Debt. *See id.* ¶¶ 4, 6, 8, 9. The Government contends that Prevezon understood there was a risk that the Netherlands would seize the AFI Europe Debt, but even it does not have the temerity to suggest that Prevezon had any reason to believe that the Government—after concluding a Settlement that provided for the release of *all* of the assets restrained in connection with this case (D.I. 716 at ¶ 2)—would then actively work with the Netherlands to bring about such a seizure.

It is hard to conjure a more blatant undermining of Prevezon's ability to receive the benefit of this bargain than what the Government did here. Defendants request discovery regarding the Government's apparent breach of the covenant of good faith and fair dealing, as this may give rise to a potential offset to any sums due the Government. *See Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank*, 392 F.3d 520, 525 (2d Cir. 2004) ("One who violates his contract with another is liable for all the direct and proximate damages which result from the violation.") (citations omitted); *see also Vista Outdoor Inc. v. Reeves Family Tr.*, 234 F. Supp. 3d 558, 563, 574 (S.D.N.Y. 2017) (ordering defendants to repay damages to plaintiff incurred by breach of good faith and fair dealing). Defendants seek, *inter alia*, materials referred to in the Government's correspondence and papers, which may show whether the Government was acting in bad faith. These materials include a copy of the complaint filed by William Browder and Hermitage Capital Management in the Netherlands; all correspondence regarding the Settlement or the Netherlands investigation between the Government, Browder, and Hermitage Capital Management; and all correspondence between Netherlands officials and the Government, including regarding the Government's request pursuant to the Request Requirement and the meeting held between the Government and Netherlands authorities on July 19 and 20, 2017. This material is essential to understanding

whether the Government "d[id] anything which [had] the effect of destroying or injuring the right of [Prevezon] to receive the fruits of the contract." *AIM Int'l Trading*, 2003 WL 21203503, at *9.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Government's motion to enforce the Settlement be denied and that Defendants be permitted discovery into a possible counterclaim for violations of the covenant of good faith and fair dealing.

Dated: December 6, 2017
      New York, New York

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By:    */s/ Faith Gay*
      Faith E. Gay
      Kevin S. Reed
      Adam M. Abensohn
      Renita Sharma
      51 Madison Avenue, 22nd Floor
      New York, New York 10010
      Tel. (212) 849-7000
      Fax (212) 849-7100
      faithgay@quinnemanuel.com
      kevinreed@quinnemanuel.com
      adamabensohn@quinnemanuel.com
      renitasharma@quinnemanuel.com

      *Attorneys for Defendants*