HCEVPREA

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4                   Plaintiff,

5            v.                              13 CV 6326 (WHP)

6   PREVEZON HOLDINGS, ET AL,

7                   Defendants.              ARGUMENT

8   ------------------------------x
                                             New York, N.Y.
9                                            December 14, 2017
                                             11:36 a.m.
10
    Before:
11
                    HON. WILLIAM H. PAULEY III,
12
                                             District Judge
13
                            APPEARANCES
14  JOON H. KIM,
         Acting United States Attorney for the
15       Southern District of New York
    PAUL MONTELEONI
16       Assistant United States Attorney

17  QUINN EMANUEL URQUHART & SULLIVAN
         Attorneys for Prevezon Defendants
18  BY:  FAITH GAY
         RENITA SHARMA
19

20  ALSO PRESENT VIA PHONE:  DENIS KATSYV
                             NATALIA VESELNITSKAYA
21

22

23

24

25

2

HCEVPREA

```
1           (Case called)
2           THE COURT:  This is oral argument on the government's
3   motion to enforce the settlement agreement.
4           Do you want to be heard, Mr. Monteleoni?
5           MR. MONTELEONI:  Yes, your Honor.  Thank you.
6           May I use the podium?
7           THE COURT:  You may.
8           MR. MONTELEONI:  Thank you, your Honor.
9           The basis for the government's motion is that the
10  contractual term release in paragraph 4 of the settlement
11  agreement took place on October 10th, when the Netherlands
12  released the AFI Europe debt owed to Prevezon that they had
13  been holding at our request from the restraint imposed in this
14  case; and then, independently, simultaneously, not at our
15  request, not with our encouragement, seized it in connection
16  with their own investigation.
17          The question is whether that set of actions included a
18  release as paragraph 4 defines it.  One thing that this motion
19  is not about is the dictionary definition of the word
20  "release."  The government and Prevezon are both using
21  "release" to mean the removal of a restraint.  It's really
22  about the context.  Which restraint are we talking about?  Are
23  we talking about the restraint from this case or all
24  restraints?
25          THE COURT:  What does the process of unfreezing the
```

HCEVPREA

1    AFI Europe debt look like?

2              MR. MONTELEONI:  The understanding -- I wasn't

3    there -- is that the way that it was frozen was that the owner

4    of the debt, the debtor, was advised by Dutch law enforcement

5    that this was restrained; and that advice that happened on

6    January 22nd, 2014, from Dutch law enforcement to the debtor,

7    certainly prevented the debtor from actually paying the debt

8    because they were told by local law enforcement that they could

9    not.  That advice was made pursuant to our request based on the

10   protective order in the case.  The original protective order

11   sort of carried in place when the protective order was narrowed

12   to drop other properties, but it never dropped that debt.  So

13   that's been constant through the case.

14             My understanding is that the release from this debt

15   was effected in the exact same way in reverse.  They were

16   advised that that restraint was no longer in force.  I assume

17   for the new seizure that they were also advised that due to the

18   Netherlands investigation they couldn't continue to pay the

19   debt.  So it is sort of an official communication by Dutch law

20   enforcement to the debtor for both the restraint and the

21   release and -- I assume, but I'm not sure -- the new restraint.

22             THE COURT:  How can something be simultaneously seized

23   as opposed to seized immediately after lifting the prior

24   restraint?

25             MR. MONTELEONI:  The times that they gave were just 1

HCEVPREA

p.m. Netherlands time, so I don't know if they gave both orders
down to the minute.  As a practical matter, even if it was like
later that day, there wasn't going to be time for the debtor to
actually pay.  I don't know about that.

        But what I would say is that there is -- it's not
uncommon in the law -- even if it doesn't happen that often
sort of in lay life when you're walking down the street -- for
someone to be under two forms of restraints simultaneously, and
a release can be effected without that person ever moving.  If
someone is held in a state facility for federal charges or for
federal immigration purposes, and then that federal restraint
is released, they are still going to be held by the state; but
it counts as a release for triggering all kinds of time periods
for the new authorities, for relinquishing the responsibility
of the original authorities for what happens after that.  It's
really it's not something that we encounter day-to-day, but in
the law it's something that is not really that anomalous.

        Again, we are looking not at the meaning of the word,
but at the context in the settlement agreement.  Are we talking
about this particular restraint, the only restraint that then
existed and the only restraint that the government was
obligated to communicate to the Netherlands about at all, or
are we talking about that restraint and then any other
restraint that might develop in the future subsequent to the
signing of this agreement.

HCEVPREA

1          So to look at the context, the most basic hornbook way

2     of figuring out the context of a term in a settlement

3     agreement, is to see where else it appears in the settlement

4     agreement.  And there's one category of the word "release" that

5     just applies to claims; we don't think that that's really very

6     relevant.  If it was, it would probably support our point; but

7     it probably just doesn't matter at all, so we put that aside.

8     We look at the term "release" as it applies to assets.

9          So the first instance is on paragraph 2 where it says:

10     The United States will release the restrained properties.

11     That's talking about the overall purposes of the agreement.

12          So that right there means that we're talking about

13     things that are in the United States's control; we are not

14     promising on behalf of someone else that they will release it

15     from an independent restraint; this is sort of necessarily

16     going to be the actions of the parties, which is, of course,

17     consistent with the background understandings that lawyers have

18     to agreements, that they bind the signatories and the parties

19     in privity with the signatories.  They are not going to bind

20     some sovereign nation.

21          So that's paragraph 2, talking about all restrained

22     properties.

23          Then paragraph 3, talking about the release of the AFI

24     Europe debt, is a materially -- almost identical -- phrase to

25     paragraph 4, the release by the government in the Netherlands

HCEVPREA

1    of the AFI Europe debt.

2            But in paragraph 3, that phrase, "the release of the

3    AFI Europe debt," is very important in context because

4    paragraph 3 is two sentences.  The first sentence says what the

5    government has to inform the government in the Netherlands,

6    that the matter is settled; that we withdraw their request to

7    restrain it; and that we request that they lift the restraint

8    that had been imposed at our request.  So the requests that we

9    have to send out is very clearly, very explicitly limited to

10   this one restraint.

11           Then the second sentence, The amended protective order

12   shall be deemed modified to allow the release of AFI Europe

13   debt, doesn't by itself have words of limitation, but by its

14   placement, it's clearly related to the release that was just

15   requested, because it is the only other sentence in the

16   paragraph and it implements -- it allows -- the Dutch to do

17   that release without running afoul of a U.S. court order.  We

18   explain, we devoted like two pages in our brief to saying why

19   we think paragraph 3's release is, by its context, even without

20   explicit words, limited to the restraint in this case.

21           Prevezon does not engage with that argument at all.

22   They don't have any argument that they put forward to the Court

23   in their opposition to why they think paragraph 3's release of

24   the AFI Europe debt expands to anything else.  There's no way

25   around it because we are just talking about what you modify the

7

HCEVPREA

1   amended protective order to accomplish.  And the amended

2   protective order comes from this case.

3           So I think that the first two uses of the word

4   "release" in the settlement agreement are very clearly talking

5   about the narrow sense of the release that the government is

6   requesting, the release that's tied to this case.

7           So then what other use of the word release are there

8   in the settlement agreement?  There's just one; there's just

9   paragraph 4.  That's the last time that the word "release" is

10  applied to assets in the agreement.  It just follows paragraph

11  3, where we're talking about a release that's tied to the

12  restraint in this case, and it uses almost identical language.

13          So I think that the standard, hornbook, black-letter

14  use of "release" in paragraph 2 should be consistent with

15  paragraph 3, should be consistent with paragraph 4, unless

16  there's some countervailing reason why they can't be.  Here I

17  think they clearly can be.

18          And then there's a final clue that really confirms

19  that when we are using "release," we are talking about the

20  specific requested release related to this case, which is that

21  paragraph 11, talking about after the release happens, after

22  the payment happens, then the remainder of the settlement

23  agreement has to be essentially discharged.  One of the things

24  that happens there is that the court shall order the restrained

25  properties returned to the claimants.  So "return" obviously

HCEVPREA

means this gets to Prevezon's hands in some way.  We think that
that contrast -- "release" does not mean that it gets to
Prevezon's hands by its definition and by context it doesn't.
That contrasts with "return," which does have to get to
Prevezon's hands.

So the government's view is "return" means return
every time it happens in the agreement; and "release," every
time it occurs in the agreement, means the specific release
that is requested here, which is the release related to this
case.  Prevezon, they don't dispute that in paragraph 2 we are
just talking about release by the U.S.; they don't dispute that
in paragraph 3 we are just talking about release related to
this case; but they say in paragraph 4 "release," same word,
shouldn't mean the same thing as paragraph 2 or 3, "release"
should mean return, the same thing as in paragraph 11.  They
want the word "release" in paragraph 4 to be construed
different from how it's in paragraph 2 or 3, and the same as
the different word "return."

So that's really the textual argument, which is we are
looking at context using the ordinary tools of contractual
construction.  We interpret the same words the same and
different words different unless there's some reason you can't.
Here everything hangs together; everything makes sense; no
weird limbo states are created if you just interpret "release"
consistently in 2, 3, and 4, and differently from "return" in

HCEVPREA

1    11.

2          Now, if that alone wasn't enough to make this meaning

3    unambiguous, I think that the drafting history here makes it

4    crystal clear, because this is not a case where this situation

5    was unanticipated, had never been thought of by the parties.

6    There actually were provisions in drafts in 2015 and in 2017,

7    that spoke to this exact situation.  They say if the government

8    of the Netherlands should issue an order or statement

9    indicating its intent to continue their restraint of this debt,

10   they are talking about exactly what happens here.

11         There's two kinds of provisions:

12         One Prevezon had been requesting from us which we

13   never agreed to, which sort of obligated the government to take

14   some responsibility for the actions of the Netherlands by

15   either saying that the government would obtain it, as if we had

16   control of it, or that we would cooperate with them in getting

17   it out, and Prevezon saying, Well, you can't really tell from

18   the removal of that cooperation language anything about what

19   happens with respect to their obligation to pay.

20         But there's another set of provisions -- provisions

21   that the government offered and provisions that Prevezon

22   offered -- that were also deleted that Prevezon does not

23   address at all in their brief.  Those provisions say that in

24   this event, if the Netherlands seizes the money, if they can't

25   get it, then they can cancel the agreement, right; they can

HCEVPREA

1    cancel the agreement, we'll set a trial date.  It's bilateral;

2    both sides could cancel the agreement, but this was at

3    Prevezon's request; they were the people who wanted to do it,

4    we just asked for our own ability to cancel it so they couldn't

5    just sort of hold the case in stasis.

6         So that provision was in there.  It was in there in

7    2015; it was in there when Michael Hess, their first separate

8    settlement counsel in 2017, asked for us to send the previous

9    offer back to them.

10        We sent them another copy of that offer; it had this

11   paragraph, paragraph 12, which had exactly that language, which

12   would have meant if this precise situation happens, Prevezon

13   can get out of the agreement without paying.

14        They then came back with various types of cooperation

15   language in that event.  When we finally decided to make an

16   offer on the eve of trial, we entirely stripped out that

17   provision.

18        If you look at the portion, the red line comparison,

19   in my declaration, this page that I cite to, page 17, shows

20   deleted paragraph 12.  You can see there's this like

21   strike-through of the language that would precisely allow

22   Prevezon to get out without paying if this precise situation

23   happens.

24        So if there were ambiguities in the contractual text

25   or structure, it's pretty hard to imagine a clearer piece of

HCEVPREA

drafting history.  Not for nothing, Prevezon just doesn't even

respond to this.  They claim when they are analyzing the

drafting history that the parties' negotiations concerned their

obligations to secure the release, not their obligations

regarding payment in the event there was no release.  That's

not accurate.

          The cancellation provision, which is -- again, we can

go see page 17, strike-through from that paragraph would have

precisely allowed them to get out without paying in this

situation.

          In 2017, we weren't willing to allow that anymore; we

thought that we should have a final agreement that isn't going

to have a possible rip cord to void it, and we stripped that

out and they signed it.  So we think that whether by just

talking about their interpretation or claiming that there's no

meeting of the minds, we really think that they can't just

insert back in a term that we specifically struck through and

deleted that basically they signed this deal, they agreed to

bear the risk of something that neither of us could control,

which is what the government in the Netherlands would do, and

what we bargained for is that they would still make their

payment if this happened.

          One thing I should point out about their claim, Well,

there was no meeting of the minds, is this is not a situation

where neither side had any reason to know about the other

side's meaning.  This is not like we say we're going to send

you grain on the ship Peerless, we sign the contract, but

there's two ships called Peerless; no one even knew about the

other Peerless, thinking about the other Peerless ship.  We had

a provision about exactly what would happen in this exact

situation and it got deleted.  They agreed to it with that

deletion.

        They also sort of say, Well, this is crazy.  This

wouldn't be commonsensical that we would agree to it in these

circumstances, because it's not good enough for us.

        Look, they agreed to provisions that they didn't

really like because obviously there's a benefit to both sides

in avoiding trial.

        In 2015, we gave them a much steeper discount.  They

could have gotten out of the case in 2015, before discovery, by

paying $2 million; but that wasn't to their liking.  And on the

eve of trial, we said $6 million and no protections in this

instance.  They swallowed the $6 million and they swallowed the

no protections, because sometimes it's in a party's interest to

sign an agreement that assigns them some level of risk because

that averts the much greater level of risk at trial.

        So that's why we believe the contract -- if the

contract was just the word "release" standing alone, that would

be ambiguous.  But taken as a whole, the contract is not

ambiguous.  As clarified by the drafting history, it's really,

HCEVPREA

1  really not ambiguous.  So we think that the deal was struck;

2  the deal should be enforced.

3          We also think that they are not entitled to discovery.

4  I didn't plan to add anything to what's in my papers, unless

5  you have any questions about that.

6          THE COURT:  All right.  Thank you, Mr. Monteleoni.

7          Ms. Gay?

8          MS. GAY:  Thank you, your Honor.

9          Thanks for seeing us this morning, verging in the

10 afternoon.

11         Your Honor, we are not here trying to get out of the

12 agreement.  I should add parenthetically, I heard from Director

13 Freeh this week.  He's been traveling overseas.  We did not

14 submit an affidavit from him.  But he is more than willing to

15 talk to the Court if the Court is interested or for us to do

16 whatever we need to do.  He's overseas another couple of days;

17 he'll be back early next week.  If we finally need that, we're

18 happy to present his views which are, very briefly, in accord

19 with ours.

20         He was involved in 2017; he thinks 2015 had nothing to

21 do with it.  He also agrees that the language that we are

22 talking about being stripped out was not something that was

23 presented to us and we rejected it.  The agreement we sent over

24 never had the language in it in 2017.

25         But more to the point, I think what was really focused

HCEVPREA

on by Director Freeh and by the government -- I wasn't there

and so I'm not going to dwell on this for long -- is I think

both sides bore some pain in getting to this settlement.  Both

sides have now said many times they think it's a good deal for

them.  I think both sides would like to keep it if they can.

It was extremely important to our client that what we

stated in this settlement was the amount; that they had nothing

to do with Magnitsky's death; that this was not any kind of

admission on their part, so there's a lot of language in there

about that from paragraphs 5 on.  I don't think we need to

rehearse that.  But that's also something that Director Freeh

can address.

Putting that aside, the contract is the contract.  If

there's a suggestion that we are not addressing paragraphs that

went before, it is simply because the language that governs our

conduct, the government's conduct, and then the Netherlands'

conduct, we think, is very much set out here.

In terms of, again, what went back and forth in 2017,

the language that we are talking about is not language that we

submitted in our draft.  What we submitted was what we

eventually signed.  There was definitely wordsmithing.  Most of

the wordsmithing, your Honor, was around the Magnitsky act and

the import to the client, given all that was going on -- who

knew at the time how much was going to go on -- that they were

not admitting to any guilt here.

1          With respect to these provisions though, I

2     understand -- and if I am misapprehending this, I am sure

3     Mr. Monteleoni will say -- that what we are arguing about is

4     not that there should be a release, but, one, what the scope of

5     the release was, and whether a release happened.  So let me

6     first address those and then I'll get to the language a bit.

7          Your Honor, I think you have a copy of the letter from

8     the Dutch.  Should I hand one up?  Would that be helpful?

9          THE COURT:  If you've got one to hand up, that would

10     be fine.

11          MS. GAY:  Your Honor, it's in the record in our reply

12     papers.

13          THE COURT:  I didn't bring it with me onto the bench.

14          MS. GAY:  Your Honor, what I've handed up is the cover

15     transmittal from the government, from Mr. Monteleoni.  He's

16     already made reference to that, the 1 p.m. simultaneous

17     actions.  And then what I've given attached to that are the two

18     pages that came to us by email from Mr. Monteleoni.  I make

19     reference to the second page, the last full paragraph before

20     "best regards."

21          In the words of the Dutch prosecutor, today we will

22     lift the restraint, as requested by the U.S. authorities, and

23     seize it at the same time.  There is no suggestion in here of

24     release of any sort, whether it's our release, which is release

25     totally of the asset, or release as the government defines it.

HCEVPREA

1   It's simply a changing of the guards, so to speak.

2           In regard to that, if we look carefully at the

3   paragraphs that have been -- I hope that your Honor hasn't

4   memorized them, but I think probably Mr. Monteleoni and I have,

5   which are paragraphs 3 and 4.  I just call to the Court's

6   attention that paragraph 3 states what the government's

7   obligations are here, our government, our United States

8   Government.

9           It says they are obligated to request the government

10  of the Netherlands to continue -- I'm sorry.  The government

11  withdraws its request for the government of the Netherlands to

12  continue to restrain the AFI Europe debt, and shall request

13  that the government of the Netherlands lift the restraint.

14          And then it says that our government's amended

15  protective order, our government's amended protective order,

16  shall be deemed modified concerning the release of this debt.

17  These are our obligations.

18          In terms of the use of the word "release," we are

19  talking here about what our government is to do.  As far as I

20  can tell, they are going to amend the protective order to say

21  this asset that they reached out and asked the Netherlands to

22  restrain can be exempted from the protective order, and that

23  they are going to ask the government to lift the restraint.

24          In paragraph 4, we are talking about the Netherlands

25  obligations in which it says they are obligated to release --

HCEVPREA

1    that the payment shall be made within 15 days of the release by

2    the government of the Netherlands of the AFI Europe debt and

3    shall be made and goes on and on.  This deals with an entirely

4    separate obligation by the Netherlands.  It's not simply that a

5    restraint be lifted; they are obligated to release the funds.

6    The release never happened even for a nanosecond.

7              THE COURT:  How can an obligation be imposed on the

8    Netherlands which was not a party to this agreement?

9              MS. GAY:  Your Honor, I think that is a risk our

10   government took.  As the Court will recall and one of the

11   reasons we have politely, but, nevertheless, pressed our

12   bad-faith argument here, is that this asset was something that

13   we -- our government -- I say "we," using the United States, my

14   United States, put into Netherlands' hands and said, Please

15   restrain this asset.  And then we -- at the same time, we, our

16   United States Government, asked them to release it or lift the

17   restraint.  We were actively helping them keep it and not

18   telling us, etc.  I think that, of course, undercuts what our

19   government's obligation was to do.

20             THE COURT:  Isn't that somewhat speculative when you

21   say that we were actively helping the government of the

22   Netherlands keep it?

23             MS. GAY:  Well, you're right, your Honor, I have no

24   ability to do anything but speculate somewhat.  I know that the

25   government of the Netherlands told our government very early on

HCEVPREA

1    after the settlement was entered into, as this letter

2    indicates, if the Court wants to look at it again, on the first

3    page, the government of the Netherlands outlined what it had

4    done prior with our government's knowledge, that it held on to

5    the request; that it was investigating, etc.

6          As I can only -- I wouldn't say speculate.  As I

7    summarize the records that the government has -- our government

8    has provided us here, your Honor, when they reached out to say

9    please lift this restraint, the Netherlands told them they were

10   doing other things.  Our government didn't say, Look, we have

11   an agreement where we have a good-faith obligation to ask you

12   to release this; we have a settlement agreement here.  Instead

13   there was a proceeding -- and we can't -- beyond what I'm

14   saying to you, Judge, is opaque to me because we haven't seen

15   the correspondence; we've asked for it.  We'd like to get it

16   still in terms of our defense to this.

17         There's no suggestion whatsoever that our government

18   said, Look, we made a deal that these assets that we asked you

19   to hold, that you would release.  And instead there seems to

20   have been just cooperation which was not revealed to us until

21   after the fact.  It frustrates the whole meaning of this

22   paragraph 4, which says that they are -- it doesn't say they

23   have to release it; it says there will be no payment due until

24   it's released.  So I don't think that we are binding -- either

25   side was binding, but we are saying there is a condition

1   precedent to the date of our payment here.

2          Again, keep in mind, your Honor, our assets are still

3   frozen.  One of the reasons we can't press any harder, let's

4   just blow this up and have a trial in January or February, is

5   because their assets are frozen.  And this was the conduit to

6   payment.

7          THE COURT:  Right.

8          But what about the government's suggestion in a

9   footnote in its brief that it would entertain an amendment of

10  the parties' agreement to permit Prevezon to make the payment

11  to the government from assets that have been frozen here other

12  than the AFI Europe debt?

13         MS. GAY:  Your Honor, I'm glad you mentioned that.  We

14  appreciated the government included that in the footnote.

15         We reached out to the government and made a proposal

16  that three-quarters of the current amount due be pulled from

17  those assets as they are released in the U.S.; and that because

18  we don't think we were the ones who engaged in risky behavior

19  here, we think our U.S. Government did by not fulfilling the

20  essence of what they were obligated to do in paragraph 3, you

21  work with the Dutch government, this is an asset you asked them

22  to restrain, you work with it to get the other 25 percent.  We

23  thought that was a perfectly reasonable thing to do,

24  particularly because we feel that we are not the people trying

25  to explode the agreement.  My client wants his assets back and

HCEVPREA

1    his life to go on.  We are not the ones coming here today and

2    saying, Unless there's no meeting of the minds -- and maybe

3    that's what has to happen -- but we'd like and I think the

4    government would like to preserve this deal.  But we were not

5    the ones who frustrated the loosening up of this asset first

6    restrained by our government, first requested that it be

7    restrained by our government, in which the whole pivoting of

8    payment is based.

9            And so, yes, we have reached out and tried to find

10   what we thought was an accommodation.  It frankly puts a lot of

11   the burden, a lot of the burden, on us, when we don't think we

12   were the wrongdoer here.

13           We are happy to keep talking about that if the Court

14   wants to send us to a magistrate or wherever, because I know my

15   client would like to get his assets unrestrained so he can go

16   on with his life.

17           But, your Honor, there is a serious question of good

18   or bad faith here.

19           THE COURT:  Before you get to that, even if the

20   Kingdom of the Netherlands had not simultaneously restrained

21   the debt, wasn't it still incumbent upon your client to enforce

22   the debt and to do so in the Netherlands?

23           MS. GAY:  Your Honor, I'm not following you.

24           THE COURT:  It's a debt, right?  They restrained a

25   debt.

1           MS. GAY:  Essentially a receivable or something like

2      that.

3           THE COURT:  Right.

4           So in order to get that debt, you might have to take

5      enforcement action, wouldn't you?

6           MS. GAY:  Well, your Honor, as far as I know, our

7      client followed the advice of their counsel in Europe

8      assiduously.  The feeling was that nothing could be done on

9      that until this restraint that our government had asked the

10     Dutch to effectuate was lifted.  Also, it was assumed that

11     there was going to be a release of that here.

12          Again, given the allegations in this case and given

13     the allegations since this case was resolved swirling around

14     our counsel, among others, no one asked me about this, but I

15     would have been adamant that nothing be done until there was

16     movement here.

17          THE COURT:  What's the extent of the U.S. Government's

18     obligation to keep the debt released?  In other words, let's

19     assume that when Mr. Monteleoni sent his letter over there, the

20     government in the Netherlands lifted the restraint, the U.S.

21     restraint.  And then two months later, someone, whether it's

22     the government of the Netherlands or some other party, sought

23     to impose a restraint.  Would that constitute a violation?  Was

24     the U.S. Government required to ensure that that debt was

25     released in perpetuity?

22

HCEVPREA

1          MS. GAY:  Well, your Honor, I think paragraph 3 fairly

2     lays out the U.S. Government's obligation.  And paragraph 4

3     lays out a condition precedent to the payment date.

4          In terms of what the U.S. was obligated to do, I would

5     say two things:  One, paragraph 3 just says that they must

6     request that the asset they asked the Dutch to tie up, there's

7     no longer a need to tie it up, number one.

8          And number two, the U.S. has an obligation, as does

9     any party to a civil contract, particularly an important

10    contract such as a government contract, to attempt to not block

11    the effectuation of the agreement.

12         So, for example, when it was learned that there would

13    be -- I think it's very risky behavior by the U.S. Government

14    when it was learned that possibly this was going to be blocked

15    up again, it was incumbent on the U.S. either to tell us that

16    there was a problem with the effectuation of the intent of this

17    contract or to say to the Dutch, We need this release because

18    we made a deal for X number of dollars with the defendant here.

19    That would be, I think -- every party under the law in the

20    cases we cite in our brief has a duty to try to effectuate the

21    intent of the contract.  Even if we quibble about the breadth

22    of the release, it is clear that the intention is that this

23    money would be -- this debt would be used, whether it was for

24    money, collateral, whatever the state of the value here, would

25    be usable by our client to make payment and then get everything

1   released to go on with his life.

2          So, yes, I think they had some obligations that were

3   clearly -- they don't have to commit a crime to have a breach

4   of their duty of good faith in effectuating a contract; but

5   they do have a duty not to impede it.  We didn't know about

6   anything.  There's no suggestion here that there was a law

7   enforcement reason that we should know.  No suggestion.  If

8   there is some proof of that, I would certainly invite the Court

9   to look at that carefully *in camera*, because I haven't seen an

10  iota -- even a hint of that so far.

11         I think the right thing to do would be to say, Look,

12  we've got a problem here.  We want our money and you want your

13  assets.  This asset that is the center of this agreement on

14  which the dating of payment is conditioned upon its release is

15  going to be potentially encumbered.  Let's talk about it.  That

16  was months ago.  Our client is as harmed by this, arguably

17  more, than the government is.

18         So in terms of what we would seek in terms as you've

19  intimated on being able to prove to talk about something beyond

20  speculation, we think we have more than speculation in what

21  we've cited in our papers and our claim of bad faith, but

22  certainly we'd be entitled to some discovery here, either we'd

23  see it or you would see it, as to what our government's work

24  with the Netherlands was during the pendency of this already

25  executed settlement agreement.

HCEVPREA

1          There's no question, as I read this contract, your

2     Honor, that there was an intention and an understanding by my

3     client, even though I wasn't settlement counsel, that this debt

4     would be released before payment was due.

5          And I just want to be super clear in case the

6     government is misunderstanding me.  We are not looking to do

7     what those old drafts did, which was to give an escape clause

8     if something like this happened.  We are looking to get the

9     money to pay the government what we agreed a compromise amount

10    for all of us, and then to release the assets, and to go on

11    with our lives.  That's it.

12         But if that's not the case, if this asset is now hung

13    up, it frustrates the entire intent of the agreement.  It also

14    results in a double payment, because we owe whatever we owe

15    here on the $6 million, plus the government of the Netherlands

16    has seized this amount that was to be used, according to this

17    contract, for us to start the payment process here.

18         So we would certainly, Judge, ask for more discovery

19    or ask for discovery.

20         THE COURT:  Why is discovery proper at this stage?

21         MS. GAY:  Well, because it is an affirmative defense

22    to the claim of breach here, your Honor.  We cannot, as you

23    say, do much more than politely -- but sincerely -- suggest

24    that the government frustrated the agreement here and actually

25    engaged in very risky behavior.

1          If the government believed that this asset was going

2     to be hung up so that the payment date would be in doubt under

3     paragraph 4, they should have come to you four months ago *in*

4     *camera* or something, if they didn't want to tell us about it

5     and said, Look, this asset, where release is conditioned, where

6     the terminology in paragraph 4 is fundamentally different than

7     paragraph 3.  Mr. Monteleoni didn't even read the entire

8     paragraph 3 to you.

9          We need to do something.  We need to make an

10    arrangement.  And we would have been upset, but we would have

11    been willing to talk about it.  We still are.

12         THE COURT:  All right.  Anything further?

13         MS. GAY:  I think, your Honor, our papers state the

14    rest of this.  If there are additional questions after

15    Mr. Monteleoni speaks, I may ask to address the Court again.

16         Thank you.

17         THE COURT:  All right.  Thank you, Ms. Gay.

18         MR. MONTELEONI:  If I may reply briefly, your Honor.

19         THE COURT:  You may.

20         MR. MONTELEONI:  Thank you.

21         To respond first to a few factual questions that came

22    up during the Court's questions, first of all, it is correct

23    that if the Netherlands had taken no action but to release the

24    debt, the debtor could still theoretically have refused to pay

25    Prevezon, which would have necessitated Prevezon to seek

1    enforcement action of a contractual nature against the debtor

2    in the Netherlands.  I'm not saying that there's any particular

3    reason to think that they would have refused to pay, but

4    theoretically --

5              THE COURT:  Bidders sometimes do, right?

6              MR. MONTELEONI:  I think that that's true.  I can't

7    say one way or another.  I think that they had been in the

8    final stages of discussing possibly paying Prevezon before law

9    enforcement stepped in; but it's entirely possible that over

10   the passage of time or that the final T's hadn't been crossed,

11   that they would not pay.  Certainly there's nothing legally in

12   the contract that would require payment to happen, either

13   simultaneously or even within 15 business days, of the

14   Netherlands releasing the funds.  That's the first point.

15             Regarding Prevezon's request to settle for 75 percent

16   of the settlement amount from the restrained assets, when we

17   responded to them, we said, again, we would explore releasing

18   the funds from the restrained assets; but we didn't settle the

19   case for 75 percent of the $6 million, we settled it for 100

20   percent of the $6 million.  That's what the contract provides

21   and that's what should be enforced.  If the Court were to enter

22   an order enforcing it, we would certainly work with Prevezon on

23   a solution to their liquidity, just it didn't change the

24   economics of how much they were paying.

25             Regarding the good-faith argument, it's not just that

HCEVPREA

1    Prevezon is sort of speculating.  There is evidence in the

2    record.  I've submitted two declarations under payment of

3    perjury.  My supervisor, Alex Wilson, submitted a declaration

4    under payment of perjury.  That's the evidence of what

5    happened.  Further discovery wouldn't change the substance of

6    that either.  It would just sort of inquire into other matters

7    which are probably privileged and don't go to the substance.

8         The substance is -- defense counsel said, We should

9    have informed the Netherlands that we had an agreement.  We did

10   inform them that we had an agreement.  We say that in the

11   declarations.  They knew we had an agreement; they knew what we

12   were asking for.  Indeed, when I met with them in July, as I

13   put in the declaration, we asked again; we asked for them to do

14   this on an expedited basis.

15        The idea that we sort of -- look, we didn't

16   halfheartedly ask; we didn't ask and say, Oh, but we didn't

17   mean it.  We asked, we asked again, and at no time did we do

18   something -- did we say that we wanted them to do anything that

19   would impede the flow of funds to the Netherlands -- to

20   Prevezon.

21        What we did do is when they requested factual

22   information, we provided them factual information, as is a very

23   common exercise of our law enforcement responsibilities.  We

24   did not disclose the pendency of their investigation of those

25   facts, which might have constituted some sort of obstruction of

HCEVPREA

1    justice in the Netherlands, which might have jeopardized -- we

2    just don't know one way or another whether there were aspects

3    of their investigation that -- which is a criminal

4    investigation, that could have been justified by the disclosure

5    of it.

6             The idea of seeking some type of relief from the Court

7    *in camera* just didn't occur to us; but we don't really

8    understand what we would have been asking the Court to do or

9    how the Court could have taken action *in camera*.

10            What the evidence shows is that our requests, which

11   defense counsel is very right, we specified carefully what our

12   obligations were, and we fully discharged them.  We let the

13   government of the Netherlands know that that was our request,

14   that we meant it.  And we also provided information of a form

15   that we would often provide in a number of circumstances, of a

16   form that expressly steered clear of the things that we had

17   explicitly promised not to provide in the confidentiality

18   order.

19            Our communications with foreign governments about this

20   case, it's not just sort of a gray area; they are actually we

21   did carve out some things that we did promise not to tell

22   foreign governments in the confidentiality order explicitly.

23   We didn't tell them those things.  We told them unrestricted

24   information.

25            So to find that there's even a *prima facie* case of a

HCEVPREA

1   breach, which is a necessary prerequisite for discovery, the

2   final few cases that we cite indicate you can't just in the

3   post-judgment context get discovery just because you want it;

4   you need to show a *prima facie* case that there is a factual

5   predicate for it.

6        Here, what we have is sworn evidence that shows the

7   opposite of it and no indication that anything happened other

8   than what that sworn evidence said.  What that sworn evidence

9   says is the things that we promised to do in the settlement

10  agreement we did.  The other things that we did were not things

11  that we didn't promise to do; they were things that we often

12  do.  It would be an expansion of the covenant of good faith and

13  fair dealing that is contrary to the covenant law to impose

14  such a term into the contracts, to impose some unspoken duty

15  for a contracting party not to provide truthful information to

16  law enforcement that not only isn't what the law provides, but

17  the perverse consequences are obvious for what that could be,

18  especially because as judicially created and implicit, it would

19  have a vast chilling effect.

20        So we really think that there is no factual predicate

21  for further inquiry on that.

22        Beyond that, we'd rest on our papers.

23        THE COURT:  All right.  Thank you.

24        Anything further, Ms. Gay?

25        MS. GAY:  Yes, your Honor.  Thank you.

HCEVPREA

1          First, as I've said before, having come into a case

2     that was hard-fought for 1,000 years, it feels like, I realize

3     that sometimes rhetoric gets heated on both sides.

4          Let me just try to make clear for the record, we are

5     not -- we were not, in reaching out to the government between

6     the last time we were here and now, trying to get a discount on

7     the dollar.  We weren't trying to get out of this agreement.

8     My client cannot afford a trial.  His assets are frozen.

9          So what we were trying to do was to find a way out.

10    We thought honorably because we think we did not put this mess

11    into play.  And we do think the government did, and I'll try to

12    make a *prima facie* case with my hands tied behind my back in

13    just a moment.

14          But with regard to that, we said, Here's the U.S.

15    assets.  Most of them have been liquidated now; I think there's

16    one property remaining.  Let's agree to release those.  You

17    take 75 percent of the value of what we've agreed to, whatever

18    the amount is, almost $6 million.  You take that.  And then

19    because this mess has been created in the Netherlands, you work

20    with us, and we will help you.  We are powerless compared to

21    the two governments.  This is an asset you ask the government

22    to restrain; you clearly think it has some value or you

23    wouldn't have asked it to be restrained.  We clearly think it

24    has some value because we made the settlement agreement pivot

25    upon its release.  With regard to that, work with the Dutch --

HCEVPREA

1    who would have never had this in the first place without you

2    asking them to take it -- to get your remaining 25 percent.

3            We thought that was reasonable.  If there's some

4    back-and-forth around the edges, we are happy to talk about it.

5    We are not looking to get out of the agreement; we are not

6    looking for a discount.  So I don't want that to be a

7    suggestion that could be a confusion.  I want that on the

8    record.

9            In terms of the value of this asset, this debt in the

10   AFI, I think both sides are speculating, your Honor, in

11   terms -- or at least the lawyers.  My client clearly thinks it

12   has value and wanted to pivot off of it for payment.  I know

13   that my client is constrained for funds.  I'd be happy to show

14   *in camera* why I know concerning our own bills.

15           But putting that aside, in terms of the government's

16   bad faith here, I think, as the Court knows -- I was a

17   prosecutor; I wouldn't make these allegations lightly; I'm

18   trying to make them delicately now.  But what we see from the

19   two declarations the government has submitted, at least

20   according to my notes, is that only nine days after this

21   settlement happened our government began to work with the Dutch

22   government -- and I don't know to what extent, your Honor, I do

23   not know -- in what would essentially become a complete

24   frustration of paragraph 4.  Even the Dutch don't say it's a

25   release; they just say we've done this simultaneous taking.  I

HCEVPREA

1   think they are very careful in not saying it is a release.  I'd

2   be interested to understand why that's the case as well.

3         But, as I've said, the case law we've cited to the

4   Court -- the Court is a diligent scholar, as its clerks are.  I

5   don't need to read these cases for you.  But we've cited a case

6   from the Eastern District, *Dunkin' Donuts* -- it cites various

7   other cases -- that doesn't suggest that there has to be

8   illegal or impermissible conduct.

9         And, of course, your Honor, law enforcement needs to

10  work with other governments; of course, your Honor, there may

11  be concerns about secrecy.  There's a protective order in this

12  case.  The bench has been approached in various -- not just

13  your Honor, but Judge Griesa.  There have been a number of

14  confidential issues in this case that have been explored.  It's

15  a delicate situation, there's no question.

16        But without telling us, the government worked in

17  secrecy, without suggesting that there was a reason for it.

18  What we are hearing now, I think, is only speculation about

19  whether there might be some law enforcement objective here.

20  We're talking about a restrained asset.

21        The standard is not that the government just stood

22  back and didn't advocate for what the Dutch were doing.  But

23  for months while my client was -- his hands were still tied,

24  this transfer, getting ready for the transfer of this asset, as

25  the Netherlands letter suggests, they held the request in

HCEVPREA

1    abeyance, they waited til they could do it at the same time.

2    We were told nothing.  I think that's very risky behavior to

3    then come in and suggest that the contract was perfectly

4    fulfilled.

5              The government frustrated what we thought was their

6    good-faith effort to have that asset released.  There's no

7    question.  And the government did not tell us about it for a

8    significant length of time.

9              We want out of this.  We want our money back.  But I

10   would say, Judge, there's no question there's been no release

11   here that triggers payment due at this moment.

12             Thank you.

13             THE COURT:  All right.

14             Counsel, thank you all for your arguments.

15             Decision on the motion is reserved.

16             Have a good holiday.

17             MS. GAY:  You too, your Honor.

18                          *    *    *

19

20

21

22

23

24

25