UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------x
                                                         :

UNITED STATES OF AMERICA,         :

                                                         :

                    *Plaintiff*,       :
                                                       :    No. 13-cv-6326 (WHP)
                       v.              :
                                                         :    <u>OPINION & ORDER</u>

PREVEZON HOLDINGS, LTD., *et al.*,   :

                                                         :

                  *Defendants*.     :

---------------------------------------------x

WILLIAM H. PAULEY III, United States District Judge:

        The United States of America (the "Government") moves to enforce the terms of a Stipulation and Order memorializing a settlement between Prevezon Holdings, Ltd., <u>et al.</u> ("Prevezon") and the Government resolving this civil forfeiture action (the "Settlement Agreement"). The Settlement Agreement provides that the protective order restraining various properties shall be vacated, and the claims against Prevezon dismissed, when several conditions are satisfied. At issue is whether the Government fulfilled its obligation to release the seizure of Prevezon's asset in the Netherlands. With the parties at loggerheads over the Government's compliance, Prevezon refused to make its settlement payment of $5.9 million.

        Separately, based on events following execution of the Settlement Agreement, Prevezon seeks discovery into whether the Government interfered with the release of the Dutch asset in question. For the reasons that follow, the Government's motion to enforce the Settlement is granted, and Prevezon's motion for discovery is denied.

BACKGROUND

On May 12, 2017, the parties entered into the Settlement Agreement to resolve the claims in this action. On May 15, 2017, this Court so-ordered the Settlement Agreement (ECF No. 716), bringing to a close a multi-year saga that arose from an elaborate tax scheme designed to bilk the Russian treasury of approximately $230 million in tax refunds (the "Russian Treasury Fraud"). According to the complaint, members of a Russian criminal syndicate utilized an intricate web of entities to funnel proceeds of the Russian Treasury Fraud to various accounts around the world. A portion of those funds—approximately $1.96 million—was transferred to Prevezon. (Second Amended Complaint, ECF No. 381 ("Compl."), ¶¶ 75–128.) Prevezon invested that money in European real estate, and then allegedly laundered the returns on that investment to purchase a portfolio of Manhattan real estate. (Compl. ¶¶ 105–110, 129–142.)

The Government commenced this action in September 2013. Shortly thereafter, Judge Griesa entered a protective order restraining several of Prevezon's assets in the United States valued in the tens of millions of dollars. (ECF No. 2.) In January 2014, the Government moved to freeze an additional asset, a debt of approximately 3 million euros owed to Prevezon by AFI Europe N.V. (the "AFI Europe Debt"). To effect that freeze, the Government asked law enforcement authorities in the Netherlands to restrain the AFI Europe Debt (the "US Restraint"). The Netherlands obliged, and the AFI Europe Debt was added to an Amended Protective Order reflecting all of the properties restrained in connection with this action (the "Amended Protective Order"). (Amended Protective Order, ECF No. 173, ¶ 4(m).) The AFI Europe Debt lies at the center of the parties' dispute concerning their respective obligations under the Settlement Agreement.

I.   Settlement Agreement

Under the Settlement Agreement, the Government agreed to "inform the Government of the Netherlands that this matter has been resolved and that the Government withdraws any request for the Government of the Netherlands to continue to restrain the AFI Europe Debt, and shall request that the Government of the Netherlands lift the restraint of the AFI Europe Debt that had been implemented at the request of the United States." (Settlement Agreement ¶ 3.) Further, the Settlement Agreement provides that the "Amended Protective Order shall be deemed modified to allow the release of the AFI Europe Debt." (Settlement Agreement ¶ 3.)

Concomitantly, Prevezon agreed to pay approximately $5.9 million "within 15 business days of the release by the Government of the Netherlands of the AFI Europe Debt." (Settlement Agreement ¶ 3.) The Settlement Agreement further contemplates that after the Government receives Prevezon's payment, the Amended Protective Order "shall be vacated as to all Restrained Properties, the Court shall order the Restrained Properties returned to the Claimants, and the Action shall be dismissed against all Defendants with prejudice." (Settlement Agreement ¶ 11.)

II.  Post-Settlement Events

On May 16, 2017—a day after this Court so-ordered the Settlement Agreement—Hermitage Capital Management Ltd. ("Hermitage") and its founder, William Browder,[1] filed a

---

[1] Browder, a non-party to this action, has been a thorn in Prevezon's side. Hermitage and Browder were among the purported victims of the Russian Treasury Fraud after a Russian criminal organization raided Hermitage's offices and stole corporate documents ultimately used to execute the tax refund scheme. In the aftermath of that raid, Browder successfully lobbied the United States for sanctions and travel restrictions on Russian officials involved in the Russian Treasury Fraud. He also supplied the Government with relevant information during the Government's investigation of Prevezon, some of which appears to have formed the basis of the Government's allegations in this action. See United States v. Prevezon Holdings, Ltd., 320 F.R.D. 112, 113 (S.D.N.Y. 2017). However, with the parties settling their dispute on the eve of trial, Browder appears to have re-directed his efforts abroad.

complaint with law enforcement authorities in the Netherlands. The Dutch complaint mirrors many of the same allegations underlying this action. The Government represents that it had no knowledge of the Netherland's investigation into Prevezon until May 24, 2017, when Dutch officials advised the Government that they were contemplating its seizure in connection with their own investigation. (Declaration of Paul M. Monteleoni in Support of Motion to Enforce Settlement Agreement, ECF No. 753 ("Monteleoni Decl."), ¶ 6.)

On June 1, 2017, the Government informed the Netherlands that this action had been resolved, and that the Government withdrew its request for the Netherlands to restrain the AFI Europe Debt. It further requested the Netherlands to lift the US Restraint from the AFI Europe Debt, and to do so in expedited fashion. (Monteleoni Decl. ¶ 7.)

On June 14, 2017, with the Government's request still pending, Dutch law enforcement officials sought a meeting with the Government regarding Hermitage's complaint in the Netherlands. The Government acceded to that request and met with Dutch officials on July 19 and 20, 2017. Over the course of those two days, at the Netherlands' request, the Government provided non-confidential information relating to the facts undergirding this action. The Government maintains that it did not disclose any confidential information. Separately, the Government reiterated its request for the Netherlands to lift the US Restraint from the AFI Europe Debt. (Monteleoni Decl. ¶ 9.)

A few months passed with no word from the Netherlands about the fate of the AFI Europe Debt. On October 9, 2017, the Government followed up with the Netherlands on its request. A Dutch official informed the Government that the Netherlands intended "to attempt to release the AFI Europe Debt from the restraint imposed in this case [i.e., the US Restraint] the next day (i.e., October 10, 2017) and simultaneously seize it in connection with its own

4

investigation." (Monteleoni Decl. ¶ 10.) On October 10, 2017, the Netherlands confirmed that it successfully lifted the US Restraint from the AFI Europe Debt and simultaneously seized it in connection with its own investigation. (Monteleoni Decl. ¶ 11.) Thus, the AFI Europe Debt remains frozen, but is now seized pursuant to the Netherlands' restraint.

Based on the Netherlands' release of the US Restraint, the Government took the position that it had satisfied its obligations under the Settlement Agreement as of October 10, 2017. The Government argues that Prevezon should have paid the $5.9 million settlement by October 31, 2017. On October 27, 2017, Prevezon asked the Government for an extension of the payment deadline, explaining that it did not believe it was yet obligated to pay. The Government declined the request. After Prevezon failed to pay, the Government brought this motion to enforce the Settlement Agreement.

## DISCUSSION

I. Standard

"A district court has the power to enforce summarily, on motion, a settlement agreement reached in a case that was pending before it." Meetings & Expositions, Inc. v. Tandy Corp., 490 F.2d 714, 717 (2d Cir. 1974). A "motion to enforce a settlement agreement is fundamentally a claim for breach of a contract." Hendrickson v. United States, 791 F.3d 354, 358 (2d Cir. 2015) (citing Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 381 (1994)). "In turn, settlement agreements are contracts and must therefore be construed according to general principles of contract law." Jimmo v. Burwell, 2016 WL 4401371, at *6 (D. Vt. Aug. 17, 2016) (citing Red Ball Interior Demolition Corp. v. Palmadessa, 173 F.3d 481, 484 (2d Cir. 1999)).

5

The Settlement Agreement does not specify which law should govern its interpretation. Although the Second Circuit has not definitively ruled on whether state-law principles apply to a federal court's interpretation of federal settlement agreements, a number of district court cases examining this question have concluded that such disputes are quintessentially of contractual interpretation and wholly governed by state law. Elliot v. City of N.Y., 2013 WL 3479519, at *2 (S.D.N.Y. July 10, 2013); Brown v. City of N.Y., 2012 WL 628496, at *2 (E.D.N.Y. Jan. 30, 2012); Powell v. Omnicom, 497 F.3d 124, 129 n.1 (2d Cir. 2007) (courts have declined to decide which law governs because "New York law and federal common law [are] materially indistinguishable"). Thus, in practice, "the circuit court and various district courts regularly apply New York law in analyzing whether a settlement agreement should be enforced, even in federal-question cases." Silas v. City of N.Y., 536 F. Supp. 2d 353, 357 (S.D.N.Y. 2008) (collecting cases).

II. Analysis

This is a challenging civil case. The events giving rise to the litigation span the globe and read like a John le Carré novel. Its procedural history has been complicated, including discovery abroad, the disqualification of counsel on the eve of trial, the assignment of another judge to try the case, and an ensuing cavalcade of motions leading up to the brink of a jury trial. But the Government's latest motion presents a simple, straightforward issue of contract interpretation: does the Netherlands' release of the US Restraint require Prevezon to pay even though the Netherlands' own restraint continues to encumber the AFI Europe Debt? More specifically, does the phrase "release by the Government of the Netherlands of the AFI Europe Debt" in Paragraph 4 of the Settlement Agreement mean that the AFI Europe Debt must be free of any restraint before Prevezon is required to pay?

6

"When interpreting a contract [under New York law], the intention of the parties should control, and the best evidence of intent is the contract itself." Gary Friedrich Enters., LLC v. Marvel Characters, Inc., 716 F.3d 302, 313 (2d Cir. 2013) (internal quotation marks and citations omitted). The first step in interpreting a contract is to determine whether its language is ambiguous. Lockheed Martin Corp. v. Retail Holdings, N.V., 639 F.3d 63, 69 (2d Cir. 2011). "Ambiguity must be determined on the face of the contract; extrinsic evidence may not be introduced in an attempt to create ambiguity." Charron v. Sallyport Global Holdings, Inc., 2014 WL 7336463, at *16 (S.D.N.Y. Dec. 24, 2014). The threshold question of whether a contract is ambiguous is an issue of law for this Court to decide. Charron, 2014 WL 7336463, at *16.

A contract is unambiguous if its "language has a definite and precise meaning . . . concerning which there is no reasonable basis for a difference of opinion." Chesapeake Energy Corp. v. Bank of N.Y. Mellon Trust Co., N.A., 773 F.3d 110, 114 (2d Cir. 2014). By contrast, a contract is ambiguous if a "reasonably intelligent person viewing the contract objectively could interpret the language in more than one way." Topps Co., Inc. v. Cadbury Stani S.A.I.C., 526 F.3d 63, 69 (2d Cir. 2008). But a contract is not ambiguous simply because "the parties urge different interpretations" or where "one party's view strains the contract language beyond its reasonable and ordinary meaning." Aetna Cas. & Sur. Co. v. Aniero Concrete Co., 404 F.3d 566, 598 (2d Cir. 2005) (internal quotation marks, alterations, and citation omitted). "Ambiguity is determined by looking within the four corners of the document, not to outside sources." JA Apparel Corp. v. Abboud, 568 F.3d 390, 396 (2d Cir. 2009) (internal quotation marks and citation omitted). It is important "for the court to read the integrated agreement as a whole"—if the "document as a whole makes clear the parties' over-all intention, courts examining isolated

7

provisions should then choose that construction which will carry out the plain purpose and object of the agreement." Lockheed Martin Corp., 639 F.3d at 69 (internal citation omitted).

While the parties contend that the Settlement Agreement is unambiguous, the "fact that both parties agree that [the operative contract is] unambiguous does not mean that [it is], especially where the parties disagree on [its] proper construction." In re Aerovias Nacionales de Colombia, S.A. Avianca, 323 B.R. 879, 887 (Bankr. S.D.N.Y. 2005). The Government advances the position that Prevezon is required to pay $5.9 million once the Government secures the "release from the restraints imposed <u>in this case</u>." (Gov't Memo. of Law in Support of Motion to Enforce Settlement, ECF No. 744 ("Mot."), at 14 (emphasis added).) To read the term "release" any more broadly, says the Government, would unreasonably burden the Government with a duty to prevent third parties, like the Netherlands, from imposing their own restraints. (<u>See</u> Mot. at 14, 19.)

Prevezon offers a competing interpretation that extends the meaning of "release" to cover the liberation of the AFI Europe Debt from any and all restraints. (<u>See</u> Prevezon's Memo. of Law in Opposition to Motion to Enforce Settlement, ECF No. 748 ("Opp."), at 11.) Prevezon's construction turns on whether it can freely access its once-restrained property. Because the "AFI Europe Debt is not available for use, nor has it ever been available for use," Prevezon argues it was never released. (Opp. at 12.)

A. <u>Textual and Structural Interpretation</u>

This Court's interpretation of the Settlement Agreement begins with its text. <u>Barscz v. Dir., Office of Workers' Comp. Programs & Elec. Boat Corp.</u>, 486 F.3d 744, 749 (2d Cir. 2007). Under Paragraph 3, the Government must do three things: (1) "inform the Government of the Netherlands that this matter has been resolved"; (2) "withdraw[ ] any request

8

for the Government of the Netherlands to continue to restrain the AFI Europe Debt"; and (3) "request that the Government of the Netherlands lift the restraint of the AFI Europe Debt that had been implemented at the request of the United States." (Settlement Agreement ¶ 3.) There is no dispute that the Government satisfied these requirements. On June 1, 2017, the Government informed the Netherlands that the parties had settled this action and withdrew its request for the Netherlands to continue restraining the AFI Europe Debt. (Monteleoni Decl. ¶ 7.) The Government also asked the Netherlands to lift the restraint of the AFI Europe Debt originally imposed at the Government's request. (Monteleoni Decl. ¶ 7.) On October 10, 2017, the Netherlands acceded to the Government's request and lifted the US Restraint. (Monteleoni Decl. ¶ 11.)

Despite that, Prevezon broadly construes the term "release" in the following paragraph, claiming that the "AFI Europe Debt is not, and has never been, 'released' as the Netherlands imposed a new restraint on that asset simultaneously with lifting the restraint it had imposed at the request of the Government." (Opp. at 9.) The term "release" in Paragraph 4 signifies the commencement of the 15-day period in which Prevezon must make its $5.9 million payment: "Payment shall be due within 15 business days <u>of the release</u> by the Government of the Netherlands of the AFI Europe Debt." (Settlement Agreement ¶ 4.) Prevezon argues that although the plain meaning of "release" is "to set free from restraint, confinement, or servitude," the AFI Europe Debt has not been released because it remains subject to the Netherlands' restraint. And because the term appears alongside its obligation to pay—separate from the Government's specific obligations pertaining to the US Restraint—Prevezon maintains "that the contemplated 'release' was not limited to the release" of the US Restraint. (Mot. at 10.)

9

Prevezon's interpretation neglects to read the disputed term in context. Nipponkoa Ins. Co. v. Watkins Motor Lines, Inc., 431 F. Supp. 2d 411, 415 (S.D.N.Y. 2006) (contractual language must be "[f]airly read in context and giving the words their plain and ordinary meaning"). As an initial matter, the dictionary definition of "release" is undisputed and has no bearing on this Court's interpretation of whether such term is intended to apply only to the US Restraint. It is conceivable for an asset to be "free[d] from restraint, confinement, or servitude," yet remain inaccessible for any number of reasons.[2] Thus, the plain meaning of the term is not inconsistent with either Prevezon or the Government's interpretation. The more relevant question is whether the "release" applies narrowly to only the US Restraint or more broadly to any restraint of the AFI Europe Debt.

The structure of the Settlement Agreement provides clarity. The term "release" is not unique to Paragraph 4. The term appears multiple times throughout the Settlement Agreement in reference to the various properties restrained in this action. (See Settlement Agreement ¶¶ 2–4.) There is nothing in the Settlement Agreement that suggests the parties intended to impart a different meaning to the "release" in Paragraph 4 from any of the other provisions in the text.

Relevant here, the term "release" appears twice in reference to the AFI Europe Debt. First, it is used in Paragraph 3 to signify the removal of the AFI Europe Debt from the Amended Protective Order once the Government has asked the Netherlands to lift the US Restraint: the "Amended Protective Order shall be deemed modified to allow the release of the

---

[2] To better conceptualize how an object may remain inaccessible even after the release of a particular restraint, the Government aptly analogizes the release and restraint at issue here with the release and restraint of a criminal defendant in custody for both state and federal charges. (Mot. at 18 n.10.) A defendant serving a state sentence may be released from state custody into federal custody to face prosecution under federal charges, yet remain detained in the same facility even after the state sentence expires. See Greenough v. Hufford, 2013 WL 4534997, at *8 (S.D.N.Y. Aug. 27, 2013).

10

AFI Europe Debt." (Settlement Agreement ¶ 3.) The Settlement Agreement then logically lays out the parameters of Prevezon's obligation in the following paragraph. Building off the "release of the AFI Europe Debt" in Paragraph 3, the Settlement Agreement in Paragraph 4 contemplates that Prevezon's $5.9 million payment must be made within 15 days of the "release by the Government of the Netherlands of the AFI Europe Debt." (Settlement Agreement ¶ 4.) It would make little sense for the parties to have ascribed a broader meaning to the "release" that triggers Prevezon's duty to pay when the preceding paragraph specifically focuses on the release of the US Restraint. Absent any language suggesting that the "release" in Paragraph 4 was intended to cover all restraints on the AFI Europe Debt, the term's application must be limited to the US Restraint. Maryland Cas. Co. v. W.R. Grace & Co., 128 F.3d 794, 799 (2d Cir. 1997) ("Terms in a document . . . normally have the same meaning throughout the same document in the absence of a clear indication that different meanings were intended."); U.S. Bank Nat'l Ass'n. v. T.D. Bank, N.A., 569 B.R. 12, 23 (S.D.N.Y. 2017) (under New York law, terms in contract must be assumed to have the same meaning throughout).

Even though both Paragraphs 3 and 4 reference the same asset, construing the scope of the "release" in Paragraph 3 as narrower than the "release" in Paragraph 4 would run against the well-established rule that "[c]ontract provisions should not be read in isolation; rather, the entire contract must be considered, and all parts of it reconciled." RJE Corp. v. Northville Indus. Corp., 198 F. Supp. 2d 249, 262–63 (E.D.N.Y. 2002); David L. Threlkeld & Co., Inc. v. Metallgesellschaft Ltd. (London), 923 F.2d 245, 251 (2d Cir. 1991) ("These are not two individual, free standing [ ] clauses; rather, they are interrelated in an integral fashion. [Plaintiff] would have us reach each of these provisions in a vacuum. This we cannot do."). Here, Paragraph 3 is necessary to construe the full import of Paragraph 4—that is, the only way

to understand what is meant by the release of the AFI Europe Debt in Paragraph 4 is to ascertain the Government's specific obligations with respect to that property in the preceding paragraph.

Adopting Prevezon's view could result in bizarre consequences, namely delaying Prevezon's payment in perpetuity based on some unspecified release that has yet to occur. The Government seeks a $5.9 million payment, and Prevezon wants the AFI Europe Debt. Both objects would remain out of reach indefinitely. Even worse, an unresolved civil forfeiture action would linger, with neither party able to do anything about it absent an agreement to rip up the Settlement Agreement and go to trial.

Moreover, under Prevezon's view, the Government would be obligated to persuade Dutch authorities to dissolve the restraint imposed in connection with their investigation. But the Government lacks the authority to question the Netherlands' law enforcement priorities or decisions, or dictate what the Netherlands chooses to do with an asset located inside its borders. Cf. United States v. (Under Seal), 794 F.2d 920, 926 (4th Cir. 1986) ("Just as comity among nations requires the United States to respect the law enforcement processes of other nations, our own national sovereignty would be compromised if our system of criminal justice were made to depend on the actions of foreign government beyond our control."). Even assuming the Netherlands releases its restraint, Prevezon's interpretation would require the Government to guard the AFI Europe Debt against the risk of any number of third party restraints imposed between the period in which the Netherlands releases the US Restraint and Prevezon collects its debt. If, for example, another creditor of the AFI Europe Debt placed a lien on it, there would be no "release." Or, if the debtor to the AFI Europe Debt objected to Prevezon's attempts to collect on it, the property would be functionally restrained and rendered

inaccessible until that dispute is resolved. The parties certainly could not have contemplated that such restraints should delay or excuse Prevezon's performance under the Settlement Agreement.

Finally, other provisions in the Settlement Agreement support the view that the "release" in Paragraph 4 refers only to the removal of the US Restraint. Paragraph 11, which governs every other restrained property except the AFI Europe Debt, provides that following receipt of the $5.9 million payment, "the Amended Protective Order shall be vacated as to all the Restrained Properties, [and] the Court shall order the Restrained Properties returned to the Claimants." (Settlement Agreement ¶11.) This provision contrasts the Government's obligations with respect to the AFI Europe Debt vis-à-vis the other restrained properties. While the Government must return the latter group of assets to claimants, it is only required to request the release of the US Restraint on the AFI Europe Debt. By agreeing to return the restrained properties in Paragraph 11, the Government must ensure that the properties remain free of any third party restraints until they are transferred back to claimants. The same cannot be said for the AFI Europe Debt because it is located abroad within the Netherlands' jurisdiction. The Settlement Agreement sensibly accounts for this difference, limiting the Government's obligation to what it can control—that it request the release of the restraint arising directly from its investigation and prosecution of Prevezon.

Accordingly, this Court concludes that the term "release" in Paragraphs 3 and 4 of the Settlement Agreement is unambiguous and refers specifically to the release of the US Restraint.[3]

---

[3] In view of this Court's determination that the Settlement Agreement is unambiguous, it need not consider the parties' drafting and negotiation history. Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co., 970 F.2d 1138, 1148 (2d Cir. 1992) ("Extrinsic evidence is unnecessary where it is determined that the contractual language is unambiguous."); Garcia v. Benjamin Grp. Enters. Inc., 800 F. Supp. 2d 399, 404 (E.D.N.Y. 2011) ("The parol evidence [rule] excludes admission and consideration of extrinsic evidence concerning the meaning of

B. Business Purpose

Prevezon urges this Court to consider the business purpose and economic realities underlying the Settlement Agreement. According to Prevezon, both parties were cognizant of the risk that the Netherlands may not release the AFI Europe Debt even if Prevezon made its $5.9 million payment. If that risk materialized, Prevezon claims that it would in effect pay $5.9 million plus the €3 million value of the AFI Europe Debt, resulting in a near $9 million payment to resolve this case. (Mot. at 15.) Thus, Prevezon argues, the Settlement Agreement was designed to mitigate this risk by "specifying that the AFI Europe Debt must be released to Prevezon" before it is required to pay $5.9 million. (Mot. at 15.)

This is a curious argument to make in view of an even greater risk that Prevezon would have faced absent settlement—a five week jury trial with the threat of losing nearly $14 million in forfeited property. Prevezon argues that avoiding the loss of the AFI Europe Debt was the principal reason behind its decision to enter into the Settlement Agreement, but that one-sided view ignores the "business purposes sought to be achieved <u>by the parties</u>." <u>Newmont Mines, Ltd. v. Hanover Ins. Co.</u>, 784 F.2d 127, 136 (2d Cir. 1986) (emphasis added). Nor can Prevezon's stated purpose be gleaned anywhere from the text of the agreement. Rather, the introductory recitals of the Settlement Agreement provide the clear objective underlying the parties' agreement. <u>United States v. Hamdi</u>, 432 F.3d 115, 123 (2d Cir. 2005) ("[C]ontracts may, and frequently do, include recitals of the purposes and motives of the contracting parties."); <u>Ross v. Ross</u>, 233 A.D. 626, 635 (N.Y. App. Div. 1931) (recitals in a contract "indicate but the purposes and motives of the parties."). The Settlement Agreement recites that the "<u>purpose of

---

provisions of a written agreement or instrument—such as documents concern the drafting history of a provision—where the relevant terms are unambiguous.").

this Stipulation and Order is to memorialize a settlement agreement pursuant to which the United States will release all of its claims . . . against all Defendants relating to this Action and release all Restrained Properties, and all Defendants and Claimants will release all their claims . . . against the United States relating to this Action." (Settlement Agreement ¶ 2 (emphasis added).) In simpler terms, the parties settled to avoid trial.

III.     Prevezon's Application for Discovery

Prevezon requests an opportunity to conduct "discovery into a potential counterclaim for breach of the covenant of good faith and fair dealing" on the basis that the Government "acted to frustrate Prevezon's legitimate expectations regarding the Settlement." (Mot. at 21.) Specifically, Prevezon believes that the Government "actively worked with the Government of the Netherlands" to engineer the imposition of a new restraint on the AFI Europe Debt following the release of the US Restraint. (Mot. at 22.)

"[G]overnment officials are presumed to act in good faith." China Trade Ctr. LLC v. Wash. Metro. Area Transit Auth., 34 F. Supp. 2d 67, 70 (D.D.C. 1999). To overcome this presumption, a party must allege and offer clear and convincing evidence of specific examples of the Government's bad faith that show an intent to injure. See United States v. Livecchi, 605 F. Supp. 2d 437, 450–51 (W.D.N.Y. 2009) (internal quotation marks and citation omitted). Moreover, "[p]roof of disagreement or even an incorrect reading of a contract is insufficient." Livecchi, 605 F. Supp. 2d at 451.

Prevezon alleges generally that the Government met with Dutch investigators for two days to discuss the Netherlands' investigation, fully aware that the Netherlands was considering its own seizure of the AFI Europe Debt. The inequity in all of this, according to Prevezon, is that the Government failed to inform Prevezon of either the Government's direct

15

cooperation with Dutch authorities or the Netherlands' intention to re-seize the AFI Europe Debt. Prevezon believed the Settlement Agreement was designed to "release <u>all</u> of the assets restrained in connection with this case," including the AFI Europe Debt, and did not expect the Government to undermine that result by "actively work[ing] with the Netherlands to bring about such a seizure." (Opp. at 23 (emphasis original).)

But these allegations fall short of the proof that a party must offer to assert a violation of the covenant of good faith and fair dealing, let alone obtain discovery on such a claim. The Government's assistance in providing non-confidential information to Dutch authorities about a case that has been well-publicized for several years is not an act of bad faith. This Court doubts that Prevezon was oblivious to the possibility that Browder had contacted other law enforcement agencies about the subject matter of this action, or that such agencies were conducting their own investigations based merely on the attention this case received. Thus, Prevezon knew, or should have known, that any of its assets, including the AFI Europe Debt, could be confiscated by other parties under any number of scenarios.

Moreover, that the Government voluntarily provided some assistance to the Netherlands' request is unsurprising. The Department of Justice and its foreign counterparts regularly cooperate in international law enforcement matters. <u>See</u> <u>United States v. Molina-Chacon</u>, 627 F. Supp. 1253, 1260 (E.D.N.Y. 1986) ("It is to be expected that United States law enforcement agencies will have to enlist the cooperation of their counterparts in other parts of the world."). Further, the Government was not obligated to disclose the subject matter of its discussions with Dutch authorities or even the mere fact that it met with them. Such a disclosure would have jeopardized the Netherlands' then-covert investigation. <u>Smith Barney, Harris Upham & Co., Inc. v. Liechtensteinische Landesbank</u>, 1993 WL 97286, at *5 (S.D.N.Y. Mar. 31,

16

1993) (no breach of covenant of good faith and fair dealing arising from "failure to provide immediate notice" about asset confiscation); cf. Donovan v. FBI, 579 F. Supp. 1111, 1119–20 (S.D.N.Y. 1983) (in the context of FOIA exemptions, "legitimate government and private interests could be harmed by release of certain types of information held by the FBI concerning [foreign] law enforcement").

None of the circumstances here suggest any unusual conduct or animus by the Government. Brock v. United States, 2012 WL 2057036, at *10 (Fed. Cl. June 7, 2012). Rather, Prevezon attempts to lace these fairly unremarkable allegations with "mere innuendo and speculation," which constitute the "types of unsupported assertions do not meet the standard of well-nigh irrefragable proof" of bad faith. Brock, 2012 WL 2057036, at *10.

Accordingly, Prevezon's request for discovery on its potential claim for breach of the covenant of good faith and fair dealing is denied.

IV. Pre-Judgment Interest

The Government seeks pre-judgment interest on Prevezon's payment dating back to October 31, 2017, the date on which Prevezon was first obligated to pay $5.9 million. "The question of an award of interest before judgment is governed by New York law." Ramnarain v. City of N.Y., 474 F. Supp. 2d 443, 447 (E.D.N.Y. 2007). Under New York law, "a plaintiff that prevails on a claim for breach of contract is entitled, as a matter of right, to prejudgment interest from the date of breach until the entry of final judgment." Boyce v. Soundview Tech. Grp., Inc., 2005 WL 627780, at *1 (S.D.N.Y. Mar. 17, 2005).

New York law provides that "[i]nterest shall be recovered upon a sum awarded because of a breach of performance of a contract," N.Y. C.P.L.R. § 5001(a), and such interest is computed "from the earliest date the cause of action existed," N.Y. C.P.L.R. § 5001(b), at a rate

of 9% per annum. N.Y. C.P.L.R. § 5004. Because Prevezon failed to make its payment, at the latest, by the fifteenth day following the Netherlands' release of the US Restraint, pre-judgment interest shall be computed from October 31, 2017 to the date judgment is entered.

## CONCLUSION

For the foregoing reasons, the Government's motion to enforce the Settlement Agreement is granted. Separately, Prevezon's application for discovery is denied. The Clerk of Court is directed to enter judgment in favor of the Government, and calculate pre-judgment interest at a rate of 9% per annum. The Clerk of Court is further directed to terminate the motion pending at ECF No. 743.

Dated: February 2, 2018
       New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.