UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------x
                              :

UNITED STATES OF AMERICA,        :

            Plaintiff,        :       13cv6326

            v.           :       <u>OPINION & ORDER</u>

PREVEZON HOLDINGS, LTD., *et al.*,  :

           Defendants.    :

--------------------------------------------x

WILLIAM H. PAULEY III, United States District Judge:

          Non-party Hermitage Capital Management Ltd. ("Hermitage") moves for an award of sanctions against Prevezon Holdings Ltd., <u>et al.</u>'s ("Prevezon") former attorney, John W. Moscow, Esq., and his law firm, BakerHostetler LLP ("BakerHostetler"). BakerHostetler represented Hermitage in connection with an investigation of a tax fraud in Russia (the "Russian Treasury Fraud"). The Russian Treasury Fraud eventually served as a central factual predicate underlying the Government's theory of liability against Prevezon. After the Government commenced this action, BakerHostetler, which had long ceased representing Hermitage, was retained by Prevezon as defense counsel.

          On multiple occasions, Hermitage objected to BakerHostetler's representation of Prevezon on the basis that BakerHostetler's prior work for Hermitage created an unavoidable conflict of interest. Although Hermitage was never a party in this action, it was concerned that BakerHostetler would use confidential information obtained in the prior representation to advance Prevezon's interests. Hermitage accused BakerHostetler of switching sides to represent Prevezon, a beneficiary of the Russian Treasury Fraud, and to discredit Hermitage's position that

it was a victim of that fraud. Even worse, Hermitage feared that BakerHostetler's improper use of confidential information would make Hermitage and its founder, William Browder, vulnerable to criminal prosecution in Russia.

After demanding BakerHostetler's voluntary recusal to no avail, Hermitage moved to disqualify BakerHostetler in October 2014 and again in December 2015. The District Court denied those motions, holding that Hermitage and Prevezon's interests were not materially adverse to each other, and that the scope of BakerHostetler's prior and current representations were not substantially related. The District Court also found the risk that BakerHostetler would improperly use confidential information obtained from its prior representation to be minimal because the Russian Treasury Fraud had little to do with Prevezon's liability in this action.

Hermitage's arguments gained more traction in the Court of Appeals. Following the District Court's second disqualification order, Hermitage sought a stay of the order and petitioned the Second Circuit for a writ of mandamus directing BakerHostetler's disqualification.[1] On appeal, the Second Circuit concluded that BakerHostetler's prior and current representations were substantially similar and that its continued representation of Prevezon posed a risk of tainting the trial in this action. Emboldened by the Second Circuit's decision, Hermitage now seeks sanctions in the form of attorneys' fees expended in connection with its disqualification motions. For the reasons that follow, Hermitage's motion is denied.

BACKGROUND

Hermitage and Browder were never parties in this action. At all times, the Government's money laundering and civil forfeiture claims were directed at Prevezon.

---

[1] This case was originally assigned to the Honorable Thomas P. Griesa, who presided over both of Hermitage's disqualification motions. In April 2016—four months into the stay of proceedings pending Hermitage's interlocutory appeal of the District Court's second disqualification order—this case was re-assigned to the Honorable William H. Pauley III for trial.

Nevertheless, Hermitage and Browder have, at various junctures in this litigation, made several forays into the shoals of this bitter dispute. Before the Government commenced this action, Hermitage and Browder supplied the Government with relevant information about the Russian Treasury Fraud. In discovery, after Prevezon subpoenaed them for relevant documents, Hermitage and Browder engaged in motion practice to quash the subpoenas and avoid deposition. Prevezon eventually deposed Browder about his knowledge and rumored role in the Russian Treasury Fraud. And on multiple occasions, Hermitage and Browder sought to disqualify Prevezon's original choice of counsel, BakerHostetler.

On May 15, 2017, the Government and Prevezon settled the claims in this action. But before the ink on that settlement had dried, Hermitage fired off a sanctions motion against Moscow and BakerHostetler.[2] As if the Second Circuit vindication of Hermitage's objection was not enough, Hermitage seeks to hold its former counsel accountable for what it perceived as "unprecedented disloyalty." Hermitage's motion for sanctions re-opens an internecine saga marked by years of sparring between the parties about the merits of Hermitage's disqualification bid. Unsurprisingly, those efforts were expensive. Hermitage now seeks to recoup over a million dollars in attorneys' fees expended in its quest to disqualify BakerHostetler.

I. Hermitage's Involvement in This Action

Despite their status as non-parties, Hermitage and Browder have cast a long shadow over this litigation in many ways, but none more important than their involvement in the

---

[2] This appears to have been a coordinated tactic. In addition to seeking a million dollars from BakerHostetler, Hermitage and Browder—just a day after this case was settled—continued their no-holds-barred campaign against Prevezon by filing a complaint mirroring largely the same allegations in this case with Dutch law enforcement authorities. Consequently, Dutch authorities seized an asset located in the Netherlands belonging to Prevezon, disrupting the settlement that Prevezon had reached with the United States. See United States v. Prevezon Holdings, Ltd., 2018 WL 679888, at *2 & n.1 (S.D.N.Y. Feb. 2, 2018).

Russian Treasury Fraud. The illicit proceeds derived from that fraud represent the starting point of the money laundering scheme undergirding the Government's claims against Prevezon.

In 2007, a Russian criminal organization (the "Organization") orchestrated the Russian Treasury Fraud—an elaborate tax refund scheme resulting in a fraudulently-obtained tax refund of approximately $230 million. To execute the scheme, members of the Organization raided Hermitage's Moscow office and its Russian law firm, Firestone Duncan. During the raid, the Organization stole corporate documents associated with three portfolio companies under Hermitage's control. The Organization then used those documents to transfer ownership of Hermitage's portfolio companies to themselves. Members of the Organization caused the portfolio companies to enter into contracts with shell companies for no other purpose than to generate sham litigation between the companies. That collusive litigation eventually resulted in judgments totaling $973 million against Hermitage's portfolio companies. The Organization then submitted the judgments in connection with tax refund applications on behalf of the portfolio companies. A few days after the applications were filed, the Organization received a $230 million refund. See United States v. Prevezon Holdings, Ltd., 251 F. Supp. 3d 684, 687 (S.D.N.Y. 2017).

After learning that its portfolio companies were stolen, Hermitage began to investigate the origins of the Russian Treasury Fraud. As an initial step, Hermitage reported the crime to Russian law enforcement authorities, filed six criminal complaints against members of the Organization, and deployed its lawyers and accountants to investigate. But instead of assisting Hermitage in recouping its losses, the Russian authorities retaliated against Hermitage and Browder by accusing them of orchestrating the Russian Treasury Fraud.

II.    Hermitage's Retention of BakerHostetler as Counsel

In September 2008, Hermitage hired Moscow and BakerHostetler.  They were tasked with "gather[ing] evidence for them to defend [Hermitage] in Russia," collecting evidence on individuals who may have been responsible for the fraud, and to convince law enforcement authorities in other jurisdictions to prosecute the parties responsible for the Russian Treasury Fraud.  The engagement letter[3] between BakerHostetler and Hermitage provides more details on the parameters of BakerHostetler's representation:

> In this engagement, [BakerHostetler] expect[s] to perform the following: extensive analysis of the factual and legal background of the events in question, examination and analysis of evidence in both testimonial and documentary form, including the testimony of expert witnesses; preparation and presentation of prosecution memoranda, if appropriate, to the United States Department of Justice (or other law enforcement agency); and cooperation and support to the United States Department of Justice if an investigation is pursued by them.

(Declaration of Mark A. Cymrot in Opposition to Motion for Attorneys' Fees, ECF No. 731 ("Cymrot Decl."), Ex. E at 1.)

During the course of BakerHostetler's nine-month engagement, Moscow and his colleagues "reviewed non-public documents from Hermitage related to the Russian Treasury Fraud, which allowed the firm to create a case timeline and chronology, and discussed potential individuals for depositions in connection with the prosecutions in Russia."  United States v. Prevezon Holdings Ltd., 839 F.3d 227, 231 (2d Cir. 2016).  Moscow also "met with staff at the U.S. Attorney's Office for the Southern District of New York, including a lengthy meeting on

---

[3]    Hermitage's engagement letter with BakerHostetler specifically notes that the fraud may have been "committed by and through Renaissance Capital [ ], some of which may have been designed to fraudulently create apparent criminal liability on Hermitage Capital Management Limited ('Hermitage')."  (Declaration of Mark A. Cymrot in Opposition to Motion for Attorneys' Fees, ECF No. 731, Ex. E at 1.)  Hermitage suspected Renaissance Capital's involvement in the Russian Treasury Fraud after it discovered Renaissance Capital had previously executed an unrelated fraud in a similar manner.

December 3, 2008 . . . and with the office of the Attorney General in the British Virgin Islands."

Prevezon Holdings, 839 F.3d at 231.  BakerHostetler "reviewed bank records and researched a proper service agent for a bank involved in routing proceeds of the Russian Treasury Fraud."

Prevezon Holdings, 839 F.3d at 231.

BakerHostetler's work also encompassed collecting evidence supporting Hermitage's claims against certain parties in the Russian Federation.  The firm drafted a twenty-five page declaration in support of Hermitage's application under 28 U.S.C. § 1782 seeking documents from Renaissance Capital (the "Declaration").  The Declaration references and describes the Russian Treasury Fraud.  (Declaration of Jacob W. Buchdahl in Support of Motion for Attorneys' Fees, ECF No. 719 ("Buchdahl Decl."), Ex. 1 at ¶¶ 10–33.)  It also enumerates the details of another fraud strikingly similar to the Russian Treasury Fraud, and attributes much of the underlying misconduct to Renaissance Capital (the "Renaissance Fraud").  (Buchdahl Decl., Ex. 1 at ¶¶ 36–67.)  In sum, the proposed § 1782 application sought U.S.-based discovery from correspondent U.S. banks of accounts into which proceeds of both the Renaissance Fraud and the Russian Treasury Fraud were deposited.  Hermitage claimed that tracing these proceeds were critical to prosecuting its claims in the Russian Federation and recovering the proceeds of the Russian Treasury Fraud.  (Buchdahl Decl., Ex. 1 at ¶¶ 7, 73–77.)

Before BakerHostetler could file the Declaration, however, Hermitage terminated the firm's engagement and retained new counsel.  Hermitage's new law firm, Brown Rudnick, subsequently expanded the scope of the Declaration.  After filing the § 1782 application, Brown Rudnick continued investigating and tracing the proceeds of the Russian Treasury Fraud.  Later, it presented its findings to the Government.

III.    Prevezon's Retention of BakerHostetler and Hermitage's Initial Objection

In September 2013—approximately four years after BakerHostetler ceased representing Hermitage—the Government filed this forfeiture action against Prevezon. Prevezon retained BakerHostetler as defense counsel. In October 2013, Hermitage's counsel at Brown Rudnick alerted BakerHostetler that the "adverse interests of Prevezon et al to those of our clients immediately place [BakerHostetler] and certain of its members in an actual conflict of interest" under Rule 1.9 of the New York Rules of Professional Conduct. (Cymrot Decl., Ex. A at 4.) As a former client, Hermitage claimed that BakerHostetler possessed "material[] information and knowledge which should not be available to Prevezon," and demanded that BakerHostetler "recuse [itself] from the case immediately." (Cymrot Decl., Ex. A at 4.) Absent BakerHostetler's voluntary recusal, Hermitage threatened to file a declaratory judgment action seeking disqualification.

In November 2013, BakerHostetler declined to withdraw. It explained that its prior representation of Hermitage was limited in scope and did not involve the exchange of confidential information that it believed necessary to defend Prevezon. BakerHostetler also disagreed that Prevezon and Hermitage's interests were materially adverse because Hermitage was not a party to the Government's civil forfeiture action. (Cymrot Decl., Ex. B at 3.) Although BakerHostetler explained that it would re-consider its position if Hermitage could "identify confidential information in [BakerHostetler's] possession or an interest of Hermitage adverse to those of the Prevezon defendants," (Cymrot Decl., Ex. B at 3), Hermitage did not respond or move to disqualify BakerHostetler.

IV.    Hermitage's First Motion to Disqualify BakerHostetler

       About a year later, in September 2014, Hermitage moved to disqualify

BakerHostetler.[4]  BakerHostetler opposed the motion, arguing that Hermitage had "failed to

articulate what cognizable interest it has as a bystander in this matter, and how its interests are

adverse, much less <u>materially</u> adverse, to those of Prevezon—particularly when Hermitage is not

presently a witness and no discovery has been sought from it."  (Prevezon Memo. of Law in

Opposition to First Motion to Disqualify, ECF No. 134 ("Prevezon First DQ Opp."), at 16

(emphasis original).)  To support its position, BakerHostetler submitted the opinion of Professor

Roy D. Simon, a legal ethics expert, who declared that no material adversity existed between

Hermitage and BakerHostetler.  Rather, Professor Simon explained that Hermitage merely had a

"rooting interest" in this litigation—"it is just a bystander rooting for one side to win."

(Declaration of Roy D. Simon, Jr., ECF No. 136 ("Simon Decl."), at ¶ 29.)  And at oral

argument, BakerHostetler represented that Prevezon did "not want to offer [Browder] as a

witness; we want to take a discovery deposition, that's all, because the government named him."

(Hr'g Tr. dated October 14, 2014, ECF No. 153 ("Oct. 14, 2014 Tr."), at 9:1–3.)

       When Hermitage hypothesized that Prevezon could seek to shift the blame onto

Hermitage as part of its defense in this action, the District Court remarked that the possibility of

that was "very speculative."  (Oct. 14, 2014 Tr. at 13:3.)  The District Court concluded that "the

issues [here] . . . are different in all substantial respects from what [Moscow and BakerHostetler]

dealt with when [they] represented Hermitage back in 2008 and early 2009."  (H'rg Tr. dated

---

[4]     Prior to seeking relief in court, Hermitage filed a complaint with the Southern District of New York's
Grievance Committee against Moscow and BakerHostetler, alleging that their representation of Prevezon raised a
conflict of interest in view of their prior representation of Hermitage.  In August 2014, the Grievance Committee
declined to take action in the matter, without prejudice to Hermitage pursuing the issue in the District Court.  See
Prevezon Holdings, 839 F.3d at 232.

October 23, 2014, ECF No. 164 ("Oct. 23, 2014 Tr."), at 69:12–14.)  The court further

commented that "there is no indication that [Moscow or BakerHostetler are] in any substantial

way taking a position which involves an attack upon or an attempt to hold liability with regard to

Hermitage."  (Oct. 23, 2014 Tr. at 68:22–25.)  Based on this reasoning, the District Court denied

Hermitage's motion.

V.    Hermitage's Second Motion to Disqualify BakerHostetler

       Prior to and following Hermitage's first motion to disqualify, BakerHostetler

sought discovery from the Government, Hermitage, and Browder.  In April and May 2014, for

example, Prevezon subpoenaed Hermitage and Browder seeking information on their roles in the

Russian Treasury Fraud.  (Buchdahl Decl., Ex. 3.)  In July 2014, Prevezon also subpoenaed

Browder for documents "related to your tracing of the proceeds from the Russian tax refund

fraud," "documents received by you in response to your application under 28 U.S.C. § 1782," his

tax records, passport and immigration documents, and documents regarding Hermitage's

structure.  (ECF No. 125–17.)  In April 2015, after collecting this evidence, BakerHostetler

deposed Browder.  (See Cymrot Decl. ¶ 16.)

       In November 2015, the Government moved for partial summary judgment,

arguing that there was no genuine dispute that the Russian Treasury Fraud had occurred, and that

it constituted a "specified unlawful activity" for purposes of establishing liability under the

federal money laundering statute.  (ECF No. 398.)  Prevezon opposed that motion, arguing that

Hermitage and Browder's culpable participation in the Russian Treasury Fraud negated the

Government's theory of fraud on a foreign bank—one of the predicate specified unlawful

activities of its money laundering claim.  (Prevezon's Motion to Strike, ECF No. 411 ("Motion

to Strike"), at 1; Prevezon's Opposition to Government's Motion for Partial Summary Judgment, ECF No. 418 ("Partial SJ Opp."), at 11.)

Specifically, BakerHostetler argued that Hermitage never lost control over its portfolio companies and that Browder "authorized the supposedly unauthorized acts alleged in [the Government's complaint] and knew about the events that the complaint[] allege[s] he was unaware of." (Partial SJ Opp. at 1.) Moreover, BakerHostetler claimed that Browder had parroted a false narrative to the Government in order to "thwart his arrest for a tax fraud conviction in Russia." (Partial SJ Opp. at 1.) In reality, argued BakerHostetler, Browder and "his agents engaged in a series of misrepresentations to execute the fraud, to distance themselves from it, and to pin it on the Russian officials investigating Browder for a separate tax fraud his companies committed." (Partial SJ Opp. at 1, 5–6.) At oral argument on the partial summary judgment motion, BakerHostetler doubled down on this strategy, telling the District Court: "what it comes down to, Judge, is, the government alleges there was an organization, unnamed, mysterious organization that did all this, and the evidence points that Hermitage and Mr. Browder did it. That is the heart of the dispute." (Hr'g Tr. dated November 30, 2015, ECF No. 446, at 36:20–24.)

With the contours of Prevezon's defense strategy now clear, Hermitage filed a new motion to disqualify BakerHostetler. In December 2015, Hermitage argued that BakerHostetler's previous assurance that it would not attack its former client was belied by its current tactics undermining the Government's allegation that Hermitage was a victim of the Russian Treasury Fraud. (Hermitage Memo. of Law in Support of Second Motion to Disqualify, ECF No. 488, at 1.) On December 18, 2015, without affording Prevezon an opportunity to oppose the motion, the District Court disqualified BakerHostetler, holding that the firm's

"change in defense strategy now makes the subjects of its former and current representation 'substantially related.'"  (Opinion dated December 18, 2015 ("December 2015 Order"), ECF No. 495, at 2.)  The District Court elaborated: "There is now a very real possibility that BakerHostetler will be in a position where it would be trying to show that its current clients (the Prevezon defendants) are not liable and showing this by attacking its former client (Hermitage) on the very subject of BakerHostetler's representation of that former client."  (December 2015 Order at 2.)

Within days, however, the District Court had second thoughts.  On December 22, 2015, the District Court certified its decision for interlocutory appeal to the Second Circuit. (ECF No. 501.)  Then, on December 28, 2015, the District Court withdrew its prior disqualification decision and permitted BakerHostetler to oppose Hermitage's motion. (H'rg Tr. dated December 28, 2015, ECF No. 517, at 4:4.)

In its opposition brief, BakerHostetler again advanced the position that representing Prevezon did not pose a conflict of interest under Rule 1.9 because the prior and current representations did not share a "patently clear relationship," and Hermitage and Prevezon's interests were not materially adverse to each other.  (Prevezon Opposition to Motion to Disqualify, ECF No. 506 ("Prevezon Second DQ Opp."), at 19.)  Specifically, BakerHostetler highlighted that the District Court's observations in October 2014 were still true: that "this new action is a different animal" and is "not related in any substantial way to what [BakerHostetler] was doing then."  (Prevezon Second DQ Opp. at 19 (quoting Oct. 23, 2014 Tr. at 68:13–15, 70:19).)  Moreover, because neither Hermitage nor Browder were parties, Prevezon's success here would not affect their legal rights, obligations, or interests.  (Prevezon Second DQ Opp. at 20.)  While Prevezon's defense strategy was predicated on discrediting Hermitage and Browder,

BakerHostetler offered several authorities in support of the proposition that mere hostility between a former and current client is insufficient to establish material adversity.

On January 8, 2016, the District Court denied Hermitage's motion to disqualify, finding that because the Russian Treasury Fraud was "a side issue," Hermitage was a "mere spectator to this litigation," and "its rights [were] not directly at stake." United States v. Prevezon Holdings Ltd., 2016 WL 96170, at *5 (S.D.N.Y. Jan. 8, 2016) ("Second Disqualification Order"), rev'd, 839 F.3d 227 (2d Cir. 2016). The District Court also found that the risk of disclosing client confidences was minimal because such information had nothing "to do with how, why, or when Prevezon allegedly laundered Russian [Treasury] Fraud proceeds . . . or how its [confidential information] would be relevant in the case against Prevezon." Second Disqualification Order, 2016 WL 96170, at *5. In making that finding, the District Court held that any knowledge about Hermitage's potential strategy obtained during BakerHostetler's prior representation was "irrelevant here, where Hermitage is not a party." Second Disqualification Order, 2016 WL 96170, at *5.

Shortly thereafter, Hermitage filed an interlocutory appeal and petitioned the Second Circuit for a writ of mandamus directing the disqualification of BakerHostetler. (ECF No. 526.)

VI.     Second Circuit Appeal and Disqualification of BakerHostetler

In October 2016, the Second Circuit granted Hermitage's mandamus petition, vacated the District Court's order, and directed the disqualification of Moscow and BakerHostetler. The Second Circuit found that a substantial relationship between the prior and current representations existed because the Russian Treasury Fraud was an indispensable component of the Government's theory in this action. Moreover, the Court of Appeals found

that Prevezon's trial strategy turned on introducing its own version of the Russian Treasury Fraud to "prov[e] [that] Hermitage is not the victim of the Russian Treasury Fraud, but the perpetrator." Prevezon Holdings, 839 F.3d at 240. Because BakerHostetler's prior representation "included investigating the Russian Treasury Fraud," the Second Circuit was "persuaded that both representations involve[d] the same facts and circumstances." Prevezon Holdings, 830 F.3d at 240.

The Second Circuit also disagreed with the District Court's holding that Hermitage was a mere spectator to the litigation, finding instead that it was a "putative victim," and that "crime victims, as well as witnesses, possess legitimate interests in criminal proceedings that may support disqualification." Prevezon Holdings, 839 F.3d at 240 (citing United States v. James, 708 F.2d 40 (2d Cir. 1983)). Based on its determination that the first two prongs of the disqualification test were satisfied, the Second Circuit gave Hermitage the "benefit of an irrefutable presumption that confidences were shared" with BakerHostetler. Prevezon Holdings, 839 F.3d at 240 (citation omitted). With that, the Court of Appeals found that BakerHostetler's involvement in the present case would taint the trial because it could use privileged information obtained in the prior representation against Hermitage. Prevezon Holdings, 830 F.3d at 241.

In December 2016, following issuance of the Second Circuit's mandate, this Court entered an order disqualifying BakerHostetler from this case and directing Prevezon to retain new counsel. (ECF No. 541.)

DISCUSSION

Hermitage seeks to hold BakerHostetler accountable for its refusal to withdraw from a conflicted representation in this case. To recover the legal fees it incurred to litigate this

issue, Hermitage moves for sanctions against BakerHostetler under 28 U.S.C. § 1927. Section 1927 provides:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

Alternatively, Hermitage moves for attorneys' fees pursuant to this Court's inherent authority to sanction any party that "has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." Chambers v. NASCO, Inc., 501 U.S. 31, 45–46 (1991). This power is "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." Chambers, 501 U.S. at 43.

The only difference between a sanctions award under § 1927 and a court's inherent power is that "awards under § 1927 are made only against attorneys or other persons authorized to practice before the courts while an award made under the court's inherent power may be made against an attorney, a party, or both." Oliveri v. Thompson, 803 F.2d 1265, 1273 (2d Cir. 1986). "As a consequence, requests for sanctions under Section 1927 and pursuant to the court's inherent authority may be decided in a single inquiry." In re Khan, 488 B.R. 515, 531 (Bankr. E.D.N.Y. 2013). The court must engage in a highly fact-specific inquiry in deciding whether to award sanctions. MacDraw, Inc. v. CIT Grp. Equip. Fin., Inc., 73 F.3d 1253, 1262 (2d Cir. 1996); DigiTelCom, Ltd. v. Tele2 Sverige AB, 2012 WL 3065345, at *6 (S.D.N.Y. July 25, 2012). The decision to issue sanctions under either ground lies within this Court's broad discretion. Sorenson v. Wolfson, 170 F. Supp. 3d 622, 634 (S.D.N.Y. 2016).

"By its terms, § 1927 looks to unreasonable and vexatious multiplications of proceedings; and it imposes an obligation on attorneys through the entire litigation to avoid dilatory tactics." United States v. Int'l Bhd. of Teamsters, 948 F.2d 1338, 1345 (2d Cir. 1991). The purpose of the statute is "to deter unnecessary delays in litigation." Int'l Bhd. of Teamsters, 948 F.2d at 1345. The statute is "indifferent to the equities of a dispute and to the values advanced by the substantive law. It is concerned only with limiting the abuse of court processes." Roadway Express, Inc. v. Piper, 447 U.S. 752, 762 (1980). To impose sanctions under either § 1927 or this Court's inherent powers, there must be clear evidence that "(1) the offending party's claims were entirely without color, and (2) the claims were brought in bad faith—that is, motivated by improper purposes such as harassment or delay." Eisemann v. Greene, 204 F.3d 393, 396 (2d Cir. 2000) (emphasis added); Sorenson, 170 F. Supp. 3d at 633.

A.  Colorable Claim

A "claim is entirely without color when it lacks any legal or factual basis." Schlaifer Nance & Co., Inc. v. Estate of Warhol, 194 F.3d 323, 337 (2d Cir. 1999) (emphasis original). Conversely, a claim is "colorable when it has some legal and factual support, considered in light of the reasonable beliefs of the individual making the claim." Revson v. Cinque & Cinque, P.C., 221 F.3d 71, 78–79 (2d Cir. 2000). "The question is whether a reasonable attorney . . . could have concluded that facts supporting the claim might be established, not whether such facts actually had been established." Schlaifer Nance & Co., 194 F.3d at 337 (emphasis original). Thus, this Court considers whether BakerHostetler's refusal to withdraw—and its arguments in support thereof—had some legal and factual support.

i. <u>First Disqualification Motion</u>

BakerHostetler's arguments against disqualification focused primarily on two distinct issues—the limited time and scope of its prior representation and Hermitage's status as a non-party. After reviewing the factual and legal grounds undergirding these arguments, this Court cannot conclude that they were so meritless as to be "utterly devoid of a legal or factual basis." <u>Schlaifer Nance & Co.</u>, 194 F.3d at 337. Rather, based on then-existing facts and legal authority, BakerHostetler's arguments "reasonably <u>might</u> [have] be[en] successful." <u>Schlaifer Nance & Co.</u>, 194 F.3d at 337. And given the District Court's denial of Hermitage's motion, BakerHostetler's arguments were, in fact, successful at least for a time.

From a factual standpoint, BakerHostetler submitted various documents lending credence to its position that its prior representation focused largely on Renaissance Capital's role in the Russian Treasury Fraud. Because the theft of Hermitage's portfolio companies were a critical aspect of the Russian Treasury Fraud, BakerHostetler necessarily "reviewed non-public documents from Hermitage related to the Russian Treasury Fraud, which allowed the firm to create a case timeline and chronology, and discussed potential individuals for depositions in connection with the prosecutions in Russia." <u>Prevezon Holdings</u>, 839 F.3d at 231. Nevertheless, the Declaration and time sheets submitted by BakerHostetler reflect that the lion's share of its work derived from preparing a detailed § 1782 application seeking documents from Renaissance Capital. This task was designed to advance Hermitage's goal of establishing Renaissance Capital's culpable participation in the Russian Treasury Fraud. Therefore, BakerHostetler had some factual support to advance the position that its prior representation "in investigating the Renaissance fraud" and its current representation of Prevezon did not involve a "congruence of <u>factual</u> matters such that it could be said that the two representations involved 'identical' or

'essentially the same' facts and evidence." (Prevezon First DQ Opp. at 23 (citing <u>Revise Clothing, Inc. v. Joe's Jeans Subsidiary, Inc.</u>, 687 F. Supp. 2d 381, 392 (S.D.N.Y. 2010)) (emphasis added).)

Hermitage's status as a non-party was a significant factor in the disqualification inquiry. Its status loomed large in both disqualification motions, raising the question of whether BakerHostetler's representation of Prevezon would put its former client, Hermitage—a non-party witness here—in harm's way. BakerHostetler has always answered that question in the negative, arguing that the disposition of this action—either a finding of liability against Prevezon or a dismissal of the action—would never affect Hermitage's interests. To bolster this argument, Hermitage submitted Professor Simon's ethics opinion which characterized Hermitage's interest as a mere "rooting interest." (Simon Decl. ¶ 29.)

From a legal standpoint, BakerHostetler drew from an arsenal of cases addressing whether a former client that is a non-party witness in litigation may disqualify counsel. In contemplating the "unprecedented remedy of disqualifying [ ] former counsel in a case in which [the former client] is not a party and when it is not even a present witness," BakerHostetler argued that "any potential conflict arising from [Hermitage's] status as a potential witness has not yet ripened into a basis for [BakerHostetler]'s disqualification and may never do so." (Prevezon First DQ Opp. at 16 (citing <u>Almonte v. Long Beach</u>, 2007 WL 951863, at *4 (E.D.N.Y. Mar. 27, 2007)) and Simon Decl. ¶ 27.) After considering the possibility that Hermitage could be called to testify as a witness in this case, BakerHostetler maintained that "[t]he risk that an attorney may cross-examine a 'former client' is not a sufficient reason, standing alone, to disqualify an attorney." (Prevezon First DQ Opp. at 17 (quoting <u>Adams v. Vill. of Keesville</u>, 2008 WL 3413867, at *11 n.11 (N.D.N.Y. Aug. 8, 2008)).) That there were

other legal authorities cutting against BakerHostetler's argument does not change this Court's calculus of whether BakerHostetler advanced a colorable claim. More relevant to the analysis is simply that BakerHostetler's position was "plausibly supported by some existing case law." Forum Ins. Co. v. Texarkoma Crude & Gas Co., 1993 WL 228023, at *3 (S.D.N.Y. June 22, 1993) (denying attorney's fees).

Relying on these factual and legal distinctions, the District Court denied the first disqualification motion. It dispensed with the notion of material adversity, holding that "neither Mr. Browder nor Hermitage are parties to this action. The action is against a company called Prevezon, completely different from Hermitage, and whatever happens in this case, whether Prevezon is held liable or not liable, will not redound to the liability or legal position of Hermitage or its principals." (Oct. 23, 2014 Tr. at 67:19–24.) The District Court also distinguished the scope of BakerHostetler's prior and current representations, finding that BakerHostetler's representation of Hermitage was limited to "a few months in 2008 and a month or so spilling over into 2009" and focused on warding off legal action in Russia and soliciting the Department of Justice's interest into "other possible people who might be liable besides Hermitage." (Oct. 23, 2014 Tr. at 68:1–9.) Importantly, the District Court held that "[t]here is no indication that [BakerHostetler] is in any substantial way taking a position which involves an attack upon or an attempt to hold" Hermitage liable—"[t]here's nothing approaching such a situation." (Oct. 23, 2014 Tr. at 68:22–69:1.)

ii. Second Disqualification Motion

The impetus for the second disqualification motion was Prevezon's strategic decision to discredit Hermitage and Browder's narrative about the Russian Treasury Fraud. Prevezon maintains that it was compelled to adopt this strategy in response to the Government's

eleven hour theory that a foreign bank—HSBC Suisse—had been defrauded as an investor of Hermitage. (Motion to Strike at 1; Partial SJ Opp. at 11.) This fundamental strategy shift decidedly placed BakerHostetler into an offensive posture vis-à-vis Hermitage. Indeed, Prevezon's decision to attack Hermitage and Browder's credibility was significant enough for the Second Circuit to comment that "[a]llowing the former counsel for Hermitage, identified by the government as a victim of the Russian Treasury Fraud, to represent Prevezon, a putative participant in the alleged crime, creates a potential for harm to future government investigations." Prevezon Holdings, 830 F.3d at 239.

The Second Circuit was ultimately persuaded that BakerHostetler's strategy of discrediting Hermitage's narrative about the Russian Treasury Fraud would jeopardize Hermitage's interests and create the untenable risk of tainting the trial. But the decision to sanction a lawyer under § 1927 or the court's inherent power does not turn on wins and losses. This Court must instead focus on whether BakerHostetler's losing argument had "some legal and factual support, considered in light of the reasonable beliefs of the individual making the claim" at the time it was made. Nemeroff v. Abelson, 620 F.2d 339, 348 (2d Cir. 1980). Thus, "[s]anctions imposed under a court's inherent power—commonly known as the bad faith exception to the 'American Rule' against fee shifting—depend not on which party wins the lawsuit, but on how the parties conduct[ed] themselves during the litigation." Int'l Bhd. of Teamsters, 948 F.2d at 1345; Roadway, 447 U.S. at 762.

Even at this juncture in the case, however, the parties—and the District Court—grappled with Hermitage's status as a non-party, and whether that fact created the kind of material adversity and trial taint that would warrant disqualification. Guided by the District Court's decision on the first disqualification motion, BakerHostetler maintained that Hermitage's

interests were no more jeopardized in 2015 than they were in 2014. Notwithstanding Prevezon's change in strategy, BakerHostetler contended that Hermitage was "misconstru[ing] a hostile position for one that satisfies the material adversity test." (Prevezon Second DQ Opp. at 20.)

There is something indecorous about a former lawyer seeking to discredit his former client's credibility and the theory that he was once hired to advance. But an "appearance of impropriety is simply too slender a reed on which to rest a disqualification order except in the rarest of cases." Bd. of Educ. of City of N.Y. v. Nyquist, 590 F.2d 1241, 1247 (2d Cir. 1979). Here, BakerHostetler's argument was again predicated on a factually and legally defensible ground—that even as Hermitage's narrative was torn to shreds, it would remain impervious to liability. As BakerHostetler argued in its opposition brief, while a "vigorous cross examination may be embarrassing to a former client (presuming it is a witness, which [Hermitage] is not), and it may even be unseemly to treat a former client as a hostile witness, [ ] there is no tangible prejudice that would result." (Prevezon Second DQ Opp. at 20–21 (citing Skidmore v. Warburg Dillon Read LLC, 2001 WL 504876, at *5 (S.D.N.Y. May 11, 2001); Vill. of Keesville, 2008 WL 3413867, at *11 n.11; Satina v. N.Y.C. Human Res. Admin., 2015 WL 6681203, at *2 (S.D.N.Y. Nov. 2, 2015); United States v. Perrone, 2007 WL 1575248, at *9, 10 (S.D.N.Y. May 29, 2007)).)

Moreover, even if a lawyer who assumes a position at odds with his former client may "well have violated the state disciplinary rules and the local civil rules of this district," that does not necessarily lead to the conclusion that the interests of his current client is "adverse to those of [his] former clients." Bangkok Crafts Corp. v. Capitolo di San Pietro in Vaticano, 376 F. Supp. 2d 426, 428 (S.D.N.Y. 2005) (denying disqualification motion after lawyer withdrew from representing former clients and advanced "positions [ ] at odds with" their interests by

representing other parties in same litigation).  The Grievance Committee's decision declining to act on Hermitage's complaint may have reinforced BakerHostetler resolve to continue as Prevezon's counsel.

Further, Hermitage struggled to articulate the particularized harm it would suffer in view of BakerHostetler's refusal to withdraw.  Hermitage cited a legal ethics opinion which explained that "[b]ecause Moscow was Hermitage's lawyer and privy to its confidences regarding the Russian tax fraud, the public would be expected to give particular credence to his accusations against Hermitage."  (Declaration of Bruce A. Green, Esq. in Support of Second Motion to Disqualify, ECF No. 489, at ¶ 17; Hermitage Memo. of Law in Support of Second Motion for Disqualification, ECF No. 488, at 4.)  But Prevezon and BakerHostetler's own ethics opinion countered that "cross-examining a former client is not materially adverse to the former client unless the former client will suffer tangible prejudice, such as a financial or property loss."  (Simon Decl. at ¶ 39.)  And to make clear that Hermitage was not at risk of being prejudiced, BakerHostetler and Prevezon submitted a declaration from a Russian lawyer attesting that companies "in the Russian Federation are not subject to criminal liability."  (Declaration of Nataliya Veselnitskaya, ECF No. 508, at ¶¶ 4–5.)

At one of the oral arguments on this second disqualification motion, BakerHostetler sought to minimize the harm that Hermitage may suffer by reiterating the limited scope of its prior representation, explaining that it was merely "retained to get a subpoena and we never even proceeded to get the subpoena . . . So the idea that somehow this wasn't that case back then in 2014 when [the court] ruled and that it's not the same case now, it's the very same allegations in the complaint."  (Hr'g Tr. dated December 18, 2015 ("Dec. 18, 2015 Tr."), at 13:1–6.)  BakerHostetler also reminded the District Court that Prevezon was "entitled, as you

said [in 2014], without inhibition, to challenge the credibility of the government's evidence" and that doing so would "have no impact on Hermitage.  They're not going to be liable.  There's not going to be a finding that they did it.  The jury's not even going to be asked that."  (Dec. 18, 2015 Tr. at 13:6–13.)

After extensive argument on the motion, the District Court again denied Hermitage's bid to disqualify BakerHostetler.  The court's second disqualification order analyzed the "substantial relationship" prong, finding that this action was "not about Hermitage," or "centrally focused on the Russian Treasury Fraud."  Second Disqualification Order, 2016 WL 96170, at *4.  The District Court characterized the Russian Treasury Fraud as an "ancillary issue in this suit" because it was "merely background information" setting the context in which illicit proceeds were laundered to the United States.  Second Disqualification Order, 2016 WL 96170, at *4.

More importantly, the District Court focused on the risk of trial taint, observing that "[t]his is where Hermitage's status as a non-party movant comes crucially into play.  Hermitage's concerns do not lead toward a substantial risk of taint to this trial," because it would not face liability in the event of a verdict against Prevezon.  Second Disqualification Order, 2016 WL 96170, at *5 (emphasis added).  Nor was the "threat of a Russian lawsuit against Hermitage" so concrete that it was likely to occur.  Second Disqualification Order, 2016 WL 96170, at *5.  Without "legal support for [Hermitage's] position that threatened legal action against a non-party in another country should impact [the District Court's] calculus in such a drastic manner as to compel disqualification," the District Court found that it could not "deprive Prevezon of its counsel of choice."  Second Disqualification Order, 2016 WL 96170, at *5.

Ten months later, the Second Circuit disagreed. Hermitage prevailed on its position that BakerHostetler never should have represented Prevezon. That BakerHostetler was ultimately disqualified does not mean BakerHostetler's claims before the District Court or the Second Circuit lacked a colorable basis. The parties' arguments presented a difficult question. And when that question was assessed against the facts and legal authorities relevant to this case, the answer was not obvious. That the District Court denied the disqualification motion on two separate occasions corroborates the challenging nature of the issue. More tellingly, the Second Circuit's observation that "this case implicates a significant and novel question of law regarding the rights of nonparty clients," Prevezon Holdings, 839 F.3d at 238, underscores the unique facts of this case, and the colorable basis on which BakerHostetler's arguments against disqualification were formulated. Torres v. City of Madera, 2006 WL 3257491, at *4 (E.D. Cal. Nov. 9, 2006) ("Where no previous court has considered a particular or novel issue, sanctions under § 1927 generally are disfavored."); see also Suazo v. NCL (Bah.), Ltd., 822 F.3d 543, 556 (11th Cir. 2016); Proctor & Gamble Co. v. Amway Corp., 280 F.3d 519, 531–32 (5th Cir. 2002); Serrato By & Through Serrato v. John Hancock Life Ins. Co., 31 F.3d 882, 887 n.2 (9th Cir. 1994). Indeed, the Second Circuit felt compelled to grant a stay of this case pending appeal to resolve a "question of first impression in this Circuit: disqualification of counsel on the basis of a conflict of interest posing a potential harm to a non-party witness," and seized the occasion to "offer useful guidance to the district courts." Prevezon Holdings, 839 F.3d at 238.

Accordingly, this Court finds that there was sufficient legal and factual support, considered in light of the reasonable beliefs of the individual making the claim to find that BakerHostetler's arguments were colorable at the time they were made.

B.  Bad Faith

Even if Hermitage could demonstrate that BakerHostetler's claims were not colorable, it must also show that they were "so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay."  Int'l Bhd. of Teamsters, 948 F.2d at 1345; Sierra Club v U.S. Army Corps of Eng'rs, 776 F.2d 383, 390 (2d Cir. 1985) (test for sanction "is conjunctive and neither meritlessness alone nor improper purpose alone will suffice"); Dow Chem. Pac. Ltd. v. Rascator Maritime S.A., 782 F.2d 329, 344 (2d Cir. 1986) ("[W]e have declined to uphold awards under the bad-faith exception absent both clear evidence that the challenged actions are entirely without color and are taken for reasons of harassment or delay or for other improper purposes.").

The bad faith requirement is a high bar to satisfy.  Revson, 221 F.3d at 77–78; McCune v. Rugged Entm't, LLC, 2010 WL 1189390, at *4 (E.D.N.Y. Mar. 29, 2010) ("[T]he bad faith standard is not easily satisfied and sanctions are warranted only in extreme cases.").  To make a finding of bad faith, a court must (1) find that the challenged actions were taken for improper purposes, such as harassment or delay; and (2) provide a high degree of specificity in the factual findings.  Oliveri, 803 F.2d at 1272.  Courts have found the following conduct may constitute bad faith:

> [R]esubmitting a motion that had previously been denied; bringing a motion based on 'facts' the opposite of which were previously found by the court; making several insupportable bias recusal motions and repeated motions to reargue; continually engaging in obfuscation of the issues, hyperbolism and groundless presumptions in addition to insinuating that the court was biased; and waiting until the eve of trial before making a jury demand.

Keller v. Mobil Corp., 55 F.3d 94, 99 (2d Cir. 1995) (internal citation omitted). "This 'bad faith' standard applies not only to the act of initiating the claim but also to a [party's] subsequent conduct." Kron v. Moravia Cent. Sch. Dist., 2001 WL 536274, at *4 (N.D.N.Y. May 3, 2001).

Based on the record before this Court, BakerHostetler did not engage in bad faith conduct. It is well-settled that "disqualification is disfavored because it has the serious and immediate adverse effect of denying the client his choice of counsel." Solomon v. Siemens Indus., Inc., 2013 WL 5728252, at *2 (E.D.N.Y. Oct. 22, 2013) (citation omitted). Indeed, the premium placed on a party's choice of counsel is so high that absent the need "to preserve the integrity of the adversary process," most ethical violations "may be dealt with by the comprehensive independent disciplinary machinery."[5] Solomon, 2013 WL 5728252, at *2. As Prevezon's defense counsel in this action, BakerHostetler advanced a colorable position to remain as counsel. Nothing in the record suggests that BakerHostetler adopted a legal position to harass Hermitage, delay this case, or otherwise improperly engage the legal process.

The District Court's decision to permit BakerHostetler to continue representing Prevezon after two disqualification motions further diminishes the notion that BakerHostetler acted in bad faith. It continued representing Prevezon with the District Court's imprimatur that it could proceed "without inhibition." (Oct. 23, 2014 Tr. at 70:3.) And from October 2014 until December 2015, BakerHostetler did just that, collecting evidence from various parties, including Hermitage, and deposing Browder on topics that signaled the possibility that Prevezon would later impeach Hermitage and Browder's stance that they were victims of the Russian Treasury Fraud. Absent any objections to its work and strategy, BakerHostetler marched onward to trial and evinced no intent to harass, delay, or improperly abuse its position as counsel.

---

[5] The contention that BakerHostetler acted in bad faith is belied by the Grievance Committee's decision not to take any action on Hermitage's complaint.

In December 2015, BakerHostetler advocated fiercely to stay on as Prevezon's counsel given that its withdrawal or disqualification would have left Prevezon without counsel. Indeed, on the very same day that Hermitage filed its second disqualification motion, the District Court granted BakerHostetler's co-counsel, Baker Botts, permission to withdraw from the case. (ECF No. 485.)  With an imminent trial date fast approaching, acquiescing to Hermitage's demand—especially when BakerHostetler had the factual and legal support to counter the threat of disqualification—would not only have deprived Prevezon of its counsel of choice in its greatest moment of need but delayed the case from proceeding to trial.  Second Disqualification Order, 2016 WL 96170, at *6 (disqualifying BakerHostetler would inflict "harm to Prevezon [that] is both certain and grave," requiring to bring in new counsel in this "lengthy, complex litigation," adding "expense and additional trial adjournment," and "defer[ring] Prevezon's right to its day in court and lengthen the time that Prevezon's funds remain under pretrial restraint"); Rossi v. Ferring Pharm., 2016 WL 593440, at *5 (D. Conn. Feb. 12, 2016) ("Courts in this Circuit are highly reluctant to take action which would deprive a party of its choice of counsel."); In re Enron Corp., 2002 WL 32034346, at *4 (Bankr. S.D.N.Y. May 23, 2002) ("One's choice of counsel is entitled to great deference.").  The exigency of this situation was amplified by the fact that Prevezon's assets valued in the tens of millions of dollars had been restrained for years by the Government's freeze order even though the Government sought a fraction of that amount in this case.

Hermitage contends that where "a law firm engages in conduct that even approaches bad faith to avoid disqualification, its former client is entitled to attorneys' fees." (Hermitage Memo. of Law in Support of Motion for Attorneys' Fees, ECF No. 718 ("Hermitage Mot. for Fees"), at 1.)  Hermitage argues that BakerHostetler should be sanctioned for

mischaracterizing the purpose and breadth of its prior representation.  In support of that contention, Hermitage cites Madison 92nd St. Assocs., LLC v. Marriott Int'l Inc., 2013 WL 591382 (S.D.N.Y. Oct. 31, 2013), which sanctioned a law firm for disregarding a clear conflict of interest.  In Madison 92nd St. Assocs., the law firm consulted a legal ethics expert about the propriety of its representation, but in doing so, misinformed the expert about the scope of its prior representation.  Finding that the law firm disregarded a conflict that even a "first year law student on day one of an ethics course" could have spotted, the court sanctioned the law firm. Madison 92nd St. Assocs., 2013 WL 591382, at *1 ("A clearer conflict of interest cannot be imagined."), aff'd sub nom. Boies, Schiller & Flexner LLP v. Host Hostels & Resorts, Inc., 603 F. App'x 19 (2d Cir. 2015).

By contrast, the conflict of interest here was not so obvious.  It took Hermitage three attempts—and a million dollars in legal fees—to clarify the issue.  And it is not obvious from the record that BakerHostetler represented the scope of its prior representation with an "unreasonably narrow description of its work."  Host Hostels, 603 F. App'x at 20.  The District Court had the benefit of the time records, declarations, and other work product—some of which were submitted under seal—before concluding that they bore no relation to BakerHostetler's work for Prevezon.  Specifically, the District Court held that the "issues in this case are different in all substantial respects from what [Moscow and BakerHostetler] dealt with when [they] represented Hermitage back in 2008 and early 2009." [6]  (Oct. 14, 2014 Tr. at 14:1–6.)

---

[6] After remarking that the prior representation materials submitted under seal were "really of no consequence," and "added nothing," the District Court went on to say, "I really have to tell you, I've got a very severe problem with the idea that now when [Moscow is] retained in a different matter, and I mean different in maybe there was some little tie, but this is a different matter—different matter—he's retained, and the issues that he will be dealing with will be much bigger, broader, and essentially different from what he was doing for Hermitage back in the earlier year."  (Oct. 14, 2014 Tr. at 13:21–22:6, 54:10–16.)

Hermitage further claims BakerHostetler acted in bad faith when it decided to attack Hermitage in 2015 in contravention of the District Court's observation in 2014 that "[i]f Mr. Moscow was now turning on the former client and attacking the former client, I mean, that wouldn't even be a hard case." (Oct. 23, 2014 Tr. at 57:20–22; Hermitage Mot. for Fees at 21.) But it is difficult to discern what the District Court meant by "attacking the former client"—that is, whether it meant an attack on a former client who becomes a party to the litigation or remains a non-party. The colloquy following the District Court's initial comments provide clarity on this issue. The District Court inquired: "[I]s [Moscow] in any way now taking an adverse position against your client in the sense of seeking to hold your client liable or obtaining a finding of something against your client?" (Oct. 23, 2014 Tr. at 57:23–58:1 (emphasis added).) When Hermitage's counsel responded that BakerHostetler sought to "impeach [its] former clients to show that they are unreliable, lacking in credibility, liars, have concocted a story, so that all that they have worked for to expose this fraud could be destroyed by what they intend to do," the District Court dismissed the answer and quipped, "that's really different from what I'm talking about." (Oct. 23, 2014 Tr. at 58:2–8.) In view of the District Court's comments, it is not clear that the District Court had ever instructed BakerHostetler that it could not adopt a new strategy impugning Hermitage.

Accordingly, this Court concludes that BakerHostetler did not make any arguments or engage in conduct that would justify a finding that it acted in bad faith. Therefore, this Court declines to sanction Moscow or BakerHostetler under either 28 U.S.C. § 1927 or its inherent authority.

<u>CONCLUSION</u>

For the foregoing reasons, in this Court's informed discretion, Hermitage's motion for attorneys' fees against Moscow and BakerHostetler is denied. The Clerk of Court is directed to terminate the motion pending at ECF No. 717.

Dated:    March 30, 2018                    SO ORDERED:
          New York, New York

_____
WILLIAM H. PAULEY III
U.S.D.J.